## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| MARKELUS Q. CARTER, | : | CASE NO. 3:19CV240 |
| | : | |
| Petitioner, | : | JUDGE ZOUHARY |
| | : | |
| v. | : | MAGISTRATE JUDGE LIMBERT |
| | : | |
| WARDEN, TOM SCHWEITZER, | : | |
| | : | |
| Respondent, | : | |

### RESPONDENT'S ANSWER/RETURN OF WRIT

The Respondent denies each of the allegations made by the Petitioner except those expressly admitted herein.

The Petitioner, Markelus Q. Carter, (hereinafter "Carter)) is incarcerated at the Ohio Correctional Reception Center.  Respondent is the warden at that Institution.

Carter has brought this action seeking a writ of habeas corpus pursuant to 28 U.S.C. §2254.

Hereinafter, the Respondent shows cause why the writ should not be granted.

## FACTUAL BACKGROUND

The Allen County Court of Appeals, Third Appellate District of Ohio, set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Carter has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998) *cert denied*, 527 U.S. 1040:

> [*P2]  On April 17, 2014, Carter was indicted for Aggravated Murder with a firearm specification in violation of *R.C. 2903.01(A)* and *R.C. 2941.145(A)* respectively, and Having Weapons While Under Disability in violation of *R.C. 2923.13(A)(3)*, a felony of the third degree. It was alleged that Carter shot and killed Kenneth Warrington shortly after 5 a.m. on February 23, 2009. Warrington had a relationship with Carter's ex/the mother of Carter's children, Sonya Burkholder (nka "Hughes"). Warrington was shot six times just outside of Sonya's residence in Lima, Ohio. Carter pled not guilty to the charges.

> [*P3]  After a lengthy pre-trial process that included, *inter alia*, multiple suppression hearings and a competency evaluation, Carter's case proceeded to a jury trial, which was held September 8-22, 2015. At trial the State presented the testimony of 30 witnesses and over 150 exhibits, then rested its case. Carter presented the testimony of 8 witnesses and in excess of 30 exhibits, then rested his case. Ultimately the jury found Carter guilty of Aggravated Murder with a firearm specification and Having Weapons While Under Disability, all as indicted.

> [*P4]  Carter was sentenced to life in prison without parole on the Aggravated Murder charge, a three-year consecutive prison term on the firearm specification, and a three-year concurrent prison term on the Having Weapons While Under Disability charge. A judgment entry memorializing Carter's sentence was filed September 22, 2015. It is from this judgment that Carter appeals, asserting the following assignments of error for our review.

>          * * *

 [*P12]  Carter and Sonya Burkholder had two children together, Tarah and Markelus. The children and Sonya lived with Carter until 2004 when Sonya's mother became "gravely ill," so Sonya moved in with her. After Sonya's mother died, Sonya stayed in her mother's former residence until Sonya lost the house in 2007. At that time, Sonya moved back in with Carter; however, it was not to rekindle a romantic relationship. Rather, according to Sonya the relationship was platonic and she and Carter lived more as "roommates." While staying at Carter's residence, Sonya slept in her daughter Tarah's room with her.

 [*P13]  Despite the fact that Sonya indicated she and Carter did not have a romantic relationship in 2007, Sonya testified that Carter was very controlling. Sonya indicated that Carter had been that way during their relationship when they were previously together, not allowing Sonya to socialize on her own. Additionally, Sonya stated that Carter did not give her a key to his home when she moved in during 2007 and that Carter had to let her in the house or she would get locked out.

 [*P14]  While living with Carter in late 2007, Sonya was working as a security shift supervisor for Allied Barton Security Services, which did security for the Husky Refinery in Lima. Through her job, Sonya developed a friendship with Kenneth Warrington, who worked at the refinery. Sonya indicated that she did not tell Carter about her friendship with Warrington.

 [*P15]  On December 15-16, 2007, Sonya and Warrington exchanged flirtatious emails, which were included in the record at trial. Sonya testified that Carter was good with computers and got into her email and found her exchanges with Warrington. The day after the email exchange, December 17, 2007, Sonya worked second shift at her security job and returned to Carter's home, showered and went to bed in Tarah's room. According to Sonya, Carter woke her up that night, extremely angry, and told her to pack her bags and get out.

 [*P16]  Sonya stated that Carter had a gun in his hand, that he followed her down the stairs, and that Carter struck her across the jaw with the gun. Sonya stated that she went outside and flagged down a police officer who happened to be in the area and told the officer what happened. The officer then approached Carter's residence but Carter would not come outside or let the officers see the children. As a result of being informed that Carter had a gun, that children were inside, and that police were refused access to check on the safety of the children, more officers were called to the

3

scene.

[*P17]  A four-hour "stand-off" then ensued wherein Carter had multiple phone conversations with a police hostage negotiator. On the calls, some of which were recorded and played for the jury, Carter denied that his children were being held hostage, but he would not come outside and would not let the police see the children. On the calls Carter talked about honor and dishonor and how an honorable person should not have to go to jail. Meanwhile, the police attempted to keep him calm. Eventually the situation ended peacefully and Carter was taken into custody. Although an "air gun" was found inside Carter's home, no actual firearm was located at that time. No charges were brought against Carter as a result of the "stand-off" incident.

[*P18]  After the December 2007 incident, Sonya moved out of Carter's residence and moved in with friends Krista and Don Bodiker, who also worked security at the refinery. Sonya stayed with the Bodikers until late-summer/early fall of 2008 when she moved into a house at 436 McKibben Street in Lima.

[*P19]  While living with the Bodikers, Sonya sought and received a civil protection order ("CPO") against Carter based primarily on the "stand-off" incident. Carter contested the CPO and appealed the granting of that CPO to this Court. We affirmed the CPO in *Burkholder v. Carter, 3d Dist. Allen No. 1-08-20, 2008-Ohio-4644.*

[*P20]  Meanwhile, after he was not charged as a result of the December 2007 "stand-off" incident, Carter was in contact with the Lima Police Department seeking to have Sonya charged for filing a false report or making false claims regarding the incident. That case was eventually assigned to a detective, though the detective testified that it was low priority and he did not look into it for a while.

[*P21]  During 2008, Sonya and Warrington's relationship deepened and according to Sonya the relationship became sexual for about two weeks in the summer of 2008. When Sonya moved out of the Bodikers' residence and into her own house on McKibben Street around August of 2008, Warrington occasionally stayed at the residence.

[*P22]  Throughout Warrington's relationship with Sonya, Warrington was married to Faye Warrington. Warrington and Faye had been married since 1983. Faye testified that Warrington told her about his relationship with Sonya when it began. Faye testified

that despite the affair she did not want a divorce because Warrington still brought his paycheck home and Faye was hopeful that they would reconcile. Warrington did eventually move out of the marital residence though, and it was Faye's understanding that Warrington stayed either at his uncle's residence or at Sonya's residence.

[*P23]  Faye testified that she did not tell her family about Warrington's infidelity, choosing instead to speak with her minister about it. Faye indicated that she did not want others to change their opinion of Warrington. However, Faye testified that her family found out about Warrington's affair because they had received anonymous letters informing them of the situation. Faye testified that she did not know who wrote the letters, but she had received phone calls from Carter informing her of the relationship between Warrington and Sonya, which Faye already knew about.

[*P24]  Faye testified that Carter called her many times, sometimes at two or three in the morning stating that Warrington's truck was at Sonya's residence. Faye testified that on one of the calls in the weeks prior to Warrington's death in February of 2009, Carter stated that he was going to give Warrington "one more chance" and that Carter stated he was going to call Warrington and tell him to stay away from Sonya. (Trial Tr. at 339). Faye asked whether Carter was threatening Warrington and she testified that Carter did not respond.

[*P25]  Similarly, the Husky Refinery received a call that was linked to Carter in early January of 2009. A man identifying himself as "Mark Carter" called the refinery requesting company policies regarding the use of property for employees engaged in an extramarital affair, specifically Sonya and Warrington. Pam Callahan answered the call for Husky and she stated that although the caller stated that he needed the information for a lawsuit and he sounded professional, she did not believe it was legitimate.

[*P26]  On February 18, 2009, the detective who had looked into Carter's claims that Sonya should be charged for making a false report regarding the 2007 "stand-off" incident informed Carter that he had looked into the matter and he recommended that no charges be filed against Sonya. The detective informed Carter that he turned the case over to the city prosecutor's office, which agreed with him. The detective indicated Carter was not happy with the results.

[*P27]  On February 22, 2009, Sonya saw Warrington at work and

Warrington indicated that he needed a key to her residence because Sonya had mistakenly taken Warrington's off of the counter and he did not have his key at the time. It seems that at that time the two worked different shifts that overlapped at the end of Sonya's and the beginning of Warrington's. According to Sonya, the two were not romantically involved at the time but Warrington still stayed at her residence occasionally and he kept some work uniforms in her son's room. Sonya testified that when she gave Warrington her key it was the last time she saw Warrington alive.

[*P28]  Sonya testified that she left work and went to pick up Tarah at Carter's residence. Sonya indicated that Tarah had sent Sonya a text message earlier asking if Warrington was coming over to Sonya's that night and Sonya found it odd. Sonya testified that she asked Tarah about the text message but Tarah did not know anything about it. Sonya then returned with Tarah to her home at 436 McKibben and went to sleep.

[*P29]  Work records established that Warrington clocked out of the refinery at 5:04 a.m. on February 23, 2009. Sometime shortly thereafter, Warrington was shot six times just outside a side entrance of Sonya's home.

[*P30]  Donald Hovest, who was picking up trash on his route on a street close to 436 McKibben, heard the gunshots in his general area. He indicated that the gunshots occurred after 5 a.m., sometime possibly around 5:20. He reported the gunshots to police, which dispatched officers related to possible gunshots in the area at 5:18 a.m. Police responded to the area but officers did not observe anything relevant at that time.

[*P31]  Rosalind Johnson was asleep on her couch across the street from 436 McKibben and was awakened by the noise from the gunshots. She looked out her window and saw a person coming out of the alley with a "hoodie jacket on, a camouflage jacket." (Trial Tr. at 819). However, Johnson did not see any actual shooting and she simply went back to sleep.

[*P32]  Sonya woke up at 6 a.m. on February 23, 2009, and noticed that Warrington's truck was parked at her residence but he had not come inside. After waking up Tarah and mentioning that it was odd, Sonya discovered Warrington's body just outside and screamed. Tarah called 9-1-1 after checking Warrington for a pulse. The 9-1-1 call was played for the jury.

[*P33]  Police responded to the scene and began an investigation.

6

It was ultimately determined that Warrington's death was a homicide resulting from six gunshot wounds. The shots were to his chin, right forearm, left chest, right buttock and two in the back. There were 12 holes total because all six bullets exited Warrington's body. The investigation further revealed that Warrington was shot by Winchester 9mm bullets. Shell casings and bullets were collected at the scene. Warrington was discovered with $160 on him, which officers felt ruled out a robbery, along with a gym bag and a cooler. Photographs of how and where Warrington was found just outside Sonya's door were included in the record.

[*P34] While at Sonya's residence surveying the scene, one officer noticed that there was an electric bill for Carter on the counter and the officer recalled the 2007 "stand-off" incident. Officers then wanted to get into contact with Carter. The detective that handled Carter's allegations against Sonya for filing a false report, Sergeant Godfrey, indicated that he had Carter's phone number so he called Carter around 8 a.m. and generally asked Carter to come into the station. When Carter answered, Carter asked if Sergeant Godfrey was calling because there had been some movement on his case with Sonya. At that time Carter was told to just come in without any further information being provided to him and Carter said he would be in shortly.

[*P35] A half-hour passed and Carter had not come in, so Sergeant Godfrey called Carter again and said something had happened to "Kenneth" and Carter needed to come in. Carter stated that he did not like the sound of that but would come to the police station as soon as he finished a work-related errand.

[*P36] Before Carter came to the police station, Carter called his attorney Ken Rexford's office to ask if something had happened to him since Carter was informed that something had happened to "Kenneth." Leah Rexford, the attorney's wife who also worked at the law firm, informed Carter that nothing had happened to Carter's attorney Ken Rexford. Carter made another call to Rexford's office shortly thereafter where Carter was "inconsolable" and talking about something happening to his baby.

[*P37] As Carter drove around to apparently complete his errands that morning, he was being followed by Detective Timothy Clark who was not in a marked cruiser. Detective Clark noticed that Carter's license plates did not match and he called for a marked cruiser to stop Carter. A patrol officer then did stop Carter and Detective Clark approached and told Carter that he wanted Carter

to come in for questioning. According to one officer, Carter then "exploded in emotion," as he kept talking about his baby, meaning his daughter Tarah. Officers were surprised by Carter's demeanor and assured Carter that Tarah was fine but Carter kept referring to her. After being repeatedly assured that his daughter was fine, Carter then voluntarily went to the police station for an interview.

[*P38]  During Carter's interview, he stated that the night prior to Warrington's murder Sonya picked up Tarah sometime after 10 p.m. and took Tarah to Sonya's residence. Carter stated that he went to bed after watching shows on his computer and then woke up at 6 a.m. to his alarm clock. Also during the interview, Carter admitted to owning a .357 but denied owning a 9mm at that time. Carter told the police that they could have his .357 and he allowed the police to do a gunshot residue test on his hands.

[*P39]  Carter was under a disability for a prior conviction and could not own a firearm, so the police indicated they were going to search his house to get the .357. A search warrant was then obtained and executed on Carter's residence to look specifically for weapons. Two guns were located at Carter's residence at that time along with a box of Winchester 9mm ammunition with some of the bullets missing. Testing later indicated that the bullets were consistent with those that killed Warrington, although they were relatively common bullets. However, testing indicated that neither of the firearms that were found at Carter's residence were used in the murder. Similarly, neither of those firearms were the subject of the Having Weapons While Under Disability charge in this case. Rather, the murder weapon, which was never found, was the firearm related to the charge.

[*P40]  As the investigation continued on the day of the murder, a second search warrant was executed on Carter's residence looking for anything related to a homicide. On Carter's kitchen table, a number of papers were found together including a copy of the private emails between Warrington and Sonya from December of 2007, a copy of the CPO Sonya had obtained against Carter, and a copy of the related police report from the December 2007 incident. There was also a document officers described as a "script" that appeared to correspond to the phone call that had been made to the Husky Refinery in January related to Sonya and Warrington's affair.

