# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| MARKELUS Q. CARTER, | : | CASE NO. 3:19CV240 |
| | : | |
| Petitioner, | : | JUDGE ZOUHARY |
| | : | |
| v. | : | MAGISTRATE JUDGE LIMBERT |
| | : | |
| WARDEN, TOM SCHWEITZER, | : | |
| | : | **HABEAS CORPUS** |
| Respondent, | : | |

---

## STATE COURT RECORD

---

DAVE YOST
Ohio Attorney General


WILLIAM H. LAMB (0015808)
Assistant Attorney General
Lead Counsel
Criminal Justice Section
441 Vine Street, 1600 Carew Tower
Cincinnati, Ohio 45202
(513) 852-1529
Fax (877) 634-8140

Counsel for Respondent

Indictment (2 Counts)
Allen County CCP, Case No. 2014-CR-0139..................................................................1

Motion to Suppress
Allen County CCP, Case No. 2014-CR-0139..................................................................2

Plaintiff State of Ohio's Motion to Limit the Scope of Suppression Hearing and
Memorandum in Support
Allen County CCP, Case No. 2014-CR-0139..................................................................3

Judgment Entry of 6/25/14
Allen County CCP, Case No. 2014-CR-0139..................................................................4

Supplemental Memorandum in Support of Motion to Suppress
Allen County CCP, Case No. 2014-CR-0139..................................................................5

Supplemental Memorandum in Support of Motion to Suppress
Allen County CCP, Case No. 2014-CR-0139..................................................................6

Judgment Entry Overruling Motion to Suppress
Allen County CCP, Case No. 2014-CR-0139..................................................................7

Motion to Compel; Motion to Dismiss or Alternatively Motion to Continue Trial
Allen County CCP, Case No. 2014-CR-0139..................................................................8

Motion for Mistrial
Allen County CCP, Case No. 2014-CR-0139..................................................................9

Verdict Forms
Allen County CCP, Case No. 2014-CR-0139..................................................................10

Judgment Entry of Conviction and Sentencing
Allen County CCP, Case No. 2014-CR-0139..................................................................11

Notice of Appeal, and Request for Transmission of Transcript; Request to Appoint
Counsel
Allen County CCP, Case No. 2014-CR-0139..................................................................12

Merit Brief of the Appellant Markelus Q. Carter
Allen County COA, Case No. 01-15-62 ........................................................................13

Brief of Plaintiff-Appellee
Allen County COA, Case No. 01-15-62 ........................................................................14

Opinion of 4/3/17
Allen County COA, Case No. 01-15-62 ........................................................................15

Notice of Appeal on an Appeal as of Right by Markelus Q. Carter
Supreme Court of Ohio, Case No. 2017-0667 ...............................................................16

Memorandum in Support of Jurisdiction
Supreme Court of Ohio, Case No. 2017-0667 ...............................................................17

Entry of 1/31/18
Supreme Court of Ohio, Case No. 2017-0667 ...............................................................18

Docket Sheets
Allen County CCP, Case No. 2014-CR-0139 .................................................................19

# INDICTMENT

2014 APR 17 AM 8: 35

**THE STATE OF OHIO**

**SS:**

**ALLEN COUNTY**

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

**COURT OF COMMON PLEAS**

Of the Term April, In the year Two Thousand Fourteen

CASE NO:

<u>COUNT ONE:</u>

THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the

County aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and

present that on or about the 23rd day of February, 2009, at Allen County, Ohio,

MARKELUS Q. CARTER, whose real and true name is to the Grand Jury unknown

did purposely, and with prior calculation and design, cause the death of another, to-wit: Kenneth
Warrington;

SPECIFICATION

The Grand Jurors further find and specify that the said MARKELUS Q. CARTER had a firearm on
or about his person or under his control while committing Aggravated Murder and recklessly
displayed the firearm, brandished the firearm, indicate that he possessed the firearm, or used it to
facilitate the offense; as listed in Section 2941.145(A) of the Ohio Revised Code;

in violation of the Ohio Revised Code Section 2903.01(A), and against the peace and dignity of the
State of Ohio.



# INDICTMENT

## COUNT TWO:

AND THE JURORS OF THE GRAND JURY aforesaid, within and for the body of the County aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 23rd day of February, 2009, at Allen County, Ohio,

MARKELUS Q. CARTER, whose real and true name is to the Grand Jury unknown

did knowingly acquire, have, carry, or use a firearm or dangerous ordnance; the said MARKELUS Q. CARTER is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in a drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in a drug of abuse;

in violation of the Ohio Revised Code Section 2923.13(A)(3), a felony of the 3rd degree, and against the peace and dignity of the State of Ohio.

JUERGEN A. WALDICK
Allen County Prosecuting Attorney

**CASE NO:**

**STATE OF OHIO vs.  MARKELUS Q. CARTER**

**INDICTMENT FOR:**   Aggravated Murder with Firearm Specification, 2903.01(A)     (1 Count);
Having Weapons Under Disability, 2923.13(A)(3) – F3 (1 Count)

JUERGEN A. WALDICK - Prosecuting Attorney

A TRUE BILL

_Judith C Dulmer_
Foreperson Grand Jury

This Bill of Indictment found upon testimony sworn and sent before the Grand Jury at the request of the Prosecuting Attorney.

_Judith C Dulmen_
Foreperson Grand Jury

On this _25_ day of _April_, 20 _14_, the within named _Markelus Q. Carter_ Defendant was arraigned, and pleads _no_ guilty to this indictment.

MARGIE J. MURPHY MILLER, Clerk

By _____
        Deputy

THE STATE OF OHIO, ALLEN COUNTY.

          I, the undersigned, Clerk of the Court of Common Pleas in and for said County, do hereby certify that the foregoing is a full, true and correct copy of the original indictment, with the endorsements thereon, now on file in my office.
          WITNESS my hand and the seal of said Court, at Lima, Ohio, this _____ day of _____ , 20____

MARGIE J. MURPHY MILLER, Clerk

By _____
        Deputy

Revised Code 2923.13 states that:
          No person shall knowingly acquire, have, carry or use any firearm or dangerous ordnance if such person is under indictment for any felony of violence, or any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

Revised Code 2937.99 states that:
          Whoever fails to appear as required, after having been released pursuant to 2937.29 of the Revised Code, shall be sentenced as follows:
          (A)          If the release was in connection with a charge of the commission of a felony, he shall be fined not more than five thousand dollars or imprisoned in a state correctional institution for not less than one nor more than five years, or both.



2014 MAY 12 AM 10: 59

MARGIE *ILLER
CLER*
ALLEN C*

## IN THE COMMON PLEAS COURT OF ALLEN COUNTY, OHIO
## CRIMINAL DIVISION

STATE OF OHIO                                 CASE NO. 2014-CR-0139

    Plaintiff,                         **JUDGE REED**

vs.

MARKELUS CARTER                          <u>MOTION TO SUPPRESS</u>

    Defendant.

---

### <u>BRANCH I</u>

Now comes the Defendant, **MARKELUS CARTER,** by and through his attorneys, **RION, RION AND RION, L.P.A., INC.,** and hereby respectfully moves this Honorable Court for an order suppressing the evidence seized herein for the reasons that the officers did not have probable cause to search the residence located at 122 E. Eureka, Lima, Ohio or the 1996 Ford Explorer, and for the further reasons set forth in the attached Memorandum.

### <u>BRANCH II</u>

Now comes the Defendant, **MARKELUS CARTER,** by and through counsel, **RION, RION & RION, L.P.A., INC.,** and hereby respectfully moves this Honorable Court for an order suppressing any statements which the Defendant may have made pursuant to the above-mentioned illegal arrest for the reasons set forth in the attached Memorandum.

Further, any statements made prior to being <u>Mirandized</u> should be suppressed.

A memorandum in support is attached.

An oral hearing is hereby requested.

**EXHIBIT**

2

Tj

Respectfully submitted,

JON PAUL RION (#0067020)
RION, RION & RION, L.P.A., INC.
Suite 2150
130 West Second Street
P.O. Box 10126
Dayton, Ohio 45402
(937) 223-9133

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a copy of the motion to suppress was sent to the office of the Prosecutor on the same day of filing, via hand delivery.

JON PAUL RION
RION, RION & RION, L.P.A., INC.

Tj

## MEMORANDUM IN SUPPORT

**MAY IT PLEASE THE COURT:**

### BRANCH I

On or about February 28, 2009, officers searched the residence at 122 E. Eureka, Lima, Ohio and the 1996 Ford Explorer, VIN: 1FMDU35P7TUC49708.

### A. NO PROBABLE CAUSE FOR THAT ADDRESS

The affidavits herein do not state any reason to believe that any evidence in relation to the Defendant's arrest was located at 122 E. Eureka, Lima, Ohio or in the 1996 Ford Explorer, VIN: 1FMDU35P7TUC49708. The search warrants based upon those deficient affidavits were executed on or about February 28, 2009.

As was observed by the court in State v. Loehr, 355 So. 2d 925 at p. 926. "It is fundamental that an affidavit upon which a search warrant is based must inform the issuing magistrate of underlying facts sufficient to support a determination that evidence of a crime is **presently on the premises to be searched**. State v. Porter, 344 So. 2d 1031 (La. 1977); State v. Paciera, 290 So. 2d 681 (La. 1974). The affidavit in the present case fails to meet this requirement." (emphasis added)

This principle was amplified by the Wyoming Supreme Court in Smith v. State, 557 P.

2d 130, where the court noted the following at pages 132 and 133:

"The probable cause necessary to be shown to uphold the search warrant in this case must be directed at the proposition that there were fruits of the crime or evidence thereof in the area of structure sought to be searched, i.e., defendant's residence. There must be a showing not only that a crime has been committed but that there is evidence of the crime in the place to be searched, Frey v. State, supra. This is clearly stated in Rice v. Wolff, 8 Cir., 513 F. 2d 1280, 1285, reversed on other grounds -- U.S. --, 96 S. Ct. 3037, 49 L.Ed. 2d 1067:

...It is fundamental constitutional law, of course, that a search warrant may issue only upon a showing that there is probable cause to believe that the item sought is located **on the premises** for which the search warrant is requested. (Citations)***" (emphasis added)

And see United State v. Kirk, 8 Cir., 534 F. 2d 1262, 1280. The case of United States v. Lucarz, 9 Cir., 430 F. 2d 1051, 1055, clearly delineates the application of this principle, which is the dispositive element in this case, with the following statement:

Tj

"But of course it cannot follow in all cases, simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence ***"

Further, at page 134, the court in <u>Smith</u> stated:

"If these facts might be presumed to show anything, they might show the commission of this burglary, but the position of the State that probable cause can arise in this manner, insofar as the possibility that there is stolen property concealed within the defendant's residence, certainly does not recognize the distinction and the rule set out in <u>United States v. Lucarz</u>, <u>supra</u>; and if we are to hold otherwise we must say that probable cause for arrest involving stolen property is probable cause to search a residence of a defendant, which is demonstrably not true."

In <u>United States v. Flanagan</u>, 427 F. 2d 745, the accused was said to have committed a burglary and was found in possession of some of the contraband. The court held that those facts were insufficient to form a factual basis to conclude the additional contraband was stashed at the accused's residence.

The court in <u>Flanagan</u> noted the following at page 747:

"In this instance the affidavit revealed no factual observations by the informants that the stolen goods were at Flanagan's residence. Nor did it state any conclusions of informants to that effect. <u>The inference that the goods were, or might be, at Flanagan's residence was entirely the District Attorney's.</u>" (here, the affiant's)

***The statement, even if reliable, that a named person who is a known felon has committed a burglary, plus possession by the suspect of some of the proceeds when arrested, does not without more authorize the issuance of a warrant to search the <u>residence of the accused miles away</u>." (emphasis added)

We are reminded of the court's admonition in <u>Sgro v. United States</u>, 287 U.S. 206 at page 210:

"The proceeding by search warrant is a drastic one. Its abuse led to the adoption of the Fourth Amendment, and this, together with legislation regulating the process should be liberally construed in favor of the individual. (citing cases)"

Tj

In resolving an even more difficult factual setting, the court's observation in <u>United</u>

<u>States v. Whitlow</u>, 339 F. 2d 975 at p. 980 is equally appropriate here:

> "...An inference might be drawn that the Whitlows were engaged in some sort of
> skulduggery, but it raises no more than an anemic suspicion that the stolen
> property was located in their home sought to be searched."

The court's analysis in <u>State v. Brown</u>, 579 P. 2d 729 is relevant to the case at bar. At

pages 730 and 731, the court reasoned as follows:

> "As may be seen, there are only two relevant factual allegations in the affidavit:
> (1) the sheriff and others had seen marijuana grow in defendant's corral; and (2)
> marijuana had recently been harvested by someone in the area near defendant's
> farm home. From these two facts the magistrate was asked to draw the inference
> that marijuana was 'probably stored in one of the buildings on the farmstead.' We
> agree with the trial court that the inference may not properly be drawn."

In <u>Scott v. State</u>, 243 A. 2d 609, as here, the affiant failed to allege that contraband was

observed in the residence and the court resolved the issue as follows at pages 614 and 615:

> "There is not even an allegation in the application for the warrant, or in the
> affidavits appended thereto, that the officers, or anyone else, ever observed the
> Magnavox stereo or the Bell & Howell movie projector being taken in or out of
> appellants' home, nor is there any allegation that anyone had any information that
> these items were ever located or seen in appellants' home. The only statement
> concerning these items was contained in Detective Farran's affidavit wherein he
> stated that he observed such items in Scott's coffee shop on January 13, 1967, that
> he subsequently learned that they were stolen, but was unable to find them in
> Scott's shop when he returned the following day. There is nothing in Farran's
> affidavit connecting these items with appellants' home or even with any vehicle
> seen leaving the coffee shop and going to appellants' home. That the allegations
> of the application for the search warrant may have been sufficient to show
> probable cause to believe that John Scott was receiving stolen goods at his coffee
> shop, does not of itself constitute probable cause to believe that such stolen goods
> were subsequently taken into the Scott home. Neither does the fact, standing
> alone, that Scott or his employee, on two occasions, drove vehicles registered to
> Mrs. Scott, and containing stolen articles, to the Scott home, establish probable
> cause that such goods were subsequently taken into the home. Indeed, in
> Detective Kulle's affidavit, there is not even a faint inkling that the contents of
> these vehicles were taken into the Scott home. As Kulle had personally observed
> these vehicles at the Scott home, the inference to be drawn from the absence of
> any allegation that the stolen articles were removed into the home is that they
> were not in fact taken into the Scott home.

Tj

... We thus conclude that there were no sufficient allegations in the application for the search warrant, or in its accompanying affidavits, to show that the evidence of the crime sought to be seized was within the place to be searched."

Herein, no where is it alleged that specific property is located at a specific address or on this particular person.

Also, see <u>U.S. v. Gramlich</u>, 551 F. 2d 1359 at p. 1362, where the court concluded:

"The affidavit disclosed that for over three weeks Lerstang and his residence in Orange Beach had been under continuous surveillance. The next pertinent fact recited was that Lerstang and others had been apprehended at Point Aux Pins, over fifty miles from the residence, unloading marijuana from a Columbian freighter. Finally, it was reported that Lerstang upon his arrest admitted to the importation of the contraband. No mention was made of any suspicious activity occurring at or near the residence.

In actuality, the affidavit related only one relevant circumstance upon which the magistrate could base his probable cause determination -- the owner of the residence had been caught in the act of smuggling contraband at a place over fifty miles from his residence. This fact alone is insufficient to justify the inference that incriminating evidence existed at that residence."

Also see <u>State V. Evans</u>, 53 Cr. L. Rpt. 1085 where the court held:

"There are no facts whatsoever linking the marijuana plants to anything in the residence, which was more than 35 miles away from the garden. Standing alone, the officer's intuition or professed knowledge of the common practices of people who grow, distribute, and sell marijuana is not an additional fact supporting probable cause that *this* particular residence contained any particular evidence..."

All of the above-cited probable cause cases involved criminal activity at the **place or upon the person** sought to be searched.

## B. <u>NO PARTICULARITY</u>

The command portion of the warrant, the portion that commands the law enforcement officers to search for the following items, is too general in this case, leaving too much discretion to law enforcement officers as to what is to be seized.

Tj

This violates the principles set out in People v. Murray, 143 Cal. Reptr. 502, where too many items were generically sought.

In State v. Simpson, 64 Ohio Misc. 42, the Court in a well-reasoned decision held as follows:

"1. Pursuant to Crim. R. 41 and R.C. 2933.23 and 2933.24, property searched under authority of a search warrant must be confined to that property which is designated in the "command" portion of the warrant.

2. A search based upon sections other than the "command" portion of the warrant, or based upon the affidavit, is unlawful and the evidence obtained thereby must be suppressed."

The Court in State v. Kealoha, 613 Pacific 2d 645, criticizes general warrants.

Also, see, Brown v. Bentree Development Corp., Montgomery County Court of Appeals, Case Number 6646, which is attached herein.

At page five (5) of this decision, the Court noted the following:

"It is well settled that a court speaks only through its journal.

"An order or judgment or decision is not rendered by an oral pronouncement from the bench or in chambers, nor by mere written minutes or memoranda, nor by a notation on the trial docket or motion docket." 23 O. Jur. 3d 27-8, Court and Judges Sec. 421. Further, "judicial action of a court of record is ordinarily properly evidenced only by the record..." O. Jur. 3d, op. cit. Accordingly we hold that there was no proper evidence before the trial court of the existence of any "lawful ... order, rule, judgment, or command" which Petzold might have violated. Cf. Witkorowski v. Witkorowski, 59 Ohio App. 425 (1951)."

"A general warrant is a warrant that authorizes a general exploratory rummaging in a person's belongings. The Fourth Amendment seeks to prevent general warrants by requiring all warrants to contain a "particular description" of the things to be seized; the particularity requirement makes general searches impossible and prevents the seizure of one thing under a warrant describing another." United States v. Christine, (CA3 N.J.) 687 F. 2d 749 (1982).

Further, the U. S. Supreme Court has set forth the rule that unnamed items may be seized only where their discovery during the search is inadvertent. Coolidge v. N.H., 403 U.S.

Tj

443 (1971). Also required is that the officer must have prior justification to be in a position to view the evidence and it's evidentiary value must be immediately apparent. <u>State v. Shinault</u>, 120 Ariz. 213, 584 P. 2d 1204 (1978 app.).

An officer completely lacks justification to be looking at the backs of items seized. <u>Arizona v. Hicks</u>, 94 L.Ed. 2d 347.

Therefore, pursuant to the Fourth Amendment requirements, all the items not specifically listed **with particularity** must be suppressed.

Rule 41(C) of the Ohio Criminal Rules provides in part as follows:

"... If the judge is satisfied that probable cause for the search exists, he shall issue a warrant **identifying the property**..." (emphasis added)Likewise, the Ohio Supreme Court has required the seizure of only those items particularly described in the warrant.

In <u>State v. Porter</u>, 7 O.O. 3d 343, the Court held in its second syllabus as follows:

"... and the affidavit must particularly describe the place to be searched and <u>particularly include the articles or things to be seized</u>..." (emphasis added)

The Court in <u>Porter</u> noted the following in its opinion at page 348, to wit:

"the articles that are the subject of the search must be particularly identified and what is to be taken not left to the discretion of the officer conducting the search."

In a subsequent decision, the Court in <u>State v. Williams</u>, 9 O.O. 3d 81, stated the following at page 83:

"One primary objective of the warrant requirement is that searches deemed necessary should be as limited in scope as possible. Otherwise, the issuance of a warrant would serve as the justification for a general search, during which police officers could rummage through a person's belongings in quest of **unidentified incriminating evidence**. (emphasis added)

"We decline to contort the plain view doctrine so as to justify the seizure here under review, since we would thus be allowing this narrow exception to the warrant requirement to swallow the rule."

Tj

In <u>United States v. Gardner</u>, 537 F. 2d 861, the United States Court of Appeals for the Sixth Federal Circuit suppressed the seizure of a sawed-off shotgun where the warrant authorized a seizure of "all firearms and ammunition."

The Court characterized the authorization as "overbroad" and reasoned as follows at page 862:

> "Based on the affidavit filed in support of the warrant, probable cause existed, if at all, to search solely for a .38 caliber pistol that was allegedly used in an armed robbery and murder. The Fourth Amendment requires warrants to particularly describe the items to be seized. Warrants may not authorize general searches, nor may they permit police officers to exercise **undirected discretion in determining what to seize.**" (emphasis added)

In <u>People v. Holmes,</u> 312 N.E. 2d 748, the Illinois Appellate Court upheld the suppression of a firearm where the warrant authorized the seizure of a "weapon." The Court required greater specificity and at page 752 stated:

> "The trial court also correctly held that the search warrant was constitutionally defective in that its recital of the items to be seized did not describe the objects with sufficient particularity.
>
> The constitutional clause requiring the search warrant to describe particularly the items to be seized was inserted to preclude the previous widespread practice of issuing general search warrants. <u>People v. Elias</u>, (1925) 316 Ill. 376, 147 N.E. 472. The clause represents a recognition by our government that it is a natural right of man to be free from unreasonable searches and seizures. (See, <u>Go-Bart Co. v. United States</u>, (1931) 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374.) In determining whether a warrant describes the objects of the search sufficiently, our Supreme Court, in <u>People V. Prall</u>, (1924) 314 Ill. 518, at p. 523, 145 N.E. 610, at p. 612, stated:
>
>> A minute and detailed description of the property to be seized is not required, but the property must be so definitely described that the officer making the search will not seize the wrong property. *** [The warrant must give the officer] information by which he could select certain property within the description in the warrant and refuse to take other property equally well described in the warrant.

Tj

In our view, for the purposes of a search warrant, the expression "undetermined amount of United States Currency" is meaningless. It fails to provide any distinction between funds obtained in the robbery and any other money. Although a precise inventory may not have been possible immediately after the robbery, nevertheless a general description of the denominations and an approximate amount could have been ascertained.

Similarly, the term "weapon" is clearly too vague to justify the issuance of a search warrant. A weapon is a generic term that could apply to a variety of instruments. It is such a broad term that officers executing the warrant had unlimited discretion as to what they could seize. More information was necessary to make the search warrant constitutionally adequate."

Likewise, the court in People v. Yusko, 357 N.Y. S. 2d 176, held that the listing of 'narcotics paraphernalia' was too broad.

## C. FACTS STALE AND REMOTE

The affidavit for the search warrants herein is fundamentally defective for its failure to state when anything is alleged to have occurred.

The court in State v. DeNegris, 212 A. 2d 894, held that the recital must be of facts so closely related to the time of issuance of the warrant as to justify a finding of probable cause at the time of the issuance of the warrant. Commonwealth v. Bove, 293 A. 2d 67.

Likewise, the court in State v. Gram, 445 P. 2d 503, held that, one month delay between purported information and issuance of the warrant was fatal to the establishment of probable cause.

The cases of Ashley v. State, 241 N.E. 2d 264; and State v. McPherson, 444 P. 2d 5, hold that an eight and six days (respectively) delay is fatal for the reason that the fact that there is probable cause to believe that a person is in possession of a substance on one day does not establish probable cause to believe it is there some eight or six days later.

Tj

In short, the longer the time lapse the more improbable it becomes that a crime is occurring. The following authority is offered in support of the above proposition. Sgro v. U.S., 287 U.S. 206; Rupinski v. U.S., 4 F.2d 17; Dandrea v. U.S., 7 F.2d 861; U.S. v. Sawyer, 213 F. Supp. 38; People v. Siemieniec, 118 N.W. 2d 430 (four days); U.S. v. Bosch, 209 F. Supp. 15; State v. Gennett, 35 O. O. 2d 368. In State v. Kittredge, 585 P. 2d 423, ninety-six hours was too stale; and Roberts v. State, 506 P. 2d 613, where twenty-three days was too remote.

In Collins v. State, 34 Cr. L. 2138, the court held that the failure to allege a time in an affidavit was fatal to the warrant. Also see, Oliver v. State, 598 P. 2d 266; Pierson v. State, 338 A. 2d 571; Latten v. State, 192 S.E. 2d 562; Windsor v. State, 265 So. 2d 916.

The court in State v. O'Brien, 528 P. 2d 176, held that the reference of "recently' was insufficient to satisfy the requirement of a demonstration that probable cause **presently** exists.

In Bailey v. State, 205 S.E. 2d 532, the date the informant **called**, but not the date when he allegedly saw the narcotics, was an incurable omission.

Here, insufficient dates are alleged stating that criminal activity occurred or is **occurring** on the premises sought to be searched. Therefore, based upon the authorities cited above, the affidavits are deficient and the warrants defective.

**D.    NO FACTUAL BASIS ALLEGED**

So far we have seen that the affidavit herein failed by not alleging **present criminal activity at a particular place**. That the warrants failed to **specifically describe** that which was authorized to be seized, and, that the allegations in the affidavit fail to assert **when** they are alleged to have occurred.

Tj

Next, and **in addition** to the above, it is asserted that not only is it alleged that specific contraband is located at a specific, but the affidavit **lacks a factual basis to support the issuance** of a warrant.

Thus, contrary to the statute, the allegations contain **innocuous** conclusions, not facts. State v. Bartlett, 119 App. 483; and State v. Bean, 13 Ohio App. 3d 69.

## BRANCH II

Due to his illegal arrest, Defendant may have made some incriminating statements. Any statements made as a result of a faulty arrest must be suppressed. See: Brown v. Illinois, 45 L.Ed. 2d 416; Taylor v. Alabama, 73 L.Ed. 2d 314; and State v. Luck, 15 Ohio St. 3d 150. Further, the Defendant was not given Miranda warnings prior to being detained and asked questions and, thus, any statements made prior to being Mirandized should be suppressed.

Further, any statements made prior to being Mirandized should be suppressed.

Respectfully submitted,

JON PAUL RION
RION, RION & RION, L.P.A., INC.

Tj

MAY. -7' 14 (WED) 11:21

PAUL W. RION (1915-1971)
JOHN H. RION
JON PAUL RION
KEVIN L. LENNEN
MATTHEW J. BARBATO
NICOLE RUTTER-HIRTH
KYLE L. LENNEN
BRADLEY D. ANDERSON

*LICENSED TO PRACTICE IN OHIO & WASHINGTON, D.C.

*Law Offices*

*Rion, Rion & Rion*

*L.P.A., Inc.*

*130 West Second Street*

*Suite 2150*

*P.O. Box 10126*

*Dayton, Ohio 45402*

TELEPHONE
937-223-9133
937-223-7766

FACSIMILE
937-223-7540

E-MAIL
info@rionlaw.com

WEB SITE
www.rionlaw.com

# C O V E R

# FAX

# S H E E T

To: Clerk of Courts

Fax: 419-222-8427

From: Rion, Rion & Rion, L.P.A., Inc.

Subject: State v. Carter

Date: 5-7-14

Pages: 13 , including this cover sheet

**COMMENTS:**

Dear Clerk -

Please file

Thank you

FILED

2014 JUN 19  AM 9: 37

MARGIE HUGHY MILLER
CLERK OF COURTS
ALLEN COUNTY OHIO

## IN THE COURT OF COMMON PLEAS, ALLEN COUNTY, OHIO

STATE OF OHIO,                          :

          **Plaintiff,**              :       CASE NO.:  CR2014-0139

  **v.**                                :

                              :       Judge Jeffrey L. Reed

**MARKELUS Q. CARTER,**                  :

          **Defendant.**             :

                              :

---

## PLAINTIFF STATE OF OHIO'S MOTION TO LIMIT THE SCOPE OF SUPPRESSION HEARING AND MEMORANDUM IN SUPPORT

     Plaintiff State of Ohio, by and through the undersigned Assistant Prosecuting Attorney, hereby respectfully moves the Court for an Order limiting the scope of the hearing on defendant Markelus Carter's motion to suppress to issues relating to law enforcement's search of Carter's vehicle for the reasons set forth in the attached Memorandum in Support.

                              Respectfully submitted,

                              _____

                              ANTHONY J. MILLER #0072302
                              Assistant Prosecuting Attorney
                              Court of Appeals Bldg., Suite 302
                              204 N. Main Street
                              Lima, OH  45801
                              (419) 222-2462
                              Fax: (419) 227-1072



EXHIBIT

3

tabbies



Prosecutor:Prosecutors:Tony:Mark Carter:Carter memo re supp hearing.doc

1

**MEMORANDUM IN SUPPORT**

## I.  INTRODUCTION

In his current motion to suppress evidence, defendant Markelus Carter asks this Court to suppress all evidence obtained by the search of his home and the search of his vehicle. He also asks the Court to suppress his statements given to law enforcement. This Court has ruled on the legality of law enforcement's search of Carter's home and the legality of his statements given to law enforcement in his previous criminal cases. Accordingly, those issues are barred by the doctrine of collateral estoppel.

However, it appears upon review of the Court records in Carter's prior cases the Court has not ruled on the legality of law enforcement's search of Carter's vehicle. To the extent that the Court has not previously ruled upon that issue, the issue is not barred by collateral estoppel.

## II.  HISTORY

On February 23, 2009, at about 5:30 a.m., Kenneth O. Warrington was shot to death while entering the home of his girlfriend, Sonya Burkholder, on McKibben St. in Lima. Members of the Lima Police Department requested that Carter come to the police station to be interviewed later that morning. Carter agreed to come to the police station during a short telephone conversation with Officer Godfrey of the Lima Police Department. After waiting a while for Carter, Detective Tim Clark located Carter near his home. Detective Clark also asked Carter to come to the police station after telling Carter why he wanted to talk to him. Carter voluntarily went to

the police station with a uniformed officer to be interviewed. Officers impounded and searched Carter's vehicle while other officers interviewed Carter.

During the interview, Carter admitted to having handguns in his home located at 122 E. Eureka St. With knowledge that Carter had a prior felony drug conviction, the Lima Police Department obtained a search warrant for the home relating to the crime of having a weapon under disability. That search warrant and affidavit are attached as Exhibit 1. Officers knew by the time they searched Carter's home that a 9mm weapon was used to murder Mr. Warrington. Officers searched Carter's home and found two handguns: a .357 revolver and a 9mm Glock semiautomatic pistol. Officers also found 9mm ammunition in Carter's home that matched the type of shell casings found at the murder scene. With this new information, they obtained a second search warrant for Carter's home relating to the crime of Murder. Notably, the search warrant relating to the murder investigation expressly covers, among other things:

> A computer/s and the contents therein, which are computer hardware and software, including: electronic data processing and storage devices, computers, and computer systems internal and peripheral storage devices. Areas of the computer that contain temporary internet files, any and all email information, system configuration/registry files, saved text documents, and user information, . . .

That search warrant and affidavit are attached as Exhibit 2. Officers collected many items from the home pursuant to the two search warrants. Those items included computers, ammunition, clothing, guns, cocaine, at least one cell phone, and numerous papers.

Carter was subsequently arrested and charged with having weapons under disability and possession of cocaine. That case's common pleas court case number was CR2009-0068. Officers continued the murder investigation during the pendency of that case. That investigation included a forensic review of the computers taken from Carter's home. Upon review of the computers, in August 2009, officers found suspected child pornography and obtained a third search warrant for that material. That search warrant is attached as Exhibit 3.

On May 12, 2009, Carter's then attorney, Kenneth Rexford, filed a motion to suppress evidence in CR2009-0068.[1] That motion is attached as Exhibit 4. In that motion, Mr. Rexford requested that this Court suppress: (1) evidence found during the impound of Carter's vehicle on February 23, 2009 (Exhibit 4, pg. 1); (2) Carter's statement to the police on February 23, 2009 (Exhibit 4, pg. 1); and (3) "the direct and derivative use of evidence seized as a result of the search of his home." (Exhibit 4, pg. 2)

Mr. Rexford then filed a "Supplemental Motion To Suppress" on May 28, 2009. (Attached as Exhibit 5) In the supplemental motion, Mr. Rexford asked this Court to rule on the validity of the second search warrant (Exhibit 2), thereby incorporating the second search warrant into his original motion to suppress. He wrote on page 2 in part:

> The State also provided the defense, on an earlier date, a copy of a second affidavit, which sought leave to expand the first search because of items found during that first search. The second affidavit and warrant, however, were only enabled by virtue of the execution of the first warrant. In other words, the fruits of the

---

[1] The child pornography case remained under investigation during this time.

first, tainted warrant yielded the supporting cause for
the second warrant.

According to the Court's docket, the Court held a hearing on the defense's
motion to suppress on July 9, 2009. Carter had new counsel, Stephen Chamberlain,
by this time.  After commencing the suppression hearing, the Court continued the
suppression hearing at the request of Carter. The Court concluded the hearing on
August 20, 2009.

On August 25, 2009, the Court issued its ruling.  The Court notes in its
"Judgment Entry Motion to Suppress" filed August 25, 2009 (attached as Exhibit 6)
that it considered, among other evidence presented at the hearing, "Exhibits #1 and
#2 (copies of affidavits and search warrants)", "State's Exhibit #3 (a cruiser cam
video tape from February 23, 2009)", and "State's Exhibit #4 (a DVD recording of
defendant's statement to police)". (See Exhibit 6, pg. 2) The Court goes on to
recognize in its Entry that Carter's "motion to suppress (and supplement) address,
at least three issues: 1) the validity of the stop of defendant, 2) whether he was in
custody when he was questioned by police, and 3) whether the evidence seized
when the subsequent search warrant [sic] were executed should be suppressed
since the warrants were based on what defendant claims were illegally obtained
statements." (Exhibit 6, pg. 7) The Court then overrules the motion to suppress as it
relates to Carter's statement and overrules the motion as it relates to both search
warrants and their supporting affidavits. (Exhibit 6, pg. 12)

Officers continued to search Carter's computers while case CR2009-0068
proceeded.  The State eventually indicted Carter for pandering obscenity involving a
minor. That case was assigned case number CR2010-0352.  In that case, on January

3, 2011, Carter's attorney, Stephen Chamberlain, filed a "Motion to Suppress Evidence Obtained Via Warrant". (Exhibit 7) Mr. Chamberlain asked this Court "for an Order suppressing any and all evidence obtained by the State of Ohio via two search warrants issued for the search of the Defendant's home and computer systems." (Exhibit 7, pg. 1)

Then, on January 21, 2011, Carter, *pro se*, filed a "Supplemental Motion To Suppress Evidence Obtained Via Warrant". (Attached as Exhibit 8) Carter attached to that motion the affidavits supporting the search warrant for his home relating to the weapons under disability charge and the affidavit supporting the search warrant for his home relating to the murder investigation. He thereby integrated both search warrants for his home into the motion, just as Mr. Rexford did in his supplemental motion to suppress evidence that he filed in CR2009-0068.

On March 7, 2011, the State filed a "Motion to Limit Scope of Suppression Hearing Based on The Doctrine of Collateral Estoppel." In it, the State argued that the Court had previously heard and ruled upon the following issues in CR2009-0068: (1) whether there was sufficient probable cause to enter Carter's home; (2) whether the police conducted their interview of Carter in a manner that complied with the Constitution; and (3) whether the officers' stop of Carter while he was on his way to the police station on February 23, 2009 was proper. Therefore, the State argued, that those issues were estopped from being re-litigated in CR2010-0352. (See Exhibit 9)

The Court agreed with the State's position and issued a Judgment Entry on March 8, 2011:

The instant motion to suppress relates to the exact same facts and circumstances as the motion to suppress in CR2009 0068. The only difference is that this case involves a search warrant obtained to retrieve material from defendant's computer, which was seized pursuant to previous search warrants, dealt with in CR2009 0068. The legality of the events leading up to the first two search warrants has been determined, appealed and affirmed.

This Court finds that the doctrine of collateral estoppel bars re-litigation of the matters already decided relating to the statements taken from defendant and the issuance of search warrant for defendant' [sic] house to look for guns and for computers. (Judgment Entry, Exhibit 10, pg. 3)

* * *

Therefore, the State's motion is well taken and the Court hereby limits the scope of the hearing on defendant's motion to suppress in this case to determination of the legality of the search warrant and subsequent search of defendant's computer for illegal images. (Id., pg. 4)

The Court later overruled defendant's motion to suppress evidence obtained during Officer Delong's search of the computer for illegal pornographic images. (See Exhibit 11)

## III. DEFENDANT'S CURRENT MOTION TO SUPPRESS

### A. Applicable Law

"Although originally a civil doctrine, the federal rule of collateral estoppel has been a part of criminal jurisprudence for over seventy-five years." *State v. Day*, 1995 Ohio App. LEXIS 4847 *5-6 (8 Dist.) (unreported)(attached after exhibits), citing *U.S. v. Oppenheimer* (1916), 242 U.S. 85, 87-88, 61 L.Ed. 161, 37 S. Ct. 68. "This rule is incorporated in the Fifth Amendment's guaranty against double jeopardy and is fully applicable to the states through the Fourteenth Amendment to the

Constitution. *Id.* at *6, citing, *Ash v. Swenson* (1970), 397 U.S. 436, 445, 25 L.Ed.2d 469, 90 S. Ct. 1189.  Collateral estoppel means that, once an ultimate issue of fact has been determine by a valid and final judgment, that issue cannot again be litigated between the same parties in a future proceeding. *Day*, 1995 Ohio App. LEXIS 4847 *6, citing, *Ash* (1970), 397 U.S. 436, 445.  In order for collateral estoppel to apply, two conditions must be met. First, the issues must be identical.  Second, the parties must be the same. *Day*, 1995 Ohio App. LEXIS 4847 *6, citing, *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108.

### B.     Carter's Motion To Suppress In This Case

Carter's most recent motion to suppress evidence has two "Branches" to it. In "Branch I", Carter asks the Court to suppress all evidence obtained through the search of his vehicle impounded on February 23, 2009 and, once again, asks the Court to suppress all evidence obtained during the search of Carter's home at 122 E. Eureka St. In "Branch II", Carter, once again, asks the Court to suppress his statements made to the police on February 23, 2009 because they were the result of an "illegal arrest" and also because he was not Mirandized.

#### 1.     Branch I

To the extent that "Branch I" of Carter's motion to suppress asks the Court to suppress the search of his home, Carter's argument is barred by the doctrine of collateral estoppel for all the same reasons cited in the Court's Judgment Entry dated March 8, 2011. (See Exhibit 10.)  The identical parties litigated the validity of the search warrants for 122 E. Eureka in case CR2009-0068.  Carter was tried and convicted in that case.  He appealed that conviction and the Court's ruling on his

motion to suppress filed in that case relating the search warrants. The appeals court upheld his conviction and the Court's decision relating to the search warrants. (Id.)

Also in "Branch I" of his current motion to suppress, Carter asks the Court to suppress all evidence obtained through the stop and search of Carter's vehicle. In case CR2010-0352, Carter filed a "Supplemental Motion to Suppress Evidence Obtained Via Warrant". (Attached as Exhibit 8.) On pages two through three of that document, Carter appears to ask the Court to suppress evidence related to the search of his vehicle, stating:

> The defense further asserts that any search warrant that may have issued was tainted by inclusion of information derived from the illegal seizure of Defendant Carter **and his vehicle** and **the search thereof** . . . (Exhibit 8, pgs. 2-3)

Upon review of the Court's Judgment Entry dated March 8, 2011 (attached as Exhibit 10), it appears the Court addressed law enforcement's stop of Carter's vehicle and overruled the suppression motion to the extent Carter asked the Court to suppress the stop. However, it does not appear that the Court specifically ruled on law enforcement's search of Carter's vehicle. Accordingly, it appears, to the extent Carter's current motion to suppress asks the Court to rule on the search of his vehicle, that issue is not barred by collateral estoppel.

### 2.    Branch II

In "Branch II" of his motion to suppress, Carter asks the Court to suppress his statements made "[d]ue to his illegal arrest" and because he was not Mirandized. (Motion to Suppress, Exhibit 10, pg. 12) These arguments are also barred by the

doctrine of collateral estoppel.  Here again, these issues were litigated by the same parties and ruled upon by this Court in CR 2009-0068. (See Exhibits 5-6.)

## IV.    CONCLUSION

This Court has previously determined the legality of law enforcement's search of Carter's home and the legality of his statements given to law enforcement on February 23, 2009. Accordingly, those issues are barred by the doctrine of collateral estoppel.

It appears upon review of the records in Carter's prior criminal cases that the Court has ruled on the legality of law enforcement's stop of Carter on February 23, 2009, but has not ruled specifically on the legality of law enforcement's search of Carter's vehicle. Therefore, to the extent that the Court has not previously ruled upon that issue, the issue is not barred by collateral estoppel.

Respectfully submitted,

_____
ANTHONY J. MILLER #0072302
Assistant Prosecuting Attorney
Court of Appeals Bldg., Suite 302
204 N. Main Street
Lima, OH  45801
(419) 222-2462
Fax: (419) 227-1072

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing was served upon Jon Paul Rion and Matthew J. Barbato, Attorneys for Defendant, 130 W. Second St., Suite 2150, P.O. Box 10126, Dayton, OH 45402 this 19th day of May, 2014 by eDiscovery at https://efds.allencountyohio.com/doc and facsimile.

_____
ANTHONY J. MILLER
Assistant Prosecuting Attorney

STATE OF OHIO        IN THE CITY OF LIMA, ALLEN

-vs-             COUNTY, STATE OF OHIO

Markelus Q. Carter        SEARCH WARRANT

COMMON PLEAS COURT
FILED

2009 FEB 24  AM 10: 40

GINA C. STALEY-BURLEY
CLERK OF COURTS
ALLEN COUNTY, OHIO

TO THE SHERIFF OF ALLEN COUNTY AND ALL HIS DEPUTIES:

TO ANY POLICE OFFICER OF THE CITY OF LIMA POLICE DEPARTMENT, ALLEN COUNTY, OHIO:

     AFFIDAVIT HAVING BEEN MADE BEFORE ME BY DETECTIVE SCOTT LELAND THAT HE HAS REASON TO BELIEVE THAT IN THE RESIDENCE OF 122 E. EUREKA, WHICH IS DESCRIBED AS A 2 STORY, SINGLE FAMILY, BLUE SIDED STICK FRAMED RESIDENCE, LOCATED ON THE SOUTH SIDE OF THE 100 BLOCK OF E. EUREKA. LOCATED IN THE CITY OF LIMA, ALLEN COUNTY, STATE OF OHIO, THERE IS NOW BEING CONCEALED CERTAIN PROPERTY, FIREARM/S AND AMMUNITION WHICH ARE EVIDENCE IN THE CRIME Of POSSESSING A WEAPON WHILE UNDER DISABILITY A VIOLATION OF 2923.13 (A) 3 OF THE OHIO REVISED CODE A FELONY OF THE THIRD DEGREE.


  I AM SATISFIED THAT THERE IS PROBABLE CAUSE TO BELIEVE THAT THE PROPERTY SO DESCRIBED IS BEING CONCEALED IN THE RESIDENCE ABOVE DESCRIBED AND THAT THE FOREGOING GROUNDS FOR APPLICATION FOR ISSUANCE OF THE SEARCH WARRANT PURSUANT TO RULE 41(B) OF THE OHIO RULES OF CRIMINAL PROCEDURE EXIST.

YOU ARE HEREBY COMMANDED TO SEARCH FORTHWITH 122 E. EUREKA NAMED FOR THE PROPERTY SPECIFIED, SERVING THIS WARRANT AND MAKING THE SEARCH AT ANY TIME IN THE DAYTIME OR NIGHT, THE COURT FINDING THAT REASONABLE CAUSE HAS BEEN SHOWN AUTHORIZING THE EXECUTION OF THIS SEARCH WARRANT AT TIMES

PAGE 1 OF 3

COMMON PLEAS COURT
FILED

2009 FEB 24  AM 10: 40

OTHER THAN DAYTIME, AND IF THE PROPERTY BE FOUND THERE TO. SEIZE IT,
LEAVING A COPY OF THIS WARRANT AND A RECEIPT FOR THE PROPERTY TAKEN, AND
PREPARE A WRITTEN INVENTORY OF THE PROPERTY SEIZED, AND RETURN THIS
WARRANT AND BRING THE PROPERTY BEFORE ME WITHIN THREE (3) DAYS OF THIS
DATE, AS REQUIRED BY THE LAW.

DATED THIS 23RD DAY OF FEBRUARY , 2009

(Signature) of Judge

JUDGE OF THE ALLEN COUNTY COMMON PLEAS COURT

The term "daytime" is defined to mean the hours from 7:00 AM to 8:00 PM.  A search made "at times
other than daytime is a search made before 7:00 AM, or after 8:00 PM. A search made before 7:00 AM
or after 8:00 PM must be specifically authorized by the Judge issuing the Search Warrant, and upon the
showing of reasonable cause for the execution of the Search Warrant, at times other than "daytime" as
herein defined.

Rule 41 (B) of the Ohio Rules of Criminal Procedure provides: "a Warrant may be issued under this
Rule to search for and seize any: (1) evidence of the commission of a criminal offense; or (2)
contraband, the fruits of crime, or things otherwise possessed; or (3) weapons or other things by means
of which a crime has been committed or  reasonably appears about to be committed."

THE STATE OF OHIO,
Allen County } SS    CERTIFICATE OF COPY

I, Margie Murphy-Miller, Clerk of the Courts within and for
the aforesaid County and State, do hereby certify that the
foregoing is a true and correct copy of the original document
now on file in said Clerk's office.
IN WITNESS WHEREOF, I have here
unto set my hand and affixed the seal
of said Court of Lima, Ohio this 24
day of February A.D. 20 11

(SEAL)

MARGIE MURPHY-MILLER
Clerk
By _____ Deputy

PAGE 2 OF 3

COMMON PLEAS COURT
FILED

2009 FEB 24  AM 10:40

GINA C. STALEY-BURLEY
CLERK OF COURTS
ALLEN COUNTY OHIO

AFFIDAVIT FOR
SEARCH WARRANT

CITY OF LIMA,
ALLEN COUNTY, OHIO
AFFIDAVIT FOR SEARCH WARRANT

STATE OF OHIO
-vs-
Markelus Q. Carter

BEFORE JUDGE JEFFERY REED

IN THE ALLEN COUNTY
COURT OF COMMON PLEAS

The undersigned being duly sworn deposes and says:  That he has reason to believe that on the premises known as 122 E. Eureka Avenue, which is further described as a two (2) story, single family, Blue sided stick frame residence located on the south side of the street in the 100 block of E. Eureka Avenue and which has the numbers 122 affixed to the front of the residence and which is located in the City of Lima, Allen County, Ohio.

There is now being concealed certain property, namely:

Firearm/s, bullets, which are evidence in the crime of Possession of weapons while under disability, a violation of Ohio Revised Code 2923.13 (A) 3 a felony of the third degree.

I, Scott E Leland , Police Detective, employed by the City of Lima, Ohio Police Department hereinafter referred to as the affiant , being duly sworn do depose and state that:

1.  I have twenty-four (24) years of law enforcement experience in the states of Ohio.
I have been employed as a Lima Police Officer for over fifteen (15) years. During this time I have been assigned to investigate major crimes as part of my normal duty.

2.  On February 23rd 2008, Officers of the Lima Police Department responded to a murder at 436 E. McKibben Street in Lima, Allen County Ohio.

3.  Your affiant states that the victim Kennith Warrington was shot and killed on the west side porch of 436 E. McKibben.

4.  Your affiant states that Warrington lived at 436 E. McKibben with Sonja Burkholder.

5.  Your affiant states that Sonja Burkholder is the former girl friend and mother of the 2 children of Markelus Q Carter.

6.  Your affiant states that Markelus Q. Carter came to the Lima Police voluntarily, to speak with detectives about the incident at his ex-girl friends house.

7.  Your affiant states that during the conversation with detectives, Markelus Q. Carter confessed that he had weapons/ firearms at his residence, which is 122 E. Eureka St. in Lima, Allen County Ohio.

8.  Your affiant states that Markelus Q. Carter was convicted on the 24th day of August 1995, Allen County Common Pleas Court case CR95-06-0268, and therefore is under disability.

9.  Your affiant states that probable cause exists to search 122 E. Eureka, Lima Allen County Ohio, for evidence of the Crime of  Possession of weapons while under disability, a violation of Ohio Revised Code 2923.13 (A) 3 a felony of the third degree.

Detective S. Leland, Affiant

Sworn to before me, and subscribed in my presence,  February 23rd, 2009

Signature of Judge

Judge of the Allen County Common Pleas Court

A night time search may be conducted if the search commences any time before 7:00 AM, or after 8:00 PM., but only if the issuing Judge by appropriate provision in the Warrant, and for reasonable cause shown, authorizes the issuance of the Search Warrant at times other than daytime.  Accordingly, the affidavit should contain facts developing such "reasonable cause for a night time search" if a night time search warrant is to be requested.

THE STATE OF OHIO,  } SS  CERTIFICATE OF COPY
Allen County

(SEAL)

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in said Clerk's office.
IN WITNESS WHEREOF, I have here unto set my hand and affixed the seal of said Court of Lima, Ohio this _____ day of _____ A.D. 20__

MARGIE MURPHY-MILLER
By _____ Clerk Deputy

RULE 41(B) of the Ohio Rules of Criminal Procedure provides: "A Warrant may be issued under this Rule to search for and seize any:  (1) evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things

otherwise possessed; or (3) weapons or other things by means
of which a crime has been committed or reasonably appears
about to be committed

2C-201

**SEARCH WARRANT**

COMMON PLEAS COURT
FILED

**2009 FEB 24  AM 10: 39**

GINA C. STALEY-BURLEY
CLERK OF COURTS
ALLEN COUNTY, OHIO

THE STATE OF OHIO
IN THE CITY OF LIMA
COUNTY OF ALLEN

-vs-

Markelus Q. Carter

BEFORE JUDGE                         IN THE ALLEN COUNTY
Jeffery Reed                         COURT OF COMMON PLEAS

To any Sheriff of Allen County and all his Deputies;

To any Police Officer of the City Of Lima Police Department, Allen County Ohio

The undersigned being duly sworn deposes and says:  That he has reason to believe that on the premises known as 122 E Eureka St. which is further described as a two story, single blue sided single family dwelling, which is located on the south side of the 100 block of E. Eureka, with the numbers 122 prominently displayed on the front  located in the City of Lima, Allen County, Ohio.

There is now being concealed certain property, namely: A computer/s and the contents therein, which are computer hardware and software, including: electronic data processing and storage devices, computers and computer systems  internal peripheral storage devices. Areas of the computer that contain temporary internet files, any and all email information, system configuration/registry files, saved text documents, and user information,   Blood evidence, blood stained clothing, clothing, DNA, hand written, typed, or computer generated notes, email hard copies between involved parties, photographs, any and all other material evidence of violations set forth herein which are; Evidence in the crimes of murder in violation of 2903.02 (A) O.R.C.



I am satisfied that there is probable cause to believe that the property so described herein is being concealed at 122 E. Eureka Street in Lima Allen County Ohio and that the facts and grounds for application for issuance of the search warrant pursuant to Rule 41 (B) of the Ohio Rules Of Criminal Procedure exist.

You are hereby commanded to search forthwith the premises of 122 E. Eureka Street for the property specified, serving this warrant and making search at any time in the daytime or night, the court finding that reasonable cause has been shown authorizing the execution of this search warrant at times other than daytime, and if the property be found there seize it, leaving a copy of this warrant and a receipt for the property taken, and prepare a written inventory of the property seized and return this warrant and bring the property before me within (3) days of this date, as required by law.

Dated this 23rd day of February 2009

Signature of Judge _____

Judge Of the Allen County Common Pleas Court

The term "daytime" is defined to mean the hours from 7:00 AM to 8:00 PM. A search made "at times other than daytime is a search made before 7:00 AM, or after 8:00 PM.. A search made before 7:00 AM or after 8:00 PM must be specifically authorized by the Judge issuing the Search Warrant, and upon the showing of reasonable cause for the execution of the Search Warrant, at times other than "daytime", as herein defined.

Rule 41 (B) of the Ohio Rules of Criminal Procedure provides: "a Warrant may be issued under this Rule to search for and

THE STATE OF OHIO,
Allen County
} SS   CERTIFICATE OF COPY

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in said Clerk's office.
IN WITNESS WHEREOF, I have here unto set my hand and affixed the seal of said court of Lima, Ohio this ___ day of _____ A.D. 2011

(SEAL)

MARGIE MURPHY-MILLER
By _____ Deputy

seize  any:  (1) evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise possessed; or (3) weapons or other things by means of which a crime has been committed or reasonably appears about to be committed

COMMON PLEAS COURT
FILED

2009 FEB 24  AM 10: 39

GINA C. STALEY-GURLEY
CLERK OF COURTS
ALLEN COUNTY, OHIO

AFFIDAVIT FOR
SEARCH WARRANT

COMMON PLEAS COURT
FILED

2009 FEB 24  AM 10: 40

GINA C. STALEY-BURLEY
CLERK OF COURTS
ALLEN COUNTY, OHIO

THE STATE OF OHIO
IN THE CITY OF LIMA
COUNTY OF ALLEN

-vs-

Markelus Q. Carter

BEFORE JUDGE
Jeffery Reed

IN THE ALLEN COUNTY
COURT OF COMMON PLEAS

The undersigned being duly sworn deposes and says:  That he has reason to believe that on the premises known as 122 E Eureka St. which is further described as a two story, single blue sided single family dwelling, which is located on the south side of the 100 block of E. Eureka, with the numbers 122 prominently displayed on the front located in the City of Lima, Allen County, Ohio.

There is now being concealed certain property, namely: A computer/s and the contents therein, which are computer hardware and software, including: electronic data processing and storage devices, computers and computer systems internal peripheral storage devices. Areas of the computer that contain temporary internet files, any and all email information, system configuration/registry files, saved text documents, and user information,   Blood evidence, blood stained clothing, clothing, DNA, hand written, typed, or computer generated notes, email hard copies between involved parties, photographs, any and all other material evidence of violations set forth herein which are; Evidence in the crimes of murder in violation of 2903.02 (A) O.R.C.

I, Scott E Leland, a Police Detective, employed by the City of Lima, Ohio Police Department, hereinafter referred to as the affiant , being duly sworn do depose and state that:

1.          I have been employed in law enforcement for 24 years, as a Police Officer for sixteen (16) years by the Lima Police Department.  I am currently ranked as a detective and have been so for eight (8) years.  I have

received several hundred hours of specialized training in computer forensics, digital data recovery and Internet related investigations from the National White Collar Crime Center and The Ohio State Peace Officers Training Academy. I have had several hundred hours of advanced training in homicide/violent crimes investigations I have been the lead investigator in over 700 criminal felony investigations.

2.  I have been an investigative or law enforcement officer of the United States within the meaning of section 2510 (7) of Title 18, United States Code, in that I have in the past been empowered to investigation and to make arrests for violations of State and Federal offenses.

3.  Your affiant states that this affidavit is based on your affiants independent knowledge and observations. Your affiant says he is familiar with the circumstances described in this Affidavit.

4.  Your affiant states that on February 23rd 2009 officers of the Lima Police Department were summoned to 436 E. McKibben Street in Lima Allen County Ohio, for what turned out to be a homicide.

5.  Your affiant states that a unknown person shot and killed Kenneth Warrington while he stood on the porch on the west side of 436 E. McKibben Street.

6.  Your affiant states that Kenneth Warrington shared 436 E. McKibben with his girl friend Sonja Burkholder.

7.  Your affiant states that Sonja Burkholder is the former live in girl friend of Markelus Q Carter.  Futher, Carter and Burholder have two biological children together.

8.  Your affiant states that a search warrant based upon probable cause was issued on February 23rd 2009 by the Honorable Jeffery L Reed of the Allen County Common Pleas Court, to search the residence of 122 E. Eureka, for evidence of the crime of Possession of weapons while under disability, a violation of Ohio Revised Code 2923.13(A) 3, a felony of the 3rd degree.

9.  Your affiant states that he, as well as several other members of the Lima Police Department executed the aforementioned search warrant on February 23rd 2009 at 122 E. Eureka.  During the service of this search warrant,

detectives located several firearms, and ammunition.  Further, detectives located, in plain view, a sizable amount of a white substance that field tested positive as cocaine.  Further, in plain view on the table in the kitchen, detectives observed copies of emails from and to Sonja Burkholder, and from and to Kenneth Warrington.

10.     Your affiant states that ammunition recovered at 122 E. Eureka, is the same brand, type and caliber as the spent casings recovered just feet from the murdered body of Kenneth Warrington, at 436 E McKibben St.

11.     Your affiant states that preliminary evidence would indicate that Warrington was shot and killed with a 9mm caliber weapon.  Your affiant recovered a 9mm Glock Pistol at 122 E Eureka.

12.     Your affiant states that he made contact with the Human resources department at Husky Refinery.  Your affiant was advised that Husky Refinery HR received a call from a male person who identified themself as Mark Carter, a attorney, who was investigating Burkholder and Warrington for having a extra marital affair on company time.  Further the caller requested all email, information for both Husky Refinery employees.

13.     Your affiant states that based upon years of training and experience, the facts in this case tell him that Burkholder and Warrington were engaged in a relationship.  Further it appears as though Carter was gathering evidence of their relationship. Burkholder left Carter for Warrington.   Your affiant states that Markelus Q. Carter had the motive, means, and opportunity to commit the crime of murder.

The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all of the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

*Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Therefore it is difficult to know*

for reasonable cause shown, authorizes the issuance of the
Search Warrant at times other than daytime.  Accordingly, the
affidavit should contain facts developing such "reasonable
cause for a night time search" if a night time search warrant
is to be requested.

RULE 41(B) of the Ohio Rules of Criminal Procedure provides:
"A Warrant may be issued under this Rule to search for and
seize any:  (1) evidence of the commission of a criminal
offense; or (2) contraband, the fruits of crime, or things
otherwise possessed; or (3) weapons or other things by means
of which a crime has been committed or reasonably appears
about to be committed."

2C-201

COMMON PLEAS Court
FILED

2009 FEB 24  AM 10: 40

GINA C. STALEY-BURLEY
CLERK OF COURTS
ALLEN COUNTY, OHIO

before a search which expert is qualified to analyze the system and its data. In any event however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, pass-word protected or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive codes imbedded in the system as a "Booby-trap"), a controlled environment is essential to its complete and accurate analysis.

13. Your affiant says that based on information as provided *supra*, probable cause exists to believe that the evidence described herein is concealed inside the residence described, and that specific evidence is contained within the computer/s listed. Your affiant says that it is necessary to search said premises and further said computer/electronic data storage devices for this and additional evidence of the crime of Murder in violation of 2903.02(A) of the Ohio Revised Code.

_____
signature of affiant

_____
official title, if any

Sworn to before me, and subscribed in my presence, Feb. 23 _____, 2009

_____
signature of Judge

Judge of the Allen County Common Pleas Court

THE STATE OF OHIO, } SS   CERTIFICATE OF COPY
Allen County

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in said Clerk's office.

IN WITNESS WHEREOF, I have here unto set my hand and affixed the seal of said Court of Lima, Ohio this ____ day of _____ A.D. 20__

(SEAL)

MARGIE MURPHY-MILLER
Clerk
By _____ Deputy

A night time search may be conducted if the search commences any time before 7:00 AM, or after 8:00 PM., but only if the issuing Judge by appropriate provision in the Warrant, and

SEARCH WARRANT
DAY TIME

STATE OF OHIO

-vs-          IN THE ALLEN COUNTY COMMON PLEAS COURT

Markelus Q. Carter          SEARCH WARRANT

To the Sheriff of Allen County and all his Deputies;

To any Police Officer of the City of Lima, Allen County, Ohio

Affidavit having been made before me by Investigator Kevin L. DeLong that he has reason to believe that computer systems and data storage systems, more specifically described as;

-Aluminum Macintosh Desktop Computer
-Sony Cybershot DSC-T9 Digital Camera
-Dell PP04C Laptop
-Vantec Nextar MX External Hard Drive
-HP zv6000 Laptop
-Two Lacie External Hard Drives in Gray Cases
-Western Digital WD3200BEKT Hard Drive
-SanDisk 4GB Cruzer USB Drive
-Four Lexar 256MB Silver and Black USB Drives
-Two Lexar 128MB Silver and Black USB Drives
-Lexar 128MB Purple USB Drive
-Lexar Trio USB Drive (unknown size)
-Two Lexar 1GB USB Drives with Digital Display
-LG 1GB Black and Silver USB Drive
-SanDisk 4GB Micro SD Card
-SanDisk 1GB SD/USB Card
-Everex GS3005 Desktop Computer

are currently at the Lima Police Department's Technology Crimes Lab located at 1119 Reservoir Rd., Lima, Allen County Ohio under the authority of the Common Pleas Court of Allen County Ohio pursuant to a separate search warrant. The listed items contain the following data, namely;

(1) Digital images of child pornography or child erotica (child erotica includes all material relating to children that is sexually suggestive and/or sexually explicit) whether being contained within other files or not, including emails, compressed or encrypted files;

(2) Electronic accounting records, in the form of computer generated logs of criminal activity, including, but not limited to, diaries, journals, calendars, or computer system audit records; electronic mail messages, opened and unopened, to or from co-



conspirators, associates, or victims; electronic chat room logs, and other electronic logs. of communications with co-conspirators, associates, or victims; computer account information, including, but not limited to computer host names and Internet addresses, account names, passwords, access telephone numbers, password files, and other information about computer systems, users, accounts and related topics, and documents that show ownership and control;

(3) Electronic communications, including, but not limited to, opened and unopened E-mail messages, instant messages (IM), letters, and other electronic records, documents, correspondence, notes, memoranda, address lists, telephone directories, screen name lists, buddy lists, advertisements, calendars, diaries, journals, telexes, faxes, audio and visual tape recordings, materials or items reflecting or relating in any way to communications or contacts between individuals at 122 E. Eureka St., Lima, Allen County, Ohio and any juvenile;

(4) Material that can provide a vehicle for sexual fantasy to those persons who have a sexual interest in children and/or any and all other evidence tending to establish violation of the criminal laws of the State of Ohio, to wit: R.C. 2907 which are evidence of the crime of Pandering Sexually Oriented Matter Involving a Minor O.R.C. 2907.322A5 and Pandering Obscenity Involving a Minor 2907.321A5 and foregoing grounds for application for issuance of the search warrant pursuant to Rule 41(B) of the Ohio Rules of Criminal Procedure exist.

**YOU ARE HEREBY COMMANDED** to search forthwith the place named for the property specified, serving this warrant and making the search at any time in the daytime or night time, the Court finding that reasonable cause has been shown authorizing the execution of this Search Warrant at times other than daytime, and if the property be found there to seize it, leaving a copy of this Warrant and a receipt for the property taken and prepare a written inventory of the property seized and return this Warrant and bring the property before me within a reasonable amount of time, as required by law.

_Jeffrey L. Reed_
(signed)

_8-25-09_
(dated)

**JUDGE OF THE ALLEN COUNTY COMMON PLEAS COURT**

The term "daytime" is defined to mean the hours from 0700 to 2000 hrs.  A search made at "times other than daytime: is a search made before 0700 or after 2000 hrs. must be specifically authorized by the Judge issuing the Search Warrant, and upon the showing of reasonable cause for the execution of the Search Warrant at times other than "daytime" as herein defined.

RULE 41(B) of the Ohio Rules of Criminal Procedure provides; "A warrant may be issued under this Rule to search for and seize any; (1) evidence of the commission of a criminal offense; or (2) contraband, the fruits of crimes or things otherwise possessed; or (3) weapons or other things by means of which a crime has been committed or reasonably appears about to be committed.

**AFFIDAVIT FOR**
**SEARCH WARRANT**

STATE OF OHIO
IN THE CITY OF LIMA
COUNTY OF ALLEN

-vs-

Markelus Q. Carter

BEFORE JUDGE

Jeffery Reed in the Allen County Court of Common Pleas

The undersigned being duly sworn deposes and said:

That he has reason to believe that computer systems and data storage devices, more specifically described as;

  -Aluminum Macintosh Desktop Computer
  -Sony Cybershot DSC-T9 Digital Camera
  -Dell PP04C Laptop
  -Vantec Nextar MX External Hard Drive
  -HP zv6000 Laptop
  -Two Lacie External Hard Drives in Gray Cases
  -Western Digital WD3200BEKT Hard Drive
  -SanDisk 4GB Cruzer USB Drive
  -Four Lexar 256MB Silver and Black USB Drives
  -Two Lexar 128MB Silver and Black USB Drives
  -Lexar 128MB Purple USB Drive
  -Lexar Trio USB Drive (unknown size)
  -Two Lexar 1GB USB Drives with Digital Display
  -LG 1GB Black and Silver USB Drive
  -SanDisk 4GB Micro SD Card
  -SanDisk 1GB SD/USB Card
  -Everex GS3005 Desktop Computer

are currently at the Lima Police Department's Technology Crimes Lab located at 1119 Reservoir Rd., Lima, Allen County Ohio under the authority of the Common Pleas Court of Allen County Ohio pursuant to a separate search warrant.  The listed items contain the following data, namely;

(1) Digital images of child pornography or child erotica (child erotica includes all material relating to children that is sexually suggestive and/or sexually explicit) whether being contained within other files or not, including emails, compressed or encrypted files;

(2) Electronic accounting records, in the form of computer generated logs of criminal activity, including, but not limited to, diaries, journals, calendars, or computer system audit records; electronic mail messages, opened and unopened, to or from co-conspirators, associates, or victims; electronic chat room logs, and other electronic logs, of communications with co-conspirators, associates, or victims; computer account information, including, but not limited to computer host names and Internet addresses, account names, passwords, access telephone numbers, password files, and other information about computer systems, users, accounts and related topics, and documents that show ownership and control;

(3) Electronic communications, including, but not limited to, opened and unopened E-mail messages, instant messages (IM), letters, and other electronic records, documents, correspondence, notes, memoranda, address lists, telephone directories, screen name lists, buddy lists, advertisements, calendars, diaries, journals, telexes, faxes, audio and visual tape recordings, materials or items reflecting or relating in any way to communications or contacts between individuals at 122 E. Eureka St., Lima, Allen County, Ohio and any juvenile;

(4) Material that can provide a vehicle for sexual fantasy to those persons who have a sexual interest in children and/or any and all other evidence tending to establish violation of the criminal laws of the State of Ohio, to wit: R.C. 2907 which are evidence of the crime of Pandering Sexually Oriented Matter Involving a Minor O.R.C. 2907.322A5 and Pandering Obscenity Involving a Minor 2907.321A5 and foregoing grounds for application for issuance of the search warrant pursuant to Rule 41(B) of the Ohio Rules of Criminal Procedure exist.

And the facts establish the foregoing grounds for issuance of a Search Warrant are as follows:

The Affiant is a Police Officer with the Lima Police Department and has been since 1998. Affiant is currently assigned as an Investigator and Digital Forensic Examiner in the Lima Police Department's Technology Crime Unit. The Affiant has conducted several hundred digital investigations and examinations and has received training/certificates from the National White Collar Crime Center, Federal Bureau of Investigations, AccessData, Guidance Software, International Association for Computer Investigative Specialists, Mobile Forensics Inc., Resolution Video Forensics, Digital Intelligence, Internet Crimes Against Children Taskforce, and the High Technology Crime Investigation Association. The Affiant is also currently an Adjunct Professor at Ohio Northern University and an Instructor for Mobile Forensics Inc. where he instructs others in digital investigations/examinations.

1. Affiant states that on July 27th, 2009, he was conducting a forensic examination on a Macintosh computer seized from the residence of Markelus Carter located at 122 E. Eureka, Lima, Ohio pursuant to a Search Warrant issued by Judge Jeffery Reed of the Allen County Common Pleas Court on Feb. 23rd, 2009.

2. The Affiant was searching for evidence in the crimes of murder in violation of Ohio Revised Code 2903.02A when he saw a digital image of a minor in a state of nudity.

3. The Affiant continued the search for evidence in the crimes of murder when he saw additional images of minors in a state of nudity.

4. The Affiant halted his search until he could seek an additional search warrant for the crime of Pandering Sexually Oriented Matter Involving a Minor O.R.C. 2907.322A5 and Pandering Obscenity Involving a Minor 2907.321A5.

Based on the facts as stated above, there is probable cause to believe that there is evidence for the crime of Pandering Sexually Oriented Matter Involving a Minor O.R.C. 2907.322A5 and Pandering Obscenity Involving a Minor 2907.321A5.

There is reason to believe that there is digital evidence contained on the above listed items and they were utilized by individual or individuals at the above mentioned residence in two respects: as instrumentality's for violating state laws, and as devices used to collect and store electronic data and records that are evidence of those crimes.

Based on the evidence previously summarized in this affidavit, there is reason to believe that individual or individuals have utilized computer hardware to possess, or control obscene material, that has a minor as one of its participants and/or possess, or control any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality.

Based upon the Affiant's knowledge, searching computerized information for evidence or instrumentality's of crime commonly requires Investigators to seize most or all of a computer systems input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the systems data in a laboratory or other controlled environment. This is true because of the following:

a. The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of millions of pages of documents and pictures. Additionally, a suspect may try to conceal criminal evidence and might store it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine which files are evidence or instrumentality's of crime. This sorting process can take weeks or months, depending on the volume of data stored and it is impractical to attempt this kind of data search on site.

b. Technical requirements.  Searching computer systems for criminal evidence is a highly technical process requiring expert skills and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.  Also, data search protocols which are used to search a computer are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction, a controlled environment is essential to its complete and accurate analysis.

Affiant respectfully requests a search warrant be issued for the above listed items which are currently located at 1119 Reservoir Rd., Lima, Ohio in the Lima Police Department's Technology Crime Lab.

_____
Signature of Applicant

_____
Official Title, if any

Sworn to before me and in my presence, ___August 25___, 20_09_

_____
JUDGE OF ALLEN COUNTY COMMON PLEAS COURT

A night time search may be conducted if the search commences any time before 7:00AM or after 8:00PM, but only if the issuing Judge by appropriate provision in the Warrant and for reasonable cause shown, authorizes the issuance of the Search Warrant at times other than daytime. Accordingly, the Affidavit should contain facts developing such "reasonable cause for a night time search" if a night time search warrant is to be requested.

RULE 41(B) of the Ohio Rules of Criminal Procedure provides; "A Warrant may be issued under this Rule to search for and seize any; (1) evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise possessed; or (3) weapons or other things by means of which a crime has been committed or appears about to be committed".

**IN THE COURT OF COMMON PLEAS**
**ALLEN COUNTY, OHIO**

COMMON PLEAS COURT
FILED

2009 MAY 12  PM 2: 17

GINA C. STALEY-BURLEY
CLERK OF COURTS
ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.  CR 2009 0068 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY REED |
| | ) | |
| vs. | ) | |
| | ) | **MOTION TO SUPPRESS** |
| MARKELUS Q. CARTER, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes the Defendant, Markelus Carter, by and through his undersigned Attorney, who hereby respectfully moves this Honorable Court to suppress the direct and derivative fruits of a warrantless stop of the Defendant, as the stop of the Defendant in his vehicle was not supported by reasonable and articulable suspicion of criminal conduct and was effected without warrant, in violation of his right to be free from unreasonable searches and seizures, a right protected by both the Ohio Constitution and the United States Constitution.

Further comes the Defendant and moves this Honorable Court to also suppress the direct and derivative fruits of the custodial interrogation of Mr. Carter that immediately followed the seizure of his vehicle and person.  This custodial interrogation was conducted while Mr. Carter was in custody and did have an objective and reasonable belief that he was not free to go.  The custodial interrogation was not preceded by proper *Miranda* warnings and without any knowing, voluntary, and intelligent waiver of rights.  This custodial interrogation was conducted after Mr. Carter had asserted his right to counsel.  This custodial interrogation occurred in the context of unreasonably deceptive practices by law enforcement to sever the attorney-client contact.  The statements made were the result of an unreasonable psychological attack on Mr. Carter that intentionally destroyed his free will and erased any possibility of a voluntary statement.  As a result, the interrogation was conducted in violation of Mr. Carter's rights to freedom from

*Kenneth J. Rexford & Co., L.L.C.*                                                    1

compelled statements against interest and to the assistance of counsel, both protected by the Ohio Constitution and by the United States Constitution.

Further comes the Defendant and respectfully moves this Honorable Court to suppress the direct and derivative use of evidence seized as a result of the search of his home. The defense asserts herein and in support that the search was conducted without the proper issuance of a search warrant and without any exception to the warrant requirement. The defense further asserts that any search warrant that may have issued was tainted by the inclusion of information derived from the illegal seizure of Mr. Carter and his vehicle and the search thereof and/or by the tainted statements illegally elicited from Mr. Carter. Mr. Carter also asserts that the search and seizures exceeded the scope of the authorization included in any warrant. Mr. Carter also prays, in this respect, that any and all personal property of Mr. Carter seized by law enforcement that is neither legitimate evidence nor contraband be returned to Mr. Carter or to a person designated by Mr. Carter to receive his property.

Further comes the Defendant and respectfully moves this Honorable Court to suppress direct and derivative use of any testing conducted on any items seized through these violations of law and direct and derivative use of any testimony enabled by these violations.

A Memorandum in Support of this Motion to Suppress is attached hereto and incorporated herein by reference as if fully rewritten.

Respectfully submitted,

KENNETH J. REXFORD (#0064599)
112 North West Street
Lima, Ohio 45801
(419) 227-0048 [office]
(419) 227-0049 [fax]
kenrexford@hotmail.com
*Attorney for Defendant Carter*

*Kenneth J. Rexford & Co., L.L.C.*                                        2

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing **Motion** was sent via regular, U.S. mail this 12th day of May, 2009, to the following:

Allen County Prosecutor
Allen County, Ohio
Court of Appeals Bldg., Suite 302
204 N. Main Street
Lima, Ohio 45801

CC:   **M.Q. CARTER**

**KENNETH J. REXFORD**
*Attorney for Defendant Carter*

## MEMORANDUM IN SUPPORT

**Facts:**

On Friday, February 20, 2009, Markelus Carter met with Investigator Godfrey of the Lima Police Department to discuss whether Mr. Carter could initiate a prosecution of Sonya Burkholder for making a false alarm. On December 17, 2007, Ms. Burkholder had reported to law enforcement that Mr. Carter had committed domestic violence against her and was holding her children hostage in his home. As a result, S.W.A.T. officers had surrounded the home and ultimately took Mr. Carter into custody, charging him with Domestic Violence and Obstructing Official Business. After a transcript of Ms. Burkholder's statements and those of their daughter during a hearing for the possible issuance of a C.P.O. was presented to the prosecution, however, the Lima City Prosecutor dismissed all charges against Mr. Carter at State cost (Lima Municipal Court Case No. 07CRB04290). Mr. Carter followed up on this issue by contacting Investigator Godfrey about the possibility of raising a complaint for this false alarm.

On the morning of February 23, 2009, Markelus Carter received a call from Investigator Godfrey asking that Mr. Carter come in to the Lima Police Department. When Mr. Carter asked if progress was made as to his complaint, Investigator Godfrey was elusive. Godfrey apparently was at this point actually investigating a suspected murder that morning, one that for some reason might have Mr. Carter as a possible suspect. Mr. Carter contacted his attorney in the Burkholder matter, Kenneth Rexford, of Lima, Ohio, to ask whether said attorney should join Mr. Carter for this meeting. The end result was that Mr. Carter would contact Investigator Godfrey to discuss what was believed to be this Burkholder false alarms matter.

Before any such contact could occur, Mr. Carter was driving in Lima, Ohio, and was stopped on the street by several law enforcement cruisers, including at least one marked car and

*Kenneth J. Rexford & Co., L.L.C.*                    4

four unmarked cars. These vehicles surrounded his vehicle on all sides, including one vehicle that was driven onto public property in the grass to the right of Mr. Carter's vehicle. He was ordered out of his vehicle and was taken in a cruiser to the Lima Police Department. As a result of a confused conversation with law enforcement, Mr. Carter was under the belief that something had happened to his daughter. Law enforcement did nothing to correct that confusion but instead coaxed that belief along with vague statements about the daughter.

When Mr. Carter arrived at the police station, he was hysterical because of a fear that something had happened to his daughter but confused as to why he was surrounded, ordered out of his vehicle, and transported to the police station. He demanded to call his attorney, which was allowed.

When Mr. Carter contacted Attorney Rexford's office, he initially spoke with Leah Rexford, the office secretary. Mr. Carter was too hysterical for Mrs. Rexford to understand him, other than that something had happened to his daughter. Attorney Rexford was called into the room to handle the call.

When Attorney Rexford first spoke with Mr. Carter, the hysteria resulted in an inability for Mr. Carter and Attorney Rexford to effectively communicate, other than that something had happened to his daughter and that he had been transported to the police station. Attorney Rexford asked Mr. Carter to hand the phone to one of the officers nearby so that he could inquire as to what was going on. That officer was asked whether something had happened to Mr. Carter's daughter, and the officer stated that he did not know but that "they are taking him upstairs right now to talk to him about it." The conversation ended at that point.

A few minutes passed, with Attorney Rexford, who knows the daughter, worrying about her well-being. After a few moments, however, something seemed wrong. So, Attorney

*Kenneth J. Rexford & Co., L.L.C.* 5

Rexford called Mr. Carter back, who was eventually allowed to answer his cell phone. During that second conversation, Mr. Carter advised counsel as to what had transpired between these two calls.

In that interim, Mr. Carter had been confronted with a murder investigation. As Mr. Carter had been mislead into thinking that his daughter had been harmed, the first thought was that his daughter had been killed. The officers clarified that the victim was a married man who was having an affair with Sonya Burkholder, and that Mr. Carter was one suspect. Without *Miranda* warnings, in the face of a known demand to speak with counsel already made, law enforcement then interrogated Mr. Carter about that incident. Law enforcement elicited from Mr. Carter statements providing cause to believe that one or more firearms might be located at the residence of Markelus Carter, who was known to be under a disability as a result of a 1995 drug-related felony conviction.

During the second contact between Mr. Carter at the police station and counsel, counsel was advised by Mr. Carter of the developments and counseled Mr. Carter to assert his right to remain silent and to not consent to any searches, but to not resist any warranted searches. Mr. Carter agreed. Counsel then asked to speak with law enforcement again. At that point, law enforcement was directed to cease and desist any further interrogation of counsel's client, which did in fact cease. Furthermore, counsel advised law enforcement, in response to a question by law enforcement, that Mr. Carter would not consent to any searches or DNA collection but would not resist the same if a proper warrant were to be obtained.

Law enforcement obtained a warrant or warrants at this point or shortly thereafter, all enabling searching for and collection of various pieces of possible evidence. The defense has not

yet seen the affidavits in support of the warrant(s) and therefore does not concede that any warrant was issued with proper establishment of probable cause.

In any event, these searches also resulted in the discovery of several items, some of which are not contraband and are not evidence of a crime and should be returned to Mr. Carter. Other items of contraband and/or evidence were seized and are likely intended for use at trial by the prosecution.

## Legal Argument:

### The Initial Stop

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable and articulable suspicion that the person is engaged in criminal activity. *State v. Martin* (2004), Montgomery App. No. 20270, 2004-Ohio-2738, at ¶10, citing *Terry, supra*; *State v. Molette* (2003), Montgomery App. No. 19694, 2003-Ohio-5965, at ¶10. This is so even if the officers lack probable cause to make an arrest. *Id.* "Reasonable suspicion entails some minimal level of objective justification for making a stop -- that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones* (1990), 70 Ohio App.3d 554, 556-557, citing *Terry*, 392 U.S. at 27.

Courts determine the existence of "reasonable and articulable suspicion" by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold."

*State v. Heard* (2003), Montgomery App. No. 19323, 2003-Ohio-1047, at ¶14, quoting *State v. Andrews* (1991), 57 Ohio St.3d 86, 87-88. An investigatory detention occurs when, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or was compelled to respond to questions. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, L.Ed.2d 497; *Terry*, 392 U.S. at 16, 19.

In this case, law enforcement had no warrant for the arrest of Mr. Carter and also lacked any legitimate basis for the stop of Mr. Carter in his vehicle, let alone for the arrest of his person from the vehicle. The fact that Mr. Carter might have in theory been a person of interest in a murder investigation does not amount to reasonable and articulable suspicion that Mr. Carter committed that murder. The "reasonable and articulable suspicion" is not simply a suspicion that some crime was committed by some person but requires that the suspicion of a criminal act must be tied to the person actually stopped.

This all violated Mr. Carter's rights under both the Ohio Constitution and the United States Constitution.

### The Arrest of Mr. Carter

If the prosecution somehow provides sufficient facts to support reasonable and articulable suspicion that a traffic offense was committed, which is doubtful, the extension of that stop into a removal of Mr. Carter and transport to the police station exceeds the scope of any authorized stop for a traffic offense. That act changed the stop of the vehicle from a *Terry* stop to a full arrest. For that arrest, the prosecution would have to prove facts sufficient to establish probable cause to believe that a criminal offense was committed.

The Fourth Amendment to the United States Constitution states that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated." Law enforcement had no warrant. No exception to the warrant requirement exists.

If the prosecution argues that the arrest was actually just an extension of an investigative detention and hence a *Terry* stop, that argument should fail. It should initially fail because the stop was so intrusive as to be an arrest and not simple an investigatory detention. Further, the scope of the initial traffic stop was exceeded, such that any investigatory detention beyond that necessary for any alleged traffic infraction would need to be supported by other indicia of another crime, which was not present, at least not present to the degree necessary for the actual detention.

In either event, this detention violated Mr. Carter's rights under the Ohio Constitution and under the United States Constitution.

*The Failure to Mirandize Carter*

Law enforcement transported Mr. Carter against his will to the police department. He had been secured after his vehicle was surrounded and his person ordered out of the vehicle. No ordinary person in his place would have felt free to leave. Accordingly, the resulting interrogation of Mr. Carter was custodial.

The conversation between Carter and law enforcement was an interrogation because law enforcement asked questions and Carter answered them.

In these circumstances, law enforcement has a duty to Mirandize Mr. Carter and to secure from him, prior to the interrogation, assurance that Mr. Carter understands and waives his rights. Law enforcement did not do this. As a result, the custodial interrogation was conducted in violation of Mr. Carter's rights under both the Ohio Constitution and the United States Constitution.

*Kenneth J. Rexford & Co., L.L.C.*                                    9

*Invasion of the Right to Counsel*

"Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues." *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640; *State v. Kelly*, Greene App. No. 2004-CA-20, 2005-Ohio-305.

Once a suspect requests counsel, the police must cease their interrogation until an attorney has been provided or the suspect himself reinitiates conversation. *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85. If a suspect in a criminal investigation requests counsel at any time during questioning, he is not subject to further interrogation until a lawyer is provided or the suspect reinitiates the interrogation. *Arizona v. Roberson* (1988), 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704; *Edwards v. Arizona* (1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386. However, the invocation of the right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371. If the statement is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. *Id.* As its rationale for such a rule of law, the United States Supreme Court stated:

"We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who -- because of fear, intimidation, lack of linguistic skills, or a variety of other reasons -- will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. '[F]ull comprehension of the rights to remain silent and

*Kenneth J. Rexford & Co., L.L.C.*                    10

request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.' A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although Edwards provides an additional protection -- if a suspect subsequently requests an attorney, questioning must cease -- it is one that must be affirmatively invoked by the suspect." (Citation omitted.) Id. at 460-461, 114 S.Ct. at 2356, 129 L.Ed.2d at 372.

Mr. Carter clearly invoked the right to counsel. After he did this, he actually did contact counsel. However, before he and counsel could complete any conversation, Mr. Carter was whisked upstairs to be interrogated.

These actions violated Mr. Carter's rights under the Ohio Constitution and under the United States Constitution.

### *Deception and the Right to Counsel*

Law enforcement was only enabled in the interrogation of Mr. Carter because of deception used to break the link of communication between suspect and counsel.

When Mr. Carter contacted Attorney Rexford, law enforcement physically ended the conversation by removing Mr. Carter from the area while Attorney Rexford was asking one of the officers for clarification of what was going on. That act, alone, was sufficient deprivation of the right to counsel to warrant suppression of the direct and derivative fruits of the custodial interrogation.

However, law enforcement also would have been "stopped," in a sense, by a demand from Mr. Carter's counsel, had law enforcement not knowingly deceived Mr. Carter's counsel into the belief that Mr. Carter was simply being advised as the father of a victim of crime (his

daughter) as to the welfare of his daughter.  That deception briefly stalled counsel's work, for a sufficient time to elicit the statements.

In *State v. Luck* (1984), 15 Ohio St.3d 150, the Ohio Supreme Court deemed this sort of deceptive practice to be sufficient to warrant suppression of any resulting statement, as a direct violation not only of the Fifth Amendment right to remain silent but also as a direct violation of the Sixth Amendment Right to Counsel.:

> "The "confession" in the instant case consists of statements made to Holmok by defendant Luck on the day of her arrest. Appellee asserts that all of these statements must be suppressed because they were obtained by Holmok as a direct result of the violation of Luck's right to the assistance of counsel under the Sixth Amendment to the United States Constitution. The trial court, after "viewing the entirety of * * * [the] circumstances," concluded that the defendant's right to counsel had been violated and granted the defendant's motion to suppress. We are in complete agreement with the trial court's determination." Id., at 154.

The act in *Luck* that amounted to the "violation of Luck's right to the assistance of counsel" was "active deception." Id., at 155.

> "...defendant Luck, immediately after her arrest, requested her husband to contact an attorney on her behalf. Holmok, who was one of the arresting officers, was well aware of Mrs. Luck's request when he later accepted Duff's phone calls at the Lakewood Police Station. Holmok told Duff that he could not speak to Mrs. Luck on the phone; and, despite his knowledge of Luck's desire to retain counsel, Holmok deliberately elicited incriminating statements from Luck without telling her that her husband had retained Duff as her attorney.(fn1) This behavior, when coupled with Holmok's assurances to Duff that he would not talk to or interrogate Mrs. Luck, amounts to active deception that is clearly violative of Luck's right to counsel." Id., at 155.

The action of law enforcement in this case, in making statements designed to convince counsel that Mr. Carter was not a suspect but rather the father of an injured or dead child being so advised, was unconscionably deceptive and calculated to create a temporary break in the attorney-client communication, sufficient to enable the interrogation to resume.

This conduct violated Mr. Carter's rights under the Ohio Constitution and under the United States Constitution.

*Deception and Voluntariness*

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of coerced, involuntary confessions, whether the statements were coerced by physical or psychological pressure. ***Rogers v. Richmond*** (1961), 365 U.S. 534, 541, and ***State v. Chase*** (1978), 55 Ohio St.2d 237, 246. When making a determination of whether the confession was voluntarily made, the trial court considers the "totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." ***State v. Edwards*** (1976), 49 Ohio St.2d 31, paragraph two of the syllabus, certiorari granted and judgment vacated on other grounds by (1978), 438 U.S. 911, and ***State v. Brooks***, 75 Ohio St.3d 148, 154, 1996-Ohio-134, reconsideration denied (1996), 75 Ohio St.3d 1452.

These cases establish that psychological mistreatment can be sufficient to coerce a confession by erasing the ability of the person to make a voluntary decision. This case involves that sort of psychological mistreatment. Mark Carter, who suffers from anxiety attacks and takes medication for the same, experienced a nearly complete nervous breakdown because law enforcement created an illusion in his mind that his daughter had been murdered. In so doing, unconscionable law enforcement tactics rendered any statements involuntary.

This conduct violated Mr. Carter's rights under the Ohio Constitution and under the United States Constitution.

*Kenneth J. Rexford & Co., L.L.C.*                                           13

*Warrant Issues*

The defense has not had an opportunity to review the evidence presented to the judiciary in support of any warrants in this case.  However, the defense does herein assert that no warrant issued with sufficient probable cause justifying the same.  Further, the defense asserts that law enforcement exceeded the scope of the warrants by searching areas not properly allowed by the warrant(s) and/or by seizing evidence that the warrants did not authorize.

The defense also asserts that law enforcement has taken into custody and refuses to release several items of personal property that are not contraband and that are not legitimate evidence of any crime.  As a result, suppression of this property from evidence should be granted and the property returned to the dominion and control of Mark Carter.

*Derivative Use*

The defense also asserts, as to each violation described above, a right to suppression of any evidence gathered because of information derived from tainted evidence or statements. ***Wong Sun v. United States*** (1963), 371 U.S. 471.

*Briefing Not Exclusive*

The arguments raised in this briefing are not to be deemed a complete assertion of rights and/or legal bases for Mr. Carter's claims.  All claims raised herein and in the main portion of this motion are specifically asserted, and all assertions of rights are meant to include reliance both upon the relevant provisions of the Ohio Constitution as well as relevant provisions of the United States Constitution.  Additionally, as to each and every argument, Mr. Carter asserts his right to the exclusionary remedy.

Respectfully submitted,

_____

**KENNETH J. REXFORD** (#0064599)

*Attorney for Defendant Carter*

***Kenneth J. Rexford & Co., L.L.C.***                                                      14

COMMON PLEAS COURT
FILED

### IN THE COURT OF COMMON PLEAS
### ALLEN COUNTY, OHIO

2009 MAY 20  PM 9: 29

OHIO OFFICIAL JOURNAL
CLERK OF COURTS
ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | **CASE NO. CR 2009 0068** |
| | ) | |
| Plaintiff, | ) | **JUDGE JEFFREY REED** |
| | ) | |
| vs. | ) | **SUPPLEMENT TO** |
| | ) | **MOTION TO SUPPRESS** |
| MARKELUS Q. CARTER, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes the Defendant, Markelus Carter, by and through his undersigned Attorney, who hereby respectfully offers to this Honorable Court supplemental argument concerning the Motion to Suppress filed earlier in this case.

On May 19, 2009, the State of Ohio filed a State's Supplemental Response to Defendant's Demand for Discovery, wherein the State served upon the defense a copy of the original affidavit forming the basis of the authorized search of Mr. Carter's home. That affidavit includes two (2) general bases for the requested warrant.

The main basis is embodied in Paragraphs 6-8, wherein Detective S. Leland states that Markelus Q. Carter had "confessed that he had weapons/firearms at his residence" as a person who was under a disability. Although the affiant claims that Mr. Carter "came to the Lima Police voluntarily, to speak with detectives about the incident at his ex-girlfriends house," Mr. Carter is claiming that being surrounded by several marked and unmarked cruisers, ordered from his vehicle, and transported against his will to the LPD offices was not a "voluntary" act factually and that the lack of *Miranda* warnings negated the "voluntariness" as a matter of law.

In any event, the affidavit establishes that these statements were the sole basis of the conclusion, in Affiant's paragraph no. 9, that inside the house would be found evidence of crime.

*Kenneth J. Rexford & Co., L.L.C.*   1

20 /1/

The State may counter that the information provided in paragraphs 1-5 also provided probable cause for the issuance of the warrant.  However, neither the United States Constitution nor the Ohio Constitution would be satisfied is a search of a residence was deemed justified merely because a person was murdered and that person happened to live with another person who is related to a third person, who owns the house sought to be searched.

The State also provided to the defense, on an earlier date, a copy of a second affidavit, which sought leave to expand the first search because of items found during that first search. That second affidavit and warrant, however, were only enabled by virtue of the execution of the first warrant.  In other words, the fruits of the first, tainted warrant yielded the supporting cause for the second warrant.

Therefore, this further discovery has established that the search of Mr. Carter's home was, in fact, a direct fruit of the tree of the interrogation of Mr. Carter without *Miranda* warnings.  Accordingly, the sole remaining question is whether the interrogation was in fact "custodial" as claimed by the defense.  The State has not briefed this issue.

Respectfully submitted,

KENNETH J. REXFORD (#0064599)
112 North West Street
Lima, Ohio 45801
(419) 227-0048 [office]
(866) 611-7448 [fax]
*Attorney for Defendant Carter*

## CERTIFICATE OF SERVICE

A copy of the foregoing **Motion** was sent via regular, U.S. mail this 26th day of May, 2009, to the Allen County Prosecutor, Allen County, Ohio, Court of Appeals Bldg., Suite 302, 204 N. Main Street, Lima, Ohio 45801; CC: M.Q. CARTER

KENNETH J. REXFORD
*Attorney for Defendant Carter*

*Kenneth J. Rexford & Co., L.L.C.*

2

COMMON PLEAS COURT

09 AUG 25  PM 3: 02

CLERK OF COURTS
ALLEN COUNTY, OHIO

# IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

|  |  |  |
|---|---|---|
| | * | |
| STATE OF OHIO, | * | CASE NO. CR2009 0068 |
| Plaintiff | * | |
| ~v~ | * | JUDGMENT ENTRY |
| | | MOTION TO SUPPRESS |
| MARKELUS Q. CARTER, | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter comes on for consideration of the motion to suppress filed on behalf of the defendant on May 12, 2009.  Defendant filed a supplement to his motion to suppress on May 28, 2009.  The suppression hearing was initially scheduled for June 15, 2009.  However, on June 3, 2009 defense counsel filed an "Emergency Motion…" for appointment of new counsel for the reason that then counsel was probably a witness with respect to the motion.  The Court appointed new counsel for defendant on June 3, 2009.  The suppression hearing was eventually continued to July 9, 2009.  On July 9, 2009 the suppression hearing began.  The suppression hearing was concluded on August 20, 2009.  Defendant appeared in open court at all hearings, represented by attorney F. Stephen Chamberlain.  Assistant prosecuting attorney M. Daniel Berry represented the State of Ohio at the hearings.  The Court gave both sides ample opportunity to present evidence

634pl

1



CR09 5698

and argument.  The Court has carefully reviewed all exhibits admitted at the hearing, including State's Exhibits #1 and #2 (copies of affidavits and search warrants), State's Exhbit #3 (a cruiser cam video tape from February 23, 2009), State's Exhibit #4 (a DVD recording of defendant's statement to police) and State's Exhibit #5 (a phone message slip).

The general facts involved in this case and pertinent to the motions to suppress are as follows:

On February 23, 2009 Investigator Charles Godfrey was assigned to investigate a homicide of Ken Warrington.  Warrington was allegedly linked to a Sonja Burkholder, who was the mother of defendant's children.  Godfrey testified that defendant was a "person of interest" in the murder investigation.  Godfrey was acquainted with defendant from a previous matter.

Godfrey testified that he called defendant's cell phone and spoke to defendant.  Godfrey asked defendant to come in and talk to him.  Godfrey said defendant told him he would come to the police station and talk.  Defendant did not show up.

Godfrey called defendant again and said something happened to "Ken" and told defendant it did not sound good.  Godfrey also checked on defendant's vehicle registration and relayed the vehicle information to officers to locate defendant's car.  Godfrey said he wanted to talk to defendant.

Detective Tim Clark testified that he was investigating the death of Ken Warrington.  Clark said he spoke with Godfrey and was advised of

2

CR09 5699

Godfrey's attempts to have defendant come in to talk with police. Godfrey had given Clark the defendant's license number. Clark said he drove by defendant's house. He saw a black Ford Explorer at or near the defendant's house, but it did not have the plate number that Godfrey had given him. Someone was near the Explorer, but Clark did not know it was defendant. In the meantime, Sergeant Leary also drove by and said the black Explorer belonged to defendant. Defendant was observed to enter the black Explorer and drive away. Police followed him. It turned out that the Explorer had two different license plates on it. When Clark was able to see the rear plate, he saw it contained the plate number that Godfrey had relayed. Armed with the knowledge that defendant's Explorer had two different plates on it, Clark radioed for a marked cruiser to stop defendant.

Defendant was stopped near the intersection of Spring Street and Jamison Avenue. Defendant exited his vehicle and was patted down. Clark arrived. Clark said defendant was not under arrest. Clark testified that he wanted to talk to defendant. Clark testified that he advised defendant that police wanted to talk to him about a homicide. Clark said defendant became very emotionally upset and cried out something about his daughter being injured. Clark said defendant was very upset and out of control. Clark said he told defendant that his daughter was fine. Clark testified that defendant was taken to the police station in a police cruiser. The stop of defendant and what occurred during the stop in recorded on State's Exhibit #3. State's Exhibit #3 shows the stop of defendant's Explorer. Nothing outside of the cruiser can be heard. At first, defendant is calm, then all of the sudden he is

3

CR09 5700

seen hopping and obviously upset.  When he gets in the cruiser and is transported to the police station, he can be heard crying things like, "Hurry, hurry!" "My baby..." "Someone tell me something..."  The patrolman driving the cruiser repeatedly told defendant he did not know what this was about, only that he was instructed to stop him.

After defendant arrived at the police department, he was interviewed by Godfrey and Kleman.  The interview was recorded on State's Exhibit #4.  The DVD last a little over two hours.  The two hours includes an interrogation, telephone call from defendant's attorney, calls from other persons, gun shot residue examination/test and a lengthy period when defendant was left alone to use his phone.

Kleman testified that defendant was interviewed as a "person of interest" in the murder investigation.  Kleman said defendant was not under arrest and was free to go.  The first thing Kleman says to defendant on the DVD is that after they talk to him, he can go home.  Kleman testified, and the DVD shows, that defendant was quite calm until the last few minutes of the interview.  On the DVD, defendant acknowledges that he "now" knew why he was at the police station.  He confessed to having a gun or gun[s] at his house for protection.   Defendant said if it was the gun that police wanted, they could have it.  During the interview, defendant had access to his cell phone and, in fact, actually used his phone.  Defendant's attorney called during the interview. The attorney, Kenneth Rexford, spoke to Kleman during the interview, and defendant was allowed to speak to his attorney on the phone for several minutes.   After speaking to Rexford, Defendant told

4

CR09 5701

Godfrey that his attorney told him what his rights were.   Kleman told Rexford that "we're not going to hold [defendant]."  After speaking to Rexford, Kleman said they would do a gun shot residue test on defendant.

Detective Scott Leland was also assigned to investigate the death of Warrington.  He swore out two affidavits and drafted two search warrants for 122 E. Eureka (defendant's home).  This Court issued two warrants (State's Exhibits #1 and #2).  The warrants were executed and property was seized that is basis for the charges in the instant case.

Defendant's "family attorney," Kenneth Rexford, testified.  Rexford testified that defendant called him early on February 23, 2009 and told him that Godfrey had contacted him.  Rexford said he told defendant to go ahead and talk to Godfrey.

Later that morning, defendant called Rexford again, this time crying and hard to understand.  Rexford learned that defendant was at the police station and worries that something had occurred involving defendant's daughter.  Rexford was advised by someone on the phone who he believed to be a police officer that defendant was being taken upstairs to talk. Rexford testified that he assumed it was in reference to defendant's daughter.  Rexford said he was never told that defendant was being interrogated regarding alleged criminal behavior.

Rexford testified that he later called defendant and found out that defendant was being interrogated.  Rexford spoke to Detective Kleman and told Kleman to cease the interrogation and decline to consent to any search.

CR09 5702

However, Rexford said he told Kleman that defendant would not resist any order for a gun shot residue examination.

Rexford testified that later, when he learned that a search warrant was being sought, he sent a note (State's Exhibit #5) to police because he thought there could be "loose" black powder in defendant's house. He said he sent the message to "protect" law enforcement personnel.

Defendant also testified at the hearing. He testified that when Godfrey first contacted him on the morning of February 23, 2009, he thought it was in reference to a case involving the mother of his children. He testified that he told Godfrey that he would come in to talk after an appointment he had that morning. He said Godfrey was very insistent that he come in immediately. Defendant testified that Godfrey told him that something had happened to "Ken" and that defendant thought he was referring to Kenneth Rexford. Defendant testified that he intended to go to the police station on his own.

Defendant testified that, thereafter, police stopped him. Defendant testified that Clark told him that police wanted to talk to him about a murder on McKibben Street. Defendant said his daughter lived on McKibben and he asked Clark, "Where is my daughter?" Defendant said Clark would not answer, so he figured something happened to his daughter and became very upset.

Defendant said he was "moved" or "directed" to the police cruiser and taken to the police station. He called Attorney Rexford and handed the phone to the officer.

CR09 5703

The motion to suppress (and supplement) address, at least three issues:  1) the validity of the stop of defendant, 2) whether he was in custody when he was questioned by police, and 3) whether the evidence seized when the subsequent search warrant were executed should be suppressed since the warrants were based on what defendant claims were illegally obtained statements.

The stop of defendant's Explorer was obviously without a warrant.  On a motion to suppress evidence, the state must prove that any warrantless search and seizure fits within one of the defined exceptions. *Lago v. Twomey* (1972), 404 U.S. 477.  One of these exceptions is set forth in *Terry v. Ohio* (1968), 392 U.S. 1. In *Terry, supra,* the court found that the governmental concern in curtailing crime would permit a police officer in appropriate circumstances to "approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." The standard for an investigatory stop as set forth in *Terry, supra,* is less than probable cause. For this exception to apply, the officer must have a reasonable belief, based upon specific and articulable facts, that the individual was engaged in or about to be engaged in criminal behavior. *Terry, supra; United States v. Cortez* (1981), 449 U.S. 411; *State v. Freeman* (1980), 64 Ohio St.2d 291.In deciding this case, this Court must look at the totality of the circumstances to determine whether the officers had reasonable suspicion to stop defendant.  *Maumee v. Weisner* (1999), 87 Ohio St.3d 295.  The test for determining whether a traffic stop was legitimate is whether the police officer possessed an articulable reasonable suspicion that

CR09 5704

a traffic violation had occurred or was occurring. See *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660.

While defendant's vehicle had two different plates on it, which is a minor violation of traffic law (see R.C. 4549.08), the real reason defendant was stopped was because officers wanted to talk to him as a "person of interest" in a homicide investigation. It is clear that police were investigating a suspected homicide of a man with whom defendant's ex-girlfriend and mother of his children was involved. Godfrey had asked defendant to come in to talk. After defendant said he would come in, he never did. Given what Godfrey knew about defendant's connection to the victim of an alleged murder, at the very least, defendant was a potential witness. The officers were legitimately interested in obtaining some information from defendant. Allowing police to make a reasonable stop of a potential witness to a crime has been upheld. *State v. Topps*, 2nd Dist. No. 22281, 2008 -Ohio- 4021.

In any event, the U.S. Supreme Court in *Whren v. United States* (1996), 517 U.S. 806, and the Ohio Supreme Court in *Dayton v. Erickson* (1996), 76 Ohio St.3d 3, paragraph one of the syllabus, both held that any violation of the law justifies stopping a vehicle regardless of the officer's subjective reasons for doing so. Both courts eschewed the "reasonable officer" test for justifying traffic stops, which focuses on whether a reasonable officer would have stopped the vehicle for the violation in question. Instead, both courts embraced an objective "could" test (the name

8

CR09 5705

used by the Ohio Supreme Court in *Erickson*), which focuses on whether any police officer *could* lawfully stop the car. *Id.* at 11-12, 665 N.E.2d 1091; *Whren*, 517 U.S. 818. In fact, the Ohio Supreme Court concluded that:

> "where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, *including* a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." (Emphasis added.) *Erickson,* 76 Ohio St.3d at 11-12.

Therefore, where a driver is violating a traffic law, that in itself provides justification for the stop, and no further balancing is required, unless the search or seizure was conducted in an extraordinary manner, such as with deadly force. *Whren v. United States* (1996), 517 U.S. 806. Defendant could have been stopped for a violation of R.C. 4549.08. There is no evidence that the stop of defendant was conducted in an extraordinary manner. The intent of the officers is irrelevant where a traffic violation occurred. *State v. Blandin,* 3rd Dist. App. No. 1-06-107, 2007 -Ohio- 6418. As long as a police officer has "probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." *Erickson,* 76 Ohio St.3d at 11-12, 665 N.E.2d 1091. See *State v. Phillips,* 3rd Dist. No. 8-04-25, 2006 -Ohio- 6338. Even minor traffic violations provide reasonable suspicion to stop a car. See *State v. Purcell* (Feb. 27, 1998), Erie App. No. E-97-056; *State v. Deichler* (May 23, 1997), Erie App. No. E-96-091.

CR09 5706

After the stop, it appears from the evidence presented on the DVD that defendant was not forced to go to the police station. The DVD shows a very upset and anxious defendant getting into the cruiser and wanting the officers to "hurry" to the station so he could find out what, if anything, happened to his daughter. The Court finds defendant agreed to go to the police station voluntarily.

At the station, defendant was interrogated. During the interview, defendant was calm, coherent, appeared to understand the officer's questions, and was never officially admonished of his *Miranda*[1] rights. As noted above, on the DVD he told Godfrey that his attorney had advised him of his rights. Defendant was not threatened or promised anything in exchange for his statement. Defendant had the opportunity to consult with his lawyer while he was at the police station.

In determining whether *Miranda's* protections apply to an individual subjected to police questioning, it must be ascertained whether the individual was "in custody." Custody is a prerequisite for triggering the duty to give Miranda warnings. *Beckwith vs. United States* (1976), 425 U.S. 341, 346. If the individual was not "in custody," there can be no "custodial interrogation," and, thus, *Miranda 's* protections do not attach.

The U.S. Supreme Court has stated that where a defendant was ***not*** under arrest but was questioned at the police station after arriving there voluntarily, a *Miranda* warning was not required, since "such a noncustodial situation is not converted into one in which *Miranda* applies simply because *

---

[1] *Miranda v. Arizona* (1966), 384 U.S. 436.

CR09 5707

* * the questioning took place in a coercive environment." *Oregon v. Mathiason* (1977), 429 U.S. 492, 495.

"The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings." *Minnesota v. Murphy* (1984), 465 U.S. 420, at 431.

Based on the evidence presented at the hearings and on the DVD, the Court finds defendant was never in custody and, thus, the need for *Miranda* warnings was not triggered.

"In deciding whether the defendant's confession in this case was involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat and inducement." See *State v. Edwards*(1976), 49 Ohio St.2d 31; *State v. Barker*(1978), 53 Ohio St.2d 135; *State v. Brewer*(1990), 48 Ohio St.3d 50,58.

"The [United States] Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined...'" *United States v. Ferrara* (C.A. 2, 1967), 377 F.2d 16, 17. In order to find that a confession was not voluntary, there must be coercive police activity. See *Colorado v. Connely* (1986), 479 U.S. 157. "A statement is voluntary if it is 'the product of an essentially free and

11

CR09 5708

unconstrained choice by the maker…'" *State v. Wiles* (1991), 59 Ohio St.3d 71, 81.

Considering the totality of the circumstances in this case, the Court finds the State has proven the defendant was not in custody, voluntarily agreed to speak to officers after having the opportunity to talk to his lawyer and knowing what the subject of the investigation was and, thus, that it was not necessary that he be given the warnings of *Miranda.* The Court does *not* believe, based on all of the evidence, especially the DVD and the conduct of both defendant and Kleman after speaking to Rexford, that Rexford told Kleman to cease the interrogation. There was no coercion, threats or promises by officers. After the interview, defendant left.

The search warrants were not based on illegally obtained evidence. The affidavits for the warrants provided a substantial basis upon which the Court could make an independent determination that probable cause existed for the search. *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

Therefore, defendant's motion to suppress is ***overruled***.

August 25, 2009

THE STATE OF OHIO,⎫
    Allen County⎭ SS   CERTIFICATE OF COPY

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in said Clerk's office.

    IN WITNESS WHEREOF, I have here unto set my hand and affixed the seal of said Court of Lima, Ohio this 5th day of May A.D. 2014

**(SEAL)**

MARGIE MURPHY-MILLER

By _____ Deputy
          Clerk

_Jeffrey L. Reed_

Jeffrey L. Reed, Judge

12

CR09 5709

FILED
COMMON PLEAS COURT

2011 JAN -3 AM 8: 01

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

1  F. Stephen Chamberlain
   Ohio Bar No. 0039815
2  Attorney at Law
   101 North Elizabeth St., Ste. 503
3  P.O. Box 1314
   Lima, OH  45802-1314
4  567-712-2863 Office
   419-235-5125 Cell
5  866-596-1146 FAX
   ChamberlainLaw@woh.rr.com
6

7  Attorney for Defendant

8

9         IN THE COURT OF COMMON PLEAS FOR ALLEN COUNTY, OHIO

                         CRIMINAL DIVISION
10

11

   STATE OF OHIO,              ) Case No.: CR2010 0352
12                             )
            Plaintiff,         ) MOTION TO SUPPRESS EVIDENCE
13                             ) OBTAINED VIA WARRANT
                               )
14       vs                    )
                               )
15 MARKELUS Q. CARTER,         )
                               )
16          Defendant          )
   _____)

17

18      Now comes the Defendant and, moves this Court for an Order

19 suppressing any and all evidence obtained by the State of Ohio

20 via two search warrants issued for the search of the Defendant's

21 home and computer systems.

22      Defendant states that there are two (2) warrants at issue

23 in this case, the first was issued on or about February 23, 2009

24 for the search of property located at 122 East Eureka Street,

25 Lima, OH.  The second is for a search of computer systems and


                    MOTION TO SUPPRESS - 1

22 ypt

Furthermore, the information necessary to establish probable cause must be timely, as probable cause must exist at the time the warrant is issued. "Because probable cause has a durational aspect, at least some temporal reference point is necessary to ascertain its existence." *United States v. Hython*, 443 F. 3d. 480, 486 (6th Cir. 2006) (citations omitted). If there is no time reference contained in the affidavit for the allegations, "there is absolutely no way to begin measuring the continued existence of probable cause." *Id.*

Defendant further moves for leave to supplement argument in this matter since the search warrant challenged herein is based, in part, upon specialized knowledge that requires the assistance of an expert in computer forensics.

WHEREFORE, Defendant moves for a suppression of evidence seized as the result of the warrants set forth above.

Respectfully submitted



F. Stephen Chamberlain
0039815

THE STATE OF OHIO,
Lake County } SS    CERTIFICATE OF COPY

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in...

... WHEREOF, I have here ... fixed the seal ... of said Court of Lake, ... 5 day of May A.D. 2014

(SEAL)

MARGIE MURPHY-MILLER

MOTION TO SUPPRESS - 1

PROOF OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Allen County Prosecutor's Office at the Court of Appeals Building, 204 North Main Street, Lima, Ohio 45801 by regular U.S. Mail on December 31, 2010.

_____
F. Stephen Chamberlain

MOTION TO SUPPRESS - 1

IN THE COURT OF COMMON PLEAS FOR ALLEN COUNTY, OHIO

CRIMINAL DIVISION

FILED
COMMON PLEAS COURT

2011 JAN 21 AM 11:38

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. : CR2010 0352 |
| | ) | |
| Plaintiff, | ) | SUPPLEMENTAL MOTION TO |
| | ) | SUPPRESS EVIDENCE |
| vs | ) | OBTAINED VIA WARRANT |
| | ) | |
| MARKELUS Q. CARTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now comes Defendant Markelus Q. Carter ("Defendant"), in pro se and by and through counsel, and hereby files his supplement to his previous motion, filed December 31, 2010, for this Court to issue an Order suppressing any and all evidence obtained by the State of Ohio via two search warrants (attached) for the search of the Defendant's home and computer, which were seized in violation of the Fourth Amendment of the United States Constitution, and Article I, Section 14 of the Ohio Constitution.

In addition to the (2) warrants specified in Defendant's December 31, 2010 motion to suppress, the first being issued on or about February 23, 2009 for the search of property located at 122 East Eureka Street, Lima, Ohio (Exhibit A), and the second warrant having been issued on or about August 25, 2009 for a search of computer systems and data storage devices of the Defendant (Exhibit C), there likewise exists an additional warrant having also been issued on February 23, 2009 (Exhibit B).





Defendant hereby respectfully moves this Court to suppress the direct and derivative fruits of a warrantless stop of the Defendant, as the stop of the Defendant in his vehicle was not supported by reasonable and articulable suspicion of criminal conduct and was effected without warrant, in violation of his right to be free from unreasonable searches and seizures, a right protected by both the United States Constitution and the Ohio Constitution.

Further comes the Defendant and moves this Court to also suppress the direct and derivative fruits of the custodial interrogation of Defendant Carter that immediately followed the seizure of his vehicle and person. This custodial interrogation was conducted while Defendant was in custody and did have an objective and reasonable belief that he was not free to go. The custodial interrogation was not preceded by proper *Miranda* warnings and without any knowing, voluntary, nor intelligent waiver of rights. This custodial interrogation was conducted after Defendant Carter had asserted his right to counsel. This custodial interrogation occurred in the context of unreasonably deceptive practices by law enforcement to sever the attorney-client contact. The statements made were the result of an unreasonable psychological attack on Defendant Carter that intentionally destroyed his free will and erased any possibility of a voluntary statement. As a result, the interrogation was conducted in violation of Defendant Carter's rights to freedom from compelled statements and to the assistance of counsel, both protected by the United States Constitution and the Ohio Constitution.

Further comes the Defendant and respectfully moves this Court to suppress the direct and derivative use of evidence seized as a result of the search of his home. The defense asserts herein and in support that the search was conducted without the proper issuance of a search warrant and without any exception to the warrant requirement. The defense further asserts that

2

any search warrant that may have issued was tainted by the inclusion of information derived from the illegal seizure of Defendant Carter and his vehicle and the search thereof and/or by the tainted statements illegally elicited from Defendant Carter also asserts that the search and seizure exceeded the scope of the authorization included in any warrant.

Further comes the Defendant and respectfully moves this Court to suppress the direct and derivative use of evidence seized as a result of the search of his home – most specifically the computer equipment and files seized as product of the expanded warrant of February 23, 2009 (Exhibit B) – where the issuance of said warrant was based upon mere suspicion that failed to contravene the plain view doctrine.  Additionally, the e-mail documents set forth as the premise to justify the fishing expedition search employed by the police were insufficient to form the basis of probable cause and failed to meet the "immediately apparent" requirement of the plain view doctrine.  Defendant Carter thereby requests, in this respect, that any and all personal property of Defendant Carter seized by law enforcement that is neither legitimate evidence or contraband be returned to Defendant Carter or to a person designated by Defendant Carter to receive his property.

Further comes the Defendant and respectfully moves this Court to suppress direct and derivative use of any testing conducted on any items seized through these violations of law and direct and derivative use of any testimony enabled by these violations.

**Facts:**

On Friday, February 20, 2009, Markelus Q. Carter met with Investigator Godfrey of the Lima Police Department to discuss whether Defendant Carter could initiate a prosecution of Sonya Burkholder for making a false alarm.  On December 17, 2007, Ms. Burkholder had

3

reported to law enforcement that Defendant Carter had committed domestic violence against her and was holding her children hostage in his home.  As a result, S.W.A.T. Officers had surrounded the home and ultimately took Defendant Carter into custody, charging him with domestic violence and obstructing official business.  After a transcript of Ms. Burkholder's statements and those of their daughter during a hearing for the possible issuance of a civil protection order ("CPO") was presented to the prosecution, however, the Lima City Prosecutor dismissed all charges against Defendant Carter at State cost (Lima Municipal Court Case No. 07CRB04290).  Defendant Carter followed up on this issue by contacting Investigator Godfrey about the possibility of raising a complaint for this false alarm.

On the morning of February 23, 2009, Defendant Carter received a call from Investigator Godfrey asking that Defendant Carter come in to the Lima Police Department.  When Defendant Carter asked if progress was made as to his complaint, Investigator Godfrey was elusive.  Godfrey apparently was at this point actually investigating a suspected murder that morning, one that for some reason might have Defendant Carter as a possible suspect.  Defendant Carter contacted his attorney in the Burkholder matter, Kenneth Rexford, of Lima, Ohio, to ask whether said attorney should join Defendant Carter for this meeting.  The end result was that Defendant Carter would contact Investigator Godfrey to discuss what was believed to be this Burkholder false alarm matter.

Before any such contact could occur, Defendant Carter was driving in Lima, Ohio, and was stopped on the street by several law enforcement cruisers, including at least one marked car and four unmarked cars.  These vehicles surrounded his vehicle on all sides, including one vehicle that was driven onto public property in the grass to the right of Defendant Carter's

4

vehicle. He was ordered out of his vehicle and was taken in a cruiser to the Lima Police

Department. As a result of a confused conversation with law enforcement, Defendant Carter was

under the belief that something had happened to his daughter. Law enforcement did nothing to

correct that confusion but instead coaxed that belief along with vague statements about

Defendant Carter's daughter.

Although Investigator Godfrey maintained the pretense that he only wanted Defendant

Carter to come to the police station to simply discuss matters relevant to the welfare of

Defendant Carter's daughter, at all times material to this suppression case the police viewed

Defendant Carter as a homicide suspect and his apprehension by the police equates to an illegal

arrest and unlawful custodial detention.

Within a very short time frame from when Investigator Godfrey contacted Defendant

Carter with his request to come in to the police station for questioning, Godfrey checked the

Ohio Law Enforcement Gateway ("OLEG") to ascertain any vehicles registered in Defendant

Carter's name. Upon having acquired information of the vehicle registered to Defendant Carter,

Godfrey relayed the information to detectives and police officers of the P.A.C.E. Unit (Allen Co.

Common Pl. Ct. No. CR2009 0068, Motion to Suppress Tr. p. 6, ln. 3-11). Lima Police

Department Sergeant Leary then drove by the 122 East Eureka Street, Lima, Ohio residence of

Defendant Carter, observed the 1996 black Ford in the driveway, and contacted his fellow

officers so that an unlawful police stop could be made once Defendant Carter exited his

residence in his vehicle. Consequently, upon Defendant Carter having then voluntarily

proceeded to the police station to meet with Godfrey under the pretense of something detrimental

having occurred to his daughter, Defendant Carter was ultimately stopped at the intersection of

5

Spring Street and Jamison Avenue and ordered from his vehicle at gunpoint, searched, apprehended and then transported to the Lima, Ohio police station. At no point did any of the arresting police officers inform Defendant Carter that he was not under arrest, nor did Defendant Carter have any reason to believe that he was not under custodial detention and free to leave of his own accord.

Most specifically, Investigator Godfrey testified that Defendant Carter was regarded as "the only person of interest" in the homicide of Ken Warrington (Allen Co. Common Pl. Ct. No. CR2009 0068, Motion to Suppress Tr. p. 4, ln. 7-11). Further, at Defendant Carter's arraignment on the weapons under disability charge – contrived charges that the police used as a fishing expedition based upon the mere suspicion of Defendant Carter as a suspect in the homicide case beyond the scope of the initial warrant (Exhibit A) so as to illegally expand the initial warrant to justify confiscation of Defendant Carter's computer equipment, files, and records (Exhibit B) – Lima Police Detective Phillip Kleman stated in open court that Defendant Carter was a "suspect" in the homicide of Mr. Warrington. Consequently, where Defendant Carter was regarded as a homicide suspect based upon nothing more than mere suspicion by police, solely because he had a previous relationship and children by Mr. Warrington's former girlfriend Sonya Burkholder, probable cause at no time existed to warrant the unlawful custodial detention, interrogation, statements, and ultimate search and seizure of any property from Defendant Carter's person, vehicle, or that property located at 122 East Eureka Street, Lima, Ohio.

When Defendant Carter arrived at the police station, he was hysterical because of fear that something had happened to his daughter but confused as to why he was surrounded, ordered out of his vehicle, and transported to the police station. He demanded to cal his attorney, which

6

was allowed.

When Defendant Carter contacted Attorney Rexford's office, he initially spoke with Leah Rexford, the office secretary. Defendant Carter was too hysterical for Mrs. Rexfort to understand him, other than that something had happened to his daughter. Mrs. Rexford then called Attorney Rexford into the room to handle the call.

When Attorney Rexford first spoke with Defendant Carter, the hysteria resulted in an inability for Defendant Carter and Attorney Rexford to effectively communicate, other than that something had happened to Defendant Carter's daughter and that he had been transported to the police station. Attorney Rexford asked Defendant Carter to hand the phone to one of the officers nearby so that he could inquire as to what was going on. That officer was then asked whether something had happened to Defendant Carter's daughter, and the officer stated that he did not know but that "they are taking him upstairs right now to talk to him about it." The conversation ended at that point.

A few minutes passed, with Attorney Rexford, who knows Defendant Carter's daughter, worrying about her well-being. After a few moments, however, something seemed wrong. So, Attorney Rexford called Defendant Carter back, who was eventually allowed to answer his cell phone. During that second conversation, Defendant Carter advised counsel as to what had transpired between these calls.

In that interim, Defendant Carter had been confronted with a murder investigation. As Defendant Carter had been mislead into thinking that his daughter had been harmed, the first thought was that his daughter had been killed. The officers clarified that the victim was a married man who was having an affair with Sonya Burkholder, and that Defendant Carter was a

7

suspect. Without Miranda warnings, in the face of a known demand to speak with counsel already made, law enforcement then interrogated Defendant Carter about that incident. Law enforcement elicited from Defendant Carter statements providing cause to believe that one or more firearms might be located at the residence of Defendant Carter, who was known to be under a disability as a result of a 1995 drug-related felony conviction.

The interrogation of Defendant Carter by the Lima, Ohio Police Department, resulting in Defendant Carter's state of hysteria, was the product of Defendant Carter's unlawful detention that thereby formed the basis of coerced statements in violation of his *Miranda* rights.

During the second contact between Defendant Carter at the police station and Attorney Rexford, Attorney Rexford was advised by Defendant Carter of the developments and counseled Defendant Carter to assert his right to remain silent and to not consent to any searches, but to not resist any warranted searched. Defendant Carter agreed. Attorney Rexford then asked to speak with law enforcement again. At that point, law enforcement was directed to cease and desist any further interrogation of Attorney Rexford's client. Furthermore, Attorney Rexford advised law enforcement, in response to a question by law enforcement, that Defendant Carter would not consent to any searches or DNA collection but would not resist the same if a proper warrant were to be obtained.

Law enforcement obtained open ended, "laundry list" warrants at that point or shortly thereafter, all enabling fishing expedition searches for and collection of various pieces of possible evidence unsupported by verifiable facts set forth in the affidavits the warrants were conditioned upon. Wherefore, said fishing expedition warrants were issued in violation of Defendant Carter's *Miranda* rights relevant to any alleged coerced information supporting

8

probable cause of weapons under disability, nor were the warrants issued with proper establishment of probable cause otherwise.

**Legal Argument:**

*The Initial Stop*

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable and articulable suspicion that the person is engaged in criminal activity. *State v. Martin* (2004), Montgomery App. No. 20270, 2004-Ohio-2738, at ¶10, citing *Terry*, supra; *State v. Molette* (2003), Montgomery App. No. 19694, 2003-Ohio-5965, at ¶10. This is so even if the officers lack probable cause to make an arrest. Id. "Reasonable suspicion entails some minimal level of objective justification for making a stop – that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones* (1990), 70 Ohio App.3d 554, 556-557, citing *Terry*, 392 U.S. At 27.

Courts determine the existence of "reasonable and articulable suspicion" by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard* (2003), Montgomery App. No. 19323, 2003-Ohio-1047, at  at ¶14, quoting *State v. Andrews* (1991), 57 Ohio St.3d 86, 87-88. An investigatory detention occurs when, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or was compelled to respond to questions.  United States v. Mendenhall, 446 U.S. 544,

533, 100 S.Ct. 1870, L.Ed.2d 497; *Terry*, 392 U.S. At 16, 19.

In this case, law enforcement had no warrant for the arrest of Defendant Carter and also lacked any legitimate basis for the stop of Defendant Carter in his vehicle, let alone for the arrest of his person from the vehicle. The fact that Defendant Carter might have in theory been a person of interest in a homicide investigation does not amount to reasonable and articulable suspicion that Defendant Carter committed that murder. The "reasonable and articulable suspicion" is not simply a suspicion that some crime was committed by some person but requires that the suspicion of a criminal act must be tied to the person actually stopped.

This all violated Defendant Carter's rights under both the United States and the Ohio Constitution.

### The Arrest of Defendant Carter

Although the prosecution is unable to provide sufficient facts to support reasonable and articulable suspicion that a traffic offense was committed, even had there existed reasonable and articulable suspicion of a mere traffic offense the extension of that stop into a removal of Defendant Carter and transport to the police station exceeds the scope of any authorized stop for a traffic offense. That act changed the stop of the vehicle from a *Terry* stop to a full arrest. For that arrest, the prosecution would have to prove facts sufficient to establish probable cause to believe that a criminal offense was committed.

The Fourth Amendment to the United States Constitution states that "the right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Law enforcement had no warrant. No exception to the warrant requirement exists.

10

If the prosecution argues that the arrest was actually just an extension of an investigative detention and hence a *Terry* stop, that argument should fail.  It should fail because the stop was so intrusive as to be an arrest and not simply an investigatory detention.  Further, the scope of the initial traffic stop was exceeded, such that any investigatory detention beyond that necessary for any alleged traffic infraction would need to be supported by other indicia of another crime, which was not present, at least not present to the degree necessary for the actual detention.

In either event, this detention violated  Defendant Carter's rights under the United States and the Ohio Constitution.

### The Failure to Mirandize Defendant Carter

Law enforcement transported Defendant Carter against his will to the police department. He had been secured after his vehicle was surrounded and his person ordered out of the vehicle. No ordinary person in his place would have felt free to leave.  Accordingly, the resulting interrogation of Defendant Carter was custodial.

The conversation between Defendant Carter and law enforcement was an interrogation because law enforcement asked questions and Defendant Carter answered them.

In these circumstances, law enforcement has a duty to Mirandize Defendant Carter and to secure from him, prior to the interrogation, assurance that Defendant Carter understands and waives his rights.  Law enforcement did not do this.  As a result, the custodial interrogation was conducted in violation of Defendant Carter's rights under both the United States and the Ohio Constitution.

### Invasion of the Right to Counsel

"Whether a statement was made voluntarily and whether an accused voluntarily,

11

knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues." *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640; *State v. Kelly*, Greene App. No. 2004-CA-20, 2005-Ohio-305.

Once a suspect requests counsel, the police must cease their interrogation until an attorney has been provided or the suspect himself reinitiates conversation. *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85. If a suspect in a criminal investigation requests counsel at any time during questioning, he is not subject to further interrogation until a lawyer is provided or the suspect reinitiates the interrogation. *Arizona v. Roberson* (1988), 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 378, 386. However, the invocation of the right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371. If the statement is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. *Id.* As its rationale for such a rule of law, the United States Supreme Court stated:

> "We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who – because of fear, intimidation, lack of linguistic skills, or a variety of other reasons – will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion
>
> is
>
> inherent in the interrogation process.' A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although Edwards provides an additional protection – if a suspect subsequently requests an attorney, questioning must cease – it is one that must be affirmatively invoked by the suspect."

(Citation omitted.) *Id.* at 460-461, 114 S.Ct. at 2356, 129 L.Ed.2d at 372.

12

Defendant Carter clearly invoked the right to counsel. After he did this, he actually did contact counsel. However, before he and counsel could complete any conversation, Defendant Carter was whisked upstairs to be interrogated.

These action violated Defendant Carter's rights under both the United States and the Ohio Constitution.

### Deception and the Right to Counsel

Law enforcement was only enabled in the interrogation of Defendant Carter because of deception used to break the link of communication between suspect and counsel.

When Defendant Carter contacted Attorney Rexford, law enforcement physically ended the conversation by removing Defendant Carter from the area while Attorney Rexford was asking one of the officers for clarification of what was going on. That act, alone, was sufficient deprivation of the right to counsel to warrant suppression of the direct and derivative fruits of the custodial interrogation.

However, law enforcement also would have been "stopped," in a sense, by a demand from Defendant Carter's counsel, had law enforcement not knowingly deceived Defendant Carter's counsel into the belief that Defendant Carter was simply being advised as the father of a victim of a crime (his daughter) as to the welfare of his daughter. That deception briefly stalled counsel's work, for a sufficient time to elicit the illegally obtained statements.

In *State v. Luck* (1984), 15 Ohio St.3d 150, the Ohio Supreme Court deemed this sort of deceptive practice to be sufficient to warrant suppression of any resulting statement, as a direct violation not only of the Fifth Amendment right to remain silent but also as a direct violation of the Sixth Amendment Right to Counsel:

13

"The 'confession' in the instant case consists of statements made to Holmok by defendant Luck on the day of her arrest. Appellee asserts that all of these statements must be suppressed because they were obtained by Holmok as a direct result of the violation of Luck's right to the assistance of counsel under the Sixth Amendment to the United States Constitution. The trial court, after 'viewing the entirety of * * * [the] circumstances,' concluded that the defendant's right to counsel had been violated and granted the defendant's motion to suppress. We are in complete agreement with the trial court's determination." *Id.*, at 154.

The act in Luck that amounted to the "violation of Luck's right to the assistance of counsel" was "active deception." *Id.*, at 155.

"...defendant Luck, immediately after her arrest, requested her husband to contact an attorney on her behalf. Holmok, who was one of the arresting officers, was well aware of Mrs. Luck's request when he later accepted Duff's phone calls at the Lakewood Police Station. Holmok told Duff that he could not speak to Mrs. Luck on the phone; and, despite his knowledge of Luck's desire to retain counsel, Holmok deliberately elicited incriminating statements from Luck without telling her that her husband had retained Duff as her attorney. (fn.1) This behavior, when coupled with Holmok's assurances to Duff that he would not talk to or interrogate Mrs. Luck, amounts to active deception that is clearly violative of Luck's right to counsel." *Id.*, at 155.

The action of law enforcement in this case, in making statements designed to convince counsel that Defendant Carter was not a suspect but rather the father of an injured or dead child being so advised, was unconscionably deceptive and calculated to create a temporary break in the attorney-client communication, sufficient to enable the interrogation to resume.

This conduct violated Defendant Carter's rights under both the United States and the Ohio Constitution.

*Deception and Voluntariness*

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of coerced, involuntary confessions, whether the statements were coerced by physical or psychological pressure. *Rogers v. Richmond* (1961), 365 U.S. 534, 541, and *State v.*

14

*Chase* (1978), 55 Ohio St.2d 237, 246.  When making a determination of whether the confession was voluntarily made, the trial court considers the "totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, paragraph two of the syllabus, certiorari granted and judgment vacated on other grounds by (1978), 438 U.S. 911, and *State v. Brooks*, 75 Ohio St.3d 148, 154, 1996-Ohio-134, reconsideration denied (1996), 75 Ohio St.3d 1452.

These cases establish that psychological mistreatment can be sufficient to coerce a confession by erasing the ability of the person to make a voluntary decision.  This case involves that sort of psychological mistreatment.  Defendant Carter, who suffers from anxiety attacks and takes medication for the same, experienced a nearly complete nervous breakdown because law enforcement created an illusion in his mind that his daughter had been murdered.  In so doing, unconscionable law enforcement tactics rendered any statements involuntary.

The conduct violated Defendant Carter's rights under both the United States Constitution and the Ohio Constitution.

*Warrant Issues*

The defense does assert that no warrant submitted to the judiciary herein was issued with sufficient probable cause justifying the same.  Further, the defense asserts that law enforcement exceeded the scope of the warrants by searching areas not properly allowed by the warrants and/or by seizing evidence that the warrants did not authorize.

The defense also asserts that law enforcement has taken into custody and refuses to

15

release several items of personal property that are not contraband and that are not legitimate evidence of any crime. As a result, suppression of this property from evidence should be granted and the property returned to the dominion and control of Defendant Carter.

*Derivative Use*

The defense also asserts, as to each violation described above, a right to suppression of any evidence gathered because of information derived from tainted evidence or statements. Wong Sun v. United States (1963), 371 U.S. 471.

*Plain View Doctrine*

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures and requires that probable cause support any warrant issued. The Fourth Amendment is applicable to the State through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 376 U.S. 643 (1961). Additionally, this constitutional protection against unreasonable search and seizures is provided in Article I, Section 14 of the Ohio Constitution.

The United States Supreme Court has defined probable cause to search as that "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Further, the doctrine of probable cause is "a practical, nontechnical conception" based on "common-sense conclusions about human behavior." *Id.* 462 U.S. at 231 (internal quotation marks and citations omitted). Consequently, this case demonstrates that the police clearly lacked probable cause relevant to the search and seizure of the personal property of Defendant Carter – most specifically the inventory of computer equipment and files – from the property located at 122 E. Eureka, Lima, Ohio (Exhibit B).

16

Further, in order to determine if proper grounds have been established for the issuance of a search warrant, the issuing magistrate is called upon to make a practical, common sense decision whether, given all of the circumstances set forth in the affidavit, including the veracity and the basis of knowledge of individuals supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found at the place to be searched. *Id.*, 462 U.S. at 238-239.

Here the warrant of February 23, 2009 (Exhibit A) was expanded based upon the alleged "plain view" observation of the police of a series of e-mail textual context that purportedly provided probable cause to consider Defendant Carter as a homicide suspect (Exhibit B). As a result of said contrived "plain view" observation of the police, the illegal warrant was issued resulting in the confiscation of the computer equipment resulting in the present charges against Defendant Carter.

The plain view observation of the police unequivocally fails on numerous constitutional standards controlling illegal search and seizures. Of obvious note is that in order for the plain view doctrine to be applicable, the illegality or criminality of the evidence must be immediately apparent. *State v. Young* (2001), 146 Ohio App.3d 245, 765 N.E.2d 938. Secondly, the police affiant failed to present the alleged e-mails before the judiciary and the warrant was thereby illegally issued based on affiant's conclusary statements that lacked facts sufficient to support probable cause to regard Defendant Carter as a homicide suspect. *United States v. Vigeant* (1st Cir. 1999), 176 F.3d 565, 569. Most importantly, the initial warrant (Exhibit A) was issued based upon facts that supported seeking evidence of a weapons under disability charge. Therefore, a stack of business records, papers, or e-mail documents, that failed to demonstrate being

17

"immediately apparent" as evidence of weapons under disability, was beyond the scope of the warrant and the expanded warrant to seize Defendant Carter's computer equipment and related computer files subsequently issued as a product thereof was illegal requiring the fruits thereof to be suppressed.

Here the police lacked probable cause to believe that the e-mail documentation amounted to evidence relevant to a weapons under disability charge that formed the basis of the initial search warrant. Even if given the ludicrous theory that the e-mail textual content were objects in plain view from that distance required to recognize, at first observation, the documentation as not related to the weapons under disability scope of the initial search warrant; the alleged incriminating nature of the e-mail textual content could not possibly be ascertained without conducting some further search of the object and therefore the plain view doctrine cannot justify its seizure or thereby provide probable cause to have issued the expanded warrant to confiscate Defendant Carter's computer equipment and files. *Minnesota v. Dickerson* (1993), 508 U.S. 366, 113 S.Ct. 2130 (*quoting: Arizona v. Hicks* (1987), 480 U.S. 321, 107, S.Ct. 1149, 94 L.Ed.2d 347).

Moreover, no probable cause existed where – aside from police affiant's mere far fetched conclusory allegation that textual content of plain view e-mail documentation somehow demonstrated collusion or complicity on behalf of Defendant Carter relevant to the homicide of Mr. Warrington – affidavit did not support a common sense association between a plain-sight observation of a stack of e-mail documentation being immediately apparent of evidence associated with a weapons under disability charge. *United States v. Klump* (2nd Cir. 2008), 536 F.3d 113, 120. Basically, affidavit was based on no more than conclusions and vague

18

generalizations of ghost textual contents of e-mail documentation, and failed to contain facts sufficient to persuade the judge to whom the request was made that the affiant had sufficient facts at his disposal to establish a probable cause link between content of e-mail documentation and complicity of Defendant Carter as homicide suspect. *State v. Bartlett* (1964), 119 Ohio App.3d 483, 200 N.E.2d 660, 28 Ohio Op.2d 90.

*Briefing Not Exclusive*

The arguments raised in this briefing are not to be deemed a complete assertion of rights and/or legal basis for Defendant Carter's claims. All claims raised herein and in the main portion of this motion are specifically asserted, and all assertions of rights are meant to include reliance both upon the relevant provisions of the United States Constitution as well as relevant provisions of the Ohio Constitution. Additionally, as to each and every argument, Defendant Carter asserts his right to the exclusionary remedy.

Respectfully submitted,

Markelus Q. Carter
P.O. Box 4501 (618999)
Lima, Ohio 45802-4501

Certificate Of Service

I hereby certify that a copy of the foregoing was sent to counsel for plaintiff at 204 North Main Street, Lima, OH, 45801 via first class mail on this 19th day of January, 2011.

Markelus Q. Carter

THE STATE OF OHIO,  } SS      CERTIFICATE OF COPY
Allen County  }

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in said Court ...

... IN ... WHEREOF, I have here ... ... my name and affixed the seal of said Court of Lima, Ohio this ___ day of _____ A.D. 20__

(SEAL)

MARGIE MURPHY-MILLER
Clerk

By _____

AFFIDAVIT FOR
SEARCH WARRANT

STATE OF OHIO                                           IN THE CITY OF LIMA,
-vs-                                                    ALLEN COUNTY, OHIO
Markelus Q. Carter                          AFFIDAVIT FOR SEARCH WARRANT

BEFORE JUDGE JEFFERY REED                          IN THE ALLEN COUNTY
                                                   COURT OF COMMON PLEAS

The undersigned being duly sworn deposes and says:  That he has reason to believe that on the
premises known as 122 E. Eureka Avenue, which is further described as a two (2) story, single
family, Blue sided stick frame residence located on the south side of the street in the 100 block
of E. Eureka Avenue and which has the numbers 122 affixed to the front of the residence and
which is located in the City of Lima, Allen County, Ohio.

There is now being concealed certain property, namely:

Firearm/s, bullets, which are evidence in the crime of Possession of weapons while under
disability, a violation of Ohio Revised Code 2923.13 (A) 3 a felony of the third degree.

I, Scott E Leland , Police Detective, employed by the City of Lima, Ohio Police Department
hereinafter referred to as the affiant , being duly sworn do depose and state that:

1.  I have twenty-four (24) years of law enforcement experience in the states of Ohio.
I have been employed as a Lima Police Officer for over fifteen (15) years. During this time I
have been assigned to investigate major crimes as part of my normal duty.

2.  On February 23rd 2008, Officers of the Lima Police Department responded to a murder at 436
E. McKibben Street in Lima, Allen County Ohio.

3.  Your affiant states that the victim Kennith Warrington was shot and killed on the west side
porch of 436 E. McKibben.

4.  Your affiant states that Warrington lived at 436 E. McKibben with Sonja Burkholder.

5.  Your affiant states that Sonja Burkholder is the former girl friend and mother of the 2
children of Markelus Q Carter.

EXHIBIT

A

6.  Your affiant states that Markelus Q. Carter came to the Lima Police voluntarily, to speak with detectives about the incident at his ex-girl friends house.

7.  Your affiant states that during the conversation with detectives, Markelus Q. Carter confessed that he had weapons/ firearms at his residence, which is 122 E. Eureka St. in Lima Allen County Ohio.

8.  Your affiant states that Markelus Q. Carter was convicted on the 24th day of August 1995, Allen County Common Pleas Court case CR95-06-0268, and therefore is under disability.

9.  Your affiant states that probable cause exists to search 122 E. Eureka, Lima Allen County Ohio, for evidence of the Crime of Possession of weapons while under disability, a violation of Ohio Revised Code 2923.13 (A) 3 a felony of the third degree.

Detective S. Leland, Affiant


Sworn to before me, and subscribed in my presence, _February 23rd, 2009

Signature of Judge

Judge of the Allen County Common Pleas Court



A night time search may be conducted if the search commences any time before 7:00 AM, or after 8:00 PM., but only if the issuing Judge by appropriate provision in the Warrant, and for reasonable cause shown, authorizes the issuance of the Search Warrant at times other than daytime.  Accordingly, the affidavit should contain facts developing such "reasonable cause for a night time search" if a night time search warrant is to be requested.

RULE 41(B) of the Ohio Rules of Criminal Procedure provides: "A Warrant may be issued under this Rule to search for and seize any: (1) evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things



## AFFIDAVIT FOR
## SEARCH WARRANT

THE STATE OF OHIO
IN THE CITY OF LIMA
COUNTY OF ALLEN

-vs-

Markelus Q. Carter

BEFORE JUDGE                                    IN THE ALLEN COUNTY
Jeffery Reed                                    COURT OF COMMON PLEAS


The undersigned being duly sworn deposes and says: That he has reason to believe that on the premises known as 122 E Eureka St. which is further described as a two story, single blue sided single family dwelling, which is located on the south side of the 100 block of E. Eureka, with the numbers 122 prominently displayed on the front located in the City of Lima, Allen County, Ohio.

There is now being concealed certain property, namely: A computer/s and the contents therein, which are computer hardware and software, including: electronic data processing and storage devices, computers and computer systems internal peripheral storage devices. Areas of the computer that contain temporary internet files, any and all email information, system configuration/registry files, saved text documents, and user information,   Blood evidence, blood stained clothing, clothing, DNA, hand written, typed, or computer generated notes, email hard copies between involved parties, photographs, any and all other material evidence of violations set forth herein which are; Evidence in the crimes of murder in violation of 2903.02 (A) O.R.C.

I, Scott E Leland, a Police Detective, employed by the City of Lima, Ohio Police Department, hereinafter referred to as the affiant , being duly sworn do depose and state that:

1.          I have been employed in law enforcement for 24 years, as a Police Officer for sixteen (16) years by the Lima Police Department.  I am currently ranked as a detective and have been so for eight (8) years.  I have

EXHIBIT

B

COPY

received several hundred hours of specialized training in computer forensics, digital data related investigations from the National White Collar Crime Center and The Ohio State Peace Officers Training Academy. I have had several hundred hours of advanced training in homicide/violent crimes investigations I have been the lead investigator in over 700 criminal felony investigations.

2.          I have been an investigative or law enforcement officer of the United States within the meaning of section 2510 (7) of Title 18, United States Code, in that I have in the past been empowered to investigation and to make arrests for violations of State and Federal offenses.

3.          Your affiant states that this affidavit is based on your affiants independent knowledge and observations. Your affiant says he is familiar with the circumstances described in this Affidavit.

4.          Your affiant states that on February 23rd 2009 officers of the Lima Police Department were summoned to 436 E. McKibben Street in Lima Allen County Ohio, for what turned out to be a homicide.

5.          Your affiant states that a unknown person shot and killed Kenneth Warrington while he stood on the porch on the west side of 436 E. McKibben Street.

6.          Your affiant states that Kenneth Warrington shared 436 E. McKibben with his girl friend Sonja Burkholder.

7.          Your affiant states that Sonja Burkholder is the former live in girl friend of Markelus Q Carter.  Futher, Carter and Burholder have two biological children together.

8.          Your affiant states that a search warrant based upon probable cause was issued on February 23rd 2009 by the Honorable Jeffery L Reed of the Allen County Common Pleas Court, to search the residence of 122 E. Eureka, for evidence of the crime of Possession of weapons while under disability, a violation of Ohio Revised Code 2923.13(A) 3, a felony of the 3rd degree.

9.          Your affiant states that he, as well as several other members of the Lima Police Department executed the aforementioned search warrant on February 23rd 2009 at 122 E. Eureka.  During the service of this search warrant,

detectives located several firearms, and ammunition.  Further, detectives located, in plain view a small amount of a white substance that field tested positive as cocaine.  Further, in plain view on the table in the kitchen, detectives observed copies of emails from and to Sonja Burkholder, and from and to Kenneth Warrington.

10.      Your affiant states that ammunition recovered at 122 E. Eureka, is the same brand, type and caliber as the spent casings recovered just feet from the murdered body of Kenneth Warrington, at 436 E McKibben St.

11.      Your affiant states that preliminary evidence would indicate that Warrington was shot and killed with a 9mm caliber weapon.  Your affiant recovered a 9mm Glock Pistol at 122 E Eureka.

12.      Your affiant states that he made contact with the Human resources department at Husky Refinery.  Your affiant was advised that Husky Refinery HR received a call from a male person who identified themself as Mark Carter, a attorney, who was investigating Burkholder and Warrington for having a extra marital affair on company time.  Further the caller requested all email, information for both Husky Refinery employees.

13.      Your affiant states that based upon years of training and experience, the facts in this case tell him that Burkholder and Warrington were engaged in a relationship.  Further it appears as though Carter was gathering evidence of their relationship. Burkholder left Carter for Warrington.   Your affiant states that Markelus Q. Carter had the motive, means, and opportunity to commit the crime of murder.

The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all of the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

*Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Therefore it is difficult to know*

*before a search which expert is qualified to analyze the system and its data. In any event however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, pass-word protected or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive codes imbedded in the system as a "Booby-trap"), a controlled environment is essential to its complete and accurate analysis.*

13. Your affiant says that based on information as provided ***supra,*** probable cause exists to believe that the evidence described herein is concealed inside the residence described, and that specific evidence is contained within the computer/s listed.   Your affiant says that it is necessary to search said premises and further said computer/electronic data storage devices for this and additional evidence of the crime of Murder in violation of 2903.02(A) of the Ohio Revised Code.


_____
signature of affiant

_____
official title, if any

Sworn to before me, and subscribed in my presence, Feb. 23 _____, 2009

_____
signature of Judge

Judge of the Allen County Common Pleas Court


A night time search may be conducted if the search commences any time before 7:00 AM, or after 8:00 PM., but only if the issuing Judge by appropriate provision in the Warrant, and

COPY

for reasonable cause shown, authorizes the issuance of the
Search Warrant at times other than daytime. Accordingly, the
affidavit should contain facts developing such "reasonable
cause for a night time search" if a night time search warrant
is to be requested.

RULE 41(B) of the Ohio Rules of Criminal Procedure provides:
"A Warrant may be issued under this Rule to search for and
seize any: (1) evidence of the commission of a criminal
offense; or (2) contraband, the fruits of crime, or things
otherwise possessed; or (3) weapons or other things by means
of which a crime has been committed or reasonably appears
about to be committed."

2C-201

**SEARCH WARRANT**
**DAY TIME**

**STATE OF OHIO**

-vs-                                                **IN THE ALLEN COUNTY COMMON PLEAS COURT**

**Markelus Q. Carter**                              **SEARCH WARRANT**

To the Sheriff of Allen County and all his Deputies;

To any Police Officer of the City of Lima, Allen County, Ohio

Affidavit having been made before me by Investigator Kevin L. DeLong that he has reason to believe that computer systems and data storage systems, more specifically described as;

- Aluminum Macintosh Desktop Computer
- Sony Cybershot DSC-T9 Digital Camera
- Dell PP04C Laptop
- Vantec Nextar MX External Hard Drive
- HP zv6000 Laptop
- Two Lacie External Hard Drives in Gray Cases
- Western Digital WD3200BEKT Hard Drive
- SanDisk 4GB Cruzer USB Drive
- Four Lexar 256MB Silver and Black USB Drives
- Two Lexar 128MB Silver and Black USB Drives
- Lexar 128MB Purple USB Drive
- Lexar Trio USB Drive (unknown size)
- Two Lexar 1GB USB Drives with Digital Display
- LG 1GB Black and Silver USB Drive
- SanDisk 4GB Micro SD Card
- SanDisk 1GB SD/USB Card
- Everex GS3005 Desktop Computer

are currently at the Lima Police Department's Technology Crimes Lab located at 1119 Reservoir Rd., Lima, Allen County Ohio under the authority of the Common Pleas Court of Allen County Ohio pursuant to a separate search warrant. The listed items contain the following data, namely;

(1) Digital images of child pornography or child erotica (child erotica includes all material relating to children that is sexually suggestive and/or sexually explicit) whether being contained within other files or not, including emails, compressed or encrypted files;

(2) Electronic accounting records, in the form of computer generated logs of criminal activity, including, but not limited to, diaries, journals, calendars, or computer system audit records; electronic mail messages, opened and unopened, to or from co-

EXHIBIT

C

conspirators, associates, or victims; electronic chat room logs, and other electronic logs, of communications with co-conspirators, associates, or victims; computer account information, including, but not limited to computer host names and Internet addresses, account names, passwords, access telephone numbers, password files, and other information about computer systems, users, accounts and related topics, and documents that show ownership and control;

(3) Electronic communications, including, but not limited to, opened and unopened E-mail messages, instant messages (IM), letters, and other electronic records, documents, correspondence, notes, memoranda, address lists, telephone directories, screen name lists, buddy lists, advertisements, calendars, diaries, journals, telexes, faxes, audio and visual tape recordings, materials or items reflecting or relating in any way to communications or contacts between individuals at 122 E. Eureka St., Lima, Allen County, Ohio and any juvenile;

(4) Material that can provide a vehicle for sexual fantasy to those persons who have a sexual interest in children and/or any and all other evidence tending to establish violation of the criminal laws of the State of Ohio, to wit: R.C. 2907 which are evidence of the crime of Pandering Sexually Oriented Matter Involving a Minor O.R.C. 2907.322A5 and Pandering Obscenity Involving a Minor 2907.321A5 and foregoing grounds for application for issuance of the search warrant pursuant to Rule 41(B) of the Ohio Rules of Criminal Procedure exist.

**YOU ARE HEREBY COMMANDED** to search forthwith the place named for the property specified, serving this warrant and making the search at any time in the daytime or night time, the Court finding that reasonable cause has been shown authorizing the execution of this Search Warrant at times other than daytime, and if the property be found there to seize it, leaving a copy of this Warrant and a receipt for the property taken and prepare a written inventory of the property seized and return this Warrant and bring the property before me within a reasonable amount of time, as required by law.

Jeffrey L. Reed
(signed)

8-25-09
(dated)

**JUDGE OF THE ALLEN COUNTY COMMON PLEAS COURT**

COMMON PLEAS COURT
FILED

IN THE COURT OF COMMON PLEAS, ALLEN COUNTY, OHIO

2011 MAR -7 PM 1:40

| | | |
|---|---|---|
| **STATE OF OHIO** | * | **CASE NO. CR 2010 0352** |
| **Plaintiff** | * | **JUDGE: JEFFREY L. REED** |
| **vs.** | * | |
| **MARKELUS Q. CARTER** | * | **MOTION TO LIMIT SCOPE** |
| **Defendant** | * | **OF SUPPRESSION HEARING** |
| | | **BASED ON THE DOCTRINE** |
| | | **OF COLLATERAL ESTOPPEL** |

Now comes the State of Ohio, by and through undersigned counsel Samuel D. Patry, Assistant County Prosecutor, and files the State's motion to limit the scope of the suppression hearing set on March 7, 2011. The following issues have already been litigated and disposed of: 1) Whether there was sufficient probable cause to enter the defendant's home, 2) Whether the use of statements upon which the probable cause was based was proper and 3) whether the evidence obtained as a result was improper. Under the doctrine of collateral estoppel, the defendant is precluded from relitigating these issues before the court, as prior judgments have already disposed of these issues.

## STATEMENT OF FACTS

On April 16, 2009, Defendant was indicted for two counts of having weapons under disability in violation of Rev. Code § 2923.13(A)(3) and one count of possession of crack cocaine in violation of Rev. Code § 2925.11(A)&(C)(4)(d) in Allen County. On May 12, 2009 the defendant filed a motion to suppress and a motion to supplement his original motion on May 28, 2009. A suppression hearing[1] was held to address three issues:

1) the validity of the stop of defendant, 2) whether he was in custody

---

[1] The suppression hearing was heard on two separate days. Specifically, the hearing began on July 9, 2009 and was continued mid-hearing after the defendant requested a continuance. The court reconvened and concluded the hearing on August 20, 2009.

47 LT

when he was questioned by police, and 3) whether the evidence seized
when the subsequent search warrant were executed should be suppressed
since the warrants were based on what defendant claims were illegally
obtained statements.

(Judgment Entry on Suppression August 25, 2009, pg 7)

After hearing evidence from the Allen County Prosecutor's Office and the defendant, the

court denied the defendant's motion to suppress. The court found the following: 1) the stop of

the defendant's vehicle was lawful and that the search warrants were not based on illegally

obtained evidence. *Id.* On November of 2009 the defendant was ultimately tried and convicted

of two counts—one count of weapons under disability and one count of possession of crack

Cocaine. The defendant then appealed his convictions assigning the following error:

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN
IT DID NOT SUPPRESS MR. CARTER'S NON-MIRANDIZED
STATEMENTS AND THE FRUITS THEREOF, DESPITE THE
FACT THAT MR. CARTER WAS QUESTIONED BY
MULTIPLE POLICE OFFICERS IN AN INTERROGATION
ROOM, WAS TOLD THAT HE COULD LEAVE AFTER THE
POLICE WERE DONE QUESTIONING HIM, AND HAD NO
WAY TO LEAVE EARLIER SINCE THE POLICE HAD
IMPOUNDED HIS VEHICLE AND TAKEN HIS KEYS.**

*State v. Carter*, 2010-Ohio-5189, *P16

The Third District Court of Appeals affirmed the trial court, holding that "the interview

was non-custodial, Miranda warnings were unnecessary, and the trial court did not err in

declining to suppress Carter's statements and the fruits thereof." *Id.* at *P26. The defendant

subsequently appealed to the Supreme Court of Ohio. However, the Supreme Court declined to

accept the appeal for review. *State v. Carter*, 127 Ohio St. 3d 1503

According to the defendant's motion, the warrants at issue were obtained on or about

February 23, 2009 and August 25, 2009. In the time frame given by the defense, a total of three

search warrants were obtained to search the defendant's home and computer systems. On

2

February 23, 2009 two search warrants were obtained and executed.  The first search warrant was obtained to search the home for "firearm/s and ammunition" and a subsequent search warrant was obtained to search for computers and other related items.

Probable cause for the first search warrant was based on statements the defendant made to police while they were investigating the murder of his ex-girlfriend's boyfriend.  The defendant was a person of interest in the murder and while investigating, police learned the defendant had weapons in his home in violation of Rev Code § 2923.13(A)(3).  It was while executing this first search warrant for weapons and ammunition that detectives observed in plain view, hard copies of "e-mails from and to Sonja Burkholder, [the defendant's ex-girlfriend], and from and to Kenneth Warrington, [the murder victim]."  (Affidavit for Search Warrant, February 23, 2009)  Based on this and other information obtained, the court granted another search warrant for

> computer/s and the contents therein, which are computer hardware and
> software, including: electronic data processing and storage devices,
> computers and computer systems internal peripheral storage devices.
> Areas of the computer that contain temporary internet files, any and all
> email information, system configuration/registry files, saved text documents,
> and user information… photographs, any and all other material evidence of
> violations set forth herein which are; Evidence in the crimes of murder…

(Search Warrant February 23, 2009)

On July 27, 2009, while conducting a forensic examination of the defendant's computer and other electronic devises obtained on February 23, Investigator Delong of the Lima Police Department's Technology Crimes Lab "saw a digital image of a minor in a state of nudity". (Affidavit for Search Warrant, August 25, 2009)  While continuing the search, Investigator Delong saw "additional images of minors in a state of nudity".  The investigator stopped his search until a warrant to investigate the material he had stumbled across could be obtained.  On

August 25, 2009 a warrant was issued to search for evidence in violation of Rev. Code 2907.322 and Rev. Code 2907.321. Based on that search warrant and the evidence obtained, the defendant was indicted on 6 Counts of Pandering obscenity of a minor. The defendant now seeks to suppress "any and all evidence obtained by the State of Ohio via two search warrants issued for the search of the Defendant's home and computer systems." His motion seeks to suppress this evidence on the basis that probable cause did not exist to obtain the search warrants issued on February 23, 2009 and August 25, 2009.

The defendant is precluded from relitigating the issue of whether there was probable cause to search the home on the first warrant issued. The State asks that the scope of the motion to suppress hearing be limited to 1) whether there was probable cause to search the computer & electronic devices for the murder of Kenneth Warrington and 2) whether there was probable cause to search the computer for child pornography after the second warrant was obtained.

## MEMORANDUM IN SUPPORT

"Although originally a civil doctrine, the federal rule of collateral estoppel has been a part of criminal jurisprudence for over seventy-five years." *State* v. *Day*, (1995, 8th Dist.) 1995 Ohio App. LEXIS 44847, *5-6 (citing *U.S.* v. *Oppenheimer* (1916), 242 U.S. 85, 87-88, 61 L. Ed. 161, 37 S. Ct. 68.) "This rule is incorporated in the Fifth Amendment's guaranty against double jeopardy and is fully applicable to the states through the Fourteenth Amendment to the United States Constitution." *Id.* at *6 (citing *Ashe* v. *Swenson* (1970), 397 U.S. 436, 445, 25 L. Ed. 2d 469, 90 S. Ct. 1189)

> "Collateral estoppel" is an awkward phrase, but it stands for
> an extremely important principle in our adversary system of
> justice. It means simply that when an issue of ultimate fact has
> once been determined by a valid and final judgment, that issue

cannot again be litigated between the same parties in any future
lawsuit.
*Ashe v. Swenson* (1970) 397 U.S. 436, 443, 90 S. Ct. 1189, 1194

"[I]n order for collateral estoppel to apply two conditions must be met: (a) the issues

must be identical and (b) the parties or their privies must be the same. *State* v. *Day* at *6 (citing

*Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St. 2d 108, 112, 254 N.E.2d 10; *State v. Crago*

(1994), 93 Ohio App. 3d 621, 637, 639 N.E.2d 801.))

Here the parties are identical.  The defendant in the case is the same, and the prosecuting

agency remains unchanged.  The issues being litigated as it pertains to having probable cause to

enter the home has already been litigated and disposed of.  *State v. Carter*, 2010-Ohio-5189

Defendant is therefore precluded from relitigating these issues under the doctrine of collateral

estoppel.

Respectfully submitted,

SAMUEL D. PATRY  (0082640)
ASSISTANT COUNTY PROSECUTOR
204 N. MAIN STREET, SUITE 302
LIMA, OHIO 45801
Tel. 419-996-4611
Fax. 419-227-1072

THE STATE OF OHIO,}
    Allen County     } SS     CERTIFICATE OF COPY

I, Margie Murphy-Miller, Clerk of the Courts within and for
the aforesaid County and State, do hereby certify that the
foregoing is a true and correct copy of the original document
now on file in said Court's office.

IN WHEREOF, I have here
unto set my hand and affixed the seal
of said Court of Lima, Ohio this ___
day of _May__ A.D. 201_

(SEAL)

MARGIE MURPHY-MILLER
By _____

## **PROOF OF SERVICE**

I hereby certify that a copy of the foregoing was sent to Defendant's Attorney F. Stephen Chamberlain via e-mail on March 7, 2011, at chamberlainlaw@woh.rr.com & ordinary mail at 101 North Elizabeth St. Ste. 503.


SAMUEL D. PATRY (0082640)
ASSISTANT COUNTY PROSECUTOR
JUVENILE DIVISION

COMMON PLEAS COURT
FILED

2011 MAR -8  AM 9: 16

_____ _____ MILLER
_____ ____ COURTS
ALLEN ___ ____

## IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

STATE OF OHIO,

           **Plaintiff**       *     **CASE NO.:  CR 2010 0352**

-v-                   *

**MARKELUS Q. CARTER,**      *     **Judgment Entry**

          **Defendant**     *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter came on for a suppression hearing this 7th day of March 2011. The defendant was present in open court along with his attorney, F. Stephen Chamberlain.  Assistant Prosecuting Attorney Samuel Patry represented the State of Ohio.

    Before the motion hearing actually began, the Court addressed the motion filed by the State on March 7, 2011 regarding limiting the scope of the hearing. The State argued that collateral estoppel barred consideration of the issues already decided at the suppression hearing in defendant's previous case, CR 2009 0068.  Defendant objected to any limit on the scope of the hearing.

    The doctrine of res judicata involves both claim preclusion and issue preclusion, known as collateral estoppel. *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 1995-Ohio-331. Claim preclusion "prevents a party from litigating a cause of action after a prior court has rendered a final judgment on the merits of that cause as to that party." *Krahn v. Kinney* (1989), 43 Ohio St.3d 103, 107, citing

1



49cm.

CR11 1547

*Norwood v. McDonald* (1943), 142 Ohio St. 299, paragraph one of the syllabus. Issue preclusion "precludes the relitigation of an issue that has been 'actually and necessarily litigated and determined in a prior action .' " *Id.,* quoting *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 195.

In *State v. Day* (Nov. 2, 1993), 8th Dist. App. No. 67767, the court determined that a common pleas court, considering a motion to suppress, was bound by a ruling on an identical motion to suppress, involving the same defendant, issued in municipal court.  Similarly, in *City of South Euclid v. Swirsky,* 8 Dist. App. No. 79865, 2002 -Ohio- 1072, the court held that the doctrines of res judicata and collateral estoppel required a municipal court to accept determination of common pleas court in granting a defendant's motion to suppress.  The court in *Day,* cited *Ashe v. Swanson* (1970), 397 U.S. 436, wherein the Supreme Court of the United States held that collateral estoppel applied in criminal cases.

In *State v. Roberts*  6th Dist. App. Nos. WD-03-001, WD-02-066, 2003 -Ohio- 5689, the court stated, "In our view, res judicata may be applicable to pre-trial determinations in a criminal case, even when a new trial is granted. [...]"  In *State v. Young*  (February 4, 1977), 5 Dist. App. No. CA-1598, the court found "no reason in law, logic, common sense or sound public policy why [collateral estoppel] should not equally be applied against an accused as well as in his favor so long as he is not thereby denied his right to trial by jury.

In *State v. Clark* (April 26, 1999), 4th  Dist. App. No. 98 CA 1, the court determined that "the doctrine of collateral estoppel did not apply to bar a second

MR11 1548

motion to suppress where the ruling on the first motion was not a final appealable order.

In the instant matter, there was a previous case involving this same defendant and the State of Ohio. That case was *State v Carter*, Allen County No. CR 2009 0068. A motion to suppress was filed in that case. The facts surrounding that previous motion are identical to the facts giving rise to the seizure complained of by defendant's instant motion in this case. Case No. CR 2009 0068 was resolved by a jury trial and defendant's conviction, thus making the judgment entry on the motion to suppress final and appealable. In fact, defendant appealed his conviction in *State v. Carter*, Allen App. No. 1-10-01, 2010-Ohio-5189. In his appeal, he raised the issue of this Court's denial of his motion to suppress. This Court was affirmed by the Court of Appeals.

The instant motion to suppress relates to the exact same facts and circumstances as the motion to suppress in CR 2009 0068. The only difference is that this case involves a search warrant obtained to retrieve material from defendant's computer, which was seized pursuant to previous search warrants, dealt with in CR 2009 0068. The legality of the events leading up to the first two search warrants has been determined, appealed and affirmed.

This Court finds that the doctrine of collateral estoppel bars re-litigation of the matters already decided relating to the statements taken from defendant and the issuance of search warrants for defendant' house to look for guns and for computers. However, the third issue, which is uniquely pertinent to the instant case, regarding the issuance of another search warrant to seize images from

3

CR11 1510

defendant's computer (which was seized during the execution of a warrant in CR 2009 0068), is not barred.

Therefore, the State's motion is well taken and the Court hereby limits the scope of the hearing on defendant's motion to suppress in this case to determination of the legality of the search warrant and subsequent search of defendant's computer for illegal images.  It is so ORDERED.

Shortly after the Court ruled form the bench regarding the scope of the hearing, defendant's counsel asked for a brief recess.  The Court granted the recess.  Shortly into the recess, defendant apparently took ill.  The jail nurse was called to the courtroom to examine defendant.  Defense counsel appeared in chambers, with the assistant prosecutor, and explained that defendant had some type of attack or seizure.  Defense counsel indicated it would be difficult for defendant to continue under the circumstances.

Therefore, the Court hereby continues the motion to suppress until **Monday, March 14, 2011 at 2:30 p.m.**  It is so ORDERED.


March 8, 2011

THE STATE OF OHIO,}
Allen County      } SS      CERTIFICATE OF COPY

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in said Court.

_Jeffrey L. Reed, Judge_

**The parties should put this date on their calendars immediately.  If any conflict exists at this time, counsel shall initiate a conference call with all counsel and the Court to discuss schedule changes.**

4

COMMON PLEAS COURT
FILED

2011 APR -6 AM 11: 26

MARCIE HEDRICK MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

# IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO,** | * | |
| **Plaintiff** | * | **Case No.:**  CR 2010 0352 |
| –v– | * | |
| **MARKELUS Q. CARTER,** | * | **JUDGMENT ENTRY** |
| | | **MOTION TO SUPPRESS** |
| **Defendant** | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

This matter comes on for consideration of the motion to suppress, filed on behalf of the defendant on January 2, 2011.  A hearing on the motion was held on March 14, 2011 and was attended by defendant, his counsel, F. Stephen Chamberlain and Assistant Prosecuting Attorney Samuel Patry.

The evidence presented shows that on August 25, 2009 Investigator Kevin Delong, the forensic examiner from the Lima Police Department technology crimes unit obtained a search warrant to search computer equipment seized from defendant's home pursuant to an earlier search warrant.



1

CR11 2469

The Fourth Amendment to the United States Constitution guarantees people the right to be free from unreasonable searches and seizures and provides that no warrants shall issue but upon probable cause. In the particular context of Fourth Amendment searches and seizures, the burden is upon the state if the contested evidence was obtained without a warrant, but upon the defendant if the search or seizure was pursuant to a warrant.   *United States v. Carhee* (C.A.10, 1994), 27 F.3d 1493, 1496; *State v. Childs* (2000), 88 Ohio St.3d 558.

Crim.R. 41(C) delineates the standard for issuing a search warrant:

"(C) Issuance and contents.  A warrant shall issue under this rule only on an affidavit or affidavits sworn to before a judge of a court of record and establishing the grounds for issuing the warrant.  The affidavit shall name or describe the person to be searched or particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located.  If the judge is satisfied that probable cause for the search exists, he shall issue a warrant identifying the property and naming or describing the person or place to be searched.  The finding of probable cause may be based upon hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished"

Evidence obtained as the result of a search warrant will be suppressed if "(1) ' * * * the magistrate or judge * * * was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth * * * '; (2) ' * * * the issuing magistrate wholly abandoned his judicial role * * * '; (3) an officer purports to rely upon ' * * * a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely

CR11 2470

unreasonable" '; or (4) ' * * * depending on the circumstances of the particular case, a warrant may be so facially deficient--*i.e.,* in failing to particularize the place to be searched or the things to be seized--that the executing officers cannot reasonably presume it to be valid.' " *Sate v. George* (1989) 45 Ohio St.3d 325, at 331, citing *United States v. Leon* (1984), 468 U.S. 897.

When a motion to suppress evidence seized pursuant to a search warrant attacks the judge or magistrate's issuance of the warrant, the motion presents two potential issues. One, and the critical issue, is whether the affidavit for the warrant provided a substantial basis upon which the magistrate could make an independent determination that probable cause existed for the search. *Illinois v. Gates* (1983), 462 U.S. 213.  The gist of the defendant's motion is that law enforcement lacked probable cause for the search warrant issued on August 25, 2009.

When assessing the adequacy of an affidavit offered to support a request for a search warrant, a magistrate must make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. George* (1989), 45 Ohio St.3d 325, paragraph one of the syllabus, quoting *Illinois v. Gates* (1983), 462 U.S. 213.  This approach is often called the "totality of the circumstances" test. *Id.*

CRII 2471

In reviewing "the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant." *George, supra,* at paragraph two of the syllabus. Instead, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed," and it "should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id; State v. Gales* (2001), 143 Ohio App.3d 55, 61.[1]

"Probable cause means the existence of evidence, less than the evidence that would justify condemnation, such as proof beyond a reasonable doubt or by a preponderance; in other words, probable cause is the existence of circumstances that warrant suspicion." *State v. Young,* 146 Ohio App.3d 245, *2001-Ohio-4284.* Consequently, the standard for probable cause does not require a prima facie showing of criminal activity; rather, the standard requires "only a showing that a probability of criminal activity exists." *Id.*

When determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, the issuing judge or magistrate is to make a common sense assessment and decide, based on all the

---

[1] Discretionary appeal to the Supreme Court of Ohio was not allowed in (2001), 92 Ohio St.3d 1445, 751 N.E.2d 483.

CRII 2472

circumstances set forth in the affidavit including the veracity and basis of knowledge of persons supplying hearsay information, whether " 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' *George*, supra at paragraph one of the syllabus. The duty of this Court, when it reviews the sufficiency of probable cause, "is simply to ensure that there was a substantial basis for concluding that probable cause existed." *George,* at paragraph two of the syllabus.   In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, this Court should accord great deference to the original determination of probable cause, and "doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." Id.

This Court is barred from conducting a *de novo* review of the sufficiency of probable cause contained in an affidavit supporting the issuance of the search warrant. *George*, supra, paragraph two of the syllabus; *State v. Martin* (Dec. 6, 1996), Ashtabula App. No. 96-A-0016, unreported.

Defendant has also *not* shown that the warrant is so *facially* deficient that the executing officers could not reasonably presume it to be valid. Probable cause is proof less than that beyond a reasonable doubt or by a preponderance of the evidence; it is " ' "only the probability, and not a prima facie showing, of criminal activity * * *." ' " *State v. George*, supra, citing *Illinois v. Gates* (1983), 462 U.S. 213.  The Court finds the affidavit demonstrate sufficient facts upon which a finding of probable cause could be made.

5

CRII 2473

Defendant cites to *United States v. Brunette* (C.A.1, 2001), 256 F.3d 14. Defendant's argument is unpersuasive for two reasons. First, the decisions of federal courts constitute persuasive authority only, and are not binding on this Court. *State v. Burnett*, 93 Ohio St.3d 419, 2001-Ohio-1581. Second, *Brunette* is distinguishable from the case at bar.

In *Brunette*, the affiant averred that all of the images in question "appeared to be within the statutory definition of child pornography, specifically, 'photographs of a prepubescent boy lasciviously displaying his genitals.' ' In the case at bar, Detective Delong averred that as he was searching the computer for evidence of another crime, he saw digital images of minors in a state of nudity. Whether photographs of a prepubescent boy's genitals are lasciviously displayed is certainly open to subjective interpretation, and would reasonably require a magistrate to view the photographs and make that determination independently. Whether an image is of a minor in a state of nudity, however, is a significantly easier question.

Delong's descriptions are reasonably specific for Fourth Amendment purposes. Cf. *United States v. Smith* (C.A.9, 1986), 795 F.2d 841 (upholding a warrant issued by a magistrate who did not view the images on the basis that the photos depicted children engaged in "sexually explicit conduct").

However, even if the Court were to determine that the affidavit did not furnish a substantial basis for concluding that there was probable cause to search the computer equipment involved in this case, the Court would still be compelled to uphold the instant search based upon the "good faith exception" to the exclusionary rule set forth by the United States Supreme Court, *United*

CR11 2474

*States v. Leon,* supra, and subsequently adopted by the Ohio Supreme Court, *State v. Wilmoth* (1986), 22 Ohio St.3d 251, 490 N.E.2d 1236; see, also, *George,* supra.

In *Leon,* the Court determined that the exclusionary rule of the Fourth Amendment "should not be applied so as to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *George,* 45 Ohio St.3d at 330, 544 N.E.2d 640, citing *Leon,* 468 U.S. at 918-923. The Court in *Leon,* supra, based this decision on the evils sought to be prevented by the exclusionary rule. In essence, the exclusionary rule was begun as a means to deter willful, or at the very least negligent, police misconduct. *Leon,* 468 U.S. at 918. Thus, the Court reasoned that barring evidence obtained by officers acting in objectively reasonable reliance on a search warrant, which was later determined to not be based on probable cause due to the error of the issuing magistrate, did not further the purpose of the exclusionary rule. *Id.* at 921.

This Court finds that Delong's reliance on the search warrants was objectively reasonable because there is no showing that this Court was misled by information in an affidavit that Delong knew was false or would have known was false except for his reckless disregard of the truth; the warrant was not facially deficient; it was not proven that the Court wholly abandoned his judicial role; and the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Thus, the officers acted in objectively reasonable reliance on

7

CRII 2475

the search warrant. *State v. McClanahan*, Seneca App. Nos. 13-03-02, 13-03-03, 2003-Ohio-4279; State *v. Williams*, Allen App. No. 1-99-86, 2000-Ohio-1861; *State v. Graham*, Hancock App. No. 5-01-01, 2001-Ohio-2327.

Therefore, the defendant motion to suppress is **overruled**. It is so ORDERED.

April 6, 2011

*Jeffrey L. Reed*

Jeffrey L. Reed, Judge

The Clerk of this Court shall forward a file stamped copy of this Judgement Entry by regular mail to each attorney of record and each party not represented by counsel. The fact of mailing shall be entered on the docket and charged as costs.

THE STATE OF OHIO,
Allen County   } ss   CERTIFICATE OF COPY

I, Margie Murphy-Miller, Clerk of the Courts within and for the aforesaid County and State, do hereby certify that the foregoing is a true and correct copy of the original document now on file in said Clerk's office.

IN WHEREOF, I have here unto set my hand and affixed the seal of said Court of Lima, Ohio this ___ day of May, A.D. 20__

(SEAL)

MARGIE MURPHY-MILLER

Clerk

By _____

8

CR11 2476

Lexis®

| **Search** | **Get a Document** | ***Shepard's*®** | **More** | | **History** | **Alerts** |

---

FOCUS™ Terms "242 u.s. 85"          Search Within  Original Results (1 – 12)  ⏷  Go    Advanced...

View Tutorial

Source: **Legal > / · · · / > OH Courts of Appeals Cases from 1913** ⓘ
Terms: **"242 u.s. 85"**  (Suggest Terms for My Search)

⬐Select for FOCUS™ or Delivery
☐

*1995 Ohio App. LEXIS 4847, ***

STATE OF OHIO, Plaintiff-Appellee vs. ARTHUR DAY, Defendant-Appellant

NO. 67767

COURT OF APPEALS OF OHIO, EIGHTH APPELLATE DISTRICT, CUYAHOGA COUNTY

1995 Ohio App. LEXIS 4847

November 2, 1995, DATE OF ANNOUNCEMENT OF DECISION

**PRIOR HISTORY: [*1]** CHARACTER OF PROCEEDING: Criminal appeal from Common Pleas Court. Case No. CR-307979.

**DISPOSITION:** JUDGMENT: AFFIRMED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant appealed his conviction for two counts of aggravated drug trafficking with specifications and possession of criminal tools from the Cuyahoga County Common Pleas Court (Ohio).

**OVERVIEW:** The municipal court determined that the search and seizure, which led to defendant's arrest, did not violate the Fourth Amendment and denied his motion to suppress in a related misdemeanor case. The court found that collateral estoppel applied. The motion to suppress filed in municipal court was almost identical to the one at issue, and the issues raised in those motions were identical because they arose from the same arrest. The motion to suppress in the municipal court named the City of Cleveland as a party, while the instant motion named the State of Ohio as a party. However, the City of Cleveland was the same sovereign as the State of Ohio. Defendant argued he was denied due process because he was precluded from testifying in the municipal court suppression hearing. However, no appeal was taken from that proceeding and defendant failed to transmit those portions of the record that supported the claimed error. Also, defendant failed to raise the due process issue before common pleas court in the felony prosecution. Finally, defendant's argument that he was denied due process when the common pleas court sentenced him was rejected because defendant misunderstood his sentence.

**OUTCOME:** The court affirmed the judgment of the trial court.

**CORE TERMS:** municipal, suppress, common pleas, collateral estoppel, misdemeanor, litigate, sentence, assignments of error, arrest, present case, vigorously, bottle, journal entry, consecutive, seized, motor vehicle, identical issue, prior action, intoxicating, trafficking, consumption, aggravated, beverage, party asserting, res judicata, fair opportunity, felony charges, actually litigated, incarceration, collaterally

## LEXISNEXIS® HEADNOTES    ⊟**Hide**

Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel 🖼

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Double Jeopardy 🖼

Constitutional Law > Bill of Rights > State Application 🖼

*HN1* Although originally a civil doctrine, the federal rule of collateral estoppel has been a part of criminal jurisprudence for over 75 years. This rule is incorporated in the Fifth Amendment's guaranty against double jeopardy and is fully applicable to the states through the Fourteenth Amendment to the United States Constitution. The United States Supreme Court defines the concept in the following manner: "collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties, in any future lawsuit. Therefore, in order for collateral estoppel to apply two conditions must be met: (a) the issues must be identical, and (b) the parties or their privies must be the same.  More Like This Headnote

Criminal Law & Procedure > Pretrial Motions & Procedures > Suppression of Evidence 🖼

Governments > Local Governments > Duties & Powers 🖼

Governments > State & Territorial Governments > General Overview 🖼

*HN2* Cities have been traditionally regarded as subordinate governmental instrumentalities created by the state to assist in the carrying out of state governmental functions. Accordingly, the City of Cleveland is deemed to be the same sovereign as the State of Ohio.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Criminal Law & Procedure > Double Jeopardy > Collateral Estoppel 🖼

*HN3* A prior judgment estops a party, or a person in privity with him, from subsequently relitigating the identical issue raised in the prior action.  More Like This Headnote

**COUNSEL:** APPEARANCES:

For Plaintiff-Appellee: STEPHANIE TUBBS JONES , Cuyahoga County Prosecutor, DAVID C. SHELDON, Assistant, 8th Floor, Justice Center, 1200 Ontario Street, Cleveland, Ohio 44113.

For Defendant-Appellant: JAMES R. WILLIS, Courthouse Square Bldg., #350, 310 Lakeside Avenue, N.W., Cleveland, Ohio 44113.

**JUDGES:** TERRENCE O'DONNELL ▾, JUDGE. DAVID T. MATIA ▾, J., CONCURS; JOHN T. PATTON ▾, C.J., DISSENTS (See Dissenting Opinion, John T. Patton ▾, C.J., attached)

**OPINION BY:** TERRENCE O'DONNELL

**OPINION**

JOURNAL ENTRY AND OPINION

O'DONNELL ▾, J.:

Appellant, Arthur Day, appeals his conviction for two counts of aggravated drug trafficking in violation of R.C. 2925.03, with specifications and possession of criminal tools in violation of R.C. 2923.24.

On February 23, 1994, appellant was arrested in Cleveland, Ohio, by Metropolitan Housing Authority officers for consumption of an intoxicating beverage in a motor vehicle in violation of R.C. 4307.64, [*2] a fourth degree misdemeanor. Two CMHA officers observed the appellant drinking from a whiskey bottle and driving a car at 4:00 a.m. on Unwin Road, a public street that runs through a housing project. The officers stopped appellant's vehicle and asked him to step out of his car. As the appellant opened the car door, one of the officers noticed a cognac bottle on the front seat of the vehicle and then arrested the appellant for consumption of an intoxicating beverage in a motor vehicle.

Following the arrest one of the officers searched the appellant for weapons and found five rocks of crack cocaine in the appellant's front pocket. The other officer inventoried the vehicle and found $ 6,884 in cash, a pager and a mobile phone.

Initially, appellant appeared in Cleveland Municipal Court on the misdemeanor charge. Appellant had filed a motion to suppress evidence claiming the CMHA officers illegally stopped his vehicle and improperly seized the liquor bottle found inside. Both parties here agree that the municipal court held a hearing on appellant's motion to suppress, heard testimony from one of the CMHA officers who participated in the arrest, and denied the motion. Appellant now specifically [*3] claims that the municipal court would not allow him to testify during the hearing which resulted in his conviction for consumption of an intoxicating beverage in a motor vehicle.

A transcript of the municipal court's hearing however, was not filed either with the court of common pleas or with this court, and therefore is not part of the record before us. Nor was the municipal court's journal entry denying the motion to suppress made part of the record. Moreover, we note that appellant never appealed from his municipal court conviction of consumption of an intoxicating beverage in a motor vehicle.

After his conviction on the misdemeanor charge, the grand jury indicted appellant for two counts of aggravated drug trafficking and one count of possession of criminal tools in the Cuyahoga County Common Pleas Court.

Again, appellant filed a motion to suppress evidence in the trial court. Appellant's motion claimed that (a) his arrest was illegal; (b) the liquor bottle was improperly seized and (c) the drugs, cash, pager and mobile phone were improperly seized. The common pleas court trial judge conducted a hearing on the motion to suppress and determined the principles of *res judicata* [*4] required the court to accept the municipal court's ruling on appellant's initial motion to suppress. Therefore, the trial court did not

address the issues of probable cause for the stop and the seizure of the liquor bottle because those issues had been previously determined by a court of competent jurisdiction and no appeal had been taken from the municipal court's ruling. However, the trial court proceeded with the hearing to determine if the drugs, cash, pager and mobile phone were properly seized. After taking testimony from the CMHA officers the trial court denied appellant's motion to suppress.

Following a jury trial, appellant was found guilty of two counts of aggravated trafficking (counts one and two) and possession of criminal tools (count three). The court then sentenced the appellant to five to fifteen years for counts one and two, to run concurrently and eighteen months for count three to run consecutive to counts one and two. The court also imposed a mandatory three year term of actual incarceration on counts one and two.

On appeal, two assignments of error are presented for our review. Appellant's first assignment of error states:

> THE COURT ERRED WHEN IT DENIED **[*5]** THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND FOR THE RETURN OF ILLEGALLY SEIZED PROPERTY.

Appellant maintains that the trial court erred when it denied his motion to suppress. Specifically, appellant claims that he was not given the opportunity for a full and fair litigation of his Fourth Amendment claims in the common pleas court because he was not permitted to testify at the municipal court hearing. Moreover, appellant argues that the court of common pleas was not bound by the ruling in the municipal court pursuant to *res judicata*.

Initially, we note that the appellant never appealed the municipal court's ruling on his motion to suppress. Thus, issues relating to that hearing cannot be considered since they are not properly presented to us on this appeal.

Here, we must consider whether or not the principles of *res judicata* or collateral estoppel required the common pleas court to accept the municipal court determination on the motion to suppress. This appears to be an issue of first impression for our court.

*HN1* Although originally a civil doctrine, the federal rule of collateral estoppel has been a part of criminal jurisprudence for over seventy-five years. See **[*6]** *U.S.* v. *Oppenheimer* (1916), 242 U.S. 85, 87-88, 61 L. Ed. 161, 37 S. Ct. 68. This rule is incorporated in the Fifth Amendment's guaranty against double jeopardy and is fully applicable to the states through the Fourteenth Amendment to the United States Constitution. *Ashe* v. *Swenson* (1970), 397 U.S. 436, 445, 25 L. Ed. 2d 469, 90 S. Ct. 1189.

In *Ashe*, the United States Supreme Court defined the concept in the following manner:

> "'collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties, in any future lawsuit. * * *" *Id.* 397 U.S. at 443.

Therefore, in order for collateral estoppel to apply two conditions must be met: (a) the issues must be identical and (b) the parties or their privies must be the same. *Whitehead* v. *Gen. Tel. Co.* (1969), 20 Ohio St. 2d 108, 112, 254 N.E.2d 10; *State* v. *Crago* (1994), 93 Ohio App. 3d 621, 637, 639 N.E.2d 801.

In the present case, the motion to suppress filed in municipal **[*7]** court is almost identical to the one filed in common pleas court and the issues raised in those motions are identical because they arose from the same arrest which formed the basis of charges in both courts.

We will next consider the second prong of the test: whether the parties are identical. The motion to suppress filed in the municipal court named the city of Cleveland as a party, while the motion to suppress filed in the common pleas court named the state of Ohio as a party. *HN2* Cities have been traditionally regarded as subordinate governmental instrumentalities created by the state to assist in the carrying out of state governmental functions. *Reynolds* v. *Sims* (1964), 377 U.S. 533, 575, 12 L. Ed. 2d 506, 84 S. Ct. 1362; State v. *Horton* (1993), 91 Ohio App. 3d 464, 469, 632 N.E.2d 993. Accordingly, the City of Cleveland is deemed to be the same sovereign as the State of Ohio in the present case.

Having determined that the issue and the parties are identical in both proceedings, we conclude that the common pleas court is bound by the earlier municipal court ruling. The syllabus of *Goodson* v. *McDonough Power Equip., Inc.* (1983), 2 Ohio St. 3d 193, 443 N.E.2d 978, **[*8]** states in part:

> *HN3* "1. ***. A prior judgment estops a party, or a person in privity with him, from subsequently relitigating the identical issue raised in the prior action." (Citations omitted.)

Appellant complains of a denial of due process alleging he was precluded from testifying in the municipal court suppression hearing. We note initially that no appeal was taken from that proceeding and, further, that the party asserting the truth of a proposition bears the burden of proof and that appellant is charged by appellate rule to transmit those portions of the record which support claimed error. This was not done in this case. Neither did appellant raise the alleged due process denial for consideration by the able common pleas court judge in the felony prosecution.

Clearly, appellant knew at the time of the misdemeanor suppression hearing he had been arrested on felony drug charges and that when he raised the issue of probable cause for arrest in the municipal court, it was a critical stage of the criminal proceedings against him.

Appellant should not be afforded two opportunities to litigate the issue of probable cause for arrest, once in the municipal court on the misdemeanor **[*9]** charges and again in the common pleas court on the felony charges. Since that issue had been decided adversely to appellant by a court of competent jurisdiction, a final appealable order existed. No appeal having been taken from the ruling on that important issue, the parties become bound by it and the common pleas court justifiably and rightfully refused to relitigate it. The trial court did not err in denying the motion to suppress evidence.

This assignment of error is overruled.

II.

Appellant's second assignment of error states:

> THE COURT DENIED DEFENDANT DUE PROCESS IN ARBITRARILY SENTENCING HIM TO SERVE CONSECUTIVE SENTENCES THAT TOTALLED ELEVEN YEARS FOR A SINGLE POSSESSION OF A QUANTITY OF COCAINE.

Appellant maintains that the trial court denied him due process when it arbitrarily sentenced him to

serve consecutive sentences that totalled eleven years for a single possession of a quantity of cocaine. Specifically, appellant asserts that his sentence for aggravated trafficking, to be served consecutive to two five to twenty five year sentences was arbitrary.

Appellant has misstated his sentence. The trial judge sentenced appellant in accordance with law to terms **[*10]** of five to fifteen years on counts one and two concurrently, but consecutive with a term of eighteen months on count three. The court also imposed a mandatory three year term of actual incarceration on counts one and two.

Therefore, appellant's second assignment of error is overruled.

Judgment of the trial court is affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

DAVID T. MATIA ▾, J., CONCURS;

JOHN T. PATTON ▾, C.J., DISSENTS (See Dissenting Opinion, John T. Patton ▾, C.J., attached)

JUDGE

TERRENCE O'DONNELL ▾

N.B. This entry is made pursuant to the third sentence of Rule 22(D), Ohio Rules of Appellate Procedure. This is an announcement of decision (see Rule 26). Ten (10) days **[*11]** from the date hereof, this document will be stamped to indicate journalization, at which time it will become the judgment and order of the court and time period for review will begin to run.

**DISSENT BY:** JOHN T. PATTON ▾

**DISSENT**

DISSENTING JOURNAL ENTRY AND OPINION

PATTON ▾, C.J., DISSENTING:

I respectfully dissent from the majority's disposition of appellant's first assignment of error. I would find that the appellant did not receive his constitutional right to due process. Consequently, I would reverse the decision of the trial court in part.

I agree with the facts as the majority has set them out. I also agree with the majority's initial analysis of case law concerning the civil doctrine of collateral estoppel. However, I believe the majority has not set forth the entire law relating to collateral estoppel and therefore its analysis is incomplete. As a

consequence, the appellant has been denied his right to due process.

I acknowledge the appellant never appealed the municipal court's ruling on his motion to suppress. Therefore, the issue of whether or not he was provided with a fair hearing at the municipal court level is not properly before us.

However, it must be determined **[\*12]** whether the court of common pleas was bound by a ruling made by the municipal court with respect to a similar motion to suppress pursuant to collateral estoppel, within the context of *res judicata.*

In *Ashe,* the United States Supreme Court defined collateral estoppel in the following manner:

> [Collateral estoppel] means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties, in any future lawsuit. * * *" *Id.* 397 U.S. at 44.

Therefore, in order for collateral estoppel to apply the issues must be identical and the parties or their privies must be the same. *Whitehead* v. *Gen. Tel. Co.* (1969), 20 Ohio St. 2d 108, 112, 254 N.E.2d 10; *State* v. *Crago* (1994), 93 Ohio App. 3d 621, 637, 639 N.E.2d 801.

In the present case, the motion to suppress filed in municipal court is almost identical to the motion to suppress filed in the court of common pleas. We note that the scope of charges filed in the courts is quite different. In the municipal court the appellant was charged with a fourth degree misdemeanor. In the common pleas court the appellant was **[\*13]** indicted on felony charges. Even though the penalties involved were substantially more severe in the common pleas court, we nonetheless hold that the issues raised in the motions to suppress were identical because they arose from the same transaction, the arrest, upon which both charges found their basis. Furthermore, I agree with the majority's analysis that the parties are the same for purposes of collateral estoppel.

Therefore, under the principles of collateral estoppel, a court of common pleas is bound by a municipal court's ruling if the parties and the issues are identical and proper due process procedures were followed. *Goodson* v. *McDonough Power Equip., Inc.* (1983), 2 Ohio St. 3d 193, 201, 443 N.E.2d 978.

As the supreme court stated in *Goodson:*

> The main legal thread which runs throughout the determination of the applicability of *res judicata,* inclusive of the adjunct principle of collateral estoppel, is the necessity of a fair opportunity to fully litigate and to be "heard" in the due process sense. Accordingly, an absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that **[\*14]** the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action. (citation omitted).

> Collaterally estopping a party from relitigating an issue previously decided against it violates due process where it could not be foreseen that the issue would subsequently be utilized collaterally, and where the party had little knowledge or incentive to litigate fully and vigorously in the first action due to the procedural and/or factual circumstances presented therein. Id. at 201.

Therefore, in order to determine if appellant was afforded his right to due process we must apply *Goodson, supra* which states the following propositions of law: (1) to apply collateral estoppel the party

estopped must have been afforded a fair opportunity to fully litigate and to be "heard" in the due process sense; (2) the party asserting the preclusion must prove that the identical issue was actually litigated in the prior action and (3) a violation of due process occurs when the estopped party had very little knowledge or incentive to litigate fully and vigorously in the first action due to the procedure and/or the factual circumstances.

Applying **[*15]** *Goodson, supra,* to the facts in this case, we must first address whether the trial court determined if appellant was afforded a fair opportunity to fully litigate and to be heard in the due process sense. I believe the majority has not fully reviewed the record in this case. The majority claims that appellant did not inform the trial court he was denied due process by the municipal court's refusal to let him testify. This is clearly wrong, the transcript of the second motion to suppress hearing explicitly shows that the appellant informed the trial court that he was denied the opportunity to testify at his motion to suppress hearing before the municipal court. In fact, the appellant read to the trial court the portion of the transcript of the municipal court hearing into the record which showed that he requested to testify and the municipal court would not permit him to do so. [TR. 49-51]

Therefore, I find the trial court was aware that appellant was denied the chance to testify at his first motion to suppress even though he vigorously requested to do so. Moreover, I note the trial court did not have before it either a journal entry from the municipal court denying appellant's **[*16]** motion to suppress or a copy of the hearing transcripts from the municipal court. Without the full hearing transcript to review I find the trial court could not properly determine if appellant was afforded his due process rights in the proceeding below.

Next, I address whether the state proved that the identical issue was actually litigated in the prior action. The evidence before the court on this issue was the motion to suppress filed in municipal court, the motion to suppress filed in common pleas court and verbal representations by counsel. I find with this information before it the trial court could have concluded that the same issue was previously litigated, but as stated above it could not conclude that appellant received his right to due process.

Finally, I address whether a violation of due process occurred because the appellant did not have the incentive to fully and vigorously litigate the first action due to the fact that he was only charged with a fourth degree misdemeanor. At the time of appellant's first hearing he was not indicted on the felony charges. Therefore, he was only formally charged with a fourth degree misdemeanor for which he received a $ 25 fine. Clearly, **[*17]** appellant did not have the same incentive to vigorously litigate his case as he did once he was formally charged and faced a possible penalty of incarceration. *Goodson,* 2 Ohio St. 3d 193, 201, 443 N.E.2d 978. Nor did appellant have the incentive to appeal the municipal court's ruling denying his motion to suppress.

Therefore, the facts in this case show that appellant was not afforded his constitutional right to due process in a sense that would allow principles of collateral estoppel to apply. As I previously stated, the trial court did not have before it either a journal entry from the municipal court denying appellant's motion to suppress or a copy of the hearing transcripts from the municipal court. I recognize the trial court was given a verbal representation from appellant's counsel that the motion to suppress filed in municipal court was denied. Nevertheless, I would hold in this case the verbal representations from counsel were not sufficient for the trial court to determine if the appellant's due process rights were satisfied. Accordingly, I would find that the trial court had an obligation to determine that appellant's right to due process were met in the proceedings **[*18]** below and it clearly failed to do so.

Therefore, applying the principles set forth by the Ohio Supreme Court in *Goodson, supra,* I would find that the appellant's right to due process was violated.

Furthermore, I find in the criminal context collateral estoppel in a double jeopardy case to be somewhat analogous to the situation in the present case, bearing in mind the differences in the standards of proof for a motion to suppress and the determination of double jeopardy claim.

A federal court has noted the following concerning the application of the doctrine of collateral estoppel in a criminal case:

> * * * in order to apply * * * collateral estoppel principles in criminal cases, the court must examine the record of the prior proceedings and conclude whether a rational jury could have grounded its verdict on an issue other than that which the defendant is seeking to foreclose from consideration. The defendant carries the burden of proving that the previous jury necessarily decided the issue that he seeks to foreclose in his favor. * * *

> "When there is more than one possible reason for the first jury's verdict, and the court cannot say for certain which reason the jury **[*19]** grounded its verdict upon, a second prosecution using evidence of actions upon which the defendant has been acquitted is not prohibited. * * * *United States* v. *White* (D.D.C. 1990), 757 F. Supp. 45, 47.

See, *State* v. *Crago* (1994), 93 Ohio App. 3d 621, 637, 639 N.E.2d 801.

Therefore, in criminal collateral estoppel cases a trial court has a duty to examine the record of the prior proceedings to ensure that the issues and the parties are identical in both cases and the trial court has an obligation to determine that the collaterally estopped party's right to due process were not violated. As set forth in my civil analysis, in the present case the trial court failed to examine the record of the prior proceedings and therefore failed to determine whether the appellant's right to due process was violated.

Accordingly, I would sustain appellant's first assignment of error.

Source:   **Legal > / · · · / > OH Courts of Appeals Cases from 1913** [i]
Terms:   **"242 u.s. 85"**  (Suggest Terms for My Search)
View:    Full
Date/Time:  Monday, June 16, 2014 - 2:30 PM EDT

* Signal Legend:
- ● - Warning: Negative treatment is indicated
- Ⓡ - Questioned: Validity questioned by citing refs
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- Ⓐ - Citing Refs. With Analysis Available
- ❶ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

● **LexisNexis®**  About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
Copyright © 2014 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

2014 JUN 25  PM 2: 00

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN CO. OHIO

## IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

STATE OF OHIO,
           **Plaintiff**    *    **CASE NO.: CR 2014 0139**

-v-             *

                         **Judgment Entry**

**MARKELUS Q. CARTER,**    *

           **Defendant**    *

* * * * * * * * * * * * * * * * * *

This matter came on for consideration of the State's motion to limit the scope of the suppression hearing, filed on June 19, 2014. The State argued that collateral estoppel bars consideration of the suppression issues raised by defendant's recent motion to suppress because those issues were already decided at previous suppression hearings in defendant's previous cases, CR 2009 0068 & CR 2010 0352.

In this case, defendant filed a motion to suppress on May 12, 2014. The instant motion to suppress contains two "branches." Branch I addresses the search of defendant's residence at 122 E. Eureka and the search of defendant's vehicle, a 1996 Ford Explorer. Branch II addresses statements that defendant made to law enforcement.

In CR 2009 0068, a motion to suppress was filed that addressed the traffic stop of defendant's Explorer on February 23, 2009, defendant's

**EXHIBIT**
4

CR14 5196

1

statements to the police on that date and two search warrants that were subsequently issued for the search of 122 E. Eureka, Lima, Ohio.  In case number CR 2009 0068, defendant was subsequently convicted, after a jury trial in which he was found guilty, of possessing a weapon while under disability and possession of crack cocaine.

In CR 2010 0352, a motion to suppress was filed that addressed another search warrant issued to law enforcement for the search of computer equipment that had been seized pursuant to one of the previous warrants.  In case number CR 2010 0352 defendant was convicted, after an "Alford" plea of guilty, of illegal use of a minor in nudity oriented material.

In the instant case, defendant seeks suppression of the same evidence seized pursuant to the same search warrants issued in the previous cases.  He also seeks suppression of the same statements given to police that were the subject of the suppression hearing in CR 2009 0068. He also seeks suppression of any evidence that resulted from the stop of his vehicle on February 23, 2009.

Case No. CR 2009 0068 was resolved by a jury trial and defendant's conviction, thus making the judgment entry on the motion to suppress final and appealable.  Defendant appealed his conviction in *State v. Carter*, Allen App. No. 1-10-01, 2010-Ohio-5189.  In his appeal, he raised the issue of this Court's denial of his motion to suppress.  This Court was

2

CRI4 5197

affirmed by the Court of Appeals. Defendant never appealed his final conviction in Case No. CR 2010 0352. Therefore, both of the previous determinations on the previous motions to suppress were final judgments.

The doctrine of res judicata involves both claim preclusion and issue preclusion, known as collateral estoppel. *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 1995-Ohio-331. Claim preclusion "prevents a party from litigating a cause of action after a prior court has rendered a final judgment on the merits of that cause as to that party." *Krahn v. Kinney*, 43 Ohio St.3d 103, 107 (1989), citing *Norwood v. McDonald*, 142 Ohio St. 299 (1943), paragraph one of the syllabus. Issue preclusion "precludes the relitigation of an issue that has been 'actually and necessarily litigated and determined in a prior action .' " *Id.*, quoting *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St.3d 193, 195 (1983).

In *State v. Day*, 8th Dist. App. No. 67767 (Nov. 2, 1993), the court determined that a common pleas court, considering a motion to suppress, was bound by a ruling on an identical motion to suppress, involving the same defendant, issued in municipal court. Similarly, in *City of South Euclid v. Swirsky*, 8 Dist. App. No. 79865, 2002 -Ohio- 1072, the court held that the doctrines of res judicata and collateral estoppel required a municipal court to accept determination of common pleas court in granting a defendant's motion to suppress. The court in *Day*,

CRI4 5198

cited *Ashe v. Swanson*, 397 U.S. 436 (1970), wherein the Supreme Court of the United States held that collateral estoppel applied in criminal cases.

In *State v. Roberts* 6th Dist. App. Nos. WD-03-001, WD-02-066, 2003 - Ohio- 5689, the court stated, "In our view, res judicata may be applicable to pre-trial determinations in a criminal case, even when a new trial is granted. [...]" In *State v. Young* , 5 Dist. App. No. CA-1598 *(February 4, 1977)*, the court found "no reason in law, logic, common sense or sound public policy why [collateral estoppel] should not equally be applied against an accused as well as in his favor so long as he is not thereby denied his right to trial by jury.

In *State v. Clark*, 4th Dist. App. No. 98 CA 1(April 26, 1999), the court determined that "the doctrine of collateral estoppel did not apply to bar a second motion to suppress where the ruling on the first motion was not a final appealable order.

The instant motion to suppress relates to the exact same facts and circumstances as the motions to suppress in CR 2009 0068 and CR 2010 0352.   The only difference is that in this case defendant seeks to suppress any evidence seized from defendant's motor vehicle,, and that particular issue (regarding evidence seized from the vehicle) was never previously decided.  The legality of the events leading up to the previous search warrants; the legality of the statements given by defendant and the initial

CR14 5199

stop of defendant's Explorer has been determined, appealed and affirmed [in CR 2009 0068].

This Court finds that the doctrine of collateral estoppel bars re-litigation of the matters already decided relating to the stop of the vehicle, statements taken from defendant and the issuance of search warrants for defendant's house to look for guns and for computers. However, the issue regarding the legality of the search of the vehicle and seizure of evidence therefrom, which was not previously determined, is not barred.

Therefore, the State's motion is well taken and the Court hereby limits the scope of the hearing on defendant's motion to suppress in this case to determination of the legality of the search and seizure from defendant's vehicle.  It is so ORDERED.

June 25, 2014

Jeffrey L. Reed, Judge

5

CR14 5200

COMMON PLEAS COURT
FILED

**2014 JUL 14  PM 3: 35**

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY. OHIO

## IN THE COMMON PLEAS COURT OF ALLEN COUNTY, OHIO
## CRIMINAL DIVISION

**STATE OF OHIO**                                    **CASE NO. 2014-CR-0139**

      Plaintiff,                              **JUDGE REED**

vs.

                                              **SUPPLEMENTAL MEMORANDUM**
**MARKELUS CARTER**                        **IN SUPPORT OF MOTION TO**
                                              **SUPPRESS**

      Defendant.

---

      Now comes the Defendant, **MARKELUS CARTER,** by and through his attorneys, **RION, RION AND RION, L.P.A., INC.**, and hereby respectfully submits this supplemental memorandum in support of the motion to suppress previously filed in this matter.

      A memorandum in support is attached.

      An oral hearing is hereby requested.

                          Respectfully submitted,

                          JON PAUL RION (#0067020)
                          RION, RION & RION, L.P.A., INC.
                          Suite 2150
                          130 West Second Street
                          P.O. Box 10126
                          Dayton, Ohio  45402
                          (937) 223-9133
                          info@rionlaw.com

**EXHIBIT**

5

Nrh

139 ymc

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a copy of the motion to suppress was sent to the office of the Prosecutor on the same day of filing, via hand delivery.

JON PAUL RION
RION, RION & RION, L.P.A., INC.

Nrh

## MEMORANDUM IN SUPPORT

**MAY IT PLEASE THE COURT:**

Undersigned counsel submits the following memorandum in support of the motion to suppress previously filed in this matter.

### I. Introduction

Carter was interrogated at least twice by law enforcement.  As a result of those statements, law enforcement obtained numerous search warrants.  There were search warrants for his residence, vehicle, and computers.  Carter was charged with possessing a weapon and child pornography.  His statements and the search warrants were addressed in part during those proceedings.  Carter, now facing a substantially more serious offense, is challenging his second interrogation, which was never addressed previously, as well as search warrants which were based in part on his interrogation.  Undersigned counsel filed a motion to suppress previously in this matter and supplements herein.

### II. Fifth Amendment Violation

Carter was interrogated by law enforcement at least twice.  He was initially arrested and taken for questioning.  That statement was previously litigated in Carter's prior case, 2009 0068.  Carter was arrested and interrogated a second time.  He was advised he was there to discuss a weapon violation, not a murder.  His Miranda warnings were administered but not voluntarily waived.  Even law enforcement acknowledged they were unclear if he understood his rights.  It is the Carter's position that all statements made during the second interrogation

Nrh

must be suppressed.  Further, all evidence obtained as a result of the second interrogation, including subsequent search warrants, must be suppressed.

The state may not use incriminating statements made during custodial interrogation unless it proves that procedural safeguards resulted in the defendant's voluntary waiver of his constitutional privilege against self incrimination.  *Miranda v. Arizona*, 384 U.S. 436 (1966). If a defendant is entitled to those safeguards, but the state fails to advise him of such, any incriminating statements made during custodial interrogation must be suppressed.  This first requires custodial interrogation; the relevant inquiry is whether a reasonable person believe there was a restraint on their freedom of movement.  *California v. Beheler*, 463 U.S. 1121 (1983).

It is Carter's position that the second interrogation was conducted without proper Miranda safeguards.  He was told he was going to be questioned about having a weapon under disability, not a murder.  He was administered some Miranda warnings, however they were not understood and thus not able to be waived.  This entire interrogation must be suppressed and any evidence obtained as a result of that interrogation must be suppressed.

First, Miranda warnings were not administered in a complete or comprehensible manner.  Law enforcement acknowledged Carter was either ill or feigning illness.  Whether he was actually ill or pretending to be ill is irrelevant because either could inhibit him from understanding his Miranda rights and comprehending a waiver of them.  In determining whether a pretrial statement is involuntary, the court should consider the totality of the circumstances including age, mentality, prior criminal experience, intensity and nature of the interrogation, existence of threat or inducement.  *State v. Hughbanks*, 99 Ohio St.3d 365

Nrh

(2003). Those same considerations apply in assessing whether rights are voluntarily waived. Id at 375. A defendant's mental condition is a factor in determining voluntariness, and may be a "significant" factor. *Id.*

Second, he was advised he was being questioned about a weapon charge. This coerced him into making statements about the weapon because he was mislead about law enforcement's true objectives. "Coercive police activity is a necessary predicate to the finding that a suspect involuntarily waived his Miranda. A suspect's decision to waive his Miranda rights [is] made voluntarily absent evidence that 'his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *Colorado v. Spring*, 479 U.S. 564 (1987). Whether the police used any action to overpower, trick, or coerce a statement is a relevant inquiry as to whether Miranda was voluntarily waived. See *State v. Severt*, 2nd Dist. 24074, 2010 Ohio 5389. The state has the burden to prove a defendant's statement was voluntarily made by a preponderance of the evidence. *State v. Melchior*, 56 Ohio St.2d 15 (1978).

A similar issue was addressed in *State v. Wilson*, 31 Ohio App.3d 133 (1986). In that case, the defendant agreed to be questioned and submit to a polygraph regarding a breaking and entering. Prior to the test, he was administered Miranda warnings. The examiner then asked the defendant if he knew of or participated in any other crimes, to which he replied he did, and described two additional breaking and entering offenses. He was then charged with those offenses. In reversing his conviction, the Twelfth District held "he should have been warned again of those rights before he was questioned about crimes other than that which was the original subject of the exam." Id. "Assuming [] that [defendant's] original written waiver

Nrh

of those rights was valid, that waiver could have only been effective in this case for the crime for which [he] knew he would be questioned..." Id.

In this case, the entire interrogation was wrought with symptoms of illness and Carter's appearance of an unwillingness to cooperate. Carter has his eyes closed, head down, slumped over, asking for medication, stating he would choke if he had water. If Carter was legitimately ill, that prevented him from understanding his Miranda rights and the implications of waiving those rights and making a statement. Alternatively, if he was exaggerating or feigning illness, that could suggest a mental defect at that time which would interfere with comprehension of the rights and prevent him from making an intelligent, calculated decision to waive those rights. His illness alone requires suppression of his statement. However, it must also be considered that he was advised he was being interrogated about a weapon case only, which law enforcement minimized, telling him "was not the end of the world." Together, those factors warrant suppression of his statements.

Further, his actions could be perceived as an effort to invoke his right to remain silent. A suspect's invocation of his right to remain silent must be honored and all questioning must cease. *Michigan v. Mosley*, 423 U.S. 96 (1975). A failure to scrupulously honor this request results in suppression of any statements. *Id* at 104. It seems evident that Carter did not want to discuss the case as he was unresponsive, mumbling, and otherwise disengaged in the conversation. He also repeatedly laid his head down, closed his eyes, and did not respond to law enforcement. This was an invocation of his right to remain silent.

Still further, Carter requested counsel at one point during the interview. The questioning did not fully stop. Once a suspect requests an attorney, police cannot further

Nrh

interrogate them until they have consulted with counsel. *Edwards v. Arizona*, 451 U.S. 477 (1981). It is Carter's position that he unequivocally requested counsel, which law enforcement acknowledged, however the conversation continued. All statements made after invocation of counsel must be suppressed. This includes any statements made that day or at a later date or time, as Carter never reinitiated questioning or otherwise rescinded that request.

Finally, pursuant to the Fruit of the Poisonous Tree doctrine, all evidence obtained as a result of these statements must be suppressed. The statements were used to obtain search warrants. The search warrants included searches of Carter's residence, computer and vehicle. Illegally obtained evidence cannot be the basis of a search warrant. See *Wong Sun v. United States*, 371 U.S. 471 (1963).

For these reasons, and the pursuant to the evidence to be introduced at the hearing scheduled in this matter, Carter seeks suppression of his statements and all derivative evidence.

Respectfully submitted,

JON PAUL RION
RION, RION & RION, L.P.A., INC.

Nrh

COMMON PLEAS COURT
FILED

2014 JUL 14  PM 3: 38

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE COMMON PLEAS COURT OF ALLEN COUNTY, OHIO
## CRIMINAL DIVISION

STATE OF OHIO

      Plaintiff,

vs.

MARKELUS CARTER

      Defendant.

CASE NO. 2014-CR-0139

**JUDGE CHENEY**
(Sitting by Assignment by Judge Reed)

**SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION TO
SUPPRESS**

---

Now comes the Defendant, **MARKELUS CARTER,** by and through his attorneys, **RION, RION AND RION, L.P.A., INC.,** and hereby respectfully submits this supplemental memorandum in support of the motion to suppress previously filed in this matter.

A memorandum in support is attached.

An oral hearing is hereby requested.

Respectfully submitted,

JON PAUL RION (#0067020)
**RION, RION & RION, L.P.A., INC.**
Suite 2150
130 West Second Street
P.O. Box 10126
Dayton, Ohio  45402
(937) 223-9133
info@rionlaw.com

**EXHIBIT**
6

Nrh

140 ypm

## CERTIFICATE OF SERVICE

    I, the undersigned, do hereby certify that a copy of the motion to suppress was sent to the office of the Prosecutor on the same day of filing, via hand delivery.

JON PAUL RION
RION, RION & RION, L.P.A., INC.

Nrh

## MEMORANDUM IN SUPPORT

**MAY IT PLEASE THE COURT:**

Undersigned counsel filed a motion to suppress in this case, addressing two interrogations of Carter and four search warrants executed in this matter.  That case is assigned to Judge Reed, who indicated this honorable court would review the search warrants.  Judge Reed is reviewing the motion to suppress addressing the interrogations.  Counsel submits this memorandum for purposes of clarity of the warrants at issue.

There were four search warrants executed in this case:  two search warrants were for Carter's residence, 122 E. Eureka, Lima, Ohio; one search warrant was directed to his computers; and one search warrant was directed to his vehicle, 1996 Ford Explorer.  At issue is whether each of the warrants was based upon probable cause, whether the command portion of the warrant was too general or lacked specificity and clarity, and whether the affidavits in support of the warrants contained conclusory statements, and stale or remote facts.  Each of these warrants were based, at least in part, on the interrogations of Carter.  If Judge Reed finds the statements were improper, then those statements cannot form the basis of probable cause of the affidavits in support of the search warrants.

Nrh

## A. **NO PROBABLE CAUSE FOR THAT LOCATION**

The affidavits herein do not state any reason to believe that any evidence in relation to the offense would be located at 122 E. Eureka, Lima, Ohio; on Carter's computer, or in the 1996 Ford Explorer, VIN: 1FMDU35P7TUC49708.   The search warrants based upon those deficient affidavits were executed on or about February 28, 2009.

"When reviewing an application for a search warrant, the magistrate judge must make an independent determination of whether probable cause exists." *Illinois v. Gates*, 462 U.S. 213 (1983).  The Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238.  "The probable cause requirement...is satisfied if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *United States v. Beasase,* 521 F.2d 1306, 1307 (6th Cir. 1975).  This requires "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). "To establish probable cause to issue a search warrant, an affidavit must contain sufficient information to allow a magistrate to draw the conclusion that evidence is likely to be found at the place to be searched." *State v. Blevins*, 3rd Dist. No. 9-06-40, 2007-Ohio-6972 citing *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct.741, 13 L.Ed.2d 684.

An affidavit in support of a search warrant must contain "the presence of some indicia of veracity of the informant or the reliability of the information material to the probability of evidence of crime." *State v. Williams*, 173 Ohio App.3d 119, 2007-Ohio-4472.  While Ohio courts have found probable cause to search a particular area in a variety of circumstances, at a

Nrh

minimum there must be some verification of the reliability of the information or other indicia of veracity of the informant.  See *State v. McIntosh*, 10th Dist. No. 04-AP-296, 2005-Ohio-1152 (where C.I. purchased cocaine as verification), *State v. Raines*, 4th Dist. No. 03CA2739, 2004-Ohio-1915 (where C.I. purchased and officer had personal knowledge), *State v. Bailey*, 12th Dist. No. CA2002-03- 057, 2003-Ohio-5280 (where informant worked with police previously and was known to be reliable).

In this case, the warrants were based in part on improperly obtained statements.  Absent those statements, there is no probable cause to search the residence, computer or vehicle.  Again, there must be sufficient information that evidence would be found at that particular location.  For these reasons, the search warrants were not based upon probable cause.

## B.  NO PARTICULARITY

The command portion of the warrants, the portion that commands the law enforcement officers to search for the following items, are too general in this case, leaving too much discretion to law enforcement officers as to what is to be seized.

In *State v. Simpson*, 64 Ohio Misc. 42, the Court in a well-reasoned decision held as follows:

"1.  Pursuant to Crim. R. 41 and R.C. 2933.23 and 2933.24, property searched under authority of a search warrant must be confined to that property which is designated in the "command" portion of the warrant.

2.  A search based upon sections other than the "command" portion of the warrant, or based upon the affidavit, is unlawful and the evidence obtained thereby must be suppressed."

Further, the U. S. Supreme Court has set forth the rule that unnamed items may be seized only where their discovery during the search is inadvertent.  *Coolidge v. N.H.*, 403 U.S.

Nrh

443 (1971). Pursuant to the Fourth Amendment requirements, all the items not specifically listed **with particularity** must be suppressed.

Rule 41(C) of the Ohio Criminal Rules provides in part as follows: "... If the judge is satisfied that probable cause for the search exists, he shall issue a warrant **identifying the property**..." (Emphasis added). In *State v. Porter,* 7 O.O. 3d 343, the Court held in its second syllabus as follows: "... and the affidavit must particularly describe the place to be searched and particularly include the articles or things to be seized..." (emphasis added). The Court in *Porter* noted the following in its opinion: "the articles that are the subject of the search must be particularly identified and what is to be taken not left to the discretion of the officer conducting the search."

In a subsequent decision, the Court in *State v. Williams*, 9 O.O. 3d 81, stated the following at page 83:

> "One primary objective of the warrant requirement is that searches deemed necessary should be as limited in scope as possible. Otherwise, the issuance of a warrant would serve as the justification for a general search, during which police officers could rummage through a person's belongings in quest of **unidentified incriminating evidence**. (emphasis added)

> "We decline to contort the plain view doctrine so as to justify the seizure here under review, since we would thus be allowing this narrow exception to the warrant requirement to swallow the rule."

Carter is asking that all four warrants be reviewed to determine whether the command portion was too general, allowing for unfettered discretion by law enforcement.

Nrh

## C.   <u>FACTS</u> <u>STALE</u> <u>AND</u> <u>REMOTE</u>

The affidavit for the search warrants herein is fundamentally defective for its failure to state when anything is alleged to have occurred.

The court in *State v. DeNegris*, 212 A. 2d 894, held that the recital must be of facts so closely related to the time of issuance of the warrant as to justify a finding of probable cause at the time of the issuance of the warrant. *Commonwealth v. Bove*, 293 A. 2d 67. Likewise, the court in *State v. Gram*, 445 P. 2d 503, held that, one month delay between purported information and issuance of the warrant was fatal to the establishment of probable cause.

The cases of *Ashley v. State*, 241 N.E. 2d 264; and *State v. McPherson*, 444 P. 2d 5, hold that an eight and six days (respectively) delay is fatal for the reason that the fact that there is probable cause to believe that a person is in possession of a substance on one day does not establish probable cause to believe it is there some eight or six days later. In *Collins v. State*, 34 Cr. L. 2138, the court held that the failure to allege a time in an affidavit was fatal to the warrant. The court in *State v. O'Brien*, 528 P. 2d 176, held that the reference of "recently" was insufficient to satisfy the requirement of a demonstration that probable cause **presently** exists.

Here, insufficient dates are alleged stating that criminal activity occurred on the premises sought to be searched. Therefore, based upon the authorities cited above, the affidavits are deficient and the warrants defective.

Nrh

### D. NO FACTUAL BASIS ALLEGED

The affidavit contained conclusions, not facts, and was improper. A warrant containing only conclusions, not facts, is insufficient to support probable cause. *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1998). "An affidavit based solely on the hearsay report of an unidentified informant must set forth 'some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable.'" *Aguilar* at 114.

In *Weaver*, an informant, who received information from a third party, told police the defendant was dealing drugs out of his home. The informant bought marijuana at the defendant's residence with the third party. The Sixth Circuit held the affidavit was lacking as it did not indicate whether the informant was reliable, and the officer had no evidence from surveillance or other investigation to corroborate that drug trafficking was occurring. The court noted that, despite the sale being only three days prior to the search, there were no "underlying factual circumstances to support the informant's knowledge regarding distribution, nor the detective's own 'belief' that these quantities of marijuana were present 'for the purpose or with the intention of unlawful possession, sale or transportation' or even that marijuana would be on the premises when the warrant was executed." *Id* at 1378. Finally, the court held the affidavit was so lacking that the good faith exception delineated in *United States v. Leon*, 468 U.S. 897 (1984) did not apply. *Id* at 1380.

In conclusion, Carter is arguing facts and legal positions which have not previously been raised. While some of these search warrants have been the subject of prior motions to suppress for Carter's prior offenses, none have raised these same factual and legal disputes. Additionally, this is the most serious offense Carter has faced and thus the search warrants are

Nrh

not barred by res judicata and can be reviewed by this court.

Wherefore Carter respectfully requests all evidence obtained from the four search warrants be suppressed.

Respectfully submitted,

JON PAUL RION
RION, RION & RION, L.P.A., INC.

Nrh

FILED
COMMON PLEAS COURT

2014 AUG 14  AM 11: 29

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE COMMON PLEAS COURT OF ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO.: CR2014-0139 |
| | : | JUDGE CHENEY |
| Plaintiff, | : | |
| v. | : | |
| | | JUDGMENT ENTRY OVERRULING MOTION TO SUPRESS |
| MARKELUS Q. CARTER, | : | |
| Defendant. | : | |

On July 31, 2014, a hearing was held on the Motion to Suppress filed May 12, 2009 on behalf of the Defendant. Defendant was personally present at the hearing and represented by attorney, Matthew Barbato. The State of Ohio was present through Assistant Allen County Prosecuting Attorneys, Jana Emerick, Teri Kohlreiser, and Destiny Hudson.

The parties stipulated to the admission of the following exhibits:

1. Affidavit for Search Warrant;

2. Search Warrant for the 1996 Ford Explorer

3. Inventory and Reciept For Property Seized by Search Warrant

The Court heard arguments by counsel for the State of Ohio and counsel for the Defendant. The evidence presented shows that on February 23, 2009 investigator Charles Godfrey from the Lima Police Department was assigned to investigate the homicide of Ken

165 ine

EXHIBIT
7

CR14 6429

Warrington, which was linked to Sonja Burkholder, mother of defendant's children. Given his previous knowledge of defendant, Godfrey testified that defendant was a person of interest in the homicide investigation. Detective Tim Clark testified that he was investigating the death of Ken Warrington. Godfrey had given Clark defendant's license plate number. When driving by defendant's home at 122 E. Eureka, Clark saw a black Ford Explorer parked, but the plate number did not match that which had been given to him by Godfrey. In the meantime, Sgt. Leary drove by and positively identified the Explorer as belonging to Defendant. At this time Defendant was observed to enter the Explorer and drive away. While police followed him it was observed that the Explorer had two different license plates on it, one of which contained the number Godfrey had told Clark. Upon noticing this, Clark radioed for a marked cruiser to stop Defendant. Cruisers stopped the vehicle at the intersection of Spring Street and Jamison Avenue. Defendant exited the vehicle and was patted down. Clark arrived shortly after this and advised defendant that he was not under arrest, but that police wanted to speak with him about a homicide. His car was later impounded and searched by Godfrey and Detective Baker.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and requires that "no Warrant shall issue but upon probable cause." U.S. CONST. amend. IV

Crim. R. 41(C) delineates the standard for issuing a search warrant:

> "(C) Issuance and contents. A warrant shall issue under this rule only on an affidavit or affidavits sworn to before a judge of a court of record and establishing the grounds for issuing the warrant. The affidavit shall name or describe the person to be searched or particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located. If the judge is satisfied

2

C214 6430

> that the probable cause for the search exists, he shall issue a warrant identifying the property and naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished"

Evidence obtained as the result of a search warrant will be suppressed if "(1) ' * * * the magistrate or judge * * * was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth * * * '; (2)' * * * the issuing magistrate wholly abandoned his judicial role * * * '; (3) an officer purports to rely upon ' * * * a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" '; or (4) ' * * * depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonable presume it to be valid.'" *State v. George* (1989), 45 Ohio St.3d 325, at 331, citing *United States v. Leon* (1984), 468 U.S. 897.

When a motion to suppress evidence seized pursuant to a search warrant attacks the judge or magistrate's issuance of the warrant, the motion presents two potential issues. One, and the critical issue, is whether the affidavit for the warrant provided a substantial basis upon which the judge could make an independent determination that probable cause existed for the search. *Illinois v. Gates* (1983), 462 U.S. 213.

In short, the Defendant's motion is that law enforcement lacked probable cause for the search warrant signed by Judge Reed on February 25, 2009.

When assessing the adequacy of an affidavit offered to support a request for a search warrant, a judge must make a "practical, common-sense decision whether, given all the

3

CR14 6431

circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. George* 1989 45 Ohio St.3d 325, paragraph one of the syllabus, quoting *Illinois v. Gates* (1983), 462 U.S. 213. This approach is often called the "totality of the circumstances" test. *Id.*

In reviewing "the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a judge, neither a trial court nor an appellate court should substitute its judgment for that of a [judge] by conducing a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which the court would issue the search warrant." *George*, *supra*, at paragraph two of the syllabus. Instead, "the duty of a reviewing court is simply to ensure that the [Judge] had a substantial basis for concluding that probable cause existed," and it "should accord great deference to the [judge's] determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." Id; *State v. Gales* (2001), 143 Ohio App.3d 55, 61.

"Probable cause means the existence of evidence, less than the evidence that would justify condemnation, such as proof beyond a reasonable doubt or by a preponderance; in other words, probable cause is the existence of circumstances that warrant suspicion." *State v. Young*, 146 Ohio App.3d 245, 2001-Ohio-4284. Consequently, the standard for probable cause does not require a prima facie showing of criminal activity; rather, the standard requires "only a showing that a probability of criminal activity exists." *Id.*

Given the affidavit supporting the issuance of the search warrant Judge Reed had a substantial basis for concluding that probable cause existed as to whether the vehicle contained evidence in the crime of murder. The affidavit sets forth that the Defendant

CR14 6432

was connected to the murder of Kenneth Warrington, that he was found driving his 1996 Ford Explorer with two different license plates. Additionally the affidavit notes that Carter had told officers he had a .357 revolver in his home, which was later found in a warranted search of his home. Finally, the affidavit states that Officers had confirmed knowledge of two counts of felony drug abuse. It cannot be over emphasized that the caliber and brand of ammunition found at the scene of Warrington's death matched ammunition that was at Defendant's home. Common sense also indicates there was likely a mode of travel and or transportation that would have been utilized between the scene of the homicide and Defendant's home.

This Court is barred from conducting a de novo review of the sufficiency of probable cause contained in an affidavit supporting the issuance of the search warrant. *George*, supra, paragraph two of the syllabus; *State v. Martin* (Dec. 6, 1996), Ashtabula App. No. 96-A-0016, unreported. Neither can this Court substitute its judgment for that of Judge Reed when reviewing the sufficiency of probable cause in Godfrey's affidavit. Rather, "the duty of a reviewing court is simply to ensure that [Judge Reed] had a substantial basis for concluding that probable cause existed." *Id.*, *State v. Phillips* (Nov. 5, 1992), Marion App. No. 9-92-22, unreported.

Defendant has in no way demonstrated that Judge Reed was not neutral and detached, that he was misled by information in the affidavit that Godfrey knew was false or that Reed wholly abandoned his judicial role. Defendant has not shown that the warrant is so facially deficient that the executing officers could not reasonably presume it to be valid.

CR14 6433

Probable cause is proof less than that beyond a reasonable doubt or by a preponderance of the evidence; it is "only the probability, and not a prima facie showing, of criminal activity * * *." *George*, supra, citing *Gates*, 462 U.S. 213. The Court finds the affidavit demonstrates sufficient facts upon which a finding of probable cause could be made.

It is therefore ORDERED that Defendant's Motion to Suppress is OVERRULED and DENIED.

IT IS SO ORDERED.

_____
JUDGE DAVID A. CHENEY

Dated: 8|11|14
Jana Emerick
Matthew Barbato

CR14 6434

FILED
COMMON PLEAS COURT

2014 AUG 11 AM 9:06

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| | * | |
| STATE OF OHIO, | * | CASE NO. CR 2014 0139 |
| Plaintiff | * | |
| -v- | * | JUDGMENT ENTRY MOTION TO SUPPRESS |
| MARKELUS Q. CARTER, | * | SECOND STATEMENT GIVEN ON FEBRUARY 23, 2009 |
| Defendant | * | |

* * * * * * * * * * * * * * * *

This 31st day of July 2014 this matter came on for a suppression

hearing on the motion to suppress (Branch II) that was filed on May 12,

2014 and the supplemental memorandum filed on July 14, 2014.

Defendant was present in open court and was represented by Attorney

Matthew Barbato. Assistant Prosecutors Jana Emerick, Terri Kohlreiser and

Destiny Hudson appeared on behalf of the State of Ohio. The issue

presented at this hearing was whether a statement defendant gave to

Sergeant Charles Godfrey and Detective James Baker on February 23,

2009, after he had been arrested for having a weapon while under a

disability, should be suppressed. The Court admitted State's Exhibits #1

and #2, copies of DVD recordings of, respectively, the second interview of

1

defendant on February 23, 2009 (which was the subject of this hearing), and the first interview of defendant on February 23, 2009 (which was previously considered in one of defendant's previous cases[1]).

A copy of the Court's Judgment Entry filed on August 25, 2009 in CR 2009 0068 is attached hereto and incorporated as if fully re-written and the Court adopts the reasoning and judgment in that case as it pertains to the instant motion.[2] "Under the doctrine of res judicata, '[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action.'" *Kelm v. Kelm*, 92 Ohio St.3d 223, 227, 749 N.E.2d 299 (2001), quoting *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 381, 653 N.E.2d 226 (1995), at syllabus. Furthermore, "[r]es judicata operates to bar litigation of 'all claims which were or might have been litigated in a first lawsuit.'" *Grava*, 73 Ohio St.3d at 382, quoting *Natl. Amusements, Inc. v. Springdale*, 53 Ohio St .3d 60, 62, 558 N.E.2d 1178 (1990).

Upon consideration of all of the evidence, including the DVDs and testimony and the written memorandum and arguments of counsel, the Courts there is no merit to the motion to suppress.

---

[1] On August 20, 2009 the Court held a hearing regarding the first statement given by defendant on February 23, 2009. That particular statement was the subject of a motion to suppress filed by the defendant in Case Number CR 2009 0068. On August 25, 2009 this Court entered a judgment overruling that motion to suppress filed in the earlier case that related to the first statement given on February 23, 2009. Defendant's subsequent conviction in CR 2009 0068 was appealed and affirmed in *State v. Carter*, 3rd Dist. (Allen) No. 1-10-01, 2010-Ohio-5189.
[2] The facts leading up to the first interrogation were presented at the hearing in CR 2009 0068.

CR 14 6391

The evidence demonstrated that on February 23, 2009, defendant was interviewed first in the morning at the Lima Police Department. After that interrogation, defendant was released and met police officers at his house on East Eureka Street in Lima, Ohio. At the house, police found a weapon and arrested defendant for having that weapon while under a disability. Defendant was then transported back to the police station. Upon his arrest, defendant asked Sergeant Godfrey if they could talk again. Godfrey told defendant he would talk to him later.

About an hour later, Godfrey escorted defendant to an interrogation room and, along with Detective Baker, interrogated defendant. The second interrogation was recorded on State's Exhibit #1.

It is clear that during the first interrogation on February 23, 2009 defendant spoke to his attorney. Law enforcement actually talked to defendant's attorney, too, during the first interview. When defendant asked to talk to Godfrey again after he was arrested, defendant did not refuse to speak to Godfrey and Baker. Police Officers knew defendant had an attorney (because they had spoken to the attorney during the morning interview), but did not contact the attorney before conducting the second interrogation. However, when defendant finally said he wanted an attorney present, the second interrogation was stopped.

At the start of the second interview on February 23, 2009 defendant asked for medication (Dilantin), but then told Baker that he was O.K.

3

CK 14 6392

Godfrey testified that he believed that defendant was feigning his illness. Baker engaged defendant in idle conversation about a friend named Gary and defendant's music studio. Defendant was responsive, although at times, he sounded confused. Godfrey called defendant's son's school to let the school know that someone else was going to pick up defendant's son. Godfrey told defendant to relax. Godfrey told defendant he was there for "weapons under a disability" and that it was "not the end of the world." Godfrey reminded defendant that he said he wanted to talk. Defendant was concerned about his children and asked whether he was allowed to protect his family.

Defendant said he was not under the influence of drugs or alcohol and that he was O.K. Godfrey and Baker explained the *Miranda*[3] rights to defendant as defendant read along on a standard admonishment form. Defendant indicated that he understood the rights and the waiver portion of the form. Defendant said he was told his attorney needed to be there. Godfrey reminded defendant again that it was defendant who said, at his house, that he wanted to talk to police. When defendant said he was willing to talk "with his attorney," Godfrey stopped the interrogation.

A suspect subjected to questioning in police custody must first be warned that (1) he or she has the right to remain silent, (2) anything he or she says can be used against him or her in a court of law, (3) he or she has

---

[3] *Miranda v. Arizona* (1966), 384 U.S. 436.

4

CA 14 63 93

the right to the presence of an attorney, and (4) if he or she cannot afford an attorney, if desired, one will be appointed for him or her prior to any questioning. *Miranda*. An individual may waive his or her right to remain silent and to have a lawyer as long as the waiver is knowingly and intelligently made. *Id*. An opportunity to exercise these rights must be afforded to him throughout the interrogation. The evidence is clear that defendant was properly admonished about his rights under *Miranda*.

A suspect may waive his *Miranda* rights provided her waiver is knowing and intelligent. *Edwards v. Arizona*, , 451 U.S. 477 (1981). In determining whether the individual effected a valid waiver of his *Miranda* rights, the court must examine the "totality of circumstances" surrounding the event. *State v. Eley*, 77 Ohio St.3d 174 (1996). Under the "totality of the circumstances" test, the reviewing court should consider: (1) the age, mentality, and prior criminal experience of the individual; (2) the length, intensity, and frequency of the interrogation; (3) the existence of physical deprivation or mistreatment; and (4) the existence of threat or inducement. See *State v. Edwards*, 49 Ohio St.2d 31 (1976). The state need only have proved that defendant waived his right to remain silent by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157 (1986).

As noted above, as Godfrey and Baker tried to determine whether defendant agreed to talk to them, defendant said he was told that he

5

CR 14 6394

should have his attorney there. Police must honor an invocation of the right to cut off questioning only if it is unambiguous. *Davis v. United States*, 512 U.S. 452 (1994), holds that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. * * * [W]e decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id*. at 461-462. "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation." *Id*. at 459, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.

The question whether a suspect invoked his right to counsel is an "objective inquiry." *Davis*, 512 U.S. at 459. Further, a suspect's alleged invocation must be examined "not in isolation but in context." *State v. Murphy*, 91 Ohio St.3d 516, 520–521 (2001). "[A] reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel * * * do[es] not require the cessation of questioning." *Davis*, at 459. "For example, statements such as, 'I think I need a lawyer,' 'Maybe I should talk to a lawyer,' and 'I think that I would like an attorney' have been deemed too ambiguous to invoke the

6

CN 14 6395

Miranda right to counsel." *State v. Zaffino*, 9th Dist. No. 21514, 2003-Ohio-7202, ¶ 58. If ambiguous requests for counsel could suffice for invocation purposes, "[p]olice officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Davis*, at 461. See, also, *State v. Long*, 1st Dist. Nos. C–090248 and C–090249, 2010-Ohio-1062, ¶ 16; *State v. Knight*, 2d Dist. No. 04–CA–35, 2008-Ohio-4926, ¶ 9, 112; *State v. Simmons*, 8th Dist. No. 86499, 2006-Ohio-4751, ¶19; *State v. Wellman*, 10th Dist. No. 05AP–386, 2006-Ohio-3808, ¶ 26; *State v. Rogers*, 12th Dist. No. CA2004–06–014, 2005-Ohio-6693, ¶ 22–25; *State v. Williams*, 10th Dist. No. 03AP–4, 2003-Ohio-7160, ¶51; *State v. Neal*, 2d Dist. Nos. 2000–CA–16 and 2000–CA–18, 2002-Ohio-6786, ¶ 46; *State v. Revels*, 12th Dist. Nos. CA2001–09–223 and CA2001–09–230, 2002-Ohio-4231, ¶ 16; *State v. Foster* (Dec. 21, 2001), 11th Dist. No. 2000–T–0333, 2001-Ohio-8806; *State v. Holman* (Dec. 21, 1999), 10th Dist. No. 99AP–92; *State v. Tefft* (Sept. 2, 1999), 3d Dist. No. 1–99–35, 1999-Ohio-866, at *3 (defendant never unambiguously and unequivocally requested counsel when he responded to an officer's statement that he had a right to an attorney with "Well I'm going to need one"); *State v. Metz* (Apr. 21, 1998), 4th Dist. No. 96 CA 48; *State v. Greene* (Dec. 14, 1993), 4th Dist. No. 92 CA 32.

With the foregoing law in mind, the credible objective evidence presented demonstrates defendant never unambiguously or

CA 14 63 96

unequivocally invoked his right to have an attorney and not talk to the officers when he said that he was told his attorney needed to be there.

However, when defendant said he would talk when his attorney was present, Godfrey stopped the interrogation.  There was no violation of the defendant's constitutional rights.

Therefore, it is ORDERED, ADJUDGED and DECREED that defendant's motion to suppress is **overruled**.

August 9, 2014

_Jeffrey L. Reed_
Jeffrey L. Reed, Judge

8

Cr 14 6397

09 AUG 25  PM 3: 02

# IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

|                          |   |                          |
|--------------------------|---|--------------------------|
|                          | * |                          |
| **STATE OF OHIO,**       | * | **CASE NO. CR2009 0068** |
| **Plaintiff**            | * |                          |
| **-v-**                  | * | **JUDGMENT ENTRY**       |
|                          | * | **MOTION TO SUPPRESS**   |
| **MARKELUS Q. CARTER,**  | * |                          |
| **Defendant**            | * |                          |

* * * * * * * * * * * * * * * *

This matter comes on for consideration of the motion to suppress filed on behalf of the defendant on May 12, 2009.  Defendant filed a supplement to his motion to suppress on May 28, 2009.  The suppression hearing was initially scheduled for June 15, 2009.  However, on June 3, 2009 defense counsel filed an "Emergency Motion..." for appointment of new counsel for the reason that then counsel was probably a witness with respect to the motion. The Court appointed new counsel for defendant on June 3, 2009.  The suppression hearing was eventually continued to July 9, 2009.  On July 9, 2009 the suppression hearing began.  The suppression hearing was concluded on August 20, 2009.  Defendant appeared in open court at all hearings, represented by attorney F. Stephen Chamberlain.  Assistant prosecuting attorney M. Daniel Berry represented the State of Ohio at the hearings.  The Court gave both sides ample opportunity to present evidence

1

CR14 6398
CR09 5698

63yol

and argument. The Court has carefully reviewed all exhibits admitted at the hearing, including State's Exhibits #1 and #2 (copies of affidavits and search warrants), State's Exhbit #3 (a cruiser cam video tape from February 23, 2009), State's Exhibit #4 (a DVD recording of defendant's statement to police) and State's Exhibit #5 (a phone message slip).

The general facts involved in this case and pertinent to the motions to suppress are as follows:

On February 23, 2009 Investigator Charles Godfrey was assigned to investigate a homicide of Ken Warrington. Warrington was allegedly linked to a Sonja Burkholder, who was the mother of defendant's children. Godfrey testified that defendant was a "person of interest" in the murder investigation. Godfrey was acquainted with defendant from a previous matter.

Godfrey testified that he called defendant's cell phone and spoke to defendant. Godfrey asked defendant to come in and talk to him. Godfrey said defendant told him he would come to the police station and talk. Defendant did not show up.

Godfrey called defendant again and said something happened to "Ken" and told defendant it did not sound good. Godfrey also checked on defendant's vehicle registration and relayed the vehicle information to officers to locate defendant's car. Godfrey said he wanted to talk to defendant.

Detective Tim Clark testified that he was investigating the death of Ken Warrington. Clark said he spoke with Godfrey and was advised of

CA 14 6399
CR09 5699

Godfrey's attempts to have defendant come in to talk with police. Godfrey had given Clark the defendant's license number. Clark said he drove by defendant's house. He saw a black Ford Explorer at or near the defendant's house, but it did not have the plate number that Godfrey had given him. Someone was near the Explorer, but Clark did not know it was defendant. In the meantime, Sergeant Leary also drove by and said the black Explorer belonged to defendant. Defendant was observed to enter the black Explorer and drive away. Police followed him. It turned out that the Explorer had two different license plates on it. When Clark was able to see the rear plate, he saw it contained the plate number that Godfrey had relayed. Armed with the knowledge that defendant's Explorer had two different plates on it, Clark radioed for a marked cruiser to stop defendant.

Defendant was stopped near the intersection of Spring Street and Jamison Avenue. Defendant exited his vehicle and was patted down. Clark arrived. Clark said defendant was not under arrest. Clark testified that he wanted to talk to defendant. Clark testified that he advised defendant that police wanted to talk to him about a homicide. Clark said defendant became very emotionally upset and cried out something about his daughter being injured. Clark said defendant was very upset and out of control. Clark said he told defendant that his daughter was fine. Clark testified that defendant was taken to the police station in a police cruiser. The stop of defendant and what occurred during the stop in recorded on State's Exhibit #3. State's Exhibit #3 shows the stop of defendant's Explorer. Nothing outside of the cruiser can be heard. At first, defendant is calm, then all of the sudden he is

3



seen hopping and obviously upset. When he gets in the cruiser and is transported to the police station, he can be heard crying things like, "Hurry, hurry!" "My baby..." "Someone tell me something..." The patrolman driving the cruiser repeatedly told defendant he did not know what this was about, only that he was instructed to stop him.

After defendant arrived at the police department, he was interviewed by Godfrey and Kleman. The interview was recorded on State's Exhibit #4. The DVD last a little over two hours. The two hours includes an interrogation, telephone call from defendant's attorney, calls from other persons, gun shot residue examination/test and a lengthy period when defendant was left alone to use his phone.

Kleman testified that defendant was interviewed as a "person of interest" in the murder investigation. Kleman said defendant was not under arrest and was free to go. The first thing Kleman says to defendant on the DVD is that after they talk to him, he can go home. Kleman testified, and the DVD shows, that defendant was quite calm until the last few minutes of the interview. On the DVD, defendant acknowledges that he "now" knew why he was at the police station. He confessed to having a gun or gun[s] at his house for protection. Defendant said if it was the gun that police wanted, they could have it. During the interview, defendant had access to his cell phone and, in fact, actually used his phone. Defendant's attorney called during the interview. The attorney, Kenneth Rexford, spoke to Kleman during the interview, and defendant was allowed to speak to his attorney on the phone for several minutes. After speaking to Rexford, Defendant told

4



Godfrey that his attorney told him what his rights were.   Kleman told Rexford that "we're not going to hold [defendant]."  After speaking to Rexford, Kleman said they would do a gun shot residue test on defendant.

Detective Scott Leland was also assigned to investigate the death of Warrington.  He swore out two affidavits and drafted two search warrants for 122 E. Eureka (defendant's home).  This Court issued two warrants (State's Exhibits #1 and #2).  The warrants were executed and property was seized that is basis for the charges in the instant case.

Defendant's "family attorney," Kenneth Rexford, testified.  Rexford testified that defendant called him early on February 23, 2009 and told him that Godfrey had contacted him.  Rexford said he told defendant to go ahead and talk to Godfrey.

Later that morning, defendant called Rexford again, this time crying and hard to understand.  Rexford learned that defendant was at the police station and worries that something had occurred involving defendant's daughter.  Rexford was advised by someone on the phone who he believed to be a police officer that defendant was being taken upstairs to talk. Rexford testified that he assumed it was in reference to defendant's daughter.  Rexford said he was never told that defendant was being interrogated regarding alleged criminal behavior.

Rexford testified that he later called defendant and found out that defendant was being interrogated.  Rexford spoke to Detective Kleman and told Kleman to cease the interrogation and decline to consent to any search.

CR 14 6902
CR09 5702

However, Rexford said he told Kleman that defendant would not resist any order for a gun shot residue examination.

Rexford testified that later, when he learned that a search warrant was being sought, he sent a note (State's Exhibit #5) to police because he thought there could be "loose" black powder in defendant's house.  He said he sent the message to "protect" law enforcement personnel.

Defendant also testified at the hearing.  He testified that when Godfrey first contacted him on the morning of February 23, 2009, he thought it was in reference to a case involving the mother of his children.  He testified that he told Godfrey that he would come in to talk after an appointment he had that morning.  He said Godfrey was very insistent that he come in immediately.  Defendant testified that Godfrey told him that something had happened to "Ken" and that defendant thought he was referring to Kenneth Rexford.  Defendant testified that he intended to go to the police station on his own.

Defendant testified that, thereafter, police stopped him.  Defendant testified that Clark told him that police wanted to talk to him about a murder on McKibben Street.  Defendant said his daughter lived on McKibben and he asked Clark, "Where is my daughter?"  Defendant said Clark would not answer, so he figured something happened to his daughter and became very upset.

Defendant said he was "moved" or "directed" to the police cruiser and taken to the police station.  He called Attorney Rexford and handed the phone to the officer.



The motion to suppress (and supplement) address, at least three issues: 1) the validity of the stop of defendant, 2) whether he was in custody when he was questioned by police, and 3) whether the evidence seized when the subsequent search warrant were executed should be suppressed since the warrants were based on what defendant claims were illegally obtained statements.

The stop of defendant's Explorer was obviously without a warrant. On a motion to suppress evidence, the state must prove that any warrantless search and seizure fits within one of the defined exceptions. *Lago v. Twomey* (1972), 404 U.S. 477. One of these exceptions is set forth in *Terry v. Ohio* (1968), 392 U.S. 1. In *Terry, supra,* the court found that the governmental concern in curtailing crime would permit a police officer in appropriate circumstances to "approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." The standard for an investigatory stop as set forth in *Terry, supra,* is less than probable cause. For this exception to apply, the officer must have a reasonable belief, based upon specific and articulable facts, that the individual was engaged in or about to be engaged in criminal behavior. *Terry, supra; United States v. Cortez* (1981), 449 U.S. 411; *State v. Freeman* (1980), 64 Ohio St.2d 291.In deciding this case, this Court must look at the totality of the circumstances to determine whether the officers had reasonable suspicion to stop defendant. *Maumee v. Weisner* (1999), 87 Ohio St.3d 295. The test for determining whether a traffic stop was legitimate is whether the police officer possessed an articulable reasonable suspicion that



a traffic violation had occurred or was occurring. See *Terry v. Ohio* (1968),

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Delaware v. Prouse* (1979), 440

U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660.

While defendant's vehicle had two different plates on it, which is a

minor violation of traffic law (see R.C. 4549.08), the real reason defendant

was stopped was because officers wanted to talk to him as a "person of

interest" in a homicide investigation.  It is clear that police were

investigating a suspected homicide of a man with whom defendant's ex-

girlfriend and mother of his children was involved.  Godfrey had asked

defendant to come in to talk.  After defendant said he would come in, he

never did.  Given what Godfrey knew about defendant's connection to the

victim of an alleged murder, at the very least, defendant was a potential

witness.  The officers were legitimately interested in obtaining some

information from defendant.  Allowing police to make a reasonable stop of a

potential witness to a crime has been upheld. *State v. Topps*, 2nd  Dist. No.

22281, 2008 -Ohio- 4021.

In any event, the U.S. Supreme Court in *Whren v. United States*

(1996), 517 U.S. 806, and the Ohio Supreme Court in *Dayton v. Erickson*

(1996), 76 Ohio St.3d 3, paragraph one of the syllabus, both held that any

violation of the law justifies stopping a vehicle regardless of the officer's

subjective reasons for doing so. Both courts eschewed the "reasonable

officer" test for justifying traffic stops, which focuses on whether a

reasonable officer would have stopped the vehicle for the violation in

question. Instead, both courts embraced an objective "could" test (the name

8



used by the Ohio Supreme Court in *Erickson*), which focuses on whether any police officer *could* lawfully stop the car. *Id.* at 11-12, 665 N.E.2d 1091; *Whren*, 517 U.S. 818. In fact, the Ohio Supreme Court concluded that:

> "where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, *including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." (Emphasis added.) *Erickson,* 76 Ohio St.3d at 11-12.

Therefore, where a driver is violating a traffic law, that in itself provides justification for the stop, and no further balancing is required, unless the search or seizure was conducted in an extraordinary manner, such as with deadly force. *Whren v. United States* (1996), 517 U.S. 806. Defendant could have been stopped for a violation of R.C. 4549.08. There is no evidence that the stop of defendant was conducted in an extraordinary manner. The intent of the officers is irrelevant where a traffic violation occurred. *State v. Blandin,* 3rd Dist. App. No. 1-06-107, 2007 -Ohio- 6418. As long as a police officer has "probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." *Erickson,* 76 Ohio St.3d at 11-12, 665 N.E.2d 1091. See *State v. Phillips,* 3rd Dist. No. 8-04-25, 2006 - Ohio- 6338. Even minor traffic violations provide reasonable suspicion to stop a car. See *State v. Purcell* (Feb. 27, 1998), Erie App. No. E-97-056; *State v. Deichler* (May 23, 1997), Erie App. No. E-96-091.

CR 14 6406
CR09 5706

After the stop, it appears from the evidence presented on the DVD that defendant was not forced to go to the police station. The DVD shows a very upset and anxious defendant getting into the cruiser and wanting the officers to "hurry" to the station so he could find out what, if anything, happened to his daughter. The Court finds defendant agreed to go to the police station voluntarily.

At the station, defendant was interrogated. During the interview, defendant was calm, coherent, appeared to understand the officer's questions, and was never officially admonished of his *Miranda*[1] rights. As noted above, on the DVD he told Godfrey that his attorney had advised him of his rights. Defendant was not threatened or promised anything in exchange for his statement. Defendant had the opportunity to consult with his lawyer while he was at the police station.

In determining whether *Miranda's* protections apply to an individual subjected to police questioning, it must be ascertained whether the individual was "in custody." Custody is a prerequisite for triggering the duty to give Miranda warnings. *Beckwith vs. United States* (1976), 425 U.S. 341, 346. If the individual was not "in custody," there can be no "custodial interrogation," and, thus, *Miranda 's* protections do not attach.

The U.S. Supreme Court has stated that where a defendant was **not** under arrest but was questioned at the police station after arriving there voluntarily, a *Miranda* warning was not required, since "such a noncustodial situation is not converted into one in which *Miranda* applies simply because *

---

[1] *Miranda v. Arizona* (1966), 384 U.S. 436.

cu 14 6407
CRO9 5707

* * the questioning took place in a coercive environment." *Oregon v. Mathiason* (1977), 429 U.S. 492, 495.

"The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings." *Minnesota v. Murphy* (1984), 465 U.S. 420, at 431.

Based on the evidence presented at the hearings and on the DVD, the Court finds defendant was never in custody and, thus, the need for *Miranda* warnings was not triggered.

"In deciding whether the defendant's confession in this case was involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat and inducement." See *State v. Edwards*(1976), 49 Ohio St.2d 31; *State v. Barker*(1978), 53 Ohio St.2d 135; *State v. Brewer*(1990), 48 Ohio St.3d 50,58.

"The [United States] Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined...'" *United States v. Ferrara* (C.A. 2, 1967), 377 F.2d 16, 17. In order to find that a confession was not voluntary, there must be coercive police activity. See *Colorado v. Connely* (1986), 479 U.S. 157. "A statement is voluntary if it is 'the product of an essentially free and

11



unconstrained choice by the maker...'" *State v. Wiles* (1991), 59 Ohio St.3d 71, 81.

Considering the totality of the circumstances in this case, the Court finds the State has proven the defendant was not in custody, voluntarily agreed to speak to officers after having the opportunity to talk to his lawyer and knowing what the subject of the investigation was and, thus, that it was not necessary that he be given the warnings of *Miranda*. The Court does *not* believe, based on all of the evidence, especially the DVD and the conduct of both defendant and Kleman after speaking to Rexford, that Rexford told Kleman to cease the interrogation. There was no coercion, threats or promises by officers. After the interview, defendant left.

The search warrants were not based on illegally obtained evidence. The affidavits for the warrants provided a substantial basis upon which the Court could make an independent determination that probable cause existed for the search. *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

Therefore, defendant's motion to suppress is *overruled*.

August 25, 2009

Jeffrey L. Reed, Judge

12

*cu 14 6409*
*CR09 5709*

COMMON PLEAS COURT
FILED

2015 SEP -8  AM 8: 32

MARCIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE COMMON PLEAS COURT OF ALLEN COUNTY, OHIO
## CRIMINAL DIVISION

| | |
|---|---|
| **STATE OF OHIO** | **CASE NO. 2014 CR 0139** |
| Plaintiff, | |
| | **JUDGE REED** |
| vs. | |
| | **MOTION TO COMPEL;** |
| **MARKELUS CARTER** | **MOTION TO DISMISS OR** |
| | **ALTERNATIVELY MOTION TO** |
| Defendant. | **CONTINUE TRIAL** |

Now comes the Defendant, **MARKELUS CARTER**, by and through his attorneys, **RION, RION & RION, L.P.A., INC.**, and hereby respectfully moves this Honorable Court to dismiss this matter or alternatively continue the trial for the reason that relevant discovery material was not disclosed in a reasonable manner, pursuant to Crim.R.16(B)(3) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), and for the reasons set forth in the attached memorandum.

A memorandum in support is attached hereto.

A hearing is respectfully requested on the motion.

Respectfully submitted,

**JON PAUL RION (#0067020)**
**RION, RION & RION, L.P.A., INC.**
130 W. Second Street, Suite 2150
P.O. Box 10126
Dayton, Ohio 45402
(937) 223-9133
(937) 223-7540 (fax)
Info@RionLaw.com

1

577

**EXHIBIT**

8

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a copy of the foregoing was sent to the office of the Prosecutor on the same day of filing.

JON PAUL RION
RION, RION & RION, L.P.A., INC.

## MEMORANDUM IN SUPPORT

**MAY IT PLEASE THE COURT:**

On September 3, 2015, counsel for Mr. Carter received notice of additional testing performed by the state. Detective Clark, it appears, sent shell casings to a lab for the purpose of extracting fingerprints by a new method. The letter by the state, which is attached as Exhibit A, indicates "nothing found in evidence was relative to the Ken Warrington case." The emails between Dr. Bond and Detective Clark seem to indicate that testing was performed in this case (see Exhibit B). In response, counsel for Mr. Carter contacted Dr. Bond in England and he confirmed that the testing was in fact completed (see Exhibit C).

There is a genuine issue of fact which cannot be resolved prior to the commencement of this case regarding whether the testing was completed and whether the results are beneficial to Mr. Carter. The potential delay is completely the result of a late disclosure of evidence. The issue is relevant even if no test was performed for the reason that it could have been performed. In the alternative, if testing was performed, the results could vindicate Mr. Carter of the alleged offense.

The state is required to provide information regarding testing and opinions by experts as to the same. Criminal defendants are entitled, by statute, to receive *all* laboratory reports, books, papers, documents, photographs and tangible objects as part of discovery. Crim.R.16(B)(3). This includes evidence even if the prosecuting attorney has no intent to use the material at trial. See amendment to Crim.R.16(B)(3) in 2010. Crim.R.16 calls for a "full and fair adjudication of the facts [and] to protect the integrity of the justice system." Crim.R.16(A). Ohio embraces a full reciprocal discovery protocol and imposes a continuing duty to supplement disclosures by both the prosecuting attorney and the defense. *Id.*

1

The prosecuting attorney is also required to turn over tangible objects which are material to the preparation of the defense. *Brady v. Maryland*, 373 U.S. 83, 87-88, 83 S.Ct. 1194, 1196-97 (1963). "It is well-settled that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment, *irrespective of good faith or bad faith of the prosecution.*'" *Hall*, 2009-Ohio-3824, ¶ 34, quoting *Brady*, 373 U.S. at 87. "Favorable evidence under *Brady* includes both exculpatory and impeachment evidence, but the evidence must be both favorable and material before disclosure is required." *Hall*, 2009-Ohio-3824, ¶ 34, citing *United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 3379 (1985).

Therefore Mr. Carter respectfully requests that the court order the immediate disclosure of all information regarding any testing performed in this case. This shall include all emails and correspondence between all detective and law enforcement and potential experts.

Further, it is respectfully requested that this matter be dismissed because of the violation of clear responsibilities placed upon the state under Brady v. Maryland and Rule 16 of the Ohio Rules of Criminal Procedure. In the alternative, if this court finds a continuance to be necessary, it is respectfully requested that Mr. Carter be released on an O.R. bond with electronic monitoring.

Respectfully submitted,

_____
**JON PAUL RION** (#0067020)
**RION, RION & RION, L.P.A., INC.**



Office of the Allen County Prosecutor

**JUERGEN A. WALDICK**

*204 N. Main St. Suite 302*
*Lima, OH 45801*
*Ph: 419-222-2462*
*Fax: 419-227-1072*

September 1, 2015

Jon Paul Rion
Attorney at Law
130 W. Second St., Suite 2150
P.O. Box 10126
Dayton, OH 45402

Re:    Markelus Q. Carter, CR2014 0139

Dear Jon Paul:

Enclosed please find a copy of email correspondence Detective Clark found while reviewing the file.  Nothing found in evidence was relative to the Ken Warrington case.  The only evidence found pertained to other case(s).  Nonetheless, we are providing the information to you.

Sincerely,

ANTHONY J. MILLER
Assistant Prosecuting Attorney

AJM/ka





## Tim Clark

**From:** Tim Clark
**Sent:** Tuesday, April 13, 2010 8:48 AM
**To:** 'jwb13@le.ac.uk'; 'john.bond@northants.police.uk'
**Subject:** Forensics case consideration

Dear Dr. Bond,

My name is Detective Timothy Clark and I work for the Lima Police Department, located in Lima, Ohio, USA. A few years ago you did some forensics work on a case being investigated by a colleague of mine by the name of Detective Kent Miller. Our county prosecutor who was familiar with your work and knew that you helped Detective Miller, asked that I contact you in regard to a Homicide investigation that I am currently investigating.

On February 23, 2009 in the early morning hours, Kenneth Warrington was shot and killed by an unknown assailant, as he exited his vehicle upon returning home from work that morning. A suspect was developed early on and quite a bit of circumstantial evidence was developed against him but nothing to link him directly to the crime.

Two shell casings and three 9mm rounds were recovered at the scene.

We would like to know if your Research Centre would be interested and/or available to examine this evidence using your technology for developing fingerprints.

Thank you for your consideration and looking forward to hearing from you in the near future.

Detective Timothy Clark
Lima Police Department
Lima, Ohio USA
(419) 221-5393

4/13/2010



hell Casings

## Loe Trudy

| | |
|---|---|
| **From:** | Loe Trudy |
| **Sent:** | 29 June 2010 08:07 |
| **To:** | 'Tim Clark' |
| **Su~~ject~~:** | RE: Shell Casings |

m,

r Bond was able to examine your casings over the weekend and has found marks on two of them. We have
~~at~~tached photographs for your information. Please note these photos are not exhibited and are for your
~~in~~formation only.

~~W~~e have packaged the casings so that your Fingerprint Experts can examine and photograph the marks for
~~th~~emselves. As you will see, on 05-34794-106 #7 we have had to remove the writing as the finger mark was
~~u~~nderneath. We trust this was acceptable. Please remind your Expert to view the casings under natural daylight
~~a~~s laboratory lights/crime lights do not work as well.

~~I~~ will return the casings via FedEx today.

~~W~~e hope these marks might assist your investigation. If we can be of any further assistance please do not
~~h~~esitate to come back to us.

~~K~~ind regards

~~T~~rudy

~~Tr~~udy Loe | Research Officer | Northamptonshire Police | Scientific Support Department | Protective Services Command

 Telep~~hone~~ 03000 111 222 Ext 2287 | Facsimile 01604 703210

Email trudy.loe@northants.pnn.police.uk

Address FHQ, Wootton Hall, Northampton, NN4 0JQ

## Northamptonshire Police: Putting Communities First

-----Original Message-----
**From:** Tim Clark [mailto:tim.clark@cityhall.lima.oh.us]
**Sent:** 27 May 2010 14:10
**To:** Loe Trudy
**Subject:** RE: Shell Casings

thank you

**From:** Loe Trudy [mailto:trudy.loe@northants.pnn.police.uk]
**Sent:** Thursday, May 27, 2010 7:42 AM
**To:** Tim Clark
**Subject:** Shell Casings

 Tim,

Just to confirm that your casings have arrived safely. We will be in touch once Dr Bond has had a chance t
examine them.

Kind regards

DEFENDANT'S EXHIBIT B.og 2.

**Kyle J. Lennen**

| | |
|---|---|
| **From:** | Jon Paul Rion |
| **Sent:** | Monday, September 07, 2015 11:41 AM |
| **To:** | Kyle J. Lennen |
| **Subject:** | Fwd: Shell casings |

Sent from my iPhone

Begin forwarded message:

> **From:** "Bond, John W. (Dr.)" <jwb13@leicester.ac.uk>
> **Date:** September 7, 2015 at 8:32:30 AM EDT
> **To:** Jon Paul Rion <JonPaul@rionlaw.com>
> **Subject: Re: Shell casings**
>
> Dear Mr Rion,
>
> If the casings sent to me by Det. Clark in 2010 were from the Warrington murder investigation (as indicated in the e-mail from Det. Clark) then, yes, in 2010 I analysed casings from the Warringtom murder investigation and the results of the examination and the casings were returned to Det. Clark by my assistant (Trudy Loe).
>
> Kind regards,
>
> John
>
> Sent from my iPad
>
>
> On 7 Sep 2015, at 13:00, Jon Paul Rion <JonPaul@rionlaw.com> wrote:
>
>> Dear Dr. Bond,
>>
>> Thank you for your quick reply.  Just so it's clear.  It appears from the context of the emails and your response, that in 2010 you analyzed casings in the Warrington murder investigation and returned those findings to authorities in Lima.  Please briefly confirm.
>>
>> Your time is greatly appreciated
>>
>> Sincerely, Jon Paul Rion
>>
>> Sent from my iPhone

1


DEFENDANT'S
EXHIBIT
C

**Kyle J. Lennen**

| | |
|---|---|
| **From:** | Jon Paul Rion |
| **Sent:** | Monday, September 07, 2015 11:40 AM |
| **To:** | Kyle J. Lennen |
| **Subject:** | Fwd: Shell casings |

Sent from my iPhone

Begin forwarded message:

> **From:** "Bond, John W. (Dr.)" <jwb13@leicester.ac.uk>
> **Date:** September 7, 2015 at 7:21:48 AM EDT
> **To:** "JonPaul@rionlaw.com" <JonPaul@rionlaw.com>
> **Subject: Shell casings**
>
> Dear Mr Rion,
>
> Many thanks for your e-mail. I did examine the shell casings as outlined in the reply from Northants Police and the results were sent back to the originating police force. I had no further contact, so have no idea what has been done with the results.
>
> Kind regards,
>
> John
>
> Sent from my iPad



DEFENDANT'S
EXHIBIT
C pg 2

FILED
COMM PLEAS COURT

2015 SEP 16 AM 8: 39

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE COMMON PLEAS COURT OF ALLEN COUNTY, OHIO
## CRIMINAL DIVISION

**STATE OF OHIO**                            **CASE NO. 2014 CR 0139**

     Plaintiff,                            **JUDGE REED**

vs.

**MARKELUS CARTER**                     **MOTION FOR MISTRIAL**

     Defendant.

_____

    Now comes the Defendant, **MARKELUS CARTER,** by and through his attorneys, **RION, RION & RION, L.P.A., INC.,** and hereby respectfully requests this honorable court grant a mistrial in this matter. In support Mr. Carter alleges his rights to a fair trial and due process have been violated for the reasons set forth in the attached memorandum.

    A memorandum in support is attached hereto.

                        Respectfully submitted,

                        JON PAUL RION (#0067020)
                        RION, RION & RION, L.P.A., INC.
                        Suite 2150
                        130 West Second Street
                        P.O. Box 10126
                        Dayton, Ohio 45402
                        (937) 223-9133
                        info@rionlaw.com

**EXHIBIT**
tabbies
9

635 LR

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a copy of the foregoing was sent to the office of the Prosecutor on the same day as filing.

JON PAUL RION
RION, RION & RION, L.P.A., INC.

# MEMORANDUM

**MAY IT PLEASE THE COURT:**

On September 15, 2015, the seventh day of trial, the state introduced evidence not previously disclosed to defense counsel. Specifically, a prosecution ballistics expert testified to tests and opinions outside the scope of the report previously submitted to defense counsel. In the course of that testimony, the defense learned that the state had ballistics testing done and had results and data from that test as of February of 2014. That testing, the results therefrom, and opinions from that testing were never disclosed to defense counsel. It was not until after direct examination of that witness that defense counsel was provided with the testing and data. The opinion rendered from the testing – that the gun involved was consistent with MAC 10 – was never disclosed to defense counsel. This requires a mistrial.

First, this constitutes a discovery and Brady violation, prejudicing Mr. Carter. This constitutes an ambush at trial and prevents defense counsel from effectively cross-examining the witness or call a defense witness to counter the testimony. After court concluded, defense counsel learned from an independent ballistics expert that the testing conducted yielded unreliable results. The state's expert conducted tests to address the lands and grooves. The expert inserted various measurements to determine what caliber weapons fit into those parameters using an FBI database. The database is not readily available to defendant. Additionally, the parameters used were unnecessarily and unreliably large. This yielded several results of possible firearms. Additional testing of the firing pin could narrow the results. The state's testing was not previously disclosed to defense counsel. The unreliability

1

cannot be challenged by the defendant because the testing was not disclosed until during trial, after the jury heard it, depriving defendant of any opportunity to "unring the bell."

Further, it changes the entire strategy of the defendant's case. The state's ballistics expert issued an opinion in the written report that the cartridges found at the scene were inconsistent with any firearms found at the home of Markelus Carter, the three bullets were from the same gun, and the casings found were all from the same gun. However, at trial the expert testified that the testing determined a MAC 10 gun fit the specifications as tested. This was a firearm never previously disclosed or addressed by the state.

Still further, there have been multiple discovery violations in this case. There has been a pattern of non-disclosure resulting in defense counsel in filing motions to compel and continue. This trial has been a game of blind man's bluff, depriving defendant of a fair trial, due process protections, and the right to confront witnesses against him.

Defendant in this matter seeks a mistrial as his rights were substantially violated, and as a result of this violation, a fair trial cannot be procured. The grant of a mistrial lies in the sound discretion of the trial court. *State v. Ahmed*, 103 Ohio St.3d 27 (2004). Mistrials are granted when a substantial right of a party has been adversely affected, where the ends of justice so require, or where a fair trial is no longer possible under the circumstances. *State v. Brinkley*, 105 Ohio St.3d 231 (2005). When the grounds for a mistrial are based upon prosecutorial misconduct, the defendant must show the alleged misconduct deprived him of a fair trial. *State v. Hawkins*, 66 Ohio St.3d 339 (1993).

Mr. Carter acknowledges a mistrial is a last resort. In *United States v. Bradshaw*, 281

2

F.3d 278 (2002), the United States Court of Appeals for the First Circuit held that the court

must consider what measures could cure the misconduct prior to considering a mistrial. A

mistrial is reserved as a last resort. *United States v. Lara-Ramirez*, 519 F.3d 76 (2008).

In this case, a mistrial is the only option. The state has held onto data and testing since

February of 2014. The opinion rendered by the ballistic expert was different than expressed in

the disclosed expert report. This has prevented the defendant from preparing cross-

examination of this witness or securing its own defense witness to negate the state's witness.

It has also deprived defense counsel from analyzing the state's case or analyzing his own trial

strategy. Defense counsel has learned that the testing used may be faulty, yielding unreliable

results. A defense expert would have to conduct his own measurements and testing to address

the unreliability of the state's testing, addressing the state expert's use of unusual parameters,

and perform other tests that could that could narrow the results.

A similar issue was addressed in *State v. Proby*, 10th Dist. 14AP-1067, 2015 Ohio

3364. In that case, a handwriting expert issued a written report that it was probable the

defendant forged a signature. He notified the state before trial that he changed his opinion.

At trial and testified he could not render an opinion on whether the defendant forged the first

name but was certain he forged the middle initial and last name. *Id* at 13-14. Defense counsel

asked for a mistrial on the basis that the state failed to disclose the change of the expert's

opinion. The defense also argued it was prejudiced because of the late disclosure, i.e. mid-

testimony. The court included the state did violate Crim.R. 16 by failing to disclose the

change in expert opinion. *Id* at 28. The court held, however, that this did not prejudice the

3

defendant because the change in the expert's opinion was minimal ("positive" vs. "highly probable"). *Id* at 36.

Crim.R. 16 requires disclosure of discovery and expert reports. Crim.R. 16(K) was designed to avoid unfair surprise and allow a defendant the opportunity to secure an adverse expert opinion. *Proby* at 32.

> Prosecutorial violations of Crim.R.16 are reversible only when there is a showing that
> (1) the prosecution's failure to disclose was a willful violation of the rule,
> (2) foreknowledge of the information would have benefitted the accused in the preparation of his defense, and
> (3) the accused suffered some prejudicial effect.

*Id* citing *State v. Joseph,* 73 Ohio St.3d 450 (1995) and *State v. Jackson,* 107 Ohio St.3d 53, 2005 Ohio 5981.

In this case, the state failed to disclose the expert's opinion and testing methods. This was in their possession since February of 2014. Even after filing motions to compel on ballistics and other discovery issues, this was never disclosed. The state also chose to elicit testimony on these issues from their expert at trial.

Further, the information would have benefitted the defense because it could have been reviewed by a defense expert and the testing and results could have been challenged. Defense counsel could have cross-examined the state's expert more thoroughly with sufficient time to prepare. Finally, the inability to prepare cross-examination, secure his own adverse defense witness, or assess the state's case caused prejudice to defendant. It is the position of defense counsel that the inculpatory evidence against Mr. Carter is not overwhelming and the state's ballistic expert is the most compelling evidence against him. Likewise, having sufficient time

4

to secure an adverse defense ballistics expert could exculpate the defendant, casting doubt on all ballistics evidence allegedly linking Mr. Carter to the offense.

Finally, the jury has already heard the testimony. Absent a significant continuance, defense counsel cannot thoroughly cross-examine the state's expert or secure its own witness. No other remedy is available to ensure Mr. Carter's due process and fair trial rights are preserved; and no other remedy will cure the misconduct by the state in failing to disclose the expert opinion and data.

Wherefore Mr. Carter respectfully requests this honorable court declare a mistrial in this matter.

Respectfully submitted,

JON PAUL RION (#0067020)
RION, RION & RION, L.P.A., INC.

FILED
PLEAS ...

2015 SEP 22 PM 12: 38

MARGIE MURPHY MILLER
COMMON COURT
ALLEN COUNTY, OHIO

## IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | Case No. CR2014 0139 |
| -v- | * | VERDICT |
| | | COUNT ONE |
| MARKELUS Q. CARTER, | * | |

* * * * * * * * * * * * * * * * *

We, the jury, being duly impaneled, sworn and affirmed find the State of Ohio (*)_____Did_____ prove beyond a reasonable doubt that **MARKELUS Q. CARTER** did purposely and with prior calculation and design cause the death of Kenneth Warrington on February 23, 2009 and in Allen County, Ohio.

Therefore we find, beyond a reasonable doubt that **MARKELUS Q. CARTER**, is (**)_____Guilty_____ of **AGGRAVATED MURDER**, as charged in Count One of the indictment.

(*) Insert in ink: **Did** or **Did Not.**
(**) Insert in ink: **Guilty** or **Not Guilty.**

Signed this _____22_____ day of September 2015.

EXHIBIT
10

647 LT

**IF YOUR VERDICT IS GUILTY OF AGGRAVTED MURDER ON COUNT ONE, DO NOT CONSIDER THE LESSER INCLUDED OFFENSE OF MURDER.**
**IF YOUR VERDICT IS NOT GUILTY OF AGGRAVATED MURDER, PROCEED TO CONSIDER THE LESSER INCLUDED OFFENSE.**
**LESSER INCLUDED OFFENSE OF MURDER IS TO BE CONSIDERED ONLY IF YOU DETERMINE THAT THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT IS GUILTY OF AGGRAVATED MURDER.  DEFENDANT CAN BE FOUND GUILTY OF ONLY ONE OFFENSE ON COUNT ONE.**

LESSER INCLUDED OFFENSE OF **MURDER**

We, the jury, being duly impaneled, sworn and affirmed find State did not prove beyond a reasonable doubt that the defendant, MARKELUS Q. CARTER is guilty of AGGRAVATED MURDER as alleged in Count One of the indictment, and we find that the State of Ohio _____(*) prove beyond a reasonable doubt that on or about the 23rd day of February 2009, in Allen County, Ohio, the defendant, MARKELUS Q. CARTER, did purposely cause the death of KENNETH WARRINGTON.

Therefore we find beyond a reasonable doubt that defendant is _____(**) of the lesser included offense of **MURDER** in that we find

(*)    Insert either "did" or "did not."
(**)   Insert either "Guilty" or "Not Guilty."

Signed this _____day of September 2015.

1._____

2._____

3._____

4._____

5._____

6._____

7._____

8._____

9._____

10._____

11._____

12._____

## IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

FILED
PLEAS CO.

2015 SEP 22  PM 12: 39

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

STATE OF OHIO,                     *           Case No.  CR2014 0139

   -v-                             *           **VERDICT**
                                               **COUNT TWO**
MARKELUS Q. CARTER,                *

* * * * * * * * * * * * * * * *

We, the jury, being duly impaneled, sworn and affirmed find the

State of Ohio (*)___*Did*_____ prove beyond a reasonable doubt

that **MARKELUS Q. CARTER** did knowingly have, carry or use a firearm and

that he had previously been convicted of a felony offense involving the

illegal possession of a drug of abuse.

Therefore we find, beyond a reasonable doubt that **MARKELUS Q.**

**CARTER**, is (**) _____*Guilty*_____ of **HAVING A WEAPON WHILE**

**UNDER A DISABILITY**, as charged in Count Two of the indictment.

 (*) Insert in ink: **Did** or **Did Not**.
(**) Insert in ink: **Guilty** or **Not Guilty**.

Signed this _ 22  day of September 2015.

649

**[Proceed to the Specification ONLY if you find defendant Guilty of Aggravated Murder OR Murder.]**

FILED
PLEAS

2015 SEP 22 PM 12: 38

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

STATE OF OHIO,          *          Case No. CR2014 0139

-v-          *          **VERDICT ON SPECIFICATION**
          Count One

MARKELUS Q. CARTER,          *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

We, the jury, being duly impaneled, sworn and affirmed, having found defendant *guilty* of (\*) __Aggravated__ Murder in Count One, further find the State (\*\*) __Did__ prove beyond a reasonable doubt that defendant had a firearm on or about his person or under his control while committing the (circle) (Aggravated Murder)/Murder and displayed the firearm, brandished the firearm, indicated that he possessed the firearm or used the firearm to facilitate the (circle (Aggravated) Murder)/Murder of Kenneth Warrington, and therefore we find, beyond a reasonable doubt that the defendant **MARKELUS Q. CARTER** is (\*\*\*) __Guilty__ of the Specification on Count One.

(\*) Insert in ink: **AGGRAVATED** if you found defendant guilty of Aggravated Murder or **leave blank** if you found defendant guilty of Murder
(\*\*) Insert in ink: **Did** or **Did Not.**
(\*\*\*) Insert in ink: **Guilty** or **Not Guilty**

Signed this __22__ day of September 2015.

648 Cr

FILED

2015 SEP 22  PM 2: 04

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

IN THE COURT OF COMMON PLEAS, ALLEN COUNTY, OHIO

**STATE OF OHIO**

PLAINTIFF

-VS-

**MARKELUS Q. CARTER**

DEFENDANT

CASE NO.  CR2014 0139

**JUDGMENT ENTRY
OF CONVICTION
AND SENTENCING**

**JUDGE JEFFREY L. REED**

-----------------------------------------------------------------------------------------------

**INDICTMENT FOR:  COUNT 1 - AGGRAVATED MURDER WITH FIREARM
SPECIFICATION, R.C. 2903.01 (A);**

**COUNT 2 - HAVING WEAPONS UNDER DISABILITY,
felony 3, R.C. 2923.13 (A)(3);**

This 25th day of April, 2014, defendant personally present in open Court with appointed counsel, Joseph A. Benavidez; State of Ohio represented by an Assistant Prosecuting Attorney. Defendant acknowledged service of a copy of the indictment; waived the reading thereof; waived any statutory waiting period and tendered a plea of **NOT GUILTY** to the charges contained in the indictment.

This 8th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Thereupon came the following named persons who were duly impaneled and sworn, to-wit:

Virginia Oglesbee
Kathryn Coon
Barbara Krites
Trixie Coolidge
Lois James
Stacy Risner

Kristy Brown
Jeremy Castle
Joseph Griffo
Donnie Miolen
Ginger Dankirt
Rose Biederman

ALTERNATE 1 - Joseph Fleischman
ALTERNATE 2 - Linda Harris

**EXHIBIT**

11

651  C/—

CR15 8251

Court recessed for the day.

This 9th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. An opening statement was made on behalf of the State of Ohio and on behalf of the defendant. Evidence was presented on behalf of the State of Ohio. During the testimony of the State's third witness the Court was advised by Juror Number 5 that she now was aware she knew a member of the Defendant's family and didn't feel she could continue to serve as a juror in the case. The Court, after a discussion with the juror, excused Juror Number 5 from further jury service and ruled said juror would be replaced by the first alternate. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 10th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 11th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following Monday.

This 14th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 15th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. The defense, through Attorney Jon Paul Rion, made a Motion for Mistrial and/or Motion for Continuance of the Trial and the same was taken under advisement by the Court. Court recessed until the following day.

This 16th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. The Court ruled on the Motion for Mistrial and/or Motion for Continuation of the Trial previously taken under advisement. The Motion for a Mistrial was OVERRULED by the Court and the Motion for a Continuance of the Trial was OVERRULED by the Court. Exceptions were noted. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

CR 15 82 52

This 17th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 18th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. The defense, through Attorney Jon Paul Rion, made a Motion for a Mistrial and the same was OVERRULED by the Court. Evidence continued to be presented by the State of Ohio. Exhibits were tendered and ruled upon by the Court for admission into evidence. State of Ohio then rested its case. Whereupon, the defendant, through his counsel, made a Motion for a Directed Verdict of Acquittal and the same was OVERRULED by the Court. Evidence was presented by the defense. Defense exhibits were tendered and ruled upon by the Court for admission into evidence. Court recessed until the following Monday.

This 21st day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the defense. Previously tendered exhibits for admission into evidence by the defense, which admissibility was taken under advisement by the Court, were ruled upon by the Court for admission into evidence. The defense then rested their case. Final arguments were presented by the State of Ohio and the defense. The Court charged the jury, and the jury retired for deliberation purposes at 4:20 P.M. The jury was released for the evening at 7:30 P.M. and to commence deliberations at 9:00 A.M. on Tuesday, September 22, 2015.

This 22nd day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Jury deliberations continued.

Whereupon, on this 22nd day of September, 2015, at 11:50 A.M. came the said jury, conducted into open Court by the bailiff, the said defendant and his counsel, Jon Paul Rion, being present in open Court, along with Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys, representing the State of Ohio. The said jury returned its verdict, signed by all twelve jurors, to-wit:

### VERDICT - COUNT 1 -
"We, the jury, being duly impaneled, sworn and affirmed, find the State of Ohio **DID** prove beyond a reasonable doubt that MARKELUS Q. CARTER did purposely and with prior calculation and design cause the death of Kenneth Warrington on February 23, 2009 and in Allen County, Ohio.

CA 15 72-53

Therefore, we find beyond a reasonable doubt that MARKELUS Q. CARTER is **GUILTY** of AGGRAVATED MURDER as charged in Count One of the indictment.

Signed this 22 day of September, 2015.

## VERDICT ON SPECIFICATION - COUNT ONE -

We, the jury, being duly impaneled, sworn and affirmed, having found Defendant GUILTY of AGGRAVATED MURDER in Count One, further find the State **DID** prove beyond a reasonable doubt that defendant had a firearm on or about his person or under his control while committing the AGGRAVATED MURDER and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used the firearm to facilitate the AGGRAVATED MURDER of Kenneth Warrington and, therefore, we find beyond a reasonable doubt that the defendant, MARKELUS Q. CARTER, is **GUILTY** of the Specification on Count One.

Signed this 22 day of September, 2015.

## VERDICT - COUNT 2 -

"We, the jury, being duly impaneled, sworn and affirmed, find the State of Ohio **DID** prove beyond a reasonable doubt that MARKELUS Q. CARTER did knowingly have, carry, or use a firearm and that he had previously been convicted of a felony offense involving the illegal possession of a drug of abuse.

Therefore, we find, beyond a reasonable doubt, that MARKELUS Q. CARTER is **GUILTY** of HAVING A WEAPON WHILE UNDER A DISABILITY as charged in Count Two of the indictment.

Signed this 22 day of September, 2015."

The Court accepted the verdicts as returned by the jury and the defendant was convicted of Count One, Aggravated Murder with Firearm Specification, and Count Two, Having Weapons Under Disability, a felony of the 3rd degree.

This matter proceeded to sentencing pursuant to R.C. 2929.19 this 22nd day of September, 2015, with the Defendant being personally present in open Court and represented by counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Following statements to the Court by the State of Ohio regarding sentencing, the defendant was given an opportunity to speak and to present witnesses

CR 15 82 54

and was afforded all rights pursuant to Crim.R. 32. The Court has considered the record, oral statements, any victim impact statement, any pre-sentence report, the purposes and principles of sentencing under R.C. 2929.11, the seriousness and recidivism factors relevant to the offense and offender pursuant to R.C. 2929.12, and the need for deterrence, incapacitation, rehabilitation and restitution.

The Court finds that the defendant has been convicted by a jury after a jury trial of:

## COUNT ONE - AGGRAVATED MURDER WITH
## FIREARM SPECIFICATION,
## A VIOLATION OF R.C. 2903.01 (A);

## COUNT TWO - HAVING WEAPONS UNDER DISABILITY,
## A VIOLATION OF R.C. 2923.13 (A)(3);
## A FELONY OF THE 3RD DEGREE;

The Court finds that a mandatory prison term is required by divisions (F) or (G) of R.C. 2929.13 or 2929.14 (G) or R.C. 2903.01 on the Aggravated Murder and on the firearm specification in Count One.

The Court further finds the following factors apply regarding the offender, the offense, or the victim, pursuant to R.C. 2929.12(B), (C), (D), and (E).

**R.C. 2929.12(B):**
The victim of the offense suffered serious physical harm as a result of the offense.

**R.C. 2929.12(D):**
The defendant previously was adjudicated a delinquent child pursuant to R.C. Chapter 2151 of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152 of the Revised Code, or the offender has a history of criminal convictions.
The defendant has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child pursuant to R.C. Chapter 2151 of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152 of the Revised Code, or the defendant has not responded favorably to sanctions previously imposed for criminal convictions.

**R.C. 2929.12(E):**
Prior to committing the offense the defendant had not been adjudicated a delinquent child, but had a juvenile traffic offender record.

The Court further finds that the defendant was born on JULY 28, 1969.

CN 15 82 55

The Court further finds that, after considering the factors set forth in R.C. 2929.12, a prison term is consistent with the purposes and principles of sentencing set forth in R.C. 2929.11 and the defendant is not amenable to an available community control sanction.

The Court further finds that a combination of community control sanctions would demean the seriousness of the defendant's conduct and its impact on the victim, that a sentence of imprisonment is commensurate with the seriousness of the defendant's conduct and its impact on the victim and that a prison sentence does not place an unnecessary burden on the state governmental resources.

**IT IS HEREBY ORDERED** that the defendant serve a stated term of:

**LIFE WITHOUT PAROLE** in prison under **COUNT ONE** for the violation of R.C. 2903.01 (A), which **IS** a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925; **FURTHER, AN ADDITIONAL MANDATORY TERM OF 3 YEARS IS IMPOSED ON THE FIREARM SPECIFICATION AND SAID THREE YEARS IS CONSECUTIVE TO THE LIFE WITHOUT PAROLE TERM;**

**36 MONTHS** in prison under **COUNT TWO** for the violation of R.C. 2923.13 (A)(3), which **is not** a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925;

**IT IS FURTHER ORDERED** the prison term imposed in Count Two is to be served **CONCURRENT** to the mandatory prison term imposed in Count One and **CONCURRENT** to the mandatory 3 year term imposed on the firearm specification.

As part of this sentence the defendant is advised that upon the completion of the prison term the defendant SHALL BE subject to such further **OPTIONAL** period of supervision under POST RELEASE CONTROL of THREE (3) years as it relates to Count Two. As authorized by law, the Adult Parole Authority may increase or reduce restrictions imposed by the parole board. If the defendant violates the terms of POST RELEASE CONTROL the parole board may return the offender to prison for a maximum period of nine months for each violation, but the total period of additional prison time imposed by the parole board for violations while under POST RELEASE CONTROL shall not exceed one-half (1/2) of the defendant's stated prison term. As part of POST RELEASE CONTROL defendant shall comply with any drug/alcohol treatment and/or monitoring. If the defendant is convicted of a felony committed while under POST RELEASE CONTROL the Court having jurisdiction over the new felony may return the defendant to prison under this case for an additional period of time as authorized by law and any prison term for the new felony may be served consecutively with the extension of prison time in this case. If the Court imposes additional prison time in this case the defendant

CR 15 82 56

shall be credited with any additional prison time imposed by the parole board for the same violation.

The additional periods of time imposed by another court because of a felony committed while under POST RELEASE CONTROL in this case or by the parole board for violations in this case while on POST RELEASE CONTROL are part of the sentence in this case.

The defendant has been sentenced to a prison term or to a community residential sanction in a jail or community-based correctional facility, therefore it is **ORDERED** that defendant shall submit to a DNA specimen collection procedure administered by the director of rehabilitation and correction or the chief administrative officer of the jail or other detention facility in which the person is serving the term of imprisonment.

Defendant is **ORDERED** to pay all costs of prosecution.

Further, the Defendant was advised by the Court of his appellate rights pursuant to Criminal Rule 32(A)(2).

**IT IS FURTHER ORDERED** the Sheriff of Allen County shall deliver the Defendant to the Ohio Department of Rehabilitation and Corrections forthwith. Credit is granted for **530 days** as of September 22, 2015 because of time spent in custody in this case prior to sentence, together with future custody days while defendant awaits transportation to the appropriate institution.

**IT IS SO ORDERED.**

DATED:  SEPTEMBER 22, 2015

JEFFREY L. REED, JUDGE

cc:  Prosecuting Attorney
     John Paul Rion
     Crime Victim Services

CR 15 82 57

FILED
COURT OF APPEALS

2015 OCT 16  AM 9: 32

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

2015 OCT 16  AM 9: 29

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

# IN THE COMMON PLEAS COURT OF ALLEN COUNTY, OHIO
## CRIMINAL DIVISION

| | |
|---|---|
| STATE OF OHIO | CASE NO. CR2014 0139 |
| Plaintiff, | JUDGE REED |
| vs. | C A 01 - 15 - 0 6 2 |
| MARKELUS Q. CARTER | **NOTICE OF APPEAL, AND REQUEST FOR TRANSMISSION OF TRANSCRIPT; REQUEST TO APPOINT COUNSEL** |
| Defendant. | |

Now comes the Defendant, **MARKELUS Q. CARTER**, by and through his attorneys, **RION, RION & RION, L.P.A., INC.**, and hereby gives notice of his appeal of the judgment rendered in the above-captioned cause to the Third District Court of Appeals, said Judgments rendered by the Allen County Common Pleas Court on September 22, 2015. Further, any and all pretrial rulings including motions to suppress, motion in limine, motions for mistrial, evidentiary rulings, motions to dismiss, discovery violations, weight of the evidence, verdict, and sentencing.

Further, the Defendant respectfully requests that the clerk transmit all transcripts and all necessary papers to the Third District Court of Appeals.

Further, it is requested that appellate counsel be appointed for the Defendant for the reason that he is indigent.

Respectfully submitted,

for _____ (#0092820)
**JON PAUL RION (#0067020) of**
**RION, RION & RION, L.P.A., INC.**
Suite 2150
130 West Second Street
P.O. Box 10126
Dayton, Ohio   45402
(937) 223-9133

**EXHIBIT**

tabbies

12

Rk

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a copy of the foregoing was sent to the office of the Prosecutor on the same day of filing.

**JON PAUL RION**
**RION, RION & RION, L.P.A., INC.**

Rk

FILED

2015 SEP 22 PM 2: 04

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

IN THE COURT OF COMMON PLEAS, ALLEN COUNTY, OHIO

**STATE OF OHIO**                                CASE NO.  CR2014 0139

PLAINTIFF

                                                 **JUDGMENT ENTRY**
-VS-                                             **OF CONVICTION**
                                                 **AND SENTENCING**

**MARKELUS Q. CARTER**

DEFENDANT                                        **JUDGE JEFFREY L. REED**

-------------------------------------------------------------------------------------------

**INDICTMENT FOR:   COUNT 1 - AGGRAVATED MURDER WITH FIREARM**
                    **SPECIFICATION, R.C. 2903.01 (A);**

              **COUNT 2 - HAVING WEAPONS UNDER DISABILITY,**
                    **felony 3, R.C. 2923.13 (A)(3);**

        This 25th day of April, 2014, defendant personally present in open Court with appointed counsel, Joseph A. Benavidez; State of Ohio represented by an Assistant Prosecuting Attorney. Defendant acknowledged service of a copy of the indictment; waived the reading thereof; waived any statutory waiting period and tendered a plea of **NOT GUILTY** to the charges contained in the indictment.

        This 8th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Thereupon came the following named persons who were duly impaneled and sworn, to-wit:

Virginia Oglesbee                    Kristy Brown
Kathryn Coon                         Jeremy Castle
Barbara Krites                       Joseph Griffo
Trixie Coolidge                      Donnie Miolen
Lois James                           Ginger Dankirt
Stacy Risner                         Rose Biederman

            ALTERNATE 1 - Joseph Fleischman
            ALTERNATE 2 - Linda Harris

Court recessed for the day.

This 9th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. An opening statement was made on behalf of the State of Ohio and on behalf of the defendant. Evidence was presented on behalf of the State of Ohio. During the testimony of the State's third witness the Court was advised by Juror Number 5 that she now was aware she knew a member of the Defendant's family and didn't feel she could continue to serve as a juror in the case. The Court, after a discussion with the juror, excused Juror Number 5 from further jury service and ruled said juror would be replaced by the first alternate. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 10th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 11th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following Monday.

This 14th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 15th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. The defense, through Attorney Jon Paul Rion, made a Motion for Mistrial and/or Motion for Continuance of the Trial and the same was taken under advisement by the Court. Court recessed until the following day.

This 16th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. The Court ruled on the Motion for Mistrial and/or Motion for Continuation of the Trial previously taken under advisement. The Motion for a Mistrial was OVERRULED by the Court and the Motion for a Continuance of the Trial was OVERRULED by the Court. Exceptions were noted. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 17th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 18th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. The defense, through Attorney Jon Paul Rion, made a Motion for a Mistrial and the same was OVERRULED by the Court. Evidence continued to be presented by the State of Ohio. Exhibits were tendered and ruled upon by the Court for admission into evidence. State of Ohio then rested its case. Whereupon, the defendant, through his counsel, made a Motion for a Directed Verdict of Acquittal and the same was OVERRULED by the Court. Evidence was presented by the defense. Defense exhibits were tendered and ruled upon by the Court for admission into evidence. Court recessed until the following Monday.

This 21st day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the defense. Previously tendered exhibits for admission into evidence by the defense, which admissibility was taken under advisement by the Court, were ruled upon by the Court for admission into evidence. The defense then rested their case. Final arguments were presented by the State of Ohio and the defense. The Court charged the jury, and the jury retired for deliberation purposes at 4:20 P.M. The jury was released for the evening at 7:30 P.M. and to commence deliberations at 9:00 A.M. on Tuesday, September 22, 2015.

This 22nd day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Jury deliberations continued.

Whereupon, on this 22nd day of September, 2015, at 11:50 A.M. came the said jury, conducted into open Court by the bailiff, the said defendant and his counsel, Jon Paul Rion, being present in open Court, along with Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys, representing the State of Ohio. The said jury returned its verdict, signed by all twelve jurors, to-wit:

### VERDICT - COUNT 1 -
"We, the jury, being duly impaneled, sworn and affirmed, find the State of Ohio **DID** prove beyond a reasonable doubt that MARKELUS Q. CARTER did purposely and with prior calculation and design cause the death of Kenneth Warrington on February 23, 2009 and in Allen County, Ohio.

Therefore, we find beyond a reasonable doubt that MARKELUS Q. CARTER is **GUILTY** of AGGRAVATED MURDER as charged in Count One of the indictment.

Signed this 22 day of September, 2015.

## VERDICT ON SPECIFICATION - COUNT ONE -

We, the jury, being duly impaneled, sworn and affirmed, having found Defendant GUILTY of AGGRAVATED MURDER in Count One, further find the State **DID** prove beyond a reasonable doubt that defendant had a firearm on or about his person or under his control while committing the AGGRAVATED MURDER and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used the firearm to facilitate the AGGRAVATED MURDER of Kenneth Warrington and, therefore, we find beyond a reasonable doubt that the defendant, MARKELUS Q. CARTER, is **GUILTY** of the Specification on Count One.

Signed this 22 day of September, 2015.

## VERDICT - COUNT 2 -

"We, the jury, being duly impaneled, sworn and affirmed, find the State of Ohio **DID** prove beyond a reasonable doubt that MARKELUS Q. CARTER did knowingly have, carry, or use a firearm and that he had previously been convicted of a felony offense involving the illegal possession of a drug of abuse.

Therefore, we find, beyond a reasonable doubt, that MARKELUS Q. CARTER is **GUILTY** of HAVING A WEAPON WHILE UNDER A DISABILITY as charged in Count Two of the indictment.

Signed this 22 day of September, 2015."

The Court accepted the verdicts as returned by the jury and the defendant was convicted of Count One, Aggravated Murder with Firearm Specification, and Count Two, Having Weapons Under Disability, a felony of the 3rd degree.

This matter proceeded to sentencing pursuant to R.C. 2929.19 this 22nd day of September, 2015, with the Defendant being personally present in open Court and represented by counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Following statements to the Court by the State of Ohio regarding sentencing, the defendant was given an opportunity to speak and to present witnesses

and was afforded all rights pursuant to Crim.R. 32. The Court has considered the record, oral statements, any victim impact statement, any pre-sentence report, the purposes and principles of sentencing under R.C. 2929.11, the seriousness and recidivism factors relevant to the offense and offender pursuant to R.C. 2929.12, and the need for deterrence, incapacitation, rehabilitation and restitution.

The Court finds that the defendant has been convicted by a jury after a jury trial of:

**COUNT ONE - AGGRAVATED MURDER WITH FIREARM SPECIFICATION, A VIOLATION OF R.C. 2903.01 (A);**

**COUNT TWO - HAVING WEAPONS UNDER DISABILITY, A VIOLATION OF R.C. 2923.13 (A)(3); A FELONY OF THE 3RD DEGREE;**

The Court finds that a mandatory prison term **is** required by divisions (F) or (G) of R.C. 2929.13 or 2929.14 (G) or R.C. 2903.01 on the Aggravated Murder and on the firearm specification in Count One.

The Court further finds the following factors apply regarding the offender, the offense, or the victim, pursuant to R.C. 2929.12(B), (C), (D), and (E).

**R.C. 2929.12(B):**
. The victim of the offense suffered serious physical harm as a result of the offense.

**R.C. 2929.12(D):**
The defendant previously was adjudicated a delinquent child pursuant to R.C. Chapter 2151 of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152 of the Revised Code, or the offender has a history of criminal convictions.
The defendant has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child pursuant to R.C. Chapter 2151 of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152 of the Revised Code, or the defendant has not responded favorably to sanctions previously imposed for criminal convictions.

**R.C. 2929.12(E):**
Prior to committing the offense the defendant had not been adjudicated a delinquent child, but had a juvenile traffic offender record.

The Court further finds that the defendant was born on JULY 28, 1969.

The Court further finds that, after considering the factors set forth in R.C. 2929.12, a prison term is consistent with the purposes and principles of sentencing set forth in R.C. 2929.11 and the defendant is not amenable to an available community control sanction.

The Court further finds that a combination of community control sanctions **would** demean the seriousness of the defendant's conduct and its impact on the victim, that a sentence of imprisonment is commensurate with the seriousness of the defendant's conduct and its impact on the victim and that a prison sentence **does not** place an unnecessary burden on the state governmental resources.

**IT IS HEREBY ORDERED** that the defendant serve a stated term of:

**LIFE WITHOUT PAROLE** in prison under **COUNT ONE** for the violation of R.C. 2903.01 (A), which **IS** a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925; **FURTHER, AN ADDITIONAL <u>MANDATORY</u> TERM OF 3 YEARS IS IMPOSED ON THE FIREARM SPECIFICATION AND SAID THREE YEARS IS CONSECUTIVE TO THE LIFE WITHOUT PAROLE TERM;**

**36 MONTHS** in prison under **COUNT TWO** for the violation of R.C. 2923.13 (A)(3), which **is not** a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925;

**IT IS FURTHER ORDERED** the prison term imposed in Count Two is to be served **CONCURRENT** to the mandatory prison term imposed in Count One and **CONCURRENT** to the mandatory 3 year term imposed on the firearm specification.

As part of this sentence the defendant is advised that upon the completion of the prison term the defendant SHALL BE subject to such further **OPTIONAL** period of supervision under POST RELEASE CONTROL of THREE (3) years as it relates to Count Two. As authorized by law, the Adult Parole Authority may increase or reduce restrictions imposed by the parole board. If the defendant violates the terms of POST RELEASE CONTROL the parole board may return the offender to prison for a maximum period of nine months for each violation, but the total period of additional prison time imposed by the parole board for violations while under POST RELEASE CONTROL shall not exceed one-half (1/2) of the defendant's stated prison term. As part of POST RELEASE CONTROL defendant shall comply with any drug/alcohol treatment and/or monitoring. If the defendant is convicted of a felony committed while under POST RELEASE CONTROL the Court having jurisdiction over the new felony may return the defendant to prison under this case for an additional period of time as authorized by law and any prison term for the new felony may be served consecutively with the extension of prison time in this case. If the Court imposes additional prison time in this case the defendant

shall be credited with any additional prison time imposed by the parole board for the same violation.

The additional periods of time imposed by another court because of a felony committed while under POST RELEASE CONTROL in this case or by the parole board for violations in this case while on POST RELEASE CONTROL are part of the sentence in this case.

The defendant has been sentenced to a prison term or to a community residential sanction in a jail or community-based correctional facility, therefore it is **ORDERED** that defendant shall submit to a DNA specimen collection procedure administered by the director of rehabilitation and correction or the chief administrative officer of the jail or other detention facility in which the person is serving the term of imprisonment.

Defendant is **ORDERED** to pay all costs of prosecution.

Further, the Defendant was advised by the Court of his appellate rights pursuant to Criminal Rule 32(A)(2).

**IT IS FURTHER ORDERED** the Sheriff of Allen County shall deliver the Defendant to the Ohio Department of Rehabilitation and Corrections forthwith. Credit is granted for **530 days** as of September 22, 2015 because of time spent in custody in this case prior to sentence, together with future custody days while defendant awaits transportation to the appropriate institution.

**IT IS SO ORDERED.**

DATED:  SEPTEMBER 22, 2015

JEFFREY L. REED, JUDGE

cc:  Prosecuting Attorney
     John Paul Rion
     Crime Victim Services

01-15-62

FILED
COURT OF APPEALS
2016 SEP 30  PM 12:55
VOID
Allen County Clerk of Courts
MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

# IN THE COURT OF APPEALS FOR ALLEN COUNTY, OHIO
## THIRD APPELLATE DISTRICT

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

FILED
COURT OF APPEALS
2016 OCT -5  PM 1:28

### STATE OF OHIO
### Plaintiff/Appellee

-vs-

### MARKELUS Q. CARTER
### Defendant/Appellant

---

On Appeal from the Court of Common Pleas for Allen County, Ohio,
Criminal Division

---

### MERIT BRIEF OF THE APPELLANT
### MARKELUS Q. CARTER

---

F. Stephen Chamberlain (0039815)
Attorney at Law
212 North Elizabeth St., 3d Fl.
PO Box 1314
Lima, OH  45802-1314
419-235-5125
866-596-1146       FAX
chamberlainlaw@me.com

*Attorney for Markelus Q. Carter
Appellant*

Anthony Miller and
Terry Kohlresier
204 N. Main Street
Lima, OH  45801

419-222-2462
419-227-1072 FAX
@allencountyohio.com

*Attorney for the State of Ohio
Appellee*

Page 1 of 45

24  50

EXHIBIT
13

TABLE OF CONTENTS

Table of Authorities      p. 3

Assignment of Error and Issues for Review  p. 5

Statement of the Case

   Procedural History     p. 6

   Statement of Facts     p. 6

Argument         p. 15

Conclusion        p. 43

   Appendix:      p. 45

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Washington* (1978), 434 U.S. 497 ---------------------------------------------------------------- 16
*Broom v. Mitchell*, 441 F.3d 392, 412 (C.A.6 2006) ---------------------------------------------------------- 39
*Illinois v. Somerville* (1973), 410 U.S. 458 ---------------------------------------------------------------- 16
*Mathews v. Parker*, 651 F.3d 489, 505 (C.A. 6 2011) ------------------------------------------------------- 39
*Michelson v. United States*, 335 U.S. 469 ------------------------------------------------------------------ 22
*Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169 -------------------------------------------------------- 26
*Radke v. State* (1923), 107 Ohio St. 399 -------------------------------------------------------------------- 25
*State v. Adams* (1980), 62 Ohio St.2d 151 ------------------------------------------------------------------ 17
*State v. Ahmed*, 103 Ohio St.3d 27 -------------------------------------------------------------------------- 34
*State v. Bell*, 145 Ohio Misc. 2d 55 -------------------------------------------------------------------------- 26
*State v. Bradley* (1989), 42 Ohio St.3d 136 ----------------------------------------------------------------- 42
*State v. Brinkley*, 105 Ohio St.3d 231 ----------------------------------------------------------------------- 34
*State v. Brown*, 100 Ohio St.3d 51 --------------------------------------------------------------------------- 34
*State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212 ------------------------------------------ 36
*State v. Franklin*, 62 Ohio St.3d 118 ------------------------------------------------------------------------ 16
*State v. Fyffe* (1990), 67 Ohio App.3d 608, 615, 588 N.E.2d 137 ------------------------------------------ 37
*State v. Garner* (1995), 74 Ohio St.3d 49 ------------------------------------------------------------------- 34
*State v. Gibson*, 2011-Ohio-1651 ----------------------------------------------------------------------------- 42
*State v. Glover* (1988), 35 Ohio St.3d 18 ------------------------------------------------------------------- 34
*State v. Greathouse*, 2007-Ohio-2136 ----------------------------------------------------------------- 16, 17
*State v. James* (Feb. 19, 1999), Clark App. No. 98 CA 54, 1999 WL 76815 -------------------------------- 17
*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492 ------------------------------------------- 37
*State v. Love*, 9th Dist. No. 21654, 2004-Ohio-1422 -------------------------------------------------------- 36
*State v. Martin* (1983), 20 Ohio ----------------------------------------------------------------------------- 36
*State v. Martin* (1983), 20 Ohio App.3d 172 --------------------------------------------------------------- 37
*State v. Otten* (1986), 33 Ohio.App.3d 339 ----------------------------------------------------------------- 36
*State v. Richey*, 64 Ohio St.3d 353 -------------------------------------------------------------------------- 20
*State v. Scott*, 61 Ohio St.2d 155 --------------------------------------------------------------------------- 25
*State v. Soke*, 105 Ohio App. 3d 226 ------------------------------------------------------------------------ 21
*State v. Tate*, Summit App. No. 21943, 2005-Ohio-2156 --------------------------------------------------- 17
*State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541 ------------------------------------- 36
*State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997–Ohio–52, 678 N.E.2d 541 -------------------------- 37
*State v. Thompson*, 141 Ohio St.3d 254 --------------------------------------------------------------------- 26
*State v. Villavicencio* (1964), 95 Ariz. 199 ----------------------------------------------------------------- 20
*State v. Wilkerson*, 64 Ohio St. 2d. 308 -------------------------------------------------------------------- 20
*State v. Williams* (1995), 73 Ohio St.3d 153 --------------------------------------------------------------- 34
*State v.. Garner*, 74 Ohio St.3d 49 -------------------------------------------------------------------------- 17
*Strickland v. Washington* (1984), 466 U.S. 688 ----------------------------------------------------------- 42
*United States v. Adams*, 722 F.3d 788 --------------------------------------------------------------------- 19
*United States v. Calvert*, (C.A.8, 1975), 523 F.2d 895 ----------------------------------------------------- 20
*United States v. Sampson*, 980 F.2d 883 (3d Cir.1992)---------------------------------------------------- 22
*United States v. Turner* (C.A.7, 1970), 423 F.2d 481 ------------------------------------------------------ 20

## STATUTES

Ohio Revised Code Section 2903.01----------------------------------------------------------------------------6
Ohio Revised Code Section 2923.13----------------------------------------------------------------------------6

## Other Authorities

*Dictionary.com Unabridged.* Random House, Inc. 25 Sep. 2016. <Dictionary.com
  http://www.dictionary.com/browse/potemkin-village>. ---------------------------------------------------- 23

## Rules

Ohio Crim. R. 16 ------------------------------------------------------------------------------------------------------ 32
Ohio Evid. R. 403 -------------------------------------------------------------------------------------------------- 18
Ohio Evid. R. 404 -------------------------------------------------------------------------------------------------- 18

## Treatises

1 Baldwin's Oh. Prac. Evid. § 404.11 -------------------------------------------------------------------------- 23
1 Wharton's Criminal Evidence (13 Ed.) 547, Section *318-------------------------------------------------- 20
*Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods,* found at
  https://www.whitehouse.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.p
  df------------------------------------------------------------------------------------------------------------------ 30
McCormick on Evidence (2 Ed. 1972), at page 92------------------------------------------------------------- 25
Strengthening Forensic Science in the United States: A Path Forward pp 154-155 ------------------------- 30
Wigmore, Code of Evidence § 1916, at 355 ------------------------------------------------------------------- 26
Wright & Graham, Federal Practice and Procedure (1978 Ed.), 441, Section 5239-------------------------- 20

## Constitutional Provisions

Ohio Const. art. I, §§ 1, 2, 5, 10, 16, and 20 ------------------------------------------------------------------- 27
U.S. Const. amends. V, VI, VIII, and XIV------------------------------------------------------------------------- 27

## ASSIGNMENTS OF ERROR

Assignment of Error One:  The Trial Court Committed error prejudicial to the Defendant by failing to exclude evidence of an altercation between the Defendant and a Government Witness in a holding Cell of the Court during Trial and allowing a Video of that altercation to be played for the Jury during the Government's Case in Chief.

Assignment of Error Two:  The Trial Court Committed error prejudicial to the Defendant by overruling Defendant's Motion for Mistrial filed on September 16, 2016 based upon Rule 16 discovery Violations and Brady Discovery Violations related to testimony of a Government witness on firearms.

Assignment of Error Three:  That the Conviction of the Defendant was against the Manifest Weight of the Evidence and, in the alternative, was based upon insufficient evidence.

Assignment of Error Four:  That the Prosecution Statements in Closing Argument Misstates the Evidence and rise to the level of Prosecutorial Misconduct and require a Reversal

Assignment of Error Five:  That the Defendant was Deprived of a Fair Trial due to Ineffective Assistance of Trial Counsel

## ISSUES PRESENTED FOR REVIEW

Whether an altercation between a Defendant and a Witness outside the presence of the Jury be used as evidence in the Government's case in chief.

Whether the Government committed discovery violations.

Whether the conviction of the Defendant was against the Manifest Weight of the Evidence.

Whether the conviction of the Defendant was based upon insufficient evidence.

Whether there was prosecutorial misconduct that deprived the Defendant of a fair trial.

Whether the Defendant was deprived of effective assistance of counsel and thus a fair trial.

## STATEMENT OF THE CASE

## PROCEDURAL HISTORY

On April 17, 2014, the Allen County, Ohio Grand Jury returned a two count indictment that charged Markelus Q. Carter with one count of Aggravated Murder with a firearm specification in violation of Ohio Revised Code Section 2903.01(A) and one count of Having a Weapon While under a Disability in violation of Ohio Revised Code Section 2923.13(A)(3).

Mr. Carter entered pleas of not guilty and the matter proceeded through several months of pre-trial proceedings including discovery and several motions to suppress.

The case was concluded by a Jury Trial. After the presentation of evidence and instructions to the Jury, the Jury returned verdicts of guilty on both counts and the specification of the indictment. A sentencing hearing was held where Mr. Carter was sentenced to Life in prison without the possibility of parole. A three year mandatory firearm specification sentences was ordered served consecutive to the life sentence. The court also ordered a 36 month sentence for the Weapons under disability charge to run concurrently with the Life sentence for murder.

This timely direct appeal as of right on a felony conviction follows.

## STATEMENT OF FACTS

### A.

Kenneth Warrington was dead: to begin with. There is no doubt whatever about that. The certificate of his death was signed by the deputy registrar, the county coroner and the undertaker. The cause of Warrington's death was likewise, no mystery; 12 gunshot wounds piercing his body on February 23, 2009 in front of the home of his paramour, Sonya Burkholder nka Hughes. Likewise, there was no doubt that Hughes had been the courtesan of the Defendant here, Markelus Carter.

The Government contends that the jealousy that Mr. Carter experienced because of the affair between Mr. Warrington and Ms. Burkholder, was so overwhelming that he planned and waited for an opportunity to end the life of Mr. Warrington in a "hailstorm of bullets". Tr. p. 315. In support of this theory, the Government had no murder weapon, no confession and no eyewitnesses. What the government did have was innuendo, assumption and Mr. Carter's very unlikable personality. This, coupled with a flawed and fragmented investigation; testimony of jailhouse snitches and legally inadmissible exhibits, led to the conviction wrongful conviction of Mr. Carter for aggravated murder.

B.

Ms. Burkholder and Mr. Carter had been romantically involved on and off for years, before February of 2009. They separated for a time but then began to live with each other because Ms. Burkholder did not have a place to live and Mr. Carter decided to allow her to stay at his house. It was not the perfect arrangement and each of them were seeing other people. It was convenient. On December 17th, 2007

there was a clear indication that Ms. Burkholder was involved with another man and Mr. Carter decides that it is time for the living arrangement to end.

Tarah, Ms. Burkholder and Mr. Carter's Daughter was there.  Ms. Burkholder was upset at being put out into the street so abruptly.  Ms Burkholder calls the police.  She made an allegation that Mr. Carter had their children in the house and he had a gun in the house.  She convinced the police that and that there was danger to the children.  The Lima Police responded, along with the S.W.A.T. team, and surround Mr. Carter's house.

Not knowing what was going on, Mr. Carter believed that he was going to get shot if he just walked out.  Mr. Carter waits until it gets light and then he and the police negotiate a peaceful way for him to turn himself so that nobody, gest hurt. The police come into the house and remove the children.  Mr. Carter is placed under arrest and put into jail.  After a time, Mr. Carter finds out that Ms. Burkholder made allegations against him stating that Mr. Carter had had hit her; that he had a gun in his hand; and he had threatened to shoot her.   The police conduct an investigation and no criminal charges are filed against Mr. Carter.  Mr. Carter is upset about the incident and begins talking to Officer Godfrey of the Lima Police Department about filing charges against Ms. Burkholder for making false reports, causing him to be arrested and putting him though this ordeal.  He continues to keep in touch with Officer Godfrey both to attempt to get charges filed or to have someone explain why he was treated the way he was by the police based only on Ms. Burkholder's allegations.

Mr. Carter found out that Ms. Burkholder's new significant other was Mr. Warrington and that he had been married to Faye Warrington for twenty-five years. The relationship between Mr. Warrington and Ms. Burkholder was not fair to Ms. Warrington, Mr. Carter or Mr. Carter's children. Mr. Warrington would spend his days with his wife, and then would come over to Ms. Burkholder's at night. Now, there was a belief that Faye Warrington and Mr. Warrington were on the verge of getting back together. There were rumors that Ms. Burkholder wanted to stay with Mr. Warrington. There were rumors that Ms. Burkholder was seeing other people during this time.

Mr. Carter had conversations with Faye Warrington. He called her and talked to her about the situation. He had conversations with Mr. Warrington, saying, "Look, it's probably not good for you if you're married. I mean, just choose." Mr. Carter had conversations with a lot of people just trying to figure out what's going on. But no one would say that Mr. Carter, threatened anybody.

On the night of February 22, 2009, the night before Mr. Warrington was shot and killed, Tarah, the daughter, saw something that she had never seen before; she saw her mother, Ms. Burkholder, for the first time that Tarah could remember, intoxicated. Not just slightly intoxicated but so intoxicated as to be belligerent. Ms. Burkholder was irritated, she seemed mad, she seemed agitated.

Ms. Burkholder, shortly before this time, had received training and had actually received her conceal and carry permit allowing her to carry a firearm.

The next morning, February 23, 2009 at six in the morning, that Ms. Burkholder came into Tarah's room and acted in a way that she had never acted before - looking out the blinds that she had never looked out. Ms. Burkholder was acting in a strange way.

Early in the morning of February 23, 2009, about 5:04 am, Mr. Warrington left work. He gathered his things that he would normally take home and left work at the Husky Refinery in Lima, Ohio. His destination was Mr. Burkholder's house located at 436 McKibben Ave. in Lima, Ohio. According to the Government, Krista Bodiker was the last person to see him alive as he waived to her on his way to McKibben Ave.

Don Hovest, who lives on Pearl Street in Lima, Ohio was taking out some garbage when he heard gunshots, he got into his car, drove around the area, passing Ms. Burkholder's house and ended up at a gas station where he called he police. The police dispatched Officer Sarchett of the Lima Police department at about 5:18 am. Rosalinde Johnson is awakened by what she believes were gunshots and after gathering herself, she goes to the window and sees a person in a hooded, camouflaged sweatshirt with their hands in their pockets coming out of the mouth of an alley.

Officer Sarchett is still looking but nothing stands out in the wide area where shots were reported. Ms. Burkholder claims she got up and realized that Mr, Warrington was not in her house so, she says she went looking outside, saw his

truck and then "Discover's" Mr. Warrington's lifeless body. It is now 6:39 am. The police officers and detectives arrive on the scene.

At the scene, shell casings were recovered from a nine millimeter cartridge and spent bullets were found in a cooler and a door. Fragments of a spent bullet were located underneath Mr. Warrington's body.

A look inside of the house makes clear that there was no robbery. A patrol officer at the house sees a power bill with Mr. Carter's name and address on it and recalls the 2007 incident at Mr. Carter's home that involved Ms. Burkholder. Mr. Carter's name get passed around the Lima Police Department and Officer Godfrey recognizes the name and has Mr. Carter's telephone number.

Once the scene was otherwise processed, Mr. Warrington's body was taken to Lucus County for an autopsy. The autopsy identified there were six gunshot wounds on Mr. Warrington. They were located on the chin, the right forearm, on the left chest, two in the back, and the right buttock. All the wounds had exit wounds associated with them. So, there was a total of twelve holes on Mr. Warrington's body. No projectiles were recovered from the body.

February 23rd, 2009 started for Mr. Carter' world with an alarm clock going off at 6:00 am. Mr. Carter turned the T.V. set on, got his son up, and drove him to

school. Mr. Carter then got gas. Mr. Carter went about his morning business when he received a call from Officer Godfrey, who said, "I need to talk to you." Mr. Carter' response was, "Oh, good. Do we have any movement?", thinking that the call was a follow-up to his complaints regarding the police and his treatment when Ms. Burkholder made a false report that caused him to be arrested. Officer Godfrey said, "I just need to talk to you. Come on down." Mr. Carter said, "All right. I'll be there in a little bit."

The testimony showed that there were gunshots heard on McKibben Street in Lima, Ohio about five-eighteen to five-thirty in the morning.

Mr. Carter did not go to the Lima Police right away so another call was received that said, in essence that the Police really needed to have him come in because something had happened to Ken. Mr. Carter had an attorney named Ken Rexford at that time who was assisting him with some of his legal questions. Mr. Carter called his lawyer after that second call to ask if Mr. Rexford is OK. Mr. Rexford's wife answers the phone. She says, "Yea, Ken's fine and everything's good." As Mr. Carter ends that call he gets pulled over by the Lima Police Department, and they tell him there's been this shooting over on McKibben. They don't say anything else.

That night Tarah, Mr. Carter' daughter, was staying with her mother, Ms. Burkholder. Based on the information that he was given, Mr. Carter genuinely believed that his daughter has been hurt or killed in an incident. Mr. Carter's reaction was as any father who believes his child is hurt or killed, he becomes an

emotional wreck. His reaction is clear from Police dashboard video. A police officer say, 'I'm not going to tell you what this is about; I just have to take you down to the station'. The police take him down to the station, leaving his car on the street. Not until the place Mr. Carter into an interrogation room do the police explain that this has to do with Mr. Warrington's been killed outside of Ms. Burkholder's house.

The police detective begins to question Mr. Carter and whether he has any guns in his home. Mr. Carter states that he does. Mr. Carter has a prior felony drug conviction, so he is prohibited from owning a gun. This gives the Lima Police probable cause, so they write a search warrant and search Mr. Carter's home. The police recover two handguns; a .357 revolver beside a computer downstairs and they find a nine millimeter pistol in a closet in the upstairs bedroom.

Both weapons are tested to see if those were the bullets that were involved with the Warrington murder, and the answer is 'no'. The police interview Mr. Carter for approximately two hours.. Then they let Mr. Carter go home. Subsequently, Mr. Carter is charged with two counts of Having a Weapon under Disability and for Felony possession of cocaine that was found during the search.[1]

Also recovered in the search are print outs of emails between Mr. Warrington and Ms. Burkholder dated prior to the 2007 incident. Also recovered in the home were various legal papers related to a Civil Protection Order hearing involving Ms. Burkholder that took place after the 2007 incident.

---

[1] After a jury Trial, Mr. Carter was convicted on one count of having a weapon under a disability and one count of possession of cocaine in Allen County Case CR2009 0068 and sentenced to a total of 4 years prison.

Pam Callahan, who worked at Husky Human Resources Department recalled getting a telephone call from a Mark Carter that wanted Husky policy on employee relationships and indicated that a court action was going on. She received this call approximately 30 days before Mr. Warrington was killed.

While in custody after his arrest, another inmate awaiting a hearing on a felony case, Joey Moore, asks to speak to detectives and says that Mr. Carter told him that he had killed someone but the police would never find the gun.

The forensic testing on the firearms recovered from Mr. Carter's home proved to be excluded as possible murder weapons.

Carlotta Williams, a female friend of Mr. Carter was taken to the jail by Mr. Carter's mother for a visit. During this visit, Mr. Carter held a note up to the glass partition that said to tell the police that she had been with Mr. Carter between 2:00 am and 6:00 am the day of the murder. She also testified that Mr. Carter attempted to call her several time on February 23, 2009 but she did not answer him.

Forensic examination of Mr. Carter's computers show internet searches for Mr. Warrington, Ms. Warrington and Ms. Burkholder. Getting information about addresses and other contact information.

Gunshot Residue Tests were preformed on Mr. Carter's car, his face and his hands all coming back negative. The same tests were done on camouflage clothing seized from Mr. Carter's home. Some of the clothing was negative but a short sleeved shirt and a long sleeved shirt did come back positive for GSR. There was

testimony that Mr. Carter, during an interview with detectives, claimed that he had not fired a weapon in several years.

During his time in prison, a fellow inmate, Mr. Upham, claims that Mr. Carter admitted to the murders and that he had details such as a paintball masks was worn during the killing and that Mr. Carter did have a paintball mask.

An examination of Mr. Carter's cell phone showed that he had taken a picture of Mr. Warrington's truck while parked at Ms. Burkholder's residence.

## ARGUMENT

### A.  The Trial Court Committed error prejudicial to the Defendant by failing to exclude evidence of an altercation between the Defendant and a Government Witness in a holding Cell of the Court during Trial and allowing a Video of that altercation to be played for the Jury during the Government's Case in Chief

On September 16, 2015, the 7th day of the trial, the Government intended to call Steven Upham, and inmate at the Allen/Oakwood Correctional Institution.  Mr. Upham's testimony would be that he had been an inmate in the same cell block with Mr. Carter and overheard him saying that he had shot a man who had been having an affair with Ms. Burkholder.  The plan was to have Mr. Upham testify after a brief recess.

During the recess of the trial, Mr. Carter was taken from the Courtroom and placed into a holding cell in a secure area of the Courthouse.  Mr. Upham was already in the holding cell when Mr. Carter was placed in the cell by courtroom deputies.  Once inside the holding cell, Mr. Carter and Mr. Upham exchanged

words briefly. Then, Mr. Carter and Mr. Upham engaged in a short fight. Correctional Staff rushed into the holding cell and separated Mr. Carter and Mr. Upham. The altercation was captured by surveillance cameras. The disturbance was made known to the Court and Counsel. It was determined that the Court would recess for the day, so the Jury was excused.

The next morning, the record indicated that the State of Ohio gave verbal notice that Government intended to introduce the video of the altercation as evidence in their case in chief. Counsel for the Defense made two motions; a motion for a mistrial and a motion to exclude the video of the altercation based upon Ohio Rules of Evidence 403 and 404. After hearing argument from both counsel, the Court addressed the Defendant's motions.

1.

As to the Defendant's motion for a mistrial, the Court overruled that motion based upon the following general statement of the law.

> Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible. *Illinois v. Somerville* (1973), 410 U.S. 458, 462-463, 93 S.Ct. 1066, 1069-1070, 35 L.Ed.2d 425, 429-430; *Arizona v. Washington* (1978), 434 U.S. 497, 505-506, 98 S.Ct. 824, 830-831, 54 L.Ed.2d 717, 728-729.

*State v. Franklin*, 62 Ohio St.3d 118, 580 N.E.2d 1 (1991). The trial court also concluded that the conduct of the Defendant (engaging in an altercation with a Government witness) was voluntary conduct or misconduct and likened this situation to the situation presented in *State v. Greathouse*, 2007-Ohio-2136, where

a defendant had forcibly flipped over counsel table in the Courtroom in front of the jury.

> Greathouse chose to engage in disruptive behavior in front of the jury and his choice should not be rewarded. In similar circumstances, courts have refused to find abuse of discretion. See, *e.g., State v. James* (Feb. 19, 1999), Clark App. No. 98 CA 54, 1999 WL 76815, *4 (refusing to hold the defendant's disruptive conduct a proper ground for mistrial because it "would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so"), and *State v. Tate,* Summit App. No. 21943, 2005-Ohio-2156, at ¶ 7 (holding that the trial court did not err in denying a motion for mistrial where the defendant's repeated outbursts forced the court to temporarily shackle defendant and remove him from the courtroom).

*State v. Greathouse,* 2007-Ohio-2136, ¶ 68 (2nd Dist. Montgomery).

The grant or denial of an order of mistrial lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v.. Garner,* 74 Ohio St.3d 49, 1995-Ohio-168.  An abuse of discretion means more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the court. *State v. Adams* (1980), 62 Ohio St.2d 151.

The trial court's refusal to grant a mistrial in this situation is an abuse of discretion.  A fair viewing of the altercation and the steps leading up to the altercation in the holding cell were all done outside of the presence of the jury.  The Defendant was, at all times, in the control of courtroom deputies and it was those Court personnel, that created the situation, not the Defendant.  Defendant's counsel argued that the Defendant would be unfairly prejudiced by seeing the Defendant and witness Upham with marks of the recent altercation.

Unlike the situations cited by the trial court and set forth infra., the Defendant was not engaging in disruptive conduct for the sake of disruption of proceedings and gaining a mistrial. The trial court should have granted the Defendant's motion for a mistrial.

2.

The trial court then addressed the use of a DVD recording of the altercation between the Defendant and Upham as evidence in its case in chief. Defense counsel argued that such evidence should be excluded pursuant to Rules 403 and 404 of the Ohio Rules of Evidence. The relevant parts of those rules read as follows:

> **(A) Exclusion Mandatory.** Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

Ohio Evid. R. 403(A) and,

> **(B) Other Crimes, Wrongs or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Ohio Evid. R. 404(B).

a.

The trial court held that Rule 404(B) was not implicated here because the video of the altercation was intrinsic evidence not wholly independent of the offenses and because the video of the altercation was an admission by conduct that reflects a consciousness of guilt. Tr. p. 1371. The Defendant believes that the trial court's analysis of this issue is flawed. Rule 404(B) and 403(A) are both implicated in this issue. The video of the altercation between Upham and the Defendant should have been excluded as evidence for the Government in its case in chief.

The trial court found that the altercation was intrinsic evidence and cited an opinion from the United States Court of Appeals for the Sixth Circuit in support of its conclusion.

> In *United States v. Barnes*, we explained: "Intrinsic" acts ... are those that are part of a single criminal episode. Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity. 49 F.3d 1144, 1149 (6th Cir.1995). The contours of what constitutes "intrinsic" evidence are not exactly clear; however, we have recognized that intrinsic evidence requires a connection to the charged offense.[26] *Id.*

*United States v. Adams*, 722 F.3d 788 (6th Cir.2013). The trial court below misses the very point made in *Adams* that to be considered intrinsic, the act is part of a single criminal episode and must have a connection to the charged offense. Using this reasoning, the altercation in the holding cell clearly is not intrinsic. First, the crimes in the indictment all deal with the murder of Kenneth Warrington in early 2009. The Upham/Carter altercation took place in 2015, six years later. Second, it is not part of or connected with the murder of Warrington.

The trial court cited an Ohio Supreme Court case, *State v. Wilkerson*, 64 Ohio St. 2d. 308 in support of its ruling. However, in *Wilderson*, the Court found that other acts evidence should be excluded. That Court also, cited with favor, a line of federal case law and treatises on evidence.

> (E)vidence of other crimes may be presented when 'they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged.' " (Citation omitted.) *United States v. Turner* (C.A.7, 1970), 423 F.2d 481, at 483-84, certiorari denied 398 U.S. 967, 90 S.Ct. 2183, 26 L.Ed.2d 552. Accord *United States v. Calvert*, (C.A.8, 1975), 523 F.2d 895, 907 certiorari denied, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314; *State v. Villavicencio* (1964), 95 Ariz. 199, 388 P.2d 245. See also, 1 Wharton's Criminal Evidence (13 Ed.) 547, Section *318 242; 22 Wright & Graham, Federal Practice and Procedure (1978 Ed.), 441, Section 5239.

*State v. Wilkinson*, 64 Ohio St.2d 308, 415 N.E.2d 261 (1980). The proof of the altercation between Upham and the Defendant in September of 2015 is no connected and proof of one does not involve proof of the murder with which the Defendant has been charged here.

The trial court also relied upon the case of *State v. Richey*, 64 Ohio St.3d 353, 1992-Ohio-44, 595 N.E.2d 915 (1992), an infamous case of an arson/murder of a child in Putman County, Ohio. In that case, the issue arose about the use of a statement by Richey to deputies and guards at the Putman County Jail "Randy Bassinger [the prosecutor and later Judge] was a dead man" and that "whoever testified against him had better hope he's six feet under." On August 17, Richey told Deputy Mike Ball to take a message to Randy Bassinger, "that when he got out he was going to cut his throat." The Supreme Court of Ohio split 4 to 3 as to the use of

these statements as consciousness of guilt.  The majority found that these Richey's threats against Prosecutor Bassinger reflect a consciousness of his guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses[2]. *Id.* at 357.  The dissenting justices pointed out the fallacy of this reasoning:

> The majority also contends that Richey's threats "reflect a consciousness of his guilt," and should therefore be admissible. It is by no means clear that this is so. A person wrongly accused could easily take out his frustration and anger in this fashion. In particular, Richey's anti-social and borderline personality traits might make the urge to lash out from a false accusation stronger. In any case, jailhouse threats are of a different order than flight from prosecution or a coverup as evidence of guilt.
>
> The threats made by Richey are, pure and simple, acts separate and distinct from the one for which he was being tried. Proof of such threats can be admitted during the guilt phase only to show motive, opportunity, intent, plan, and so forth. (Evid.R. 404[B].) As the threats came after the events for which Richey was being tried, none of these factors can possibly be proved by evidence of later threats. Therefore the evidence is inadmissible for the guilt phase of trial, and it was error for the trial court to admit it.

*Id.* at 374-375.  The dissent's reasoning above is clearly applicable here.  The acts are separate and distinct from the matter being tried.  The proof of the altercation itself would not be evidence of the Warrington homicide.  The altercation came years after the fact during trial and this activity is distinctly different than flight from authorities or coverup of wrongdoing.  The Defendant here was upset at the

---

[2] The trial court also cited *State v. Soke*, 105 Ohio App. 3d 226 in support of its ruling. A fair reading of that case indicates that the threats to witnesses in that case were not made by the defendant but by associates of the defendant, and were admitted for a limited purposes of explaining reluctance to testify at prior trials. This is not supportive of the trial court here since the acts is Soke fall outside 404(B) because they are not the acts of the accused.

Page 21 of 45

wrongful nature of Upham's unfounded allegations against him and lashed out in frustration, not from "consciousness of guilt". Therefore, admission based upon the trial court's interpretation that this is intrinsic evidence is flawed. The DVD of the altercation should not have been admitted on that ground.

b.

The trial court's allowing the DVD of the altercation between Upham and the Defendant would still be in error if the same is subjected to analysis under Rule 404(B). The law in this area has become so hypersensitive to any nexus between act and one of the listed reasons for admission under 404(B) that almost any act could be introduced by the Government and approved as admissible against an accused. However, trial courts, as gatekeepers must also approach this area with caution.

> Character evidence is not rejected because it is irrelevant. On the contrary, "it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948). The government knows this, and we do too. Although the government will hardly admit it, the reasons proffered to admit prior bad act evidence may often be potemkin village, because the motive, we suspect, is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character.

*United States v. Sampson*, 980 F.2d 883 (3d Cir.1992)[3].

---

[3] A Potemkin Village is a pretentiously showy or imposing façade intended to mask or divert attention from an embarrassing or shabby fact or condition. It is a reference to Prince Grigory Potemkin's setting up fake villages along the route of Empress Catherine II royal progress through newly acquired territory from the Ottoman Empire to demonstrate wealth, prosperity and peace. Potemkin's men

Page 22 of 45

Rule 404(B) is the most litigated provision in the Rules of Evidence. Professor Imwinkelried, who has written a book on this topic, has remarked:

> The numbers alone tell the story: In most jurisdictions, alleged errors in the admission of uncharged misconduct are the most frequent ground for appeal in criminal cases; in many states, such errors are the most common ground for reversal; and the Federal Rule in point, Rule 404(b), has generated more reported cases than any other subsection of the rules.

> He also added that this subject "is perhaps the most misunderstood area of evidence law." Wigmore concurred, noting the "bewildering variances of rulings in the different jurisdictions and even in the same jurisdiction."

404.11 Other-acts evidence: In general, 1 Baldwin's Oh. Prac. Evid. § 404.11 (3d ed.).

In order to become admissible under Rule 404(B), the Government has the burden of showing that the evidence of other acts by the defendant tend to prove any of the following: motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Here, the Government argued that the altercation in the holding cell constituted an identity by modus operandi. The prosecutor argued:

> Not to mention that it also shows, quite frankly, his modus of operation [sic] when he feels someone is doing something wrong to him. Disrespecting him I think was his own language. Disrespecting him. You're going to pay. That's his mode. He's going to physically attack you and he's going to do it when you're not ready for it because he sucker punched Mr. Upham. It's the State's belief that he shot Ken Warrington in the back. Thankfully he didn't have a gun yesterday.

---

would set up a village and act as settlers as the Empress and her Court passed, then disassemble the same and set it up down river ahead of the progress. *Dictionary.com Unabridged*. Random House, Inc. 25 Sep. 2016. <Dictionary.com http://www.dictionary.com/browse/potemkin-village>.

Tr. at p. 1365.  From the Government's argument above, it is clear that any connection between the altercation in the holding cell and the Warrinton homicide is completely non-existent.  The Government logic that a fistfight equates to a pattern of murder is flawed as it begs the question that one behavior begets and indicates another; a person who fights is a person who murders.  Nothing could be more fundamentally incorrect.  While it may be true that all murders arise from an assault, not all assaults end in murders.  Therefore, the Government's assertion that this evidence should be admitted under a modus operandi identification cannot be sustained.

None of the other exceptions listed in 404(B) were argued.  That the altercation evidence would be admissible on the grounds of opportunity to commit murder or preparation and planning for a murder is undoubtedly inapplicable here.  The time between the 2009 murder and the 2015 fight separates the two acts by over five years and there is no nexus between the fight that happened well after a crime and any fact regarding its preparation, plan or opportunity to commit the crime.  Knowledge, absence of mistake, or accident are likewise untenable rationales for admission since there is no logical connection between the act of a fight with a witness five years on that would provide any evidence as to knowledge of any part of the crime.  That the fight five years later would have any relevance to a jury finding lack of mistake or lack of accident is imaginary.

Therefore, none of the recognized exceptions under 404(B) exist and the evidence of the altercation between Upham and the Defendant should have been exceled for all purposes pursuant to a 404(B) analysis.

3.

Finally, even if this Court were to find that the altercation evidence was intrinsic or fit into one of the 404(B) exceptions, the mandatory prohibition against admission of evidence that, while relevant, must still be excluded under Rule 403(A) where its probative values is substantially outweighed by the danger of unfair prejudice, or confusion of the issues or of misleading the jury.

If there is probative value at all to the admission of the DVD of the fight between Upham and the Defendant during the trial in a holding cell, it would have to be a consciousness of guilt or modus operandi exception. As argued above, neither of these grounds are legitimate. Furthermore, if the act is too remote in time, its probative value diminishes. An act can be too remote to be relevant. *Radke v. State* (1923), 107 Ohio St. 399, 140 N.E. 586. See <u>McCormick on Evidence</u> (2 Ed. 1972), at page 92 *followed in State v. Scott*, 61 Ohio St.2d 155, 400 N.E.2d 375 (1980). A difference of five to six years clearly makes these acts too remote from each other to be probative.

Assuming, for the sake of argument, that there is probative value, the question then turns to whether admission of the evidence for probative value is substantially outweighed by the danger of unfair prejudice. Of course any evidence tending to lead a trier of fact to a defendant's guilt is prejudicial and therefore not

the reason for exclusion.  The focus is upon the prejudicial evidence being unfair to the defendant so that its admission would be of such a nature that the jury could not properly interpret it or put it into the correct perspective.  See *State v. Bell*, 145 Ohio Misc. 2d 55 (excluding pictures of adult homosexual conduct in a prosecution for other sex offenses).  "Unfairly prejudicial evidence usually appeals to the jury's emotions, rather than to intellect". *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001) followed in *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 112 (2014), reh'g denied, 141 Ohio St.3d 1458, 2015-Ohio-239, 23 N.E.3d 1198, ¶ 112 (2015), and cert. denied, 136 S.Ct. 83, 193 L.Ed.2d 74 (2015), reh'g denied, 136 S.Ct. 574, 193 L.Ed.2d 456 (2015).  Prejudicial evidence is defined as evidence that would: (1) be likely to stimulate an excessive emotion or to awaken a fixed prejudice as to a particular subject or person involved in the issues, (2) and thus dominate the mind of the tribunal and prevent a rational determination of the truth, (3) and where the evidence having this tendency is not necessary to the ascertainment of the truth.  Wigmore, Code of Evidence § 1916, at 355 (3d ed. 1942).

A clear indication that the Government used this evidence to appeal to emotions and unfair prejudice is in the way that the Government characterized the altercation in closing argument.  In closing, the Government insisted that this was part and parcel to the phase "snitches get stiches" and that the Defendant was enforcing some kind of code of fellow inmates.  Tr. at 1771-1772.  The Government used the altercation DVD as evidence not only that the Defendant was in prison,

but that he was a evil man, a bad man and one disserving of contempt and guilty because he enforced a code of not snitching.

Since that is how the Government used the evidence, it probative value as to the proof of the allegations against the Defendant is very small and is outweighed, not just substantially, but overwhelmingly by the danger that the evidence would unfairly prejudice the Defendant by characterizing him as a hardened convict. It served to confuse the jury and allowed them to use emotional responses and improper inferences that the hardened convict was guilty of murder.

4.

Every once in a while, a truly egregious violation of evidence rules come to light on appeal. Defense Counsel made several contemporaneous objections. This is that egregious violation. The refusal of the trial court to conduct its gatekeeping role and allowing evidence of the fight between the Defendant and a Government witness, including a DVD recording of the same played for the jury during a case in chief is one of those occasions where this court must find error and reverse the conviction. The Defendant was and is entitled to a fair and impartial trial. The allowance of this unfairly prejudicial evidence that had little or nothing to do with the presentation of the Government's case, deprived the Defendant of a fair trial in violation of the rules of evidence but also in violation of his rights under the Ohio Constitution and the United States Constitution. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 10, 16, and 20.

**B. The Trial Court Committed error prejudicial to the Defendant by overruling Defendant's Motion for Mistrial filed on September 16, 2016 based upon Rule 16 discovery Violations and Brady Discovery Violations related to testimony of a Government witness on firearms.**

On September 16, 2015 during the presentation of evidence of the State of Ohio's case in chief, the Government offered the testimony of Kevin Kramer from the firearms section of the Ohio Bureau of Criminal Investigation. The testing and report of Mr. Kramer set forth that the firearms obtained from Mr. Carter's home do not match the weapon used to shoot Mr. Warrington.

After going through the reports and procedures, the State of Ohio begins to question Mr. Kramer on the consistency of a firearm known as a MAC-10 being the source of the cartridges found at the crime scene. Defense Counsel objected and moved for a mistrial along with filing a formal motion for the Court's consideration the following morning. The testimony, objections and arguments were made mostly on the record from Tr. pp. 1145 to 1273 (approximately 130 pages of the transcript).

Essentially, the issue is that the Government produced a report with Mr. Kramer's name on it, that tested the firearm evidence collected at the crime scene and compared it to the two firearms confiscated from Mr. Carter's home. The report goes no farther than this. The Government then elicits testimony from Kramer that a prior analyst with BCI made a notation in his notes that a MAC-10 could also fire the cartridge and make similar markings on the shell casings that were collected from the crime scene.

The notation was buried inside of the notes of the full file from BCI on the case and the specific findings were not disclosed to the Defense.  See Motion for Mistrial Filed September 16, 2015.

After much argument, the Court overruled the motion for a mistrial and found that any discovery violation, if any, did not rise to the level of declaring a mistrial.  Defense counsel having the evening to review the material and consult by telephone with an expert somehow cured any defect and the trial could move forward.  For the reasons that follow, this episode of the trial renderers the entire proceeding unjust and unfair.

1.

Any testimony regarding a MAC-10 as being similar to or consistent with the evidence gathered at the crime scene should have been excluded because it is "junk science".  As far back as 2009 the National Academy of Science, in a widely published and disseminated book found that certain types of firearms identifications were not based in science.  Specifically, statements that certain markings or impressions are consistent with one firearm or another was called into question.

> Toolmark and rearms analysis suffers from the same limitations dis- cussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from

manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable.

…

The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.

Strengthening Forensic Science in the United States: A Path Forward pp 154-155 http://www.nap.edu/catalog/12589.html.

In September of 2016 the President's Council of Advisors on Science and Technology (PCAST) issued a report entitled: *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods,* found at https://www.whitehouse.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic _science_report_final.pdf. This report continues to question the scientific validity of much of criminal forensic science. two important gaps: (1) the need for clarity about the scientific standards for the validity and reliability of forensic methods and (2) the need to evaluate specific forensic methods to determine whether they have been scientifically established to be valid and reliable. *Id.* at p. x.

In the area of firearms examinations, the PCAST group concluded that even comparisons of a know sample of a fired bullet to a bullet collected at a crime scene does not reach the level of rigor to be considered scientifically reliable. They conclude as follows:

The early studies indicate that examiners can, under some circumstances,

associate ammunition with the gun from which it was fired. However, as described above, most of these studies involved designs that are not appropriate for assessing the scientific validity or estimating the reliability of the method as practiced. Indeed, comparison of the studies suggests that, because of their design, many frequently cited studies seriously underestimate the false positive rate.

At present, there is only a single study that was appropriately designed to test foundational validity and estimate reliability (Ames Laboratory study). Importantly, the study was conducted by an independent group, unaffiliated with a crime laboratory. Although the report is available on the web, it has not yet been subjected to peer review and publication.

The scientific criteria for foundational validity require appropriately designed studies by *more than one group* to ensure reproducibility. Because there has been only a single appropriately designed study, the current evidence falls short of the scientific criteria for foundational validity.335 There is thus a need for additional, appropriately designed black-box studies to provide estimates of reliability.

*Id.* at p. 111. Therefore, if there is no validity to side by side comparisons, then the speculative opinions as offered in this case surly cannot be admissible evidence. For this reason alone, the Court should have granted the Defendant a mistrial.

## 2.

Putting aside the unscientific nature of the opinion of Mr. Kramer regarding the consistency of evidence with the MAC-10, the Defendant is correct that this is a serious discovery violation and is a textbook example of the evil of trial by ambush that discovery rule seek to avoid.

(K) **Expert Witnesses; Reports.** An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause

shown, which does not prejudice any other party. Failure to disclose the
written report to opposing counsel shall preclude the expert's testimony at
trial.

Ohio Crim. R. 16(K). Any fair reading of this rule requires that an expert witness,

like Mr. Kramer, must produce a written report summarizing testimony. Not just

part of the testimony. The reason for this is self-evident; so that the opposing party

has notice of the testimony that will be presented at trial. In Mr. Kramer's case,

this would require that he provide a summary of his testimony regarding

consistency of evidence with the use of a MAC-10 firearm. Mr. Kramer's report

does NOT contain any information that he would testify regarding the possibility

that a MAC-10 firearm could have produced the markings on the forensic firearms

evidence in this case.

The Government spends the majority of its argument to the Court pointing

out that in a note from another expert, there is a mention that a MAC-10 is one of

long list of firearms that could have created the markings on the firearms evidence.

At one point the prosecutors make the claim that discovery rules do not require the

Government to reveal its trial strategy. While that is true, as a general proposition,

it does not mean that the Government can skip over mandatory discovery

requirements. The claim of revealing the Government's trial strategy rings false

since it is the expert's testimony and opinion, or, rather, the lack of notice of the

expert's opinion that the Defendant claims violates his rights. An experts report

and testimony are well outside any work product of the prosecutors. Therefore,

there is a clear discovery violation.

Page 32 of 45

3.

The next question is what, if any, sanction there should be for this misconduct by the prosecutor. As stated infra., Defendant made an oral motion for mistrial on September 15, 2015 and filed a written motion before the start of the court day on September 16, 2015. Defense counsel's motion provides several sound reasons for the Court to declare a mistrial. First, defense counsel made contact with an expert in firearms and learned that the method and used by the Government's expert in concluding that a MAC-10 was a possible candidate for the murder weapon was based upon looking at an existing FBI database. That same expert called the use of this database unreliable for this type of analysis and opinion. The database is not publicly available. Second, the discovery and information that defense counsel had indicated that the BCI's testing and testimony, according to the report filed under Rule 16, was limited to the forensic examination of items found at the crime scene and that none of them matched or were consistent with the firearms recovered from the Mr. Carter's home. Defense counsel prepared for trial based upon the report. Defense counsel did not suspect that the Government expert would be providing testimony well beyond the scope of the report and render opinions on issues outside of that report. Third, defense counsel points to several times he needed to file motions to compel discovery during the run up to trial. Defense counsel argued that he was blindsided with this information in the middle of the trial.

Mistrials are within the discretion of the trial court.

The trial court did not err in not sua sponte declaring a mistrial at that point. The determination of whether to grant a mistrial is in the discretion of the trial court. *State v. Glover* (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900; *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 42. "[T]he trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial." *Glover,* 35 Ohio St.3d at 19, 517 N.E.2d 900; see, also, *State v. Williams* (1995), 73 Ohio St.3d 153, 167, 652 N.E.2d 721. This court will not second-guess such a determination absent an abuse of discretion.

*State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92 (2004).

Mistrials are necessary "only when the ends of justice so require and a fair trial is no longer possible." *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623, follows in *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 105 (2005).

Mr. Carter was deprived of a fair trial as a result of this discovery misconduct by the Government. Defense counsel clearly outlined the rational for the Trial Court. The Government had the reports since February of 2014 and did not provide them to the defense until mid-trial. Defense counsel could not prepare to cross examine this expert on this opinion because it was not disclosed. Had defense counsel known that this would be part of the expert's testimony, he could have researched the issue, obtained an expert of his own and used that expert in the defense case in chief to rebut and challenge the Government's expert. In Mr. Carter's case, the opinion of the BCI Firearms expert was a pillar of the defense case. The Government did not have a murder weapon. The Government tested all the firearms at the Defendant's home and did not find a murder weapon. The Government then had a theory that a MAC-10 firearm was the murder weapon.

Page 34 of 45

That theory was based on three legs; testimony of two witness that related to statements against interest by Mr. Carter that mentioned a MAC-10. The third leg is Mr. Kramer's opinion testimony (purporting to be expert testimony with a scientific basis) that a MAC-10 *could* be a murder weapon.

Had defense counsel been provided the expert opinion during pre-trial discovery, a plan or strategy of defense would have been possible, including, but not limited to a pre-trial *Daubert* hearing on the issue of the invalid junk science that the Government used to blind-side the defense. Timely notice via discovery would also allow the Defendant the opportunity to have its own expert to rebut what is mere opinion of the Government's witness based upon unsound data.

The continuation of the trial under these circumstances was grossly unfair and a mistrial should have been granted. However, the trial court overruled that motion. Tr. at p. 1244. The trial court found no discovery violation and issued no sanction. Tr. at pp. 1235 to 1246. Based upon the foregoing, this is reversible error.

## C. That the Conviction of the Defendant was against the Manifest Weight of the Evidence and, in the alternative, was based upon insufficient evidence.

### 1.

Respect for the decisions of juries is a foundation of the trust and confidence that citizens have in the criminal justice system. Therefore, when determining whether convictions were against the manifest weight of the evidence, the reviewing

court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

A determination of whether a conviction is against the manifest weight of the evidence does not permit a Court to view the evidence in the light most favorable to the State to determine whether the State has met its burden of persuasion. *State v. Love,* 9th Dist. No. 21654, 2004-Ohio-1422, at ¶11. Rather, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio.App.3d 339, 340.

2.

A conviction that lacks sufficient evidence of all of the elements of the offense is clearly also against the manifest weight of the evidence. However, when

reviewing a case based upon the sufficiency of the evidence, an appellate court utilizes different standards. See *Bryan–Wollman v. Domonko,* 115 Ohio St.3d 291, 2007–Ohio–4918, 874 N.E.2d 1198.

When reviewing the sufficiency of the evidence, the inquiry focuses on the adequacy of the evidence and whether the evidence submitted at trial, if believed, could reasonably support a finding of guilt beyond a reasonable doubt. See *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997–Ohio–52, 678 N.E.2d 541, 546 (stating, "sufficiency is the test of adequacy"); *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, 503. The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jenks,* supra. This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. However, where "the evidence offered by the prosecution in support of the elements of the offense charged is so insubstantial and insufficient, and of such slight probative value, that it is not proper to make a finding beyond a reasonable doubt that appellant committed all of the acts constituting the elements of the offense, a reviewing court must reverse, rather than affirm, the conviction." *State v. Fyffe* (1990), 67 Ohio App.3d 608, 615, 588 N.E.2d 137.

With the foregoing standards in mind, this court should conclude that the convictions in this case were against the manifest weight of the evidence or were based upon insufficient evidence.

Page 37 of 45

3.

Excluding the evidence that was improperly introduced (and which has been reviewed above) the evidence presented by the State of Ohio sets forth a case based entirely upon speculation and required the jury in this case to draw improper inferences from that evidence in order to get to a conviction.  Taking the same evidence presented by the Government, there is a substantial likelihood that the killer who struck down Mr. Warrington on that cold February morning was likely, Ms. Burkholder.

Ms. Burkholder knew that there was a very good chance that Mr. Warrington wanted to end their affair and return to his marriage bed.  Ms. Burkholder had taken and passed courses to qualify her for a license to carry a concealed firearm. Mr. Warrington was gunned down at her home in the early morning hours when she knew he would be coming over to be with her.  Ms. Burkholder's daughter related to the jury that Ms. Burkholder was in a state of extreme intoxication and was acting in a bazar manner.  No firearm was ever taken from Ms. Burkholder for testing.[4]  Ms. Burkholder had a motive, the means and the opportunity to be a prime suspect in the death of Mr. Warrington.

Unfortunately, the evidenced pointing to Ms. Burkholder was not subjected to the same level of scrutiny as evidence pointing to Mr. Carter.  However, a fair

---

[4] In point of fact, the Defense investigators attempted to find the firearm but were thwarted in their efforts by representatives of both the Prosecutor and the Lima Police Department.

reading of the evidence presented indicates that the strength of the case against Ms. Burkholder is undeniable.

Furthermore, the defense presented witnesses who contradicted the Government's jailhouse witnesses by demonstrating that they were unreliable and not worthy of belief.

### D. That the Prosecution Statements in Closing Argument Misstates the Evidence and rise to the level of Prosecutorial Misconduct and require a Reversal

#### 1.

The standard for Prosecutorial Misconduct requires a reviewing court to look at several factors. The United States Court of Appeals for the Sixth Circuit has set forth "a two step inquiry to determine whether the prosecutorial misconduct rises to the level of unconstitutionality. 'To satisfy the standard . . ., the conduct must be both improper and flagrant.'" *Mathews v. Parker,* 651 F.3d 489, 505 (C.A. 6 2011) reversed on other grounds, *Parker v. Matthews,* 132 S. Ct. 2148, 567 U.S., 183 L. Ed. 2d 32 (2012).)(quoting *Broom v. Mitchell,* 441 F.3d 392, 412 (C.A.6 2006)). The Sixth Circuit then outlines four factors to be considered "'(1) the likelihood that the remarks . . . tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against [Matthews].'" *Id.* at 506.

2.

During closing argument the Government made an argument regarding expert testimony of Matthew Congleton - who performed gunshot residue (GSR) testing for this case - argued that gunshot residue was not found on Mr. Carter's car:

> Now, there was not gunshot residue found on that car.  True.  But, Mr. Congleton told you that the gunshot residue does not stick to smooth surfaces.  If there was any on Mr. Carter's bare hands and then transferred to that door handle it probably wouldn't stick to that door handle.  If it did, it may have blown away in the wind as Mr. Carter drove.

Tr. at p. 1812. Any fair review of Mr. Congleton's testimony (Tr. at p. 1115 et. seq.) shows he made not statements that GSR would blow away as Mr. Carter drove away from the crime scene.

Other times, the Government, in closing, makes remarks that shift the burden of proof from the Government to the Defendant.  For example:

> Also with respect to Sonya Mr. Rion brings up the idea that she was with a lot of other men.  Well, we know of one other than Mr. Warrington and that would be Agruello Harris.  Okay?  I don't know that there was any evidence of a lot of other men.  But, again, even assuming there were other men, is it just a mere possibility that some other man did this?  Because a mere possibility does not rise to a level of reasonable doubt.
>
> MR. RION:  Objection, your Honor.  It's shifting the burden.
>
> THE COURT:  The Court will remind the jurors, and I'll tell you in the instructions, it's the State's burden to prove.

Tr. at p. 1817, and:

Mr. Rion also said, "Well, maybe that gunshot residue got on those clothes," not one article, and not two articles, but three articles of clothing collected from the defendant's house, "got on those clothes at the Police Station." Maybe. Maybe. Okay, now we have two possibilities. I would submit to you that the more possibilities we have the more likely it is that each one of them is a mere possibility. Okay? Well, maybe. Maybe. Maybe isn't good enough. Maybe doesn't get you to reasonable doubt. The jury instructions tell you that.

> MR. RION:  Objection, your Honor. He's reversing the burden of proof.  Maybe doesn't get you reasonable doubt is reversing the burden of proof in the case.

> MR. MILLER:  I'm speaking directly to the jury instructions that talks specifically about mere possible doubt.

> THE COURT:  Okay. The statement you just made I'll sustain and tell the jury to disregard.  But, continue.

> MR. MILLER:  Okay.

> THE COURT:  The State has the burden of proof.

Tr. at pp. 1808-1809.  Then, the Government misstates defense counsel's argument:

> Now, Carlotta. Mr. Rion said something with respect to Carlotta and this is very important. He said -- Mr. Rion suggested that Mr. Carter was not trying to set up an alibi because he was guilty, but because maybe he was innocent and this alibi was true.

> MR. RION:  Objection. That's not what I said.

> THE COURT:  It's just argument. The jury will decide what the evidence is.  Overruled.

Tr. at p. 1826.

3.

As set forth infra. the Government committed discovery violations in

connection with this case. The cumulative discovery violations and improper arguments present a ground for revisable error.

### E. That the Defendant was Deprived of a Fair Trial due to Ineffective Assistance of Trial Counsel

It is well established that an individual charged with a crime, is entitled to effective representation. *Strickland v. Washington* (1984), 466 U.S. 688. In order to succeed on a claim, the Appellant must show that trial counsel's performance was deficient and fell below an objective standard of reasonableness resulting in prejudice as well as showing that, except for those errors, the outcome would have been different. *State v. Gibson,* 2011-Ohio-1651. *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.

Most egregious in this case is defense counsel's handling of the testimony of the Government's firearms expert, Mr. Kramer. As set forth in more detail above, the Government elicited testimony that a MAC-10 firearm was consistent with the forensic findings of bullets and casings recovered at the crime scene. That, coupled with the testimony of other witnesses that Defendant had bragged or claimed to have owned or used a MAC-10 provided a direct link between Mr. Carter and the murder.

If the Government is to be believed, defense counsel knew or should have known that the Government had of evidence of a MAC-10 as a possible murder weapon from pre-trial disclosures of witness statements and a listing of possible

Page 42 of 45

connections with a MAC-10 with the forensic evidence. Defense counsel failed to find that link and then prepare for a defense thereof. In addition, the record disclosed that defense counsel had the name of and spoke to an expert. From the proffer of that expert, it was apparent that the whole basis of Mr. Kramer's opinion was subject to attack if an expert was employed. Although he asked for a mistrial, defense counsel failed to request time to secure the expert and present that testimony to the jury.

But for this lapse of duty, the verdict in this case would have been not guilty.

## CONCLUSION

For the reasons set forth herein, the verdict and judgment of the trial court should be reversed and the case remanded for a new trial.

Respectfully submitted,

F. Stephen Chamberlain (0039815)
Attorney for Appellant

## PROOF OF SERVICE

I hereby certify that a true copy of the foregoing was served upon the Allen County Prosecutor by electronic means on September 29, 2016.

F. Stephen Chamberlain (0039815)
Attorney for Appellant

# APPENDIX

2015 SEP 22  PM 2:04

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

IN THE COURT OF COMMON PLEAS, ALLEN COUNTY, OHIO

**STATE OF OHIO**                                   CASE NO.  CR2014 0139

        PLAINTIFF
                                                    **JUDGMENT ENTRY**
-VS-                                                **OF CONVICTION**
                                                    **AND SENTENCING**
**MARKELUS Q. CARTER**

        DEFENDANT                                **JUDGE JEFFREY L. REED**

----------------------------------------------------------------------------------------------------

**INDICTMENT FOR:   COUNT 1 - AGGRAVATED MURDER WITH FIREARM**
**SPECIFICATION, R.C. 2903.01 (A);**

**COUNT 2 - HAVING WEAPONS UNDER DISABILITY,**
**felony 3, R.C. 2923.13 (A)(3);**

        This 25th day of April, 2014, defendant personally present in open Court with appointed counsel, Joseph A. Benavidez; State of Ohio represented by an Assistant Prosecuting Attorney. Defendant acknowledged service of a copy of the indictment; waived the reading thereof; waived any statutory waiting period and tendered a plea of **NOT GUILTY** to the charges contained in the indictment.

        This 8th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Thereupon came the following named persons who were duly impaneled and sworn, to-wit:

| | |
|---|---|
| Virginia Oglesbee | Kristy Brown |
| Kathryn Coon | Jeremy Castle |
| Barbara Krites | Joseph Griffo |
| Trixie Coolidge | Donnie Miolen |
| Lois James | Ginger Dankirt |
| Stacy Risner | Rose Biederman |

ALTERNATE 1 - Joseph Fleischman
ALTERNATE 2 - Linda Harris

651   ✓—                                    CR 15  8251

Court recessed for the day.

This 9th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. An opening statement was made on behalf of the State of Ohio and on behalf of the defendant. Evidence was presented on behalf of the State of Ohio. During the testimony of the State's third witness the Court was advised by Juror Number 5 that she now was aware she knew a member of the Defendant's family and didn't feel she could continue to serve as a juror in the case. The Court, after a discussion with the juror, excused Juror Number 5 from further jury service and ruled said juror would be replaced by the first alternate. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 10th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 11th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following Monday.

This 14th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 15th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. The defense, through Attorney Jon Paul Rion, made a Motion for Mistrial and/or Motion for Continuance of the Trial and the same was taken under advisement by the Court. Court recessed until the following day.

This 16th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. The Court ruled on the Motion for Mistrial and/or Motion for Continuation of the Trial previously taken under advisement. The Motion for a Mistrial was OVERRULED by the Court and the Motion for a Continuance of the Trial was OVERRULED by the Court. Exceptions were noted. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

CR 15 82 52

This 17th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the State of Ohio. Court recessed until the following day.

This 18th day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. The defense, through Attorney Jon Paul Rion, made a Motion for a Mistrial and the same was OVERRULED by the Court. Evidence continued to be presented by the State of Ohio. Exhibits were tendered and ruled upon by the Court for admission into evidence. State of Ohio then rested its case. Whereupon, the defendant, through his counsel, made a Motion for a Directed Verdict of Acquittal and the same was OVERRULED by the Court. Evidence was presented by the defense. Defense exhibits were tendered and ruled upon by the Court for admission into evidence. Court recessed until the following Monday.

This 21st day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Evidence continued to be presented by the defense. Previously tendered exhibits for admission into evidence by the defense, which admissibility was taken under advisement by the Court, were ruled upon by the Court for admission into evidence. The defense then rested their case. Final arguments were presented by the State of Ohio and the defense. The Court charged the jury, and the jury retired for deliberation purposes at 4:20 P.M. The jury was released for the evening at 7:30 P.M. and to commence deliberations at 9:00 A.M. on Tuesday, September 22, 2015.

This 22nd day of September, 2015, defendant personally present in open Court with counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Jury deliberations continued.

Whereupon, on this 22nd day of September, 2015, at 11:50 A.M. came the said jury, conducted into open Court by the bailiff, the said defendant and his counsel, Jon Paul Rion, being present in open Court, along with Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys, representing the State of Ohio. The said jury returned its verdict, signed by all twelve jurors, to-wit:

**VERDICT - COUNT 1** -
"We, the jury, being duly impaneled, sworn and affirmed, find the State of Ohio **DID** prove beyond a reasonable doubt that MARKELUS Q. CARTER did purposely and with prior calculation and design cause the death of Kenneth Warrington on February 23, 2009 and in Allen County, Ohio.

CA 15 92-53

Therefore, we find beyond a reasonable doubt that MARKELUS Q. CARTER is **GUILTY** of AGGRAVATED MURDER as charged in Count One of the indictment.

Signed this 22 day of September, 2015.

## VERDICT ON SPECIFICATION - COUNT ONE -

We, the jury, being duly impaneled, sworn and affirmed, having found Defendant GUILTY of AGGRAVATED MURDER in Count One, further find the State **DID** prove beyond a reasonable doubt that defendant had a firearm on or about his person or under his control while committing the AGGRAVATED MURDER and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used the firearm to facilitate the AGGRAVATED MURDER of Kenneth Warrington and, therefore, we find beyond a reasonable doubt that the defendant, MARKELUS Q. CARTER, is **GUILTY** of the Specification on Count One.

Signed this 22 day of September, 2015.

## VERDICT - COUNT 2 -

"We, the jury, being duly impaneled, sworn and affirmed, find the State of Ohio **DID** prove beyond a reasonable doubt that MARKELUS Q. CARTER did knowingly have, carry, or use a firearm and that he had previously been convicted of a felony offense involving the illegal possession of a drug of abuse.

Therefore, we find, beyond a reasonable doubt, that MARKELUS Q. CARTER is **GUILTY** of HAVING A WEAPON WHILE UNDER A DISABILITY as charged in Count Two of the indictment.

Signed this 22 day of September, 2015."

The Court accepted the verdicts as returned by the jury and the defendant was convicted of Count One, Aggravated Murder with Firearm Specification, and Count Two, Having Weapons Under Disability, a felony of the 3rd degree.

This matter proceeded to sentencing pursuant to R.C. 2929.19 this 22nd day of September, 2015, with the Defendant being personally present in open Court and represented by counsel, Jon Paul Rion; State of Ohio represented by Anthony J. Miller and Terri L. Kohlrieser, Assistant Prosecuting Attorneys. Following statements to the Court by the State of Ohio regarding sentencing, the defendant was given an opportunity to speak and to present witnesses

CR 15 82 54

and was afforded all rights pursuant to Crim.R. 32.  The Court has considered the record, oral statements, any victim impact statement, any pre-sentence report, the purposes and principles of sentencing under R.C. 2929.11, the seriousness and recidivism factors relevant to the offense and offender pursuant to R.C. 2929.12, and the need for deterrence, incapacitation, rehabilitation and restitution.

The Court finds that the defendant has been convicted by a jury after a jury trial of:

**COUNT ONE - AGGRAVATED MURDER WITH
FIREARM SPECIFICATION,
A VIOLATION OF R.C. 2903.01 (A);**

**COUNT TWO - HAVING WEAPONS UNDER DISABILITY,
A VIOLATION OF R.C. 2923.13 (A)(3);
A FELONY OF THE 3RD DEGREE;**

The Court finds that a mandatory prison term is required by divisions (F) or (G) of R.C. 2929.13 or 2929.14 (G) or R.C. 2903.01 on the Aggravated Murder  and on the firearm specification in Count One.

The Court further finds the following factors apply regarding the offender, the offense, or the victim, pursuant to R.C. 2929.12(B), (C), (D), and (E).

**R.C. 2929.12(B):**
The victim of the offense suffered serious physical harm as a result of the offense.

**R.C. 2929.12(D):**
The defendant previously was adjudicated a delinquent child pursuant to R.C. Chapter 2151 of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152 of the Revised Code, or the offender has a history of criminal convictions.
The defendant has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child pursuant to R.C. Chapter 2151 of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152 of the Revised Code, or the defendant has not responded favorably to sanctions previously imposed for criminal convictions.

**R.C. 2929.12(E):**
Prior to committing the offense the defendant had not been adjudicated a delinquent child, but had a juvenile traffic offender record.

The Court further finds that the defendant was born on JULY 28, 1969.

CN 15 82 55

The Court further finds that, after considering the factors set forth in R.C. 2929.12, a prison term is consistent with the purposes and principles of sentencing set forth in R.C. 2929.11 and the defendant is **not** amenable to an available community control sanction.

The Court further finds that a combination of community control sanctions **would** demean the seriousness of the defendant's conduct and its impact on the victim, that a sentence of imprisonment is commensurate with the seriousness of the defendant's conduct and its impact on the victim and that a prison sentence **does not** place an unnecessary burden on the state governmental resources.

**IT IS HEREBY ORDERED** that the defendant serve a stated term of:

**LIFE WITHOUT PAROLE** in prison under **COUNT ONE** for the violation of R.C. 2903.01 (A), which IS a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925; **FURTHER, AN ADDITIONAL MANDATORY TERM OF 3 YEARS IS IMPOSED ON THE FIREARM SPECIFICATION AND SAID THREE YEARS IS CONSECUTIVE TO THE LIFE WITHOUT PAROLE TERM;**

**36 MONTHS** in prison under **COUNT TWO** for the violation of R.C. 2923.13 (A)(3), which **is not** a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925;

**IT IS FURTHER ORDERED** the prison term imposed in Count Two is to be served **CONCURRENT** to the mandatory prison term imposed in Count One and **CONCURRENT** to the mandatory 3 year term imposed on the firearm specification.

As part of this sentence the defendant is advised that upon the completion of the prison term the defendant SHALL BE subject to such further **OPTIONAL** period of supervision under POST RELEASE CONTROL of THREE (3) years as it relates to Count Two. As authorized by law, the Adult Parole Authority may increase or reduce restrictions imposed by the parole board. If the defendant violates the terms of POST RELEASE CONTROL the parole board may return the offender to prison for a maximum period of nine months for each violation, but the total period of additional prison time imposed by the parole board for violations while under POST RELEASE CONTROL shall not exceed one-half (1/2) of the defendant's stated prison term. As part of POST RELEASE CONTROL defendant shall comply with any drug/alcohol treatment and/or monitoring. If the defendant is convicted of a felony committed while under POST RELEASE CONTROL the Court having jurisdiction over the new felony may return the defendant to prison under this case for an additional period of time as authorized by law and any prison term for the new felony may be served consecutively with the extension of prison time in this case. If the Court imposes additional prison time in this case the defendant

CR 15 82 56

shall be credited with any additional prison time imposed by the parole board for the same violation.

The additional periods of time imposed by another court because of a felony committed while under POST RELEASE CONTROL in this case or by the parole board for violations in this case while on POST RELEASE CONTROL are part of the sentence in this case.

The defendant has been sentenced to a prison term or to a community residential sanction in a jail or community-based correctional facility, therefore it is **ORDERED** that defendant shall submit to a DNA specimen collection procedure administered by the director of rehabilitation and correction or the chief administrative officer of the jail or other detention facility in which the person is serving the term of imprisonment.

Defendant is **ORDERED** to pay all costs of prosecution.

Further, the Defendant was advised by the Court of his appellate rights pursuant to Criminal Rule 32(A)(2).

**IT IS FURTHER ORDERED** the Sheriff of Allen County shall deliver the Defendant to the Ohio Department of Rehabilitation and Corrections forthwith. Credit is granted for **530 days** as of September 22, 2015 because of time spent in custody in this case prior to sentence, together with future custody days while defendant awaits transportation to the appropriate institution.

**IT IS SO ORDERED.**

DATED:  SEPTEMBER 22, 2015

JEFFREY L. REED, JUDGE

cc:  Prosecuting Attorney
John Paul Rion
Crime Victim Services

CR 15 82 57

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.
(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.
(D) No person who is under detention as a result of having been found guilty of or having pleaded guilty to a felony or who breaks that detention shall purposely cause the death of another.
(E) No person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer when either of the following applies:
(1) The victim, at the time of the commission of the offense, is engaged in the victim's duties.
(2) It is the offender's specific purpose to kill a law enforcement officer.
(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.
(G) As used in this section:
(1) "Detention" has the same meaning as in section 2921.01 of the Revised Code.
(2) "Law enforcement officer" has the same meaning as in section 2911.01 of the Revised Code.


R.C. 2903.01


***************


(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
(1) The person is a fugitive from justice.
(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.
(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

(4) The person is drug dependent, in danger of drug dependence, or a chronic alcoholic.

(5) The person is under adjudication of mental incompetence, has been adjudicated as a mental defective, has been committed to a mental institution, has been found by a court to be a mentally ill person subject to court order, or is an involuntary patient other than one who is a patient only for purposes of observation. As used in this division, "mentally ill person subject to court order" and "patient" have the same meanings as in section 5122.01 of the Revised Code.

(B) Whoever violates this section is guilty of having weapons while under disability, a felony of the third degree.

(C) For the purposes of this section, "under operation of law or legal process" shall not itself include mere completion, termination, or expiration of a sentence imposed as a result of a criminal conviction.


R.C. 2923.13

**************

(A) **Purpose, Scope and Reciprocity.** This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures.

(B) **Discovery: Right to Copy or Photograph.** Upon receipt of a written demand for discovery by the defendant, and except as provided in division (C), (D), (E), (F), or (J) of this rule, the prosecuting attorney shall provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:

(1) Any written or recorded statement by the defendant or a co-defendant, including police summaries of such statements, and including grand jury testimony by either the defendant or co-defendant;

(2) Criminal records of the defendant, a co-defendant, and the record of prior convictions that could be admissible under Rule 609 of the Ohio Rules of Evidence of a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal;

(3) Subject to divisions (D)(4) and (E) of this rule, all laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings, or places;

(4) Subject to division (D)(4) and (E) of this rule, results of physical or mental examinations, experiments or scientific tests;

(5) Any evidence favorable to the defendant and material to guilt or punishment;

(6) All reports from peace officers, the Ohio State Highway Patrol, and federal law enforcement agents, provided however, that a document prepared by a person other than the witness testifying will not be considered to be the witness's prior statement for purposes of the cross examination of that particular witness under the Rules of Evidence unless explicitly adopted by the witness;

(7) Any written or recorded statement by a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal.

**(C) Prosecuting Attorney's Designation of "Counsel Only" Materials.** The prosecuting attorney may designate any material subject to disclosure under this rule as "counsel only" by stamping a prominent notice on each page or thing so designated. "Counsel only" material also includes materials ordered disclosed under division (F) of this rule. Except as otherwise provided, "counsel only" material may not be shown to the defendant or any other person, but may be disclosed only to defense counsel, or the agents or employees of defense counsel, and may not otherwise be reproduced, copied or disseminated in any way. Defense counsel may orally communicate the content of the "counsel only" material to the defendant.

**(D) Prosecuting Attorney's Certification of Nondisclosure.** If the prosecuting attorney does not disclose materials or portions of materials under this rule, the prosecuting attorney shall certify to the court that the prosecuting attorney is not disclosing material or portions of material otherwise subject to disclosure under this rule for one or more of the following reasons:

(1) The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion;

(2) The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will subject a witness, victim, or third party to a substantial risk of serious economic harm;

(3) Disclosure will compromise an ongoing criminal investigation or a confidential law enforcement technique or investigation regardless of whether that investigation involves the pending case or the defendant;

(4) The statement is of a child victim of sexually oriented offense under the age of thirteen;

(5) The interests of justice require non-disclosure.

Reasonable, articulable grounds may include, but are not limited to, the nature of the case, the specific course of conduct of one or more parties, threats or prior instances of witness tampering or intimidation, whether or not those instances resulted in criminal charges, whether the defendant is pro se, and any other relevant information.

The prosecuting attorney's certification shall identify the nondisclosed material.

**(E) Right of Inspection in Cases of Sexual Assault.**

(1) In cases of sexual assault, defense counsel, or the agents or employees of defense counsel, shall have the right to inspect photographs, results of physical or mental examinations, or hospital reports, related to the indictment, information, or complaint as described in section (B)(3) or (B)(4) of this rule. Hospital records not related to the information, indictment, or complaint are not subject to inspection or disclosure. Upon motion by defendant, copies of the photographs, results of physical or mental examinations, or hospital reports, shall be provided to defendant's expert under seal and under protection from unauthorized dissemination pursuant to protective order.

(2) In cases involving a victim of a sexually oriented offense less than thirteen years of age, the court, for good cause shown, may order the child's statement be provided, under seal and pursuant to protective order from unauthorized dissemination, to defense counsel and the defendant's expert. Notwithstanding any provision to the contrary, counsel for the defendant shall be permitted to discuss the content of the statement with the expert.

**(F) Review of Prosecuting Attorney's Certification of Non-Disclosure.** Upon motion of the defendant, the trial court shall review the prosecuting attorney's decision of nondisclosure or designation of "counsel only" material for abuse of discretion during an *in camera* hearing conducted seven days prior to trial, with counsel participating.

(1) Upon a finding of an abuse of discretion by the prosecuting attorney, the trial court may order disclosure, grant a continuance, or other appropriate relief.

(2) Upon a finding by the trial court of an abuse of discretion by the prosecuting attorney, the prosecuting attorney may file an interlocutory appeal pursuant to division (K) of Rule 12 of the Rules of Criminal Procedure.

(3) Unless, for good cause shown, the court orders otherwise, any material disclosed by court order under this section shall be deemed to be "counsel only" material, whether or not it is marked as such.

(4) Notwithstanding the provisions of (E)(2), in the case of a statement by a victim of a sexually oriented offense less than thirteen years of age, where the trial court finds no abuse of discretion, and the prosecuting attorney has not certified for nondisclosure under (D)(1) or (D)(2) of this rule, or has filed for nondisclosure under (D)(1) or (D)(2) of this rule and the court has found an abuse of discretion in doing so, the prosecuting attorney shall permit defense counsel, or the agents or employees of defense counsel to inspect the statement at that time.

(5) If the court finds no abuse of discretion by the prosecuting attorney, a copy of any discoverable material that was not disclosed before trial shall be provided to the defendant no later than commencement of trial. If the court continues the trial after the disclosure, the testimony of any witness shall be perpetuated on motion of the state subject to further cross-examination for good cause shown.

**(G) Perpetuation of Testimony.** Where a court has ordered disclosure of material certified by the prosecuting attorney under division (F) of this rule, the prosecuting attorney may move the court to perpetuate the testimony of relevant witnesses in a hearing before the court, in which hearing the defendant shall have the right of

cross-examination. A record of the witness's testimony shall be made and shall be admissible at trial as part of the state's case in chief, in the event the witness has become unavailable through no fault of the state.

**(H) Discovery: Right to Copy or Photograph.** If the defendant serves a written demand for discovery or any other pleading seeking disclosure of evidence on the prosecuting attorney, a reciprocal duty of disclosure by the defendant arises without further demand by the state. A public records request made by the defendant, directly or indirectly, shall be treated as a demand for discovery in a criminal case if, and only if, the request is made to an agency involved in the prosecution or investigation of that case. The defendant shall provide copies or photographs, or permit the prosecuting attorney to copy or photograph, the following items related to the particular case indictment, information or complaint, and which are material to the innocence or alibi of the defendant, or are intended for use by the defense as evidence at the trial, or were obtained from or belong to the victim, within the possession of, or reasonably available to the defendant, except as provided in division (J) of this rule:

(1) All laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings or places;

(2) Results of physical or mental examinations, experiments or scientific tests;

(3) Any evidence that tends to negate the guilt of the defendant, or is material to punishment, or tends to support an alibi. However, nothing in this rule shall be construed to require the defendant to disclose information that would tend to incriminate that defendant;

(4) All investigative reports, except as provided in division (J) of this rule;

(5) Any written or recorded statement by a witness in the defendant's case-in-chief, or any witness that it reasonably anticipates calling as a witness in surrebuttal.

**(I) Witness List.** Each party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal. The content of the witness list may not be commented upon or disclosed to the jury by opposing counsel, but during argument, the presence or absence of the witness may be commented upon.

**(J) Information Not Subject to Disclosure.** The following items are not subject to disclosure under this rule:

(1) Materials subject to the work product protection. Work product includes, but is not limited to, reports, memoranda, or other internal documents made by the prosecuting attorney or defense counsel, or their agents in connection with the investigation or prosecution or defense of the case;

(2) Transcripts of grand jury testimony, other than transcripts of the testimony of a defendant or co-defendant. Such transcripts are governed by Crim. R. 6;

(3) Materials that by law are subject to privilege, or confidentiality, or are otherwise prohibited from disclosure.

**(K) Expert Witnesses; Reports.** An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis,

conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

**(L) Regulation of Discovery.**

(1) The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

(2) The trial court specifically may regulate the time, place, and manner of a *pro se* defendant's access to any discoverable material not to exceed the scope of this rule.

(3) In cases in which the attorney-client relationship is terminated prior to trial for any reason, any material that is designated "counsel only", or limited in dissemination by protective order, must be returned to the state. Any work product derived from said material shall not be provided to the defendant.

**(M) Time of Motions.** A defendant shall make his demand for discovery within twenty-one days after arraignment or seven days before the date of trial, whichever is earlier, or at such reasonable time later as the court may permit. A party's motion to compel compliance with this rule shall be made no later than seven days prior to trial, or three days after the opposing party provides discovery, whichever is later. The motion shall include all relief sought under this rule. A subsequent motion may be made only upon showing of cause why such motion would be in the interest of justice.

Ohio Crim. R. 16

****************

**(A) Exclusion Mandatory.** Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

**(B) Exclusion Discretionary.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

Ohio Evid. R. 403

************************

**(A) Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:
(1) *Character of Accused.* Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.
(2) *Character of Victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.
(3) *Character of Witness.* Evidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609.
**(B) Other Crimes, Wrongs or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.


Ohio Evid. R. 404


************************


§1 All men are, by nature, free and independent, and have certain inalien- able rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.

(1851)

rIght to alter, reform, or abolIsh government, and repeal specIal prIvIleges.

§2 All political power is inherent in the people. Government is instituted for their equal protection and bene t, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privi- leges or

immunities shall ever be grant- ed, that may not be altered, revoked, or repealed by the General Assembly.

§5 The right of trial by jury shall be in- violate, except that, in civil cases, laws may be passed to authorize the render- ing of a verdict by the concurrence of not less than three-fourths of the jury.

§10 Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penal- ty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise in- famous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to con- stitute such grand jury and the number thereof necessary to concur in nding such indictment shall be determined by law. In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and speedy public trial by an impartial jury of the county in which the offense is alleged to have been com- mitted; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any wit- ness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the tak- ing of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. No per- son shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be consid- ered by the court and jury and may be the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense.

§16 All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.

Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

§20 This enumeration of rights shall not be construed to impair or deny oth- ers retained by the people; and all pow- ers, not herein delegated, remain with the people.

Constitution of the State of Ohio Article I. (parts)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Amendment V**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## Amendment VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

## Amendment VIII

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

## AMENDMENT XIV

**Note:** Article I, section 2, of the Constitution was modified by section 2 of the 14th amendment.
**Section 1.**
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
**Section 2.**
Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age,* and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.**

No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.**

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.**

The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

United States Constitution (Select Amendments)

FILED
COURT OF APPEALS

2016 DEC -1  PM 2: 28

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE THIRD DISTRICT COURT OF APPEALS
### ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | APPEAL CASE NO:  01-15-062 |
| Plaintiff-Appellee | : | |
| -vs- | : | REGULAR CALENDAR |
| MARKELUS Q. CARTER | : | (APPEAL FROM COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO) |
| Defendant-Appellant | : | |

## BRIEF OF PLAINTIFF-APPELLEE

JANA E. EMERICK
Reg. #0059550
Assistant Prosecuting Attorney
Allen County, Ohio
Counsel of Record
Court of Appeals Bldg., Suite 302
204 North Main Street
Lima, Ohio 45801
(419) 222-2462
Fax:   (419) 227-1072

COUNSEL FOR PLAINTIFF-
APPELLEE

F. STEPHEN CHAMBERLAIN
Reg. #0039815
Attorney at Law

212 North Elizabeth Street, 3rd. Floor
P.O. Box 1314
Lima, Ohio  45802-1314
(419) 235-5125
(866) 596-1146

COUNSEL FOR DEFENDANT-
APPELLANT

29 50

EXHIBIT
14

# TABLE OF CONTENTS

**PAGES**

Table of Contents.........................................................................................................i

Table of Cases, Statutes and Other Authorities ...................................................iii

Statement of the Case ...............................................................................................1

Statement of the Facts...............................................................................................2

Statement of Assignments of Errors .......................................................................3

Argument

Assignment of Error One...........................................................................................4

> **THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY FAILING TO EXCLUDE EVIDENCE OF AN ALTERCATION BETWEEN THE DEFENDANT AND A GOVERNMENT WITNESS IN A HOLDING CELL OF THE COURT DURING TRIAL AND ALLOWING A VIDEO OF THAT ALTERCATION TO BE PLAYED FOR THE JURY DURING THE GOVERNMENT'S CASE IN CHIEF.**

Assignment of Error Two .......................................................................................10

> **THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY OVERRULING DEFENDANT'S MOTION FOR MISTRIAL FILED ON SEPTEMBER 16, 2016 BASED UPON RULE 16 DISCOVERY VIOLATIONS AND BRADY DISCOVERY VIOLATIONS RELATED TO TESTIMONY OF A GOVERNMENT WITNESS ON FIREARMS.**

Assignment of Error Three .....................................................................................17

> **THAT THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND, IN THE ALTERNATIVE, WAS BASED UPON INSUFFICIENT EVIDENCE.**

Assignment of Error Four........................................................................................29

> **THAT THE PROSECUTION STATEMENTS IN CLOSING ARGUMENT MISSTATES THE EVIDENCE AND RISE TO THE LEVEL OF PROSECUTORIAL MISCONDUCT AND REQUIRE A REVERSAL.**

i

Assignment of Error Five ....................................................................................35

       **THAT THE DEFENDANT WAS DEPRIVED OF A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

Conclusion ..........................................................................................................38

Proof of Service ..................................................................................................38

Appendix...............................................................................................................39

## TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

**PAGES**

**Cases**

*Dunlop v. United States* (1897), 165 U.S. 486, 498 ........................................................29

*Lakewood v. Papadellis* (1987), 32 Ohio St.3d 1, 3 ........................................................14

*Rigby v. Lake County*, 58 Ohio St.3d 269, 271, 1991 Ohio LEXIS 921 ...........................5

*State v. Ballew*, 76 Ohio St.3d 244, 255, 1996 Ohio 81 ...................................................29

*State v. Bey*, 85 Ohio St.3d 487, 495, 1999 Ohio 283 ......................................................29

*State v. Clemons*, 82 Ohio St.3d 438, 452, 1998 Ohio 406 ..............................................33

*State v. Collins*, 89 Ohio St.3d 524, 527-528, 2000 Ohio 231 .........................................33

*State v. D'Ambrosio*, 67 Ohio St.3d 185, 193, 1993 Ohio 170.........................................33

*State v. Ferguson*, 5 Ohio St. 3d 160, 163, 1983 Ohio LEXIS 740...................................34

*State v. Foust*, 105 Ohio St.3d 137, 153-154, 2004 Ohio 7006........................................36

*State v. Gibson*, 3rd Dist. No. 1-96-61, 1997 Ohio App. LEXIS 850 .................................7

*State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 1988 Ohio LEXIS 172............................35

*State v. Hoffner*, 102 Ohio St.3d 358, 365, 2004 Ohio 3430............................................36

*State v. Leonard* (May 21, 1993), Lawrence App. No. CA92-12, 1993 Ohio App. LEXIS

2725 ....................................................................................................................6

*State v. Leonard*, 4th Dist. No. CA92-12, 1993 Ohio App. LEXIS 2725 ...........................6

*State v. Lott*, 51 Ohio St.3d 160, 165, 1990 Ohio LEXIS 244 .........................................29

*State v. Lyle*, 3rd Dist. No. 1-14-41, 2015 Ohio 1181 .......................................................17

*State v. Maurer*, 15 Ohio St.3d 239, 267, 1984 Ohio LEXIS 1285...................................29

*State v. McAlphine*, 8th Dist. No. 79216, 2002 Ohio App. LEXIS 198 ..............................8

iii

*State v. Parson* (1983), 6 Ohio St.3d 442, 445 ................................................................14

*State v. Richey* , 64 Ohio St.3d 353, 357, 1992 Ohio 44 .....................................................6

*State v. Smith*, 14 Ohio St.3d 13, 14, 1984 Ohio LEXIS 1228 ..........................................29

*State v. Soke* (1995), 105 Ohio App.3d 226, 663 N.E.2d 986 ..............................................6

*State v. Sparks*, 3rd Dist. No. 14-01-03, 2001 Ohio 2140 ...................................................33

*State v. Thompson* (1987), 33 Ohio St.3d 1, 9, 514 N.E.2d 407..........................................36

*State v. Thompson,* 33 Ohio St.3d 1 .....................................................................................33

*State v. Wilkinson* (1980), 64 Ohio St.2d 308, 317, 1980 Ohio LEXIS 882 ......................6

*State v. Williams*, 23 Ohio St.3d 16, 20, 1986 Ohio LEXIS 597 .........................................33

*Strickland v. Washington* (1984), 466 U.S. 668, 686-687 ..................................................35

**Statutes**

R.C. 2903.01(A) ...............................................................................................................1, 18

R.C. 2923.13(A)(3).............................................................................................................1, 18

R.C. 2941.145 .........................................................................................................................18

R.C. 2941.145(A) ..............................................................................................................1, 18

**Rules**

Crim.R. 16 ..............................................................................................................................15

Crim.R. 16(B)(4)) ..................................................................................................................16

Crim.R. 16(K)..............................................................................................................11, 14, 16

Crim.R. 16(L) .........................................................................................................................15

Evid.R. 404(B)........................................................................................................................6, 7

## STATEMENT OF THE CASE

Defendant-appellant, Markelus Q. Carter ("defendant"), appeals the judgment of conviction and sentence entered against him in the Allen County Court of Common Pleas, following a jury trial in which defendant was found guilty of aggravated murder and having a weapon while under disability.

Procedurally, this case originated on April 17, 2014, when the Allen County grand jury returned a two count indictment against defendant, charging him as follows:  Count 1 – aggravated murder, in violation of R.C. 2903.01(A); and Count 2 – having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(3).  Count 1 also contained a firearm specification pursuant to R.C. 2941.145(A).

On April 25, 2014, an arraignment was held and defendant entered a plea of not guilty to the indictment.  After 16 months of pretrial proceedings, a jury trial began in the case on September 8, 2015.  Following the presentation of evidence by the State of Ohio and then by the defense, the jury received the case for deliberation on September 21, 2015.  After deliberating for approximately three hours, the jury was released for an overnight recess. Deliberations resumed at 9:00 a.m. the following day and, following approximately three more hours of deliberations, the jury returned verdicts of guilty on both counts of the indictment and on the firearm specification.

A sentencing hearing was then held.  On Count 1, defendant was sentenced to life without parole, with a consecutive three-year term of mandatory incarceration imposed for the firearm specification.  On Count 2, defendant was sentenced to thirty-six months in prison, to be served concurrently with the sentence for Count 1.

Defendant thereafter filed the instant appeal.

1

## STATEMENT OF THE FACTS

An extensively detailed statement of the facts of this case will be set forth in the third assignment of error, *infra*, and will not be repeated here for the sake of brevity.  However, the totality of the evidence presented at trial in this case established the following facts:

On February 23, 2009, after clocking out of work at the Husky Refinery at 5:00 a.m., Kenneth Warrington was ambushed and brutally murdered as he arrived home approximately fifteen minutes later.  He was shot six times and left for dead on the concrete patio just outside the door to his girlfriend's house at 436 East McKibben Street in Lima, Allen County, Ohio. Warrington's body was found over an hour later by his girlfriend, Sonya Burkholder, after she awakened and began checking around the house because Warrington's truck was parked outside but he was not inside the home.  For several reasons, the investigation of Warrington's murder almost immediately focused on the defendant, Markelus Carter, who was Sonya Burkholder's former long-time boyfriend and the father of her two children.

As noted above, defendant was ultimately charged in this case with aggravated murder with a firearm specification and with having a weapon while under disability.  Following a jury trial, defendant was convicted and sentenced for those crimes.  He now appeals.

2

## STATEMENT OF ASSIGNMENTS OF ERROR

**Assignment of Error One**

THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY FAILING TO EXCLUDE EVIDENCE OF AN ALTERCATION BETWEEN THE DEFENDANT AND A GOVERNMENT WITNESS IN A HOLDING CELL OF THE COURT DURING TRIAL AND ALLOWING A VIDEO OF THAT ALTERCATION TO BE PLAYED FOR THE JURY DURING THE GOVERNMENT'S CASE IN CHIEF.

**Assignment of Error Two**

THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY OVERRULING DEFENDANT'S MOTION FOR MISTRIAL FILED ON SEPTEMBER 16, 2016 BASED UPON RULE 16 DISCOVERY VIOLATIONS AND BRADY DISCOVERY VIOLATIONS RELATED TO TESTIMONY OF A GOVERNMENT WITNESS ON FIREARMS.

**Assignment of Error Three**

THAT THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND, IN THE ALTERNATIVE, WAS BASED UPON INSUFFICIENT EVIDENCE.

**Assignment of Error Four**

THAT THE PROSECUTION STATEMENTS IN CLOSING ARGUMENT MISSTATES THE EVIDENCE AND RISE TO THE LEVEL OF PROSECUTORIAL MISCONDUCT AND REQUIRE A REVERSAL.

**Assignment of Error Five**

THAT THE DEFENDANT WAS DEPRIVED OF A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

## ASSIGNMENT OF ERROR ONE

**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY FAILING TO EXCLUDE EVIDENCE OF AN ALTERCATION BETWEEN THE DEFENDANT AND A GOVERNMENT WITNESS IN A HOLDING CELL OF THE COURT DURING TRIAL AND ALLOWING A VIDEO OF THAT ALTERCATION TO BE PLAYED FOR THE JURY DURING THE GOVERNMENT'S CASE IN CHIEF.**

In the first assignment of error, defendant asserts that the trial court erred in permitting the state to admit into evidence a video-recording of defendant assaulting a prosecution witness, an attack which occurred when the two men were inadvertently placed into the same jail holding cell during the course of the trial. Within the first assignment of error, defendant also argues that the trial court erred in failing to grant a defense motion for a mistrial relating to the same holding cell incident.

On September 16, 2015, which was the seventh day of trial in this case, the State of Ohio presented the testimony of Ohio State Highway Patrol Sergeant Cameron Smith. (Tr., 1339-1354). Smith testified that in February of 2014, while assigned as an investigator at Allen Correctional Institution in Lima, he had been asked by Lima Police Department Detective Tim Clark to speak to prison cellmates of the defendant, who had been incarcerated at that prison on other felony charges during much of the multi-year investigation in this case. (Tr., 1339-1354; 1499-1502). Smith spoke to defendant's former cellmates, who relayed no information pertinent to the Warrington murder investigation. (Tr., 1345-1346). However, after speaking to those inmates, Smith was then approached by an inmate named Stephen Upham, who had information relevant to the murder investigation. (Tr., 1346). This information was then passed along to Detective Clark, who discovered that defendant had previously made statements to Upham that incriminated defendant in Warrington's murder. (Tr., 1375-1384; 1499-1504).

4

After Smith's trial testimony concluded, the court then took a brief afternoon recess, after which the prosecution intended to call Stephen Upham to the stand. (Tr., 1354- 1409).  During the break, defendant and Stephen Upham (both of whom were in custody) were inadvertently placed in the same holding cell at the Allen County Jail. (Tr., 1354-1409).  While in the holding room, defendant violently assaulted Upham, and the incident was caught on jail security video cameras. (Tr., 1354-1409).  This was brought to the attention of the trial judge, who then recessed the trial for the day. (Tr., 1355-1359).

The following morning, the prosecution indicated its intention to admit into evidence the video-recording of defendant attacking Upham. (Tr., 1359-1361).  Over objection from the defense, and following arguments from both parties as to the issue of the video's admissibility, the trial court ruled that the video could be played for the jury as part of the state's case. (Tr., 1359-1371).  The trial court also overruled a defense motion for a mistrial relating to the holding cell incident. (Tr., 1363-1369).

First, as to defendant's challenge to the admissibility of the holding cell video, the Supreme Court of Ohio has held that:

> [o]rdinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence.  The admission of relevant evidence pursuant to Evid. R. 401 rests within the sound discretion of the trial court. *E.g., State v. Sage* (1987), 31 Ohio St. 3d 173, 31 OBR 375, 510 N.E. 2d 343, paragraph two of the syllabus.  An appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion.  *State v. Finnerty* (1989), 45 Ohio St. 3d 104, 107, 543 N.E. 2d 1233, 1237.  As this court has noted many times, the term "abuse of discretion" connotes more than an error of law; it implies that the court acted unreasonably, arbitrarily or unconsciously.  *E.g., Blakemore v. Blakemore* (1983), 5 Ohio St. 3d 217, 219, 5 OBR 481, 482, 450 N.E. 2d 1140, 1142.

*Rigby v. Lake County*, 58 Ohio St.3d 269, 271, 1991 Ohio LEXIS 921.

Generally, evidence of a criminal defendant's bad acts is governed by Evid.R. 404(B), which provides:

> **Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.**

However, evidence of other crimes may also be presented when "they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 317, 1980 Ohio LEXIS 882.

Under Ohio law, it is well established that evidence of threats or intimidation of witnesses on the part of a criminal defendant reflects a consciousness of guilt and is admissible at trial as an admission by conduct. *State v. Soke* (1995), 105 Ohio App.3d 226, 663 N.E.2d 986, citing to *State v. Richey* , 64 Ohio St.3d 353, 357, 1992 Ohio 44.  Hence, intimidation of a witness is not "wholly independent" of the charged offenses.  *State v. Soke, supra,* citing *State v. Leonard* (May 21, 1993), Lawrence App. No. CA92-12, 1993 Ohio App. LEXIS 2725; *State v. Reese* (Jan. 7, 1988), Cuyahoga App. Nos. 53115 and 53116, 1988 Ohio App. LEXIS 272.

As the court elaborated upon in *State v. Leonard*, 4th Dist. No. CA92-12, 1993 Ohio App. LEXIS 2725, at 13-15:

> **In 2 McCormick on Evidence (4 Ed. 1992) 190-191, at Section 265(e) (footnotes omitted), the author states:**
>
> **\* \* \* As might be expected, wrongdoing by the party in connection with its case amounting to an obstruction of justice and is also commonly regarded as an admission by conduct. By resorting to wrongful devices, the party is said to provide a basis for believing that he or she thinks the case is weak and**

6

> not to be won by fair means, or in criminal cases that the accused is conscious of guilt. Accordingly, the following are considered under this general category of admissions by conduct: a party's false statement about the matter in litigation, whether before suit or on the stand; subornation of perjury; fabrication of documents; undue pressure by bribery, intimidation, or other means to influence a witness to testify favorably or to avoid testifying; destruction or concealment of relevant documents or objects; attempt to corrupt the jury; and hiding or transferring property in anticipation of judgment.

> Ohio courts are in accord with the foregoing authority and hold that evidence of threats or intimidation of witnesses reflect a consciousness of guilt and are admissible as admission by conduct. *State v. Richey* (1992), 64 Ohio St.3d 353, 357, 595 N.E.2d 915; *State v. Black* (July 15, 1980), Franklin App. No. 80AP-152, unreported; *cf.,* also, *State v. Walker* (1978), 55 Ohio St.2d 208, 378 N.E.2d 1049.

Thus, as the trial court correctly found in the instant case, the witness intimidation engaged in by defendant toward Steven Upham was not "wholly independent" of the crimes with which defendant was charged, and therefore Evid.R. 404(B) was not implicated. (Tr., 1369-1371). Physically attacking the witness as he waited to testify was a form of witness intimidation on defendant's part and was admissible pursuant to the above authority, upon which the trial court properly relied.

Defendant also argues on appeal that the trial court erred in failing to grant a mistrial over the holding cell incident.

In *State v. Gibson*, 3rd Dist. No. 1-96-61, 1997 Ohio App. LEXIS 850, this court noted that:

> The decision to grant or deny a motion for a mistrial lies within the sound discretion of the trial court. *State v. Garner* (1995), 74 Ohio St. 3d 49, 59, 656 N.E.2d 623 citing *State v. Glover* (1988), 35 Ohio St. 3d 18, 517 N.E.2d 900; *State v. Widner* (1981), 68 Ohio St. 2d 188, 429 N.E.2d 1065. Mistrials are appropriately granted only when the ends of justice so require and a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St. 3d 118, 127, 580 N.E.2d 1, citing *Illinois v. Somerville* (1973) 410 U.S. 458, 462-463, 35 L. Ed. 2d 425, 93 S. Ct. 1066.

In this case, it was undisputed that defendant and the witness he attacked, Stephen Upham, were inadvertently placed together in the holding cell. (Tr., 1368). Specifically, the

7

record reflects that Upham was already in the cell, waiting his turn to testify, when a corrections officer then placed defendant into the same cell to wait out the afternoon trial recess. (Tr., 1354-1369; 1375-1395; State's Exhibit 173).  Once locked in the holding cell together, a development to which defendant lodged no objection to the unknowing corrections officer who placed defendant there, defendant then launched an unprovoked physical attack on Upham. (Tr., 1354-1369; 1375-1395; State's Exhibit 173).  The following morning, defense counsel argued that a mistrial should be granted as a result of the incident, on the chance the press may have reported the incident and because the witness, who had yet to testify, had visible injuries as a result of the assault that the jury would see.  (Tr., 1363).

As the trial court correctly noted when overruling the mistrial motion, defendant's mistrial motion sought to take advantage of an "error" that defendant himself induced. (Tr., 1367-1369).  The trial court found, and the defense agreed, that it was an accident that defendant and the witness were put in the same holding room. (Tr., 1368).  However, the trial court also found that the video established that the assault on the witness was an intentional act on the part of the defendant. (Tr., 1368-1369; State's Exhibit 173).

In *State v. McAlphine*, 8th Dist. No. 79216, 2002 Ohio App. LEXIS 198, at 21-22, the court of appeals analyzed the law applicable here as follows:

> **It is well established that a court will not permit a party to take advantage of such "invited error." Under the invited error doctrine, a party may not take advantage of an alleged error that the party induced or invited the trial court to make.** *State ex rel. Fowler v. Smith* **(1994), 68 Ohio St. 3d 357, 359, 626 N.E.2d 950;** *Rhodes v. Rhodes Industries, Inc.* **(1991), 71 Ohio App. 3d 797, 806, 595 N.E.2d 441. "[A] litigant cannot be permitted, either intentionally or unintentionally to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible."** *Lester v. Leuck* **(1943), 142 Ohio St. 91, 93, 50 N.E.2d 145.  Further, courts have been reluctant to consider the disruptive conduct of a defendant to be a proper ground for a mistrial. See** *State v. James,* **1999 Ohio App. LEXIS 506 (Feb. 19, 1999), Clark App. No. 98-CA-54, unreported**

8

(outburst by defendant during voir dire insufficient to declare mistrial); *State v. Gonzalez*, 1998 Ohio App. LEXIS 5510 (Nov. 18, 1998), Athens App. No. 97CA52, unreported (outbursts and interruptions, made both in and out of jury's presence, insufficient to declare mistrial). "To hold that the disruptive conduct of a defendant is a proper ground for a mistrial, it has been said, would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so." *James*, 1999 Ohio App. LEXIS 506, citing cases at Annotation, Disruptive Conduct of Accused (1979), 89 A.L.R.3d 960 (in presence of jury as ground for mistrial or discharge of jury). * * *

In the present case, the trial court correctly relied upon this precedent, and did not abuse its discretion in ruling that the defendant could not participate in an intentional, disruptive act and then seek the protection of the court from his own misbehavior.  (Tr., 1368-69).

Defendant's first assignment of error should be overruled.

9

## ASSIGNMENT OF ERROR TWO

**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY OVERRULING DEFENDANT'S MOTION FOR MISTRIAL FILED ON SEPTEMBER 16, 2016 BASED UPON RULE 16 DISCOVERY VIOLATIONS AND BRADY DISCOVERY VIOLATIONS RELATED TO TESTIMONY OF A GOVERNMENT WITNESS ON FIREARMS.**

In the second assignment of error, defendant argues that the trial court erred in overruling a defense motion for a mistrial that was made at trial on the basis of an alleged discovery violation by the state.

At trial, the prosecution called Kevin Kramer as a witness. Kramer, a firearms identification and ballistics expert employed by the Ohio Bureau of Criminal Identification and Investigation ("BCI&I"), testified with regard to ballistics testing performed by BCI&I on evidence submitted in the case. Specifically, BCI&I analysis confirmed that two spent cartridge cases found at the crime scene had been fired from the same weapon, and that three recovered spent bullets were also all fired from the same firearm that fired the casings. (Tr., 1145-1170; 1249). The testing conducted by BCI&I also confirmed that two firearms recovered from defendant's home on the date of the crime were not the firearms that had fired the two casings and three bullets recovered from the murder scene. (Tr., 1145-1170; 1248-1249). Kramer identified State's Exhibit 138 as the report containing his findings. (Tr., 1162)

With regard to the determination of what gun may have fired the recovered ballistics evidence, Kramer was then asked by the prosecution whether there was a certain class of firearms that would have produced the same rifling characteristics as those found on the recovered casings and bullets. (Tr., 1172-1174). The defense objected, on the basis that this information was outside that contained within Kramer's report. (Tr., 1172-1173). The trial court overruled the objection, and Kramer testified that there was a class of firearms that would match

10

the rifling characteristic at issue, and that the F.B.I. kept a list of firearms that would cause the same general rifling characteristics. (Tr., 1174).

As prior evidence in the trial had suggested that defendant had a Mac-10 type of firearm in his possession at or before the time of the murder in this case, the prosecutor then asked Kramer if a Mac-10 would be one of the guns that would produce the same rifling specifications. (Tr., 1174). Over objection, Kramer then identified State's Exhibit 139 as a photograph of a firearm consistent in style and appearance with what is known as a Mac-10 style of firearm, and testified that a Mac-10 style of weapon would be a candidate on the list of guns that produce the same rifling. (Tr., 1174-1179).

Following Kramer's direct examination, the defense lodged a lengthy objection to Kramer's testimony about Mac-10 type firearms, and to the prosecution's use of the photograph of a Mac-10 style gun that had been marked as State's Exhibit 139. (Tr., 1179-1181). Defense counsel then moved for a mistrial on the basis of what he claimed was a discovery violation. (Tr., 1181). Specifically, defense counsel claimed that Kramer's testimony about a Mac-10 being on the candidate list of guns capable of producing the rifling characteristics at issue went beyond the expert report that had been provided to the defense in discovery pursuant to Crim.R. 16(K). (Tr., 1181). As such, defense counsel claimed Kramer's testimony about Mac-10s was inadmissible.

After some initial argument from counsel for both of the parties, the trial court recessed the trial for the evening in order to give defense counsel more time to study the issue, and the trial court took the mistrial motion under advisement. (Tr., 1198).

The following morning, the trial court heard arguments and received evidence from both parties as to the defense mistrial motion.

11

In support of their motion, the defense contended that a mistrial was necessary on the grounds that the prosecution had not disclosed in discovery the fact that a Mac-10 was a possible candidate for the murder weapon. (Tr. 1199 – 1216). The defense also objected to State's Exhibit 139 on the basis that the demonstrative photograph of a Mac-10 style gun had not been provided to the defense prior to trial. *Id.*

The prosecution responded by presenting several exhibits, along with argument. State's Exhibit 1-M was a BCI&I report of ballistics testing by a former BCI&I scientist named Todd Wharton, which the defense acknowledged had been provided to them by the state in discovery on May 5, 2014. (Tr., 1217-1218). The prosecution noted that Exhibit 1-M described the evidence bullets as having been "fired from a barrel with conventional rifling consisting of six lands and six grooves, right hand twist." (Tr., 1217). The second paragraph of that report went on to state that "the rifling specifications on the evidence bullets correspond to numerous brands of nine millimeter Luger caliber semi-automatic firearms." (Tr., 1217).

The prosecution noted that such language in Exhibit 1-M alone would have put the defense on notice that the ballistics examiner and firearms identification expert could possibly testify as to what firearm brands the rifling may correspond with, which is exactly what Kevin Kramer did. (Tr., 1218). The state then noted that the defense further had been provided with Exhibit 2-M, the report of BCI&I ballistics examiner Heather Williams, which reported that the ballistics evidence had been re-examined and that Williams' findings concurred with those outlined in Wharton's prior report. (Tr., 1218-1219). The defense stipulated that they had also received this report in discovery and in a timely manner, over a year prior to trial. (Tr., 1218).

With regard to defense counsel's claim that he was surprised and unprepared for the "Mac-10 testimony" by the ballistics expert, the prosecution noted that the state had provided to

the defense in discovery on May 5, 2014 a police report and DVD relating to a police interview with state's witness Joey Moore. (Tr., 1219-1210).  In that interview, which the defense had known about for over a year prior to trial, the witness, Joey Moore, specifically referenced hearing the defendant discussing having a Mac-10, and suggesting that that was the gun that had been involved in the shooting at issue. (Exh. 4-M).

With regard to defendant's objection to State's Exhibit 139, being a demonstrative photograph of a Mac-10 style gun, the prosecution noted that any failure to provide the photo to the defense prior to the start of trial was purely inadvertent. (Tr., 1185-1186; 1219; 1226).  The state noted that it had provided defense counsel with a detailed and itemized exhibit list on the morning the trial began, which had been a full week before, and that the list clearly noted that Exhibit 139 was a photo of a Mac-10 and that the prosecution intended to show the photo to witness Carlotta Williams, which the prosecution had done. (Tr., 1185-1186; 1219; 1226).

Ultimately, as to the defense claim of unfair surprise, the prosecution noted that, given the two guns found at defendant's home were excluded as the murder weapon, it should not have come to any kind of surprise to the defense that the prosecution would then be interested in what type of firearm the murder weapon could have been. (Tr., 1225).  Because the state possessed evidence from Joey Moore suggesting defendant had used a Mac-10 to commit the murder, and because witness Carlotta Williams had seen defendant with gun in the style of a Mac-10, it therefore also would have been no surprise that the prosecution would be interested in asking its ballistics expert if a Mac-10 could have fired the ballistics evidence found at the murder scene. (Tr., 1223-1228).

Upon hearing these arguments and reviewing the record, the trial court overruled defendant's motion for a mistrial. (Tr., 1235-1246).  The trial court found that the defense

allegation of non-disclosure with regard to the ballistics report was not well taken, as evidence of the fact that the murder weapon was in a certain category of firearms had been disclosed via ballistics expert reports provided by the state in discovery many months in advance of trial. (Tr., 1235-1246). The trial court further noted that the defense had been put on notice of evidence indicating defendant possessed a Mac-10 that could have been used in the shooting. (Tr., 1235-1246). Because the defense had been put on notice of the evidence at issue through the pre-trial discovery and through the exhibit list provided on the first day of trial, the trial court found that the mistrial motion was not well taken. (Tr., 1235-1246). Finally, the trial court also noted that it would give due consideration to granting a continuance to give defense counsel some time to consult with or procure his own expert witness, should a continuance be requested by the defense following cross-examination of Kevin Kramer. (Tr., 1245).

In terms of the law applicable here, the decision of a trial court denying a mistrial relating to an alleged discovery violation should not be reversed on appeal absent an abuse of discretion. See, *e.g. State v. Parson* (1983), 6 Ohio St.3d 442, 445. In exercising its discretion relating to discovery violations, a trial court is to inquire into the circumstances of the discovery violation and impose the least severe sanction consistent with the purpose of the discovery rules, which is to prevent surprise and the secreting of evidence favorable to the other party. *Lakewood v. Papadellis* (1987), 32 Ohio St.3d 1, 3.

Crim.R. 16(K) governs the disclosure of expert witness reports, and provides:

**An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause show, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.**

14

Crim.R. 16(L) governs the regulation of discovery, and provides:

**The trial court may make orders regulating discovery not inconsistent with this rule.  If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.**

In the instant case, as detailed above, the prosecution timely provided in discovery a series of three expert reports relating to the ballistics examination performed upon the evidence bullets and casings.  The second paragraph of that report went onto state that "the rifling specifications on the evidence bullets correspond to numerous brands of nine millimeter Luger caliber semi-automatic firearms." (Tr., 1217).  As noted by both the prosecution and the trial court, and as detailed above, such information served to put the defense on notice that the ballistics examiner and firearms identification expert could possibly testify as to what brands the rifling may or may not correspond with, which is exactly what Kevin Kramer did.  The defense also had more than ample notice that a Mac-10 may be implicated in the case.

While the prosecution did neglect to provide to the defense in advance of trial a copy of State's Exhibit 139 (a photograph of a firearm consistent in style and appearance with what is known as a Mac-10 style of firearm), the record established that the violation was not willful.  Moreover, as the defense had been provided an itemized list of prosecution exhibits at the start of the trial, a list that included State's Exhibit 139 and described it as a photograph of a Mac-10, the defense claim of surprise about the exhibit a full week later lacked legitimacy.

Finally, it should be noted that Crim.R. 16 does not mandate the disclosure of any and all data used by an expert in performing calculations or in reaching an opinion or conclusion.  Rather, the rule requires only that the results reached must be provided to the defense.  See

15

Crim.R. 16(B)(4)) and Crim.R. 16(K).  Most importantly, Crim.R. 16(K) provides only that an expert report must be a *summary* of the expert's testimony, findings, analysis, conclusions, or opinion, *not* a detailed, word for word script of the testimony that the expert has yet to give.

For all of these reasons, the trial court did not abuse its discretion in overruling the motion for a mistrial made with regard to the ballistics expert's testimony.

Defendant's second assignment of error should be overruled.

## ASSIGNMENT OF ERROR THREE

**THAT THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND, IN THE ALTERNATIVE, WAS BASED UPON INSUFFICIENT EVIDENCE.**

In the third assignment of error, defendant argues both that his conviction was against the weight of the evidence and that there was not sufficient evidence to support defendant's conviction.

This court set forth the standards of review applicable to these claims in *State v. Lyle*, 3rd Dist. No. 1-14-41, 2015 Ohio 1181, at P8-10, as follows:

> **Whether there is legally sufficient evidence to sustain a verdict is a question of law.** *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, 818 N.E.2d 229, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.
>
> The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, 972 N.E.2d 517, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541 (1997), paragraph two of the syllabus.
>
> Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Andrews*, 3d Dist. Allen No. 1-05-70, 2006-Ohio-3764, ¶ 30, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1st Dist.1983).

In the instant case, defendant was found guilty in Count 1 of aggravated murder, in violation of R.C. 2903.01(A), and in Count 2 of having a weapon while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(3).  The aggravated murder charge also contained a firearm specification pursuant to R.C. 2941.145(A).

As charged in this case, the essential elements of aggravated murder were that the defendant purposely caused the death of Kenneth Warrington and that defendant did so with prior calculation and design. See R.C. 2903.01(A).  As charged in this case, the essential elements of having a weapon while under disability were that the defendant knowingly acquired, had, carried or used any firearm and that the defendant had previously been convicted of a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in a drug of abuse. See R.C. 2923.13(A)(3).  Finally, the essential elements of the firearm specification were that the defendant, while committing the aggravated murder, had a firearm on or about his person or under his control, and that he displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used the firearm to facilitate the offense.  See R.C. 2941.145.

The evidence presented at trial established that, on February 23, 2009, Kenneth Warrington ended an overnight work shift at the Husky Refinery in Lima, and left work at 5:04 a.m. (Tr., 509-514; 531).  Approximately fifteen minutes later, Warrington was shot to death as he arrived at the door to his girlfriend's home at 436 East McKibben Street in Lima. (Tr., 546-549; 553-560).  He was shot six times and left for dead on the concrete patio just outside a side entrance door to the house. (Tr., 716-719; Tr. 598-647; 658-667).  Warrington's body was found in that location at approximately 6:30 a.m. that day by Warrington's girlfriend, Sonya

Burkholder, after she awakened and began checking around the house because Warrington's truck was parked outside but he could not be found inside the home. (Tr., 403-415; State's Exhibit 9).

Based on that evidence, the question of whether someone had purposely caused Warrington's death was not disputed at trial.  However, the prosecution nonetheless presented overwhelming evidence establishing those facts.  Additionally, there was also a vast quantity of evidence presented that established beyond a reasonable doubt that Warrington's murder had been committed by the defendant, who was Sonya Burkholder's former long-time boyfriend and the father of her two children.

In that respect, there was a mountain of evidence that defendant was jealous of and extremely obsessed with Sonya Burkholder's relationship with the victim.  Sonya Burkholder and defendant began dating in 1989, when Sonya was sixteen years old. (Tr., 364).  They subsequently had two children together, a boy names Markelus and a girl named Tarah. (Tr., 365; 1082).

In December of 2007, when Burkholder and defendant were still living together with their two children at defendant's house at 122 East Eureka Street in Lima, defendant became enraged late one night when he found emails on the computer that Burkholder had been exchanging with Warrington. (Tr., 380-394). Although it was approximately 2:00 a.m., defendant threw Burkholder out of the house, threatening her at gunpoint, and making her leave without the children. (Tr., 386-394; 479-499; 518-523; 755).  After Burkholder immediately reported the matter to the Lima Police Department, officers went to the home to check on the safety of the children, but defendant refused to let the police have access to the children and then proceeded to engage in a four-hour standoff with the police that lasted until 8:11 a.m. (Tr., 386-

394; 479-499; 753-758).  During the standoff, defendant had numerous phone conversations with a police hostage negotiator, and recordings of those conversations reflected that defendant was enraged over Sonya's betrayal of him with her apparent involvement with Ken Warrington. (Tr., 479-499).

As a result of that incident, which occurred on December 17, 2007, Sonya Burkholder ended her relationship with defendant for good and filed a petition for a protection order, seeking to prohibit defendant from having any contact with her. (Tr., 396-397; 518-523).  While the couple's two children were not a part of the protection order sought by Burkholder, defendant still aggressively fought Burkholder's request for the protection order in court. (Tr., 396-397; 858-890; State's Exhibit 135). When Burkholder was granted the protection order, defendant then filed an appeal of that decision. (Tr., 396-397; 858-890; State's Exhibit 135).

After the court of appeals denied defendant's appeal in September of 2008, defendant then contacted the Lima Police Department and sought to have charges filed against Sonya Burkholder for purportedly making a false report about the December 2007 incident. (Tr., 1273-1278).  Defendant made repeated calls to the police department, pressuring the police to hold Sonya Burkholder responsible for the December 17, 2007 incident that embarrassed defendant and caused him to be arrested. (Tr., 1279).

Detective Charles Godfrey from the Lima Police Department was assigned to investigate defendant's claims against Burkholder, an investigation that Godfrey finally undertook during the second week of February in 2009. (Tr., 1273-1284).  After reviewing all relevant information, Godfrey found inadequate evidence upon which to prosecute Sonya Burkholder for making a false report, and that professional opinion was confirmed by the municipal court prosecutor's office. (Tr., 1273-1284).

20

On February 18, 2009, Godfrey called the defendant and told him that the investigation into Burkholder was completed and that no legal action against Burkholder would be taken. (Tr., 1283). In response, defendant became upset and said that Godfrey and the system had let defendant down, and that Sonya was "going to get away with it". (Tr., 1283). Notably, that was just five days before Ken Warrington was gunned down outside Burkholder's home. (Tr., 1284).

Because of this background, defendant almost immediately became a person of interest in Ken Warrington's murder. (Tr., 751-753; 1284-1285; 1463). As police wished to speak with defendant, and because Detective Godfrey had been in contact with defendant just days earlier, Godfrey called defendant ninety minutes after Warrington's murder had been discovered and asked defendant to come to the police department to talk. (Tr., 1284-1285). Defendant agreed to come, but then did not show up, even though defendant had indicated he was at home, which is just a few blocks from the police department. (Tr., 1285-1286). At 8:30 a.m., when defendant had not shown up as agreed, Godfrey called defendant again and told defendant that the police needed defendant to come to the police station, because "something happened to Kenneth" and the police needed to know if defendant was involved. (Tr., 1285-1286). Instead of inquiring, "Ken who?" or "what happened?" or inquiring about his daughter (who lived at Burkholder's) or asking "why" or "what do you mean?" or any other obvious and normal reactions, defendant said he had an errand to run and that he would be there in an hour. (Tr., 1286-1287).

Meanwhile, Detective Tim Clark was surveilling defendant's home at 122 East Eureka Street, to see if defendant could be located. (Tr., 1467). Clark observed defendant pulling away from his house, traveling in a direction away from the direction to the police department. (Tr., 1467-1471). Because Detective Clark was in an unmarked vehicle, Clark had a nearby uniformed officer in a cruiser pull defendant over, to let defendant know that detectives wished

21

to speak to him about the shooting on McKibben. (Tr., 772-777; 1470-1472; State's Exhibit 97). Once defendant was out of his vehicle and given this information, defendant began acting absolutely insane, shrieking nonstop and crying out that his daughter had been killed, even though the police repeatedly told defendant that his daughter was fine. (Tr., 772-777; 1472-1475; State's Exhibit 97). This dramatic and rather obviously faked reaction was captured on police cruiser video. (State's Exhibit 97). Defendant did, however, agree to accompany officers to the police department. (Tr., 1475-1477).

Once at the police department, at which point defendant's bizarre overreaction ended and defendant then appeared extraordinarily calm, defendant was interviewed by Detective Phillip Kleman, with Sergeant Godfrey sitting in. (Tr., 840-850; State's Exhibit 98). During the interview, defendant admitted having a firearm at his house, being a .357, and offered to turn the gun over to police. (Tr., 840-850; 1478; State's Exhibit 98). However, police made the decision to seek a search warrant in order to retrieve defendant's firearm. (Tr., 1478). Detective Kleman told defendant that, because defendant was under disability due to a prior felony conviction, the police would search defendant's home to get the gun, and defendant then began pleading with Kleman to not search the home and to let defendant keep the gun. (State's Exhibit 98). In the same interview, defendant told the detectives that defendant has not fired a gun since New Year's Eve of 2006, being two years prior to the murder. (State's Exhibit 98).

Police obtained search warrants for defendant's home and found a box of nine millimeter Winchester ammo, with some of the bullets missing. (Tr., 1288-1294, 1489; State's Exhibit 129.) This was the exact same caliber, style and type of bullets that killed Warrington. (Tr., 1150-1157; 1171-1172).

That same day, police discovered that Rosalind Johnson, a neighbor of Sonya Burkholder's, had heard the gunshots at the time of the murder and then went to her window. (Tr., 818-828).  At that time, Johnson saw a person walking briskly down the alley, away from Burkholder's house. (Tr., 818-828).  That person was wearing a camouflage top, with the camouflage style matching that of a camouflage shirt found in defendant's home several hours after the murder. (Tr., 818-828).

Sitting out on defendant's kitchen table, on top of a stack of paperwork, police found copies of private emails between Ken Warrington and Sonya Burkholder, dating from December of 2007. (Tr. 858-890; State's Exhibit 134).  On defendant's kitchen table, police investigators also found a transcript of the civil protection order hearing, the magistrate's decision on that, and copies of police reports relating to the December 2007 stand-off incident between defendant and the police. (Tr., 858-884, 1489; State's Exhibit 135).  There was a also a copy of a court of appeals decision, dated September 15, 2008, denying defendant's appeal of the trial court's decision granting Burkholder a protection order. (Tr., 858-884, 1489; State's Exhibit 135).

Police also located a digital camera in defendant's home. (Tr., 809-813; 862-866).  On that camera, police found multiple images of different street locations in Lima that appeared to be taken from a vehicle while driving. (Tr., 809-812; State's Exhibits 142, 143, 144.).  One photograph was of the pickup truck belonging to Ken Warrington, parked outside of Sonya Burkholder's home at 436 East McKibben. (Tr., 809-812; State's Exhibit 6).  That photograph was dated January 9, 2009. (Tr., 812).

Computers and mobile devices were also seized from defendant's home pursuant to a search warrant, and then subsequently forensically analyzed. (Tr., 783-817; 862-864; 1433-1435).  On defendant's computers and mobile devices, police found that multiple Internet

searches had been done on topics relevant to the investigation of Ken Warrington's murder. (Tr., 783-817).  On February 17, 2009, a search had been done on defendant's computer of the Allen County Auditor's website for information on the property at 436 East McKibben owned by Sonya Burkholder, and for a map of the surrounding areas. (Tr., 805-807).  It was also discovered that, under the user name of "Markelus Carter", an Internet search had been done for the "Lima refinery". (Tr., 807).  There had also been Google searches performed for "Sonya Burkholder" and "Ken Warrington". (Tr., 807-808).  A palm device contained an address listing for Kenneth and Faye Warrington, along with a phone number. (Tr., 808).  The phone number had a "star six seven" by it, indicating it had been called while using "*67" to block a caller I.D. display on the receiving phone. (Tr., 808-809).

Because police had a witness, Rosalind Johnson, who saw a man in camouflage leaving the crime scene immediately after the murder, police also looked for camouflage items in defendant's home. (Tr., 858-877).  In all, four items of camouflage clothing were found, two of which matched the pattern worn by the person seen by Rosalind Johnson. (Tr., 858-877). Those two shirts, one short sleeved and one long, were later tested for gunshot residue and found to have gunshot residue on them. (Tr., 1115-1127).

Police also seized a pair of gloves sitting out on defendant's kitchen table that day, thinking they could have gunshot residue on them, if defendant had worn them during the shooting. (Tr., 877-878; State's Exhibit 132).  Defendant's gloves were tested and gun shot residue was located on the gloves. (Tr., 1115-1127).

Defendant was arrested that afternoon for having a weapon under disability, due to two firearms having been located in his house by police. (Tr., 1287-1297). When taken into custody outside his home, defendant asked to speak with Sergeant Godfrey again. (Tr., 1297).  Once on

station, Godfrey and his detective supervisor, Lieutenant Baker, sat down to speak with defendant, who then faked a seizure-like condition. (Tr., 1304-1318; State's Exhibits 140 and 140-A).

Following defendant's arrest, defendant was overheard by another Allen County Jail inmate, Joey Moore, discussing the murder investigation against defendant. (Tr., 1040-1051). Defendant indicated to Moore that defendant had killed his girlfriend's boyfriend. (Tr., 1040-1051). Defendant also indicated to Moore that defendant had a Mac-10 firearm that the police did not find. (Tr., 1050-1051). A Mac-10 was a weapon consistent with the type that fired the ballistics evidence in the case. (Tr., 1172-1179).

When defendant was incarcerated in February of 2009, following Warrington's murder, defendant made contact with Carlotta Williams, a long-time friend, and requested that Carlotta come to the jail to visit defendant. (Tr., 1079-1092). Carlotta agreed to do so and, when she visited defendant in the Allen County Jail, defendant held up a note, asking Carlotta to tell the police that she was with defendant between 1:00 and 6:00 a.m. on the date of the murder, which had not been the case. (Tr., 1079- 1095). Carlotta had also previously seen defendant with a gun resembling a Mac-10 in size, shape and style. (Tr., 1079-1100).

Pam Callahan, a human resources department employee at Husky Refinery, where both Warrington and Burkholder worked, had received a phone call at work in January of 2009, the month before Warrington's murder. (Tr., 352-353). The caller identified himself as Mark Carter and said he was requesting company policies regarding personal use of company property such as computers and telephone systems. (Tr., 354). The caller went on to tell Callahan that two of the company's employees, Sonya Burkholder and Ken Warrington, were having an extramarital affair and utilizing company property to do so. (Tr., 354). The caller indicated he needed the

25

records for the court, and stated that he did not want to implicate Husky. (Tr., 354). Callahan told the caller that she could not release company information without a court order, and said she would refer the information on to her boss. (Tr., 354). Callahan then documented the telephone conversation in a report, and emailed a copy to her boss. (Tr., 356-357). Just over a month later, when police searched defendant's home following Warrington's murder, sitting on defendant's kitchen table was a written out "script" of what the caller to Husky had said on the phone to Callahan the month before. (Tr., 858-878, 1489; State's Exhibit 133).

In the months prior to the murder, defendant had also taken to calling Faye Warrington, who was the estranged wife of Kenneth Warrington, even though defendant and Faye were total strangers. (Tr., 338-340). Ken and Faye Warrington had been married twenty-six years when, approximately a year before his murder, Ken began an affair with Sonya Burkholder, which Faye learned about. (Tr., 332-336). While Faye and Ken separated when Ken moved out in the fall of 2008, their relationship remained civil and Faye hoped that Ken would return to the marriage. (Tr., 335-337). During that same time frame, in the year before Warrington's murder, defendant began making unsolicited and repeated calls to Faye at her home, telling Faye that her husband was having an affair with defendant's girlfriend. (Tr., 338). Some of the countless calls would come at two or three o'clock in the morning, when defendant would call Faye to say that Ken's truck was over at Sonya's home. (Tr., 338). A couple of weeks before Ken Warrington's murder, defendant called Faye and said that he was going to give Ken one more chance to stay away from Sonya. (Tr., 339).

Finally, after defendant was convicted and imprisoned for crimes unrelated to Warrington's murder (but discovered as a result of the investigation thereof), defendant became acquainted with a fellow prison inmate, Stephen Upham, (Tr., 1375-1380). While in prison,

defendant told Upham that defendant had shot someone. (Tr., 1380).  Specifically, defendant told Upham that there had been an argument between defendant and the mother of his children, and that a boyfriend had become mad and threatened defendant's kids, and that defendant shot the boyfriend a couple weeks later. (Tr., 1380-1381).  Defendant told Upham that defendant had been wearing camouflage when he committed the murder. (Tr., 1381).

All of this evidence was more than legally sufficient to establish defendant's identity as the person who murdered Kenneth Warrington, and clearly outweighed any evidence to the contrary.  Moreover, the evidence established that Warrington was killed on a Monday morning at 5:15 a.m. in February, on a dark, cold and snowy day. The cumulative evidence established that Warrington had been ambushed, as the evidence ruled out a robbery or a burglary or a random drive-by shooting.  There were no signs of a robbery, as nothing was stolen and Warrington was found with over a hundred and fifty dollars on him, with his wallet and credit cards intact. (Tr., 1460-1461).  Warrington's keys were found in the door to the home, but yet no one had entered the residence or stolen Warrington's vehicle. (Tr., 1460-1461). All of those facts established that Warrington's murder was not happenstance, as the home was located in a quiet residential neighborhood, and Warrington was shot at close range, outside the door to the residence where he was staying, as he had just arrived home from work on that cold and dark night. (Tr., 1460-14610.)  All of the evidence, and especially the fact that Warrington was shot six times at close range, also indicated that his murder was not a random crime but, rather, a purposeful and preplanned act that was committed with a firearm.  Finally, it was undisputed that defendant had a prior felony conviction for the possession of drugs from 1995 that put him under disability. (Tr., 843-846).

27

A review of the evidence discussed above and, more importantly, a review of the entire trial record should establish to this court that defendant's convictions for aggravated murder with a firearm specification and for having a weapon while under disability were indeed supported by sufficient evidence and were not against the manifest weight of the evidence.

Defendant's third assignment of error should be overruled.

## ASSIGNMENT OF ERROR FOUR

**THAT THE PROSECUTION STATEMENTS IN CLOSING ARGUMENT MISSTATES THE EVIDENCE AND RISE TO THE LEVEL OF PROSECUTORIAL MISCONDUCT AND REQUIRE A REVERSAL.**

In the fourth assignment of error, defendant asserts that statements made by the prosecution in its final closing argument amounted to prosecutorial misconduct and reversible error.

"The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 1984 Ohio LEXIS 1228. The focus of that inquiry should be on the fairness of the trial, not the culpability of the prosecutor. *State v. Bey*, 85 Ohio St.3d 487, 495, 1999 Ohio 283. "'[I]f every remark made by counsel outside of the testimony were grounds for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation.'" *State v. Maurer*, 15 Ohio St.3d 239, 267, 1984 Ohio LEXIS 1285, quoting *Dunlop v. United States* (1897), 165 U.S. 486, 498.

Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. *State v. Ballew*, 76 Ohio St.3d 244, 255, 1996 Ohio 81. A prosecutor may freely comment on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn therefrom. *State v. Lott*, 51 Ohio St.3d 160, 165, 1990 Ohio LEXIS 244.

In the instant case, defendant first takes issue with an argument made by the prosecution in rebuttal to defense counsel's argument on the fact that no gunshot residue was found on

defendant's vehicle when swabbed right after the murder.  In this regard, the prosecutor made the following rebuttal argument:

> Now, there was not gunshot residue found on that car.  True.  But, Mr. Congleton told you that the gunshot residue does not stick to smooth surfaces.  If there was any on Mr. Carter's bare hands and then transferred to that door handle it probably wouldn't stick to that door handle.  If it did, it may have blown away in the wind as Mr. Carter drove.

(Tr., 1812).

In response, defense counsel objected, asserting "[t]hat was not the expert's testimony." (Tr., 1812).  The trial court overruled the objection, noting that the jury can recall what the testimony was, and indicating that this was argument and not evidence. (Tr., 1812).

With regard to defendant's objection to the prosecution's rebuttal argument about the lack of gunshot residue found on the door handle to defendant's car, the record reflects that Matt Congleton, a forensic scientist from BCI&I and expert in gunshot residue, testified at trial about gunshot residue analysis he performed on evidence submitted to him. (Tr., 1115-1144).  Gunshot residue was located on a pair of gloves and two camouflage shirts seized from defendant's home several hours after the murder in this case. (Tr., 858-889; 1125-1132).  Congleton also analyzed swabbed samples taken from the driver's door of defendant's vehicle, but did not find any gunshot residue on those samples. (Tr., 1132).

Following Congleton's testimony about finding no gunshot residue on the samples taken from defendant's vehicle, Congleton testified as follows:

> Q.  [by prosecutor]  * * *  Is gunshot residue more likely or less likely to stick to a smooth surface?
>
> A.  Generally speaking – well, when a firearm is discharged the gases that escape the firearm turn into particles.  Those particles then settle on whatever is present, whether it's smooth or not smooth.  A smoother object obviously would have less adhesion power – it would give the particles less

30

**stick-to-itiveness than a rougher surface. So, that's kind of how it would work. They would be less likely to hang on for as long amongst disruption.**

**Q. Okay. When you say amongst disruption what do you mean?**

**A. Well, what I mean is that if there were gunshot residue particles sitting on top of something it will stay there until it's disrupted. In other words, what I mean is that something has to make the particles move, whatever that force is. Without a force to make it move, regardless of the surface, it will still remain on that surface.**

**Q. Okay. Okay. I understand. Is gunshot residue, when it sticks to something – that's my term, a lay term – when it sticks to something, well, if that something is moved around is gunshot residue shed? Does it fall off as the movement occurs?**

**A. Generally speaking; yes. The more an object or person moves, or it rubs up against something or themselves, the more likely you will have gunshot residue shed and continue to be shed from whatever surface it might be.**

(Tr., 1135-1136).

Thus, the record reflects that the reasoning and assertions by the prosecutor in his rebuttal argument about the gunshot residue (or lack thereof) was merely summarizing the testimony given by the expert and arguing the facts potentially established thereby that would explain why no gunshot residue was found on samples taken from defendant's vehicle. (Tr., 1132-1136; 1812). While the prosecutor did not reiterate the expert witness's testimony verbatim, nothing said by the prosecutor in that summation improperly mischaracterized the witness's actual testimony. (Tr., 1132-1136; 1812). Congleton testified that gunshot residue sheds from objects as movement occurs, and so it was neither improper nor inaccurate for the prosecution to argue that the movement resulting from a car being driven may have caused any such residue to slough off the car while in motion. (Tr., 1132-1136; 1812). This falls within the range of permissible inferences that a prosecutor is entitled to make in closing arguments, pursuant to the authority cited above.

31

Defendant also takes issue with other statements made by the prosecution in its rebuttal argument, statements which defendant claims improperly shifted the burden of proof from the State of Ohio to the defendant. In this respect, there are two instances of argument about which defendant complains.

In the first instance, the prosecutor was responding to a defense argument that gunshot residue located on defendant's clothing may have resulted from contamination at the police department. Specifically, the prosecutor stated:

> **Mr. Rion also said, "Well, maybe that gunshot residue got on those clothes," not one article, and not two articles, but three articles of clothing collected from the defendant's house, "got on those clothes at the Police Station." Maybe. Maybe. Okay, now we have two possibilities. I would submit to you that the more possibilities we have the more likely it is that each of them is a mere possibility. Okay? Well, maybe. Maybe. Maybe isn't good enough. Maybe doesn't get you to reasonable doubt. The jury instructions tell you that.**

(Tr., 1808).

In the second instance, the prosecutor was responding to a defense argument that the victim's girlfriend was involved with other men and that one of those men could have been the perpetrator. In that regard, the prosecutor stated:

> **Also, with respect to Sonya Mr. Rion brings up the idea that she was with a lot of other men. Well, we know of one other than Mr. Warrington and that would be Agruello Harris. Okay? I don't know that there was any evidence of a lot of other men. But, again, even assuming there were other men, is it just a mere possibility that some other man did this? Because a mere possibility does not rise to the level of reasonable doubt.**

(Tr., 1817).

As to the defendant's appellate claim concerning these remarks, any comments made in closing argument that are alleged to be inappropriate must be reviewed in context. In this case, just prior to the first challenged comment, *supra*, the prosecutor pointed out to the jury that:

> **Mere possibilities, in other words, possibilities detached from evidence, those that are simply floated, does not rise to the level of reasonable doubt.  Why?  Because anything is possible.**

(Tr., 1808).

In Ohio, "reasonable doubt" in defined, in relevant part, as follows:

> **Reasonable doubt is a doubt based on reason and common sense.  Reasonable doubt is not a mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.**

In this case, as the prosecution noted to the trial court in response to the defense objection to the comments, the prosecutor's comments were directly in line with the jury instructions that specifically state that mere possible doubt does not amount to reasonable doubt. (Tr., 1809).

It is certainly true that the state may not attempt to shift the burden of proof upon a defendant. *State v. Sparks*, 3rd Dist. No. 14-01-03, 2001 Ohio 2140, citing *State v. Thompson*, 33 Ohio St.3d 1.  However, as was done in the instant case, the prosecution is entitled to comment on a defendant's failure to offer evidence or to call witnesses other than the defendant to offer evidence in support of the defendant's case or evidence that would logically address issues raised by the defense in their case. *State v. Clemons*, 82 Ohio St.3d 438, 452, 1998 Ohio 406, *State v. D'Ambrosio*, 67 Ohio St.3d 185, 193, 1993 Ohio 170; *State v. Williams*, 23 Ohio St.3d 16, 20, 1986 Ohio LEXIS 597.  Moreover, "[s]uch comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent." *State v. Collins*, 89 Ohio St.3d 524, 527-528, 2000 Ohio 231.

For all of these reasons, the State of Ohio submits that the remarks at issue here fall within the range of appropriate latitude granted a prosecutor during closing arguments.  Most

importantly, the record as a whole reflects that defendant received a fair trial and defendant has failed to establish that his substantial rights were prejudiced by the comments of the prosecutor.

Finally, defendant argues on appeal that the prosecutor misstated defense counsel's argument in the following segment of the prosecution's rebuttal argument:

> **Now, Carlotta. Mr. Rion said something with respect to Carlotta and this is very important. He said – Mr. Rion suggested that Mr. Carter was not trying to set up an alibi because he was guilty, but because maybe he was innocent and this alibi was true.**

(Tr., 1826).

In his closing argument, defense counsel specifically argued to the jury that defendant did not ask Carlotta to serve as an alibi because defendant was guilty but, rather, because he thought the system would not give him a fair shake. (Tr., 1803). Overall, defense counsel also certainly argued that defendant was not guilty of the crimes with which he was charged. (Tr., 1782-1804). Because the prosecutor's comments were an accurate reflection of defense counsel's overall argument, such comments do not constitute error.

As to all of the comments made by the prosecution during closing arguments that are challenged on appeal, it should also be noted that the trial court specifically instructed the jury that the closing arguments of counsel were not evidence. (Tr., 1745; 1832). A reviewing court should presume that the jury followed the trial court's instruction. *State v. Ferguson*, 5 Ohio St. 3d 160, 163, 1983 Ohio LEXIS 740.

For the reasons outlined, defendant's prosecutorial misconduct claims should be found to be without merit, and defendant's fourth assignment of error should be overruled.

## ASSIGNMENT OF ERROR FIVE

**THAT THE DEFENDANT WAS DEPRIVED OF A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

In the fifth assignment of error, defendant asserts that he was denied the effective assistance of counsel.

To establish the ineffective assistance of a trial attorney, a defendant must show on appeal that (1) the attorney made errors so egregious that the attorney was not functioning as the "counsel" guaranteed a criminal defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 686-687. In essence, a defendant must show that the proceeding, due to his attorney's ineffectiveness, was so demonstrably unfair that there is a reasonable probability that the result would have been different absent his attorney's deficient performance. *Id.*, at 693. Furthermore, in reviewing a claim of ineffective counsel, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance". *Id.*, at 689. In Ohio, a properly licensed attorney is presumed to execute his or her duties in an ethical and competent manner. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 1988 Ohio LEXIS 172.

In the instant case, defendant argues that his counsel was ineffective at trial in the handling of the state's ballistics and firearms expert, Kevin Kramer. Specifically, defendant claims that his trial counsel prejudicially lapsed in failing to note in advance of trial that the prosecution possessed evidence linking defendant to a Mac-10 handgun and that such a firearm was potentially consistent with the category of handguns that could have fired the bullets and casings used to murder Kenneth Warrington.

35

In response, the State of Ohio would first note that the Mac-10 evidence was an extremely minor portion of the prosecution's case against defendant.  Moreover, while a Mac-10 was consistent with the bullets and casings used in the murder, so were dozens of other types and styles of firearms.

Moreover, the record reflects that defense counsel conducted a thorough and effective cross-examination of the state's ballistics expert, Kevin Kramer, on these issues.  The decision to not request a continuance to consult further with a potential defense expert would be a strategic decision on the part of counsel.

"Debatable trial tactics do not establish ineffective assistance of counsel." *State v. Hoffner*, 102 Ohio St.3d 358, 365, 2004 Ohio 3430, P 45.  Trial counsel's failure to request an expert is a "debatable trial tactic," and does not amount to ineffective assistance of counsel.  See *State v. Thompson* (1987), 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (trial counsel's failure to obtain a forensic pathologist to challenge the issue of rape was not ineffective assistance of counsel); *State v. Foust*, 105 Ohio St.3d 137, 153-154, 2004 Ohio 7006, P 97- 99, (trial counsel's failure to request funds for a DNA expert, an alcohol and substance-abuse expert, a fingerprint expert, and an arson expert did not amount to ineffective assistance of counsel because appellant's need for experts was "highly speculative" and counsel's choice "to rely on cross-examination" of prosecution's expert was a "legitimate tactical decision").

Finally, as detailed above in the third assignment of error, even without considering the "Mac-10 evidence", the prosecution possessed a mountain of evidence that, when considered all together, clearly established proof beyond a reasonable doubt that defendant was guilty as charged.

In all, defendant has failed to demonstrate that trial counsel's handling of the prosecution ballistics evidence was so ineffective as to result in substantial prejudice to defendant's case.

Defendant's fifth assignment of error should be overruled.

## CONCLUSION

For all of the reasons stated above, the State of Ohio submits that defendant's assignments of error are without merit, and requests that the judgment of the trial court be affirmed.

Respectfully submitted,

JANA E. EMERICK #0059550
Assistant Prosecuting Attorney
Allen County, Ohio
Court of Appeals Bldg., Suite 302
204 North Main Street
Lima, Ohio 45801
(419) 222-2462
Fax:    (419) 227-1072

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing was served upon F. Stephen Chamberlain, 212 North Elizabeth Street, 3rd Floor, P.O. Box 1314, Lima, Ohio 45802-1314, on this 1st day of December, 2016, by regular United States mail.

JANA E. EMERICK #0059550
Assistant Prosecuting Attorney
Allen County, Ohio

38

**<u>APPENDIX</u>**

## 2903.01 Aggravated murder.

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

## 2923.13 Having weapons while under disability.

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

(1) The person is a fugitive from justice.

(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

# 2941.145 Firearm displayed, brandished, indicated that offender possessed the firearm, or used it to facilitate offense specification.

(A) Imposition of a three-year mandatory prison term upon an offender under division (B)(1)(a)(ii) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. The specification shall be stated at the end of the body of the indictment, count, or information, and shall be stated in substantially the following form:

"SPECIFICATION (or, SPECIFICATION TO THE FIRST COUNT). The Grand Jurors (or insert the person's or the prosecuting attorney's name when appropriate) further find and specify that (set forth that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense)."

(B) Imposition of a three-year mandatory prison term upon an offender under division (B)(1)(a)(ii) of section 2929.14 of the Revised Code is precluded if a court imposes a one-year , eighteen-month, six-year, fifty-four-month, or nine-year mandatory prison term on the offender under division (B)(1) (a)(i), (iii), (iv), (v), or (vi) of that section relative to the same felony.

(C) The specification described in division (A) of this section may be used in a delinquent child proceeding in the manner and for the purpose described in section 2152.17 of the Revised Code.

(D) Imposition of a mandatory prison term of fifty-four months upon an offender under division (B)(1)(a)(v) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm o n or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed a firearm, or used the firearm to facilitate the offense and that the offender previously has been convicted of or pleaded guilty to a firearm specification of the type described in section 2941.141, 2941.144, 2941.145, 2941.146, or 2941.1412 of the Revised Code. The specification shall be stated at the end of the body of the indictment, count, or information, and shall be in substantially the following form:

"SPECIFICATION (or, SPECIFICATION TO THE FIRST COUNT). The Grand Jurors (or insert the person's or the prosecuting attorney's name when appropriate) further find and specify that (set forth that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated t hat the offender possessed a firearm, or used the firearm to facilitate the offense and that the offender previously has been convicted of or pleaded guilty to a firearm specification of the type described in section 2941.141, 2941.144, 2941.145, 2941.146, or 2941.1412 of the Revised Code.)"

(E) Imposition of a mandatory prison term of fifty-four months upon an offender under division (B)(1)(a)(v) of section 2929.14 of the Revised Code is precluded if the court imposes a one-year, eighteen-month, three-year, or nine-year mandatory prison term on the offender under division (B)(1)(a)(i), (ii), (iii), (iv), or (vi) of that section relative to the same felony.

(F) As used in this section, "firearm" has the same meaning as in section 2923.11 of the Revised Code.

**RULE 16.    Discovery and Inspection**

**(A)    Purpose, Scope and Reciprocity.**  This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures.

**(B)    Discovery: Right to Copy or Photograph.**  Upon receipt of a written demand for discovery by the defendant, and except as provided in division (C), (D), (E), (F), or (J) of this rule, the prosecuting attorney shall provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:

(1)    Any written or recorded statement by the defendant or a co-defendant, including police summaries of such statements, and including grand jury testimony by either the defendant or co-defendant;

(2)    Criminal records of the defendant, a co-defendant, and the record of prior convictions that could be admissible under Rule 609 of the Ohio Rules of Evidence of a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal;

(3)    Subject to divisions (D)(4) and (E) of this rule, all laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings, or places;

(4)    Subject to division (D)(4) and (E) of this rule, results of physical or mental examinations, experiments or scientific tests;

(5)    Any evidence favorable to the defendant and material to guilt or punishment;

(6)    All reports from peace officers, the Ohio State Highway Patrol, and federal law enforcement agents, provided however, that a document prepared by a person other than the witness testifying will not be considered to be the witness's prior statement for purposes of the cross examination of that particular witness under the Rules of Evidence unless explicitly adopted by the witness;

(7)    Any written or recorded statement by a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal.

**(C)    Prosecuting Attorney's Designation of "Counsel Only" Materials.**    The prosecuting attorney may designate any material subject to disclosure under this rule as "counsel only" by stamping a prominent notice on each page or thing so designated.  "Counsel only" material also includes materials ordered disclosed under division (F) of this rule. Except as otherwise provided, "counsel only" material may not be shown to the defendant or any other person, but may be disclosed only to defense counsel, or the agents or employees of defense counsel, and may not otherwise be reproduced, copied or disseminated in any way. Defense counsel may orally communicate the content of the "counsel only" material to the defendant.

**(D)    Prosecuting Attorney's Certification of Nondisclosure.**    If    the    prosecuting attorney does not disclose materials or portions of materials under this rule, the prosecuting attorney shall certify to the court that the prosecuting attorney is not disclosing material or portions of material otherwise subject to disclosure under this rule for one or more of the following reasons:

(1)    The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion;

(2)    The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will subject a witness, victim, or third party to a substantial risk of    serious economic harm;

(3)    Disclosure will compromise an ongoing criminal investigation or a confidential law enforcement technique or investigation regardless of whether that    investigation involves the pending case or the defendant;

(4)    The statement is of a child victim of sexually oriented offense under the age of thirteen;

(5)    The interests of justice require non-disclosure.

Reasonable, articulable grounds may include, but are not limited to, the nature of the case, the specific course of conduct of one or more parties, threats or prior instances of witness tampering or intimidation, whether or not those instances resulted in criminal charges, whether the defendant is pro se, and any other relevant information.

The prosecuting attorney's certification shall identify the nondisclosed material.

**(E)    Right of Inspection in Cases of Sexual Assault.**

(1)    In cases of sexual assault, defense counsel, or the agents or employees of defense counsel, shall have the right to inspect photographs, results of physical or mental examinations, or hospital reports, related to the indictment, information, or complaint as described in section (B)(3) or (B)(4) of this rule.  Hospital records not related to the

information, indictment, or complaint are not subject to inspection or disclosure. Upon motion by defendant, copies of the photographs, results of physical or mental examinations, or hospital reports, shall be provided to defendant's expert under seal and under protection from unauthorized dissemination pursuant to protective order.

(2)     In cases involving a victim of a sexually oriented offense less than thirteen years of age, the court, for good cause shown, may order the child's statement be provided, under seal and pursuant to protective order from unauthorized dissemination, to defense counsel and the defendant's expert. Notwithstanding any provision to the contrary, counsel for the defendant shall be permitted to discuss the content of the statement with the expert.

**(F)     Review of Prosecuting Attorney's Certification of Non-Disclosure.**     Upon motion of the defendant, the trial court shall review the prosecuting attorney's decision of nondisclosure or designation of "counsel only" material for abuse of discretion during an *in camera* hearing conducted seven days prior to trial, with counsel participating.

(1)     Upon a finding of an abuse of discretion by the prosecuting attorney, the trial court may order disclosure, grant a continuance, or other appropriate relief.

(2)     Upon a finding by the trial court of an abuse of discretion by the prosecuting attorney, the prosecuting attorney may file an interlocutory appeal pursuant to division (K) of Rule 12 of the Rules of Criminal Procedure.

(3)     Unless, for good cause shown, the court orders otherwise, any material disclosed by court order under this section shall be deemed to be "counsel only" material, whether or not it is marked as such.

(4)     Notwithstanding the provisions of (E)(2), in the case of a statement by a victim of a sexually oriented offense less than thirteen years of age, where the trial court finds no abuse of discretion, and the prosecuting attorney has not certified for nondisclosure under (D)(1) or (D)(2) of this rule, or has filed for nondisclosure under (D)(1) or (D)(2) of this rule and the court has found an abuse of discretion in doing so, the prosecuting attorney shall permit defense counsel, or the agents or employees of defense counsel to inspect the statement at that time.

(5)     If the court finds no abuse of discretion by the prosecuting attorney, a copy of any discoverable material that was not disclosed before trial shall be provided to the defendant no later than commencement of trial. If the court continues the trial after the disclosure, the testimony of any witness shall be perpetuated on motion of the state subject to further cross-examination for good cause shown.

**(G)     Perpetuation of Testimony.** Where a court has ordered disclosure of material certified by the prosecuting attorney under division (F) of this rule, the prosecuting attorney may move the court to perpetuate the testimony of relevant witnesses in a hearing before the court, in

which hearing the defendant shall have the right of cross-examination. A record of the witness's testimony shall be made and shall be admissible at trial as part of the state's case in chief, in the event the witness has become unavailable through no fault of the state.

**(H)    Discovery:  Right to Copy or Photograph.**  If the defendant serves a written demand for discovery or any other pleading seeking disclosure of evidence on the prosecuting attorney, a reciprocal duty of disclosure by the defendant arises without further demand by the state. A public records request made by the defendant, directly or indirectly, shall be treated as a demand for discovery in a criminal case if, and only if, the request is made to an agency involved in the prosecution or investigation of that case.   The defendant shall provide copies or photographs, or permit the prosecuting attorney to copy or photograph, the following items related to the particular case indictment, information or complaint, and which are material to the innocence or alibi of the defendant, or are intended for use by the defense as evidence at the trial, or were obtained from or belong to the victim, within the possession of, or reasonably available to the defendant, except as provided in division (J) of this rule:

(1)    All laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings or places;

(2)    Results of physical or mental examinations, experiments or scientific tests;

(3)    Any evidence that tends to negate the guilt of the defendant, or is material  to punishment, or tends to support an alibi. However, nothing in this rule shall be     construed     to require the defendant to disclose information that would tend to     incriminate that defendant;

(4)    All investigative reports, except as provided in division (J) of this rule;

(5)    Any written or recorded statement by a witness in the defendant's case-in- chief, or any witness that it reasonably anticipates calling as a witness in  surrebuttal.

**(I)    Witness List.** Each party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal. The content of the witness list may not be commented upon or disclosed to the jury by opposing counsel, but during argument, the presence or absence of the witness may be commented upon.

**(J)    Information Not Subject to Disclosure.**  The following items are not subject to disclosure under this rule:

(1)    Materials subject to the work product protection. Work product includes, but is not limited to, reports, memoranda, or other internal documents made by the prosecuting attorney or defense counsel, or their agents in connection with the investigation or prosecution or defense of the case;

(2)     Transcripts of grand jury testimony, other than transcripts of the testimony of a defendant or co-defendant. Such transcripts are governed by Crim. R. 6;

(3)     Materials that by law are subject to privilege, or confidentiality, or are otherwise prohibited from disclosure.

**(K)     Expert Witnesses; Reports.**     An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

**(L)     Regulation of discovery.**

(1)     The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

(2)     The trial court specifically may regulate the time, place, and manner of a *pro se* defendant's access to any discoverable material not to exceed the scope of this rule.

(3)     In cases in which the attorney-client relationship is terminated prior to trial for any reason, any material that is designated "counsel only", or limited in dissemination by protective order, must be returned to the state. Any work product derived from said material shall not be provided to the defendant.

**(M)     Time of motions.**     A defendant shall make his demand for discovery within twenty-one days after arraignment or seven days before the date of trial, whichever is earlier, or at such reasonable time later as the court may permit.  A party's motion to compel compliance with this rule shall be made no later than seven days prior to trial, or three days after the opposing party provides discovery, whichever is later.  The motion shall include all relief sought under this rule. A subsequent motion may be made only upon showing of cause why such motion would be in the interest of justice.

[Effective:  July 1, 1973; amended effective July 1, 2010; July 1, 2016.]

**Staff Notes (July 1, 2010 Amendments)**

Division (A): Purpose, Scope and Reciprocity

The purpose of the revisions to Criminal Rule 16 is to provide for a just determination of criminal proceedings and to secure the fair, impartial, and speedy administration of justice through the expanded scope of materials to be exchanged between the parties. Nothing in this rule shall inhibit the parties from exchanging greater discovery beyond the scope of this rule. The rule accelerates the timing of the exchange of materials, and expands the reciprocal duties in the exchange of materials. The limitations on disclosure permitted under this rule are believed to apply to the minority of criminal cases.

The new rule balances a defendant's constitutional rights with the community's compelling interest in a thorough, effective, and just prosecution of criminal acts.

The Ohio criminal defense bar, by and through the Ohio Association of Criminal Defense Lawyers and prosecutors, by and through the Ohio Prosecuting Attorneys Association, jointly drafted the rule and submitted committee notes to the Commission on the Rules of Practice and Procedure. The Commission on the Rules of Practice and Procedure discussed, modified, and adopted the notes submitted in developing these staff notes.

Division (B): Discovery; Right To Copy or Photograph

This division expands the State's duty to disclose materials and information beyond what was required under the prior rule. All disclosures must be made prior to trial. This division also requires the materials to be copied or photographed as opposed to inspection as permitted under the prior rule. Subject to several exceptions, the State must provide pretrial disclosure of all materials as listed in the enumerated divisions.

Division (C): Prosecuting Attorney's Designation of "Counsel Only" Materials

The State is empowered to limit dissemination of sensitive materials to defense counsel and agents thereof in certain instances. Documents marked as "Counsel Only" may be orally interpreted to the Defendant, or to counsel's agents and employees, but not shown or disseminated to other persons. The rule recognizes that defense counsel bears a duty as an officer of the court to physically retain "Counsel Only" material, and to limit its dissemination. Counsel's duty to the client is not implicated, since the rule expressly allows oral communication of the nature of the "Counsel Only" material.

Division (D): Prosecuting Attorney's Certification of Nondisclosure

This division provides a means to prevent disclosure of items or materials for limited reasons. The prosecution must be able to place reasonable limits on dissemination to preserve testimony and evidence from tampering or intimidation, and certain other enumerated purposes. The new rule explicitly recognizes that it is the prosecution's duty to assess the danger to witnesses and victims, and the need to protect those witnesses and victims by controlling the early disclosure of certain material, subject to judicial review.

A nondisclosure must be for one of the reasons enumerated in the rule, and must be certified in writing to the court. The certification need not disclose the contents or meaning of the nondisclosed material, but must describe it with sufficient particularity to identify it during judicial review as described in division (F).

The certification process recognizes the unique nature of sex crimes against children. In the event of a certification of nondisclosure, defense counsel will have the right to inspect the statement no later than the seven-day review hearing provided in subsection (F), which is an improvement from the prior Criminal Rule 16(B)(1)(g).

Finally, the rule recognizes that not every eventuality can be anticipated in the text of a rule, and allows nondisclosure in the interest of justice.

Division (E):  Right of Inspection in Cases of Sexual Assault

This division recognizes the intensely personal nature of a sexual assault, and provides a special mechanism for discovery in such cases. It represents an exception to division (B).

The compromise between the interests in the privacy and dignity of the victim are balanced against the right of the defendant to a thorough review of the State's evidence by permitting inspection, but not copying, of certain materials. Upon motion of the defendant, the court may, in its discretion, permit these materials to be provided under seal to defense counsel and the defendant's expert.

In cases involving the sexual abuse of a child under the age of 13, upon motion and for good cause shown, the trial court may order dissemination of the child's statement under seal and pursuant to protective order to defense counsel and the defendant's expert. This provision facilitates meaningful communication between defense counsel and the defense expert, and to permit timely compliance with division (K) of the rule.

Division (E)(2) is intended to give sufficient time for an expert to evaluate the statement, and also to permit defense counsel to consult with the expert on the content of the statement and issues related to it. This division is designed to provide an exception to the nondisclosure procedure sufficient to permit the expert and defense counsel to effectively evaluate the statement. The protective order shall apply to defense counsel and defendant's experts and agents.

Division (F): Review of Prosecuting Attorney's Certification of Non-Disclosure

This division provides for judicial review at the trial court level of a prosecutor's certification of nondisclosure. As in many other executive branch decisions the standard for review, subject to constitutional protections, is an abuse of discretion – that is, was the prosecutor's decision unreasonable, arbitrary or capricious? The prosecution of a case is an executive function.  The rule's nondisclosure provision is a tool to ensure the prosecutor is able to fulfill that executive function.

The prosecutor should possess extensive knowledge about a case, including matters not properly admissible in evidence but highly relevant to the safety of the victim, witnesses, or community. Accordingly, the rule vests in the prosecutor the authority for seeking protection by the nondisclosure, and deference when making a good faith decision about unpredictable prospective human behavior.

The review is conducted *in camera* on the objective criteria set out in division (D), seven days prior to trial, with defense counsel participating. If the Court finds an abuse of discretion, the material must be immediately disclosed to defense counsel. If the Court does not find an abuse of discretion, the material must nonetheless be disclosed no later than the commencement of trial.  Further judicial review is provided by giving the prosecutor a right to an interlocutory appeal of an order of disclosure as provided for in Criminal Rule 12(K), which is amended to accommodate that process.

Upon motion of the State, the certification of nondisclosure or "Counsel Only" designation is reviewable by the trial judge in the *in camera* proceeding.  The preferred practice is to record or transcribe the *in camera* review to preserve any issues for appeal and sealed to preserve the confidential nature of the information.

The *in camera* review is set seven days prior to trial so that it is, in essence, the end of the trial preparation stage. There was substantial debate regarding the time for this review.  Seven days provides adequate opportunity for the defense to prepare for trial and respond to the content of any nondisclosed material. The protective purpose of this process would be destroyed if courts routinely granted continuances of a trial date after conducting the seven-day nondisclosure review. The Commission anticipated that continuances of trial dates would occur only in limited circumstances.

Division (F)(4) seeks to protect victims of sexual assault who are still in their tender years.

Division (G): Perpetuation of Testimony

This division provides that if after judicial review the Court orders disclosure of evidence, the prosecutor upon motion to the Court is given a right to perpetuate testimony in a pretrial hearing as set forth in the subsection.

Division (H): Discovery: Right to Copy or Photograph

The previous rule allowed for disclosure of specified relevant evidence in the possession of defense counsel to the State upon the State's motion. This division expands defense counsel's duty to disclose materials and information beyond what was required under the prior rule. In this division a reciprocal duty of disclosure now arises upon defense counsel's motion for discovery without further demand from the State. This division requires the materials to be copied or photographed, as opposed to the prior rule that only allowed for inspection by the State. Subject to several exceptions covered in division (J), defense counsel must provide pretrial disclosure of materials as listed in the enumerated subsections. This division seeks to define the defense counsel's reciprocal duty of disclosure while respecting the constitutional and ethical obligations required in representing a client.

For the first time, defense counsel has a duty to provide the State with evidence that tends to support innocence or alibi. This allows the State to properly assess its case, and re-evaluate the prosecution. The Commission believes this provision will facilitate meaningful plea negotiation and just resolution.

Division (I): Witness List

This division imposes an equal duty on each party to disclose the list of witnesses that will be called at trial. It prohibits counsel from commenting on the witness lists but does not prohibit the commenting upon the absence or presence of a witness relevant to the proceeding. See, *State v. Hannah*, 54 Ohio St.2d 84, 374 N.E.2d 1359 (1978).

Division (J): Information Not Subject to Disclosure

This division clarifies what information is not subject to disclosure by either party for reasons of confidentiality, privilege, or due to their classification as documents determined to be work product. This division also references that the disclosure or nondisclosure of grand jury testimony is governed by Rule 6 of the Rules of Criminal Procedure.

Division (K): Expert Witnesses; Reports

The division requires disclosure of the expert witness's written report as detailed in the division no later than twenty-one days prior to trial. Failure to comply with the rule precludes the expert witness from testifying during trial. This prevents either party from avoiding pretrial disclosure of the substance of expert witness's testimony by not requesting a written report from the expert, or not seeking introduction of a report. This division does not require written reports of consulting experts who are not being called as witnesses.

Division (L): Regulation of Discovery

The trial court continues to retain discretion to ensure that the provisions of the rule are followed. This discretion protects the integrity of the criminal justice process while protecting the rights of the defendants, witnesses, victims, and society at large.

In cases in which a defendant initially proceeds *pro se*, the trial court may regulate the exchange of discoverable material to accommodate the absence of defense counsel. Said exchange must be consistent with and is not to exceed the scope of the rule. In cases in which the attorney-client relationship is terminated prior to trial for any purpose, any material designated "Counsel Only" or limited in dissemination by protective order must be returned to the State. Any work product derived from such material shall not be provided to the defendant.

The provisions of (L)(2) and (L)(3) are designed to give the court greater authority to regulate discovery in cases of a *pro se* defendant and addresses the problems that could arise if a defendant terminates the employment of his attorney and then demands everything in the attorney's file. This could frustrate the protections built into the rule to avoid release of material directly to the defendant in some cases.

Section (M): Time of Motions

This division requires timely compliance with all provisions of this rule subject to judicial review. Adherence to the requirements of this division will help to ensure the fair administration of justice.

**Staff Notes (July 1, 2016 Amendment)**

In *State v. Athon*, 2013-Ohio-1956, the Court addressed the question of when a request of discovery by a criminal defendant triggers reciprocal discovery obligations under Crim.R. 16(H).  The amendment seeks to put into effect the rule announced by the Court in *Athon*, and articulates a standard designed to allow defense counsel to be able to determine, at the time of filing a public records request, whether that request would trigger reciprocal discovery.

**RULE 404.   Character Evidence not Admissible to Prove Conduct; Exceptions; Other Crimes**

**(A)   Character evidence generally.**   Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:

**(1)   Character of accused.**   Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

**(2)   Character of victim.**   Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

**(3)   Character of witness.**   Evidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609.

**(B)   Other crimes, wrongs or acts.**   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[Effective: July 1, 1980; amended effectively July 1, 2007, July 1, 2012.]

**Staff Note (July 1, 2012 Amendment)**

The original Ohio Rule did not adopt the notice requirement included in the federal version of the rule. The rule, as amended, adds mutuality to the federal version of the rule so as to also provide the prosecution with notice of the defendant's intention to offer evidence under this rule. The purpose of adding the notice requirement is to provide the prosecution and the defense with the opportunity to prepare their case. Notice provided pursuant to this rule does not constitute a "demand of the defendant" under Crim.R. 16, and does not, in and of itself, constitute the initiation of discovery under Crim.R. 16. The rule should not be construed to exclude otherwise relevant and admissible evidence solely because of a lack of notice, absent a showing of bad faith.

FILED
COURT OF APPEALS

2017 APR -3  AM 11: 45

MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### ALLEN COUNTY

---

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**         **CASE NO.  1-15-62**

    **v.**

**MARKELUS Q. CARTER,**         **O P I N I O N**

    **DEFENDANT-APPELLANT.**

---

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR2014 0139**

**Judgment Affirmed**

**Date of Decision:   April 3, 2017**

---

**APPEARANCES:**

    *F. Stephen Chamberlain* **for Appellant**

    *Jana E. Emerick* **for Appellee**



EXHIBIT
15

CAN-150

Case No. 1-15-62

**SHAW, J.**

{¶1} Defendant-appellant, Markelus Q. Carter ("Carter"), brings this appeal from the September 22, 2015, judgment of the Allen County Common Pleas Court sentencing Carter after he was found guilty in a jury trial of Aggravated Murder with a firearm specification in violation of R.C. 2903.01(A) and R.C. 2941.145(A), and Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), a felony of the third degree.  On appeal, Carter argues that there was insufficient evidence presented to convict him, that his convictions were against the manifest weight of the evidence, that the trial court erred by denying his request for a mistrial based upon an altercation that occurred in a holding cell between Carter and a State's witness, that the trial court improperly allowed evidence of the altercation to be introduced during the trial, that the State committed discovery violations, that the State committed prosecutorial misconduct in closing arguments, and that Carter received ineffective assistance of counsel.

### Facts and Procedural History

{¶2} On April 17, 2014, Carter was indicted for Aggravated Murder with a firearm specification in violation of R.C. 2903.01(A) and R.C. 2941.145(A) respectively, and Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), a felony of the third degree.  It was alleged that Carter shot and killed Kenneth Warrington shortly after 5 a.m. on February 23, 2009.  Warrington had a

Case No.  1-15-62

relationship with Carter's ex/the mother of Carter's children, Sonya Burkholder (nka "Hughes").  Warrington was shot six times just outside of Sonya's residence in Lima, Ohio.  Carter pled not guilty to the charges.

{¶3} After a lengthy pre-trial process that included, *inter alia*, multiple suppression hearings and a competency evaluation, Carter's case proceeded to a jury trial, which was held September 8-22, 2015.  At trial the State presented the testimony of 30 witnesses and over 150 exhibits, then rested its case.  Carter presented the testimony of 8 witnesses and in excess of 30 exhibits, then rested his case.  Ultimately the jury found Carter guilty of Aggravated Murder with a firearm specification and Having Weapons While Under Disability, all as indicted.

{¶4} Carter was sentenced to life in prison without parole on the Aggravated Murder charge, a three-year consecutive prison term on the firearm specification, and a three-year concurrent prison term on the Having Weapons While Under Disability charge.  A judgment entry memorializing Carter's sentence was filed September 22, 2015.  It is from this judgment that Carter appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY FAILING TO EXCLUDE EVIDENCE OF AN ALTERCATION BETWEEN THE DEFENDANT AND A GOVERNMENT WITNESS IN A HOLDING CELL OF THE COURT DURING TRIAL AND ALLOWING A VIDEO OF THAT ALTERCATION TO BE**

-3-

CA17-152

Case No. 1-15-62

**PLAYED FOR THE JURY DURING THE GOVERNMENT'S CASE IN CHIEF.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT BY OVERRULING DEFENDANT'S MOTION FOR MISTRIAL FILED ON SEPTEMBER 16, 2016, BASED UPON RULE 16 DISCOVERY VIOLATIONS AND BRADY DISCOVERY VIOLATIONS RELATED TO TESTIMONY OF A GOVERNMENT WITNESS ON FIREARMS.**

**ASSIGNMENT OF ERROR 3**
**THAT THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND, IN THE ALTERNATIVE, WAS BASED UPON INSUFFICIENT EVIDENCE.**

**ASSIGNMENT OF ERROR 4**
**THAT THE PROSECUTION STATEMENTS IN CLOSING ARGUMENT MISSTATE THE EVIDENCE AND RISE TO THE LEVEL OF PROSECUTORIAL MISCONDUCT AND REQUIRE A REVERSAL.**

**ASSIGNMENT OF ERROR 5**
**THAT THE DEFENDANT WAS DEPRIVED OF A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.**

{¶5} For ease of discussion, we elect to address the assignments of error out of the order in which they were raised.

### *Third Assignment of Error*

{¶6} In Carter's third assignment of error, he argues that there was insufficient evidence presented to convict him of Aggravated Murder with a firearm

CA17-153

Case No. 1-15-62

specification and Having Weapons While Under Disability.  Carter also argues that his convictions were against the manifest weight of the evidence.

Standard of Review

{¶7} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).  Sufficiency is a test of adequacy.  *Id.*  When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶8} By contrast, in reviewing whether the trial court's judgment was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony.  *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997).  In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.  Furthermore, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment

-5-

Case No.  1-15-62

results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." *Thompkins* at paragraph 4 of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3).

Relevant Statutes

{¶9} Carter was convicted of Aggravated Murder, which is codified in R.C. 2903.01(A), and reads, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

{¶10} A firearm specification was attached to the Aggravated Murder, which is codified in R.C. 2941.145.  It requires that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶11} Carter was also convicted of Having Weapons While Under Disability for possessing the weapon he used in the murder of Kenneth Warrington.  Having Weapons While Under Disability is codified in R.C. 2923.13(A)(3), and reads " * * *[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]

-6-

CA17-185

Case No.  1-15-62

### Evidence Presented

*a. Testimony Regarding Events Prior to the
February 23, 2009 Murder*

{¶12} Carter and Sonya Burkholder had two children together, Tarah and Markelus.  The children and Sonya lived with Carter until 2004 when Sonya's mother became "gravely ill," so Sonya moved in with her.  After Sonya's mother died, Sonya stayed in her mother's former residence until Sonya lost the house in 2007.  At that time, Sonya moved back in with Carter; however, it was not to rekindle a romantic relationship.  Rather, according to Sonya the relationship was platonic and she and Carter lived more as "roommates."  While staying at Carter's residence, Sonya slept in her daughter Tarah's room with her.

{¶13} Despite the fact that Sonya indicated she and Carter did not have a romantic relationship in 2007, Sonya testified that Carter was very controlling.  Sonya indicated that Carter had been that way during their relationship when they were previously together, not allowing Sonya to socialize on her own.  Additionally, Sonya stated that Carter did not give her a key to his home when she moved in during 2007 and that Carter had to let her in the house or she would get locked out.

{¶14} While living with Carter in late 2007, Sonya was working as a security shift supervisor for Allied Barton Security Services, which did security for the Husky Refinery in Lima.  Through her job, Sonya developed a friendship with

-7-

CAM- 156

Case No.  1-15-62

Kenneth Warrington, who worked at the refinery.  Sonya indicated that she did not tell Carter about her friendship with Warrington.

{¶15} On December 15-16, 2007, Sonya and Warrington exchanged flirtatious emails, which were included in the record at trial.  Sonya testified that Carter was good with computers and got into her email and found her exchanges with Warrington.  The day after the email exchange, December 17, 2007, Sonya worked second shift at her security job and returned to Carter's home, showered and went to bed in Tarah's room.  According to Sonya, Carter woke her up that night, extremely angry, and told her to pack her bags and get out.[1]

{¶16} Sonya stated that Carter had a gun in his hand, that he followed her down the stairs, and that Carter struck her across the jaw with the gun.[2]  Sonya stated that she went outside and flagged down a police officer who happened to be in the area and told the officer what happened.  The officer then approached Carter's residence but Carter would not come outside or let the officers see the children.  As a result of being informed that Carter had a gun, that children were inside, and that police were refused access to check on the safety of the children, more officers were called to the scene.

---

[1] It was insinuated that it was at this point Carter found the emails between Sonya and Warrington.
[2] Tarah's testimony differed as to this incident, stating that Carter never struck Sonya with a gun.  There was also conflicting testimony as to whether Sonya had some actual injury on her face from any purported strike.

-8-

CA 17- 157

Case No.  1-15-62

{¶17} A four-hour "stand-off" then ensued wherein Carter had multiple phone conversations with a police hostage negotiator.  On the calls, some of which were recorded and played for the jury, Carter denied that his children were being held hostage, but he would not come outside and would not let the police see the children.  On the calls Carter talked about honor and dishonor and how an honorable person should not have to go to jail.  Meanwhile, the police attempted to keep him calm.  Eventually the situation ended peacefully and Carter was taken into custody.  Although an "air gun" was found inside Carter's home, no actual firearm was located at that time.   No charges were brought against Carter as a result of the "stand-off" incident.

{¶18} After the December 2007 incident, Sonya moved out of Carter's residence and moved in with friends Krista and Don Bodiker, who also worked security at the refinery.  Sonya stayed with the Bodikers until late-summer/early fall of 2008 when she moved into a house at 436 McKibben Street in Lima.

{¶19} While living with the Bodikers, Sonya sought and received a civil protection order ("CPO") against Carter based primarily on the "stand-off" incident. Carter contested the CPO and appealed the granting of that CPO to this Court.  We

CA17- 158

Case No.  1-15-62

affirmed the CPO in *Burkholder v. Carter*, 3d Dist. Allen No. 1-08-20, 2008-Ohio-4644.[3]

{¶20} Meanwhile, after he was not charged as a result of the December 2007 "stand-off" incident, Carter was in contact with the Lima Police Department seeking to have Sonya charged for filing a false report or making false claims regarding the incident.  That case was eventually assigned to a detective, though the detective testified that it was low priority and he did not look into it for a while.

{¶21} During 2008, Sonya and Warrington's relationship deepened and according to Sonya the relationship became sexual for about two weeks in the summer of 2008.  When Sonya moved out of the Bodikers' residence and into her own house on McKibben Street around August of 2008, Warrington occasionally stayed at the residence.

{¶22} Throughout Warrington's relationship with Sonya, Warrington was married to Faye Warrington.  Warrington and Faye had been married since 1983.  Faye testified that Warrington told her about his relationship with Sonya when it began.  Faye testified that despite the affair she did not want a divorce because Warrington still brought his paycheck home and Faye was hopeful that they would reconcile. Warrington did eventually move out of the marital residence though, and

---

[3] In our 2008 opinion, the last name of Krista and Don Bodiker was spelled "Boedeker," likely due to what the court reporter typed in the corresponding transcripts. Krista and Don spelled their last name for the record in this transcript.

CA17-159

Case No. 1-15-62

it was Faye's understanding that Warrington stayed either at his uncle's residence or at Sonya's residence.

{¶23} Faye testified that she did not tell her family about Warrington's infidelity, choosing instead to speak with her minister about it. Faye indicated that she did not want others to change their opinion of Warrington. However, Faye testified that her family found out about Warrington's affair because they had received anonymous letters informing them of the situation. Faye testified that she did not know who wrote the letters, but she had received phone calls from Carter informing her of the relationship between Warrington and Sonya, which Faye already knew about.

{¶24} Faye testified that Carter called her many times, sometimes at two or three in the morning stating that Warrington's truck was at Sonya's residence.[4] Faye testified that on one of the calls in the weeks prior to Warrington's death in February of 2009, Carter stated that he was going to give Warrington "one more chance" and that Carter stated he was going to call Warrington and tell him to stay away from Sonya. (Trial Tr. at 339). Faye asked whether Carter was threatening Warrington and she testified that Carter did not respond.

{¶25} Similarly, the Husky Refinery received a call that was linked to Carter in early January of 2009. A man identifying himself as "Mark Carter" called the

---

[4] Her specific words were, "after that, I can't even tell you how many phone calls I got from him." (Trial Tr. at 338).

CAD-160

Case No. 1-15-62

refinery requesting company policies regarding the use of property for employees engaged in an extramarital affair, specifically Sonya and Warrington. Pam Callahan answered the call for Husky and she stated that although the caller stated that he needed the information for a lawsuit and he sounded professional, she did not believe it was legitimate.

{¶26} On February 18, 2009, the detective who had looked into Carter's claims that Sonya should be charged for making a false report regarding the 2007 "stand-off" incident informed Carter that he had looked into the matter and he recommended that no charges be filed against Sonya. The detective informed Carter that he turned the case over to the city prosecutor's office, which agreed with him. The detective indicated Carter was not happy with the results.

*b. Testimony Regarding the Murder and its Investigation*

{¶27} On February 22, 2009, Sonya saw Warrington at work and Warrington indicated that he needed a key to her residence because Sonya had mistakenly taken Warrington's off of the counter and he did not have his key at the time. It seems that at that time the two worked different shifts that overlapped at the end of Sonya's and the beginning of Warrington's. According to Sonya, the two were not romantically involved at the time but Warrington still stayed at her residence

-12-

CA17-161

Case No.  1-15-62

occasionally and he kept some work uniforms in her son's room.[5]  Sonya testified that when she gave Warrington her key it was the last time she saw Warrington alive.

{¶28} Sonya testified that she left work and went to pick up Tarah at Carter's residence.  Sonya indicated that Tarah had sent Sonya a text message earlier asking if Warrington was coming over to Sonya's that night and Sonya found it odd.  Sonya testified that she asked Tarah about the text message but Tarah did not know anything about it.  Sonya then returned with Tarah to her home at 436 McKibben and went to sleep.

{¶29} Work records established that Warrington clocked out of the refinery at 5:04 a.m. on February 23, 2009.  Sometime shortly thereafter, Warrington was shot six times just outside a side entrance of Sonya's home.

{¶30} Donald Hovest, who was picking up trash on his route on a street close to 436 McKibben, heard the gunshots in his general area.  He indicated that the gunshots occurred after 5 a.m., sometime possibly around 5:20.  He reported the gunshots to police, which dispatched officers related to possible gunshots in the area at 5:18 a.m.  Police responded to the area but officers did not observe anything relevant at that time.

---

[5] The extent of Sonya and Kenneth's relationship at the time of Kenneth's death was a source of some dispute. When making a later 9-1-1 call Tarah referred to Kenneth as his mother's boyfriend. Sonya maintained that the two were good friends at the time of his death but no longer romantically involved.

-13-

CA17-162

Case No.  1-15-62

{¶31} Rosalind Johnson was asleep on her couch across the street from 436 McKibben and was awakened by the noise from the gunshots.  She looked out her window and saw a person coming out of the alley with a "hoodie jacket on, a camouflage jacket." (Trial Tr. at 819).  However, Johnson did not see any actual shooting and she simply went back to sleep.

{¶32} Sonya woke up at 6 a.m. on February 23, 2009, and noticed that Warrington's truck was parked at her residence but he had not come inside.  After waking up Tarah and mentioning that it was odd, Sonya discovered Warrington's body just outside and screamed.  Tarah called 9-1-1 after checking Warrington for a pulse.  The 9-1-1 call was played for the jury.

{¶33} Police responded to the scene and began an investigation.  It was ultimately determined that Warrington's death was a homicide resulting from six gunshot wounds.  The shots were to his chin, right forearm, left chest, right buttock and two in the back.  There were 12 holes total because all six bullets exited Warrington's body.  The investigation further revealed that Warrington was shot by Winchester 9mm bullets.  Shell casings and bullets were collected at the scene. Warrington was discovered with $160 on him, which officers felt ruled out a robbery, along with a gym bag and a cooler.  Photographs of how and where Warrington was found just outside Sonya's door were included in the record.[6]

---

[6] The jury also took a jury view of what was Sonya's residence at the time.

CAR-163

Case No. 1-15-62

{¶34} While at Sonya's residence surveying the scene, one officer noticed that there was an electric bill for Carter on the counter and the officer recalled the 2007 "stand-off" incident.[7] Officers then wanted to get into contact with Carter. The detective that handled Carter's allegations against Sonya for filing a false report, Sergeant Godfrey, indicated that he had Carter's phone number so he called Carter around 8 a.m. and generally asked Carter to come into the station. When Carter answered, Carter asked if Sergeant Godfrey was calling because there had been some movement on his case with Sonya. At that time Carter was told to just come in without any further information being provided to him and Carter said he would be in shortly.

{¶35} A half-hour passed and Carter had not come in, so Sergeant Godfrey called Carter again and said something had happened to "Kenneth" and Carter needed to come in. Carter stated that he did not like the sound of that but would come to the police station as soon as he finished a work-related errand.[8]

{¶36} Before Carter came to the police station, Carter called his attorney Ken Rexford's office to ask if something had happened to him since Carter was informed that something had happened to "Kenneth." Leah Rexford, the attorney's wife who

---

[7] It appears that Tarah was using the electric bill to show proof of residence for a school-related issue. It was not insinuated that Carter himself had left the electric bill or that he had brought it there himself.

[8] Carter stated that he had to drop off some "proofs" to an insurance agent before he would come into the station. When Carter was later stopped, he did have the referenced "proofs" on him. However, officers spoke with the insurance agent who indicated that he had requested the proofs so long ago from Carter that he was not specifically expecting them that day.

-15-

CA17-164

Case No.  1-15-62

also worked at the law firm, informed Carter that nothing had happened to Carter's attorney Ken Rexford.   Carter made another call to Rexford's office shortly thereafter where Carter was "inconsolable" and talking about something happening to his baby.

{¶37} As Carter drove around to apparently complete his errands that morning, he was being followed by Detective Timothy Clark who was not in a marked cruiser.  Detective Clark noticed that Carter's license plates did not match and he called for a marked cruiser to stop Carter.  A patrol officer then did stop Carter and Detective Clark approached and told Carter that he wanted Carter to come in for questioning.   According to one officer, Carter then "exploded in emotion," as he kept talking about his baby, meaning his daughter Tarah.  Officers were surprised by Carter's demeanor and assured Carter that Tarah was fine but Carter kept referring to her.[9]   After being repeatedly assured that his daughter was fine, Carter then voluntarily went to the police station for an interview.

{¶38} During Carter's interview, he stated that the night prior to Warrington's murder Sonya picked up Tarah sometime after 10 p.m. and took Tarah to Sonya's residence.  Carter stated that he went to bed after watching shows on his computer and then woke up at 6 a.m. to his alarm clock.  Also during the interview, Carter admitted to owning a .357 but denied owning a 9mm at that time.  Carter told

---

[9] A video of the stop was introduced into evidence.  In the video, Carter wails repeatedly as he says something happened to his "baby," despite being told by officers that nothing had happened to Tarah.

-16-

CA17- 165

Case No. 1-15-62

the police that they could have his .357 and he allowed the police to do a gunshot residue test on his hands.

{¶39} Carter was under a disability for a prior conviction[10] and could not own a firearm, so the police indicated they were going to search his house to get the .357. A search warrant was then obtained and executed on Carter's residence to look specifically for weapons. Two guns were located at Carter's residence at that time along with a box of Winchester 9mm ammunition with some of the bullets missing. Testing later indicated that the bullets were consistent with those that killed Warrington, although they were relatively common bullets. However, testing indicated that neither of the firearms that were found at Carter's residence were used in the murder. Similarly, neither of those firearms were the subject of the Having Weapons While Under Disability charge in this case. Rather, the murder weapon, which was never found, was the firearm related to the charge.

{¶40} As the investigation continued on the day of the murder, a second search warrant was executed on Carter's residence looking for anything related to a homicide. On Carter's kitchen table, a number of papers were found together including a copy of the private emails between Warrington and Sonya from December of 2007, a copy of the CPO Sonya had obtained against Carter, and a

---

[10] The prior conviction is essentially undisputed on appeal but a certified copy of a judgment entry indicating that Carter had been found guilty of two fourth degree drug-related felonies in 1995 was entered into evidence. (State's Ex. 99).

CA 17-166

Case No.  1-15-62

copy of the related police report from the December 2007 incident.  There was also a document officers described as a "script" that appeared to correspond to the phone call that had been made to the Husky Refinery in January related to Sonya and Warrington's affair.

{¶41} In addition to this paperwork, officers located camouflage clothing, which was later tested for gunshot residue ("GSR").  A short sleeve camouflage shirt and a long sleeve camouflage shirt both tested positive for GSR despite Carter stating in his interview that he had not fired a gun in years.  Rosalind Johnson indicated that the camouflage pattern was consistent with what she had seen from her window on the morning of the murder.  However, neither of the camouflage shirts contained a hood, which she had mentioned seeing.  Nevertheless, officers also located a pair of gloves on a table and the gloves tested positive for GSR as well.

{¶42} Various electronics belonging to Carter were seized during the search and analyzed.  On one of Carter's digital cameras, there were images of streets in Lima and a picture of Warrington's truck parked outside of Sonya's home at 436 McKibben dated January 9, 2009.  A forensic search of Carter's computer revealed he had been on the county auditor's website for information on the property at 436 McKibben and that he had been looking at a map of the surrounding area.  In addition, there were google searches performed for Sonya Burkholder and Kenneth

-18-

Case No.  1-15-62

Warrington.  A separate "palm" device also contained an address for Kenneth and Faye Warrington as well as a phone number, which had a *67 designation by it indicating that the number had been used while dialing *67 to block the caller ID.

{¶43} On the day of the murder Carter was arrested for Having Weapons While Under Disability, which is separate from the same charge in this case.  When Carter was taken into custody, he requested to speak with Sergeant Godfrey for a second time that day.  Another interview of Carter was then conducted, and that interview was played for the jury.  In the interview, Carter had some kind of 'tic,' or seizure-like occurrence that the officers did not believe was genuine.  Little of relevance came out of the interview.

{¶44} While Carter was incarcerated for Having Weapons While Under Disability, Joey Moore, another inmate, stated that he heard Carter discussing the murder investigation.  Moore testified at trial that Carter said that police found 16 grams of crack at his residence but they did not find a Mac-10 firearm that Carter claimed to have disassembled.  A ballistics expert from BCI testified that a "Mac-10 style" firearm would be one of over 130 possible 9mm firearms that could have been consistent with the firearm that fired the bullets that killed Warrington.[11]  Joey Moore also testified that Carter indicated that he had killed his girlfriend's

---

[11] The State's ballistic expert testified that the "Mac" in Mac-10 is an abbreviation for "Military Armament Corporation" and the 10 stands for model 10.  The ballistic expert testified that multiple manufacturers made a firearm similar to the Mac-10, though they were not actual "Mac-10's," which were produced by a specific manufacturer.

-19-

CA17 - 168

Case No. 1-15-62

boyfriend.[12]   Police found Moore's statement credible because he was fairly accurate in the amount of crack that was found at Carter's residence and it was not something Moore could have known otherwise.

{¶45} Also while Carter was incarcerated, he contacted a friend named Carlotta Williams and requested that she visit him.  When she did, Carlotta testified that Carter held up a note asking her to tell the police that she was with him from 1:00 a.m. to 6:00 a.m. on the day of the murder.  Carlotta refused and stated that the alibi Carter was requesting her to provide was false.  She also stated at trial that she had seen Carter with a gun resembling a Mac-10 before when she was shown a generic demonstrative picture of a Mac-10 style firearm, though she said she had little familiarity with firearms.

{¶46} Stephen Upham, another inmate who was incarcerated with Carter, testified that Carter told him about the murder.  Upham testified that Carter indicated that he had gotten into an argument with the mother of his children and her boyfriend got mad and threatened Carter's children.  Carter told Upham that a couple of weeks after this incident Carter shot the boyfriend.  Upham testified that Carter indicated he watched the victim for a couple of weeks coming and going and that he was wearing camouflage and a paintball mask when he committed the murder.

---

[12] Moore's testimony is slightly confusing on this issue as he initially states that Carter told him that he "smoked the bitch" referring to Carter's girlfriend, but Moore then clarifies when prompted that he meant that Carter indicated he smoked the boyfriend of his girlfriend.

CA17-169

Case No. 1-15-62

{¶47} Notably just before Upham testified, he was mistakenly placed in the same holding cell with Carter during a brief recess in the trial. Upham asked Carter how his trial was going, and stood up, then Carter assaulted Upham. A video of this incident was introduced into evidence.[13]

*Sufficiency of the Evidence*

{¶48} At the conclusion of the State's case, which consisted of 30 witnesses and over 150 exhibits, Carter made a Crim.R. 29 motion for acquittal. Carter's motion was overruled by the trial court. Carter now contends on appeal that the State presented insufficient evidence to convict him of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability.

{¶49} Although Carter claims that there was insufficient evidence to convict him his actual arguments related to his convictions seem to be that his convictions were against the manifest weight of the evidence because he contends that the State's testimony was not credible and that Sonya was more likely to be the killer than Carter. These arguments go to weight of the evidence rather than sufficiency.

{¶50} Nevertheless, to the extent that Carter is arguing that there was insufficient evidence presented to convict him, we do not find Carter's arguments well-taken as the State produced ample evidence to establish each element of Aggravated Murder, the accompanying firearm specification, and Having Weapons

---

[13] Whether this incident and the evidence related to it were admissible is the subject of a separate assignment of error, which will be discussed *infra*.

CA17- 170

Case No.  1-15-62

While Under Disability.   In fact, the State presented substantial circumstantial evidence against Carter.  Notably, the Supreme Court of Ohio has stated that, "direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence."  *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991).

{¶51} In this case the State clearly established evidence of a motive and it also clearly established a plan for Carter to murder Warrington based on Carter's statements to Faye, the pictures Carter took essentially casing the area around Sonya's residence, and the searches Carter did on his computer.  Warrington was shot six times just as he was returning to Sonya's from work, indicating that the murder was not an accident and that the killer had been waiting for him to return and aware of his schedule, which is essentially what Carter told Upham.

{¶52} The State also presented evidence of a witness who saw someone near the scene at the time of the gunshots wearing camouflage and Carter was found in possession of camouflage clothing and gloves that had GSR on them.  Corroborative of this evidence was the fact that Carter told Upham that Carter had committed a murder while wearing camouflage and a paintball mask.[14]  Further, Carter possessed bullets of the same type and caliber that were used to kill Warrington.

---

[14] Carter was known to play paintball and a picture of Carter wearing a paintball mask on the top of his head was introduced into evidence.

-22-

CA 17- 171

Case No. 1-15-62

{¶53} Moreover, multiple jailhouse witnesses testified that Carter admitted to killing someone and Carter also sought out a friend to manufacture an alibi. Additionally, on the day of the murder officers remarked on the repeatedly odd behavior of Carter during the traffic stop and during his interviews, much of which was viewed by the jury.

{¶54} Based on all of this we conclude that sufficient evidence was presented to find that Carter committed Aggravated Murder and did so with a gun, which would make him guilty of the accompanying firearm specification and Having Weapons While Under Disability as well.

*Manifest Weight of the Evidence*

{¶55} Turning to Carter's argument that his convictions were against the manifest weight of the evidence, we must review all of the evidence presented, which includes the evidence presented by Carter. Carter called several witnesses on his behalf who were inmates with the inmates who testified against Carter. The inmates testifying on Carter's behalf casted doubt on the credibility of the State's inmate-witnesses, particularly Upham.

{¶56} Carter also emphasized that sometime after the "stand-off" incident, Sonya got a concealed-carry license. In addition, Carter called a witness who testified that prior to Warrington's death a sign had been put on Warrington's license

-23-

CA17- 172

Case No.  1-15-62

plate that said "Number One Asshole."  Sonya previously testified that she put that

sign on Warrington's truck in jest, as Warrington was a practical joker.

{¶57} In his case-in-chief, Carter also called a fingerprint expert from BCI

who testified that none of the prints taken from Warrington's truck were consistent

with Carter's prints.  Finally, Carter called his daughter, Tarah, who testified that

Carter did not strike Sonya with a gun during the 2007 "stand-off" incident, contrary

to what Sonya had testified.  Tarah also testified that Warrington was not at Sonya's

residence every night; however, Tarah testified, contrary to Sonya, that Sonya

indicated she was waiting on Warrington to get a divorce, and that Warrington had

indicated to Sonya that it was imminent.  Finally, Tarah testified that the night before

the murder Sonya was "acting different," and that she was drunk, which Tarah had

never seen.

{¶58} On appeal, Carter contends that the evidence actually established that

Sonya was the more likely suspect or, at the very least, the evidence created

reasonable doubt as to whether Carter killed Warrington.  Despite Carter's

arguments, officers testified that Sonya was investigated and that she was ruled-out

as a suspect.  In addition, Sonya testified that she took the concealed-carry course

with a number of people at work who were doing the course but she never actually

purchased a gun.  The jurors were also able to see and hear Sonya's testimony, as

CA17-173

Case No.  1-15-62

well as any contrary testimony of her daughter Tarah, and evaluate their credibility for themselves.

{¶59} Notwithstanding Sonya, Carter ignores the overwhelming circumstantial evidence establishing him as the culprit of the Warrington murder, which was discussed previously.  After a thorough review of the record, the transcripts, and the exhibits presented we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice.  Therefore, we find that Carter's arguments are not well-taken and his third assignment of error is overruled.

### First Assignment of Error

{¶60} In Carter's first assignment of error, he argues that the trial court erred by failing to declare a mistrial after there was an altercation between Carter and one of the State's inmate-witnesses, which occurred in a holding cell during a recess on the seventh day of trial.  In addition, Carter argues that the trial court erred by permitting evidence of the altercation to be presented to the jury, claiming that it was improper under Evid.R. 403 and Evid.R. 404(B).

### Standard of Review

{¶61} The grant or denial of a motion for a mistrial rests within the sound discretion of the trial court.  *State v. Garner*, 74 Ohio St.3d 49, 59 (1995).  Thus the trial court's decision is to be given great deference.  *State v. Hines*, 3d Dist. Marion No. 9-15-13, 2005-Ohio-6696, ¶ 23.  Notably, mistrials are appropriate only when

-25-

CAM- 174

Case No.  1-15-62

the ends of justice so require and a fair trial is no longer possible.  *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).  Because the decision to grant or deny a motion for mistrial rests within the sound discretion of the court, we will apply an abuse of discretion standard in reviewing the issue.  An abuse of discretion constitutes a decision that is arbitrary, capricious, or grossly unsound.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶62} Similarly, as to the evidentiary issues raised by Carter, we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard.  *State v. Cassel*, 2d Dist. Montgomery No. 26708, 2016-Ohio-3479, ¶ 13, citing *State v. Graham,* 58 Ohio St.2d 350 (1979), and *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 19.

Relevant Rules of Evidence

{¶63} Carter contends that Evidence Rules 403 and 404(B) should have precluded presentation of the altercation between Carter and Upham at trial.  Evidence Rule 403(A) reads as follows.

> **(A)  Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.**

Evidence Rule 404(B) reads,

> **(B)  Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,**

-26-

CA17- 175

Case No.  1-15-62

**however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.**

The Altercation, the Mistrial Motion, and the
Introduction of Evidence of the Altercation

{¶64} On the seventh day of Carter's trial, Steven Upham, an inmate who had previously been incarcerated with Carter, was set to testify against Carter. Upham was the inmate who Carter had told that Carter killed a man while wearing camouflage and a paintball mask.

{¶65} Just prior to Upham testifying, Upham was placed in a holding cell. When the trial court took a brief afternoon recess, Carter was taken and placed in the same holding cell with Upham.[15] No one else was present in the holding cell at that time.  It is undisputed that neither Carter nor Upham said anything to the corrections officers questioning why they were placed in the same holding cell or alerting the officers to the situation.

{¶66} Upham was seated when Carter entered the holding cell.  According to Upham, who was surprised that they were placed in the same cell, Upham said to Carter, "How's your trial going?" (Trial Tr. at 1396).  Carter then responded by

---

[15] Just after the incident both parties stated that they believed the incident was entirely accidental. (Trial Tr. at 1362).

-27-

CA 17- 17(

Case No.  1-15-62

saying, "Why are you lying on me?" (*Id*. at 1397).  At that time, Upham stood up and Carter then approached and assaulted Upham by throwing a punch.  Next, Upham tried to put Carter in a headlock and Carter put his finger in Upham's eye. Carter also bit Upham's arm, leaving teeth marks.  After roughly forty seconds, officers responded and broke up the altercation.  The incident was recorded by surveillance video but there was no accompanying sound.  Upham had several abrasions from the altercation, which were photographed.

{¶67} Following the altercation, the trial court recessed the trial for the day. When court reconvened the following morning defense counsel moved to have evidence of the incident excluded contending that it was improper character evidence.  In the event that the evidence was not excluded, defense counsel argued that the trial court should declare a mistrial.  The State strongly opposed a mistrial and argued that the evidence should be admissible as showing a "consciousness of guilt."

{¶68} The trial court permitted both parties to make arguments in support of their positions.  Defense counsel argued that placing Carter and Upham in the holding cell together was a complete accident and that the incident itself was not created by Carter.  Defense counsel argued that evidence of the incident would be highly prejudicial and it would constitute improper "other acts" evidence under Evid.R. 404(B).  Further, defense counsel argued that if Upham was to testify

-28-

CA17- 177

Case No.  1-15-62

defense counsel would be seeking a mistrial due to visible marks that may be on Upham from the incident, which could further prejudice Carter.  Moreover, defense counsel was concerned that the jury may have heard about the incident because it had been covered in the newspaper.

{¶69} By contrast, the State argued that while Carter and Upham should not have been placed in the same holding cell together, the ultimate assault was an intentional act perpetrated by Carter and that he should not be granted a mistrial on the basis of his own actions in assaulting a State's witness.  As to the admissibility of the evidence, the State argued that Carter's actions reflected "consciousness of guilt" as Carter was aware of what Upham's testimony was likely to be, particularly since a number of Carter's witnesses were inmates seeking to discredit Upham.

{¶70} After allowing the parties to make their arguments, the court addressed both the motion for mistrial and the ability of the State to present evidence of the altercation.  The court began with Carter's motion for mistrial because, "obviously if I grant the mistrial then everything else is, I suppose, moot[.]"  (Trial Tr. at 1366).

{¶71} The trial court then analyzed the issue on the record, citing a number of cases to support its decision.  First, the trial court noted that a mistrial only needed to be declared when a fair trial was no longer possible and that a mistrial should not be ordered merely because some error or irregularity had intervened.  *State v. Franklin*, 62 Ohio St.3d 118, 127-128 (1991).  Then, the trial court cited the invited

-29-

CA17- 178

Case No.  1-15-62

error doctrine, wherein a party could not take advantage of an error that the party induced, and indicated that the invited error doctrine had been applied to motions for a mistrial where the defendant had been disruptive.  The trial court cited a number of cases to support its point.  *See State v. Greathouse*, 2d Dist. Montgomery No. 21536, 2007-Ohio-2136 (defendant's own disruptive actions in the courtroom could not be grounds for a mistrial); *State v. Chambers*, 10th Dist. No. 99AP-1308, 2000 WL 963890 *5 ("In the present case, appellant cannot participate in numerous, intentional, disruptive acts and then seek the protection of the court from his own misbehavior."); *State v. Gonzalez*, 4th Dist. Athens No. 97CA52, 1998 WL 823737 (invited error doctrine precluded defendant from taking advantage of any prejudice that resulted from his own disruptive behavior in courtroom); *State v. James*, 2d Dist. Clark No. 98-CA-54, 1999 WL 76815 *4 (defendant could not take advantage of his own outburst because it would "provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so.").

{¶72} After citing these cases, among others, for their overriding principles, the trial court came to the following conclusion regarding the motion for a mistrial.

> **Now, I agree with the defense characterization, and based upon all of the information that I have that's been presented that's on the record, it was an accident. It was an unfortunate accident that the defendant and the witness were put in the same holding room. But, what occurred thereafter I find was not an accident. It was intentional based upon the viewing of the video of that. I'm going to find that the defendant cannot participate in an intentional act.**

-30-

CAM- 179

Case No. 1-15-62

**So, I'm going to overrule the Motion for a Mistrial under the invited error doctrine.**

(Trial Tr. at 1368-69).

{¶73} Next, the trial court turned to whether evidence of the altercation could be presented at trial. The trial court determined that Evid.R. 404(B) was not implicated in situations where the act is related to the crime or has a connection to the offense. *See State v. Goehring*, 6th Dist. No. OT-06-023 2007-Ohio-5886, ¶ 15, quoting *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994) ("Evid.R. 404(B) allows the admission of 'other acts' evidence if it is 'related to and share[s] common features with the crime in question * * *.' "). To support its position, the trial court cited, *inter alia*, *State v. Williams*, 8th Dist. Cuyahoga No. 89461, 2008-Ohio-1948, which stated, "Evidence of threats or intimidation of witnesses reflect a consciousness of guilt and are admissible as admission by conduct." *Williams* at ¶ 29; *see also*, *State v. Soke*, 105 Ohio App.3d 226 (8th Dist.1996).

{¶74} Here, the trial court found that there was a connection to the offense because Upham was going to testify that Carter had confessed a murder to him and relayed some of the details. Then the court determined that,

> **[Evid.R.] 404(B) is not implicated. This is intrinsic evidence not wholly independent of the offenses and it is evidence of an admission by conduct reflecting a consciousness of guilt that tends logically to prove an element of the crimes charged. But, even if 404(B) were implicated, which I don't think it is, but if 404(B) would be implicated it would be admissible for other purposes other than to prove character or that the defendant acted in**

-31-

CA17-180

Case No.  1-15-62

**conformity with character, such as intent, knowledge, motive, and things that are listed in 404(B).**

(Trial Tr. at 1371).

{¶75} Thus the trial court permitted the State to introduce evidence of the incident at trial through the testimony of Upham.  Upham then testified regarding the incident, stating that Carter punched him and that Upham put Carter in a headlock in the hopes that guards would respond shortly.  In addition, the State introduced the surveillance video from the holding cell, which showed the altercation.  The State also introduced multiple pictures of Upham's injuries.

{¶76} After Upham testified, defense counsel again moved for a mistrial stating that Carter was now being charged with intimidation of a witness for Carter's actions during the altercation.   Additionally, defense counsel stated his understanding that there was an investigation being done as to how Carter and Upham had been placed in the same holding cell.  Defense counsel stated that he wanted that investigation to be included in the record.  The court ordered that investigation to be included in the record, and the reports that were produced were included as court exhibits separate from the trial.

{¶77} Those court exhibits were included in the record on appeal and they contained offense reports from various officers stating what happened from their perspective, including one that concluded, "[i]t was later discovered that there was a miscommunication between jail staff and court security which lead to Dep. Enyart

-32-

CA17- 181

Case No. 1-15-62

placing the two inmates together in the same holding cell by mistake." (Court's Ex. 4).

{¶78} After hearing defense counsel's argument renewing his motion for a mistrial, the trial court went on to state its own view of what led to the incident, beginning with the court's recollection of an in-chambers discussion of the logistics of having the prison witnesses in the same building as Carter.

> **My understanding was that they would be separated. I double-checked my entries. * * * It was the Court's understanding that that would have been generally understood. In our chamber conference there was a discussion about the prison inmates, specifically Mr. Upham, being kept in the probate holding room, which is separate from the regular holding room. I think it was in the nature of perhaps a mistake because Mr. Upham was dressed in stripes instead of in typical Department of Corrections garb that somehow there was a non-communication, or a miscommunication, to the booking officers who brought him up. So, it was an accident/mistake. I think I already mentioned that on the record. So, that's the court's take on that.**

(Trial Tr. at 1562-63).

{¶79} The court then overruled defense counsel's renewed motion for a mistrial. The court did indicate it would inquire into whether anyone on the jury had heard about the incident from the news, and the court did so. No one on the jury indicated having heard anything about the case outside of the courtroom. (*Id.* at 1374-75).

{¶80} In addition, the trial court did state that it would give a specific instruction to the jury that the incident could only be considered to show

-33-

Case No. 1-15-62

consciousness of guilt and not to show actions in conformity with character. The trial court did, in fact, give the jury such an instruction. It read,

> **Testimony has been admitted indicating that the defendant was involved in a physical altercation with a witness in the holding room. You are instructed that defendant's conduct alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find that the facts do not support that the defendant's conduct, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness or an awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.**

(Trial Tr. at 1844-45).

Carter's Arguments Related to the Motion for Mistrial on Appeal

{¶81} On appeal, Carter renews his argument that the trial court should have granted his motion for a mistrial. Carter contends that the cases cited by the trial court in making its decision to overrule the motion for a mistrial were distinguishable and that the situation in this case was not of Carter's making. Carter contends that court personnel created the situation, not Carter as the trial court determined. Carter contends that the cases cited by the trial court were all situations where the defendant was specifically disruptive without provocation, and most often in front of the jury.

-34-

CA17-183

Case No. 1-15-62

{¶82} In our review of the matter, we cannot condone the serious lapse that occurred by placing Carter in the same holding cell with Upham; however, we cannot find that the trial court abused its discretion in determining that the physical altercation itself was actually a direct result of Carter's own intentional action in assaulting Upham. As the trial court indicated, when Carter was paced in the holding cell he could have told the authorities that it was Upham in the cell or Carter could simply have chosen not to assault Upham when they were in the same cell. Instead, Carter chose to assault Upham, which was not an action by the State.

{¶83} Moreover, in the cases cited by the trial court, *James*, *Gonzalez*, *Greathouse*, and *Chambers*, *supra*, multiple Ohio Appellate Courts found that in situations where a defendant's actions led to his own motion for a mistrial, it was not an abuse of discretion for the trial court to overrule the defendant's motion for a mistrial, particularly under the invited error doctrine. While Carter contends that the cases cited by the court to overrule his motion for a mistrial were distinguishable, they do stand for the proposition that a defendant cannot take advantage of a situation that he created himself. It may be true that the altercation would not have been possible had Carter and Upham been kept separate as they were ordered to be, but Carter ignores that Upham never would have been struck had Carter simply ignored him upon entering the holding cell, or taken some action other than resorting to physical violence.

-35-

CAn- 184

Case No. 1-15-62

{¶84} In sum, while we wish to emphasize that Carter and Upham should never have been placed in the same holding cell, we cannot find that the trial court abused its discretion in declining to grant Carter a mistrial based on Carter's actions. Thus, Carter's argument is not well-taken.

### Admissibility of Evidence of the Altercation

{¶85} Carter next contends that even if it was not error for the trial court to overrule his motion for a mistrial, any evidence related to the altercation should not have been presented to the jury.  More specifically, Carter contends that his altercation with Upham in the holding cell in 2015 was not connected to the 2009 murder of Kenneth Warrington.

{¶86} In support of his position, Carter urges this Court to apply the dissent's rationale in a 4-3 decision by the Supreme Court of Ohio, *State v. Richey*, 64 Ohio St.3d 353, 1992-Ohio-44, *abrogated in part by State v. McGuire*, 80 Ohio St.3d 390, 1997-Ohio-335.  In *Richey* the Supreme Court of Ohio determined that threats made by Richey to the prosecutor were admissible evidence as "consciousness of guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses."[16]  *Richey* at 357.

{¶87} By contrast, the dissent in *Richey*, which Carter relies upon, stated that

**A person wrongly accused could easily take out his frustration and anger in this fashion.  In particular, Richey's anti-social and**

---

[16] *Richey* was reviewed under a plain error standard.

-36-

CA 17-185

Case No. 1-15-62

borderline personality traits might make the urge to lash out from a false accusation stronger. In any case, jailhouse threats are of a different order than flight from prosecution or a coverup as evidence of guilt.

The threats made by Richey are, pure and simple, acts separate and distinct from the one for which he was being tried. Proof of such threats can be admitted during the guilt phase only to show motive, opportunity, intent, plan, and so forth. (Evid.R. 404[B].) As the threats came after the events for which Richey was being tried, none of these factors can possibly be proved by evidence of later threats. Therefore the evidence is inadmissible for the guilt phase of trial, and it was error for the trial court to admit it.

*Richey* at 374-375.

{¶88} Carter contends that the rationale in the *Richey* dissent should be applied in this case. However, the cited portion is facially from the *Richey* dissent rather than the majority. Moreover, while a separate portion of *Richey* has been abrogated, the majority's ruling on consciousness of guilt has not been altered. *Richey's* underlying holding related to "consciousness of guilt" has, in fact, been cited even recently by multiple Ohio Appellate Courts. *State v. White*, 10th Dist. Franklin No.15AP-565, 2016-Ohio-1405; *State v. Tucker*, 10th Dist. Franklin Nos. 15AP-434, 15AP-435, 2016-Ohio-1033, ¶ 17; *State v. Culegrove*, 8th Dist. Cuyahoga No. 102173, 2015-Ohio-3476, ¶ 20, citing *State v. Soke*, 105 Ohio App.3d 226, 250 (8th Dist.1995) ("Intimidation of a witness is not independent of the charged offense; it is an indicator of guilt."). This court has also used similar reasoning to *Richey* recently, although we did not directly cite *Richey*. *State v.*

-37-

CA17-186

Case No. 1-15-62

*Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ("Moreover, '[u]nder Ohio law, 'evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct.' ").

{¶89} Carter thus urges this Court to essentially disavow a majority decision from the Supreme Court of Ohio and ignore decisions from various districts, including a prior opinion from this Court, indicating that threats against a witness can be used to show consciousness of guilt. Until this Court is given guidance otherwise from the Supreme Court of Ohio, we are bound to follow the majority opinion in *Richey*, and we are persuaded by the precedent of this Court and the other appellate courts. In these circumstances, we cannot find that the trial court abused its discretion in finding that Carter's actions could be reflective of a consciousness of guilt and thus were admissible at trial.

{¶90} Although Carter next contends that evidence of the altercation would not be admissible under Evid.R. 404(B) if it was not admissible as "consciousness of guilt," we need not address this issue having found that it was not an abuse of discretion for the trial court to find that the evidence was admissible as consciousness of guilt. However, Carter does contend that even if this Court did find that the evidence was somehow relevant and admissible, its probative value was still substantially outweighed by the danger of unfair prejudice and it should have been excluded under Evid.R. 403.

-38-

CAr~ 187

Case No. 1-15-62

{¶91} After reviewing the record and the arguments, we cannot find Carter's argument well-taken. Undoubtedly there is some inherent prejudice in evidence being used against Carter but there is probative value in the altercation as well. We cannot find that the trial court abused its discretion in determining that the probative value was not substantially outweighed by the danger of unfair prejudice, particularly given the deference accorded to trial courts in evidentiary matters. Therefore, Carter's first assignment of error is overruled.

### Second Assignment of Error

{¶92} In Carter's second assignment of error, he argues that the trial court erred by failing to grant a mistrial based upon what he claims are discovery violations committed by the State. Carter argues that the State failed to disclose information that was testified to by its ballistic expert and that Carter was prejudiced by it. Carter also argues that the State failed to disclose a demonstrative picture of a Mac-10 style firearm to the defense.

Standard of Review

{¶93} As stated previously, the decision to grant a mistrial is within the sound discretion of the trial court. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92. Regarding the alleged discovery violations, we will also review the trial court's decision under an abuse of discretion standard. *See State v. Opp*, 3d Dist. Seneca No. 13-13-33 2014-Ohio-1138, ¶¶ 7-15.

-39-

CA17- 188

Case No.  1-15-62

### Criminal Rule 16(K)

{¶94} In this assignment of error, Carter contends that the State violated Crim.R. 16(K), which reads,

> **(K)  Expert Witnesses; Reports. An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.**

### The Alleged Discovery Violation, Mistrial Motion, and Ruling by the Trial Court

{¶95} On the sixth day of Carter's trial, the State called Kevin Kramer, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation to testify.  Kramer was qualified as an expert in "forensic firearm ballistic bullet and casing analysis" with no objection by the defense.

{¶96} Kramer then testified that he "re-worked" or re-analyzed the ballistic evidence in this case.  The ballistic evidence had been analyzed twice previously. The first person to analyze the ballistic evidence for the State, Todd Wharton, had taken a new job in Florida and the second person to analyze the evidence, Heather Williams, was on a leave of absence due to a medical issue so Kramer was asked to analyze the evidence and testify at trial.  Kramer testified that he did not review the

-40-

CA17-189

Case No. 1-15-62

prior reports before doing his own analysis and that he actually did not even have access to notes or findings from the prior testing until he got his own results.

{¶97} Kramer testified that as a result of his examination he determined that the casings found at the scene of the Warrington murder were fired from the same firearm and that they were 9mm Luger cartridges. In addition, Kramer testified that the box of Winchester ammo—which had been located in Carter's residence—contained bullets consistent with the bullets presented by the State for him to test, although they were relatively common bullets. However, Kramer concluded that the bullets at the scene of the murder were not fired by the weapons submitted to him that were found during the search of Carter's residence.

{¶98} Kramer's report reflected his findings and was entered into evidence. It read, in pertinent part, "Examination of the three (3) fired bullets * * * revealed they are consistent with 9mm Luger full metal jacketed bullets fired from a conventional rifled barrel having (6) lands and six (6) grooves, right-hand twist." (State's Ex. 138). Kramer's findings were consistent with the findings of the two prior analysts.

{¶99} After testifying to his analysis, Kramer was asked whether he was familiar with a firearm referred to as a Mac-10 and he answered in the affirmative. As Kramer was being shown a demonstrative exhibit of a generic picture of a Mac-10 style firearm, defense counsel asked to approach the bench. Defense Counsel

CA17-190

Case No.  1-15-62

objected to the photo and the questioning, stating that the picture was not provided in discovery and that he was not prepared to cross-examine Kramer relative to a Mac-10 because there was nothing in Kramer's report regarding a Mac-10.

{¶100} The State argued that it had already shown the demonstrative picture of a Mac-10 style firearm to Carlotta Williams, who previously testified in the trial, that defense counsel did not object at that time, and that Kramer was an expert in firearms and could therefore testify regarding his familiarity with a Mac-10.  The State also argued that the defense was put on notice of possible inquiry into a Mac-10 due to the statements of Joey Moore.  Carter had made statements that were overheard by Moore, including that when the police searched Carter's residence the police did not find a disassembled Mac-10.  Ultimately the trial court overruled defense counsel's objection and allowed the State to ask questions regarding a Mac-10.

{¶101} The questioning of Kramer then resumed.  Kramer testified that the demonstrative picture produced by the State in Exhibit 139 was "consistent in style and appearance with what's been described as a Mac-10 style of firearm."  (Trial Tr. at 1176).  Next, Kramer described a Mac-10's appearance and how it operated. Kramer was then asked if back in 2009 there was any kind of Mac-10 that could have fired the bullets found at the scene of the Warrington murder.  Kramer stated that given the specific "groove" characteristics in the bullets, after reviewing Todd

-42-

CA17-191

Case No.  1-15-62

Wharton's report and notes and Heather Williams's report and notes there was a Mac-10 style weapon on the list of possible candidate firearms that could have fired the bullets.  Defense counsel objected to portions of this testimony.

{¶102} Before the defense cross-examined Kramer, defense counsel asked to break for the evening given what he termed the "surprise of the disclosure." Defense counsel argued that tying the rifling specifics on the bullets at the scene of the murder to the Mac-10 was a new issue to him and it was not disclosed in Kramer's report.  The trial court then excused the jury for the night and at that time defense counsel moved for a mistrial, contending that Kramer's testimony went beyond the scope of his report.

{¶103} At that time defense counsel acknowledged that he had received Kramer's report and the reports from the prior analysts.  However, defense counsel stated that he had never seen any list from any expert tying a Mac-10 style firearm to the bullets from the Warrington Murder scene.  But, defense counsel did acknowledge that he was aware of Joey Moore's statement regarding a Mac-10.

{¶104} Defense counsel then contended that he could not properly cross-examine Kramer based on the new information.  He indicated that he would need to get his own expert.  The State, by contrast, indicated that the previous analysts' reports and the discussions regarding rifling grooves on the bullets should have put

-43-

Case No.  1-15-62

defense counsel on notice, particularly when combined with Joey Moore's statement.

{¶105} The trial court inquired as to whether the defense had the candidate list of the firearms that BCI stated were possibly consistent with the rifling characteristics on the bullets, and defense counsel stated he did not.  The State was then ordered to give the candidate list to the defense at that time.  Court then recessed for the evening, and reconvened the following morning.

{¶106} On the morning of the seventh day of Carter's trial, defense counsel filed a written motion for a mistrial.  The trial court heard arguments from both parties on the matter.  Defense counsel again contended that the State had violated Crim.R. 16 by not disclosing the possible firearm candidate list, which contained over 130 firearms that could have fired the 9mm Luger rounds and created similar "lands and grooves" on the bullets that were found at the scene of the Warrington murder.

{¶107} Defense counsel also stated that he had contacted an expert who defense counsel thought could contradict the State's evidence, or at least indicate that the State's candidate list was overly broad and that the potential expert could possibly exclude the Mac-10 as a candidate.  Defense counsel argued that he was prejudiced by the State's non-disclosure of the firearm candidate list.

CA 17- 193

Case No.  1-15-62

{¶108} By contrast, the State argued that the defense was not unfairly surprised as the firearm candidate list was more akin to notes used in generating an expert report and thus was not required to be given under Crim.R. 16(D).  The State maintained that the candidate list was simply a large list of possible firearms that could match the lands and grooves on the fired bullets, leading to Todd Wharton's stated conclusion that he could not match the bullets at the scene to a single specific firearm.  Todd Wharton's report, which the trial court included as a court exhibit, contained the following language.

> **Examination of the evidence bullets * * * revealed that they are 9mm Luger caliber, full metal jacketed design, and fired from a barrel with conventional rifling consisting of six (6) lands and six (6) grooves, right-hand twist.  Microscopic comparisons of the three (3) evidence bullets to each other revealed matching individual barrel engraved striations, confirming that the evidence bullets were fired from the same firearm.  Further microscopic comparison of the evidence bullets to test fires from the Glock pistol, submitted as item #1, revealed dissimilar general rifling class characteristics (polygonal rifling versus conventional rifling).  These findings confirm that the evidence bullets were not fired by the submitted pistol.**
>
> **The rifling specifications on the evidence bullets correspond to numerous brands of 9mm Luger caliber semi-automatic firearms.**
>
> **\* \* \***
>
> **Digital images of the individual characteristics present on the evidence cartridge case, submitted as item #4, have been entered into Ohio's computerized firearms identification system ("NIBIN/IBIS") and compared with images of all similar specimens currently on file.  No identification was made at this time; however, the images will remain in the system and will be**

-45-

CA17-194

Case No.  1-15-62

**routinely compared with all future images entered by any of the laboratories in the Ohio network.**

(Court Exhibit 1-M).

{¶109} The State argued that the analysts' reports contained the conclusions that were required to be turned over under Crim.R. 16 and that defense counsel was on notice and could have examined any of the experts related to what possible weapons matched the rifling characteristics on the bullets, particularly given that Wharton and Kramer's reports contained those rifling characteristics.

{¶110} Separately, the State argued that the demonstrative picture of a Mac-10 style firearm was listed as a potential exhibit to be presented at trial in the State's exhibit list, which was given to defense counsel just prior to trial.  Specifically, the exhibit list indicates "Mac-10 Photo" with Kramer and C. Williams as the witnesses who would identify the exhibit.  (Court's Ex. 1-M).

{¶111} After hearing the parties' arguments, the trial court proceeded to rule on the matter.  The trial court indicated that it had reviewed the memorandum supporting defense counsel's motion for a mistrial, that it had reviewed what had been disclosed in discovery and what had not been disclosed, and that it had reviewed relevant case authority.

{¶112} The trial court then conducted its analysis on the record, stating that defense counsel did have Joey Moore's statement regarding the Mac-10, that it did have Todd Wharton's report indicating that there was a list of possible candidate

CAN- AS

Case No. 1-15-62

firearms but none of them could be specifically identified as the weapon used in the

murder, and that defense counsel had information that other firearms could have

fired the bullets.  What defense counsel did not have, was the actual list of candidate

firearms (Defense Exhibit HH), which contained 131 possible matching firearms

made by dozens of manufacturers.

{¶113} The court then made the following ruling.

> But, I find it's not necessarily a discovery violation not giving the
> defense exhibit 'HH' until yesterday because Mr. Wharton's
> report indicates that there was a list of guns that could have fired
> the casings that were tested.  The defendant knew of Mr.
> Wharton's report.  The defendant's counsel knew that Moore had
> said that the defendant had an unassembled Mac-10 at his house.
> Therefore, since the defendant had Wharton's report and knew
> that there was evidence that the casings could have been fired
> from any number of guns, including a Mac-10, I find that failure
> to provide the full exhaustive hundred and thirty-one list is not a
> willful discovery violation.  It's more in the nature of notes or data
> that supports the conclusion in Wharton's report.

> Did the defendant have prior discovery that the State would
> show a picture of the Mac-10?  Apparently at the very earliest
> would be on the day the trial started when the list of exhibits was
> provided.  I find that the picture is demonstrative or illustrative
> of what Moore said that the defendant told him, or that he heard
> the defendant say.  Demonstrative evidence is admissible if it
> satisfies the general standard of relevance set forth in Evidence
> Rule 401, if it is substantially similar to an object that it is
> intended to represent.

(Trial Tr. at 1242-43).

{¶114} In sum, the trial court stated,

-47-

CAM- 194

Case No.  1-15-62

> **The defense had access to all B.C.I. reports.  The defense had access to all the witnesses.  If there is a violation I think the only violation here would be not giving the actual picture of the Mac-10, the purported Mac-10, State's Exhibit '139'.  So with that in mind, finding that there has not been any other discovery violation, I'm going to exercise discretion.**

(*Id.* at 1243).

{¶115} The court thus found that there was no willful violation of the discovery rules by the State in this instance.  Therefore, the court determined that the severe sanction of a mistrial was not appropriate.  The court indicated that it had given defense counsel the evening to prepare for cross-examination of Kramer and that defense counsel had demonstrated that he was prepared to do so through his argument to the court in support of his motion for a mistrial.  However, the court stated that if defense counsel needed a continuance when the trial reached the defense's case-in-chief to present an expert, the court would take that under advisement at that time.  In addition, the court noted that it would give an instruction that the photograph of the Mac-10 style-weapon was merely a demonstrative exhibit.[17]

{¶116} Following the hearing on the mistrial, trial resumed and defense counsel cross-examined Kramer.  On cross-examination Kramer indicated that an actual "Mac-10" was not on the candidate firearm list, but two manufacturers made

---

[17] The trial court did give a generic instruction regarding demonstrative exhibits.

Case No. 1-15-62

a firearm similar to the Mac-10, and they were on the candidate list. Kramer also acknowledged that over 130 different 9mm firearms could have fired the bullets that were located at the Warrington murder and if Kramer was shown a demonstrative photograph of each and every one of them he would agree that they were all consistent with the rifling pattern of the bullets from the scene of the Warrington murder.

### Carter's Argument on Appeal and Analysis

{¶117} Carter now renews his argument on appeal that the trial court should have granted his motion for a mistrial and that the State committed discovery violations. Carter argues that Crim.R. 16(K) requires an expert to produce a report summarizing his testimony and he contends that Kramer's report only summarized part of his testimony. In addition, Carter argues that there is actually little validity to the science behind Kramer's testimony. Carter argues that various publications have questioned the validity of comparing a bullet collected at a crime scene to a fired bullet in a lab and that such an analysis does not reach the level of rigor to be considered scientifically viable. Finally, Carter argues that defense counsel had indicated he had been in contact with an expert who had said that he would undermine the State's ballistic evidence had defense counsel been aware of the Mac-10 information.

-49-

CA17-198

Case No. 1-15-62

{¶118} In our own review of the trial court's decision on this matter, we would begin by noting that the trial court was very thorough in addressing these issues. The trial court also prepared a thorough record, having the referenced ballistic expert reports and the "candidate list" included in the record as court exhibits separate from the trial, many of which may not have otherwise been included. In addition, the trial court also held lengthy arguments on these issues and clearly considered the record and some relevant caselaw.

{¶119} Dealing first with the purported discovery violations, we cannot find that the trial court abused its discretion. Defense counsel was in possession of Joey Moore's statement regarding a Mac-10 and defense counsel also did have the reports from the analysts indicating that a number of potential firearms could cause similar groove patterns on the bullets in this case. A Mac-10 style weapon was one of over 130 of those firearms and Kramer, the expert, could only say that the Mac-10 style was one of many possible candidates. Defense counsel thus did receive a summary of the experts' findings and was clearly aware that a Mac-10 style firearm was a weapon that Carter was alleged to be in possession of. Moreover, defense counsel was able to effectively cross-examine Kramer on the issue given the extra night to prepare.

{¶120} As to the demonstrative photograph of a Mac-10 style firearm, defense counsel was provided with an exhibit list indicating that the photograph

-50-

CA17- 199

Case No.  1-15-62

would be used.  While the State should still have provided the defense with the actual photograph, defense counsel did have the ability to ask for it.  Similarly defense counsel did not object to the use of the demonstrative photo with a prior witness and was aware of it at that time, prior to Kramer's testimony.  Again, defense counsel was also aware of the possibility of reference to a Mac-10 given that Joey Moore was set to be a witness at trial.

{¶121} Given the trial court's familiarity with the case and its analysis of the issue, we cannot find that the trial court abused its discretion in finding that there was no discovery violation, or that if there was it was not serious enough to warrant a mistrial.  Mistrials are to be granted only in exceptional circumstances, and we cannot find given the specific facts before us that the trial court abused its discretion in declining to grant Carter's motion for a mistrial, even if there were some discovery irregularities.  Therefore, Carter's second assignment of error is overruled.

### Fourth Assignment of Error

{¶122} In Carter's fourth assignment of error, he argues that the prosecutor committed misconduct during closing arguments.  Specifically, Carter argues that the prosecutor misstated evidence and that the State attempted to shift the burden of proof to the defense.  In addition, Carter argues that the cumulative discovery violations constituted prosecutorial misconduct.

-51-

CA17. 200

Case No.  1-15-62

### Standard of Review

{¶123} Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. Seneca No. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986). "In making this determination, an appellate court should consider several factors:  (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

{¶124} Furthermore, as to prosecutorial misconduct allegations related to closing arguments, "[p]arties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be drawn from the evidence.' " *State v. Wolff*, 7th Dist. Mahoning No. 07MA166, 2009-Ohio-7085, at ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-

CA 17- 201

Case No. 1-15-62

6266, at ¶ 213.  A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn.  *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 116.

Alleged Improper Statements in Closing Arguments

{¶125} Carter first argues that during its rebuttal closing argument the State made an improper statement related to the expert testimony of Matthew Congleton, who had performed the GSR testing in this case.  Carter claims that the following statement during the prosecutor's rebuttal closing argument was improper.

> **Now, there was not gunshot residue found on that car.  True.  But, Mr. Congleton told you that gunshot residue does not stick to smooth surfaces.  If there was any on Mr. Carter's bare hands and then transferred to that door handle it probably wouldn't stick to that door handle.  If it did, it may have blown away in the wind as Mr. Carter drove.**

> **[DEFENSE COUNSEL]: Objection.  That was not the expert's testimony.**

> **THE COURT: Well, the jury can remember what the testimony was.  This is argument.  It's not evidence.**

(Trial Tr. at 1812).

{¶126} Carter contends that a "fair review" of Congleton's testimony shows that Congleton did not make any statements as to GSR blowing away as Carter drove away.  Contrary to Carter's argument, a "fair review" of the prosecutor's statement indicates that the prosecutor was suggesting something that "may" have happened.  The prosecutor was not indicating that the GSR expert actually did testify that the

-53-

CA17- 202

Case No.  1-15-62

GSR likely blew off of the vehicle.  Rather the prosecutor was making an inference based on Congleton's testimony.  Congleton actually did testify that "[a] smoother object obviously would have less adhesion power—it would give the particles less stick-to-itiveness than a rougher surface."  (Trial Tr. at 1135).  Congleton also testified that, "[g]enerally speaking * * * [t]he more an object or person moves, or it rubs up against something or themselves, the more likely you will have gunshot residue shed and continue to be shed from whatever surface it might be."  (*Id.* at 1136).  Thus the prosecutor's statement is a fair inference made from the evidence.

{¶127} Finally, even if the statement was somehow error, which we do not find that it is, the jury was clearly instructed that closing arguments were not evidence and we presume the jury followed that instruction.  Thus Carter's argument on this issue is not well-taken.

{¶128} Carter next argues that the following statement made during the State's rebuttal closing argument was improper.

> **[PROSECUTOR]:  [Defense Counsel] also said, "Well, maybe that gunshot residue got on those clothes," not one article, and not two articles, but three articles of clothing collected from the defendant's house, "got on those clothes at the Police station." Maybe.  Maybe.  Okay, now we have two possibilities.  I would submit to you that the more possibilities we have the more likely it is that each one of them is a mere possibility.  Okay?  Well, maybe.  Maybe.  Maybe just isn't good enough.  Maybe doesn't get you to reasonable doubt.  The jury instructions tell you that.**

-54-

<CA17-203

Case No. 1-15-62

> **[DEFENSE COUNSEL]: Objection, Your Honor. He's reversing the burden of proof. Maybe doesn't get you reasonable doubt is reversing the burden of proof in this case.**
>
> **[PROSECUTOR]: I'm speaking directly to the jury instructions that talks specifically about mere possible doubt.**
>
> **[THE COURT]: Okay. The Statement you just made I'll sustain and tell the jury to disregard. But, continue.**
>
> **[PROSECUTOR]: Okay.**
>
> **THE COURT: The State has the burden of proof.**

(Trial Tr. at 1808-1809).

{¶129} Here, clearly the trial court *sustained* an objection and the jury was instructed to disregard. We must presume that the jury followed the court's instructions, particularly given that shortly thereafter the jury was specifically instructed on reasonable doubt as follows.

> **Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not a mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.**
>
> **If, after a full and impartial consideration of all of the evidence, you are firmly convinced of the truth of the charge the State has proved its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge you must find the defendant not guilty.**

-55-

<A17- 204

Case No.  1-15-62

(Trial Tr. at 1830-31).

{¶130} Given that the trial court sustained the objection to the prosecutor's statement, that the trial court gave thorough instructions related to reasonable doubt, and given our presumption that the jury followed the trial court's instructions, we can find no error here, let alone prejudicial error.

{¶131} Next, Carter argues that the prosecutor committed error in making the following statement in rebuttal closing argument.

> **Also with respect to Sonya [Defense Counsel] brings up the idea that she was with a lot of other men.  Well, we know of one other than Mr. Warrington and that would be Arguello Harris.  Okay? I don't know that there was any evidence of a lot of other men. But, again, even assuming there were other men, is it just a mere possibility that some other man did this?  Because a mere possibility does not rise to a level of reasonable doubt.**

> **[DEFENSE COUNSEL]:  Objection, your Honor. It's shifting the burden.**

> **THE COURT:  The Court will remind the jurors, and I'll tell you in the instructions, it's the State's burden to prove.**

(Trial Tr. at 1817).

{¶132} Here, the state's indication that a mere possibility does not rise to the level of reasonable doubt is straight out of the jury instructions.  Again the court also provided specific instructions related to reasonable doubt.  We can find no error here, let alone prejudicial error.

-56-

CA17- 205

Case No. 1-15-62

{¶133} Next, Carter argues that the following statement of the prosecutor during rebuttal closing argument was error.

> **Now, Carlotta. [Defense Counsel] said something with respect to Carlotta and this is very important. He said – [Defense Counsel] suggested that Mr. Carter was not trying to set up an alibi because he was guilty, but because maybe he was innocent and the alibi was true.**

> **[DEFENSE COUNSEL]: Objection. That's not what I said.**

> **THE COURT: It's just argument. The jury will decide what the evidence is. Overruled.**

(Trial Tr. at 1826).

{¶134} It appears that the prosecutor's statement in rebuttal closing argument was in reference to the following portion of defense counsel's closing argument.

> **Carlotta, when asked by the Prosecutor, said this whole thing about this alibi stuff. It wasn't meant by Markelus because he was guilty and he was trying to create a falsehood to get out of it. Markelus Carter feels, and felt, like the system wasn't going to give him a fair shake and he needed extra help to do it.**

(Trial Tr. at 1803).

{¶135} While the prosecutor's characterization of what defense counsel said in rebuttal closing argument was not entirely accurate, we cannot find that it was an unfair characterization of the evidence or that it in any way prejudiced the outcome of the trial or rose to the level of prosecutorial misconduct. Thus Carter's arguments related to statements made during the prosecutor's rebuttal closing statements are not well-taken.

-57-

CAN- 206

Case No. 1-15-62

{¶136} Finally, Carter argues summarily in two sentences in his brief that the State's discovery violations and improper arguments cumulatively constitute reversible error. We found no error in closing arguments and although there were discovery irregularities in this case, we cannot find that anything here rose to the level of prosecutorial misconduct. Thus there is no basis for cumulative error. Therefore, Carter's fourth assignment of error is overruled.

### Fifth Assignment of Error

{¶137} In Carter's fifth assignment of error, he argues that he received ineffective assistance of counsel. Specifically, he contends that defense counsel poorly handled the government firearms expert, Kramer, and that defense counsel failed to adequately investigate the possibility of a Mac-10 style weapon being involved in this case.

### Standard of Review

{¶138} To establish his claims on appeal, Carter must show that trial counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley,* 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same

-58-

CA17. 207

Case No. 1-15-62

order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Purported Ineffective Assistance and Analysis

{¶139} Carter contends that if the State is to be believed that defense counsel should have been on notice from discovery that a Mac-10 style firearm would be painted as the alleged murder weapon, then defense counsel was ineffective for failing to adequately investigate the matter. In addition, Carter contends that defense counsel failed to call an expert related to ballistics despite indicating on the record that he had been in contact with one.

{¶140} Contrary to Carter's arguments, there is no evidence in the record that his trial counsel could have called a witness to dispute Kramer's testimony. Multiple days before Carter presented his case-in-chief, the trial court addressed Carter's motion for a mistrial related to discovery matters, which was discussed in the second assignment of error. As defense counsel argued for a mistrial, he indicated that he had been in contact with an expert and the expert would look into the matter and the expert gave some brief opinions on the matter over the phone, but it did not appear that the expert had actually reviewed the ballistic evidence yet based on Carter's counsel's representations. Although it overruled Carter's motion for a mistrial, the trial court indicated that it would consider granting Carter a continuance when the trial reached his case-in-chief if Carter needed to bring in an

-59-

CA17-208

Case No. 1-15-62

expert, but defense counsel never requested such a continuance. In fact, defense counsel did not suggest at any point later in the trial that he had received further word from the expert and would like to call the expert to testify.

{¶141} On appeal, Carter would have us find, without any facts to support it, that his counsel was ineffective for failing to investigate, request a continuance, or call an expert when there is no indication that a ballistic expert would actually have been able to meaningfully contradict testimony by the State. It is equally likely, though equally uncertain, that the expert reviewed the evidence and could not provide any exculpatory testimony. Carter would have this Court engage in pure speculation that some expert existed who would have provided exculpatory testimony related to ballistics that would somehow overcome the mountain of other circumstantial evidence against him.

{¶142} Moreover, even if Carter could produce evidence disputing the State's expert that a Mac-10 style firearm was one of over 130 firearms that could match the groove patterns on the bullets found at the Warrington murder scene, such testimony would only call into question the type of firearm used in the murder, not the murder itself. Thus we cannot find any prejudicial error here.

{¶143} This is particularly true given that Carter's trial counsel was able to effectively cross-examine the State's expert and have him admit that the bullet grooves matched with over 130 weapons, giving little weight to his assertion that

-60-

CA17-209

Case No.  1-15-62

the Mac-10 style weapon was one of many possible firearms.  For these reasons, Carter's fifth assignment of error is overruled.

### Conclusion

{¶144} For the foregoing reasons Carter's assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

/jlr

CA 17- 210

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**ALLEN COUNTY**

FILED
COURT OF APPEALS
2017 APR -3  AM 11: 45
MARGIE MURPHY MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

**STATE OF OHIO,**

     **PLAINTIFF-APPELLEE,**         **CASE NO. 1-15-62**

     **v.**

**MARKELUS Q. CARTER,**         **J U D G M E N T**
                                    **E N T R Y**

     **DEFENDANT-APPELLANT.**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27, and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

_____
JUDGE

_____
JUDGE

_____
JUDGE

**DATED:**  April 3, 2017

33 Srs.

CA 17-149

Supreme Court of Ohio Clerk of Court - Filed May 18, 2017 - Case No. 2017-0667

# IN THE SUPREME COURT OF OHIO

| | |
|---|---|
| STATE OF OHIO<br>      Plaintiff/Appellee | ON APPEAL FROM THE COURT<br>OF APPEALS FOR ALLEN COUNTY<br>OHIO, THIRD APPELLATE |
| -vs- | DISTRICT OF OHIO |
| MARKELUS Q. CARTER<br>      Defendant/Appellant | COURT OF APPEALS CASE<br>01-15-62 |

—

## NOTICE OF APPEAL ON AN APPEAL AS OF RIGHT
## BY
## MARKELUS Q. CARTER

—

F. Stephen Chamberlain (0039815)
Attorney at Law
212 North Elizabeth St., 3d Fl.
PO Box 1314
Lima, OH  45802-1314
419-235-5125
866-596-1146        FAX
chamberlainlaw@me.com

*Attorney for Markelus Q. Carter*
*Appellant*

Anthony Miller (0072301) and
Terry Kohlresier (003982)
Asst. Allen County Prosecutors
204 N. Main Street
Lima, OH  45801
419-222-2462
419-227-1072 FAX
@allencountyohio.com

*Attorney for the State of Ohio*
*Appellee*



EXHIBIT
16

## NOTICE OF APPEAL

Now comes Markelus Q. Carter and hereby gives notice of appeal to the Supreme Court of Ohio from the judgment of the Allen County Court of Appeal, Third Appellate District entered on April 3, 2017.

This is an appeal of a felony conviction, raises substantial constitutional questions and is one of public or great general interest.

Respectfully submitted,

/s/ F. Stephen Chamberlain

F. Stephen Chamberlain (0039815)
Attorney for Appellant

## PROOF OF SERVICE

I certify that a copy of the foregoing was served upon Counsel for the State of Ohio, Anthony Miller at Tmiller@allencountyohio.com and Terri Kohlrieser at tkohlrieser@allencountyohio.com by electronic means on May 15, 2017 by electronic means.

/s/ F. Stephen Chamberlain

F. Stephen Chamberlain (0039815)
Attorney for Appellant

Supreme Court of Ohio Clerk of Court - Filed May 18, 2017 - Case No. 2017-0667

# IN THE SUPREME COURT OF OHIO

STATE OF OHIO
　　　Plaintiff/Appellee

-vs-

MARKELUS Q. CARTER
　　　Defendant/Appellant

ON APPEAL FROM THE COURT
OF APPEALS FOR ALLEN COUNTY
OHIO, THIRD APPELLATE
DISTRICT OF OHIO

COURT OF APPEALS CASE
01-15-62

---

## MEMORANDUM IN SUPPORT OF JURISDICTION

---

F. Stephen Chamberlain (0039815)
Attorney at Law
212 North Elizabeth St., 3d Fl.
PO Box 1314
Lima, OH  45802-1314
419-235-5125
866-596-1146　　　FAX
chamberlainlaw@me.com

*Attorney for Markelus Q. Carter*
*Appellant*

Anthony Miller (0072301) and
Terry Kohlresier (003982)
Asst. Allen County Prosecutors
204 N. Main Street
Lima, OH  45801
419-222-2462
419-227-1072 FAX
@allencountyohio.com

*Attorney for the State of Ohio*
*Appellee*

Memorandum In Support Of Jurisdiction

Page 1 of 11



<u>TABLE OF CONTENTS</u>

EXPLANATION OF WHY THIS CASE IS A CASE OF
PUBLIC OR GREAT GENERAL INTEREST AND
INVOLVES A SUBSTANTIAL CONSTITUTIONAL
QUESTION..............................................................................3

STATEMENT OF THE CASE AND FACTS................................................3

ARGUMENT IN SUPPORT OF PROPOSITIONS OF LAW...........................5

Proposition of Law:  Evidence of a physical attack by a criminal defendant upon a Government witness outside of the presence of a jury in the midst of a criminal trial should not be admitted in a criminal trial as intrinsic evidence or for purpose of demonstrating "consciousness of guilt" unless and until the trial court conducts a full and searching analysis of the unfair prejudice that such evidence presents. This violates a criminal defendant's statutory and Constitutional Rights under the Sixth and Fourteenth amendments to the United States Constitution and Article 1, Section 10 Of The Ohio Constitution.

CONCLUSION...............................................................................10

PROOF OF SERVICE......................................................................10

Memorandum In Support Of Jurisdiction

## EXPLANATION OF WHY THIS CASE IS A CASE OF PUBLIC OR GREAT GENERAL INTEREST AND INVOLVES A SUBSTANTIAL CONSTITUTIONAL QUESTION

This case presents to the Court with a clear case of overreach and abuse of actions of a criminal defendant that are unconnected to the crime alleged used to appeal to emotions of a jury and essentially winning a conviction on facts that tend to show matters that are disconnected to the crime at bar.

## STATEMENT OF THE CASE

### Procedural History

On April 17, 2014, the Allen County, Ohio Grand Jury returned a two count indictment that charged Markelus Q. Carter with one count of Aggravated Murder with a firearm specification in violation of Ohio Revised Code Section 2903.01(A) and one count of Having a Weapon While under a Disability in violation of Ohio Revised Code Section 2923.13(A)(3).

Mr. Carter entered pleas of not guilty and the matter proceeded through several months of pre-trial proceedings including discovery and several motions to suppress.

The case was concluded by a Jury Trial. After the presentation of evidence and instructions to the Jury, the Jury returned verdicts of guilty on both counts and the specification of the indictment. A sentencing hearing was held where Mr. Carter was sentenced to Life in prison without the possibility of parole. A three-year mandatory firearm specification sentences was ordered served consecutive to the life sentence. The court also ordered a 36 month sentence for the Weapons under disability charge to run concurrently with the Life sentence for murder.

A timely direct appeal was had and the Third District Court of Appeal affirmed the conviction and sentence of Mr. Carter on April 3, 2017. This timely appeal as of right follows.

### Statement of the Facts

Kenneth Warrington was the victim of a homicide by gunshot on February 23, 2009 in front of the home of his paramour, Sonya Burkholder nka Hughes. Ms. Hughes had also been the courtesan of the Defendant here, Markelus Carter.

The State of Ohio had no murder weapon, no eyewitness testimony and no confession. The case was based upon circumstantial evidence. A tent pole of the State of Ohio's case was testimony of two jail house informants. One of those informants was Steven Upham.

On 7th day of the trial, the Government intended to call Mr. Upham, an inmate at the Allen/Oakwood Correctional Institution.  Mr. Upham's testimony would be that he had been an inmate in the same cell block with Mr. Carter and overheard him saying that he had shot a man who had been having an affair with Ms. Burkholder.  The plan was to have Mr. Upham testify after a brief recess.

During the recess of the trial, Mr. Carter was taken from the Courtroom and placed into a holding cell in a secure area of the Courthouse.  Mr. Upham was already in the holding cell when Mr. Carter was placed in the cell by courtroom deputies.  Once inside the holding cell, Mr. Carter and Mr. Upham exchanged words words briefly.  Upham said to Carter, "How's your trial going?" (Trial Tr. at 1396). Carter then responded by

Mr. Upham said to Carter, "How's your trial going?" Carter then responded by saying "Why are you lying on me?".  Then, Mr. Carter and Mr. Upham engaged in a short fist fight.  Correctional Staff rushed into the holding cell and separated Mr. Carter and Mr. Upham.  The altercation was captured by surveillance cameras.  The disturbance was made known to the Court and Counsel.  It was determined that the Court would recess for the day, so the Jury was excused.  The State of Ohio gave verbal notice that it intended to introduce the video of the altercation as evidence in their case in chief.  After argument, the Court allowed the video of the altercation to be played for the jury.

## ARGUMENT IN SUPPORT OF PROPOSITION OF LAW

Memorandum In Support Of Jurisdiction

Page 5 of 11

Proposition of Law:  Evidence of a physical attack by a criminal defendant upon a Government witness outside of the presence of a jury in the midst of a criminal trial should not be admitted in a criminal trial as intrinsic evidence or for purpose of demonstrating "consciousness of guilt" unless and until the trial court conducts a full and searching analysis of the unfair prejudice that such evidence presents. This violates a criminal defendant's statutory and Constitutional Rights under the Sixth and Fourteenth amendments to the United States Constitution and Article 1, Section 10 Of The Ohio Constitution.

Every once in a while, a truly egregious violation of evidence rules come to light on appeal.  Defense Counsel made several contemporaneous objections.  This is that egregious violation.  The refusal of the trial court to conduct its gatekeeping role and allowing evidence of the fight between the Defendant and a Government witness, including a DVD recording of the same played for the jury during a case in chief is one of those occasions where this court must find error and reverse the conviction.  The Defendant was and is entitled to a fair and impartial trial.  The allowance of this unfairly prejudicial evidence that had little or nothing to do with the presentation of the Government's case, deprived the Defendant of a fair trial in violation of the rules of evidence but also in violation of his rights under the Ohio Constitution and the United States Constitution.  U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 10, 16, and 20.

Defense counsel argued that such evidence should be excluded pursuant to Rules 403 and 404 of the Ohio Rules of Evidence, however, the trial court held that Rule 404(B) was not implicated here because the video of the altercation was intrinsic evidence not wholly independent of the offenses and because the video of

the altercation was an admission by conduct that reflects a consciousness of guilt. The Defendant believes that the trial court's analysis of this issue is flawed. Rule 404(B) and 403(A) are both implicated in this issue. The video of the altercation between Upham and the Defendant should have been excluded as evidence for the Government in its case in chief.

The trial court found that the altercation was intrinsic evidence relying upon *United States v. Adams*, 722 F.3d 788 (6th Cir.2013). *Adams* states that to be considered intrinsic, the act is part of a single criminal episode and must have a connection to the charged offense. The altercation in the holding cell clearly is not intrinsic because the crime occurred in 2009 and the fight took place in 2015. The fight is not part of or connected with the murder.

The trial court cited this court's decision in case, *State v. Wilkerson*, 64 Ohio St. 2d. 308 in support of its ruling. The *Wilderson*, opinion held that:

> (E)vidence of other crimes may be presented when 'they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged.' " (Citation omitted.) *United States v. Turner* (C.A.7, 1970), 423 F.2d 481, at 483-84, certiorari denied 398 U.S. 967, 90 S.Ct. 2183, 26 L.Ed.2d 552. Accord *United States v. Calvert*, (C.A.8, 1975), 523 F.2d 895, 907 certiorari denied, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314; *State v. Villavicencio* (1964), 95 Ariz. 199, 388 P.2d 245. See also, 1 Wharton's Criminal Evidence (13 Ed.) 547, Section *318 242; 22 Wright & Graham, Federal Practice and Procedure (1978 Ed.), 441, Section 5239.

*State v. Wilkinson,* 64 Ohio St.2d 308, 415 N.E.2d 261 (1980).

This Court should take special notice of the well-reasoned dissent of Justice Herbert R. Brown in *State v. Richey*, 64 Ohio St.3d 353, 1992-Ohio-44, 595 N.E.2d 915 (1992) at 374-375. "[i]n any case, jailhouse threats are of a different order than flight from prosecution or a coverup as evidence of guilt". The dissent's reasoning above is clearly more persuasive and logical. The acts are separate and distinct from the matter being tried. The proof of the altercation itself would not be evidence of the Warrington homicide. The altercation came years after the fact during trial and this activity is distinctly different than flight from authorities or coverup of wrongdoing. The Defendant here was upset at the wrongful nature of Upham's unfounded allegations against him and lashed out in frustration, not from "consciousness of guilt".

The Government's argument at trial showed any connection between the altercation in the holding cell and the Warrinton homicide is completely non-existent. The Government logic that a fistfight equates to a pattern of murder is flawed as it begs the question that one behavior begets and indicates another; a person who fights is a person who murders. Nothing could be more fundamentally incorrect. While it may be true that all murders arise from an assault, not all assaults end in murders. Therefore, the Government's assertion that this evidence should be admitted under a modus operandi identification cannot be sustained.

Finally, even if the altercation evidence was intrinsic or fit into one of the 404(B) exceptions, the mandatory prohibition against admission of evidence that,

while relevant, must still be excluded under Rule 403(A) where its probative values is substantially outweighed by the danger of unfair prejudice, or confusion of the issues or of misleading the jury.

If there is probative value, the question then turns to whether admission of the evidence for probative value is substantially outweighed by the danger of unfair prejudice.  Of course any evidence tending to lead a trier of fact to a defendant's guilt is prejudicial and therefore not the reason for exclusion.  The focus is upon the prejudicial evidence being unfair to the defendant so that its admission would be of such a nature that the jury could not properly interpret it or put it into the correct perspective. "Unfairly prejudicial evidence usually appeals to the jury's emotions, rather than to intellect". *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001) followed in *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 112 (2014), reh'g denied, 141 Ohio St.3d 1458, 2015-Ohio-239, 23 N.E.3d 1198, ¶ 112 (2015), and cert. denied, 136 S.Ct. 83, 193 L.Ed.2d 74 (2015), reh'g denied, 136 S.Ct. 574, 193 L.Ed.2d 456 (2015).  Prejudicial evidence is defined as evidence that would: (1) be likely to stimulate an excessive emotion or to awaken a fixed prejudice as to a particular subject or person involved in the issues, (2) and thus dominate the mind of the tribunal and prevent a rational determination of the truth, (3) and where the evidence having this tendency is not necessary to the ascertainment of the truth.  Wigmore, Code of Evidence § 1916, at 355 (3d ed. 1942).

A clear indication that the Government used this evidence to appeal to emotions and unfair prejudice is in the way that the Government characterized the altercation in closing argument.  In closing, the Government insisted that this was part and parcel to the phase "snitches get stiches" and that the Defendant was enforcing some kind of code of fellow inmates.  Tr. at 1771-1772.  The Government used the altercation DVD as evidence not only that the Defendant was in prison, but that he was a evil man, a bad man and one disserving of contempt and guilty because he enforced a code of not snitching.

Since that is how the Government used the evidence, it probative value as to the proof of the allegations against the Defendant is very small and is outweighed, not just substantially, but overwhelmingly by the danger that the evidence would unfairly prejudice the Defendant by characterizing him as a hardened convict.  It served to confuse the jury and allowed them to use emotional responses and improper inferences that the hardened convict was guilty of murder.

<u>CONCLUSION</u>

For the reasons set forth herein, the this Court should accept this case and proposition of law for full merit briefing and argument.

Respectfully submitted,

/s/ F. Stephen Chamberlain

F. Stephen Chamberlain (0039815)
Attorney for Appellant

Memorandum In Support Of Jurisdiction

Page 10 of 11

PROOF OF SERVICE

I certify that a copy of the foregoing was served upon Counsel for the State of Ohio, Anthony Miller at Tmiller@allencountyohio.com and Terri Kohlrieser at tkohlrieser@allencountyohio.com by electronic means on May 15, 2017 by electronic means.

/s/ F. Stephen Chamberlain
_____
F. Stephen Chamberlain (0039815)
Attorney for Appellant

Memorandum In Support Of Jurisdiction

# The Supreme Court of Ohio



FILED

JAN 31 2018

CLERK OF COURT
SUPREME COURT OF OHIO

State of Ohio

v.

Markelus Q. Carter

Case No. 2017-0667

E N T R Y

Upon consideration of the jurisdictional memoranda filed in this case, the court declines to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).

(Allen County Court of Appeals; No. 1-15-62)

Maureen O'Connor
Chief Justice



EXHIBIT

18

The Official Case Announcement can be found at http://www.supremecourt.ohio.gov/ROD/docs/

## CR 2014 0139 STATE OF OHIO VS CARTER, MARKELUS Q JLR

Case Type:
CRIMINAL

Case Status:
Closed

File Date:
04/17/2014

DCM Track:

Action:
AGGRAVATED MURDER W/ FIREARM SPECIFICATION

Status Date:
04/17/2014

Case Judge:
REED, JEFFREY L

Next Event:

| All Information | Party | Charge | Event | Docket | Financial | Receipt | Disposition |

### Docket Information

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 04/17/2014 | COMPUTERIZED RESEARCH FEE ORC 2303.201A1 | $6.00 |
| 04/17/2014 | COST FOR COMPUTER FEE 2303.201B1  Receipt: 476128  Date: 02/04/2016  Receipt: 482943  Date: 05/09/2016  Receipt: 484674  Date: 06/07/2016  Receipt: 492888  Date: 10/12/2016  Receipt: 494704  Date: 11/10/2016  Receipt: 496653  Date: 12/13/2016  Receipt: 498181  Date: 01/10/2017 | $20.00 |
| 04/17/2014 | CR GEN'L SPL PROJECTS FUND | $50.00 |
| 04/17/2014 | REPORT OF GRAND JURY FILED | $0.00 |
| 04/17/2014 | INDICTMENT FILED  AGGRAVATED MURDER W/ FIREARM SPECIFICATION 2903.01(A)  HAVING WEAPONS UNDER DISABILITY 2923.13(A)(3)  F3  Receipt: 474724  Date: 01/12/2016  Receipt: 502048  Date: 03/07/2017  Receipt: 504330  Date: 04/10/2017  Receipt: 506315  Date: 05/09/2017  Receipt: 508033  Date: 06/08/2017 | $25.00 |
| 04/17/2014 | REQUEST FOR WARRANT ON INDICTMENT FILED | $0.00 |
| 04/17/2014 | WARRANT ALONG WITH COPY OF INDICTMENT ISSUED TO SHERIFF OF ALLEN COUNTY  Receipt: 508033  Date: 06/08/2017  Receipt: 509921  Date: 07/11/2017 | $7.00 |
| 04/17/2014 | LETTER FROM JUERGEN WALDICK TO JUDGE CHENEY FILED | |
| 04/17/2014 | JUDGEMENT ENTRY FIXING BOND FILED (1,000,000.00/CASH)  Receipt: 508033  Date: 06/08/2017 | $2.00 |
| 04/17/2014 | COPIES  Receipt: 508033  Date: 06/08/2017 | $1.00 |
| 04/18/2014 | WARRANT TO ARREST RETURNED, EXEC 04/17/14 FILED | $28.00 |
| 04/25/2014 | REQUEST FOR DISCOVERY FILED  JOSEPH A BENAVIDEZ (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 04/25/2014 | REQUEST FOR NOTICE OF INTENDED EVIDENCE FILED  JOSEPH A BENAVIDEZ (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 04/25/2014 | MOTION FOR BILL OF PARTICULARS FILED  JOSEPH A BENAVIDEZ (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 04/25/2014 | JOURNAL ENTRY ASSIGNING COUNSEL FILED  Receipt: 508033  Date: 06/08/2017 | $2.00 |



EXHIBIT
19

Case Details - CourtView Justice Solutions.  Page 2 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 04/29/2014 | STENOGRAPHER FEES FILED | $25.00 |
| 04/30/2014 | STATES RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 05/01/2014 | PRE-TRIAL ORDER FILED  Receipt: 508033  Date: 06/08/2017 | $2.00 |
| 05/01/2014 | COPIES  Receipt: 508033  Date: 06/08/2017 | $2.00 |
| 05/01/2014 | MAILING FEES  Receipt: 509921  Date: 07/11/2017  Receipt: 511920  Date: 08/08/2017 | $8.00 |
| 05/01/2014 | JUDGMENT ENTRY - SUBSTITUTION OF COUNSEL FILED  Receipt: 511920  Date: 08/08/2017 | $4.00 |
| 05/01/2014 | COPIES ISSUED TO PROSECUTOR, JON PAUL RION, & JOSEPH BENAVIDEZ  Receipt: 511920  Date: 08/08/2017  Receipt: 513536  Date: 09/05/2017 | $6.00 |
| 05/01/2014 | MAILING FEES  Receipt: 513536  Date: 09/05/2017 | $8.00 |
| 05/05/2014 | (FAXED) REQUEST FOR DISCOVERY FILED  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 05/05/2014 | FAX TRANSMISSION  Receipt: 513536  Date: 09/05/2017 | $5.00 |
| 05/06/2014 | CERTIFICATE OF SERVICE FILED | |
| 05/07/2014 | FAX TRANSMISSION  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant)  Receipt: 513536  Date: 09/05/2017 | $5.00 |
| 05/07/2014 | MOTION FOR BILL OF PARTICULARS FILED  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 05/07/2014 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 05/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  LUCAS CO FOR: MANEESHA PANDY MD FILED  Receipt: 513536  Date: 09/05/2017 | $2.00 |
| 05/08/2014 | SUBPOENA ISSUED TO SHERIFF OF MADISON CO FOR: HEATHER WILLIAMS FILED  Receipt: 513536  Date: 09/05/2017 | $2.00 |
| 05/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  MADISON CO FOR: MATTHEW CONGLETON FILED  Receipt: 513536  Date: 09/05/2017  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/08/2014 | SUBPOENA ISSUED TO SHERIFF OF WOOD CO FOR: TODD WHARTON FILED  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/08/2014 | SUBPOENA ISSUED TO SHERIFF OF WOOD CO FOR: DAVID HAMMOND FILED  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CO FOR: JULIE COX FILED  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/08/2014 | MAILING FEES  Receipt: 517552  Date: 11/02/2017 | $12.00 |
| 05/12/2014 | FAX TRANSMISSION  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant)  Receipt: 517552  Date: 11/02/2017  Receipt: 519349  Date: 12/04/2017 | $15.00 |
| 05/12/2014 | MOTION TO SUPPRESS FILED  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 05/13/2014 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 05/15/2014 | SUBPOENA RETURNED FROM MADISON SERVED: MATTHEW CONGLETON DATE:  05/14/14 FILED | $17.00 |
| 05/15/2014 | SUBPOENA RETURNED FROM MADISON CO SERVED: HEATHER WILLIAMS DATE: 05/14/14 FILED | $17.49 |
| 05/16/2014 | STENOGRAPHER FEES FILED | $25.00 |
| 05/16/2014 | WAIVER OF SPEEDY TRIAL FILED  Receipt: 515641  Date: 10/05/2017 | $4.00 |
| 05/16/2014 | PRE-TRIAL ORDER FILED  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/16/2014 | COPIES  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/16/2014 | MAILING FEES  Receipt: 517552  Date: 11/02/2017 | $8.00 |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 05/16/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED (LIMA NEWS)  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/16/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED (WIMA)  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/19/2014 | SUBPOENA RETURNED FROM  WOOD CTY SERVED:   TODD WHARTON  DATE:   5/13/14   FILED | $13.00 |
| 05/19/2014 | SUBPOENA RETURNED FROM  WOOD CTY SERVED:  DAVID M HAMMOND   DATE:   5/13/14   FILED | $13.00 |
| 05/19/2014 | SUBPOENA RETURNED FROM  WOOD CTY SERVED:  JULIE COX   DATE:   5/13/14   FILED | $13.00 |
| 05/19/2014 | SUBPOENA RETURNED FROM LUCAS CTY SHERIFF SERVED:  MANEESHA PANDY MD  DATE:   5/13/14 FILED | $12.00 |
| 05/20/2014 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 05/20/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CTY  FOR: TODD WHARTON FILED  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/20/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CTY  FOR: DAVID HAMMOND FILED  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/20/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CTY  FOR:  JULIE COX FILED  Receipt: 515641  Date: 10/05/2017 | $2.00 |
| 05/20/2014 | SUBPOENA ISSUED TO SHERIFF OF MADISON CTY   FOR: MATTHEW J CONGLETON FILED  Receipt: 515641  Date: 10/05/2017  Receipt: 517552  Date: 11/02/2017 | $2.00 |
| 05/20/2014 | SUBPOENA ISSUED TO SHERIFF OF MADISON CTY   FOR: HEATHER A WILLIAMS FILED  Receipt: 519349  Date: 12/04/2017 | $2.00 |
| 05/20/2014 | SUBPOENA ISSUED TO SHERIFF OF LUCAS CTY  FOR: MANEESHA PANDY MD FILED  Receipt: 519349  Date: 12/04/2017 | $2.00 |
| 05/20/2014 | MAILING FEES  Receipt: 519349  Date: 12/04/2017  Receipt: 521009  Date: 01/03/2018 | $12.00 |
| 05/27/2014 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 05/28/2014 | SUBPOENA RETURNED FROM MADISON CO SERVED: MATTHEW CONGLETON DATE:  05/23/14   FILED | $17.00 |
| 05/28/2014 | SUBPOENA RETURNED FROM MADISON CO SERVED: HEATHER WILLIAMS DATE:  05/23/14   FILED | $17.49 |
| 06/05/2014 | AFFIDAVIT OF INDIGENCY FILED | |
| 06/05/2014 | APPLICATION FOR ATTORNEY FEES FILED  Receipt: 519349  Date: 12/04/2017 | $4.00 |
| 06/09/2014 | JUDGMENT ENTRY GRANTING ATTORNEY FEES FILED | |
| 06/09/2014 | COPY OF ENTRY & AFFIDAVIT ISSUED TO AUDITOR | |
| 06/13/2014 | SUBPOENA RETURNED FROM  WOOD CTY SHERIFF  SERVED:  JULIE COX   DATE: 5/28/14   FILED | $13.00 |
| 06/13/2014 | SUBPOENA RETURNED FROM  WOOD CTY SHERIFF  SERVED:  DAVID M HAMMOND  DATE: 5/28/14    FILED | $13.00 |
| 06/13/2014 | SUBPOENA RETURNED FROM  WOOD CTY SHERIFF  SERVED:  TODD WHARTON   DATE: 5/28/14   FILED | $13.00 |
| 06/18/2014 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 06/19/2014 | STATE OF OHIO'S MOTION TO LIMIT THE SCOPE OF SUPPRESSION HEARING & MEMORANDUM IN SUPPORT FILED | $0.00 |
| 06/25/2014 | JUDGMENT ENTRY ON STATE OF OHIO'S MOTION TO LIMIT THE SCOPE OF SUPPRESSION HEARING & MEMORANDUM IN SUPPORT FILED  Receipt: 521009  Date: 01/03/2018 | $10.00 |
| 06/25/2014 | COPIES  Receipt: 521009  Date: 01/03/2018  Receipt: 523083  Date: 02/05/2018 | $10.00 |
| 06/25/2014 | MAILING FEES  Receipt: 523083  Date: 02/05/2018 | $8.00 |
| 06/26/2014 | | $0.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| | REISSUE OF SUBPOENA  BY REGULAR MAIL TO SHERIFF OF LUCAS  CTY  FOR: MANEESHA PANDY MD FILED | |
| 07/01/2014 | STENOGRAPHER FEES FILED | $25.00 |
| 07/01/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - THE LIMA NEWS  Receipt: 519349  Date: 12/04/2017 | $2.00 |
| 07/01/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - WIMA  Receipt: 519349  Date: 12/04/2017 | $2.00 |
| 07/01/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - WLIO  Receipt: 523083  Date: 02/05/2018 | $2.00 |
| 07/01/2014 | WAIVER OF SPEEDY TRIAL FILED  Receipt: 523083  Date: 02/05/2018 | $4.00 |
| 07/01/2014 | PRE-TRIAL ORDER FILED  Receipt: 523083  Date: 02/05/2018 | $2.00 |
| 07/01/2014 | COPIES  Receipt: 523083  Date: 02/05/2018 | $2.00 |
| 07/02/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: SGT CHARLES E GODFREY FILED  Receipt: 523083  Date: 02/05/2018  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/07/2014 | SUBPOENA RETURNED SERVED: SGT CHARLES E GODFREY  DATE:  7/3/14 FILED | $13.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: TIM HOEHN FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: PAM CALLAHAN FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: PAUL LOGSDON FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DON BODICKER FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: AARON SANKS FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ERIC BENNET FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DAVID W EVANS JR FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DAVONTE KNUCKLES FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: CARLOTTA WILLIAMS FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ROSALYN JOHNSON FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: MARKELUS K CARTER FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: TARAH CARTER FILED  Receipt: 525201  Date: 03/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: SONYA BURKHOLDER HUGHES FILED  Receipt: 525201  Date: 03/05/2018  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DET M BAKER FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: OFF A MONTGOMERY FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: CALVIN WOODRUFF FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: BOB SARCHET FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: SGT C HILE FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |

Case Details - CourtView Justice Solutions                    Page 5 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: OFF K RICKER FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ROBERT HAMMELL FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: OFF M DOUGLASS FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: SGT A GREEN FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ID OFF M CARMAN FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ID OFF G ADKINS FILED  Receipt: 527207  Date: 04/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ID OFF K WHITNEY FILED  Receipt: 527207  Date: 04/03/2018  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DET D MARIK FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: PHIL KLEMAN FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: SGT C GODFREY FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DET S NEIDEMIRE FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DET S LELAND FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: KENT MILLER FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: LT J BAKER FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DET T CLARK FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: CLAY BALYEAT FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: FAYE WARRINGTON FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF FOR: JEFF WARRINGTON FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CO FOR: TODD WHARTON FILED  Receipt: 528985  Date: 05/03/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF WOOD CO  FOR: DAVID HAMMOND FILED  Receipt: 528985  Date: 05/03/2018  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CO FOR: DANIEL DAVISON FILED  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF WOOD CO  FOR: JULIE COX FILED  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  LUCAS CO FOR: MANEESHAY PANDY MD FILED  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF MADISON CO FOR: HEATHER WILLIAMS FILED  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  MADISON CO FOR: MATTHEW CONGLETON FILED  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  LORAIN CO FOR: KEVIN DELONG FILED  Receipt: 531060  Date: 06/05/2018 | $2.00 |

Case Details - CourtView Justice Solutions                                        Page 6 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 07/08/2014 | SUBPOENA ISSUED TO SHERIFF OF  HARDIN CO FOR: KENNETH BRAYSHAW FILED  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/08/2014 | MAILING FEES  Receipt: 532789  Date: 07/03/2018 | $20.00 |
| 07/11/2014 | SUBPOENA RETURNED SERVED: CLAVIN WOODRUFF  DATE:  07/10/14        FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED FROM MADISON CTY SHERIFF SERVED:  MATTHEW J CONGLETON  DATE:  7/11/14 FILED | $17.00 |
| 07/14/2014 | SUBPOENA RETURNED FROM MADISON CTY SHERIFF SERVED:  HEATHER A WILLIAMS  DATE:  7/11/14 FILED | $17.48 |
| 07/14/2014 | SUBPOENA RETURNED FROM  HARDIN CTY SHERIFF SERVED:  KENNETH BRAYSHAW  DATE:  7/10/14 FILED | $45.74 |
| 07/14/2014 | SUBPOENA RETURNED FROM  LUCAS CTY SHERIFF SERVED: MANEESHA PANDY MD  DATE:  7/1/14 FILED | $12.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: OFF MATTHEW R DOUGLASS    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: OFF KELLY M RICKER    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  SGT CURT HILE    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  OFF AARON MONTGOMERY   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:   SONYA BURKHOLDER HUGHES  DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: TARAH CARTER   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: MARKELUS K CARTER    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: ROSALYN JOHNSON    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: CARLOTTA WILLIAMS    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: AARON SANKS   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: ERIC BENNET   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  DAVID W EVANS JR  DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  DAVONTE KNUCKLES    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: DET TIMOTHY S CLARK   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  DET DONALD K MARIK  DATE:  7/11/14 FILED | $19.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: DET SCOTT E LELAND   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  DET KENT M MILLER  DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  LT JAMES L BAKER  DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  DET SEAN E NEIDEMIRE    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  SGT CHARLES E GODFREY   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: ID OFF KENNETH E WHITNEY    DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: ID OFF GREGORY J ADKINS   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED: ID OFF MICHAEL L CARMAN   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  SGT ANDREW C GREEN  DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  CLAY BALYEAT  DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUBPOENA RETURNED SERVED:  DET MARK A BAKER   DATE:  7/11/14 FILED | $13.00 |
| 07/14/2014 | SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS FILED  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 07/14/2014 | SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS FILED  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 07/15/2014 | SUBPOENA RETURNED SERVED:  FAYE WARRINGTON   DATE: 7/12/14 FILED | $21.00 |

Case Details - CourtView Justice Solutions                    Page 7 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 07/15/2014 | SUBPOENA RETURNED SERVED: JEFF WARRINGTON   DATE: 7/13/14 FILED | $21.00 |
| 07/16/2014 | SUBPOENA RETURNED SERVED: PAUL LOGSDON DATE: 07/15/14        FILED | $13.00 |
| 07/16/2014 | SUBPOENA RETURNED SERVED: TIM HOEHN DATE: 07/15/14        FILED | $13.00 |
| 07/16/2014 | SUBPOENA RETURNED SERVED: DON BODICKER DATE: 07/15/14        FILED | $13.00 |
| 07/18/2014 | SUBPOENA RETURNED FROM LUCAS CTY SHERIFF SERVED:  MANEESHA PANDY MD DATE:  7/14/14 FILED | $12.00 |
| 07/21/2014 | SUBPOENA RETURNED SERVED: PHIL KLEMAN DATE: 07/17/14        FILED | $31.00 |
| 07/21/2014 | SUBPOENA RETURNED SERVED: ROBERT HAMMELL DATE: 07/18/14        FILED | $29.00 |
| 07/21/2014 | SUBPOENA RETURNED SERVED: BOB SARCHET DATE: 07/17/14        FILED | $13.00 |
| 07/23/2014 | SUBPOENA RETURNED FROM  WOOD CTY SHERIFF SERVED: DAVID M HAMMOND   DATE: 7/14/14 FILED | $13.00 |
| 07/23/2014 | SUBPOENA RETURNED FROM  WOOD CTY SHERIFF SERVED:  DANIEL DAVISON  DATE: 7/14/14 FILED | $13.00 |
| 07/23/2014 | SUBPOENA RETURNED FROM  WOOD CTY SHERIFF SERVED:  TODD WHARTON   DATE: 7/14/14 FILED | $13.00 |
| 07/23/2014 | SUBPOENA RETURNED FROM  WOOD CTY SHERIFF SERVED:  JULIE COX  DATE: 7/14/14 FILED | $13.00 |
| 07/25/2014 | SUBPOENA RETURNED SERVED: PAM CALLAHAN DATE:  07/25/14        FILED | $43.00 |
| 07/31/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - WLIO  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/31/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED  - THE LIMA NEWS  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 07/31/2014 | STENOGRAPHER FEES FILED | $25.00 |
| 07/31/2014 | STENOGRAPHER FEES FILED | $25.00 |
| 08/01/2014 | FAX TRANSMISSION  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant)  Receipt: 531060  Date: 06/05/2018  Receipt: 532789  Date: 07/03/2018 | $5.00 |
| 08/01/2014 | DEFENDANT'S IDENTIFICATION OF POTENTIAL EXPERT WITNESS FILED  JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/04/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - THE LIMA NEWS  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 08/04/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - WLIO  Receipt: 531060  Date: 06/05/2018 | $2.00 |
| 08/04/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - WIMA  Receipt: 532789  Date: 07/03/2018  Receipt: 534734  Date: 08/03/2018 | $2.00 |
| 08/04/2014 | SUBPOENA RETURNED FROM  LORAIN CTY SHERIFF SERVED:  KEVIN DELONG   DATE: 8/1/14 FILED | $29.74 |
| 08/11/2014 | JUDGMENT ENTRY MOTION TO SUPPRESS SECOND STATEMENT GIVEN ON FEBRUARY 23, 2009 FILED  Receipt: 534734  Date: 08/03/2018  Receipt: 536951  Date: 09/05/2018  Receipt: 540904  Date: 11/02/2018 | $40.00 |
| 08/11/2014 | COPIES ISSUED TO PROSECUTOR, JOHN PAUL RION  Receipt: 536951  Date: 09/05/2018 | $20.00 |
| 08/11/2014 | MAILING FEES  Receipt: 540904  Date: 11/02/2018 | $4.00 |
| 08/11/2014 | JUDGMENT ENTRY OVERRULING MOTION TO SUPRESS FILED  Receipt: 540904  Date: 11/02/2018  Receipt: 542600  Date: 12/03/2018 | $12.00 |
| 08/11/2014 | COPIES  Receipt: 542600  Date: 12/03/2018 | $12.00 |
| 08/11/2014 | MAILING FEES  Receipt: 538909  Date: 10/02/2018 | $8.00 |
| 08/29/2014 | SUBPOENA ISSUED TO ATTORNEY  FOR: TIME WARNER CABLE/CUSTODIAN OF RECORDS FILED  Receipt: 538909  Date: 10/02/2018 | $2.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/29/2014 | SUBPOENA ISSUED TO ATTORNEY  FOR: CELLECO PARTNERSHIP DBA VERIZON WIRELESS/CUSTODIAN OF RECORDS FILED  Receipt: 538909  Date: 10/02/2018 | $2.00 |
| 08/29/2014 | SUBPOENA ISSUED TO ATTORNEY  FOR: RECORD CUSTODIAN/ SPRINT PCS WIRELESS SPRINT SPECTRUM LP FILED  Receipt: 538909  Date: 10/02/2018 | $2.00 |
| 09/18/2014 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 09/22/2014 | PRE-TRIAL ORDER FILED  Receipt: 538909  Date: 10/02/2018 | $2.00 |
| 09/22/2014 | COPIES  Receipt: 538909  Date: 10/02/2018 | $2.00 |
| 09/22/2014 | MAILING FEES  Receipt: 542600  Date: 12/03/2018 | $8.00 |
| 09/22/2014 | ASSIGNMENT NOTICE FILED | $0.00 |
| 09/22/2014 | ASSIGNMENT NOTICE FILED | $0.00 |
| 10/01/2014 | (FAXED) WITNESS LIST FILED JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | |
| 10/01/2014 | FAX TRANSMISSION  Receipt: 542600  Date: 12/03/2018  Receipt: 544452  Date: 01/04/2019 | $6.00 |
| 10/20/2014 | STENOGRAPHER FEES FILED | $25.00 |
| 10/20/2014 | WAIVER OF SPEEDY TRIAL FILED  Receipt: 538909  Date: 10/02/2018 | $4.00 |
| 10/20/2014 | ASSIGNMENT NOTICE FILED | $0.00 |
| 10/20/2014 | ASSIGNMENT NOTICE FILED | $0.00 |
| 10/21/2014 | PRE-TRIAL ORDER FILED  Receipt: 542600  Date: 12/03/2018 | $2.00 |
| 10/21/2014 | COPIES  Receipt: 538909  Date: 10/02/2018 | $3.00 |
| 10/21/2014 | MAILING FEES  Receipt: 544452  Date: 01/04/2019 | $12.00 |
| 10/21/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED (WLIO)  Receipt: 544452  Date: 01/04/2019 | $2.00 |
| 10/21/2014 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED (LIMA NEWS)  Receipt: 544452  Date: 01/04/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF  LUCAS CO FOR: MANEESHA PANDY MD FILED  Receipt: 544452  Date: 01/04/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF MADISON CO  FOR: MATTHEW CONGLETON FILED  Receipt: 544452  Date: 01/04/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF MADISON CO FOR: HEATHER WILLIAMS FILED  Receipt: 544452  Date: 01/04/2019  Receipt: 544695  Date: 01/08/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CO FOR: DANIEL DAVISON FILED  Receipt: 544695  Date: 01/08/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CO FOR: DAVID HAMMOND FILED  Receipt: 544695  Date: 01/08/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CO FOR: JULIE COX FILED  Receipt: 544695  Date: 01/08/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF  WOOD CO FOR: TODD WHARTON FILED  Receipt: 544695  Date: 01/08/2019 | $2.00 |
| 10/27/2014 | MAILING FEES  Receipt: 544695  Date: 01/08/2019 | $12.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: SONYA BURKHOLDER HUGHES FILED  Receipt: 544695  Date: 01/08/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: TARAH CARTER FILED  Receipt: 544695  Date: 01/08/2019  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: MARKELUS K CARTER FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ROSALYN JOHNSON FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |

Case Details - CourtView Justice Solutions                                    Page 9 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: CARLOTTA WILLIAMS FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DAVONTE KNUCKLES FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: DAVID W EVANS JR FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: ERIC BENNET FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF OF FOR: AARON SANKS FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/27/2014 | SUBPOENA ISSUED TO SHERIFF FOR: JOEY MOORE FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF LORAIN CTY  FOR: KEVIN DELONG FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF HARDIN CTY FOR: KENNETH BRAYSHAW FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | MAILING FEES  Receipt: 546325  Date: 02/05/2019 | $8.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: DET TIMOTHY S CLARK FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR:  DET SCOTT E LELAND FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: DET SEAN E NEIDEMIRE FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: SGT CHARLES E GODFREY FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: PHIL KLEMAN FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: DET DONALD K MARIK FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR:  ID OFF KENNETH E WHITNEY FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: ID OFF GREGORY J ADKINS FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: ID OFF MICHAEL L CARMAN FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: OFF MATTHEW R DOUGLASS FILED  Receipt: 546325  Date: 02/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: SGT CURT HILE FILED  Receipt: 546325  Date: 02/05/2019  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR:  OFF AARON MONTGOMERY FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: CALVIN WOODRUFF FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR:  DON BODICKER FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR:  PAUL LOGSDON FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR:  TIM HOEHN FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: FAYE WARRINGTON FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |

Case Details - CourtView Justice Solutions                         Page 10 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: PAM CALLAHAN FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: JEFF WARRINGTON FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA ISSUED TO SHERIFF OF  FOR: CLAY BALYEAT FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 10/31/2014 | SUBPOENA RETURNED FROM MADISON COUNTY SERVED: HEATHER A WILLIAMS DATE: 10/29/2014     FILED | $17.49 |
| 10/31/2014 | SUBPOENA RETURNED FROM MADISON COUNTY SERVED: MATTHEW J CONGLETON DATE: 10/29/2014     FILED | $17.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: CARLOTTA WILLIAMS DATE: 11/3/2014     FILED | $0.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: DAVONTE KNUCKLES DATE: 11/3/2014     FILED | $0.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: ERIC BENNET DATE: 11/3/2014     FILED | $0.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: MARKELUS K CARTER DATE: 11/3/2014     FILED | $0.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: TARAH CARTER DATE: 11/3/2014     FILED | $0.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: ROSALYN JOHNSON DATE: 11/3/2014     FILED | $0.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: DET D MARIK DATE: 11/4/2014     FILED | $19.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: ID OFF K WHITNEY DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: OFF A MONTGOMERY DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: OFF M DOUGLASS DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: DET S LELAND DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: SGT C GODFREY DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: DET S NEIDEMIRE DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: DET T CLARK DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: ID OFF G ADKINS DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: ID OFF M CARMAN DATE: 11/4/2014     FILED | $13.00 |
| 11/04/2014 | SUBPOENA RETURNED SERVED: SGT C HILE DATE: 11/4/2014     FILED | $13.00 |
| 11/05/2014 | SUBPOENA RETURNED SERVED: PAM CALLAHAN DATE:  11/05/14     FILED | $19.00 |
| 11/05/2014 | SUBPOENA RETURNED SERVED: CALVIN WOODRUFF DATE: 11/04/14     FILED | $13.00 |
| 11/05/2014 | SUBPOENA RETURNED SERVED: CLAY BALYEAT DATE:  11/05/14     FILED | $15.00 |
| 11/06/2014 | SUBPOENA RETURNED SERVED: JEFF WARRINGTON DATE:  11/04/14     FILED | $35.00 |
| 11/06/2014 | SUBPOENA RETURNED SERVED: FAYE WARRINGTON DATE:  11/05/14     FILED | $17.00 |
| 11/06/2014 | SUBPOENA RETURNED SERVED: PHIL KLEMAN  DATE: 11/6/14 FILED | $23.00 |
| 11/07/2014 | SUBPOENA RETURNED SERVED: TIM HOEHN  DATE:  11/6/14 FILED | $13.00 |
| 11/07/2014 | SUBPOENA RETURNED SERVED: PAUL LOGSDON  DATE:  11/07/14     FILED | $17.00 |
| 11/10/2014 | SUBPOENA RETURNED FROM LUCAS COUNTY SHERIFF SERVED: MANEESHA PANDY MD DATE: 10/31/14 FILED | $12.00 |
| 11/10/2014 | SUBPOENA RETURNED SERVED: DON BODICKER  DATE: 11/10/14 FILED | $15.00 |
| 11/12/2014 | SUBPOENA RETURNED FROM HARDIN CTY SHERIFF SERVED: KENNETH BRAYSHAW DATE: 11/6/14 FILED | $45.74 |
| 11/14/2014 | SUBPOENA RETURNED FROM LORAIN CTY SHERIFF  SERVED: KEVIN DELONG  DATE: 11/7/14 FILED | $29.74 |
| 11/24/2014 | SUBPOENA RETURNED FROM WOOD CO SERVED: DAVID HAMMOND DATE: 11/05/14 FILED | $13.00 |

Case Details - CourtView Justice Solutions                    Page 11 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 11/24/2014 | SUBPOENA RETURNED FROM WOOD CO SERVED: JULIE COX DATE: 11/05/14    FILED | $13.00 |
| 11/24/2014 | SUBPOENA RETURNED FROM WOOD CO SERVED: DANIEL DAVISON DATE: 11/05/14 FILED | $13.00 |
| 11/24/2014 | SUBPOENA RETURNED FROM WOOD CO SERVED: TODD WHARTON DATE: 11/05/14 FILED | $13.00 |
| 12/09/2014 | PRE-TRIAL ORDER FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 12/09/2014 | COPIES  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 12/09/2014 | MAILING FEES  Receipt: 548425  Date: 03/05/2019 | $8.00 |
| 12/09/2014 | ASSIGNMENT NOTICE FILED | $0.00 |
| 02/27/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 03/02/2015 | (FAXED) MOTION FOR CONTINUANCE FILED | $0.00 |
| 03/02/2015 | FAX TRANSMISSION  Receipt: 548425  Date: 03/05/2019 | $5.00 |
| 03/02/2015 | (FAXED) ENTRY GRANTING CONTINUANCE FILED  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 03/02/2015 | COPIES  Receipt: 548425  Date: 03/05/2019 | $2.00 |
| 03/02/2015 | MAILING FEES  Receipt: 548425  Date: 03/05/2019 | $8.00 |
| 03/02/2015 | REASSIGNMENT NOTICE FILED | $0.00 |
| 03/02/2015 | COPIES  Receipt: 548425  Date: 03/05/2019  Receipt: 550469  Date: 04/03/2019 | $3.00 |
| 03/02/2015 | MAILING FEES  Receipt: 550469  Date: 04/03/2019 | $12.00 |
| 03/16/2015 | FAX TRANSMISSION
JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant)  Receipt: 550469  Date: 04/03/2019 | $6.00 |
| 03/16/2015 | MOTION TO CONTINUE FILED
JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 03/18/2015 | STATE OF OHIO'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO CONTINUE TRIAL DATE FILED | $0.00 |
| 03/18/2015 | JUDGMENT ENTRY DENYING MOTION TO CONTINUE FILED  Receipt: 550469  Date: 04/03/2019 | $6.00 |
| 03/18/2015 | COPIES  Receipt: 550469  Date: 04/03/2019  Receipt: 550968  Date: 04/10/2019 | $6.00 |
| 03/18/2015 | MAILING FEES  Receipt: 550968  Date: 04/10/2019 | $8.00 |
| 03/19/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 03/24/2015 | ASSIGNMENT NOTICE FILED | $0.00 |
| 03/24/2015 | COPIES  Receipt: 550968  Date: 04/10/2019 | $3.00 |
| 03/24/2015 | MAILING FEES  Receipt: 550968  Date: 04/10/2019  Receipt: 552496  Date: 05/03/2019 | $12.00 |
| 03/25/2015 | SUBPOENA RETURNED **NOT** SERVED: AARON SANKS  REASON: NOT SURE IF SERVED DONE AS WALK THROUGH BY PROSECUTORS DATE: 03/24/2015    FILED | $0.00 |
| 03/25/2015 | SUBPOENA RETURNED **NOT** SERVED: JOEY MOORE  REASON: NOT SURE IF SERVED DONE AS WALK THROUGH BY PROSECUTORS DATE: 03/24/2015    FILED | $0.00 |
| 03/26/2015 | SUGGESTION OF INCOMPETENCY TO STAND TRIAL FILED
JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 03/26/2015 | STENOGRAPHER FEES FILED | $25.00 |
| 03/26/2015 | ORDER FOR PRISON MENTAL HEALTH RECORDS FILED  Receipt: 550968  Date: 04/10/2019 | $2.00 |
| 03/26/2015 | COPIES  Receipt: 550968  Date: 04/10/2019 | $2.00 |
| 03/26/2015 | MAILING FEES  Receipt: 552496  Date: 05/03/2019 | $8.00 |
| 03/27/2015 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED  - THE LIMA NEWS  Receipt: 550968  Date: 04/10/2019 | $2.00 |

Case Details - CourtView Justice Solutions                    Page 12 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 03/27/2015 | ASSIGNMENT NOTICE FILED | $0.00 |
| 03/27/2015 | COPIES  Receipt: 552496  Date: 05/03/2019 | $3.00 |
| 03/27/2015 | MAILING FEES  Receipt: 552496  Date: 05/03/2019 | $12.00 |
| 03/27/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 04/01/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: SONYA BURKHOLDER FILED  Receipt: 552496  Date: 05/03/2019 | $4.00 |
| 04/01/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: ROGER BURKHOLDER FILED  Receipt: 552496  Date: 05/03/2019 | $4.00 |
| 04/01/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: TARAH CARTER FILED  Receipt: 552496  Date: 05/03/2019 | $4.00 |
| 04/01/2015 | FAX TRANSMISSION  Receipt: 552496  Date: 05/03/2019  Receipt: 555109  Date: 06/14/2019 | $8.00 |
| 04/01/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 04/01/2015 | FAX TRANSMISSION<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant)  Receipt: 555109  Date: 06/14/2019 | $18.00 |
| 04/01/2015 | MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVERS FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 04/01/2015 | DEFENDANT'S MOTION TO PERMIT ACCUSED TO APPEAR IN CIVILIAN CLOTHING AT ALL PROCEEDINGS FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 04/03/2015 | ENTRY FOR SPECIAL PROCESS SERVERS FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | COPIES MAILED TO JON PAUL RION AND ISSUED TO PROSECUTOR  Receipt: 555109  Date: 06/14/2019 | $1.00 |
| 04/03/2015 | ENTRY FOR DEFENDANT TO APPEAR IN CIVILIAN CLOTHING TO ALL PROCEEDS FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | COPIES MAILED TO JON PAUL RION AND ISSUED TO PROSECUTOR  Receipt: 555109  Date: 06/14/2019 | $1.00 |
| 04/03/2015 | MAILING FEES  Receipt: 555109  Date: 06/14/2019 | $4.00 |
| 04/03/2015 | DEFENDANTS AMENDED WITNESS LIST FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: SHASHONE ALLEN FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: VANESSA WHITE FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: CAROL MATHEWSON FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: LINDA HUGHES FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DANA MCCLURE FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: ROBERT STAHLER FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: LEON JOHNSON FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: ERIC BENNETT FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: JOE KETCHAM FILED  Receipt: 555109  Date: 06/14/2019 | $2.00 |
| 04/03/2015 | | $2.00 |

Case Details - CourtView Justice Solutions                    Page 13 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| | SUBPOENA ISSUED TO ATTORNEY FOR: DENNIS STAPLES FILED  Receipt: 555109  Date: 06/14/2019 | |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: BOB MYERS FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: MIKE EDELBROCK FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: BOB CRITES FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: HAROLD KING FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: MICHAEL GREEN FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DR ROBERT FULMER FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DAVONTE KNUCKLES FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DELLA SMITH FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: ROGER BLACKHAWK FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: CARLOTTA WILLIAMS FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: MARKELUS K CARTER FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DET T CLARK FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: EBONY GIBSON FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DAVID EVANS FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: JUSTIN GIBSON FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: CHARLES GODFREY FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: PAULETTA HOHBEIN FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: BYRON HOLTON FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: ANGELA COLEMAN FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: LEAH REXFORD FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DET D MARIK FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: RUBY CARTER FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: KENNETH REXFORD FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: AARON SANKS FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: STEVEN SAVAGE FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: CHASTON SCOTT FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: SGT C SMITH FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: KENNETH VICKS FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: DAVID SLUSHER FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: STEVEN UPHAM FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: THOMAS SMITH FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: ABDUL BARI FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: AGRUELLO HARRIS FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: STANLEY LOTT FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: TARISSA ROSS FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: JOHN DAWSON FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: PAM CALLAHAN FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: WENDY DILTZ FILED | $2.00 |
| 04/03/2015 | SUBPOENA ISSUED TO ATTORNEY FOR: NANCY MILLER FILED | $2.00 |

Case Details - CourtView Justice Solutions                    Page 14 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 04/06/2015 | SUBPOENA RETURNED SERVED: VANESSA WHITE DATE: 04/03/2015          FILED | $0.00 |
| 04/06/2015 | SUBPOENA RETURNED SERVED: CAROL MATHEWSON DATE: 04/03/2015          FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: PAULETTA HOHBEIN  DATE:  4/7/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: DET DON MARIK  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: KENNETH VICKS  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: SGT CAMERON SMITH   DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: DR ROBERT FULMER  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: STEVEN SAVAGE #A423361   DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: CHASTON SCOTT #A497310  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: STEVEN UPHAM  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: THOMAS SMITH  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: ABDUL BARI  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: ANGELA HOWARD   DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: CHARLES GODFREY   DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: DET TIM CLARK  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: ROBERT STAHLER  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED:  JOHN DAWSON  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | SUBPOENA RETURNED SERVED: ERIC BENNETT  DATE:  4/6/15 FILED | $0.00 |
| 04/07/2015 | STATES RESPONSE TO DEFENDANTS MOTION FOR BILL OF PARTICULARS FILED | $0.00 |
| 04/07/2015 | STATES RESPONSE TO DEFENDANTS REQUEST FOR NOTICE OF INTENDED EVIDENCE FILED | $0.00 |
| 04/07/2015 | FAX TRANSMISSION<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $29.00 |
| 04/07/2015 | MOTION FOR COURT ORDER FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 04/07/2015 | MOTION TO COMPEL EXCULPATORY EVIDENCE & MOTION TO CONTINUE FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 04/08/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 04/09/2015 | STENOGRAPHER FEES FILED | $25.00 |
| 04/09/2015 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED (WLIO TV) | $2.00 |
| 04/09/2015 | PRE-TRIAL ORDER FILED | $4.00 |
| 04/09/2015 | COPIES | $4.00 |
| 04/09/2015 | ASSIGNMENT NOTICE FILED | $0.00 |
| 04/09/2015 | COPIES | $3.00 |
| 04/09/2015 | MAILING FEES | $12.00 |
| 04/09/2015 | ORDER FOR EXAMINATION FILED | $2.00 |
| 04/09/2015 | COPIES | $4.00 |
| 04/09/2015 | MAILING FEES | $16.00 |
| 04/09/2015 | WARRANT TO CONVEY FOR EXAM W/ CERT COPY OF ENTRY ISSUED TO SHERIFF | $7.00 |
| 04/09/2015 | Issue Date:  04/09/2015<br>Service:  WARRANT TO CONVEY FOR EXAM<br>Method:  PERSONAL SERVICE | $0.00 |

Case Details - CourtView Justice Solutions                                    Page 15 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| | Provider: ALLEN COUNTY SHERIFF<br>Cost Per:  $0.00 | |
| | CARTER, MARKELUS Q<br>C/O ALLEN CTY JAIL<br>LIMA, OH  45801<br>Tracking No: S000015336 | |
| 04/10/2015 | SUBPOENA ISSUED TO SHERIFF OF WOOD COUNTY FOR: DANIEL DAVISON FILED | $2.00 |
| 04/10/2015 | SUBPOENA ISSUED TO SHERIFF OF MADISON COUNTY FOR: HEATHER A WILLIAMS FILED | $2.00 |
| 04/10/2015 | SUBPOENA ISSUED TO SHERIFF OF WOOD COUNTY FOR: DAVID HAMMOND FILED | $2.00 |
| 04/10/2015 | SUBPOENA ISSUED TO SHERIFF OF LUCAS COUNTY FOR: MANEESHA PANDY MD FILED | $2.00 |
| 04/10/2015 | SUBPOENA ISSUED TO SHERIFF OF WOOD COUNTY FOR: JULIE COX FILED | $2.00 |
| 04/10/2015 | SUBPOENA ISSUED TO SHERIFF OF MADISON COUNTY FOR: MATTHEW J CONGLETON FILED | $2.00 |
| 04/13/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 04/16/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 04/20/2015 | SUBPOENA RETURNED FROM MADISON CTY SHERIFF SERVED: HEATHER A WILLIAMS DATE: 4/16/15 FILED | $17.00 |
| 04/20/2015 | SUBPOENA RETURNED FROM MADISON CTY SHERIFF SERVED: MATTHEW J CONGLETON DATE: 4/16/15 FILED | $17.49 |
| 04/21/2015 | SUBPOENA RETURNED **NOT** SERVED: SONYA BURKHOLDER HUGHES  REASON: DONE AS WALKTHOUGH BY PROSECUTORS UNKNOWN IF SERVED DATE: 04/21/2015 FILED | $0.00 |
| 04/21/2015 | SUBPOENA RETURNED **NOT** SERVED: DAVID W EVANS JR  REASON: DONE AS WALKTHROUGH BY PROSECUTORS UNKNOWN IF SERVED DATE: 04/21/2015 | $0.00 |
| 04/24/2015 | SUBPOENA RETURNED FROM LUCAS CTY SHERIFF SERVED:   MANEESHA PANDY MD DATE: 4/16/15 FILED | $12.00 |
| 04/27/2015 | SUBPOENA RETURNED SERVED FROM WOOD COUNTY SHERIFF: DANIEL DAVISON DATE: 04/16/2015 FILED | $13.00 |
| 04/27/2015 | SUBPOENA RETURNED SERVED FROM WOOD COUNTY SHERIFF: DAVID M HAMMOND DATE: 04/16/2015 FILED | $13.00 |
| 04/27/2015 | SUBPOENA RETURNED SERVED FROM WOOD COUNTY SHERIFF: JULIE COX DATE: 04/16/2015 FILED | $13.00 |
| 04/29/2015 | WARRANT TO CONVEY RETURNED SERVED; 4/28/15 FILED | $160.00 |
| 05/11/2015 | FAX TRANSMISSION<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $7.00 |
| 05/11/2015 | MOTION FOR COURT PAID INVESTIGATIVE EXPENSES FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 05/12/2015 | ENTRY GRANTING COURT PAID INVESTIGATIVE EXPENSES FILED | $2.00 |
| 05/12/2015 | COPIES MAILED TO JON PAUL RION AND ISSUED TO PROSECUTOR | $2.00 |
| 05/12/2015 | MAILING FEES | $2.00 |
| 05/13/2015 | JUDGMENT ENTRY APPROVING EXPERT FEES AND/OR EXPENSES FILED | |
| 05/13/2015 | COPY OF ENTRY & AFFIDAVIT ISSUED TO AUDITOR | |
| 06/03/2015 | ASSIGNMENT NOTICE FILED | $0.00 |
| 06/03/2015 | COPIES | $3.00 |
| 06/03/2015 | MAILING FEES | $6.00 |
| 06/18/2015 | STENOGRAPHER FEES FILED | $25.00 |

Case Details - CourtView Justice Solutions                                    Page 16 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 06/18/2015 | JUDGMENT ENTRY DETERMINATION OF COMPETENCY FILED | $2.00 |
| 06/18/2015 | COPIES | $2.00 |
| 06/18/2015 | MAILING FEES | $4.00 |
| 06/18/2015 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED (THE LIMA NEWS) | $2.00 |
| 06/23/2015 | FAX TRANSMISSION<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $11.00 |
| 06/23/2015 | MOTION TO COMPEL DISCOVERY OF BCI GSR DENSITY REPORTS FILED | $0.00 |
| 07/08/2015 | ORDER COMPELLING DISCOVERY FILED | $6.00 |
| 07/08/2015 | COPIES ISSUED TO PROSECUTOR | $3.00 |
| 07/08/2015 | EMAILED COPIES TO JON PAUL RION | $2.00 |
| 07/09/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 07/13/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 08/03/2015 | STATES MOTION FOR JURY VIEW FILED | $0.00 |
| 08/07/2015 | (FAXED) MOTION FOR ADDITIONAL INVESTIGATIVE EXPENSES FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/07/2015 | (FAXED) APPLICATION FOR COURT PAID EXPERTS AND EXPENSES FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/07/2015 | FAX TRANSMISSION | $8.00 |
| 08/11/2015 | SUBPOENA ISSUED TO SHERIFF FOR: PHIL KLEMAN FILED | $2.00 |
| 08/11/2015 | STATES DEMAND FOR DISCOVERY FILED | $0.00 |
| 08/11/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 08/11/2015 | SUBPOENA RETURNED SERVED: PHIL KLEMAN DATE: 08/11/2015          FILED | $13.00 |
| 08/11/2015 | JUDGMENT ENTRY APPROVING EXPERT FEES AND/OR EXPENSES FILED | |
| 08/11/2015 | JUDGMENT ENTRY GRANTING ADDITIONAL COURT PAID INVESTIGATIVE EXPENSES FILED | |
| 08/11/2015 | COPY OF ENTRY APPROVING EXPERT FEES AND/OR EXPENSES, ENTRY GRANTING ADDITIONAL COURT PAID INVESTIGATIVE EXPENSES ISSUED TO AUDITOR | |
| 08/11/2015 | EMAILED COPIES TO JON PAUL RION | $2.00 |
| 08/11/2015 | COPIES ISSUED TO PROSECUTOR | $1.00 |
| 08/11/2015 | SUBPOENA ISSUED TO SHERIFF OF WOOD COUNTY FOR: KEVIN KRAMER FILED | $2.00 |
| 08/17/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 08/18/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 08/18/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR: CARLOTTA WILLIAMS FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR: ROSALYN JOHNSON FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF OF LORAIN COUNTY FOR: KEVIN DELONG FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF OF FRANKLIN COUNTY FOR: JESSE PITTMAN FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF OF PUTNAM COUNTY FOR: DON HOVAST FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF OF HARDIN COUNTY FOR: KENNETH BRAYSHAW FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: DISPATCHER M TIDD FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: DON BODICKER FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: BOB SARCHET FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: OFFICER M DOUGLAS FILED | $2.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: CALVIN WOODRUFF FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: DET D MARIK FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: SGT C HILE FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: DET S NEIDEMIRE FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: OFFICER A MONTGOMERY FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: DET T CLARK FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: KENNETH E WHITNEY FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: PAM CALLAHAN FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: FAYE WARRINGTON FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: SGT C GODFREY FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: DET S LELAND FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: SGT C SMITH FILED | $2.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: JOEY MOORE FILED | $2.00 |
| 08/18/2015 | JOURNAL ENTRY FOR REMOVAL OF STEVEN T UPHAM FILED | $2.00 |
| 08/18/2015 | COPIES | $2.00 |
| 08/18/2015 | MAILING FEES | $4.00 |
| 08/18/2015 | SUBPOENA ISSUED TO SHERIFF FOR: STEVEN T UPHAM FILED | $2.00 |
| 08/18/2015 | WARRANT FOR REMOVAL ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 08/18/2015 | Issue Date: 08/18/2015<br>Service: WARRANT FOR REMOVAL<br>Method: PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br>Cost Per: $0.00<br><br>CARTER, MARKELUS Q<br>C/O ALLEN CTY JAIL<br>LIMA, OH 45801<br>Tracking No: S000015690 | $0.00 |
| 08/18/2015 | SUBPOENA RETURNED SERVED: ROSALYN JOHNSON DATE: 8/18/15 FILED | $13.00 |
| 08/19/2015 | MOTION FOR COURT PAID EXPERT EXPENSES FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/20/2015 | SUBPOENA RETURNED SERVED: JOEY MOORE DATE: 08/19/2015 FILED | $13.00 |
| 08/20/2015 | SUBPOENA RETURNED SERVED: CARLOTTA WILLIAMS DATE: 08/19/2015 FILED | $13.00 |
| 08/20/2015 | JUDGMENT ENTRY GRANTING COURT PAID EXPERT EXPENSES FILED | $2.00 |
| 08/20/2015 | COPIES MAILED TO JON PAUL RION AND ISSUED TO PROSECUTOR | $2.00 |
| 08/20/2015 | MAILING FEES | $2.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: BOB SARCHET DATE: 8/20/15 FILED | $25.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: DISP MISSY TIDD DATE: 8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: CALVIN WOODRUFF DATE: 8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: DET DONALD K MARIK DATE: 8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: DET SCOTT E LELAND DATE: 8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: DET TIMOTHY S CLARK DATE: 8/20/15 FILED | $13.00 |

| Date | Docket Text | Amount Owed |
|---|---|---|
| 08/21/2015 | SUBPOENA RETURNED SERVED: KENNETH E WHITNEY    DATE:  8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: OFF AARON MONTGOMERY    DATE:  8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: DET SEAN E NEIDEMIRE  DATE:  8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED: SGT CHARLES E GODFREY  DATE: 8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED:  SGT CURT HILE   DATE: 8/20/15 FILED | $13.00 |
| 08/21/2015 | SUBPOENA RETURNED SERVED:  OFF MATTHEW R DOUGLASS   DATE:  8/20/15 FILED | $13.00 |
| 08/24/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 08/24/2015 | MOTION TO CONVEY WITNESS (STEVEN SAVAGE) FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/24/2015 | MOTION TO CONVEY WITNESS (ABDUL BARI) FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/24/2015 | MOTION TO CONVEY WITNESS (THOMAS SMITH) FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/24/2015 | MOTION TO CONVEY WITNESS (KENNETH VICKS) FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/24/2015 | MOTION TO CONVEY WITNESS (CHASTON SCOTT) FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/25/2015 | SUBPOENA RETURNED SERVED:  PAM CALLAHAN    DATE: 8/21/15 FILED | $27.00 |
| 08/25/2015 | SUBPOENA RETURNED SERVED: SGT C SMITH    DATE: 8/21/15 FILED | $13.00 |
| 08/25/2015 | SUBPOENA RETURNED SERVED: FAYE WARRINGTON    DATE: 8/21/15 FILED | $19.00 |
| 08/25/2015 | SUBPOENA RETURNED SERVED: DON BODICKER    DATE:  8/24/15 FILED | $19.00 |
| 08/25/2015 | PLAINTIFF STATE OF OHIOS MOTION FOR A CERTIFICATE PURSUANT TO THE UNIFORM ACT TO SECURE THE ATTENDANCE OF WITNESSES FROM OUTSIDE OF THE STATE IN CRIMINAL PROCEEDINGS FILED | $0.00 |
| 08/26/2015 | SUBPOENA RETURNED FROM PUTNAM COUNTY SHERIFF SERVED: DON HOVAST DATE: 08/20/2015 FILED | $27.48 |
| 08/26/2015 | JUDGMENT ENTRY GRANTING PLAINTIFF'S MOTION FOR A CERTIFICATE PURSUANT TO THE UNIFORM ACT TO SECURE THE ATTENDANCE OF SONYA HUGHES F.K.A. SONYA BURKHOLDER FILED | $2.00 |
| 08/26/2015 | COPIES ISSUED TO PROSECUTOR | $2.00 |
| 08/26/2015 | CERTIFIED COPY OF ENTRY ISSUED TO PROSECUTOR | $4.00 |
| 08/27/2015 | MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVERS FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 08/27/2015 | DEFENDANTS 2ND AMENDED WITNESS LIST FILED BY<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | |
| 08/27/2015 | JUDGMENT ENTRY DESIGNATING SPECIAL PROCESS SERVERS FILED | $2.00 |
| 08/27/2015 | COPIES ISSUED TO PROSECUTOR | $1.00 |
| 08/27/2015 | EMAILED COPIES TO JON PAUL RION | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: EBONY GIBSON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: PAULETTA HOHBEIN FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: BYRON HOLTON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: JOHN DAWSON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ANGELA HOWARD FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: TARISSA ROSS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ROGER BLACKHAWK FILED | $2.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: TODD WHARTON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: HEATHER WILLIAMS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: VICKI BARTHOLOMEW FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: MATTHEW CONGELTON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: JULIE COX FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: PATRICK CRAWFORD FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DANIEL DAVISON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: SCOTT DOBRANSKY FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: RAYMOND PEOPLES FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: STANLEY LOTT FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: AGRUELLO HARRIS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: THOMAS SMITH #A525834 C/O CASE MANAGER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: TARAH CARTER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ROGER BURKHOLDER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: KENNETH VICKS #A270096 C/O CASE MANAGER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: STEVEN UPHAM #A648985 C/O CASE MANAGER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: RODNEY REED FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: SHERIFF SAMUEL A CRISH FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ABDUL BARI #A531381 C/O CASE MANAGER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CARLOTTA WILLIAMS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: MARKELUS K CARTER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: BOB CRITES FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DET T CLARK FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: WENDY DILTZ FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DAVID SLUSHER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DAVID EVANS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DR ROBERT FULMER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ERIC WALKINS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DAMANT WATKINS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: JUSTIN GIBSON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: JOE SIMPSON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: VERONICA DINIKINS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CARLA SIMPSON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: NANCY MILLER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: MICHAEL GREEN FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ERIC BENNETT FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DELLA SMITH FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: SGT C SMITH FILED | $2.00 |

Case Details - CourtView Justice Solutions                          Page 20 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: SONYA BURKHOLDER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: MIKE EDELBROCK FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CAROL MATHEWSON FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CHARLES GODFREY FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: HAROLD KING FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: LINDA HUGHES FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: VANESSA WHITE FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ERIC BENNETT FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: RON HAWLER FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: KENNETH VICKS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: GERALD BIBBS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: OSCAR WILLIAMS FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: AMESHA BOYEUR FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: KIM HALL FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: RON HOWARD FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: BROOKS HOUGHTON FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: BETTY MALLOY FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: RON HANDLER FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DERRICK GLENN FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: SHIRLEY LONG FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CHRISTIAN MYERS FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: KENNETH BRAYSHAW FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ROSALIN JOHNSON FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DON BODIKER FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CHRISTA BODIKER FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: TERESA ZAPP FILED | $2.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CARL MATHEWS FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: JOHN BURNS FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: LEAH REXFORD FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DAVONTE KNUCKLES FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: JOE KETCHAM FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: CHASTON SCOTT #A497310 C/O CASE MANAGER FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ROY JOHNSON FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ALLISON MURTHA FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: HAROLD KING FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: ROBERT STAHLER FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DENNIS STAPLES FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: KENNETH REXFORD FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: SHASHONE ALLEN FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: AARON SANKS FILED | $4.00 |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: STEVEN SAVAGE #A423361 C/O CASE MANAGER FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: RUBY CARTER FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DET D MARIK FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: LINDA HUGHES FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: DANA MCCLURE FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: PAM CALLAHAN FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: BOB MYERS FILED | $4.00 |
| 08/27/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: LEON JOHNSON FILED | $4.00 |
| 08/27/2015 | ORDER TO CONVEY WITNESS (STEVEN SAVAGE) FILED | $4.00 |
| 08/27/2015 | ORDER TO CONVEY WITNESS (ABDUL BARI) FILED | $4.00 |
| 08/27/2015 | ORDER TO CONVEY WITNESS (THOMAS SMITH) FILED | $4.00 |
| 08/27/2015 | ORDER TO CONVEY WITNESS (KENNETH VICKS) FILED | $4.00 |
| 08/27/2015 | ORDER TO CONVEY WITNESS (CHASTON SCOTT) FILED | $4.00 |
| 08/31/2015 | STATES RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 08/31/2015 | SUBPOENA RETURNED FROM HARDIN CTY SERVED:  KENNETH BRAYSHAW  DATE: 8/26/15 FILED | $45.73 |
| 08/31/2015 | WARRANT FOR REMOVAL  (STEVEN SAVAGE) ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 08/31/2015 | Issue Date:  8/31/15<br>Service:  WARRANT FOR REMOVAL OF WITNESS<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>STEVEN SAVAGE #A423-361<br>C/O ACI<br>PO BOX 4501<br>LIMA OH 45802 | $0.00 |
| 08/31/2015 | WARRANT FOR REMOVAL  (ABDUL BARI) ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 08/31/2015 | Issue Date:  8/31/15<br>Service:  WARRANT FOR REMOVAL OF WITNESS<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>ABDUL BARI #A531-381<br>C/O ACI<br>PO BOX 4501<br>LIMA OH 45802 | $0.00 |
| 08/31/2015 | WARRANT FOR REMOVAL (THOMAS SMITH) ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |

Case Details - CourtView Justice Solutions                          Page 22 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/31/2015 | Issue Date: 8/31/15<br>Service: WARRANT FOR REMOVAL OF WITNESS<br>Method: PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br> THOMAS SMITH #A525-834<br>C/O ACI<br>PO BOX 4501<br>LIMA OH 45802 | $0.00 |
| 08/31/2015 | WARRANT FOR REMOVAL  (KENNETH VICKS) ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 08/31/2015 | Issue Date: 8/31/15<br>Service: WARRANT FOR REMOVAL OF WITNESS<br>Method: PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>KENNETH VICKS #A270-096<br>C/O ACI<br>PO BOX 4501<br>LIMA OH 45802 | $0.00 |
| 08/31/2015 | WARRANT FOR REMOVAL (CHASTON SCOTT) ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 08/31/2015 | Issue Date: 8/31/15<br>Service: WARRANT FOR REMOVAL OF WITNESS<br>Method: PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>CHASTON SCOTT #A497-310<br>C/O MANSFIELD CORRECTIONAL<br>PO BOX 788<br>MANSFIELD, OH 44901 | $0.00 |
| 09/01/2015 | WARRANT FOR REMOVAL RETURNED **NOT** SERVED: THOMAS SMITH   DATE: 8/31/15 REASON: RECALLED PER COURT FILED | $0.00 |
| 09/01/2015 | WARRANT FOR REMOVAL RETURNED **NOT** SERVED: ABDUL BARI   DATE: 8/31/15 REASON: RECALLED PER COURT FILED | $0.00 |
| 09/01/2015 | WARRANT FOR REMOVAL RETURNED **NOT** SERVED:  STEVEN SAVAGE   DATE: 8/31/15 REASON: RECALLED PER COURT FILED | $0.00 |
| 09/01/2015 | WARRANT FOR REMOVAL RETURNED **NOT** SERVED: CHASTON SCOTT   DATE: 8/31/15 REASON: RECALLED PER COURT FILED | $0.00 |
| 09/01/2015 | WARRANT FOR REMOVAL RETURNED **NOT** SERVED:   KENNETH VICKS  DATE: 8/31/15 REASON: RECALLED PER COURT FILED | $0.00 |
| 09/01/2015 | SUBPOENA ISSUED TO SHERIFF FOR: MARKELUS K CARTER C/O DET T CLARK FILED | $2.00 |
| 09/01/2015 | SUBPOENA ISSUED TO SHERIFF FOR: TARAH CARTER C/O DET T CLARK FILED | $2.00 |
| 09/01/2015 | SUBPOENA ISSUED TO SHERIFF FOR: SONYA HUGHES C/O DET T CLARK FILED | $2.00 |
| 09/01/2015 | PROSECUTOR'S NOTICE OF INTENDED USE OF EVID. R. 404(B) EVIDENCE FILED | $0.00 |
| 09/02/2015 | AMENDED JOURNAL ENTRY ISSUING WARRANT FOR REMOVAL OF WITNESS (STEVEN T UPHAM) FILED | $2.00 |
| 09/02/2015 | COPIES | $1.00 |
| 09/02/2015 | WARRANT FOR REMOVAL OF WITNESS STEVEN T UPHAM ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |

Case Details – CourtView Justice Solutions                    Page 23 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 09/02/2015 | Issue Date: 09/02/2015<br>Service:  WARRANT FOR REMOVAL OF WITNESS STEVEN T UPHAM<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br>Cost Per:  $0.00<br><br>STEVEN T UPHAM #A648-985<br>C/O ACI<br>PO BOX 4501<br>LIMA OH 45802 | $0.00 |
| 09/02/2015 | SUBPOENA ISSUED TO SHERIFF OF  FOR: CHRISTA BODIKER FILED | $2.00 |
| 09/02/2015 | SUBPOENA RETURNED FROM LORAIN CTY SHERIFF SERVED:  KEVIN DELONG  DATE:  8/25/15 FILED | $29.74 |
| 09/02/2015 | SUBPOENA RETURNED SERVED: SONYA HUGHES C/O DET T CLARK DATE: 09/02/2015 FILED | $13.00 |
| 09/02/2015 | ASSIGNMENT NOTICE FILED | $0.00 |
| 09/02/2015 | COPIES | $3.00 |
| 09/02/2015 | MAILING FEES | $6.00 |
| 09/03/2015 | NOTICE OF INTENDED USE OF EVIDENCE FILED | $0.00 |
| 09/04/2015 | SUBPOENA RETURNED SERVED: MARKELUS K CARTER DATE: 09/02/2015        FILED | $13.00 |
| 09/04/2015 | SUBPOENA RETURNED SERVED: CHRISTA BODIKER DATE: 09/02/2015        FILED | $13.00 |
| 09/04/2015 | WARRANT FOR REMOVAL RETURNED **NOT** SERVED: STEVEN T UPHAM REASON: PER COURT  DATE: 09/03/2015 FILED | $0.00 |
| 09/04/2015 | SUBPOENA RETURNED SERVED: STEVEN T UPHAM  DATE: 09/04/2015        FILED | $13.00 |
| 09/08/2015 | SUBPOENA ISSUED TO ATTORNEY  FOR: KEEPER OF RECORDS / LPD FILED | $4.00 |
| 09/08/2015 | MOTION TO COMPEL: MOTION TO DISMISS OR ALTERNATIVELY MOTION TO CONTINUE TRIAL FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 09/08/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: FRED CLOUD FILED | $4.00 |
| 09/08/2015 | FAX TRANSMISSION<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $7.00 |
| 09/08/2015 | DEFENDANT'S 3RD AMENDED WITNESS LIST FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 09/09/2015 | SUBPOENA RETURNED **NOT** SERVED: TARAH CARTER  REASON: UNKNOWN IF SERVED DONE AS A WALK THROUGH BY PROSECUTORS  DATE: 09/07/2015        FILED | $0.00 |
| 09/09/2015 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED (THE LIMA NEWS) | $2.00 |
| 09/09/2015 | STATES SUPPLEMENTAL RESPONSE TO DEFENDANTS DEMAND FOR DISCOVERY FILED | $0.00 |
| 09/10/2015 | DEFENDANT'S 3RD AMENDED WITNESS LIST FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 09/10/2015 | MOTION TO QUASH SUBPOENA FILED<br>DIANE W FRENCH (ACSO) | $0.00 |
| 09/10/2015 | REQUEST & ORDER FOR MEDIA COVERAGE OF COURT PROCEEDINGS FILED - WLIO | $2.00 |
| 09/10/2015 | MOTION TO CONVEY WITNESS FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 09/10/2015 | DEFENDANT'S 4TH AMENDED WITNESS LIST FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |

Case Details - CourtView Justice Solutions                    Page 24 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 09/11/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: KEEPER OF OHIO BCI FORENSIC LABORATORY CHAIN OF CUSTODY REPORT FILED | $4.00 |
| 09/11/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: VICKI BARTHALEMEW FILED | $4.00 |
| 09/11/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: KEEPER OF PROPERTY CHAIN OF CUSTODY LIMA POLICE DEPARTMENT FILED | $4.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: ANGELA HOWARD DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: PAULETTA HOHBEIN DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: DET D MARIK DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: TARISSA ROSS DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: DAVID EVANS DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: VANESSA WHITE DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: LEAH REXFORD DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: DAVONTE KNUCKLES DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: KENNETH REXFORD DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: AARON SANKS  DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: PAM CALLAHAN DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: HEATHER WILLIAMS DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: TODD WHARTON DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: VICKI BARTHOLOMEW DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: MATTHEW CONGLETON DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: JULIE COX DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: PATRICK CRAWFORD DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: DANIEL DAVISON DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: RAYMOND PEOPLES DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: SCOTT DOBRANSKY DATE: 08/29/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: CARLOTTA WILLIAMS DATE: 09/04/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: FRED CLOUD DATE: 09/08/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: EBONY GIBSON DATE: 09/08/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: JOHN DAWSON DATE: 09/08/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: JUSTIN GIBSON DATE: 09/08/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: DELLA SMITH DATE: 09/03/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: ROBERT STAHLER DATE: 09/09/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: SHERIFF SAMUEL A CRISH DATE: 08/27/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: CHARLES GODFREY DATE: 08/27/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: SGT C SMITH DATE: 08/27/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: DET T CLARK DATE: 08/27/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA ISSUED TO PROCESS SERVER FOR: AGRUELLIO HARRIS FILED | $2.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: AGRUELLIO HARRIS DATE: 09/11/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: KEEPER OF PROPERTY CHAIN OF CUSTODY LIMA POLICE DEPARTMENT DATE: 09/11/2015       FILED | $0.00 |
| 09/11/2015 | SUBPOENA RETURNED SERVED: KEEPER OF PROPERTY CHAIN OF CUSTODY LIMA POLICE DEPARTMENT DATE: 09/11/2015       FILED | $0.00 |

Case Details - CourtView Justice Solutions                    Page 25 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 09/14/2015 | ORDER TO CONVEY WITNESS (VINCENT W CUNNINGHAM) FILED | $4.00 |
| 09/14/2015 | COPIES | $2.00 |
| 09/14/2015 | WARRANT FOR REMOVAL ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 09/14/2015 | Issue Date:  09/14/2015<br>Service:  WARRANT FOR REMOVAL<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br>Cost Per:  $0.00<br><br>CARTER, MARKELUS Q<br>C/O ALLEN CTY JAIL<br>LIMA, OH   45801<br>Tracking No: S000015740 | $0.00 |
| 09/14/2015 | ORDER ISSUING WARRANT FOR REMOVAL (OF WITNESS CHASTON SCOTT) FILED | $2.00 |
| 09/14/2015 | WARRANT FOR REMOVAL ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 09/14/2015 | Issue Date:  09/14/2015<br>Service:  WARRANT FOR REMOVAL<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br>Cost Per:  $0.00<br><br>CHASTON SCOTT #A497-310<br>C/O MANSFIELD CORRECTIONAL INSTITUTION | $0.00 |
| 09/14/2015 | ORDER TO CONVEY WITNESSES (KENNETH VICKS, STEVEN SAVAGE, ABDUL BARI, AND THOMAS SMITH) FILED | $2.00 |
| 09/14/2015 | COPIES | $4.00 |
| 09/14/2015 | WARRANT FOR REMOVAL ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 09/14/2015 | ISSUE DATE: 9/14/15<br>Service:  WARRANT FOR REMOVAL OF WITNESS<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>KENNETH VICKS #A270-096<br>C/O ACI<br>LIMA, OHIO | $0.00 |
| 09/14/2015 | WARRANT FOR REMOVAL ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 09/14/2015 | ISSUE DATE: 9/14/15<br>Service:  WARRANT FOR REMOVAL OF WITNESS<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>STEVEN SAVAGE #A423-361 | $0.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| | C/O ACI<br>LIMA, OHIO | |
| 09/14/2015 | WARRANT FOR REMOVAL ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 09/14/2015 | ISSUE DATE: 9/14/15<br>Service:  WARRANT FOR REMOVAL OF WITNESS<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>ABDUL BARI #A531-381<br>C/O ACI<br>LIMA, OHIO | $0.00 |
| 09/14/2015 | WARRANT FOR REMOVAL ISSUED TO SHERIFF W/ CERT COPY OF ENTRY | $7.00 |
| 09/14/2015 | ISSUE DATE: 9/14/15<br>Service:  WARRANT FOR REMOVAL OF WITNESS<br>Method:  PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br><br>THOMAS SMITH #A525-834<br>C/O ACI<br>LIMA, OHIO | $0.00 |
| 09/15/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  ALLEN / OAKWOOD C.I. (RECORDS - KENNETH VICKS) FILED | $2.00 |
| 09/15/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  ALLEN / OAKWOOD C.I. (RECORDS - STEVEN SAVAGE) FILED | $2.00 |
| 09/15/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  ALLEN / OAKWOOD C.I. (RECORDS - ABDUL BARI) FILED | $2.00 |
| 09/15/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  ALLEN / OAKWOOD C.I. (RECORDS - THOMAS SMITH) FILED | $2.00 |
| 09/15/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  ALLEN / OAKWOOD C.I. (RECORDS - VINCENT W CUNNINGHAM) FILED | $2.00 |
| 09/15/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  ALLEN / OAKWOOD C.I. (RECORDS - CHASTON SCOTT) FILED | $2.00 |
| 09/16/2015 | MOTION FOR MISTRIAL FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 09/17/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  CORI SMITH FILED | $2.00 |
| 09/17/2015 | SUBPOENA ISSUED TO PROSECUTOR FOR:  JIM KRUMMEL FILED | $2.00 |
| 09/17/2015 | AMENDED WARRANT FOR REMOVAL RETURNED SERVED: DATE: 9/4/15 FILED | $20.00 |
| 09/18/2015 | SUBPOENA RETURNED SERVED: CORI SMITH DATE: 09/17/2015      FILED | $14.00 |
| 09/18/2015 | SUBPOENA RETURNED SERVED: JIM KRUMMEL DATE: 09/17/2015      FILED | $14.00 |
| 09/18/2015 | WARRANT FOR REMOVAL OF STEVEN SAVAGE RETURNED, 09/17/2015 FILED | $20.00 |
| 09/21/2015 | WARRANT FOR REMOVAL OF VINCENT WILLIAM CUNNINGHAM RETURNED, 09/18/2015 FILED | $20.00 |
| 09/21/2015 | WARRANT FOR REMOVAL OF KENNETH HICKS RETURNED, 09/18/2015 FILED | $20.00 |
| 09/21/2015 | WARRANT FOR REMOVAL OF THOMAS SMITH RETURNED, 09/18/2015 FILED | $20.00 |
| 09/21/2015 | WARRANT FOR REMOVAL OF ABDUL BARI RETURNED, 09/18/2015 FILED | $20.00 |
| 09/21/2015 | WARRANT FOR REMOVAL OF CHASTON SCOTT RETURNED, 09/18/2015 FILED | $383.00 |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|------|-------------|------------|
| 09/22/2015 | VERDICT COUNT ONE FILED | $0.00 |
| 09/22/2015 | VERDICT ON SPECIFICATION - COUNT ONE FILED | $0.00 |
| 09/22/2015 | VERDICT COUNT TWO FILED | $0.00 |
| 09/22/2015 | STENOGRAPHER FEES FILED | $275.00 |
| 09/22/2015 | JUDGMENT ENTRY OF CONVICTION & SENTENCING FILED | $14.00 |
| 09/22/2015 | COPIES | $21.00 |
| 09/22/2015 | MAILING FEES | $6.00 |
| 09/22/2015 | WARRANT TO CONVEY TO ORIENT ISSUED TO SHERIFF | $4.00 |
| 09/22/2015 | Issue Date: 09/22/2015<br>Service: WARRANT TO CONVEY TO ORIENT<br>Method: PERSONAL SERVICE<br>Provider: ALLEN COUNTY SHERIFF<br>Cost Per: $0.00<br><br>CARTER, MARKELUS Q<br>C/O ALLEN CTY JAIL<br>LIMA, OH 45801<br>Tracking No: S000015784 | $0.00 |
| 09/22/2015 | WARRANT TO CONVEY TO ORIENT | $219.00 |
| 09/24/2015 | CALLING JURY FEE | $25.00 |
| 09/24/2015 | JURY EXPENSES | $4,965.00 |
| 09/25/2015 | WARRANT TO CONVEY RETURNED, 09/24/2015 FILED | $0.00 |
| 10/05/2015 | CRIMINAL WITNESS FEES - BOB SARCHET | $12.00 |
| 10/05/2015 | CRIMINAL WITNESS FEES - DET DONALD K MARIK | $24.00 |
| 10/05/2015 | JURY EXPENSES (RIGALI'S  MEAL) | $173.83 |
| 10/05/2015 | SENTENCING INFORMATION<br>COUNT 1: PRISON -LIFE WITHOUT PAROLE<br>  **CREDIT FOR 530 DAYS**<br>     MANDATORY 3- YEAR PRISON FOR FIREARM SPEC - **SERVE CONSECUTIVE TO LIFE W/O PAROLE<br>COUNT 2: PRISON - 36 MONTHS **SERVE CONCURRENT TO TERM IMPOSED IN COUNT 1 AND CONCURRENT TO 3-YEAR TERM IMPOSED<br>     ON FIREARM SPECIFICATION | |
| 10/05/2015 | FEES PAID PURSUANT TO ORC 2949.091  Receipt: 474724  Date: 01/12/2016 | $30.00 |
| 10/05/2015 | FEES PAID PURSUANT TO ORC 2743.70  Receipt: 474724  Date: 01/12/2016 | $30.00 |
| 10/05/2015 | CITIZENS REWARD PROGRAM ORC 9.92 | $1.00 |
| 10/05/2015 | FEES PD PURSUANT TO ORC 120.36 PUBLIC DEFENDER | $25.00 |
| 10/05/2015 | COST FOR COMPLETE RECORD | $1,012.00 |
| 10/05/2015 | RECEIVING, DISCHARGING AND SURRENDERING PRISONER FILED | $10.00 |
| 10/05/2015 | TAKING PRISONER BEFORE JUDGE | $15.00 |
| 10/05/2015 | COPIES | $24.00 |
| 10/05/2015 | CERTIFIED COPY | $6.00 |
| 10/05/2015 | COST BILL MAILING FEE | $1.00 |
| 10/05/2015 | COST BILL FILED | $0.00 |
| 10/05/2015 | | |

Case Details - CourtView Justice Solutions                Page 28 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| | COST BILL MAILED<br>CARTER, MARKELUS Q was sent bill for $11,335.18.<br>Printed on 10/05/2015  13:52:59.38. | |
| 10/08/2015 | (FAXED) MOTION TO SUPPLEMENT THE RECORD FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 10/08/2015 | (FAXED) MOTION FOR PAYMENT TO EXPERT FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 10/08/2015 | (FAXED) MOTION FOR PAYMENT TO INVESTIGATOR FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 10/08/2015 | FAX TRANSMISSION | $11.00 |
| 10/13/2015 | SUBPOENA RETURNED FROM  FRANKLIN CTY SHERIFF  SERVED:  JESSE PITTMAN   DATE:  9/4/15 FILED | $95.49 |
| 10/14/2015 | ORDER TO SUPPLEMENT RECORD FILED | $2.00 |
| 10/14/2015 | COPIES ISSUED TO PROSECUTOR, ALLEN CTY SHERIFF DEPT | $2.00 |
| 10/14/2015 | EMAILED COPIES TO JON PAUL RION | $2.00 |
| 10/16/2015 | NOTICE OF APPEAL AND REQUEST FOR TRANSMISSION OF TRANSCRIPT; REQUEST TO APPOINT COUNSEL FILED (01-15-062)<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 10/16/2015 | PRAECIPE FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 10/16/2015 | CRIMINAL APPEAL DOCKETING STATEMENT FILED<br>JON PAUL RION (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $0.00 |
| 10/16/2015 | AFFIDAVIT OF INDIGENCY FILED | |
| 10/19/2015 | SUBPOENA RETURNED FROM SHERIFF OF WOOD COUNTY SERVED: KEVIN KRAMER  DATE: 08/17/2015 FILED | $13.00 |
| 10/20/2015 | JOURNAL ENTRY APPOINTING F STEPHEN CHAMBERLAIN AS APPELLATE COUNSEL FILED | $2.00 |
| 10/20/2015 | COPIES MAILED TO F STEPHEN CHAMBERLAIN, JON PAUL RION, AND ISSUED TO JUERGEN WALDICK | $3.00 |
| 10/20/2015 | MAILING FEES | $4.00 |
| 11/04/2015 | ORDER GRANTING COURT PAYMENT OF EXPERT FEES FILED | $2.00 |
| 11/04/2015 | COPY ISSUED TO PROSECUTOR | $1.00 |
| 11/04/2015 | EMAILED COPIES TO JON PAUL RION | $2.00 |
| 11/04/2015 | ORDER GRANTING COURT PAYMENT OF INVESTIGATIVE FEES FILED | $2.00 |
| 11/04/2015 | COPY ISSUED TO PROSECUTOR | $1.00 |
| 11/04/2015 | EMAILED COPIES TO JON PAUL RION | $2.00 |
| 11/17/2015 | ORDER APPROVING PAYMENT FOR SERVICES FILED | $4.00 |
| 11/17/2015 | ORDER APPROVING PAYMENT FOR SERVICES FILED | $6.00 |
| 11/17/2015 | COPIES OF ORDERS ISSUED TO AUDITOR | |
| 11/25/2015 | MOTION TO EXTEND TIME TO FILE RECORD ON APPEAL | $0.00 |
| 11/25/2015 | ORDER TO EXTEND TIME TO FILE RECORD ON APPEAL FILED | $2.00 |
| 01/08/2016 | MOTION TO SUSPEND COLLECTION OF COURT COSTS FILED<br>F STEPHEN CHAMBERLAIN (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $15.00 |
| 01/08/2016 | COST FOR COMPUTER FEE 2303.201B1  Receipt: 498181  Date: 01/10/2017  Receipt: 500045  Date: 02/07/2017  Receipt: 502048  Date: 03/07/2017 | $20.00 |
| 01/08/2016 | FAX TRANSMISSION<br>F STEPHEN CHAMBERLAIN (Attorney) on behalf of MARKELUS Q CARTER (Defendant) | $5.00 |
| 01/08/2016 | | |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| | JUDGMENT ENTRY GRANTING CLERKS/AUDITORS FEE FOR AN INDIGENT DEFENDANT FILED | |
| 01/08/2016 | COPY OF ENTRY & AFFIDAVIT ISSUED TO AUDITOR | |
| 01/11/2016 | DEPOSIT FOR COSTS  Receipt: 474612  Date: 01/11/2016 | $60.04 |
| 01/11/2016 | JUDGMENT ENTRY ON MOTION TO SUSPEND COLLECTION OF COURT COSTS FILED | $4.00 |
| 01/11/2016 | COPIES MAILED TO F STEPHEN CHAMBERLAIN AND ISSUED TO PROSECUTOR | $4.00 |
| 01/11/2016 | MAILING FEES | $2.00 |
| 02/03/2016 | DEPOSIT  Receipt: 476053  Date: 02/03/2016 | $4.32 |
| 03/28/2016 | JUDGMENT ENTRY GRANTING TRANSCRIPT FEES FILED (COPY ISSUED TO THE AUDITOR) | $4.00 |
| 03/28/2016 | TRANSCRIPT-TIME WAIVER HEARING FILED | |
| 03/28/2016 | TRANSCRIPT-MOTION FOR CONTINUANCE AND TIME WAIVER FILED | |
| 03/28/2016 | TRANSCRIPT-MOTION TO SUPPRESS FILED | |
| 03/28/2016 | TRANSCRIPT-HEARING ON MOTION TO SUPPRESS FILED | |
| 03/28/2016 | TRANSCRIPT-TIME WAIVER AND CONINUE JURY TRIAL HEARING FILED | |
| 03/28/2016 | TRANSCRIPT-PLEA OFFER HEARING FILED | |
| 03/28/2016 | TRANSCRIPT-HEARING ON VARIOUS PRE-TRIAL MOTIONS FILED | |
| 03/28/2016 | TRANSCRIPT-REVIEW COMPETENCY REPORT HEARING FILED | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 1) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 2) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 3) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 4) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 5) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 6) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 7) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 8) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 9) | |
| 03/28/2016 | TRANSCRIPT-JURY TRIAL FILED (VOL 10) | |
| 03/28/2016 | TRANSCRIPT OF ORIGINAL PAPERS TRANSMITTED TO THE COURT OF APPEALS AS THE COMPETE RECORD | $0.00 |
| 03/28/2016 | CLERK'S FEE FOR PREPARING TRANSCRIPT | $7.35 |
| 04/13/2016 | MOTION AND ENTRY GRANTING CLERKS/AUDITORS TRANSCRIPT FEE FOR AN INDIGENT DEFENDANT FILED | |
| 04/13/2016 | COPY OF ENTRY & AFFIDAVIT ISSUED TO AUDITOR | |
| 05/06/2016 | DEPOSIT  Receipt: 482776  Date: 05/06/2016 | $1.17 |
| 06/06/2016 | DEPOSIT FOR COSTS  Receipt: 484523  Date: 06/06/2016 | $1.21 |
| 10/11/2016 | DEPOSIT  Receipt: 492743  Date: 10/11/2016 | $3.18 |
| 11/09/2016 | DEPOSIT  Receipt: 494647  Date: 11/09/2016 | $4.00 |
| 12/12/2016 | DEPOSIT  Receipt: 496567  Date: 12/12/2016 | $4.28 |
| 01/09/2017 | DEPOSIT  Receipt: 498051  Date: 01/09/2017 | $4.32 |
| 02/06/2017 | DEPOSIT  Receipt: 499928  Date: 02/06/2017 | $7.55 |
| 03/06/2017 | DEPOSIT  Receipt: 501840  Date: 03/06/2017 | $11.02 |
| 04/03/2017 | | $65.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| | CERTIFIED COPY OF JUDGMENT ENTRY AND OPINION AFFIRMING JUDGMENT OF THE TRIAL COURT WITH COSTS ASSESSED TO APPELLANT FOR WHICH JUDGMENT IS HEREBY RENDERED FILED | |
| 04/06/2017 | COST FOR COMPLETE RECORD | $168.00 |
| 04/06/2017 | COPIES | $9.00 |
| 04/06/2017 | COST BILL MAILING FEE | $1.00 |
| 04/06/2017 | UPDATED COSTS SENT TO CASHIER / CRC | |
| 04/06/2017 | MAILING FEES | $2.00 |
| 04/06/2017 | COST BILL FILED | $0.00 |
| 04/06/2017 | COST BILL MAILED CARTER, MARKELUS Q was sent bill for $11,696.93. Printed on 04/06/2017  10:24:39.11. | |
| 04/07/2017 | DEPOSIT  Receipt: 504215  Date: 04/07/2017 | $11.57 |
| 05/08/2017 | DEPOSIT  Receipt: 506202  Date: 05/08/2017 | $11.06 |
| 06/07/2017 | DEPOSIT  Receipt: 507981  Date: 06/07/2017 | $11.00 |
| 07/10/2017 | DEPOSIT  Receipt: 509836  Date: 07/10/2017 | $11.00 |
| 08/07/2017 | DEPOSIT  Receipt: 511827  Date: 08/07/2017 | $11.75 |
| 08/31/2017 | LETTER FAXED TO CRC TO STOP GARNISHMENT DUE TO PAYMENT PLAN | |
| 09/01/2017 | DEPOSIT  Receipt: 513443  Date: 09/01/2017 | $25.00 |
| 10/04/2017 | DEPOSIT FOR PAYMENT PLAN  Receipt: 515606  Date: 10/04/2017 | $25.00 |
| 10/04/2017 | CORESPONDENCE FROM RUBY CARTER IN REGARDS TO DEFENDANT'S COURT COSTS FILED | $0.00 |
| 11/01/2017 | DEPOSIT - PAYMENT PLAN  Receipt: 517479  Date: 11/01/2017 | $25.00 |
| 12/01/2017 | DEPOSIT - PAYMENT PLAN  Receipt: 519238  Date: 12/01/2017 | $25.00 |
| 01/02/2018 | DEPOSIT PAYMENT PLAN  Receipt: 520959  Date: 01/02/2018 | $25.00 |
| 02/02/2018 | DEPOSIT-PAYMENT PLAN  Receipt: 522994  Date: 02/02/2018 | $25.00 |
| 03/02/2018 | DEPOSIT PAYMENT PLAN  Receipt: 525112  Date: 03/02/2018 | $25.00 |
| 04/02/2018 | DEPOSIT - PAYMENT PLAN  Receipt: 527056  Date: 04/02/2018 | $25.00 |
| 05/02/2018 | DEPOSIT  Receipt: 528912  Date: 05/02/2018 | $25.00 |
| 05/31/2018 | JOURNAL ENTRY ORDERING PARTIES TO CLAIM EXHIBITS FILED | $0.00 |
| 06/04/2018 | DEPOSIT  Receipt: 530961  Date: 06/04/2018 | $25.00 |
| 06/11/2018 | RECEIPT OF EXHIBITS FILED | |
| 07/02/2018 | DEPOSIT  Receipt: 532688  Date: 07/02/2018 | $25.00 |
| 08/02/2018 | DEPOSIT  Receipt: 534700  Date: 08/02/2018 | $25.00 |
| 09/04/2018 | DEPOSIT  Receipt: 536853  Date: 09/04/2018 | $25.00 |
| 10/01/2018 | DEPOSIT - PMT PLAN  Receipt: 538792  Date: 10/01/2018 | $25.00 |
| 11/01/2018 | DEPOSIT  Receipt: 540823  Date: 11/01/2018 | $25.00 |
| 11/30/2018 | DEPOSIT  Receipt: 542516  Date: 11/30/2018 | $25.00 |
| 01/03/2019 | DEPOSIT  Receipt: 544381  Date: 01/03/2019 | $25.00 |
| 01/07/2019 | DEPOSIT  Receipt: 544614  Date: 01/07/2019 | $25.00 |
| 02/04/2019 | DEPOSIT  PMT PLAN  Receipt: 546239  Date: 02/04/2019 | $50.00 |
| 03/04/2019 | DEPOSIT  Receipt: 548336  Date: 03/04/2019 | $50.00 |

Case Details - CourtView Justice Solutions                    Page 31 of 31

| Date | Docket Text | Amount Owed |
|------|-------------|------------:|
| 04/02/2019 | DEPOSIT FOR PAYMENT PLAN  Receipt: 550404  Date: 04/02/2019 | $25.00 |
| 04/03/2019 | RECEIPT OF EXHIBITS FILED | |
| 04/09/2019 | DEPOSIT FOR PAYMENT PLAN  Receipt: 550941  Date: 04/09/2019 | $25.00 |
| 05/02/2019 | DEPOSIT FOR PAYMENT PLAN  Receipt: 552402  Date: 05/02/2019 | $50.00 |
| 06/13/2019 | DEPOSIT FOR PAYMENT PLAN  Receipt: 555086  Date: 06/13/2019 | $50.00 |