FILED
COMMON PLEAS COURT

2016 MAR 23 PM 1:04

## IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

CLERK OF COURTS
ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO.  CR2014 0139 |
| Plaintiff | * | |
| | * | **TRANSCRIPT -** |
| -VS- | * | JURY TRIAL |
| **MARKELUS Q. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

### A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio  45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

**(VOLUME 1 OF 10)**

683  J.O.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# TABLE OF CONTENTS

## (VOLUME 1 OF 10)

TUESDAY, SEPTEMBER 8, 2015 -

COURT COMMENCED AT 9:07 A.M. (WITHOUT
   PROSPECTIVE JURORS) ..... 1

DISCUSSION REGARDING DEFENDANT'S MOTION TO
   COMPEL/MOTION TO DISMISS OR MOTION TO
   CONTINUE JURY TRIAL ..... 1

STATE'S FIRST WITNESS ON MOTIONS -
   DETECTIVE TIMOTHY CLARK - KOHLRIESER ..... 6
      DEFENDANT'S EX. 'B' STIPULATED TO FOR
      ADMISSION INTO EVIDENCE ..... 8
             - RION ..... 13
      DEFENDANT'S EX. 'D' STIPULATED TO FOR
      ADMISSION INTO EVIDENCE ..... 18
             - KOHLRIESER ..... 22
             - COURT ..... 24
             - RION ..... 29
             - KOHLRIESER ..... 30
             - COURT ..... 33
             - RION ..... 34
             - KOHLRIESER ..... 35

ARGUMENT ON MOTIONS - KOHLRIESER ..... 38

ARGUMENT ON MOTIONS - RION ..... 42

MOTION TO COMPEL GRANTED BY THE COURT ..... 43

MOTION TO DISMISS AND MOTION TO CONTINUE
   JURY TRIAL DENIED BY COURT ..... 44

COURT IN RECESS ON PRE-TRIAL MATTERS AT 10:13 A.M. ..... 47

COURT RECONVENED AT 10:57 A.M. (WITHOUT
   PROSPECTIVE JURORS) ..... 48

STATE'S EXHIBITS '3' THROUGH '6' TENDERED FOR
   ADMISSION INTO EVIDENCE ON THE MOTION HRG. ..... 50

STATE'S EXHIBITS '3' THROUGH '5' ADMITTED INTO
    EVIDENCE ON THE MOTION HEARING                           51

STATE'S EXHIBITS '1', '2' AND '6' ADMITTED INTO
    EVIDENCE ON THE MOTION HEARING                           52

COURT IN RECESS AT 11:06 A.M.                                53

COURT RECONVENED AT 11:18 A.M. (WITH
    PROSPECTIVE JURORS PRESENT)                              53

OPENING COMMENTS BY COURT                                    53

PROSPECTIVE JURORS SWORN                                     68

VOIR DIRE - COURT                                            69

COURT QUESTIONING JUROR NO. 4 ONLY                           102

JUROR NO. 4 EXCUSED BY COURT                                 104

VOIR DIRE - KOHLRIESER                                       106

VOIR DIRE - RION                                             159

PEREMPTORY CHALLENGES                                        184

VOLUME ONE CONCLUDED                                         222

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**NOTE:**  THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE.  SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS.

## MOTION TO COMPEL/MOTION TO DISMISS  - OR - MOTION TO CONTINUE JURY TRIAL -

### STATE OF OHIO'S EXHIBITS -

1 - E-MAIL FROM TIM CLARK TO STEVE GOEDDE AND E-MAILS BETWEEN TIM CLARK AND TRUDY LOE AND/OR DR. JOHN BOND;

2- E-MAILS BETWEEN TERRI KOHLRIESER AND DR. JOHN BOND;

3 - E-MAILS BETWEEN TIM CLARK AND TRUDY LOE AND/OR DR. JOHN BOND;

4- E-MAILS BETWEEN TIM CLARK AND TRUDY LOE AND/OR DR. JOHN BOND;

5 - E-MAILS BETWEEN TIM CLARK AND TRUDY LOE AND/OR DR. JOHN BOND;

6 - E-MAILS BETWEEN TIM CLARK AND TRUDY LOE WITH ATTACHED IMAGES;

### DEFENDANT'S EXHBITS -

B - E-MAILS BETWEEN TIM CLARK AND TRUDY LOE AND/OR DR. JOHN BOND;

D - IMAGES OF SHELL CASINGS;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

1          **TUESDAY, SEPTEMBER 8, 2015**

2          **9:07 A.M.**

3

4                    THE COURT:   All right.  We're on the

5     record and today is the 8th day of September, 2015.  The matter before the

6     Court is Case Number CR2014 0139, which is captioned The State of Ohio

7     -vs- Markelus Q. Carter.  For the record, are you Markelus Carter?

8     DEFENDANT:  Yes.

9                    THE COURT:   Okay.  The record will show

10    that Mr. Carter is present in Court and represented by Jon Paul Rion.

11    Assistant Prosecuting Attorneys Anthony Miller and Terri Kohlrieser are here

12    representing the State of Ohio.

13          The matter is assigned for the commencement of a jury trial this

14    morning.  We do have a pool of prospective jurors that are waiting out in the

15    hallway.  None of them are in the Courtroom.  The Court is on the record

16    without the potential jurors present because a matter has just arisen this

17    morning.  Defense counsel has filed this morning, and we've had a brief

18    discussion in chambers with all counsel present, but the Court wants to put

19    this all on the record, there is a Motion to Compel/Motion to Dismiss or, in the

20    alternative, they have a Motion to Continue the Trial that was filed by the

21    defense this morning.  Notwithstanding the fact that we had some discussion

22    in chambers that wasn't recorded and so I want to put everything on the

23    record and give everybody a full opportunity to put on the record their

1    position with regard to this most recent of motions.

2         So, it's a defense motion, Mr. Rion.  Do you want to be heard?  Again,

3    your written Motion is on record.  You don't have to reiterate everything in

4    there.  But, just make sure you get everything on, your argument, on the

5    record so it's clear what the issue is.

6         MR. RION:   Your Honor, on Thursday, and

7    this is Tuesday after a long weekend, on Thursday prior to trial, late

8    afternoon, I believe as the Court was closing for the holiday weekend, I was

9    handed a document from the Prosecutor's Office that indicated there was

10    some testing done in England as it relates to the shell casings in this case.

11    The Prosecutor says he put it on Courtview, or whatever, a couple of days

12    earlier, but the first time I was made aware of it or saw it was when I received

13    this document, otherwise I would have brought it to the Court's attention

14    before now.  I don't think it changes the analysis.  The document that was

15    given to us states that shell casings were sent to England for forensic testing.

16    It was confirmed that Doctor Bond in England looked at them.  I believe, if you

17    see the e-mail from Doctor Bond, the only reference made to 05-34794 was

18    indication that they had to remove the writing.  There was not an indication as

19    to that was an indication that all of the findings were limited to that case.  It

20    was just referenced that they had to remove a piece of tape on that shell

21    casing.

22         Over the weekend I contacted Doctor Bond by e-mail and I have

23    attached those two e-mails.  The first e-mail was, "Did you analyze the shell

1  casings in the Warrington murder," and he affirmed that he did.  Secondly, I

2  reconfirmed it with him, to make sure there was no confusion, that it was in

3  reference to the Warrington murder and he reconfirmed that that was his

4  understanding of what he had done.

5      It should be noted that there's no e-mail that shows that there's any

6  other cases being analyzed except for the Warrington murder, at least that I

7  have received, that went to Doctor Bond.

8      My concern is multiple.  Number one, it's my belief, and I think the

9  Prosecutor will stipulate, that shell casings were, in fact, sent for forensic

10  testing to England in 2010 and the defense was not put on notice of that.  It

11  does appear as if that there were potential findings.  I think the Court needs to

12  understand what Doctor Bond does.  He doesn't actually analyze the

13  fingerprint itself.  He simply creates some type of, or, through some

14  technology that I haven't been able to fully understand or investigate yet

15  because of the late disclosure, but through a technology he's able to create

16  so the prints can be identified by someone other than himself and he simply

17  then sends back those prints in a fashion in which they are identifiable.  At

18  this point from Doctor Bond it appears that not only did he test the bullets

19  from the Warrington case, but there may have been results that were then

20  forwarded back here.

21      It's my understanding that the e-mail server, or at least the computer

22  that Detective Clark was using at the time, is no longer in service and we do

23  not at this point have the full string of e-mails from Detective Clark as to what

4

1   his conversation was.  I spoke with the forensic unit at the Northampton

2   Police Department where this originally occurred and they said that they had

3   some records in relation to it, but I really just need to talk to Bond, and so

4   Doctor Bond was the one I spoke to.  But, it's my belief that the forensic

5   department, the forensic lab, at the police department would have additional

6   information as to correspondence, et cetera.

7       My client is in jail.  It's not with any great joy that I ask for a

8   continuance, your Honor.  But if, in fact, Doctor Bond has any

9   correspondence that's indicating results that he forwarded to either a

10  detective, or the police department, or the Prosecutor's Office this case will be

11  reversed with prejudice would be my sense.  It goes a little further.  If he did a

12  report and the findings were negative that would be relevant to our case as

13  well - now, for a couple of different reasons.  Information as to the day that

14  the shell casings were sent, the day they were sent back, the integrity of the

15  evidence, who handled the evidence - there's all sorts of things that are

16  raised by this issue.  The defense had absolutely no information on this prior

17  to Thursday of last week.  So, I have no choice but to ask for a continuance.  I

18  would ask that the government at least stipulate that the documents that I've

19  attached to my exhibit (sic) are accurate and I'm telling the Court that those

20  e-mails were the only two e-mails that I received from Doctor Bond in the

21  limited time that I was able to speak with him to prepare for this.

22      I would ask that the e-mail that Detective Clark sent in July of 2007 be

23  attached as an exhibit as well.  I don't know if you have that.

1        MRS. KOHLRIESER:  I have it.  I'm going

2    to put him on the stand and ask him about it and introduce it.  No problem.

3        MR. RION:   I would ask that that be made

4    part of the record because it indicates in there that Detective Clark -- let me

5    get the language.  Can I see that?

6        MRS. KOHLRIESER:   Sure.

7        MR. RION:   At least in this, from the

8    Detective's point of view, now this may not be Doctor Bond's point of view,

9    but the Detective's understanding is, "They were unable to lift any prints from

10   the Warrington homicide shell casings."  So, they say that, which would

11   indicate that there's some communication, some report, some document out

12   there, some correspondence, that would show that.  I think it's -- well, if they

13   were to look through their server they would find what the correspondence is

14   and the information from the forensic department that would confirm this.

15       The shell casings are obviously very important in this case.  They

16   found two shell casings at the scene.  This is largely a circumstantial

17   evidence case.  Based upon that and the severity of the significance of it I

18   would ask for a continuance of this matter and the other remedies sought in

19   my Motion.

20       THE COURT:   Okay.  All right.  Who's

21   going to respond for the State?  Mrs. Kohlrieser?

22       MRS. KOHLRIESER:   Your Honor, prior to

23   argument, the State would actually like to call Detective Clark to the stand so

1    we have some evidence as to this particular issue.

2                              THE COURT:   Okay.

3    WHEREUPON, called to appear as a witness in this proceeding was one:

4                **D E T E C T I V E   T I M O T H Y   C L A R K**

5    who, having been duly sworn by the bailiff herein, testified as follows:

6                              **DIRECT EXAMINATION**

7    **BY MRS. KOHLRIESER:**

8    Q       Would you state your name for the record?

9    A       Timothy Clark.

10   Q       Okay.  For the record, how are you employed?

11   A       I'm a Detective with the Lima Police Department.

12   Q       Okay.  Back in February, February 23rd of 2009, were you assigned

13   the Ken Warrington homicide?

14   A       Yes.

15   Q       Okay.  And as part of that and, I guess, with maybe the Court's

16   permission for a little leading to get us through this, were two shell casings

17   found at that scene?

18   A       Yes.

19   Q       Okay.  And were they collected as evidence by Lima Police

20   Department officers?

21   A       Yes.

22   Q       And at some point my understanding is, and if you would explain to the

23   Court, I believe in 2010 Doctor Bond and some of his work came to your, I

1  guess, knowledge.  Could you explain for the Court what you know of Doctor

2  Bond and kind of how we got here today in relation to Doctor Bond?

3  A        Well, prior to my involvement with Doctor Bond Detective Miller had

4  sent Doctor Bond, I believe, shell casings from a different case.

5  Q        Just so we're clear, because of things we talked about in chambers,

6  that was actually a 1989 murder case; correct?  It was a cold case he was

7  working on?

8  A        I believe -- I don't know the exact date, but it was a cold case.  The

9  Prosecutor's Office had directed him to locate Doctor Bond and send shell

10  casings from the '89 case.  Kent Miller was able to actually find Doctor Bond

11  lecturing in close proximity to this time frame in Nashville, Tennessee.  So,

12  Detective Miller actually drove shell casings down to Nashville, Tennessee

13  and gave them to Doctor Bond and Doctor Bond eventually examined those

14  shell casings and no results were found.

15  Q        Just so we're clear, that was not Lucious Upshaw; was it?

16  A        That was not Lucious Upshaw, nor was it Markelus, or, Kenneth

17  Warrington.

18  Q        For the record, Lucious Upshaw, was he a suspect or a victim?

19  A        Lucious Upshaw was a murder victim in 2005.  This would be a

20  different case from what Kent Miller did.  I'm just referencing that's how we

21  came to know Doctor Bond.

22  Q        Okay.  We'll get to Lucious in a minute.  But, go ahead.

23  A        Anyhow, I was contacted by the Prosecutor's Office, and more

1    specifically Juergen Waldick, and he was aware of what Detective Miller had

2    previously done and Mr. Waldick advised me to send shell casings to Doctor

3    Bond in regard to the Warrington and Upshaw case.

4    Q    Okay. And did you, in fact, do that?

5    A    I did.

6    Q    Okay. Did you have some communications via e-mail with Doctor

7    Bond at the time?

8    A    I sent Doctor Bond an e-mail making the request. I think I received a

9    confirmation e-mail from one of his assistants. Then, eventually I think we got

10    a third e-mail indicating that he did recover what he determined to be

11    markings from shell casings.

12             MRS. KOHLRIESER: Your Honor, at this

13    time I believe the Court has the defense's filing from this morning at eight

14    thirty-two and attached to that is Defendant's exhibit 'B'.

15             THE COURT: Correct.

16             MRS. KOHLRIESER: I believe it's two

17    pages. The State would stipulate to the admission of that for purposes of this

18    hearing for the Court to consider. I just wanted to have Detective Clark

19    identify that.

20    Q    I'll hand you a copy of the defense's Motion which is marked State's

21    (sic) exhibit 'B'. Do you recognize that?

22    A    I do.

23    Q    And what is that, for the record?

1    A       I believe this is the initial e-mail that I sent to Doctor Bond requesting

2    that he examine the shell casings from the Carter, or, from the Warrington

3    case.

4    Q       And there is a second page to that as well; correct?  What does that

5    appear to be?

6    A       This indicates that Doctor Bond examined shell casings and stated that

7    he photographed marks on a case, being 05-34794.

8    Q       Okay.  That case number, have you been able to, that number that's

9    referenced in that e-mail, have you been able to track that number?

10    A       Yes.

11    Q       What -- I guess, for the record, -- those are called C.F.S. numbers at

12    the Lima Police Department; correct?

13    A       Yes.

14    Q       Okay.

15    A       Call for service numbers.

16    Q       Okay.  And the 05 number that we see attached in that e-mail, what

17    case does that C.F.S. number pertain to?

18    A       It pertains to the Lucious Upshaw murder case.

19    Q       And those first numbers, 05, what does that tell you as a Lima Police

20    Department Officer?

21    A       05 is the year of the call.

22    Q       And what year was Kenneth Warrington killed?

23    A       2009.

1  Q      Would his case number start with an 09 then?

2  A      It does.

3  Q      I'm going to hand you what I'm marking as State's exhibit '1'. It's noted

4  with today's date, but I'm actually going to write 'Motion to Compel' on here so

5  that should we go to trial today we can distinguish it. I'll have you look at

6  State's exhibit '1', please. Do you recognize that document?

7  A      I do.

8  Q      Okay. That's actually, I believe, three pages?

9  A      Yes.

10 Q      And what is State's exhibit '1'?

11 A      Well, page one -- well, page two and three are correspondence.

12 Again, my initial e-mail that I had sent to Doctor Bond and then a response

13 from Mrs. Trudy Loe who indicated they would be pleased to look it over.

14 Page one is an e-mail that I sent to -- all the e-mails between myself and

15 Doctor Bond's office were in April, according to this. I don't remember

16 exactly. But, using this it says April. This e-mail I sent to the County

17 Investigator for your office, Steve Goedde, in July of 2010 and it just says

18 that, "I received the results back from the shell casings that I sent off to

19 England per J.W.," Juergen Waldick's, "request." This says, "They were

20 unable to lift any prints from the Warrington case; however, they did get prints

21 from the Lucious Upshaw homicide and that I had Kenny Whitney examine

22 those prints at that time."

23 Q      And just so we're clear, when you say 'prints', Doctor Bond was not

1   saying that these are prints that are absolutely identifiable and usable;

2   correct?

3   A       That's correct.  They're markings is what his terminology is.  It's very

4   hard to get a full print off of a shell casing because of the limited space and

5   the rounded nature of a shell casing.

6   Q       He was simply saying that he found something that appeared to be

7   prints?

8   A       Have your guys look at it.

9   Q       Yea.  Okay.  All right.  Now, let me ask you - specifically in this e-mail

10  you are providing information for Investigator Goedde to pass on to Juergen

11  Waldick in regards to nothing was found on the casings related to the

12  Kenneth Warrington homicide.  Let me ask you, Detective, did you receive

13  any other reports from Doctor Bond of any type or any direct communication

14  from Doctor Bond himself regarding what he did or did not find or was it

15  simply from -- I forgot her name.

16  A       Trudy Loe.

17  Q       Trudy Loe.  Did you receive any information --

18  A       I never got any reports indicating what they did.  Any communication

19  was just an e-mail between the two of us saying 'this is what we found'.

20  Q       So, when you are telling Investigator Goedde that they didn't find

21  anything in Ken Warrington's casings where did you get that information

22  from?

23  A       I'm assuming I got it via e-mail from Trudy Loe.

1    Q    Well, that's what I'm asking.

2    A    Yes.

3    Q    Defense exhibit 'B' that I showed you a moment ago --

4    A    Yes.

5    Q    -- is that Trudy Loe's response?  Is that what you're talking about when

6    she said 'we found in this particular case number'?

7    A    Yes.  "Doctor Bond was able to examine your casings and found marks

8    on two of them."

9    Q    Okay.  Did that imply to you --

10   A    And then she referenced -- then she referenced 05-34794.

11   Q    Okay.

12   A    Which is Lucious Upshaw.

13   Q    Okay.  So, you never had any kind of information --

14   A    So, taking this e-mail here I wrote this e-mail to let the Prosecutor's

15   Office know that we found nothing on Warrington, but we did find, or, we got

16   some results back for Upshaw.

17   Q    Okay.

18   A    Per your office's request.

19                              MRS. KOHLRIESER:   No further questions

20   at this time.

21                              THE COURT:   Mr. Rion, any questions for

22   the Detective?

23                              MR. RION:   Yes.

## CROSS EXAMINATION

**BY MR. RION:**

Q       Sir, your answer to the question of where you received the information

as far as the conclusions as it relates to the Warrington shell casings --

A       It's Warrington.

Q       -- the Warrington shell casings, your statement was 'you assume from

e-mails'; correct?

A       I got an e-mail from them.  I did not get any reports.

Q       Okay.  If you could just answer my question?  Your answer was that

'you assume it was from e-mails'; correct?

A       I didn't assume.  I got an e-mail.

Q       Okay.  Now, do you still have the computer that was utilized to

generate these e-mails?

A       We just got brand new computers within the last month.

Q       Okay.

A       And probably computers before that one in 2010.  So, I guess, no.

Q       And you have -- I assume that you're connected to a server; correct?

A       I have no clue.

Q       So, you may be?

A       I have no clue.  However e-mail works, that's what we do.

Q       Your e-mail goes through -- this isn't your personal e-mail; correct?

A       This is a work e-mail.

Q       All right.  Have you checked your work e-mails to find the full string --

1    A      There is no full string.

2    Q      I'm sorry.  Could you answer my question instead of coming up with

3    your own?

4    A      Okay.

5    Q      Did you check the server --

6    A      No.

7    Q      -- to determine whether or not there was more to the full string of

8    e-mails than what's presented here?

9    A      No.

10   Q      The document that you've presented here that you gave to the

11   Prosecutors last week came from a box; correct?

12   A      It came from my box of belongings in regard to this case; yes.

13   Q      Okay.  And whether that's the full string of e-mails, you did not check

14   on your server or ask someone to check to see if there's more information?

15   A      There is no other information.

16   Q      Sir, if you could just answer my question?

17   A      What is your question exactly?

18   Q      The question was, you didn't check to see --

19   A      I said I didn't check.

20   Q      Now, the e-mail that you did receive states that they were able to lift

21   prints on -- "We have packaged the casings so fingerprints can be examined

22   by somebody."  The only reference to the 05 case number in the e-mail is

23   simply stating that they had to remove some writing from that one; correct?

1    It's not a conclusion based on that e-mail.

2    A       Which e-mail are you looking at, sir?

3    Q       Sorry.  It would be State's exhibit --

4                           MR. RION:   May I approach the witness,

5    your Honor?

6                           THE COURT:   Sure.

7    Q       State's '6'.  Well, page two of Defense exhibit 'B'.  In reference to the

8    05 case number in that was simply that a sticker had to be removed; correct?

9    A       I'm not sure I understand your question.

10   Q       "As you will see, on 05-34794-106, number seven, we have had to

11   remove the writing as the finger mark was underneath."  So, that's the

12   information you received; correct?

13   A       That's in the e-mail; correct.

14   Q       Okay.  Now, did you have any -- you stated in the State's exhibit, "They

15   were unable to lift any prints from the Warrington homicide shell casings."

16   That's your statement; correct?

17   A       That's an e-mail I wrote to the Investigator at the Prosecutor's Office.

18   Q       And that's in --

19   A       That's a generalization of what I was reading from this e-mail.

20   Q       And that's in 2010; correct?

21   A       Yes.

22   Q       Five or six years ago?

23   A       Yes.

1    Q     Or, four or five years ago.  And that e-mail was not disclosed to the

2    defense at all prior to today; correct?

3    A     Which e-mail?

4    Q     The one where you had conclusions from a forensic examiner that they

5    were unable to lift any prints.

6    A     I thought I turned over everything I had last week.

7    Q     To the Prosecutor?

8    A     Yea.

9    Q     Okay.  And I guess we can deal with stipulations as to what was turned

10    over to the defense later.  But, prior to last week that information had not

11    been provided to the defense to the best of your knowledge; correct?

12    A     That's correct.

13    Q     Now, do you recall the date that you sent the casings to England?

14    A     I would have to -- I would -- no.  I guess to answer your question it's

15    no, without looking at the e-mail I sent to their office indicating that I was

16    sending them, which I think was in April of 2010.

17    Q     Did you write a report indicating the work you had done on this?

18    A     No.

19    Q     Is there anything that you would have provided in discovery to the

20    Prosecutor's Office that would have been forwarded to us indicating that this

21    work had been done prior to last week?

22    A     No.

23    Q     Have you ever spoken to Doctor Bond?

1   A   I don't believe so.  Do you mean over the phone?

2   Q   Yes.

3   A   I don't recall.

4   Q   By e-mail?  You don't recall?

5   A   Our communication was by e-mail.

6   Q   You don't recall, or it was by e-mail?

7   A   To my knowledge it was by e-mail.

8   Q   And did you directly correspond with Doctor Bond at all?

9   A   I sent e-mails to that office and I think that Trudy Loe responded to

10  most of them.  I would have to go through them and see if Doctor Bond

11  actually responded to any of them.

12  Q   And, again, we don't have -- you haven't confirmed with the full string

13  there was --

14  A   I don't believe there was a full string.  I believe what we have is what

15  we have.

16  Q   Well, let me put it to you this way.  There was a -- what you turned over

17  to the defense were these two pages, your first e-mail and then this second

18  e-mail.  Defendant's exhibit 'B'.  That's all that was turned over; correct?

19  A   Are you including this one here?

20  Q   Yes.  Defendant's exhibit 'B'.

21  A   And this as well?

22  Q   Well, we'll talk about -- okay, that was turned over last week.

23  A   I believe so.

18

1    Q      Okay.  There would have had to have been more e-mails than what

2    you've stated; correct?

3    A      I don't believe so.

4    Q      Well, for example, you received -- I'm going to hand you what's been

5    marked as Defendant's exhibit 'D'.

6                                    MRS. KOHLRIESER:   Just a second.  Jon

7    Paul, I received this.  He didn't.

8                                    MR. RION:   Right.  Right.

9                                    MRS. KOHLRIESER:   Okay.  Go ahead.

10                                   THE COURT:   We've got stickers here.  Do

11   you want to mark that?

12                                   MR. RION:   Oh, yea.

13                                   MRS. KOHLRIESER:   What did you mark

14   it?

15                                   MR. RION:   'D'.

16                                   MRS. KOHLRIESER:   The State is willing

17   to stipulate to the admission of Defense exhibit 'D' for purposes of this

18   hearing as an attachment that I received via my e-mail from Doctor Bond on

19   Sunday.

20                                   THE COURT:   Okay.

21   Q      Now, those -- so, Defense exhibit 'D' was not included in what you

22   turned over last week; correct?

23   A      Correct.

1    Q      And that was something that was actually brought in directly from, or,

2    e-mailed directly from Doctor Bond's office to the Prosecutor this Sunday or

3    Monday; correct?

4    A      Correct.

5    Q      Now, you obviously would have received, or, someone would have, by

6    e-mail, back in 2010, you have to agree that somebody would have seen at

7    least those images?  They would have been e-mailed to you; correct?

8    A      I don't recall seeing those before until yesterday.

9    Q      Okay.

10    A      We did have the -- if you want me to go on.  Those are from the

11    Lucious Upshaw.  They're not from Carter.

12    Q      I understand.  My only point is that that would have been another

13    e-mail that would have been sent to you.

14    A      Well, assuming that that was sent to me.

15    Q      Okay.  Are you saying it wasn't, or are you saying you don't recall?

16    A      I don't know.  I don't recall.

17    Q      Okay.  All right.  You would think that if there was evidence in a case

18    that you would -- well, I'm sure you guys paid money for Doctor Bond to look

19    at this.

20    A      Actually, I don't think we did.

21    Q      Well, it's not really relevant.  But, he would have sent you those

22    images; correct?

23    A      And I also am very --

1   Q       Sir, just answer my question.  It would seem in the normal course of

2   business that he would have sent those images to you back in 2010.

3   A       If I had those images you would have had, or, we would have had

4   pictures of them with everything else that I have.

5   Q       That's my point.

6   A       Yea.

7   Q       If you had them you would have done that.  That's not saying that it

8   wasn't e-mailed to you.  It just wasn't in the box that you turned over.

9   A       No.  I'm saying that if he would have e-mailed those to me I would

10  have had them.  I print everything that I get.

11  Q       Is it your testimony today under oath that you did not receive those

12  e-mails in 2010?

13  A       I don't recall receiving those e-mails and they're not related to this

14  case.

15  Q       It's possible you did; correct?

16  A       I have no idea.

17  Q       It's possible you did; correct?

18  A       Okay.

19  Q       Which means that there's possibly more e-mails; correct?

20  A       I don't believe so.

21  Q       But, you don't know because you haven't checked that.

22  A       If that's how you want to represent the answer, I guess; yes.

23  Q       And in those other e-mails, if there were any others, could be

1  information about the Warrington case coming from either Doctor Bond or his

2  assistant, Loe Trudy (sic)?

3  A      No.

4  Q      Nevertheless, you generated a report in July of 2010 indicating

5  affirmatively some conclusion or result that a forensic expert reached as it

6  relates to the Warrington case; correct, saying that they were not able to lift

7  any prints from the Warrington casings?

8  A      That's simply how I wrote that e-mail.  That's my wording.  That's the

9  wording I chose to use at that time.  I don't know the relevance of that; but,

10  that's the wording I used to let Steve Goedde know that there was nothing on

11  the Carter case, but there was something on the Upshaw case.

12  Q      Has your e-mail server crashed in the last five years that you're aware

13  of?

14  A      Your questions about e-mails and servers are probably better to

15  someone else than myself.  I know how to use e-mail.  I know how to send an

16  e-mail and how to receive an e-mail.  Where they go in cyberspace, I have no

17  idea, and what it takes to do that.  So, as far as servers and things of that

18  nature, I really can't answer those questions.  We have changed computers at

19  least twice probably since 2010.

20  Q      And do you know whether or not the images in Defense exhibit 'D'

21  would be contained within that server or not?

22  A      I have no idea.

23  Q      All right.

1      THE COURT:   Any other questions from

2  the State?

3      MRS. KOHLRIESER:   Just a couple of

4  follow-ups.

5  ### REDIRECT EXAMINATION

6  **BY MRS. KOHLRIESER:**

7  Q      Detective Clark, it's clear from those exhibits there that you, in fact,

8  specifically referenced the Ken Warrington homicide in e-mailing Doctor

9  Bond; correct?

10  A      Yes.

11  Q      Are you aware of whether you sent any e-mails regarding the Lucious

12  Upshaw homicide?

13  A      I sent those along with Carter's.

14  Q      You sent what along?

15  A      Shell casings.

16  Q      Okay.  Go ahead.

17  A      Well, this all occurred in 2010, which would have been shortly

18  thereafter the Warrington homicide.  The Upshaw homicide occurred in 2005.

19  So, my suspicion is that the reason I framed the wording the way it was was

20  because Carter was the most recent, or, Warrington was the most recent and

21  that was the one I was most interested in.

22  Q      Okay.  Let me ask you this, Detective.  You worked the Ken

23  Warrington homicide since the beginning; correct?

1    A    Yes.

2    Q    If you had ever received any kind of e-mail from Doctor Bond or a

3    proxy of his, somebody on the Northamptonshire Police Department, that type

4    of thing, regarding finding something on casings related to Ken Warrington's

5    homicide, or images thereof, what would you have done with that?

6    A    Well, potential fingerprints on a shell casing found at the Warrington

7    murder scene would certainly be important information to have.  There was

8    none.  There was nothing to follow-up on.

9    Q    Would you have followed up on that if --

10    A    I would have followed up on that kind of information had it been there.

11    The only thing that we got was in regard to Lucious Upshaw.

12    Q    If Defendant's exhibit 'D' were casings in Ken Warrington's homicide

13    you, being the lead detective, --

14    A    We would have that material.

15    Q    -- would you have had somebody examine that?

16    A    Yes.  Just like I had somebody examine not these photographs, but

17    when we got the information back on Upshaw I had Kenny Whitney examine

18    them.

19    Q    In fact, that's what you're communicating to Steve Goedde to

20    communicate with Juergen Waldick; correct?

21    A    Correct.

22    Q    And you said something in your cross examination regarding printing

23    everything you get.  Could you explain what you mean by that?

1   A       Well, I think of myself as somewhat of obsessive/compulsive.  I print all

2   my e-mails.  If there were e-mails -- what I pulled out of the box that day, last

3   Monday, I was thinking 'oh, you know what, I'd better show these to you guys

4   because I don't know if you know about them'.  They're meaningless, in my

5   opinion.  That is what I had.  I make a habit of printing everything.

6   Q       Okay.  And when you print it do you then put it in the appropriate box

7   or case file or that type of thing?

8   A       Correct.

9   Q       And so did you go through the entirety of your Ken Warrington

10  homicide box?

11  A       That's what I was doing on Monday when I came across these things

12  was I was going through both boxes of paperwork and reports and everything

13  that we had in regard to the Warrington case in preparing for this trial.  I came

14  across those things, which I hadn't thought about before because they

15  weren't relevant, and when I did come across them I gave what I had to you

16  guys.

17  Q       Okay.

18                              MRS. KOHLRIESER:   Nothing further.

19                              THE COURT:  Any other questions, Mr.

20  Rion?

21                              MR. RION:   No, your Honor.

22                              THE COURT:   Okay.  The Court has some

23  questions and I'll allow counsel to follow-up on my questions.  Some of these

1    questions may cover some of the things you guys know already, but I want to

2    get it clear in my mind.  Detective, on the June 29th e-mail from Trudy Loe - I

3    think it's Defendant's 'B', page two --

4    A       Yes.

5                                    THE COURT:   It says, "We have attached

6    photographs for your information."  Do you see that?

7    A       Yes.

8                                    THE COURT:   Do you recall looking at

9    those photographs at the time?

10   A       I don't recall any photographs.

11                                   THE COURT:   And then you didn't print

12   photographs off at that time?

13   A       I believe that if I had them I would have printed them.

14                                   THE COURT:   Okay.  She says that they're

15   attached.  This e-mail --

16   A       It doesn't have an attachment on it.

17                                   THE COURT:   Yea.  I don't know how that

18   e-mail works.  Most e-mails will indicate whether there's an attachment.  But,

19   you're saying you don't recall photographs?

20   A       Well, the thing is, when they examine a photograph -- they don't

21   examine the photographs.  In other words, these photographs here would not

22   be examined.

23                                   THE COURT:   Yea.  What I'm trying to get

1    at is the photographs that are in State's exhibit '1' --

2    A    Yea, I don't recall seeing any photographs at that time.

3                    THE COURT:  -- would they have been the

4    same photographs that were attached, if there were any attached, to an

5    e-mail?

6    A    I don't know.

7                    THE COURT:  She says in that same

8    e-mail that there were markings found on two casings.

9    A    Correct.

10                   THE COURT:  She's identified one of

11    those casings as 05-34794-106, number seven; correct, in her e-mail?

12    A    Correct.

13                   THE COURT:  And that --

14    A    That is one of these photographs here.

15                   THE COURT:  -- that is the Upshaw

16    casing?

17    A    That is Upshaw.

18                   THE COURT:  She doesn't identify the

19    other of the two.

20    A    But, it's identified in this photograph.

21                   THE COURT:  But, that photograph -- you

22    don't know if that's the same photograph that she attached to her e-mail in --

23    A    No.  This came recently from their records.

1          THE COURT:   So, you don't remember

2    getting photographs with the June 29th, 2010 e-mail?

3    A       I don't, and I don't have any of those in my paperwork.

4          THE COURT:   Do you have enough

5    experience to identify in State's exhibit '1' what type of casings those are, I

6    mean, caliber-wise?

7    A       These?  These are forty-five caliber.

8          THE COURT:   I mean, do you have the

9    expertise to be able to say that by looking at them?

10   A       You cannot look at shell casings from close-up like this and say for

11   sure.  But, we looked at the evidence that we have and they are forty-five

12   caliber.

13         THE COURT:   Those are the Upshaw

14   case?

15   A       Correct.  The Warrington case are nine millimeter.

16         THE COURT:   Are you aware of any

17   photographs of nine millimeter shell casings from the Warrington case?

18   A       I am not.

19         THE COURT:   Do you have -- let me see

20   that State's exhibit '1'.

