FILED

2016 MAR 23  PM 1:05

IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

--------------------------------------------------------------------------------

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO.  CR2014 0139 |
| Plaintiff | * | |
| | | **TRANSCRIPT -** |
| -VS- | * | JURY TRIAL |
| **MARKELUS Q. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

--------------------------------------------------------------------------------

## A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio  45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

**(VOLUME 2 OF 10)**

684  50

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# TABLE OF CONTENTS

## (VOLUME 2 OF 10)

**TUESDAY, SEPTEMBER 8, 2015 - CONTINUED -**

| | |
|---|---|
| CONTINUATION OF PEREMPTORY CHALLENGES | 223 |
| JURY SWORN AT 5:31 P.M. | 266 |
| PEREMPTORY CHALLENGE ON ALTERNATE | 278 |
| ALTERNATES SWORN AT 5:45 P.M. | 283 |
| REMAINING PROSPECTIVE JURORS RELEASED | 283 |
| INSTRUCTIONS AND ADMONITIONS TO JURY | 283 |
| COURT RECESSED FOR DAY AT 5:52 P.M. | 288 |

**WEDNESDAY, SEPTEMBER 9, 2015 -**

| | |
|---|---|
| COURT COMMENCED AT 8:54 A.M. | 289 |
| INSTRUCTIONS REGARDING JURY VIEW | 289 |
| JURY EXCUSED FOR JURY VIEW | 290 |
| DISCUSSION REGARDING STATE'S TWO MOTIONS FOR USE OF INTENDED EVIDENCE | 292 |
| MOTION FOR SEPARATION OF WITNESSES - KOHLRIESER | 295 |
| COURT RULING - MOTION FOR SEPARATION OF WITNESSES GRANTED | 296 |
| CONTINUED DISCUSSION REGARDING STATE'S TWO MOTIONS FOR USE OF INTENDED EVIDENCE | 296 |
| COURT RULING - MOTION GRANTED REGARDING 2007 INCIDENT | 303 |

COURT RULING - MOTION DENIED REGARDING
    2004/2005 ACTS INVOLVING KENNETH BRAYSHAW    304

DISCUSSION REGARDING L.P.D. SUBPOENAS    305

INSTRUCTIONS GIVEN ON NOTE TAKING    314

OPENING STATEMENT - MILLER    315

OPENING STATEMENT - RION    324

STATE'S FIRST WITNESS -
    FAYE WARRINGTON - KOHLRIESER    332
                - RION    344

STATE'S SECOND WITNESS -
    PAM CALLAHAN - KOHLRIESER    351
                - RION    358

STATE'S THIRD WITNESS -
    SONYA HUGHES - MILLER    361

VOLUME TWO CONCLUDED    418

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**NOTE:**  THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE.  SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS.  HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT
     436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED
     BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND
     HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED
     BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436
     MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
     POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
     POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT
     BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED
    FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED
    AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT
    AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT
    AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE
    WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT
    WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE
    AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM
    (ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE
    AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S
CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS-
MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS-
MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM
AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA
STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND
AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET
SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND
PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFEL IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSCT9 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK
AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN
STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK
EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT
436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND
PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
    SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
    KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
    HEAD/NECK;

## DEFENDANT'S EXHIBITS -

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
    WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
    MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET
AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET,
SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN
STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH
BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH
BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE
IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON
MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING
AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH WITH CAMOUFLAGE
CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT
    122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - **(NOT ADMITTED BY
    COURT)**;

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING
    AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN
     STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY
     CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE
     NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A.
     MOORE;

DD - JUDGMENT ENTRY ON SENTENCING  IN STATE OF OHIO -VS-
     JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R.
     FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON **(WITHDRAWN BY THE
     DEFENSE)**;

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS-
     STEPHEN UPHAM, LUCAS CO. CASE NO.
     G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING
FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR
VICKIE BARTHOLOMEW;

## **COURT'S EXHIBITS** -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND
STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW)
BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED
A.C.S.O. OFFENSE REPORTS;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2          THE COURT:   Okay.  We're reconvening

3    this 8th day of September, 2015 in CR2014 0139, State of Ohio -vs- Markelus

4    Q. Carter.  The defendant is present in Court with counsel.  The State is

5    present.  The jurors that are remaining, the prospective jurors that are

6    remaining, have returned to the Courtroom.

7          I do want to put on the record that during that break one other juror,

8    and I'm trying to find her number, --

9          MRS. KOHLRIESER:   Number fifty-four,

10   Sarah Shine.

11          THE COURT:   Okay.  Number fifty-four

12   had provided the Court, with counsel present in chambers, some information

13   that disqualified her as a juror based upon a prior conviction for a felony.  The

14   Court inquired of her in chambers with counsel present.  She explained the

15   situation.  So, she has been excused.  Is there any objection to excusing that

16   juror from the State?

17          MR. MILLER:   No, your Honor.

18          THE COURT:   From the defense?

19          MR. RION:   No, your Honor.

20          THE COURT:   All right.  So, fifty-four is no

21   longer here.  Let's move forward as quickly as possible, again, giving

22   everybody a fair opportunity to inquire.  The State may exercise a second

23   peremptory, if you wish to.

1          MRS. KOHLRIESER:   Thank you, your

2   Honor.  The State would thank and excuse Miss Durr.

3          THE COURT:   Okay.  Next prospective

4   juror, please?

5   LINDA THAYER, DEPUTY CLERK OF COURTS:   Kristy Brown.

6          THE COURT:   Take the second seat there

7   in the back row.  Miss Brown, how are you?

8   PROSPECTIVE JUROR:   Good.

9          THE COURT:   Have you been able to hear

10  everything thus far?

11  PROSPECTIVE JUROR:   Yes.

12          THE COURT:   You had brought up

13  something earlier.  It seems like years ago.  But, you had a concern?

14  PROSPECTIVE JUROR:   It was my wife's cousin was involved, or, was the

15  victim of a murder.

16          THE COURT:   That's right.  The one over

17  in Delphos in the cornfield.

18  PROSPECTIVE JUROR:   Yes.

19          THE COURT:   And you didn't think that

20  was going to influence -- if I recall, you told me that you think you could put

21  that aside and that wouldn't influence your decision in this case if you were

22  chosen as a juror.

23  PROSPECTIVE JUROR:   Yes, sir.

1          THE COURT:   Do you still feel that way?

2    PROSPECTIVE JUROR:   Yes, sir.

3          THE COURT:   Have you heard everything

4    else - all the other questions, all the principles that we've explained?

5    Anything come up that as you sat back there in further contemplation said,

6    'you know, I'd love to do this, but I just don't think I can be fair and impartial'?

7    Anything like that come up?

8    PROSPECTIVE JUROR:   No.

9          THE COURT:   The State may inquire.

10          MRS. KOHLRIESER:   Hi, Miss Brown.

11   How are you?

12   PROSPECTIVE JUROR:   Good.

13          MRS. KOHLRIESER:   I'm familiar with the

14   situation over in Delphos.  Do you understand, and maybe you don't, that that

15   was investigated by a totally different agency?  That was a county case.  The

16   Lima Police Department had nothing to do with it.

17   PROSPECTIVE JUROR:   Yes.

18          MRS. KOHLRIESER:   Okay.  The facts

19   and circumstances of that case obviously are different from the facts and

20   circumstances in this case; correct?

21   PROSPECTIVE JUROR:   Right.

22          MRS. KOHLRIESER:   I also noticed that

23   your wife was, as you've marked down, was a witness for a patient at work.

1    That was a criminal case; wasn't it?

2    PROSPECTIVE JUROR:   Yes.

3                         MRS. KOHLRIESER:   Was there anything

4    about -- I guess let me ask you this.  Did you talk with her at all about what

5    she had to do, what she was talking about, or her feelings about testifying or

6    anything?

7    PROSPECTIVE JUROR:   No, not really.

8                         MRS. KOHLRIESER:   Okay.  So, nothing

9    about her experience, you know, left one way or the other with you; right?

10   PROSPECTIVE JUROR:   Right.

11                        MRS. KOHLRIESER:   Okay.  Let me just

12   ask you - anything about the experience with, well, I believe you said it was

13   her cousin?

14   PROSPECTIVE JUROR:   Yes.

15                        MRS. KOHLRIESER:   With her cousin that

16   left a bad taste in your mouth one way or the other - the way law enforcement

17   handled it, or the way the Court system handled it, or I guess just the facts of

18   it in general?

19   PROSPECTIVE JUROR:   No.  I really wasn't that close to it.

20                        MRS. KOHLRIESER:   And, again, you've

21   heard our questions and so I won't belabor them.  But, particularly the

22   standard of proof questions that we asked, and we've asked them several

23   times and I'm actually starting to lose my voice, so congratulations that

1    means less questions.  Would you be able to put aside any sympathy that you

2    may feel for the victim's family or the defendant and his family?

3    PROSPECTIVE JUROR:   Yes.

4                              MRS. KOHLRIESER:   What do you think

5    about what the previous potential jurors had to say regarding, you know,

6    'there can't be a doubt in my mind in order for me to find him guilty'?

7    PROSPECTIVE JUROR:   Well, it's, you know, the law that we have to, or,

8    you have to prove your case beyond a reasonable doubt and so I'll follow

9    those guidelines and he is innocent until proven guilty.

10                             MRS. KOHLRIESER:   Okay.  Anything

11   about, again, I guess, and I don't know how to put this, but holding us to a

12   higher standard?  Do I need to find that bug for you that tells you that the last

13   breath the victim took was at five thirty-two P.M.?

14   PROSPECTIVE JUROR:   No.

15                             MRS. KOHLRIESER:   Okay.  Any

16   problems that you have over the next couple of weeks being able to sit here

17   and judge this case?

18   PROSPECTIVE JUROR:   No.

19                             MRS. KOHLRIESER:   Okay.  And I think

20   you had -- oh, no.  For some reason I thought your children were younger.

21   They're able to take care of themselves; correct?

22   PROSPECTIVE JUROR:   They're not even in the state.

23                             MRS. KOHLRIESER:   Okay.  All right.  It's

1   not like you're having to worry about getting them to school or anything like

2   that; right?

3   PROSPECTIVE JUROR:   No.  We just moved the last one to Michigan last

4   weekend.  So, we're good.

5                               MRS. KOHLRIESER:   Okay.  So, they're

6   off to college - bye, see you, write home every now and then?

7   PROSPECTIVE JUROR:   Yep.

8                               MRS. KOHLRIESER:   Okay.  All right.

9   Thank you, your Honor.  We would -- well, actually, let me ask you real quick.

10  I know your wife is a nurse.  You work at Macy's?

11  PROSPECTIVE JUROR:   Yes.

12                              MRS. KOHLRIESER:   Anything about --

13  you know, I told you about the type of pictures and the type of case that we're

14  talking about.  Why I ask is because I had a murder case, and it wasn't mine

15  actually, it was another Prosecutor in our office, and I don't know how to be

16  delicate about this, but I personally have seen lots of blood and gore and very

17  bad crime scenes and that type of thing, and in this particular case, not to

18  downplay it, but it wasn't that particularly kind of gruesome type of crime

19  scene.  Are you understanding what I'm saying?

20  PROSPECTIVE JUROR:   Uh-huh.

21                              MRS. KOHLRIESER:   And we had a juror

22  who went down, literally.  She couldn't take it and had to get removed.  We

23  had an alternate take her spot.  Anything that you think, well, that makes you

1    queasy, or you don't want to have to see that type of stuff, or you --

2    PROSPECTIVE JUROR:   No.  Our dinner conversations sometimes revolve

3    around that stuff.  So, I'm good.

4                                    MRS. KOHLRIESER:   All right.  Thank you.

5    We'd pass for cause, your Honor.

6                                    THE COURT:   Mr. Rion, do you care to

7    inquire?

8                                    MR. RION:   I have one question.  If you

9    can give Markelus a fair trial raise your hand.  Thank you.

10                                   THE COURT:   I just want to follow-up with

11   just a technical question because --

12                                   MR. RION:   I was trying to keep it short,

13   Judge.

14                                   THE COURT:   This is quick.  On the

15   master list it's listed as Hrinko; but, that name is changed to Brown; right?

16   PROSPECTIVE JUROR:   Yes, sir.

17                                   THE COURT:   I just want to make sure we

18   have the right, or, the same person.  Okay.  All righty.  Both sides have

19   passed for cause.  Mr. Rion, the defense has a second peremptory, if you

20   wish.

21                                   MR. RION:   Can we approach?  I have a

22   quick question.

23                                   THE COURT:   Sure.

1    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

2    the record, as follows.)

3                                    MR. RION:   Do you want us to exercise

4    from the box?  In other words, the peremptories, I guess aren't for the people

5    out of the box, but in the box?

6                                    THE COURT:   Yes.

7                                    MR. RION:   Okay.  Okay.

8    (WHEREUPON, Court continued on the record, as follows.)

9                                    THE COURT:   Mr. Rion?

10                                   MR. RION:   I would thank juror number

11   four, Karen Wireman.

12                                   THE COURT:   Okay.  You're excused.

13   Thank you for coming in.  Thank you for your patience.  Next prospective

14   juror, please?

15   LINDA THAYER, DEPUTY CLERK OF COURTS:   Jack McDermitt.

16                                   THE COURT:   Okay.  Hello, again, Mr.

17   McDermitt.  How are you?

18   PROSPECTIVE JUROR:   Good.

19                                   THE COURT:   We did talk to you earlier.

20   You're a firefighter and obviously work with the Police Department on

21   occasion if there's some criminal investigation along with a fire.

22   PROSPECTIVE JUROR:   Yea, and accidents.

23                                   THE COURT:   And accidents.  I noticed I

1    think when some of the names of some of the witnesses were read off, and it

2    looked like at least from your expression and I know you raised your hand,

3    that some of those people you are familiar with?

4    PROSPECTIVE JUROR:   Yes, and especially Calvin Woodruff.  I work with

5    him.

6                             THE COURT:   Because he used to be on

7    the Police Department, but now he's --

8    PROSPECTIVE JUROR:   He used to be on the Police Department.  He's on

9    the Fire Department; yes.

10                           THE COURT:   I don't know, is he a

11    witness?  He was on the Police Force in '09?

12                           MRS. KOHLRIESER:   He is.  He's a very

13    minor witness; but, yes, he is a witness.

14                           THE COURT:   Okay.  Well, I mean,

15    nevertheless, --

16    PROSPECTIVE JUROR:   But, I'm familiar with the majority of the officers

17    that are at L.P.D.

18                           THE COURT:   Okay.  Well, there are going

19    to be a lot of officers testifying, as well as a lot of lay persons testifying.

20    Based upon your contact with law enforcement and your interaction with them

21    do you feel just because they might wear a uniform that they should be given,

22    or, tested by a different test for credibility as opposed to a lay person?

23    PROSPECTIVE JUROR:   No.

1    THE COURT:   Everybody is subject to the

2    same test --

3    PROSPECTIVE JUROR:   Everybody; yea.

4    THE COURT:  -- of believability?  There

5    might be some -- would you agree there might be some police officers that

6    based upon how they testify you might not believe based upon all of the

7    circumstances and all the evidence?

8    PROSPECTIVE JUROR:   Yea.

9    THE COURT:   You're not going to just say,

10   'well, they're police officers and I've worked with them before and, by God,

11   what they say I'm going to believe no matter what else anybody says'?

12   Would you take that attitude?

13   PROSPECTIVE JUROR:   No, I would not.

14   THE COURT:   And you're a firefighter?

15   You're not an arson investigator?

16   PROSPECTIVE JUROR:   No.

17   THE COURT:   But, you understand a little

18   bit about what it might take in the investigation of an accident or an arson?

19   PROSPECTIVE JUROR:   Yea.

20   THE COURT:   Given that, and working

21   with investigators at the time, do you feel like you can say, 'okay, I'm going to

22   give everybody the same, and listen to, and I'll judge everybody equally no

23   matter who presents it and try to sort it all out'?

1    PROSPECTIVE JUROR:   Yea.

2                              THE COURT:   Do you think then your

3    occupation or your interaction with law enforcement is going to influence the

4    way you look at this case at all?

5    PROSPECTIVE JUROR:   No, I don't believe it would.

6                              THE COURT:   You could be fair and

7    impartial?

8    PROSPECTIVE JUROR:   Yea.

9                              THE COURT:   Firefighters have to be fair

10   in assessing what's going on; right?

11   PROSPECTIVE JUROR:   Yea.

12                             THE COURT:   All right.  The State may

13   inquire of this potential juror.

14                             MRS. KOHLRIESER:   Hi, Mr. McDermitt.

15   How are you?

16   PROSPECTIVE JUROR:   I'm okay.

17                             MRS. KOHLRIESER:   I just want to make

18   sure that we're clear.  Obviously you mentioned that you work with Calvin

19   Woodruff and, as I indicated, he is a witness in this case.  I guess in the

20   scheme of things I would qualify him as a minor witness but, obviously, he

21   has something to add.  Are you willing to put aside whatever you know about

22   him, whatever you know about any of the police officers that may come into

23   the Courtroom, and assess their credibility based upon what you see here

1    and all the evidence surrounding it?

2    PROSPECTIVE JUROR:  Yes.

3                          MRS. KOHLRIESER:  Any pressure you

4    feel, like, 'oh, if I don't vote guilty them guys are never going to let me live this

5    down'?

6    PROSPECTIVE JUROR:  No.

7                          MRS. KOHLRIESER:  Okay.  Do you

8    consider yourself a pretty fair and impartial person?

9    PROSPECTIVE JUROR:  I like to think so; yes.

10                         MRS. KOHLRIESER:  Okay.  I'll ask you

11   what Mr. Rion's asked.  If you were the State of Ohio or you were the

12   defendant in this case would you want someone like you as a juror?

13   PROSPECTIVE JUROR:  Yea.

14                         MRS. KOHLRIESER:  Are you

15   open-minded and you'll listen to people?

16   PROSPECTIVE JUROR:  Yea.

17                         MRS. KOHLRIESER:  Do you have any --

18   I'm guessing in fire situations there are times when you kind of have to take

19   control of the situation?

20   PROSPECTIVE JUROR:  Yea.

21                         MRS. KOHLRIESER:  Any problem with

22   that?

23   PROSPECTIVE JUROR:  No.

1          MRS. KOHLRIESER:   Now, I just want to

2    make sure - there are times when the Fire Department does assist the police

3    in various types of things as well; correct?

4    PROSPECTIVE JUROR:   Yea.

5          MRS. KOHLRIESER:   Not just a fire?

6    PROSPECTIVE JUROR:   Yea.  We interact on medical calls, car accidents

7    where somebody's been hurt.

8          MRS. KOHLRIESER:   All right.  Were you

9    working for the Fire Department in 2009?

10   PROSPECTIVE JUROR:   Yes.

11         MRS. KOHLRIESER:   Okay.  Do you recall

12   whether you ever came to any type of murder investigation during that time?

13   PROSPECTIVE JUROR:   I do not remember being there at that time; no.

14         MRS. KOHLRIESER:   Okay.  Again, I

15   realize you work for the City and so there's some different requirements.  Any

16   problem you're going to have sitting here for the next couple of weeks?

17   PROSPECTIVE JUROR:   No.

18         MRS. KOHLRIESER:   Thank you.  We'd

19   pass for cause, your Honor.

20         THE COURT:   Mr. Rion, do you want to

21   inquire?

22         MR. RION:   I would.  Thank you.  Good

23   afternoon, sir.

1   PROSPECTIVE JUROR:   Hi.

2                              MR. RION:   I just want to go through the

3   list of witnesses that you are familiar with or have a relationship with.  How

4   many of the officers did you have, or Detectives, do you have an

5   understanding of or a relationship with?

6   PROSPECTIVE JUROR:   Do you mean interactions through work?

7                              MR. RION:   Yea.

8   PROSPECTIVE JUROR:   I don't know them all by name, but I'm pretty sure

9   I've interacted with about every officer on the Police Force.  I've been on the

10  department for sixteen years.

11                             MR. RION:   Okay.  So, Kleman, Marik,

12  Neidemire, Godfrey?

13  PROSPECTIVE JUROR:   At some point in my career I'm sure I've --

14                             MR. RION:   How about Detective Clark?

15  PROSPECTIVE JUROR:   I'm not sure I've ever met Detective Clark.

16                             MR. RION:   So, Woodruff is a friend you're

17  closer to than the others?

18  PROSPECTIVE JUROR:   Yea.  He's on the Fire Department.  I was his

19  supervisor when he first came to the Fire Department.

20                             MR. RION:   So, you have a pretty direct

21  understanding of him?

22  PROSPECTIVE JUROR:   Yea.

23                             MR. RION:   Does he know you're here?

1    PROSPECTIVE JUROR:   No.

2                                    MR. RION:   Would he be at work today

3    and you're here?

4    PROSPECTIVE JUROR:   We have three different shifts.  He's on a different

5    shift now.

6                                    MR. RION:   You understand the concern;

7    right?

8    PROSPECTIVE JUROR:   Yea.

9                                    MR. RION:   So, is it legitimate at all?  I

10   mean, again, there's a roomful of people here that can take your position.  So,

11   if you're not the man for this case, that's fine.  I just have to understand from

12   your point of view on this one.

13   PROSPECTIVE JUROR:   Well, I'd like to think I'd be able to listen to the

14   information.

15                                    MR. RION:   Well, like to think is good.  But,

16   is that as strong as you can say is that you would like to think that you would

17   treat the officers like everybody else whether you knew them or not?  So, you

18   couldn't say 'yes', -- yes, you can and you would like to think that you would,

19   but consciously or sub-consciously you might be judging them or what they're

20   saying and the importance of it based upon your relationships with them;

21   correct?  Is that fair?

22   PROSPECTIVE JUROR:   Yea, it's fair.  I think you do that with anybody that

23   you know.

1          MR. RION:   Yea, sure.  And the more you

2   know them the more you're going to skew it.  So, the point it, and we were

3   talking earlier, it might be smart to do it in the reverse - the person who knows

4   everyone the most be the judge as opposed to the people that don't have any

5   information.  Well, you are sitting in the position where you have certain

6   information that you're probably going to import if you're picked on the case

7   about those witnesses.  There's just no way in my mind that you couldn't.

8   Right?  Do you agree?

9   PROSPECTIVE JUROR:   Yea.

10          MR. RION:   And, given that, obviously

11   fairness isn't the question.  I have no reason to believe that you're not

12   completely fair.  Impartial, though, only because you have already made up

13   your mind before the trial has even begun as to the character and quality of

14   evidence that certain witnesses would put on the stand.  It's not a negative

15   thing.  It's just in this case -- I mean, if you can't be -- if you're going to import

16   that information in, then it would affect your impartiality.  Would you agree?

17   PROSPECTIVE JUROR:   Yea.

18          MR. RION:   Okay.  So, in this case is it fair

19   to say that though you could be fair, given the relationship you have with this

20   whole list of people, and I could go on, and some of them you might not know

21   their name, but you know their face when they get up there, that you could

22   not, at least outside looking in, be impartial; is that fair?

23   PROSPECTIVE JUROR:   Yea, probably.

1          MR. RION:   Okay.  All right.  I appreciate

2   your honest answers.  Okay.  Thank you.

3          THE COURT:   Do you pass for cause?

4          MR. RION:   No, your Honor.  We would

5   assert a cause on this.

6          THE COURT:   Why don't you approach

7   quickly?

8   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

9   the record, as follows.)

10          THE COURT:   Do you object to the

11   challenge?  Do you guys want to state it?

12          MRS. KOHLRIESER:   Yes, your Honor.

13   That was basically Mr. Rion (inaudible).

14          THE COURT:   He answered his questions.

15   I'm going to allow it.  I'm going to excuse him.

16          MR. RION:   Thank you.

17   (WHEREUPON, Court continued on the record, as follows.)

18          THE COURT:   Mr. McDermitt, you're

19   excused.  Next potential juror, please?

20   LINDA THAYER, DEPUTY CLERK OF COURTS:   Trixie Coolidge.

21          THE COURT:   We're getting there, folks.

22   How are you this afternoon?

23   PROSPECTIVE JUROR:   Good.

1           THE COURT: Okay. Have you been able

2   to hear everything thus far?

3   PROSPECTIVE JUROR: Yes.

4           THE COURT: You have an idea of what

5   the questions are all about and what we're trying to get at?

6   PROSPECTIVE JUROR: Yes.

7           THE COURT: Is there anything that you

8   thought about as you sat back there thinking, 'well, they asked that question',

9   and 'I heard that answer', and 'I agree with that', 'I disagree', or 'I can't be

10   fair'? Is there anything that's come up?

11   PROSPECTIVE JUROR: I can be fair.

12           THE COURT: Okay. And you've got the

13   time if we need you for a couple of weeks?

14   PROSPECTIVE JUROR: Yes.

15           THE COURT: All right. The State may

16   inquire.

17           MRS. KOHLRIESER: Sorry. It's been a

18   long day. Hi, Miss Coolidge. You were probably thinking that you might not

19   get in this box; weren't you?

20   PROSPECTIVE JUROR: Yea.

21           MRS. KOHLRIESER: I see that your

22   mailing address is Cridersville. Are you still in Allen County?

23   PROSPECTIVE JUROR: I'm in Allen County.

1                             MRS. KOHLRIESER:  Okay.  Do you --

2   well, I guess, let me just put it out there.  My brother-in-law is the village

3   administrator for Cridersville.  Do you have anything to do with the Township

4   proper?

5   PROSPECTIVE JUROR:  I live in Perry Township.

6                               MRS. KOHLRIESER:  Okay.  Gotcha.  All

7   right.  I see that you work at Procter & Gamble.

8   PROSPECTIVE JUROR:  Yes.

9                               MRS. KOHLRIESER:  And they're usually

10  a really good employer with jury duty.

11  PROSPECTIVE JUROR:  Yea, they don't like it; but, they'll be all right.

12                            MRS. KOHLRIESER:  Okay.  All right.  Let

13  me ask you, and I see that you checked 'no'.  But, have you had any

14  interactions with law enforcement yourself?  Have you ever got a speeding

15  ticket?

16  PROSPECTIVE JUROR:  I got a speeding ticket; yes.

17                            MRS. KOHLRIESER:  Okay.  Know of any

18  reason --

19  PROSPECTIVE JUROR:  I deserved it.

20                            MRS. KOHLRIESER:  I'm sorry?

21  PROSPECTIVE JUROR:  I deserved it.

22                            MRS. KOHLRIESER:  Yea, I got one

23  myself; but, I probably deserved worse.  Anyhow, do you have any friends

1    that have ever had involvement with law enforcement one way or the other?

2    PROSPECTIVE JUROR:  An ex.  My ex.

3                              MRS. KOHLRIESER:  Okay.  Anything

4    about that --

5    PROSPECTIVE JUROR:  He's not my friend.

6                              MRS. KOHLRIESER:  Well, let's not go

7    into that.

8    PROSPECTIVE JUROR:  Just being honest.

9                              MRS. KOHLRIESER:  I appreciate that.  I

10   really do.  But, anything about how that situation was handled or anything

11   that, you know, it didn't sit well with you regarding law enforcement, or the

12   criminal justice system, or anything of that nature?

13   PROSPECTIVE JUROR:  I thought it was a fair process.

14                              MRS. KOHLRIESER:  Okay.  Were you

15   able to hear the questions that Mr. Rion asked a little while ago about

16   statistics with, quite frankly, race and who's on death row and things of that

17   nature?

18   PROSPECTIVE JUROR:  Yes.

19                              MRS. KOHLRIESER:  Do you have any

20   concerns for yourself that that would factor into your decision?

21   PROSPECTIVE JUROR:  Not at all.

22                              MRS. KOHLRIESER:  Okay.  I'll just ask

23   you and be blunt - any concerns that you have with what's going on in this

1    world or other things that you may have known long before the news became

2    so prevalent or you have some inclination that law enforcement treats certain

3    people differently than others and unfairly?

4    PROSPECTIVE JUROR:   No.

5                                      MRS. KOHLRIESER:   As you sit here do

6    you think you could be a fair and impartial juror?

7    PROSPECTIVE JUROR:   Yes.

8                                      MRS. KOHLRIESER:   Would you want you

9    on a jury?

10   PROSPECTIVE JUROR:   Yes, I would.

11                                     MRS. KOHLRIESER:   Okay.  Do you

12   consider yourself a leader or a follower?

13   PROSPECTIVE JUROR:   I'm a leader.

14                                     MRS. KOHLRIESER:   Okay.  Now, you're

15   pretty firm in that.  Are you also stubborn?

16   PROSPECTIVE JUROR:   I am.

17                                     MRS. KOHLRIESER:   Okay.  Stubborn to

18   the point where it's my way or the highway?

