IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO. CR2014 0139 |
| Plaintiff | * | |
| | * | **TRANSCRIPT -** |
| -VS- | * | JURY TRIAL |
| | * | |
| **MARKELUS Q. CARTER** | * | |
| | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

--------------------------------------------------------------------------------

A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, 130 West Second Street, Suite 2150, P.O. Box 10126, Dayton, Ohio 45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

(VOLUME 3 OF 10)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# T A B L E   O F   C O N T E N T S

## (VOLUME 3 OF 10)

### WEDNESDAY, SEPTEMBER 9, 2015 - CONTINUED -

STATE'S THIRD WITNESS - CONTINUED -

| | |
|---|---|
| SONYA HUGHES - RION | 419 |
| - MILLER | 445 |
| COURT DISCUSSION WITH JUROR NO. 2 | 456 |
| QUESTIONING OF JUROR NO. 2 - KOHLRIESER | 459 |
| COURT DISCUSSION WITH JUROR NO. 5 | 460 |
| QUESTIONING OF JUROR NO. 5 - RION | 461 |
| COURT RULING - JUROR NO. 5 RELEASED | 462 |
| ARGUMENT REGARDING JUROR NO. 2 - KOHLRIESER | 462 |
| - RION | 464 |
| COURT RULING - JUROR NO. 2 REMAINS ON JURY | 464 |
| FIRST ALTERNATE REPLACES JUROR NO. 5 | 465 |
| STATE'S THIRD WITNESS CONTINUED - | |
| SONYA HUGHES - MILLER | 466 |
| - RION | 466 |
| COURT RECESSED FOR THE DAY AT 3:51 P.M. | 472 |

### - THURSDAY, SEPTEMBER 10, 2015 -

| | |
|---|---|
| COURT COMMENCED AT 8:36 A.M. | 472 |
| STATE'S FOURTH WITNESS - | |
| DET. SEAN NEIDEMIRE - MILLER | 473 |
| - RION | 501 |
| - MILLER | 505 |
| - RION | 508 |

STATE'S FIFTH WITNESS -
DONALD BODIKER - MILLER ........................ 509

STATE'S SIXTH WITNESS -
KRISTA BODIKER - MILLER ........................ 515
- RION ........................................... 532
- MILLER ........................................ 537
- RION ........................................... 540

STATE'S SEVENTH WITNESS -
DONALD HOVEST - MILLER ......................... 544
- RION ........................................... 552

STATE'S EIGHTH WITNESS -
ROBERT SARCHET - KOHLRIESER .................... 553
- RION ........................................... 566

STATE'S NINTH WITNESS -
MELISSA PAGE - MILLER .......................... 570

STATE'S TENTH WITNESS -
OFF. MATTHEW DOUGLASS - KOHLRIESER ............. 574
- RION ........................................... 584

STATE'S ELEVENTH WITNESS
CALVIN WOODRUFF - MILLER ....................... 585
- RION ........................................... 592

VOLUME THREE CONCLUDED ......................... 596

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**NOTE:**  THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE.  SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS.  HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT 436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436 MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM (ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFLE IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSC79 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT 436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULUM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
HEAD/NECK;

**- DEFENDANT'S EXHIBITS -**

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT 122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - (NOT ADMITTED BY COURT);

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A. MOORE;

DD - JUDGMENT ENTRY ON SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R. FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON (WITHDRAWN BY THE DEFENSE);

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS- STEPHEN UPHAM, LUCAS CO. CASE NO. G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR VICKIE BARTHOLOMEW;

**<u>COURT'S EXHIBITS</u>** -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW) BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED A.C.S.O. OFFENSE REPORTS;

1    THE COURT:  All right.  Just for the record

2    then it's still the 9th of September, 2015.  We're reconvening in CR2014

3    0139, State of Ohio -vs- Markelus Q. Carter.  The defendant is present with

4    counsel.  The State is present.  The jurors have returned after the afternoon

5    recess.

6    Mrs. Hughes is still on the stand.  You're still under oath.  Mr. Rion, you

7    can inquire.

8    MR. RION:  With the Court's permission, I

9    would like the witness to use the easel to draw the shed that the motion light

10   was on.

11   THE COURT:  Do you have -- are there

12   markers there?

13   MR. RION:  Yea, I think there's two

14   markers right there.

15   (WHEREUPON, witness drew requested drawing on easel.)

16   MR. RION:  I'd ask the witness to take the

17   stand again.

18   THE COURT:  Now, if you want her to

19   testify to that, you might make sure she can see it.  Maybe move it back a

20   little bit.  Okay.

21   **CROSS EXAMINATION**

22   **BY MR. RION:**

23   Q    The shed that you just drew was the brown shed, the wooden shed,

419

1    that the State showed you in their picture; correct?
2    A    Yes.
3    Q    And I believe on your drawing this is the house; correct?  That's your
4    house?
5    A    Yes.  That would be the back of the house.
6    Q    The motion detector -- is this the light?
7    A    Yes.
8    Q    It's on the corner?
9    A    It's up by where the -- yea, but it's on the side.
10    Q    Here?
11    A    Yes.
12    Q    If you could come down, just so there's no confusion, and just draw the
13    light?
14    (WHEREUPON, witness drew on sketch on easel.)
15    Q    It's your testimony -- well, at what time in the morning did you see that
16    light on?
17    A    After six o'clock.
18    Q    It's your testimony that at six A.M. something set off that motion light?
19    A    Or prior to it; yes.
20    Q    But, when you went back a few minutes later it was turned off; correct?
21    A    Yes.
22    Q    And it would turn on for approximately thirty seconds; correct?
23    A    No.  Twenty minutes/twenty-five minutes, somewhere in there.

1    Q.  Okay.  Twenty to twenty-five minutes --

2    A.  Yes.

3    Q.  -- if somebody passed through?  Did you tell our investigator that it

4         would turn on for a thirty second period?

5    A.  No.

6    Q.  You deny that?

7    A.  I do.

8    Q.  Okay.  When were the two weeks that you had a sexual relationship?

9         Today -- you're testifying today.  When were the two weeks that you had a

10        sexual relationship with Ken Warrington?

11   A.  It was in the summertime.

12   Q.  The summertime?

13   A.  Yes.

14   Q.  Of 2008?

15   A.  Yes.

16   Q.  Which month?

17   A.  I -- the end of -- maybe in August.

18   Q.  Those were the only two weeks you had a sexual relationship?

19   A.  Yes.

20   Q.  Now, prior to that, back in '07, you said there was no sexual

21        relationship?

22   A.  That's correct.

23   Q.  You were just friends?

1   A   That's correct.

2   Q   No sexual innuendos?

3   A   We joked around.

4   Q   You spoke with Detective Clark.  Do you see Detective Clark sitting

5   here?

6   A   Yes.

7   Q   Do you recall that on February 23rd you spoke with him?

8   A   Vaguely.

9   Q   Do you vaguely recall telling him that you had been dating for one year

10  prior to moving into, or, Ken Warrington moving into your house that you had

11  dated him, you'd been seeing him for a one year period of time?

12  A   We were friends.

13  Q   Do you deny making that statement?

14  A   I don't deny making that statement; but, we were friends at that time.

15  Q   So, you told the detective, Detective Clark, sitting right there, that you

16  were seeing him for a one year period prior to him moving in, but you're

17  saying that statement that you made to him was a lie; is that correct?

18  A   We were friends.

19  Q   Answer my question.  Are you saying that the statement that you made

20  to him on the date of this offense was a lie?

21  A   I made the statement.  No, it's not a lie.  I probably did make that

22  statement.

23  Q   So, you made the statement, but the statement wasn't true?

1   A   We were friends.

2   Q   I'm sorry.  Could you answer my question?  You made the statement,

3   but the statement wasn't true?

4   A   Not in that term; no.

5   Q   Then when you told Detective Clark on that same date, February 23rd,

6   2009, that you were in love with Ken Warrington -- did you just say that you

7   were friends with him or did you tell him that you were in love with him?

8   A   I told him that I was in love with him; yes.

9   Q   Did you tell him that he moved into your house around November of

10  2008?

11  A   He stayed there.  He did not move in.

12  Q   Did you tell Detective Clark that he moved into your house in

13  November of 2008?

14  A   He would come and go as he pleased.  He did not move in.

15  Q   Would you answer my question?  Did you tell Detective Clark that he

16  moved in in November of 2008?

17  A   I don't recall saying that.

18  Q   I'll hand you what's been marked as Defense exhibit 'A'.  Are these the

19  e-mails between you and Ken Warrington from 2007?

20  A   Yes, they are between us.

21  Q   And those are a fair and accurate copy of some e-mails of yours

22  between you and Ken Warrington in 2007?

23  A   Yes.

1  Q  Do you state in these e-mails that you want him?

2  A  I probably did.

3  Q  Did you state in the e-mail -- is this one of the conversations from Ken

4  Warrington - "I really want you and when is the question - logistics." Is that a

5  a question that he wrote to you?

6  A  Yea, but it was all in a joking manner.

7  Q  That was a joke?

8  A  Yea.

9  Q  Excuse me?

10  A  Yes.

11  Q  Your response, "Okay, I will take the first one. When can I have you?"

12  Sorry. Sorry. Your response, "Do you really want me or not? You already

13  have me." That's a joke?

14  A  Yes. We talked like that all the --

15  Q  This is in 2007; right?

16  A  Yes.

17  Q  "Okay, I'll take you. When can I have you?" That's a joke?

18  A  We did joke a lot; yes.

19  Q  "Your choice. Your choices are you have me or you have me." That

20  was your statement to him; correct?

21  A  I assume; yes.

22  Q  His response, "What are my choices?" Your statement, "When you

23  figure out what you want to do, let me know. Until then I think I need your

1   space from me."  Is that a joke?

2   A   It was all in -- you're taking it out of context.  It was all a joke.

3   Q   This is the conversation that I have.

4   A   I know.  I see that.

5   Q   "I don't know what I want to do."  That's a statement from him.  Is that a

6   joke?

7   A   It was - the whole thing.

8   Q   "No, but this is about you."  That's a statement from you.  It says,

9   "We're talking in circles."  Ken says, "We're talking in circles - not going

10  anywhere."

11  A   Well, that happened quite a bit.

12  Q   And then you say, "This is about you becoming a necessary for me."

13  Is that a joke?

14  A   It was all a joke.

15  Q   So, you're admitting today that you told Detective Clark that you were

16  dating/seeing each other for a year and that he moved in in November and

17  that you were in love with him, but today you're telling this jury that you were

18  just friends and you only had a two week fling?  Is that -- is that your

19  testimony?

20  A   We did only have a two week fling; yes.  And, he never moved

21  completely in with me.

22  Q   Did Detective Clark also ask you about a gentleman by the name of

23  Aguello Harris?

1    A    He did; yes.

2    Q    Did he ask you whether or not you had a sexual relationship with him?

3    A    He did; yes.

4    Q    Did you deny that you had a relationship with him?

5    A    I never had anything to do with him.

6    Q    Never had --

7    A    No, I did not.

8    Q    Okay.  Is that how you pronounce his name - Agruello Harris?

9    A    I don't even know.

10   Q    Did you have a drinking problem?

11   A    After that happened in 2008; yes.

12   Q    Were you drinking on the night in question?

13   A    No.  I only drink on my days off.

14   Q    You were with Tarah that night, correct?

15   A    Yes.

16   Q    And Tarah and you have a good relationship; you said?

17   A    Yes.

18   Q    Okay.  And Tarah saw you that night; correct?

19   A    Yes.  I picked her up.  Yes.

20   Q    She was still in high school; right?

21   A    Yes.

22   Q    She wasn't drinking; right?

23   A    No.

1  Q.  Now, let's go back to 2007.  December 17th, 2007.  What time did you

2     get home?

3  A.  Ten-ten/ten-fifteen.

4  Q.  And you got home at ten-ten/ten-fifteen and you said you went straight

5     to -- well, what did you say you did?  You just put on your pajamas and went

6     to bed?

7  A.  No.  I took a shower first.

8  Q.  You took a shower and went to bed?

9  A.  Yes.

10  MRS. KOHLRIESER:  Your Honor, if I

11  could just stop them a minute?  I believe Mr. Rion said 2008.  Are we talking

12  about the December 2007 incident?

13  MR. RION:  Yes.

14  MRS. KOHLRIESER:  Okay.  I just wanted

15  to make sure we were on the same page.

16  THE COURT:  Does the witness

17  understand what he's talking about?

18  A.  Yes.

19  THE COURT:  Okay.  Go ahead.

20  Q.  And how long after that did you and Markelus have a conversation?

21  A.  I don't know how long it was.  I fell asleep.

22  Q.  Now, charges were dismissed against Markelus; correct?

23  A.  I don't know if they were or not.

1   Q   You don't know?  You're telling this jury that he hit you with a pistol?  Is

2       that your testimony?

3   A   Yes, he did.

4   Q   And where did he hit you with a pistol?

5   A   Across my jaw right here.

6   Q   Across your jaw?  Hard?

7   A   Yes.

8   Q   All right.  And was he holding the pistol in one of his hands?

9   A   Yes.

10  Q   Which one?

11  A   Right hand.

12  Q   Describe the pistol for me.

13  A   A handgun.

14  Q   What color?

15  A   I believe it was silverish grayish.

16  Q   And do you recall talking to the police about this incident back in 2007,

17      in fact, that same night?

18  A   Did I talk to -- I'm sorry?

19  Q   Did you talk to the police about this that night?

20  A   Yes, I did.

21  Q   And I assume if someone hits you hard with a pistol -- like, hit the table

22      as hard as he hit you.  Hit that as hard as he hit you.

23  A   I can't do that.

1  Q  Why?  Because it would hurt your hand?  Would it be that hard?

2  A  Yea.

3  Q  So, harder than that?  (Demonstrates)

4  A  Probably not quite that hard; no.

5  Q  So, like that?  (Demonstrates)  I mean, hard, --

6  A  It was like a smack with a --

7  Q  -- with a metal object?

8  A  Yea.

9  Q  It didn't leave a single mark; did it?

10  A  It left a mark down here.

11  Q  Oh, it did?

12  A  You couldn't see it until the next day.

13  Q  Oh, I see.  So, the officer noted, or, looked at it and there was no

14  marks; correct?

15  A  There wasn't at that time; no.

16  Q  Now, did you tell the officer, and this is Officer Hile, did you tell Officer

17  Hile that he hit you with a pistol?

18  A  Yes, I believe so.

19  Q  Okay.  And when you say you believe so, what do you mean?

20  A  That I told him that.

21  Q  So, he didn't hit you with a closed fist; right?

22  A  No.

23  Q  And you deny telling Officer Hile that Markelus hit you with a closed

1    fist, correct?

2   A   I told him that he had a gun in that hand and that he hit me with the

3    gun in my jaw.

4   Q   Answer my question.

5   A   What was your question?

6   Q   My question was - you didn't tell Officer Hile that he hit you --

7   A   I said he hit me; yea.

8   Q   -- with a closed fist?

9   A   I don't know what I told him.  I cannot recall at this time.

10  Q   You don't recall what you told Officer Hile?

11  A   Not at this time; no.

12  Q   Did you ever tell Officer Hile that it wasn't a silver gun that he had in

13   his hand, that he didn't hit you with, but that it was a black gun?

14  A   It could have been black.

15  Q   It could have been black?  You realize you're under oath; correct?

16  A   Yes, I do.

17  Q   Okay.  So, you said it was silver.  But, now you're saying, well, it could

18   have not been silver, but it could have been black.  Is that your testimony?

19  A   It was a dark colored gun, a handheld gun, hand gun.

20  Q   Do you recall talking to our investigators about two months ago?

21  A   The young kids?

22  Q   Yes.

23  A   Yes.

1   Q. Not in jail here, but while in Indiana. Do you recall them telling them that it

2   was a shiny silver gun that was utilized?

3   A. I might have.

4   Q. You might have? Okay. So now, today, it might not be a shiny silver,

5   but now it's a dark silver?

6   A. It was a gun. I'm not really sure of the color.

7   Q. Now, you testified during direct that Mr. Warrington called -- well, you

8   saw him at work and he said that he needed the key that he had left on the

9   counter; correct?

10  A. Yes, he forgot it.

11  Q. And that was the night before, I assume?

12  A. No. That was from a couple of days prior.

13  Q. And he said that he was going to come over -- I believe he said he

14  needed the key so he could come get his uniform.

15  A. Yea. He said he was getting too big for the ones that he had.

16  Q. So, he was going to come and get his clothes?

17  A. Yea.

18  Q. Was he leaving?

19  A. He didn't live there. So, he was just grabbing his uniform.

20  Q. Was he leaving to go back to live with Mrs. Warrington?

21  A. I believe he was already with her at that time.

22  Q. Oh, so he was living in the house with Mrs. Warrington on February

23  23rd, 2009?

1   A    I believe so.

2   Q    And if he was just coming to get his uniforms -- well, he was getting his

3   uniforms to go take them back to his wife's house?  Was that your

4   understanding?

5   A    Yea.  Yes.

6   Q    Because that's where he was living at the time?

7   A    Yes.

8   Q    Going back to Detective Clark here.  You spoke to him on February

9   23rd.

10  A    Okay.

11  Q    Did you tell him that he was living with you at the time?

12  A    He had stuff there.  He was not living with me.

13  Q    Answer my question.

14  A    I don't -- I don't know if I said that or not.  February 23rd is not a very

15  good --

16  Q    Did you tell Detective Clark that Ken Warrington had gone back to his

17  wife and was living with his wife?

18  A    That's where he was living.

19  Q    That's not what my question is.  Did you tell Detective Clark that Ken

20  Warrington, on February 22nd/23rd, was actually living with Mrs. Warrington?

21  A    Yes.

22  Q    Okay?  So, tell me about that conversation.  What did you tell

23  him?

1    A    I don't remember back that far.

2    Q    Okay. So, when did you tell him that? I'm sure Detective Clark is a

3         very thorough man. I'm sure he would have asked you when did Mr.

4         Warrington move back in with Mrs. Warrington.

5    A    He was there on and off and he also stayed at a farm house as well.

6    Q    Please answer my question. Did Detective Clark ask you when it was

7         that Mr. Warrington moved back in with Mrs. Warrington?

8    A    He never really moved out. That's the point.

9    Q    He never moved out of Mrs. Warrington's house?

10   A    Not completely, that I'm aware of.

11   Q    Okay. Now, Tarah was with you two or three nights, or, three or four

12        nights a week; right?

13   A    That's correct.

14   Q    So, she was in the house with you and so she would have seen who

15        was there and who was not there; correct?

16   A    That is correct.

17   Q    And you deny that you were drinking at all that night; correct?

18   A    No. I worked that night.

19   Q    When did you give him a key to the house?

20   A    It was cold outside. I'm not really sure. I know there was snow on the

21        ground, but a specific date I don't know.

22   Q    Not in November of '08?

23   A    I don't know.

1     Q    Not when he moved in?

2     A    He never completely moved in.  I don't recall.

3     Q    Did he sleep in the same bed with you in the month of December?

4     A    No, he did not.

5     Q    Did he sleep in the same bed with you in the month of January?

6     A    No, he did not.

7     Q    Now, on Christmas Eve of 2008 did he give you a present?  Did he

8          give you some jewelry?

9     A    No.  He knew I didn't like jewelry.

10    Q    Now, Tarah was there at the house that night; correct?

11    A    Yes.

12    Q    For Christmas?

13    A    Yes.

14    Q    He knows you don't like jewelry?

15    A    He knows that, and flowers.  I don't care for either.

16    Q    Tarah got decent grades in school and all, or did she not?

17    A    She had at that time; yes.

18    Q    She did?

19    A    Yes.

20    Q    She didn't get D's and F's?  She wasn't getting D's and F's?

21    A    Yes, that started.

22    Q    Okay.  So, I just asked you one question, whether she got decent

23         grades, and you said 'yes'.

1    A    She had decent grades in the beginning and they slowly went downhill.

2    Q    During that entire year of 2008 did Mr. Warrington give you any

3    money?

4    A    For pizza; yes.

5    Q    Pizza money?

6    A    Yes. Mostly for food.

7    Q    So, he gave you pizza money during this time period, but here's a

8    person that's staying there. Now, when was it that -- well, did Mr. Warrington

9    have a son named Jeff?

10    A    Yes.

11    Q    And did Jeff come over to your house one night?

12    A    He didn't come in the house.

13    Q    Right. He came into the street, or, the yard area?

14    A    He was on the street; yes.

15    Q    When was that?

16    A    I don't -- I don't know the exact date.

17    Q    What month?

18    A    I don't know the month.

19    Q    What season?

20    A    I think we were -- I believe it was during the fall.

21    Q    Was this during the two weeks that you guys were sleeping with each

22    other, or not?

23    A    No.

1   Q   When he called you a home wrecker -- did he call you a home

2       wrecker?

3   A   And a bitch; yes.

4   Q   And a bitch.  Did it occur to you that you were, from Mr. Warrington's

5       son's point of view, that his home was being wrecked because of your

6       relationship with him?

7   A   Yes, it did occur to me.  That's why I didn't call the cops on him.

8   Q   Now, do you have a telephone?

9   A   I'm sorry?

10  Q   Do you have a telephone?

11  A   Yea.  Yes.

12  Q   And the police took your phone that day, correct, on February 23rd to

13      look at?

14  A   I don't know if they did or not, honestly.

15  Q   Were you throwing up at all that day?

16  A   I don't remember.

17  Q   So, in the early morning hours -- well, you don't remember?  Why did

18      you call Mrs. Warrington and tell her 'don't fuck with me'?

19  A   I never called Mrs. Warrington ever.

20  Q   Why did you say that you were going to go over there?

21  A   I never said I was going to go over there.

22  Q   Now, you got your gun training in 2008?

23  A   2007.

1    Q    2007?

2    A    Yes.

3    Q    I'm not trying to confuse you.  I'm just asking you.

4    A    It was 2007, the spring.

5    Q    The spring of 2007?  So, that would be before the December, 2007

6    incident with Markelus?

7    A    It was 2008.  I'm sorry.

8    Q    Okay.  Now, that cost money; right?

9    A    It was one hundred dollars.

10   Q    One hundred dollars?  You had to take a twelve hour class or

11   something?

12   A    Yes.

13   Q    And two hours of that was gun training, like in the shooting range;

14   correct?

15   A    Yes.

16   Q    So, you had training.  Who trained you?  Like officers or people that

17   know how to shoot guns?

18   A    Officers.  Inspectors.

19   Q    Okay.  So, you were instructed for two hours actually with a gun and

20   then for ten hours of just safety training and other types of training on how to

21   shoot and maintain a weapon; correct?

22   A    Yes.

23   Q    So, you know how to shoot?

1   A   No.

2   Q   No?

3   A   Never.

4   Q   Did you always wake Tarah up at six A.M.?

5   A   In the winter months; yes.

6   Q   So, from December to March?

7   A   If there was snow or was icy out; yes. Otherwise; no.

8   Q   Now, school didn't start until about eight o'clock?

9   A   Yes.

10  Q   And you lived about ten/fifteen minutes away from the school?

11  A   Yes.

12  Q   But, you would wake -- well, how old was she at the time?

13      Sixteen/seventeen? Somewhere around in there? Fifteen?

14  A   Somewhere in there.

15  Q   You would wake the teenager up two hours before she had to go to

16      school? Is that what you did?

17  A   Yes, I would.

18  Q   And it's your testimony that was your practice?

19  A   That was on -- on bad mornings, yes, it was.

20  Q   Now, it didn't snow that night, correct?

21  A   No. It got really cold.

22  Q   I'm sorry. I'm just checking something on the computer. I apologize to

23      the jury. State's exhibit '5'. Maybe I can focus this. So, this is the shed that

1    we're talking about; correct?

2  A  Yes.

3  Q  I don't see any motion lights on --

4  A  It's over -- I'm sorry -- it's on the other side.

5  Q  All right.  So, it's not on the front and it's not on the corner; correct?

6  A  It's on the side where, well, I don't know what you call it, but it's on the

7     side, between the back of the house and the shed.

8  Q  Well, we took some pictures.  I'll print this and mark it.  The roof goes

9     down a little bit; correct?

10 A  Yes.

11 Q  So, this is the other side of it.  You're saying it's on this side

12    somewhere?