[*P41]  In addition to this paperwork, officers located camouflage clothing, which was later tested for gunshot residue ("GSR"). A short sleeve camouflage shirt and a long sleeve camouflage shirt

8

both tested positive for GSR despite Carter stating in his interview that he had not fired a gun in years. Rosalind Johnson indicated that the camouflage pattern was consistent with what she had seen from her window on the morning of the murder. However, neither of the camouflage shirts contained a hood, which she had mentioned seeing. Nevertheless, officers also located a pair of gloves on a table and the gloves tested positive for GSR as well.

[*P42]  Various electronics belonging to Carter were seized during the search and analyzed. On one of Carter's digital cameras, there were images of streets in Lima and a picture of Warrington's truck parked outside of Sonya's home at 436 McKibben dated January 9, 2009. A forensic search of Carter's computer revealed he had been on the county auditor's website for information on the property at 436 McKibben and that he had been looking at a map of the surrounding area. In addition, there were google searches performed for Sonya Burkholder and Kenneth Warrington. A separate "palm" device also contained an address for Kenneth and Faye Warrington as well as a phone number, which had a *67 designation by it indicating that the number had been used while dialing *67 to block the caller ID.

[*P43]  On the day of the murder Carter was arrested for Having Weapons While Under Disability, which is separate from the same charge in this case. When Carter was taken into custody, he requested to speak with Sergeant Godfrey for a second time that day. Another interview of Carter was then conducted, and that interview was played for the jury. In the interview, Carter had some kind of 'tic,' or seizure-like occurrence that the officers did not believe was genuine. Little of relevance came out of the interview.

[*P44]  While Carter was incarcerated for Having Weapons While Under Disability, Joey Moore, another inmate, stated that he heard Carter discussing the murder investigation. Moore testified at trial that Carter said that police found 16 grams of crack at his residence but they did not find a Mac-10 firearm that Carter claimed to have disassembled. A ballistics expert from BCI testified that a "Mac-10 style" firearm would be one of over 130 possible 9mm firearms that could have been consistent with the firearm that fired the bullets that killed Warrington. Joey Moore also testified that Carter indicated that he had killed his girlfriend's boyfriend. Police found Moore's statement credible because he was fairly accurate in the amount of crack that was found at Carter's residence and it was not something Moore could have known otherwise.

9

[*P45]  Also while Carter was incarcerated, he contacted a friend named Carlotta Williams and requested that she visit him. When she did, Carlotta testified that Carter held up a note asking her to tell the police that she was with him from 1:00 a.m. to 6:00 a.m. on the day of the murder. Carlotta refused and stated that the alibi Carter was requesting her to provide was false. She also stated at trial that she had seen Carter with a gun resembling a Mac-10 before when she was shown a generic demonstrative picture of a Mac-10 style firearm, though she said she had little familiarity with firearms.

[*P46]  Stephen Upham, another inmate who was incarcerated with Carter, testified that Carter told him about the murder. Upham testified that Carter indicated that he had gotten into an argument with the mother of his children and her boyfriend got mad and threatened Carter's children. Carter told Upham that a couple of weeks after this incident Carter shot the boyfriend. Upham testified that Carter indicated he watched the victim for a couple of weeks coming and going and that he was wearing camouflage and a paintball mask when he committed the murder.

[*P47]  Notably just before Upham testified, he was mistakenly placed in the same holding cell with Carter during a brief recess in the trial. Upham asked Carter how his trial was going, and stood up, then Carter assaulted Upham. A video of this incident was introduced into evidence.

(Exhibit 15, Journal Entry and Opinion, ¶¶2-4 and 12-47; *State v. Carter,* Third App. Dist. No. 1-15-62, 2017 Ohio App. LEXIS 1231, 2017 Ohio 1233 (April 3, 2017) at ¶¶2-4 and 12-47.)

## STATE CONVICTION

On April 17, 2014, an Allen County Grand Jury indicted Carter on one count of aggravated murder with a firearm specification and one count of

having weapons under disability.  (Exhibit 1, Indictment)    Carter entered a plea of not guilty to the indictment and the case was set for trial. [1]

On May 12, 2014, Carter, through counsel, filed a motion to suppress all evidence taken from his home and motor vehicle and any statements made to police from the purported illegal search and arrest.   (Exhibit 2, Motion to Suppress)  The State filed a motion to limit the scope of a suppression hearing to the search of the vehicle because the trial court had previously ruled on the search of the home and statements made to the police. (Exhibit 3, State of Ohio's Motion to Limit the Scope of Suppression Hearing)  On June 25, 2014, the trial court granted the State's motion and limited the suppression hearing to the legality of the search and seizure of Carter's motor vehicle. (Exhibit 4, Judgment Entry Limit Suppression)   On July 14, 2014, Carter, through counsel, filed two supplemental memoranda in support of his motion to suppress. (Exhibits 5 & 6, Supplemental Memoranda in Support of Motion to Suppress)   The trial court held a hearing and overruled Carter's motion to suppress.  (Exhibit 7, Judgment Entry Overruling Motion to Suppress)

After much passage of time, Carter next filed a motion to compel, motion to dismiss, or alternatively motion to continue trial. (Exhibit 8, Motion to Compel; Motion to Dismiss or Alternatively motion to continue Trial) Carter's counsel argued that the late disclosure of new forensic evidence was the reason for the delay. *Id.* The trial court granted the motion to compel but denied the

---

[1] The trial court summarized this information in its judgment entry at the conclusion of the trial and sentencing: Exhibit 11, herein.

motion to dismiss or continue the jury trial. (Tr. Vol. 1, 43-46)  Trial began on September 8, 2015. *Id.*

On the seventh day of trial, Carter filed a motion for a mistrial because the state introduced evidence not previously disclosed to the defense, to wit: ballistics expert testimony outside the scope of the report previously furnished to defense counsel. (Exhibit 9, Motion for Mistrial)   The court overruled the mistrial motion. (Tr. Volume 7, 1241-1246)

Carter was found guilty of aggravated murder and having a weapon while under disability. (Exhibit 10, Verdict Forms)  On September 22, 2015, Carter was ordered to serve a sentence of life without parole. (Exhibit 11, Judgment Entry Sentence)

## **DIRECT APPEAL**

Carter, through counsel, filed an appeal to the Third District Court of Appeals, Allen County, Ohio. (Exhibit 12, Notice of Appeal) In his brief, Carter set forth the following assignments of error:

1. The Trial Court committed error prejudicial to the Defendant by failing to exclude evidence of an altercation between the Defendant and a Government Witness in a holding Cell of the Court during trial and allowing a video of that altercation to be played for the jury during the Government's Case in Chief.

   Issue Presented for Review:   Whether an altercation between a Defendant and a Witness outside the presence of the Jury be used as evidence in the Government's case in chief. (sic)

2. The Trial Court committed error prejudicial to the Defendant by overruling Defendant's Motion for Mistrial filed on September 16, 2016 based upon Rule 16 discovery Violations and Brady

Discovery Violations related to testimony of a Government witness on firearms.

Issue Presented for Review:  Whether the Government committed discovery violations.

3. That the Conviction of the Defendant was against the Manifest Weight of the Evidence and, in the alternative, was based upon insufficient evidence.

First Issue Presented for Review:  Whether the conviction of the Defendant was against the Manifest Weight of the Evidence.

Second Issue Presented for Review:  Whether the conviction of the Defendant was based upon insufficient evidence.

4. That the Prosecution Statements in Closing Argument Misstates the Evidence and rise to the level of Prosecutorial Misconduct and require a Reversal. (sic)

Issue Presented for Review:  Whether there was prosecutorial misconduct that deprived the Defendant of a fair trial.

5. That the Defendant was Deprived of a Fair Trial due to Ineffective Assistance of Trial Counsel.

Issue Presented for Review:  Whether the Defendant was deprived of effective assistance of counsel and thus a fair trial.

(Exhibit 13, Carter's Brief)  The State's brief is Exhibit 14.  On April 3, 2017, the Court of Appeals affirmed the judgment of the trial court. (Exhibit 15, Opinion and Judgment Entry)

Carter, through his appellate counsel, filed a timely appeal of the Court of Appeals' decision that affirmed the judgment to the Ohio Supreme Court. (Exhibit 16, Notice of Appeal) In his memorandum in support of jurisdiction, Carter asserted the following proposition of law:

Evidence of a physical attack by a criminal defendant upon a Government witness outside of the presence of a jury in the midst of a criminal trial should not be admitted in a criminal trial as

13

intrinsic evidence or for purpose of demonstrating "consciousness of guilt" unless and until the trial court conducts a full and searching analysis of the unfair prejudice that such evidence presents.    This violates a criminal defendant's statutory and Constitutional Rights under the Sixth and Fourteenth amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution.

(Exhibit 17, Memorandum in Support of Jurisdiction)  The State did not file a response.  On January 31, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.C.Prac.R. 7.08(B)(4). (Exhibit 18, Entry)

Exhibit 19 is the docket in the case.

## **FEDERAL HABEAS CORPUS**

Carter, *pro se*, filed the instant petition for a writ of habeas corpus that was received by the court on January 31, 2019.  His grounds for relief are as follows:

**GROUND ONE**:
**Supporting Facts**: Trial court committed error prejudicial to the defendant by failing to exclude evidence of an altercation between the defendant and a government witness in a holding cell of the jail during trial outside the view of jury and allowing a video of the altercation to be played for the jury during the government's case in chief.

**GROUND TWO**:
**Supporting Facts**:  The trial court committed error prejudicial to the defendant by overruling defendant's motion for mistrial filed on September 16, 2015 based on Rule 16 Discovery violations related to testimony of a government witness on firearms.

**GROUND THREE**:
**Supporting Facts:**  The conviction of the defendant was against the manifest weight of the evidence and, in the alternative, was based upon insufficient evidence.

**GROUND FOUR**:
    **Supporting Facts**:  That the prosecution statements in closing argument misstates the evidence and rise to the level of prosecutorial misconduct and require a reversal.

 **GROUND FIVE**: That the defendant was deprived of a fair trial due to ineffective assistance of trial counsel.

*See,* Page ID#16.

INTRODUCTION

The following outline of respondent's argument will assist the Court.

*The petition*

Carter's federal habeas petition could well be considered inadequate under the provisions of habeas Rule 2(c) of the Rules Governing Section 2254 Cases in [federal] District Courts by reason of its terseness.  On the other hand, Carter's five habeas grounds track the assignments of error in the state Court of Appeals, and it will serve the interest of prompt disposition of the petition to proceed to decide the petition entirely on the state record.  This is, in any event, how federal habeas corpus should normally function.  *Cullen v. Pinholster,* 563 U.S. 170, 182 (2011) (Holding that review under 28 U.S.C. §2254(d)(1) is limited to the record that was before the state court that adjudicated the habeas claim on the merits.)

The state Court of Appeals accomplished a thorough and compelling factual and legal analysis of the claims in the present federal habeas petition, and Carter and this Court are bound by that analysis:  The more so because Carter does not introduce any other basis for his petition than what is set forth in the state record. *Cullen v. Pinholster.*

*Procedural default*

The law to apply regarding procedural default will be set out hereafter, but the Court will note at the outset that Carter appealed the first of his habeas claims in one, complete round of state court review to include the Supreme Court of Ohio. (Exhibit 17, Carter's brief in the Supreme Court of Ohio)  Carter did <u>not</u> appeal his other habeas claims to the Supreme Court of Ohio. Thus Carter's habeas claims except for ground one—the only habeas claim to receive a complete state court review—are all procedurally defaulted. *O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999) (Holding that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.)

Carter cannot return to the state courts to litigate assignments of error derived from the trial and record of trial that were not pursued on direct appeal through the Supreme Court of Ohio because of the state rule of res judicata. *Hand v. Houk,* 871 F.3d 390, 408-409 (6th Cir. 2017).

Therefore, all Carter's habeas claims, except for habeas claim one, are procedurally defaulted. *Lovins v. Parker,* 712 F.3d 283, 295 (6th Cir. 2013) (Second way to procedurally default a habeas claim: a petitioner fails to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.)

Carter cannot claim ineffective assistance of appellate counsel as cause for the procedural default arising from his brief in the Supreme Court of Ohio

because Carter is not entitled to appellate counsel in the Supreme Court of Ohio. *Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987) (Holding that the right to appointed counsel extends to the first appeal of right, and no further.) Moreover, as will become apparent hereafter, in light of the thorough and compelling state court adjudication, there can be no actual prejudice or a miscarriage of justice to avoid the procedural default of all the habeas claims other than habeas claim one.

Therefore, only habeas claim one survives procedural default for review in this forum.  Habeas claim one has its own difficulty as will become apparent hereafter.

*Habeas claim one is not cognizable*

As will be set out hereafter, habeas claim one involves an evidentiary question that is committed to the discretion of the trial court and state court review.

Claim one does not present a federal constitutional issue, and this Court only reviews federal constitutional issues.  28 U.S.C. §2254(a).  *Swarthout v. Cooke,* 562 U.S. 216, 219 (2011) (Holding that the habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.) (Internal quotation marks omitted).

Evidentiary questions rarely rise to the level of a due process concern that would trigger constitutional review. *Wilson v. Sheldon,* 874 F.3d 470, 475-

476 (6th Cir. 2017) (Holding, *inter alia*, that with regard to evidentiary rulings, the standard for habeas relief is not easily met, and ultimately states have wide latitude with regard to evidentiary matters under the Due Process Clause.) (Numerous cases cited)

*Conclusion*

The Court has no other option than to dismiss Carter's federal habeas petition.

*Merits under 28 U.S.C. §2254(d) [the AEDPA]*

Notwithstanding this procedural posture of the petition, respondent will set out the thorough and compelling state court adjudication for the Court's review.  In doing so, respondent does not waive the argument for procedural default of habeas claims two through five or the non-cognizability of habeas claim one set out herein; respondent will present the state court's adjudication, and arguments that may be derived from that adjudication, as a convenience to the Court for whatever purpose the Court may have for it but not as a waiver of the procedural default or the non-cognizability of habeas ground one.  The law to apply follows.