21         MRS. KOHLRIESER:   I don't think that's

22   State's exhibit '1'.

23         MR. RION:   Defendant's exhibit 'D', your

1  Honor.

2              THE COURT:   Oh, I'm sorry.  Excuse me.

3  Defendant's 'D'.  Every time I said State's exhibit '1' I meant -- well, I want the

4  pictures.  Defendant's 'D'.  There's no year on these photographs; is there?

5  A      They're just referenced by the case number.

6              THE COURT:   Well, it says June 10th, but

7  it doesn't say the year; does it?

8              MRS. KOHLRIESER:   Your Honor, I think

9  the testimony denoted that the 09 indicated - or, excuse me - the 05 indicated

10  the year.

11              THE COURT:   Yea.  But, that's the year of

12  the case number.  I'm talking about when the photographs were taken.

13  There's no indication when those photographs were taken.

14  A      No, but all of the exchanges were between like April and July of 2010.

15              MRS. KOHLRIESER:   Your Honor, I

16  believe State's exhibit '1', the e-mail that I received from Doctor Bond,

17  indicates all the cases he reviewed in 2010.

18              THE COURT:   You got the casings back in

19  the Warrington case that you sent to England?

20  A      We have them back.

21              THE COURT:   The actual casings you got

22  back?  They are nine millimeter casings?

23  A      Correct.

1          THE COURT:  There were two of them?

2     A     That we sent?  Yes.

3          THE COURT:  And you got those back?

4     A     I believe so.

5          THE COURT:  You're not aware of any

6     photographs of those nine millimeter casings that Doctor Bond or anybody

7     else took?

8     A     If I had photographs they would be a part of the record.  I don't have

9     them.

10          THE COURT:  You don't recall getting

11     photographs from Trudy Lee, or, Loe in June of 2010 as indicated in her

12     e-mail to you?

13     A     Definitely not in Carter.  Obviously there were photographs taken in

14     Upshaw; but, I don't remember getting those either.

15          THE COURT:  Okay.  Any other questions

16     from the defense based upon my questions?

17                    **RECROSS EXAMINATION**

18     **BY MR. RION:**

19     Q     Is it the -- who maintains, which police agency maintains the server?

20     A     I have no idea, sir.  I would assume the Lima Police Department, City

21     of Lima.

22          MR. RION:  Nothing further.

23          MRS. KOHLRIESER:  Your Honor, may I

1    ask some follow-up?

2                                    THE COURT:   Well, I don't know if Mr.

3    Rion is done.

4                                    MRS. KOHLRIESER:   Oh, I thought he

5    said 'thank you'.

6    Q       Well, -- in your e-mails, at least the ones that were in the box, you don't

7    reference any other investigation other than the Ken Warrington case?

8    A       That's correct.  That was the most current.

9    Q       But, you give --

10   A       That was the one on my mind.

11   Q       You give fact patterns and you're giving some background information.

12   You didn't give any background information in any other case except for Mr.

13   Warrington's case; correct?

14   A       That was the one I was most interested in at the time.

15   Q       So, that's correct?

16   A       I would believe so.  I think that's fair.

17                                   MR. RION:   Nothing further.

18                                   THE COURT:   Anything from the State

19   then in follow-up?

20                           **<u>REDIRECT EXAMINATION</u>**

21   **BY MRS. KOHLRIESER:**

22   Q       Just for the record, Lucious Upshaw, is that a case that you were

23   assigned to investigate?

1   A      In 2005; yes.

2   Q      Okay.  And do you know whether those prints were identifiable on

3   those casings?

4   A      To my knowledge Kenny Whitney could not determine anything from

5   them.

6   Q      And this weekend, or yesterday even, you, in fact, along with Mr. Miller

7   went and looked at those casings; correct?

8   A      Yes.

9   Q      Pulled that evidence and, again, the caliber of those casings were you

10  able to determine?

11  A      They were forty-five, or, forty.

12  Q      Okay.

13  A      Forty-five.  They're not nine millimeter.  I know that.

14  Q      Okay.  They're not nine millimeter?

15  A      Yea.

16  Q      And was that consistent with the type of bullet that killed Lucious

17  Upshaw?

18  A      Yes, it was.

19  Q      And have you had the opportunity, along with myself, Mr. Miller, and

20  the defense, to go through all of the evidence seized and found at the scene

21  in the Ken Warrington homicide?

22  A      Yes.

23  Q      And that does include the two casings that you sent to Doctor Bond?

1   A      I believe so; yes.

2   Q      Anything, or, any kind of marking on those casings, on those

3   packages, on the subsequent packages that they were in to indicate any kind

4   of fingerprints found on them?

5   A      Not that I'm aware of.

6   Q      And then real quickly, your e-mail has always been that cityhall.lima,

7   well, for at least since 2002; correct?

8   A      That's when I started; yes.

9   Q      That crawl of cityhall.lima.oh.us; correct?

10  A      Yes.

11  Q      Okay.  Is there somebody in your office that you could give your, like,

12  password to and they could go look for your string real quick to resolve this

13  issue that Mr. Rion is attempting to make here by having someone look at

14  your e-mail to see if they can find a string with Northamptonshire Police

15  Department on it?

16  A      I honestly don't know the answer to that.  I don't think so.

17  Q      Okay.  Could you go do it?

18  A      I don't think so.

19  Q      What do you mean?  Can you not go in your e-mail and type subject

20  and put that in there?

21  A      I have a different computer today than I did in 2010.

22  Q      I know.  But, your e-mail address has always been the same; correct?

23  A      I don't know.  I mean, if you say I can do that then I might be able to.

1   Q     That's not what I'm saying. Has your e-mail address always been the

2  same?

3   A     Yes.

4   Q     Okay. And you're saying in your entire boxes of evidence in this case -

5  well, not evidence - but your reports and whatever paperwork and things like

6  that you don't have any photographs of these casings that --

7   A     In regards to Warrington?

8   Q     Yes.

9   A     I do not.

10   Q     Okay.

11                    MRS. KOHLRIESER:  Nothing further.

12                    THE COURT:  Okay. I have a couple more

13  and then I'll let counsel follow-up. When you looked at the evidence with

14  counsel do you recall if you guys looked at the shell casings from this case?

15   A     I'm sure we got them out and looked at them. I can't tell you to what

16  extent.

17                    THE COURT:  Is there a chain of custody

18  form?

19   A     There should definitely be that.

20                    THE COURT:  Would that chain of custody

21  show that they were sent to England and returned?

22   A     Well, it should.

23                    MRS. KOHLRIESER:  Your Honor, I guess

1    for the record in that record, I don't know that Detective Clark was present for

2    all those times.  I believe that Mr. Rion and his associates came up a total of

3    three times and with Miss Emerick and Mr. Miller went through everything.

4    I'm sure Mr. Rion would stipulate to that fact that he's certainly been able to

5    review all of the evidence, including those casings.

6              THE COURT:   The last question I have -

7    Detective, have you ever received, been made aware of, put on notice, are

8    now aware of any photographs from England of the nine millimeter casings in

9    this case?

10    A     No.

11              THE COURT:   All right.  Any follow-up

12    questions from the defense either to mine or as redirect, or, recross from the

13    State's questions?

14              **RECROSS EXAMINATION**

15    **BY MR. RION:**

16    Q     But for contacting Doctor Bond this weekend you would have

17    answered the question that he had never sent any pictures on any case?

18    A     That's correct.

19    Q     And so it was only after speaking with Doctor Bond briefly via

20    e-mail that you even had any memory of any pictures; correct?

21    A     Correct.

22    Q     And you don't dispute Doctor Bond, who says in the e-mails to me, that

23    he provided information in regards to this case to him?  You don't dispute

1   those e-mails; correct?

2   A        I dispute the way that you're phrasing it.

3   Q        Well, the e-mails speak for themselves.

4   A        I will say this --

5   Q        You don't dispute the e-mails; correct?

6   A        No.

7   Q        Lastly, do you recall how you packaged the casings?

8   A        I vaguely remember using FedEx.

9   Q        Do you recall the way in which --

10  A        No.  I would have had my I.D. people do it.

11  Q        So, you didn't package the casings that were sent out?

12  A        I.D. handles the evidence.

13                              MR. RION:   Nothing further.

14                              THE COURT:   Anything else from the

15  State?

16                              MRS. KOHLRIESER:   One last follow-up.

17                  **REDIRECT EXAMINATION**

18  **BY MRS. KOHLRIESER:**

19  Q        You said because the Warrington homicide was the most recent that

20  was the most pressing on your mind, so to speak.  Do you know whether you

21  made Doctor Bond or anyone at the Northamptonshire Police aware that, in

22  fact, they were looking at casings in multiple cases, such as Lucious

23  Upshaw's homicide, or could they have thought that everything they were

1   looking at were all in the Warrington homicide?

2   A       If you look at the e-mail that I sent, I did not mention Lucious Upshaw.

3   We just sent an e-mail -- or, we just sent different shell casings.

4   Q       But you, in fact, sent Lucious Upshaw's and Ken Warrington's --

5   A       Together.  Well, at the same time.

6   Q       At the same time?

7   A       Yea.

8   Q       Thank you.

9                       THE COURT:   Okay.  Any other questions

10   of the Detective?  You may step down, Detective.

11   A       Thank you.

12                      THE COURT:   Any other evidence the

13   State wants to present in this regard?

14                      MRS. KOHLRIESER:   Yes, your Honor.  I

15   guess I'm going to mark it State's exhibit '2'.  It would be -- I'll make a

16   professional reputation, unless you would like me to testify, my e-mails to

17   Doctor Bond this weekend and the response I got from Doctor Bond.  We had

18   pictures, but this is the actual contact, or, conversation.

19                      THE COURT:   Has Mr. Rion seen that?

20                      MRS. KOHLRIESER:   I think I read it to

21   him.  I don't know that I've actually shown him.

22                      THE COURT:   Let me have those exhibits,

23   too.

1                          MRS. KOHLRIESER: I had Mrs. Osting

2 print those out since I don't have a connection to the printers. So, that's why

3 you see Shelly, Shelly Osting, on there.

4                          MR. RION: As long as we have a joint

5 stipulation as to the defense communications with Doctor Bond as well.

6                          MRS. KOHLRIESER: Absolutely.

7                          THE COURT: Okay.

8                          MRS. KOHLRIESER: I've marked this, for

9 the record, as State's exhibit '2', Motion to Compel, with today's date, your

10 Honor. It's two pages. I apologize.

11                          THE COURT: So, you're representing

12 then that Defendant's exhibit 'D', -- well, you received these photographs in

13 response to these e-mails as part of this?

14                          MRS. KOHLRIESER: Yes, your Honor.

15 You'll see reference in there of him saying 'I have attached the images of the

16 things I reviewed' that he had retained.

17                          THE COURT: Okay. The problem and the

18 question I was asking Detective Clark, apparently Doctor Bond's e-mail, or

19 someone's e-mail, doesn't indicate when there are attachments to a file.

20                          MRS. KOHLRIESER: I'm sorry? Say it

21 again, your Honor.

22                          THE COURT: His e-mails don't indicate

23 there's an attachment. He says in here, "I've attached a Word file showing

1  these images."

2          MRS. KOHLRIESER:  But, you're saying it

3  doesn't show up on that?

4          THE COURT:  Up at the heading -- my

5  e-mail, for example, would say 'from John Bond, date, to so and so, subject,

6  and then it would have an indication of 'attachments' so you would know there

7  are attachments.

8          MRS. KOHLRIESER:  Yes, I see exactly

9  what you're saying, your Honor.  Yes.

10          THE COURT:  But, that apparently wasn't

11  in the June 29th of 2010 e-mail from Trudy Loe where she says 'we have

12  attached photographs'.  There's no, other than Detective Clark's testimony,

13  whether or not photographs were attached.  We have your representation that

14  these were, indeed, attached to your e-mails.

15          MRS. KOHLRIESER:  Yes.

16          THE COURT:  Okay.  Any other evidence

17  from the State's point of view?

18          MRS. KOHLRIESER:  Not evidence, your

19  Honor.  Just, I guess, argument.

20          THE COURT:  Well, yea, you put this

21  evidence on to preface your argument.  So, you may argue your position with

22  regard to the Motion.

23          MRS. KOHLRIESER:  Firstly, your Honor,

1   I would note as far as timing goes, a letter from Mr. Miller from our office was

2   sent along with the attachments that you see to the Motion filed by the

3   defense and put in e-discovery on September 1st of 2015.  Our computer

4   records all of that.  So, as far as timing goes, this wasn't something that we

5   just now gave.  Even though it might have been handed to Mr. Rion, he

6   signed up for e-discovery.  He's gotten everything else through e-discovery.

7   This was sent through e-discovery so that he could have quicker access than

8   regular mail or handing --

9                                    THE COURT:   By the way, on the

10   e-discovery what work area is his under because I looked under J. P. Rion

11   and I couldn't find --

12                                    MRS. KOHLRIESER:   It was established

13   under Matt Barbato at the time.  But, we've continued to use that and Mr.

14   Rion has never --

15                                    THE COURT:   I was looking for -- okay.  All

16   right.

17                                    MRS. KOHLRIESER:   I think they worked

18   that out.

19                                    THE COURT:   I was looking for discovery

20   this weekend myself and I couldn't access it.

21                                    MRS. KOHLRIESER:   That's why.  It's

22   under Mr. Barbato.

23                                    THE COURT:   That, again, is the Court's -

1   and this is beside the point - but, the Court doesn't like e-discovery because

2   when I want to see e-discovery I can't get it. When it's a file, even though the

3   file may be two feet thick, at least I can see things. So, I was frustrated by

4   that. But, go on. As long as Mr. Rion acknowledges that he had access to

5   the e-discovery.

6                           MRS. KOHLRIESER:   Anyhow, your

7   Honor, with that said, a couple of things that I noticed here. When the

8   defense talks about its communications with Doctor Bond, and the Court has

9   before it, they're asking specific questions about 'did you evaluate things in

10  the Ken Warrington homicide' and obviously he did. 'Did you find things in

11  the Ken Warrington homicide'? Obviously, he did. There's no indication that

12  Doctor Bond knew that he was actually looking at two homicide cases. More

13  importantly, what Mr. Rion did not ask of him is 'did you find anything on any

14  other casings other than what's referenced in this e-mail'? Nothing specific

15  about any other casings. A simple question like that could have resolved all

16  of this. He obviously was in communications with him and he chose not to

17  ask that specific question, for whatever reason. I have actually e-mailed

18  Doctor Bond while we've been sitting here to see if there was anything else

19  that he found markings on. He has not responded to me. Obviously he might

20  not be right in front of his computer. They are, I believe, five hours ahead of

21  us. But, this is a day that he works. That type of thing. But, regardless, you

22  heard Detective Clark's testimony. I think the Court is well aware of Detective

23  Clark and his O.C.D., quite frankly. He prints things out and he puts them

1     in his box. If he would have received these they would have gone in the box.

2     If he had been made aware of any type of markings on casings related to the

3     Ken Warrington homicide he would have followed-up on that. He was

4     investigating this. You heard his testimony. This was first priority in his mind.

5     Even though he was assigned to Lucious Upshaw, Ken Warrington's murder

6     was the more recent event and that was in the forefront of his mind. Certainly

7     when he wrote the e-mail to Investigator Goedde, again, if he had any

8     indication that there were any kind of markings on the nine millimeter casings

9     at issue in Ken Warrington's murder he would have followed-up on that

10     because it could have done a number of things, particularly if those prints

11     were identifiable with the defendant. So, to act like it's some kind of nefarious

12     thing or that type of thing is just ridiculous. To act like there's something that

13     Detective Clark just doesn't remember in that regard is, quite frankly,

14     unfathomable given what he was attempting to do in this case in his

15     investigation.

16         If the Court is hung up on the e-mail issue and things like that, again,

17     I'm not that well versed in computers but I believe someone could easily,

18     particularly Detective Leland who is in the Technology Crimes Unit, could run

19     over to Detective Clark's computer and get with his password and check that

20     e-mail to see if there's any other communications from the Northamptonshire

21     Police Department, if that's what this Court is desirous of doing. It's not

22     necessary to a continuance.

23         Furthermore, this Motion also addresses a dismissal for <u>Brady</u>

1    material.  There's not one shred of evidence that this is exculpatory in any

2    way, shape, or form.  In fact, if there had been markings on those casings and

3    they didn't belong to the defendant that wouldn't make it exculpatory.  That

4    would simply mean that somebody else handled them at one point.  So, they

5    are potentially useful maybe, but there's nothing exculpatory warranting

6    dismissal pursuant to <u>Brady vs. Maryland</u>, your Honor.

7            We would ask that you overrule the Motion in its entirety.

8                        THE COURT:   Okay.  Any final word, Mr.

9    Rion, since it's a defense Motion?

10                        MR. RION:   Just three quick points, your

11   Honor.  If we're still e-mailing experts to determine if there's anything else

12   then there's a problem.

13           Point two, I think it would be ineffective assistance of counsel not to

14   subpoena the e-mail records between Doctor Bond and Trudy Loe and this

15   Detective from back then.  There's clearly more in the file than what was in

16   the box.

17           Thirdly, and lastly, Detective Clark indicates in his e-mail in July,

18   State's exhibit '1', that there were findings made.  I don't have those findings.

19           We're asking for a continuance, your Honor.

20                        THE COURT:   Okay.  One other question I

21   have to both sides, and perhaps you can agree, perhaps not, and I don't

22   know if it matters, but on these photographs, Defendant's exhibit 'D', there's

23   writing, or, typing on them.  Was that on there by Doctor Bond or was that

1   put on there since?

2                        MRS. KOHLRIESER:   That is exactly how

3   it came from Doctor Bond.

4                        THE COURT:   Do you have any cause to

5   believe that that's not Doctor Bond's -- that that appeared on the images that

6   were sent to Mrs. Kohlrieser?

7                        MR. RION:   I don't know who took those

8   and whether or not they're conflating the two shell casings.  In other words, I

9   mean, if they all came in the same box and they were in the same container, I

10  mean, who knows.

11                       MRS. KOHLRIESER:   Your Honor, --

12                       MR. RION:   The relevance of that needs

13  more discovery to determine what it is.  There's just so many things up in the

14  air on this.

15                       MRS. KOHLRIESER:   Your Honor, as Mr.

16  Rion has seen, no doubt, when he's looked at all the discovery here, each

17  casing is packaged separately.  Even if there was one big envelope that

18  everything was sent in, each casing itself would be packaged individually and

19  individually marked.  I know Mr. Rion has seen that for a fact himself that

20  they're individually marked.  Every time they're opened they're initialed and

21  they're dated - the whole nine yards.

22                       THE COURT:   Okay.  All right.  Thank you

23  very much.  The Court will grant the Motion to Compel.  If the State has any

1   other information regarding these shell casings in this case, or any reports, I

2   would order that that be turned over immediately to the defense.

3         I'm going to overrule the Motion to Dismiss and I'm going to overrule

4   the Motion to Continue the trial.

5         I'll just state my reasons on this. It's clear that Detective Clark sent the

6   casings from this case to England. It's clear that those casings came back

7   from England. It's clear there is no written report from Doctor Bond. There

8   are e-mails from Trudy Loe that were sent to Detective Clark. There is an

9   e-mail from Doctor Bond to Assistant Prosecuting Attorney Kohlrieser, but

10  there's no written reports from Bond. There are no -- based upon the

11  testimony of Detective Clark he said there are no other e-mails. But, I will

12  give leave to counsel to file a subpoena to see if there are other e-mails. The

13  defense can subpoena Detective Clark. The defense can subpoena Doctor

14  Bond, if you want. If complying with that subpoena for Doctor Bond would

15  require a continuance of the defense case we'll deal with that if that arises

16  that way. But, I'm going to base my decision to overrule the Motion to

17  Dismiss and the Motion to Continue by finding that there has been no

18  showing of a discovery violation. Doctor Bond, in his e-mail to Prosecutor

19  Kohlrieser, indicates that he did some examinations of items that were sent to

20  him. He has since retired from the Police Department over there in

21  Northampton, but he kept images, he said. He retained images of all of the

22  work he processed. He reviewed those images that he took of the cases that

23  were sent to him and he attached - and I'm going to find that Defense exhibit

'D' has been shown to be the Word file showing these images. So, taking that from Doctor Bond's most recent e-mail of September 6th to Prosecutor Kohlrieser Defendant's exhibit 'D' are the images that he took in the cases sent from Lima. It's clearly indicated on Defendant's exhibit 'D' that those images are images from a 2005 case, -34794, which is not the case at hand. So, the Court's going to find the evidence showed there were no images of the casings in this case.

He indicates markings -- well, he doesn't. Trudy Loe indicated there were markings found on two casings that were sent to her back in June of 2010. She mentions one of those, number seven, which is the second page of Defense exhibit 'D' and that is clearly the one she's talking about, number seven, because she said they had to remove the writing as the finger mark was underneath the writing, and in Defense exhibit 'D', the second page, clearly shows that there was some writing. It's encased by a red square and that writing appears to have been removed in the accompanying photograph. So, that would be the one she's referring to. So, that was one of the two. The second image, the only evidence I have here is the second image would have been the top page of Defendant's exhibit 'D' which is, again, from 05-34794. So, those are the two casings that markings were found on. From that the evidence would show no markings were found on any casings from this case and that would then give rise to Detective Clark reaching the conclusion in his e-mail to Steve Goedde, the Investigator for the Prosecutor's Office, in July of 2010 that there were no prints from the Warrington homicide

1    shell casings - however, they did get some prints off of shell casings from the

2    Lucious Upshaw homicide.

3           So, we know that the casings were sent to England.  We know they

4    were sent back.  We know that there were e-mails.  We know -- well, I don't

5    know for sure if Doctor Bond looked at all the casings, but we know he only

6    photographed images of two of the casings.  We have those images.  From

7    Trudy Loe's e-mail there were marks found on only two.  Doctor Bond's e-mail

8    most recently to Prosecutor Kohlrieser says the two images he's sending to

9    her show the images that he took of the cases that were sent to him.  So, I'm

10   finding there were no images, no photographs, taken of Warrington's shell

11   casings.

12          I would say there's no discovery -- I said there's no discovery violation.

13   I'll rephrase that - no violations, discovery violations, that would warrant a

14   dismissal of the case.  No prejudice has been shown by the late, the very late,

15   disclosure of these e-mails and these images.  But, again, if the defense

16   wants to subpoena Detective Clark's e-mails I'll allow that to happen.  You

17   can have that in the defense case.  If you want it before -- assuming Detective

18   Clark takes the stand and that subpoena can't be complied with before

19   Detective Clark takes the stand, I'll give you a continuance before Detective

20   Clark testifies.  If you want to subpoena Doctor Bond to testify so he can

21   explain everything he did I'll allow that.  If that requires a continuance we'll do

22   that at the time.  But, we're going to move forward with jury selection and get

23   the trial started.  That will be my ruling.  Exceptions will be noted.

1    Anything else?

2                              MR. RION:   Your Honor, just to -- I will

3    have a subpoena. I have one for various things. If we swear in a jury and if

4    the information is different than the Court has heard it to be, then we'll be

5    asking for --

6                              THE COURT:   Well, certainly if something

7    new comes -- yea, if something new comes up that would change the state of

8    the facts as I have determined they exist that would certainly be grounds for a

9    brand new --

10                             MR. RION:   Well, I'll argue at that point that

11   prejudice attaches since the jury would have been sworn in. I'm just putting

12   them on notice that if there's more to this where the defense would be

13   headed.

14                             MRS. KOHLRIESER:   Your Honor, can we

15   perhaps meet privately in chambers to discuss a couple of things off the

16   record?

17                             THE COURT:   Okay. We've got a jury

18   that's been sitting around for an hour and a half.

19                             MRS. KOHLRIESER:   I know.

20                             THE COURT:   We can go to chambers.

21   (WHEREUPON, COURT WAS IN RECESS AT 10:13 A.M.)

22

23

1          THE COURT:   The record will reflect that

2   today is the 8th day of September, 2015.  We are reconvening in CR2014

3   0139, State of Ohio -vs- Markelus Q. Carter.

4          The record will reflect the defendant is present in Court with his

5   counsel.  The State is present.  The prospective jurors who have been called

6   as potential jurors in this case are still waiting in the hallway.

7          We've taken some extra time this morning.  We've already put on the

8   record a hearing we had on the defense Motion.  At the end of that hearing

9   the State asked to have a brief conference in chambers.  So, we had a brief

10  conference in chambers.  I want the record to reflect, and I'll let counsel add

11  anything they want to add to it, but while in chambers we actually attempted

12  to make an international call to England to contact Doctor Bond, who is the

13  subject of the e-mails that have already been made exhibits.  We were unable

14  to get ahold of him.  That was the Court's suggestion to do that to see if we

15  couldn't nip some of this in the bud, so to speak, but we were unable to

16  contact him.  As we were doing that it's my understanding, based upon the

17  representations made in chambers, that the Prosecutor's Office had gone

18  ahead and obtained, apparently, obtained all of the e-mails between

19  Detective Clark and Doctor Bond and Miss Loe, Trudy Loe.  That's what was

20  at least represented to me.  I'll let the parties explain further.

21         So, I'm going on the record again now to allow the parties -- if the State

22  has some additional information they want to present, we'll put that in the

23  record, just so there's a full and complete record.

1          MRS. KOHLRIESER:   Yes, your Honor.

2    Thank you.

3          THE COURT:   Go ahead.

4          MRS. KOHLRIESER:   The State has

5    marked as exhibits '3', '4', '5', and '6' and has provided copies of all of these

6    to the defense counsel just now.  By way of record while we were adjourned

7    Attorney Caldwell from our office went over to the Lima Police Department

8    and made communications with Detective Clark.  Miss Caldwell had been

9    sitting in the back watching our prior hearing.  She got Mr. Clark's e-mail

10   password from him and she went in and she was able to track back, as best

11   as her computer abilities, let me give that caveat, a string of e-mails between

12   Detective Clark and Doctor Bond, as well as Detective Clark and Trudy - and I

13   apologize - Loe, who was referenced earlier in these cases.  These are all the

14   e-mails between them that she was able to find.  I will note that they also

15   contain additional information that Tim Clark wrote to her.  "Just so I can say I

16   asked, I have recovered shell casings from two other unsolved homicides that

17   have gone cold.  Am I asking too much to send them along as well?  Sure you

18   are busy like everyone else, but you never know.  Thanks again."  Then they

19   replied, "Feel free to send them as well."  You can see in these various

20   exhibits those exchanges, including on exhibit '5', "Per our earlier

21   conversations -- Doctor Bond, per our earlier conversations, I am sending

22   shell casings to your office for three different homicides hopefully in the mail

23   today.  Thanks for your help.  Detective Clark."

1    Then, lastly, we have printed off here exhibit '6', which is the

2    communications that were submitted I believe as exhibit, Defendant's exhibit

3    'B' in the hearing today, between Detective Clark and Trudy Loe.  There was

4    some question about the attachments and the pictures and things like that.

5    Miss Caldwell was able to find that e-mail and also find that there were

6    attachments.  She printed up the attachments and they are what were

7    submitted, and I apologize, but I think as Defendant's exhibit 'D' as well.

8    So, the State, again, should this come down the road for review any

9    other time would ask to admit exhibits '3', '4', '5', and '6' into evidence and

10   would represent that, again, not only have we provided them to defense

11   counsel, but to the best of our knowledge these are the extent of the e-mails

12   and Detective Clark admits that what these say is what he would have

13   e-mailed and then gotten in response.  These are his communications, so to

14   speak.

15                    THE COURT:   Okay.  Any objection to

16   admitting these for the purpose of this hearing and putting them in the record,

17   Mr. Rion?

18                    MR. RION:   Again, obviously this Detective

19   has no recollection of these communications.  So, I hear what the Prosecutor

20   is saying; but, this clearly shows that there's -- well, to answer your question,

21   Detective Clark can't testify to these because he had no recollection about the

22   majority of these communications.

23   I don't know what search term was used, your Honor.  I don't know if

1  this was -- I know what the Prosecutor is representing and I'll take that at face

2  value.  I'm not suggesting, or, I'm not conceding that these are all of the

3  e-mails to the Police Department.

4                    THE COURT:  I understand.  I understand.

5  I'm not expecting you to concede that these are all the e-mails.  But, I'm going

6  to admit State's exhibits '3', '4', and '5' as it relates to the issue that was

7  raised by the defense Motion to Compel and Dismiss and an alternate Motion

8  to Continue the Trial.  Again, as I've already indicated on the record, I granted

9  the Motion to Compel.  The State has complied with that real quick here,

10  apparently, at least submitting these exhibits.  The Motion to Dismiss I

11  overruled.  I found there is no -- if there is anything here, there's late

12  disclosure.  There's no showing of any non-disclosure.  Based upon

13  everything that has been brought forth now, the late disclosure does not, well,

14  there's no establishment of any prejudice.  The late disclosure, if anything,

15  shows that several casings were examined by Doctor Bond and Doctor Bond

16  found markings on two different casings that are from another case.  Nothing

17  was found, and the evidence shows, nothing was found by Doctor Bond

18  relevant to this case.  So, the Motion to Dismiss is overruled.  The Motion to

19  Continue is overruled.  I'll admit those exhibits over objection.  Exceptions are

20  noted.

21          Anything else before we get the jurors in here and start a very late voir

22  dire?

23                    MRS. KOHLRIESER:  Your Honor, just

1  one last correction. I'm sorry. Detective Clark just brought up to me that Miss

2  Caldwell actually asked Sergeant Bev Leary of the Lima Police Department,

3  who is in charge of their communications in that regard, to look these up.

4  Destiny didn't do it herself. Sergeant Leary, as a representative of the Lima

5  Police Department, did.

6  COURT REPORTER:  Judge, you admitted '3', '4', and '5'. There's also a

7  '6'.

8  THE COURT:  Oh, is there a '6'?  Did I just

9  say '3', '4', and '5'?

10  MRS. KOHLRIESER:  Yes. I thought so;

11  but, I wasn't sure.

12  THE COURT:  I'm sorry. I didn't -- I went

13  through -- okay. There is a '6'. Detective Clark, is your e-mail

14  tim.clark@cityhall.lima.ohio.us?

15  DETECTIVE CLARK:  It's .oh.us.

16  THE COURT:  Oh, .oh.us. All right. All the

17  exhibits are admitted.

18  Anything else from the defense?

19  MR. RION:  No, your Honor.

20  THE COURT:  All right. I'll explain to the

21  jurors and I'll take the rap for the delay. I'm used to that. Then we'll get

22  started with the jury selection. My intentions are to break, -- you know, at

23  twelve-thirty I had another criminal pre-trial scheduled in there and it's got to

1    get done. So, it will probably just basically be the Court's voir dire and then

2    we can start with the attorneys' questioning after a lunch break. We may

3    break sooner if I get done sooner. But, then we'll start with -- well, we did

4    have anticipated a jury view in the morning. Did you set up a time?

5    BAILIFF: No. I was going to do that today.

6                              THE COURT: All right. Well, we'll still plan

7    and hopefully get a jury selected today and do a jury view and openings

8    tomorrow. All right. I'll step out. We'll be in recess as the Court staff brings

9    in the prospective jurors and then we'll get started.

10   (WHEREUPON, COURT WAS IN RECESS AT 11:06 A.M.)

11

12

13                          **TUESDAY, SEPTEMBER 8, 2015**

14                          **11:18 A.M.**

15

16                              THE COURT: Just for the record, note that

17   it's September 8th, 2015 and we are convening in Case Number CR2014

18   0139. The caption of the case is The State of Ohio -vs- Markelus Q. Carter.

19             I'll get on with some introductions in a bit, but first and foremost to the

20   prospective jurors, ladies and gentlemen, first of all, I want to just give you my

21   apologies for keeping you out in the hallway for longer than was anticipated.

22   My job is very interesting. You never know on any given day what's going to

23   come up and what's going to happen. As much as we plan and as much as

1    the lawyers prepare, and the Court prepares, and my staff prepares for a trial

2    like this we just never know when, well, in this case Tuesday morning rolls

3    along, especially coming off of a long holiday weekend, what issues might

4    come up.  Occasionally issues come up that I have to deal with related, or not

5    related, to the case that we can't let the jurors know what's going on if it's

6    related to the case.  We kind of have to keep you in the dark, so to speak, so

7    you don't get any information pertaining to the case until the appropriate time

8    period.  So, I'm apologizing and I'm taking the blame for the delay in getting

9    you in here.  I know it's an inconvenience for you to be here in some cases.

10   We try very hard to minimize the delays, but sometimes they're beyond my

11   control.  People always say, "Well, you're the Judge.  Can't you do that?"

12   Sometimes I don't even have control over certain things that come up.  But,

13   we have to deal with them in a method, in a methodical way to make sure

14   everything is covered, all bases are covered.  So, I apologize for keeping you

15   out there in the hallway, not knowing what's going on, not knowing why you're

16   here, and what kind of case is here.  I assume you knew you were here for

17   jury service.  So, with that, please, I don't expect you to be happy about it,

18   about the delays.  I'm only begging for your understanding that it's a matter

19   that we just had to deal with.  If you serve on this jury and when this is all over

20   with I would be more than glad to sit down with any of you as a group, or

21   individually, and explain to you some of these things.  But, the rules of the

22   Courtroom prohibit me from explaining certain things to you until the

23   appropriate time comes along.  So, if you're serving on the jury in this case

1  you'll get an idea of how these things flow.  Sometimes not as smoothly as

2  everybody would like.

3  So, you're all called here for potential jury service.  That's pretty clear.

4  I hope you all understood your summons to come here.  You all followed your

5  summons.  Unfortunately, there were some people that didn't show up.  As a

6  matter of fact, I understand one of you took off in the meantime and left.  Well,

7  we can deal with people like that.  I'm not trying to scare anybody.  But, if

8  someone doesn't fulfill their jury service that could be a contempt of court that

9  could be punishable as a contempt of court.  So, for those people that didn't

10  show up, or for that individual that took off, we have your names and we know

11  where you live.  But, you guys are here and you were troopers and you stuck

12  with it.  Again, I beg for your patience in this matter.

13  We're going to get started here with the selection process.  Believe it

14  or not, not all of you are going to be a juror on this case.  We're going to pick

15  twelve jurors and then we're going to pick two people to be alternate jurors.

16  So, fourteen people will actually stay here.  The rest of you will be excused

17  sometime today.  I hope we can get all the selection process done today; but,

18  I can't promise that.  So there, again, is a bit of an inconvenience.  Some of

19  you may have to come back tomorrow to finish this process.  But, only

20  fourteen of you will stay - twelve to be jurors and two to be alternates.  I'll

21  explain all of that in a minute.

22  You all came and you all, I think, understood - either you were afraid to

23  be found in contempt or, I hope, you understood this was a civic

1    responsibility.  Recently I gave a speech and told people in the community

2    how important jury service is.  I believe in that.  I think that you folks at least

3    understand how important it is because the system doesn't work unless

4    people are willing to serve.  What the citizens shouldn't have to put up with

5    are the long delays.  But, again, I wish we could avoid that.  There will be

6    some delays.  Perhaps even if you're on this jury there will be some times

7    when you're out there waiting and wondering what's going on.  Because the

8    rules of the Courtroom tell us that we can't tell the jurors everything until after

9    the case is over with, some of those times you'll be kept in the dark.  Let me

10    promise you this - if you serve on the jury in this case you will get all the

11    evidence and information that you need to make a decision in this case.  We

12    won't keep that from you.  What we do off the record, or, on the record but

13    outside of the jurors are procedural matters and certainly legal issues that

14    come up.  That's because in a jury trial the jurors that are selected, well, they

15    are the ones who listen to the facts and look at the evidence and hear the

16    evidence and make a decision as to what happened or what was proven and

17    what wasn't proven.