19   PROSPECTIVE JUROR:   No, not at all.  I know how to work with folks.

20                                     MRS. KOHLRIESER:   Okay.  So, have

21   there been times where you maybe got into an argument and you thought it

22   was all this way and then as you thought about it more --

23   PROSPECTIVE JUROR:   I changed my mind; yes.

1      MRS. KOHLRIESER:   So, you don't have a

2   problem changing your mind if you're firmly convinced to; right?

3   PROSPECTIVE JUROR:   Correct.

4      MRS. KOHLRIESER:   Okay.  Do you have

5   any problems sticking to your guns, though, if you're firmly convinced that

6   you're right?

7   PROSPECTIVE JUROR:   No, I don't.

8      MRS. KOHLRIESER:   Okay.  Anything

9   else you think we should know about you?

10   PROSPECTIVE JUROR:   No.

11      MRS. KOHLRIESER:   Anything if you were

12   standing in my shoes that you would ask you?

13   PROSPECTIVE JUROR:   No, I can't think of anything.

14      MRS. KOHLRIESER:   Real quick - when

15   you got your jury summons what did you think?

16   PROSPECTIVE JUROR:   My husband said, "Oh crap, you're going to be

17   mad."  I said, "Well, this could be interesting.  I've never done it before.  I

18   don't know."

19      MRS. KOHLRIESER:   Okay.  So, your

20   husband was more like, 'oh boy, she's not going to like this'?

21   PROSPECTIVE JUROR:   Yea.

22      MRS. KOHLRIESER:   But, you're actually,

23   'okay, I can do this'.

1     PROSPECTIVE JUROR:   Yea.

2                          MRS. KOHLRIESER:   Okay.  Anything

3     about the subject matter that we've talked about, those pictures and things

4     like that, that concerns you?

5     PROSPECTIVE JUROR:   No, that shouldn't be a problem.

6                          MRS. KOHLRIESER:   Okay.  Thank you.

7     We pass for cause, your Honor.

8                          THE COURT:   Mr. Rion, questions?

9                          MR. RION:   I'm just trying to understand

10    the first part of that conversation.  You said your ex was what?

11    PROSPECTIVE JUROR:   He had troubles with the law - not me.

12                         MR. RION:   Oh, okay.  I misheard it.  Okay.

13    PROSPECTIVE JUROR:   And that he's not my friend.

14                         MR. RION:   Okay.  I heard 'he was a police

15    officer'.

16    PROSPECTIVE JUROR:   No, no.  Oh, no.

17                         MR. RION:   Okay.  Okay.  Now it makes

18    perfect sense.  All right.  It's getting late.  You've heard all of the questions

19    and all of the points that both sides have been trying to make for the last four

20    hours; right?

21    PROSPECTIVE JUROR:   Right.

22                         MR. RION:   Are you comfortable sitting in

23    that seat given all the parameters that people have been throwing out?

1    PROSPECTIVE JUROR:   Yes.

2                              MR. RION:   And can I trust you that you'll

3    uphold your oath in this case?

4    PROSPECTIVE JUROR:   Yes.

5                              MR. RION:   Thank you.

6                              THE COURT:   Pass for cause?

7                              MR. RION:   Pass for cause.

8                              THE COURT:   All right.  Very good.  The

9    State has a third peremptory if you wish to exercise it.

10                             MRS. KOHLRIESER:   Your Honor, the

11   State would pass.

12                             THE COURT:   The State passes on the

13   third.  The defense has a third opportunity if you wish to exercise it.

14                             MR. RION:   Actually may we approach?

15                             THE COURT:   Sure.

16   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

17   the record, as follows.)

18                             MR. RION:   I think I'm only on my second

19   peremptory.

20                             THE COURT:   No.  Your second one --

21                             MR. RION:   Who was that?  The last one

22   was for cause.  Who was that?

23                             MRS. KOHLRIESER:   (Inaudible).

1          THE COURT:   No, she wasn't for cause.

2     Mr. McDermitt was.

3          MR. RION:   Oh, Karen Wireman.

4          THE COURT:   You excused her and then

5     Mr. McDermitt came up.  Yea.  So, you're on your third.

6     (WHEREUPON, Court continued on the record, as follows.)

7          THE COURT:   Do you want to exercise a

8     third?

9          MR. RION:   Yea.  I'd thank Mr. Shappell.

10         THE COURT:   Mr. Shappell, thank you for

11    your patience.  Next prospective juror, please.

12    LINDA THAYER, DEPUTY CLERK OF COURTS:   Barbara Jackson.

13         THE COURT:   We'll have you take the very

14    last seat there in the back row.  Okay.  You know the routine.  Have you

15    heard everything thus far?

16    PROSPECTIVE JUROR:   Yes.

17         THE COURT:   Has anything come up

18    either in a question asked, or the answer of another juror or an idea, or

19    concept, or anything that's been said, the length of the trial, anything that

20    causes you some concern in your ability to be fair and impartial?

21    PROSPECTIVE JUROR:   No.

22         THE COURT:   And could we use your

23    services for a couple of weeks if we need you?

1    PROSPECTIVE JUROR:  Yes.

2                              THE COURT:  All right.  The State may

3    inquire of number twelve.

4                              MRS. KOHLRIESER:  All right.  Miss

5    Jackson, hang in there.  To the rest of you, we're coming to the end

6    eventually, I promise.  You've heard all the questions.  Any reason I wouldn't

7    want you as a juror?

8    PROSPECTIVE JUROR:  No.

9                              MRS. KOHLRIESER:  What's your

10   thoughts on the reasonable doubt standard that I've brought up over and over

11   and over again?

12   PROSPECTIVE JUROR:  I would listen and I would be very, very fair

13   because if I was in that position I would want people to be fair to me.

14                              MRS. KOHLRIESER:  Okay.  When you

15   say 'that position', do you mean if you were on trial?

16   PROSPECTIVE JUROR:  Yes.  Yes.

17                              MRS. KOHLRIESER:  What about from the

18   State of Ohio's perspective?  I don't know if you recall at the beginning, but I

19   talked about it's not just about a fair trial for the defendant.  It's also a fair trial

20   for the people of the State of Ohio.  If you were me would you want you?

21   PROSPECTIVE JUROR:  Yes.

22                              MRS. KOHLRIESER:  Anything going on in

23   your life the next couple of weeks that you think, 'oh, I can't stay here'?

1    PROSPECTIVE JUROR:   No.

2                        MRS. KOHLRIESER:   If you could be

3    anybody for a day and then go back to being you who would you be?

4    PROSPECTIVE JUROR:   My mom.

5                        MRS. KOHLRIESER:   Why?

6    PROSPECTIVE JUROR:   Because my mom was my life.

7                        MRS. KOHLRIESER:   A good lady?

8    PROSPECTIVE JUROR:   I just lost her in November.

9                        MRS. KOHLRIESER:   Let me ask you

10   about that.  Do you remember me talking about losing my mom?

11   PROSPECTIVE JUROR:   Yes.

12                       MRS. KOHLRIESER:   Did you have people

13   in your family that reacted differently to your mom's death?

14   PROSPECTIVE JUROR:   Yes.

15                       MRS. KOHLRIESER:   Do you have

16   siblings?

17   PROSPECTIVE JUROR:   I come from a family of sixteen.

18                       MRS. KOHLRIESER:   I'm sorry?  What?

19   PROSPECTIVE JUROR:   I come from a family of sixteen.

20                       MRS. KOHLRIESER:   That's what I

21   thought I heard you say.  Okay.  So, I imagine you ran a gamut of emotions;

22   right?

23   PROSPECTIVE JUROR:   I was the third oldest girl.

1          MRS. KOHLRIESER:   Okay.  Is it fair to

2    say that your mom was a pretty solid rock for your family?

3    PROSPECTIVE JUROR:   Yes.

4          MRS. KOHLRIESER:   I don't think I have

5    any other questions other than have you always been a homemaker?

6    PROSPECTIVE JUROR:   Well, I did (inaudible) for about thirty years and

7    then I stopped and stayed home.

8          MRS. KOHLRIESER:   Any involvements

9    you've had with law enforcement, a speeding ticket or whatever it happened

10   to be, that would affect you one way or the other?

11   PROSPECTIVE JUROR:   No, never.

12         MRS. KOHLRIESER:   Okay.  Thank you.

13   Nothing further.  We'd pass for cause.

14         THE COURT:   All right.  Mr. Rion?

15         MR. RION:   Well, here's something new.

16   When we're in the hallway or outside in the parking lot or getting lunch or

17   something the Judge will tell you that I can't say hello.  I can't use the normal

18   civilities that I might use in other settings.  So, as long as we understand what

19   the rules are, during this case I can't talk to you and obviously you can't talk

20   to me once it all starts.  Will you not interpret it that I'm somehow being rude

21   by not trying to make conversation with you while the case is going on?  Do

22   you understand?  Sometimes people get -- well, people get actually awkward

23   in the hallway.  But, if we all know what the rules are it's no problem.

1    Whatever our civilities are, we understand that we're not one way or the

2    other.  All right.  I heard your answers.  Anything at all to bring up?

3    PROSPECTIVE JUROR:   No.

4                                    MR. RION:   Thank you.

5                                    THE COURT:   Pass for cause?

6                                    MR. RION:   Pass.

7                                    THE COURT:   All right.  Thank you.  We're

8    on our fourth peremptory.  If the State wishes to exercise one, you may.

9                                    MRS. KOHLRIESER:   May I have just a

10   moment, your Honor?

11                                   THE COURT:   Sure.

12   (WHEREUPON, Court went off the record briefly.)

13                                   MRS. KOHLRIESER:   Your Honor?

14   Excuse me.  The State would thank and excuse Miss Jackson.

15                                   THE COURT:   Oh.  Mrs. Jackson, thank

16   you for your patience.  You're excused.  Next potential juror?

17   LINDA THAYER, DEPUTY CLERK OF COURTS:   Rose Biederman.

18                                   THE COURT:   How are you, Mrs.

19   Biederman?

20   PROSPECTIVE JUROR:   Fine; thank you.

21                                   THE COURT:   Have you been able to hear

22   everything thus far okay?

23   PROSPECTIVE JUROR:   Yes, sir.

1　　　　　　　　　　　　THE COURT:　Get the gist of the questions

2　and the answers, the responses, of other jurors?

3　PROSPECTIVE JUROR:　Uh-huh.

4　　　　　　　　　　　　THE COURT:　Was there anything that

5　stood out in your mind as you sat back there thinking, 'if I get up to that point

6　they need to know about me because it might affect --

7　PROSPECTIVE JUROR:　That I get real tired just sitting all day.

8　　　　　　　　　　　　THE COURT:　Okay.　A lot of people do.　If

9　you're chosen as a juror and, let's say, you get tired of sitting you can always

10　stand up if you just stand in your spot.　Would that help?

11　PROSPECTIVE JUROR:　Yes, it would.

12　　　　　　　　　　　　THE COURT:　All right.　So, anybody can

13　do that.　I should have said that earlier because those chairs aren't the most

14　comfortable.　If you're on the jury you can bring a pillow.　If you're on the jury

15　maybe wear layered clothing in case it would get warm.　But, those are good

16　points to bring out.　But, other than that, do you think that's going to prevent

17　you from listening and participating and being fair and impartial?

18　PROSPECTIVE JUROR:　No, sir.

19　　　　　　　　　　　　THE COURT:　And if you do get tired, by

20　all means stand up and stretch.　We'll try to be conscious of that and allow

21　breaks.　If you can't hear or see something, raise your hand and say, 'I can't

22　hear them', or, 'they're standing in front of them and I can't see'.　Will you be

23　able to do all of that?

1    PROSPECTIVE JUROR:  Yes, sir.

2                                THE COURT:  Okay.  The State may

3    inquire.

4                                MRS. KOHLRIESER:  Miss Biederman,

5    sometimes my voice trails off.  Have you been able to hear everything I've

6    said today?

7    PROSPECTIVE JUROR:  Yes, ma'am.

8                                MRS. KOHLRIESER:  Okay.  Any reason I

9    wouldn't want you as a juror?

10   PROSPECTIVE JUROR:  I would want me.

11                               MRS. KOHLRIESER:  Why not?  Okay.

12   Do you consider yourself a fair-minded person?

13   PROSPECTIVE JUROR:  Yea.

14                               MRS. KOHLRIESER:  I see you're retired.

15   Where are you retired from?

16   PROSPECTIVE JUROR:  Elk's Lodge.

17                               MRS. KOHLRIESER:  Okay.  And you're a

18   widow?

19   PROSPECTIVE JUROR:  Yes.

20                               MRS. KOHLRIESER:  Would your

21   husband, before he passed, consider you a fair-minded person?

22   PROSPECTIVE JUROR:  Sometimes.

23                               MRS. KOHLRIESER:  Would he have

1    considered you stubborn?

2    PROSPECTIVE JUROR:   Uh-huh.

3                                  MRS. KOHLRIESER:   Would he be right?

4    PROSPECTIVE JUROR:   Not all the time.

5                                  MRS. KOHLRIESER:   I mean, sometimes

6    we all have a little bit of stubbornness in us; right?

7    PROSPECTIVE JUROR:   Yes, we do.

8                                  MRS. KOHLRIESER:   Are you able,

9    though, to sit and listen to the other eleven folks you would be with and, you

10   know, if they convinced you otherwise and if what they had to say sounded

11   reasonable you could change your mind?

12   PROSPECTIVE JUROR:   Yes.

13                                 MRS. KOHLRIESER:   Any problem

14   sticking to your guns, though, if you think 'no, these people are crazy and I'm

15   right'?

16   PROSPECTIVE JUROR:   No.

17                                 MRS. KOHLRIESER:   Okay.  Any

18   interactions you've had with law enforcement that causes you any concern or

19   anything?

20   PROSPECTIVE JUROR:   No.

21                                 MRS. KOHLRIESER:   Any concerns you

22   have with being able to sit for the next couple of weeks and seeing the types

23   of photos in here and the types of things we've been talking about?

1    PROSPECTIVE JUROR:   No.

2                              MRS. KOHLRIESER:   Okay.  We'd pass

3    for cause, your Honor.

4                              THE COURT:   Okay.  Mr. Rion, you may

5    inquire.

6                              MR. RION:   You wouldn't want you?  Is

7    that what I heard you say?

8    PROSPECTIVE JUROR:   I said I would want me.

9                              MR. RION:   Would or would not?

10   PROSPECTIVE JUROR:   I would.

11                             MR. RION:   Why?

12   PROSPECTIVE JUROR:   Why?

13                             MR. RION:   Yea.

14   PROSPECTIVE JUROR:   Why not?  I'm fair.

15                             MR. RION:   That's fair.

16   PROSPECTIVE JUROR:   I can be fair.

17                             MR. RION:   All right.  You're not swaying to

18   one side or the other side?

19   PROSPECTIVE JUROR:   No.

20                             MR. RION:   Do you think this whole

21   process that's lasted four hours is helpful --

22   PROSPECTIVE JUROR:   Helpful?

23                             MR. RION:   -- in finding a fair jury?

1    PROSPECTIVE JUROR:   Well, yea, I guess.

2                            MR. RION:   It's a lot of hard questions and

3    some people sort of -- well, you just get tired of the same questions, I guess,

4    and the concepts get shallower each time you do it.  It's not really meant to do

5    that.  But, it just happens in every single case.  So, in all seriousness, you

6    heard my concerns when I was talking to the original twelve about how

7    important this actually is and the burden that you're actually taking on.  Are

8    you willing to accept that?

9    PROSPECTIVE JUROR:   I am.

10                            MR. RION:   And do you feel that in any

11   way you're swayed one way or the other?

12   PROSPECTIVE JUROR:   No.

13                            MR. RION:   Thank you.

14                            THE COURT:   Pass for cause?

15                            MR. RION:   Yes, your Honor.

16                            THE COURT:   All righty.  Okay.  The

17   defense has a fourth and final peremptory if you wish to exercise it.

18                            MR. RION:   Your Honor, we'd thank Mr.

19   Sterling.

20                            THE COURT:   Mr. Sterling, you're

21   excused.  Thank you for your participation.  Next juror, please?

22   LINDA THAYER, DEPUTY CLERK OF COURTS:   Kathryn Kerr.

23                            THE COURT:   It always seems to be

1    the last chair.  But, the last chair in the front row there, Mrs. Kerr.  How are

2    you doing?

3    PROSPECTIVE JUROR:   Good.

4                                    THE COURT:   Have you been able to hear

5    everything thus far?

6    PROSPECTIVE JUROR:   Uh-huh.

7                                    THE COURT:   Anything come up that

8    would weigh upon your ability to be fair and impartial?

9    PROSPECTIVE JUROR:   Well, I've got an upcoming surgery and I've got to

10   go to the heart doctor on the 18th of this month.  So, are you going to be still

11   in -- when is that, it's a week from this Friday, on the 18th.

12                                    THE COURT:   I don't have any idea.

13   PROSPECTIVE JUROR:   Because the heart doctor then goes on vacation

14   and so then it'll postpone that surgery.

15                                    THE COURT:   You have an appointment

16   on the 18th that you can't miss?

17   PROSPECTIVE JUROR:   Right.  I tried to make it a little later and --

18                                    THE COURT:   Let me put it this way - if we

19   were here and it was time to do deliberations are you going to say, 'let's hurry

20   this up; let's make a decision because I've got an appointment to make'?

21   PROSPECTIVE JUROR:   Well, I flunked my stress test, or, my EKG and --

22                                    THE COURT:   You're an R.N.?  You're an

23   R.N.; right?  What unit do you work on up there?

1    PROSPECTIVE JUROR:   I do home health.

2                                          THE COURT:   Okay.  I know how difficult it

3    is --

4    PROSPECTIVE JUROR:   It's a three-thirty appointment on Friday.

5                                          THE COURT:   Well, I know how difficult it

6    is.  See, I don't know.  The trial might be over, but you folks may be in

7    deliberations.  I can work around a three-thirty appointment if the trial is still

8    going on and maybe break early that day and allow you to have that

9    appointment.  But, I wouldn't necessarily do that if you were in the middle of

10   deliberations.  So, I wouldn't want that to impact your deliberations and you sit

11   there and worry and say, 'I'm just going to go along with the crowd because I

12   want to get out of here', or something like that.  Or, to put pressure on

13   somebody else, 'come on, you're delaying things; let's go'.

14   PROSPECTIVE JUROR:   No, it's too serious.

15                                          THE COURT:   So, if you were involved --

16   PROSPECTIVE JUROR:   Well, I'm --

17                                          THE COURT:   Well, I mean, that's very

18   serious, too.  But, like I say, if you remind the bailiff if we're still in the middle

19   of the case and there's witnesses and it's three-thirty on Friday, well,

20   everybody would probably welcome getting out early on a Friday.  Because

21   I'm keeping you late today I have -- well, I'll control it that way.  But, I don't

22   want to control your deliberations and I don't want that to interfere with your

23   deliberations.

1    PROSPECTIVE JUROR:   Right.

2                                  THE COURT:   Other than that you're good

3    to go health-wise?

4    PROSPECTIVE JUROR:   Yea.

5                                  THE COURT:   And that's an appointment

6    for prior to a surgery?

7    PROSPECTIVE JUROR:   Yea, that's the next month.

8                                  THE COURT:   The same doctor?

9    PROSPECTIVE JUROR:   No.  Doctor Nissan.  It's female --

10                                 THE COURT:   This isn't, then, a first visit

11   before a surgery type of thing?

12   PROSPECTIVE JUROR:   It would be a month before.  It's in case they would

13   have to do something - you know, a heart stint, or --

14                                 THE COURT:   So, they want to make sure

15   your heart is good before they do a surgery?

16   PROSPECTIVE JUROR:   Right.

17                                 THE COURT:   Well, you tell me.  I'm going

18   to put it on you.  Do you think you could sit here?  Let's assume we're still in

19   trial, or, the case is still going on a week from Friday.  Is that something that's

20   then going to upset you or detract from your attention that you're going to hold

21   it against one party or another?

22   PROSPECTIVE JUROR:   Oh, no.

23                                 THE COURT:   Or --

1   PROSPECTIVE JUROR:   Well, I'll call.  I'll see if this Doctor Anike -- I also

2   see Doctor Pamela Gardner.

3                              THE COURT:   Are you willing to do it?  I

4   mean, it's up to you.  I don't want you to do it and then hold it against anybody

5   involved in the case and say, 'gosh, if they wouldn't talk so much we'd get out

6   of here sooner'.

7   PROSPECTIVE JUROR:   No, no.

8                              THE COURT:   Myself included.  You can

9   hold it against me, but not the parties.  Will you do that?

10  PROSPECTIVE JUROR:   Yes.

11                             THE COURT:   Could you be fair and

12  impartial?

13  PROSPECTIVE JUROR:   Oh, I am.

14                             THE COURT:   All right.  Do you care to

15  inquire?

16                             MRS. KOHLRIESER:   Actually, your

17  Honor, may we approach just a moment?

18  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

19  the record, as follows.)

20                             MRS. KOHLRIESER:   I guess I was just

21  saying that none of us has any more preempts.   We have plenty of jurors left.

22  I would say let's just kick her so we don't even run into that issue because I've

23  been burned before by jurors who are --

1     MR. RION:   Well, they're going to be done

2  with their case by Friday, this Friday, they said.

3                    MRS. KOHLRIESER:  Well, we think.

4                    MR. RION:  So, I don't know.  I mean, my

5  case isn't going to take a week.  I'll be lucky if it takes two days.

6                    MR. MILLER:   Why risk it when we have

7  enough jurors in this case and (inaudible).

8                    MRS. KOHLRIESER:  I would think, noting

9  what she wrote on here, that you would want her gone.  I just don't want a

10  problem, you know, (inaudible) down the road.

11                    MR. RION:   No objection.

12  (WHEREUPON, Court continued on the record, as follows.)

13                    THE COURT:   Okay.  Thank you very

14  much, folks.  Everybody is thinking that we can get this done, but there's no

15  guarantee.  I don't want to put any pressure on you.  So, you're excused.

16  Good luck at the doctor.  We'll get you on another trial; okay?

17  PROSPECTIVE JUROR:   Okay.

18                    THE COURT:   Next prospective juror,

19  please?

20  LINDA THAYER, DEPUTY CLERK OF COURTS:   Stacy Risner.

21                    THE COURT:   I could be a task master

22  and say you have two minutes.

23                    MR. RION:   What?

1    THE COURT:  I could be a task master

2    and say you have two minutes.  But, I won't.  How are you?

3    PROSPECTIVE JUROR:  Good.

4    THE COURT:  Have you been able to hear

5    everything?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  Anything come up that

8    would weigh upon your ability to be fair and impartial?

9    PROSPECTIVE JUROR:  No.

10    THE COURT:  Two weeks if we need it?

11    We may not need it.  We might need it.  Okay?

12    PROSPECTIVE JUROR:  Yes.

13    THE COURT:  All right.  The State may

14    inquire.

15    MRS. KOHLRIESER:  Any problem, given

16    the ages of your children, and any activities they may be involved in sitting

17    here over the next couple of weeks?

18    PROSPECTIVE JUROR:  No.  It should be fine.

19    MRS. KOHLRIESER:  Do you consider

20    yourself a leader or a follower?

21    PROSPECTIVE JUROR:  Follower.

22    MRS. KOHLRIESER:  Okay.  Would you, I

23    guess, describe yourself similar to what the lady behind said?

1    PROSPECTIVE JUROR:  Yes.

2                 MRS. KOHLRIESER:  Okay.  I see that

3    you're a sub. at Elida.

4    PROSPECTIVE JUROR:  I just got hired a week ago.

5                 MRS. KOHLRIESER:  Okay.  Is that going

6    to be any kind of problem for you?

7    PROSPECTIVE JUROR:  I don't think so.

8                 MRS. KOHLRIESER:  I mean, they have

9    other subs. that they can get?

10    PROSPECTIVE JUROR:  They do.

11                MRS. KOHLRIESER:  Have you subbed

12    before?

13    PROSPECTIVE JUROR:  Just last year at Elida.

14                MRS. KOHLRIESER:  Ever had a time

15    when you needed to decide between people of who to believe, students, and

16    things of that nature, or maybe you haven't been that involved yet.

17    PROSPECTIVE JUROR:  Not too much yet.

18                MRS. KOHLRIESER:  Would you say

19    you're a pretty good judge of people?

20    PROSPECTIVE JUROR:  Yes.

21                MRS. KOHLRIESER:  I'll just ask you the

22    questions I've asked everybody else.  Any concerns you have?  You know

23    you better than I do.  Any concerns you have?  Does race play any kind of

1   factor for you?

2   PROSPECTIVE JUROR:   No.

3                               MRS. KOHLRIESER:   Any concerns you

4   have with the level of proof that's needed?

5   PROSPECTIVE JUROR:   No.

6                               MRS. KOHLRIESER:   Again, I go back to

7   the two jurors that I've used previously.   Do you have to have every question

8   answered?   Do you understand some questions just won't ever be answered?

9   PROSPECTIVE JUROR:   Yes.

10                              MRS. KOHLRIESER:   Any reason myself

11  or Mr. Rion wouldn't want you as a juror?

12  PROSPECTIVE JUROR:   No.   I've done this before.

13                              MRS. KOHLRIESER:   You have?

14  PROSPECTIVE JUROR:   It was a D.U.I. case.

15                              MRS. KOHLRIESER:   Okay.   Anything

16  about that that left a bad taste in your mouth, so to speak, for the criminal

17  justice system, for Prosecutors, defense attorneys, defendants, anything?

18  PROSPECTIVE JUROR:   No, not at all.

19                              MRS. KOHLRIESER:   And did you actually

20  deliberate in that case?

21  PROSPECTIVE JUROR:   I don't know what you mean by deliberate.

22                              MRS. KOHLRIESER:   Were you one of the

23  ones that actually got to vote and say 'guilty' or 'not guilty'?

1    PROSPECTIVE JUROR:   Yes.

2                              MRS. KOHLRIESER:   Okay.  Thank you.

3    We would pass for cause, your Honor.

4                              THE COURT:   Mr. Rion, any questions?

5                              MR. RION:   I'll get right to this.  Do you

6    remember when I was asking questions about investigations and sometimes

7    if you keep looking in one direction you see certain things, but by looking in

8    one direction you're ignoring things in another direction?  Do you

9    acknowledge that that can happen in investigations?

10   PROSPECTIVE JUROR:   Yes.

11                             MR. RION:   I'm just going to ask - can you

12   be a good juror in this case?

13   PROSPECTIVE JUROR:   Yes.

14                             MR. RION:   Are you comfortable holding

15   Mr. Carter's, well, making this weighty decision in his life?

16   PROSPECTIVE JUROR:   I don't see how anybody could feel comfortable.

17                             MR. RION:   Are you willing to accept it?

18   PROSPECTIVE JUROR:   Yes.

19                             MR. RION:   Nothing further.  Pass for

20   cause.

21                             THE COURT:   Okay.  Thank you.  All right.

22   So, everyone has passed for cause for the twelve that are seated.  All the

23   peremptories are over with.  Anything else from either side?  Ladies and

1    gentlemen, you will be the jury in this case.  We're going to swear these jurors

2    in and then from the rest of you I'll need two more for alternates.  So, hold on

3    tight.  You folks, if you would please stand up, we'll swear you in.

4    LINDA THAYER, DEPUTY CLERK OF COURTS:   Would everyone in the

5    jury box please raise your right hand?  "Do you swear or affirm that you will

6    diligently inquire into and carefully deliberate all matters between the State of

7    Ohio and the defendant, Markelus Q. Carter?  Do you swear or affirm that you

8    will do this to the best of your skill and understanding and without bias or

9    prejudice as you shall answer to God or as you do under the pains and

10   penalties of perjury?  Do you so swear or affirm?"

11   JURORS:  I do.

12   LINDA THAYER, DEPUTY CLERK OF COURTS:   Thank you.  Please be

13   seated.

14                              THE COURT:   Okay.  Then, number one,

15   Miss Oglesbee, move over a seat, and Mrs. Coon, if you could move over a

16   seat?  I'm trying to make room here.  I know we're still in the order that Mrs.

17   Oglesbee is number one and Mrs. Coon is number two.  But, I need the next

18   two potential jurors as potential alternates to take the two seats there.

19   LINDA THAYER, DEPUTY CLERK OF COURTS:   Sue Beining and Brenda

20   Groman.

21                              THE COURT:   Mrs. Beining, take the front

22   seat.  Mrs. Groman, take the back row seat.  I'll allow counsel to inquire of

23   both of these potential jurors.  If you want to ask a few questions of the

1    remaining audience to determine whether or not you'll have a peremptory or

2    not, I'll allow that.  Just try to make it as brief as possible.  But, I'll give you a

3    full opportunity.

4              First off, Mrs. Beining, how are you?

5    PROSPECTIVE ALTERNATE:  Good.  Thank you.

6                              THE COURT:  Have you been able to hear

7    everything thus far?