13 A  Yes.  That's how the wiring is.

14 Q  That's where the wiring is?  Is it on the roof?

15 A  Yes, it is.

16 Q  It's attached to the roof?

17 A  Yes.

18 Q  Where on the roof?

19 A  Off to the side.

20 Q  Stop my finger.  Direct my finger.

21 A  Oh, up -- well, right about -- well, like back a little bit.  Right about in

22    there.  But, it's higher up.  It's somewhere like that.

23 Q  So, right here, but on this side is what you're saying; correct?

1    A    Yes.

2    Q    And you deny telling the investigators that it had about a thirty second

3    loop on it once something --

4    A    It did not have a thirty second loop.

5    Q    And you deny telling the investigators that?

6    A    I do deny telling them that.

7    Q    So, let's see.  Ken Warrington, the person that you were in love with,

8    dies on February 23rd, 2009.  You are married to another individual by when?

9    When did you get married?

10   A    December of 2009.

11   Q    The same year.  And this protection order that you got on Mr. Carter,

12   well, it was removed as it related to the children by mid-January, so, within

13   two weeks or so; correct?

14   A    January?

15   Q    I'm sorry.  Yea, January of -- well, you got a protection order after this

16   whole incident and it kept him away from his kids for a couple of weeks but

17   then within a couple of weeks they were back home; correct?

18   A    I don't know what the time frame was.  I don't recall.  I don't remember.

19   Q    If I told you it was January 18th, does that sound about right?

20   A    Sure.

21   Q    Did you open the front door of the house?

22   A    No.

23   Q    Never did?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | So, when you woke up that morning -- State's exhibit '4', this is the |
| 3 | | side door; correct? |
| 4 | A | Yes. |
| 5 | Q | And that's where Mr. Warrington was ultimately found; correct? |
| 6 | A | Yes. |
| 7 | Q | This is your front door; right? |
| 8 | A | Yes. |
| 9 | Q | You never use your front door? |
| 10 | A | No. |
| 11 | Q | So, it wouldn't make any sense to look out your front door if you were |
| 12 | | trying to look for Ken Warrington; correct? |
| 13 | A | No.  No one ever used that door. |
| 14 | Q | Now, when you were living -- let's go back to 2005.  So, you lose your |
| 15 | | house that your mom lived in; right? |
| 16 | A | That's correct. |
| 17 | Q | And you really needed a place to stay; right? |
| 18 | A | That's correct. |
| 19 | Q | And Ruby Carter and you were friendly on some level; correct? |
| 20 | A | I'm sorry? |
| 21 | Q | Markelus' mother and you were friendly enough; correct? |
| 22 | A | Sometimes. |
| 23 | Q | And when you moved back in with Markelus it wasn't like you guys |

1   were necessarily dating at that time; right?

2   A   That's correct.

3   Q   You needed a place to stay?

4   A   That's correct.

5   Q   And he was kind enough to give you a place to stay?

6   A   That's correct.

7   Q   And you had your own place, I guess, your own room, you said?

8   A   Tarah and I shared a room; yes.

9   Q   Okay.  So, you and Markelus weren't, like, sharing a room?

10  A   No.  No.

11  Q   And that was by mutual agreement?

12  A   Yes.

13  Q   So, it wasn't like he said, 'you can come live in my house, but you've

14  got to sleep in my bed'.  It was, like, 'look, you can stay here, but this will be

15  the way it's set up'.  You guys both agreed on that?

16  A   Yes.

17  Q   And it wasn't -- well, did that relationship sometimes cross lines during

18  those two years?

19  A   I don't know what you mean.

20  Q   Did the two of you have sex during that time from time to time between

21  2005 and 2007, just sporadically and casually?

22  A   I don't think so.

23  Q   Maybe; but, you don't remember?

1    A    No.  There's no maybe.  No.

2    Q    You didn't?  Okay.  So, it was a completely platonic relationship?

3    A    Yes.

4    Q    And it was expected that the two of you were not dating and that's the

5         way it was; correct?

6    A    That's right.

7    Q    And, again, that was a mutual arrangement that you and Markelus

8         Carter had?

9    A    Yes.

10   Q    So, from your perspective, Ken Warrington had already moved out of

11        your house and was already living back with his wife; correct?

12   A    He never moved in and so he couldn't move out.  He was with his wife;

13        that's correct.

14   Q    Okay.  And Tarah, who lives with you, would have had full knowledge

15        of that; correct?

16   A    Yes.

17   Q    It would have been obvious to anyone that was living over there --

18   A    Yes.

19   Q    -- that that's what was going on?

20   A    Yes.

21   Q    So, it was as casual and as nonchalant as you're saying today, and he

22        was just there to pick up a uniform that was still --

23   A    That morning.

1        Q    That morning.

2        A    Well, he didn't say when.  He told me it might be a couple of days and I

3    said that that was fine.

4        Q    So, you weren't even expecting him that morning?

5        A    I was not expecting him.

6        Q    If you weren't expecting him then why at six in the morning were you

7    looking?

8        A    Because the light was on and I looked outside and saw his truck.  His

9    truck wouldn't be there if he wasn't.

10       MR. RION:    If I could have one second?

11       THE COURT:    Okay.

12    (WHEREUPON, Court went off the record briefly.)

13       Q    Did you call Ken Warrington - and excuse my language - an asshole?

14       A    Oh, yea.  Yes.

15       Q    Did you actually take the word asshole and draw it on a magnet and

16    put a number one before it, so number one asshole, and put it on his license

17    plate?

18       A    Yes, I did.

19       Q    When did you do that?

20       A    Earlier -- a week or so prior to the incident.  I'm not really sure.

21       Q    A week before?

22       A    Somewhere in there.

23       Q    I'm handing you what's been marked as Defendant's exhibit '2'.

1    THE COURT:  It would be 'B'.  Use letters.

2    MR. RION:  I'm sorry.  'B'.

3    Q    Is that your handwriting?

4    A    Yes.

5    Q    Is that what you put on his car a week before he was shot?

6    A    I don't know the time frame; but, yes, we did put it there.  Yes.

7    Q    Is that what you put on the man's car that you're in love with?

8    A    Yes.

9    Q    And is that what you put on the man's car who was already back living

10    with his wife, Mrs. Warrington?

11    A    Yes.  He caution taped my whole car.  That was a payback.

12    MR. RION:  Nothing further.

13    THE COURT:  Okay.  Any redirect?

14    MR. MILLER:  Yes, your Honor.

15    <u>REDIRECT EXAMINATION</u>

16    BY MR. MILLER:

17    Q    Let's pick up right there.  Why did you put the number one asshole sign

18    on Ken Warrington's car?

19    A    He took caution tape and hazard tape and wrapped my whole car.  I

20    couldn't even get in it.

21    Q    Why did he do that?

22    A    'Cause he's a prankster.  He always did stuff.

23    Q    Did this go on --

1   A   All the time.  And it wasn't just me, either.

2   Q   All the time?

3   A   Yes.

4   Q   You worked out at the Refinery.

5   A   Yes.

6   Q   Did he have the reputation of being kind of a prankster?

7   A   Yes.

8   Q   Fun-loving guy?

9   A   Yes.

10   Q   The guy you can joke around with?

11   A   Yes.

12   Q   They guy that would take caution tape, or whatever, and tape up your

13   car?

14   A   Yes.

15   Q   And the guy that would take kind of a jab back, like putting number one

16   asshole --

17   MR. RION:  Objection.  Leading.

18   Q   -- number one asshole on his --

19   THE COURT:  It's leading.  Sustained.

20   A   Yes.

21   Q   Was he the type of guy that would take a joke like putting number one

22   asshole on his car?

23   A   He knew it was there; yes.

1    Q   Now, you got beat up pretty hard about the color of this gun when you

2        were coming down the stairs; right?

3    A   Yes.

4    Q   Now, do you remember when I was showing you the picture of that

5        camouflage?

6    A   Yes.

7    Q   Okay?

8    A   Yes.

9    Q   Do you remember telling the jury, the folks here, that you don't see

10       color well?

11   A   Yes.

12   Q   Do you see color well?

13   A   No, I do not.

14   Q   Okay.  So, whether it was silver, white, green, purple, black - would

15       you know?

16   A   I really wouldn't know.

17   Q   With any, you know, certainty?

18   A   I couldn't even compare it.  I still wouldn't know.

19   Q   The bottom line is, what did you see in Markelus Carter's hand, you

20       know, as he was rushing you out of the house on December 17th, 2007 on

21       Eureka Street?

22   A   A gun; a hand gun.

23   Q   We're kind -- we worked kind of back from where he left off.  You were

447

1   questioned by Mr. Rion about moving back into the Eureka Street house.

2   A   Yes.

3   Q   I think it was in your direct testimony that you said you did that after

4   you lost the house on Pine Street.

5   A   Yes.

6   Q   Whose house was that again?

7   A   My mother's.

8   Q   Okay.  She had passed?

9   A   Yes.

10  Q   Okay.  Did you have anywhere else to go in that time of your life?

11  A   It would have been Sidney, Ohio and I didn't want to uproot the kids

12  because they were going to a good school.

13  Q   Fair enough.  It would have been to Sidney, Ohio.  But, did you have

14  anywhere else in Lima to go at that time in your life?

15  A   No, I did not.

16  Q   Your mother had just passed?

17  A   Yes, that's correct.

18  Q   And you lost the house?

19  A   Yes.

20  Q   Were you really comfortable moving back into 122 East Eureka at that

21  time frame?

22  A   I wasn't comfortable with it, but I didn't have a choice.

23  Q   Were you comfortable -- because we're talking about so many time

448

1    frames, let me ask you, when you moved back into that house, just for

2    clarification, and I'm going to use the words 'were you seeing Ken

3    Warrington', whether it be a sexual relationship, or were you friends with him?

4    A    I was friends with him.

5    Q    You had a relationship with him at that time?

6    A    Yes.

7    Q    Were you comfortable telling Markelus about that relationship when

8    you moved back into 122 East Eureka as you've described?

9    A    No.

10    Q    Okay.  But, you just said, and I think all through this testimony you said

11    that you were not having a sexual relationship with Markelus Carter.  You

12    were basically roommates I think was what your testimony was on my direct.

13    A    Yes.

14    Q    Okay.  Why weren't you comfortable telling him about this relationship

15    when you moved back in?

16    A    Because of his controlling ways and issues and I was afraid he would

17    snap.  He would not believe that we were just friends, or friends with anyone,

18    as far as that goes.

19    Q    Now, you were questioned about waking up Tarah two hours before

20    school.

21    A    Yes.

22    Q    Would it surprise you that Markelus woke up the kids approximately

23    two hours before school, too?

1   A   That wouldn't surprise me.

2   Q   You were questioned about the C.C.W. that you got.

3   A   Okay.

4   Q   Again, we brought that up. Why did you get the C.C.W.?

5   A   I was talked into it - take the class; protection.

6   Q   By whom?

7   A   People at work. They also took it as well. So, it was like a, well,

8 almost a social event to take the class because everybody who took the class

9 at that time worked at the Refinery.

10   Q   Again, was this before or after the December 17th, 2007 incident?

11   A   After.

12   Q   One second. I forgot something here. Sorry. You were questioned

13 also about the phone call that was apparently made to Faye Warrington.

14   A   I never called her.

15   Q   Let me ask you this - did you have a cell phone back in roughly

16 September of 2008?

17   A   Yes.

18   Q   Did Tarah have access to your cell phone?

19   A   Yes.

20   Q   You were describing Tarah as a good student at first, but then --

21   A   Yes. Yes.

22   Q   -- her grades fell off. I'm just going to ask you this - is Tarah kind of a

23 handful?

```
 1    A    Yes.

 2    Q    At times?

 3    A    Yes.

 4    Q    Is she kind of a pot stirrer?

 5    A    Yes.

 6    Q    Do you know what I mean by that?

 7    A    I do.  Yes.  She still is sometimes.

 8    Q    A pot stirrer?  Okay?  Sometimes?  She had access to your phone

 9         around September of 2008?

10    A    Yes.

11    Q    You didn't make that phone call?

12         MR. RION:  Objection.  Leading.

13    A    I did not make that phone call.

14         THE COURT:  Overruled.  It was leading.

15         But, overruled.

16    Q    Now, the word, or phrase, it's probably two words, but maybe it's one,

17         home wrecker, was thrown around.  Okay?  Did you and Ken talk about this

18         sexual relationship you had?

19    A    Yes.

20    Q    As a result of those relationships did you both decide that you were

21         going to cool it a little bit here?

22    A    Yes, absolutely.

23    Q    Is that because, Sonya, and I'm just going to ask you an honest
```

1   question here, okay, and you've been questioned now for awhile, I'm just

2   going to ask you a question here - did you feel kind of like a home wrecker?

3   A   Yes, I did.

4   Q   Did that bother you?

5   A   Yes, it did.

6   Q   Is that kind of why you decided, at least on your part, --

7   A   Yes.

8   Q   -- and you really can't say what Ken was thinking, but is that why on

9   your part you decided to back off in this relationship?

10  A   Yes.

11  Q   You were asked about where Ken may have been living, whether it

12  was with you or with Faye.  Did Ken bounce back and forth between your

13  house, and home, and I think you mentioned a farm house?

14  A   Yes.  He bounced between the three.  I never knew where he was

15  going to be.

16  Q   Okay.  Did he ever move in and stay all the time with you?

17  A   No, he did not.

18  Q   So, if someone says to you 'when did Ken move in', if somebody asked

19  you 'when did Ken move in', your response would be?

20  A   He never moved in.

21  Q   Okay.  Do you understand how somebody could think he moved in

22  because there were clothes there and he slept there?

23  A   Yes.

1    Q    Et cetera?

2    A    Yes.

3    Q    Now, you were asked about a series of e-mails.  I'm not going to show

4    them to you again.  But, Mr. Rion characterized the language as, you know, 'I

5    really want you,' and I had you', and that.  In the time leading up to -- when

6    the time -- we're all getting a little tired -- in the time period leading up to the

7    two weeks or so that you had a sexual relationship with Ken Warrington,

8    okay, did you flirt with Ken Warrington a little bit?

9    A    Yea. Yes.

10    Q    Back and forth?

11    A    Yes.

12    Q    Did you care for him?

13    A    Yes.  You couldn't not care for him.

14    Q    Okay.  Is it fair to say you loved him?

15    A    Yes.

16    Q    Is it fair to say you wanted a guy like him?

17    A    Unmarried, though.  Yes.

18    Q    Well, aside from that.  I understand that.  Set aside

19    the fact that he was married.  Is it fair to say you wanted a guy like him?

20    A    Yes.

21    Q    Was Markelus a guy like him?

22    A    No.

23    Q    Did you love Ken even though the relationship was at some point was not

453

1 sexual?

2 A Yes.

3 Q Are you able to love somebody and not - you - are you able to love

4 somebody and not be sexual with them?

5 A Absolutely.

6 MR. MILLER: Your Honor, can I take a one

7 second break to confer with counsel, but may we approach for a second?

8 THE COURT: Okay.

9 (WHEREUPON, Court went off the record briefly.)

10 MR. MILLER: Your Honor, can we

11 approach?

12 THE COURT: Please do.

13 (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

14 the record, as follows.)

15 MRS. KOHLRIESER: I believe - sorry - I

16 believe that with the questioning that Mr. Rion engaged in about this platonic

17 relationship that she had with Markelus and things like that -- he's going after

18 this jealousy --

19 MR. RION: Is this mic. amplifying?

20 MRS. KOHLRIESER: Is it? Anyhow, I

21 think by his questions about their relationship, the platonic relationship, he's

22 going to the jealousy angle of it - you know, 'it was a mutual agreement', you

23 didn't sleep together', 'you didn't have a sexual relationship', that type of

1  thing, and then his follow-up question about did she tell him about the other

2  men, or other man, Ken Warrington, and her saying no, I think that opens up

3  the Brayshaw issue again as to why she wouldn't have done that, regardless

4  of what kind of relationship they were in, because they weren't in a

5  relationship when he went off on Ken Brayshaw either. That's what I'm

6  getting at. I think he's opened that door.

7  MR. RION: He opened the door. I didn't

8  open the door.

9  MRS. KOHLRIESER: You opened the

10  door when you talked about --

11  MR. RION: The nature of the relationship?

12  I didn't ask about his girlfriends or anything like that. I purposely stayed away

13  from that.

14  THE COURT: (Inaudible).

15  COURT REPORTER: I can't hear you, Judge.

16  THE COURT: I didn't hear the door

17  opened. So, my ruling still stands.

18  MR. RION: Judge, I've got something

19  weird. I've got a picture on my computer that I didn't print out because I didn't

20  anticipate it. Can I use it and then follow it up with --

21  THE COURT: Yea, that's fine.

22  MR. RION: Okay.

23  (WHEREUPON, Court continued on the record, as follows.)

1    THE COURT:  Okay, Any other redirect?

2    Just a second.  Just a second.

3    (WHEREUPON, Court and bailiff have a brief discussion, off the record.)

4    THE COURT:  Something's come up.

5    We'll take a short break; okay?  I want counsel to stay in.  We'll just excuse

6    the jurors for a brief moment and then we'll come back in and finish up with

7    this witness.  I think we're still in the redirect, if there's any more redirect.

8    So, ladies and gentlemen of the jury, we'll excuse you for a few

9    minutes.  Don't go very far away.  It shouldn't be very long.

10   Monica, just bring back in --

11   (WHEREUPON, jurors were excused from the Courtroom.)

12   BAILIFF:  Do you want the witness to step out?

13   THE COURT:  Yea, that would be a good

14   idea, too.  You can step out of the room.  We'll have you right back in; okay?

15   (WHEREUPON, witness was excused from the Courtroom.)

16   (WHEREUPON, juror number two was brought into the Courtroom.)

17   THE COURT:  I just want the record to

18   reflect, and it wouldn't show up on the record necessarily, but when counsel

19   was at the Bench for a conference I noticed the bailiff went and spoke with

20   one of the jurors, juror number two.  She's actually seated in the first seat, but

21   because of Mrs. Coon, well, it would be Mrs. Oglesbee.  You had mentioned

22   something to Monica and Monica brought it to my attention.  I need you to

23   share that, if you could, with everybody.

1    JUROR NUMBER TWO:  Okay.  Yea, when you asked about the Carter

2    family and you mentioned the names, or whatever, I didn't know him and I

3    didn't think that I knew any of his family.  But, after seeing his mother in the

4    Courtroom, I knew her as a child, plus I knew, well, her mother and some of

5    her siblings.

6        THE COURT:  You did exactly what you're

7    supposed to do in letting us know that.  Now, the question is, is that going to

8    influence the way you would view the facts of this case or does that now

9    present a problem for you, in your mind - I can't read your mind; you have to

10   be honest with us - that you don't think you can be fair and impartial in this

11   case?

12       JUROR NUMBER TWO:  I can be fair and impartial.

13       THE COURT:  Okay.

14       JUROR NUMBER TWO:  We grew up as children.  I knew them as children.

15   After we grew up I didn't see them for years and years.

16       THE COURT:  Okay.

17       JUROR NUMBER TWO:  But, when she -- when I saw her in the Courtroom I

18   knew who she was.

19       THE COURT:  Okay.  You're telling me,

20   though, that that's not going to make a difference in the way you look at this

21   case?

22       JUROR NUMBER TWO:  No.

23       THE COURT:  Whatever your decision,

1  and nobody can predict what your decision is going to be because we haven't

2  heard all the evidence or got the instructions, but whatever that decision

3  might be you're going to make it based on evidence?

4  JUROR NUMBER TWO: Right.

5  THE COURT: And based on instructions?

6  JUROR NUMBER TWO: Yes.

7  THE COURT: And not let the relationship,

8  or, knowing members of the Carter family interfere with that and whatever that

9  decision is you'll be able to walk out of here and say, "If I ever run into these

10  people whatever my decision is it's my decision." You can do that?

11  JUROR NUMBER TWO: Yes.

12  THE COURT: Okay. Does counsel want

13  to follow up with any questions?

14  MRS. KOHLRIESER: Yes, your Honor.

15  THE COURT: The State?

16  MRS. KOHLRIESER: Your Honor, do you

17  mind if she sits down?

18  THE COURT: Oh, yea.

19  MRS. KOHLRIESER: I don't think she

20  needs to stand up.

21  THE COURT: Maybe she wanted to stand.

22  I didn't know.

23  MRS. KOHLRIESER: If you want to, go

1    ahead.  You said you also knew Ruby Carter's mother --

2        JUROR NUMBER TWO:  Yes.

3        MRS. KOHLRIESER:  -- growing up as a

4    child?  Were your families fairly close?  Did you grow up in the same

5    neighborhood?

6        JUROR NUMBER TWO:  That's it.  We grew up in the same neighborhood.

7        MRS. KOHLRIESER:  Okay.  Did you like

8    their family?

9        JUROR NUMBER TWO:  Did I like them?

10       MRS. KOHLRIESER:  Yea.

11       JUROR NUMBER TWO:  Yea, as a kid.  I mean, we played together.

12       MRS. KOHLRIESER:  I know you said you

13   haven't really been around them in a long time, but obviously you've seen

14   her, and that type of thing, that you're able to recognize her sitting here;

15   correct?

16       JUROR NUMBER TWO:  Yes.

17       MRS. KOHLRIESER:  Okay.  That's all.

18       THE COURT:  Mr. Rion, do you have any

19   questions?

20       MR. RION:  No questions.  Thank you,

21   your Honor.

22       THE COURT:  Again, Mrs. Oglesbee, not

23   to beat a dead horse, but you're saying it's not going to make a difference?

1    JUROR NUMBER TWO:  No.

2    THE COURT:  Okay.  That's good.

3    JUROR NUMBER TWO:  I wanted you to know, though.

4    THE COURT:  I'm glad you did.  You did

5    the right thing by letting us know.  Okay?  Then, go back and join your

6    fellow jurors.

7    BAILIFF:  Miss James wants to speak to you also.

8    THE COURT:  Okay.  Well, then, bring her

9    in.

10   (WHEREUPON, juror number two was excused from the Courtroom and juror

11   number five was brought into the Courtroom.)

12   THE COURT:  This would be number five

13   in the box.  All right.  Juror number five is in here - Mrs. James.  Monica had

14   indicated you had something you wanted to share.  I wanted to do this outside

15   of everybody else's presence.  Is there something you wanted to share with

16   us all?

17   JUROR NUMBER FIVE:  I don't know him, but when the lawyer said Ruby

18   Carter, well, I knew then that I shouldn't be on here because I know his

19   mother.

20   THE COURT:  Okay.  You say you

21   shouldn't be on.  Why are you saying you shouldn't be on the jury?

22   JUROR NUMBER FIVE:  Because I know the mother.

23   THE COURT:  Okay.

1    JUROR NUMBER FIVE:  And I don't feel right judging.

2    THE COURT:  Okay.  You think it's going

3    to interfere with your ability to be fair and impartial to both sides?

4    JUROR NUMBER FIVE:  Yea.

5    THE COURT:  Okay.  That's exactly what

6    you needed to tell us if you have those issues.

7    JUROR NUMBER FIVE:  But, if I had known that before, see, but they never

8    brought her name up and so I didn't know.

9    THE COURT:  Okay.  Does counsel want

10   to inquire at all?

11   MRS. KOHLRIESER:  No, your Honor.

12   THE COURT:  Mr. Rion?

13   MR. RION:  Yea, I do.  Whether you feel

14   right is not really the question.

15   JUROR NUMBER FIVE:  I would feel bad trying to judge her son.  I'm just

16   going to be truthful about it.  If I had known it before -- but, I didn't know until

17   you said Ruby Carter and I said 'oh, no'.  I mean, I don't think that I could be

18   impartial.  I mean, --

19   MR. RION:  That's the question - can you

20   be impartial.  If you're saying you don't think you can, then that's fine.

21   JUROR NUMBER FIVE:  Yea.

22   MR. RION:  Okay.

23   THE COURT:  Don't fret over it.

1   JUROR NUMBER FIVE:  Okay.

2   THE COURT:  Okay?  I'm going to let you

3   go.

4   JUROR NUMBER FIVE:  Thank you.

5   THE COURT:  All right.  Thank you for

6   coming in.

7   JUROR NUMBER FIVE:  Uh-huh.

8   THE COURT:  Then we'll note that the

9   number one alternate will take that seat.