*Review under the AEDPA*

The law to apply under 28 U.S.C. §2254(d) [the AEDPA] has been recited in many different ways.  The following is one possible description.

The applicable standard of review in federal habeas corpus of constitutional issues that were addressed on the merits in a state court of appeals is set forth in 28 U.S.C. § 2254(d).  Under that provision, a writ of

18

habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) [the AEDPA].

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] court's decision but unreasonably applies that principle to the facts of the prisoner's case.'" *Otte v. Houk,* 654 F.3d at 600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster*, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's

determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007). This is a "substantially higher threshold." *Ibid.* To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its result, *Harrington v. Richter*, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them," *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam). In addition, the state court's findings of fact are presumed correct and can be rebutted only when the petitioner presents clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

*Otte v. Houk,* 654 F.3d at 600 (emphasis in original).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court re-litigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter,* ___ U. S. ___ , 131 S. Ct. 770 , 786 (2011).  In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 786-87.  Moreover, the writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams*, 529 U.S. at 412).

## I.   Habeas ground one, alleged evidentiary error in failing to exclude evidence, is not cognizable in federal habeas corpus and, in the alternative, is meritless under the AEDPA.

### *The background*

The state Court of Appeals provided the factual background for habeas claim one, and there is a presumption of correctness of the state court's adjudication of the facts that Carter does not challenge. 28 U.S.C. §2254(e)(1).

[*P46]   Stephen Upham, another inmate who was incarcerated with Carter, testified that Carter told him about the murder. Upham testified that Carter indicated that he had gotten into an argument with the mother of his children and her boyfriend got mad and threatened Carter's children. Carter told Upham that a couple of weeks after this incident Carter shot the boyfriend. Upham testified that Carter indicated he watched the victim for a couple of weeks coming and going and that he was wearing camouflage and a paintball mask when he committed the murder.

[*P47]   Notably just before Upham testified, he was mistakenly placed in the same holding cell with Carter during a brief recess in the trial. Upham asked Carter how his trial was going, and stood up, then Carter assaulted Upham. A video of this incident was introduced into evidence. (footnote omitted)

* * *

[*P64]   On the seventh day of Carter's trial, Steven Upham, an inmate who had previously been incarcerated with Carter, was set to testify against Carter. Upham was the inmate who Carter had told that Carter killed a man while wearing camouflage and a paintball mask.

[*P65]   Just prior to Upham testifying, Upham was placed in a holding cell. When the trial court took a brief afternoon recess, Carter was taken and placed in the same holding cell with Upham. FTNT 15 No one else was present in the holding cell at that time. It is undisputed that neither Carter nor Upham said anything to the corrections officers questioning why they were placed in the same holding cell or alerting the officers to the situation.

 [*P66]  Upham was seated when Carter entered the holding cell. According to Upham, who was surprised that they were placed in the same cell, Upham said to Carter, "How's your trial going?" (Trial Tr. at 1396). Carter then responded by saying, "Why are you lying on me?" (Id. at 1397). At that time, Upham stood up and Carter then approached and assaulted Upham by throwing a punch. Next, Upham tried to put Carter in a headlock and Carter put his finger in Upham's eye. Carter also bit Upham's arm, leaving teeth marks. After roughly forty seconds, officers responded and broke up the altercation. The incident was recorded by surveillance video but there was no accompanying sound. Upham had several abrasions from the altercation, which were photographed.

 [*P67]  Following the altercation, the trial court recessed the trial for the day. When court reconvened the following morning defense counsel moved to have evidence of the incident excluded contending that it was improper character evidence. In the event that the evidence was not excluded, defense counsel argued that the trial court should declare a mistrial. The State strongly opposed a mistrial and argued that the evidence should be admissible as showing a "consciousness of guilt."

FTNT 15: Just after the incident both parties stated that they believed the incident was entirely accidental. (Trial Tr. at 1362).

(Exhibit 15, Journal Entry and Opinion, ¶¶46-47 and 64-67; *State v. Carter,* Third App. Dist. No. 1-15-62, 2017 Ohio App. LEXIS 1231, 2017 Ohio 1233 (April 3, 2017) at ¶¶46-47 and 64-67.)  (Hereafter, "State court adjudication, ¶__")

*Law to apply: Evidentiary ruling*

Generally a claim premised on a state evidentiary rule faces a steep climb to arrive at a Due Process level of concern. Two helpful cases describing the law to apply are *Burger v. Woods,* 515 Fed. Appx. 507, 510 (6th Cir. 2013) (unpublished) (A due process claim premised on a mistaken state court evidentiary ruling faces a steep climb; a "garden-variety" character-evidence

error does not "cross the constitutional threshold" of due process.) and a more recent case, *Wilson v. Sheldon,* 874 F.3d 470, 475-476 (6th Cir. 2017) (Holding, *inter alia*, that with regard to evidentiary rulings, the standard for habeas relief is not easily met, and ultimately states have wide latitude with regard to evidentiary matters under the Due Process Clause.) (Citing numerous cases)

Moreover, "fundamental fairness" has been defined very narrowly. *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003).

### *Habeas ground one is not cognizable*

Carter claimed in the state Court of Appeals that (1) the trial court erred in not declaring a mistrial after the altercation in the holding cell, and (2) the trial court erred by permitting evidence of the altercation to be presented to the jury.  State court adjudication, ¶60. (Exhibit 13, Carter's brief, pp. 15-27.)

### (1)

The mistrial branch of habeas ground one as presented to the state court is not cognizable because whether to grant or deny a mistrial is committed to the discretion of the state court and rarely presents a constitutional question. State court adjudication, ¶61 [Citing standard of review under Ohio law as resting within the sound discretion of the trial court.].  Habeas review of a state decision regarding a mistrial involves the narrow review of due process. *Zuern v. Tate,* 336 F.3d 478, 485 (6th Cir. 2003) citing, *Donnelly v. DeChristoforo,* 416 U.S. 637, 641-642 (1974).

23

The due process argument is substantially weakened by the trial court's observation that Carter should not be allowed to take advantage of a situation he himself created. State court adjudication, ¶83. Carter chose to assault Upham. *Id.* Indeed, Carter could have told jail personnel that he preferred not to be in the same cell as Upham.

Moreover, in this case the trial judge heard the opinions of the parties, and acted with exceptional deliberation. Tr. 1359-1369 and especially Tr. 1361-1366 [argument of the parties]; 1366-1369 [Trial court's ruling].  *Klein v. Leis,* 548 F.3d 425, 432-433 (6th Cir. 2008).  The trial court used analogous authority from cases involving disruptive behavior to arrive at its decision, and this is not unfair to Carter in light of Carter's behavior that he could have avoided.

Even in the absence of the trial court's consideration of other alternatives to a mistrial, the record in this case provides sufficient justification for the state court ruling. *Klein v. Leis.* The trial court noted that if it granted the mistrial then everything else was "moot." Tr. 1366.  There were no other alternatives. The altercation, once having occurred, was beyond the control of the attorneys or the court to remedy. The real question, as noted immediately hereafter, was its significance and whether the evidence were admissible.

Thus the mistrial branch of habeas ground one in its aspect of non-cognizability is complete and relatively straight-forward on its facts and law.

Having denied the mistrial motion, the court then considered whether the altercation was admissible evidence and what form the evidence should take.

(2)

The evidentiary question is likewise not obviously difficult under the law to apply and in recognition of the state court's role in conducting a fair trial.

In this instance the trial court was exceptionally conscientious in its ruling on the evidentiary question as it was on the matter of the mistrial. Tr. 1369-1371 [Trial court's ruling on the evidence]. The ruling explicitly considered state evidence rule 404(B) and whether it even applied. The trial court held that 404(B) did not clearly apply but if it did then one of the exceptions permitting admissibility would allow the evidence to come before the jury. Tr. 1371.  The trial court primarily concluded that the evidence was an admission by conduct reflecting consciousness of guilt. Tr. 1371. This simply makes sense: The likelihood is that only a guilty person would beat up a witness against him to prevent the testimony or intimidate the witness. Consciousness of guilt is <u>not</u> hard to imagine in these circumstances.

Moreover, the trial court gave an instruction on the use of the evidence as it said it would. Tr. 1371.  Tr. 1844-1845.  With these facts in mind, the standard to apply becomes easy to fit to the situation.

One version of the standard to apply is set out in *Wilson v. Sheldon.*

 With regard to evidentiary rulings, the standard for habeas relief is not easily met. "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process."

*Coleman v. Mitchell,* 268 F.3d 417, 439 (6th Cir. 2001). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell,* 244 F.3d 533, 542 (6th Cir. 2001). Moreover, such rulings "are usually not to be questioned in a federal habeas corpus proceeding." *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988)). Even if errors are made in the application of state law, "[such] errors . . . especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), cert. denied, 464 U.S. 962, 104 S. Ct. 396, 78 L. Ed. 2d 338 (1983). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman,* 244 F.3d at 542). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour,* 224 F.3d at 552 (quoting *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996)). Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause. *Id.*

*Wilson v. Sheldon,* 874 F.3d at 475-476.

Here the issue is, as recited above, especially pertaining to the admissibility of the evidence as described in *Wilson v. Sheldon.* Moreover, "fundamental fairness" is defined very narrowly. *Bugh v. Mitchell,* 329 F.3d at 512. Bad acts evidence does not generally violate "fundamental fairness" because the United States Supreme Court has not held that such evidence violates due process. *Id.* Since a bad act (the altercation) is all Carter has to hang his hat on to make out a constitutional issue, his argument must fail.

Not only is the altercation considered as a "bad act" not cognizable, but here the "bad act" is related, although indirectly, to the trial and is hence even less likely to violate due process. The "bad act" here does not engage propensity evidence, which is the usual objection to such evidence, but rather involves an attack on a state's witness that constitutes a related uncharged offense. The bridge between the act and its admissibility as consciousness of guilt (as well as admissibility under state evidentiary Rule 404) takes this evidentiary ruling well out of the range of a violation of fundamental fairness.

For these reasons, habeas ground one is not cognizable in this forum.

### The AEDPA

In the alternative, habeas ground one is meritless under the AEDPA pursuant to the standard of review previously described.

The state court's adjudication, in full, is as follows. Although parts of the adjudication that analyze Ohio law are not relevant in this forum, the full state court adjudication is presented herein.

**First Assignment of Error**

[*P60]  In Carter's first assignment of error, he argues that the trial court erred by failing to declare a mistrial after there was an altercation between Carter and one of the State's inmate-witnesses, which occurred in a holding cell during a recess on the seventh day of trial. In addition, Carter argues that the trial court erred by permitting evidence of the altercation to be presented to the jury, claiming that it was improper under Evid.R. 403 and Evid.R. 404(B).

Standard of Review

[*P61]  The grant or denial of a motion for a mistrial rests within the sound discretion of the trial court. *State v. Garner,* 74 Ohio St.3d 49, 59, 1995 Ohio 168, 656 N.E.2d 623 (1995). Thus the trial court's decision is to be given great deference. *State v. Hines,* 3d Dist. Marion No. 9-15-13, 2005-Ohio-6696, ¶ 23. Notably, mistrials are appropriate only when the ends of justice so require and a fair trial is no longer possible. *State v. Franklin,* 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). Because the decision to grant or deny a motion for mistrial rests within the sound discretion of the court, we will apply an abuse of discretion standard in reviewing the issue. An abuse of discretion constitutes a decision that is arbitrary, capricious, or grossly unsound. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140 (1983).

[*P62]  Similarly, as to the evidentiary issues raised by Carter, HN8 we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *State v. Cassel,* 2d Dist. Montgomery No. 26708, 2016-Ohio-3479, ¶ 13, 66 N.E.3d 318, citing *State v. Graham,* 58 Ohio St.2d 350, 390 N.E.2d 805 (1979), and *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 19, 972 N.E.2d 528.

Relevant Rules of Evidence

[*P63]  Carter contends that Evidence Rules 403 and 404(B) should have precluded presentation of the altercation between Carter and Upham at trial. Evidence Rule 403(A) reads as follows.

**(A) Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.**

*Evidence Rule 404(B)* reads,

**(B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,**

**knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.**

The Altercation, the Mistrial Motion, and the Introduction of Evidence of the Altercation

 [*P64]  On the seventh day of Carter's trial, Steven Upham, an inmate who had previously been incarcerated with Carter, was set to testify against Carter. Upham was the inmate who Carter had told that Carter killed a man while wearing camouflage and a paintball mask.

 [*P65]  Just prior to Upham testifying, Upham was placed in a holding cell. When the trial court took a brief afternoon recess, Carter was taken and placed in the same holding cell with Upham. FTNT 15 No one else was present in the holding cell at that time. It is undisputed that neither Carter nor Upham said anything to the corrections officers questioning why they were placed in the same holding cell or alerting the officers to the situation.

 [*P66]  Upham was seated when Carter entered the holding cell. According to Upham, who was surprised that they were placed in the same cell, Upham said to Carter, "How's your trial going?" (Trial Tr. at 1396). Carter then responded by saying, "Why are you lying on me?" (Id. at 1397). At that time, Upham stood up and Carter then approached and assaulted Upham by throwing a punch. Next, Upham tried to put Carter in a headlock and Carter put his finger in Upham's eye. Carter also bit Upham's arm, leaving teeth marks. After roughly forty seconds, officers responded and broke up the altercation. The incident was recorded by surveillance video but there was no accompanying sound. Upham had several abrasions from the altercation, which were photographed.

 [*P67]  Following the altercation, the trial court recessed the trial for the day. When court reconvened the following morning defense

29

counsel moved to have evidence of the incident excluded contending that it was improper character evidence. In the event that the evidence was not excluded, defense counsel argued that the trial court should declare a mistrial. The State strongly opposed a mistrial and argued that the evidence should be admissible as showing a "consciousness of guilt."

[*P68]  The trial court permitted both parties to make arguments in support of their positions. Defense counsel argued that placing Carter and Upham in the holding cell together was a complete accident and that the incident itself was not created by Carter. Defense counsel argued that evidence of the incident would be highly prejudicial and it would constitute improper "other acts" evidence under Evid.R. 404(B). Further, defense counsel argued that if Upham was to testify defense counsel would be seeking a mistrial due to visible marks that may be on Upham from the incident, which could further prejudice Carter. Moreover, defense counsel was concerned that the jury may have heard about the incident because it had been covered in the newspaper.