18         As the Judge in a jury trial I don't make any decisions regarding facts.

19    I have to make decisions regarding the law, procedure, conduct of the

20    participants, and all those logistical things are my realm of authority in a jury

21    trial.  I'm not going to decide any facts.  It will be the jurors that decide the

22    facts.  That is unique to our system of justice where we take individuals from

23    the community that are willing to give up some of their time and come in here

1   and resolve these important matters for the community. So, if you serve --

2   well, first off, for showing up you get a star beside your name. If you serve on

3   this jury you get a double star beside your name because you participated in

4   our system. Some of you have probably already been on a jury and you

5   know what to expect. Expect the unexpected. You experienced a little of that

6   this morning. But, we will try hard to keep the case moving.

7          We're going to select from you folks fourteen people based upon a

8   bunch of questions that I'm going to ask and the lawyers are going to ask you.

9   We want jurors that can be fair and impartial. Those two words are the

10  central theme of the selection process and the central theme of this entire

11  trial. Fairness and impartiality. So, in other words, if you're a person that

12  might know something about this case after you learn a little bit, or know

13  some of the people involved, or because of something that may have

14  happened in your own lives or the lives of your family members that this kind

15  of a case isn't the type of case that you can be fair and impartial, well, that's

16  what we have to find out. That's why we go through the selection process.

17  So, what we're going to do is I'm going to ask you some questions and the

18  attorneys are going to ask you some questions and then we'll select out of

19  that.

20         But, before we do that, I want to just go through a little bit more on

21  logistical things. The first thing we'll do here is introduce everybody that's

22  involved. I gave the case number and the case name, State of Ohio -vs-

23  Markelus Q. Carter. But, I want you to meet the people that are going to

1   be involved, not only just so you know who's involved, but this is that point

2   and time when you think to yourself, 'oh, I know so and so and I don't think I

3   can be fair', or, 'I know maybe what this is about and I don't think I can be

4   fair'.  Just because you know somebody doesn't mean you can't be fair and

5   impartial.  For God's sakes, my mother was on a jury once.  I mean, she

6   obviously knew me, but she served on a jury.  So, just because you know

7   somebody doesn't mean you can't be fair and impartial.  But, if you know

8   somebody and you know something about them that you either couldn't

9   believe them, or you would believe everything they said whether it was true or

10  not, or you know something about the case, then you need to let us know that

11  and that you might not be a good juror on this particular case.

12        I'm not asking you to think down in your minds, and you probably

13  wouldn't have to go too far, to come up with a reason why you don't want to

14  be here.  Maybe everybody in this room, except hopefully myself and my staff

15  and the attorneys, want to be here.  This is what we do for a living.  You folks

16  do other things for a living and you have other things going on in your lives.

17  So, I'm not asking you to give me the top ten reasons you don't want to be

18  here.  But, if you don't think you can be fair and impartial, we do need to know

19  that.

20        So, introductions.  The State of Ohio.  They're represented by the Allen

21  County Prosecutor's Office.  Juergen Waldick is our Prosecutor.  He's not

22  involved in this case, but two of his Assistants are.  So, Mr. Miller, do you

23  want to introduce yourself, your colleague, and the gentleman you have at

1    your table with you?

2                                     MR. MILLER:   Yes, your Honor.  Thank

3    you very much.  Good morning, everybody.  My name is Anthony Miller.  I'm

4    as Assistant County Prosecutor, as the Judge said.  With me today is Terri

5    Kohlrieser who is also an Assistant County Prosecutor in our office.  Also with

6    us today is Tim Clark from the Lima Police Department.

7                                     THE COURT:   Okay.  We'll ask later if you

8    know any of these folks.  Markelus Q. Carter is the defendant.  He's

9    represented by an attorney from Dayton, Mr. Rion, who practices not only in

10   Montgomery County, but he practices and he's been in Allen County many

11   times.  Mr. Rion, do you want to introduce yourself and your client?

12                                     MR. RION:   Good morning.  It's almost

13   afternoon.  I'm Jon Paul Rion, an attorney.  This is Markelus Carter.  I'll be

14   speaking for him today.

15                                     THE COURT:   Okay.  Thank you.  Just a

16   few more introductions here of my staff.  Monica Garlock is over here on my

17   right.  She's the bailiff of the Court.  The bailiff will be the person with whom

18   the jurors who are chosen will have the most interaction.  The bailiff is kind of

19   in charge of the jurors during the course of the case.  There will be some

20   rules.  You won't be able to talk to me during the case, or talk to the lawyers.

21   If you have any concerns or questions you address those to the bailiff and

22   then she would let me know.  She kind of screens those and can be a liaison

23   between the jurors and the Court.  Monica is also involved in swearing in

1    witnesses and things like that.

2            On my immediate right is Sue Thomas.  She's the Court Reporter.

3    You'll see the microphones.  We're recording everything.  This is what they

4    call a Court of Record.  Everything has to be recorded, even the questions to

5    you and the responses from you all will be recorded.  So, we'd ask you to

6    please speak up.  The Court Reporter is also involved in marking exhibits and

7    other logistical things like that.  We've kind of advanced to the twenty-first

8    century now with recording on CD's instead of the old shorthand or the

9    stenographer that you might see in the old movies.  Everything is being

10   recorded nonetheless.  That's the Court Reporter's job.

11           On my left is a Deputy Clerk, Shannon Rice.  You've already interacted

12   with Shannon.  She's kind of kept track of the order of the jurors.  You folks'

13   names all appeared on a computer generated list.  There's no magic in how

14   you got in the box and you folks didn't.  It's just all computer generated from

15   the voter registration list.  So, when you register to vote you're registered to

16   be a potential juror.  Some people never get called.  Some people get called a

17   lot.  It's just the luck of the draw.

18           The fact that you twelve are in the jury box doesn't give you any more

19   priority in terms of being a juror.  Anybody, the very last person in the very

20   last row, might be a juror in this case.  We don't know who's going to stay and

21   who's not going to stay.  We go through the selection process.  If we run out

22   of jurors then we go out to Walmart or the Lima Mall and grab unsuspecting

23   people up off the streets.  So, if you think it was inconvenient to wait around

1    for a couple of hours this morning, think about shopping on a Tuesday

2    morning and a Sheriff's Deputy comes up and nabs you and says, "We need

3    you for a jury."  We hope we don't get to that point; but, that's the process.

4        So, the questions that we ask will be directed to all of you, but we're

5    going to concentrate on the twelve that are in the jury box individually more so

6    at the beginning.  But, all of you listen because if one of these folks is

7    excused for some reason then we'll call for someone out in the audience to

8    come up and fill the spot.  Instead of going over every question with every

9    juror we want everybody to listen and then if any of you folks in the audience

10   get up to the jury box we'll say, "Did you hear all of the questions?  Was there

11   any response you wanted to give?  Anything important?"  Then, you'll be

12   subject to some individual questioning, too.  But, I found it to be a quicker

13   process if the attorneys will individualize their questions with the twelve in the

14   jury box first.  Now, I'll ask general questions of everybody.  I may

15   individualize some of those questions.  It depends on the responses.

16       We do have a list of jurors' names.  Sometimes there's a concern of

17   who's got this information.  The lawyers have this information.  You filled out

18   jury questionnaires and so we have some personal information.  But, I'm

19   going to make the lawyers turn this in to the Court when the case is over with

20   so they don't have this.  You don't have to worry about later on somebody

21   having your information.  They have it now for their use during the selection

22   process.  But, I just want counsel to know now that I'm ordering that after the

23   jury is selected that you return this information to the Court.  Okay?

1    So, what are you here for?  I said The State of Ohio -vs- Markelus Q.

2    Carter.  It is a criminal case.  There have been allegations made and there

3    has been an indictment made that Mr. Carter has committed criminal

4    offenses.  There are two counts.  This is a case involving an allegation.  I

5    want to stress the word 'allegation' at this point.  There's an indictment.

6    Here's a copy of it.  It's a formal piece of paper.  The process says that this is

7    what notifies Mr. Carter in this case that he's been charged with crimes.  This

8    doesn't prove anything.  This is just a legal process, a legal piece of paper.

9    There's been a lot of news in the last year or so about, you know, out in the

10   St. Louis suburbs, or wherever, there's an indictment.  What does that mean?

11   An indictment is just the process by which charges are brought formally.

12   There hasn't been a trial.  This indictment doesn't prove anything.  As a

13   matter of fact, under our Constitution, thank God, a person who is indicted is

14   presumed to be innocent unless and until the State of Ohio, who is bringing

15   the case, can prove beyond a reasonable doubt that that individual did

16   commit these crimes.  That's very important.  I said fairness and impartiality

17   were the major themes.  The presumption of innocence and the fact that the

18   State of Ohio has to prove the defendant guilty beyond a reasonable doubt,

19   those, too, are very important things that you have to keep in mind and you

20   have to agree to abide by if you're a juror in this case.  In other words, if you

21   can't understand that Mr. Carter is presumed to be innocent, if you can't

22   accept that, or if you can't hold the State to the burden of proof beyond a

23   reasonable doubt, not a higher burden, but beyond a reasonable doubt, then

1    maybe you couldn't be a juror in this case.  I think most of you folks -- well,

2    we're just looking for people that have common sense, can listen to evidence,

3    and can make a decision and can follow the rules.  I'll give you the rules that

4    you follow.  The thing is, you can't make up your own rules as we go along.

5    That's important.

6         In this case Mr. Carter is charged with one count of Aggravated Murder

7    and there's a gun specification on that.  I'll explain that in a little bit.  But, this

8    Aggravated Murder is alleged to have occurred back in February of 2009.  So,

9    it's a time from awhile back.  February 23rd of '09 are the allegations of this

10   alleged Agg. Murder.  It is alleged to have occurred here in Lima, Ohio over

11   around 436 East McKibben Street.  The victim of the alleged Agg. Murder

12   was one Kenneth Warrington, or Warrington (pronunciation).  That's the first

13   count of Aggravated Murder.  In that case it says, it's alleged, again nothing's

14   been proven and Mr. Carter is presumed innocent, but it's alleged that Mr.

15   Carter, on that date, and here in Allen County, did purposely and with prior

16   calculation and design cause the death of Kenneth Warrington.  That's a

17   charge of Aggravated Murder.

18        Count One also has what's called a specification.  That's just an

19   additional finding that the Grand Jurors found.  It's a gun specification.

20   They're saying that Mr. Carter allegedly had a firearm on or about his control

21   while committing the Aggravated Murder and that he either displayed it,

22   brandished it, or indicated that he possessed it, or used it to facilitate the

23   Aggravated Murder.  So, that's a gun specification.  In other words, they're

1   saying this Aggravated Murder was accomplished by the use of a gun.  It's a

2   firearm specification.  That's Count One.

3       In Count Two the defendant is charged with, and again he's presumed

4   innocent, nothing's been proven and that's why we're having a trial, to see if

5   the State can prove beyond a reasonable doubt, but Count Two is a charge of

6   Having a Weapon While Under a Disability.  That's alleged on the same date

7   and the same place and the same time.  Having a weapon under a Disability

8   is against the law.  Now, the disability isn't necessarily a physical disability

9   that you might think of in common parlance.  The disability, well, in this case

10  it's alleged that the defendant had a prior conviction for another case that

11  made it illegal for him to have a gun in this case.  It's alleged that he did

12  knowingly acquire, have, carry, or use a firearm and that he had either been

13  under indictment or been convicted previously of a charge involving the illegal

14  use, possession, sale, or administration of drugs of abuse.  In that case there

15  might be evidence of a prior conviction or a prior indictment.  You can't use

16  that kind of evidence for anything other than whether or not it proves beyond

17  a reasonable doubt that he had that prior.  In other words, you can't say, 'well,

18  if they show me evidence that he had been previously convicted of an offense

19  that must mean he's committed something else'.  You can't do that.  Evidence

20  of a prior conviction when there's a Weapon Under a Disability is only to be

21  used and considered to determine whether the State has proven that prior

22  conviction to prove that the defendant was under a disability.  So, that's what

23  that case is about.  I'll give you more instructions on that as that comes by if

1   you are actually a juror on this case.  But, I wanted to let you know a little bit

2   about this case.

3        Obviously it's a serious matter.  Obviously.  Every case that comes

4   here is serious.  We don't like to have to deal with these kinds of cases.

5   Nobody does.  But, that's why it's important that we have jurors, people from

6   the community, that are willing to serve because this is important.  This is not

7   only important, as you can imagine, to Mr. Carter, and to the Prosecutor's

8   Office, but it's important to our whole system that we have jurors that are

9   willing to resolve these kinds of cases.  Again, it's not necessarily a pleasant

10  experience.  Most people, though, -- well, I hope if you serve on this jury you'll

11  understand what I'm talking about.  Most people, after they serve on a jury, no

12  matter what kind of case it is, come away with a better understanding of our

13  system, a better appreciation as to what goes on, and a better appreciation

14  for the system that we have.  Other countries don't do it this way.  Other

15  countries don't have juries.  They try to copy-cat us and say, 'boy, that

16  American system'.  Those forefathers must have known something when they

17  set up this whole right to have a jury trial.  It's a great, great system.  I'm not

18  saying that just because I work in it.  But, anyways.

19        Don't concern yourselves with penalties.  That's not an issue for jurors.

20  You don't make this decision and think of that as you're back there

21  deliberating.  You know, what happens after this is not your concern.  It can't

22  be your concern.  The issue of punishment, if we ever get there in the event a

23  person is found guilty of a criminal offense, is upon the Judge to decide.  So,

1     you can't let those kind of considerations - sympathy, prejudice, anything like

2     that - enter into your considerations if you're chosen as a juror.

3         I'm just going to give you a little quickie here before we get the jury

4     selection process going. You'll decide this case on the evidence that's

5     presented. Evidence is all the testimony received from the witnesses, the

6     exhibits that might be admitted in the trial, and any fact that I require you to

7     accept. The qualifications of a good juror, besides some of the questions that

8     I'm going to go through - we need a willingness to be fair and impartial. We

9     need a willingness and ability to listen. We need a willingness to follow the

10     law that I give to you and not make it up and not use your own idea of what

11     you think the law should be. Also, a willingness to use your common sense. I

12     will give you the law that is necessary. In fact, I've already got a draft made.

13     We call these instructions. It explains what the case is about in detail. It

14     gives you definitions. It tells you how to conduct your deliberations. It tells

15     you what to do and what not to do. So, they're pretty -- I mean, they might be

16     long, but they're not that difficult to understand, I don't think.

17         I'm going to start asking questions as we get started here. I don't want

18     you to think that we're trying to invade into your personal space. Some of the

19     questions are going to be personal. We just have to ask them. We can't read

20     your minds. So, if we say 'do you know anybody involved', it would be an

21     injustice if you sat there and didn't say anything and then later on, six months

22     from now, say 'oh, I didn't tell them that I knew so and so and that had an

23     impact on my decision'. We don't want that. That's the worst thing that

1   could happen.

2        Again, the fact that there's an indictment that's been filed doesn't prove

3   anything.  The defendant is presumed to be innocent until his guilt is

4   established beyond a reasonable doubt.  The defendant must be acquitted, or

5   found not guilty, unless the State produces evidence which convinces you

6   beyond a reasonable doubt of every essential element of the offenses

7   charged.  I'll tell you what those elements are.  The defendant doesn't have to

8   prove anything.  The defendant doesn't have to take the stand.  The

9   defendant doesn't have to present any evidence.  The defendant has no

10   burden whatsoever.  That's all upon the State of Ohio.  It's important that you

11   keep that in mind.  The State has to prove beyond a reasonable doubt the

12   defendant is guilty.  "Reasonable doubt is present when, after you have

13   carefully considered and compared all of the evidence, you cannot say you

14   are firmly convinced of the truth of the charge.  Reasonable doubt is a doubt

15   based on reason and common sense."  Again, there's that common sense.

16   "Reasonable doubt is not a mere possible doubt because everything relating

17   to human affairs or depending on moral evidence is open to some possible or

18   imaginary doubt."  If space aliens came down and did this, well, that's a

19   possible imaginary science fiction doubt.  "Proof beyond a reasonable doubt

20   is proof of such character that an ordinary person would be willing to rely and

21   act upon it in the most important of his or her own affairs."

22        All right.  So, now we're going to swear all of you in as potential jurors

23   and I'm going to start asking questions.  I'll finish my questions and then

1   we're going to take a noon recess and then we'll come back and finish up the

2   questions by the lawyers after lunch.  So, if you would all please stand up?

3   We're going to ask you to swear or to affirm that you'll be truthful in your

4   answers.

5   SHANNON RICE, DEPUTY CLERK OF COURTS:   Please raise your right

6   hand.  "Do you solemnly swear or affirm that you will truly and fully answer all

7   questions put to you by the Court or counsel touching your qualifications to sit

8   as a juror in the case now called for trial, and this you do as you shall answer

9   to God or as you do under the pains and penalties of perjury?"  Do you so

10  swear or affirm?

11  PROSPECTIVE JURORS:   I do.

12  SHANNON RICE, DEPUTY CLERK OF COURTS:   Thank you.  Please be

13  seated.

14                              THE COURT:   All right.  We'll try to make

15  this as quick and as painless as possible.  Again, this is the part of the trial

16  that they don't usually show on television because it's usually not the most

17  exciting.  But, you know, in terms of, well, all stages of the trial are very

18  important.  So, this is just as important as the very last thing because we

19  need to get fair and impartial jurors.  So, bear with us.

20        The questions that I ask are asked of all potential jurors.  They may

21  sound personal.  I apologize if they are; but, we have to ask them.  I just want

22  you to relax.  This is a new experience for most of you.  Maybe you don't like

23  talking in public.  If there's an issue that comes up that's personal and you

1   would rather not speak in front of everybody, indicate that and we can have a

2   one-on-one with you.  Okay?  We're not trying to put anybody on the hot seat

3   and in the spot light and embarrass anybody.  We just need truthful answers.

4         The first question is - is there anyone who considers themselves to be

5   a chronic alcoholic or a drug dependent person?  That's very personal.  But,

6   the statute has that question.  A person in that category would not be eligible

7   to be on the jury.

8         Now, I'm going to ask questions and, again, when I ask these

9   questions remember that I need your answers, but the main thing is 'would it

10   prevent you from being fair and impartial'.

11        I gave you a brief sketch of the facts.  Does anybody have any

12   knowledge about this case whatsoever?  Anybody?  You'll have to raise your

13   hand.  Nobody's raising a hand.  I know there might have been some sketchy

14   things in the media, and I'll get to that in a minute.  But, does anybody feel

15   that they have any knowledge about the case at all?  Okay.  Nobody's

16   indicated that.

17        Does anybody know any of the participants that have been introduced?

18   Not necessarily the Court staff.  But, if you know some Court staff and you

19   feel that would make you unable to be fair and impartial, let us know.  But,

20   any of the participants that have been introduced, does anybody know them?

21   No?  Okay.  Oh, I'm sorry.  I'm sorry.  I missed you.  Yes?  Mrs. Marik?

22   PROSPECTIVE JUROR:  I know Detective Clark.

23                    THE COURT:  Okay.  And your husband

1   is a retired Lima Police Officer; right?

2   PROSPECTIVE JUROR:   Yes, he is.

3                              THE COURT:   Okay.  I know you.  We go

4   to the same church.

5   PROSPECTIVE JUROR:   Yes.

6                              THE COURT:   Do you think the fact that

7   your husband is a former police officer with the Lima Police, that Detective

8   Clark works for the Lima Police Department, or that we know each other, do

9   you think that would make you fair and impartial, or, unable to be fair and

10  impartial?

11  PROSPECTIVE JUROR:   I would hope I could be; but, I don't know.

12                             THE COURT:   Was Don on the department

13  in '09?

14                             MRS. KOHLRIESER:   Your Honor, Don

15  Marik is, in fact, one of our witnesses, a very major witness.

16                             THE COURT:   Well, why didn't you just say

17  so?

18                             MRS. KOHLRIESER:   I didn't want to

19  interrupt you.  I was getting ready to.

20  PROSPECTIVE JUROR:   I didn't know if I could say that.

21                             THE COURT:   You're excused.  I believe

22  your husband may be a witness.

23  PROSPECTIVE JUROR:   Do I go now?

1          THE COURT:   Yea.  Thank you for coming

2   in.  Right here in the front row - your name, sir?

3   PROSPECTIVE JUROR:   Jack McDermitt.

4          THE COURT:   Okay.

5   PROSPECTIVE JUROR:   I'm a Captain with the Lima Fire Department.  I'm

6   familiar with both of them.  I work with L.P.D. on a daily basis.

7          THE COURT:   Were you involved at all

8   with this?

9   PROSPECTIVE JUROR:   I don't believe I was on the call.

10          THE COURT:   Do you think that your work

11   as a fireman is going to prevent you from being fair and impartial?  I mean,

12   you can assess, if you're chosen as a juror, you can listen to the evidence

13   and give a fair assessment?

14   PROSPECTIVE JUROR:   I think I can.

15          THE COURT:   Okay.  I appreciate that.

16   There might be some more questions of you.  Anybody else?  Way back in

17   the back row.  Your name, sir?

18   PROSPECTIVE JUROR:   Harold Cheney.

19          THE COURT:   Okay.

20   PROSPECTIVE JUROR:   I knew the Warrington family.

21          THE COURT:   Okay.  Close?  Or, just

22   knew of them?

23   PROSPECTIVE JUROR:   Just knew.

1          THE COURT:  Do you think that that is

2  going to prevent you from being fair and impartial?

3  PROSPECTIVE JUROR:  Well, I remember when this happened.

4          THE COURT:  Do you think that that would

5  make it impossible for you to be fair and impartial and look at the evidence

6  fairly and impartially?

7  PROSPECTIVE JUROR:  Probably.

8          THE COURT:  Okay.  Fair enough.  You're

9  excused.  Anybody else?  Right here in the front row again?  Your name?

10  PROSPECTIVE JUROR:  Phyllis Laman.

11          THE COURT:  Okay.

12  PROSPECTIVE JUROR:  I didn't speak up when you asked the question

13  about having heard anything about the case because I thought you were

14  talking to those people.

15          THE COURT:  Okay.

16  PROSPECTIVE JUROR:  I have been privileged to sit in on the evening meal

17  with two of the witnesses for the prosecution and I do have very strong

18  feelings.

19          THE COURT:  Okay.  Without sharing what

20  you know, you think that would prevent you from being fair and impartial?

21  PROSPECTIVE JUROR:  I think it would.

22          THE COURT:  Okay.  You're excused.

23  Anyone else?  See, this is where I get nervous because now everybody

1    thinks, 'oh, is that all I have to do, or, all I have to say to get off of this'?

2    That's not what we're looking for.  We're looking for honesty.  These folks

3    have been honest.  It would be unfair if they wouldn't have shared it and then

4    came back later and said, 'you know, I had dinner with a couple of the

5    witnesses before all of this happened and I knew that'.  We don't want that.

6    So, anybody else?  Okay.

7         Are any of you folks, yourselves or close family members, employed by

8    the Prosecutor's Office, any law enforcement office, or a defense attorney law

9    firm, or anything like that?  No?  Great.  Okay.

10    PROSPECTIVE JUROR:   Could you repeat that?

11                        THE COURT:   If you or a family member,

12    close family member, is employed by law enforcement, a Prosecutor's Office,

13    a defense attorney's office, in that situation?

14    PROSPECTIVE JUROR:   In 2009 my son was a City Prosecutor.

15                        THE COURT:   Oh, what's your name?

16    PROSPECTIVE JUROR:   Geiger.

17                        THE COURT:   Oh, okay.

18    PROSPECTIVE JUROR:   David Geiger is my son.

19                        THE COURT:   Okay.  I remember him.

20    Where's he at now?

21    PROSPECTIVE JUROR:   He's in Columbus.

22                        THE COURT:   Do you think that's going to

23    interfere -- do you know anything about this case?  I don't even know if this

1      case went through a preliminary hearing or anything.

2      PROSPECTIVE JUROR:   I don't know anything about the case.

3                                    THE COURT:   Do you think that's going to

4      interfere and make it impossible for you to be fair and impartial?

5      PROSPECTIVE JUROR:   No.

6                                    THE COURT:   Okay.  Nice to meet you.

7      And right here in the front row, your name?

8      PROSPECTIVE JUROR:   Jennifer Gresham.

9                                    THE COURT:   Okay.

10     PROSPECTIVE JUROR:   My son is a Deputy with the Sheriff's Department.

11                                   THE COURT:   He works here in the jail;

12     right?

13     PROSPECTIVE JUROR:   And my husband works in the jail.

14                                   THE COURT:   Okay.  Who's your cousin?

15     PROSPECTIVE JUROR:   No.  My husband works in the jail.

16                                   THE COURT:   Okay.

17     PROSPECTIVE JUROR:   And my son works for the Sheriff's Department as

18     a Deputy.

19                                   THE COURT:   Oh, as a Deputy?  All right.

20     Are either of those folks involved in this case?  Prosecutor's Office?  No?  Do

21     you feel that that would prevent you from being fair and impartial?

22     PROSPECTIVE JUROR:   I don't believe.

23                                   THE COURT:   All right.  Thank you for

1    think you could be fair and impartial notwithstanding that your daughter-in-law

2    is with the Federal Prosecutor's Office?

3    PROSPECTIVE JUROR:   I thought you would want to know.

4                                    THE COURT:   You could still be fair and

5    impartial?

6    PROSPECTIVE JUROR:   Yes.

7                                    THE COURT:   That's what we need to

8    know.  There may be some more inquiry of you.  I don't think Alyssa was at

9    the Prosecutor's Office in '09; was she?

10                                   MRS. KOHLRIESER:   Yes, she was.

11                                   THE COURT:   Oh, was she?  Did she work

12   on this case at all?

13                                   MRS. KOHLRIESER:   But, she's had

14   nothing to do with this matter.

15                                   THE COURT:   Did you ever talk to Alyssa

16   about this particular case, or any case?

17   PROSPECTIVE JUROR:   No.

18                                   THE COURT:   Okay.  The second row

19   there, in the black, your name?

20   PROSPECTIVE JUROR:   Sue Beining.

21                                   THE COURT:   And --

22   PROSPECTIVE JUROR:   Greg Crites subpoenaed me to a civil suit and it

23   was dismissed and I don't know if he's going to be --

1          THE COURT:  He's not involved in this

2    case.

3    PROSPECTIVE JUROR:  His daughter is.

4          THE COURT:  Pardon?

5    PROSPECTIVE JUROR:  I mean, -- I'm sorry.  His daughter was in my case.

6          THE COURT:  Yea.  But, Greg Crites is not

7    involved in this case as I know; is he?

8          MRS. KOHLRIESER:  No.  The Sheriff's

9    Office is not involved in any way, shape, or form.

10          THE COURT:  The reason I asked is

11   because we had a Mrs. Krites and I didn't know if she was related.  But, you

12   know Greg Crites?  He subpoenaed you to something?  The fact that he's law

13   enforcement and you were involved in something with him, does that prevent

14   you from being fair and impartial in this case?

15   PROSPECTIVE JUROR:  My question is, is he going to subpoena me again?

16          THE COURT:  I don't know.

17   PROSPECTIVE JUROR:  I mean, at the same time.

18          THE COURT:  Well, I don't know what that

19   was -- if you're on jury service and you get a subpoena while you're on jury

20   service let me know and we'll take care of it.  Okay?

21   PROSPECTIVE JUROR:  Okay.

22          THE COURT:  All right.  I do have some

23   power.

1  PROSPECTIVE JUROR:  That's fine.

2              THE COURT:  Is there something on-going

3  right now, you mean, that you might get subpoenaed in?

4  PROSPECTIVE JUROR:  Yes.

5              THE COURT:  If that happens if you're on

6  the jury, let me know.

7  PROSPECTIVE JUROR:  Okay.

8              THE COURT:  We won't want you to be

9  bothered by that.  Okay?  What Court was that in?

10  PROSPECTIVE JUROR:  It was here.  It was Juvenile Court.

11              THE COURT:  Oh, okay.  All right.  Well,

12  let's worry about that if it happens.  Okay?  Another hand there?  Ma'am, your

13  name?

14  PROSPECTIVE JUROR:  My nephew is a Deputy Sheriff.

15              THE COURT:  What's your name?

16  PROSPECTIVE JUROR:  Cyndy Smith.  Cynthia Smith.

17              THE COURT:  Who's your nephew?

18  PROSPECTIVE JUROR:  Dana Sutherland.

19              THE COURT:  Oh, okay.  He's your

20  nephew?

21  PROSPECTIVE JUROR:  Yes, he's my nephew.

22              THE COURT:  I don't think he's involved in

23  this case; is he?

1    MRS. KOHLRIESER:  No, your Honor.

2    THE COURT:  Okay.  Do you feel that the

3    fact that your nephew is on the Sheriff's Department would prevent you from

4    being fair and impartial?

5    PROSPECTIVE JUROR:  I can be fair and impartial.

6    THE COURT:  Okay.  Good.  Anybody

7    else?  All right.  Very good.

8    Okay.  Let's go through -- we did touch on a little bit of this.  Does

9    anybody else have any kind of an action, legal action, a complaint, or a

10    grievance involving the Lima Police Department, the Prosecutor's Office,

11    Attorney Rion's office, or Mr. Carter, or anything like that that you would have

12    some conflict in that regard?  Anybody?  No hands.  All right.  Great.

13    I'll let the parties let you know, and there's a lot of witnesses here.

14    Hopefully they've pared them down.  They'll let you know who the potential

15    witnesses might be.  I could read the list, but it's long.  I'll just let them give

16    you the names and if you, again, know somebody, that's one thing, but if you

17    know them and then think, 'oh, well, if that person testifies I already know

18    what I'm going to say', well, if that's the case, if you couldn't be fair and

19    impartial, we'll let them ask you.

20    Anybody been subpoenaed in this case?  One potential juror indicated

21    getting a subpoena in something else.  Is anybody subpoenaed?  We had

22    Detective Marik's wife here.  She's been excused because he was

23    subpoenaed.  Anybody else have a family member that you're aware of that

1   got subpoenaed for this case?  Okay.  Nobody?  All right.

2        This case was presented to the Grand Jury in April of 2014.  Was

3   anybody on the Grand Jury back then?  Okay.  Very good.

4        I'll ask this and this usually gets some responses.  Has anybody ever

5   been on a jury before?  Okay.  Anybody on a criminal case before?  All of the

6   folks that raised their hands have been civil cases, like a personal injury, or a

7   contract, or something like that?  Oh, we've got one hand up.  Ma'am, your

8   name?

9   PROSPECTIVE JUROR:  Linda Harris.

10       THE COURT:  You've been on a criminal

11  jury before?

12  PROSPECTIVE JUROR:  Yes.

13       THE COURT:  When was that?

14  PROSPECTIVE JUROR:  I don't remember.  It involved arson which resulted

15  in a death.

16       THE COURT:  So, has it been more than

17  five years ago?

18  PROSPECTIVE JUROR:  Oh, yes.

19       THE COURT:  All right.

20  PROSPECTIVE JUROR:  More than ten.

21       THE COURT:  Did you get to actually

22  deliberate and go back and reach a verdict?

23  PROSPECTIVE JUROR:  Yes.

1    THE COURT:   Okay.  Can you forget all of

2    that if things were different then and follow the rules in this case and follow

3    the law that I give to you in this case?

4    PROSPECTIVE JUROR:   Yes.

5    THE COURT:   Would you be willing to

6    serve again if we need you?

7    PROSPECTIVE JUROR:   If you need me; yes.

8    THE COURT:   Okay.  Two down.  Were

9    you on a criminal case?  Your name?

10   PROSPECTIVE JUROR:   Yes, a robbery.  Is that a criminal case?

11   THE COURT:   Yea.  Yep.  When was that?

12   PROSPECTIVE JUROR:   Ages ago.

13   THE COURT:   What's your name, just for

14   the record?

15   PROSPECTIVE JUROR:   Brenda Groman.  It was probably -- it was at least

16   ten years ago.

17   THE COURT:   Okay.  And you deliberated

18   and reached a verdict?

19   PROSPECTIVE JUROR:   Yes.

20   THE COURT:   Okay.  Were you willing to

21   serve again if we need you?

22   PROSPECTIVE JUROR:   Yes, that's fine.

23   THE COURT:   You could put that

1    experience behind you and judge this one on the facts of this case?

2    PROSPECTIVE JUROR:   Yes.

3                              THE COURT:   And not say, 'well, we found

4    that guy guilty of Robbery, or not guilty of Robbery, and so this is the way we

5    should do this one'?  You wouldn't do any of that kind of comparison; would

6    you?

7    PROSPECTIVE JUROR:   No.

8                              THE COURT:   Very good.  The folks that

9    have been on a civil trial, is there anyone who doesn't understand the burden

10   of proof was different in a civil case?  You might have heard the term

11   'preponderance of the evidence'.  That's a different, a lesser, burden in a civil

12   case.  In a criminal case it's got to be 'beyond a reasonable doubt'.  Does

13   anyone not understand that?  Okay.  All right.

14          Now, given the nature of this case, obviously, the allegations here,

15   given the nature of the case, the subject matter of this case, whether anyone

16   in your family has ever been involved either as someone charged with or the

17   victim of a serious crime, anything about the nature of the case that would

18   prevent anyone from being fair and impartial?  Okay.  Right here in the front

19   in the blue?  Your name?

20   PROSPECTIVE JUROR:   Kristy Brown.

21                              THE COURT:   Can you share?

22   PROSPECTIVE JUROR:   My wife's cousin was the victim of the murder that

23   happened in Delphos.  She was shot in the cornfield last year.

1                      THE COURT:  Oh, okay.  All right.  That

2 just got resolved, I think.

3 PROSPECTIVE JUROR:  Yes.

4                      THE COURT:  That was a -- well, who was

5 it again?

6 PROSPECTIVE JUROR:  Coller.

7                      MRS. KOHLRIESER:  Patrick Coller.

8                      THE COURT:  Well, I know.  I know the

9 person.  But, the relationship to you.

10 PROSPECTIVE JUROR:  Oh, my wife's cousin.

11                      THE COURT:  Okay.  Could you put that

12 experience out of your mind, you think?  These are completely different

13 allegations here.

14 PROSPECTIVE JUROR:  Yes.

15                      THE COURT:  You still could be fair and

16 impartial?

17 PROSPECTIVE JUROR:  Yes.

18                      THE COURT:  You won't let that terrible

19 incident that happened to your family enter into the consideration in this

20 case?

21 PROSPECTIVE JUROR:  No.

22                      THE COURT:  Okay.  Anyone else?  Okay.

23 Does anybody have the inclination and, gosh, this is I guess a real relevant

1  question these days with all the onslaught of the media and what's happening

2  in our country but, first off, can everybody put that all aside what's happening

3  between citizens and law enforcement and not come in here with a chip on

4  your shoulder either way saying, 'I'm against law enforcement', or, 'I'm always

5  for law enforcement no matter what happens'?  Is anybody of either of those

6  ilks?  Everybody can say, 'these are allegations here and we're not going to

7  listen to what the media's talked about in other communities', and not say,

8  'this is my chance to get even', or, 'my chance to make a statement for or

9  against law enforcement'?  Anybody of that persuasion, or, of that attitude?