8    PROSPECTIVE ALTERNATE:  Yes.

9                              THE COURT:  Has anything come up that

10   you think would weigh upon your ability to be fair and impartial in this case?

11   PROSPECTIVE ALTERNATE:  The only thing is is the three weeks.  I think

12   that -- I have a mom and dad that are both failing in health and there's three

13   appointments in the next three weeks that I have to take them two.  One is in

14   Columbus and two in Lima.

15                             THE COURT:  Any next week?

16   PROSPECTIVE ALTERNATE:  Next week?  No.

17                             THE COURT:  And then --

18   PROSPECTIVE ALTERNATE:  Well, do you mean this coming week?  This

19   week, no.

20                             THE COURT:  The rest of this week?

21   PROSPECTIVE ALTERNATE:  No.

22                             THE COURT:  And all of next week?

23   PROSPECTIVE ALTERNATE:  Next week we have to go to Columbus and

1   either he's going to have back surgery or we're going to put him in the nursing

2   home.

3                               THE COURT:  And you're the only person

4   that can help your parents out?

5   PROSPECTIVE ALTERNATE:  For that one; yes.

6                               THE COURT:  Okay.

7   PROSPECTIVE ALTERNATE:  And I go into work at three-thirty in the

8   morning.

9                               THE COURT:  Did you work --

10  PROSPECTIVE ALTERNATE:  Please?

11                              THE COURT:  -- last night?

12  PROSPECTIVE ALTERNATE:  Yes.  I get up at ten after two and go in at

13  three-thirty.  I start my day at three-thirty.

14                              THE COURT:  All right.  Okay.  Then

15  you're off at?

16  PROSPECTIVE ALTERNATE:  It kind of depends.  I'm management.

17                              THE COURT:  Okay.  With respect to

18  these appointments she has with her parents, any objection if I let her go?

19                              MR. RION:  No objection.

20                              THE COURT:  All right.  So, you're

21  excused.

22  PROSPECTIVE ALTERNATE:  Thank you.

23                              THE COURT:  Mrs. Groman, step down in

1    the next seat there.  Then another juror for the second alternate?

2    LINDA THAYER, DEPUTY CLERK OF COURTS:   Joseph Fleischman.

3                              THE COURT:   Mr. Fleischman, you'll take

4    the back row seat.  Mrs. Groman, how are you?

5    PROSPECTIVE ALTERNATE:   Fine.

6                              THE COURT:   Have you been able to hear

7    everything?

8    PROSPECTIVE ALTERNATE:   Yes.

9                              THE COURT:   Anything that you want us

10   to know about that might interfere with your ability to serve?

11   PROSPECTIVE ALTERNATE:   No.  I think I could serve.  I don't have any

12   problem with that.  But, I do want you to know that I know Officer Aaron

13   Montgomery and my husband works at Husky, in case that makes any

14   difference.

15                             THE COURT:   Okay.  Patrolman

16   Montgomery is a witness?

17                             MRS. KOHLRIESER:   Yes.

18                             THE COURT:   And how well do you know

19   Aaron Montgomery?

20   PROSPECTIVE ALTERNATE:   He was in my daughter's class in high

21   school.

22                             THE COURT:   Close friends?

23   PROSPECTIVE ALTERNATE:   Oh, no.  I -- no.

1               THE COURT:  I mean, do you talk about

2    his work?

3    PROSPECTIVE ALTERNATE:  No.  No.  I haven't talked to him in five years.

4               THE COURT:  Okay.  Then your husband

5    works at Husky?

6    PROSPECTIVE ALTERNATE:  Yes.

7               THE COURT:  Do you, or, do you

8    remember your husband ever talking about Mr. Warrington?

9    PROSPECTIVE ALTERNATE:  Yes.

10              THE COURT:  And --

11   PROSPECTIVE ALTERNATE:  Other than when he passed away my

12   husband, well, I remember him mentioning that just because it was a fellow at

13   work.  But, he --

14              THE COURT:  Did he render, or, have you

15   ever heard anyone render an opinion as to how Mr. Warrington died?

16   PROSPECTIVE ALTERNATE:  Not at all.

17              THE COURT:  Okay.  Did you or your

18   husband attend the funeral; do you know?

19   PROSPECTIVE ALTERNATE:  No, no.  No.

20              THE COURT:  Do you think that's going to

21   interfere with your ability to assess this evidence fairly and impartially?

22   PROSPECTIVE ALTERNATE:  No, no.  No, no.  I just wanted you to know

23   that they worked at the same place.

1    THE COURT:  You're doing exactly what

2    you're supposed to do.  Are you telling me that that's not going to interfere

3    with your ability to be fair and impartial?

4    PROSPECTIVE ALTERNATE:  No.  As far as I know they didn't even know

5    each other.

6    THE COURT:  Okay.  That's good.  All

7    right.  Mr. Fleischman?

8    PROSPECTIVE ALTERNATE:  Fleischman.

9    THE COURT:  Fleischman?  Same

10   question - have you heard everything thus far?

11   PROSPECTIVE ALTERNATE:  Most.  Seventy-five or eighty percent of it.

12   Some of it was, you know, muted back there.

13   THE COURT:  Okay.  Anything --

14   PROSPECTIVE ALTERNATE:  No, I have not.

15   THE COURT:  -- come up that would weigh

16   upon your ability to be fair and impartial?

17   PROSPECTIVE ALTERNATE:  No.

18   THE COURT:  You know what kind of case

19   it is and what we're talking about?

20   PROSPECTIVE ALTERNATE:  Yes.  Yes.

21   THE COURT:  You've heard the gist of it

22   about being fair and impartial?

23   PROSPECTIVE ALTERNATE:  Yes.

1                          THE COURT: Do you think you could be

2   fair and impartial?

3   PROSPECTIVE ALTERNATE: Yes. It's just times when they stepped away

4   from the mic. that sitting back there it was harder to hear.

5                          THE COURT: All right. Do you have any

6   close relationship to law enforcement?

7   PROSPECTIVE ALTERNATE: No, I do not.

8                          THE COURT: Have anything against law

9   enforcement?

10   PROSPECTIVE ALTERNATE: No, I do not.

11                          THE COURT: Have anything against Mr.

12   Carter?

13   PROSPECTIVE ALTERNATE: No.

14                          THE COURT: Do you believe that as he

15   sits here today he's innocent under our Constitution?

16   PROSPECTIVE ALTERNATE: Yes, indeed. Yes.

17                          THE COURT: You're going to require the

18   State of Ohio to prove beyond a reasonable doubt --

19   PROSPECTIVE ALTERNATE: Uh-huh.

20                          THE COURT: -- he's guilty before you'd

21   find him guilty?

22   PROSPECTIVE ALTERNATE: Yes.

23                          THE COURT: And if they don't your

1   verdict would be not guilty?

2   PROSPECTIVE ALTERNATE:  Uh-huh.

3                    THE COURT:  Okay.  Do you have any

4   questions?

5   PROSPECTIVE ALTERNATE:  No.

6                    THE COURT:  All right.  The State may

7   inquire of the two prospective alternates.  I'll give some leeway,

8   understanding the timing here, if you want to inquire of one or two of the other

9   folks in the audience in the order that they are there so you can plan

10  accordingly.  Okay?

11                   MRS. KOHLRIESER:  Miss Groman, let

12  me ask you just briefly.  I'm standing here just because it's easier and it takes

13  less time.  You said that other than when Mr. Warrington died initially and

14  your husband mentioning something you didn't believe your husband even

15  knew him?

16  PROSPECTIVE ALTERNATE:  No, I don't believe that he knew him, other

17  than he mentioned it because they both, well, that he had worked at Husky, at

18  the same place.  I remember him mentioning that he was killed.

19                   MRS. KOHLRIESER:  Okay.  He never

20  talked about, like, what the scuttlebutt was or anything of that nature

21  regarding what happened or anything?

22  PROSPECTIVE ALTERNATE:  No.  I don't believe that my husband even

23  worked in the same department at all as that gentleman did.

1              MRS. KOHLRIESER:   Just 'hey, there's a

2    guy that works at the plant that was killed'?

3    PROSPECTIVE ALTERNATE:   Yes.  I don't know that he even knew him.  In

4    fact, I don't even know if he worked for Husky proper or if he worked as a

5    contractor.  So, I don't even know that.

6              MRS. KOHLRIESER:   Okay.  Along those

7    lines, I mentioned some other potential Husky employees or contractor

8    employees.  Is your husband actually a Husky employee?

9    PROSPECTIVE ALTERNATE:   Yes.

10             MRS. KOHLRIESER:   Not a contractor?

11   Okay.  Does the name Don Bodiker or Krista Bodiker ring a bell at all?

12   PROSPECTIVE ALTERNATE:   Huh-uh.  I've not heard those names.

13             MRS. KOHLRIESER:  All right.

14   PROSPECTIVE ALTERNATE:   I believe you mentioned Pam Callahan?

15             MRS. KOHLRIESER:  Yes.

16   PROSPECTIVE ALTERNATE:   I actually know her, too, just from Husky

17   outings.

18             MRS. KOHLRIESER:   Okay.

19   PROSPECTIVE ALTERNATE:   I don't know what her capacity is there.

20             MRS. KOHLRIESER:   I'm glad you

21   mentioned that specifically.  Anything about what you know about Pam or

22   what you know about Husky and how things go out there or anything like that

23   that you can't put aside and judge this case fairly and impartially?

1   PROSPECTIVE ALTERNATE:  No.

2                          MRS. KOHLRIESER:  Okay.  Anything you

3   think we should know about you?

4   PROSPECTIVE ALTERNATE:  Not that I can think of.

5                          MRS. KOHLRIESER:  Do you consider

6   yourself a leader or a follower?

7   PROSPECTIVE ALTERNATE:  It depends what it is.

8                          MRS. KOHLRIESER:  Okay.  Fair enough.

9   All right.  Mr. -- is it Fleischman?

10  PROSPECTIVE ALTERNATE:  Fleischman; yes.

11                         MRS. KOHLRIESER:  Okay.  Your only

12  hearing issues were when, well, for instance, myself, I walked away from the

13  mic. and maybe you couldn't hear me as well?

14  PROSPECTIVE ALTERNATE:  Right.

15                         MRS. KOHLRIESER:  You don't have

16  actual hearing issues; do you?

17  PROSPECTIVE ALTERNATE:  No, I do not.

18                         MRS. KOHLRIESER:  Okay.  Since being

19  up here are you able to hear me okay and things of that nature?

20  PROSPECTIVE ALTERNATE:  Uh-huh.

21                         MRS. KOHLRIESER:  Okay.  Anything you

22  think we should know about you?

23  PROSPECTIVE ALTERNATE:  No.

1          MRS. KOHLRIESER:  Well, I know that

2    most people say that, you know, they're fair and impartial or what have you.  I

3    see that you're married.  What would your wife say about you, do you think?

4    PROSPECTIVE ALTERNATE:   I've been married thirty years.  So, positive.

5          MRS. KOHLRIESER:   Okay.  Do you

6    consider yourself a fairly stubborn person or a fairly open-minded person?

7    PROSPECTIVE ALTERNATE:   Open-minded.

8          MRS. KOHLRIESER:   And have you heard

9    anything about this case on the news or otherwise?

10    PROSPECTIVE ALTERNATE:   No, I have not.

11          MRS. KOHLRIESER:   Do you watch any of

12    those C.S.I. type of shows?

13    PROSPECTIVE ALTERNATE:   No, I do not.  The Golf channel.

14          MRS. KOHLRIESER:   Okay.  Anything

15    about your employment or anything, either one of you, I guess, that for the

16    next couple of weeks you can't be here or any concerns you have?

17    PROSPECTIVE ALTERNATES:   No.

18          MRS. KOHLRIESER:   Okay.  Thank you,

19    your Honor.  We pass for cause.

20          THE COURT:   Mr. Rion, do you care to

21    inquire?

22          MR. RION:   You were an alternate before

23    in another case?

1    PROSPECTIVE ALTERNATE:  Yes.

2                        MR. RION:  So, you may be an alternate

3    here.  The day may come if somebody gets sick or something happens that

4    one or both of you would have to take on the responsibilities that the twelve is

5    taking on.  As much as, I guess, we're thinking about it as you're an alternate

6    and not a juror, well, you could in a heart beat become a juror.  You've heard

7    everything, minus what we haven't said in the mic., so I'm not going to repeat

8    it all at this hour.  But, are you both willing to take on that responsibility and

9    should I be comfortable about that decision of yours to take on that

10    responsibility?

11    PROSPECTIVE ALTERNATES:  Yes.

12                        MR. RION:  When I say comfortable, I

13    mean would you be fair?

14    PROSPECTIVE ALTERNATE:  Uh-huh.

15                        MR. RION:  Okay.  We'll pass for cause.

16    Thank you.

17                        THE COURT:  Okay.  I didn't go into it a

18    lot, but do either of you have a problem with being an alternate,

19    understanding that you may not actually deliberate as long as these twelve

20    still serve?  Is that a problem for either of you?

21    PROSPECTIVE ALTERNATES:  No.

22                        THE COURT:  Can you both still pay close

23    attention to the case?  Because, like Mr. Rion said, you never know and

1   something might come up.  Mrs. Groman?

2   PROSPECTIVE ALTERNATE:   Yes.

3                           THE COURT:   Mr. Fleischman?

4   PROSPECTIVE ALTERNATE:   Uh-huh.

5                           THE COURT:   Okay.  All right.  We have

6   two potential alternates.  The State may exercise a peremptory if you wish as

7   to the alternates.

8                           MRS. KOHLRIESER:   Your Honor, the

9   State would thank and excuse Miss Groman.

10                          THE COURT:   Mrs. Groman, you're

11  excused.  Next potential juror?

12  LINDA THAYER, DEPUTY CLERK OF COURTS:   Linda Harris.

13                          THE COURT:   How are you?

14  PROSPECTIVE ALTERNATE:   Should I move down one?

15                          THE COURT:   Yea.

16  PROSPECTIVE ALTERNATE:   I'm fine.  Thank you.

17                          THE COURT:   Thanks for catching that,

18  Mr. Fleischman.  You're now the first alternate and she would be the second if

19  she's still here.  Okay.  Miss Harris, have you been able to hear everything?

20  PROSPECTIVE ALTERNATE:   Yes, except a few times when she stepped

21  away from the mic. that I couldn't hear.

22                          THE COURT:   Okay.  She'll take note of

23  that and not step away anymore.

1  PROSPECTIVE ALTERNATE:  But, everything else; yes.

2                           THE COURT:  You have the general idea

3  here that we're looking for a fair and impartial person to serve as a juror?

4  PROSPECTIVE ALTERNATE:  Yes.

5                           THE COURT:  And the alternate's role is,

6  well, you'd only be the juror if something would happen where another

7  couldn't serve and Mr. Fleischman would be the first alternate and you would

8  be the second alternate.  Do you have a problem with that?

9  PROSPECTIVE ALTERNATE:  No.

10                          THE COURT:  You were on a jury before?

11  PROSPECTIVE ALTERNATE:  Yes.

12                          THE COURT:  Arson and murder?

13  PROSPECTIVE ALTERNATE:  Yes.

14                          THE COURT:  Which one was that?

15  PROSPECTIVE ALTERNATE:  It's been over ten years ago.  So, I honestly

16  don't remember.

17                          THE COURT:  Okay.  Things might have

18  changed differently in terms of procedure and rules.  That was in Allen

19  County?

20  PROSPECTIVE ALTERNATE:  Yes.

21                          THE COURT:  Can you put that one aside

22  and not say, 'well, in that case they did it this way and so why didn't they do it

23  that way in this case'?  Can you --

1  PROSPECTIVE ALTERNATE:  I don't think I'll have any problem since I

2  really can't remember, you know.

3  THE COURT:  Okay.  All right.  So, that's

4  not going to influence your ability to be fair and impartial?

5  PROSPECTIVE ALTERNATE:  No.  We'll start fresh.

6  THE COURT:  Are you available for a

7  couple of weeks if we need you?

8  PROSPECTIVE ALTERNATE:  Yes.

9  THE COURT:  Okay.  The State may

10  inquire.

11  MRS. KOHLRIESER:  Miss Harris, just

12  briefly.  You understand, I'm guessing, pretty well the dynamics of what goes

13  on in the jury room at times; correct?

14  PROSPECTIVE ALTERNATE:  Yes.

15  MRS. KOHLRIESER:  Okay.  The case

16  that you had before was pretty serious; correct?

17  PROSPECTIVE ALTERNATE:  Yes.

18  MRS. KOHLRIESER:  Anything -- and I

19  know you say you don't remember a lot about it, but anything in general about

20  your experience with it that left you unsatisfied, for lack of a better term?

21  PROSPECTIVE ALTERNATE:  No.

22  MRS. KOHLRIESER:  Was it a fairly --

23  well, again, obviously the weight of it is one thing, but was it a fairly

1    positive experience for you?

2    PROSPECTIVE ALTERNATE:   Yes.

3                                         MRS. KOHLRIESER:   And did you have

4    any problem -- you were actually one of the twelve voting jurors; correct?

5    PROSPECTIVE ALTERNATE:   Yes, I was.

6                                         MRS. KOHLRIESER:   And did you have

7    any problems coming to a decision?

8    PROSPECTIVE ALTERNATE:   No.

9                                         MRS. KOHLRIESER:   Listening to others?

10   PROSPECTIVE ALTERNATE:   No.

11                                        MRS. KOHLRIESER:   Understanding the

12   burden of proof and things of that nature?

13   PROSPECTIVE ALTERNATE:   No.

14                                        MRS. KOHLRIESER:   Okay.  Thank you.

15   We'd pass for cause, your Honor.

16                                        THE COURT:   Mr. Rion, questions?

17                                        MR. RION:   Ma'am, was that a death

18   penalty case?

19   PROSPECTIVE ALTERNATE:   Pardon me?

20                                        MR. RION:   Was that a death penalty

21   case?

22   PROSPECTIVE ALTERNATE:   No.

23                                        MR. RION:   Okay.  Do you recall who the

1    lawyer was on that case?

2    PROSPECTIVE ALTERNATE:  No.

3                              MR. RION:  Okay.  So, that was awhile ago

4    then?

5    PROSPECTIVE ALTERNATE:  Yes.  It's been over ten years.

6                              MR. RION:  Okay.  If you're on this jury

7    why would you be one of the twelve in this room, or fourteen in this room, that

8    should have the honor of sitting there?

9    PROSPECTIVE ALTERNATE:  I think I'm a fair person and an honest person

10   and I would listen to what was presented and then make my decision.

11                             MR. RION:  Do you have any sense one

12   way or the other on this case?

13   PROSPECTIVE ALTERNATE:  No.  I'm not familiar with it at all.

14                             MR. RION:  You didn't see anything on the

15   news or anything like that?

16   PROSPECTIVE ALTERNATE:  No.

17                             MR. RION:  Thank you.

18                             THE COURT:  Pass for cause, Mr. Rion?

19                             MR. RION:  Pass for cause, your Honor.

20                             THE COURT:  Okay.  Thank you.  All right.

21   The defense has the opportunity for a peremp. as to the alternates if you wish

22   to exercise it.

23                             MR. RION:  Your Honor, we are satisfied

1    with this jury panel.  Thank you.  We pass.

2                              THE COURT:   Okay.  All right.  So, we

3    have two alternates.  Would you two please stand and we'll swear you in?

4    LINDA THAYER, DEPUTY CLERK OF COURTS:   Would the two alternates

5    please raise your right hand?  "Do you swear or affirm that you will diligently

6    inquire into and carefully deliberate all matters between the State of Ohio and

7    the defendant, Markelus Q. Carter?  Do you swear or affirm that you will do

8    this to the best of your skill and understanding and without bias or prejudice

9    as you shall answer to God or as you do under the pains and penalties of

10   perjury?  Do you so swear or affirm?"

11   ALTERNATES:  I do.

12                              THE COURT:   Okay.  The record will

13   reflect that we have a jury of twelve and we have two alternates.  So, to the

14   rest of you folks, you are excused with our thanks.  I know it's been a long

15   day.  I appreciate your patience.  We almost made it to Walmart; but, we

16   didn't need to.  So, thank you very much.

17   (WHEREUPON, remaining prospective jurors were released and excused

18   from the Courtroom.)

19                              THE COURT:   For the rest of you, we're

20   going to break for the day.  Tomorrow we'll start off with you're going to be

21   taken to the scene in a group.  We'll have transportation for you.  You've got

22   to come here first.  I want you here at eight forty-five.  We've got the

23   arrangements for transportation at nine.  I'll have some instructions before

1  you're taken to the scene.  So, we'll have you in here at about eight forty-five.

2  Then the taxi service will be here and you'll be taken to the scene.

3          The instructions I want to give you as you break are kind of similar to

4  what I gave you before.  As a reminder, it's important that you be fair and

5  attentive throughout the trial.  Do not discuss the case among yourselves or

6  with anyone else.  This includes family and friends.  The media may be here.

7  Don't discuss it with the media.  Do not post anything about this case on the

8  Internet, or Facebook, or Twitter, or anything else.  If you would have a

9  discussion or post something or be exposed to that it could lead to a mistrial

10  and would severely compromise the parties' rights to a fair trial.  Do not

11  permit anyone to discuss the case in your presence, other than in the

12  Courtroom.

13          Do not form or express any opinion about the case, as we've said a

14  couple of times, until you hear all of the evidence and get the instructions and

15  it is finally submitted to you.  You are not to discuss this case among

16  yourselves.  You will receive the opening statements tomorrow after you visit

17  the scene, and then you'll get the evidence, and then there will be closing

18  arguments, and then you'll get the instructions.  It would be unfair for you to

19  discuss this case among yourselves before you receive everything necessary

20  for your decision.

21          Explain the rule prohibiting discussion of the case to your family and

22  friends.  When the trial is over you are released from this instruction and you

23  can talk to anyone about it.  You don't have to; but, you'll be released from

1    the admonition not to discuss the case at this time.

2         If, during the trial, any issues arise that affect your ability to be fair and

3    impartial or to pay attention, explain the matter to Monica, the bailiff, who will

4    inform me.

5         At any time if you cannot hear or see a witness, or an attorney, or me,

6    please make that fact known immediately by raising your hand.

7         I'll remind you every time we have a recess of these instructions.  I

8    won't necessarily go over them in great detail.  If there is any media

9    coverage, and they weren't here today but sometimes they wait until the

10   opening statements, I'm going to instruct you now don't pay attention to any

11   media.  Don't read anything.  If you get the local paper and you see there's a

12   headline, don't read that.  I'll ask you every time we come in in the morning if

13   you were able to follow my instructions.  Make sure nothing influences your

14   ability to be fair and impartial in this case.

15        So, if you could get here by eight forty-five I'll have just some brief

16   instructions for you and then we'll get you on the vans to go to the scene.

17   Again, there's instructions I'll give you at that time.  I'm not going to give them

18   to you now as I'll give them to you right before you leave.

19        I'd like the lawyers to be here, well, let's say by eight in case there's

20   anything that needs to go on the record before the jurors get here.  If you

21   want to talk among yourselves and you don't have anything that you think is

22   going to be on the record, that's fine, too.  But, let's get here early enough

23   that the jurors won't be kept waiting.  They'll be going to the scene anyways.

1    You folks are free to go to the scene, too.  Mr. Rion, let me know if Mr. Carter

2    wants to go.  He will not be riding, obviously, with the jurors.  If he wants to go

3    and observe the jurors at the scene, we'll have him there and I'll make

4    arrangements for that.  That's his right if he wants to do that.  You both can

5    go.  Also, you won't be riding with the jurors.  I'll give some rules about that.

6         If there's anything in particular the attorneys want to be pointed out to

7    the jurors - I won't allow the attorneys to talk - but, get that information to

8    Monica first thing in the morning so she'll know when she gets to the scene to

9    say, 'please look at this', or, 'please look at that', or, 'please pay attention to

10   this'.  But, other than that, there won't be any communication at the scene.

11        So, the attorneys here at eight.  The jurors here at eight forty-five.

12        Anything from the State?

13                          MRS. KOHLRIESER:   Just for the record,

14   your Honor, I supplied Monica with our request for the jury view, as well as a

15   copy to the defense.

16                          THE COURT:   Okay.  Anything else from

17   you, Mr. Rion?

18                          MR. RION:   No, thank you, your Honor.

19                          THE COURT:   Any questions of you folks?

20   Question?

21   JUROR:   I need to let my boss know.

22                          THE COURT:   Okay.

23   JUROR:   So, do I just tell them that --

1      THE COURT:  If your summons - and I

2  think Shelly is still out there - if you need something more than the summons

3  then --

4  JUROR:  I know.  I just need to let him know tonight because they're going to

5  have -- somebody is going to have to do my work for me.

6      THE COURT:  Okay.  If that's a problem,

7  like I said, I'll call.

8  JUROR:  No.  It's just I need to know --

9      THE COURT:  Yea, you can let them know

10  that you're on a trial and that it's anticipated that it might take a couple of

11  weeks.  Don't tell about the case because that person may know something

12  and they would want to say, 'oh, yea, I know all about that'.  That's what we're

13  trying to avoid.  Okay?  Any other questions or concerns?

14      Again, if you want to bring a pillow, and dress in layers.  I don't mind if

15  you have bottled water.  I've had bad experiences with coffee and pop.  When

16  it spills it's harder to clean than water.  So, if you want bottled water I don't

17  have a problem with you bringing that in.  Something like that is fine.  Some

18  jurors want to bring snacks.  That's for in the jury room.  I don't want you

19  sitting and chomping on popcorn during the case.  It might distract others.

20      I'll have some instructions about note taking after you get back from

21  the scene, too.  Okay?

22      Another question from the alternate?

23  ALTERNATE:  The parking pass that we presently have continues for --

1      THE COURT:   It should be good.  It will be

2   good; yea.  There shouldn't be any issues of parking.  Parking across from

3   the Courthouse, in the lot, is probably the most convenient.  But, anyplace

4   downtown as long as you display that pass.  Okay?  I don't think they like you

5   parking in the front of the Courthouse because that's reserved for Sheriff's

6   Deputy's cars usually.

7   ALTERNATE:   But, metered spaces are fine if need be?  Okay.

8      THE COURT:   Yea, as long as you have

9   that thing on your dash they're not going to mess with you.  But, if they do, let

10   me know and I'll mess with them.  All right?

11      Any others?  See you in the morning.  We'll stand in recess.

12   **(WHEREUPON, COURT RECESSED FOR THE DAY AT 5:52 P.M.)**

13

14

15

16

17

18

19

20

21

22

23

1                    **WEDNESDAY, SEPTEMBER 9, 2015**

2                    **8:54 A.M.**

3

4                    THE COURT:   All right then.  Let the

5      record reflect we're reconvening on this 9th day of September, 2015 in Case

6      Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  Let the record

7      also reflect that the defendant is present in Court with counsel.  The State of

8      Ohio is present.  All the jurors have returned from the evening recess.

9                    Welcome back, ladies and gentlemen of the jury.  I just want to ask - is

10     there any of the jurors that did not, or, were not able to comply with the

11     instructions that I gave to not discuss the case?  Is there any issue with any

12     juror that arose over the evening that would now make it impossible for you to

13     continue?  Nobody has raised their hand.  So, good enough.

14                   As we talked about yesterday evening when we adjourned for the day,

15     you were going to be taken to the scene.  You're going to be taken to the

16     scene involved in this case.  You will be required to remain together, under

17     the supervision of the bailiff, until you return to the Courtroom.  Counsel and

18     the parties may be present at the time, but they may not discuss this case or

19     demonstrate anything relating to it.  Monica will point out certain things to you.

20                   What you observe at the scene is not evidence since conditions may

21     have changed since the time of the events in this case.  Obviously this is

22     alleged to have occurred back in '09.  The evidence as to the physical

23     appearance of the scene must come to you from the witness stand.  The sole

1    purpose of this viewing is to help you understand the evidence as it will be

2    presented to you in the Courtroom during the trial.

3          So, we've got transportation arranged.  They were to be here around

4    nine.  I just looked out the window and I don't think they're here yet.  So, sit

5    tight.  As soon as the transportation arrives Monica will take you all down

6    together.  Again, you'll be under the supervision of Monica.  Don't have any

7    discussion about the case among yourselves.  Again, Monica may point

8    certain things out to you.  Then we'll bring you back here and then we'll get

9    started with the opening statements at that time.

10          Timing again, again, we're trying to be conscious of your time.  I'm

11   going to be taking a conference call in another matter at nine o'clock.  As

12   soon as that's done -- I don't know how long you guys will be out there.  It

13   shouldn't be very long because it's not far away.  But, we'll try to get started

14   right when you get back; okay?

15          Anything else from counsel before we recess and let them go on the

16   view?