10   MRS. KOHLRIESER:  Your Honor, can we

11   actually -- before you make an additional decision can we be heard, please?

12   THE COURT:  All right.  Just a second.

13   Don't let them in yet.

14   BAILIFF:  Wait?

15   THE COURT:  Yea.  The State wanted to

16   be heard.

17   MRS. KOHLRIESER:  A couple of things.

18   Obviously we have no objection to Mrs. James, who flat out said she didn't

19   think she could be fair and impartial.  However, I think there's a bigger

20   question here, not necessarily for a cause thing with Mrs. Oglesbee, but I

21   specifically referenced the Carter family names, including Ruby Carter,

22   because I know that Miss Carter knows a lot of folks in town and the Carter

23   family, well, I know that the defendant's got a number of siblings and things

462

1 of that nature. So, I mentioned the names, such as Ruby Carter, because at

2 the time I thought Ruby was potentially going to be a witness in the trial,

3 which is actually kind of why I raised the separation of witnesses. But, if she

4 wasn't, I knew that she would be here in support of her son, as she always is.

5 So, I specifically asked that question. I understand when you're talking about

6 a for cause thing that Miss Oglesbee thinks that she can put that aside and

7 stuff like that. However, the State, who actually passed on a peremp. would

8 very well have used a peremp. on somebody that knew the defendant's

9 mother and grew up with the defendant's mother. I said that name and it's

10 not my fault that she didn't recognize it until she saw her in here. I'm not

11 putting any blame on that juror, either. But, it's not about a cause issue. Now

12 it's also about -- I mean, even though she says that, I think it's very hard to

13 put past, particularly when she's going to sit and judge whether this woman's

14 son murdered somebody, to get past that portion.

15 I also find it particularly disturbing when both Miss Oglesbee and Miss

16 James were trying to explain their positions to this Court that Miss Carter is,

17 quite frankly, back here making noise, talking, and saying things loud enough

18 where I can hear her saying those things. There shouldn't be that kind of

19 influence.

20 I'm sorry, but, Miss Oglesbee, again, if I had known that, I would have

21 used a peremp. on her. I passed a peremp. because I had no reason to have

22 any inclination that maybe she wouldn't be a good fit for this trial, which is

23 exactly what peremps. are for. That's why I think it only appropriate at this

1    time that both Miss Oglesbee, as well as Miss James, be dismissed and the

2    two alternates put in their places.

3    THE COURT: Okay, Mr. Rion, do you

4    want to be heard?

5    MR. RION: Your Honor, I don't recall Ruby

6    Carter's name coming up in voir dire at all by either side. The argument that I

7    would have utilized a peremp.", well, that changes the dynamics on the

8    peremps. that I would have used. She said they knew each other twenty,

9    well, probably fifty years ago and haven't really kept in touch since. During

10    the questioning of this witness during voir dire there was nothing that was

11    indicated to dismiss her. So, I don't think we can go back and her peremp.,

12    well, now utilize it after you've passed, number one, and there's no record

13    that would demonstrate that cause is present.

14    So, I'm not arguing about the other person. It's very clear. I think the

15    two cases are dichotomous.

16    THE COURT: Okay. Well, I've already

17    excused Mrs. James. We'll replace Mr. Fleischman as number five now. I'm

18    not going to excuse Mrs. Oglesbee. She's indicated by her answers that it

19    was not going to make any difference and it would not influence her ability to

20    be fair and impartial. I have to take her at her word. I don't know of any

21    authority, other than perhaps the Court exercising discretion to allow a

22    peremptory after the trial has already begun. I'm not exercising that

23    discretion with Mrs. Oglesbee. So, I'm not going to excuse her at this point.

1    Anything else? Okay. Bring the jurors back in.

2    (WHEREUPON, jury was returned to the Courtroom.)

3    THE COURT: Okay. Please be seated

4    everybody. Let the record reflect that all but one juror has returned. Mr.

5    Fleischman, you will now be number five. So, you can move down to the fifth

6    seat.

7    JUROR: I've got to move chairs, huh? Is that one softer?

8    THE COURT: Probably not. There's a

9    cushion. Can you take the cushion off of one? If you want to take a cushion

10    off -- whoever wants to fight over that extra cushion, you can use it.

11    The Court has excused one of the jurors. So, the procedure would be

12    that the first alternate, Mr. Fleischman, will take the place of that juror. So,

13    you are now number five. Okay? Miss Harris, you are still an alternate.

14    Okay? All right.

15    So, we will continue. I think we were getting towards or getting close

16    to the end, maybe, of the redirect by the State. The witness -- well, we need

17    to get the witness back. I think -- did Mr. Miller go to get the witness?

18    MRS. KOHLRIESER: Yes, your Honor.

19    THE COURT: Okay. Mrs. Hughes, if you

20    would take the stand again? Come forward. I apologize for the musical

21    chairs here. But, you're still under oath; okay? Have a seat back up here.

22    Hopefully it won't be too much longer.

23    (WHEREUPON, witness returned to the witness stand.)

1    THE COURT:  Mr. Miller, you may

2    continue.

3    MR. MILLER:  Thank you, your Honor.

4    **CONTINUED REDIRECT EXAMINATION OF SONYA HUGHES**

5    **BY MR. MILLER:**

6    Q    Did Markelus ever express concern about men you had around the

7    kids?

8    A    Yes.

9    Q    What sort of things would he say?

10   A    He didn't want any men around the kids.

11   Q    Did he tell you that?

12   A    Yes, he did.

13   Q    Did he tell you that under no certain terms?

14   A    No man ever.

15   Q    Did you kill Ken Warrington?

16   A    No, I did not.

17   MR. MILLER:  No further questions.

18   THE COURT:  Okay.  Any follow-up

19   recross, Mr. Rion?

20   **RECROSS EXAMINATION**

21   **BY MR. RION:**

22   Q    The prosecutor asked you what you would say if someone asked

23   whether or not Ken Warrington was living there, or if he had moved in, and

1   your answer was that you wouldn't say that he moved in because he didn't

2   move in.  Right?

3   A   That's correct.

4   Q   But, when this detective asked you your answer was that he moved in

5   around the end of November, 2008; correct?

6   A   I may have said that.

7   Q   Now, I'm going to show you - it's a little strange, I'm going to print it out

8   and the jury will have the picture - but, I'm going to just show you a picture.

9   You had moved in to that house how long beforehand?

10  A   What day did I move in?  September.

11  Q   2008?

12  A   Yes.

13  Q   And that shed was a new shed?

14  A   Yes.

15          MR. MILLER:  Judge, objection.  It's

16  outside the scope of my redirect.

17          MRS. KOHLRIESER:  The information

18  about the shed.  All of that.  None of that was --

19          MR. MILLER:  I didn't bring that up.

20          THE COURT:  Overruled.  I'm going to

21  allow it.  Let's move on.

22  Q   I'm going to show you what will be marked as Defendant's exhibit --

23  are we on 'C'?

1    THE COURT: 'C'.

2    MR. MILLER: Judge, I'm going to object

3    for the same reason as before.

4    THE COURT: Overruled. Go ahead.

5    Q    So it's clear, it's image number 2329. Is that your shed?

6    A    Yes, it is.

7    Q    And does that show about half of --

8    A    That's not half. That's about a fourth, and it would be more towards

9    that way.

10    Q    All right. But, this is a fair and accurate picture?

11    A    I can't --

12    Q    I'll just leave that. That's a fair and accurate picture of your shed on

13    that day; correct?

14    A    That is a picture of the shed; yes.

15    MR. RION: No further questions. Thank

16    you.

17    THE COURT: Okay. You may step down.

18    Counsel, approach.

19    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

20    the record, as follows.)

21    THE COURT: She's not under subpoena

22    any more? Because I think there's somebody that wants to come and pick

23    her up.

1  MRS. KOHLRIESER: I know. That's okay.

2  I know we just had them out, --

3  COURT REPORTER: I can't hear her answer.

4  MRS. KOHLRIESER: I know we just had

5  them out, but I need to --

6  THE COURT: Do you have a witness

7  that's going to be about a half hour to forty-five minutes?

8  MR. MILLER: Yea.

9  MRS. KOHLRIESER: Probably about an

10  hour.

11  MR. MILLER: Probably close to an hour.

12  THE COURT: I don't want to necessarily

13  go past four-thirty today. I was planning on breaking about four-thirty

14  because we kept them late last night. Well, we'll recess now. We'll recess

15  now. Okay?

16  (WHEREUPON, Court continued on the record, as follows.)

17  THE COURT: Folks, I was just talking with

18  counsel to see -- well, trying to schedule all of this and keep conscious of your

19  time, we kept you late last evening, and I want to keep things moving. They

20  have a witness they think might take an hour or so more. I'm going to break

21  for the day and give you an early break. Since we went late yesterday we're

22  going to have an early break today. Now, I can't guarantee we're always

23  going to be done right at four-thirty. There will be some days when we'll go

1  past four-thirty, like we did yesterday.  But, today, since we got a lot of

2  information here today -- you haven't got all of the evidence.  We'll break now.

3  What's the schedule in the morning?  Do I have something?  Can everybody

4  be back at eight-thirty tomorrow morning?  Does that work for everybody?

5  Nobody is saying 'no'.  So, eight-thirty.  We'll have you back at eight-thirty.  I

6  have a couple of things I have to do before that.  But, we'll get started at

7  eight-thirty.

8  Remember the admonitions.  Don't discuss the case among

9  yourselves or comment to anybody or talk about the case or express any

10  opinions about what you've heard.  I know human nature is like, well, you just

11  want to tell people about this.  I'm instructing you not to do that.  That would

12  be very, very improper - not so much as you talking as to what other people

13  might react and then, like, they're going to put questions in your mind or

14  they're going to say, 'oh, yea, I heard down at the barbershop this happened',

15  and then you're going to start thinking, 'oh, no'.  You've got to decide this

16  case on what you hear in the Courtroom.  You can't be influenced by anything

17  on the outside.  So, keep that close in mind.

18  Don't pay attention to any media.  Over the noon hour I was having

19  lunch in the break room and I know they already had something on T.V. about

20  it.  Walk out of the room at six o'clock.  Don't pay any attention to that.  If you

21  get the newspaper, don't read that section.  Keep it aside.  Tell your spouse

22  to put it aside.  You can look at it after it's all done and you can see if the

23  media got it right because nine times out of ten, with all due respect, they

1    don't get it a hundred percent right all the time because they only have limited

2    space and they're going to put the things that they think are neat and exciting

3    and maybe emphasize those things that you wouldn't necessarily give the

4    same attention.  I don't know.  Maybe you would.  But, the point is, you can't

5    be exposed to any of the media.  So, I'm going to instruct you not to pay

6    attention to any of that.

7    So, we'll get started at eight-thirty.  We'll try to keep moving.  I'm going

8    to tell you now that tomorrow there's going to be -- well, I don't know where

9    we're going to be at that time, but I have a docket at one o'clock on

10   Thursdays.  It's called a Drug Court.  It's a specialized docket for individuals

11   that have substance abuse problems.  I'm going to do that between one and

12   one-thirty.  So, we may have a little longer lunch or we may have a later

13   lunch.  I'm more concerned about you folks getting a good lunch.  I usually

14   don't eat lunch on Thursdays because I have that other docket.  Don't worry

15   about that.  But, I'm just giving you a heads up for your planning.  I'd like to

16   maybe go through until twelve-thirty/quarter till one tomorrow morning and

17   then have the break extend to one-thirty to give me time to go do my Drug

18   Court.  So, that's kind of the plan.

19   Again, four-thirty is the target date.  I'm talking long enough to get to

20   four-thirty.  I don't want to do that.  But, we may go a little longer.  So, I hope

21   you're flexible.  You've been great.  You've been troopers on the delays.  We

22   try to minimize those.  Remember my admonitions and we'll see you in the

23   morning.  Get a good night's sleep and don't pay any attention to any media

1    about this.  All right?

2    We'll stand in recess until eight-thirty in the morning.

3    (WHEREUPON, COURT RECESSED FOR THE DAY AT 3:51 P.M.)

4

5

6    THURSDAY, SEPTEMBER 10, 2015

7    8:36 A.M.

8

9    THE COURT:  All right.  Let the record

10   reflect that it's the 10th day of September, 2015 and we are reconvening in

11   Case Number CR2014 0139, which is captioned The State of Ohio -vs-

12   Markeius Q. Carter.  The record will reflect the defendant is in Court with his

13   counsel.  The State is present.  The jurors have returned from the evening

14   recess.

15   Welcome back, ladies and gentlemen of the jury.  Again, I ask this, and

16   sometimes it sounds routine, but it's not routine, it's something very important

17   that I need to ask - has everybody been able to, or, is there anyone who has

18   not been able to follow the instructions during the recess to not talk about the

19   case, or to be exposed to anything about the case, or has anything come up

20   in anyone's life that you think is going to influence your ability to be fair and

21   impartial?  Anybody in that situation?  Okay.  It's very important that we

22   always remember that.  Even though I say these things over and over each

23   time we have a recess, it's very important that we comply with this to make

1    sure that there's nothing that you're exposed to on the outside that would

2    influence your ability to be fair and impartial because you have to decide the

3    case on what's presented in the Courtroom and put aside anything that you

4    might be exposed to on the outside.  So, I won't harbor on that too much

5    longer.

6            We'll continue with the presentation of the State's case.  The State

7    may call their next witness.

8            MR. MILLER:  Sean Neidemire.

9            THE COURT:  Okay.

10   WHEREUPON, called to appear as a witness in this proceeding was one:

11           D E T E C T I V E   S E A N   N E I D E M I R E

12   who, having been duly sworn by the bailiff herein, testified as follows:

13           BAILIFF:  He has no objection.

14           THE COURT:  Okay.

15                         **DIRECT EXAMINATION**

16   **BY MR. MILLER:**

17           Q    Good morning, Sean.

18           A    Good morning, sir.

19           Q    Would you state your full name for the record, please?

20           A    Sean Neidemire.

21           Q    Sean, where do you work?

22           A    I work for the Lima Police Department.

23           Q    How long have you worked for the Lima Police Department?

```
 1    A    Sixteen years.

 2    Q    For how long?

 3    A    Sixteen years.

 4    Q    Sixteen years?  As you sit here today what's your title with the Lima

 5         Police Department?

 6    A    I'm a detective with the Police Department.  I've been so for about the

 7         last four years.

 8    Q    And what were you before you were a detective for the Lima Police

 9         Department?

10    A    I originally started out as a patrolman in uniform working the streets

11         and then I moved to the Drug Task Force for a short time and then up to

12         detective.

13    Q    Now, I want to take you back to December of 2007.

14    A    Okay.

15    Q    You stated you worked for the Lima Police Department for sixteen

16         years.  Were you with the Lima Police Department then?

17    A    Yes, sir.

18    Q    And specifically on December 17th of 2007 in what capacity were you

19         working for the Lima Police Department on that day?

20    A    That evening I was actually off.  It was my day off.  I was on third shift,

21         or, assigned to work third shift, but I was called in at home.  I was a member

22         of our, well, at the time our hostage negotiation team.

23    Q    Okay.  Were you a patrolman technically back then?
```

1      A     Yes, sir.

2      Q     But, you mentioned you were a part of the hostage negotiation team.

3    Is that sort of a -- I use the term special duty - I know that means something in

4    law enforcement. But, is it sort of a specialty within the department?

5      A     Yes, sir.

6      Q     Okay. So, you're a patrolman, but yet you had this sort of special job?

7      A     Yes, sir.

8      Q     Now, what does it mean, and what it means is kind of inherent in the

9    name, but tell these folks what exactly a hostage negotiator does.

10     A     Sure. It's now been changed to a crisis negotiator. The old term was

11    hostage negotiator. Anytime we have a situation or scenario where someone

12    is inside a residence or a building and won't come out for one reason or

13    another, it's maybe a dangerous situation for officers to go into, or maybe

14    there's other people in the residence and the situation isn't safe, we need to

15    establish a line of communication with that person. It's the negotiator's job to

16    speak with that person on the phone and find out what the problem is and see

17    if we can't work out some kind of resolution.

18     Q     Okay. Now, does that require of you to go through some specialized

19    training before you become, or, at least in your case before you became a

20    hostage negotiator?

21     A     Yes. I attended a one week course down at the State Police Training

22    Academy. I had actually just been on the team I think three months and had

23    just started my training at this time in December of 2007.

1    Q.   So, you were fairly new on the job in the sense of being a negotiator?

2    A.   Yes. Yea.  I actually started as a patrolman in 2002 and was put on

3    the team in 2007.  I think it was somewhere around September.  Like I said, I

4    had only been on like three months.

5    Q.   Okay.  Now, you've mentioned a team.  We've been talking about a

6    negotiator.  You've mentioned a team.

7    A.   Yes.

8    Q.   Are there other people involved when you have such a situation as

9    you've described?

10   A.   Yes.

11   Q.   Maybe not directly in the negotiating process, but you mentioned a

12   team.  Do you have a support staff, so to speak?

13   A.   Yes.

14   Q.   What does that entail?

15   A.   There's always a supervisor in charge.  There is typically, well, you

16   have what's called your primary negotiator, the person who is actually on the

17   phone and talking to the person who's in the crisis, or, in the situation.  Then

18   you have a secondary negotiator who is his back-up, who will sit with him

19   while he's talking.  They may write notes back and forth and exchange ideas

20   to maybe 'try this,' or 'try that' type of resolution.  He's also the contact for

21   anybody else who needs to get the negotiator information.  They don't come

22   and talk directly to the negotiator, they talk to the second guy.  That way the

23   negotiator can focus on what's going on on the phone.  Then there's usually

1 one, two, or maybe three what we would call intelligence gatherers who will

2 go get background information, information on the house.  Anything that

3 would be important in that situation those other officers would get that and

4 bring that to the second guy who could then relay it to the negotiator so he

5 knew everything that was going on.

6     Q    Those intelligence guys, or, gatherers --

7     A    Yes.

8     Q    Well, why are they important?

9     A    They're very important.  If someone has a history, whether it be a

10 criminal history, a history of mental illness, or some kind of recent event that

11 happened in their life that could have triggered the current event that's going

12 on, well, there's all kinds of information that we can gather that becomes

13 important when you're talking to that person on the other phone.

14     Q    When you have a situation like this are these situations taken very

15 seriously?

16     A    Yes, sir.

17     Q    Now, you have the primary negotiator and you have these sort of

18 secondary folks, if you will.

19     A    Yes.

20     Q    Although their roles are very important.  I hesitate to use that term.

21 But, the support staff, I guess.  Is the S.W.A.T. team involved - and I'll get to

22 the specific situation here - but, generally speaking is the S.W.A.T. team

23 involved in a hostage negotiation or whatever they call it today?

1  A    Not generally; but, every time.  If the crisis negotiation team, as it's
2  called now, gets called in the S.W.A.T. team is called in as well, or, the
3  tactical team.  They're called in in case the situation turns to a violent state or
4  some kind of state.  They're specially trained with their tactics and their
5  equipment to handle that.  But, they're always there when the crisis team is
6  there as well.
7  Q    The folks that are on this team, including the S.W.A.T. team, I will
8  include them on the team when I say the team'.
9  A    Sure.
10  Q    Are they trained to sort of expect the unexpected?
11  A    Yes.
12  Q    Okay.  Is that why we have the S.W.A.T. team and a number of
13  support staff and so forth?
14  A    Yes.
15  Q    Okay.
16  A    These situations are constantly changing.  I'm actually now on the --
17  our S.W.A.T. team is called an Enhanced Tactical Unit now at the Police
18  Department.  I serve on that now.  So, I did my time on the hostage team and
19  now I'm on the S.W.A.T. team.  So, I'm kind of on the other side of it.  We
20  train in these scenarios frequently.  When we train in them we're always
21  throwing different curve balls into the situation; you know?  You could be in
22  these scenarios for -- well, some of them can last three, four, five, six hours.
23  We train.  When we're training we'll do them for two or three hours and then

1    all of a sudden we'll have, you know, someone come running out of the

2    house, or, you know, we'll hear gun shots or whatever, and those officers

3    have to know what their reaction is and what they need to be doing at that

4    time.

5    Q.    So, inherent in your training is sort of thinking of what could happen

6    and then training for what could happen?

7    A.    Absolutely.

8    Q.    Okay.  And then hope that it doesn't?

9    A.    Absolutely.

10    Q.    Okay.  Let's switch focus now to a specific time frame of December

11    17th, 2007.  You mentioned you were with L.P.D. and you were kind of new to

12    the hostage negotiation team at that time.

13    A.    Correct.

14    Q.    And had just taken a one week training course?

15    A.    Uh-huh.

16    Q.    Just to bring focus to that time.  You were called in?

17    A.    I was.

18    Q.    Who did you receive the call from?

19    A.    It would have been -- I don't recall the specific officer.  It would have

20    been either the shift supervisor from third shift or the desk officer who would

21    have been working that would have been calling in different people for

22    different teams.  I was called in at three-thirty in the morning.  So, when they

23    called --

1    Q    Where were you when you were called in?

2    A    I was at home sleeping.  I remember it very clearly because I was

3    excited it was my first call out.

4    Q    So, this was your first call out?

5    A    This was my first actual call out as a team member; yes.

6    Q    Okay.  Let alone a negotiator - a team member, period - this was your

7    first call out?

8    A    Yes, this was my first one.

9    Q    Okay.  So, you get called out at three-thirty or so in the morning?

10    A    Uh-huh; yes, sir.

11    Q    Where did you go when you got called?

12    A    I immediately ran out the front door and went straight to the Police

13    Department.  I know I was the first negotiation team member to get there.  I

14    immediately reported to the shift supervisor, who was Sergeant Stevenson at

15    the time.  I asked him what we had; what the situation was.

16    Q    Did you have any idea what was going on when you got on the phone

17    call?

18    A    No.

19    Q    Okay.  So, you just came in because they needed you?

20    A    Right.  Typically what we tell them is when they call, just call and

21    say, hey, you need to come in; we've got a situation', and don't give us too

22    much explanation because we're not -- well, if you're asleep in the middle of

23    the night, if you've ever been called in the middle of the night you don't hear

1     the first three or four minutes of what somebody is telling you.  It's just easier

2     for them to say, 'hey, we need you to come in', because they've got other

3     people they've got to call, too.  Instead of giving me a long explanation just

4     say, 'hey, I need you to come in'.  Okay.  You hang up the phone and you're

5     out the door.

6   Q  You get the details when you get there?

7   A  Absolutely.

8   Q  Okay.  And did you get the details this time when you got there?

9   A  I did.  I got them from Sergeant Stevenson.

10   Q  And what were you told when you got there?

11   A  He explained to me that there had been some sort of a domestic

12     dispute at a house on East Eureka Street and that the victim was on station.

13   Q  Meaning what?

14   A  There was a domestic violence call of some sort.

15   Q  On station?  What does on station mean?

16   A  On station means that the victim was at the Police Department.

17   Q  Okay.

18   A  And that officers had been out there and that the subject, the other half

19     of this call, or, this disturbance was still in the house and that there were

20     children in the house.

21   Q  Okay.  So, that's the information that you received when you arrived,

22     as you say, on station?

23   A  Yes, sir.

1    Q. Okay. Now, did you have the opportunity after you got on station to

2    meet with the person who was said to be the victim?

3    A    Yes.

4    Q    And do you remember who that was?

5    A    It was Sonya Burkholder.

6    Q    Okay. Did you have a conversation with her?

7    A    Yes, I did.

8    Q    Okay. Did she tell you what happened in preparation, I mean, for

9    purposes of your entering into this situation as a negotiator -- well, let me

10   rephrase it. When you get on scene, generally speaking, is it important for

11   you to have information about the situation before you begin your

12   negotiations?

13   A    Absolutely. As much information as you can.

14   Q    Okay. And did you then, in this specific situation, talk to Sonya

15   Burkholder to try to gather information about the situation you were about to

16   get into?

17   A    Yes.

18   Q    Okay. What did she tell you so you could be prepared to begin the

19   negotiations?

20   MR. RION:  Objection to hearsay.

21   MR. MILLER:  It's not offered for the truth

22   of the matter.

23   THE COURT:  I'll overrule the objection.

1 Go ahead.

2 A  We were able to speak briefly. We spoke for, well, I don't think it was

3 much more than five or ten minutes. She explained to me that she had been

4 living at this house with the father of her children, Mr. Carter, Markelus Carter.