[*P69]  By contrast, the State argued that while Carter and Upham should not have been placed in the same holding cell together, the ultimate assault was an intentional act perpetrated by Carter and that he should not be granted a mistrial on the basis of his own actions in assaulting a State's witness. As to the admissibility of the evidence, the State argued that Carter's actions reflected "consciousness of guilt" as Carter was aware of what Upham's testimony was likely to be, particularly since a number of Carter's witnesses were inmates seeking to discredit Upham.

[*P70]  After allowing the parties to make their arguments, the court addressed both the motion for mistrial and the ability of the State to present evidence of the altercation. The court began with Carter's motion for mistrial because, "obviously if I grant the mistrial then everything else is, I suppose, moot[.]" (Trial Tr. at 1366).

[*P71]  The trial court then analyzed the issue on the record, citing a number of cases to support its decision. First, the trial court noted that a mistrial only needed to be declared when a fair trial was no longer possible and that a mistrial should not be ordered merely because some error or irregularity had intervened. *State v.*

30

*Franklin,* 62 Ohio St.3d 118, 127-128, 580 N.E.2d 1 (1991). Then, the trial court cited the invited error doctrine, wherein a party could not take advantage of an error that the party induced, and indicated that the invited error doctrine had been applied to motions for a mistrial where the defendant had been disruptive. The trial court cited a number of cases to support its point. *See State v. Greathouse,* 2d Dist. Montgomery No. 21536, 2007-Ohio-2136 (defendant's own disruptive actions in the courtroom could not be grounds for a mistrial); *State v. Chambers,* 10th Dist. No. 99AP-1308, 2000 Ohio App. LEXIS 3104, 2000 WL 963890 *5 ("In the present case, appellant cannot participate in numerous, intentional, disruptive acts and then seek the protection of the court from his own misbehavior."); *State v. Gonzalez,* 4th Dist. Athens No. 97CA52, 1998 Ohio App. LEXIS 5510, 1998 WL 823737 (invited error doctrine precluded defendant from taking advantage of any prejudice that resulted from his own disruptive behavior in courtroom); *State v. James,* 2d Dist. Clark No. 98-CA-54, 1999 Ohio App. LEXIS 506, 1999 WL 76815 *4 (defendant could not take advantage of his own outburst because it would "provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so.").

 [*P72]  After citing these cases, among others, for their overriding principles, the trial court came to the following conclusion regarding the motion for a mistrial.

> **Now, I agree with the defense characterization, and based upon all of the information that I have that's been presented that's on the record, it was an accident. It was an unfortunate accident that the defendant and the witness were put in the same holding room. But, what occurred thereafter I find was not an accident. It was intentional based upon the viewing of the video of that. I'm going to find that the defendant cannot participate in an intentional act.**

> **So, I'm going to overrule the Motion for a Mistrial under the invited error doctrine.**

(Trial Tr. at 1368-69).

[*P73]  Next, the trial court turned to whether evidence of the altercation could be presented at trial. The trial court determined that Evid.R. 404(B) was not implicated in situations where the act is related to the crime or has a connection to the offense. *See State v. Goehring,* 6th Dist. No. OT-06-023 2007-Ohio-5886, ¶ 15, quoting *State v. Lowe,* 69 Ohio St.3d 527, 531, 1994 Ohio 345, 634 N.E.2d 616 (1994) ("Evid.R. 404(B) allows the admission of 'other acts' evidence if it is 'related to and share[s] common features with the crime in question * * *.'"). To support its position, the trial court cited, *inter alia, State v. Williams,* 8th Dist. Cuyahoga No. 89461, 2008-Ohio-1948, which stated, "Evidence of threats or intimidation of witnesses reflect a consciousness of guilt and are admissible as admission by conduct." Williams at ¶ 29; *see also, State v. Soke,* 105 Ohio App.3d 226, 663 N.E.2d 986 (8th Dist.1996).

[*P74]  Here, the trial court found that there was a connection to the offense because Upham was going to testify that Carter had confessed a murder to him and relayed some of the details. Then the court determined that,

> **[Evid.R.] 404(B) is not implicated. This is intrinsic evidence not wholly independent of the offenses and it is evidence of an admission by conduct reflecting a consciousness of guilt that tends logically to prove an element of the crimes charged. But, even if 404(B) were implicated, which I don't think it is, but if 404(B) would be implicated it would be admissible for other purposes other than to prove character or that the defendant acted in conformity with character, such as intent, knowledge, motive, and things that are listed in 404(B).**

(Trial Tr. at 1371).

[*P75]  Thus the trial court permitted the State to introduce evidence of the incident at trial through the testimony of Upham. Upham then testified regarding the incident, stating that Carter

punched him and that Upham put Carter in a headlock in the hopes that guards would respond shortly. In addition, the State introduced the surveillance video from the holding cell, which showed the altercation. The State also introduced multiple pictures of Upham's injuries.

 [*P76]  After Upham testified, defense counsel again moved for a mistrial stating that Carter was now being charged with intimidation of a witness for Carter's actions during the altercation. Additionally, defense counsel stated his understanding that there was an investigation being done as to how Carter and Upham had been placed in the same holding cell. Defense counsel stated that he wanted that investigation to be included in the record. The court ordered that investigation to be included in the record, and the reports that were produced were included as court exhibits separate from the trial.

 [*P77]  Those court exhibits were included in the record on appeal and they contained offense reports from various officers stating what happened from their perspective, including one that concluded, "[i]t was later discovered that there was a miscommunication between jail staff and court security which lead to Dep. Enyart placing the two inmates together in the same holding cell by mistake." (Court's Ex. 4).

 [*P78]  After hearing defense counsel's argument renewing his motion for a mistrial, the trial court went on to state its own view of what led to the incident, beginning with the court's recollection of an in-chambers discussion of the logistics of having the prison witnesses in the same building as Carter.

> **My understanding was that they would be separated. I double-checked my entries. * * * It was the Court's understanding that that would have been generally understood. In our chamber conference there was a discussion about the prison inmates, specifically Mr. Upham, being kept in the probate holding room, which is separate from the regular holding room. I think it was in the nature of perhaps a mistake because Mr. Upham was dressed in stripes instead of in typical Department of Corrections garb that somehow there was a non-**

**communication, or a miscommunication, to the booking officers who brought him up. So, it was an accident/mistake. I think I already mentioned that on the record. So, that's the court's take on that.**

(Trial Tr. at 1562-63).

[*P79] The court then overruled defense counsel's renewed motion for a mistrial. The court did indicate it would inquire into whether anyone on the jury had heard about the incident from the news, and the court did so. No one on the jury indicated having heard anything about the case outside of the courtroom. (Id. at 1374-75).

[*P80] In addition, the trial court did state that it would give a specific instruction to the jury that the incident could only be considered to show consciousness of guilt and not to show actions in conformity with character. The trial court did, in fact, give the jury such an instruction. It read,

**Testimony has been admitted indicating that the defendant was involved in a physical altercation with a witness in the holding room. You are instructed that defendant's conduct alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find that the facts do not support that the defendant's conduct, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness or an awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.**

(Trial Tr. at 1844-45).

34

Carter's Arguments Related to the Motion for Mistrial on Appeal

[*P81]  On appeal, Carter renews his argument that the trial court should have granted his motion for a mistrial. Carter contends that the cases cited by the trial court in making its decision to overrule the motion for a mistrial were distinguishable and that the situation in this case was not of Carter's making. Carter contends that court personnel created the situation, not Carter as the trial court determined. Carter contends that the cases cited by the trial court were all situations where the defendant was specifically disruptive without provocation, and most often in front of the jury.

[*P82]  In our review of the matter, we cannot condone the serious lapse that occurred by placing Carter in the same holding cell with Upham; however, we cannot find that the trial court abused its discretion in determining that the physical altercation itself was actually a direct result of Carter's own intentional action in assaulting Upham. As the trial court indicated, when Carter was paced in the holding cell he could have told the authorities that it was Upham in the cell or Carter could simply have chosen not to assault Upham when they were in the same cell. Instead, Carter chose to assault Upham, which was not an action by the State.

[*P83]  Moreover, in the cases cited by the trial court, James, Gonzalez, Greathouse, and Chambers, supra, multiple Ohio Appellate Courts found that in situations where a defendant's actions led to his own motion for a mistrial, it was not an abuse of discretion for the trial court to overrule the defendant's motion for a mistrial, particularly under the invited error doctrine. While Carter contends that the cases cited by the court to overrule his motion for a mistrial were distinguishable, they do stand for the proposition that a defendant cannot take advantage of a situation that he created himself. It may be true that the altercation would not have been possible had Carter and Upham been kept separate as they were ordered to be, but Carter ignores that Upham never would have been struck had Carter simply ignored him upon entering the holding cell, or taken some action other than resorting to physical violence.

[*P84]  In sum, while we wish to emphasize that Carter and Upham should never have been placed in the same holding cell, we

cannot find that the trial court abused its discretion in declining to grant Carter a mistrial based on Carter's actions. Thus, Carter's argument is not well-taken.

Admissibility of Evidence of the Altercation

[*P85]  Carter next contends that even if it was not error for the trial court to overrule his motion for a mistrial, any evidence related to the altercation should not have been presented to the jury. More specifically, Carter contends that his altercation with Upham in the holding cell in 2015 was not connected to the 2009 murder of Kenneth Warrington.

[*P86]  In support of his position, Carter urges this Court to apply the dissent's rationale in a 4-3 decision by the Supreme Court of Ohio, *State v. Richey*, 64 Ohio St.3d 353, 1992-Ohio-44, 595 N.E.2d 915, abrogated in part by *State v. McGuire,* 80 Ohio St.3d 390, 1997-Ohio-335, 686 N.E.2d 1112. In *Richey* the Supreme Court of Ohio determined that threats made by Richey to the prosecutor were admissible evidence as "consciousness of guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses." FTNT 16

[*P87]  By contrast, the dissent in Richey, which Carter relies upon, stated that

> **A person wrongly accused could easily take out his frustration and anger in this fashion. In particular, Richey's anti-social and borderline personality traits might make the urge to lash out from a false accusation stronger. In any case, jailhouse threats are of a different order than flight from prosecution or a coverup as evidence of guilt.**
>
> **The threats made by Richey are, pure and simple, acts separate and distinct from the one for which he was being tried. Proof of such threats can be admitted during the guilt phase only to show motive, opportunity, intent, plan, and so forth. (Evid.R. 404[B].) As the threats came after the**

> **events for which Richey was being tried, none of these factors can possibly be proved by evidence of later threats. Therefore the evidence is inadmissible for the guilt phase of trial, and it was error for the trial court to admit it.**

*Richey* at 374-375.

[*P88] Carter contends that the rationale in the Richey dissent should be applied in this case. However, the cited portion is facially from the Richey dissent rather than the majority. Moreover, while a separate portion of Richey has been abrogated, the majority's ruling on consciousness of guilt has not been altered. Richey's underlying holding related to "consciousness of guilt" has, in fact, been cited even recently by multiple Ohio Appellate Courts. *State v. White,* 10th Dist. Franklin No.15AP-565, 2016-Ohio-1405; *State v. Tucker,* 10th Dist. Franklin Nos. 15AP-434, 15AP-435, 2016-Ohio-1033, ¶ 17; *State v. Colegrove,* 8th Dist. Cuyahoga No. 102173, 2015-Ohio-3476, ¶ 20, citing *State v. Soke,* 105 Ohio App.3d 226, 250, 663 N.E.2d 986 (8th Dist.1995) ("Intimidation of a witness is not independent of the charged offense; it is an indicator of guilt."). This court has also used similar reasoning to Richey recently, although we did not directly cite Richey. *State v. Missler,* 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ("Moreover, '[u]nder Ohio law, 'evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct.'").

[*P89] Carter thus urges this Court to essentially disavow a majority decision from the Supreme Court of Ohio and ignore decisions from various districts, including a prior opinion from this Court, indicating that threats against a witness can be used to show consciousness of guilt. Until this Court is given guidance otherwise from the Supreme Court of Ohio, we are bound to follow the majority opinion in Richey, and we are persuaded by the precedent of this Court and the other appellate courts. In these circumstances, we cannot find that the trial court abused its discretion in finding that Carter's actions could be reflective of a consciousness of guilt and thus were admissible at trial.

[*P90] Although Carter next contends that evidence of the altercation would not be admissible under Evid.R. 404(B) if it was

not admissible as "consciousness of guilt," we need not address this issue having found that it was not an abuse of discretion for the trial court to find that the evidence was admissible as consciousness of guilt. However, Carter does contend that even if this Court did find that the evidence was somehow relevant and admissible, its probative value was still substantially outweighed by the danger of unfair prejudice and it should have been excluded under Evid.R. 403.

[*P91]  After reviewing the record and the arguments, we cannot find Carter's argument well-taken. Undoubtedly there is some inherent prejudice in evidence being used against Carter but there is probative value in the altercation as well. We cannot find that the trial court abused its discretion in determining that the probative value was not substantially outweighed by the danger of unfair prejudice, particularly given the deference accorded to trial courts in evidentiary matters. Therefore, Carter's first assignment of error is overruled.

FTNT 15: Just after the incident both parties stated that they believed the incident was entirely accidental. (Trial Tr. at 1362).

FTNT 16: Richey was reviewed under a plain error standard.

State court adjudication, ¶¶60-91.

The state court's adjudication is not objectively unreasonable nor is it "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter,* ___ U. S. ___ , 131 S. Ct. 786-787.

To be absolutely clear, there is no indication whatever that placing Carter and the witness in the same holding cell was anything other than an accident or mischance.  State court adjudication, ¶65 n. 15; ¶¶77-78.