10  You've got to be able to do this based on the facts of this case.  It's the job of

11  the jurors to decide who they believe and who they don't believe.  But, we

12  wouldn't want someone coming in here and saying, 'I don't care what law

13  enforcement says.  They could say that the sky is purple and I'll believe them

14  because they wear a uniform'.  We wouldn't want those people.  Well, maybe

15  the sky could be purple in certain circumstances.  That's a bad example.  But,

16  we wouldn't want someone to come in and say, 'I don't care what law

17  enforcement says.  I don't like them.  They could be the most truthful person

18  in the world, but since they wear a uniform I'm not going to believe them'.

19  That would be unfair.  We've got to be fair to both sides.  Does everybody

20  understand that?  Okay.

21          Now, this is a biggie.  It's a very serious case.  I expect this case is

22  going to probably take a couple of weeks.  It's not the longest case we've

23  ever had.  We just had one in February that took about a month.  This is

1   probably easily going to be a couple of weeks.  It will go into next week.  It

2   might, and I don't know, you saw this morning, some things sometimes

3   happen that delay.  But, I definitely can tell you it's probably a good two

4   weeks and maybe into that third week.  Now, you've all sacrificed something

5   to be here - either it's a job, or retirement time, or some other plans that you

6   had.  We got school started.  We're back to school.  Things are going on.

7   But, is there any problem with anybody knowing that this case might go into a

8   third week?  All right.  I expected there would be some hands.  You folks hold

9   on to those.  If we get to you we'll ask more questions.  But, right up here, first

10  off, number two.  Mrs. Kramer; is it?

11  PROSPECTIVE JUROR:  Yes.  I have a daughter that's getting ready to go

12  down to Columbus to have a bunch of tests ran to figure out what she's got

13  wrong with her, next week.

THE COURT:  Okay.  How old is your

15  daughter?

16  PROSPECTIVE JUROR:  She's eight.

THE COURT:  So, these are things that

18  have been scheduled for a long time?

19  PROSPECTIVE JUROR:  Yea.  It took us two months to get the

20  appointment.

THE COURT:  And you can't get them

22  rescheduled, I can assume that.  So, next week is really going to be bad for

23  you?

1  PROSPECTIVE JUROR:  It's next Monday and it's an overnight study from

2  Monday to Tuesday night, or, from Monday night to Tuesday morning.

3  THE COURT:  Do you know if it would be

4  more than Monday and Tuesday, or it could be?

5  PROSPECTIVE JUROR:  I'm not a hundred percent sure yet.

6  THE COURT:  But, Monday and Tuesday

7  are really bad for you?

8  PROSPECTIVE JUROR:  Not happening.

9  THE COURT:  Any objection if I let her go?

10  MRS. KOHLRIESER:  None whatsoever.

11  MR. RION:  No, your Honor.

12  THE COURT:  You're excused.  Thank you

13  for sharing.  Next potential juror, please, from the audience?

14  SHANNON RICE, DEPUTY CLERK OF COURTS:  Kathryn Coon.

15  THE COURT:  Kathryn Coon?  Are they in

16  the right order there?  Is that the next one?

17  SHANNON RICE, DEPUTY CLERK OF COURTS:  Uh-huh.

18  BAILIFF:  We put her on this end because --

19  THE COURT:  Oh, okay.  All right.  Fair

20  enough.

21  PROSPECTIVE JUROR:  Judge?  You asked if anyone had any schedules

22  or anything.

23  THE COURT:  Yea.  I'll get to you in a

1   minute.

2   PROSPECTIVE JUROR:  Oh, okay.

3                           THE COURT:  We've got to replace

4   another juror here.  Yea, that's fine.  Can you make the step okay?

5   PROSPECTIVE JUROR:  Yes.

6                           THE COURT:  Okay.  Just for the record,

7   and for everybody's benefit, we'll have Mrs. Coon in the first chair even

8   though she's designated now as number two, just for convenience sake.

9   Okay.  I'll just ask you, Mrs. Coon, have you been able to hear everything

10  thus far?

11  PROSPECTIVE JUROR:  Yes.

12                          THE COURT:  Has anything come up that

13  presented an issue for you to be fair and impartial?

14  PROSPECTIVE JUROR:  No.

15                          THE COURT:  All right.  Now, anybody

16  else in the front row on a scheduling thing?  Is it Mr. Ward?

17  PROSPECTIVE JUROR:  Yea.

18                          THE COURT:  What's your issue?

19  PROSPECTIVE JUROR:  My wife has a disability and I do most everything

20  around the house and when I'm gone she's by herself.

21                          THE COURT:  Okay.  And leaving her for

22  long times is not --

23  PROSPECTIVE JUROR:  Three weeks would be a real stretch.

1    THE COURT:  So, no one is with her
2    during the day?
3    PROSPECTIVE JUROR:  Her mother just passed away too, and the
4    mother's birthday is Wednesday.
5    THE COURT:  Okay.  Any objection if we
6    let Mr. Ward go?
7    MRS. KOHLRIESER:  No, your Honor.  I
8    believe by age he's allowed to defer as well.
9    THE COURT:  Well, he didn't claim that.
10   Don't tell them that.  No.  You're excused.  Thank you.  Next potential juror,
11   please?
12   SHANNON RICE, DEPUTY CLERK OF COURTS:  Lois James.
13   THE COURT:  And, Miss James, we'll ask
14   you to just take that chair right over here that Mr. Ward just vacated so we
15   can make sure we keep track of everybody.  Have you been able to hear
16   everything, Miss James?
17   PROSPECTIVE JUROR:  Yes.
18   THE COURT:  Okay.  Anything come up
19   that you feel would impact your ability to be fair and impartial?
20   PROSPECTIVE JUROR:  No.
21   THE COURT:  All right.  Very good.
22   Anyone else in the front row as far as scheduling?  Back row?  There were a
23   couple of hands.  I'm going to start over here.  It's Miss Durr?

PROSPECTIVE JUROR:   Yes.  I want to know how does it work?  Do we go home every day?

THE COURT:   Yea.  Yea.  You'll go home in the evening.  I was going to get to that.  We usually go until about four-thirty depending on -- well, we might get out a little earlier or we might go a little later.  But, you go home.  In some cases when you hear about sequestering a jury and keeping them in a hotel, that's usually only on cases, well, a different kind of case than this.  We're not planning on doing that.  But, yea, you go home in the evening.  I give you some instructions to follow.  You can't talk to people during the time, but then you come back in the morning and we do it again and it's like that.

PROSPECTIVE JUROR:   As far as my work goes, what do I tell them?

THE COURT:   Well, your employer knows you're here now?

PROSPECTIVE JUROR:   No, because this was my day off actually.

THE COURT:   Oh, okay.  Who do you work for?

PROSPECTIVE JUROR:   Lima Convalescent Home.

THE COURT:   Okay.  I don't know what their individual company policy is.  Most companies are very good about jury service.  Some companies will pay you, but then they might expect you to give, or reimburse, for the amount that you get for jury service.  You get like thirty dollars a day while you're on a jury.  So, I don't know your company's

1   policy.  But, if it was an issue I would be willing to talk to your company and

2   tell them how important it is for you to serve on the jury.  But, I wouldn't want

3   you to jeopardize your work.  Companies can't discipline you for serving on a

4   jury.  But, I know in the real world some companies frown on it because it

5   makes it inconvenient for that company to have someone to replace you.  So,

6   the issue is really yours.  I would talk to your employer if that became a

7   problem.  You get a small daily stipend for being on a jury.  I think it's about

8   thirty bucks a day.  I don't know if your company pays you while you're on jury

9   service.  But, if they do, some companies might want you to give them, or,

10  reimburse them for the amount that you got from the Court.  So, I don't know

11  if that answers your question.

12  PROSPECTIVE JUROR:  Yes, it does.  Thank you.

13                              THE COURT:  Is that a problem for you to

14  serve if we need you for a couple of weeks?

15  PROSPECTIVE JUROR:  I don't know how they do it.  I'm not worried about

16  the pay.  I have time for my time off actually.

17                              THE COURT:  Okay.

18  PROSPECTIVE JUROR:  I just wanted to know was they supposed to let me

19  come to Court.

20                              THE COURT:  They are supposed to let

21  you.

22  PROSPECTIVE JUROR:  Okay.

23                              THE COURT:  But, again, some

1  companies are not real good about that.  I have, on occasion, called

2  companies.  Sometimes when they get a call from a Judge they say, "Oh,

3  okay."  I don't know if there's any magic in that.  But, I wouldn't want you to go

4  back to work in a couple of weeks and they say, 'oh, you're the one who went

5  on jury service; you put us way behind', and then they hold that against you.

6  You probably know your company better than I do.  Are they pretty good

7  about things like that?  No?

8  PROSPECTIVE JUROR:  Uh, I don't know.  I've never had nobody

9  experience this.

10                          THE COURT:  Well, it's up to you.  Do you

11  think you could do this?  In other words, I don't want you to be on the jury and

12  then every day you're thinking, 'oh, my gosh, I'm missing work; what are they

13  going to do to me'.  I mean, we'll give you a chance to call during the break

14  and you can find out maybe.

15  PROSPECTIVE JUROR:  I'm not -- I'm not too worried.

16                          THE COURT:  You're not concerned?

17  Okay.

18  PROSPECTIVE JUROR:  I just was asking.

19                          THE COURT:  All right.  You're willing to

20  serve if we need you?

21  PROSPECTIVE JUROR:  If you need me.

22                          THE COURT:  Okay.  Down the line here.

23  Right there.  Is it Stevens?

1  PROSPECTIVE JUROR:  Yes.  My daughter's baby is due in two weeks.

2                              THE COURT:  Congratulations.  Is this a

3  first grandchild?

4  PROSPECTIVE JUROR:  No.  Oh, no.

5                              THE COURT:  And is she local?

6  PROSPECTIVE JUROR:  No.  She lives in Pittsburgh.

7                              THE COURT:  So, were you planning on

8  being there?

9  PROSPECTIVE JUROR:  I'd like to.

10                              THE COURT:  Well, is everything good so

11  far?

12  PROSPECTIVE JUROR:  Yea.

13                              THE COURT:  If the baby was born during

14  your jury service that's one reason we have alternates.

15  PROSPECTIVE JUROR:  Well, she's counting on me taking care of her other

16  two little girls.

17                              THE COURT:  Okay.  I understand.  I'm

18  saying if you had to be there when the baby comes, well, take off.  I'm a

19  grandparent.  I understand.  We've had people on the jury that are expecting

20  babies.  I want to know, though, if you were on this jury you would give your

21  undivided attention to this case and if you got that call you let Monica know

22  and then if you had to leave, or if anybody got sick and had to leave, or

23  something unexpected comes up, that's why we have alternates.  With that

1  in mind, would you be willing to serve?

2  PROSPECTIVE JUROR:  Yes.

3                                    THE COURT:  Okay.  So, there's not an

4  issue of health reasons now, she's not bedridden or anything like that?

5  PROSPECTIVE JUROR:  No.

6                                    THE COURT:  So, there's no concern in

7  that regard.  Okay.  All right.  And, Mr. Miolen?  Is that how you pronounce

8  that?

9  PROSPECTIVE JUROR:  Yes.  I have a vacation already planned to the

10  Grand Canyon.  It's already been paid for.  I leave on October 4th.  I don't

11  come back until September (sic) 25th.

12                                    THE COURT:  October 4th?  I'd like to say

13  we're going to be done by then; but, given this morning I can't guarantee it.  I

14  think there's a good chance we'll be done.

15  PROSPECTIVE JUROR:  Okay.

16                                    THE COURT:  If you serve for the next

17  two/two and a half weeks before that would that present a problem?

18  PROSPECTIVE JUROR:  Yes, I could serve.

19                                    THE COURT:  You could serve?

20  PROSPECTIVE JUROR:  Yes.

21                                    THE COURT:  Okay.  If October 4th gets

22  here you can yell at me and say, 'Judge, I thought you said we would be

23  done'.  I'll say, "I did, but I'm sorry.  You're excused.  Go on vacation."  All

1   right?

2   PROSPECTIVE JUROR:   All right.

3                                    THE COURT:   Have you ever been to the

4   Grand Canyon?

5   PROSPECTIVE JUROR:   No.

6                                    THE COURT:   Well, you're in for a treat.

7   It's one of the most beautiful places in the world.  Anyone else?  Okay.  If any

8   of you folks have concerns, keep that in the back of your mind.  We'll try to

9   keep things moving.  If one of these folks gets excused and you come up

10  here you can let us know then.  Okay?

11          Any other hardship - financial, physical, health-wise for you or a close

12  family member - that would prevent you from being fair and impartial and in

13  giving your undivided attention over the next couple of weeks at least?  No?

14  Great.

15          As I said, I will give you instructions of the law.  You haven't heard --

16  well, you've heard some of those instructions.  I gave you the definition of

17  reasonable doubt.  I've given you other instructions.  Is there anybody who

18  doesn't think they're going to be able to follow my instructions?  Okay.  It's

19  important that you do that even if you disagree.  Even if you think the law

20  should be changed you can't do it as a juror.  What you do is the minute

21  you're done with this case you go and call your legislator and say, 'I was just

22  on a jury and I don't agree with the law'.  That's the way to get a law changed

23  and not on jury service.  Okay?

1    Okay. All of you speak the English language and understand it? I

2 suppose if you didn't you wouldn't know what I was saying. So, all right.

3 Everybody's good with that?

4    Are all of you still residents of Allen County? Very good. Anyone who

5 is not a resident of Allen County? Okay.

6    Is there anyone who cannot accept this idea that Mr. Carter is

7 presumed innocent? He's an innocent man sitting there. The State has the

8 burden of proof beyond a reasonable doubt that he's guilty. Is there anyone

9 who cannot understand and accept that? Nobody has indicated thus. Very

10 good.

11    Anybody else think of any reason that you can't be fair and impartial,

12 fair to both the State of Ohio and to Mr. Carter? Anyone? Okay.

13    A little bit on publicity. There has been sketchy stuff. This happened

14 in '09. There's been a little bit in the media. Does anybody feel like they're

15 familiar with any of this case because of what you've seen or heard in the

16 media? Okay. There might be some media coverage during the case. I'll

17 instruct you, if you're on this jury, that during the course of the case you can't

18 pay attention to any of that stuff. You've got to put that out of your mind. No

19 one has indicated that they have seen or heard anything that they can

20 remember about this case. Very good. Oh, I'm sorry. Right here? Miss

21 James?

22 PROSPECTIVE JUROR: Yea. I seen it on the news.

THE COURT: Did you form an impression

23

1  about the case?

2  PROSPECTIVE JUROR:  No, because I didn't know him.  I didn't know

3  nothing.

4                    THE COURT:  And you can understand

5  that on the news on T.V. they have like a sixty second time slot that they try to

6  cram it all in there and they might get it wrong.

7  PROSPECTIVE JUROR:  That's true.

8                    THE COURT:  Anything you might have

9  gotten an impression of you'd be able to set that aside and listen to the

10  evidence that's presented and decide the case on the evidence and not on

11  what you might have been exposed to in the media?

12  PROSPECTIVE JUROR:  Yea, I can do that.

13                    THE COURT:  Great.  The old saying is,

14  don't believe anything you hear in the news.  I mean, their editorials

15  sometimes, well, they like to slant it sometimes.  The newspaper only has so

16  many inches that they can give to a story.  They pick out the things that they

17  want to pick out and they don't pick out everything - believe me.  Anyone

18  else?  Okay.

19           This is where we turn it over to the lawyers.  But, because you guys

20  have been so good today and had a long sitting around process we're going

21  to excuse you all for lunch and to come back --

22                    MRS. KOHLRIESER:  Your Honor?

23                    THE COURT:  Oh, I'm sorry.

1                        MRS. KOHLRIESER:  I apologize.  Can we

2 approach just a moment?

3                        THE COURT:  You may.  Sometimes the

4 lawyers will approach the Court and will whisper up here.  We're talking

5 procedure matters and things like that.  Ignore that.  If you overhear anything,

6 ignore it.  We'll let you know what you need to know.  Counsel may approach.

7 This is not working very well still?

8 COURT REPORTER:  I'm not sure.  I'll have to see during the break.

9                        THE COURT:  If I do this, can you pick up

10 this microphone?

11 COURT REPORTER:  No.

12 (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

13 the record, as follows.)

14                        MRS. KOHLRIESER:  Your Honor, you

15 didn't ask about convicted of felonies and I know there's somebody out there

16 that's been convicted of a felony.

17                        THE COURT:  Oh, okay.

18                        MRS. KOHLRIESER:  It's a disqualifier.

19 That's all.

20                        THE COURT:  All right.  Got it?

21 COURT REPORTER:  Yes.

22                        THE COURT:  Okay.

23 (WHEREUPON, Court continued on the record, as follows.)

1   THE COURT:  We have to record

2   everything and they always have to whisper.  I did neglect one question.  It

3   was on my list, but I skipped over it in my desire to go fast.  Is there anybody

4   that's previously been convicted of a felony offense?  A felony is a type of

5   offense for which you could be sentenced to prison.  It's not necessarily that

6   you were sentenced to prison.  Back there in the back, your name, sir?

7   PROSPECTIVE JUROR:   Michael Hembd.

8   THE COURT:   Okay.

9   PROSPECTIVE JUROR:   I was convicted in 1989 of Delivery of a Controlled

10  Substance to a Delinquent Child.

11  THE COURT:   Has that ever been -- have

12  you ever got a commutation from the government or an expungement or

13  anything?

14  PROSPECTIVE JUROR:   No.  I served my twenty months out of thirty

15  months.

16  THE COURT:   I'm going to excuse you,

17  though.  One of the things in Ohio law is that if you have a felony conviction

18  that disqualifies you from jury service unless you've been restored through --

19  PROSPECTIVE JUROR:   Okay.

20  THE COURT:   So, you're excused.  Thank

21  you.  That's very personal.  I appreciate it.  Anybody else?  Okay.

22  Anything else from the State before we break?

23  MRS. KOHLRIESER:   No, your Honor.

1    Thank you.  Sorry.

2                           THE COURT:  Anything from the defense?

3                    MR. RION:  No.  Thank you, Judge.

4                           THE COURT:  Okay.  What we're going to

5    do is break for about an hour and come back at about one-fifteen.  Look at

6    who you're seated beside.  We need you to stay in the same order.  If you

7    have an issue with that and forget, well, we'll have people here that can keep

8    you in the same order.  We have to do this now while we go through this

9    process because we have got to stick with the order.

10           During the recess -- oh, did you have a question?

11   PROSPECTIVE JUROR:  Yea, I have a question.  Her name is familiar to me

12   because I was a volunteer for CASA through the Juvenile Court.

13                           THE COURT:  And her husband is a

14   Magistrate out there.  Is that who you're thinking of?

15   PROSPECTIVE JUROR:  And there was a case that I was involved with as

16   far as just being there for the child.

17                           THE COURT:  Okay.  Was Mrs. Kohlrieser

18   involved, or her husband?

19   PROSPECTIVE JUROR:  Her name sounds familiar.

20                           MRS. KOHLRIESER:  My husband is Todd

21   Kohlrieser.  He's a Magistrate out there and handles those types of cases.

22   Might that be --

23   PROSPECTIVE JUROR:  I guess.  The name is just familiar, though.

1  THE COURT:  Do you think that you've got

2  any pre-conceived notions about how this case should turn out based upon

3  the fact that you were involved in a juvenile proceeding as a CASA volunteer

4  and that name is familiar?  Is that going to make any difference to you?

5  PROSPECTIVE JUROR:  No.

6  THE COURT:  Okay.  I'm not trying to ask

7  you a question that you can't answer.  I appreciate you letting us know.

8  Anybody else?  Okay.

9  During the recess - we call this a recess, we go back to elementary

10  school and you're on recess - don't talk to any of the lawyers or any

11  participant in the case about the case.  Don't talk among yourselves about the

12  case.  Don't go home, or call, or have contact with anybody in your family, or

13  friends, and tell them that you're on this case because they might know

14  something about it and then they want to start telling you.  So, you can tell

15  your spouse and your family members, 'I'm not a juror yet; but, I might be a

16  juror and I can't tell you what the case is about because I don't want you to

17  say anything'.  It's very important that you follow those rules.  None of you

18  have been sworn in as jurors yet, but you're all potentially jurors and I

19  wouldn't want anybody to be exposed to something that they shouldn't be

20  exposed to.

21  Now, I don't know if you folks are the types that like to get on

22  Facebook, and Twitter, and all that stuff.  Don't do it about this case.  Don't

23  get on there and say, 'guess what, I might be a juror in this case', because

1   out there in cyberspace there will be somebody that will see your post and

2   they'll want to tell you everything they know about the case and then all of a

3   sudden you're exposed to things you shouldn't be exposed to.  So, no

4   communication about the case to anyone by any means or by electronic

5   means.  Don't get on Facebook about the case, or Twitter about the case.

6   Don't talk to anybody about the case.  Don't try to do any independent

7   research about the case.  An easy rule to remember - just tell people that you

8   can't talk to them about it.  Okay?

9          Get a lunch.  Get back here by one-fifteen.  We'll try to get moving and

10   get this selection process over with so we can get started with the case.  See

11   you in about an hour.

12   (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

13

14          THE COURT:  We're on the record.  Today

15   is the 8th day of September, 2015.  We're reconvening in Case Number

16   CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The defendant is

17   present with counsel.  The State is present.

18          We have back in the Courtroom just one juror.  The other jurors have

19   been asked to leave the Courtroom.  The juror who was seated in the fourth

20   chair during the initial voir dire, Mrs. Davis, I understand that you had brought

21   to the Court staff a concern or two that you had.  We wanted to not subject

22   you to having everybody hear your issues.  So, we're going to talk to you

23   individually.  Is there a concern you have about your service?

1   PROSPECTIVE JUROR:   I have a lot of anxiety and, frankly, when I heard it

2   was a murder --

3   COURT REPORTER:   She'll need to speak up.

4   PROSPECTIVE JUROR:   If it was any other case I think it would probably be

5   all right.  But, to sit here long term --

6                            THE COURT:   The subject matter has

7   caused you anxiety?  Is that what you're --

8   PROSPECTIVE JUROR:   Yea, it does.

9                            THE COURT:   Okay.  You don't think you

10  can sit and listen and be fair and impartial to both sides?  Do you think it's

11  going to interfere with your ability to make a decision?

12  PROSPECTIVE JUROR:   I think I can make a decision.  I'm just afraid of

13  having an anxiety attack or something.

14                           THE COURT:   Okay.  Are you, and I don't

15  mean to get too personal, have you had a history of anxiety attacks?

16  PROSPECTIVE JUROR:   Yes, and I've been on medication.

17                           THE COURT:   Okay.  Are you currently on

18  medication?

19                           MR. RION:   Your Honor, no objection from

20  the defense.

21                           THE COURT:   Okay.  Any objection?

22                           MRS. KOHLRIESER:   No, your Honor.

23                           THE COURT:   Okay.

104

1    PROSPECTIVE JUROR:   I'm on Xanax.

2                        THE COURT:   Okay.  Well, we'll let you go;

3    okay?  All right.  Thank you.  Thank you for sharing.  Sorry to put you through

4    all of this.

5    PROSPECTIVE JUROR:   Thank you.  That's all right.

6                        THE COURT:   Let's bring all the other

7    jurors in.

8                        MRS. KOHLRIESER:   Your Honor, did you

9    note for the record that that was Miss Davis?

10                       THE COURT:   Yea.

11                       MRS. KOHLRIESER:   All right.

12                       THE COURT:   Yea.  I thought I did.  We'll

13   just bring everybody else in and we'll stay in here.

14   (WHEREUPON, prospective jurors were returned to the Courtroom.)

15                       THE COURT:   Okay.  Everybody has

16   found their spot.  You can be seated.  Okay.  Let the record reflect then the

17   prospective jurors have all returned from the noon recess.  Ladies and

18   gentlemen, again, you're experiencing everything there is about jury service,

19   including one particular juror asked to speak confidentially with the Court

20   about a concern that she had and so we had to have everybody else

21   removed.  Our technology is such that the only way we can do it to get

22   everything on the record is we have to have that juror in here by him or

23   herself, which we did, and inquired about her concern.  So, she's been

1    excused.  That's why that seat is empty there and we need the next

2    prospective juror to fill that spot.

3    SHANNON RICE, DEPUTY CLERK OF COURTS:   Karen Wireman.

4                              THE COURT:   Miss Wireman, if you'll take

5    the one, two, three, four, fifth chair there?  Next one over.  Again, we're trying

6    to keep track of everyone.  We have a little cheat sheet here.  We have to

7    keep track of everything.  Miss Wireman, how are you?

8    PROSPECTIVE JUROR:   Fine.

9                              THE COURT:   Have you heard everything

10   thus far and all the questions asked and answers given?  Is there anything

11   that's come up that you think would impact your ability to be fair and impartial

12   in a case like this?

13   PROSPECTIVE JUROR:   No, sir.

14                             THE COURT:   Okay.  Very good.  The

15   attorneys will probably have some questions for all of you more.  I did want to

16   go on the record with number seven, Miss Durr.  I understand that you had

17   indicated to the bailiff that you had checked with your employer.

18   PROSPECTIVE JUROR:   Yea.

19                             THE COURT:   You had some questions

20   early on.  Everything is okay with them?

21   PROSPECTIVE JUROR:   Yes.

22                             THE COURT:   Okay.  That's good.

23   PROSPECTIVE JUROR:   That's what they said.

1      THE COURT:  Pardon?

2  PROSPECTIVE JUROR:  That's what they said.

3      THE COURT:  Okay.  All righty.  I think

4  we're good to go.  Everybody able to follow my instructions during the break?

5  You didn't go and talk to anybody or hear anything about this case?

6  Anybody?  Very good.

7      The State may inquire.

8      MRS. KOHLRIESER:  It's not usually when

9  I'm starting that I say this - good afternoon, folks.  As the Judge said, there's

10  going to be times where it just gets a little strange.  It never ceases to amaze

11  me what we have as long as I've been doing this.

12      Now is the chance for us to kind of ask you some more pointed

13  questions than what you've previously been asked, although asking if you

14  have a drug or alcohol dependency is pretty pointed.  The purpose of this is to

15  try and get a sense of whether you're a good juror for this particular case

16  because not only is the defense entitled to a fair trial but the State of Ohio is

17  entitled to a fair trial.  People forget that sometimes.  You know, you hear this

18  word 'the government'.  Well, in a prosecution we're the State of Ohio and we

19  represent the citizens of Allen County.  We represent you, quite frankly.  So,

20  we're just as entitled to a fair trial as the defense is.  That's what the purpose

21  of asking you all of these questions is - to see whether you can be fair and

22  impartial.  What I mean by that is we all have a past that we bring with us.

23  We all have experiences and things like that that, you know, we just can't take

1    away.  They're part of what makes us who we are; right?  So, for instance, I

2    do a lot of sexual assault cases against children.  Now, that obviously is not

3    what we have here.  But, it never fails whenever I do one of those there is a

4    juror, or multiple jurors, who were victims of child molestation, or know

5    someone who was accused of it, or knows someone who was the victim of it

6    and they just can't, or, the thought of having to listen to that type of evidence

7    and judge that type of case, well, they can't be fair and impartial.  It just sits

8    too close to home.  Do you guys understand what I'm talking about?  Okay.

9    So, maybe they're not good for a child sexual assault case.  But, they'd be

10   just fine for somebody breaking and entering into the Clark Station and

11   stealing some cigarettes.  Okay?  They don't bring that same baggage.

12   That's what really these questions are aimed at getting from you folks is a

13   sense of whether you can be fair and impartial.

14       There are no wrong answers.  All we're trying to get here is the truth.

15   Like Judge said, it's not about, you know, I want to know what you think about

16   your neighbors.  I'm not trying to get all of your personal business like that.

17   But, we do have to ask some questions so that we can see if you're the right

18   juror for this type of trial.  We're talking about something fairly serious here.  I

19   mean, it's Aggravated Murder, as the Judge read the charge to you.  So,

20   again, fairness is tantamount here.

21       Now, with that said, one of the things Judge touched on was the length

22   of this trial.  We most definitely will go till the end of this week.  So, that

23   means we will definitely go into next week.  Where it goes in that week is hard

1    to say because of the number of witnesses.  Each side -- well, the witnesses

2    we present we ask them questions and then the defense gets a chance to ask

3    them questions and so on and so forth.  It's the same thing if they choose to

4    present a case.  They ask questions and we get a chance to cross examine.

5    So, it's kind of hard to tell how long it's going to take.  You never know what's

6    going to happen.  I've had in trials where all of a sudden the sixth witness

7    comes up here and one of the jurors realizes 'oh, I know that person' because

8    they knew him as Woody even though his name was Charles Smith.  They

9    knew him as Woody.  So, they have to, you know, speak up.  That's why we

10   have alternates, as Judge said.  So, you have to keep in mind that for this

11   trial, and for those of you who have done other trials, this is a marathon and

12   not a sprint because we want to make sure we get it right.

13          Now, obviously we're going to start usually in the morning anywhere

14   between eight and nine generally is when Judge will have you come in.

15   We're going to end anywhere between -- well, sometimes we end as early as

16   four and sometimes we end as late as five/five-thirty.  It just kind of depends

17   upon the flow of the trial.  With that said, is there anybody that thinks, you

18   know, Monday through, well, I guess Tuesday through Friday and then into

19   next week, knowing those parameters, that you're not going to be able to sit

20   here for a week and a half/two weeks and do that?  All right.

21          Let me ask you.  I'm just going to start with Mr. Sterling.  You've done

22   jury service before; correct?  What did you think when you got your summons

23   to be here today?

1    PROSPECTIVE JUROR:  Why so soon?

2                 MRS. KOHLRIESER:  You felt like you

3    were just on a jury?

4    PROSPECTIVE JUROR:  Yea.

5                 MRS. KOHLRIESER:  Okay.  Anybody get

6    their summons and go, 'yes, jury duty'.  What?  I hear laughs.  Nobody was

7    excited?  Okay.  Who got their jury summons and went, 'oh, jury duty'?  He's

8    not looking.  Raise your hand.  You know you did.  Okay.  Miss, is it Dankirt?

9    PROSPECTIVE JUROR:  Yes.

10                MRS. KOHLRIESER:  Why did you say

11    'oh, jury duty'?

12    PROSPECTIVE JUROR:  I don't know.  Just because it's something new and

13    different and I've never been involved and so I'm like 'oh'.

14                MRS. KOHLRIESER:  Now that you know

15    how long it's going to go and what type of case it is are you really like 'oh, jury

16    duty'?

17    PROSPECTIVE JUROR:  Kind of.

18                MRS. KOHLRIESER:  But, even with that,

19    are you willing to sit and listen?  I mean, we're talking about multiple hours a

20    day listening to the evidence and at the end of the day you're going to be

21    called upon to make a conclusion.  Do you see any problems with that?  Who

22    else raised their hand?  I saw somebody else raise their hand.  Was it you,

23    Miss Stevens?  Why did you think, 'oh, jury duty'?

1    PROSPECTIVE JUROR:   Because I was on another case on another trial.

2                        MRS. KOHLRIESER:   Okay.  Were you

3    like Mr. Sterling there - like 'again'?

4    PROSPECTIVE JUROR:   Yea.

5                        MRS. KOHLRIESER:   I imagine there are

6    some people that have never got a jury summons before.

7    PROSPECTIVE JUROR:   I know.  That's what I can't figure out.

8                        MRS. KOHLRIESER:   How do you get on

9    that list; right?

10   PROSPECTIVE JUROR:   Yea.

11                       MRS. KOHLRIESER:   Okay.  With that,

12   again, you know, 'oh, I've already done this', is there anything -- do you

13   remember if it was a civil case that you were on?

14   PROSPECTIVE JUROR:   Yea, it was.

15                       MRS. KOHLRIESER:   Okay.  So, it was a

16   smaller jury?

17   PROSPECTIVE JUROR:   Oh, I don't think so.

18                       MRS. KOHLRIESER:   Civil cases typically

19   have eight jurors.  In criminal cases we have twelve.  You heard Judge talk

20   about reasonable doubt?

21   PROSPECTIVE JUROR:   Uh-huh.

22                       MRS. KOHLRIESER:   In civil cases it's

23   usually preponderance of the evidence.  It's really who you believe a little bit

1    more than the other, so to speak, in very general terms. Are you going to be

2    able to put aside what you know about that case and how that case was

3    handled and understand that there's different rules for this one and follow

4    those?

5    PROSPECTIVE JUROR:   Yes.

6                         MRS. KOHLRIESER:   Now, were there

7    times, and feel free to pipe in here, Mr. Sterling, when you were sitting on the

8    jury that things were going on up at the Bench and you were like 'wait a

9    minute now', or where you had to go sit back in the jury room and wait for

10   however long and you were thinking 'what are they doing in there'?

11   PROSPECTIVE JUROR:   No, not really, because it went really fast.

12                        MRS. KOHLRIESER:   Oh, okay. Well, this

13   will probably not be a repeat of that because, quite frankly, there are going to

14   be some things that you don't get to know. Anybody here one of those

15   people that, you know, 'it's killing me that they're up there and I want to know

16   what they're talking about, what they're saying and what they're doing'? I see

17   a little bit of a smile there from you. Is it Mr. Griffo?

18   PROSPECTIVE JUROR:   Yes.

19                        MRS. KOHLRIESER:   Are you a little bit

20   like that?

21   PROSPECTIVE JUROR:   Somewhat.

22                        MRS. KOHLRIESER:   You're curious;

23   right? Is it going to be a problem for you if the Judge tells you 'sorry, you

1    don't get to know'?

2    PROSPECTIVE JUROR:   No.

3                              MRS. KOHLRIESER:   Okay.  You know

4    what they say curiosity did to the cat; right?  All right.

5         I'm going to shift gears a little bit here and that way we can just see if

6    anybody has any problems right off the bat.  I'm going to give you a number

7    of potential witnesses.  I'm sorry - I normally say this at the beginning.  For

8    those of you folks sitting out in the gallery, most of my questions are going to

9    be directed at these lucky twelve who are in the box right now.  But, please

10   just pay attention to the questions.  That way if you get up here, and as you

11   see, some of you have already come up here, that way if something kind of

12   rings a bell to you, like 'oh, she should probably know that', when you get up

13   here if you'll let me know.  Okay?  So, just keep those in your mind.

14        All right.  Obviously we have Detective Tim Clark here.  We have a

15   number of officers involved in this case.  Retired Detective Phil Kleman.  Let

16   me know if any of these names ring a bell.

17   PROSPECTIVE JUROR:   (Inaudible).

18                              MRS. KOHLRIESER:   Mr. Shappell; is it?

19   PROSPECTIVE JUROR:   Yes.

20                              MRS. KOHLRIESER:   Okay.  Anything

21   about what you know about Detective Kleman that you think you can't be fair

22   and impartial in this case?

23   PROSPECTIVE JUROR:   No.  Like I say, I knew him, well, probably

1 twenty-five years ago.

2                    MRS. KOHLRIESER: Okay. All right. So,

3 whatever that was, you can put that aside and judge this case for what it is?