17                              MR. MILLER:   No, your Honor.

18                              MR. RION:   No, your Honor.

19                              THE COURT:   Okay.  I want just counsel to

20   stay in the room here for a minute or so; but, Monica can take the jurors back

21   to the jury room and check on the transportation.  We'll stand in recess until

22   the jurors get back.

23   (WHEREUPON, JURY WAS EXCUSED FOR A VIEW OF SCENE.)

1          THE COURT:   All right.  The jurors have

2    left the Courtroom.  I just want to get on the record, first off, both sides have

3    had an opportunity to give Monica some instructions as to what they wanted

4    pointed out; is that correct?

5          MR. RION:   It is, your Honor.

6          THE COURT:   Okay.  The State, too?

7          MRS. KOHLRIESER:   Yes, your Honor.

8          THE COURT:   And then I understand, Mr.

9    Rion, you had indicated to the Court in chambers that Mr. Carter did not wish

10   to accompany the jurors on the --

11         MR. RION:   That is true as well.

12         THE COURT:   Well, he wouldn't be with

13   the jurors; but, he has the right to be out there while they're there.

14         MR. RION:   That was explained to him.

15         THE COURT:   He's waiving that; is that

16   correct?

17         MR. RION:   Yes, your Honor.

18         THE COURT:   Okay.  Then I understand

19   that counsel, neither counsel, is planning on going out there, either?

20         MRS. KOHLRIESER:   No, your Honor.

21         MR. RION:   No, your Honor.

22         THE COURT:   Okay.  We did have another

23   issue we talked about in chambers regarding the State's Motion under

1    404 (B) with some other evidence of other acts that they wanted to present.

2    We had some discussion in chambers. We need to get that on the record. I

3    do have a nine o'clock conference call. I hope that doesn't take too long. So,

4    if you guys can just stand by? As soon as I'm freed up we can come in. I

5    want to get that taken care of before we have the opening statements so you

6    know the parameters. In other words, regarding whatever the ruling would be

7    on that other acts evidence that may make a difference in how you present

8    your opening statement. So, I want to make sure we do that beforehand.

9    Again, as soon as the jurors are back and ready to go and after we take care

10   of that we can get started with the openings. Okay?

11        Anything else? Okay. Sit tight. I hope that this conference call won't

12   take too awfully long and then we can come back in here and deal with that

13   404 (B) stuff. Okay? We'll be in recess.

14   (WHEREUPON, COURT WAS IN RECESS.)

15

16                              THE COURT:  Okay. The record should

17   reflect -- oh, not yet.

18   COURT REPORTER:  Okay.

19                              THE COURT:  Okay. Let the record reflect

20   then we're reconvening in CR2014 0139, State of Ohio -vs- Markelus Q.

21   Carter on the 9th of September, 2015. The defendant is present with

22   counsel. The State is present. The jurors have returned from the view, but

23   they are not in the Courtroom. I apologize. My conference call took longer

1    than I thought.  But, let's go ahead and handle this issue.  I'm addressing the

2    State's Motion of Notice of Intended Use of Evidence, 404 (B) evidence, that

3    was filed on September 1 regarding, and I'll just use the generic, a December,

4    2007 incident and things that have followed from December of '07.  That was

5    filed on September 1st.  There's also a September 3rd filing of a Notice of

6    Intended Use of 404 (B) evidence and this involves and, well, we'll just

7    generically call it Kenneth Brayshaw evidence.  So, the State has put on a

8    Notice of Intended Use of the Evidence.

9            I don't know, Mr. Rion, if you were going -- I know that these just

10   happened in the last few days.  Was there a written response?

11                        MR. RION:   There is, and I'll file it.  It

12   simply states that, well, I think the standard for 404 (B) evidence, first of all, is

13   that there's reasonable and timely notification.  Given how long this case has

14   been pending, I would argue that it's not reasonable to just be notified the

15   week before trial of the use of it.

16           Secondly, as to the merits, we discussed at length in chambers the

17   issue.  I don't really need to repeat it.  The Brayshaw issue seems to demand

18   separate analysis than the December issue.  I would primarily argue that the

19   Brayshaw incident should not be admitted for any purpose because it's not

20   related.  The State is using it simply to show or create a false sense of a

21   pattern, or actions conformity, or a character issue.  I don't think that they can

22   or could show the requisite connection to attempt to show a motive.  There

23   are police reports that should probably be made a part of the record if the

1   Court needs to see those to understand the context in which at least the

2   anticipated testimony comes from police reports.

3                    THE COURT:   Okay.  Does the State want

4   to explain any more, other than what you've got in writing on the two notices?

5                    MR. MILLER:   Yes, your Honor.  Do you

6   want me to handle each one of the referenced incidents in turn?

7                    THE COURT:   Yea.  I think it's, as Mr. Rion

8   indicated, I think these are two separate groups of evidence, or types of

9   evidence.  So, yea, let's kind of deal with them separately.

10                   MR. MILLER:   Okay.  In turn?  Okay.  I'll

11  speak to the Ken Brayshaw, or, what we will refer to as the Ken Brayshaw

12  incident first because --

13                   THE COURT:   That's the September 3rd

14  notice.

15                   MR. MILLER:   Okay.  Because that

16  happens, in the context of this case, earlier.  So, I think in terms of chronology

17  it makes sense.

18       Now, we expect the facts to show that Ken Brayshaw was a former

19  boyfriend of Sonya Burkholder.  Sonya Burkholder is sort of the lady at the

20  heart of this case, if you will, in the sense that she had children with Markelus,

21  at times lived with Markelus, and while they weren't married, well, essentially

22  had a, I'll term it as a marriage type relationship, for an extended period of

23  time with Markelus.  Well, during that period of time she was working at the

1    Husky Refinery and met Ken Brayshaw.  She struck up a relationship with

2    Ken Brayshaw.  That relationship was a sexual one and it is one that led to

3    Ken Brayshaw offering, or, asking Sonya to marry him.  He bought her a ring

4    and she accepted the ring.  Now, soon thereafter, and no one except for

5    Markelus really knows why or how he found out, Markelus found out about

6    this particular relationship and set about breaking up the relationship.  What

7    he did was he showed up at Ken Brayshaw's house in Ada unannounced,

8    and nobody knows how he got that information, and he told Ken Brayshaw

9    that he was with Sonya, so to speak, and Ken Brayshaw said, "Well, I'll talk to

10   Sonya about that."  Well, a day or two, or some days later, there was another

11   meeting between the parties, such as they were, out at what used to be called

12   the Pharm, P-H-A-R-M, on the east side of town out in what we call Eastgate.

13   In that parking lot Ken Brayshaw was to meet Sonya and they were supposed

14   to discuss this particular situation.  Unbeknownst to Ken Brayshaw Markelus

15   showed up and had a recorded argument between Markelus and Sonya

16   Burkholder where Sonya Burkholder is emphatically telling Markelus that he,

17   meaning Ken Brayshaw, is gay.  Now, we expect the testimony to be that she

18   was saying that in order to protect herself and Ken Brayshaw from an angry

19   Markelus Carter.

20        Now, what does this have to do, as the defense asked, with the

21   broader case?  Well, as the Court -- well, as the Court may not know, or may

22   know, from looking at discovery, this case spans a significant period of time.

23                          MRS. KOHLRIESER:  Your Honor, if I may

1    interrupt just a second? I don't think there's actually been a formal separation

2    of witnesses motion. But, considering that we're talking about evidence, and

3    I've noticed people have walked in, and particularly Ruby Carter, which my

4    understanding is that the defense has subpoenaed as a witness and is listed

5    on the witness list, I would ask that that be made before we talk any further

6    about the case.

7                                THE COURT:   Okay. Any objection to

8    separation of witnesses?

9                                MR. RION:   No objection to the motion and

10    the Court's order. We do not anticipate calling Miss Carter to the stand.

11                                THE COURT:   Okay. Well, I will, just for

12    the record, grant the order separating witnesses. Any folks that have been

13    subpoenaed, with the exception now that the defense has indicated they're

14    not going to be calling Ruby Carter, but any other person who's been

15    subpoenaed as a witness, unless counsel would indicate they are not going to

16    be used, will have to leave the Courtroom until they testify. Okay. Continue.

17                                MR. MILLER:   Thank you, your Honor.

18    Now, as I was saying, this case spans a significant period of time. As the

19    Court is going to see throughout the testimony in this case, it cannot be

20    viewed in separate, distinct segments of time. Although certain events

21    happened temporally, detached from each other, the entire sequence of

22    events is a continuum. This is one of those events in that continuum. The

23    point of this evidence is to show that Markelus Carter, and I'm simplifying

1    this - but, when Markelus Carter is presented with a situation where Sonya is

2    about to move on, so to speak, he reacts.  He reacts in a particular way.  He

3    specifically reacts when there is evidence presented to him that, you know,

4    Sonya is about to get married or move on permanently.  One of the specific

5    ways he reacts is to control her and bully her and intimidate the boyfriend at

6    issue.

7          Now, again, what does this have to do with Ken Warrington?  Well, it

8    has a lot to do with it because when you fast-forward in time during this

9    continuum and move up to the time when Sonya is with Ken Warrington this

10   same modus operandi occurs with Markelus.  We have very similar facts.  It's

11   a guy met out at the Refinery.  There's going to be evidence that, well, at

12   least Markelus believed, that Ken Warrington had bought Sonya a ring.  That

13   set into motion a very similar mode of operating by Markelus that led to Ken

14   Warrington's death.

15         I'm trying to condense a lot of testimony to give the Court a summary

16   of what we expect.  But that, in essence, -- and on top of that we have, with

17   Ken Brayshaw, we have Markelus showing up surreptitiously out in Ada, far

18   from where he lives, to confront Ken Brayshaw.  Well, similarly with Ken

19   Warrington, there's going to be, and we expect there to be evidence that Mr.

20   Carter was stalking Ken Warrington in the weeks and days coming up, or,

21   leading up to Ken Warrington's death.

22         So, we have very similar situations here between the two Kens, if you

23   will - Ken Brayshaw and Ken Warrington.  We feel that it is important.  It goes

1    to modus operandi.  Maybe to a lesser extent, or an equal extent, it goes to

2    motive in the sense that he's motivated by these boyfriends that are impeding

3    on his, and I'll just use the word, territory, for lack of a better term.  So, they're

4    very similar incidences.

5        Now, the 2007 incident, unless the Court has any questions about the

6    Ken Brayshaw incident, the 2007 incident, again in this continuum, occurs

7    two, and I'm going to use round numbers, two, two and a half, three years

8    after the Ken Brayshaw incident, which was roughly 2004/2005.  The

9    December, 2007 incident is, well, that is the motive for this case.  What we

10   have in that incident is an incident in the late evening between Markelus

11   Carter and Sonya Burkholder, now known as Sonya Hughes, but I'm going to

12   continue to say Burkholder because that's what I know her as, but Sonya

13   comes homes and goes to bed and is awakened by Markelus, a mad

14   Markelus who, according to the facts that we expect, had a gun in his hand

15   and threatened her and hit her with the gun and threw her out of the house all

16   over this relationship that was now, at this point and time, involving Ken

17   Warrington.  Now, again, condensing a lot of expected testimony into

18   somewhat of a summary here, I think the evidence is going to show that

19   there's a series of events that follows that.  The series of events essentially

20   are, okay, a C.P.O. being filed by Sonya, a hearing being had, Sonya moving

21   out into other people's house.  Again, here we have Sonya breaking free.

22   She's moving out into other people's house for an extended period of time

23   and never going back to the Eureka Street home where this happened, but

1    getting her own home on McKibben where the murder happened.  All while

2    that is going on Markelus is doing certain things to try to get her back under

3    his control, so to speak.  Particularly -- particularly it is noticeable in his

4    statement given to Phil Kleman on the day of the murder that he is extremely

5    upset about this - which happened, by the way, fourteen months later, the

6    murder is fourteen months later - but, he is still extremely upset about this

7    2007 incident and the police handling of it and specifically the police not

8    following through or agreeing to file charges against Sonya, which he

9    believed should have been filed.  Okay?  Interwoven with that are his efforts,

10   similar to the Ken Brayshaw thing, his efforts to try to break up this

11   relationship.  There's just too many, I guess to go into with the Court now, I

12   mean, that's what the trial is about.  But, the point is, this 2007 incident, okay,

13   among a couple of other things, but this 2007 incident is really the spark that

14   lit the fuse that led to the explosion, if you will, through a series of events.

15           So, both of these incidences, the 2007 incident and the Ken Brayshaw

16   incident two years before that or so, are important for similar, but somewhat

17   separate, reasons too.  They go to modus operandi and, particularly with the

18   2007 incident, they go to motive.  Okay?  One second, your Honor.

19   (WHEREUPON, Court went off the record briefly.)

20                      MR. MILLER:   Now, one other thing I want

21   to introduce in terms of the argument from Mr. Rion about timely notification

22   of this.  The State has, to the best of its ability, given timely discovery to Mr.

23   Rion.  Initially in this case --

1          THE COURT:  Except for Doctor Bond.

2          MR. MILLER:  Well, --

3          THE COURT:  Go ahead.

4          MR. MILLER:  Arguably that was timely

5   when at least we found out about it.  Okay?  I would just ask the Court to

6   indulge us a little bit because this case spans back six years and the case

7   itself covers, you know, two years of time.  So, it's not insignificant the amount

8   of material we have.

9          Now, the point of this is these incidences were referenced in numerous

10  ways by numerous witnesses in discovery.  This is nothing new, although we

11  are required to give the 404 (B) notice, you know, under the rules.  These

12  things are nothing new to Mr. Rion.  Clear back in the initial discovery -- well,

13  back in May of '14 we gave Mr. Rion certain discovery and underneath that,

14  frankly, really the State, I don't think, had to give it but we gave it, it says

15  'facts which support Markelus Carter's motives'.  He has this information.

16  That document talks about Markelus Carter filing a complaint with the L.P.D.

17  alleging Sonya Burkholder filed false charges in regards to a domestic dispute

18  in December of 2007.  It goes on to say, "Sergeant Godfrey investigated the

19  complaint and informed Carter the case was closed with no charges," in

20  February of '09.  It also -- the same document talks about, "During the search

21  of Markelus Carter's home, after the murder and as a result of the search

22  warrant, Carter still had all the paperwork regarding the domestic violence, or,

23  the domestic incident, Court transcripts, e-mail conversations between Sonya

1    Burkholder and Ken Warrington, and other paperwork, leading one to believe

2    that this situation continued to bother Carter and was an issue for Carter."

3    That's something that I had forgotten to mention.  These Court documents

4    relating to the 2007 incident - I mentioned that there was a C.P.O. and I

5    mentioned there was a couple of things that happened after that - those Court

6    documents were found on the kitchen table the day of the murder when the

7    officers served the search warrant at Mr. Carter's home.  So, clearly, I mean,

8    yes, they relate back some years, but they also relate to the incident because

9    they're, I mean, they're clearly at the forefront of Mr. Carter's mind.  They're

10   on his kitchen table.  So, they're evidence in this case.  They were found

11   during the search warrant.  It cannot be avoided.

12        In addition, in the same documents provided in discovery back in May,

13   it is noted under the motives for Mr. Carter's actions on the 23rd of February,

14   2009 that Markelus Carter attempted to break off past relationships with

15   boyfriends of Sonya Burkholder, contacting past boyfriends and making

16   Sonya tell them they were over.  That is specifically relating to the Ken

17   Brayshaw incident.  So, it is not as if the defense -- that this has been sprung

18   on the defense.  It's all there.  We also gave him Mr. Brayshaw's statement -

19   him, being the defense counsel.  Sorry.  So, the defense has had this

20   information.  He's also had our take on it because we provided it to him and

21   actually we probably didn't have to do that.

22        So, all that being said in my somewhat inarticulate attempt to

23   condense a lot of information for the Court in summarizing our position on this

1    404 (B) stuff, we feel that, you know, this is highly relevant information and it's

2    admissible and it should be allowed.  The jury should hear it.

3           As for different facts that I think Mr. Rion is going to argue, now I

4    understand that the defense may have a different take on the 2007 incident.  I

5    understand the defense may have a different take on the Ken Brayshaw

6    incident in terms of what happened and how violent, or not violent, Mr. Carter

7    was during the 2007 incident, for example.  Okay.  Well, that's for a jury to

8    determine.  But, the jury needs to hear that.

9                          THE COURT:   Okay.  I think I understand

10   that.  I'll give -- Mr. Rion, real quickly, any response you want me to take into

11   consideration?

12                         MR. RION:   Your Honor, the only response

13   is that today is the first day that I've ever heard that Kenny Brayshaw gave, or

14   was thinking about giving, Sonya a ring.  In fact, in his own statement he says

15   that 'it's someone that he would consider marrying', but nothing past that.  So,

16   as far as this ring connection concept, that's the first I heard that.

17          I acknowledge that we did get Ken Brayshaw's statement a long time

18   ago.  I acknowledge we got the other documents he referred to.

19          That's the only addition I have to add.

20                         MR. MILLER:   Your Honor, may I respond

21   to that briefly?

22                         THE COURT:   Okay.  Quickly; yea.  Go

23   ahead.

1        MR. MILLER:   Okay.  As the Court well

2    knows, the defense has asked for and received funds for investigators.

3    Those investigators have been out talking to numerous witnesses on

4    numerous occasions.  They have had every opportunity to track down Ken

5    Brayshaw and talk to him.  He's not real hard to find.  I mean, he was fairly

6    cooperative with us.  He works, just like everybody else.  He's not hard to get

7    ahold of.  That information came about in doing due diligence in preparing for

8    trial.  He had the opportunity to find that out.

9        THE COURT:   Okay.  I understand that.

10    Let me make a ruling on this.  I'm going to treat these in terms of, well, I'm

11    taking it that the defense is objecting to this.  They put on a Notice of Intent.

12    So, it's basically in whether I'm going to allow the evidence or not.

13        Let's take the first one filed.  That was regarding the December, 2007

14    incident.  Let's call it the December, 2007 incident, but it's everything from

15    2007 in December and leading up to when the search warrants were

16    executed and the subsequent death of Kenneth Warrington.  The Court is

17    going to allow that evidence under Evidence Rule 404 (B) as other acts, a

18    sequence of acts, of the defendant.  Again, the issue in this case revolves

19    around the death of Kenneth Warrington.  So, I find that all of those

20    incidences, because the representation is made, anyways, assuming the

21    evidence will be such as the State has represented it to be, revolving around

22    Sonya's relationship with Kenneth Warrington.  I would find that those all go

23    to proof of motive, or intent, or preparation, or plan with regard to the

1    allegations of the aggravated murder of Kenneth Warrington.  So, I will allow

2    the 404 (B) evidence of those series of other events and acts of the defendant

3    with relationship to December of '07 up to the subsequent demise of Mr.

4    Warrington and also things that may have been found after the death of

5    Kenneth Warrington pursuant to the search warrant as they relate to that

6    December, or, everything that's happened in that time frame.  I find that those

7    are all proximately, temporally related to the issue of this case as to who

8    murdered Kenneth Warrington.

9         With regard to the September 8th, or, excuse me, September 3rd

10   intent to use evidence regarding the earlier 2004/2005 incidents or acts

11   involving Kenneth Brayshaw, who apparently, it's been represented, was an

12   ex, or had also had a relationship with this Sonya, taking into consideration

13   everything the State has represented, and assuming that they're representing

14   what they believe the evidence would show, I'm going to rule that the State

15   not use that evidence.  The reasons are, first off, I'm going to find the

16   temporal connection is too remote.  I find it's not -- well, while it may show, as

17   the State - and I wrote this down as Mr. Miller said it - 'the point of that

18   evidence is to show how the defendant reacts and that he had a similar

19   reaction when Kenneth Warrington came along', I find that that is exactly what

20   404 says isn't to be allowed.  It shows a character of a person in order to

21   show that he acted in conformity therewith.  There was no representation that,

22   and I know you said they met at a neutral place, but no evidence that he was

23   stalking Mr. Brayshaw.  There was no C.P.O. involving Sonya with

1    relationship to Brayshaw.  There was no representation that there was any

2    kind of physical harm done to Mr. Brayshaw.  It perhaps could show the

3    evidence of the Brayshaw relationship and defendant's acts with respect to

4    Brayshaw could show that he's easily angered by jealousy.  But, again, I find

5    that that's more showing, or, it's proving his character, the type of person he

6    is, and then you want to show that he acted that same way with respect to

7    Warrington and I find that there's just too remote of a connection both

8    temporally and with relevancy.  So, I'm going to disallow that evidence of

9    Brayshaw.

10       I will allow evidence regarding to December of '07 and anything

11    relating to the relationship Sonya may have been having with Kenneth

12    Warrington because I think that is both temporally and materially and

13    relevancy related to his motive, his intent, his preparation, his plan to show

14    the allegations that he meant to do harm to Mr. Warrington.  Again, those are

15    allegations at this point.  But, I'll allow that evidence.

16       So, I hope that's clear - my ruling.

17       So, anything else?

18                 MRS. KOHLRIESER:  Yes, your Honor.

19                 THE COURT:  Go ahead.

20                 MRS. KOHLRIESER:  A totally different

21    topic.  My understanding is yesterday Mr. Rion served subpoenas on the

22    Lima Police Department asking for various records.  I haven't seen the

23    subpoenas myself.  But, what the I.D. Officer, who would be the one who

1   would have to gather these items that are being requested by the subpoena

2   because they relate to the chain of custody and things of that nature

3   regarding various pieces of evidence, I.D. Officer Carman brought to me

4   today, and I supplied a copy to Mr. Rion, the chain of custody as far as

5   L.P.D.'s custody of items for every piece of evidence we have in the Kenneth

6   Warrington murder case.  He has those.  I'm guessing he hasn't had an

7   opportunity to look at them.  I don't know if he was desirous of more

8   information regarding these items, again, not having seen the subpoena, but

9   the way L.P.D. records department and I.D. Officer Carman were taking it,

10  well, they thought that they had substantially more documents that the

11  subpoena was requiring them to give.  I don't know -- I mean, Rule 16 is

12  designed a specific way.  It's awfully late in the game for this.  It's taking I.D.

13  Officer Carman, just to come up with what he came up with, it took him

14  several hours to generate those off the computer and things of that nature.

15  It's not just hit a button and there you go.  I'm also --

16                          THE COURT:   This is relating to

17  documents, evidence, and chain of custody with regard to the Warrington

18  murder?

19                          MRS. KOHLRIESER:  Yes.  I'm talking

20  about the Warrington one at this time.

21                          THE COURT:   I'm seeing a subpoena here

22  for records regarding the murder of Lucious Upshaw.

23                          MRS. KOHLRIESER:  Yes.

```
1                              THE COURT:   That's a different thing?
2                              MRS. KOHLRIESER:   I was going to get to
3     that next.
4                              THE COURT:   All right.  I don't see the
5     subpoena issued for the --
6                              MR. RION:   It's the same.  Your Honor, it's
7     the second sentence.
8                              THE COURT:   Oh, okay.  I'm sorry.  Yea.
9                              MR. RION:   It's the second sentence.
10                             THE COURT:   It also asks for any and all
11    records.  It was filed on September 8th, yesterday.
12                             MRS. KOHLRIESER:   Could you read that,
13    please, to me, your Honor?  I'm sorry.
14                             THE COURT:   'Any and all records
15    pertaining to the murder of Lucious Upshaw in 2005, including, but not limited
16    to, shell casing analysis.  Further, any and all property logs of property in and
17    out of the property room regarding the murder of Lucious Upshaw in 2005,
18    including, but not limited to, chain of custody information; any and all records
19    pertaining to the murder of Kenneth Warrington and/or defendant, Markelus
20    Carter, including, but not limited to, shell casing analysis.  Further, any and all
21    property logs of property in and out of the property room including, but not
22    limited to, chain of custody information'.  So, it does include both records
23    pertaining to the murder of Lucious Upshaw and to the murder of Kenneth
```

1    Warrington.

2                                    MRS. KOHLRIESER:   Okay.  Let's talk

3    about Kenneth Warrington just for a second.  Obviously that's subject to

4    Criminal Rule 16.  We've given everything that Criminal Rule 16 requires to

5    the defense.  Now, I understand what sparked that was the late notice of

6    Doctor Bond and all that that we've already talked about and I won't get into

7    that.  But, as far as -- I mean, that's a very broad subpoena, I think the Court

8    would agree.

9                                    THE COURT:   You've provided information

10   regarding the murder of, or, the chain of custody evidence in the Warrington

11   case?

12                                   MRS. KOHLRIESER:   Yes.

13                                   THE COURT:   You've given new stuff that

14   you didn't give before?

15                                   MRS. KOHLRIESER:   Yes.  Well, chain of

16   custody records aren't required to be given by 16.

17                                   THE COURT:   I understand.  But, you've

18   given it?

19                                   MRS. KOHLRIESER:   But, now that we

20   know that that was something that he's subpoenaing I.D. Officer Carman

21   prepared it and brought it to me.

22                                   THE COURT:   Is there anything in there

23   regarding the Lucious Upshaw murder?

1          MRS. KOHLRIESER:   No.  That is simply

2   Ken Warrington because I specifically -- well, I don't know if the subpoena

3   has a date for him.  Basically it boiled down to this - I.D. Officer Carman

4   called me and said 'this is going to take me days to get all of this'.

5          THE COURT:   Okay.  Let's do this.  I

6   understand what's the deal here.  You've given some things to Mr. Rion.

7   Perhaps he can look at that and say that he's satisfied; perhaps not.  But, this

8   isn't an issue that we have to deal with right now, with all due respect.

9          MRS. KOHLRIESER:   Well, it is.

10          THE COURT:   Why?

11          MRS. KOHLRIESER:   If I.D. Officer

12   Carman is going to have to sit over there -- he's got other things to do.

13   Particularly with Lucious Upshaw I'm moving to quash that flat out because

14   that is an on-going murder investigation to which he's entitled to nothing in

15   that and it's not relevant to this case.

16          THE COURT:   Is Carman here now, or he

17   gave this stuff and went back?

18          MRS. KOHLRIESER:   He gave this stuff

19   and I told him that I would be in touch.

20          THE COURT:   Okay.

21          MRS. KOHLRIESER:   But, again, because

22   of the broadness of that stuff -- he wants to comply with the subpoena, but

23   he's just like, 'well, can you see what you can do as far as narrowing this

1    down for me'.  I don't want him spending all day --

2                              THE COURT:   So, there might be other

3    things over there in the Warrington case that he hasn't given over?

4                              MRS. KOHLRIESER:   I don't -- well,

5    nothing that I.D. Officer Carman has given period.  It's been all of us.

6    Everything that we have been made aware of we have given to the defense.  I

7    understand, and this happens a lot of times, you know, post-conviction or

8    whatever they make public records requests for things.  But, again, it takes

9    days to do all of that, to track the things down.

10                             THE COURT:   Okay.  Here's the deal.

11   There's the State of Ohio, well, actually it's <u>IN RE:  Subpoena Duces Tecum</u>

12   <u>served upon Attorney Potts</u>.  It's an Ohio Supreme Court case.  They cite the

13   <u>United States vs. Nixon</u>, the case involving Richard Nixon and all of the

14   records dealing with Watergate.  The Supreme Court of Ohio says that I have

15   to have a separate evidentiary hearing to decide a Motion to Quash.  I would

16   assume that would mean maybe having the officer come in and give evidence

17   as to the burden upon him to do that.  That's what I'm saying - I don't have

18   time right now to have an evidentiary hearing.  They're entitled to have one.

19   Unless we want to keep the jury waiting another couple of hours and have

20   them revolt against us all, I'm not wanting to do that.  I understand the motion.

21   We're going to have an evidentiary hearing on it.  If you file a Motion to Quash

22   the Subpoenas we're going to have an evidentiary hearing because that's

23   what the <u>Potts</u> case says I have to do.

1       Now, all this is created because all of this is last minute stuff. But, I

2   have a lot of respect for the jurors and I don't want to keep them waiting any

3   longer. Unless Officer Carman is out there and wants to come in and give

4   some testimony as to what the burden on him would be to get this, I mean,

5   the issues are are the documents evidentiary and relevant, were they

6   otherwise procurable reasonably in advance of trial by the exercise of due

7   diligence, can the defense not properly prepare for trial without the production

8   in advance of trial, will the failure to obtain the inspection unreasonably delay

9   the trial, was the application made in good faith and not intended as a general

10  fishing expedition? I see based upon what went on yesterday any number of

11  those factors under the Nixon case might apply in this case. But, the law

12  says that I have to have an evidentiary hearing. Do you want to have an

13  evidentiary hearing right now?

14                          MRS. KOHLRIESER:   Your Honor, does

15  the subpoena have a date of compliance?