5 There had been some kind of an argument and that he had struck her with

6 some sort of a pistol. Once I understood that much then my focus was to be

7 more about learning as much as I could about Mr. Carter. My involvement in

8 the actual domestic violence, or whatever that call was, wasn't too much. My

9 focus then was to try and learn as much background information as I could of

10 Mr. Carter. At that point, being the newest guy on the team, my expectation

11 was that I would be an intelligence gathering officer and I wouldn't be actually

12 sitting in the hot seat, so to speak.

13 Q  Is that what happened?

14 A  No. Well, like I said, we only were talking for five or ten minutes when

15 her cell phone rang and it was Mr. Carter. He had called her cell phone. I

16 asked her to give me the phone and she gave it to me and then I began the

17 negotiation process with Mr. Carter.

18 Q  Now, let me stop you there. Is that the optimum way to start the

19 process?

20 A  Absolutely not.

21 Q  Okay. Why?

22 A  Well, first off, we like to do it in a setting where it's more controlled. I

23 didn't have a secondary negotiator with me. I didn't have any of the rest --

483

```
 1    the rest of the team I don't think was there yet at the time.  We don't typically
 2    like to talk when we're that far away from the scene, or the residence, or
 3    wherever the place is.  Typically we take our vehicle out to the scene that's
 4    equipped with phones and stuff like that that we can use and so we're close
 5    by and so we're able to work with the command post and work with the
 6    S.W.A.T. team and have that communication.  Sitting at the police station and
 7    talking to somebody who's six, seven, eight blocks away is not the optimal
 8    situation.  But, when he called her cell phone and the opportunity was there to
 9    make contact with him and speak with him you seize that and you take that.
10    The sooner you get them talking and the longer you keep them talking the
11    better it is for you.
12    Q    So, it was important to take the phone call even though you didn't have
13    everything completely set up quite right?
14    A    Absolutely.  Absolutely.
15    Q    And, again, why is that?  Why did you decide to take that call?
16    A    Typically with these situations if we wait and we don't seize the
17    opportunity we can go out to the scene and we can take what we call a throw
18    phone, which is a phone that's inside of a plastic case or in a bag, and we
19    throw it in through a window or through a door and --
20    Q    Kind of like the movies?
21    A    Yea, kind of like the movies.  This is not too far off.  And then you sit
22    there and wait for it to ring.  You call it, and you call it.  You
23    wait for them to pick up the phone.  They're in control of whether or not they
```

484

1 answer the phone or not.  This was an opportunity for us to establish contact

2 with him immediately.

3 Q That was important?

4 A Absolutely.  Absolutely.

5 Q Why?

6 A Again, the sooner you make contact with him the sooner the process is

7 started and the sooner you're able to start to try and deescalate things as

8 quickly as possible.

9 Q So, you had to take that opportunity?

10 A Absolutely.

11 Q Okay.  When you make these -- again, in a perfect situation, would

12 these phone calls between, say, yourself, the hostage negotiator generally,

13 and the person you're trying to talk to, so to speak, would those phone calls

14 be, again, in a perfect world, recorded?

15 A No.

16 Q No?

17 A No.  We prefer them not to be recorded.  We don't even record them

18 for training purposes or anything like that.  In this instance I spoke on the

19 phone, the cell phone, for an hour to an hour and a half, maybe two hours

20 tops, and the cell phone that I was using, which was Miss Burkholder's, well,

21 the battery died.  So, I wanted to establish contact immediately, right

22 afterwards.  One of the cardinal rules is that if you get disconnected to hang

23 up the phone and then keep calling, keep calling.  You've got to keep -- in

1   these situations you want to keep contact. You want to keep talking. So, I

2   ran to the first phone I could find, which happened to be the phone in the

3   Sergeant's office at the Police Station, and immediately called Mr. Carter

4   back. That phone line is recorded. It didn't even cross my mind at the time,

5   but it was recorded.

6   Q. Well, again, you had an opportunity -- well, actually Mr. Carter made

7   the first contact?

8   A. Yes.

9   Q. And it's important once that first contact was made to maintain that

10   contact?

11   A. Absolutely.

12   Q. Is that because you're not certain if you lose that contact whether you'll

13   ever get it back?

14   A. Yes, absolutely. That's part of it.

15   Q. And then it's an unknown situation?

16   A. That's part of it. Another part of it, too, you don't know -- well, when

17   you're talking to that person you know they're not doing anything else. You

18   know that they're not trying to harm themselves or harm somebody else. You

19   know that they're not trying to harm one of the officers who's outside. You

20   know, you have their attention. You have their focus. You want to keep it

21   with you and not let it start to wander to everything else.

22   Q. So, because it started out somewhat out of the ordinary with getting

23   contact from the person in the house, Mr. Carter, you felt it was important to

1    maintain that contact?

2 A  Absolutely.

3 Q  By whatever means?

4 A  Yes.

5 Q  Okay. So, the phone that you did go to, whose was that again?

6 A  It was in the Sergeant's office, the shift supervisor's office. It's a

7    landline phone. That phone line is recorded.

8 Q  Okay. That phone line is recorded?

9 A  Yes.

10 Q  As a normal course of business at the L.P.D.?

11 A  Yes.

12 Q  It wasn't just recorded for these circumstances?

13 A  No.

14 Q  It's just a recorded line?

15 A  It's recorded twenty-four hours a day seven days a week and three

16    hundred and sixty-five days a year.

17 Q  For all kinds of other reasons, I suppose?

18 A  Everything. Yep.

19 Q  All right. So, in this situation were at least some of the phone calls

20    back and forth recorded?

21 A  Yes.

22 Q  When I say back and forth, I mean between you and Mr. Carter.

23 A  Yes.

1  Q.  I don't know, but were there any other phone calls made to you from

2  Mr. Carter, or at this point were all phone calls going from you to Mr. Carter?

3  A.  After the initial call where he called Miss Burkholder's phone, every call

4  from then on was me calling him.

5  Q.  Okay. So, in fact, had you not re-initiated that contact -- let me say

6  this. You had to re-initiate the contact?

7  A.  Yes. There were several times during the incident where he would

8  hang up on me. That's common. That happens quite frequently in these

9  types of situations. The first thing I would do is just hit redial and just start

10  calling him back because you've got to keep their attention.

11  Q.  Again, important to keep contact?

12  A.  Absolutely.

13  Q.  Okay. So, the conversation you initially had with Mr. Carter when he

14  called in on Miss Burkholder's phone was not recorded?

15  A.  Correct.

16  Q.  It wasn't a recorded line?

17  A.  Yea. It was two cell phones.

18  Q.  Now, the phone calls that you made back out once you went into the

19  shift supervisor's office, well, were some, or all, of those recorded?

20  A.  Yes.

21  Q.  Let me ask you one quick question before we get into these exhibits

22  here. When you called out to Mr. Carter did he answer the phone every time

23  you called?

1    A    No.

2    Q    Okay. So, there were some phone calls you made that were not, well,

3    I don't want to say not received, but weren't picked up?

4    A    Weren't answered. Yea, correct.

5    Q    All right. Now, I want to hand you a couple of discs. One of them is

6    marked State's exhibit '8-A', and the other one is marked State's exhibit '8-B'.

7    Well, before we get into that, how long did this -- well, I assume at some point

8    you made contact with Mr. Carter over the phone.

9    A    Yes.

10    Q    How long did this entire situation last?

11    A    It ended at, I believe, eight-eleven in the morning. That's when he

12    came out of the house. I believe I began speaking with him somewhere a

13    little after four A.M., four-fifteen maybe.

14    Q    Were you talking to him that entire time?

15    A    Most of it. The only reason I wouldn't have been talking to

16    him would have been because we had lost connection. Either he had hung

17    up the phone, or I think there was one point in this scenario where we said,

18    "I'm going to give you five minutes, to just take a break, Mark, I'll call you

19    back in five minutes." Whether that was because -- well, I know at one point

20    he wanted to talk to somebody else, or whatever the case may be. I said,

21    "Fine. I'll call you back in five minutes." But, other than that, we were talking

22    to him the entire time.

23    Q    Okay. So, in other words, if we listen to the phone recordings there

1  not some four hours long or something like that?

2  A  No.

3  Q  Because there were times when you weren't speaking to him, or you

4  lose contact, or whatever?

5  A  Correct.

6  Q  Okay.  I will show you now what's been marked as State's

7  exhibit '8-A' first.  Let's take them in turn here.  Will you please tell the jury --

8  well, John, do you want to see it?  Please tell the jury what State's exhibit

9  '8-A' is.

10  A  This is an audio CD of the phone conversations from the standoff on

11  December of 2007.

12  Q  Okay.  Now, we'll contrast that in a second with '8-B'.  What is '8-B'?

13  A  This is the same set of phone calls except the hang-ups and the

14  unanswered calls are not on this CD.  It's just the ones where the actual

15  conversation is occurring.

16  Q  Does '8-A' contain the hang-ups and the disconnects and so forth?

17  A  Yes.

18  Q  So, this would contain --

19  A  The whole entire thing.

20  Q  -- the whole entire thing?  But, for efficiency purposes we have '8-B'

21  that contains the conversation; correct?

22  A  Yes.

23  Q  Have you had an opportunity to listen to these?

1   A    I have.

2   Q    Are they true and accurate copies of your conversations, including the

3   hang-ups and everything?

4   A    Yes, sir.

5   MR. MILLER:  Your Honor, I'd like to play a

6   selected portion of these phone calls, if you'll just give us a second to get

7   those ready.

8   THE COURT:  Okay.

9   (WHEREUPON, Court went off the record briefly.)

10  MR. RION:  If I could have a second?

11  THE COURT:  Okay.

12  MR. RION:  Anyone that's here who is

13  under subpoena, you're not allowed to stay in the Courtroom because there's

14  a separation of witness Order in place.

15  THE COURT:  Thank you, Mr. Rion.

16  MR. MILLER:  It takes a second for this

17  thing to cue up, your Honor.

18  (WHEREUPON, State's exhibit '8-B' played in open Court.)

19  Q    Some of these clips cut off in the middle because --

20  A    Yes.

21  Q    -- they're segmented, correct?

22  A    Yes.

23  Q    Okay.  Now, what is your number one priority in these situations?

1    A    In this situation my number one prior is to continue to de-escalate the

2         situation and by that I mean that typically these are emotional situations

3         where someone is very high, very agitated, and my job is to continue to bring

4         them down to a level where we can reason with them and logically get them

5         to, you know, comply with what we need to do.

6    Q    What did you need to do in this situation?

7    A    In this situation we needed Mr. Carter to come outside of the residence

8         so we could bring him in and finish the domestic violence call, get his

9         statement, and determine what needed to be done from there.

10   Q    In this particular situation when you were the primary negotiator did

11        you have a concern for the children?

12   A    Yes.

13   Q    Why?

14   A    Because they were inside the house and it was a very volatile situation

15        and, according to the victim, the suspect had a gun inside the residence.

16   Q    Now, that's the information you had at the time?

17   A    Yes, sir.

18   Q    Now, in these situations when you might get conflicting information, let

19        me ask you, do you assume the worst?

20   A    Yes.

21   Q    And why is that?  I mean, it's kind of obvious.  But, why is that?  Why

22        would you assume the worst case facts?

23   A    That way you're prepared.  If you assume that he has a gun in there

1   and it's, you know, the worst gun ever, it's a huge .44 magnum, fully

2   automatic, Bazooka, whatever you want to say, and he's willing to use it, then

3   you're more prepared in case that does happen.  If it doesn't happen, that's

4   great, and we can just continue on.

5        Q    But, you, as a negotiator, have to assume the worst facts?

6        A    Absolutely.

7        Q    And proceed from there?

8        A    Yes.

9        Q    To try to avoid the worst?

10       A    Yes.

11       Q    Okay.

12  (WHEREUPON, State's exhibit '8-B' continued to be played in open Court.)

13       Q    Now, in these situations --

14  THE COURT:  Just a second.  She needs

15  to talk to Monica.

16  (WHEREUPON, Court went off the record briefly.)

17  BAILIFF:  She needs a restroom break.

18  THE COURT:  Okay, Hold up.  We'll take

19  everybody and have a break at the same time.  Hold up.  Hold up.

20  BAILIFF:  I don't think she can wait, Judge.

21  THE COURT:  Oh, you can't wait?  Go

22  ahead and go.  Remember the admonitions.  We'll take a break for

23  everybody.  We'll be in recess.  Everybody else can leave.  Remember the

1    admonitions.  Don't discuss the case, formulate or express any opinions.

2    We'll stand in recess.  Okay?

3    MR. MILLER:  How long?  How long,

4    Judge?

5    THE COURT:  I don't know how long.  A

6    few minutes.

7    MR. MILLER:  I'll just hang around.

8    (WHEREUPON, COURT WAS IN RECESS.)

9

10

11    THE COURT:  For the record -- are we on

12    the record?

13    COURT REPORTER:  Yes.

14    THE COURT:  We're on the record.  It's

15    still the 10th of September, 2015.  We're still in Case Number CR2014 0139,

16    State of Ohio -vs- Markelus Carter.  The defendant is present with his

17    attorney.  The State is present.  All the jurors have returned.

18    Again, ladies and gentlemen of the jury, that's exactly -- if something

19    happens and you need to take a break, or stand up, or whatever, do that.

20    We'll deal with it.

21    We'll continue with the presentation of the State's case.  Detective

22    Neidemire is on the stand.  You're still under oath.  You may continue.

23    MR. MILLER:  Thank you, your Honor.

**DIRECT EXAMINATION OF DETECTIVE SEAN NEIDEMIRE CONTINUED**

1 
2 BY MR. MILLER:
3 Q    Mr. Neidemire, how many, if you know, how many D.V. calls, domestic
4 violence calls, does the Lima Police Department get in, well, a year?
5 A    Oh, probably thousands. We get numerous domestic violence calls
6 every day. They're fairly common. They're probably one of the most
7 common calls that we get.
8 Q    Is it usual that the hostage negotiation team, or H.N.T. team, gets
9 called to those incidents?
10 A    No. No.
11 Q    Is it usual that -- well, in your time at the Lima Police Department how
12 many times, over that entire span, how many times has the hostage
13 negotiation team been called out to the scene?
14 A    They're typically --
15 MR. RION: Objection. Relevance.
16 THE COURT: Overruled. Go ahead.
17 A    They're typically activated one or two times a year and that's about it.
18 Q    Now, in your experience, why was this situation different than the usual
19 domestic violence situation? First of all, have you responded to domestic
20 violence situations in your career?
21 A    Oh, yes.
22 Q    Many?
23 A    Many. Many, many, many.

1  Q    And, of course, you responded to this situation.  What was different in

2  your experience with this situation from other domestic violence situations

3  that you've been called to respond to?

4  A    The difference in this one is, real simply, the victim came to us and

5  explained to us that the incident had happened and that there was a gun

6  involved and there were children inside the house and we couldn't get Mr.

7  Carter to come outside.  That's how it evolved into an issue where the

8  negotiation team needed to come out.

9  Q    Okay.  With that, I think we have one more clip.

10  A    Okay.

11  (WHEREUPON, State's exhibit '8-B' continued to be played in open Court.)

12  Q    Now, did the conversation go on in a similar manner for a period of

13  time beyond what we've heard already?

14  A    Yea.  The conversation was pretty much the same the entire time.  Mr.

15  Carter would express that he did not feel he needed to go to jail, or should go

16  to jail, and did not want to go to jail.  That was, in my opinion, the primary

17  reason why this was prolonged as long as it was.  It would be me explaining

18  to him, you know, "If you come out now we'll get your statement, we'll talk

19  about things, and we'll get this worked out."  At one point he asked to talk to

20  his attorney.  We even tried to contact his attorney for him to try and help

21  speed the process along.  Anything I could say to him to get him to come

22  outside we tried.  At one point he didn't want to come outside until his kids

23  went to school.  I offered to make sure that the kids got off to school okay,

496

1 that we would take care of all of that.  You know, it was just more of the same

2 for almost four hours.

3 Q Now, I think it was either in the first clip or the second clip that you

4 were explaining to him that if he came out -- he was talking about going to jail,

5 like you said.  You said, "Well, not necessarily.  You'll go to arraignment."

6 Were you trying to explain that it was not necessarily so that he would go to

7 jail?  Is that what you were trying to convey?

8 A Yes.  Yes.

9 Q Okay.

10 A I was trying to explain to him that, you know, if his attorney, which he

11 had a local attorney at the time that, again, we were trying to get into contact

12 with, but if he came to the arraignment with him that maybe he could post his

13 bail and he could get out of jail the exact same day.  Again, I was trying to

14 minimalize everything to him, make everything be as least dramatic as

15 possible.  You know, 'if you come right now we'll try to get you out of here the

16 same day.  You can post bond.  You can do this'.  We were giving these

17 options to show him that everything is not the worst case scenario.

18 Q Now, based on your experience in, you know, in sixteen years is it

19 possible that that could have, in fact, happened?

20 A Absolutely.

21 Q Just as you had explained it?

22 A Absolutely.

23 Q All right.  How did this end?

1   A    Eventually, and I believe it was about eight-eleven in the morning, Mr.

2   Carter came outside and complied with the -- well, when you're the negotiator

3   you want to talk them into coming outside and meeting with the officers

4   outside.  As a S.W.A.T. officer there's usually what's called an arrest team set

5   up and it's three or four guys, depending on the scenario, who are close to

6   the door of the residence and when he comes outside he becomes their

7   responsibility and it's their turn to take over and they give him explicit

8   commands.  Typically it's, you know, "Keep your hands where we can see

9   them," and "come towards us; come towards us," and then we'll have him

10  drop down onto the ground and then we'll walk up and arrest them.  At about

11  eight-eleven in the morning that's what happened here.  He was then brought

12  to the Lima Police Department.  My job was over at that point.

13  Q    Okay.  So, you don't know what happened with him after that?

14  A    No.

15  Q    But, he was taken into custody?

16  A    He was.

17  Q    And that is usual in these sorts of situations, or not?

18  A    Absolutely.

19  Q    Okay.  Then the process that you were explaining to him in one of

20  these clips about the arraignment and so forth, and the bond, and all of that,

21  that happens after he's arrested?

22  A    Yes.

23  Q    Okay.

```
 1    A    After he's arrested and charged.  The victim has to come in and sign a

 2         charge at the prosecutor's office at Lima Municipal Court and then it goes on

 3         from there.

 4    Q    But, again, and based on your experience as a police officer, it's at that

 5         point that sometimes those charged with domestic violence are then released

 6         that day in some instances?

 7    A    Yes.

 8    Q    Okay.  Not all; but some?

 9    A    Correct.

10         MR. MILLER:  I have no further questions.

11         THE COURT:  Okay.  I just want to ask,

12         before I let Mr. Rion, is there a way to figure out by either the timer on the CD

13         or some other way for the record to show what portions were played or, if

14         that's in evidence, if the jury would want to hear those portions that were

15         played again?

16         MR. MILLER:  We can do that.  It's not a

17         timer.  What it is - I'll just explain it for the Court - when you put in the disc

18         there are little icons that come up.  Those icons represent the different time

19         clips.

20         THE COURT:  Certain segments?

21         MR. MILLER:  Right.

22         THE COURT:  And you can identify which

23         icons were played on the record?
```

1   MRS. KOHLRIESER:  I can do that now,

2   your Honor.

3   MR. MILLER:  We can do that.  In fact,

4   that's how Mrs. Kohlrieser and I, I believe, selected.

5   THE COURT:  I just want the record to

6   have that.  Then, too, if the jurors, -- well, if the whole CD is in evidence, well,

7   obviously they could listen to it if it's in evidence in their deliberations.  But, if

8   they wanted to pinpoint to the exact icons that were played I just wanted to

9   know how to identify that.

10  MR. MILLER:  We can do that.

11  MRS. KOHLRIESER:  Yes, your Honor.

12  The first one that we played, -- they all have the date.  They start with the

13  date in reverse.  It's 2007, 12-17, is how that starts.

14  MR. MILLER:  It comes up with the year,

15  the month, and then day.

16  MRS. KOHLRIESER:  Yea.  But, the

17  individual ones, that's where you see the difference in the numbers.  The first

18  one is 060450.  The next one that we heard, the second one that we heard,

19  was 062115.  Then the last one that we just played was 062732.

20  THE COURT:  All right.

21  MR. MILLER:  And if there's any questions,

22  your Honor, I mean, the bailiff can -- I've got that noted.

1  THE COURT:  Well, it's just a matter of I

2  want the record to show mainly.  Okay.

3  MRS. KOHLRIESER:  For the record; yes.

4  THE COURT:  Okay.  With that, then, Mr.

5  Rion, do you have questions of this witness?

6  MR. RION:  Just a few, your Honor.  Thank

7  you.

8  **CROSS EXAMINATION**

9  **BY MR. RION:**

10  Q  Good morning, sir.

11  A  Morning.

12  Q  Were you involved -- well, I guess during this time you said you tried to

13  contact his attorney; correct?

14  A  Yes, sir.

15  Q  And is that Kenneth Rexford?

16  A  Yes, sir.

17  Q  And obviously it's early in the morning and so you weren't able to do

18  that; correct?

19  A  Correct.

20  Q  But, you tried.  Were you involved with the search at all?

21  A  No, sir.

22  Q  And are you aware that -- so, this happened on December 17th, 2007.

23  Were you aware that by February 22nd, 2008, based on insufficient evidence,

1     the case was dismissed?

2   A   I had nothing to do with the case after -- like I said, after he came out

3     the front door that was the end of my involvement.

4   Q   Now, you said that there were two teams there; correct?

5   A   There would have been the hostage negotiation team and the

6     S.W.A.T. team would have been called out as well.

7   Q   Yea. And then there were two snipers that were there as well; correct?

8   A   I would have no idea about that. It wouldn't be uncommon. But, I

9     wouldn't -- I wasn't out at the scene.  Again, I was at the Police Station.

10   Q   If I could hand you, well, it would be the report from that day to see if it

11     would refresh your recollection?

12   A   Okay.

13   Q   If that helps?

14   A   Okay.

15     (WHEREUPON, witness reviewed document)

16   A   Okay.

17   Q   Does that refresh your recollection as to who was there and how they

18     were situated?

19   A   Well, again, that's the S.W.A.T. team.  I wasn't on the S.W.A.T. team.

20     I wasn't involved in that. That would have been - well, he's now Chief of

21     Kettering - Protsman's report. I didn't have anything to do with that situation.

22     It is typical in a hostage or barricaded situation that there are snipers posted.

23     So, that's not a surprise.

1    Q    If it says that Officers Green and Godfrey were snipers, would that be

2         inconsistent with any information that you had from that night?

3    A    No.

4    Q    And snipers are there to -- well, obviously they have high powered

5         weapons; correct?

6    A    Correct.

7    Q    And they're stationed in a position that, if they need to, they will kill?

8    A    If they have to. But, their primary job is actually to gather intelligence.

9    Q    I understand. They're not there to cause it. But, they're sent out there

10        for that purpose if need be?

11   A    If needed.

12   Q    So, if someone were to look out their window there would be at least --

13        and here I'm showing there's two teams of four. So, there's eight or nine

14        people, plus two snipers, that would be positioned completely around the

15        house. That's consistent with the S.W.A.T. team?

16   A    No. Typically uniform patrol officers have the perimeter. The reason

17        there is two segments in the S.W.A.T. team typically is because they're set up

18        in arrest teams and in an incident like this that is long in duration and in

19        December in Ohio it's rather cold - and I remember this night specifically

20        being very cold and snowy - they'll rotate those officers and those teams in

21        and out of a warm area so you're not out there for four/five hours in close to

22        zero temperature. You're going to get frost bite and you're not able to

23        function properly. So, they would rotate those guys in. They wouldn't all

1   be standing around the house waiting for him; no.

2   Q   It says here team one was on the west side and the north side and

3   team two was on the east side and --

4   MRS. KOHLRIESER:  Objection, your

5   Honor.  He's reading from a report.  He asked if it refreshed his recollection.

6   He can ask him specific questions to have him answer.  But, just to read from

7   that report, which I don't know which report he's looking at.

8   THE COURT:  I'm going to sustain it

9   because I think I heard him say it wasn't his report.  So, he couldn't refresh

10   his memory anyways if it's not his report.  So, sustained.