The obvious and unmistakable fact is that Carter assaulted the witness, and the situation could have been avoided by Carter. State court adjudication, ¶82. It is not unreasonable to conclude that in instances in which a defendant's own action leads to the motion for a mistrial, it is not an abuse of discretion to overrule the motion. State court adjudication, ¶83. A defendant should not be able to take advantage of a situation that he himself created. *Id.*

As for the admissibility of the evidence, a threat, especially an assault against a witness who testifies for the state, can be used to show consciousness of guilt, and that connection may be left to the jury to decide when given the appropriate instruction. State court adjudication, ¶89. The jury were given the appropriate instruction. State court adjudication, ¶80. The state court followed state precedent in arriving at its legal conclusion, and that precedent is not objectively unreasonable. State court adjudication, ¶88. As for weighing the probative value versus the danger of unfair prejudice, that sort of decision is classically left to the trial court to resolve in the exercise of its discretion. State court adjudication, ¶¶90-91.

These conclusions are self-evidently reasonable and meet the standard for approval of the state court's adjudication in this case in the application of law as set forth in the AEDPA.

*Conclusion*

Ground one is not cognizable and, in the alternative, meritless under the AEDPA.

**II.      Ground two, alleged discovery violation, is procedurally defaulted and, in the alternative, meritless under the AEDPA.**

*Law to apply*: *procedural default*

The law to apply for procedural default has been variously articulated; one version is as follows.

The general law of procedural default can be summarized as follows:

The Supreme Court has stated that "in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas corpus review of the claims is barred* unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) (emphasis added). A federal habeas petitioner can procedurally default a claim by "failing to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim." *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977)). When the state procedural rule prevents the state court from hearing the merits of the claim, procedural default occurs when 1) a petitioner failed to comply with the rule, 2) the state actually enforced the rule against the petitioner, [ftnt.1] and 3) the rule is an "adequate and independent" state ground foreclosing review of a federal constitutional claim. *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003). Failure to comply with well-established and normally enforced procedural rules usually constitutes "adequate and independent" state grounds for foreclosing review. *See id.* at 745.

A petitioner may avoid this procedural default only by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case. *See Sykes*, 433 U.S. at 87. A showing of cause requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default

must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation marks omitted)).

In the absence of cause and prejudice, a petitioner may demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice. A fundamental miscarriage of justice results from the conviction of one who is "actually innocent." *Murray*, 477 U.S. at 496.

Ftnt 1: This Court also requires that the state courts consistently enforce the rule, else a petitioner who fails to comply with the rule cannot predictably be said to have anticipated default of that ground.

*Lundgren v. Mitchell,* 440 F.3d 754, 763-764 (6th Cir. 2006).

Once the procedural default is established, the question then devolves upon whether a petitioner can demonstrate "cause" and "prejudice" and that, in turn, requires some further definition.  "Cause" means that a petitioner can meet his burden to demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  *Murray v. Carrier,* 477 U.S. 478, 488 (1986).  The passage of time while a petitioner did nothing is not an objective factor external to the defense sufficient to establish cause to excuse the procedural default.  *Hodges v. Colson,* 727 F. 3d 517, 532 (6th Cir. 2014).

Ineffective assistance of counsel may constitute cause but only if an

assertion of ineffective assistance of counsel is not itself procedurally defaulted. *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000) (An ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted).

Likewise, cause cannot logically be premised on ineffective assistance of appellate counsel if there is no right to counsel in an appellate forum beyond the first level of appeal. *Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987). Obviously the Supreme Court of Ohio is beyond the first level of review.

Prejudice means actual and substantial disadvantage to a petitioner infecting the entire trial with error of constitutional dimensions.  *United States v. Frady,* 456 U.S. 152, 170 (1982).   A petitioner may also invoke a miscarriage of justice as when a petitioner provides new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent.  *Hodges v. Colson,* 727 F.3d at 530.

*The procedural default in this case*

In this case Carter failed to accomplish one, complete round of state court review by appealing habeas ground two—as well as habeas grounds three through five—to the Supreme Court of Ohio. *O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999). As noted above, Carter cannot return to the state courts for a second direct appeal in light of the state rule of res judicata. *Hand v. Houk,* 871 F.3d 390, 408-409 (6th Cir. 2017).  Carter is not entitled to appellate counsel in the Supreme Court of Ohio and as a consequence he cannot claim ineffective assistance of appellate counsel as cause for the procedural default.

42

*Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987). Although the lack of cause completes the procedural default since Carter must establish both cause and actual prejudice/miscarriage of justice to avoid the procedural default, Carter's case for actual prejudice or a miscarriage of justice is not realistic under the heightened standard to apply to avoid procedural default: Actual and substantial disadvantage to a petitioner infecting the entire trial with error of constitutional dimensions.  *United States v. Frady.*  The defense had access to the relevant reports and the disputed discovery was of an illustrative picture the existence of which the defense had, at the very least, constructive notice. State court adjudication, ¶¶119-120.  Although not necessary to complete the procedural default where cause is unavailable, the absence of actual prejudice or a miscarriage of justice will become clearer in the analysis of habeas ground two under the AEDPA.

*The AEDPA*

The full state court's adjudication was as follows:

**Second Assignment of Error**

 [*P92]  In Carter's second assignment of error, he argues that the trial court erred by failing to grant a mistrial based upon what he claims are discovery violations committed by the State. Carter argues that the State failed to disclose information that was testified to by its ballistic expert and that Carter was prejudiced by it. Carter also argues that the State failed to disclose a demonstrative picture of a Mac-10 style firearm to the defense.

Standard of Review

[*P93]  As stated previously, the decision to grant a mistrial is within the sound discretion of the trial court. State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92, 813 N.E.2d 637. Regarding the alleged discovery violations,  we will also review the trial court's decision under an abuse of discretion standard. See State v. Opp, 3d Dist. Seneca No. 13-13-33 2014-Ohio-1138, ¶¶ 7-15.

Criminal Rule 16(K)

[*P94]  In this assignment of error, Carter contends that the State violated Crim.R. 16(K), which reads,

> **(K) Expert Witnesses; Reports. An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.**

The Alleged Discovery Violation, Mistrial Motion, and Ruling by the Trial Court

[*P95]  On the sixth day of Carter's trial, the State called Kevin Kramer, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation to testify. Kramer was qualified as an expert in "forensic firearm ballistic bullet and casing analysis" with no objection by the defense.

[*P96]  Kramer then testified that he "re-worked" or re-analyzed the ballistic evidence in this case. The ballistic evidence had been analyzed twice previously. The first person to analyze the ballistic evidence for the State, Todd Wharton, had taken a new job in Florida and the second person to analyze the evidence, Heather

44

Williams, was on a leave of absence due to a medical issue so Kramer was asked to analyze the evidence and testify at trial. Kramer testified that he did not review the prior reports before doing his own analysis and that he actually did not even have access to notes or findings from the prior testing until he got his own results.

[*P97]  Kramer testified that as a result of his examination he determined that the casings found at the scene of the Warrington murder were fired from the same firearm and that they were 9mm Luger cartridges. In addition, Kramer testified that the box of Winchester ammo—which had been located in Carter's residence—contained bullets consistent with the bullets presented by the State for him to test, although they were relatively common bullets. However, Kramer concluded that the bullets at the scene of the murder were not fired by the weapons submitted to him that were found during the search of Carter's residence.

[*P98]  Kramer's report reflected his findings and was entered into evidence. It read, in pertinent part, "Examination of the three (3) fired bullets * * * revealed they are consistent with 9mm Luger full metal jacketed bullets fired from a conventional rifled barrel having (6) lands and six (6) grooves, right-hand twist." (State's Ex. 138). Kramer's findings were consistent with the findings of the two prior analysts.

[*P99]  After testifying to his analysis, Kramer was asked whether he was familiar with a firearm referred to as a Mac-10 and he answered in the affirmative. As Kramer was being shown a demonstrative exhibit of a generic picture of a Mac 10 style firearm, defense counsel asked to approach the bench. Defense Counsel objected to the photo and the questioning, stating that the picture was not provided in discovery and that he was not prepared to cross-examine Kramer relative to a Mac-10 because there was nothing in Kramer's report regarding a Mac-10.

[*P100]   The State argued that it had already shown the demonstrative picture of a Mac-10 style firearm to Carlotta Williams, who previously testified in the trial, that defense counsel did not object at that time, and that Kramer was an expert in firearms and could therefore testify regarding his familiarity with a Mac-10. The State also argued that the defense was put on notice

45

of possible inquiry into a Mac 10 due to the statements of Joey Moore. Carter had made statements that were overheard by Moore, including that when the police searched Carter's residence the police did not find a disassembled Mac-10. Ultimately the trial court overruled defense counsel's objection and allowed the State to ask questions regarding a Mac 10.

[*P101]    The questioning of Kramer then resumed. Kramer testified that the demonstrative picture produced by the State in Exhibit 139 was "consistent in style and appearance with what's been described as a Mac-10 style of firearm." (Trial Tr. at 1176). Next, Kramer described a Mac-10's appearance and how it operated. Kramer was then asked if back in 2009 there was any kind of Mac-10 that could have fired the bullets found at the scene of the Warrington murder. Kramer stated that given the specific "groove" characteristics in the bullets, after reviewing Todd Wharton's report and notes and Heather Williams's report and notes there was a Mac-10 style weapon on the list of possible candidate firearms that could have fired the bullets. Defense counsel objected to portions of this testimony.

[*P102]    Before the defense cross-examined Kramer, defense counsel asked to break for the evening given what he termed the "surprise of the disclosure." Defense counsel argued that tying the rifling specifics on the bullets at the scene of the murder to the Mac-10 was a new issue to him and it was not disclosed in Kramer's report. The trial court then excused the jury for the night and at that time defense counsel moved for a mistrial, contending that Kramer's testimony went beyond the scope of his report.

[*P103]  At that time defense counsel acknowledged that he had received Kramer's report and the reports from the prior analysts. However, defense counsel stated that he had never seen any list from any expert tying a Mac-10 style firearm to the bullets from the Warrington Murder scene. But, defense counsel did acknowledge that he was aware of Joey Moore's statement regarding a Mac-10.

[*P104]    Defense counsel then contended that he could not properly cross-examine Kramer based on the new information. He indicated that he would need to get his own expert. The State, by contrast, indicated that the previous analysts' reports and the

46

discussions regarding rifling grooves on the bullets should have put defense counsel on notice, particularly when combined with Joey Moore's statement.

 [*P105]  The trial court inquired as to whether the defense had the candidate list of the firearms that BCI stated were possibly consistent with the rifling characteristics on the bullets, and defense counsel stated he did not. The State was then ordered to give the candidate list to the defense at that time. Court then recessed for the evening, and reconvened the following morning.

 [*P106]  On the morning of the seventh day of Carter's trial, defense counsel filed a written motion for a mistrial. The trial court heard arguments from both parties on the matter. Defense counsel again contended that the State had violated Crim.R. 16 by not disclosing the possible firearm candidate list, which contained over 130 firearms that could have fired the 9mm Luger rounds and created similar "lands and grooves" on the bullets that were found at the scene of the Warrington murder.

 [*P107]  Defense counsel also stated that he had contacted an expert who defense counsel thought could contradict the State's evidence, or at least indicate that the State's candidate list was overly broad and that the potential expert could possibly exclude the Mac-10 as a candidate. Defense counsel argued that he was prejudiced by the State's non-disclosure of the firearm candidate list.

 [*P108]  By contrast, the State argued that the defense was not unfairly surprised as the firearm candidate list was more akin to notes used in generating an expert report and thus was not required to be given under Crim.R. 16(D). The State maintained that the candidate list was simply a large list of possible firearms that could match the lands and grooves on the fired bullets, leading to Todd Wharton's stated conclusion that he could not match the bullets at the scene to a single specific firearm. Todd Wharton's report, which the trial court included as a court exhibit, contained the following language.

**Examination of the evidence bullets * * * revealed that they are 9mm Luger caliber, full metal jacketed design, and fired from a barrel with conventional rifling consisting of six (6) lands and six (6) grooves, right-hand twist. Microscopic comparisons of the three (3) evidence bullets to each other revealed matching individual barrel engraved striations, confirming that the evidence bullets were fired from the same firearm. Further microscopic comparison of the evidence bullets to test fires from the Glock pistol, submitted as item #1, revealed dissimilar general rifling class characteristics (polygonal rifling versus conventional rifling). These findings confirm that the evidence bullets were not fired by the submitted pistol.**

**The rifling specifications on the evidence bullets correspond to numerous brands of 9mm Luger caliber semi-automatic firearms.**

**\* \* \***

**Digital images of the individual characteristics present on the evidence cartridge case, submitted as item #4, have been entered into Ohio's computerized firearms identification system ("NIBIN/IBIS") and compared with images of all similar specimens currently on file. No identification was made at this time; however, the images will remain in the system and will be routinely compared with all future images entered by any of the laboratories in the Ohio network.**

(Court Exhibit 1-M).

 [*P109] The State argued that the analysts' reports contained the conclusions that were required to be turned over under Crim.R. 16 and that defense counsel was on notice and could have examined any of the experts related to what possible weapons matched the rifling characteristics on the bullets, particularly given that

Wharton and Kramer's reports contained those rifling characteristics.

[*P110]    Separately, the State argued that the demonstrative picture of a Mac 10 style firearm was listed as a potential exhibit to be presented at trial in the State's exhibit list, which was given to defense counsel just prior to trial. Specifically, the exhibit list indicates "Mac-10 Photo" with Kramer and C. Williams as the witnesses who would identify the exhibit. (Court's Ex. 1-M).

[*P111]    After hearing the parties' arguments, the trial court proceeded to rule on the matter. The trial court indicated that it had reviewed the memorandum supporting defense counsel's motion for a mistrial, that it had reviewed what had been disclosed in discovery and what had not been disclosed, and that it had reviewed relevant case authority.

[*P112]  The trial court then conducted its analysis on the record, stating that defense counsel did have Joey Moore's statement regarding the Mac-10, that it did have Todd Wharton's report indicating that there was a list of possible candidate firearms but none of them could be specifically identified as the weapon used in the murder, and that defense counsel had information that other firearms could have fired the bullets. What defense counsel did not have, was the actual list of candidate firearms (Defense Exhibit HH), which contained 131 possible matching firearms made by dozens of manufacturers.

[*P113]  The court then made the following ruling.