4 PROSPECTIVE JUROR: Yes.

5                    MRS. KOHLRIESER: Okay. Let's see,

6 we also have, and it was mentioned earlier, Detective Don Marik. He was

7 with the Lima Police Department for a number of years and now he's with

8 Shawnee's Police Department. Detective Sean Neidemire. Sergeant Charles

9 Godfrey. Officers Michael Carman, Greg Adkins, and Kenny Whitney. He's

10 retired from the Police Department now. Major James Baker. Detective Scott

11 Leland. Kevin Delong. He was an Officer and he's now moved into private

12 employment. All right. Aaron Montgomery. Bob Sarchet. Matt Douglass.

13 Oh, sorry.

14 PROSPECTIVE JUROR: I used to work late nights at the hospital and so I

15 knew a lot of these. Bob, or, Mr. Sarchet also early in his career.

16                    MRS. KOHLRIESER: Okay. Through your

17 employment at the hospital is that how you got to know some of these guys?

18 PROSPECTIVE JUROR: Yes.

19                    MRS. KOHLRIESER: And, again, anything

20 about that that you can't set aside?

21 PROSPECTIVE JUROR: No.

22                    MRS. KOHLRIESER: They were a little

23 younger twenty-five years ago.

1    PROSPECTIVE JUROR:   A little.

2                         MRS. KOHLRIESER:   Weren't we all.

3    Let's see.  I apologize.  Matt Douglass.  Curt Hile.  Calvin Woodruff.  He was

4    an L.P.D. Officer and now he works for the fire department.  Let's see.  Missy

5    Page.  She was formerly known as Missy Tidd.  She's a dispatcher.  How

6    about a Sergeant Cameron Smith?  He works out at the prison.  While I'm

7    thinking about this, Miss James, you indicated in your questionnaire that you

8    have a son that's a Corrections Officer.

9    PROSPECTIVE JUROR:   Yes.  He's in Chillicothe.

10                        MRS. KOHLRIESER:   Okay.  So, he's not

11   local or anything?

12   PROSPECTIVE JUROR:   No.

13                        MRS. KOHLRIESER:   Okay.  All right.

14   Let's see.  We also have a number of scientists that are involved.  Most of

15   them don't live in town; but, I'll read their names to you in case you know

16   them.  Matt Congleton.  Todd Wharton.  He's now an investigator down in

17   Florida.  Heather Williams.  Kevin Kramer.  Julie Cox.  Natasha Brannam.

18   Daniel Davison.  Pete Tassey.  I also have a doctor, a coroner, Doctor

19   Maneesha Pandey.  Then we have several folks that work in or around our

20   community, particularly at Husky there's a few.  Don Bodiker and his wife,

21   Krista Bodiker.  We have a Don Hovest.  Pam Callahan.  There may be some

22   other Husky people that I don't have their names up here.  I apologize.  Then

23   there's, again, some folks who aren't in law enforcement or in science.  Nancy

1  Miller.  Wendy Diltz.  Rosalind Johnson.  Stephen Upham.  Joey Moore.

2  Carlotta Williams.  Yes, sir?

3  PROSPECTIVE JUROR:  I just know the name Carlotta Williams.

4              MRS. KOHLRIESER:  Okay.  Do you know

5  how you knew her?

6  PROSPECTIVE JUROR:  She was a secretary at one of the schools that I

7  taught at before.

8              MRS. KOHLRIESER:  Okay.  Anything

9  about that -- well, I don't know if it's the same Carlotta Williams.

10  PROSPECTIVE JUROR:  Right.

11              MRS. KOHLRIESER:  Is there anything

12  about that that you can't put aside and judge --

13  PROSPECTIVE JUROR:  I just know the name.

14              MRS. KOHLRIESER:  Oh, okay.  Gotcha.

15  Sonya Hughes.  She was Sonya Burkholder.  Yes, ma'am?

16  PROSPECTIVE JUROR:  I knew one of the names that you mentioned - Don

17  Bodiker and his wife.

18              MRS. KOHLRIESER:  Okay.  Anything

19  about knowing them or anything like that that --

20  PROSPECTIVE JUROR:  Just from the work out at the refinery.

21              MRS. KOHLRIESER:  Okay.  Are you the

22  one who has a husband employed out at the refinery?

23  PROSPECTIVE JUROR:  Both my kids are out there.

1          MRS. KOHLRIESER:  Okay.  Anything

2    about knowing them or anything about them that you don't think you could be

3    fair and impartial in listening to their testimony?

4    PROSPECTIVE JUROR:  No.

5          MRS. KOHLRIESER:  Okay.  Great.  All

6    right.  Let's see.  There's also potential witnesses - the defendant's children,

7    Tarah Carter and Markie Carter.  They're a little younger.  I mean, they're not

8    young.  They're in their early twenties.  The victim in this case, as has been

9    told to you, is Kenneth Warrington.  He worked at Husky.  Does that name

10   ring a bell to you at all?

11   PROSPECTIVE JUROR:  Not that I can recall.

12         MRS. KOHLRIESER:  Not that you can

13   recall?  Okay.  Some of his family may testify - Faye Warrington, and he had

14   a son, Jeff Warrington.  Any of those names sound familiar?  Okay.  All right.

15        Do any of you know each other?  Look around.  Look at your neighbor.

16   PROSPECTIVE JURORS:  Yea.

17         MRS. KOHLRIESER:  Okay.  Miss

18   Oglesbee and Miss James, you two know each other?

19   PROSPECTIVE JURORS:  Yes.

20         MRS. KOHLRIESER:  Okay.  Close?  Or,

21   just, you know, --

22   PROSPECTIVE JUROR:  No.  I haven't seen her about twenty-five/thirty

23   years.  So, no.

1               MRS. KOHLRIESER: Okay. It's old home

2 week. Okay. I got you. Anything about your relationship with Miss James,

3 and the same goes for you with Miss Oglesbee, that if you get back in that

4 room you may have different opinions so do you think you would be more

5 inclined to listen to each other than your own self or the other people?

6 PROSPECTIVE JUROR: No. I would use my own judgment.

7               MRS. KOHLRIESER: Okay. And you,

8 Miss James?

9 PROSPECTIVE JUROR: The same here.

10               MRS. KOHLRIESER: Okay. Well,

11 sometimes, like I've had an employer and an employee. You know, it can be

12 tough on an employee if they want to get in there and argue and worry about

13 what their employer might do. It's like we talked about with Miss Durr. 'Well,

14 they say they're fine with me doing jury service'. But, it's another thing once

15 you get in there. Nothing about that that's going to be a problem for you

16 ladies?

17 PROSPECTIVE JUROR: Not for me.

18               MRS. KOHLRIESER: Okay. I once had

19 an aunt and a niece on a jury. That was kind of interesting. All right.

20      Now let's talk a little bit more about your personal situations. Does

21 anyone here work third shift? Did anybody work last night or anything? No?

22 Everybody's fresh and ready to go, except for maybe the drag from this

23 morning? Okay.

118

1          Does anybody have any reason that they don't think they can sit here

2     from, say, eight-thirty to four-thirty every day?  Now, it's not a forced march.

3     We get bathroom breaks.  We usually have a mid-morning break and a

4     mid-afternoon break and the lunch break, like you saw.  Anybody have any

5     kind of condition that they think that might cause trouble sitting here?

6     Yes, ma'am?

7     PROSPECTIVE JUROR:  I have an overactive bladder.  So, you do have

8     breaks or whatever?

9                              MRS. KOHLRIESER:  Yes, we do.  And, if

10    you have any problem, like if something comes up, you just raise your hand

11    and the Judge will more than be happy to let you go, or, let everybody go,

12    quite frankly.  Do you feel okay doing that?

13    PROSPECTIVE JUROR:  Yea.

14                             MRS. KOHLRIESER:  Okay.  All right.

15    With that said, do you think, and you know your condition better than me, but

16    do you think everything's going to be all right?

17    PROSPECTIVE JUROR:  Yea.

18                             MRS. KOHLRIESER:  Okay.  All right.

19    Let's see.  Is it Mr. Miolen?

20    PROSPECTIVE JUROR:  Miolen.

21                             MRS. KOHLRIESER:  Miolen.

22    PROSPECTIVE JUROR:  Miolen.

23                             MRS. KOHLRIESER:  My last name is

1    Kohlrieser.  You can imagine it gets butchered all the time.  Do you watch any

2    shows like C.S.I., NCIS, Law & Order, or any of those shows?

3    PROSPECTIVE JUROR:  Yes.  Yes.

4                                    MRS. KOHLRIESER:  Okay.  So, let's say

5    we're talking about a rape case.  We're not.  That's not what this case is

6    about.  But, we'll pretend for a moment that we are.  What kind of evidence

7    might you expect to have from the State of Ohio in order to prove a rape?

8    PROSPECTIVE JUROR:  Hard evidence, I guess.

9                                    MRS. KOHLRIESER:  Hard evidence?

10   Such as?

11   PROSPECTIVE JUROR:  (Inaudible).

12                                   MRS. KOHLRIESER:  Okay.  Might you

13   expect in a rape case there might be semen?

14   PROSPECTIVE JUROR:  Yes.

15                                   MRS. KOHLRIESER:  There might be DNA

16   from that?

17   PROSPECTIVE JUROR:  Yes.

18                                   MRS. KOHLRIESER:  Maybe some

19   injuries to the victim?  Anybody got anything else that you might expect to

20   see?  If a weapon is used, maybe the weapon?

21   PROSPECTIVE JUROR:  Yea.

22                                   MRS. KOHLRIESER:  What if you have a

23   rape case where there isn't any semen and there isn't any DNA?  Do you

120

1  think you would have a hard time convicting?  Why not?

2  PROSPECTIVE JUROR:  Well, I'd be impartial and listen to the evidence.

3            MRS. KOHLRIESER:  What never ceases

4  to amaze a lot of the jurors in the types of cases that I often times do, not

5  always but often times do, is a lot of times in a rape there is no semen left

6  behind.  There is no DNA left behind.  Because, for instance, rape can occur

7  in a number of ways.  It's not what you traditionally think of.  An object can be

8  used.  A hand can be used.  Things of that nature.  So, you don't necessarily

9  get those things.  The Judge is going to tell you that one witness, if believed,

10  is sufficient to prove someone guilty beyond a reasonable doubt.  What do

11  you think about that, Mr. Miolen?  Say your rape victim comes in and --

12            MR. RION:  Your Honor, I'm going to

13  object.  I don't know if that's part of the instruction.

14            THE COURT:  It is.  I'll overrule the

15  objection.  But, yea, don't give too many instructions unless you know for

16  sure.  I mean, the instructions haven't been finalized.  But, that's typically the

17  instruction I give.  So, go ahead.

18            MRS. KOHLRIESER:  Thank you.  I did

19  receive a draft copy, your Honor.  One witness, if believed, is enough.  How

20  do you feel about that?

21  PROSPECTIVE JUROR:  Well, I guess if the evidence leads to that

22  conclusion and the witness is credible; yes.

23            MRS. KOHLRIESER:  Okay.  If the

1    witness is credible.  How would you determine whether that person was

2    credible?  What kind of things do you look at in figuring out if somebody is

3    telling you the truth?

4    PROSPECTIVE JUROR:   I would probably look at the evidence that was in

5    the case.

6                    MRS. KOHLRIESER:  Do you watch how

7    they testify?

8    PROSPECTIVE JUROR:   Yea.

9                    MRS. KOHLRIESER:  Do you have any

10   acquaintance that you have that sometimes tell tall tales?

11   PROSPECTIVE JUROR:   Oh, yea.

12                  MRS. KOHLRIESER:  I see Miss James

13   shaking her head.  We all know somebody like that who tells tall tales.  Their

14   fish was this big; right?  Okay.  What kind of things, and since Miss James

15   was shaking her head I'll just ask her, what kind of things do you look at when

16   you're trying to tell if somebody is telling you the truth?

17   PROSPECTIVE JUROR:  Body language.

18                  MRS. KOLRIESER:  Body language?

19   Okay.  That's okay.  Miss Dankirt, you just jump right in.  That's fine.

20   PROSPECTIVE JUROR:  Sorry.

21                  MRS. KOHLRIESER:  Body language.

22   What kind of things are you looking for in somebody's body language?

23   PROSPECTIVE JUROR:  Me?

1                          MRS. KOHLRIESER:  Yes.

2    PROSPECTIVE JUROR:  Oh, I'm sorry.  Okay.  Eye contact.  The way they

3    position themselves when they're sitting there.  How they bring it out to you.

4    Do they stutter or they do 'uh' and look around or whatever.  If they focus.

5    That's what you look at.

6                            MRS. KOHLRIESER:  Does everybody

7    agree with Miss James on that type of thing that you're looking at with

8    people?  Miss -- is it Coon?

9    PROSPECTIVE JUROR:  Uh-huh.

10                         MRS. KOHLRIESER:  Okay.  Miss Coon,

11    what kind of things do you look at when you're trying to tell if somebody is

12    telling you the truth?

13    PROSPECTIVE JUROR:  I watch their eyes.

14                         MRS. KOHLRIESER:  Okay.  Such as?

15    PROSPECTIVE JUROR: Well, if they're glancing around or if their eyes are

16    shifty.  If they close their eyes a lot of times.  I found that people will close

17    their eyes when they're trying to stretch the truth or something.  I can often tell

18    by watching their eyes.

19                         MRS. KOHLRIESER:  Okay.  Anybody

20    here have children?  Most of us?  Okay.  Miss Krites, is it?

21    PROSPECTIVE JUROR:  Yes.

22                         MRS. KOHLRIESER:  How many children

23    do you have?

1    PROSPECTIVE JUROR:   One.

2                                    MRS. KOHLRIESER:   Just one?  Okay.

3    That child ever lie to you growing up?

4    PROSPECTIVE JUROR:   Well, I know the one time that I caught him it never

5    happened after that.

6                                    MRS. KOHLRIESER:   Okay.  Anybody got

7    more than one child?  Multiple kids?  Okay.  Mr. Shappell?

8    PROSPECTIVE JUROR:   Yes.

9                                    MRS. KOHLRIESER:   Do you ever get two

10   different stories from two different children?

11   PROSPECTIVE JUROR:   Certainly.

12                                   MRS. KOHLRIESER:   How do you figure

13   out who's telling the truth and who's not?

14   PROSPECTIVE JUROR:   Sometimes I ask more questions and try to see

15   what's going on.

16                                   MRS. KOHLRIESER:   Kind of question

17   them a little bit and see who hangs tight with their story?  What about one of

18   thems motive for lying?  Do you ever think about that?  Like your fisherman

19   who tells the tall tale.  Their motive is because they want to look better than

20   what they were; right?  They want to act like they caught a bigger fish than

21   what they actually caught; right?  So, for instance, let's say, and I'm not

22   saying that any of you go to bars, but let's pretend for a minute that you're

23   working in a bar.  You're the bouncer.  You're the one in charge of checking

1  I.D.'s and seeing who's getting in.  Are you just going to look at that license

2  and say, 'yep, you can come in'.  How about you, Miss Krites?

3  PROSPECTIVE JUROR:   No.  You'd better be looking at dates.  You'd better

4  be looking at the picture.

5  　　　　　　　　MRS. KOHLRIESER:   Okay.  I worked at a

6  bar when I was in college, which is amazing because I didn't look old enough

7  to be in one, let me tell you.  I looked like I was twelve when I was about

8  twenty-five.  But, sometimes we would ask 'what's your date of birth'.  It goes

9  with what Miss James was saying - if somebody can rattle that off, you know,

10  12-29-80 as opposed to 12-29, uh, '92, well, that tells you something; right?

11  The way they're delivering it.  But, you're also looking at their motive.  If I sit

12  here and tell you that I'm forty years old do I have any apparent motive to lie

13  to you right here standing here?

14  PROSPECTIVE JUROR:   No.

15  　　　　　　　　MRS. KOHLRIESER:   No.  But, if I'm trying

16  to get in a bar and I'm not twenty-one might I have a little bit of a motive to tell

17  you that I am?

18  PROSPECTIVE JUROR:   Oh, yes.

19  　　　　　　　　MRS. KOHLRIESER:   Okay.  So, those are

20  the things that we're talking about.  The reason that I mention the one witness

21  is because sometimes in these child sex cases that I have it's just that one

22  little voice that I have because it also never ceases to amaze people that

23  even a small child, six/seven years old, who's raped by an adult won't have

125

1    any injuries.  Those people have this idea in their head about what would

2    happen to a child if that happened to them.  But, usually they're not reported

3    right away.  They've had time to heal.  We always bring medical professionals

4    in to talk about that's an area of the body that heals very quickly because it's

5    not dry skin and your body just heals down there faster.  So, we often times

6    don't have injuries.  That doesn't mean it didn't happen.  So, again, not to get

7    into what this case has, does anybody, and I've asked Mr. Miolen, but does

8    anybody have a problem with that concept if the Judge tells you that's what

9    the law is?  Is that not -- again, there's no wrong answers.  But, does that sit

10   well with some of you, or not sit well with some of you?  Okay.

11        Now, the Judge is going to instruct you about reasonable doubt.  I'm

12   certainly going to let him do that.  But, he's also going to tell you that you are

13   the ones that decide who to believe, what to believe, how much to believe, or

14   not at all.  That's your own individual decision.  You're the determiners of the

15   facts.  It's based on the quality of the evidence and not necessarily the

16   quantity of it.

17        Now, when we talk about that I give an example, and I have it right

18   here in this Courtroom, about direct evidence versus circumstantial evidence.

19   Let's see.  Miss Dankirt, have you heard that term before - circumstantial

20   evidence?  'Oh, that's just a circumstantial case'.  Do you know what that

21   means for it to be circumstantial?

22   PROSPECTIVE JUROR:  Not exactly.

23                              MRS. KOHLRIESER:  Okay.  Well, let me

126

1   give you an example.  Let's say it's January here in northwest Ohio.  You go

2   to bed.  Well, you get ready to go to bed and you lock up and you look outside

3   and your driveway is clear and your grass is clear and the sky looks clear.

4   Nothing outside.  You lock up and you go to bed.  You get up the next day

5   and in doing your thing you go to unlock your door and you look outside and

6   there's white stuff covering your driveway and covering your lawn.  What do

7   you think happened while you were sleeping?

8   PROSPECTIVE JUROR:   It must have snowed.

9                        MRS. KOHLRIESER:   Anybody disagree

10  with her?  Did you see it snow?

11  PROSPECTIVE JUROR:   No.

12                       MRS. KOHLRIESER:   No.  You were

13  sleeping.  Remember when the Judge used those two words 'common

14  sense'?  How long have you lived in Ohio?

15  PROSPECTIVE JUROR:   A long time.

16                       MRS. KOHLRIESER:   Uh-huh.  January.

17  Cold outside.  You wake up and there's white stuff on the ground.  It's

18  probably snow; right?

19  PROSPECTIVE JUROR:   Absolutely.

20                       MRS. KOHLRIESER:   Okay.  That's what

21  we call circumstantial evidence.  You didn't see it.  It's different if, say, Miss

22  Durr comes to you the next day and says, "Man, I came in last night at like

23  eleven o'clock and, oh, the snow was just coming down."  She's a direct

1    witness of it.  You circumstantially determined that it snowed.  Any reason to

2    not believe them, either one of them, Miss Durr who actually saw it or Miss

3    Dankirt who says 'yes'.  Miss Oglesbee, any reason not to believe Miss

4    Dankirt any more than --

5    PROSPECTIVE JUROR:   Is there any reason not to believe her?

6                                    MRS. KOHLRIESER:   Yea.

7    PROSPECTIVE JUROR:   No.

8                                    MRS. KOHLRIESER:   Because it makes

9    sense; right?

10   PROSPECTIVE JUROR:   Uh-huh.

11                                   MRS. KOHLRIESER:   Okay.  Here's the

12   reason I asked that question like that - because of reasonable doubt.  I once

13   had a juror sitting right there in Miss Krites seat who said, "Huh-uh, no, no,

14   no, huh-uh - it could be cotton balls all over your yard or could be toilet paper

15   all over your yard."  You laugh.  So did I.  He was dead serious.  That's what

16   Judge was talking about when he talked about -- well, is it possible someone

17   with a lot of time on their hands and a lot of cotton balls on their hands took

18   the time to go to your driveway and your yard to put cotton balls all over it to

19   confuse you?  It's possible, just like I guess there's a possibility there are

20   aliens out there.  Is it reasonable when you use your common sense?  That's

21   what reasonable doubt is.   You don't check your common sense at the door.

22   That's exactly why we have twelve of you here - is to bring common sense to

23   the floor.  It really took me aback, that example, but ever since then I have

1    used it in every jury trial because that's an excellent example of reasonable

2    doubt.

3              Now, let's say it was last night.  What was the temperature last night

4    when we went to bed?  It was a hot one yesterday; wasn't it?  It's still kind of

5    warm outside today.  You wake up and there's white stuff all over your grass.

6    What are you thinking now, Miss Dankirt?

7    PROSPECTIVE JUROR:   It definitely wasn't snow.

8                              MRS. KOHLRIESER:  What the heck;

9    right?  So, you might go outside to investigate it and things like that; right?

10   PROSPECTIVE JUROR:   Absolutely.

11                             MRS. KOHLRIESER:   Trying to figure out

12   what's going on.  But, in January you don't actually have to go out there and

13   pick it up, feel it, smell it, and test it to make sure it's snow; right?

14   PROSPECTIVE JUROR:   Right.

15                             MRS. KOHLRIESER:   Because you're not

16   dumb; right?  Okay.  All right.  Now, this case, as Judge told you from the

17   indictment, happened back in 2009.  He was indicted last year, but now it's

18   come and it's been six years since this incident happened.  What do you

19   think, Mr. Griffo, about a witness who maybe doesn't recall every last detail of

20   everything they were doing that day?

21   PROSPECTIVE JUROR:   What do I think?

22                             MRS. KOHLRIESER:   Yea.  Would you

23   expect that?

129

1   PROSPECTIVE JUROR:  Well, yea, because people can forget things.  I

2   mean, they might forget, like, specific details.

3                                   MRS. KOHLRIESER:  Okay.

4   PROSPECTIVE JUROR:  They would still know some facts, possibly.

5                                   MRS. KOHLRIESER:  Okay.  Anybody

6   disagree with Mr. Griffo?  It's okay.  He doesn't have to be right.  How do you

7   think a witness might act, and I'll pick on you, Miss Stevens, to a traumatic

8   event?

9   PROSPECTIVE JUROR:  I think they would remember that.

10                                  MRS. KOHLRIESER:  Okay.  Have you

11  ever had anything traumatic happen to you?  Have you been in a car accident

12  or anything of that nature?

13  PROSPECTIVE JUROR:  No.

14                                  MRS. KOHLRIESER:  Anybody here been

15  in a car accident or had some kind of trauma?  Okay.  Well, let me ask you

16  this.  What about a death in the family?  Has anybody ever lost anyone close

17  to them - a parent; a sibling?  Miss Durr, who did you lose?

18  PROSPECTIVE JUROR:  My grandmother.

19                                  MRS. KOHLRIESER:  Your grandmother.

20  Do your parents have siblings?

21  PROSPECTIVE JUROR:  Yes.

22                                  MRS. KOHLRIESER:  Okay.  You have

23  cousins?

1    PROSPECTIVE JUROR:  Yes.

2                    MRS. KOHLRIESER:  Did everybody react

3    the same to your grandma's death?

4    PROSPECTIVE JUROR:  No, everyone didn't.

5                    MRS. KOHLRIESER:  Okay.  Anybody

6    else have a similar experience where someone close to you died and some

7    people react this way and some people react that way?  You just never know

8    until you're in that situation; do you?  I use my mother's death as an example.

9    My sister's much older.  She took care of my mother.  We cremated my mom

10   and my sister knew the people that ran the funeral home and so they brought

11   my mom's ashes out to us.  My sister lives down in Georgia.  We were

12   standing on the porch, because my sister has one of those where you've got

13   a garage, a mailbox, the driveway, and my sister completely lost her mind.

14   She was yelling at this woman, "No, no, no, no, no, that's not her.  Get away.

15   I don't want it.  Get away.  Get away.  Get away."  I had to go down there and

16   take the box of ashes and sign the paperwork for her and that type of thing.

17   My sister says later to me, when she got her act back together, "I do not know

18   what happened out there.  I'm supposed to be the strong one.  I'm the older

19   one.  What happened there?"  You just never know how you're going to react

20   to something until you're in those shoes; do you?  My sister never expected

21   that.  Have you guys had similar experiences?  Well, maybe not completely

22   going off the deep end.  But, people react differently to different situations;

23   correct?

1    Now, I'm going to ask you a very personal question.  It's not meant to

2    put anybody on the spot.  Mr. Sterling, if you had to describe my hair color

3    what would you say?  You're not going to hurt my feelings.  Give me whatever

4    color you think.

5    PROSPECTIVE JUROR:   I think the phrase is, like, dirty blonde.

6                        MRS. KOHLRIESER:  Dirty blonde?  Okay.

7    Anybody?  Would anybody classify my hair a different color or have a

8    different way of describing it?  Miss James, how would you describe my hair?

9    PROSPECTIVE JUROR:  I wouldn't say a blonde.

10                       MRS. KOHLRIESER:  Okay.  What would

11   you say?

12   PROSPECTIVE JUROR:  Your color?

13                       MRS. KOHLRIESER:  Yea.  What color is

14   my hair?

15   PROSPECTIVE JUROR:  Brown.

16                       MRS. KOHLRIESER:  Brown?  Okay.

17   What would you say?

18   PROSPECTIVE JUROR:  Frosted.

19                       MRS. KOHLRIESER:  Frosted?  What

20   would you say?

21   PROSPECTIVE JUROR:  Brown with blonde highlights.

22                       MRS. KOHLRIESER:  Don't feel bad, Mr.

23   Sterling.  I always pick on a man first with that question.  If you look real close

1   you would see that there's a lot of gray in there.  But, I don't believe in

2   growing old gracefully.  I'm fighting it every step of the way and I don't care.

3   At times people might say my hair is red.  I like to experiment.  It's not red

4   right now.  But, the point is, is Mr. Sterling wrong or lying about my hair color?

5   Is Miss James lying or wrong about my hair color?  It's their perception of my

6   hair color; isn't it?

7        Now, would you all agree that my hair is roughly shoulder length?

8   PROSPECTIVE JUROR:  Uh-huh.

9                        MRS. KOHLRIESER:  Would you all agree

10  that it appears that I have hair and it's my hair?  Okay.  Would you

11  understand that sometimes witnesses may pick up on different details that

12  somebody else doesn't?  Does that mean anybody is lying?

13  PROSPECTIVE JUROR:  No.

14                        MRS. KOHLRIESER:  It might just be the

15  way somebody perceives something; right?

16        I remember vividly a car accident my husband and I were in when a

17  car hit us on the driver's side.  My husband was driving.  I vividly remember

18  seeing him turn to me and mouth, and I'm sorry if this offends anybody, the

19  following words because he saw the car crash coming.  He doesn't remember

20  that.  Does it make it any less true because he doesn't remember that that

21  happened?  Is he lying?  Am I lying?  You notice different things about

22  different people; correct?  Okay.

23        Now, Judge also touched upon the fact that you're not going to get

1    to know, or consider, I should say, when you go back there to determine guilty

2    or not guilty what the punishment might be.  That's not your concern.  Your

3    concern is to determine whether the defendant is guilty of the crimes that the

4    State has alleged against him.  Miss Oglesbee, would that bother you not to

5    know what might potentially happen to somebody?

6    PROSPECTIVE JUROR:   No.

7                                    MRS. KOHLRIESER:   Oh, I'm sorry.  You

8    all are switched.  You're Miss Oglesbee.  Miss Coon, what about you?  Does

9    that bother you?

10   PROSPECTIVE JUROR:  I don't know that it would bother me.  I would be

11   curious, though.

12                                   MRS. KOHLRIESER:   Okay.  The point is,

13   it can't drive your decision.  Does anybody have a problem with that,

14   understanding that your job is to determine the facts?  The Judge is going to

15   give you the law.  You see if those facts show guilty or not guilty.  Anybody

16   have a problem with that?

17                 Now, the Judge also touched upon following the law even if you don't

18   like it.  I've had a couple of times jurors say, "Oh, well, we just didn't want to

19   do," whatever it was.  They said, "But, we read those instructions and it said

20   that we had to do this and so that's what we did."  Anybody have an issue

21   doing that even if inside you don't feel like that's right?  For instance, a lot of

22   people think marijuana ought to be legal.  I'm not going to ask any of you your

23   position on it.  But, do you all understand that it's illegal to possess marijuana

134

1   in the State of Ohio?  Sometimes there might be somebody who goes, "You

2   know what, I don't care if it is illegal.  I'm not voting guilty because it shouldn't

3   be."  They're not following the law; are they?  If the law says that it's illegal

4   and they decided that, yes, this person had this marijuana, well, that means

5   they're guilty.  Anybody have a problem with that?  Some people think the

6   O.V.I. laws, and it used to be known as D.U.I. laws, aren't exactly fair.

7   Anybody have a problem following the law?

8          Anybody have religious convictions that they think, 'you know what, I

9   can't stand in judgment of somebody.  Don't pick me for this jury because I

10  don't want to have to judge anybody'.  Do you understand that you're not

11  judging the person.  You're judging the facts.  Does anybody have any

12  problems with that?  Miss Stevens, any problem?

13  PROSPECTIVE JUROR:  I don't know.

14                              MRS. KOHLRIESER:  What don't you

15  know?

16  PROSPECTIVE JUROR:  I mean, this is a person's life.  I don't know.

17                              MRS. KOHLRIESER:  Okay.  What do you

18  mean by that?

19  PROSPECTIVE JUROR:  Whatever we decide is going to affect the rest of

20  his life.

21                              MRS. KOHLRIESER:  Uh-huh.

22  PROSPECTIVE JUROR:  Do we have that kind of authority?  I don't know.

23                              MRS. KOHLRIESER:  Okay.  Well, I guess

1   it goes back to kind of what I was saying a little bit.  Your job is to listen to

2   whatever witnesses come to the stand.  Shannon won't be there.  Witnesses

3   are going to come forward and they're going to testify.  They're going to tell

4   you what they know, what they saw, what they heard, and that type of thing,

5   what they've experienced, and that type of thing.  You're going to get some

6   physical exhibits as well.  Pictures and things, stuff like that.  Your job is to go,

7   'okay, this is what I believe happened in this case'.  The Judge is going to tell

8   you the law.  You're to decide, based upon what you found happened in this

9   case and what the law says, guilty or not guilty.  You're not judging the

10  defendant and whether he's a good person or a bad person, or what's going

11  to happen to him, or anything like that.  You're deciding did he commit -- well,

12  did a crime occur and did he commit it.  Putting it that way, does that help you

13  at all, or confuse you more?

14  PROSPECTIVE JUROR:   I think it confuses me more.

15              MRS. KOHLRIESER:   Okay.  What can I

16  do to help you?

17  PROSPECTIVE JUROR:  I don't know.

18              MRS. KOHLRIESER:   Okay.  Do you have

19  a problem determining whether somebody is believable or not?

20  PROSPECTIVE JUROR:   Oh, it would have to be -- it would depend on the

21  circumstances.

22              MRS. KOHLRIESER:   Okay.  Well, let's

23  take baby steps.  You don't have any problem listening to people; correct?

1   PROSPECTIVE JUROR:   Right.

2                               MRS. KOHLRIESER:   Okay.  We're not

3   going to ask you to judge each person one at a time.  Do you understand

4   that?  You're not going to be called upon to make a decision as to who to

5   believe, what to believe, how much, or how little to believe until the very end.

6   PROSPECTIVE JUROR:   Right.

7                               MRS. KOHLRIESER:   And you're not

8   going to be called upon to do that until the State has presented all of its

9   evidence, the defendant has had an opportunity, if he so chooses, because

10  it's his right not to, to present whatever evidence he wants to, and then we

11  have a chance to rebut that one last time.  It's at that point we're going to

12  present what's called closing argument where we try to explain to you the

13  case.  We'll tell you that you've got this piece of evidence, this piece of

14  evidence, this piece of evidence, and how that all works out.  Obviously the

15  State's position is going to be this is why you should find him guilty.  The

16  defense position is going to be this is why you should find him not guilty.

17  Then the Judge is going to instruct you on what the law is.  This is what the

18  State has to prove in order to show Aggravated Murder.  You're going to be

19  called upon to sit in the room with eleven people and discuss whether you

20  think the State has shown all those things and then make your determination.

21  If the State has, then he's guilty of Aggravated Murder.  Or, if the State hasn't,

22  then he's not guilty of Aggravated Murder.  Do you think you'll have a problem

23  doing that?

1   PROSPECTIVE JUROR:   Again, I don't know.  I just -- going back to the T.V.

2   question, I don't know what I would do if this man isn't guilty and what if we --

3   I don't know.  I just -- I don't know if I could do it.

4                              MRS. KOHLRIESER:   Okay.  Are you

5   afraid of messing up?

6   PROSPECTIVE JUROR:   Yes.  Yes.

7                              MRS. KOHLRIESER:   Okay.  And that's,

8   obviously, that's my term.   You're afraid of getting it wrong?

9   PROSPECTIVE JUROR:   Yes.

10                              MRS. KOHLRIESER:   Okay.  Do you think

11  that would hamper you in such a way that you just would be too nervous and

12  too second guessing that you couldn't write 'guilty'?

13  PROSPECTIVE JUROR:   The facts would have to be very, very, very clear

14  for me.

15                              MRS. KOHLRIESER:   Okay.  Fair enough.

16  Do you guys see what she's saying?  Anybody else feel similar?  Mr. Miolen?

17  PROSPECTIVE JUROR:   Yes.

18                              MRS. KOHLRIESER:   Okay.  I'll ask you,

19  are you able to listen?

20  PROSPECTIVE JUROR:   Oh, yea.

21                              MRS. KOHLRIESER:   Got any problem

22  trying to figure out whether somebody is telling the truth or not and making a

23  judgment call?

1  PROSPECTIVE JUROR:  No.

2  MRS. KOHLRIESER:  Okay.  Do you think

3  once the Judge gives you the instructions and you've heard all of the

4  evidence and the arguments and things like that that you could come to a

5  decision?

6  PROSPECTIVE JUROR:  Oh, yea.

7  MRS. KOHLRIESER:  Do you think you

8  would have a hard time setting aside this idea of what may happen?

9  PROSPECTIVE JUROR:  No.

10  MRS. KOHLRIESER:  Okay.  Anybody

11  else?  Again, part of it is waiting until the end because you're going to get a

12  little bit here, and a little bit here.  Each witness is going to add something to

13  the pot, so to speak.  You may, at the time when you hear something, go 'why

14  do I care about that'.  Anybody have a problem holding off judgment until

15  everything is in and then deciding?  You know, sometimes we hear somebody

16  tell something and we go 'uh-huh', and then later on we get the other part of

17  the story.  Have you guys ever had that happen?  Some friend of yours came

18  to you and told you something, or co-worker, comes to you and tells you

19  something and you think, 'oh, how could that happen', and then later on you

20  get the other side of the story.  Have you ever gotten that other side of the

21  story and known that other side of the story is full of it?  It doesn't make sense

22  to you using your credibility determinations?  Have you ever had that

23  happen?  Or, maybe vice-versa.  Once you heard that side you realized that

1  that first person was fooling you.