16                          THE COURT:   Because you're entitled.

17  We'll have one.

18                          MRS. KOHLRIESER:   Does the subpoena

19  have a date of compliance - when he's supposed to show up with these

20  records?

21                          THE COURT:   Yea, Tuesday, September

22  8th, at nine A.M.

23                          MRS. KOHLRIESER:   Okay. Well, then,

1    it's moot, I guess.  Apparently he didn't comply with the subpoena.

2                              THE COURT:   The subpoena was filed at

3    eight thirty-three yesterday and it was to comply on September 8th at nine

4    A.M.  I don't know when the recipient -- I don't see a return in the file yet.  It

5    may be over at the Clerk's Office.  Obviously he got served with it because he

6    apparently brought some stuff over.

7                              MRS. KOHLRIESER:   He got served after

8    the noon hour, your Honor, when I believe Mr. Rion went and served it.

9                              THE COURT:   As far as opening

10   statements are concerned and getting witnesses on, if we would all agree that

11   in the meantime Carman can go about his other duties -- can we agree to

12   that?  It's not needed in the opening statements; is it?

13                             MRS. KOHLRIESER:   No, your Honor.

14   Well, I guess it's moot.  The subpoena time has expired.

15                             THE COURT:   Mr. Rion, were you planning

16   on --

17                             MR. MILLER:   The time has expired.

18                             MRS. KOHLRIESER:   I didn't know what

19   the date was, your Honor.

20                             THE COURT:   Yea.  It says to bring that to

21   the Allen County Common Pleas Court, Courtroom B, on Tuesday,

22   September 8th at nine A.M.  It was filed a half hour before that and apparently

23   wasn't served until after that time.  If we need to revisit this issue we can.

1          MRS. KOHLRIESER:   Okay.

2          THE COURT:  But, I'm asking if anybody is

3    going to get into this kind of stuff in opening statements?

4          MRS. KOHLRIESER:   Not us.

5          THE COURT:   Is the defense intending in

6    an opening statement to get into things that were in the Lucious Upshaw

7    murder case?

8          MR. RION:   I don't know what the evidence

9    shows.  Again, this went to our motion --

10          THE COURT:   I'm going to make a ruling

11    that you're not going to talk about the Lucious Upshaw murder in the opening

12    statement.

13          MR. RION:   I don't -- it goes to our Motion

14    to Continue.  Assuming that the logs show what I would hope they would

15    show, it wouldn't come up -- no, for opening statements it's not needed.

16          THE COURT:   If we need to have a full

17    evidentiary hearing under Potts and Nixon we will do that.  But, we're going to

18    go with opening statements now before I have a riot in the jury room.  Okay?

19    Is everybody ready for that?

20          MR. MILLER:   We're ready.

21          THE COURT:   Let's bring the jurors in.

22    (WHEREUPON, JURY WAS BROUGHT INTO THE COURTROOM.)

23          THE COURT:   Let the record reflect the

1    jurors are returned to the Courtroom after your quicker than I expected view

2    of the scene, ladies and gentlemen.  I had another matter and so the delay

3    here is my fault.  We had some other quick issues to take up on the record.

4    But, we're back and we're going to get started now.

5         I am going to permit the jurors who desire to take notes during the trial

6    to do so.  No juror is required to take notes.  The taking of notes is entirely a

7    matter of personal choice for each juror.  The fact that the notes taken by a

8    juror supports his or her recollection in no way makes his or her memory

9    more reliable than that of the jurors who do not take notes.  Do not let the

10   taking of notes divert your attention from what is being said or happening in

11   the Courtroom.  Some persons believe that the taking of notes is not helpful

12   because it may distract a person's attention and interfere with hearing all of

13   the evidence.  All notes are confidential and for the consideration of the juror

14   only.  Each note-taker will leave his or her notes or his or her chair, where

15   they were when you came in, during all recesses and until deliberations

16   begin.  At that time you will be allowed to take your notes to the jury room.  All

17   notes will be returned to the bailiff for destruction at the time the jury is

18   discharged.  Okay?

19        I may have been hearing things, but I thought I heard a beep.

20   Everybody turn off your cell phones so we don't have that.  Maybe it wasn't.

21        So, let's get started with opening statements.  Now, opening

22   statements are statements of counsel.  Opening statements are not evidence.

23   They're given to assist you.  They're sort of like, to paraphrase, I've heard

1    different ones, they're like a table of contents, they're like a road map to set

2    the course of the case, but basically they're an aid to assist you.  They're the

3    counsels' statements as to what they believe the evidence will, or will not,

4    show.  So, it's just kind of like that, like a table of contents, if you will, before

5    you open a book.  You say, okay, chapter one is going to be about this, and

6    chapter two, and then you start actually getting the evidence when you read

7    the book.  So, these are just kind of organizational aids to assist you as to

8    what each side believes the evidence will be, or won't be.

9            So, both sides are entitled to an opening statement.  The State is going

10   to go first.  As we've indicated all along, they'll be going first because they

11   have this burden of proof.  So, the law says they have the burden of proof and

12   they go first.  The defense doesn't have to present anything.  The defense

13   has no burden of proof.  Again, as we talked a lot yesterday, it's the

14   defendant's constitutional right.  If he decides not to present anything or

15   decides not to testify, that's a constitutional right.  You can't hold it against

16   him.  You can't consider that for any purpose.  Okay?

17           So, does the State have an opening statement you would like to

18   make?

19                       MR. MILLER:   Yes, your Honor.  Thank

20   you.  Ladies and gentlemen, the evidence is going to show in this case that

21   on February 23rd, 2009 Markelus Quan Carter, this man right here,

22   ambushed and murdered Kenneth Warrington in a hailstorm of bullets.  He

23   executed him on the doorstep of a home located at 436 McKibben Avenue

1    here in Lima, Allen County, Ohio.  On that cold, dark morning, February 23rd,

2    2009, Ken Warrington, who worked out at the Refinery, gathered up his stuff,

3    the things he took to work every day, a duffel bag and a cooler, and he went

4    out to his truck and he got in his truck and he drove off into the morning,

5    heading towards that address that I just mentioned.  What he did not know

6    was that Markelus Quan Carter was waiting for him to murder him.

7         This case, the evidence is going to show, is about Markelus Carter's

8    insatiable need for control, his perceived loss of control over Sonya

9    Burkholder, with whom he had children, and those children.  It's also about

10    his desperate attempt to regain that control once he perceived losing it.  And

11    it's about Mr. Carter's murder of Kenneth Warrington when Mr. Carter could

12    not regain that control.  When it appeared that Markelus Carter had no other

13    option to regain that control the evidence is going to show that he murdered

14    Ken Warrington.

15         You'll hear from Sonya Hughes - it's now Hughes - but, you're going to

16    hear many refer to her as Sonya Burkholder because I tend to refer, if I knew

17    a maiden name before they were married, I just tend to refer to the maiden

18    name.  You may hear me say, and you may hear others in this Courtroom

19    say, Sonya Burkholder.  Just know that her name is now Hughes.  Sonya

20    Hughes.  She will tell you how she met Markelus at a young age.  She never

21    married him, but had two kids with him.  Their names are Markie and Tarah.

22    You'll hear the way Markelus controlled Sonya and her life in the time leading

1     up to December, a very important date, December 17th of 2007, some

2     fourteen months before the murder I've referenced.

3         Sonya will tell you how she met Ken Warrington out at the Refinery.

4     It's now Husky.  It's changed names so many times.  I don't know what it was

5     back then.  We may hear that.  But, the Refinery.  Sonya will tell you how they

6     became friends, she and Ken Warrington, became friends.  She'll tell you

7     then how they became lovers.  You will hear that Ken was married at that

8     time to Faye Warrington.  You will hear Faye talk about how this relationship,

9     if you will, between Sonya and Ken, her husband, affected her marriage.

10    Most importantly, you will hear how Markelus reacted when he found out

11    about this relationship between Sonya and Ken.

12        I'm going to digress one second right here because I'm going to give

13    you a little warning.  The evidence in this case spans back, as I've mentioned,

14    years.  The evidence in this case is not going to come at you in some linear

15    form.  What I mean by that is the evidence is not going to be this happened,

16    well, it is to a certain extent, but not all of it is going to be that this happened,

17    and then this happened, and then this happened.  Things are going to be

18    happening and at the same time other things are going to be happening.  All

19    those things are going to be presented to you in testimony.  So, it's incumbent

20    upon you to pay attention to each witness.  Understand that when that

21    witness is testifying and giving the information necessary for you all to decide

22    this case, well, keep in mind that, particularly as this case proceeds and after

23    you've heard a number of witnesses, that any one witness's testimony may

1   be contemporaneous and not necessarily subsequent to or prior to another

2   witness's testimony.  There's going to be a lot of moving parts in this case is

3   what I'm trying to say.  Okay?

4        Now, I mentioned the control.  You're going to hear about that.  I

5   mentioned also the evidence is going to show how Markelus was, at a certain

6   point, losing control of Sonya and, as a side note, keep in mind as the

7   evidence proceeds, the children, Tarah and Markie.  It's not just about Sonya,

8   you'll hear.  Okay?

9        I mentioned this very important date, December 17th, 2007.  It's a

10   watershed moment.  The evidence is going to show that on that day, or

11   actually that evening, Sonya got off work at the Refinery and came home.

12   The home then was with Markelus.  The home then was at 122 East Eureka.

13   Now, another warning - we're going to be talking about two homes, one at

14   122 East Eureka, and I've already mentioned the other one up at McKibben.

15   Okay?  I told you, there's a lot of moving parts in this case.  Okay?  But, at

16   that time Markelus, Sonya, and the kids were living at 122 East Eureka.

17   That's where Sonya came home.  She went upstairs and she got ready for

18   bed.  She worked the shift that she got home later in the evening.  She laid

19   down with her daughter.  She was awakened by an angry Markelus.  The

20   evidence is going to show as the case proceeds, okay, and things are going

21   to unfold at certain times and you're going to have to look at evidence and go,

22   'oh, that relates back to this'.  Again, this isn't some linear thing.  It's going to

23   be something you're going to have to view holistically. We'll talk about that.

1    She's awakened by an angry Markelus who found e-mails between Sonya

2    and Ken Warrington because at this time Ken Warrington and Sonya were in

3    that relationship that I discussed.

4        On that evening Markelus threatened Sonya, hit Sonya, and threw her

5    out of the house.  You're going to hear about that incident.  You're going to

6    hear about what followed that incident because what happened then was

7    Sonya left the house and, well, my term will be, that a standoff ensued at 122

8    East Eureka because Sonya, when she left the house, flagged down a police

9    officer - as fate would have it, a police officer was passing right by - she told

10   the police officer what happened and a standoff ensued that took some hours.

11   Sonya never returned to 122 East Eureka.  She went to live with some

12   friends, the Bodikers.  You're going to hear about the Bodikers.  They're going

13   to testify.  They're going to tell you about that night from their perspective

14   because Mrs. Bodiker was a friend of Sonya's and Sonya called Mrs. Bodiker

15   for help.  You'll hear that testimony.  But, the point here in this time frame is

16   the evidence is going to show that it is at this time that Markelus really begins

17   to lose control, lose control of Sonya and, again, with Sonya go the kids.

18   Okay?  You'll hear with respect to the standoff that even when presented with

19   a reasonable resolution to the standoff that Markelus wanted to control the

20   situation.  It will be a theme throughout the testimony that Markelus likes to be

21   in control.

22       Now, what happens after that?  Well, the evidence is going to show

23   that what happens after that is a desperate attempt by Markelus Carter to

1   regain that control.  Those desperate attempts span roughly fourteen months.

2   They culminate in Markelus murdering Ken Warrington.

3        Now, you may wonder at some point during the testimony, 'well, he

4   threw her out of the house; why did he want to control her'?  I'm going to ask

5   you to listen to all of the evidence and wait until the argument, or, arguments

6   in this case are made and the evidence is going to suggest a number of

7   reasons why he would still want to continue to control Sonya beyond the time

8   that he threw her out of the house in December of 2007.  In any event, for

9   whatever reason, you're going to know through this evidence that he, in fact,

10  still wanted control over Sonya.

11       You're going to hear from Faye Warrington about how Markelus called

12  her on numerous occasions talking about this relationship between Sonya

13  and Ken.

14       You're going to hear how Markelus called out to the Refinery in an

15  effort to break up this relationship between Sonya and Ken so he could regain

16  control.

17       You're going to hear how Markelus stalked Ken in the weeks and days

18  leading up to the murder.

19       You're going to hear how after that 2007 incident Markelus actually

20  wanted charges filed against Sonya and you're going to hear how the Lima

21  Police Department, after investigating this incident from his perspective,

22  reported to him in the days before the murder - "Look, Markelus, there's

23  nothing there; we're not going to pursue the charges."  That was just days

1    before the murder.

2          You're going to hear in Markelus' own words when interviewed the day

3    of the murder just how mad he was about that decision.  To say the least, he

4    wasn't happy because there went another attempt to interfere with this

5    relationship with Ken Warrington and thereby regain control.  It's not the only

6    attempt, as I've mentioned.  That decision by the Lima Police Department and

7    that communication to Markelus of that decision is another seminal event in

8    this case.  You'll hear about that.  It may have been, in his mind, the final

9    straw.  I submit to you that it was.  The evidence is going to suggest that it

10   was.

11         The evidence is going to prove that now there's only one alternative.

12   Nobody listens to Markelus, the evidence is going to show.  Nobody takes his

13   side of the story, the evidence is going to show, according to Markelus.

14   There's only one alternative, as you'll see, and that alternative is murdering

15   Ken Warrington - all in an effort to regain control.

16         Now, this case is not about whether or not Ken Warrington was

17   murdered.  There is no question Ken Warrington was murdered.  You're going

18   to hear from the coroner, Doctor Pandey, in a rather clinical way about how

19   she performed the autopsy and you're going to hear her conclusion that this

20   was homicide - murder.  I will warn you now that there will be pictures that

21   accompany her testimony.  They're necessary.  They're evidence.

22         The question that's going to be raised is going to be did Markelus do

23   it?  Well, the evidence is going to show that there's plenty of motive.  But, did

1   he do it?  The evidence is going to show that he did because the evidence

2   that we have that you will see links him to the murder.  You're going to hear

3   scientific evidence that links him to the murder.  Now, you're going to have to

4   take that scientific evidence and you're going to have to couple it with other

5   evidence presented in this case.  That's why I say that you're going to have to

6   listen very carefully to every witness, no matter how short their testimony

7   might be, because what you're going to do later is take that evidence and put

8   it with other evidence and then some other evidence to get the entire picture.

9   But, you're going to have scientific evidence that links Mr. Carter to that

10   murder.  Not only that, the State expects there to be testimony that Mr. Carter

11   told others how he did it, how he murdered Ken Warrington in that hailstorm

12   of bullets that I mentioned.  You'll see that that evidence, what he told other

13   people, matches other evidence in the case.

14          Now, we have an indictment in this case, as the Court, I believe, has

15   mentioned.  The indictment contains two counts.  One count is Aggravated

16   Murder.  The other count is what's called Having a Weapon Under Disability.

17   Aggravated Murder is set forth in the indictment as 'did purposely, with prior

18   calculation and design, cause the death of another, to-wit:', meaning who,

19   'Kenneth Warrington'.  There's what's called a gun specification on this

20   particular count.  A gun specification simply means, and the Court will instruct

21   you on it, that Markelus used a gun to commit the murder.  Now, listen to the

22   Court's instructions on the gun specification and follow the instructions.

23   Okay?

1          There's going to be evidence in this case of a number of guns.  You're

2    going to hear about a number of guns.  You might hear about a nine

3    millimeter Glock.  You might hear about a Smith & Wesson .357.  The

4    evidence is going to show those aren't the murder weapons.  But, the

5    evidence is also going to show that he likely had a third weapon that the

6    police never found; but, he had ample time to get rid of.  Okay?  Another

7    word of caution - as the evidence proceeds listen carefully and don't get

8    confused with the guns because you're going to hear about two guns that

9    aren't the murder weapon and then you're going to hear about a third

10   weapon.  Okay?

11         Now, this second count is Having a Weapon Under Disability.  What

12   does that mean?  It's not a physical disability.  Again, listen to the Court's

13   instructions on this count when you get them at the end of the case.  You're

14   going to hear testimony directly relevant to this count about prior convictions

15   of Mr. Carter that put him under what's called a legal disability.  In other

16   words, he's not allowed to have a firearm.  That's my summary of it.  Listen to

17   the Court's instructions on it.  Those are the two counts that you're going to

18   ultimately resolve in this case.

19         Now, again, this case will not be about whether Ken Warrington was

20   murdered.  It's going to be about this man, this man, Markelus Quan Carter,

21   being the one that did it.  At the end of this trial -- at the end of this trial one

22   name, justice will call one name, and it will be Markelus Quan Carter.

23                              THE COURT:  Thank you.  Mr. Rion?

1          MR. RION:   May it please this Honorable

2     Court, friends and family of Mr. Carter, those in attendance, and ladies and

3     gentlemen of the jury.  February 23rd, 2009 started in Markelus' world with an

4     alarm clock going off at six.  He drove his son to school.  He turned the T.V.

5     set on.  He woke up and turned the T.V. set on and got his son up and drove

6     him to school.  He got gas.  He went to the mailbox and then received a call.

7     The call was from Detective, or, Officer Godfrey, who said, "I need to talk to

8     you."  Markelus' response was, "Oh, good.  Do we have any movement?"  I'll

9     get to this December 17th thing in a minute.  But, he's referring to what

10    happened two years before and the investigation of it.  The Officer said, "I just

11    need to talk to you.  Come on down."  He said, "All right.  I'll be there in a little

12    bit."  So, Markelus -- well, you're going to hear that there were gunshots

13    heard over on McKibben about five-eighteen to five-thirty in the morning, early

14    in the morning.  Then you're going to hear that Markelus, Jr., Mark's son, was

15    at school between seven-thirty and seven-fifty that morning.  You're going to

16    hear that the police, shortly thereafter, stopped Markelus.  So, they called him

17    again.  They said, "Hey, listen.  We really need you to come down."  He said,

18    "All right.  I'm coming right down."  They stopped him.  The second phone call

19    that they made to Markelus was that he -- this had something -- something

20    happened to Ken.  Now, at the time Markelus had a lawyer and his name was

21    Ken Rexford.  You're going to hear evidence that Markelus called his lawyer

22    after that second call - not to say, 'hey, I need to talk to you, I'm being

23    investigated for something', but 'are you okay', thinking that something had

1    happened to Ken was referring to Ken Rexford.  Ken's wife answers the

2    phone.  She says, "Yea, Ken's fine and everything's good."  Ken gets on the

3    phone, I think, and 'everything's good'.  Then Markelus gets pulled over and

4    they tell him there's been this shooting over on McKibben.

5         Now, that night Tarah, Markelus' daughter, was staying with her

6    mother.  Markelus thinks that his daughter has been involved in an incident.

7    He, you'll hear, well, you'll hear the reaction.  You'll hear the police officer

8    say, 'I'm not going to tell you what this is about; I just have to take you down

9    to the station'.  So, he takes him down to the station.  They explain that this

10   has to do with, well, not his daughter, Tarah, but that Ken Warrington's been

11   killed.  They start asking Markelus whether he has any guns in his house.  He

12   says, "Yea."  So, they go and they search the house.  They find a .357 and

13   they find a nine millimeter.  They send those weapons off to get tested to see

14   if those were the bullets that were involved with the Ken Warrington murder,

15   and the answer is 'no'.  They interview Markelus for I think it was around two

16   hours.  He's explaining and answering questions.  He even talks to his lawyer.

17   Ken calls back at some point and he tries to explain what it's about and hangs

18   up with him and keeps talking to the police.  Then they let Markelus go home.

19        They then search the house.  They find a weapon.  Markelus wasn't

20   allowed to have a weapon because of a prior conviction.  They then arrest

21   him and then here goes the case.  He's ultimately convicted of that Weapon

22   Under Disability and goes to prison for a long period of time on that.  That

23   becomes relevant, as you'll see.

1   So, let's go back to 2007, this watershed moment that the Prosecutor

2   talks about. Sonya and Markelus dated for years, on and off. They broke up

3   for awhile before 2005 and really on the insistence of his mother they get

4   back together, meaning Sonya needed a place to live because she didn't

5   have one and Markelus decided to allow her to stay at the house. It's one of

6   those unhealthy relationships where they both are together sometimes, but I

7   think they're both probably dating others as well. It wasn't really meant that

8   they were living together. It was by convenience and then it just sort of

9   became habit. But, on December 17th, 2007 there was a clear indication that

10  Sonya was involved with another man and Markelus, not trying to control or

11  keep Sonya, says, "You've got to get out." Tarah was there. You'll hear from

12  Tarah, their daughter. She was there and saw the whole thing. Sonya goes

13  down the stairs and leaves. She's obviously mad. She's put out on the street

14  and has no place to go. It's late. So, she calls the police. The police literally

15  surround the house. I think there's an allegation that Markelus has the kids in

16  the house and he has a gun in the house and that it's a violent situation and

17  the S.W.A.T. team is called and surrounds his house. Well, Markelus is

18  scared to death that he's going to get shot if he just walks out. So, he's

19  talking to the people. He waits until it gets light and then they negotiate a

20  peaceful way for him to, like, turn himself in for this to happen so that nobody,

21  or, so that he doesn't get hurt. The police come in and take the kids. They

22  take Markelus and put him in jail for a period of time - days. Civil protection

23  orders are filed. He can't see his kids. She had told the police that he had

1    hit her and that he had a gun in his hand and he had threatened her.  That's

2    what she tells the police.  The police investigate and they observe all the

3    physical evidence they have to investigate and look at.  They don't bring any

4    criminal charges against Markelus.  So, charges are dismissed.  So, the

5    charges are dismissed and now Markelus is talking to Officer Godfrey about,

6    'all right, look, this lady said that I had beaten her, and that I pulled guns on

7    her, and that I had threatened her, and I couldn't see my kids for 'X' period of

8    time, and I was taken to jail - I'd like for a Falsification charge to be brought

9    against her'.  They looked at this.  When I say charges weren't brought, what I

10   mean, well, you know, they held him obviously for a period of time.  So,

11   charges may have been brought, but then they were dismissed shortly

12   thereafter once they looked at all of the evidence against Markelus.  Then no

13   charges are brought against either Markelus, and the physical evidence really

14   doesn't support charges being brought against Sonya.  So, that's really the

15   case and Markelus' involvement.

16            Now, when he realized that Ken Warrington was married to Faye

17   Warrington for twenty-five years and they had a relationship he obviously

18   didn't think that was a good influence on his kids, or a good situation - not fair

19   to Faye and not fair to him.  In fact, you'll hear that Ken would go spend his

20   days with Faye, his wife, and then would come over to Sonya's at night.  Now,

21   there was a belief that Sonya and Faye - I'm sorry - Faye and Ken were on

22   the verge of getting back together.  There was also a rumor that Sonya

23   wanted to stay with Ken.  There were also rumors that Sonya was with other

1   people during this time.  So, it's true that Markelus had conversations with

2   Faye.  He called her and talked to her about the situation.  He had

3   conversations with Ken, saying, "Look, it's probably not good for you if you're

4   married.  I mean, just choose."  He had conversations with a lot of people just

5   trying to figure out what's going on here.  But, you'll never hear anyone say

6   that Markelus, from Faye, that he threatened anybody.  You'll never hear that

7   there was anything but a civil kind of, 'okay, look, these are the facts, whether

8   you know them or not, your husband is spending the night here and you need

9   to know what's going on', and that kind of thing.

10        So, let's go to the night of February 22nd.  You're going to hear from

11   Tarah, the daughter, that something different happened that night, something

12   that she had never seen.  This is the night before the killing.  Tarah's going to

13   tell you that Sonya, for the first time in her life, saw her mother -- Tarah's

14   going to tell you that she saw Sonya intoxicated.  I don't mean, oh, a couple

15   of drinks.  I mean, belligerent intoxicated.  It was the first time she had ever

16   seen this.  You're going to hear that she thought -- that she seemed irritated,

17   she seemed mad, she seemed whatever.  You're going to hear that Sonya,

18   shortly before that, had received training and had actually received her

19   conceal and carry permit.  She had twelve hours of training on how to use a

20   firearm.  You're going to hear from Tarah that that next morning, at six in the

21   morning, that Sonya came into Tarah's room and acted in a way that she had

22   never acted before - looking out the blinds that she had never looked out.

23   She was acting in a strange way.  I want you to hear how people acted

1   differently and I'm just going to put all the facts out there so you can draw a

2   conclusion.  Obviously I don't have the resources of the Police Department.

3   So, I'm not going to say that I can prove to you beyond a reasonable doubt

4   who did this.

5        You're going to hear evidence that there was a series of vehicles that

6   were unusual in that neighborhood that night.  You're going to hear testimony,

7   you know, that a lot of different people could have possibly been involved -

8   from Sonya, to the random act of senseless violence, to potential other

9   people that were upset, people in Faye's family who possibly, obviously,

10  could be upset that Ken Warrington is disrupting -- I mean, they have kids

11  together and it's a long relationship.  I mean, it was a strange non-functional,

12  dysfunctional situation that Sonya had created here.

13       So, the police look at these various things, but they keep focusing on

14  Markelus.  They keep trying to find reasons to why they say it's Markelus,

15  Markelus, Markelus, Markelus.  So, the investigation starts moving and they

16  start collecting their data in that regard.  They start talking to people while

17  Markelus is in prison.  They try talking to a person in prison who, I assume, is

18  going to come in here and say that he talked about facts from the case, a

19  person who can potentially be released from prison a few years from now if

20  he has good behavior and it seems like he's given good cooperation.  You're

21  going to hear from a lot of people from the prison that say that that alleged

22  statement that they're talking about, about him talking about facts of the case,

23  that it was manufactured - that they were in prison with this guy who is going

1    to come in here.

2         At the end of the day I think the evidence will show you this.  There's a

3    little piece of evidence here, that like the man coming out of the woods after

4    hearing a shot, you can infer 'yes' and you can infer 'no'.  There will be

5    another piece of evidence here.  You can infer 'yes' and you can infer 'no'.

6    Another piece of evidence here.  You can infer 'yes' and you can infer 'no'.  If

7    you infer 'no' on all three, there's zero evidence against Markelus Carter.  If

8    you infer 'yes' here and infer 'yes' here and infer 'yes' here, then the

9    Prosecutor will have a general picture, a general picture that they can at least

10   articulate in closing arguments.  Ladies and gentlemen, the evidence in this

11   case will clearly show that on February 23rd, 2009 that there is not evidence

12   beyond a reasonable doubt to indicate that Markelus Carter was at all

13   involved in the death of Ken Warrington.  In fact, the evidence, I think, will

14   support a conclusion pointing to others.  I ask you to listen carefully.  Listen to

15   all of the evidence.  Make no conclusions until you hear the last sentence

16   from the witnesses before you start trying to size this up.  After you do that we

17   will ask for a verdict of not guilty on both counts, both the Aggravated Murder

18   and the Weapons Under Disability.  Thank you.

19                           THE COURT:  All right.  Thank you.  That

20   concludes the opening statements which, again, are not evidence.

21        So, we're going to take a short break here.  I know you've been on sort

22   of a break when you took the jury view, but we'll take a short break until

23   eleven o'clock.  Just for counsels' purposes, my intentions would be to go

1  until about twelve-thirty and have a little later lunch.  But, we'll start up at

2  eleven o'clock.

3      Remember the admonitions, ladies and gentlemen.  Don't discuss the

4  case.  You haven't heard any evidence yet.  Don't discuss the case among

5  yourselves or with anyone else.  Don't express or reach any conclusions.  No

6  deliberations.  Don't have any contact with any of the persons involved.  I see

7  there is media coverage of this case.  If you could, and I don't know how

8  instantaneous that is, but obviously don't go on your Internet, your cell

9  phones, or anything.  Don't pay attention to any media accounts.  Don't listen

10  to or read any media accounts about the case.  Have no contact with the

11  media.

12      We'll stand in recess until eleven o'clock.

13  (WHEREUPON, COURT WAS IN RECESS.)

14

15

16      THE COURT:  Okay.  We're on the record.

17  It's still the 9th of September, 2015.  We're in CR2014 0139, State of Ohio

18  -vs- Markelus Carter.  The defendant is present with counsel.  The State is

19  present.  The jurors have been returned.

20      So, we will start now with the presentation of the evidence.  The State

21  may call their first witness.

22      MRS. KOHLRIESER:  Your Honor, the

23  State would call Faye Warrington.

1    WHEREUPON, called to appear as a witness in this proceeding was one:

2                              F A Y E   W A R R I N G T O N

3    who, having been duly sworn by the bailiff herein, testified as follows:

4    BAILIFF:   She has an objection.

5                              THE COURT:   Okay.  This witness has

6    asked that she not be photographed.  So, I'm going to instruct the media,

7    pursuant to the Rules of Superintendence, to not put her image in the media,

8    or, on the media.  Go ahead.