11   MRS. KOHLRIESER:  Thank you.

12   MR. RION:  I'll ask without referring to

13   it.  I'll be happy to show the prosecutor, which was provided by, I think, you.

14   Q   Would it be normal that one team would be set up on the west side and

15   the north side and another team would be set up on the east side and the

16   south side?

17   A   Depending on the situation, they could have different positions set up

18   around the house; yes.

19   Q   And in this instance you're not aware of whether there were eight

20   officers in all four directions and two snipers around the house, or not; is that

21   what you're saying?

22   A   No, sir.  There would be -- I could pretty much say with confidence that

23   there would be snipers posted.  However, they would be in a concealed

1    position where most generally -- well, as a sniper myself, you don't want to be

2    seen. So, you're in a position where you have a good vantage point, but you

3    don't want to be seen. The other officers, as far as their exact positions that

4    night, again, I was at the Police Station and I couldn't tell you. But, they could

5    be in different places around the house - absolutely.

6    Q    And we've all seen it, and you'll acknowledge, that at times in these

7    situations that snipers and/or S.W.A.T. team officers, based on their

8    perception of events, -- well, you said you assume the worst - that someone's

9    got Bazookas and all sorts of stuff?

10    A    Sure.

11    Q    You acknowledge that assuming the worst then and then perceiving

12    things from that vantage point you're trained and obviously the goal is to

13    protect everybody, but you're also trained to, one, assume the worst and, two,

14    to take action if you perceive things consistent with that position; correct?

15    A    Yes.

16    Q    Thank you.

17    MR. RION:    Nothing further.

18    THE COURT:    Okay. Any redirect?

19    MR. MILLER:    Yes, your Honor.

20    <u>REDIRECT EXAMINATION</u>

21    **BY MR. MILLER:**

22    Q    Detective Neidemire, you testified I think on my direct that you've been

23    involved in a number of domestic violence calls.

1    A    Yes.

2    Q    Okay.  Are you familiar with the term as it's used down at Municipal

3    Court of inefficient, or, insufficient evidence?

4    A    Yes.

5    Q    Based on your sixteen years of experience handling domestic violence

6    calls does that often times mean that the victim --

7         MR. RION:  I'm going to object.  I'm going

8    to object, your Honor.

9         MR. MILLER:  Can we approach, your

10   Honor?

11        THE COURT:  No.  I'll overrule the

12   objection.  Go ahead.

13   Q    Does that often times mean the victim, for one reason or another, just

14   chose not to follow through with the charge?

15   A    Sure.

16   Q    And sometimes is it the case -- well, let me ask you.  Over your sixteen

17   years of experience have you had the opportunity to speak to domestic

18   violence victims?

19   A    Many.  Many.

20   Q    Okay.  Is it your experience that often times they choose not to follow

21   through with charges because they're scared?

22   A    Yes.

23        MR. RION:  Objection.

1   THE COURT:  Overruled.  Go ahead.

2   Q   Were you aware, and I know that you weren't out at the scene, but you

3   were involved with this incident, were you aware that the officers, after Mr.

4   Carter was taken into custody, they did go in and, as we say, cleared the

5   house?

6   A   That would be common practice; yes.

7   Q   Are you aware of that?

8   A   I believe they did; yes.

9   Q   Are you aware -- are you aware that they found an air gun?

10  A   I've been told that.  But, I never saw it.

11  Q   Okay.  So, you didn't see it?

12  A   No.  I was never out there.

13  Q   It is true that sometimes these incidences do go awry; isn't that

14  correct?

15  A   Yes.

16  Q   But, more often than not, just following up on the question that Mr.

17  Rion asked, more often than not these incidences turn out okay?

18  A   Yes.

19  Q   And more often than not they turn out okay because the person in the

20  house followed directions?

21  A   Yes; absolutely.

22  Q   Is that correct?

23  A   Absolutely.

1     Q   Based on your experience and training?

2     A   Yes. Once they follow our directions and they come out, well, as long

3 as they do that it always ends peacefully.

4     MR. MILLER: No further questions.

5     THE COURT: Any recross?

6     <u>RECROSS EXAMINATION</u>

7     <u>BY MR. RION:</u>

8     Q   Sir, in this instance, as far as the insufficiency of the evidence, are you

9 aware of what the insufficiency was?

10    A   No, I'm not.

11    Q   Okay. Are you aware that Tarah Carter was eventually interviewed by

12 police?

13    A   I believe so. But, again, I didn't have anything to do with that part.

14    Q   And are you aware that Tarah Carter actually testified in a C.P.O.

15 hearing in reference to this matter?

16    A   No.

17    Q   So, the issue as far as the insufficient evidence, it could have been that

18 there was insufficient evidence?

19    A   Yea. That really wasn't my job that night.

20    Q   Thank you.

21    THE COURT: Okay? You may step down,

22 Detective. Thank you. Next witness for the State?

23    MR. MILLER: Don Bodiker.

1    WHEREUPON, called to appear as a witness in this proceeding was one:

2    D O N A L D   B O D I K E R

3    who, having been duly sworn by the bailiff herein, testified as follows:

4    BAILIFF:  He has no objection.

5    THE COURT:  All right.  Thank you.  Go

6    ahead, Mr. Miller.

7    MR. MILLER:  Thank you, your Honor.

8    DIRECT EXAMINATION

9    BY MR. MILLER:

10    Q  Mr. Bodiker, can you state your full name for the record?

11    A  I'm sorry - say it again?

12    Q  Can you state your full name for the record?

13    A  My name is Donald R. Bodiker.

14    Q  How do you spell your last name?

15    A  B-O-D-I-K-E-R.

16    Q  Okay.  Are you married?

17    A  Yes, I am.

18    Q  Who are you married to?

19    A  I am married to Krista Bodiker.

20    Q  Okay.  Are you employed?

21    A  I work part-time now.

22    Q  Okay.  Were you employed full-time back on February 23rd, 2009?

23    A  Yes, I was.

1   Q.  Where were you employed?

2   A.  I was with Allied Barton Security Services as the account manager and

3   we worked security at the Lima Refinery.

4   Q.  Okay.  You were the account manager for the Lima Refinery?

5   A.  Yes, sir.

6   Q.  And as the account manager you were responsible, I suppose, for

7   staffing the security folks out at the Refinery?

8   A.  Staffing and security of the plant.

9   Q.  Security of the plant as well?

10  A.  Access; control; I.D. badging - everything that had to do with security

11  for the Lima Refinery.

12  Q.  Okay.  Would that include not only your, and when I say your

13  employees I mean Allied Barton, but your employees and the Refinery

14  employees?

15  A.  That was for all employees and contractors - everyone who came in

16  and out of the plant.

17  Q.  Okay.  So, just to make sure I understand, you were responsible for

18  I.D. badging, and entrance and exit of all employees, whether they were

19  contractors or employees, of the Lima Refinery on a daily basis?

20  A.  That's correct.

21  Q.  Okay.  Back in February of 2009 what kind of, well, when you say

22  badging, what kind of system was in place, just in general terms, of

23  employees coming and going?  Just for clarification, when I say

1    employees I'm going to include in that term contractors; okay?

2    A    Okay.

3    Q    Because I know there's probably a distinction between Refinery

4    employees and contractors; is that correct?

5    A    Yes.

6    Q    Okay. So, when I say employees I mean everybody.

7    A    Okay. So, all personnel that came into the Lima Refinery they had to

8    go through an I.D. trailer and that's where I worked every day. They had to

9    get an I.D. card and they would get a prox. card. This was just like a card

10   they would show to give them access to a door, or a gate, or a turnstile. Of

11   course, based on whether they were an employee or a contractor, then they

12   would have different levels of access.  Employees have more access.

13   Q    Okay. What's a prox. card?

14   A    A prox. card is a proximity card.  It's a card that you just hold up to.

15   well, they have a card reader and we used a Linnell system, a security

16   system, and you would hold this card up to a reader and it would read it back

17   to the computer and the computer would open up the door if you had access,

18   or it would not open up the door if you did not. We in the security department,

19   we determine who had the access and make sure that they didn't need that

20   access.

21   Q    Okay. So, a proximity card is just one of those cards that, well, most of

22   us have seen them, but you hold them up there and --

23   A    It just grants them access.  I'm sure there's a lot of people that use a

512

1   card in their jobs to get into a certain area or something like that. It's the

2   same principle.

3   Q   Okay. Did you know Ken Warrington?

4   A   Yes, I did.

5   Q   How did you know Ken Warrington?

6   A   I started work out there in 1992/93. Ken Warrington worked in the

7   fuels/oil storage facility. He was an employee. Just a big friendly guy. I knew

8   him from there. I would run into him throughout the plant.

9   Q   Okay. Talk to him on occasion?

10   A   Talked to him on occasion.

11   Q   Okay. All right. So, you knew him from work?

12   A   Yes, sir. One time he did come to my house actually and got rid of a

13   tree for me.

14   Q   Okay. But, primarily you knowing him was work related?

15   A   That's where I met him at was - work related.

16   Q   Is that how you would describe your relationship with him - friendly, but

17   work related?

18   A   Yes, sir.

19   Q   Do you recall the day that Ken Warrington was killed?

20   A   Yes, I was.

21   Q   Do you recall at some point someone from the Lima Police Department

22   coming to you after Ken was killed and asking that you check the system out

23   at the Refinery to determine what time Ken left the Refinery prior to being

1 killed?

2 A Yes, I do.

3 Q Okay. Let me back up one -- well, let me go forward. Do you recall --

4 well, did you actually check and see?

5 A Yes, I did.

6 Q Do you recall what time Ken left?

7 A It was five oh four in the morning.

8 Q Okay.

9 THE COURT: Do you want to give the

10 date again?

11 Q Of what day?

12 A Geez, what date was that?

13 Q In any event, it was the day he was -- did they specifically ask you to

14 check the day that he was killed?

15 A It was the day -- it was the day that he was killed and I checked it and

16 he left at five oh four in the morning.

17 Q Okay. The specific request to you was, you know, check this date?

18 A Yes, it was.

19 Q And it was because they wanted to see what time, you know, the time

20 he left the day he was killed?

21 A Yes.

22 Q Okay. You don't recall the specific date at this time?

23 A I tell you what - that was, what, seven/eight years ago. If just, you

1    know, seems like such a long time ago. Actually it was in, well, it was

2    February of 2009, I believe. But, I do not remember the exact date.

3    Q  Okay. But, they specifically asked you, or, informed you that they were

4    checking on what time he left on the day he was killed?

5    A  Absolutely.

6    Q  And you got that information?

7    A  I checked it. I was the one that would check on all people that were

8    out there from time to time when we would have to check for if they were

9    there, they were not there, or for pay purposes to make sure they actually

10   worked a day. They did ask me to check his last entry.

11   Q  So, they specifically asked you to check the last entry?

12   A  Yes.

13   Q  Okay. By entry you mean what?

14   A  The last time his card hit the reader. The last time it was recorded into

15   the computer system, the access control system.

16   Q  Okay. And you checked that?

17   A  Yes, I did.

18   Q  Okay. And you recall it being five oh four the day he was killed?

19   A  It was exactly five oh four.

20   MR. MILLER:  No further questions.

21   THE COURT:  Okay. Any questions, Mr.

22   Rion?

23   MR. RION:  No questions. Thank you, sir.

1 THE COURT: Okay, Sir, you're done.

2 Thank you. Next witness?

3 MR. MILLER: Krista Bodiker.

4 WHEREUPON, called to appear as a witness in this proceeding was one:

5 **KRISTA BODIKER**

6 who, having been duly sworn by the bailiff herein, testified as follows:

7 BAILIFF: She has no objection.

8 THE COURT: Okay. Thank you. Go

9 ahead.

10 **DIRECT EXAMINATION**

11 **BY MR. MILLER:**

12 Q Morning.

13 A Good morning.

14 Q Would you state your full name for the record? Can you state your full

15 name for the record?

16 A Krista Bodiker.

17 Q Okay. Can you spell your last name?

18 A B-O-D-I-K-E-R.

19 Q Okay, Krista, I'm going to take you back in time; okay?

20 A Okay.

21 Q I'm going to take you back to December 7th - I'm sorry - December of

22 2007. Okay? Where were you employed at that time?

23 A I was employed by Allied Barton Security and was working at the Lima

1    Refinery.

2    Q   Okay.  By the way, are you married?

3    A   Yes, I am.

4    Q   Who are you married to?

5    A   Don Bodiker.

6    Q   Is that the guy that just left?

7    A   He just left; yes.

8    Q   Okay.  So, you were employed with --

9    A   He was my boss.

10   Q   He was?

11   A   Yes.

12   Q   Okay.  All right.  I'm sorry - what was your job title?

13   A   I was supervisor of third shift.

14   Q   Okay.  Back in December of 2007 did you know an individual named

15       Sonya Burkholder?

16   A   Yes, sir.

17   Q   How did you meet Sonya?

18   A   Through work.  She got hired at the Refinery as a security guard.

19   Q   Also with Allied Barton?

20   A   Yes, sir.

21   Q   Okay.  Did she work for you?

22   A   For a time, yea, until she became a supervisor herself, but off and on

23       she would work night shift with me if needed.

1   Q.  Okay.  So, I take it from what you just said she did not come in as a

2   supervisor with Allied Barton?

3   A.  No, sir.

4   Q.  If you recall, what did she come in as?  What was her title?

5   A.  Security guard.

6   Q.  Security guard?

7   A.  Uh-huh.  Officer.  Yea.

8   Q.  And then she became a supervisor?

9   A.  She ended up a supervisor, yea, down the road later on.

10  Q.  Yes.  After some period of time she, well, would you call it a

11  promotion?

12  A.  Yes, it is a promotion.

13  Q.  Okay.  Somewhere down the road after she started she was promoted

14  to supervisor?

15  A.  Right.

16  Q.  Do you recall how many people she supervised?

17  A.  Normally on a shift it was between two and three.

18  Q.  Okay.  How would you describe, again, back in 2007, how would you

19  describe your relationship with Sonya?

20  A.  It was -- we were on good terms as employees.

21  Q.  Okay.  At some time -- well, would you describe it as a work

22  relationship or something more?

23  A   Not in the beginning, but later on, yes, we talked a lot and we became

```
 1    kind of friendly; yes.

 2    Q    Okay.  Would you say she looked at you as sort of a confidante?

 3    A    Yes, sir.

 4    Q    Would she talk to you on occasion about her children's father -

 5         Markelus?

 6    A    No, not so much.

 7    Q    She didn't talk about him at all?

 8    A    Well, no, not really.

 9    Q    Okay.  Was there a time in December of 2007 that Sonya and her

10         children came to live with you and Don?

11    A    Yes, sir.

12    Q    How did that come about?

13    A    I relieved her at ten o'clock from her shift.  She briefed me and she left.

14    Q    Do you remember the date of this?  Do you remember the date of what

15         you're describing?

16    A    Not exactly.  It was -- they were on either snow break, the children, or

17         the Christmas break.  I don't really recall the exact date.  All I know is it was

18         winter.  It was December.

19    Q    Okay.  2007?  Was it before Christmas?

20    A    Yes, uh-huh.

21    Q    Okay.  Because you mentioned the kids were on Christmas break.

22         Was it before Christmas?

23    A    Before Christmas; yea.
```

1    Q.   Okay.  Tell me what happened.

2    A    She left and went home, or so I assumed.  She left the Refinery.

3    Between ten, my shift that started at ten P.M., and eleven, I don't remember

4    the exact time --

5    Q.   That's okay.

6    A    -- we got a phone call and my co-worker answered the phone and she

7    said, "Oh, okay."  She turned to me and she said, "Krista, you have a phone

8    call.  Sonya's calling."

9    Q.   Okay.  So, you described her leaving and your shift starting at ten.  Did

10   your shift start after Sonya's?

11   A    Yes, my shift started after Sonya's; yea.

12   Q.   Okay.

13   A    She worked second shift and I worked third shift.

14   Q.   As a third shift supervisor; right?

15   A    Yea.

16   Q.   Okay.  Got it.  All right.  Okay.  I'm caught up.  Go ahead with your

17   story.

18   A    She answered the phone, or, I answered the phone and Sonya was on

19   the phone and she said, --

20        MR. RION:  Objection to this as hearsay.

21        MR. MILLER:  It's not offered for the truth

22   of the matter.  She's describing what occurred that night.

23        THE COURT:  I'm going to overrule the

1    objection and let her testify.  Go ahead.

2    Q    Go ahead.

3    A    Proceed?

4    Q    Proceed.

5    A    She said, "Krista, I need help.  Could you come down on Kibby Street?

6    I need to talk."  So, I said, "Well, I really can't leave.  You know I'm on duty."

7    She said, "Please, please come."  I remember that exactly because she was

8    crying at the time.

9    Q    On the phone?

10    A    Yes.

11    Q    Okay.

12    A    So, I left the gatehouse and I went down there.  She was sitting in her

13    vehicle.  She came out of her vehicle and I saw her face and she was just

14    shaking, very, very much shaking.

15    Q    Was she crying?

16    A    Yea.

17    Q    You know, people can cry hard, or not so hard.  How would you

18    describe her crying?

19    A    It was a normal sobbing.

20    Q    Okay.  A sobbing type cry?

21    A    Sobbing; yea.

22    Q    Okay.  Then what happened?

23    A    I said, "What happened to your face?"  She said --

1    MR. RION:  Objection.

2    THE COURT:  Overruled.

3    Q    Go ahead.

4    A    She said, "Markelus hit me and he put a gun in my face." I said,

5    "Why?"  She said, "He kicked me out of the house and I want my children."

6    Q    Were the children with her at the time?

7    A    No, sir.

8    Q    You mentioned her face.  Did you observe any, well, what you would --

9    A    She was --

10   Q    Krista, one second.  Okay?  Again, you're not the only one that does

11   this because it's usual.  What happens is is that in usual conversation I will

12   begin to ask something and then you will anticipate what I'm going to ask and

13   you'll answer.

14   A    Okay.

15   Q    That happens in conversation every day.  The problem with doing that

16   in here is that we have a Court Reporter who needs to take down and

17   eventually sometimes type up what is said.  If we're talking over each other

18   that's very difficult for her to do.

19   A    I'm sorry.

20   Q    No, no, don't apologize.  It's very easy to fall into that conversational

21   mode.  So, please just wait until I ask my question and then I'll give you all the

22   time to answer.  Okay?  Okay.  Did you notice anything about her face, any

23   injuries?

1    A    Yes, sir.

2    Q    Okay. What did you notice?

3    A    She was scratched up and kind of, well, like there was crusted blood

4         on her face, the left side of her face, and she was holding her chest.

5    Q    Okay. Where did this meeting take place? I mean, you described a

6         parking lot, I think. But, were you in a car or outside of a car?

7    A    It was across the street. There was a car wash, or a laundromat, or

8         something, yea, in that matter and she was parked right there.

9    Q    Okay. When you had this conversation with her were you and she in

10        the car or out of the car, or, a car?

11   A    She came out of her car.

12   Q    Okay. Were you in a car?

13   A    Her car?

14   Q    No. Were you in a car?

15   A    Yes. Yes.

16   Q    Did she get in the car with you when you had this conversation or did

17        you get out to meet her?

18   A    At first we were out, standing outside, and I got cold and I said, "Make

19        it quick, I've got to go back to work."

20   Q    Okay. And that's when she told you what happened, I

21        suppose?

22   A    That's what happened.

23   Q    According to her that's what's happened, that's what she told you?

1   A   Yes.

2   Q   Now, what happened after that?

3   A   That same night?

4   Q   Uh-huh.  Just tell me what happened after that.

5   A   Okay.  I told her -- well, first of all, there was a police officer and he told

6   me that they were going to take her to the police station.  I said, "Okay," I told

7   Sonya, I said, "After my shift I'm going to come up to the police station and we

8   can talk."

9   Q   Okay.  Did you do that?

10  A   Yes, sir.

11  Q   Okay.  What happened?  I don't need to know what you talked about,

12  but after you spoke with her what happened after that?

13  A   I had to leave and I went back to my workplace.

14  Q   Okay.  Now, eventually you got off of work; correct?

15  A   At six o'clock in the morning.

16  Q   At six o'clock?  We started this conversation with me asking, you know,

17  generally how Sonya came to live with you.  Did she come to live with you

18  after this particular incident that you've described?

19  A   Yes, sir.

20  Q   Okay.  How soon after, if you recall?

21  A   That same day.

22  Q   Okay.  So, you got off at six A.M.?

23  A   Yes, sir.

1   Q   And she came to live with you that same day?

2   A   That same day.

3   Q   Now, did the kids, Markie and Tarah, come and live with you as well?

4   A   Yes, sir.

5   Q   Okay. I suppose that would be you and Don, your husband?

6   A   Yes.

7   Q   So, I suppose because she was living with you that you had the

8   opportunity to continue to observe her face? Did you continue to observe

9   injuries on her face? Did you continue to observe injuries on her face?

10   A   Yes, sir.

11   Q   Okay. Had you noticed any of those injuries that you've described

12   today before you went to meet her after her call? That's a bad question. The

13   injuries that you've described, did you observe those injuries on her prior to

14   her calling you that night?

15   A   No, sir.

16   Q   How long did Sonya and the kids stay with you and Don?

17   A   Approximately nine months.

18   Q   At the end of the nine months where did they go; if you know?

19   A   My husband talked her into getting ahold of Habitat for Humanity to

20   build her a house.

21   Q   Okay.

22   A   And the house was completed and she moved in.

23   Q   Okay. Do you know where that house was, or, is?

1    A    Yes.  It was behind Schoonover's Park on the south side.

2    Q    Was it on a street called McKibben?  Not sure?  That's okay if you're

3         not sure.

4    A    I'm not sure; no.

5    Q    Okay.  That's fine.

6    A    I don't know the name of the street.

7    Q    Okay.  We're just trying to narrow it down.  But, she moved out into a

8         Habitat for Humanity house?

9    A    Yes, sir.

10   Q    Okay.  Somewhere over by Schoonover Park?

11   A    Right.

12   Q    Okay.  Had you ever met -- in the time that you've known -- how long

13        have you known Sonya?

14   A    She was hired in on a shut down and from then on she was kept

15        working for Allied Barton.  There was a short period of time where she went

16        over to the chemical side for a shut down and then she came back.  Our boss

17        wanted her back because she was a very conscious worker and from then on

18        we were pretty much working together.

19   Q    Okay.  So, she went over to the chemical side and then your boss

20        wanted her back?

21   A    Uh-huh.

22   Q    Was your boss Don?

23   A    Yes.

1    Q    Okay.  And he wanted her back and so --

2    A    Yes.

3    Q    -- he hired her back; is that right?  He hired her back?

4    A    Well, she never lost a job for Allied Barton.  It was just --

5    Q    Placement?

6    A    Replacement; yea.  She was placed someplace else at one time.

7    Q    Okay.  But, did you know her -- have you known her for a number of

8    years?

9    A    Before that?

10   Q    Yes, before this incident.  How long had you known her before

11   December of 2007?

12   A    Well, from the time she started working until -- well, I really don't

13   remember.  Maybe three years.

14   Q    Okay.

15   A    Approximately; yea.

16   Q    We're going back some time.  So, that's fine.  Okay.  During that time

17   that you worked with Sonya out at the Refinery did Markelus Carter ever

18   come out to the Refinery?

19   A    One time.

20   Q    One time?  Can you describe that time?

21   A    Yes, I remember it pretty clear.  Sonya got a phone call and she said to

22   me, "Markelus is coming out because Tarah has a friend and he wants to

23   know what is going to have Tarah and he's going to go on with her and her

1    friend and him in the car and he wanted," she told me, she said that he said
2    he wanted to take her home.
3    Q   So, Sonya's at work with you?
4    A   Uh-huh.
5    Q   Now, did Markelus actually come out?
6    A   Yes, he did.  Yes, he did.
7    Q   Okay.  I want to get the picture right.
8    A   Yea, okay.
9    Q   So, he was there and she went to meet with him?
10   A   When he pulled up to the gatehouse she went outside and talked for a
11   few minutes and came back in.
12   Q   And then told you what he wanted?
13   A   Yes.  She told me that she told him to just take the friend home.
14   Q   Was he wanting Sonya to take the friend home?
15   A   She said, "He wanted me to take Tarah's friend back home."
16   Q   Okay.
17   A   She couldn't leave.  So, she told him, and I don't know exactly what
18   was said, but she came back into the gatehouse at our workplace and she
19   said, "I can't leave and I told him just to take her to," well, wherever her home
20   was.
21   Q   Okay.  What was her demeanor?
22   A   What was her demeanor?
23   Q   As she was saying this to you.