> **But, I find it's not necessarily a discovery violation not giving the defense exhibit 'HH' until yesterday because Mr. Wharton's report indicates that there was a list of guns that could have fired the casings that were tested. The defendant knew of Mr. Wharton's report. The defendant's counsel knew that Moore had said that the defendant had an unassembled Mac-10 at his house. Therefore, since the defendant had Wharton's report and knew that there was evidence that the casings could have been fired from any number of guns, including a**

**Mac-10, I find that failure to provide the full exhaustive hundred and thirty-one list is not a willful discovery violation. It's more in the nature of notes or data that supports the conclusion in Wharton's report.**

**Did the defendant have prior discovery that the State would show a picture of the Mac-10? Apparently at the very earliest would be on the day the trial started when the list of exhibits was provided. I find that the picture is demonstrative or illustrative of what Moore said that the defendant told him, or that he heard the defendant say. Demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evidence Rule 401, if it is substantially similar to an object that it is intended to represent.**

(Trial Tr. at 1242-43).

 [*P114]  In sum, the trial court stated,

**The defense had access to all B.C.I. reports. The defense had access to all the witnesses. If there is a violation I think the only violation here would be not giving the actual picture of the Mac 10, the purported Mac-10, State's Exhibit '139'. So with that in mind, finding that there has not been any other discovery violation, I'm going to exercise discretion.**

(Id. at 1243).

 [*P115]  The court thus found that there was no willful violation of the discovery rules by the State in this instance. Therefore, the court determined that the severe sanction of a mistrial was not appropriate. The court indicated that it had given defense counsel the evening to prepare for cross-examination of Kramer and that defense counsel had demonstrated that he was prepared to do so through his argument to the court in support of his motion for a

mistrial. However, the court stated that if defense counsel needed a continuance when the trial reached the defense's case-in-chief to present an expert, the court would take that under advisement at that time. In addition, the court noted that it would give an instruction that the photograph of the Mac-10 style-weapon was merely a demonstrative exhibit. FTNT 17

[*P116]  Following the hearing on the mistrial, trial resumed and defense counsel cross-examined Kramer. On cross-examination Kramer indicated that an actual "Mac-10" was not on the candidate firearm list, but two manufacturers made a firearm similar to the Mac-10, and they were on the candidate list. Kramer also acknowledged that over 130 different 9mm firearms could have fired the bullets that were located at the Warrington murder and if Kramer was shown a demonstrative photograph of each and every one of them he would agree that they were all consistent with the rifling pattern of the bullets from the scene of the Warrington murder.

Carter's Argument on Appeal and Analysis

[*P117]  Carter now renews his argument on appeal that the trial court should have granted his motion for a mistrial and that the State committed discovery violations. Carter argues that Crim.R. 16(K) requires an expert to produce a report summarizing his testimony and he contends that Kramer's report only summarized part of his testimony. In addition, Carter argues that there is actually little validity to the science behind Kramer's testimony. Carter argues that various publications have questioned the validity of comparing a bullet collected at a crime scene to a fired bullet in a lab and that such an analysis does not reach the level of rigor to be considered scientifically viable. Finally, Carter argues that defense counsel had indicated he had been in contact with an expert who had said that he would undermine the State's ballistic evidence had defense counsel been aware of the Mac 10 information.

[*P118]  In our own review of the trial court's decision on this matter, we would begin by noting that the trial court was very thorough in addressing these issues. The trial court also prepared a thorough record, having the referenced ballistic expert reports and the "candidate list" included in the record as court exhibits

separate from the trial, many of which may not have otherwise been included. In addition, the trial court also held lengthy arguments on these issues and clearly considered the record and some relevant caselaw.

[*P119]  Dealing first with the purported discovery violations, we cannot find that the trial court abused its discretion. Defense counsel was in possession of Joey Moore's statement regarding a Mac-10 and defense counsel also did have the reports from the analysts indicating that a number of potential firearms could cause similar groove patterns on the bullets in this case. A Mac-10 style weapon was one of over 130 of those firearms and Kramer, the expert, could only say that the Mac-10 style was one of many possible candidates. Defense counsel thus did receive a summary of the experts' findings and was clearly aware that a Mac-10 style firearm was a weapon that Carter was alleged to be in possession of. Moreover, defense counsel was able to effectively cross-examine Kramer on the issue given the extra night to prepare.

[*P120]  As to the demonstrative photograph of a Mac-10 style firearm, defense counsel was provided with an exhibit list indicating that the photograph would be used. While the State should still have provided the defense with the actual photograph, defense counsel did have the ability to ask for it. Similarly defense counsel did not object to the use of the demonstrative photo with a prior witness and was aware of it at that time, prior to Kramer's testimony. Again, defense counsel was also aware of the possibility of reference to a Mac-10 given that Joey Moore was set to be a witness at trial.

[*P121]  Given the trial court's familiarity with the case and its analysis of the issue, we cannot find that the trial court abused its discretion in finding that there was no discovery violation, or that if there was it was not serious enough to warrant a mistrial. Mistrials are to be granted only in exceptional circumstances, and we cannot find given the specific facts before us that the trial court abused its discretion in declining to grant Carter's motion for a mistrial, even if there were some discovery irregularities. Therefore, Carter's second assignment of error is overruled.

FTNT 17: The trial court did give a generic instruction regarding demonstrative exhibits.

State court adjudication, ¶¶92-121.

*Actual prejudice/miscarriage of justice*

Although it may be overlooked in the *Sturm und Drang* of the discussion of the parties at trial, there is no actual prejudice because the defense counsel was given extra time to prepare an effective cross-examination. State court adjudication, ¶116 ("Kramer [the state's witness] also acknowledged that over 130 different 9mm firearms could have fired the bullets that were located at the Warrington murder and if Kramer was shown a demonstrative photograph of each and every one of them he would agree that they were all consistent with the rifling pattern of the bullets from the scene of the Warrington murder.")

And that ends for any practical purpose the question of actual prejudice/miscarriage of justice as an additional reason (other than cause) to prevent Carter from avoiding the procedural default of habeas ground two.

*The AEDPA*

The adjudication under the AEDPA was factually based to an unusual degree, and Carter has not challenged the presumption of correctness of the state court's factual determinations. 28 U.S.C. §2254(e)(1). On that basis alone, the adjudication of the state court cannot logically be objectively unreasonable or "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter,* ___ U. S. ___ , 131 S. Ct. 786-787.

The alleged "discovery violation" was a tempest in a teapot. The defense was on notice regarding the contested information: A photograph of a Mac-10. State court adjudication, ¶¶99-100 and ¶103 and ¶114.  The specific state court adjudication on the admissibility of the contested evidence was as follows and bears repeating:

> [*P119]  Dealing first with the purported discovery violations, we cannot find that the trial court abused its discretion. Defense counsel was in possession of Joey Moore's statement regarding a Mac-10 and defense counsel also did have the reports from the analysts indicating that a number of potential firearms could cause similar groove patterns on the bullets in this case. A Mac-10 style weapon was one of over 130 of those firearms and Kramer, the expert, could only say that the Mac-10 style was one of many possible candidates. Defense counsel thus did receive a summary of the experts' findings and was clearly aware that a Mac-10 style firearm was a weapon that Carter was alleged to be in possession of. Moreover, defense counsel was able to effectively cross-examine Kramer on the issue given the extra night to prepare.

State court adjudication, ¶119.

This adjudication is not objectively unreasonable or "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.*  The "purported discovery violation" is a generous characterization by the state Court of Appeals; in fact there was no discovery violation of consequence.  The object in question was a photograph.

Moreover, the photograph was in the nature of illustrative evidence. State court adjudication, ¶120.

[*P120]   As to the demonstrative photograph of a Mac-10 style firearm, defense counsel was provided with an exhibit list indicating that the photograph would be used. While the State should still have provided the defense with the actual photograph, defense counsel did have the ability to ask for it. Similarly defense counsel did not object to the use of the demonstrative photo with a prior witness and was aware of it at that time, prior to Kramer's testimony. Again, defense counsel was also aware of the possibility of reference to a Mac-10 given that Joey Moore was set to be a witness at trial.

*Id.*

This adjudication, likewise, is not objectively unreasonable etc.  In short, there was no discovery violation, and the state court's exhaustive adjudication makes that clear.

Habeas ground two, in addition to being procedurally defaulted, is utterly meritless.

## III.  Ground three, manifest weight/insufficient evidence, is procedurally defaulted and, in the alternative, meritless under the AEDPA. Manifest weight is not a cognizable constitutional claim. Sufficiency of evidence is reviewed under a two-layer standard of review.

### Procedural default

As briefed above, habeas ground three was not presented to the Supreme Court of Ohio and is thus procedurally defaulted for the same reason that habeas ground two is procedurally defaulted. Moreover, habeas ground three cannot be avoided since Carter cannot claim cause for the procedural default where he is not entitled to appellate counsel in the Supreme Court of Ohio. And that is the end of habeas ground three since Carter must demonstrate both

cause and actual prejudice/miscarriage of justice to avoid the procedural default. Nonetheless, it will become apparent that there is no actual prejudice/miscarriage of justice when the merits of habeas ground three under the AEDA will be reviewed hereafter. Although respondent will brief the merits under the AEDPA, the procedural default is outcome-determinative in this case.

### Manifest weight / Sufficiency of evidence

Manifest weight is not a cognizable federal constitutional claim, but in this case it is folded into the constitutional claim of sufficiency of evidence since both were fairly presented in the state Court of Appeals although not in the Supreme Court of Ohio. State court adjudication, ¶¶6-54. Sufficiency of evidence was adjudicated at ¶¶48-54. Since both manifest weight and sufficiency of evidence claims were fairly presented in the state Court of Appeals, there is no necessity to distinguish them herein. *See, Hively v. Warden, Marion Corr. Inst.,* No. 2:17cv222, 2018 U.S. Dist. LEXIS 18096 (N. D. Ohio February 5, 2018) at *26-40. Sufficiency of evidence will be reviewed under a doubly deferential standard of review. *Hively* at *36-39 citing, *Tucker v. Palmer,* 541 F.3d 652, 656-657 (6th Cir. 2008).

### Doubly deferential standard of review

The standard of review to apply for sufficiency of the evidence under the AEDPA was recently set out in a published case from the Sixth Circuit Court of Appeals as follows (with minor editing):

Criminal defendants have a due-process right not to be convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [they are] charged." *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). But under AEDPA, [this Court's] review of a state-court conviction for sufficiency of the evidence is very limited. *See Brown v. Konteh,* 567 F.3d 191, 204 (6th Cir. 2009). [This Court will] give two layers of deference to state-court convictions.

First, as in other sufficiency-of-the-evidence challenges, [this Court will] determine "whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 205 (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). [This Court will] not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Id.* This means that "even though [the Court] might have not voted to convict a defendant had [the Court] participated in jury deliberations, [the Court] must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution." *Id.*

Second, "even were [the Court] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt . . . [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.* (emphases omitted) (citing 28 U.S.C. § 2254(d)(2)).

"[T]his standard is difficult to meet," no doubt, but "that is because it was meant to be." *Harrington v. Richter,* 562 U.S. 86, 102, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). "[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (internal quotation marks and citation omitted).

*Thomas v. Stephenson,* 898 F.3d 693, 698 (6th Cir. 2018).

*The state court adjudication of sufficiency of evidence*

The respondent presented the state court adjudication of the facts of the case in the opening portion of the present answer/return of writ, and that lengthy adjudication will not be set out again at this point. (Exhibit 15, Journal Entry and Opinion, ¶¶2-4 and 12-47; *State v. Carter,* Third App. Dist. No. 1-15-62, 2017 Ohio App. LEXIS 1231, 2017 Ohio 1233 (April 3, 2017) at ¶¶2-4 and 12-47.)

Omitting the part of the state court adjudication regarding manifest weight at ¶¶55-59, the following is the state court adjudication regarding sufficiency of evidence.

[*P6]  In Carter's third assignment of error, he argues that there was insufficient evidence presented to convict him of Aggravated Murder with a firearm specification and Having Weapons While Under Disability. Carter also argues that his convictions were against the manifest weight of the evidence.

Standard of Review

[*P7]  Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541 (1997). Sufficiency is a test of adequacy. Id. When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, 818 N.E.2d 229, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

[*P8]  By contrast, in reviewing whether the trial court's judgment was against the manifest weight of the evidence, the appellate

court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Furthermore, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Thompkins at paragraph 4 of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3).

Relevant Statutes

 [*P9]   Carter was convicted of Aggravated Murder, which is codified in R.C. 2903.01(A), and reads, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

 [*P10]   A firearm specification was attached to the Aggravated Murder, which is codified in R.C. 2941.145. It requires that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

 [*P11]   Carter was also convicted of Having Weapons While Under Disability for possessing the weapon he used in the murder of Kenneth Warrington. Having Weapons While Under Disability is codified in R.C. 2923.13(A)(3), and reads " * * *[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]

State court adjudication, ¶¶6-11.

The following is the specific adjudication regarding sufficiency of evidence.

Sufficiency of the Evidence

[*P48]  At the conclusion of the State's case, which consisted of 30 witnesses and over 150 exhibits, Carter made a Crim.R. 29 motion for acquittal. Carter's motion was overruled by the trial court. Carter now contends on appeal that the State presented insufficient evidence to convict him of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability.

[*P49]  Although Carter claims that there was insufficient evidence to convict him his actual arguments related to his convictions seem to be that his convictions were against the manifest weight of the evidence because he contends that the State's testimony was not credible and that Sonya was more likely to be the killer than Carter. These arguments go to weight of the evidence rather than sufficiency.

[*P50]  Nevertheless, to the extent that Carter is arguing that there was insufficient evidence presented to convict him, we do not find Carter's arguments well-taken as the State produced ample evidence to establish each element of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability. In fact, the State presented substantial circumstantial evidence against Carter. Notably, the Supreme Court of Ohio has stated that, "direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson,* 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

[*P51]  In this case the State clearly established evidence of a motive and it also clearly established a plan for Carter to murder Warrington based on Carter's statements to Faye, the pictures Carter took essentially casing the area around Sonya's residence, and the searches Carter did on his computer. Warrington was shot six times just as he was returning to Sonya's from work, indicating that the murder was not an accident and that the killer had been

waiting for him to return and aware of his schedule, which is essentially what Carter told Upham.