2  PROSPECTIVE JUROR:  'Scuse me.

3                          MRS. KOHLRIESER:  Yes, ma'am?

4  PROSPECTIVE JUROR:  I have a question.

5                          MRS. KOHLRIESER:  Sure.

6  PROSPECTIVE JUROR:  Would we be allowed to take notes during the

7  trial?

8                          MRS. KOHLRIESER:  Judge?

9                          THE COURT:  Yes.  I'll give you some

10  instructions.  If you're chosen as a juror I'll give you some instructions on

11  note-taking.

12  PROSPECTIVE JUROR:  Okay.

13                          MRS. KOHLRIESER:  All right.  Obviously,

14  especially with something lengthy, you might want to take a few notes there.

15  PROSPECTIVE JUROR:  Yea, if there's something we question.

16                          MRS. KOHLRIESER:  Okay.  You

17  understand, though, that you might have a note down and Miss Oglesbee

18  might have a note down and she noted something that you didn't.

19  PROSPECTIVE JUROR:  Oh, yea.

20                          MRS. KOHLRIESER:  Okay.  That doesn't

21  mean that it didn't happen; right, because it's not in your note?

22  PROSPECTIVE JUROR:  No.

23                          MRS. KOHLREISER:  It doesn't

1    necessarily mean that it came out like she thinks it did according to her note.

2    Does anybody have any problem, I guess, listening to each other and what

3    your different views may be?

4        Does anybody here consider themselves a leader?  Miss James, I see

5    you.  Do you consider yourself a leader?

6    PROSPECTIVE JUROR:  No.

7                    MRS. KOHLRIESER:  No?  I keep picking

8    on you.  I'm so sorry.  Okay.  I'm ignoring Miss James now.  Anybody else

9    consider themselves a leader - think that they're, you know, pretty good at

10   taking charge if necessary?  Nobody?  Is everybody here a follower?  If the

11   crowd says it, that's what I'll do?

12   PROSPECTIVE JUROR:  It depends on who the leader is.

13                   MRS. KOHLRIESER:  Okay.  All right.

14   Good point.  It depends upon who the leader is.  Does anybody here consider

15   themselves stubborn?  Once you make up your mind you're pretty set?

16   Nobody?  Miss Krites, I saw that face.

17   PROSPECTIVE JUROR:  Yea, but I can -- it's like being able to laugh at

18   yourself.  Can you change your mind, too?

19                   MRS. KOHLRIESER:  Are you willing to

20   listen to others and their opinions?

21   PROSPECTIVE JUROR:  Yes.  Yes.  Yea, I can say that I'm stubborn.

22                   MRS. KOHLRIESER:  Okay.  Well, let me

23   ask in the reverse since nobody said that they thought they were a leader

1   here.  Is there anybody here that feels like they might be a little more of a

2   follower?  If there's eleven people in the room saying this, well, you're

3   probably going to go along with those eleven?  Anybody feel that way?

4   Here's the deal.  Each one of you is going to have to have your own opinion.

5   Each one of you is going to have to decide yourself whether you think he's

6   guilty or not guilty.  There are going to be other voices in that room.  Anybody

7   here have a problem speaking in front of people and representing your

8   opinion on things and telling people what you think about something?

9   Nobody?

10       The reason I ask is because I had a trial one time that was eleven to

11   one.  Eleven people thought not guilty.  One person thought guilty.  They

12   deliberated for quite some time.  That one person listened to everybody, but

13   she was firmly convinced that the person was guilty.  The eleven were firmly

14   convinced that the person was not guilty.  It resulted, after several hours, in

15   what we call a mistrial.  So, we went to the victim and asked her, she was a

16   fourteen year old girl who had been raped, asked her 'do you want to do it

17   again; do you want to go through this again'?  She said, "Sure.  What do we

18   got to lose?  I know what I'm telling is the truth."  So, we did it again.  Twenty

19   minutes.  Twelve people.  Twelve different people - guilty.  A couple of

20   months later I saw that one juror.  She worked at St. Rita's.  She asked me,

21   "What did you guys do with that case?  Did you retry it?"  I said, "Yea, we did."

22   She said, "How did it turn out?"   I said, "Guilty."  She was so excited that she

23   had held out because she felt like almost giving in because eleven people

142

1   were very strong voices.  It could have been the other way as well.  Anybody

2   here think they might have a problem if you're that one lone voice?

3       Now, with that said, and that's why I asked you if there was anybody

4   here that was stubborn.  Is there anybody here who has a hard time - 'you

5   know what, I formed this opinion and I think it's this way' - listening to other

6   people and rationalizing it and discussing it and perhaps maybe you do

7   change your mind and admitting that you changed your mind?  Has anybody

8   ever gotten into an argument with their spouse, their significant other, and

9   even once you changed your mind, even once you knew they were right, you

10  weren't telling them that?  'He ain't got to know he was right.  I know it; but, I

11  ain't telling him'.  Anybody?  Come on.  I heard snickers.  There's somebody

12  out there, Miss James, and I'm not trying to pick on you so much, but I

13  appreciate your honesty there.  Are you going to be like that in a case like

14  this?

15  PROSPECTIVE JUROR:   No.

16              MRS. KOHLRIESER:   Okay.  You're willing

17  to listen to other people's opinions?

18  PROSPECTIVE JUROR:   Of course.

19              MRS. KOHLRIESER:   And like Miss Krites

20  said, you know, if you genuinely change your mind then you're going to

21  change your mind?

22  PROSPECTIVE JUROR:   Yes.

23              MRS. KOHLRIESER:   Anybody else have

1    any problem with that?

2         Now, I told you a little bit -- I gave you an example, kind of, of

3    reasonable doubt.  Is there anybody here that thinks 'I don't like that

4    reasonable doubt standard.  That's not right.  They'll have to show me that it's

5    not cotton balls.  They'll have to show me that it's not toilet paper out there.

6    There should be no doubt whatsoever before I say guilty'.  Anybody?  Like I

7    said, there's no wrong answers.  Yes, ma'am?

8    PROSPECTIVE JUROR:  That's just what I went back and said.  I would

9    have to know that it was cut and dry.

10                      MRS. KOHLRIESER:  Okay.  Do you

11   understand that sometimes we don't always have the answers to every

12   question?

13   PROSPECTIVE JUROR:  Yes.

14                      MRS. KOHLRIESER:  For instance, and I

15   think Judge might have used this as an example, a lot of times jurors,

16   particularly in sexual assault cases against children, and not sometimes,

17   every time, every time I've gone back and talked to a jury after one of those

18   types of trials they always ask me 'has he done this before'.  That's

19   something that the law doesn't allow me to tell you because you're to judge

20   whether he did it this time.  But, they think that's relevant and they think that's

21   a big deal because a lot of people think if he's done it once then he's probably

22   done it again.  So, in their heads they think it's relevant.  But, the law says no.

23   So, there may be questions that you have that legally I can't answer for you.

1    I can't give you that stuff.  Are you saying that if you have questions in your

2    mind you're not going to be able to say guilty?

3    PROSPECTIVE JUROR:   How could you if we didn't have all of the facts?

4                                    MRS. KOHLRIESER:   Okay.  Well, here's

5    the thing.  Would you agree that most crimes don't happen right in front of

6    people?

7    PROSPECTIVE JUROR:   Oh, yea.

8                                    MRS. KOHLRIESER:   Would you agree

9    that we don't always know what's in a person's mind when they do

10   something?  For instance, anybody remember, and I would hope you do, the

11   Colorado Theater shooting during the premier of Batman?  The kid came in

12   there and blew all those people away.  They have no idea what truly caused

13   him to do that.  That's a question I'm sure that people in that theater, and the

14   Prosecutors, and probably even the defense counsel, wonder all the time.

15   Why?  It's a question that's not answered.  Would you still be able to find him

16   guilty even though you don't know why he did it?

17   PROSPECTIVE JUROR:   If there was enough eye witnesses in that case.

18                                    MRS. KOHLRIESER:   Okay.  But, it had

19   eye witnesses; right?  Anybody else feel similar to Miss Stevens?  Mr.

20   Miolen?

21   PROSPECTIVE JUROR:   I just feel that, you know, he's innocent until

22   proven guilty.

23                                    MRS. KOHLRIESER:   Absolutely.  It's

1   not just a feeling.  That's the law.

2   PROSPECTIVE JUROR:  Right.

3                              MRS. KOHLRISER:  That's the law.

4   PROSPECTIVE JUROR:  For the substantial evidence, or, circumstantial, I'm

5   sorry, evidence I can, you know, I can believe it if, you know, if some of the

6   other testimony, you know, would lead me to believe that.

7                              MRS. KOHLRIESER:  Okay.  That's what

8   I'm talking about.  You may not know every answer.  You may not know what

9   shoes he was wearing.  Or, you may not know where this thing was, or where

10  that thing was, or how this happened, or that type of thing.  If you've got

11  questions like that is that going to be a problem for you?

12                              MR. RION:  Objection.  It's hard to

13  anticipate what the question is.  That's going to be the issue.  I don't know if

14  that question is answerable.

15                              THE COURT:  Well, I understand.  I'm

16  going to overrule the objection.  It's voir dire.  It's just a hypothetical.  So, go

17  ahead.

18                              MRS. KOHLRIESER:  I guess what I'm

19  getting at is, we're talking about reasonable doubt.  Okay?  I gave you the

20  example of the cotton balls versus the snow and that type of thing.  We may

21  not ever have anybody that actually saw it snowing.  That doesn't mean it

22  didn't snow; does it, when you look at all of the other circumstances?  We

23  may not know -- I know there's modern technology to tell that, but let's say

1  hypothetically, we may not know if it snowed at two A.M. or it snowed at three

2  A.M.  That doesn't mean it didn't snow; does it?

3  PROSPECTIVE JUROR:  No.

4                        MRS. KOHLRIESER:  Okay.  And that

5  often happens in cases.  To this day I can never ever begin, and I've done

6  case after case after case, and study after study after study, and I can't tell

7  you why anyone would think it would be okay to have sex with a six year old.

8  I can never answer that question for you.  It doesn't mean it didn't happen.

9  But, it's a good question.  Why?  Why would you do that?  But, that doesn't

10  make it necessarily relevant to whether it happened; does it?  That's what I'm

11  getting at.  Is anybody here going to hold me to answering every little thing

12  despite the fact that, you know what, I'm not the one that did the crime?  I'm

13  left with whatever was left for me.  We're dealt the cards -- you know, you

14  have to play the cards you're dealt type thing.

15                        On a kind of much lesser degree, Miss Durr, I'll ask you since it's been

16  long since I've asked you a question, there are going to be times when a

17  question is asked and an objection is made and the Judge is going to say

18  sustained, meaning the witness can't answer that question.  Is that something

19  you think might bother you?  'Why are they objecting?  I want to know the

20  answer to that'.  And you don't get the answer.

21  PROSPECTIVE JUROR:  No, I don't think it will bother me.

22                        MRS. KOHLRIESER:  Do you understand

23  what I was talking about with there are some things the law just doesn't allow

1   you folks to know?

2   PROSPECTIVE JUROR:   Yes, I understand that.

3                           MRS. KOHLRIESER:   And really I know a

4   lot of people joke about it, but, I mean, the laws are there for certain reasons.

5   I mean, there really is rhyme, or, reason to their rhyme, so to speak, even

6   though sometimes it's not always obvious.  We're trying to judge each case

7   based upon the evidence that comes in.  That's why I don't get to say, "Well,

8   Miss Krites said that Miss Durr said that Miss Oglesbee said that Miss Coon

9   said."  I'm not allowed to do that, either.  It might be good to know what Miss

10  Coon said.  But, if Miss Coon is not available, or what have you, what she

11  said doesn't come in because I can't say what she said.  Do you understand

12  that?

13  PROSPECTIVE JUROR:   Yes.

14                          MRS. KOHLRIESER:   It's what we call

15  hearsay.  You've heard that.  Again, there's always some exceptions to that.

16  Don't, like, hold me to that.

17          And does everybody understand - let me see, who haven't I picked on

18  in awhile - Miss Wireman, I've barely talked to you and so we'll put you on the

19  hot seat in just a second - do you understand in this country everybody,

20  regardless of how much or how little evidence, has the right to a trial?  The

21  Colorado Theater shooter.  All those witnesses.  Caught redhanded.  Found

22  all those weapons and things like that right on him and in his car.  His house

23  was booby-trapped.  He had, I don't know, manifestos or whatever he wrote

1   about it and that type of thing.  Even video.  He went to trial.  Did you know

2   that?  Do you know as he sat there in that Court, until the jury found him

3   guilty, that he was innocent?  Does everybody understand that?  When the

4   Judge was talking about the defendant is presumed innocent, even the

5   Colorado Theater shooter was presumed innocent until the State proved it

6   beyond a reasonable doubt.  So, even though there were however many eye

7   witnesses to it and mounds of evidence to it, as he sat in that seat, just like

8   this defendant sits here, he's innocent.

9                       MR. RION:   Objection.

10                      THE COURT:  Overruled.  Go ahead.

11                      MRS. KOHLRIESER:   And I'm not saying

12   this is the Colorado Theater shooter.  That's not what I was trying to do.  I

13   was just demonstrating that that's what the law in this country is.  A person is

14   not guilty until a jury says so.  Do you have any problems with that?  Do you

15   think that he should have just come in and pled?  No?  Why not?

16   PROSPECTIVE JUROR:   Because he has his rights to give out his evidence,

17   too.

18                      MRS. KOHLRIESER:   That's absolutely

19   right.  It doesn't matter if I commit a crime in front of all of you, and with the

20   video playing, and with all of you sitting here, and all of the people out there,

21   and the Judge right here, and the Deputy, and even if he runs and tackles me

22   and gets all the physical evidence he possibly could want, a dream case, I'm

23   still innocent until proven guilty; correct?  I'm still entitled to a trial; correct?

1  PROSPECTIVE JUROR:  Uh-huh.

2                        MRS. KOHLRIESER:  I'm still entitled to

3  have people come in here and testify in order to show my guilt; correct?  It's

4  also my right to sit there and not say a word; isn't it?  Anybody have a

5  problem with that?

6          A couple of things and then I'll let Mr. Rion ask you some questions.

7  I'll ask -- let's see -- Mr. Shappell, as you sit there, anything you think, you

8  know, if I was in her shoes I would ask this question.

9  PROSPECTIVE JUROR:  No, I can't say that there is.

10                        MRS. KOHLRIESER:  Anything you think

11 that I should know about you that I haven't asked about?  Something that

12 might be important?

13 PROSPECTIVE JUROR:  No.

14                        MRS. KOHLRIESER:  Anybody else, you

15 know, if you were standing in my shoes, 'oh, she should have asked this

16 question', or, 'she might want to know this about me'.

17          Anybody have, and I noticed on some of your questionnaires that

18 you've checked 'convicted of a crime' or 'have a close family member or

19 friend convicted of a crime'.  Anybody that checked 'yes' on that question do

20 you think in your case or in your loved one's case that it wasn't handled fairly?

21 Anybody has -- well, let's see.  Let me just go to some of the ones that

22 checked 'yes'.  I'll ask you, Miss Oglesbee.  You actually checked that you've

23 been the victim of a crime.

1  PROSPECTIVE JUROR:  Yes.

2  MRS. KOHLRIESER:  Anything about the

3  way that was handled?  Did they find out who did it?

4  PROSPECTIVE JUROR:  No.

5  MRS. KOHLRIESER:  Anything about the

6  way that was handled and they never caught who did it that you're like, 'oh,

7  the police, they can't do their job'.

8  PROSPECTIVE JUROR:  Well, it was a theft.  Nothing ever came of it.

9  MRS. KOHLRIESER:  Okay.  Do you think

10  the police should have done more?

11  PROSPECTIVE JUROR:  I don't think there was any more that they could

12  have done.

13  MRS. KOHLRIESER:  Sometimes you just

14  don't have anything; right?  Your stuff is gone and there's not a clue as to who

15  did it; right?

16  PROSPECTIVE JUROR:  Right.

17  MRS. KOHLRIESER:  All right.  Most of

18  you checked 'no', 'no', 'no'.  Wow.  I think this is the most no's I've ever had

19  here.  I think Judge asked you guys - but, anybody with law enforcement

20  connections that you think there's a reason you can't be fair and impartial in

21  this particular case?

22  Miss Durr, are you related to Dana or a Keith Durr?  I see your face.  I

23  mean, are you related to them?

1  PROSPECTIVE JUROR:  Yes, I'm related to one of them.

2  MRS. KOHLRIESER:  Okay.  I'm guessing

3  you have some opinion about that relation.

4  PROSPECTIVE JUROR:  Uh, no.  I'm just wondering why you're asking me.

5  MRS. KOHLRIESER:  Well, and not to put

6  you on the spot with some of them, but at least one of them has been in

7  trouble with the law and things of that nature.  Anything about the way that

8  case was handled or anything that sits ill with you?

9  PROSPECTIVE JUROR:  No.  I think both of them have been in trouble with

10  the law.

11  MRS. KOHLRIESER:  Okay.  All right.

12  PROSPECTIVE JUROR:  And I think when you do something wrong, if they

13  prove it, I think you should take the punishment.

14  MRS. KOHLRIESER:  Okay.  Would

15  everybody agree with that?  Anybody else here, and maybe I missed it on

16  your questionnaire, that has family or loved ones that have been in trouble

17  with the law before?

18  PROSPECTIVE JUROR:  I have a nephew that's in prison now.  But, I had

19  no part in the trial or whatever.

20  MRS. KOHLRIESER:  Okay.  Did your

21  family talk about it at all or anything like that?

22  PROSPECTIVE JUROR:  No.  They don't live here in Lima.

23  MRS. KOHLRIESER:  Okay.  All right.  So,

1   nothing about that would influence you one way or the other with the police in

2   this case or anything?

3   PROSPECTIVE JUROR:  Huh-uh.

4                                    MRS. KOHLRIESER:  Miss James, I asked

5   you about -- well, you have a son in Corrections?

6   PROSPECTIVE JUROR:  He's a Corrections Officer.

7                                    MRS. KOHLRIESER:  Okay.  Do you guys

8   ever talk about his work or anything like that?

9   PROSPECTIVE JUROR:  No.

10                                   MRS. KOHLRIESER:  Okay.  All right.  Mr.

11  Shappell, it was you who knew some law enforcement officers from years

12  ago.  Did you work in, like, in a criminal sector or were they just doing security

13  out there?

14  PROSPECTIVE JUROR:  During the nights they would stop in.  Basically

15  they stopped in for coffee and just to be social and things in the middle of the

16  night.

17                                   MRS. KOHLRIESER:  All right.  Anything

18  about that that makes you think 'oh, I can't trust them', or, 'oh, I'll only trust

19  them'?

20  PROSPECTIVE JUROR:  No.  At that time, as well as today, in all jobs and

21  things there's people that are great and people that aren't so great.  So, --

22                                   MRS. KOHLRIESER:  Would everybody

23  agree with that statement?

1   PROSPECTIVE JUROR:  Yea.

2              MRS. KOHLRIESER:  And, you know,

3   Judge kind of hinted on it a little bit that, you know, there's a lot of things

4   going on in this country right now and a lot of things you see in the news and

5   stuff like that.  There's officers that do their job well, and officers that don't do

6   their job very well.  Yes, ma'am?

7   PROSPECTIVE JUROR:  I don't know if this relates to anything or not.  I was

8   a Corrections Officer for three and a half years.

9              MRS. KOHLRIESER:  Okay.  Here at our

10   prison?

11   PROSPECTIVE JUROR:  At Allen Correction.

12              MRS. KOHLRIESER:  Okay.

13   PROSPECTIVE JUROR:  I was the first visiting room officer when they first

14   opened.

15              MRS. KOHLRIESER:  Okay.  So, it's been

16   awhile since you've been out there?

17   PROSPECTIVE JUROR:  Oh, yea.  Yes.

18              MRS. KOHLRIESER:  Okay.  Anything

19   about that experience that -- because, quite frankly, there might be some

20   people coming in from prison, prisoners, to testify.  Would you think, 'oh, I

21   ain't believing them people', or, you know, --

22   PROSPECTIVE JUROR:  Well, that's been about twenty -- over twenty some

23   years ago.  It was when they first opened and I worked there for three and a

1  half years.

2                    MRS. KOHLRIESER:  Okay.  So, whatever

3  you did out there and whatever experiences you had out there you could put

4  aside and judge this case based upon what you have before you?

5  PROSPECTIVE JUROR:  Yes.

6                    MRS. KOHLRIESER:  Okay.  Anybody

7  here that has any reservations whatsoever?  You know what kind of case it is.

8  But, you think, you know what, I just don't want to do this.  Miss Stevens, I

9  saw that hand.  Is it based upon what we talked about?

10  PROSPECTIVE JUROR:  Yes.

11                    MRS. KOHLRIESER:  And understand it's

12  not a pretty job to have to do, quite frankly.  But, do you think you could be

13  fair and impartial and judge this case?

14  PROSPECTIVE JUROR:  I don't know.  Like her, my daughter worked for Mr.

15  Warrington's brother.  So, I don't know if that's got anything to do with, or,

16  would have anything to do with this or not.  He owned Daryl and Daryl's.

17                    MRS. KOHLRIESER:  Okay.  Anything

18  about that relationship, for whatever reason, that you think, you know, you

19  owe something to the Warrington family, or maybe you didn't like those

20  Warringtons, or whatever?

21  PROSPECTIVE JUROR:  I didn't really know the man.

22                    MRS. KOHLRIESER:  Okay.  So, that's not

23  something that would necessarily influence your decision?

1   PROSPECTIVE JUROR:  I don't see how.

2                       MRS. KOHLRIESER:  And the reason I

3   ask that is sometimes people form opinions.  We had somebody leave earlier

4   that said, you know, they had the fortune of going to dinner with some

5   witnesses and, you know, sometimes you just think the world of some people.

6   Or, sometimes you don't think very good of people.

7   PROSPECTIVE JUROR:  Right.

8                       MRS. KOHLRIESER:  That's what we

9   need to know if that's going to color your judgment when that's the subject

10  matter of the case and if there's a witness that comes in.  Do you see what

11  I'm saying?

12  PROSPECTIVE JUROR:  I didn't know if Mr. Warrington would be a witness

13  or not.

14                      MRS. KOHLRIESER:  At this time I don't

15  believe he's going to be.  But, that was with a brother of his.

16  PROSPECTIVE JUROR:  Yes.

17                      MRS. KOHLRIESER:  I guess what we

18  don't want, the bottom line, is when people are making decisions on guilty or

19  not guilty for them to feel like they have some kind of loyalty, or some kind of

20  duty to somebody, or some kind of ill will towards somebody and that's what

21  is influencing their decision.  I had a juror once in the middle of a trial where a

22  witness came up and that person hadn't recognized the name, and it was a

23  defense witness, and this person piped up with 'oh, yea, I knew her in

1   school and she was great and, you know, I know she's an honest person and

2   I don't think she would lie about anything'.  We asked, you know, 'can you put

3   that aside' and understand, you know, that just because she swears to tell the

4   truth doesn't mean she is and, you know, judge it based upon everything?

5   That person said, "Well, I don't think I could."  Well, that's not an impartial

6   juror.  Do you know what I mean?  They bring something to the table, so to

7   speak, about that witness and that might make them more apt to believe that

8   person, or disbelieve that person if they knew them the opposite way.  That's

9   what we're looking for here.  Do you have anything like that?

10  PROSPECTIVE JUROR:   Like I said, I didn't really know Dick that well.  But,

11  I don't --

12                        MRS. KOHLRIESER:   That's okay.  I know

13  I keep putting you on the spot and I don't mean to.

14  PROSPECTIVE JUROR:   No.  No.

15                        MRS. KOHLRIESER:   I guess it goes for

16  anybody.  Anything that you've heard or seen or anything here in the last

17  several hours that you think no way, huh-uh, I don't think I can do this?  Other

18  than Miss Stevens?  Okay.  Your Honor, we would have one cause.  I don't

19  know if you want us to --

20                        THE COURT:   Approach the Bench.

21  Again, ladies and gentlemen, prospective jurors, disregard anything you might

22  overhear during a Bench conference.

23  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

1   the record, as follows.)

2                           MRS. KOHLRIESER:  We would pass for

3   cause, with the exception of Miss Stevens just because of the reasonable

4   doubt questions that she gave and how can you answer if you have any

5   questions left and that type of thing.  I don't believe that she can be fair and

6   impartial.

7                           MR. RION:  I'd like just a chance to ask her

8   questions and then --

9                           MRS. KOHLRIESER:  Fair enough.

10                          THE COURT:  Okay.  We're going to take

11  a break first.

12                          MR. RION:  Yes.

13                          THE COURT:  Let's just take a break now.

14  All right.

15  (WHEREUPON, Court continued on the record, as follows.)

16                          THE COURT:  Okay.  At this point, other

17  than noted, do you pass for cause, Mrs. Kohlrieser?

18                          MRS. KOHLRIESER:  Yes, your Honor.

19                          THE COURT:  Okay.  We're going to take

20  a break, folks.  It's kind of midafternoon here.  This will be the last break

21  before the evening recess.  Again, we anticipate going until about four-thirty.

22  Maybe we'll get done sooner; maybe not.  That's what I'm aiming for.  So, this

23  is about mid-way through the afternoon.

1    Remember the instructions I gave you before not to discuss the case

2    or what's been happening among yourselves or with anyone else.  Have no

3    contact with the participants.  Again, don't contact anybody over your cell

4    phone or any of those electronic media kind of things.  Stick around.  You can

5    go outside.  This is a non-smoking building.  If you are a smoker you need to

6    go outside and do that.  But, again, don't have any conversations about the

7    case with anyone.  We'll stand in recess until about three o'clock and then

8    we'll come back in here and finish up this process hopefully.  Okay?  If I could

9    see counsel in chambers?

10   (WHEREUPON, COURT WAS IN RECESS.)

11

12

13                    THE COURT:   Okay.  We're reconvening

14   this 8th day of September, 2015 in Case Number CR2014 0139, State of

15   Ohio -vs- Markelus Q. Carter.  The record will reflect the defendant is present

16   in Court with counsel.  The State is present.  All jurors have returned, or,

17   prospective jurors have returned.

18          Is there any prospective juror that was exposed to something outside

19   the Courtroom that you feel might influence your ability to be fair and

20   impartial?  Anybody not follow my instructions not to discuss the case?  All

21   right.

22          We'll continue with the selection process.  Mr. Rion, you may inquire

23   on behalf of Mr. Carter.

1     MR. RION:  Thank you, your Honor.  Good

2   afternoon.  As you know, my name is Jon Paul Rion.  I'm an attorney in

3   Dayton.  My father was a criminal defense lawyer and my grandfather was

4   also a criminal defense lawyer in Dayton.  My dad's name was Jon Rion and

5   my grandfather's name was Paul.  Does anybody recognize anyone in my

6   family or had any dealings with our office over the seventy-six years that

7   we've been there?

8        I want to start really not by throwing out a lot of legal ideas, but just to

9   sort of talk to you for a minute about what this really means.  First

10  impressions are crucial; right?  It's something when you make them you keep

11  them - right or wrong.  In this case what was your first impression by way of

12  introduction to Mr. Carter?  It was that he was charged with Murder.  It was

13  that he was charged with Weapons Under Disability.  It was that there was

14  somebody that had passed away, obviously.  Mr. Warrington.  That's sort of,

15  when you meet him, that's your -- you're here to decide whether something

16  happened or didn't happen.  That's a first impression, whether you like it or

17  not.  As much as you can say, 'oh, well, I'll just consider him innocent to the

18  way I consider the guy out in Colorado that did something innocent, or, guilty'.

19  This really is a life changing situation.  The Prosecutor used the example of a

20  case where the jurors were read the same instructions and presumably saw

21  the same facts and eleven to one in that case they said not guilty and then

22  they tried it again and different people and a different result, which means that

23  there's something somewhat random and that mistakes can happen.  Do you

1  feel what I'm trying to say, Miss Krites?

2  PROSPECTIVE JUROR:   Yea, I do.

3                            MR. RION:   And when the Judge says it's

4  proof beyond a reasonable doubt, -- well, let's go through the standards of

5  proof that we have in the State of Ohio.  We have 'by a preponderance',

6  which some of you sat on civil cases.  Now, billions of dollars, and I mean

7  billions, more money than any of us will see times a thousand in our lives, can

8  be won or lost in a trial on the standard of preponderance of evidence.  Jurors

9  are told that you have to believe it's more likely than not that that happened,

10  whatever the allegation is, before you can award that money.  So, that's the

11  lowest standard that we have; right?

12           The next standard that the law has is the standard that's called 'clear

13  and convincing evidence'.  The evidence has to be clear and the evidence

14  has to be convincing.  That's a higher standard than by a preponderance.

15           The Judge, in this case, is going to tell you that those two standards

16  are not good enough.  They're not high enough.  They're not stringent enough

17  for a case that can literally massively change someone's life.  The standard

18  has to be 'beyond a reasonable doubt'.  There's some language that you're

19  going to hear that obviously you can't make stuff up.  You're not going to hear

20  me argue that he was attacked by people from Russia or something.  I mean,

21  it's not like that.  We're talking about beyond - not reasonable doubt.  Beyond

22  a reasonable doubt is the standard.  You'll have to be, just as you would be

23  willing to give someone a billion dollars, or multiple lifetime's worth of money

1    on a lower standard, be able to award certain things in other cases, well, in

2    this case that standard has to be that high.

3           Mr. Shappell, can you hold the State to that standard?

4    PROSPECTIVE JUROR:   I believe so.

5                                   MR. RION:   Without watering it down?

6    Now, I know the State is going to argue, well, this is use your common sense

7    or whatever.  But, it's not.  This isn't a living room with my two kids or your

8    two kids.  This isn't trying to apply household ways of doing things because

9    this is a Courtroom.  It's wonderful that without a law degree, without any

10   specialized training, without any type of class that you would have to take

11   before you could walk in here, I mean, we literally took twelve people and the

12   gallery, who also would be the twelve, and we're telling you that this is your

13   Courtroom.  You have as much, if not more, power than the Judge for the

14   next two weeks without any degrees and without any classes on how to tell if

15   someone is telling the truth or lying, what they really are trying to do, or if they

16   are trying to manipulate the system or not.  I mean, it's pretty amazing.  I work

17   for you.  The Prosecutor works for you.  The witnesses work for you.  In other

18   words, you are the center here because you are given the sacred task of

19   determining whether or not someone did something.  But, it's not like the

20   living room where it's 'okay, let's try to figure this out'.  This is you have to be

21   able to say that if you're not firmly convinced, if you can't say it's beyond a

22   reasonable doubt, that you can say that this man cannot be convicted.  Now,

23   think about that for a minute.

1    Miss James, let's apply the standard of more probable than not for a

2    second.  This is when you're back there and you're saying, 'oh, I think he

3    probably did it'.  I mean, just think about this, and think about that, and think

4    about this.  I mean, the Prosecutor obviously has something they're going to

5    put up or else we wouldn't be here at all; right?  They have to have something

6    that they're going to try to tell you.  So, that will cause everyone to go like this.

7    I mean, I'm not saying they have no evidence and everything is a bunch of

8    junk and you're going to hear something for two days and you're home.  This

9    is a serious determination.  Do you have the, well, fortitude is the wrong word,

10    the conviction that if you're back there and you're saying, 'oh, you know, I

11    think he probably did it, but it's not proof beyond a reasonable doubt', do you

12    have any problem in the world saying not guilty?  Miss James, what do you

13    think?

14    PROSPECTIVE JUROR:  No.

15                                        MR. RION:  No problem?

16    PROSPECTIVE JUROR:  No.

17                                        MR. RION:  Well, let's raise it up.  Mr.

18    Sterling, let's raise up the ante.  The State provides clear and convincing

19    evidence.  We're going up to the next standard.  They're able to come in here

20    and say that there's clear and convincing evidence.  There's evidence that's

21    clear and there's evidence that could convince you.  But, the Judge will tell

22    you that the standard here is not that standard either.  It's a higher standard.

23    Would you bend the law and say, 'well, it's clear and convincing so, therefore,

1   that's good enough'?

2   PROSPECTIVE JUROR:   Well, I still got to hear your side of the story, too.

3                  MR. RION:   Oh, I hear you.  But, my point

4   is, at the end of the day, after I've spoken and they've spoken, everybody's

5   spoken, and I'm not trying to box you in here and I'm not going to, well, I'm

6   just telling you that if the standard is, in your mind after you've heard

7   everything, 'well, it looks like there was convincing evidence and it seems like

8   it was clear evidence', if the Judge reads the standard of beyond a

9   reasonable doubt and you say it's not that far would you have any problem in

10   the world saying not guilty?  That's what the law is; right?  It's a different

11   standard than what's in your living room with your kids.  Right?  My child

12   doesn't -- and I'm a defense attorney.  There's no clear and convincing

13   standard that I apply.  I've convicted my kids on far less than you're ever

14   going to hear in this Courtroom.  That doesn't mean that I'm wrong in doing

15   that.  That's the household.  In your household you error on the side of you're

16   going to do right and if that means that we've got to do this, then fine.  There's

17   an old saying that is -- well, I think Blackstone is one of the guys that started

18   the law and it was repeated by one of the founders, Thomas Jefferson, or

19   somebody that it's better for ten guilty men to go free than for one innocent

20   man to be convicted.  Mr. Griffo, do you disagree with that statement?

21   PROSPECTIVE JUROR:   No.

22                  MR. RION:   'Cause this is a criminal Court

23   and the power then that this Judge would have to impose a sentence for an

1    Aggravated Murder.

2            You hear the stories about every six months or so about someone

3    who's done twenty years, or ten years, or fifteen years in prison, or he's on

4    death row maybe, and then the DNA evidence or some piece of evidence

5    came forward and said it wasn't him; right?  Is everyone familiar with these

6    stories that are out there?  They had twelve jurors who sat there and said,

7    'well, I find beyond a reasonable doubt that this person did X, Y, and Z', and

8    then he's sentenced to life, death, or whatever the Court did or the jury did,

9    depending upon the case.  So, the only thing I'm trying to state to you is that

10   there is a lot of -- well, we can talk and laugh and kind of go through what's

11   this and what's that, but the twelve of you are about to become very much, or,

12   given a sacred task.  That's what, in my mind, it means to be a fair juror - not

13   that you can listen to the evidence and listen to the law and apply it because

14   my four year old could do that.  You are being given a task of making sure

15   that not just in writing, but in spirit, that we don't make a mistake.  The way

16   the Court makes that assurance is by making sure the law is clear.  Is that a

17   fair request to make to you?  Miss Wireman, would you agree with what I'm

18   trying to say?

19   PROSPECTIVE JUROR:  Yes.

20                          MR. RION:  Let me sort of put it another

21   way.  If you were in Mr. Carter's seat would you want those same standards

22   to apply?

23   PROSPECTIVE JUROR:  Yes.

1       MR. RION:   Would you want a juror like

2   yourself on the jury?

3   PROSPECTIVE JUROR:   I want somebody to be honest; yes.

4       MR. RION:   And would you be comfortable

5   with someone like you on the jury if you happened to be charged with

6   something?

7   PROSPECTIVE JUROR:   Say it again?

8       MR. RION:   If you're sitting there, but

9   there's someone like you that holds the qualities of a juror that you would

10  want if you were charged with a crime to judge the case?