9                              MRS. KOHLRIESER:   Thank you.

10                          **DIRECT EXAMINATION**

11   **BY MRS. KOHLRIESER:**

12   Q      Can you state your name for the record, please?

13   A      Faye Lynn Warrington.

14   Q      What's your address, Miss Warrington?

15   A      3753 Gloucester Place.

16   Q      And how long have you lived there?

17   A      Twenty…twenty-seven years.

18   Q      Do you have any children?

19   A      One.

20   Q      And who's that?

21   A      Jeffrey.

22   Q      Okay.  How old is Jeffrey?

23   A      He will be thirty in a few days.

1  Q      Okay.  Have you ever been married?

2  A      Pardon me?

3  Q      Have you ever been married?

4  A      Yes.

5  Q      And to whom were you married?

6  A      Ken Warrington.

7  Q      When did you wed Ken Warrington?

8  A      In 1983.

9  Q      Miss Warrington, I'm going to hand you what's been previously marked

10  as State's exhibit '1' and ask you if you recognize who's depicted in that

11  photo.

12  A      That's my husband.

13  Q      Your husband, Ken?

14  A      Yes.

15                          MRS. KOHLRIESER:   Your Honor, for the

16  record, I'm publishing it for the jury.

17                          THE COURT:   Okay.

18  Q      The image that I just showed you, is that what we see now on the

19  overhead projector?

20  A      Yes.

21  Q      And that was your husband, Ken?

22  A      Uh-huh.

23  Q      Now, are you still married to Ken?

1   A      Ken is deceased.

2   Q      When did he die?

3   A      2009.

4   Q      What was Ken like?

5   A      He was a wonderful person.  He was very laid back.  He was a good

6   father, a good brother, and a son, and son-in-law.

7   Q      Was he a likeable guy, in your opinion?

8   A      Yes, he was.  He never had issues with anybody.

9   Q      Let's talk about your marriage a little bit, Miss Warrington.

10   A      Okay.

11   Q      In the last couple of years preceding his death what was your husband

12   like?  Well, what your marriage like, I should say.

13   A      It was the same up until maybe the last year or so.

14   Q      Okay.  What changed?

15   A      It was after he started talking to Sonya Burkholder and then it became

16   more.

17   Q      Okay.  When you say it became more, do you mean it turned into a

18   romantic relationship?

19   A      Yes.

20   Q      How was it that you came to learn of this relationship?

21   A      He told me when the relationship first started and I believe that when it

22   first started he was just -- she was talking to him about her problems and then

23   it developed more and became romantic.

1    Q       Okay.  So, it started off more of like a confidante type of thing?

2    A       Yes.

3    Q       And then developed, in your belief, to something more than that?

4    A       Exactly.

5    Q       What was your reaction upon learning that it had developed into

6    something more?

7    A       I wasn't happy.  But, even through that we didn't fight.  We never did.

8    Q       You never fought with him about that?

9    A       Huh-uh.

10   Q       Why not?

11   A       We just were civil as could be.  He was still coming home every day -

12   stopping by going or coming from work.  He brought his paycheck home.  We

13   talked about things.  But, we never argued.  We had never argued through

14   the whole time that we were married.

15   Q       Okay.  So, you're saying even though you learned that he was

16   basically having an affair with Sonya Burkholder you didn't yell at him, you

17   didn't scream at him, you didn't do anything?

18   A       No.  Like I said, we talked about it and I was always under the

19   impression -- well, he said he didn't know why he was doing it; it wasn't me.  I

20   still had hope that he was going to come back home.

21   Q       Okay.  In fact, at that point you two had been married how many

22   years?

23   A       Twenty-six.  We were together over thirty.

1    Q       He's being unfaithful to you.  Why didn't you leave him?

2    A       Because I thought he would come back home.  I didn't want a divorce.

3    Q       Did you actually, though, seek some legal advice in that regards?

4    A       I asked Clay Balyeat what I should do to protect myself just in case.

5    The only thing he suggested was to put money out of our joint account in a

6    single account in case I would need it if Ken wasn't paying the bills.  I told

7    Clay -- that's the first thing I told him, I do not want a divorce.

8    Q       Did you start putting money aside?

9    A       I did when he told me to.

10   Q       Okay.

11   A       But, I didn't have to put any more aside because Ken still brought his

12   paycheck home.

13   Q       So, the bills were still paid as normal and everything in that regard?

14   A       Exactly.

15   Q       Did you share with anybody in your family about Ken's infidelity?

16   A       Not right away.  I talked to my minister.

17   Q       Why didn't you tell your family members?

18   A       I thought things would work out and I didn't want them to change the

19   opinion they had of him.

20   Q       I guess what I'm getting from you is you didn't want them to know, in

21   case he did  come back you didn't want them treating him differently and that

22   type of thing?

23   A       Right.

1    Q        Okay.  Do you know whether your family ever found out that he was

2    seeing -- anyone in your family found out he was seeing another woman?

3    A        My sister and my mother received letters in the mail that told them Ken

4    is seeing another woman; he's moved out of the house; maybe you should

5    ask Faye about this.  They were the identical handwriting.  They were from

6    the same person, who wrote those two letters.  That's how my mother and my

7    sister found out.

8    Q        Was there any indication as to who wrote those letters?  No return

9    address or anything?

10   A        I have no idea.

11   Q        And did you then talk to them about it?

12   A        Yes.  They confronted me about it after that.

13   Q        What was their reaction?

14   A        They weren't happy, either.  They tried to be very supportive of me and

15   what I was going through.

16   Q        Did you explain your position to them about not divorcing --

17   A        Yes.

18   Q        -- him and things like that?

19   A        Yes.

20   Q        Were they supportive of that decision as well?

21   A        Yes.

22   Q        And at some point did your son find out?

23   A        Yes.

338

1    Q      I'm guessing he wasn't very pleased, either?

2    A      No.  He was very angry.

3    Q      Angry at who?

4    A      His dad and Sonya.  He was angry with both of them.  He was angry

5    with his father for making that more than just a confidante.  Luckily, before

6    Ken was killed, they had made amends - quite awhile before that.

7    Q      Okay.  So, even though he was mad initially they came to terms with

8    each other, so to speak?

9    A      Right.

10   Q      Now, Miss Warrington, are you familiar with a person by the name of

11   Markelus Carter?

12   A      Yes.

13   Q      How do you know him?

14   A      I knew him to start with from phone calls that he made to my house.

15   Q      What do you mean?

16   A      He called me and told me that he thought his girlfriend was having an

17   affair with my husband.  I said, "My husband has already told me he's talking

18   with her."  He said, "It's more than that."  Then, after that, I can't even tell you

19   how many phone calls I got from him.  Some of them would be at two or three

20   o'clock in the morning telling me that Ken's truck was over there.  I wasn't

21   going to get up and go over there.  But, I can't even tell you how many times

22   that I got the calls.

23   Q      So, many times?

1    A      Yes.

2    Q      In the days and weeks preceding Ken's killing did you receive phone

3    calls from him?

4    A      Uh-huh.

5    Q      And were they always the same nature?

6    A      Pretty much, except one that was probably two or three weeks before

7    Ken's death.  He called --

8    Q      From the defendant?  Okay.

9    A      Yea.  He said that he was going to give Ken one more chance.  I said,

10   "Meaning?"  He said, "I'm going to call him and tell her to stay away," or, him

11   to stay away from her.

12   Q      That was a couple of weeks prior to Ken's murder?

13   A      Yes.  I asked Ken, he stopped by after work, and I asked him if he had

14   called him and he said, "Yes."  I asked him if he had threatened him and he

15   didn't answer.

16   Q      When the defendant would tell you these things what was your

17   reaction?

18   A      I didn't really have much of a reaction.  I told him I wanted Ken to come

19   home.

20   Q      Were you able to see -- granted this was 2009 and cellphones and

21   landlines and stuff have taken some turns, but were you able to see when the

22   defendant's number was coming up?

23   A      It rang private most of the time.  The call was private.

1    Q       Why did you continue to answer his calls?

2    A       Because it came up private and my mother is ninety-three years old

3    and her phone calls are private.  They come up private.  I was afraid that if,

4    you know, she needed me in the middle of the night and she's ninety-three

5    years old, well, I had to answer the phone in case it was her.

6    Q       What kind of things, if you recall, during all these conversations you

7    had with the defendant would you say back to him?  When he would tell you

8    that Ken's here, or Ken's over here, and this is going on, and that type of

9    thing, what would you say back to him?

10   A       Not much.  I told him that -- he said that he didn't want Ken around

11   her, and I said, "Well, I don't want Ken around her, either.  I want him to come

12   home."

13   Q       What was his demeanor like in these phone calls?

14   A       He wasn't -- he didn't sound mean or anything.

15   Q       Did he seem very firm in his belief, though, or his desire not to have

16   your husband around Sonya?

17   A       Yes.

18   Q       You said that Ken had informed you that the defendant had called him.

19   Did the defendant ever ask you to pass messages to Ken?

20   A       Not that I recall.

21   Q       And had you discussed with Ken that the defendant was calling you

22   repeatedly?

23   A       Uh-huh.  He was calling Ken, too, but I have no idea what he said to

1    him.

2    Q      Now, let's talk about the day before Ken was killed, February 22, 2009.

3    Did you see him that Sunday?

4    A      Before the Monday?

5    Q      Yes, the day before he was killed.

6    A      Yes.  He stopped by.

7    Q      Okay.  When you say stopped by, was he still living in your home?

8    A      He had most of his things still in my home; yes.

9    Q      Okay.  Well, was he laying his head down at your house when he

10   wasn't working?

11   A      Once in awhile; yes.

12   Q      Do you know where he was staying other than your home?

13   A      As far as I know, to start with he stayed at his uncle's, his uncle was

14   deceased, with her and then I guess sometimes he stayed at her house.

15   Q      Okay.  Now, on that day, February 22nd, the day before he was killed,

16   do you know what shift Ken was working at that time?

17   A      He was on nights.

18   Q      Okay.  Do you know what hours that was?

19   A      They changed it to twelve hour shifts.  It would either be seven to

20   seven, or seven to seven.

21   Q      All right.  But, you said that they changed hours at that time?

22   A      They changed it to the twelve hour shifts which made it either way.  It

23   was seven in the morning until seven P.M., and then seven P.M. till seven

1    A.M.

2    Q      Okay.  So, if some people employed at Husky would say those hours

3    were five P.M. to five A.M. would you have reason to dispute that?

4    A      No.  I think some of the different units might have worked different.

5    But, it was all twelve hours at that point.

6    Q      So, you said he stopped by the house.  Can you take the jury through

7    a little bit about what happened before he left?

8    A      He just stopped by and spoke to me about going into work and things

9    that had been happening.  He wanted to know if there was anything that he

10   could do for me.  He was like the old Ken, except I knew when he left that he

11   wasn't going to come home that night, or, that morning.  He told me he loved

12   me before he left.

13   Q      Did you see him alive again after that?

14   A      No.

15   Q      If you would, tell the jury how you came to learn that Ken had been

16   killed.

17   A      Lieutenant Baker went and got my son and they came to the house

18   and told me that Ken had been shot and he didn't make it.

19   Q      I understand that that weekend you had been sick.

20   A      Yes.  I had the flu.  Jeffrey called and said he was coming to lunch at

21   ten o'clock in the morning.  I looked out -- I had a robe on and I looked out the

22   window and there was a gentleman in a suit who I found out later was

23   Lieutenant Baker.  They found Jeffrey's business card in Ken's wallet.  So,

1    Lieutenant Baker drove out to Allan Nott to get Jeffrey because he didn't want

2    him driving across town.  So, he told him first.  They sat beside each other.

3    Jeffrey sat me on the other side of him and then he told me himself.

4    Q      Jeff told you?

5    A      Yes.

6    Q      When he called you at ten o'clock to tell you he was coming home for

7    lunch did that strike you as odd?

8    A      I said it was odd and he said, "Well, I've got a meeting later and so I'm

9    just going to eat early."

10   Q      Okay.  When he showed up at the door with the man in a suit how

11   were you dressed?

12   A      I had a robe on.  I was just getting ready to take a shower.  He said,

13   "Don't take a shower.  I'm coming home for lunch."  That made no sense to

14   me.  But, like I said, I had had the flu and I was getting ready to take a shower

15   and get dressed.  He told me just to hang on and that he would be there

16   shortly.

17   Q      Now, Miss Warrington, did Ken have a life insurance policy?

18   A      Yes.

19   Q      Okay.  And were you the beneficiary under that?

20   A      Yes.

21   Q      Okay.  I'm not going to ask you specifically how much, but it wasn't

22   millions of dollars; was it?

23   A      No.

1   Q      When you sat down with your lawyer and things of that nature and

2   having gone through the last six years, how is your financial situation?

3   A      It was okay.

4   Q      Would it have been better or worse with Ken still alive?

5   A      Better.

6   Q      Why's that?

7   A      He's not bringing home a paycheck every two weeks and so the

8   money I got is what I live on until I'm old enough to draw anything else.

9   Q      To the day Ken died did you know for sure whether he was going to

10  come back to you or whether he was going to stay with Sonya?

11  A      I didn't know for sure.  But, he told me the night before that he loved

12  me.

13  Q      Thank you.

14                          MRS. KOHLRIESER:   No further questions

15  at this time.

16                          THE COURT:   Mr. Rion, any questions?

17                  **CROSS EXAMINATION**

18  **BY MR. RION:**

19  Q      Good morning, ma'am.

20  A      Hi.

21  Q      I just have a few questions.

22  A      Okay.

23  Q      Thank you for coming.  Shortly after this occurred you were actually

1    interviewed by Detective Clark over there; right?

2    A    Yes.

3    Q    And he was asking you some questions.  One of the questions that he

4    asked I think you've answered already this morning.  He asked you whether

5    or not in all the conversations you had with Markelus whether or not Markelus

6    ever threatened you or anyone in your family, and your answer was 'no, he

7    never threatened me or anyone in my family'; correct?

8    A    Right.

9    Q    There was also, though, a phone call that you received from Sonya; is

10    that true?

11    A    Yes.

12    Q    And what time of night was it that Sonya called you?

13    A    That was early wee hours.  Or, that was more in the evening,

14    nighttime, like late.

15    Q    You were in bed late?

16    A    Yes.

17    Q    I can tell from the way you are that the words I'm going to ask you to

18    say wouldn't come out of you mouth normally.  I'm going to ask you to repeat

19    to the jury what she told you.

20    A    She -- I answered the phone and she said, "Don't fuck with me."  I

21    never said a word back to her and I hung up.  I did call Ken at work to tell him

22    that she called and said that.  He said, "She called here, too.  She told me

23    that she's coming to the house."  She never came to the house.

1  Q      She said that she was going to come to your house?

2  A      Yes.  She told Ken that and Ken was at work where he couldn't leave

3  until he got a sub.  She said she was coming to my house.

4  Q      Did that worry you, or concern you?

5  A      Not really.  I have the Bath -- the Sheriff's Department has a Bath

6  Officer which can be reached pretty quick.  A guy that lived across the street

7  from me was a guard at the prison.  I felt like I had plenty of people that would

8  be there, you know, just in case.

9  Q      So, it worried you to the extent that you thought, 'well, at least I have

10  security officers and other people --

11  A      Right.  Exactly.

12  Q      -- that know how to use weapons around'?  Do you recall to the best of

13  your recollection when that call was made?  Not the time of day, but the

14  month or the day.

15  A      No, I don't.

16  Q      To put everything into perspective, Ken moved out of the house.  Well,

17  was it on two different occasions that he moved out?

18  A      Yes.

19  Q      The first time he moved out, roughly speaking, what was the time

20  frame of that?

21  A      Maybe about six months.

22  Q      So, six months before, or for six months?

23  A      Before.

1    Q      Okay.

2    A      Well, before what?

3    Q      Before February 23rd.

4    A      Yes.

5    Q      Okay.  So, like in August or so?  Late summer; was it, for the first time

6    he moved out; generally speaking?

7    A      The first time he moved out was towards fall, around Christmas time,

8    for about six months, and then he came back.

9    Q      Okay.

10   A      Then later that year and into the next year was the February he got

11   killed.

12   Q      Oh.  Okay.  So, when he moved out the second time was that around

13   November of 2008 that he moved out?

14   A      Yea, probably.

15   Q      Okay.  And you said he was living, or, staying either at Sonya's house

16   or at his uncle's house?

17   A      Yes.

18   Q      And she was with him was your understanding?  I thought I heard you

19   say that.  Would she stay there with him?  Is that your understanding?

20   A      As far as I know; but, I can't give you a positive answer.

21   Q      That was your understanding?

22   A      Yes.

23   Q      You obviously didn't go there and see or whatever.  But, that was your

1    understanding?

2    A      Right.

3    Q      And you said during direct he admitted to you during this entire -- well,

4    that he was, in fact, having a relationship with Sonya and didn't know why, or

5    whatever, but that's what was going on; correct?

6    A      Correct.  The first time he brought that up to tell me about it was -- well,

7    back then we had no text packages on our phones and he told me that I was

8    going to get a huge cell phone bill.  I said, "Why?"  He said, "This gal at work's

9    been texting and I text her back."

10   Q      What's the time frame on that?  Was that like a year before?

11   A      The whole thing was about a year before he got killed.

12   Q      So, in the fall/winter of 2007 into 2008 is when things got started and

13   that was the first time he moved out; correct?

14   A      The whole year of 2008.  It was that whole year.  Then Ken was killed

15   in February of 2009.

16   Q      Had you and he spoken about trying to work this out and for him to

17   move back home?

18   A      Yes.  He was considering counseling.

19   Q      And was that right around this time period when you were having the

20   conversation about counseling?

21   A      Yes.

22   Q      To the best of your knowledge during that entire year, let's say all of

23   2008, all of Ken's monies went to you; correct?

1    A      Yes.

2    Q      In other words, he literally deposited his check into a joint account?

3    A      Yes, he did, and he brought the check stub and the receipt to the

4    house.

5    Q      Then you were --

6    A      It was like it always was.

7    Q      Then you were in control of the money from that point forward?

8    A      Yes.

9    Q      So, you paid the bills and you looked after the bank accounts?

10   A      Exactly.

11   Q      So, can I -- is it fair to say, then, that none of his paycheck, from what

12   you could obviously tell, was going to Sonya?

13   A      As far as I know, no.  When he went to the bank he always kept a little

14   bit of cash out.  But, when you looked on the bank receipt you could see that

15   it wasn't much.  I had the bank receipt and the check stub.

16   Q      Okay.  And did Sonya know - well, I guess I don't know if you would

17   know this - but, did Sonya, was she aware that he was still coming to the

18   house almost on a daily basis?

19   A      I have no idea.

20   Q      Miss Warrington, I'm sorry about your loss.  I thank you for coming

21   today.

22   A      Thank you.

23                                    THE COURT:  Any other questions from

1    the State?

2                                    MRS. KOHLRIESER:  No, your Honor.

3                                    THE COURT:  Okay.  Thank you.  You

4    may step down.

5                                    MR. RION:  Oh, I'm sorry.

6                                    THE COURT:  Okay.  Just a second.  Miss

7    Warrington?

8                                    MR. RION:  I forgot one little line of

9    questioning.  Is that okay?

10                                   THE COURT:  Okay.  Go ahead.  You can

11   have a seat.

12                    <u>**CROSS EXAMINATION CONTINUED**</u>

13   **BY MR. RION:**

14   Q      Take a seat.  Sorry.  Did you receive -- you spoke on direct

15   examination about letters that your family members had received.

16   A      Yes.

17   Q      Did you -- were those letters given to you?

18   A      They were mailed to their homes.

19   Q      But, then did your family members give them to you?

20   A      They showed them to me.

21   Q      But, then they kept them?

22   A      My sister has both of them.

23   Q      Okay.  The letters went to who in your family?

1    A      To my sister and my mother.

2    Q      And did you have a conversation with Ken about these letters?

3    A      Yes, and he said that he had no idea who sent them.

4    Q      Was there another conversation about Ken's brother-in-law?  I'm sorry.

5    Your brother.  Was a letter sent to -- are those the only two people that you're

6    aware of in your family that letters were sent to?

7    A      Yes.

8    Q      Okay.  And you saw them and felt that the handwriting was identical,

9    correct, on both of them?

10   A      Uh-huh.

11   Q      That's all I have.  Thank you.

12                                    THE COURT:   Okay.  Any redirect?

13                                    MRS. KOHLRIESER:   No, your Honor.

14                                    THE COURT:   All right.  You may step

15   down now.  Thank you.  The State may call their next witness.

16                                    MRS. KOHLRIESER:   Pam Callahan.

17   WHEREUPON, called to appear as a witness in this proceeding was one:

18                          P A M   C A L L A H A N

19   who, having been duly sworn by the bailiff herein, testified as follows:

20   BAILIFF:   She has an objection.

21                                    THE COURT:   Okay.  This witness also

22   has requested that she not be photographed.  So, I'll instruct the media to

23   comply with that.  Go ahead.

1          MRS. KOHLRIESER:   Thank you.

2                    **DIRECT EXAMINATION**

3    **BY MRS. KOHLRIESER:**

4    Q     Could you state your name for the record, and spell your last name?

5    A     Pam Callahan, C-A-L-L-A-H-A-N.

6    Q     Miss Callahan, are you currently employed?

7    A     No, I'm retired.

8    Q     Okay.  How long have you been retired?

9    A     Since June of 2013.

10   Q     Okay.  Before retiring where did you work?

11   A     I worked at the Husky Lima Refinery.

12   Q     Okay.  What did you do at Husky prior to retiring?

13   A     I worked in the Human Resources Department.  I was a senior H.R.

14   advisor.

15   Q     Okay.  Approximately how long had you worked in H.R.?  About what

16   year did you start in H.R.; if you recall?

17   A     I went into H.R. probably about 1990.

18   Q     And as part of your duties were you familiar with many of the

19   employees at the Refinery?

20   A     Oh, yes.  There for a time I was the recruiter and so I did hire a lot of

21   the employees and then I went and moved into benefits.  So, yes, I knew the

22   employees.

23   Q     In fact, employees would have to speak to you and things like that

1    regarding benefits and things of that nature?

2    A    Yes.

3    Q    Consequently, did you know Kenneth Warrington?

4    A    I did.

5    Q    Did you also know a Sonya Burkholder?

6    A    No.  I knew of Sonya; but, I never met Sonya.

7    Q    Okay.  Was Sonya -- so, you knew the name?

8    A    I knew the name.

9    Q    Okay.  Was Sonya an employee of Husky?

10    A    No.  She was a guard.  She worked for Allied Barton Security System.

11    Q    For those of us who may not be that familiar with Husky, there's a lot of

12    contractor work out there; correct?

13    A    Yes.  Yes, there is.

14    Q    So, even though people would say 'I work at Husky', that doesn't

15    necessarily mean for Husky?

16    A    Correct.

17    Q    Okay.  So, she was part of security; you said?

18    A    Yes.

19    Q    Now, back in January of 2009 were you contacted at H.R. about Ken

20    Warrington and Sonya Burkholder in relation together?

21    A    I did receive a phone call.

22    Q    Could you describe for the jury that conversation?

23    A    Yes.  I received a phone call from a gentleman who identified himself

1     as a Mark Carter.  He was requesting company policies.  These policies

2     specifically that he was interested in was personal use of company property,

3     such as computers and telephone system.  I told him at that time that I was

4     unable to release any policies to him without a Court Order.  He went on to

5     state that there was two of our employees that was having an extramarital

6     affair.  He went on to identify them as Sonya Burkholder and Ken Warrington.

7     He said the affair was taking place on company property in the facility using

8     the computers, using the telephone, and using e-mails.  He said that he really

9     didn't want to implicate Husky, but he was giving all this information,

10    gathering all the information that they received from a private investigator

11    about this affair and about the company property.  I told him that I could not

12    give him this without the Court Order, but that I would contact my boss, which

13    was H.R. Manager David Stein, and we would discuss the issue.  The phone

14    conversation then ended.

15    Q      Okay.  The person that represented themselves to be Mark Carter, did

16    they indicate what position they had in all of this investigation?

17    A      I don't recall at this time if he did.  He was very professional sounding.

18    He was very intent on wanting these company policies.  He said they were

19    going to Court or something.

20    Q      So, he did implicate there was something in Court, that type of thing?

21    A      Yes.  Yes, he did say that he needed these policies for the Court.  He

22    did not want to implicate Husky.  I'm assuming that he didn't want us being

23    subpoenaed for something if I could provide these policies.

1  Q    Did this call sound like something legitimate to you?

2  A    No.

3  Q    Okay.  Why was that?

4  A    Well, first of all, the name.  There was scuttlebutt.

5  Q    You had heard the name Mark Carter before?

6  A    I heard the name of Markelus Carter.

7  Q    Okay.  In relation to Sonya and/or Ken?

8  A    I did.  I don't know anything firsthand.  I mean, it was just the

9  scuttlebutt when you were out there at work and you know something is going

10  on.  You are aware of this.

11  Q    Okay.  Again, I don't want you to go into what the scuttlebutt was.

12  A    No.  Because it's not firsthand.  So, I don't know.

13  Q    Okay.  But, that name rang a bell to you?

14  A    It did.

15  Q    Okay.  I assume in your capacity in H.R. that you've gotten lots of calls

16  from lawyers and things of that nature.

17  A    I have.  I have.

18  Q    And did this seem like any of those calls that you had received before?

19  A    I'm sorry?  I didn't hear that.

20  Q    Did that -- did this call seem similar to those calls that you had received

21  before?

22                              MR RION:   Objection.  Relevancy.

23                              THE COURT:  Overruled.

1  Q      Go ahead.

2  A      He was after an intent of the company policy and I thought it was a

3  little strange that they would want the company policy for an extramarital

4  affair.

5  Q      Okay.  Now, you said you indicated to the caller that you would take it

6  up with your boss, --

7  A      Yes.

8  Q      -- who was David Stein at the time?

9  A      Yes.

10  Q      And when that call ended did you, in fact, communicate this to Mr.

11  Stein?

12  A      I did.  I went in and I spoke with David.  I waited a little while actually

13  because he was out of the office.  He was in a meeting.  I then spoke with

14  David and then I put everything documented, like we are supposed to do.  I

15  documented it and I sent David an e-mail.

16  Q      Okay.  And did you put a copy of that e-mail anywhere else?

17  A      Yes.  Standard procedure is that you document and then you put the

18  copy into the personnel file, which this copy of the menu - I'm sorry - of the

19  e-mail went into Ken Warrington's personnel file.

20  Q      Okay.  Even though you may have waited some time for him to return

21  from a meeting, was it still the same day?

22  A      Oh, absolutely.  Oh, yes.  Yes.  I had my notes and then I did the

23  e-mail.

1   Q     I'm going to hand you what's been previously marked as State's exhibit

2  '2'.  I'd ask you to take a look at that for me.  Do you recognize that

3  document?

4  A     I do.  I forgot something.

5  Q     What is that?

6  A     I forgot -- yea, I do remember sending this.  This is the e-mail that I

7  sent.

8  Q     Okay.  That's actually a copy of the e-mail; correct?

9  A     Yes, it is.

10  Q     Okay.  And you said you forgot something.  Is there something in that

11  e-mail that you didn't testify about just now?

12  A     Yea.  Actually he had provided me with e-mail addresses that was

13  taken from the evidence that their private investigator had.

14  Q     E-mail addresses for who?

15  A     Sonya and Ken Warrington.

16  Q     Okay.  That was included in --

17  A     That's included in here.

18  Q     When is that e-mail dated?

19  A     The e-mail is dated Monday, January 2nd, 2009.

20  Q     Okay.  January 2nd?

21  A     January 12th.

22  Q     Okay.

23  A     Did I say 2nd?  I'm sorry.

1          MRS. KOHLRIESER:  Nothing further.

2     Thank you.

3          THE COURT:  Okay.  Mr. Rion, questions?

4          MR. RION:  Thank you, your Honor.

5                    **CROSS EXAMINATION**

6     **BY MR. RION:**

7     Q     Good morning.

8     A     Good morning.

9     Q     I have just a few questions.  I'm taking from the conversation, the way

10    it was ended, that you indicated to him that you needed to talk to your

11    supervisor or something; correct?

12    A     Yes.

13    Q     And that you would get back with him?  Was that articulated to him?

14    A     I told him that I would discuss the issue with my supervisor; yes.

15    Q     And then get back with him?

16    A     He did not leave a telephone number.  He did not leave anything

17    where I could contact him back.

18    Q     Did you ask for that?

19    A     No.

20    Q     Okay.  So, basically you said you would have to discuss it with your

21    supervisor and on that issue you didn't receive any more information; correct?