1   A   Very pleasant.

2   Q   Okay. Did she seem upset about anything?

3   A   Just at times when she --

4   Q   Well, this specific incident.

5   A   Oh, this one? Yea, she was a little upset. Yes, she was.

6   Q   Now, during the time, the nine months that Sonya and the kids were

7   living with you and Don, did Markelus ever come out to your house?

8   A   One time.

9   Q   Okay. Tell me about that.

10   A   He drove into our driveway and picked up Tarah.

11   Q   Okay.

12   A   But, he did not come in our house.  It was just in the driveway and

13   Tarah went out and went into his car.

14   Q   Did you have a conversation with Sonya about that?

15   A   Yes.  I told her that I don't like that and, "You tell him that I don't want

16   him even coming to Coop Road where we live."

17   Q   Okay. You didn't want him there?  You didn't want him there?  That's

18   the conversation?

19   A   Exactly.

20   Q   Okay. Did you know a guy named Ken Warrington?

21   A   Yes, I do.

22   Q   How did you meet him?

23   A   He was working at the Refinery.  The place that he was working, well,

1  I met him when he brought paperwork up to the gatehouse that we had to

2  forward to other places in the Refinery.

3  Q.  Okay.  Did you see him often out at the Refinery?

4  A.  Whenever he worked.

5  Q.  Whenever he worked?

6  A.  Whenever his shift was, and it was night shift; yes.

7  Q.  Okay.  Did you often talk to him?

8  A.  I did.

9  Q.  What kind of a guy was he to talk to?

10  A.  Oh, things about football and about blah blah stuff – things that don't

11  matter.

12  Q.  Small talk?  Would you talk small talk?

13  A.  Yea, small talk; yea.

14  Q.  Was he a friendly guy to you?

15  A.  Very friendly; yea.

16  Q.  Now, were you aware that Ken Warrington and Sonya Burkholder were

17  in some sort of a relationship while each of them worked out at the Refinery?

18  A.  Not in the Refinery, but --

19  Q.  Well, I mean while they both worked there.  I know that it may not have

20  happened in the Refinery.

21  A.  Yes.

22  Q.  But, during that time frame that they worked there?

23  A.  Not at first.

1    Q    Did you become aware of that relationship?

2    A    Yes.

3    Q    Okay.  Did you talk to Sonya about that?

4    A    Yea.

5    Q    Yea.  What did you tell her?

6    A    I said, "Sonya, this is not a good place.  Please tell him to stay away

7    from you while we're working, or, you're not working.  It's not supposed to

8    happen.  If you two want to be together," I said, "you tell him to get a divorce

9    first and then make it right."

10    Q    You just gave her a little advice on that topic?

11    A    Yea.

12    Q    Both professionally and personally, it sounds like?

13    A    Uh-huh; yes, sir.

14    Q    Okay.  What was her reaction to that?

15    A    She said, "Okay, I will do that."

16    Q    Did you talk to Ken about this relationship at all?

17    A    Yes, sir.  Yes, I did.

18    Q    What did you tell him?

19    A    I said the same thing.

20    Q    The same thing?

21    A    I said, "Kenny, make it right.  Stay away.  Get a divorce and then move

22    on with your life."

23    Q    Now, Ken was not your employee?

1   A   No.

2   Q   I mean, you work for Allied Barton?

3   A   Yes.

4   Q   And he actually worked for --

5   A   For Husky; uh-huh.

6   Q   So, you really had no say in the work side of it, but just --

7   A   When we ran into each other that's what I told him.

8   Q   Okay.

9   A   Yea.

10   Q   Now, was that advice more of sort of friend to friend advice?

11   A   That was friendly advice.

12   Q   Okay.

13   A   A motherly advice.

14   Q   Understood. When was the last time you saw Ken?

15   A   That was around five o'clock in the morning. I don't know the exact

16   date. But, he left through my gate. I have a habit of looking out the window

17   between five o'clock in the morning, five A.M. and six A.M., when the

18   employees leave through the gate to make sure the gate goes up and the

19   turnstiles go and they can walk through the turnstiles. That was one of my

20   jobs. He left about five o'clock. I looked at him and I waved and he stuck his

21   hand out of his truck and waved back and went towards the traffic light to

22   Metcalf Street.

23   Q   Is that the last that you saw him?  Is that the last you saw him?

1    A    That's the last I saw him; yea.

2    Q    I asked you if that was the last time you saw him.

3    A    Yes.

4    Q    Was that the day that he died?

5    A    That was the day he -- yes.

6         MR. MILLER:  I have no further questions.

7         THE COURT:  Questions, Mr. Rion?

8         MR. RION:  Thank you, your Honor.

9                        **CROSS EXAMINATION**

10        **BY MR. RION:**

11   Q    Ma'am, you said that on December 17th that you received a call from

12        Sonya about what time?

13   A    Between ten P.M. and eleven P.M.

14   Q    Okay.  What time did you meet with her then?  What time did you meet

15        with her?

16   A    Between ten P.M. and eleven P.M.

17   Q    Okay.  So, you received a call from her and then you met her shortly

18        thereafter?

19   A    Yes, sir.

20   Q    And so you met her before eleven P.M.?

21   A    Yes, sir.

22   Q    Okay.  Now, you said that she was scratched up?

23   A    Yes, sir.

1    Q    Where were the scratches?

2    A    On her face.

3    Q    On her face?  Where on her face?

4    A    If I recall correctly, when I faced her it was her left side.

5    Q    Okay.  Where on her left side?

6    A    On her cheek.

7    Q    So, she had scratches on her cheek?

8    A    Uh-huh.

9    Q    And then you said she had crusted blood on the side of her face?

10   A    Too; yea.

11   Q    Two?  Two places?

12   A    No.  She had --

13   Q    Oh, as well?

14   A    As well; yea.

15   Q    Okay.  Describe the crusted blood.  Where was it?

16   A    She showed me a bruise on her chest.

17   Q    I'm sorry?  I asked you to describe the crusted blood.  Where was it?

18   A    On her left cheek, at the same place she was bruised up.

19   Q    Okay.  Could you point to your cheek on where the crusted blood was

20        that you saw on her cheek?

21   A    About right here.

22   Q    Okay.  Then you also said that she had bruises on her chest?

23   A    Yes, she had a bruise on her chest.

1   Q.  Okay. And these bruises on her chest were clearly visible to you;
2   correct?
3   A.  When she opened her blouse she showed me the bruise; yes.
4   Q.  Okay. So, yes, clearly visible. And the place where the crusted blood
5   was on her face and the scratches on her face, that was clearly visible;
6   correct?
7   A.  Visible; yes, sir.
8   Q.  Now, the police were called; correct?
9   A.  Right.
10   Q.  And they came; correct?
11   A.  Right.
12   Q.  And then did you stay with her while she was with the police?
13   A.  No.
14   Q.  Okay. How many hours were you with her before the police were
15   called?
16   A.  The police was there when I got there.
17   Q.  Okay. So, the police were already there?
18   A.  Yes, sir.
19   Q.  And do you recall the officer's name?
20   A.  No.
21   Q.  Was it Officer -- okay. When you saw her with the police she appeared
22   to be cooperating with them; correct?
23   A.  Right.

534

1   Q   Like she flagged them down. Well, they were there. They were talking

2      about the incident and talking about the situation, et cetera; correct?

3   A   That I don't know.

4   Q   And you described -- the prosecutor asked you what she said

5      happened. Let me get this right. You said that she said that he hit her;

6      correct?

7   A   Yes, sir.

8   Q   And that was with his fist? With his fist or his hand?

9   A   She did not specify that.

10   Q   And also 'he put a gun in my face'. That was the other thing he did?

11   A   Yes, sir.

12   Q   Okay. So, he hit her and he put a gun in her face? Those were the

13      two things?

14   A   Right.

15   Q   And that's what she told you?

16   A   That's what she told me.

17   Q   And you don't know what she told the police?

18   A   No.

19   Q   So then she stays with you for nine months?

20   A   Approximately; yes.

21   Q   And the kids were with you, Tarah and little Markelus, Markie, they

22      were with you for just about a month or so; correct?

23   A   No - off and on, and Tarah more than Markie.

1   Q. Okay. So, after this incident on December 17th when she came, or,

2   when Sonya came to live with you did the two children also come and stay

3   that --

4   A. Yes, sir.

5   Q. -- next night or whatever?

6   A. Yes. We spent Christmas together.

7   Q. And they stayed there at the house for a couple of weeks solid;

8   correct?

9   A. Pretty much; yea.

10   Q. And then after January or so then the children were back with

11   Markelus, their father, and they would come and visit with you; correct,

12   meaning with Sonya?

13   A. Tarah, not so much; but, Markie, yea. He went back; yea.

14   Q. Now, you said that you gave advice to Sonya about committing

15   adultery. When was it that you gave her that advice?

16   A. When I noticed that they were more than a little friendly - when I saw

17   that.

18   Q. When was that?

19   A. I would have to guess, but maybe August.

20   Q. Did anything happen in November of 2008 that you're aware of?

21   A. Excuse me?

22   Q. Do you know where she was living in November of 2008?

23   A. At the house that she built with the help of that company.

1  Q  And do you know who she was living with in November of 2008?

2  A  With her children.

3  Q  Nobody else?

4  A  Not to my knowledge.

5  Q  Did you ever go over to the house?

6  A  Yes.

7  Q  Did you ever spend the night?

8  A  No.

9  Q  Did you ever see whose clothes were in the house in the closet?

10  A  No.

11  Q  So, you're a friend of Sonya's; correct?  You are a friend of Sonya's?

12  A  Yes, I am.  I was.

13  Q  And at the same time you were a friend of Sonya's -- well, I'll leave it

14  there.  Thank you.

15  THE COURT:  Any redirect?

16  MR. MILLER:  Can I have one second,

17  your Honor?

18  THE COURT:  Sure.

19  (WHEREUPON, Court went off the record briefly.)

20  <u>__REDIRECT EXAMINATION__</u>

21  **BY MR. MILLER:**

22  Q  Mrs. Bodiker, -- let me get to the microphone here.  Do you recall

23  testifying at a civil protection order hearing?

1    A    Yes.

2    Q    Okay.  Relating to the same subject matter that you've testified here

3    today to?

4    A    Not the murder.

5    Q    No, I mean, --

6    A    The protective hearing.

7    Q    -- the December of 2007 incident that you've talked about.

8    A    Yes.

9    Q    Okay.  I asked you about what time you got that call and about what

10   time you met Sonya.

11   A    That night?

12   Q    That night; yes.

13   A    Between ten and eleven.  The exact time?

14   Q    Do you know the exact time?

15   A    I would say it was --

16   Q    Let me ask you this - do you recall the exact time?

17   A    I was called?

18   Q    Do you recall the exact time?  Let me say it this way.  Do you recall the

19   exact time that you went out to meet Sonya?

20   A    Yes.

21   Q    You do?

22   A    Yes.

23   Q    Okay.  What was that time?

538

1    A    The exact time I could not tell you, but around --

2    Q    Well, let me stop you there.  Would it be helpful to you then if I showed

3    you your testimony from the C.P.O. hearing?  Would it be helpful to you in

4    recalling the exact time?

5    A    That probably would because it's been a long time.

6    Q    Oh, I understand.

7    A    Yea.

8    Q    Okay.

9    MR. MILLER:  Your Honor, may I approach

10   the witness?

11   THE COURT:  Okay.

12   MR. RION:  Can I see the document?

13   MR. MILLER:  Sure.

14   (WHEREUPON, Court went off the record briefly.)

15   Q    Mrs. Bodiker, I'm going to hand you something I want you to read to

16   yourself.

17   A    Uh-huh.

18   Q    Okay?  Silently.  It's portions of your testimony relating to the subject

19   matter that you testified to here today, specifically the December 17th, 2007

20   incident.  I think you'll get the gist of it if you pick up right here at about line

21   eleven and go down through twenty-three and then on the following page the

22   first couple of lines.  Look up at me when you're done.

23   (WHEREUPON, witness reviewed document.)

539

1   Q   Does that help you recall what time you went out to meet with Sonya?

2   A   Yes, but it was not two-thirty.

3   Q   Okay.

4   A   It was between ten and eleven.

5   Q   Okay.

6   A   Yea, that's not correct.

7   Q   Because you went to work at what time?

8   A   I came to work at ten o'clock - well, a quarter till.  I always give enough

9       time, about fifteen minutes, to get briefed on what happened prior that I

10      should know at the work place.

11  Q   Okay.  On what happened on that shift before you?

12  A   Yes.

13  Q   And then you went out and you would know what was going on at

14      work?

15  A   Right.  That's how we worked.

16  Q   Okay.

17      MR. MILLER:  No further questions.

18      THE COURT:  All right.  Any recross?

19          RECROSS EXAMINATION

20  BY MR. RION:

21  Q   Ma'am, do you recall also being asked during that same hearing where

22      you testified before whether or not you saw any blood and your answer was

23      'no blood'?

1   A   I did not testify on that; no.

2   Q   Would it help to refresh your recollection by looking at your testimony?

3   A   Probably not.

4   Q   Let me show it to you just so you can look at it.

5   A   Okay.

6       MR. RION:  Can I approach the witness?

7       THE COURT:  Sure.

8   Q   This is just to refresh your recollection.

9   A   Uh-huh.

10  Q   That's you - Krista Bodiker; correct?

11  A   Uh-huh.  Excuse me.  First of all, this is spelled wrong.

12  Q   Okay.

13  A   This is spelled -- my whole name is spelled wrong.

14  Q   Okay.  But for your name --

15  A   That's not me.

16  Q   This isn't you?

17  A   This is not me.  This person is not me.  If this is supposed to be me, it's

18      spelled wrong.

19  Q   Did you meet at a car wash on Main Street?

20  A   At the parking lot.

21  Q   At the car wash?

22  A   Yes.

23  Q   Okay.  "What place is this that you -- do you know the name of the

place that you came to?" "It was on Main Street.  It was a car wash."

MRS. KOHLRIESER:  Your Honor?  I'm

going to object.  It's beyond the scope.  Furthermore, he's trying to read this

and somehow get her to answer the way he wants her to answer.

THE COURT:  It's cross examination.

MRS. KOHLRIESER:  It's not how you

refresh and it's beyond the scope, your Honor.

THE COURT:  It's not refreshing.  He can

cross examine using prior statements that she says those are her prior

statements.  Overruled.  Go ahead.

Q I'm just trying to establish that this was your testimony.

A Sure.

Q You deny that you said when I asked - "Well, you said that you talked

to her and the time was ten after two in the morning."  You deny that, correct?

A Correct.

Q You were asked, "Did you see anything unusual about her?"  There's

no mention of any -- well, just read through this.  I'm going to ask you if

there's any mention of any blood that you saw.

(WHEREUPON, witness reviewed document.)

Q Feel free to read as much as you would like to read.

A No.  I don't recall.

Q Okay.  In looking at this would you agree with me there's no mention

that you testified that you saw any blood?

1    A    Okay.

2    MR. RION:  Nothing further.

3    THE COURT:  Okay. Thank you, ma'am.

4    You may step down. Okay? Does anybody on the jury need a break? I'm

5    the type that I like to keep going. But, does anybody need a break? Does

6    counsel need a break?

7    MR. MILLER:  Yes.

8    MRS. KOHLRIESER:  I think your staff

9    needs a break.

10    MR. MILLER:  I think your staff does.

11    THE COURT:  I was going to ask them.

12    Do you need a break?

13    BAILIFF:  I would like one.

14    THE COURT:  Okay. Let's take about a ten

15    minute or so break, until about five till. I want to try and keep going, but with

16    the idea, again, that I'll need to break around one o'clock. So, we might do a

17    little later, or, go a little later and have an extended -- well, maybe break

18    sooner than that and have an extended lunch. But, we'll have a recess here

19    for about ten minutes.

20    (WHEREUPON, COURT WAS IN RECESS.)

21

22

23

1  THE COURT:  We're reconvening in Case

2  Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter, on this 10th

3  day of September, 2015.  The defendant is present in Court with counsel.

4  The State is present.  The jurors have been returned from the recess.

5  We'll continue with the State's next witness.

6  MR. MILLER:  Don Hovest.

7  WHEREUPON, called to appear as a witness in this proceeding was one:

8  **D O N A L D   H O V E S T**

9  who, having been duly sworn by the bailiff herein, testified as follows:

10  BAILIFF:  He has an objection.

11  THE COURT:  Okay.  This witness has

12  asked not to be photographed, as is his right under Superintendence Rule 12.

13  So, I would ask the media not to publish his image in any media.  All right.

14  Go ahead.

15  <u>DIRECT EXAMINATION</u>

16  **BY MR. MILLER:**

17  Q  Will you state your full name for the record, please?

18  A  Donald D. Hovest.

19  Q  Okay.  Can you spell your last name?

20  A  H-O-V-E-S-T.

21  Q  Okay.  Don, where do you work?

22  A  J&N Haulers.

23  Q  What does J&N Haulers do?

1   A   I pick trash up.

2   Q   Okay.  Were you working at J&N Haulers in February of 2009?

3   A   Yes.

4   Q   What was your route back in February of 2009?

5   A   As far as --?

6   Q   What was your route here for pick-up?  Were you a truck driver for

7   them?

8   A   Yea, I drive a pick-up around picking up trash with a dump bed on the

9   back.

10  Q   Okay.  So, you had a pick-up.  You picked up trash.  You had a pick-up

11  truck and you would pick up trash?

12  COURT REPORTER:  I'm having trouble hearing him.

13  Q   Okay.  See that microphone, Don?  Talk right into it.

14  A   All right.

15  Q   I do the same thing.  I get in trouble for it.  So, I try to do this as much

16  as I can.

17  A   Okay.

18  Q   Lean right up into there and talk as loud as you can into it.

19  A   Okay.

20  Q   It does two things.

21  A   Okay.

22  Q   It records your voice so that we have a record of what's said in here.  It

23  also amplifies your voice and it projects it over certain speakers in here so

| | | |
|---|---|---|
| 1 | | that everybody can hear. |
| 2 | A | Okay. |
| 3 | Q | Okay? |
| 4 | A | All right. |
| 5 | Q | You're a pretty soft-spoken guy. |
| 6 | A | Yea. |
| 7 | Q | So, if you don't speak into that everybody's going to have a hard time |
| 8 | | hearing you. Okay? |
| 9 | A | Okay. |
| 10 | Q | I think you were saying that you were a truck driver for J&N Haulers in |
| 11 | | February of 2009. |
| 12 | A | Yes. |
| 13 | Q | And you had a pick-up truck? |
| 14 | A | Yea, a pick-up with a dump, a dump on the back that I dump into the |
| 15 | | packer. |
| 16 | Q | That's where you put the trash as you ran around on your route? |
| 17 | A | Yea. |
| 18 | Q | Okay. I want to take you back to February 23rd, 2009; okay? |
| 19 | A | Yea. |
| 20 | Q | You know the area of McKibben and Pearl Street here in Lima? |
| 21 | A | That's my trash route; yea. |
| 22 | Q | That was your trash route? |
| 23 | A | Yea. |

```
 1    Q    Back on February 23rd, 2009?

 2    A    Yea.

 3    Q    Okay.  Were you driving your route on that day?

 4    A    Yes.

 5    Q    While you were on your route did you hear gunshots on that day?

 6    A    Yes.

 7    Q    Do you do your route in the mornings?

 8    A    Yea, early mornings.

 9    Q    Okay.  Was it during the early morning that you heard what you

10         thought to be gunshots?

11    A    Yes.

12    Q    Do you recall specifically about what time that was?

13    A    I'm not sure what time it was.  What time did I call?  Probably around

14         five something, around in there.

15    Q    Okay.  Somewhere around in that area?

16    A    Yea, in that general area; yea.

17    Q    Okay.  Could it have been closer to five-twenty/five-thirty, around in

18         that time?

19    A    Somewhere -- I'm not, like I said, sure on the time, but somewhere in

20         there.  That's usually when I get around in that area.

21    Q    Okay.  So, you're in that area around that time when you do that?

22    A    Yea.

23    Q    Okay.  Now, to your left is what is marked State's exhibit '150' - one
```

1    five zero.  Okay?  Now, with the Court's permission, I'm going to ask you to

2    come out of your seat and walk up to exhibit '150'.

3         MR. MILLER:  Judge, may he do that?

4         THE COURT:  Yea, that's fine.

5    Q    Okay.  Don, why don't you come up and stand right there next to '150'.

6    I'm going to --

7         THE COURT:  Just make sure that he

8    speaks up when he testifies.

9         MR. MILLER:  Yea.  I know we're going to

10   have the microphone issue.  Okay.

11   Q    Now, I have a black marker in my hand.

12   A    Okay.

13        BAILIFF:  That's a pointer.

14   Q    Oh, it's a pointer.  Do you have a marker?

15        MRS. KOHLRIESER:  I have a marker.

16        BAILIFF:  The markers should be up there.

17        MRS. KOHLRIESER:  Your Honor, if I

18   could, I could take the microphone from this table and hold it up to him while

19   he testifies if the Court would so allow me.

20        THE COURT:  No.  We'll see how it goes.

21   Q    Now I have in my hand a black marker; okay?  I'm going to ask you to

22   put a black 'X' in the area where you were when you heard the gunshots;

23   okay?  So, you see '150'?

548

1  A  Yea.

2  Q  Okay. Here's the black marker. Go ahead and put an 'X' in the area

3     where you were when you heard the gunshots.

4  A  Okay. About right in here somewhere. (Indicating.)

5  Q  Okay.

6     MR. MILLER:  Okay. Now, for the record,

7     the black 'X' is placed on Pearl Street. Okay? That's just for the record in

8     case we put another 'X' somewhere.

9     THE COURT:  Well, maybe if you're going

10    to put other 'X's' then have him initial that or something.

11    MR. MILLER:  Well, okay. We can use

12    different colors.

13    THE COURT:  All right. Okay.

14 Q  Don, why don't you go ahead and initial that 'X' with your initials.

15 A  Okay.

16 Q  You can have a seat now.

17    THE COURT:  Pull that microphone back

18    around so you can talk in it.

19 Q  Okay. Now, Don, you marked on exhibit '150' where you were when

20    you heard the gunshots. When you heard what you thought were gunshots.

21    what did you do?

22 A  Well, I actually had one more bag of trash that I picked up and threw in

23    and then I drove around to the back side of the park and come up the other

1  side.

2  Q  Okay.  Why don't you stand back up and show the folks where you

3  drove?  I'm going to kind of narrate for the record here so that we know

4  what's going on.

5  A  I went around here this way and come up --

6  Q  Hold on one second.  Slow down.

7  A  Okay.

8  Q  I've got to narrate because we've got to have this on record.

9  A  Okay.  I went down this way here towards --

10  Q  When you say 'down this way,' you're going --

11  A  Towards the park.

12  Q  -- towards the park?  Towards Liberty Street?

13  A  Liberty Street; yea.

14  Q  Okay.

15  A  Then I come up around and --

16  Q  So, you turn, you make a left turn on Liberty?

17  A  Left turn on Liberty and left turn on to McKibben.

18  Q  Yea.

19  A  Then I come around here and --

20  Q  When you say you come around here', you went down --

21  A  I'm not sure if I was on Jefferson or Jackson here, but one of these two

22  streets.  There's a Clark Station on Jackson.

23  Q  Okay.

1   A   That's where I stopped and called it in.

2   Q   Okay. Now, put that microphone right in front of your face.

3   A   Okay.

4   Q   You were kind of telling me away from the microphone what you did. I

5       want you to say exactly what you did into that microphone.

6   A   Okay. I went towards the park and I turned left on Liberty Street.

7   Q   Okay.

8   A   Then when I got to McKibben Street I took another left.

9   Q   Okay.

10  A   Then it was either Jefferson or Jackson that I turned to the right on to

11      go to the Clark Station and that's where I called.

12  Q   Okay. When you say you went to the Clark Station, well, why did you

13      go to the Clark Station?

14  A   That's where my next transfer was and I wasn't sure who was out there

15      or what was going on. That's the reason why I waited until then to call.