[*P52]  The State also presented evidence of a witness who saw someone near the scene at the time of the gunshots wearing camouflage and Carter was found in possession of camouflage clothing and gloves that had GSR on them. Corroborative of this evidence was the fact that Carter told Upham that Carter had committed a murder while wearing camouflage and a paintball mask. FTNT 14  Further, Carter possessed bullets of the same type and caliber that were used to kill Warrington.

[*P53]  Moreover, multiple jailhouse witnesses testified that Carter admitted to killing someone and Carter also sought out a friend to manufacture an alibi. Additionally, on the day of the murder officers remarked on the repeatedly odd behavior of Carter during the traffic stop and during his interviews, much of which was viewed by the jury.

[*P54]  Based on all of this we conclude that sufficient evidence was presented to find that Carter committed Aggravated Murder and did so with a gun, which would make him guilty of the accompanying firearm specification and Having Weapons While Under Disability as well.

FTNT 14: Carter was known to play paintball and a picture of Carter wearing a paintball mask on the top of his head was introduced into evidence.

State court adjudication, ¶¶48-54.

(1) *Jackson v. Virginia*

The standard to apply from *Jackson v. Virginia is* "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

In this instance the determination is not difficult since the facts as recited by the state Court of Appeals are extensive and are not challenged.  28 U.S.C. §2254(e)(1).

Although not a necessary element of the offenses, Carter clearly was the only person with a motive to kill and had demonstrated prior bizarre behavior. State court adjudication, ¶13 and ¶¶15-17 [the "stand-off"] and ¶¶24-25 and ¶37 [behavior shortly after the killing] and ¶40 [copies of private emails between Sonya and the victim found in Carter's house (why would Carter have or be interested in such emails?) and a "script" used by a "Mark Carter" to make a phone call to Sonya's employer regarding Sonya's affair with the victim as related at ¶25] and ¶42.

Carter's argument that his ex-wife was the actual killer is not supported by any evidence. (Exhibit 13, Carter's brief, pp. 38-39.) There is no evidence that Sonya had a firearm and no evidence that on the date of the murder that Sonya and her daughter Tarah, who was living with her mother Sonya, put together a false narrative to cover their own murder of the victim just outside their home in the early morning hours of the day in question. State court adjudication, ¶¶28-32. *See also,* Tr. 1713-1715 [Tarah's, testimony].   The prosecutor's argument noted the improbability of that theory. Tr. 1816-1817.

Other circumstantial evidence tied Carter to the killing. Camouflage clothing found in Carter's home tested positive for gunshot residue and was similar in pattern to that observed by the witness Rosalind Johnson at the time

and place of the shooting.  State court adjudication, ¶¶31 and 41.  Carter attempted to construct a false alibi for himself.  State court adjudication, ¶45. That Carter attempted to construct a false alibi strongly suggests that he does not have an alibi. The witness Upham testified to statements Carter made to him not only admitting the killing but adding incriminating detail that Upham could not otherwise have known about.  State court adjudication, ¶46.  There is no doubt that Carter had access to firearms generally. State court adjudication, ¶39. Typically a firearm that is used in a crime is the first thing disposed of by the perpetrator, and in this case Carter had plenty of time to do that. And finally, the victim was shot six times with a weapon using 9mm bullets, which is no mean feat, and suggests the intent necessary to establish aggravated murder. State court adjudication, ¶33.  And that was the prosecutor's argument.  Tr. 1754 [purpose].  The defense response is that everyone must be lying—even those who do not know each other. Tr. 1818-1819 [prosecutor's argument].

For all these reasons, Carter fails to establish the merits of a claim of a lack of sufficient evidence under the *Jackson* standard.  He also fails to meet the standard under the AEDPA.  The state court's adjudication was as follows.

## (2) The AEDPA

The state court's adjudication as related to insufficiency of evidence was as follows:

Sufficiency of the Evidence

[*P48]  At the conclusion of the State's case, which consisted of 30 witnesses and over 150 exhibits, Carter made a Crim.R. 29 motion for acquittal. Carter's motion was overruled by the trial court. Carter now contends on appeal that the State presented insufficient evidence to convict him of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability.

[*P49]  Although Carter claims that there was insufficient evidence to convict him his actual arguments related to his convictions seem to be that his convictions were against the manifest weight of the evidence because he contends that the State's testimony was not credible and that Sonya was more likely to be the killer than Carter. These arguments go to weight of the evidence rather than sufficiency.

[*P50]  Nevertheless, to the extent that Carter is arguing that there was insufficient evidence presented to convict him, we do not find Carter's arguments well-taken as the State produced ample evidence to establish each element of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability. In fact, the State presented substantial circumstantial evidence against Carter. Notably, the Supreme Court of Ohio has stated that, "direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson,* 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

[*P51]   In this case the State clearly established evidence of a motive and it also clearly established a plan for Carter to murder Warrington based on Carter's statements to Faye, the pictures Carter took essentially casing the area around Sonya's residence, and the searches Carter did on his computer. Warrington was shot six times just as he was returning to Sonya's from work, indicating that the murder was not an accident and that the killer had been waiting for him to return and aware of his schedule, which is essentially what Carter told Upham.

[*P52]   The State also presented evidence of a witness who saw someone near the scene at the time of the gunshots wearing camouflage and Carter was found in possession of camouflage

64

clothing and gloves that had GSR on them. Corroborative of this evidence was the fact that Carter told Upham that Carter had committed a murder while wearing camouflage and a paintball mask. FTNT 14 Further, Carter possessed bullets of the same type and caliber that were used to kill Warrington.

[*P53]  Moreover, multiple jailhouse witnesses testified that Carter admitted to killing someone and Carter also sought out a friend to manufacture an alibi. Additionally, on the day of the murder officers remarked on the repeatedly odd behavior of Carter during the traffic stop and during his interviews, much of which was viewed by the jury.

[*P54]  Based on all of this we conclude that sufficient evidence was presented to find that Carter committed Aggravated Murder and did so with a gun, which would make him guilty of the accompanying firearm specification and Having Weapons While Under Disability as well.

FTNT 14: Carter was known to play paintball and a picture of Carter wearing a paintball mask on the top of his head was introduced into evidence.

State court adjudication, ¶¶48-54.

The state court's adjudication meets the AEDPA standard in that it is not objectively unreasonable or "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter,* ___ U. S. ___ , 131 S. Ct. 786-787.

The accumulation of facts as described by the state court is compelling. State court adjudication, ¶51-53. This was a planned killing; only Carter did the planning and only Carter had the motive. *Id* at ¶51. The killing pointed to

Carter by reason of the clothing with gunshot residue, that Carter told Upham that he (Carter) committed the aggravated murder while wearing camouflage clothing and a *paintball mask* (a *paintball mask* that Carter was known to have and Carter was known to play paintball). *Id* at ¶52 and n. 14. And other evidence of Carter's access to weapons and Carter's odd behavior and statements to others—including the attempt to create a false alibi. *Id* at ¶¶52-53.  These conclusions in light of the state court's exhaustive recitation of the evidence in the case ¶¶12-47 meet the AEDPA standard of review.

Carter fails both of the deferential standards of review.

Habeas ground three is procedurally defaulted as well as meritless under the AEDPA.

## IV.  Habeas ground four, prosecutorial misconduct in argument, is procedurally defaulted as well as meritless under the AEDPA.

### *Procedural default*

Habeas ground four is procedurally defaulted for the same reasons that habeas grounds two and three are procedurally defaulted. Carter failed to accomplish one, complete round of state court review, and he does not get a second direct appeal in light of the state rule of res judicata. Although the procedural default is complete since Carter cannot demonstrate cause for the default, as previously explained, he likewise cannot establish actual prejudice or a miscarriage of justice for reasons that will be apparent in the discussion regarding the merits under the AEDPA.

*The AEDPA*

The state court's adjudication of what is habeas ground four was as follows:

**Fourth Assignment of Error**

[*P122] In Carter's fourth assignment of error, he argues that the prosecutor committed misconduct during closing arguments. Specifically, Carter argues that the prosecutor misstated evidence and that the State attempted to shift the burden of proof to the defense. In addition, Carter argues that the cumulative discovery violations constituted prosecutorial misconduct.

Standard of Review

[*P123] Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns,* 3d. Dist. Seneca No. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood,* 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson,* 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L. Ed. 2d 144 (1986). "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton,* 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995).

[*P124] Furthermore, as to prosecutorial misconduct allegations related to closing arguments, "[p]arties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be drawn from the evidence.'" *State v. Wolff,* 7th Dist. Mahoning No. 07MA166, 2009-Ohio-7085,

at ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 213, 900 N.E.2d 565. A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 116, 840 N.E.2d 151.

Alleged Improper Statements in Closing Arguments

[*P125]    Carter first argues that during its rebuttal closing argument the State made an improper statement related to the expert testimony of Matthew Congleton, who had performed the GSR testing in this case. Carter claims that the following statement during the prosecutor's rebuttal closing argument was improper.

> **Now, there was not gunshot residue found on that car. True. But, Mr. Congleton told you that gunshot residue does not stick to smooth surfaces. If there was any on Mr. Carter's bare hands and then transferred to that door handle it probably wouldn't stick to that door handle. If it did, it may have blown away in the wind as Mr. Carter drove.**

> **[DEFENSE COUNSEL]: Objection. That was not the expert's testimony.**

> **THE COURT: Well, the jury can remember what the testimony was. This is argument. It's not evidence.**

(Trial Tr. at 1812).

[*P126]    Carter contends that a "fair review" of Congleton's testimony shows that Congleton did not make any statements as to GSR blowing away as Carter drove away. Contrary to Carter's argument, a "fair review" of the prosecutor's statement indicates that the prosecutor was suggesting something that "may" have happened. The prosecutor was not indicating that the GSR expert actually did testify that the GSR likely blew off of the vehicle. Rather the prosecutor was making an inference based on Congleton's testimony. Congleton actually did testify that "[a] smoother object obviously would have less adhesion power—it

would give the particles less stick-to-itiveness than a rougher surface." (Trial Tr. at 1135). Congleton also testified that, "[g]enerally speaking * * * [t]he more an object or person moves, or it rubs up against something or themselves, the more likely you will have gunshot residue shed and continue to be shed from whatever surface it might be." (*Id.* at 1136). Thus the prosecutor's statement is a fair inference made from the evidence.

 [*P127]  Finally, even if the statement was somehow error, which we do not find that it is, the jury was clearly instructed that closing arguments were not evidence and we presume the jury followed that instruction. Thus Carter's argument on this issue is not well-taken.

 [*P128]   Carter next argues that the following statement made during the State's rebuttal closing argument was improper.

> **[PROSECUTOR]: [Defense Counsel] also said, "Well, maybe that gunshot residue got on those clothes," not one article, and not two articles, but three articles of clothing collected from the defendant's house, "got on those clothes at the Police station." Maybe. Maybe. Okay, now we have two possibilities. I would submit to you that the more possibilities we have the more likely it is that each one of them is a mere possibility. Okay? Well, maybe. Maybe. Maybe just isn't good enough. Maybe doesn't get you to reasonable doubt. The jury instructions tell you that.**

> **[DEFENSE COUNSEL]: Objection, Your Honor. He's reversing the burden of proof. Maybe doesn't get you reasonable doubt is reversing the burden of proof in this case.**

> **[PROSECUTOR]: I'm speaking directly to the jury instructions that talks specifically about mere possible doubt.**

69

**[THE COURT]: Okay. The Statement you just made I'll sustain and tell the jury to disregard. But, continue.**

**[PROSECUTOR]: Okay.**

**THE COURT: The State has the burden of proof.**

(Trial Tr. at 1808-1809).

 [*P129]  Here, clearly the trial court sustained an objection and the jury was instructed to disregard. We must presume that the jury followed the court's instructions, particularly given that shortly thereafter the jury was specifically instructed on reasonable doubt as follows.

**Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not a mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.**

**If, after a full and impartial consideration of all of the evidence, you are firmly convinced of the truth of the charge the State has proved its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge you must find the defendant not guilty.**

(Trial Tr. at 1830-31).

[*P130]  Given that the trial court sustained the objection to the prosecutor's statement, that the trial court gave thorough instructions related to reasonable doubt, and given our presumption that the jury followed the trial court's instructions, we can find no error here, let alone prejudicial error.

[*P131]  Next, Carter argues that the prosecutor committed error in making the following statement in rebuttal closing argument.

> **Also with respect to Sonya [Defense Counsel] brings up the idea that she was with a lot of other men. Well, we know of one other than Mr. Warrington and that would be Arguello Harris. Okay? I don't know that there was any evidence of a lot of other men. But, again, even assuming there were other men, is it just a mere possibility that some other man did this? Because a mere possibility does not rise to a level of reasonable doubt.**

> **[DEFENSE COUNSEL]: Objection, your Honor. It's shifting the burden.**

> **THE COURT: The Court will remind the jurors, and I'll tell you in the instructions, it's the State's burden to prove.**

(Trial Tr. at 1817).

[*P132]  Here, the state's indication that a mere possibility does not rise to the level of reasonable doubt is straight out of the jury instructions. Again the court also provided specific instructions related to reasonable doubt. We can find no error here, let alone prejudicial error.

[*P133]  Next, Carter argues that the following statement of the prosecutor during rebuttal closing argument was error.

71

> **Now, Carlotta. [Defense Counsel] said something with respect to Carlotta and this is very important. He said - [Defense Counsel] suggested that Mr. Carter was not trying to set up an alibi because he was guilty, but because maybe he was innocent and the alibi was true.**
>
> **[DEFENSE COUNSEL]: Objection. That's not what I said.**
>
> **THE COURT: It's just argument. The jury will decide what the evidence is. Overruled.**

(Trial Tr. at 1826).

[*P134]   It appears that the prosecutor's statement in rebuttal closing argument was in reference to the following portion of defense counsel's closing argument.

> **Carlotta, when asked by the Prosecutor, said this whole thing about this alibi stuff. It wasn't meant by Markelus because he was guilty and he was trying to create a falsehood to get out of it. Markelus Carter feels, and felt, like the system wasn't going to give him a fair shake and he needed extra help to do it.**

(Trial Tr. at 1803).