11  PROSPECTIVE JUROR:   No, I don't think it would be fair.

12      MR. RION:   You think you could be fair?

13  PROSPECTIVE JUROR:   Yes.

14      MR. RION:   Well, some other things that

15  maybe the law has that are sort of against our instincts a little bit.  So, the first

16  impressions are there.  It doesn't stop now because what happens next is the

17  State gets to give their opening statement tomorrow and they'll tell you what

18  they think the case is going to show.  So, that's a first impression.  I get to go

19  second.  Then the State goes first with evidence.  That's another first

20  impression.  Then I go after that.  So, the case is sort of built in closing

21  arguments.  They go first and then I go.  But, then they go last.  So, these first

22  impressions play out through the whole thing.  Holding off before you make

23  any conclusions and until you hear the whole story is going to be real

1    important, obviously.

2            Miss Coon, in your house did you have kids?  Do you have kids?

3    PROSPECTIVE JUROR:   Yes.

4                        MR. RION:   How many?

5    PROSPECTIVE JUROR:   Three.

6                        MR. RION:   Three?  If your children said

7    'well, the law says that I don't have to explain something to you', -- you asked

8    them a question and they said, 'I'm not going to answer that question', would

9    you hold that against them in your household?

10   PROSPECTIVE JUROR:   Yes.

11                       MR. RION:   That would mean something to

12   you; right?

13   PROSPECTIVE JUROR:   Yes.

14                       MR. RION:   It could mean they must be

15   holding something back because they're not talking; right?  I mean, that's our

16   natural inference that we draw from someone saying that they're not going to

17   talk; right?

18   PROSPECTIVE JUROR:   Uh-huh.

19                       MR. RION:   So, I've gone back in the jury

20   room after a case is over.  My client really didn't have anything to add had I

21   put him on the stand; but, I chose not to put him on the stand because he

22   didn't have much to add.  The jury said, "Well, why didn't your client take the

23   stand?"  So, I explained to them.  I said, "Well, did it make a difference to you

1   that he didn't?"  They said, "Yea, it really did."  The Judge is going to tell you,

2   and this is after the Salem Witch trials where they tried to force people to say

3   things and our history of, well, it goes back thousands of years, but the law

4   says that if the defendant doesn't take the stand you can't in your brain say

5   'why didn't he take the stand'.  Fair?  That's the law; right?  Now, do you guys

6   agree with this law, or disagree with the law?  Let's take a show of hands.

7   Everybody who disagrees with the law that says -- well, not that you don't

8   have the right -- you don't have to take the stand, but if you don't take the

9   stand that you can't think something negative about it.  So, it's two questions.

10  I want to be honest with you because I want to talk this through because it's

11  important.  I don't want 'well, okay, I'll just give him the right answer or

12  whatever'.  Do you think the law is written correctly, or should it be written

13  differently?

14  PROSPECTIVE JUROR:   No, I think it's written correctly.

15                                  MR. RION:   Okay.  And, Miss Oglesbee,

16  do you agree?

17  PROSPECTIVE JUROR:   Yea.

18                                  MR. RION:   Okay.  Does anyone disagree

19  with these two ladies?  That means not just saying 'oh, yea, it's a good law

20  and that's the way it should be', but that means -- and, who knows, but you'll

21  see from the facts what Markelus may or may not know about this event.  The

22  decision might be that, look, we don't have to put on any defense and he can't

23  really aid you in your decision.  He can't add to your process.  So why put him

1   up there and waste time just so I can say that I put him up there?  I mean, do

2   you understand that could be -- well, the law doesn't even allow us to go into

3   why he would or why he wouldn't.  Right?  So, it's just better if he says

4   nothing so no one would hold it against him.  Is that fair?  Miss Dankirt, are

5   you comfortable with that?

6   PROSPECTIVE JUROR:  Absolutely.

7                MR. RION:  Okay.  The Judge will tell you

8   that not only is it the law like the legislature wrote it, but it's the Constitution.

9   He has a Constitutional right.  This is a Constitutional thing.  He'll tell you that

10   you can't use that in any way in your decision making process for or against.

11      Now, I'm not trying to telegraph to you how the case is going to unfold.

12   I'm just telling you that this is the law.   Miss James, are you okay with it?

13   You're sort of thinking, it looks like.

14   PROSPECTIVE JUROR:  No, I'm just listening to you.  I'm listening.

15                MR. RION:  Okay. All right.  Mr. Sterling,

16   do you agree with that?  I mean, it's the Constitution.

17   PROSPECTIVE JUROR:  That's right.

18                MR. RION:  This burden of proof thing.  Mr.

19   Miolen?  Did I say that right?

20   PROSPECTIVE JUROR:  Yes.

21                MR. RION:  What does the burden of proof

22   mean to you?  Like who has -- do you know what the words the burden of

23   proof means?

1    PROSPECTIVE JUROR:   Well, the burden of proof is, I feel, would be the

2    State stating their evidence and you go by the evidence to tell your decision.

3                           MR. RION:   Now, Mr. Sterling said, well,

4    he's going to wait until he hears my side, too.  Trust me - I have things to say

5    here, too.  So, I'm not -- but, in the end, do I have to prove that Markelus

6    Carter is innocent?

7    PROSPECTIVE JUROR:   No.

8                           MR. RION:   In the end, do they have to

9    prove that he's guilty?  Does the State of Ohio have to prove that he's guilty?

10   PROSPECTIVE JUROR:   Yes.

11                          MR. RION:   And guilt means -- there's

12   elements to an offense, like purposely caused the death of another, et cetera.

13   All those elements would have to be shown; right?  You can't say, 'well, I got

14   three out of five and so, therefore, that's good enough'.  They have to prove

15   all five elements to you; right?  The Judge will instruct you on that.

16        The Prosecutor mentioned something about circumstantial and direct

17   evidence.  I believe the analogy that she gave was direct, or, was accurate

18   about the snow.  Let me give you another one, though, just to sort of put it in

19   perspective.  You're out in your backyard.  Imagine a big backyard and so

20   you've got a couple of acres or at least some land there and so much so that

21   you can't see and, well, there's some woods out there.  You hear a gunshot.

22   It's outside of deer season, but it's close, or whatever.  Five minutes later you

23   see this man walking out with a shotgun out of the woods.  Now, Miss Krites,

1   what would you think?

2   PROSPECTIVE JUROR:   Your first thought would probably be 'I wonder if he

3   did that'.  But, that would be assuming.  Assuming means you do not know.

4                   MR. RION:   So, that's drawing an

5   inference.  Then, ten minutes later, on the other side of the woods another

6   guy walks out.  Now, that inference substantially changes now; right?

7   PROSPECTIVE JUROR:   Right.

8                   MR. RION:   So, that's circumstantial

9   evidence.  I grant that there are occasions when snow falls -- when you went

10  to sleep and it's twenty degrees and you can add all the facts you want to it

11  and when you woke up -- well, that's a strong inference.  There are other

12  times when that inference, well, your first thought is 'I heard a noise, I saw

13  something come out, there's clearly a connection between that gunshot and

14  that person coming out', until you see that second person or until the guy

15  says, 'yea, I was back there and I heard a noise', well, I mean, then he

16  explains it all to you.

17          Let me go on direct evidence as well.  Miss Oglesbee, you wear

18  glasses; right?

19  PROSPECTIVE JUROR:   Uh-huh.

20                  MR. RION:   How bad -- if I took your

21  glasses off could you see me clearly?

22  PROSPECTIVE JUROR:   Yea, I could still see you, but probably not as clear

23  as with the glasses on.

1                  MR. RION: Let's assume -- well, my

2 eyesight gets worse daily. So, let's just assume ten years from now and I just

3 really can't see. Okay? So, I'm squinting and I sort of see somebody and I

4 say she's, and I give some quality about you, you're wearing a hat. Okay?

5 That's direct evidence; right? I think I see a hat because my eyesight is bad

6 or whatever, but it's still direct evidence. It's just bad direct evidence because

7 the source of the evidence isn't all that great. So, you can have strong

8 evidence and weak evidence regardless of the type of evidence. I think that's

9 the point. When you assess the weight of the evidence in this case it's not as

10 if circumstantial evidence is great evidence and direct evidence is great

11 evidence. They both can be terrible. They both can be great, I suppose,

12 under certain circumstances. The snow example is a perfect example. So,

13 keep that in mind when you're weighing the evidence because if the inference

14 isn't clear and obvious then maybe the inference isn't accurate. That's the

15 problem with circumstantial evidence.

16        I thought I heard it right, but let me just ask one more time. Has

17 anyone heard about this from the newspaper, or T.V., or in any way

18 whatsoever? Miss Davis, or, Miss James, you heard about it?

19 PROSPECTIVE JUROR: I just -- I seen him on T.V., but I didn't hear what

20 was going on with him. I just remember seeing him. I was walking through

21 the room. That was it.

22                  MR. RION: Going back to first impressions

23 again, obviously people make first impressions, or, impressions. Would that

1   affect you in any way?

2   PROSPECTIVE JUROR:   No, because I didn't know --

3                              MR. RION:   You just walked by and saw it?

4   PROSPECTIVE JUROR:   You know, I knew he was in Court, but I didn't

5   know why.

6                              MR. RION:   That's fair.  The Prosecutor --

7   has anybody here ever been charged with a serious crime, like a really

8   serious crime?  The Prosecutor has gone through a lot of examples - if you, if

9   you had to go and pick up some ashes from a mailbox, or if you are put in a

10  situation that maybe you've never been in before - that you don't know how

11  you would react; right?  I think all of you said, yea, that could be and that it

12  could cause you to act differently than you normally would; right?  Does

13  anyone think that this is an easy thing to be charged with Aggravated

14  Murder?  One time, just to tell a story about stressful events, I was arguing a

15  case in the Court of Appeals and I started turning gray.  My legs started going

16  out.  I was shaking and I can't control.  It was an easy case.  I don't know why

17  it happened; but, it just happened.  To them, and the question that was being

18  asked, I mean, was easy.  It was far less stressful than this because it's

19  stressful trying to go through this case.  Anyone watching me would think that

20  it was maybe my first time in Court, or maybe I hadn't been a lawyer for

21  twenty years, or maybe I must have a thought about the case.  I mean, a lot

22  of things, because I watched it on video, could have been inferred from how I

23  was reacting to the Judges' questions.  But, for whatever reason, it happened.

1  But, everyone agrees that being put in a stressful situation that some people

2  are going to be cold and react very clearly and, you know, some people in

3  emergency situations they're jolly on the spot and they get the tourniquet on

4  and whatever and they stop it and they're calm as can be, and other people

5  become hysterical, right, and just do and say strange things.  Does everybody

6  agree with that?

7       The Prosecutor made a lot about they have to deal with the cards that

8  they were dealt.  There was a couple of references of they don't create the

9  facts, or they have to deal with what they have or whatever.  Do you

10  remember all of that?  Does anyone think that, well, how should I say this,

11  well, that they should be given the benefit of a doubt?  Mr. Griffo, that's

12  probably not an articulate question.  Let me rephrase that.  Do you think their

13  excuse of 'well, we just don't have all of the evidence that we would like, but

14  we have to just deal with the cards that we were given', is that an invitation to

15  somehow find guilt even though they don't have all their cards?

16  PROSPECTIVE JUROR:   No.

17                                    MR. RION:   I have listened to everything

18  you have said and so I don't need to talk to you for an hour and a half and ask

19  a lot of questions.  There's one subject matter that's sort of of interest.  Miss

20  James, -- or, well, Miss Stevens, you knew the Warrington family, at least the

21  extended family, on some level; correct?

22  PROSPECTIVE JUROR:   Yes.  My daughter worked for the deceased's

23  brother.

1          MR. RION:   And I can broaden this out

2  from Mr. Warrington to anybody that's been killed.  We want, as a group, to

3  find the person who did it and then hold them responsible; right?

4  PROSPECTIVE JUROR:   Yes.

5          MR. RION:   So, there's a sympathy level.

6  There's a, well, not an obligation, but sort of an obligation.  We feel obliged to

7  try to solve this; right?  So, that's -- and obviously all of us are going to have

8  sympathy for either Markelus Carter or for Mr. Warrington's family or others.

9  What I think the Court will tell you is that regardless of your desire and natural

10  instinct, your urge, to find someone and hold them responsible and get them

11  because, you know, you're going to see pictures of the person that was killed.

12  There's no question about it.  The question is who, and not what, and not

13  whether.  Will you be able to separate sympathy from your decision and

14  simply look at the facts?  In other words, would you ever find Markelus Carter

15  guilty just because you felt sorry for Mr. Warrington?

16  PROSPECTIVE JUROR:   No.

17          MR. RION:   Does everybody else agree

18  with that?  Again, that's a slightly -- well, you're being asked to do things that

19  in the normal course of your day you're probably not asked to do.  You have

20  to find certain things.  That's why the jury instructions are so important.

21      Now, Miss Stevens, you stated that you had concerns because you

22  didn't want to wrongly convict an innocent person; right?

23  PROSPECTIVE JUROR:   Yes.

1    MR. RION:  All right.  And I bet you I can

2    ask anyone here - Miss Dankirt, do you want to wrongly convict an innocent

3    person?

4    PROSPECTIVE JUROR:  No.

5                MR. RION:  Mr. Shappell?

6    PROSPECTIVE JUROR:  No.

7                MR. RION:  I could ask anybody.  Your

8    statement that the evidence -- I think if I listened to you correctly, and correct

9    me if I'm wrong, but I thought you simply said that it would have to be very,

10   very, very clear.  That's your wording.  If the Judge gives you the instruction

11   that beyond a reasonable doubt, well, you have to translate, I guess in your

12   mind, very, very, very clear to beyond a reasonable doubt and see if those

13   two mesh?  They might.  You might be saying the same thing.  If you're

14   allowed to make sure that the State has proven its case beyond a reasonable

15   doubt before, like you wouldn't even be permitted to find Markelus Carter

16   guilty until and unless they had fulfilled that function, does that cause you

17   some amount of, well, relief isn't the right word, but does it put it in context of

18   what the task is?

19   PROSPECTIVE JUROR:  I don't know what you're saying.

20               MR. RION:  Everybody here shares the

21   feeling that you have that this may be one of the more weightier things that

22   you've ever been asked to do in your life.

23   PROSPECTIVE JUROR:  Uh-huh; correct.

1       MR. RION:  And unless the evidence is

2  there nobody in this box should or, hopefully, would convict; correct?

3  PROSPECTIVE JUROR:  Correct.

4       MR. RION:  If that's the standard that's

5  being applied and you, as a citizen of Allen County, get to uphold that legal

6  standard, would you be able to be fair and impartial?  That's the question.

7  PROSPECTIVE JUROR:  Yea.  Do you mean vote what my conscience and

8  the facts that are in front of me?

9       MR. RION:  Yes.

10  PROSPECTIVE JUROR:  Yes.

11       MR. RION:  Anyone see a picture of a

12  dead person before?  Not just like on CNN or Fox or whatever.  So, that can

13  be thought provoking.  Have you ever seen an autopsy picture before?  I'm

14  getting two, just for the record, Mr. Shappell and Miss Krites that have seen

15  these things I assume from the medical field.  Are you and Miss Krites in the

16  same capacity here?

17  PROSPECTIVE JUROR:  I worked down in surgery, but I did do some

18  (inaudible) at the hospital and we saw a lot of stuff come in and out of there,

19  you know, like pictures and different things.

20       MR. RION:  I'd like to be able to tell you to

21  consider this -- well, it has an effect.  It will affect every one of you and it will

22  cause a reaction to the tragedy that you're going to hear about.  This whole

23  thing that goes to sympathy is going back to the original question.  I'm telling

177

1    you that there is a tragedy that happened on February 23rd, 2009. There's

2    no question about it. Given that, can we look at the facts and not let that

3    emotional overflow create something like a witch hunt? Is that fair?

4            Anybody dealt with jailhouse snitches before? That's a colloquial term

5    for people that are in prison who come forward and make statements against

6    other people. Has anyone had any dealings with them before?

7    PROSPECTIVE JUROR:  Uh-huh.

8                          MR. RION:  What were your dealings?

9    PROSPECTIVE JUROR:  I worked in corrections, so there was a lot of that.

10                         MR. RION:  And in that instance were

11   there situations where people simply were trying to create a way to get out of

12   prison?

13   PROSPECTIVE JUROR:  I don't think it was necessarily a way to get out of

14   prison. I think it was a way to get the other person probably in trouble or

15   whatever.

16                         MR. RION:  Okay. For whatever reason?

17   PROSPECTIVE JUROR:  Yea.

18                         MR. RION:  Prison is not a good place to

19   be; right?

20   PROSPECTIVE JUROR:  Right.

21                         MR. RION:  If you're an inmate.

22   PROSPECTIVE JUROR:  Yea. I worked there.

23                         MR. RION:  You got to go home. But,

1  going in it wasn't necessarily a good thing.  You know about the concept of

2  people trying to -- well, you hear an awful lot of stuff from people in there;

3  right?

4  PROSPECTIVE JUROR:  Yes.

5              MR. RION:  Anybody else had any

6  dealings with inmates trying to say things?  Okay.  Well, the Judge will give

7  you a whole list of factors that you can judge someone's credibility by.  If you

8  thought about it you could probably write out the same list in ten minutes.

9  What someone has to gain or lose would obviously be one of the factors;

10  right?

11          There were a couple -- well, a lot of the witnesses that the State

12  mentioned may be our witnesses.  So, just because the State calls a witness

13  doesn't mean that's the State's witness.  They simply have information and

14  during cross examination I may get out the information that I would have

15  wanted from them and had they not called them I would have called them as

16  a witness.  So, maybe it's not the State's witness/defense witness.  But, they

17  read to you a list of witnesses.  I wanted to add to that some people.

18  Anybody know anybody at B.C.I., the Bureau of Criminal Investigations?

19  They do a lot of the lab work, the forensic work, for the State.  Anyone have

20  any associations with anyone there?  Anybody know a guy by the name of

21  Eric Bennett?  Don Hughes?  Abdul Bari, or, Bari (pronunciation)?  Chaslon

22  Scott?  Steve Savage?  Ken Vicks?  Thomas Smith?  Vickie Bartholimew?

23          I think we're getting to the point in our society where I don't have to

1   ask this question, but I'll ask it.  I'm just going to ask it generically, but it's an

2   important question.  The reason it's important -- let me just give you some

3   statistics.  Whether it's meaningful or not, just so you're aware of the statistics

4   might be helpful.  It deals with the issue of race.  It goes something like this.

5   I'm going to use death penalty cases as an example.  There is no white

6   person on death row for having raped a black woman and then killing her.

7   Okay?  There are nine black people on death row --

8                              MRS. KOHLRIESER:   Your Honor?  I

9   object.  Can we approach just a moment?

10                             THE COURT:   Okay.

11  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

12  the record, as follows.)

13                             MRS. KOHLRIESER:   Jury nullification is a

14  cute idea.  It's not allowed in voir dire.

15                             MR. RION:   No, no, no.

16                             MRS. KOHLRIESER:   Whether these

17  stats. are actually true or not is something totally different.

18                             MR. RION:   They are.

19                             MRS. KOHLRIESER:   He's aimed at jury

20  nullification and he knows damn well what he's doing.

21                             MR. RION:   That's ridiculous.

22                             MR. MILLER:   Of course not.

23                             THE COURT:   I'm going to overrule the

1   objection.

2                         MRS. KOHLRIESER:  Can you also

3   instruct them?

4                         THE COURT:  I'm going to overrule the

5   objection.  Go ahead.

6                         MRS. KOHLRIESER:  Can you also

7   instruct them that these numbers he's throwing out are not any kind of

8   evidence whatsoever?  I don't know if he's telling the truth or not, or

9   embellishing.

10                      THE COURT:  I'm overruling it.

11                      MRS. KOHLRIESER:  Okay.  Well, I'll want

12   an instruction on that.

13   (WHEREUPON, Court continued on the record, as follows.)

14                      THE COURT:  All right.  Go ahead.

15                      MR. RION:  Thank you.  There are nine

16   people on death row where you reverse the races and where a white person -

17   I'm sorry - where a black person raped a white woman and then killed her.

18   Okay?  Those are statistics.  There's biases that are conscious and

19   subconscious and they're direct and indirect.  This isn't a death penalty case.

20   This has nothing to do with rape or sex or anything like that.  Don't get me

21   wrong.  My point is simply that race, though we all, if I asked all of you, would

22   say 'no, of course race isn't an issue; of course it's not; of course it's not'.

23   Sometimes it comes in in weird ways and I just wanted you to be aware of it

1   knowing that, I'm sure, that nobody here would ever make a decision based in

2   any part on race.  But, knowing the statistics simply puts you on notice on

3   that.  So, does everyone agree that race really is not an issue in the

4   Courtroom in 2015?

5   PROSPECTIVE JUROR:   It shouldn't be.

6                                         MR. RION:   It shouldn't be; right?

7   Statistics sometimes show otherwise and we scratch our heads as to why.

8   But, being made aware that these statistical disparities are there could help

9   the jury in trying to make a determination in making sure that it's not part of

10  their decision-making process.  Is that fair?  Obviously me saying it doesn't

11  mean that it's going to clear it out of people's heads; but, I'm in no way saying

12  that anyone here would ever do that.  But, Miss James, I guess you could say

13  that we know it happens from time to time; right?  And I know also having

14  tried a lot of jurys that I've never felt that I had ever met anybody on a jury

15  that had any type of racial bias that came into it.  But, I'm naïve probably in

16  the cases that I've had not thinking that it subconsciously on some level

17  enters into it.  So, that's my only point.  So, just keep it in mind for what it's

18  worth.  But, statistics show that it's a concern.

19          Well, that's pretty much all I have.  Voir dire means that you get to

20  speak and I get to speak.  This is really as much of a time for you to decide

21  whether or not you want this job and whether or not you want to take on this

22  responsibility.  Does anybody have any concerns, questions, or thoughts that

23  they would like to bring to my attention before I sit down?  Okay?

1   PROSPECTIVE JUROR:  I would just like to say I do not want to do this.  I

2   do not feel comfortable doing this.  I absolutely do not want to do this.

3                            MR. RION:  Okay.  I think you've made that

4   clear.  I appreciate you and I appreciate the reasons why.  You've articulated

5   that.  I don't think anybody here wants to take on that responsibility.  But, if --

6   PROSPECTIVE JUROR:  But, I guess what I'm saying is I feel that there's

7   people out there that would maybe like to sit here and I absolutely do not.

8                            MR. RION:  Fair enough.  I hear you and

9   the Prosecutor hears you as well.  The standard is simply, knowing that you

10   don't want to and probably nobody wants to, if you are tasked to do so would

11   you be fair and impartial?  That's the question.  I think you said the answer is

12   'yes'.

13   PROSPECTIVE JUROR:  What other choice do you have?

14                            MR. RION:  Thank you.

15                            THE COURT:  Okay.  Why don't counsel

16   approach?  Did you pass for cause, Mr. Rion, with these twelve?

17                            MR. RION:  Yes, your Honor.

18                            THE COURT:  Okay.  Counsel, approach.

19   Again, ladies and gentlemen, our sound system is not the best in the world.  If

20   you overhear anything at the Bench I'm ordering you to disregard it.

21   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

22   the record, as follows.)

23                            THE COURT:  Do you object to the State's

1  challenge for cause?

2          MR. RION:  I do.

3          MRS. KOHLRIESER:  Just briefly, your

4  Honor.  The way that question was worded to the juror, well, I still don't think

5  she said she would be fair and impartial.  She said she didn't know; she

6  would have a hard time with it.  He asked whether she could put her -- when

7  he asked her directly he talked about whether she could put her sympathies

8  for the victim and his family aside.  He did not ask the reverse - can you put

9  any sympathies you may have for the defendant and getting it wrong aside?

10  That was her big thing is that it's not fair and impartial if you're going to rule

11  out of fear.  That's my concern.

12          THE COURT:  (Inaudible).

13  COURT REPORTER:  Judge, you need to use the microphone.

14          THE COURT:  I'm going to overrule the

15  challenge for cause.  So, we'll go to peremptories then.  Okay.

16  (WHEREUPON, Court continued on the record, as follows.)

17          THE COURT:  Okay, ladies and

18  gentlemen, we're to the final part of the selection process.  So, all of you are

19  still potential jurors.  What the law allows now, after the attorneys have had a

20  chance to ask questions, now the Court calls upon the attorneys and they can

21  ask for a juror to be excused and they don't have to give a reason and there

22  doesn't have to be any further questions.  We call these peremptory

23  challenges.  Each side gets four opportunities.  Each side can exercise all

1    four opportunities, or they can choose not to.  There's really not going to be a

2    reason.  They don't say 'we're excusing so and so because'.  They're just

3    going to ask that a juror be excused.  So, if you are excused at this point you

4    shouldn't feel like 'well, what did I do wrong', or 'why don't they like me'.

5    Don't worry about it.  The law just gives them this right to exercise it for

6    whatever reason and they don't have to state a reason.

7         The other thing I wanted to say is that the statements from counsel

8    during voir dire and during opening statements are not evidence.  The things

9    that are brought up, while there might be some examples and there might be

10    some hypotheticals, you haven't heard any evidence yet.  So, I wanted to just

11    make sure that was clear.

12         Also, and I think Mr. Rion made this clear, again, this is not a death

13    penalty case.  You don't have to consider punishment and you can't consider

14    punishment if you're chosen as a juror in this case.  You just judge the

15    evidence, the testimony of the witnesses, the exhibits, and make a decision

16    based upon that and not take into consideration what, or, if the person is

17    found guilty what the punishment might be.  That should not enter into your

18    considerations at all.

19         So, the State may exercise a first peremptory, if you wish to.

20                    MRS. KOHLRIESER:  Yes, your Honor.

21    Thank you.  The State would thank and excuse Miss Stevens.

22                    THE COURT:  Miss Stevens, you're

23    excused with our thanks.  Next prospective juror, please?

1    LINDA THAYER, DEPUTY CLERK OF COURTS:   Jennifer Gresham.

2                            THE COURT:   How are you doing?

3    PROSPECTIVE JUROR:   Good.

4                            THE COURT:   Okay.  I didn't even have to

5    tell you which seat to take.  You got the idea.  Have you been able to hear

6    everything thus far?

7    PROSPECTIVE JUROR:   Yes.

8                            THE COURT:   Has anything come out

9    either in a question, or a response from other jurors, or anything that was

10    discussed that as you sat back there you thought, 'as soon as I get up there

11    I've got to tell them this because it has a bearing on my ability to be fair and

12    impartial'.  Anything that's come up?

13    PROSPECTIVE JUROR:   No, sir.

14                            THE COURT:   Okay.  Do you think you

15    could be fair and impartial in a case like this?

16    PROSPECTIVE JUROR:   I do.

17                            THE COURT:   The time that we've talked,

18    maybe two weeks, maybe possibly a little longer, does that present any

19    problems that you couldn't be fair and impartial?

20    PROSPECTIVE JUROR:   No.

21                            THE COURT:   Very good.  The State may

22    inquire of Miss Gresham.

23                            MRS. KOHLRIESER:   Hi, Miss Gresham.

1   How are you?

2   PROSPECTIVE JUROR:  Good.

3                          MRS. KOHLRIESER:  Miss Gresham,

4   obviously you heard all of our questions.  Anything that I asked, or Mr. Rion

5   asked, for that matter, that you thought, 'oh, you know, I should probably tell

6   the Court when I get up there'?

7   PROSPECTIVE JUROR:  No.

8                          MRS. KOHLRIESER:  Okay.  I want to ask

9   you a couple of specific questions on a couple of things.  Mr. Rion mentioned

10  in his voir dire about watering it down for burden of proof and things like that

11  and he likened things to your kids and your living room.  I hope you didn't take

12  my questions that I was likening this to trying to decipher between your kids

13  and who to believe.  That's only a starting point.  What kind of things do you

14  look at, and I'm going to start with your children, to tell whether they're telling

15  the truth?

16  PROSPECTIVE JUROR:  Just the way they behave to each other and who's

17  covering for who.  My kids are close in age, so I can usually tell.  There's like

18  facial expressions or little tell tales they do that I look for.

19                          MRS. KOHLRIESER:  And that's because

20  you know them; right?

21  PROSPECTIVE JUROR:  Yes.

22                          MRS. KOHLRIESER:  How do you go

23  about handling it with someone that you don't know like you know your

1  children?

2  PROSPECTIVE JUROR:   I concentrate on -- eye contact is big, but I watch

3  for nervousness and, you know, if they seem uncertain about answering a

4  question.  Delays.

5       MRS. KOHLRIESER:   Okay.

6  PROSPECTIVE JUROR:   Hesitant.

7       MRS. KOHLRIESER:   Do you think

8  somebody might be nervous sitting up here on this stand and answering

9  questions even if they're telling the truth?

10  PROSPECTIVE JUROR:   Yes.

11       MRS. KOHLRIESER:   A little nerve

12  wracking for you maybe sitting here answering my questions?

13  PROSPECTIVE JUROR:   A little.

14       MRS. KOHLRIESER:   And obviously

15  nobody's really trying to assess your credibility or anything like that.  You're

16  just answering questions about yourself; right?

17  PROSPECTIVE JUROR:   Right.

18       MRS. KOHLRIESER:   But, it's kind of

19  nervous being in the hot seat; isn't it?

20  PROSPECTIVE JUROR:   It is.

21       MRS. KOHLRIESER:   Okay.  Now, let's

22  talk about this statement of proof a little bit.  Mr. Rion was absolutely right that

23  it is the State of Ohio's responsibility to prove anybody guilty beyond a

1   reasonable doubt.  Do you agree with that?

2   PROSPECTIVE JUROR:  Yes.

3               MRS. KOHLRIESER:  I'll just tell you that

4   it's a burden that I take very seriously.  Quite frankly, I take great pride in that

5   burden because I don't want to wrongfully convict somebody.  Do you believe

6   that of me?

7   PROSPECTIVE JUROR:  I do.

8               MRS. KOHLRIESER:  Do you think I want

9   to wrongfully convict somebody?

10   PROSPECTIVE JUROR:  No.

11              MRS. KOHLRIESER:  Do you have any

12   impressions that Detective Clark wants to wrongfully convict somebody?

13              MR. RION:  Objection.

14              THE COURT:  Overruled.

15              MRS. KOHLRIESER:  And I agree with Mr.

16   Rion that it is a high standard - beyond a reasonable doubt; correct?

17   PROSPECTIVE JUROR:  Yes.

18              MRS. KOHLRIESER:  And Mr. Rion, I

19   think, used the examples of the preponderance, clear and convincing, and

20   reasonable doubt.  Were you listening to that part of it?

21   PROSPECTIVE JUROR:  Yes.

22              MRS. KOHLRIESER:  And Miss Stevens,

23   who was sitting in the seat before you, answered some questions, and I don't

1   know whether you will recall them, about answering all of the questions and

2   being concerned that maybe she'll get it wrong.  Do you remember those

3   answers?

4   PROSPECTIVE JUROR:  Yes.

5                    MRS. KOHLRIESER:  I mean, that's pretty

6   fair; right?  Nobody wants to get it wrong; correct?

7   PROSPECTIVE JUROR:  Correct.

8                    MRS. KOHLRIESER:  Do you understand

9   that since the beginning of the Constitution, the beginning of this country,

10   that's been the standard in every criminal case?

11   PROSPECTIVE JUROR:  I do.

12                    MRS. KOHLRIESER:  Do you know that

13   there are a significant number of people that are convicted and there is a

14   number of people that aren't convicted; correct?

15   PROSPECTIVE JUROR:  True.

16                    MRS. KOHLRIESER:  Do you understand

17   that that same task is assigned to every Prosecutor in every case in every

18   state in this nation day in and day out?

19   PROSPECTIVE JUROR:  Yes.

20                    MRS. KOHLRIESER:  Mr. Rion also

21   mentioned some things about people on death row who have been sitting

22   there for twenty years, or however long and, for instance, DNA exonerated

23   them.  Do you understand that science has moved significantly --

1   PROSPECTIVE JUROR:   Yes.

2                              MRS. KOHLRIESER:   -- in just the last ten

3   years?  The tests that we have available today weren't necessarily tests that

4   we had available twenty years ago.  With that said, do you watch shows like

5   C.S.I. and those types of things?

6   PROSPECTIVE JUROR:   Sometimes.

7                              MRS. KOHLRIESER:   Do you understand

8   that a lot of those tests are fictional?

9   PROSPECTIVE JUROR:   Sure.

10                             MRS. KOHLRIESER:   Do you understand

11  that I can't take a bug and say, 'oh, yes, this body was exposed to the

12  southern region of California between 1980 and 1982 and sat there for

13  approximately five days'?  Do you understand that that's fictional?

14  PROSPECTIVE JUROR:   Sure.

15                             MRS. KOHLRIESER:   I'm going to give

16  you an example of one of my favorite ones ever from C.S.I.  There was a

17  murder and they had video of a flower shop and these two brothers were

18  arguing.  There was no sound, but you could tell they were like mad at each

19  other.  You could tell by their body language and things like that.  They

20  noticed in the background one of the leaves of one of the plants moving every

21  time they talked and they were able to take those vibrations from the plants

22  and figure out every word spoken in that conversation to find out who was the

23  murderer.  That's T.V.; right?

1   PROSPECTIVE JUROR:   Yes.

2                                MRS. KOHLRIESER:   Are you going to

3   hold me to some kind of burden that's not even there?  Maybe some day they

4   can do it.  You know, I heard chuckles.  But, maybe some day they can

5   actually do it.  But, do you understand that it is what it is?  You know, I'm sure

6   they would have loved to have had DNA forty years ago.  But, it wasn't there

7   yet; right?

8   PROSPECTIVE JUROR:   Right.

9                                MRS. KOHLRIESER:   I'm sure the ladies

10  in the fifties and sixties that had to wash and set their hair would have just

11  loved to have, you know, curling irons readily available.  But, are you going to

12  hold me to some standard of something that isn't there?  I cannot create tests

13  that don't exist.

14  PROSPECTIVE JUROR:   I accept that.

15                               MRS. KOHLRIESER:   That's what I was

16  talking about in my earlier voir dire - I cannot create evidence that isn't there.

17  In fact, I would be in trouble if I did that; wouldn't I?

18  PROSPECTIVE JUROR:   I would think so.

19                               MRS. KOHLRIESER:   If I said, "Oh, look,

20  here's a fingerprint," and it's one I planted there; right?

21  PROSPECTIVE JUROR:   Yes.

22                               MRS. KOHLRIESER:   Do you understand

23  that if Miss Stevens burden in her mind which she would need to find

1  someone guilty, every question answered to her satisfaction, that you

2  wouldn't necessarily ever be able to hold anybody accountable for any

3  criminal actions? That's what I mean about reasonable. That's why I was

4  asking those questions about the snow versus cotton balls. That's why when

5  Mr. Rion was talking about, you know, you've never been to law school and

6  you haven't taken legal classes necessarily, well, that's the beauty of twelve

7  jurors is that you come here and use your mind and you apply common sense

8  to what you hear here. There's not some talismanic formula. I can't take you

9  to a class that will help you be a lie detector. Even lie detector tests are

10  subject to some flaws. In fact, they're not even usable in Court. Did you

11  know that?