22    In other words, Mark Carter didn't call back or anything like that?

23    A     No.  It is standard procedure that we do not release any company

1    policies without a Court Order.

2    Q      Okay.  This person that called identified himself as Mark Carter;

3    correct?

4    A      Uh-huh.

5    Q      All the information contained in the State's exhibit that you have before

6    you, that's pretty much the full recollection you have of the conversation in

7    regards to this; correct?

8    A      Correct.

9    Q      Mr. Carter appeared to be professional when you talked to him?

10   A      He did; uh-huh.

11   Q      Nothing further.

12                              MR. RION:   Thank you.

13                              THE COURT:   Any other questions from

14   the State?

15                              MRS. KOHLRIESER:   No, your Honor.

16                              THE COURT:   Miss Callahan, you're

17   excused.  Thank you for coming in.

18   A      Thank you.

19                              THE COURT:   The next witness?

20                              MRS. KOHLRIESER:   May we approach?

21                              MR. MILLER:   May we approach?

22                              THE COURT:   Sure.

23   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

1     the record, as follows.)

2                          MRS. KOHLRIESER:   It was going to be

3     Ken Brayshaw.  But, now he's calling Sonya and she's going to be lengthy.

4     He's painting her as a murderer.  I'm sure it's going to be lengthy.

5                          THE COURT:   Okay.

6     (WHEREUPON, Court continued on the record, as follows.)

7                          THE COURT:   Okay, ladies and gentlemen

8     of the jury.  The State has indicated the next witness might be on the stand a

9     little longer than -- we were kind of shooting for twelve-thirty.  But, we'll give

10    you an early noon recess.  We'll take our recess now.  I hope that doesn't

11    cause anybody any more inconvenience.

12           Remember the admonitions.  Don't discuss the case among

13    yourselves or with anyone else, including people that you might come into

14    contact with over the lunch hour.  Don't let your family or friends know what's

15    been going on because, again, it's not that I'm worried about you folks saying

16    something.  It's more so that the other folks would react and say, 'oh, what

17    about this', or, 'what about that', or, 'did you know about this'.  Then you start

18    thinking about things that you shouldn't be thinking about - things that are on

19    the outside.  Any media accounts, remember, don't listen to or read any of

20    those.  Don't get on the Internet.  Don't get on Facebook.  Don't twitter

21    anything about the case.  Don't discuss the case among yourselves.  Don't

22    formulate or reach any opinions or express any opinions about what you've

23    heard thus far.

1        We'll break until -- well, I'll go until one o'clock.  I did schedule a

2    twelve-thirty in another matter.  But, I think we can get that over with.  So, one

3    o'clock and we'll get started right then with the next witness.  Okay?  All right.

4    We'll be in recess until one o'clock.

5    (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

6

7                          THE COURT:   Okay.  The record shows

8    we're reconvening after lunch here on the 9th of September, 2015 in Case

9    Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The record

10   shows that the defendant is in Court with his attorney.  The State is present.

11   The jurors have returned.

12        So, we'll continue then with the presentation of the State's case.  The

13   State may call their next witness.

14                          MR. MILLER:   The State calls Sonya

15   Hughes.

16   WHEREUPON, called to appear as a witness in this proceeding was one:

17                      S O N Y A   H U G H E S

18   who, having been duly sworn by the bailiff herein, testified as follows:

19   BAILIFF:   She has an objection.

20                          THE COURT:   Okay.  This witness has

21   indicated, as her right, her wish not to be photographed.  So, I'll instruct the

22   media not to have images of her in the media.  Mr. Miller, go ahead.

23                          MR. MILLER:   Thank you, your Honor.

1      **DIRECT EXAMINATION**

2      **BY MR. MILLER:**

3      Q      Sonya, can you state your name, please?

4      A      Sonya Hughes.

5      Q      Were you formerly known as Sonya Burkholder?

6      A      Maiden name; yes.

7      Q      Is Burkholder?

8      A      Yes.

9      Q      Okay.  Did you get married recently?

10     A      No.

11     Q      When did you get married and change your name to Hughes?

12     A      December of 2009.

13     Q      December of '09?

14     A      Yes.

15     Q      Okay.  Now, do you live in Lima now?

16     A      No.

17     Q      Okay.  Did you used to live in Lima?

18     A      Yes.

19     Q      Where did you used to live in Lima?

20     A      On McKibben Street.

21     Q      Do you remember the address?

22     A      436.

23     Q      McKibben?

1    A    Yes.

2    Q    In Lima, Allen County, Ohio?

3    A    Yes.

4    Q    Now, where have you been staying the last few nights?

5    A    Allen County Jail.

6    Q    Why are you in the Allen County Jail?

7    A    You put me there.

8    Q    Me personally, or the prosecution?

9    A    The prosecution.

10   Q    Okay.  Do you know why?

11   A    Because they thought I wouldn't show up.

12   Q    Okay.  Do you know a guy named Markelus Quan Carter?

13   A    I do.

14   Q    Do you see him in the Courtroom today?

15   A    Yes.

16   Q    Where is he seated?

17   A    To my left.

18   Q    Why don't you point to him and describe what he's wearing.

19   A    A vest.

20                    MR. RION:   Your Honor, Mr. Carter has

21   already acknowledged that this is Markelus Carter.  For this witness and all

22   others, we acknowledge that.

23                    MR. MILLER:   You acknowledge that?

1          THE COURT:  Okay.  All right.

2          MR. MILLER:  Let the record reflect that

3    he's been identified.

4          THE COURT:  It does.

5          MR. MILLER:  Thank you.

6    Q     Now, how do you know Mr. Carter?

7    A     We had two children together.

8    Q     Okay.  When did you meet him?

9    A     1989.

10   Q     All right.  Do you recall -- well, how old were you in 1989?  How old

11   were you when you met him?  That might be easier.

12   A     Sixteen.

13   Q     Okay.  Is he older than you?

14   A     Yes.

15   Q     Were you in high school when you met?

16   A     Yes.

17   Q     How long after you met him did you start dating?

18   A     A month maybe.

19   Q     Was he good to you back then?

20   A     Yes.

21   Q     Did he make you happy?

22   A     Yes.

23   Q     What did you like about him?

1   A       He was good to me back then.

2   Q       Okay.  Did you ever marry him?

3   A       No.

4   Q       Why not?

5                           MR. RION:   Objection.  Relevance.

6                           THE COURT:  Yea.

7                           MR. MILLER:   I'll withdraw the question.

8                           THE COURT:  Okay.  He withdrew the

9   question.

10  Q       Now, do you have kids with Markelus?

11  A       Yes.

12  Q       How many?

13  A       Two.

14  Q       Boys?  Girls?

15  A       A boy and a girl.

16  Q       Okay.  What are their names?

17  A       Markelus and Tarah.

18  Q       And what are their ages as you sit here today?

19  A       Twenty-three and twenty-one.

20  Q       Did you work throughout your relationship with Markelus?

21  A       Yes.

22  Q       Tell me what kind of jobs you had.

23  A       I worked at Lee's Chicken, and I also worked at the Mall at a computer

1    store.

2    Q        How long did you work at Lee's?

3    A        Thirteen years.

4    Q        Okay.  When did you start there?

5    A        '89.

6    Q        And when did you stop working there?

7    A        2002.

8    Q        Did you have any other jobs during that time frame?

9    A        No.

10   Q        Okay.  And you mentioned another job.  Tell me about that job.

11   A        Oh, a computer store in the Mall.  It went bankrupt.

12   Q        Okay.  Was there a time when you started working at the Refinery here

13   in Lima?

14   A        Yes.  Yes.

15   Q        Okay.  What did you do out at the Refinery?

16   A        Supervisor, second shift, security.

17   Q        You were a supervisor?

18   A        Yes.

19   Q        How many people did you supervise?

20   A        Anywhere from eight as a normal to twenty during shutdown.  It just

21   depended.

22   Q        Now, during the time that you were with Markelus did he have a

23   regular job?

1    A      No.

2    Q      He did not?

3    A      No.

4    Q      Okay.  Did you and the kids live with Markelus that entire time, well,

5    from the time you met him --

6    A      No.  No.

7    Q      -- until let's just say December of 2007?

8    A      From '89 to 2007?

9    Q      Yea.

10   A      Not the whole time; no.

11   Q      Okay.  When did you start living with him?

12   A      We had an apartment and then I moved out and moved in with my

13   mom to take care of her because she was gravely ill.

14   Q      Where did your mom live?

15   A      On Pine Street.

16   Q      Okay.  How long did you live with your mom?

17   A      Six months.

18   Q      Okay.  Did the kids live with you or --

19   A      They went back and forth.

20   Q      Okay.  They went back and forth, meaning between you and

21   Markelus?

22   A      Yes.

23   Q      While you were living with your mom?

1    A      Yes.

2    Q      Was your mom ill?

3    A      Yes.

4    Q      Now, during this time that you were with Markelus, whether you were

5    living with him or not, and when I say 'with him', well, during the time that

6    you've known him, did you and Markelus socialize with other people, other

7    couples?

8    A      We socialized; yes.

9    Q      Okay.  Were you ever allowed to socialize on your own?

10   A      He didn't like it; no.

11   Q      He didn't like it?

12   A      No.

13   Q      Okay.  So, I assume you weren't allowed to go out with your friends, so

14   to speak?

15   A      Right.  No.

16   Q      What would he do if you did that?

17   A      I didn't do it.

18   Q      Why not?

19   A      I didn't want to face -- I didn't want to create chaos and I knew that that

20   would happen.  I just didn't do it.

21   Q      Okay.  During this time period that you were, again, with Markelus,

22   whether you were living with him or not, did you interact with other men in

23   front of Markelus?

1    A       No.

2    Q       Why not?

3                                        MR. RION:   Objection.

4                                        THE COURT:   Overruled.

5    Q       Why not?

6    A       The only people I interacted with were the people that I worked with.

7    Q       Okay.  My question was - why wouldn't you, or, why didn't you interact

8    with other men when you were with Markelus?

9    A       I didn't want to create another issue.

10   Q       By 'issue', what do you mean?

11   A       He was very controlling.  So, therefore, --

12   Q       In what way?  I mean, what would he do if you were interacting --

13   A       Assume the worst.  Assume that I was seeing this person or messing

14   around with these people or whatever.

15   Q       Okay.  So, if you were to, at a social event, for example, -- you know,

16   you mentioned that you interacted with other couples and you did things

17   together.  Is it your testimony that if he would see you talking to another man

18   for --

19                                        MR. RION:   Objection.  Leading.

20                                        THE COURT:   Sustained.

21                                        MR. MILLER:  Okay.  I'll withdraw it.

22   Q       Did Markelus have girlfriends during this time period?

23   A       I believe so; yes.

1    Q      What makes you say so?

2    A      Late nights coming in and out of the house; different times of the day

3    phone calls.

4                              MR. RION:  Objection.  Relevance.

5                              THE COURT:  Overruled.

6    Q      So, you had an indication that he was seeing other --

7    A      Yes.

8    Q      -- women at that time?

9    A      Yes.

10   Q      Now, during this time -- well, let's focus on a time period when you

11   were living with Markelus.

12   A      Okay.

13   Q      Now, you mentioned an apartment that you lived in with Markelus.

14   A      Uh-huh.

15   Q      I want to focus on the time period that you lived with him at 122 East

16   Eureka Street.

17   A      Okay.

18   Q      Okay?  Can you tell me, and I know we're going back a significant

19   period of time, so just the best you can, can you tell me the time period that

20   you lived with him, and when I say you I also include the kids, lived with him

21   at 122 East Eureka Street?  Okay?  Can you give me a rough time frame?

22   A      How long?

23   Q      Yea.  What was the time frame you lived with him there?

1    A    I want to say 2005 to 2007.

2    Q    Okay.

3    A    Somewhere in there.  Late 2004.

4    Q    Okay.  Fair enough.  Understood.  During that time frame were you

5    free to go?  Did you have a key to that house?

6    A    No, I did not.

7    Q    You didn't have a key?

8    A    No.

9    Q    How did you get in and out?

10   A    I had to let -- he let me in and out.

11   Q    What do you mean?

12   A    Like when I came home from work he would let me in the house.

13   Q    How would that work?  I mean, what would have to happen for you --

14   A    I would have to stay in the house or I would get locked out.

15   Q    Now, let's back up.  You mentioned going to work and coming home

16   from work.

17   A    Right.

18   Q    I don't want to put words in your mouth, but I think you said that he

19   would have to let you in.

20   A    Yes.

21   Q    Explain how that would work.

22   A    I would knock on the door and wait for him to let me in the house after I

23   got off of work.

1    Q        How many days a week did you work?

2    A        Five at that -- five, depending on what was going down, but normally

3    five.  I was full-time.

4    Q        So, you didn't have a key to the house you lived in?

5    A        No, I did not.

6    Q        Okay.  Let me just give you a hypothetical.  If you went out to the store

7    and came back how would you get in the house?

8    A        I would have to hope he was there to let me back in.

9    Q        What if he wasn't?

10   A        I would have to wait for him to get to the house.

11   Q        What if the kids were there?  Would they let you in?

12   A        Sometimes they would; sometimes they wouldn't.

13   Q        Why would they not?

14   A        They only wouldn't if he told them not to.

15   Q        Did he tell them not to on occasion; that you're aware of?

16   A        Yes.  They told me that.

17   Q        How often --

18                                         MR. RION:  Objection.  Hearsay.

19                                         THE COURT:  I'm going to overrule it.  Go

20   ahead.

21   Q        Now, you mentioned that you had a job, or, various jobs during the

22   time that you were with Markelus.

23   A        Uh-huh.

1    Q    Did you bring home the paychecks?

2    A    I did; yes.

3    Q    What did you do with them?

4    A    They went on food and I would give him money when I could to go

5    towards the bills.

6    Q    Okay.  What was the first part?  I'm going to ask you to do something

7    here, okay, because you're kind of soft-spoken.  I'm going to ask you to -- do

8    you see that microphone right in front of your face?  Lean right up into it and

9    speak right into it.  Okay?  I know -- I have mine bent that way.

10    A    Okay.

11    Q    It does two things.  First of all, it amplifies your voice so that everybody

12    can hear you.  Okay?  The second thing it does is that it's recording your

13    voice so that everything you say can be taken down in here for the record.

14    A    Okay.

15    Q    So, it's kind of important, particularly for someone like yourself who is a

16    little soft-spoken, to speak right into the microphone.

17    A    Okay.

18    Q    Okay?

19    A    Yes.

20    Q    So, I'm going to ask you to do that.  I can hear you fine, but some

21    others may not, and particularly the Court Reporter.  Okay?  Now, I think we

22    were talking about paychecks and you mentioned that you would bring home

23    paychecks and you would do what with them?

| | | |
|---|---|---|
| 1 | A | My paychecks? |
| 2 | Q | Yes. |
| 3 | A | Buy groceries for the house and give him money when I could. |
| 4 | Q | Okay. |
| 5 | A | Pay my car payment and insurance. |
| 6 | Q | Okay.  And, again, did Markelus have a regular job at any point? |
| 7 | A | No. |
| 8 | Q | I want to talk about Markie. |
| 9 | A | Okay. |
| 10 | Q | Your son? |
| 11 | A | Uh-huh. |
| 12 | Q | How would you describe Markie's relationship with his father, |
| 13 | | Markelus? |
| 14 | A | They were close. |
| 15 | Q | They're close? |
| 16 | A | Yes. |
| 17 | Q | Did Markelus spend a lot of time with Markie? |
| 18 | A | Yes. |
| 19 | Q | How would you describe their relationship? |
| 20 | A | With Markie? |
| 21 | Q | Between Markelus and Markie. |
| 22 | A | Describe their relationship? |
| 23 | Q | Yea. |

1    A       Father/son relationship.

2    Q       Okay.  Now, Tarah, how would you describe Tarah's relationship with

3    Markelus?

4    A       When she was younger they were closer.  Once she started getting

5    older they kind of drifted.

6    Q       Okay.  What do you mean by drifted?

7    A       Teenager.  I don't know the word.  She just was going through the

8    motions of being a teenager and kind of withdrawed (sic).  She was

9    withdrawn.

10   Q       Typical --

11   A       Typical; yea.

12   Q       -- teenage stuff?

13   A       Yea.

14   Q       Teenage girl stuff?

15   A       Yea.

16   Q       Okay.  All right.  Now, when you say drifted do you mean drifted away

17   from Markelus?

18   A       Yes.  Yes.

19   Q       And who did she -- did she drift to anyone in particular?

20   A       Her friends.  She's a social butterfly.  So, she would try to, you know,

21   drift towards them or me, if I was there, because I did work a lot.

22   Q       Okay.  Did you spend a lot of time with Tarah?

23   A       I tried.

1    Q       Okay.  And was there a time when you left, which we're going to talk

2    about, at 122 East Eureka and Tarah was staying with you on occasion?

3    A       Yes.

4    Q       Okay.  What about Markie?  Did Markie stay with you on occasion?

5    A       Very seldom.

6    Q       Where did he stay?

7    A       With his dad on Eureka.

8    Q       Okay.  So, there was a time when Tarah drifted to her friends and

9    would stay with you on occasion?

10   A       Yes.

11   Q       Is that accurate?

12   A       Yes.

13   Q       But, Markie pretty much stayed with his dad?

14   A       Yes.

15   Q       How would you describe Markelus' and Markie's relationship today?

16   A       I wouldn't know.

17   Q       Why not?

18   A       I speak to Markie very rarely.  He won't talk to me.

19   Q       He will not?

20   A       No.

21   Q       Where's he living?

22   A       122 Eureka.

23   Q       Okay.  Which is Markelus' house?

1   A   Yes.

2   Q   What about Tarah?

3   A   Tarah lives with me.

4   Q   Tarah lives with you?

5   A   Uh-huh.

6   Q   During the time you lived with Markelus did you know him to have guns

7   in the house?

8   A   Yes.

9   Q   How many?

10  A   Four or five.

11  Q   Where did he keep them in the house?

12  A   Bedroom, living room, dining room, kitchen.

13  Q   Okay.  Did he carry them around the house while he was in the house?

14  A   On occasion; yes.

15  Q   Did he have holsters for these guns?

16  A    Not that I'm aware of.

17  Q   Did he carry guns outside of the house?

18  A   I believe so; yes.

19  Q   Have you ever seen him carry the gun, or, guns?

20  A   Yes.

21  Q   Where would he carry them when he carried them?

22  A   In his pants.

23  Q   In his pants?

1   A       Yes.

2   Q       Now, when you say in his pants, be a little more descriptive.  How

3   would he carry those?

4   A       Like around the waistband, like tucked in.

5   Q       Okay.  Again, I don't want to put words in your mouth, but I'm trying to

6   understand.  Would he tuck them inside his waistband?

7   A       Of his pants; yes.

8   Q       Of his pants?

9   A       Yes.

10  Q       Okay.  Did you know Markelus to have camouflage clothing?

11  A       Yes.

12  Q       I'm going to hand you what has been marked as State's exhibit '100';

13  okay?

14                              MR. MILLER:  With the Court's permission,

15  I'll approach the witness.

16                              THE COURT:  Sure.  '100'?

17                              MR. MILLER:  I'm sorry.  '101'.

18                              THE COURT:  '101'?

19                              MR. MILLER:  '101'.

20                              THE COURT:  Okay.

21  Q       Take a look at that picture, please.

22  A       A t-shirt.

23  Q       Do you recognize what that is?

1    A       A t-shirt.

2    Q       Okay.  Well, let's just clear something up right now; okay?  Do you see

3    color well?

4    A       No, I do not.

5    Q       No, you do not.  Do you see patterns well?

6    A       Yes, I do.

7    Q       Okay.  All right.  Now, I'm going to put this up and have you look at it

8    again because you don't see colors well; do you?

9    A       No, I don't.

10   Q       Okay.  Now, have you ever seen Markelus wear clothing like that?

11   A       Yes.

12   Q       Okay.  Let's put it up here for the jury to see.

13                              MR. RION:   Tony, if I could see it?

14                              MR. MILLER:   Oh, yes.  There we go.

15   That's good.  Thank you.

16   Q       I have placed State's exhibit '101' on the screen.  Have you seen

17   Markelus wear clothing with patterns like that?

18   A       Yes.

19   Q       How often would Markelus wear clothing like that?

20   A       Not very often.

21   Q       Okay.  When would he wear clothing like that?  Would he wear it in the

22   winter?

23   A       Yes, or summer.

1    Q    So, he would wear it on occasion year round?

2    A    Yes.

3    Q    Is Markelus pretty good with computers?

4    A    Yes.

5    Q    Does he spend a lot of time on computers?

6    A    Yes.

7    Q    Do you know whether or not he ever got into your e-mails?

8    A    He did; yes.

9    Q    How do you know that?

10   A    Because he found some.  The only way that he would have found

11   those was by going and getting to my e-mail.

12   Q    Okay.  Now, let's switch gears a little bit.  I'm going to hand you what's

13   been marked as State's exhibit '1'.  Okay?  I'm just going to put it up here on

14   the screen.  Do you recognize that person?  Do you recognize him?

15   A    Yes.

16   Q    Who is it?

17   A    Ken Warrington.

18   Q    How do you know Ken Warrington?

19   A    We were co-workers at the Refinery.

20   Q    When did you meet him?

21   A    Not long after I started working out there.

22   Q    And when did you start working out there; to the best of your

23   recollection?

1    A    2004.

2    Q    Where were you living at the time?

3    A    Oh, on Pine Street.

4    Q    With your mother?

5    A    She had already passed away.

6    Q    Okay.  Well, your mother passed?

7    A    Yea.  Yes.

8    Q    I'm sorry to hear that.  Okay.  This was 2004 time frame?

9    A    Yes.

10   Q    So, your mother passed, but I take it that you stayed in the home?

11   A    Yes.

12   Q    Okay.  Was there a time then that you left the Pine Street home?

13   A    Yes.

14   Q    Why did you leave the Pine Street home, which was your mother's

15   home?

16   A    I lost the house.

17   Q    Okay.  Where did you go?

18   A    To 122 Eureka.

19   Q    To live with whom?

20   A    Markelus.

21   Q    Who was with you at that time to live with Markelus?  Who went with

22   you; if anyone?

23   A    The kids.

1    Q      Okay.  Tarah and Markie?

2    A      Yea.  Yes.

3    Q      Now, is this the same time frame -- when you left the Pine Street home

4    is that roughly the same time frame that you met Ken Warrington?

5    A      I'm sorry?  Could you repeat, please?

6    Q      Uh-huh.  I know we're going back quite a ways.  I get it.  When you left

7    the Pine Street home is that the same time frame that you met Ken

8    Warrington?

9    A      It was not long after I started at the Refinery.

10   Q      Okay.  You went to live with Markelus in the Eureka Street house?

11   A      Yes.

12   Q      Did you know Ken Warrington then?

13   A      Co-workers.

14   Q      Right.  I know.

15   A      Yes.  Yes.

16   Q      You knew him?

17   A      Yes.

18   Q      When you met Ken did you like him?

19   A      Yes.

20   Q      Did you start dating him at some point?

21   A      A few years later.

22   Q      Okay.  At what point did you start dating Ken Warrington, to the best of

23   your recollection?  What year?  We'll start with that.

1    A    2008.

2    Q    Okay.  That's when you started dating him?

3    A    Yes, briefly.

4    Q    You knew him before that, though?

5    A    Yes.

6    Q    So, now we have a little bit of a fixed time frame here.  You started

7    dating him in roughly 2008.

8    A    Yes.

9    Q    Let's back up a little bit, okay, to 2007.

10   A    Okay.

11   Q    Let's narrow that down because we're dealing with a long time ago and

12   there's a lot of time frames.  Let's narrow that down.  Let's talk about

13   December of 2007; okay?

14   A    Okay.

15   Q    Did you know Ken Warrington then?

16   A    Yes.

17   Q    Were you in a sexual relationship with Ken Warrington at that point?

18   A    No.

19   Q    Okay.  Did you enter into -- well, did that relationship become a sexual

20   relationship at some point after that?

21   A    2008.

22   Q    Okay.  That's when you started dating; right?

23   A    Right.

1    Q        Okay.  Now we've got that all tied up.  But, back to 2007, then it was

2    not a sexual relationship?

3    A        No, it was not.

4    Q        Okay.  In 2007, I'm going to stick to 2007, did you know Ken was

5    married?

6    A        Yes.

7    Q        Did you and Ken talk about the fact that he was married?

8    A        Yes.

9    Q        After the relationship became sexual did you still talk to Ken about the

10   fact that he was married?

11   A        Yes.

12   Q        And what were those conversations like?

13   A        We were intimate for approximately two weeks and then to just be

14   friends.

15   Q        Okay.

16   A        Because he was married and had a long time with her we agreed, it

17   was a mutual agreement, that he try to make it work with his wife.

18   Q        Okay.  Did you tell Markelus about this relationship with Ken?

19   A        No, I did not.

20   Q        Well, what was your relationship like with Markelus at that time in 2007

21   and 2008?

22   A        In --

23   Q        2007/2008 what was your relationship like with Markelus?

1    A      In 2007 is when I moved out.  Do you mean prior to that?

2    Q      Prior to that.

3    A      There really wasn't a relationship.

4    Q      What do you mean?  You lived there.

5    A      I lived there.  I slept in my daughter's room with her.

6    Q      Okay.

7    A      I had to be careful coming and going for fear of being locked out.  I

8    didn't really -- I didn't do anything.

9    Q      Did you have an intimate relationship with Markelus --

10   A      No, I did not.

11   Q      -- in 2007?

12   A      No, I did not.

13   Q      Early to mid 2007?

14   A      No, I did not.

15   Q      Okay.  Did you communicate with him much at all in the house?

16   A      Not a lot; no.

17   Q      So, when you met Ken Warrington -- the whole entire time you knew

18   Ken Warrington, and let's just focus on the time frame up until December 17th

19   of 2007, in that time frame, and prior to that, did you ever say to Markelus,

20   "Hey, you know, I've got a boyfriend."

21   A      Well, he wasn't my boyfriend.  No.

22   Q      Did you ever even mention Ken Warrington to him?

23   A      No.  We were just friends.

1    Q    Okay.  Let's pick up on December 17th of 2007, that day.

2    A    Okay.

3    Q    You were living at 122 East Eureka on that day; is that correct?

4    A    Yes.

5    Q    Who lived there with you at that time on that day?

6    A    Markie, Tarah, and Markelus.

7    Q    And, again, your relationship with Markelus was functional at best?

8    A    Yes.

9    Q    I mean, you didn't communicate --

10    A    More like roommates.

11    Q    Okay.  That's perfect.  I used the word 'functional'.  But, more like

12    roommates?

13    A    Yes.

14    Q    Was he working a regular job?

15    A    No.

16    Q    Were you working a regular job?

17    A    Yes.

18    Q    Where were you working on that day?

19    A    At the Refinery.

20    Q    Okay.  Did you actually physically work that day?

21    A    Yes.

22    Q    Do you remember what shift?

23    A    Second.

1    Q      What time did you get home?

2    A      Ten -- so, ten-ten.

3    Q      Okay.  What did you do when you got home?

4    A      Went upstairs and took a shower, jammies, and bed.

5    Q      You went upstairs and took a shower?

6    A      Put my jammies on and went to bed.

7    Q      Where did you go to bed?

8    A      With Tarah in her room.

9    Q      Okay.  Did something happen right after you went to bed?

10   A      I'm not really sure of the time frame, but I woke up and he was --

11   Q      When you say 'he', who's he?

12   A      Markelus.

13   Q      Okay.

14   A      He woke me up and he told me to pack my bag and get the -- out.

15   Q      Okay.  I want you to tell us, and maybe you're not comfortable saying it

16   here in Court, but it happens sometimes in Court, tell me exactly what

17   Markelus told you that night.

18   A      He said, "Get up, pack your bag, and get the fuck out."

19   Q      With that same tone?

20   A      Yes.

21   Q      Did you notice if he had anything in his hands?

22   A      Yes.

23   Q      What did he have in his hand?

1   A    A gun; a hand gun.  A handheld gun.

2   Q    Okay.  Now, what did you do?

3   A    I asked him what was going on.

4   Q    Did he tell you?

5   A    No.  He just told me to pack my bag and get out.

6   Q    That's all he said?

7   A    Yes.

8   Q    And what did you do then?

9   A    I got up and I packed my bag and started out the bedroom door where

10  he was standing.

11  Q    Is this a two-story house?

12  A    Yes.

13  Q    Are the bedrooms upstairs or downstairs?

14  A    They're upstairs.

15  Q    Okay.  So, you were in an upstairs bedroom?

16  A    Yes.

17  Q    Where was Tarah?

18  A    Beside me.

19  Q    Okay.  Where was Markie?

20  A    In his room sleeping.

21  Q    Did Markie wake up at any point during this entire thing?

22  A    No, not that I'm aware of.

23  Q    Okay.  Now, you mentioned that Tarah was beside you.

1  A     Yes.

2  Q     So, she must have woken up?

3  A     She did.

4  Q     Okay.

5              MR. RION:   Your Honor, just a continuing

6  objection to what we talked about earlier.