16  Q   So, you wanted to get out of the area?

17  A   Yea. Yea.

18  Q   Okay. So, you went to the Clark Station?

19  A   Yea.

20  Q   And what did you do at the Clark Station?

21  A   I called 9-1-1.

22  Q   You called 9-1-1?

23  A   Yea.

1    MR. MILLER:  No further questions.

2    THE COURT:  Mr. Rion, any questions?

3    CROSS EXAMINATION

4    BY MR. RION:

5    Q    You said you heard some shots; right?

6    A    Yes.

7    Q    What did they sound like?

8    A    Well, just one right after another.  I don't know.  Rapid succession I

9    guess you would call it.

10   Q    How many?

11   A    Probably six - something like that.  I'm not sure.

12   Q    You were - let me get my bearings here - you were right here when

13   you heard them; correct?

14   A    Yes.

15   Q    And then how long did it take you to drive around and get up to the

16   station?  Estimate it.  In other words, the time between when you heard the

17   shots and the time that you called 9-1-1.

18   A    Ten/fifteen minutes at the most.  I didn't drive real fast.

19   Q    Okay.  Thank you, sir.

20   THE COURT:  Any redirect?

21   MR. MILLER:  No, sir.

22   THE COURT:  Okay.  Thank you, sir.

23   You're done.  You may step down.  Next witness?

1    MRS. KOHLRIESER:  The State would call

2    Bob Sarchet, your Honor.

3    WHEREUPON, called to appear as a witness in this proceeding was one:

4              R O B E R T   S A R C H E T

5    who, having been duly sworn by the bailiff herein, testified as follows:

6    BAILIFF:  He has an objection.

7    THE COURT:  Does?

8    BAILIFF:  Yes.

9    THE COURT:  Okay.  This witness also

10   has requested not to be photographed.  So, I'll order the media not to publish

11   his image.

12                  DIRECT EXAMINATION

13   BY MRS. KOHLRIESER:

14   Q    I'm checking the clock so I can say good morning to you.  Could you

15   state your name for the record and spell your last name?

16   A    Robert Sarchet, S-A-R-C-H-E-T.

17   Q    And, Mr. Sarchet, where are you employed?

18   A    I was employed at the Lima Police Department.  I retired in December

19   of 2011.

20   Q    December of 2011?

21   A    Yes.

22   Q    And how long were you with the Lima Police Department, if you recall?

23   A    Thirty-five years.

1    Q   And what were your duties with the police department?

2    A   The entire time I was a street officer handling, on third shift, handling

3    calls for service.

4    Q   So, if someone called the police station and needed help you might get

5    sent out?

6    A   Yes.

7    Q   Okay.  You said third shift?

8    A   Yes.

9    Q   What hours was third shift when you were working there?

10    A   Eleven P.M. to seven A.M.

11    Q   And you were working that shift back in February of 2009?

12    A   Yes, I was.

13    Q   And at that time, and I think maybe for a large part of your time there,

14    what was the general area that you were assigned in the City?

15    A   I worked the downtown beat, which consisted primarily from Grand

16    Avenue to Elm Street, and Pine Street over to Jameson, and the downtown

17    business district.

18    Q   Okay.  Did that include the area of North Jackson, East Pearl, and East

19    McKibben?

20    A   That was a couple of blocks east of my area, but it wasn't uncommon

21    for me to get pulled from my area to work another area.

22    Q   So, basically that butted right up against your area; correct?

23    A   Right.  Yes.

1    Q.   Okay.  Now, I want you to look real quick at what's been marked as

2    State's exhibit '150' there.  Do you see that?

3    A.   Yes.

4    Q.   Okay.  Do you recognize what that aerial photo is covering?

5    A.   Yes.

6    Q.   What area would that be?

7    A.   This would be the area where I was dispatched to a call.  It would be

8    just east of my area.  My area stopped at the railroad tracks at Pine Street.

9    This was just a block or two over from my area.

10   Q.   Okay.  Let me stop you there.  Make sure you speak up since we're

11   away from the microphones so all the jurors can hear you.  You pointed to,

12   well, if you're facing it, the left hand side of State's exhibit '150', correct, when

13   you were saying 'my area' and you made a hand gesture?

14   A.   Yes.  Right.

15   Q.   Okay.  The last complete, I guess, north and south road we can see on

16   '150' is Jackson Street, correct?

17   A.   Right.

18   Q.   Okay.  Are you talking about just to the west of that would be primarily

19   where your beat ended, so to speak?

20   A.   That's correct.

21   Q.   Okay.  Is there a railroad track near here that we just can't see on the

22   side there?

23   A.   Yes.  It's just right -- it would be right here west of Jackson.

555

1   Q.  Okay.  So, just west of Jackson, but is before you get to the next

2   street, which would be Wayne Street?

3   A.  No, Union.

4   Q.  Excuse me.  Union.  Sorry.

5   A.  Yes.

6   Q.  Okay.  So, right off this map would be railroad tracks; correct?

7   A.  That's right.

8   Q.  Okay.  And at the bottom, or, I guess towards the bottom of this map

9   do you see where it says 'Pennsylvania' down here?

10   A.  Yes.

11   Q.  Is that a railroad as well?

12   A.  Yes.  That's a railroad track that intersects down here at Union and

13   Wayne Street.

14   Q.  Okay.  Just a few blocks north, in fact, there's another set of railroad

15   tracks; correct?

16   A.  Those are the same tracks.  They go up and then it splits off.

17   Q.  All right.  Thank you.  You can have a seat.  All right.  Let's go back to

18   February 23rd, 2009.  You said you were working third shift; correct?

19   A.  Yes.

20   Q.  Now, at approximately five-eighteen were you made aware of a call

21   involving the 400 block of East Pearl?

22   A.  Yes.

23   Q.  Okay.  Can you explain to the jury what kind of a call that was?

1   A   Yes.  I was dispatched to the 400 block of East Pearl to investigate the

2   report of shots being fired in the area.

3   Q   Is that what you mean by sometimes you were called a little bit outside

4   of your area?

5   A   Yes.

6   Q   So, would it be fair to say that you were fairly familiar with Pearl and

7   McKibben and that area?

8   A   Yes.

9   Q   Okay.  Now, you got a call for shots fired?

10   A   Yes.

11   Q   And where were you, if you recall, when that actual call came in?

12   A   I was in the area of Main and McKibben.

13   Q   Okay.  So, McKibben, but a few blocks to the west?

14   A   Yea.  I was about three or four blocks to the west of that.

15   Q   Okay.  And Pearl Street is actually south of McKibben?

16   A   Yes.

17   Q   What did you do when the dispatch came over for shots fired in the

18   400 block of East Eureka, or, East Pearl?

19   A   I drove down Main Street to Pearl and then cut east and went over to

20   Pearl Street.

21   Q   So, Main Street, which is actually right outside this Courthouse;

22   correct?

23   A   Yes.

1  Q  And you went down Main Street to Pearl?

2  A  Yes.

3  Q  Okay.  And then went up Pearl to the 400 block?

4  A  Went east on Pearl; right.

5  Q  Okay.  Did you notice anything -- well, I guess, when you go on a shots

6  fired call, you've gone on them before, I assume?

7  A  Yes.

8  Q  Many times?

9  A  Yes.

10  Q  How would you go about -- and all you know is that there's shots fired

11  in this general vicinity.  How do you handle that?

12  A  Well, you roll down all the windows in the cruiser.  You drive slow.  You

13  look for anybody moving.  You look for anybody running from the area.  You

14  look for any cars leaving the area.  You also look at the ground for spent shell

15  casings or anything out of the ordinary.  Sometimes you find somebody laying

16  that's been shot, laying on the ground.  Just anything out of the ordinary that

17  would indicate shots were fired.

18  Q  Okay.  Did you basically follow that same routine for this call?

19  A  Yes.

20  Q  Okay.  Did you, and I'm trying to make this for the record here, head

21  east on Pearl then?

22  A  Yes.

23  Q  From there, once you got to the 400 block of East Pearl, where did you

```
 1    drive to?

 2    A    I just drove real slow down to Liberty.  I turned north on Liberty and

 3         then come back west on McKibben.  I circled the block real slow, maybe one

 4         or two miles an hour.  I stayed in the area about ten minutes checking for

 5         anything out of the ordinary and I didn't find anything.

 6    Q    Okay.  So, just, again, for people who may not be as good at directions

 7         as you, you're driving down Pearl?

 8    A    Yes.

 9    Q    If you're facing it, the right hand side of the map?

10    A    Driving down Pearl east to Liberty.

11    Q    At Liberty do you take a left hand turn?

12    A    Yes.  It only goes left.  There's a house right here.  There's no road.

13         There was a church that used to have a little parking lot here.  Liberty only

14         goes north.  Liberty only goes the one block to McKibben.

15    Q    Okay.  Then you take a left on McKibben?

16    A    Right.

17    Q    Because to the right of all of that is Schoonover Park; correct?

18    A    Yes.  Right here.

19    Q    So, in the top right hand corner of State's exhibit '150' that's what we

20         see, and I guess even towards the middle that's all Schoonover Park?

21    A    That's right.

22    Q    Thank you.  Do you remember what kind of night it was?

23    A    It was cold.  There was snow on the ground.  It was a real cold night.
```

1  Q  Now, do you know whether any other dispatches were received or any
2  calls went out with multiple callers calling in for shots fired?
3  A  No, not until six thirty-nine there was another call dispatched. But, at
4  five-eighteen there was just that one call.
5  Q  Okay. Now, would it surprise you if only one, given it's a populated
6  area; correct?
7  A  Yes.
8  Q  Is that uncommon when you have shots fired that maybe not
9  everybody that heard them called?
10  A  Yea. But, also in that area there's trains banging together a lot and so
11  you do get some sounds that maybe people were just thinking 'well, that
12  could be a train' or something. Sometimes you'll get three or four callers
13  calling in. Sometimes they'll be shots fired in an area and nobody will call in.
14  Q  Okay. But, you're saying that around that, because of the tracks that
15  we talked about, there's a lot of clackety-clack type of banging around?
16  A  Yea. I think there's a switching station up there north of Pearl and
17  McKibben where they bang, well, they're connecting trains and they bang into
18  each other and you can hear them.
19  Q  Okay. Now, in the time that you were driving around you failed to see
20  anything about the ordinary, you said, I believe?
21  A  That's right.
22  Q  You just mentioned six thirty-nine. So, a little over an hour later, an
23  hour and a half almost, but before your shift ended you said another call

1         came in for that area?

2   A   Yes.

3   Q   What was the nature of that call?

4   A   They got a call at 436 McKibben of a report of a possible shooting

5       victim.

6   Q   Okay. That call came in. Was that roughly in the same area as Pearl?

7   A   Yea. It's one block north of Pearl.

8   Q   So, when you heard that call go out over the dispatch what did you

9       think?

10   A   That somebody did hear shots fired at five-eighteen. I responded to

11       that location and assisted the other officers with the investigation.

12   Q   So, you actually went to 436 East McKibben then?

13   A   Yes.

14   Q   Is that here in Lima, Allen County, Ohio?

15   A   Yes, it is.

16   Q   What did you observe upon your arrival?

17   A   I observed a victim, later identified as Kenneth Warrington, who was

18       laying on a concrete pad. It was up a little bit from the road. There's like a

19       hill. I got out of my car and I walked up there and I could see him laying on

20       the pad and I observed that he was bleeding from his head.

21   Q   Okay.

22   A   Or, had bled from his head.

23   Q   All right. I'm going to show you what has previously been marked as

1    State's exhibits '157' and '158' and ask you to take a look at those for me.

2    Before we talk too much about them, you actually stayed to help in whatever

3    way you could at that address; correct?

4    A    That's right.

5    Q    Okay. Did you also photograph what you saw?

6    A    Yes.

7    Q    Are you aware whether I.D. officers were actually called out as well?

8    A    Yes.

9    Q    So, your activities were aside from the identification officers; correct?

10    A    Right. I took photos. As soon as I got there I started snapping photos.

11    Q    Okay. At that time of night are there any officers available right then?

12    A    No. They had to call them in.

13    Q    So, you're snapping them to get what it looks like at that moment?

14    A    Right.

15    Q    Okay. Do they fairly and accurately -- '157' and '158', do they fairly

16    and accurately represent what you observed at that call at approximately six

17    thirty-nine A.M., in the morning?

18    A    Yes.

19    MR. RION:  Can I see what you have?

20    MRS. KOHLRIESER:  Oh, I'm sorry.

21    Q    State's exhibit '157'. What are we looking at here, Mr. Sarchet?

22    A    That is a picture, or, a photograph of Mr. Warrington laying on the

23    concrete pad on the west side of 436 East McKibben.

1  Q   This dark part that we see going from his body down the pad there,

2  what did you believe that to be at the time?

3  A   I believed that to be blood.

4  Q   Did Mr. Warrington appear deceased?

5  A   Yes.

6  Q   And is that exactly how you found it as far as things propped up

7  against the door and what looks like glass there?

8  A   Yes.

9  Q   And you didn't disturb that scene?

10  A   No.

11  Q   State's exhibit '158'. What are we looking at in this picture?

12  A   You're looking at the concrete pad where Mr. Warrington was laying.

13  That is looking, to the south, to be a car parked just south of that concrete

14  pad.

15  Q   Okay.  It appears to still be dark outside at this time?

16  A   Yes.

17  Q   Now, that concrete pad that we've talked about, and you said there's a

18  little ridge there, is that actually an alleyway that goes through there?

19  A   Yes, there's an alleyway just to the west of that pad.  It comes up at an

20  incline.

21  Q   Now, given what you and -- well, did other officers respond as well?

22  A   Yea, Officer Douglass -- the first call?

23  Q   No, no.  The six thirty-nine call.

1    A    Yes, there were several officers there.

2    Q    And is that typical for something of this nature?

3    A    Yes.

4    Q    And given what you observed and other officers observed is this the

5    type of scenario that calls for a supervisor or someone higher up to be called?

6    A    Yes.

7    Q    Why is that?

8    A    Just so they can call the shots - call I.D., call in others. I believe the

9    supervisor beat me there to the scene. He automatically called for I.D. and

10    detectives to respond to the scene.

11    Q    You said you assisted. Obviously we heard you say that you took

12    pictures. Did you do anything else to secure the scene?

13    A    Yes. I hung crime scene tape up around the house at 436 East

14    McKibben and made sure nobody entered the crime scene.

15    Q    Okay. Is it part of your role as an officer to make sure nobody touches

16    anything?

17    A    That's correct.

18    Q    That's for the crime scene guys to handle; correct?

19    A    Right. That's correct.

20    Q    Okay. It's not your role or other uniform officers' roles to actually

21    collect evidence? If there's a bullet there you don't pick it up; right?

22    A    No.

23    Q    Okay. Did you participate in any questioning any neighbors in the area?

1    A    Yes.

2    Q    Okay.  Had those neighbors called the police, to your knowledge, of

3    the shots fired?

4    A    No.  They didn't call the police.  One of the neighbors across the street

5    wanted to know if there was a problem over there at 436.  She came out of

6    her house and stood on her porch and called me over and wanted to know if

7    there was a problem over there.  I told her that there had been.  I asked her if

8    she had heard anything or seen anything during the night.

9    Q    Okay.  I'm going to stop you there because I don't want you to tell me

10   what she said.

11   A    Okay.

12   Q    But, did you ever learn who did, in fact, call the police that night, the

13   five-eighteen call?

14   A    Yes.

15   Q    Okay.  Who was that person?

16   A    His name was Don Hovest.

17   Q    Did you make contact with Mr. Hovest?

18   A    I tried calling him, but it went to voicemail.  So, I left a message for him

19   to call me back and if I wasn't there, because I was ending my shift, to ask for

20   the detective bureau.

21   Q    Okay.  Had Mr. Hovest left his identifying information with dispatch or

22   something?  Is that how you knew who called?

23   A    Yes, he left his phone number and his name and I called the

565

1   number that he left and that's when it went to voicemail.

2   Q   Other than following up with Mr. Hovest and talking to the neighbors

3   across the street and what you've already testified to at the scene, did that

4   basically end your involvement in this case?

5   A   Yes.

6   Q   I apologize, I'm not sure if I asked you this or not, but State's exhibit

7   '150' that we just saw, the big diagram there, does that, given your knowledge

8   and experience of the scene, does that fairly and accurately represent the

9   area of the 400 block of East McKibben and East Pearl Street?

10  A   Yes, it does.

11  Q   From Jackson, I guess, to Liberty?

12  A   Yes.

13  Q   Thank you.

14        MRS. KOHLRIESER:   No further

15  questions.

16        THE COURT:   Okay, Mr. Rion?

17                    CROSS EXAMINATION

18  BY MR. RION:

19  Q   Good morning, sir.

20  A   Morning.

21  Q   I just have a few questions.   Looking at the State's exhibit here, can

22  you just point out to the jury where 436 McKibben is in relation to --

23  A   This is 436 right here.

1   Q.  So, 436 McKibben is there.

2   A.  Right there.  There's an alley that goes through.

3   Q.  This is the house right there; right?

4   A.  Yes.

5   Q.  And there's the shed that was attached to, well, not attached, but next

6   to it, or, behind it; correct?

7   A.  Yes, there was a shed back there.

8   Q.  And there's the 'X' where -- well, there's an 'X' right there; correct?

9   A.  Yes.

10  Q.  Okay.  You were the first on scene then; correct?

11  A.  On the first call, at the five thirty-eight (sic) to investigate shots fired.

12  On the second call of a possible shooting victim I was not the first officer

13  there.

14  Q.  Okay.  So, you were there and were assisting others?

15  A.  Right.

16  Q.  Okay, let's start at the first call.  You get there -- well, about what

17  time do you think you got there?

18  A.  Real close to five-eighteen.  It only took me a minute maybe to get to

19  the scene.

20  Q.  Okay.  You're looking for anything unusual; correct?

21  A.  That's right.

22  Q.  Any motion lights that are on?

23  A.  Anything.  If they would have popped on I would have noticed that.

1 Anybody walking away, or running away, cars leaving the area, dogs barking,

2 anything that was unusual.

3 Q Anything? At that point no bright lights, no evidence of movement, no

4 dogs barking; correct?

5 A That's correct.

6 Q To all three questions?

7 A That's correct.

8 Q And you actually drove right by 436 McKibben; correct?

9 A That's correct.

10 Q Things appeared dark and normal?

11 A Everything appeared to be normal from what I could see at the time.

12 Q So, nothing stuck out?

13 A No.

14 Q When you went the second time did you take a series of pictures;

15 correct?

16 A That's correct.

17 Q Is it fair to say you were the first one on scene with a camera, I guess?

18 Did you start the cameras, or, the pictures?

19 A Yes.

20 Q Were you looking around at all?

21 A Yes.

22 Q Did you see any fresh footprints leading from the area?

23 A Not fresh. You know, the snow -- there was snow on the ground, but it

1    was trampled down in a lot of places because it didn't snow that night.  So,

2    the snow had already been there.  There were tire tracks in the alley.

3    Q    There were fresh tire tracks from Mr. Warrington's car.  Were you able

4    to see those?

5    A    I don't recall that; no.

6    Q    Okay.  Do you recall when it snowed last?

7    A    No, I don't.

8    Q    Or how long had that snow been on the ground?

9    A    I know it didn't snow that night.

10   Q    Right.  Okay.  Did you notice any cars driving in or out of that area?

11   A    No.

12   Q    Did anybody assist you, or did you simply, since you do the route, and

13   just leave it at that given that you didn't see anything out of the ordinary?

14   A    Officer Douglass responded to that area also.

15   Q    Okay.  So, two officers before the second call --

16   A    That's correct.

17   Q    -- did assist in trying to determine if anything at all had happened?

18   A    Yes.

19   Q    All right.  Thank you very much.

20   THE COURT:  Any redirect?

21   MRS. KOHLRIESER:  No, your Honor.

22   THE COURT:  Okay.  You're excused.

23   Thank you for coming in.  Next witness, please?

```
 1    MR. MILLER:  Missy Page.
 2    WHEREUPON, called to appear as a witness in this proceeding was one:
 3                    M E L I S S A   P A G E
 4    who, having been duly sworn by the bailiff herein, testified as follows:
 5    BAILIFF:  She has an objection.
 6    THE COURT:  Okay.  This witness is also
 7    exercising her right not to be photographed or at least to be published in the
 8    media.  So, I would order the media to comply.
 9                      DIRECT EXAMINATION
10    BY MR. MILLER:
11    Q    It's still morning.  Good morning.
12    A    Morning.
13    Q    I'm going to ask you to do the same thing we've had a number of
14    witnesses do and that is to talk right into this microphone, okay, because it
15    both records and amplifies your voice so everybody can hear you and we're
16    picking up everything that's being said in the Courtroom on the recording
17    device.  Okay?
18    A    Okay.
19    Q    Can you state your full name for the record?
20    A    Melissa Page.
21    Q    Okay.  Do you go by Missy?
22    A    I do go by Missy.
23    Q    Okay.  Is it okay for me to call you Missy?
```

```
 1   A    Yes.

 2   Q    All right.  Now, Missy, where do you work?

 3   A    Lima Police Department.

 4   Q    In what capacity?

 5   A    Third shift dispatcher.

 6   Q    Okay.  What does a dispatcher go?

 7   A    Calls emergency calls for police, E.M.S., and fire.

 8   Q    Okay.  Scoot up close to that microphone, okay, because I know I can

 9        barely hear you and if I can barely hear you then everybody here is going to

10        have a hard time hearing you.  Okay?

11   A    Okay.

12   Q    Feel free to talk as loud - well, within reason - as loud as you want.

13        okay?  Speak right in there and speak up.  All right?  Now, I asked you your

14        occupation.  I'm going to ask you to repeat the answer to that question.  What

15        is your occupation?

16   A    Third shift dispatcher.

17   Q    Okay.  With who?

18   A    The Lima Police Department.

19   Q    The Lima Police Department?  What does a dispatcher do?

20   A    We answer and dispatch calls for police, fire, and E.M.S.

21   Q    Okay.  Police, fire, and E.M.S. being emergency medical services?

22   A    Emergency medical services; uh-huh.

23   Q    Or E.M.T.'s they're also known as?
```

1    A    Uh-huh, paramedics.

2    Q    Paramedics and that sort of thing?

3    A    Uh-huh.

4    Q    Does that include receiving and dispatching for 9-1-1 calls?

5    A    Yes.

6    Q    Okay. Were you working as a dispatcher on February 23rd, 2009?

7    A    I was.

8    Q    Okay. Were you working third shift?

9    A    I was.

10   Q    And when is third shift - from when to when?

11   A    Eleven P.M. to seven A.M. the next morning.

12   Q    Okay. Did you, during that shift, take a 9-1-1 call for shots fired in the

13   area of 436 - I'm sorry - did you take a 9-1-1 call for an emergency at 436

14   East McKibben?

15   A    I did.

16   Q    Okay. I'm going to hand you what has been marked as State's exhibit

17   '9'. Have you had an opportunity to hear that dispatch?

18   A    Yes.

19   Q    I'll hand you what has been marked as State's exhibit '9'. What is

20   State's exhibit '9'?

21   A    436 East McKibben 9-1-1 calls.

22        MR. MILLER:   Your Honor, can we have a

23   moment to cue it up?

1   THE COURT:  Sure.

2   (WHEREUPON, Court went off the record briefly.)

3   THE COURT:  Now, is this similar - does it

4   have an icon for the specific call or is it just one call?

5   MR. MILLER:  Yea, there are two icons on

6   there and it will be the second one, or the one to the right.

7   THE COURT:  Okay.

8   (WHEREUPON, State's exhibit '9' was played in open Court.)

9   Q    Okay.  First of all, is that a true and accurate copy of your dispatch --

10  A    Yes.

11  Q    -- to 436 East McKibben on February 23rd, 2009?

12  A    It is.

13  Q    Okay.  There was a little bit of police talk in there.  You say code three

14  on the phone  What does that mean?

15  A    Emergent - lights and sirens.

16  Q    That means whoever is going turn on your sirens and lights and get

17  there; right?

18  A    Uh-huh.

19  MR. MILLER:  One second.

20  (WHEREUPON, Court went off the record briefly.)

21  MR. MILLER:  No further questions, your

22  Honor.

23  THE COURT:  Mr. Rion, questions?

1    MR. RION: No questions.

2    THE COURT: Okay. Miss page, thank

3    you for coming in. You're excused. Do you have another witness ready that

4    we might be able to get to?