[*P135]   While the prosecutor's characterization of what defense counsel said in rebuttal closing argument was not entirely accurate, we cannot find that it was an unfair characterization of the evidence or that it in any way prejudiced the outcome of the trial or rose to the level of prosecutorial misconduct. Thus Carter's arguments related to statements made during the prosecutor's rebuttal closing statements are not well-taken.

[*P136]   Finally, Carter argues summarily in two sentences in his brief that the State's discovery violations and improper arguments

cumulatively constitute reversible error. We found no error in closing arguments and although there were discovery irregularities in this case, we cannot find that anything here rose to the level of prosecutorial misconduct. Thus there is no basis for cumulative error. Therefore, Carter's fourth assignment of error is overruled.

State court adjudication, ¶¶122-136.

The state court was perfectly correct to cite and rely on *Darden v. Wainwright,* 477 U.S. 168 (1986). *Id.* at ¶123. The Sixth Circuit Court of Appeals has set forth a helpful recitation of the law to apply as follows:

> The key question on the merits "is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quotation omitted). Because that standard is "a very general one," courts have considerable leeway in resolving such claims on a case-by-case basis. *Parker v. Matthews,* 567 U.S. 37, 48, 132 S. Ct. 2148, 183 L. Ed. 2d 32 (2012) (per curiam). That leeway increases in assessing a state court's ruling under AEDPA. We "cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites . . . other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable." *Trimble* [*v. Bobby,* 804 F.3d [767] at 783 [2015].

> Darden illustrates the high bar a defendant needs to clear to win a prosecutorial misconduct claim. The prosecutor in that case asked the jury to "give [the defendant] death" because "[t]hat's the only way I know that he is not going to get out on the  public." 477 U.S. at 180 n.10. After referring to the defendant as "this animal," and adding for good measure that he should be kept on a leash, the prosecutor wished for his death and disfigurement in increasingly brutal terms: "I wish I could see him sitting here with no face, blown away by a shotgun." *Id.* at 180 nn.11-12. Even though these comments "undoubtedly were improper," the Court still found "they did not deprive the petitioner of a fair trial" in view of the district court's curative jury instructions—that the lawyers' comments do not amount to evidence. *Id.* at 180-81.

*Stewart v. Trierweiler,* 867 F.3d 633, 638-639 (6th Cir. 2017).

Thus, the bar to finding a meritorious claim of prosecutorial misconduct in argument is an extremely high one. Carter does not even come close to meeting that bar on the facts of this case.

Moreover, the state Court of Appeals was perfectly correct to rely on the presumption that the jury follows its instructions. State court adjudication, ¶130. *Francis v. Franklin,* 471 U.S. 307, 324 n. 9 (1985); *United States v. Lawrence,* 735 F.3d 385, 403 (6th Cir. 2013).

As in *Stewart,* here Carter does not clear *Darden*'s high bar, made higher still by the AEDPA. *Stewart,* 867 F.3d at 639. In this case, there was no objection to the state court's instruction on reasonable doubt that was given at the beginning of the court's instructions. State court adjudication, ¶129. Tr. 1830-1831. Moreover, the prosecutor during his argument readily agreed with the rule that the prosecution bears the burden of proof. Tr. 1809.

The state court's adjudication of the various objections by defense counsel is not objectively unreasonable especially in light of *Darden v. Wainwright* nor is it "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter,* ___ U. S. ___ , 131 S. Ct. 786-787.

Habeas ground four is procedurally defaulted and meritless under the AEDPA.

**V.     Ground five, ineffective assistance of counsel, is procedurally defaulted and, in the alternative, meritless pursuant a doubly deferential standard of review to apply under the AEDPA.**

*Procedural default*

As briefed above for habeas grounds two through four, habeas ground five was not presented to the Supreme Court of Ohio and is thus procedurally defaulted for the same reason that the other habeas grounds are procedurally defaulted. Carter cannot claim cause for the procedural default where he is not entitled to appellate counsel in the Supreme Court of Ohio. And that is the end of habeas ground five since Carter must demonstrate both cause and actual prejudice/miscarriage of justice to avoid the procedural default. Nonetheless, it will become apparent that there is no actual prejudice/miscarriage of justice when the merits of habeas ground five under the AEDA will be reviewed hereafter. Although respondent will brief the merits under the AEDPA, the procedural default is outcome-determinative in habeas ground five as in grounds two through four.

*Standard of review*

The standard of review for a claim of ineffective assistance of counsel is doubly deferential as described in *Woods v. Etherton,* ___ U.S. ___ , 136 S. Ct. 1149, 1151 (2011):

> When the claim at issue is one for ineffective assistance of counsel, AEDPA review is "doubly deferential," *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011), because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in

the exercise of reasonable professional judgment," *Burt v. Titlow,* 571 U.S. ___, ___ , 134 S. Ct. 10, 17 (2013) (quoting *Strickland v. Washtongton,* 466 U.S. 668, 690 (1984); internal quotation marks omitted). In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow, supra,* at ___, 134 S. Ct. 10.

*Woods v. Etherton* (with minor editing).

The general law to apply to any ineffective assistance of counsel claim is as follows:

> To prove ineffective assistance of counsel, a petitioner must make two showings. First, he must demonstrate that counsel's performance did not meet "an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Second, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," with a reasonable probability defined as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. [A petitioner] bears the burden of rebutting the presumption that trial counsel acted "for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (per curiam).

*Brown v. Curtin,* 661 Fed. Appx. 398, 409 (6th Cir. 2016) (unpublished) (quoted with minor editorial changes).

See also, *Premo v. Moore,* ___ U.S. ___ , 131 S. Ct. 733, 739-740 (2011). "The standards created by *Strickland* and §2254(d) are both 'highly deferential'…and when the two apply in tandem, review is 'doubly' so." *Id* at 740. "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.*

First, it will be helpful to analyze the state court's adjudication of ineffective assistance of counsel on direct appeal as follows:

*State court adjudication on direct appeal*

**Fifth Assignment of Error**

[*P137]  In Carter's fifth assignment of error, he argues that he received ineffective assistance of counsel. Specifically, he contends that defense counsel poorly handled the government firearms expert, Kramer, and that defense counsel failed to adequately investigate the possibility of a Mac-10 style weapon being involved in this case.

Standard of Review

[*P138] To establish his claims on appeal, Carter must show that trial counsel's performance was deficient and that counsel's deficient performance prejudiced him. State v. Jackson, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, 836 N.E.2d 1173, citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. State v. Bradley, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989), quoting Strickland at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Purported Ineffective Assistance and Analysis

[*P139]  Carter contends that if the State is to be believed that defense counsel should have been on notice from discovery that a Mac-10 style firearm would be painted as the alleged murder weapon, then defense counsel was ineffective for failing to adequately investigate the matter. In addition, Carter contends that defense counsel failed to call an expert related to ballistics despite indicating on the record that he had been in contact with one.

[*P140]  Contrary to Carter's arguments, there is no evidence in the record that his trial counsel could have called a witness to dispute Kramer's testimony. Multiple days before Carter presented his case-in-chief, the trial court addressed Carter's motion for a mistrial related to discovery matters, which was discussed in the second assignment of error. As defense counsel argued for a mistrial, he indicated that he had been in contact with an expert

77

and the expert would look into the matter and the expert gave some brief opinions on the matter over the phone, but it did not appear that the expert had actually reviewed the ballistic evidence yet based on Carter's counsel's representations. Although it overruled Carter's motion for a mistrial, the trial court indicated that it would consider granting Carter a continuance when the trial reached his case-in-chief if Carter needed to bring in an expert, but defense counsel never requested such a continuance. In fact, defense counsel did not suggest at any point later in the trial that he had received further word from the expert and would like to call the expert to testify.

 [*P141]  On appeal, Carter would have us find, without any facts to support it, that his counsel was ineffective for failing to investigate, request a continuance, or call an expert when there is no indication that a ballistic expert would actually have been able to meaningfully contradict testimony by the State. It is equally likely, though equally uncertain, that the expert reviewed the evidence and could not provide any exculpatory testimony. Carter would have this Court engage in pure speculation that some expert existed who would have provided exculpatory testimony related to ballistics that would somehow overcome the mountain of other circumstantial evidence against him.

 [*P142]  Moreover, even if Carter could produce evidence disputing the State's expert that a Mac-10 style firearm was one of over 130 firearms that could match the groove patterns on the bullets found at the Warrington murder scene, such testimony would only call into question the type of firearm used in the murder, not the murder itself. Thus we cannot find any prejudicial error here.

 [*P143]  This is particularly true given that Carter's trial counsel was able to effectively cross-examine the State's expert and have him admit that the bullet grooves matched with over 130 weapons, giving little weight to his assertion that the Mac-10 style weapon was one of many possible firearms. For these reasons, Carter's fifth assignment of error is overruled.

State court adjudication, ¶¶137-143.

*Application*

There are two matters to be kept in mind in the evaluation of the basis for alleged ineffective assistance of counsel in this case.

First, it is not contested that the firearm actually used in the killing was never found. The forensic evidence indicated that over 130 firearms could have been the murder weapon, and defense counsel made the most that could be made out of that circumstance. State court adjudication, ¶116 and ¶142 and especially ¶116.

> On cross-examination Kramer indicated that an actual "Mac-10" was not on the candidate firearm list, but two manufacturers made a firearm similar to the Mac-10, and they were on the candidate list. Kramer also acknowledged that over 130 different 9mm firearms could have fired the bullets that were located at the Warrington murder and if Kramer was shown a demonstrative photograph of each and every one of them he would agree that they were all consistent with the rifling pattern of the bullets from the scene of the Warrington murder.

State court adjudication, ¶116.

So the question to ask is what more could the defense expect after this cross-examination that was not already before the jury from that cross-examination.  Any defense expert—even assuming there were such an expert, which is not demonstrated in this record—could only, at best, provide the same conclusion that was brought out by defense counsel on cross-examination.

Second, as noted in the state court's adjudication, the question of a defense expert was discussed at trial. Defense counsel stated that he contacted a named expert. Tr. 1203-1204. The question from the defense perspective was whether the list of 130 possible murder weapons was overly broad or could be narrowed down. Tr. 1205. It might be possible, according to defense counsel, that the list of weapons might not include a Mac-10.  Tr. 1206. The trial court and defense counsel discussed the availability of a named defense expert. Tr.

1233-1235. After extensive and careful reasoning, the trial court ruled, in part, that the defense had an opportunity to consult an expert, even with respect to the Mac-10, from the reports in the case previously provided. Tr. 1239; 1241. Whether inculpatory or exculpatory, it's clear there were 131 brands of firearms but only two of which were Mac-10s. Tr. 1242.  The defense knew from a report furnished by the prosecution that Carter had an unassembled Mac-10 at his house. Tr. 1242. Unfired nine millimeter cartridges were found in Carter's house that were the same brand and type that matched the casings that were fired and located at the scene. Tr. 1243. The trial court found that there is no indication that the introduction of the picture of the nine millimeter Mac-10 as an illustration would confuse or mislead the jury. Tr. 1243.  The picture wasn't a law enforcement picture, but a picture the prosecutor got off the Internet (and was thus available to anyone and not a willful discovery violation). Tr. 1244.

The trial court gave the defense the evening to prepare for cross-examination which, by all indications, was highly effective.  Tr. 1245.  The trial court took under advisement the question of whether the defense required an expert and a continuance to obtain the testimony of an expert. Tr. 1245.

As best respondent can determine from the record, the question of a ballistics expert drops out of consideration, and there was no defense request for a continuance.  The state court's adjudication is accurate that there is nothing in the record to indicate that there is an expert who could have helped

Carter. State court adjudication, ¶¶140-141.  On this basis there is no showing of deficient performance under the first test in *Strickland.*

In addition, there is nothing to indicate that Carter was prejudiced in light of the cross-examination his defense counsel performed and in light of the proposition, as brought out by his defense counsel, that more than 130 different firearms could have been used in the killing. In this respect, Carter cannot establish the second test in *Strickland* that there is any reasonable probability that the outcome of the proceeding would have been different.

*Conclusion to habeas ground five*

The *Strickland* standard is a general one so the applications are legion. Here Carter fails both tests for ineffective assistance of counsel.  His defense counsel on cross-examination got as much from cross-examination as an expert was likely to obtain for him by diminishing the force of the unassembled weapon and rounds found in Carter's house.  Since the actual weapon was never found and there were over 130 possible murder weapons, defense counsel was able to forcefully present this fact to the jury. The record indicates that the defense consulted a named expert but chose not to call the expert.  In the absence of any other fact, the presumption that defense counsel made a valid tactical choice is unrebutted. Not only is there no indication of deficient performance, but in addition there is an absence of prejudice of the heightened sort required under *Strickland.*

In addition, the state court's adjudication is accurate and fair to Carter on the record before it.  The state court declined to engage in speculation, and

81

indeed it had no other choice. State court adjudication, ¶141.  Thus Carter fails at the second level of deferential review as at the first level.

Habeas ground five is procedurally defaulted as well as meritless under the standard of review to apply for claims of ineffective assistance of counsel.

## CONCLUSION

Attached to the answer/return of writ is the state court record consisting of 19 exhibits and the transcript of the trial.

Carter is not entitled to an evidentiary hearing since all his grounds are record-based, and the state courts have rendered adjudications.  *Cullen v. Pinholster,* 563 U.S. 170, 185 (2011) (If a claim has been adjudicated in a state court, a federal habeas petitioner must overcome the limitation of 28 U.S.C. §2254(d)(1) on the record that was before the state court.)

The only possible outcome is that the Court should deny Carter's habeas petition.


Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

s/William H. Lamb (0051808)
WILLIAM H. LAMB
Assistant Attorney General
Criminal Justice Section
441 Vine Street, 1600 Carew Tower
Cincinnati, Ohio 45202
(513) 852-1529
(877) 634-8140 (FAX)
william.lamb@ohioattorneygeneral.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of July, 2019, a copy of the foregoing *Return of writ* was filed electronically with the Court and a copy mailed by first class mail to the petitioner, Markelus Q. Carter, #A719-105, Correctional Reception Center, 11271 State Route 762, P.O. Box 300, Orient, Ohio 43146.

s/William H. Lamb_____
WILLIAM H. LAMB
Assistant Attorney General