12  PROSPECTIVE JUROR: I didn't.

13            MRS. KOHLRIESER: Okay. Because

14  they're not infallible. There's too many risks. Let me ask you for yourself --

15  and, again, I use Miss Stevens as an example. I don't use her -- she's

16  entitled to her opinions. Like I said, there's no wrong answer. But, she

17  becomes a good example, quite frankly, of what we're talking about. Say a

18  witness can't tell you whether your shirt was pink or red, or maybe Miss Durr

19  says your shirt is pink and Miss Oglesbee says, no, it's red. It's kind of like

20  my hair example. Even if that question wasn't definitively answered, but they

21  could say, 'oh, yea, brown hair, her face, she's wearing a gold necklace, she

22  was wearing khaki pants', and all that type of thing, could you find someone

23  guilty -- or, could you not -- let me ask you this way - could you find that

193

1   person not guilty because you didn't have that one question about was it a

2   red top or pink top answered?  Would that hold you up?

3   PROSPECTIVE JUROR:  I don't think it would hold me up.  I think it would

4   be dependent on everything else you had that you did have and not one piece

5   that you were missing.

6                              MRS. KOHLRIESER:  Exactly.  That's one,

7   I guess, one cog in the machine; right?

8   PROSPECTIVE JUROR:  Right.

9                              MRS. KOHLRIESER:  Because you have

10  to determine -- you know, it's hard to answer that in the abstract; right?  You

11  have to see, well, what else is there besides the color of the shirt; right?

12  PROSPECTIVE JUROR:  Right.  Right.

13                             MRS. KOHLRIESER:  I felt like, and this is

14  just my take on it, and I could be wrong, but that Miss Stevens had some fear

15  of getting it wrong.  Do you think you ought to make your decision, guilty or

16  not guilty, because you're worried about messing up?

17  PROSPECTIVE JUROR:  No.

18                             MRS. KOHLRIESER:  Sometimes you've

19  got to trust what you saw, what you heard, and what you know to make a

20  decision.

21  PROSPECTIVE JUROR:  Yes.

22                             MRS. KOHLRIESER:  Any problem with

23  that?

1  PROSPECTIVE JUROR:   No.

2  MRS. KOHLRIESER:   And just like Mr.

3  Rion asked about the sympathy for the Warrington family and what happened

4  to Kenneth Warrington, I think it's natural for people to have some sympathy

5  for someone on trial; would you agree?

6  PROSPECTIVE JUROR:   Sure.

7  MRS. KOHLRIESER:   Mr. Rion talked

8  about the importance of this decision; correct?  Are you able to put aside the

9  sympathy that you may end up having for the victim's family and the

10  sympathy you may end up having for the defendant and/or his family and

11  judge this case based upon what evidence you actually get?

12  PROSPECTIVE JUROR:   Yes.

13  MRS. KOHLRIESER:   And that's what we

14  mean by not considering punishment because that's not material to whether

15  the person did it or not.  That's what you're going to be called to say - is this

16  person guilty of this crime.  Plain and simple.  Now, I say plain and simple but,

17  again, I don't mean to, you know, downplay it.  It's certainly a serious

18  decision.  But, that's your question.  Any problems with that?

19  PROSPECTIVE JUROR:   No.

20  MRS. KOHLRIESER:   Let me give you a

21  scenario about the direct and circumstantial evidence.  Again, it's one Mr.

22  Rion brought up about hearing a gunshot and being in the woods.  He

23  mentioned seeing a hunter, or somebody, come out with a gun over their

1  shoulder five minutes later, and then he mentioned maybe ten minutes later

2  another person comes out with a gun over their shoulder. You don't actually

3  know who fired that one shot; do you?

4  PROSPECTIVE JUROR: No.

5  MRS. KOHLRIESER: Okay. All right. If

6  you were called upon to answer that question might it influence your decision

7  if the one that comes out holding the gun is also dragging a fresh deer that's

8  bleeding?

9  PROSPECTIVE JUROR: It might.

10  MRS. KOHLRIESER: It might? Okay.

11  What if he drug it up to you and you were able to see that that was a bullet

12  hole in that deer and that it was bleeding profusely right then and this deer is

13  freshly dead and the other guy doesn't have anything.

14  PROSPECTIVE JUROR: Then I would probably infer that the one that

15  brought it to you probably killed it.

16  MRS. KOHLRIESER: Okay. But, again, it

17  all depends upon how much comes to you; right?

18  PROSPECTIVE JUROR: Right.

19  MRS. KOHLRIESER: You don't want to

20  make that decision based on just seeing somebody come out of the woods.

21  Well, not a definitive decision. I think it was Miss Krites who said something

22  about you would be assuming.

23  PROSPECTIVE JUROR: Right.

1                      MRS. KOHLRIESER:   There could be all

2   kinds of things - how big the area is; how long it took them to get there; you

3   know, there's a number of things that would factor into ultimately whether you

4   decided that that was the person that made the shot; correct?

5   PROSPECTIVE JUROR:   Yes.

6                      MRS. KOHLRIESER:   Okay.  Lastly, Mr.

7   Rion talked about first impressions.  I guess I want to ask you when he talked

8   about, you know, the State gets the first impression of, you know, what you

9   saw of, you know, the defendant and what you heard Judge Reed say and

10   things like that.  I don't want to get too personal, but have you ever gone to

11   church?

12   PROSPECTIVE JUROR:   Yes.

13                      MRS. KOHLRIESER:   Ever know

14   somebody that goes every week, dresses to the nines, always there for

15   whatever is needed, and sinning Monday through Saturday?

16   PROSPECTIVE JUROR:   Yes.

17                      MRS. KOHLRIESER:   If you just saw that

18   person on Sunday you might think, 'oh, there's a good Christian lady', or,

19   'good Jewish woman', or whatever church you want to go to.  So, first

20   impressions aren't always accurate; are they?

21   PROSPECTIVE JUROR:   Not always.

22                      MRS. KOHLRIESER:   Mr. Rion mentioned

23   about they don't get out of your mind.  Have you ever had a first impression

1    totally squashed?

2    PROSPECTIVE JUROR:   Sure.

3                         MRS. KOHLRIESER:   And when you think

4    of that person do you think of them in terms of the first impression or do you

5    think about the terms of what you finally found out about that person?

6    PROSPECTIVE JUROR:    What you know about them now.

7                         MRS. KOHLRIESER:   Okay.  So, you can

8    put that aside and see it for what it is; right?  Or, them for who they are;

9    correct?

10   PROSPECTIVE JUROR:   You might remember that it was your first

11   impression, but it doesn't mean you got to hold on to it.

12                        MRS. KOHLRIESER:    It doesn't mean it's

13   your lasting impression; does it?

14   PROSPECTIVE JUROR:   Right.

15                        MRS. KOHLRIESER:   And you need to

16   hear everything in order to make that determination; don't you?

17   PROSPECTIVE JUROR:   Yes.

18                        MRS. KOHLRIESER:   The last thing I'm

19   going to ask you, you heard my scenario.  I think it was Mr. Shappell, and I

20   apologize because I'm not sure if it was him, but I talked about a rape case

21   and you might expect to find semen, or DNA, or that type of thing.  Do you

22   remember me talking about it always surprises jurors when there's not

23   physical evidence when you're talking about a small child?

198

1 PROSPECTIVE JUROR:  Uh-huh.

2 MRS. KOHLRIESER:  And, again, there

3 can be a variety of reasons for that; right?

4 PROSPECTIVE JUROR:  Right.

5 MRS. KOHLRIESER:  Let me ask you how

6 you would feel, or, how you think you would feel, I guess I should say, if in a

7 rape case there's no semen, there's no DNA linking that person, does it mean

8 that the rape didn't happen?

9 PROSPECTIVE JUROR:  Not necessarily; no.

10 MRS. KOHLRIESER:  Does it mean that it

11 wasn't necessarily that person?

12 PROSPECTIVE JUROR:  No.

13 MRS. KOHLRIESER:  Would you have to

14 listen to what the victim actually came in and said and told you about?

15 PROSPECTIVE JUROR:  Yes.

16 MRS. KOHLRIESER:  Would you consider

17 things like that victim's motive for saying those things?

18 PROSPECTIVE JUROR:  Yes.

19 MRS. KOHLRIESER:  The pressure,

20 perhaps, that the person was under?

21 PROSPECTIVE JUROR:  Yes.

22 MRS. KOHLRIESER:  Something we often

23 look for in cases like that is would you look at the opportunity the person had

1    to be alone with that child to do something like that?

2    PROSPECTIVE JUROR:  Yes.

3                    MRS. KOHLRIESER:  That's what I meant

4    by the cards we're dealt.  Mr. Rion asked some questions regarding that and I

5    guess I wanted to hear your feelings on this as well.  Do you understand that

6    the State doesn't choose who the victim is?

7    PROSPECTIVE JUROR:  Yes.

8                    MRS. KOHLRIESER:  The State doesn't

9    choose what color that victim is, either; does it?

10   PROSPECTIVE JUROR:  No.

11                   MRS. KOHLRIESER:  Do you know that,

12   and I don't know the statistics and I'm not going to stand here and act like I

13   do, I don't have a report for that, but there are people in prison on death row,

14   and this isn't a death row case, but on death row of white people who have

15   killed white people, black people that have killed black people, black people

16   that have killed white people, and white people that have killed black people,

17   and in that mix I'm sure there's Hispanic people, and Asian people, and all

18   kinds of things like that with killing the same race and killing other races;

19   correct?

20   PROSPECTIVE JUROR:  Yes.

21                   MRS. KOHLRIESER:  Do you think race is

22   going to play into your decision in any way, shape, or form?

23   PROSPECTIVE JUROR:  No.

200

1                            MRS. KOHLRIESER:  Nothing further at

2  this time, your Honor.  We'd pass for cause.

3                            THE COURT:  Do you pass for cause for

4  this juror?  Do you pass for cause?

5                            MR. MILLER:  Do you pass for cause?

6                            MRS. KOHLRIESER:  Oh, yes.  I thought I

7  said that.  I'm sorry, your Honor.

8                            THE COURT:  Okay.  Mr. Rion, any inquiry

9  of this potential juror?

10                          MR. RION:  Thank you.  Good evening.

11  You come from a family of law enforcement; correct?

12  PROSPECTIVE JUROR:  I do.

13                          MR. RION:  Is it your father that's --

14  PROSPECTIVE JUROR:  No.

15                          MR. RION:  Alexander is your son?

16  PROSPECTIVE JUROR:  He's my son; yes.

17                          MR. RION:  And he's in law enforcement

18  and Todd -- well, how is Todd related to you?

19  PROSPECTIVE JUROR:  He's my husband.

20                          MR. RION:  And he's in law enforcement?

21  PROSPECTIVE JUROR:  Corrections; yes.

22                          MR. RION:  And you have another son

23  who is also in security in the Air Force?

201

1    PROSPECTIVE JUROR:   Yes.

2                        MR. RION:   So, you talk probably a lot

3    about investigations and stuff like that with them; right?  A little bit?

4    PROSPECTIVE JUROR:   Not too often.

5                        MR. RION:   Not specific cases, but general

6    ideas on --

7    PROSPECTIVE JUROR:   Sometimes.  Not a lot.

8                        MR. RION:   Do you remember when we

9    lost the space shuttle, when it blew up?

10   PROSPECTIVE JUROR:   Yea.

11                       MR. RION:   And do you remember that

12   there was a long period of time when NASA said that we don't want to

13   investigate one particular avenue over another for fear that we'll keep

14   investigating the wrong thing and reach a conclusion based upon our

15   investigation when really we should be looking over here?  Do you remember

16   all of that?

17   PROSPECTIVE JUROR:   Not really.  Not really.

18                       MR. RION:   Okay.  Do you agree with the

19   concept?

20   PROSPECTIVE JUROR:   Yes.

21                       MR. RION:   Do you agree that sometimes

22   if you keep looking in one direction you'll find things that will sort of fit and

23   start to look a certain way simply because you're looking in that direction?

1    about one thing and tell the truth about another thing; right?

2    PROSPECTIVE JUROR:   Yes.

3                    MR. RION:   And be mistaken, or give you a

4    mixed bag in what's going on with that person; right?

5    PROSPECTIVE JUROR:   Uh-huh.

6                    MR. RION:   Do you believe that you would

7    be able to parse that out and figure out the motives for this statement, or that

8    statement, or that with the various witnesses to figure out what weight to give

9    what they're trying to say and try to figure out why it is, well, if you look at

10   other evidence in relation to this evidence why it wouldn't be accurate?

11   PROSPECTIVE JUROR:   I don't understand the question that you're asking.

12                    MR. RION:   Because someone is untruthful

13   about one thing does that mean they're untruthful about all things?

14   PROSPECTIVE JUROR:   No.

15                    MR. RION:   So, the question is, when

16   you're looking at a situation would you be able to spend some time analyzing

17   why people said what they said and whether it was a flat out cold lie or

18   whether or not it was said for a reason and had nothing to do with the case?

19   PROSPECTIVE JUROR:   I would like to think I could do that.  But, I'm never

20   going to know that person's motive.  I'm only going to think I know that

21   person's motive.

22                    MR. RION:   It would be easier if you knew

23   them your whole life; right?

1   PROSPECTIVE JUROR:  Yes.

2               MR. RION:  So, if we were able to look at

3   every witness you couldn't be on the jury unless you knew everybody who

4   was going to testify because then you would really be able to figure out,

5   'okay, so that's so and so and I know his book and he's this and he's that'.  I

6   mean, then you would be able -- we want to exclude people because they

7   know them, but actually the opposite might be more effective for trying to

8   figure out the truth of what's really going on; right?  Sometimes.

9   PROSPECTIVE JUROR:  And maybe not.

10              MR. RION:  Yea; right.

11   PROSPECTIVE JUROR:  I mean, you can think you know someone and not

12   know them.

13              MR. RION:  Fair enough.  I don't have any

14   other questions.  I've listened to your responses and obviously you've heard

15   everything everyone has asked.  Do you have any questions for me?

16   PROSPECTIVE JUROR:  No, sir.

17              MR. RION:  Okay.  Thank you.  Pass for

18   cause.

19              THE COURT:  Okay.  Thank you.  Now as

20   you make your way back, Mr. Rion, the defense has a peremptory if you wish

21   to exercise it.

22              MR. RION:  I thank Miss Gresham.

23              THE COURT:  Okay.  Miss Gresham,

1  thank you. You're excused. Next potential juror, please?

2  LINDA THAYER, DEPUTY CLERK OF COURTS: Jeremy Castle.

3  THE COURT: Good afternoon, Mr. Castle.

4  How are you?

5  PROSPECTIVE JUROR: Pretty good.

6  THE COURT: Okay. Have you been able

7  to hear everything thus far?

8  PROSPECTIVE JUROR: Yes.

9  THE COURT: Okay. Anything that's come

10  up either by question from counsel or by the Court, or any responses from

11  any other jurors, or any concept of idea that raised in your mind some issues

12  that you think might interfere with your ability to be fair and impartial in a case

13  like this?

14  PROSPECTIVE JUROR: Not that I can think of.

15  THE COURT: Okay. I noticed your shirt.

16  Did you watch the game last night?

17  PROSPECTIVE JUROR: Yes. I was up very late.

18  THE COURT: All right. You know, a lot of

19  people probably were. Are you okay, I mean, in terms of staying awake?

20  PROSPECTIVE JUROR: Yes.

21  THE COURT: There are no more night

22  games, I don't think, for the next couple of weeks, or on weeknights. But, are

23  you able to serve if we need you for a couple of weeks?

1   PROSPECTIVE JUROR:  Yes.

2                              THE COURT:  Okay.  The State may

3   inquire of number eight.

4                              MRS. KOHLRIESER:  Hi, Mr. Castle.  How

5   are you?

6   PROSPECTIVE JUROR:  Pretty good.

7                              MRS. KOHLRIESER:  You're in the roofing

8   business?

9   PROSPECTIVE JUROR:  Yes.

10                             MRS. KOHLRIESER:  Are you working a

11  lot right now?

12  PROSPECTIVE JUROR:  Yea, pretty much.

13                             MRS. KOHLRIESER:  And I know Judge

14  asked you about any questions that we've asked so far that kind of ring a bell.

15  Anything about missing work during this time of year over the next several

16  days that's going to cause you too much financial hardship?  Do you think

17  you'll be all right?

18  PROSPECTIVE JUROR:  No, I'm good.  I've been saving up for the past

19  couple of months, so I'm all right.

20                             MRS. KOHLRIESER:  Okay.  All right.  Let

21  me ask you - I see you checked here 'no' as to whether anybody in your

22  family has been convicted of a crime or been the victim of a crime.  Do you

23  work with a lot of different people in the roofing business?

1    PROSPECTIVE JUROR:  Yea.

2                             MRS. KOHLRIESER:  You work with

3    people that have been convicted of crimes?

4    PROSPECTIVE JUROR:  There's a few of them that's on probation right

5    now.

6                             MRS. KOHLRIESER:  Okay.  Any thoughts

7    you have one way or the other about those folks?

8    PROSPECTIVE JUROR:  It doesn't affect me at all.  They seem all right.

9    There are some shady ones that don't last if they -- well, I can't think of the

10   word --

11                            MRS. KOHLRIESER:  If they're not coming

12   into work, or they're using drugs, or they're doing whatever they're not

13   supposed to be doing?

14   PROSPECTIVE JUROR:  Yea.  If they're not doing what they're supposed to

15   be doing they don't last long.

16                            MRS. KOHLRIESER:  Have you ever

17   talked with any of them about their cases or what landed them where they

18   are?

19   PROSPECTIVE JUROR:  A couple of times if they --

20                            MRS. KOHLRIESER:  Shared.

21   PROSPECTIVE JUROR:  Yea, if they shared.

22                            MRS. KOHLRIESER:  It's not like you're

23   asking them, 'hey, what are you in for'?

1    PROSPECTIVE JUROR:  Yea.

2                              MRS. KOHLRIESER:  It's not like you're

3    asking like that; right?  Anything about the conversations you've had, the

4    experiences you've had, that left any kind of impression one way or the other

5    for the judicial system, or criminal defendants, or anything of that nature one

6    way or the other with you?

7    PROSPECTIVE JUROR:  No, not really.

8                              MRS. KOHLRIESER:  Is it fair to say that,

9    just like with everything, there's some people who have committed a crime

10   and they're not necessarily some horrible person; right?

11   PROSPECTIVE JUROR:  Yea.  You don't have a bad opinion if --

12                             MRS. KOHLRIESER:  And, likewise, there

13   are some people -- there are good and bad in every job; right?

14   PROSPECTIVE JUROR:  Yea.

15                             MRS. KOHLRIESER:  There's good and

16   bad in all walks of life; right?

17   PROSPECTIVE JUROR:  Yea.

18                             MRS. KOHLRIESER:  And there's a lot of

19   gray in-between; isn't there?

20   PROSPECTIVE JUROR:  Uh-huh.

21                             MRS. KOHLRIESER:  So, I imagine, and

22   I'm kind of at this end of the category, when you're out there roofing on a hot

23   ninety degree day I imagine that when you get off work you don't look your

1   absolute best; do you?

2   PROSPECTIVE JUROR:   No.  Usually you're pretty dirty.

3                              MRS. KOHLRIESER:   Okay.  But, again,

4   coming into Court today you're not roofing and you cleaned up and you look

5   nice and that's probably how you normally look when you're not working;

6   right?

7   PROSPECTIVE JUROR:   Yep.

8                              MRS. KOHLRIESER:   So, would you say

9   first impressions aren't always accurate impressions?

10  PROSPECTIVE JUROR:   Yea.  I've met a few people that impressions later

11  on down the road weren't what you think of them from when you first meet

12  them.

13                             MRS. KOHLRIESER:   Okay.  And, again,

14  your chair seems to be the hot chair right now.  Like Miss Gresham before

15  you, you might remember what your first impression was, but does that mean

16  that's what you keep the whole time?

17  PROSPECTIVE JUROR:   No, not really.

18                             MRS. KOHLRIESER:   Different facts come

19  into play?  Different information comes to you?

20  PROSPECTIVE JUROR:   Yea, you find out certain aspects of people's lives

21  after you get to know them.  You thought a certain way and you might think of

22  them different later down the road.

23                             MRS. KOHLRIESER:   Okay.  Are you

1    familiar with the term 'don't judge a book by its cover'?

2    PROSPECTIVE JUROR:   Yea.

3                    MRS. KOHLRIESER:   Would you agree

4    there are some times, you know, I've got a nice suit on and I might look a

5    certain way, but if you saw me at Walmart on a Saturday when I've run out of

6    toilet bowl cleaner and I run to Walmart I might look a little different; right?

7    PROSPECTIVE JUROR:   You might have a few curlers in your hair or

8    whatever.

9                    MRS. KOHLRIESER:   No, no, I wouldn't

10    have curlers in my hair. But, sometimes I might not have a brush. But, do

11    you see what I'm saying?

12    PROSPECTIVE JUROR:   Yea.

13                    MRS. KOHLRIESER:   You can't just look

14    at a person and right instantly know?

15    PROSPECTIVE JUROR:   Yea.

16                    MRS. KOHLRIESER:   Okay. But,

17    sometimes your first impression is your right impression; isn't it? Anything

18    you think in your past that you bring to the table one way or the other that you

19    think you couldn't be fair and impartial?

20    PROSPECTIVE JUROR:   No. I've known people on both sides there. You

21    know, like not following a lawful path. But, they'd be all right when they're

22    around, well, around me. But, you know, well, whatever they want to do they

23    can do. I mean, --

1               MRS. KOHLRIESER:  Any problems you

2   have following the law even if you don't necessarily agree with it?

3   PROSPECTIVE JUROR:  No.

4               MRS. KOHLRIESER:  You know you better

5   than anybody else in this room; right?  Would you consider yourself a

6   follower, or a leader, or sometimes both, depending?

7   PROSPECTIVE JUROR:  Like on roofing, if there's a job that needs to be

8   done and you don't feel something's right, well, you've got to sometimes

9   speak up and say, 'hey, this ain't how we should be doing this'.  I mean, you

10   can be a follower, but sometimes you've got to say, 'hey, this ain't how we

11   should be doing this'.  Sometimes you've got to be a follower and then turn

12   into a leader on the roof.

13              MRS. KOHLRIESER:  Okay.  So, for

14   instance, you know, if there's something that's not right that roof could

15   collapse; right?

16   PROSPECTIVE JUROR:  Yea.  Like, 'hey, we should be tying off', you know,

17   something, or some safety issue, you know, and somebody's not doing

18   something safe you've got to tell them and, hey, you can't just be quiet.

19   You've got to let them know, 'hey, you're not supposed to be doing that.  Get

20   away from the edge'.  They might think they know more than you, but then

21   you might have to speak up and say, 'hey, you shouldn't be doing that.  That's

22   not the way we do it'.

23              MRS. KOHLRIESER:  And you don't have

1    any problem being that person?

2    PROSPECTIVE JUROR:   No.

3                                    MRS. KOHLRIESER:   You heard the

4    examples that myself and Mr. Rion have given regarding reasonable doubt,

5    and hunting scenarios, and snow scenarios, and that type of thing?

6    PROSPECTIVE JUROR:   Yes.

7                                    MRS. KOHLRIESER:   And, again, I'm just

8    going to use that seat - Miss Stevens' answers versus Miss Gresham's

9    answers.  Would you tend to follow Miss Gresham's answers or Miss

10   Stevens' answers?  Miss Stevens was the first lady.  Miss Gresham was the

11   one who just got dismissed.

12   PROSPECTIVE JUROR:   I would go with making my own opinion depending

13   on what was presented to me.

14                                   MRS. KOHLRIESER:   Do you think that

15   you can put whatever sympathies that you may have aside, whether that

16   sympathy is for the victim or that sympathy is towards the defendant and

17   judge this case based upon what you hear, and see, and reason?

18   PROSPECTIVE JUROR:   Yea, I would hope so, depending on what you

19   guys presented.  Hopefully it's a strong enough case.

20                                   MRS. KOHLRIESER:   Now, you just used

21   the word 'hopefully'.  Would you have any problem if you believed that the

22   State of Ohio presented sufficient evidence, and you were convinced beyond

23   a reasonable doubt that the defendant did it, of finding him guilty?

1 PROSPECTIVE JUROR: No, I wouldn't.

2      MRS. KOHLRIESER: Okay. If you think

3 that the State did not meet its burden, that we don't present sufficient

4 evidence to find the defendant guilty beyond a reasonable doubt, would you

5 have a problem voting not guilty?

6 PROSPECTIVE JUROR: I would not have a problem voting either way.

7 Depending on if you prove your case and you've got sufficient evidence, I

8 would vote guilty or not guilty, depending on how strong the evidence is.

9      MRS. KOHLRIESER: Okay. Are you

10 willing to wait and listen and hear everything before you reach those

11 conclusions, instead of saying 'oh, that lady goes to church every Sunday and

12 she sure does like nice and that's a good Christian woman', when you don't

13 know what she's doing behind closed doors Monday through Saturday?

14 PROSPECTIVE JUROR: Yea.

15      MRS. KOHLRIESER: You're going to wait

16 to have those doors opened? Okay. Thank you, your Honor. Well, actually

17 one last question. Mr. Rion touched on it and I meant to address it with

18 everybody. But, there are going to be some photographs shown in this case

19 and they're going to be both the scene where Kenneth Warrington was killed,

20 with him there, and the autopsy that was conducted to determine his cause of

21 death. They're not rainbows and kittens. Anything you know about yourself

22 that you think you're not going to be able to handle that?

23 PROSPECTIVE JUROR: I'm actually a deer hunter, so I've actually -- well,

1   not a human, but I've seen --

2                    MRS. KOHLRIESER:  Do you think you

3   would be okay with that?

4   PROSPECTIVE JUROR:  I would be all right with seeing it.

5                    MRS. KOHLRIESER:  Okay.  Thank you.

6   We pass for cause.

7                    THE COURT:  Okay.  Mr. Rion, questions

8   of this potential witness (sic)?

9                    MR. RION:  Thank you, your Honor.

10                   MRS. KOHLRIESER:  Do you mean juror,

11   your Honor?

12                   THE COURT:  Oh, yea.

13                   MR. RION:  Good afternoon.  Your last

14   answer, if you don't mind, if I can put you on the spot a second.  There's no

15   wrong answer, so don't think I'm coming at you.  Maybe it just slipped out;

16   but, let's just handle it.  Your answer was, 'hopefully you guys have a strong

17   enough case' or something like that.  What did you mean by that?

18   PROSPECTIVE JUROR:  I hope that they would have all the facts that would

19   require them to have to prove -- if they maybe don't have all the facts then I

20   couldn't see putting a guilty verdict out there if I didn't feel that they presented

21   a strong enough case.

22                   MR. RION:  Okay.  It's just the word

23   'hopefully'.  It was that word.  Hopefully means that you hope that they have.

1   I mean, that's the way I heard it.  That's the way Mr. Carter would have heard

2   it; I assume.  Did you mean by that -- well, I'm just trying -- I'm just trying to

3   make sure there's not --

4   PROSPECTIVE JUROR:   I know that sometimes people go to trial that may

5   be innocent that they may have been in the vicinity but might not have -- but,

6   the deer hunting case, well, maybe the kid dragging the deer had a different

7   gauge than the gunshot.  But, you assume that that guy, the first one, might

8   have shot it because he had --

9                          MR. RION:   So, let me ask you.  If a juror,

10  if a potential juror, said it this way to the Prosecutor, "I hope -- well, hopefully

11  you guys do not have enough evidence to prove the case."  Would you think

12  that answer would be odd?  Why?

13  PROSPECTIVE JUROR:   Because then they would assume that he would

14  be innocent.

15                         MR. RION:   Because he's taking sides for

16  it; right?

17  PROSPECTIVE JUROR:   Yea.

18                         MR. RION:   So, can I -- and it doesn't

19  make any difference to me what the answer is - are you taking sides?

20  PROSPECTIVE JUROR:   No.

21                         MR. RION:   Okay.  So, the answer was, 'I

22  hope you wouldn't bring me here if you didn't have something to tell me'.

23  PROSPECTIVE JUROR:   Yea.

1        MR. RION:  'But, I'm not going to be one

2 way or the other, I'm going to call it exactly the way I see it, however that is'.

3 PROSPECTIVE JUROR:  Yea.  Hopefully we'll be presented with a strong

4 enough case.  That's why we're all here.

5        MR. RION:  Okay.  Or, not.  I mean -- well,

6 do you want a certain result I guess is what I'm trying to say?

7 PROSPECTIVE JUROR:  No.  It doesn't matter to me.

8        MR. RION:  And would you want someone

9 like yourself on the jury if say a family member of yours was on trial?

10 PROSPECTIVE JUROR:  I think so.

11        MR. RION:  Why?

12 PROSPECTIVE JUROR:  Because I would listen to both sides and come to a

13 conclusion of who made a stronger case.

14        MR. RION:  On the who makes the

15 stronger case, do you expect me to -- do you think I have to prove his

16 innocence to you?

17 PROSPECTIVE JUROR:  No.

18        MR. RION:  Do you think I have to make

19 any case?

20 PROSPECTIVE JUROR:  No.

21        MR. RION:  I mean, obviously I'm not

22 going to go over there and just start sleeping.  But, the point is, I don't carry,

23 or, I don't have to make a case to you of innocence; right?  I can put holes in

1    their case. I can put on evidence if I so choose. I can show you my angles of

2    the case; right? But, none of that is necessary or required.

3    PROSPECTIVE JUROR: No.

4                         MR. RION: Okay. Thank you.

5                         THE COURT: Pass for cause?

6                         MR. RION: Yes, your Honor. Okay. I just

7    want the record to reflect that it is four-thirty. I was aiming for four-thirty to

8    end the day. I'd like to go on and complete this process. Is there any

9    potential juror that has a problem if we continue and get this done today so all

10    of you don't have to come back? Fourteen of you are going to come back. Is

11    there someone who has a problem? There's a hand up in the audience.

12    Your name, please?

13    PROSPECTIVE JUROR: Sarah Shine.

14                         THE COURT: Okay. You talked to Monica

15    about an employer that you're supposed to contact by five o'clock?

16    PROSPECTIVE JUROR: Yes.

17                         THE COURT: And that's an in-person

18    contact?

19    PROSPECTIVE JUROR: Yes.

20                         THE COURT: You can't call them on the

21    phone?

22    PROSPECTIVE JUROR: Well, I can call them on the phone and let them

23    know that I have to come back.

1                        THE COURT:   Okay.  If someone from the

2   Court was there to confirm that you're here, would that help?

3   PROSPECTIVE JUROR:   Yes.

4                        THE COURT:   And then you could stay on

5   and get this done?

6   PROSPECTIVE JUROR:   Yes.

7                        THE COURT:   I don't know if you're going

8   to be on the jury or not.  Would that work?

9   PROSPECTIVE JUROR:   Yes, if I could make that call.  Yes.

10                     THE COURT:   Let's take a five minute

11   break.  If you want to see Shelly out front, if she's still here.  If she's not,

12   Monica can help you make a call.  Then if they need, we'll get on the phone

13   and say that we're from the Court and 'she's still here', will that work?

14   PROSPECTIVE JUROR:   Yes.

15                     THE COURT:   Does anybody else have an

16   issue?

17   PROSPECTIVE JUROR:   Well, how many hours are you talking?

18                     THE COURT:   That's a better question for

19   the lawyers.  I'm done talking.  It's up to the lawyers.

20                     MR. RION:   I hear you.

21                     THE COURT:   I don't know.  They've got

22   four opportunities for peremptories.  Each side has exercised one.  I don't

23   anticipate it in terms of plural hours, but, who knows.

1   PROSPECTIVE JUROR:   Do we get take out with this?

2                    MRS. KOHLRIESER:   Your Honor, in all

3   seriousness and, again, this is largely guess work, with the number of

4   preempts. we have I can't see us going much past five-thirty, if then, to give

5   them an idea.  Obviously I can only control one side of it.

6                    THE COURT:   So, another hour or so?  If

7   you need to make calls home to let people know where you're at, that's okay,

8   as long as you don't say 'I'm on this murder case and this is what it's about'.

9   You can make those calls.  Does anybody else have an issue?  Oh, right

10  here?  Your name?

11  PROSPECTIVE JUROR:   My name is Katherine Morvay.  I just know that I'm

12  not going to be able to do the whole two weeks of the trial because I start

13  school next week.

14                   THE COURT:   Where at?

15  PROSPECTIVE JUROR:   UNOH.

16                   THE COURT:   Okay.  Classes start next

17  week?

18  PROSPECTIVE JUROR:   On Monday.

19                   THE COURT:   And if you miss the first

20  week you're going to be behind?

21  PROSPECTIVE JUROR:   Yea.

22                   THE COURT:   What are you studying?

23  PROSPECTIVE JUROR:   Medical office management.

1          THE COURT:   Any objection if I excuse

2    her?

3          MRS. KOHLRIESER:   Oh, no, your Honor.

4    Sorry.

5          THE COURT:   Okay.  What was your

6    name again?

7    PROSPECTIVE JUROR:  Katherine Morvay.

8          THE COURT:   All right.  You're excused.

9    PROSPECTIVE JUROR:  Thank you.

10          THE COURT:   Now we've got all the hands

11    coming up.  Sir, your name?

12    PROSPECTIVE JUROR:  Christopher Lake.  I'm in class now.  So, two

13    weeks is going to put me behind, too.

14          THE COURT:   Where at are you in school?

15    PROSPECTIVE JUROR:  Rhodes.

16          THE COURT:   Okay.  What are you

17    studying?

18    PROSPECTIVE JUROR:  Environmental health and safety.

19          THE COURT:   What year are you?

20    PROSPECTIVE JUROR:  What's that?

21          THE COURT:   What year?

22    PROSPECTIVE JUROR:  I graduate next semester.

23          THE COURT:   So, a couple of weeks

1   would put you so far behind it might jeopardize your schooling? Any objection

2   if we let this juror go?

3                          MRS. KOHLRIESER: No, your Honor. He

4   had actually indicated that on his questionnaire.

5                          THE COURT: Okay.

6                          MR. RION: No, your Honor.

7                          THE COURT: And, again, your name

8   again?

9   PROSPECTIVE JUROR: Chris Lake.

10   BAILIFF: Judge, what are their names?

11                         THE COURT: Pardon?

12   BAILIFF: What are their names again?

13                       THE COURT: What was your name?

14   PROSPECTIVE JUROR: Lake, L-A-K-E.

15                       MRS. KOHLRIESER: Number sixty-two,

16   Monica.

17   LINDA THAYER, DEPUTY CLERK OF COURTS: Christopher Lake.

18                     THE COURT: And the last one?

19                     MRS. KOHLRIESER: Was number

20   forty-five.

21   LINDA THAYER, DEPUTY CLERK OF COURTS: Katherine Morvay.

22                     THE COURT: She was forty-five. So,

23   forty-five and sixty-two.

1    BAILIFF:   Thank you.

2                        THE COURT:   Anybody else if we go --

3    you're excused, sir.  Anybody else if we go another hour or so?  We'll try to

4    keep it moving.  But, I want to give the one juror a break to go call her

5    employer and everybody else if you need to make phone calls or arrange for

6    rides to show up.  Tell them to shoot for five-thirtyish.  We'll stick around.  We

7    won't leave you late here or staying here all by yourself.

8            All right.  Let's take a short break of five or ten minutes and then get

9    right back to this.  The State will have its next peremptory when we come

10   back.

11   (WHEREUPON, COURT WAS IN RECESS.)

12

13   **(VOLUME ONE CONCLUDED.)**

14

15

16

17

18

19

20

21

22

23