7              THE COURT:   Okay.  Overruled for the

8  reasons previously given.

9  Q     Did this incident wake up -- did Markelus wake up Tarah?

10  A     Yes.

11  Q     While he was telling you to get out?

12  A     Yes.

13  Q     Okay.  So, you got up and you packed your bags and you're heading

14  out?

15  A     Yes.

16  Q     Where exactly is Tarah at that time?

17  A     She's sitting on her bed.  Her dad kept telling her to go back to sleep.

18  She had already started crying.

19  Q     Okay.

20  A     I went out the door with my bag and he was right behind me.

21  Q     So, he was right behind you?  Where was Tarah at that time?

22  A     She was still sitting on her bed and eventually she was behind him.

23  Q     That's what I was going to get to.  Was Tarah behind him?

| | | |
|---|---|---|
| 1 | A | Behind him. |
| 2 | Q | While she was in bed? |
| 3 | A | Yes.  Well, -- |
| 4 | Q | Describe it however you would describe it. |
| 5 | A | If you were standing in the doorway the bed would be like right there. |
| 6 | Q | Okay. |
| 7 | A | She was still in bed and she hopped up when I started out the door. |
| 8 | Q | Okay.  Now, when you started out the door she was in bed? |
| 9 | A | Yes. |
| 10 | Q | Then Markelus was where? |
| 11 | A | He was right behind me. |
| 12 | Q | So, he was between you and Tarah? |
| 13 | A | Yes. |
| 14 | Q | Now, you said these were upstairs bedrooms? |
| 15 | A | Yes. |
| 16 | Q | Did you start down the stairs? |
| 17 | A | Yes. |
| 18 | Q | Where was Markelus? |
| 19 | A | Behind me. |
| 20 | Q | How close behind? |
| 21 | A | A step behind. |
| 22 | Q | And where was Tarah? |
| 23 | A | Behind him. |

1    Q      How far behind; if you know?

2    A      I don't know.

3    Q      Okay.  Okay.  Now, are you walking down the stairs?

4    A      Yes.

5    Q      Do you have bags in your hands?

6    A      One bag; yes.

7    Q      One bag.  Just one bag?

8    A      Yes.

9    Q      Is Markelus saying anything to you at this point?

10   A      He's not saying anything to me at all.  He's telling Tarah to go back to

11   bed.

12   Q      And you are walking down the stairs?  Again, how close is he behind

13   you?

14   A      One step.

15   Q      Is he one step behind you all the way down the stairs?

16   A      Yes.

17   Q      Okay.  When you get to the bottom of the stairs what happens at the

18   bottom of the stairs?

19   A      There's a little landing.

20   Q      Uh-huh.  Go ahead.  What happens?

21   A      I got off the landing and I turned around and he still had the gun, of

22   course, in his hand.  Tarah's behind him and he's telling Tarah to go back to

23   bed.  She's not listening.

1  Q      Now, what is -- now, you've turned around now?

2  A      Yes.

3  Q      What is Markelus' demeanor?

4  A      Angry.

5  Q      Okay.  Go ahead.  What else happens?

6  A      He looked at me.  He turned around and looked at me and told me to

7  get out of the house, to leave now.

8  Q      What were his words, the best you can recollect?

9  A      Get the fuck out.

10  Q      Okay.  And did he do anything at that point?

11  A      He still had the gun.

12  Q      Go ahead.

13  A      It was very visible.

14  Q      Okay.  Then what happened?

15  A      I wasn't sure where my keys were to my truck.

16  Q      Okay.

17  A      I saw them, they were on the floor.  When I bent down to get them I got

18  back up and we got in this little foyer and that's when he grabbed me and he

19  hit me in the face with the gun.

20  Q      Okay.  Then what happened?

21  A      I got out of the house.

22  Q      You left the house?

23  A      Yes.

1    Q    What happened then?

2    A    I got in the truck.  I couldn't dial 9-1-1 on my phone.

3    Q    Why not?

4    A    I just couldn't make my hands work.

5    Q    Were you scared?

6    A    Yes.

7    Q    So, you got in your truck.  What did you do?

8    A    I was going to drive to the police station.

9    Q    Okay.

10   A    But, I realized I forgot where it was at.

11   Q    Okay.  Now, let me stop you there.  Where were the kids?

12   A    In the house with him.

13   Q    Both of them?

14   A    Yes.

15   Q    Go ahead.

16   A    Then, lucky me, I saw a police officer drive, or, driving down the street.

17   Q    So, what did you do?

18   A    Well, I flashed him to stop, and he did.

19   Q    By flashed him, what do you mean?

20   A    With my, like, blinkers, or, lights.

21   Q    Bright lights?

22   A    Yea.

23   Q    Bright lights flashed type of thing?

1   A       Yea.

2   Q       Okay.  What happened?

3   A       He stopped and I explained to him what happened.

4   Q       Okay.  Then what happened?

5   A       He had me pull and park the truck at the car wash.

6   Q       Just so the people know - where is that car wash?

7   A       It's on the corner of Eureka and Main.

8   Q       Is it pretty close to 122 East Eureka?

9   A       Oh, yea.  Yea.  It's like a fourth of a block away.

10  Q       Okay.  I was going to ask you whether it was a block or shorter?

11  A       Shorter.

12  Q       Okay.  So, he had you pull in there?

13  A       Yes.

14  Q       Okay.  Then what happened?

15  A       He went to the house and I don't know what happened with that.

16  Q       Now, were you able to get in contact with somebody named Krista

17  Bodiker?

18  A       I was; yes.

19  Q       Who's Krista Bodiker?

20  A       Third shift supervisor at the Refinery.

21  Q       Okay.  Did you know her from work?

22  A       Yes.

23  Q       How did you know her?  What was your relationship, so to speak?

| | | |
|---|---|---|
| 1 | A | Well, she worked thirds and I worked seconds.  So, it was mostly |
| 2 | | passing, you know, in passing. |
| 3 | Q | Would you describe yourself as friends with her? |
| 4 | A | Yes.  Yes.  Oh, yea. |
| 5 | Q | Did she come out? |
| 6 | A | She did. |
| 7 | Q | She came out? |
| 8 | A | Yes. |
| 9 | Q | Just simply to be with you? |
| 10 | A | Yes. |
| 11 | Q | How long had you known Krista Bodiker by this time? |
| 12 | A | From the day I started out there. |
| 13 | Q | Okay. |
| 14 | A | I met her like that first week that I was there. |
| 15 | Q | And this would have been, what, two years? |
| 16 | A | Three years. |
| 17 | Q | Three years? |
| 18 | A | Yea. |
| 19 | Q | Now, later that evening were you -- well, let me ask you this.  Were you |
| 20 | | eventually reunited with the kids? |
| 21 | A | The next day, or, morning. |
| 22 | Q | Okay. |
| 23 | A | Yes. |

1   Q     Now, did you go -- go ahead.  As best as you can recollect, when did --

2   A     I was trying to think.  It was hours and hours later.  But, it would have

3  been the same morning.

4   Q     We're talking about a time frame that spans over midnight; correct?

5   A     Exactly.

6   Q     Okay.  But, it was hours later?

7   A     Yes.

8   Q     Okay.  Did you and the kids go back to live at 122 East Eureka?

9   A     No.

10  Q     Where did you go?

11  A     We went to live with Krista and Don Bodiker.

12  Q     How long did you live with them?

13  A     Nine months.

14  Q     Okay.  As best as you can recall?

15  A     Yea, about nine months.

16  Q     Now, after that nine month period, as you recall, where did you go to

17  live?

18  A     I bought the house on McKibben.

19  Q     Is that the 436 McKibben you've referenced?

20  A     Yes.

21  Q     Now, after this 2007 incident you've described did you file for a

22  protection order?

23  A     I did; yes.

1   Q      Were the kids initially a part of that Order?

2   A      Yes, they were.

3   Q      Did they remain a part of that Order?

4   A      For a brief time; yes.

5   Q      Okay.  For a brief time, but eventually they were not, I suppose from

6   your answer?

7   A      Exactly.

8   Q      Okay.  After that 2007 incident did you continue a relationship with Ken

9   Warrington?

10  A      Yea, we were friends.  Yes.

11  Q      Okay.  But, sometime in 2008, I think was your testimony, it became a

12  sexual relationship?

13  A      Yes.

14  Q      Okay.  And how long did that sexual relationship last?

15  A      A couple of weeks.

16  Q      Now, you mentioned this home on McKibben.  I want to show you what

17  has been marked as State's exhibits '3', '4', and '5'.  Okay?  Sonya, I'm going

18  to hand these three pictures to you; okay?  They're a group.  I want you to

19  look at each one of them and I'll ask you questions.  Okay?  You tell me when

20  you're done looking at them; okay?

21  A      Okay.

22  Q      Nothing about colors.

23  A      That's the front of my house on --

1   Q       Well, just a minute.  Just take a look at them and tell me when you're

2   done looking at them.  Look at each one of them.

3   A       Okay.

4   Q       Now, Sonya, I'm going to put on the screen here State's exhibit '3'.  Do

5   you recognize that?

6   A       Yes.  That's the front of my house.

7   Q       Which house?

8   A       On McKibben.

9   Q       There's really three houses - McKibben, Eureka, and Pine.  Which

10  house is that?

11  A       McKibben.

12  Q       436 McKibben?

13  A       Yes.

14  Q       State's exhibit '4', what is that?

15  A       That's a picture of my house on McKibben.

16  Q       Okay.  State's exhibit '5'?

17  A       That's the back of my house, my vehicle, and that would be Ken's

18  vehicle in front of the shed.

19  Q       When you say your house --

20  A       On McKibben.

21  Q       On McKibben?  There's a pick-up truck in that picture.  Whose is that?

22  A       That belonged to Ken Warrington.

23  Q       There's a dark colored car in that picture.  Whose is that?

1    A    That's mine.

2    Q    Now, again, February of 2009 you're living in that house on McKibben?

3    A    Yes.

4    Q    And specifically on February 23rd of 2009 you're living in that house on

5    McKibben?

6    A    Yes.

7    Q    And you're still seeing -- well, when I say 'seeing', I'm going to ask you

8    to clarify.  You're still seeing Ken Warrington?

9    A    Yes.  Yes.

10    Q    How would you describe your relationship with Ken Warrington in

11    February of 2009?  How would you describe it?

12    A    That's when we decided to become just friends.  We had already

13    decided that.

14    Q    Okay.  You were friends?  That's how you describe it?

15    A    Yes.

16    Q    Now, did Ken stay with you on occasion in --

17    A    He would; yea.

18    Q    Just a minute.  Let me finish.  Did Ken stay with you on occasion in

19    February of 2009?

20    A    Yea.  He would show up whenever.

21    Q    Now, you say he would show up whenever.  Did he have a key?

22    A    He did have a key.

23    Q    To that McKibben house?

1    A      Yes.

2    Q      You just answered this question. Did he come and go as he pleased?

3    A      Yes.

4    Q      Now, I need to do this. State's exhibit '6'. I'm handing you State's

5    exhibit '6'. What is that a picture of?

6    A      Kenny's pick-up truck.

7    Q      Now, let me ask you this - State's exhibits '4', '5', and '6', or, '3', '4', '5',

8    and '6' that I've showed you, do those truly and accurately depict the scene

9    as your house was in February of 2009?

10   A      Yes.

11   Q      And does that truly and accurately depict Ken Warrington's truck as it

12   was in February of 2009?

13   A      Yes.

14   Q      Did Ken have clothes at your house on McKibben --

15   A      Uniforms for work - a couple.

16   Q      One thing; okay? Let me completely finish the question. It's natural in

17   conversation when two people talk that we anticipate what the question's

18   going to be and we just answer it. It happens all the time. Okay? We can

19   kind of fall into this conversational mode, but the problem with that is in the

20   Courtroom the folks here to hear the case need to hear the question and the

21   answer, but also it's very difficult for the recording equipment and the Court

22   Reporter to type up conversation where people are talking over each other.

23   Okay? So, what we need to do is kind of, well, as best as possible, stay out

1    of that conversational mode and wait until I ask the question and then answer

2    it.  Okay?

3    A       Okay.

4    Q       Did Ken have clothes at your McKibben Street home in February of

5    2009?

6    A       Yes.

7    Q       Where did he keep those clothes?

8    A       In the back room, which was Markie's room.

9    Q       Not in your room?

10   A       No.

11   Q       Okay.  Did Ken sleep at 436 McKibben on occasion?

12   A       He did; yes.

13   Q       Where did he sleep?

14   A       In the back room - Markie's room.

15   Q       Not in your room?

16   A       No.

17   Q       How often would Ken sleep at your house in February of 2009?

18   A       Once a week.

19   Q       Okay.

20   A       Twice a week at the most.

21   Q       Now, where was, just so we can get a complete picture here, we've

22   jumped around a lot in this, where was Markelus living in February of 2009?

23   A       122 Eureka.

1    Q    Okay.  Where was your son, Markie, living?

2    A    122 Eureka.

3    Q    Okay.  But, yet, you maintained a room for him at your house?

4    A    Yes.

5    Q    Where was Tarah living in February of 2009?

6    A    Back and forth.

7    Q    Okay.  When you say back and forth, do you mean back and forth

8    between 122 East Eureka and your house on McKibben?

9    A    Yes.

10   Q    Did you have much communication with Markelus in February --

11   A    No.

12   Q    -- of 2009?

13   A    No.

14   Q    I'm going to do something a little procedural here before we get into

15   something here at the end.  I'm going to show you what's been marked as

16   State's exhibit '7'.  I'm going to show you this and then we'll talk about it.  This

17   is State's exhibit '7'.  Do you recognize what's marked as State's exhibit '7'?

18   A    Yes.

19   Q    What is that?

20   A    It's a bill.

21   Q    Okay.  What kind of bill?

22   A    I believe electric.

23   Q    State's exhibit '7', what is that?

1   A      It's an electric bill.

2   Q      An electric bill?  Can you read whose name is on it?

3   A      Mark Carter.

4   Q      Now, why would Mark Carter's -- do you know where this -- where was

5   this the day, if you know, where was this the day Ken Warrington was killed?

6   A      It would have been laying in my house on the counter.

7   Q      Okay.  Why would a bill - just a second - why would a bill with Mark

8   Carter's name on it be sitting on your counter, and when you say your house

9   I'm assuming 436 McKibben?

10  A      Correct.

11  Q      Why would a bill with Mark Carter's name on it be sitting on a counter

12  at 436 McKibben?

13  A      Tarah was taking it to school the next day so that they could readjust

14  her grants for school.

15  Q      Where did she go to school?

16  A      L.C.C.

17  Q      And they needed that information?

18  A      Yea.  Yes.

19  Q      Do you know why?

20  A      It had to do with how much money she could get for grants to stay in

21  the school.

22  Q      Okay.  Was Tarah with you the morning of February 23rd, 2009?

23  A      Yes.

1    Q      At your house on McKibben?

2    A      Yes.

3    Q      Was she going to school that day?

4    A      Yes.

5    Q      Let's talk about February 22nd  -- well, let's do this.  Let's talk about

6    the afternoon or so of February 22nd and into the morning of February 23rd,

7    2009.

8    A      Okay.

9    Q      Okay?  Now, did you see Ken Warrington in the afternoon or evening

10   of February 22nd, 2009, the day before he was killed?

11   A      No, I did not.

12   Q      Okay.  Did you see him at any point during the day of February 22nd,

13   2009, or even the evening?

14   A      Only at work.

15   Q      Okay.  Tell me about that.

16   A      He, as he did many times before, left the house key on the counter.

17   Q      On which counter?

18   A      On my counter on McKibben.

19   Q      Okay.

20   A      He wanted to know if I would grab it for him because he wanted to stop

21   by the house sometime the next day or the day after to grab his uniforms.

22   Q      Okay.  So, you're working?

23   A      Yes.

1    Q    Is this the evening of February 22nd, 2009?

2    A    Yes.

3    Q    Or, is it during the day of February 22nd, 2009?

4    A    It would have been the evening.

5    Q    The evening of February 22nd, 2009.  Ken stops by to get a key?

6    A    Well, he stopped by the guard shack.

7    Q    At the refinery?

8    A    Yes.

9    Q    To get a key for the McKibben home?

10   A    Yes.

11   Q    Because he left his on the counter?

12   A    Yes.  That's the one that I grabbed; yes.

13   Q    Okay.  Gotcha.  You had the key?

14   A    Yes.

15   Q    Okay.  To the McKibben house?

16   A    Yes.

17   Q    And he needed it?

18   A    Yes.

19   Q    Okay.  Did you give him the key?

20   A    At work I did; yes.

21   Q    Okay.  Did you see Ken alive after that?

22   A    At work I did.

23   Q    You saw Ken alive at work after you gave him the key?

1    A    Yes.

2    Q    Okay.  Did he eventually leave work, or did you leave work?

3    A    I got off at ten that night.

4    Q    Okay.  Okay.  So, the night of February 22nd, 2009 you got off work at

5    ten?

6    A    Yes.

7    Q    And you went home?

8    A    I picked Tarah up from her dad's.

9    Q    Where at?

10   A    At 122 Eureka.

11   Q    And then you went where?

12   A    Then I went home.

13   Q    Okay.  To which house?

14   A    McKibben Street.

15   Q    With Tarah?

16   A    Yes.

17   Q    Now, when you left work, as you've described, did you see Ken alive

18   after that?

19   A    No.

20   Q    When was the next time you saw Ken?

21   A    I never saw him again after that.

22   Q    Alive?

23   A    Right.



1   Q       Did you get any texts from Tarah the evening of February 22nd, 2009

2   when you were at work?

3   A       Yes.

4                                   MR. RION:   Objection.

5                                   THE COURT:   I'm going to overrule --

6   there was an objection.  I'll overrule it.

7   Q       When I say from Tarah, were they coming from her phone?

8   A       Her phone number; yes.

9   Q       What were they asking, or, what were they saying?

10                                  MR. RION:   Objection.

11                                  MR. MILLER:   It's not offered for the truth

12  of the matter.

13                                  MR. RION:   Your Honor, may we

14  approach?

15                                  THE COURT:   Okay.  Approach.  Ladies

16  and gentlemen of the jury, disregard anything you might overhear.

17  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

18  the record, as follows.)

19                                  MR. RION:   He's clearly offering this for the

20  truth of the matter.

21                                  MR. MILLER:   I'm not.

22                                  MRS. KOHLRIESER:   In fact, they're not

23  even statements.  They're questions.

1              MR. MILLER:   They're questions.  They're

2    not even statements.  The anticipated testimony is 'when's Ken going to come

3    over'?  That's a question; not a statement.

4              MRS. KOHLRIESER:   It's not even being --

5              MR. MILLER:   There's no truth to it.

6              MRS. KOHLRIESER:   She's making

7    inquiry.

8              MR. RION:   There's no other -- I mean,

9    they could have gotten these texts.  They can get it in through Tarah.

10             MRS. KOHLRIESER:   She's saying she

11   received texts from Tarah.

12             MR. MILLER:   She received texts from

13   Tarah.

14             MR. RION:   I understand, but it's Tarah's

15   words.

16             MR. MILLER:   No, it's not necessarily.

17             MRS. KOHLRIESER:   It's not even offered

18   for the truth of the matter asserted.  It's not hearsay.

19             THE COURT:   I'm going to overrule the

20   objection.

21             MR. MILLER:  You're going to what?

22             THE COURT:   Go ahead.

23             MR. MILLER:   Oh, I didn't hear what you

409

1    said.

2    (WHEREUPON, Court continued on the record, as follows.)

3                                    THE COURT:   Okay.  Go ahead.

4    Q    What did these texts say?

5    A    She wanted to know if Ken was stopping by in the morning after work.

6    Q    Did you find that strange?

7    A    Yes.

8    Q    Why?

9    A    Because she knew I didn't know that.

10   Q    Okay.

11                                   MR. RION:   I'm sorry?  I didn't hear the

12   answer.

13   Q    Could you repeat the answer, please?

14   A    She knew I didn't know.

15   Q    Did you talk to her about those texts when you picked her up that

16   evening?

17   A    Yes.  I asked her why she kept texting me over and over again with the

18   same question.  I told her I didn't know.

19   Q    What did she say?

20                                   MR. RION:   Objection.

21                                   THE COURT:   Overruled.

22   Q    What did she say in response to your question?

23   A    She at first didn't even know what I was talking about.  I said, "You

1   texted me wanting to know if Kenny was going to stop by in the morning."

2   Q      Okay.  Now, let me ask you this.  Did you ever apply for a C.C.W.?

3   A      Yes, I did.

4   Q      Tell me what you think C.C.W. means.

5   A      A concealed carry permit.

6   Q      Okay.  You applied for one of those?

7   A      Yes.

8   Q      When did you do that?

9   A      Spring of '07.

10  Q      Spring of '07?

11  A      I think so.

12  Q      Was it before or after the December of 2007 incident?

13  A      After.

14  Q      Okay.  So, it wouldn't have been --

15  A      It would have been '08.

16  Q      Okay.  Going to February 23rd of 2009, do you remember that

17  morning?

18  A      Some.

19  Q      Tell me what you remember about that morning.

20  A      My alarm went off at six.  I got up and I turned it off.  I turned my T.V.

21  off.

22  Q      Your T.V. was on?

23  A      Yes.

1    Q    Was it cold that morning?

2    A    Yes.

3    Q    Did you have the heat on?

4    A    Yes.

5    Q    Is your house big or is it a pretty small house?  How would you

6    describe it?

7    A    Small.

8    Q    Small?  Do you have a furnace?

9    A    A loud one; yes.

10   Q    Well, you have a furnace.  I assume you have a furnace.  You had the

11   heat on.  I mean, unless you heat with wood or something; right?

12   A    We had a furnace.  I had a furnace.

13   Q    That was actually my fault.  That wasn't very well asked.  But, you had

14   a furnace?

15   A    Yes.

16   Q    Okay.  Was it on?

17   A    Yes.

18   Q    Was it loud?

19   A    Yes.

20   Q    Do you have a lot of trains around that area?

21   A    Yes.

22   Q    If I say to you a train switches, do you know what I mean?

23   A    Yes, I do.

1   Q      What do you think that means?

2   A      Switching tracks.

3   Q      Okay.  And joining cars, do you know what that means?

4   A      Yes.

5   Q      Do they switch and join cars a lot in that area?

6   A      Yes, they did.

7   Q      Was that loud?

8   A      Yes, it was.

9   Q      A lot of banging?

10  A      Yes.

11  Q      At all hours?

12  A      Yes.

13  Q      So, you had the T.V. on.  The furnace was on.  You wake up and you

14  shut off the T.V.  What do you do then?

15  A      I opened my bedroom door and I went into Tarah's room to wake her

16  up for school.

17  Q      Okay.  Then what?

18  A      Well, while I was in her bedroom I noticed that the, well, it's a motion

19  light that was hooked on to my shed was on.

20  Q      Okay.

21  A      I had the wrong watt of bulb in there.  It was like a thousand watt.

22  Q      Okay.  Well, go on with what happened.

23  A      I looked out the window because it's a motion light and so something

1   had to be out there.  So, I looked out the window and I saw Kenny's truck.  I

2   didn't think anything of it.

3   Q      Is that the same truck we've seen in these pictures that I've shown

4   you?

5   A      Yes.  Yes.

6   Q      Where was it parked?

7   A      In front of that shed.

8   Q      Sitting in the same place we've seen in these pictures --

9   A      Yes.

10  Q      -- that I've shown you here during your testimony?

11  A      Yes.

12  Q      Okay.  Go ahead.

13  A      I didn't think anything of it.  I started, or, tried to get Tarah up.

14  Q      Did she wake up very easy?

15  A      No.

16  Q      She didn't wake up very easy?

17  A      Not at that time; no.

18  Q      No?  Heavy sleeper?

19  A      She just didn't want to get up.

20  Q      Yea, I hear you.  Okay.  Go ahead.

21  A      So, I nudged her again.  I said, "Okay, five more minutes."  I went to

22  the restroom.  On my way to the restroom I noticed that Markie's bedroom

23  door was open.  So, I looked in and the bed was still made.

1    Q      Meaning what to you?

2    A      That Ken wasn't in there.

3    Q      Okay.

4    A      The bathroom door was open and the light was off, so I knew that he

5    wasn't in the bathroom.  I walked in the living room.  Nobody was in the living

6    room or the kitchen.  So, I went back to try and get Tarah up, up for school.

7    Q      Was she getting up?

8    A      No.

9    Q      Okay.  Go ahead.

10   A      So, I noticed the light was off.

11   Q      Okay.  The same light that you were just talking about?

12   A      Yes.

13   Q      Okay.  Go ahead.

14   A      So, I thought that was strange because I didn't have the light set right.

15   Q      Okay.

16   A      So, I looked out again and his truck was there.  So, I'm thinking, 'well,

17   it's cold out; maybe he fell', you know.

18   Q      Uh-huh.

19   A      So, I went to the kitchen.  I peeked in Tarah's room and she was

20   getting up.  I went to the kitchen to look outside to see whether or not he fell.

21   The blind didn't fit the door right and so you had to move the blind to open the

22   door.

23   Q      Oh, it hung down too far?

1   A      Yea.

2   Q      Okay.

3   A      And I noticed it appeared to be hot sauce all over my window.  I

4   immediately got mad at the neighbors because I thought they threw a hot

5   sauce bottle at my window.

6   Q      Why would they do that?

7   A      Kids.

8   Q      Ornery kids in the neighborhood?

9   A      Oh, yea.  I opened the door and I don't remember anything after that.

10  Q      Nothing?

11  A      Nothing.

12  Q      Now, you told me you applied for a C.C.W.

13  A      Yes.

14  Q      A concealed carry permit.

15  A      Right.

16  Q      Did you ever buy a gun?

17  A      No, I did not.

18                              MR. MILLER:  One second, your Honor.

19                              THE COURT:  Okay.

20  (WHEREUPON, Court went off the record briefly.)

21  Q      I think maybe there at the end you said you don't remember anything

22  after that.  But, let me ask you - do you remember going up to the police

23  station?

1    A       No, I do not.

2    Q       Okay.  Do you remember talking to the police at any time?

3    A       No.

4    Q       Okay.  You don't remember any of that?

5    A       I remember getting a cup of water.

6    Q       That's all you remember?

7    A       That's it.

8    Q       Nothing after that?

9    A       No.

10                              MR. MILLER:   One second.

11   (WHEREUPON, Court went off the record briefly.)

12   Q       What's the next thing you remember, Sonya?

13   A       We were at Krista's house, Krista and Don Bodiker's house.

14   Q       Why were you there?

15   A       Because I couldn't go back to the house, to my house on McKibben.  I

16   could not go back to it.

17   Q       Did you ever return to McKibben?

18   A       I did.

19   Q       For how long?

20   A       Two or three days later.

21   Q       Okay.  Two or three days later?  And you lived there -- did you live

22   there for any period of time after your return two or three days later?

23   A       Yes, I did.

1    Q    How long?

2    A    Until December maybe.

3    Q    Of that year?

4    A    Yes.

5    Q    Of '09?

6    A    Yes.

7    Q    Okay.  Then where did you go?

8    A    Well, Don and I got married and --

9    Q    Don Hughes?

10   A    Yes.

11                           MR. MILLER:   No further questions.

12                           THE COURT:   Okay.  Mr. Rion, questions?

13                           MR. RION:   May we approach, your

14   Honor?

15                           THE COURT:   Yea.

16   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

17   the record, as follows.)

18                           MR. RION:   I'd like to take a five minute

19   break either now or part of the way through my cross.  There's some

20   documents that the State has that I would like to look at before she's done.

21                           THE COURT:   Okay.  Well, I mean this

22   would be the better time right now.  Okay.  That's fine.

23   (WHEREUPON, Court continued on the record, as follows.)

1          THE COURT:   All right.  Ladies and

2    gentlemen of the jury, we're going to take a short break now.  I was trying to

3    make the timing good.  But, we'll take -- well, let's go for no more than fifteen

4    minutes.  That will take us to two-thirty.

5          Remember the admonitions now.  Don't discuss the case among

6    yourselves or with anyone else.  Don't formulate or express any opinions

7    about what you've heard.  The witness will still be under oath.  You don't have

8    to stay in here.  Don't talk to the witness.  Don't have any contact.  Okay?  So,

9    she can go back to the waiting room or something like that.

10          We'll stand in recess.

11   (WHEREUPON, COURT WAS IN RECESS.)

12

13   **(VOLUME TWO CONCLUDED.)**

14

15

16

17

18

19

20

21

22

23