5    MRS. KOHLRIESER: I believe so.

6    THE COURT: Okay. Who would that be?

7    MRS. KOHLRIESER: Officer Matt

8    Douglass, your Honor.

9    THE COURT: Okay.

10   WHEREUPON, called to appear as a witness in this proceeding was one:

11   **OFFICER MATTHEW DOUGLASS**

12   who, having been duly sworn by the bailiff herein, testified as follows:

13   BAILIFF: He has no objection.

14   THE COURT: Okay. Go ahead.

15   <u>**DIRECT EXAMINATION**</u>

16   **BY MRS. KOHLRIESER:**

17   Q   Could you state your name for the record and spell your last name?

18   A   Yes. It's Matthew R. Douglass, D-O-U-G-L-A-S-S.

19   Q   And obviously the jury can see what you're wearing. But, for the

20   record, can you tell us your place of employment?

21   A   Yes. I work for the Lima Police Department.

22   Q   And how long have you been with the Lima Police Department?

23   A   Eleven and a half years.

1   Q    What's your current position?

2   A    My current position is a school safety officer and Safety City officer.

3   Q    So, you get to work with kids a lot?

4   A    Yes.

5   Q    How long have you been the Safety City and school resource officer?

6   A    Approximately a year and a half now.

7   Q    Now, were you working as a regular patrol officer back in February of

8        2009?

9   A    Yes, I was.

10  Q    And specifically were you working the morning of February 23rd,

11       2009?

12  A    Yes. I worked third shift.

13  Q    And that's eleven P.M. to seven A.M.?

14  A    Yes, it is.

15  Q    So, you would have actually come into work on the 22nd, but the

16       majority of your hours would be on the 23rd?

17  A    Yes, that's correct.

18  Q    Now, at approximately five-eighteen did you have occasion to respond

19       to a shots fired call in the 400 block of East Pearl?

20  A    Yes, I did.

21  Q    Where were you when that call went out?

22  A    I was around the intersection of Cole and Diller when the call went out.

23  Q    Okay.  Approximately how far away is that from --

1   A   I'd say probably three miles, maybe four miles.

2   Q   Okay. Did you respond to that call?

3   A   Yes, I did.

4   Q   And do you know approximately how long it took you to get there?

5   A   Probably about maybe ten minutes maybe - twelve minutes,

6       somewhere in there.

7   Q   You didn't go lights and sirens blazing?

8   A   No.

9   Q   Why not?

10  A   We actually handle, on thirds, we handle a lot of shots fired calls which

11      a lot of times when we check the area we don't find anything and we go back

12      in service. I mean, we do go fairly quickly. At nighttime it's easier to get

13      around because there's less traffic. But, unless our dispatchers tell us to go

14      code three, which is lights and sirens, we don't normally go lights and sirens.

15  Q   So, if there was a red light or something you would have stopped for it?

16  A   I would stop for it. If there was some reason to step it up and go

17      through the red light then we would.

18  Q   Like if you got more information coming in or something of that nature?

19  A   Yes.

20  Q   Okay.

21  A   Yes, that's correct.

22  Q   Do you recall whether another officer also responded to that?

23  A   Yes. Officer Sarchet was already in the area while I was on route to

1   the call.

2   Q   And while you were on route to the call did you get information from

3   Officer Sarchet regarding his findings?

4   A   Yes.  He had told me that he hadn't found anything and told me that I

5   could go ahead and disregard.

6   Q   Okay.  Do you recall where you when you disregarded?

7   A   Yes.  I was actually on McKibben heading eastbound and I was almost

8   to Jackson Street.

9   Q   Okay.  So, would you have been to the west of Jackson Street on

10  McKibben?

11  A   No.  Yes, I was on the west side.  I'm sorry.

12  Q   So, you never crossed over Jackson Street and actually got in the 400

13  hundred block of East McKibben?

14  A   No.  It actually goes Jackson and then Jefferson.  So, I was told to

15  disregard right as I was approaching Jackson and McKibben.

16  Q   Now, let me ask you – when you were on McKibben approaching

17  Jackson did you see any traffic?

18  A   Yes.  There was one car that was crossing the railroad tracks and that

19  would have been in the 300 block as I was coming eastbound.  I noticed that

20  that vehicle was coming from that area where we were sent for the shots fired

21  call.  I had noticed that there was a headlight missing on that car.

22  Q   Okay.  Did you also notice its plate?

23  A   Yes, I did.

1   Q   Is that something common for you to just kind of take plates in your --

2   A   Usually when we're going to a call like that you want to make sure you

3       pay attention to everything around you. As I was passing the car I just

4       glanced at the front license plate as I passed it and then I turned around.

5       After he had told me to disregard I had just followed it for a little while and

6       then just pulled off of it then.

7   Q   Okay. Other than having a headlight out, was that car, well, was it

8       flying out of there or was it doing anything to raise concern?

9   A   No. It was just leaving the area.

10  Q   When you say the railroad tracks are you talking about the ones that

11      run north and south?

12  A   Yes. That would be just to the east of Jackson on McKibben.

13  Q   East of Jackson?

14  A   I'm sorry. To the west. Sorry.

15  Q   All right. Let's just -- we have a map here.

16  A   Okay.

17  Q   I wasn't planning on using it with you, but let's just do it. Feel free to

18      step on down, Officer Douglass. If you will, make sure you raise your voice

19      enough for the jury and the Court Reporter to hear you. Okay. Take a look at

20      State's exhibit '150'. Do you recognize what that aerial shot is of?

21  A   Yes, I do.

22  Q   Okay. What is that?

23  A   That is the City of Lima and that would be the area where we were

578

1 sent to the initial shots fired call.

2 Q   Okay.  As you're facing exhibit '150' do you see Jackson Street there

3 to the left?

4 A   Yes.

5 Q   Okay.  Do you also see McKibben Street here?

6 A   Yes.

7 Q   It's kind of a little above the middle, I guess.  And where Jackson and

8 McKibben crosses?

9 A   Yes.

10 Q   And is that where you said you were called off?

11 A   Yes.  I was coming from this direction here.  The railroad tracks are

12 right about right here.  So, it's actually off the picture right here.  So, as I'm

13 coming across here the car had came across and through here and that's

14 when I passed it and that's when I was also told to disregard by Officer

15 Sarchet.  So, I had only made it to about right here.

16 Q   So, you were basically in the intersection of McKibben and Jackson

17 and turned around and went back towards that car; correct?

18 A   Yes.

19 Q   Okay.  When you say the tracks are actually off, do you mean, again,

20 looking at '150', that they would be to the left of where the map drops off?

21 A   They would be to the left where the map drops off.

22 Q   All right.  Thank you.  Now, after being called off and you said you

23 followed the car for a bit and then disregarded it, at six thirty-nine did

1  another call come in involving roughly that same area that we just discussed?

2  A  Yes.

3  Q  What was that?

4  A  There was a shooting victim that was located at 436 East McKibben.

5  Q  And when you heard that call go out what did you think?

6  A  I believed that the shots fired call that myself and Sarchet had

7  responded to earlier was related to that.

8  Q  And you said 436 East McKibben?

9  A  Yes, I believe that was the address.

10  Q  And for the record, is that here in Lima, Allen County, Ohio?

11  A  Yes, it is.

12  Q  And did you respond to that call?

13  A  Yes, I did.

14  Q  What did you notice upon arrival?

15  A  When I arrived on location myself and several other officers responded

16  up to the house and I observed Mr. Warrington laying on, well, it would have

17  been the west side of the house.  He was laying right by the entry door there.

18  Q  Okay.  Upon noticing that what, if anything, did you do?

19  A  I began assisting another officer.  I believe it might have been Officer

20  Woodruff.  We started to put crime scene tape up and basically kept a

21  perimeter and didn't allow anyone else to go in front of that, right where the

22  crime scene was.

23  Q  All right.  Let's explain that a little bit for folks who may not be familiar

1   with those types of terms.  When you say crime scene tape you're talking

2   about the yellow tape that says 'crime scene'?

3       A    Yes.  Yes, the yellow caution tape.

4       Q    Okay.  When you say perimeter, well, what were you doing?  How do

5   you know what to cordon off?  Why do you make that decision?

6       A    We usually do an area large enough that in case there's other

7   evidence around we want to make the crime scene large enough that if we do

8   find other evidence that it's going to be inside the scene and that no one else

9   can go inside of that area.

10      Q    Okay.  So, that tape basically establishes the area where there may be

11  evidence?

12      A    Yes.

13      Q    And, I guess, lay people aren't allowed to go in and out of that area?

14      A    That's correct.

15      Q    Is a crime scene log also kept?

16      A    Yes, it is.

17      Q    And what does a crime scene log do?

18      A    A crime scene log basically keeps track of who goes within the crime

19  scene tape – who enters the actual crime scene.  They keep track of when

20  they go in and when they come out.

21      Q    And is it usual for uniformed officers to kind of stand by that perimeter

22  to make sure no unauthorized people come in?

23      A    Yes, that's correct.

```
 1       Q    And did you take on that duty as well?

 2       A    Yes.

 3       Q    At some point was a decision made regarding calling a supervisor and

 4            getting perhaps detectives and that out?

 5       A    Yes.

 6       Q    Fairly quickly?

 7       A    Yes, it was fairly quickly.

 8       Q    Now, how long did you say you've been an officer?

 9       A    All together for approximately sixteen years.

10       Q    I asked this of Officer Sarchet, but I'll ask it of you as well, once you

11            know that I.D. is coming, I.D. officers are coming and detectives are coming,

12            do you touch anything?

13       A    No.

14       Q    When you roll up on a scene like this would you have touched

15            anything?

16       A    No, I wouldn't have.

17       Q    And is that something all officers attempt to do?  You don't want to

18            disturb --

19       A    Yes, you don't want to disturb the crime scene or any evidence that

20            may be laying around.

21       Q    And do you recall whether anyone was home at 436 East McKibben?

22       A    Yes.  I believe Sonya and her daughter, who I believe was Tarah, were

23            both there.
```

1    Q. So, two women?

2    A. Yes.

3    Q. And did they remain at that scene while it was being processed by I.D.

4    and things of that nature?

5    A. They were at the scene at first and then I ended up transporting them

6    to the Lima Police Department.

7    Q. So, you actually drove them to the police department?

8    A. Yes, I did.

9    Q. And other than taking them to the police department and having to type

10    up a report and that type of thing did that end your involvement with this

11    investigation?

12    A. Yes, it did.

13    Q. Now, the information about the car that you saw, were you able to

14    actually get a license plate and description of the car?

15    A. Yes. I was actually able to have our dispatchers -- when I passed it

16    initially I ran the plate and had the dispatchers mark and hold it just because I

17    wanted to make sure it didn't have anything to do with the call.

18    Q. Did you pass that information on to supervisors or to the detectives?

19    A. Yes, I did.

20    MRS. KOHLRIESER: Just a moment.

21    THE COURT: Okay

22    (WHEREUPON, Court went off the record briefly.)

23    MRS. KOHLRIESER: No further

```
1    questions.

2    THE COURT:  Okay.  Questions, Mr.

3    Rion?

4    MR. RION:  Just very briefly.

5    CROSS EXAMINATION

6    BY MR. RION:

7    Q    Do you recall who took over the information about the vehicle that you

8    saw?

9    A    No.  When I did my initial report I included that information in my report

10   about the vehicle.

11   Q    And are you aware of whether or not it ended up being something

12   relevant or not relevant?

13   A    I believe it was non-relevant to the case.

14   Q    Just a random person driving?

15   A    Yes, I believe so.

16   Q    And you drove Tarah and Sonya to the police station?

17   A    Yes, I did.

18   Q    Were you involved in taking Tarah's phone from her, or collecting her

19   phone at all?

20   A    No.  No, I don't believe so.

21   Q    So, you just simply drove them there?

22   A    Yes.

23   Q    Okay.  Thank you, sir.
```

584

1      THE COURT:  Any redirect?

2      MRS. KOHLRIESER:  No, your Honor.

3      THE COURT:  Okay.  Patrolman, you're

4  excused.  Thank you for coming in.  Do you have a witness perhaps that

5  would only be within a half hour?

6      MRS. KOHLRIESER:  Yes, we do.

7  Probably about fifteen minutes, your Honor.

8      THE COURT:  Next witness then?

9      MR. MILLER:  Calvin Woodruff.

10     WHEREUPON, called to appear as a witness in this proceeding was one:

11             C A L V I N   W O O D R U F F

12  who, having been duly sworn by the bailiff herein, testified as follows:

13     BAILIFF:  He has an objection.

14     THE COURT:  Okay.  This witness does

15  not wish to be photographed.  So, I'll order that the media not publish his

16  image.  Go ahead.

17     MR. MILLER:  Thank you, your Honor.

18             DIRECT EXAMINATION

19  BY MR. MILLER:

20     Q    Will you state your full name for the record, please?

21     A    Calvin Woodruff.

22     Q    Calvin, where do you work?

23     A    I currently work at the Lima Fire Department.

585

1   Q   Where did you work back on February 23rd of 2009?

2   A   The Lima Police Department.

3   Q   So, you went from the police department to the fire department?

4   A   I did.

5   Q   Were you actually working on February 23rd of 2009?

6   A   I was.

7   Q   For the Lima Police Department?

8   A   Correct.

9   Q   Were you dispatched to 436 East McKibben here in Lima, Allen

10      County, Ohio on that day?

11  A   I was.

12  Q   Do you recall about what time you were dispatched out there?

13  A   It was early morning.  I'm not real sure.

14  Q   Okay.  Do you recall the nature of the call?

15  A   I believe it was for a possible shooting victim.

16  Q   Okay.  Where were you when you got the call?

17  A   I was sitting actually close to the station, I believe, there on Central,

18      between Market and High.

19  Q   Okay.  When you got the call did you proceed directly to the scene?

20  A   I did.

21  Q   Can you describe just in general terms when you arrived at the scene

22      what you observed, just in general terms?

23  A   There were several of us police officers that arrived about the same

586

1   time.  When we arrived it was kind of dark.  They said something about, on
2   the call, about a porch.  We didn't observe anything on the front porch.  At the
3   side of the house we observed a victim laying there on the west side of the
4   house.
5   Q   You say you did observe the victim laying there?
6   A   We did, as we walked up.
7   Q   You're using the pronoun 'we'.  Did you?
8   A   I did.  Correct.
9   Q   Okay.  Let me present you with a couple, or, three pictures here.  The
10  first one is State's exhibit '3'.  The other would be State's exhibit '4', and then
11  the other one I will use will be State's exhibit '157'.  Now, I'm going to hand
12  these to you and I'm going to hand them to you as a group.
13  A   Okay.
14  Q   Okay?  I'm going to ask you to take a look at these pictures.  Just let
15  me know when you're done with that; okay?
16  A   Okay.
17  Q   Finished?
18  A   I am.
19  Q   Now, starting with State's exhibit '3'.  What are we looking at with
20  State's exhibit '3' and then I'll publish these as we go?
21  A   Okay.  That would be the front of the house where we found the victim.
22  Q   Okay.  When you say the front of the house where you found the
23  victim, --

1   A   Facing towards the street.

2   Q   Okay. Is that 436 East McKibben?

3   A   Yes.

4   Q   That's the front of the house?

5   A   Correct.

6   Q   And State's exhibit '4'? What are we looking at there?

7   A   That's kind of the side of the house where the alley runs next to

8       the house.

9   Q   Now, as you look at the house from the vantage point of where that

10      picture was taken is there, in fact, a slight rise to the house?

11  A   There was.

12  Q   A grade towards the house, or, in other words, up?

13  A   Yes, there was.

14  Q   Then State's exhibit '157'. What are we looking at there?

15  A   That is how we initially found the victim, or, how we found the victim.

16  Q   Now, do each of these, State's exhibit '3', State's exhibit '4', and

17      State's exhibit '157', truly and accurately depict the scene in the picture as it

18      was on February 23rd, 2009?

19  A   They do.

20  Q   Now, you've described going out to the scene, arriving at the scene,

21      and observing the victim. What did you do after that?

22  A   As we came upon the victim I observed that there was blood coming

23      from the victim – however, that blood was frozen.

```
 1    Q   Okay.

 2    A   It was crystallized on top.  There was no movement.  Like I said, the

 3        blood was frozen solid at that time.

 4    Q   Okay.  Did you participate in securing the scene?

 5    A   Yes.  At that time our job, or, my job was to secure the scene and

 6        preserve any evidence to make sure that nothing was messed with.

 7    Q   Sort of to preserve the integrity of the scene?

 8    A   Correct.

 9    Q   Now, in doing that is it typical it is referred to in what's typical in the police

10        business as a crime scene log?  You're familiar with that term?

11    A   I am.

12    Q   Is it typical that a crime scene log would be started?

13    A   Yes.

14    Q   What is a crime scene log?

15    A   The crime scene log is to log who is in the crime scene, was ever in

16        the crime scene, when they came, when they arrived at the crime scene, and

17        when they left the crime scene.

18    Q   Okay.  Is there usually one person tasked with the duty of keeping a

19        crime scene log?

20    A   There way there's no confusion.  That one person has the

21        clock and they are the one that is in charge of allowing people in and out.

22    Q   So, you said the one person with the clock.  Do you physically have a

23        clock, or do you have a watch, or something?
```

1   A   I believe I had a cell phone, I believe.

2   Q   Okay.

3   A   Yes.

4   Q   Some sort of time instrument so that when somebody comes to the

5   scene you check the time and then what do you do?

6   A   I would log the time.  I would put their name down and the time that

7   they were in.  When they leave the scene I would then, or, they would then

8   have to come to see me and I would, again, log, by looking at that same

9   instrument, when they left.

10  Q   Okay.  So, it's something akin to punching a time clock in and out?

11  A   Correct.

12  Q   For folks that are coming in and out of the crime scene?

13  A   Correct.

14  Q   Now, were you the one that actually kept the log at this particular crime

15  scene?

16  A   I was.

17  Q   I'm going to hand you what's been marked as State's exhibit '10'.  Just

18  take a look at State's exhibit '10' and let me know when you're done

19  reviewing it.

20  A   Okay.

21  Q   What is State's exhibit '10'?

22  A   That is my crime scene log that I had started with this crime scene.

23  Q   Just for the record, how many pages does State's exhibit '10' contain?

1   A   There's two pages.

2   Q   Two pages? Okay. It's your crime scene log that you started for 436

3       East McKibben?

4   A   It's the one that I started and finished; correct.

5   Q   And finished?

6   A   Yes.

7   Q   Now, just because -- well, I want to ask you a question here, and I

8       should have asked you when I was standing up there. So, I'm going to

9       approach you. We have, clearly, a time in column and a time out column.

10  A   Uh-huh.

11  Q   But, the times are denoted in such a fashion -- well, for example, if you

12      look at Patrolman Hile, it says three zero six nine.

13  A   Uh-huh.

14  Q   What does that mean?

15  A   It's military time. That would be six thirty-nine in the morning.

16  Q   So, you're running this on a military clock, or, a twenty-four hour clock?

17  A   A twenty-four hour clock; correct.

18  Q   Okay. So, just by way of example, for the record, well, what's the last

19      time out?

20  A   The last time out would be -- the last time out on the crime scene log?

21  Q   Yea.

22  A   Okay. It would be eleven forty-seven.

23  Q   Okay. That's eleven forty-seven A.M.?

1    A    A.M.: correct.

2    Q    Okay.  Is this a true and accurate copy of your crime scene log?

3    A    It is.

4    Q    Now, you mentioned that eleven forty-seven was the last, well, I call it

5    time out.  In other words, the last time somebody left.  Is that when the scene

6    would have been cleared?

7    A    Correct.

8    Q    What does cleared mean in police parlance?

9    A    It means that, well, the detectives, or I.D., or whoever, well, that's when

10   they were done processing the scene at that time.

11   Q    Okay.  In other words, done?  I mean, there may be some follow-up,

12   but, in essence, for your purposes we're clearing the scene?

13   A    Correct.  Correct.

14   Q    Okay.

15   MR. MILLER:  I have no further questions.

16   THE COURT:  Okay, Mr. Rion, any

17   questions?

18   MR. RION:  Just a few.

19   CROSS EXAMINATION

20   BY MR. RION:

21   Q    Good morning, sir.

22   A    Morning.

23   Q    People are there.  Officers are at the scene essentially from six

1    thirty-nine until eleven forty-seven; is that about right?

2    A    That's correct.

3    Q    So, three/four hours?  Somewhere in there?  Who was in charge?  You

4    were in charge of the perimeter, I guess, but who was in charge of the crime

5    scene itself?

6    A    Let's see.  We had Sergeants there that would have been in charge

7    initially and then the detectives and I.D. come and take over the crime scene.

8    Q    Okay.  So, would that be Detective Clark?

9    A    I'm not -- I don't recall exactly who was the detective.

10   Q    If you could look at your report would that refresh your recollection?

11   A    It would.

12   (WHEREUPON, witness reviewed report.)

13   A    Okay.

14   Q    Let me know when you're done.

15   A    Okay.

16   Q    After looking at your report does that refresh your recollection as to

17   who was in charge of the crime scene?

18   A    I guess I'm not exactly understanding your question.

19   Q    What would be the -- well, when Detective Clark showed up what did

20   he do?

21   A    He would be the one that would start the investigation.

22   Q    Okay.  And was it turned over to him at that point, the investigation?

23   A    He was the detective that showed up; yes.

593

1    Q    In other words, your language on this sheet is that when Detective
2    Clark arrived the crime scene was turned over," when I.D. detective Marik
3    and Detective Clark arrived the crime scene was turned over to them'. What
4    does that mean?
5    A    It means that they are the ones that are now directing us on what to
6    do.
7    Q    Okay.
8    A    They are the ones that, I guess, are the people that are calling the
9    shots, I guess.
10   Q    And who there was primarily responsible for the collection of evidence,
11   like the evidence crew?  Who would do that?
12   A    That would be the I.D. bureau.
13   Q    So, that would be Detective Marik?
14   A    Correct.
15   Q    Okay.  And do you recall anybody else that would have been with him
16   that would have -- well, would he have been in charge at that point for the
17   collection of evidence?
18   A    I believe so; yes.
19   Q    So, you stayed there the entire time; correct?
20   A    Correct.
21   Q    When you were there there were approximately nineteen individuals or
22   so that came and went?
23   A    Correct.

1    Q    Mostly police officers, detectives, and doctors were there, coroner's

2    office people, and quite a few of them from the Prosecutor's Office as well;

3    correct?

4    A    Correct.

5    Q    And did you notice any unusual footprints, tire tracks, or anything that

6    came to light that you saw?

7    A    Not necessarily. That alley looked like it was pretty well used at the

8    time. I saw nothing out of the ordinary, I guess. But, that wasn't necessarily

9    part of my job, either. I mean, I secured the scene and --

10    Q    You were to keep the neighbors and anybody else from trying to

11    wander in and doing something. Once the scene was released by eleven

12    forty-seven then anybody could come in at that time that wishes to; correct?

13    A    Sure.

14    Q    Like, there's no restrictions for anyone at that point?

15    A    Correct.

16    Q    Thank you, sir.

17    THE COURT: Okay. Any redirect?

18    MR. MILLER: No, sir.

19    THE COURT: All right. You're free to go.

20    Thank you for coming in.

21    A    All right. Thank you.

22    THE COURT: Do you have another quick

23    one?

1    MRS. KOHLRIESER:  It's the I.D. Officer.

2    He's very lengthy.

3    THE COURT:  Okay.  Well, we anticipated

4    this.  We're going to take a little extended lunch period.  Now, I've got a one

5    o'clock to one-thirty.  It's a little after -- about ten after twelve, give or take.

6    So, we'll go until one about forty-five.  It will be a little extended because I

7    have another docket that I don't want to let go.

8    So, ladies and gentlemen of the jury, we'll break now until one

9    forty-five.  Remember the admonitions.  Don't discuss the case among

10   yourselves or with anyone else.  Don't watch, listen to, or read any media

11   accounts.  Don't do any independent research.  Don't go on the Internet.

12   Don't formulate or express any opinions.  We'll see everybody back at one

13   forty-five.

14   (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

15

16   (VOLUME THREE CONCLUDED.)

17

18

19

20

21

22

23