IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO.

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO. CR2014 0139 |
| Plaintiff | * | |
| -VS- | * | **TRANSCRIPT -** JURY TRIAL |
| **MARKELUS Q. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

---------------------------------------------------------------------------------------------------------

A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio 45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio 45802

(VOLUME 4 OF 10)

# TABLE OF CONTENTS

## (VOLUME 4 OF 10)

**- THURSDAY, SEPTEMBER 10, 2015 - CONTINUED -**

STATE'S TWELFTH WITNESS -
DET. DONALD MARIK - KOHLRIESER          597

COURT RECESSED FOR DAY AT 3:35 P.M.          650

**- FRIDAY, SEPTEMBER 11, 2015 -**

COURT COMMENCED AT 8:52 A.M.          651

COURT DISCUSSION WITH JUROR NO. 7          651

QUESTIONING OF JUROR NO. 7 - RION          653

STATE'S TWELFTH WITNESS CONTINUED -
DET. DONALD MARIK - KOHLRIESER          658
- RION          667
- KOHLRIESER          689

COURT DISCUSSION WITH JUROR NO. 2          705

STATE'S TWELFTH WITNESS CONTINUED -
DET. DONALD MARIK - RION          708

STATE'S THIRTEENTH WITNESS -
DR. MANEESHA PANDEY - MILLER          709
- RION          744
- MILLER          747

STATE'S FOURTEENTH WITNESS -
SGT. CURTIS HILE - KOHLRIESER          748
- RION          766
- KOHLRIESER          770
- RION          771

STATE'S FIFTEENTH WITNESS -
PTL. AARON MONTGOMERY - KOHLRIESER          772
- RION          781

STATE'S SIXTEENTH WITNESS -
KEVIN DELONG - KOHLRIESER                    783

VOLUME FOUR CONCLUDED                        802

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**NOTE:** THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE. SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS. HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

**STATE OF OHIO'S EXHIBITS -**

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT 436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436 MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED
FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED
AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT
AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT
AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE
WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT
WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE
AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM
(ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE
AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S
CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS-
MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS-
MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM
AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA
STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND
AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET
SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND
PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFEL IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSCT9 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT 436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULUM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
HEAD/NECK;

**- DEFENDANT'S EXHIBITS -**

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT 122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - (NOT ADMITTED BY COURT);

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A. MOORE;

DD - JUDGMENT ENTRY ON SENTENCING  IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R. FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON (WITHDRAWN BY THE DEFENSE);

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS- STEPHEN UPHAM, LUCAS CO. CASE NO. G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR VICKIE BARTHOLOMEW;

**COURT'S EXHIBITS** -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW) BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED A.C.S.O. OFFENSE REPORTS;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1        THE COURT:  Back on the record in Case

2    Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter. We're

3    reconvening. The defendant is present in Court with his attorney. The State

4    is present. The jurors have returned from the noon recess.

5        Welcome back, ladies and gentlemen of the jury. It was brought to my

6    attention, and I don't want to make a big deal about this, about some logistics.

7    When some of you went to lunch yesterday and came back and wanted to eat

8    up here and the gate was down, which it always is over the lunch hour, and

9    you weren't able to get back in, well, I apologize for that. In the future now if

10   you're going to leave and come back over the lunch hour let us know and

11   we'll make sure that security is aware and to be looking out for you because I

12   don't want you out there having to eat your lunch out in the outer lobby. So,

13   again, I apologize for all of that. We appreciate and we need the input if

14   there's something that's unrelated to the case that's making the experience

15   negative, well, let us know and we'll try to improve upon that. We've been

16   having jury trials up here for I don't know how many hundreds of years, but

17   there's always room for improvement. It's never happened before. The fact

18   that it did, well, we'll try to not to make it happen again.

19       All right. So, we'll continue with the State's case. The State may call

20   their next witness.

21       MRS. KOHLRIESER:  Yes. The State

22   would call Detective Don Marik.

23       THE COURT:  Detective Marik.

1    WHEREUPON, called to appear as a witness in this proceeding was one:

2    D E T E C T I V E   D O N A L D   M A R I K

3    who, having been duly sworn by the bailiff herein, testified as follows:

4    BAILIFF:  He has no objection.

5    THE COURT:  Okay.  Yea, the cameras

6    left when they heard you were coming.  No.

7    DIRECT EXAMINATION

8    BY MRS. KOHLRIESER:

9    Q.   All right.  Will you state your name for the record, please?

10   A.   My name is Don Marik.  I'm a detective formerly with the Lima City

11   Police and currently with the Shawnee Township Police Department.

12   Q.   How long have you been with the Shawnee Township Police

13   Department?

14   A.   I started my fourth year, and I was with the City for thirty-three.

15   Q.   Okay.  When did you retire from the City?

16   A.   2012.

17   Q.   What division were you working in when you retired from, well, when

18   you say City, you mean the Lima Police Department?

19   A.   Yes.

20   Q.   From the City.

21   A.   The City of Lima.  I was a detective there.

22   Q.   And how long were you a detective?

23   A.   It was 1987 when I was promoted.

1    Q    Okay.  So, awhile?

2    A    Yes.

3    Q    All right.  Now, was there a time while you were in the detective

4    bureau, particularly in the years of 2008/2009, that you were actually

5    assigned to do work in the identification section as well?

6    A    Yes.

7    Q    And how was it that you came to be in that capacity?

8    A    There was a shift in personnel.  One of the identification officers had

9    accepted a job with the Bureau of Criminal Investigation.  So, I was

10   temporarily placed in his position until that position could be filled through the

11   Civil Service.

12   Q    Now, let's talk about what that means.  As an I.D. officer, in that

13   capacity, what kinds of things were you tasked with doing?

14   A    It was multi-tasking - processing crime scenes; taking care of the

15   property room; photographing prisoners; fingerprinting prisoners.

16   Q    Now, when you say processing a crime scene, what do you mean by

17   that?

18   A    If I was called to a particular crime scene I was there to collect

19   evidence, take photographs, properly document, and make reports.

20   Q    Okay.  And did you receive any specialized training to do that?

21   A    Over the years I spent many classes at the Police Officer's Training

22   Academy in London, Ohio for many such investigations.

23   Q    Did you learn techniques about preserving evidence and the proper

1  handling of evidence so as not to destroy any potentially identifying

2  information?

3  A  Yes.

4  Q  And on the morning of February 23rd, 2009 were you called to a scene

5  at 436 East McKibben here in Lima?

6  A  I was.

7  Q  And what was the nature of that call?

8  A  There was a shooting at that location and I was called to start the

9  processing, photographing, and collection of evidence at that scene.

10  Q  Were you informed that someone had actually been killed?

11  A  Yes.

12  Q  And did you, in fact, go to 436 East McKibben?

13  A  Yes.

14  Q  And what did you observe upon arriving?

15  A  I went to that location.  I remember, because the address was on

16  McKibben Street, I went to East McKibben and I noticed that the Police had it

17  cordoned off with police line tape, which means I couldn't come up that way.

18  This house sat somewhat up on a hill.  So, I went around the block, which

19  would have put me on Pearl Street, and then I came in through the alley and

20  was able to park the van in the alley a distance away from the crime scene.

21  Q  Okay.  That was actually going to be my next question.  You were

22  actually driving a van?

23  A  Yes.

1    Q    Was that a van used for the Identification Bureau?

2    A    That's where -- the equipment was kept in there.

3    Q    When you say equipment, like what kinds of things would you need?

4    A    Cameras, ladders, collection items, anything that was related to the

5    collection of property at a crime scene.

6    Q    Gloves?

7    A    Yes.

8    Q    And by gloves I mean like latex gloves for you to touch things?

9    A    Yes.

10   Q    Or whatever - surgical type of gloves you're talking about.  Bags to

11   place evidence in and that type of thing?

12   A    You name it, we try to put it in there.

13   Q    Okay.  So, you drove that van and you actually went around and up the

14   alley there?

15   A    Yes.

16   Q    From Pearl Street?

17   A    Yes.

18   Q    Okay.  Once you parked and you got into the actual perimeter of the

19   crime scene what did you observe?

20   A    The responding officers had taped off, like I said, with yellow police

21   tape an area quite a distance from where I could see the deceased.  They did

22   that on purpose so that, number one, and, number two, to keep people out and, to

23   preserve any evidence that might be there.  As I approached there were

1  officers there at the scene.  As I approached, which would have been from
2  the south to the north, things that I noticed I wanted to look at fairly quick
3  because crime scenes on the outside are subject to deterioration through
4  atmospheric conditions.  In other words, I've been to crime scenes where it
5  was perfectly fine and then it started raining or there was no snow on the
6  ground and all of a sudden the snow covered up your crime scene.  So, I
7  wanted to make sure that because it was outside that I could see things and
8  possibly measure, photograph, and collect before anything would happen.
9  Luckily, it was snow covered.  It was very cold.  It was ten/fifteen degrees.  It
10  was a clear day.  I remember that.  I didn't think it was going to snow.  But,
11  still, as I approached I wanted to see if I could see things.  From my
12  experience at shootings you're looking for items left behind, items brought to
13  the crime scene, items left behind, tracks in the snow, footprints, car tracks in
14  the snow, anything that could have relevance to the crime.
15      Q.    So, as you're approaching is that what you're kind of looking for?  Are
16  you stepping carefully?  Are you just kind of taking it slow and taking in the
17  scene, so to speak?
18      A.    You try not to have tunnel vision.  You could see where the person was
19  laying, but you also keep your eyes open to the left and to the right just to see
20  if something is out of place to the left, or to the right, and you look beyond the
21  crime scene.  You try to get a bigger picture of the whole situation.
22      Q.    So, if I understand you right, Detective Marik, I think the obvious place
23  to look would be at what turned out to be Kenneth Warrington's body;

1    correct?

2    A    Yes.

3    Q    Okay. It would be to look at the body. But, you're talking about you

4    can't just focus on that. You've got to see the big picture?

5    A    Yes.

6    Q    Okay. And did you notice the ground conditions?

7    A    It was snow covered. The snow in the alley wasn't a recent snow. The snow in the alley

8    was packed by vehicles driving up and down the alley. I'm not sure when it

9    snowed. It could have snowed a couple of days prior to that. There were

10   some areas that looked like melting had already started. There wasn't a

11   substantial amount of snow. I remember that. There might have been an

12   inch, inch and a half, of snow on the ground, if that. But, still enough that it

13   covered the ground and the alley.

14   Q    All right. So, as you're coming up, I guess closer to the most obvious

15   point of the crime scene, being Mr. Warrington's body, what do you do?

16   You're taking all of this in and you finally get up to where Mr. Warrington is.

17   What do you go about doing then?

18   A    You keep looking and scanning. When I approached Mr. Warrington I

19   could see items that were going to be measured later on and graphed and

20   then collected - things being shell casings, and it turned out later spent

21   bullets. I noticed near the side door, which was a screen door, it was propped

22   open. This would have been on the west side of the house. The door was

23   propped open with an Igloo ice chest. There was a gym bag there. I also

603

1 noticed that the glass from the storm door was shattered. It was safety glass
2 and there were pieces of glass everywhere. Then as you got closer you
3 could see that there were keys in the door. There were obviously
4 indentations in the door where something had struck it, projectiles of some
5 type.
6 Q. Now, once you're able to kind of take in everything do you get some
7 kind of briefing from the officers on site, or at least one of the officers on site?
8 A. Yes.
9 Q. Okay.
10 A. I don't recall which officer it was, but they responded to this area
11 because of shots fired and they had been there earlier in the evening, and
12 then obviously another call had come in and that's when apparently
13 somebody had found Mr. Warrington outside and then called the police a
14 second time.
15 Q. Okay. When you were walking up and you're looking, you know, for
16 obvious footprints or things of that nature, did you find anything that stuck out
17 in your mind as unusual as far as in the snow, possible suspect footprints, or
18 that type of thing?
19 A. I couldn't. There were tracks in the snow from vehicles. I couldn't
20 determine if that was from vehicles related to the police, related to vehicles
21 traveling up and down that alley the day before, or the night of. It was hard to
22 tell. As far as footprints go, because the snow was packed down you really
23 couldn't make a clear determination of somebody coming up to the crime

1  scene or somebody leaving the crime scene. You just couldn't tell. Sure,
2  there were footprints there. But, obviously I couldn't determine who left them
3  there.
4  Q  Okay. Are there times, you know, in your experience as a detective,
5  as a street officer, as an I.D. officer, where you have had footprints in fresh
6  snow that you've been able to follow and solve a crime?
7  A  Absolutely.
8  Q  Okay. But, this was not that?
9  A  No.
10  Q  All right. So, now you've assessed the scene and you've talked to the
11  officer. You, as an I.D. officer, what do you start actually doing in order to
12  preserve the scene and collect from it? What's the first steps you take?
13  A  I leave the scene alone. That's one thing. With no disrespect to the
14  deceased, sometimes you have to do that and then process the crime scene,
15  and then take photographs, and then collect your evidence, and then do what
16  you have to do after that. The first thing I did was I got my digital camera and
17  I started taking photographs, and quite a few photographs I might add.
18  Q  What all kinds of things do you photograph?
19  A  You try to photograph from a distance to get an overall picture of the
20  crime scene. You try to do it from different directions and then you proceed to
21  go closer, and closer, and closer to get an idea of what the crime scene
22  actually looks like. You want to get the surrounding areas - what the alley
23  looked like; maybe houses next to the specified home; et cetera, et

1   cetera.

2   Q   Okay. So, is it fair to say you took a number of photographs?

3   A   Yes.

4   Q   Okay. Do you also then measure the location of various items?

5   A   Yes.

6   Q   Do you photograph those measurements that you take?

7   A   Yes.

8   Q   Once you get done photographing everything, well, I shouldn't say

9   done, but once you get your first few sets of photographs and things of that

10  nature and you're getting ready to actually pick up an object that you're going

11  to collect as evidence, how do you identify that? Do you have those little tent

12  type of things? I think people have seen that before.

13  A   We have items, and they're tents. They're plastic items. They're very

14  small. They usually have a number on them and some type of measuring on

15  the bottom of them so you can get an idea of how big this item is that you're

16  picking up - something that you can compare it with. You photograph it with

17  and without and then you document it.

18  Q   Okay. The tent, does that help you keep up with, for instance, you

19  may have fifty bullets that you find, or, fifty casings you find at a crime scene,

20  you know, if there's some big to do going on. Would you tent each one of

21  those before you collected it?

22  A   You try to.

23  Q   Okay. And the purpose of that being so you know where this one was

909

1 versus this one?

2 A  Right.

3 Q  Okay.  All right.  Let's go ahead and show some pictures before we

4 move on to the next stage.  I'm going to hand you a large stack of pictures, so

5 bear with me here a second.  They're not all in numerical order.  I'm going to

6 hand you State's - and for the record, I've shown these to Mr. Rion prior -

7 State's exhibit '3', '4', '5', '7', and then '11' through '67'.  Have you had an

8 opportunity to review these before coming in today?

9 A  Yes.

10 Q  And this is not all of the pictures that you took; correct?

11 A  Correct.

12 Q  It's largely just what we selected to be illustrative?

13 A  Yes.

14 Q  Take a look at those and tell me when you're done.

15 (WHEREUPON, witness reviewed exhibits.)

16 Q  Okay.  Now, the entire stack of exhibits that I gave you there, those are

17 all photographs; correct?

18 A  Yes.

19 Q  Who took those photographs?

20 A  I did.

21 Q  And do they truly and accurately reflect the scene as you found it on

22 February 23rd of 2009?

23 A  Yes.

607

1    Q.  Okay.  Now, let's go through these.  All right.  State's exhibit '3' we've

2    seen a couple of times.  But, seeing as how you took the picture, can you tell

3    us what we're seeing there?

4    A    This is 436 East McKibben Street.  That would be the front of the

5    home.  It faces McKibben Street.  It would face north.

6    Q.  Okay.  State's exhibit '4'?  What do we see here?

7    A    That is the same location, with the home next door.  As you can tell, it

8    sits up on a hill.  That's also facing north, but it also shows the west side of

9    the house also.  That shows the alley and the tracks in the snow.

10   Q.  Okay.  Now, Detective Mark, it's a little darker here, but do you see

11   where my pen is practically in the middle of the picture?

12   A    Yes.

13   Q.  Okay.  This door, is this the door you talked about was propped open?

14   A    Yes.

15   Q.  Okay.  And even though it's kind of difficult to see in this picture, what

16   is on the other side of that propped open door?

17   A    Mr. Warrington.

18   Q.  Okay.  And then is this a car parked here?

19   A    Yes.

20   Q.  State's exhibit '5'.  What are we looking at here?

21   A    This picture was taken south of this house at 436 East McKibben

22   Street.  Again, it shows the south side of the house.  It shows the west side of

23   the house.  The door is propped open.  Mr. Warrington would be on the

1    concrete pad just in front of this four, four door.  On the south side would be
2    what we learned to be Mr. Warrington's pick-up truck.
3    Q    When you say the south side, do you mean what appears to be the
4    rear of the home there?
5    A    Yes.
6    Q    In front of this, well, what looks like a little wooden shed here?
7    A    Yes.
8    Q    Okay.  And you said you learned later that that was actually Mr.
9    Warrington's vehicle?
10   A    Yes.
11   Q    Let's skip '7' for right now.  State's exhibit '11'.  Again, what are we --
12   what are we looking at here?
13   A    Again, this is 436 East McKibben Street.  It's a little closer.  I took it
14   probably towards the street.  This shows the alley.  It shows the door being
15   propped open.  Right in front of the car, closer to the house, would be Mr.
16   Warrington on the ground, on the patio.
17   Q    Okay.  Now, is this the crime scene tape that we were talking about
18   here?
19   A    Yes.
20   Q    Okay.  So, you appear to be on the outside of the perimeter taking this
21   shot?
22   A    Yes.
23   Q    Okay.  Now, do you see in the background here where my finger is

609

1    just beyond the car?  Is this another house back here?

2    A    I believe it's a garage.

3    Q    Well, the smaller structure is a garage.  Does this appear to be a

4    house?

5    A    Yes, that would be a house that's on Pearl Street.

6    Q    Okay.  So, their, I guess, rear yards would abut each other?

7    A    Yes.

8    Q    Now, I don't know whether you know, Detective Marik, I know it's been

9    a long time since you've been a street officer for the Lima Police Department,

10   but do you know if that house is still there?

11   A    That I don't know.

12   Q    Okay.  But, it was there, obviously, on February 23rd?

13   A    Yes.

14   Q    All right.  State's exhibit '12'.  Again, what are we looking at in this

15   shot?

16   A    This picture I was north of the house.  I was in the north/south alley.

17   You can see my van parked with the lights on.

18   Q    This right here where my finger is, about in the middle of the picture?

19   A    Yes.  Yes.

20   Q    All right.

21   A    This shows the amount of tracks in the alley, the crime scene tape and,

22   of course, it shows how close 436 East McKibben Street was to the next

23   house just west of it, as you can see from this red car.  You can even see the

1  yellow police tape close to that house on the west side of this alley.

2  Q. Okay. State's exhibit '13'.

3  A. This is a photograph I took while I was standing in the alley. This is the

4  west side of the home. This is how it was when I got there. Mr. Warrington is

5  on this concrete pad close to the house, laying in front of the car. The door is

6  propped open with items - the igloo, the gym bag, and the interior door is how

7  I found it.

8  Q. Okay. Now, the pictures that we've gone through so far, is that what

9  you were talking about like starting big and you work your way in taking

10  pictures?

11  A. Yes.

12  Q. Okay. State's exhibit '14'? Now what are we looking at?

13  A. Again, this is a closer photograph of Mr. Warrington laying on his left

14  side. It shows him close to the home. It shows the interior door partially

15  opened. It shows broken glass on the concrete. There's an igloo container

16  there. It shows the deceased as I found him on that day.

17  Q. Clearly upon the time you arrived there had been no medical

18  intervention; correct?

19  A. Yes, that's correct.

20  Q. All right. State's exhibit '15'?

21  A. That's a closer photograph of Mr. Warrington.

22  Q. Okay. Are you able at this point to see any injuries on him, or

23  ascertain where most of this blood was coming from?

119

1    A    I can assume; but, I did not do an up-close examination.

2    Q    Okay. State's exhibit '16' here now. What are we looking at?

3    A    This is the north side of house. I'm standing in the alley. I'm sorry.

4    This is the west side of the house. I'm standing in the alley. This is a

5    photograph of the Ford Taurus, Taurus or Mercury, I'm not sure which it is,

6    but it was parked in that spot. Mr. Warrington would be on the paved, or, on

7    the concrete pad in front of this vehicle.

8    Q    Then this snow here, is this where you're talking about how it was fairly

9    packed down and there were numerous tracks and things of that nature?

10    A    Yes. It clearly indicates that there had been some melting in recent

11    days. I'm not sure when it had snowed last. But, obviously by this snow

12    being melted in those different areas I could tell that there had been some

13    snow melting.

14    Q    Did it look like to you that things had melted and refrozen, you know,

15    how it gets harder and harder in the wintertime? Is that how it appeared to

16    you?

17    A    Yes. It was ten to fifteen degree. It was probably melted and frozen

18    several times.

19    Q    Exhibit '17'. What are we looking at here?

20    A    I'm standing in the alley within the crime scene. I'm facing in a

21    southerly direction. I'm trying to show possible tracks left in the snow by Mr.

22    Warrington's pick-up truck. It appears, from my guesstimation, that those

23    were left by Mr. Warrington as he pulled in to that spot.

1    Q    They seemed to follow him right to where he parked?

2    A    Yes.

3    Q    State's exhibit '18'. What are we looking at here?

4    A    I'm standing in the alley. I'm facing east. That is the south side of the

5         house, or, the back side of the house. That would be Mr. Warrington's Ford

6         pick-up truck parked facing east.

7    Q    Okay. State's exhibit '19'. What are we looking at here?

8    A    I am standing south of that house. I'm outside of the police tape, the

9         crime scene tape. It depicts the alley, the north/south alley, Mr. Warrington's

10        pick-up truck parked there, and also the proximity to the garage and also the

11        house just west of 436 East McKibben Street.

12   Q    Okay. Can you also see, again, in the snow what appeared to be

13        either melting or -- well, it's not fresh and pristine; correct?

14   A    That's correct.

15   Q    That was State's exhibit '19'. State's exhibit '20'. What are we looking

16        at in this photograph?

17   A    As I testified before, you always try to take photographs as you see

18        them and then if you're going to possibly measure anything afterwards then

19        you take it with the tape in it. That was the coordinates with this metal tape

20        that I show, or, that I put down as a reference.

21   Q    Okay. So, these perpendicular lines that we see in the picture, that's a

22        tape measure that you have actually placed down now to get some sense of

23        space?

613

1    A    To try to get coordinates; yes.

2    Q    Okay.  Now, just outside this, down here in this bottom right hand

3    corner here, -- do you see where my pen is?

4    A    Yes.

5    Q    What are those?

6    A    Those were spent shell casings.

7    Q    We'll get to those in just a minute.  State's exhibit '21'.  What are you

8    trying to show here?  Let's start here big.  Do you see where my pen is?

9    What is this?

10    A    That's obviously blood from the victim.

11    Q    And at this point the victim has actually been removed from the scene;

12    correct; if you know?

13    A    I don't believe he had been removed yet.

14    Q    Okay.  Sorry.  Over here are you trying to get some kind of images or

15    prints or anything?

16    A    You know, I'd almost have to see the original of that.

17    Q    Oh, absolutely.

18    A    It's kind of distorted.  I can't tell.

19    Q    Let me give you a couple here.  '21' and '22'.  There's also what

20    appears to be some blood splatter closer to the end of the walkway there;

21    correct?

22    A    There was blood on this pad at this location.  There was something

23    here that caught my eye.  I thought it might have been ashes from a cigarette.

615

1    Q.  Okay.  So, you photographed it just in case that became important?

2    A.  You photograph a lot of things that turn out to be unimportant.

3    Q.  Okay.

4    A.  This also was part of the snow and it also shows the melting and the

5    one footprint in there.  But, that's obviously an old one.

6    Q.  Okay.  Is it fair to say that it's something that you -- well, you take

7    photographs of anything that might catch your eye; correct?

8    A.  Yes.

9    Q.  Okay.  I think you said - I'm sorry, but I was writing something - that a

10   lot of times those things turn out to be nothing; right?

11   A.  That's correct.

12   Q.  Okay.  So, State's exhibit '21', again, you're referencing the blood.  Do

13   you see this little spot here?

14   A.  Yes.

15   Q.  Did that also appear to be blood to you?

16   A.  Yes.

17   Q.  Okay.  Then State's exhibit '22' is a little bit closer-up shot of the blood

18   that I just pointed out?  Correct?

19   A.  Right.

20   Q.  Okay.  Then you said this appeared to -- well, is this what you're

21   talking about, this black dot right here where my pen is?

22   A.  Yes.

23   Q.  That it showed perhaps some kind of ash or something?

1   A   Yes.

2   Q   And what appeared to be an older footprint to you?

3   A   Yes.

4   Q   All right. Now, State's exhibit '23'. Just a minute. What are we looking

5   at right here?

6   A   This is the victim, Mr. Warrington. This is his Carhartt coat. This

7   would be his right pocket. There appears to be some type of tear in the

8   fabric.

9   Q   Are you talking about almost dead center here in the picture?

10   A   Yes.

11   Q   Okay. At the time what were you concerned that might be?

12   A   I was concerned that this possibly would be either an entrance or exit

13   from a projectile.

14   Q   Okay. State's exhibit '24'. What are we looking at here, other than my

15   fingerprint on it? Sorry.

16   A   That's a picture depicting Mr. Warrington's back side. I believe those

17   are his sweatpants and this appears to be some type of tearing in the

18   sweatpants.

19   Q   Are you talking about what is like the wider spots we see in there?

20   A   Yes. Possibly it's either an entrance or exit wound.

21   Q   Now, State's exhibit '25'. What are we looking at here?

22   A   That's number one. That would be the photographic tent that was

23   used to depict the two shell casings in that picture.

1    Q    Detective Marik, I see you leaning over a little bit.  If you want to step

2    down at any point please feel free.  Okay?  Is this the tent thing you were

3    describing earlier that has the one on it?

4    A    Yes.

5    Q    Okay.  And these were what we saw earlier depicted and what turned

6    out to be two spent shell casings?

7    A    Yes.

8    Q    When you say a spent shell casing, what do you mean?

9    A    The bullet has been fired from the shell casing.  The shell casing is

10    usually an object that is ejected from a semi-automatic handgun.

11    Q    So, the bullet sits in a casing, right?

12    A    Right.

13    Q    And the bullet goes out into whatever is being shot at and the casing

14    gets ejected and is trash, so to speak?

15    A    Yes.

16    Q    Okay.  All right.  State's exhibit '26?

17    A    This is a closer photograph of the same two items.

18    Q    Is that what you were talking about earlier?  Again, you try to put it in

19    perspective in a wider shot and then you get closer so you can see more of

20    what the object is?

21    A    Yes.

22    Q    But, that tent there tells you that we're still referring to the same thing;

23    correct?

1   A   Yes.

2   Q   State's exhibit '27'. What are you doing in this photograph here?

3   A   This is for my coordinates. I'm trying to get an idea of how far it is from

4   the side of the house, how far it is off of the pad. It's a metal tape to measure

5   with.

6   Q   A common tape measure that many of us would have?

7   A   Yes.

8   Q   Okay. Now, just for the record, you have the end of the tape measure,

9   where we can actually see the orange body of it, at the very end of the

10  concrete pad; correct?

11  A   Yes.

12  Q   Okay. And that tape measure goes up to -- well, I see the first one is

13  between the seven and eight inch mark?

14  A   Correct.

15  Q   And then the second one between the eleven, or, I guess almost

16  starting somewhere in the ten and continuing on to close to a foot?

17  A   Yes.

18  Q   Okay. And then this longer tape here would actually go from the house

19  to the end of the pad?

20  A   Yes.

21  Q   Okay. State's exhibit '28'. What are we looking at here?

22  A   That's the igloo.

23  Q   Okay.

1   A    I'd have to look at the photograph to see.  That's a spent bullet.

2   Q    Okay.

3   A    It's on the concrete pad.

4   Q    Okay.  When you say a spent bullet, what do you mean by that?

5   A    Again, it's the projectile that is fired from a gun.

6   Q    Okay.  State's exhibit '29'.  What are we looking at now?

7   A    It would be the same item.  It's, again, laying next to the igloo cooler.

8        It's on the concrete pad.  It's depicted by that number two tent.  There's,

9        obviously, what appears to be the blood and broken glass in the photograph.

10  Q    Okay.  So, these little shards of like blue blue type of material appear to be

11       broken glass; correct?

12  A    Yes.

13  Q    And then the little red spots we see throughout appear to be blood to

14       you?

15  A    Yes.

16  Q    And this is actually on the other side of the door from where Mr.

17       Warrington's body is; correct?

18  A    Right.  This is closer to the screen door.

19  Q    State's exhibit '30'.  What are we looking at here?

20  A    I'm going to have to look at the photograph of it.

21  Q    That's fine.  I'm going to hand you '30' and '31' to kind of give you

22       some perspective there.

23  A    Again, that's the projectile, spent bullet.

1    Q    This is a different one; correct?

2    A    Yes.  This is on the concrete pad.  This is closer to Mr. Warrington.  It's

3         closer to his Carhartt coat.

4    Q    It's directly behind his body; correct?

5    A    Right.  It's depicted with tent number three.

6    Q    The other one was on the other side of the cooler, the other side of the

7         door; correct?  The cooler, igloo cooler, or whatever you want to call it.

8    A    Yes.

9    Q    Okay.  Let's put this up there now so the jury can see it.  So, '30' is a

10        close-up shot of another spent, well, I think you said bullet.

11   A    Yes.

12   Q    Okay.  And then '31' is what?

13   A    That would be the same bullet the tent number three photograph.

14        It's number three.

15   Q    Now, I'm going to show you something here.  His jacket appears to be

16        raised; correct?

17   A    Yes.

18   Q    But, it wasn't raised in the earlier photographs; correct?

19   A    I'd have to see the earlier photographs.

20   Q    Let me show you actually State's exhibit '32'.  This will give you some

21        perspective.  State's exhibit '32'.  Does his jacket appear raised from his -- as

22        raised from his pants as it did in the last picture?

23   A    Yes.

1  Q  Just a different --

2  A  It was moved probably so we could get that photograph a little better.

3  Q  Okay. Gotcha. But, again, that's the same bullet that we're talking

4  about, spent bullet; correct?

5  A  Yes.

6  Q  Now, State's exhibit '33'. Is this taken a little later in the morning?

7  Does it look a little bit lighter outside?

8  A  Yes.

9  Q  Okay. And in '33' that's actually after Mr. Warrington's body has been

10  removed; correct?

11  A  Yes.

12  Q  Okay. What are we looking at in this picture?

13  A  This would be the west side of the home. This would be the side door.

14  At this time we had propped it open so we could get an accurate

15  measurement of this interior door. It obviously shows some indentations and

16  what appears to be the blood. At this point we had placed a yellow dowel rod

17  through a hole that was in the door.

18  Q  So, you actually found and, again, we'll get to that in a little bit, but right

19  here where we see this little yellow, is that what you're talking about a dowel

20  rod?

21  A  Yes.

22  Q  You found what appeared to be a bullet hole in that?

23  A  Yes.

1    Q.    And, again, this is after it looks like all kinds of things had been

2    removed.  The Igloo cooler's not there.  The duffel bag is not there.  The

3    bullets aren't there.

4    A.    Right.

5    Q.    Okay.  Now, State's exhibit '34'.  Before I go there -- just a second.

6    You said something about his keys were in the door.  In State's exhibit '33'

7    are his keys still in the door?

8    A.    I can only assume.  I can't tell from the blown-up photograph.

9    Q.    Can you tell looking at the closer shot?

10   A.    I still can't tell if the keys were in there or not.

11   Q.    Okay.  Fair enough.

12   A.    I knew the keys were in there at one time.

13   Q.    Okay.  We're going to get to that.  All right.  State's exhibit '34'.  What

14   are we looking at there?

15   A.    This would be the interior door.  It would be on the west side of the

16   house.  It's a metal door.  It has several indentations in it and also what

17   appears to be blood.  It also shows a set of keys that are in the lock in the

18   door knob.

19   Q.    When you arrived on scene were there, in fact, a set of keys in the

20   door knob like that?

21   A.    Yes.

22   Q.    Okay.  When you say interior door, do you mean inside the storm

23   door?  This door clearly leads outside; correct?

1   A   Right. There's an interior and an exterior door. That's the one that

2       leads into the house.

3   Q   Okay. Well, let's talk about State's exhibit '35'. What are we looking at

4       here?

5   A   That's a metal measuring tape that I used to show where the

6       indentations were on various parts of the door.

7   Q   Okay. This is actually the door we just saw; correct?

8   A   Yes.

9   Q   Okay. So, do you see where the red two is?

10   A   Right.

11   Q   Okay. Are we talking about just on the other side of that two right

12       there? Is that where there appears to be some damage?

13   A   There's an indentation there.

14   Q   This would be on the lower half of the door; correct?

15   A   Yes.

16   Q   When we see that two, is that two feet from the ground?

17   A   Yes.

18   Q   Or, from the concrete pad, I should say. Okay. State's exhibit '36'.

19       We've moved up the door slightly, or are we still looking at the same thing?

20   A   It would be the same photograph, I believe.

21   Q   Okay.

22   A   But, without the tape.

23   Q   Okay. Are we talking about the injury to the door, so to speak?

1      A   Yes.

2      Q   Okay. State's exhibit '37'. Does that appear to be mid-way into the

3   door, about mid-range there?

4      A   Yes.

5      Q   Okay. Other than the keys in the door, what are you documenting in

6   this photograph?

7      A   I believe there was another indentation just to the right of the door

8   knob. There's a little dent there.

9      Q   There's a dent to the right of the door knob. Are you talking about right

10   in here?

11      A   Yes. And then there was another -- another indentation would be --

12      Q   The much larger obvious hole?

13      A   The much larger -- yea, that was documented before. But, there was

14   another indentation in the sill, or, well, it was the trim along the door.

15      Q   We're going to get to the trim. Let's just focus on the door for right

16   now; okay?

17      A   Right. Okay.

18      Q   So, you've got apparent damage to the door. I'm looking at State's

19   exhibit '38'. Is this that same shot, just with a tape measure?

20      A   Yes. You can see it's two feet ten inches and then the indentation off

21   to the right of the door knob.

22      Q   Okay. So, you're actually measuring this, I guess, larger looking

23   amount of damage at two feet ten inches?

1   A   Yes.

2   Q   Okay.  And, in the end, even with something like this, State's exhibit

3   '39' is, well, you take a closer-up version so you could see exactly what that

4   is?

5   A   Yes.

6   Q   Okay.  State's exhibit '40'.  Okay.  Is this the one you said was just

7   slightly to the right of the door knob?  Well, I'm going to keep calling it

8   damage, just for our purposes.  What's the number there - three ten?  Excuse

9   me.  It's two feet ten inches.

10  A   It's two feet -- between two feet ten and two feet eleven.

11  Q   Okay.  That, again, is not quite as obvious, but still damage to the

12  door?

13  A   Yes.

14  Q   All right.  Now, let's take a look at State's exhibit '41' at the door frame

15  itself.  What are we taking a picture of here, Detective?

16  A   There was -- this is, again, the interior door was open.  The exterior

17  door was propped open.  Just below the middle hinge, in the wood, there was

18  an indentation and then we found another hole in the refrigerator.  That white

19  item where that shovel is, that's the kitchen refrigerator.

20  Q   This right here?

21  A   Yes.

22  Q   Just inside the door is the actual refrigerator?

23  A   Yes.

1   Q   And that's like a snow shovel?

2   A   Yes.

3   Q   And a broom propped up against it?

4   A   Yes.

5   Q   In this picture, this pane glass here, was that intact or broken out?

6   A   That was broken.

7   Q   And is that what you ascertained all the glass on the patio was from -

8       that being broken out?

9   A   Yes.

10  Q   I call it a patio.  You called it a concrete pad.  Okay.  State's exhibit

11      '42'.  What are we looking at here?

12  A   It would be a close-up photograph of the indentation in the frame.  It

13      comes at about two feet three inches.  It appears, again, there's a dent of

14      some type in this.  You also see what appears to be blood on this frame.

15  Q   Even though it looks darker here than in the actual picture, it's red and

16      it looks more like blood; correct?

17  A   Yes.

18  Q   State's exhibit '43'.  Now, there's no keys in that door at this point;

19      correct?

20  A   Right.

21  Q   And it's closed?

22  A   In the most way, yes, it is closed.

23  Q   Okay.  What are we seeing depicted here?

1   A   This was a deformity in the door, possibly by a projectile.  I wanted to
2       show that it went through the door.  So, that's a yellow dowel rod that I
3       inserted through there.
4   Q   Okay.  So, that's actually a hole?
5   A   Yes.
6   Q   And, I mean, it goes all the way through the door?
7   A   Yes.
8   Q   Okay.  Then State's exhibit '44'.  Is this that the same hole without the
9       dowel rod?
10  A   Yes.
11  Q   That's above what looks like a bolt lock?
12  A   Yes.
13  Q   Let me ask you – I don't know if you'll be able to see it.  In State's
14      exhibit '44', will you look at the actual window in that door for me, particularly
15      the bottom of that picture.  Does it appear that there's blood splatter on that
16      window?
17  A   Yes.
18  Q   Did you actually see blood splatter yourself?
19  A   Yes.
20  Q   Okay.  While I'm up here, State's exhibit '45'.  What is that?
21  A   That is the hole in the door with the metal tape showing about four feet
22      five inches.  Again, it's showing blood, or, what appears to be blood.
23  Q   There's actually blood on the window, as well as on the door frame?

1    A    Yes.

2    Q    What did that measure?

3    A    Approximately four feet five inches.

4    Q    All right. State's exhibit '46'. What are we looking at in this picture?

5    A    This was taken from within the kitchen at 436 East McKibben Street.

6    That is the door that we've been discussing. That's the broom. The shovel is

7    still there. That's the refrigerator just inside this door.

8    Q    So, basically you're on the inside of the home now taking pictures of

9    the door, versus being on the outside and taking pictures of the door like we

10   were talking about?

11   A    Yes.

12   Q    Okay. Is this the tape measure up against the refrigerator as well?

13   A    Yes.

14   Q    State's exhibit '47'. What are we looking at here?

15   A    Again, I'm within the kitchen of the house. This is a metal measuring

16   tape, four feet four/four feet five inches. This appears to be a deformity within

17   the metal skin of the door. This would be on the inside of the house.

18   Q    Did that appear to correspond with the hole you found on the outside

19   that you put a dowel rod in?

20   A    Yes.

21   Q    Okay, All right. State's exhibit '48'. What are we actually looking at

22   now?

23   A    Again, that's a photograph I took inside the kitchen. It shows the side

1    of the refrigerator.  As you can see, the snow shovel is there.  I had my

2    metal measuring tape there.  It depicts four feet three inches from the floor.

3    Again, it shows a deformity in the refrigerator, which is a hole.

4    Q    We're going to match up the hole.  Right here in the middle, is that

5    where you're talking about?

6    A    Yes.

7    Q    Okay.  This would be the door frame here to the, I guess, left of the

8    picture?

9    A    Yes.

10   Q    And then there's that shovel you're talking about and you can see the

11   refrigerator freezer's door; correct?

12   A    Right.

13   Q    State's exhibit '49'.  What are we looking at here?

14   A    That's the inside of the refrigerator.  That would be, more specifically,

15   the freezer.  It's open and clearly seen is a spent bullet.

16   Q    Right in front of what looks like to be some package of meat or some

17   sort?

18   A    Yes.

19   Q    Okay.  State's exhibit '50'.  What are we looking at there?

20   A    That's a closer photograph of the same projectile.

21   Q    Where you can actually see that it's a bullet now?

22   A    Yes.

23   Q    And State's exhibit '51'?

1    A    That would be with the plastic photo tent depicting number four.

2    Q    Okay.  State's exhibit '52'.  What are we looking at here?

3    A    It's a photograph taken within the kitchen area of 436 East McKibben

4         Street.  That's the refrigerator, with the doors closed, and the stove, and a

5         snow shovel inside.

6    Q    Okay.  Was there also like a counter space over here in the far side of

7         the picture?

8    A    Yes.

9    Q    State's exhibit '53'.  What are we looking at here?

10   A    That's within the kitchen area.  It's taken towards the door and the

11        refrigerator and it shows the kitchen and items on this desk, if you will, that's

12        within the kitchen area.

13   Q    Okay.  Does that appear to be a phone?

14   A    Yes.

15   Q    I know it's a little ancient now with a cord and everything, like a

16        landline.

17   A    Yes, that's a phone.

18   Q    Okay.  State's exhibit '54'.  What are we looking at in this picture?

19   A    That would be, I believe, an electric bill.

20   Q    Now, there what appears to have been like the base of the phone;

21        correct?

22   A    Yes.

23   Q    And then it looks like a book a like a book of some sort?

630

1    A    A book and some various papers.

2    Q    This white paper, is this what you're referring to as the electric bill?

3    A    Yes.

4    Q    Now, just a second, but back to State's exhibit '7'. What is that?

5    A    It's from American Electric Power. It's an electric bill, I believe, of a

6         hundred and seventy-two dollars. There's printing on it of Mark O. (sic)

7         Carter, 122 East Eureka Street, Lima, Ohio.

8    Q    You found that lying on the counter?

9    A    Yes.

10   Q    All right. Let's go back to where we were. State's exhibit '55'. What

11        are we looking at here now?

12   A    I'm standing in the kitchen/living room area. I'm facing north and

13        taking a photograph of that north door and the surrounding area.

14   Q    Is that what we would have seen in the very first picture that you took

15        of the front of the house that depicted the address and stuff? Is that that front

16        door basically?

17   A    Yes.

18   Q    State's exhibit '56'. What are we seeing in this photo?

19   A    It's a photograph within 436 East McKibben Street. I'm standing,

20        which would probably be in the kitchen, and I'm facing towards that north

21        facing door. That's more or less the living room area of this home.

22   Q    Okay. Let's move to a different series of pictures. State's exhibit '57'.

23        What are we looking at here?

1    A    That is the outside floor mat that was on the concrete pad.  This would

2    have been the general area where the Igloo ice container and the gym bag,

3    well, they were located there.

4    Q    We're going to get to some closer shots, but did you end up recovering

5    evidence off of that mat?

6    A    Yes.

7    Q    Okay.  State's exhibit '58'.  I've got a feeling that I'm going to have to

8    bring them up to you and then we'll publish them.  State's exhibit '58' and '59'

9    real quick.  If you'll look at them yourself, then I'll put them up there.  Can you

10   tell the jury what you see in those two pictures?

11   A    These would be bullet fragments.  They were located on this mat.

12   They appear to be copper jacketed and they're depicted with a number five

13   and a tent.

14   Q    Okay.  So, State's exhibit '58' would be without the tent and '59' with

15   the tent?

16   A    Yes.

17   Q    Okay.  When you say bullet fragments, how do you get a bullet

18   fragment?

19   A    Most of the bullets are covered with a copper lining on the outside.

20   Sometimes when they hit objects they tend to break apart.  Sometimes the

21   lead breaks apart and sometimes the copper breaks apart.  In this particular

22   case it's this part of the actual cartridge, after it's fired, after it's hit something

23   and the bullet has broken apart.

632

1    Q    So, let's take a look at exhibit '58' here.  Would this be the part of the

2    mat that would have been, well, not directly up against, but closer to the

3    door?

4    A    Closer to the home; yes.

5    Q    Okay.  Is this what we're looking at in here, what appears to be

6    fragments to you?

7    A    Yes.

8    Q    State's exhibit '59'.  Is this a closer-up of that fragment?

9    A    Yes.

10   Q    The color is a little different here, but it's actually a copper color?

11   A    Yes.

12   Q    State's exhibit '60'.  I'm actually just going to bring these up to you, too.

13   Sorry.  I'm going to show you '60' and '61' and have you take a look at those.

14   What's depicted in '60', the one in your right hand?

15   A    This would be the mat that was on the concrete pad.  It has broken

16   glass, the igloo container, the gym bag, and the steel tape that I measured

17   with.  What is depicted in it is, again, a cartridge, or, bullet fragment and in the

18   other photograph it would be depicted by photo tent number six.

19   Q    Okay.  So, exhibit '60' would be your wide shot with the measurements

20   of that mat; correct?

21   A    Yes.

22   Q    Okay.  And then '61' would be a closer-up of the fragment that you

23   then found in that area?

1    A    Yes.

2    Q    And it's tented as tent number six?

3    A    Yes.

4    Q    Okay.  Now, State's exhibit '62'.  What's different in this picture versus

5         the other pictures?  What's missing here?

6    A    There is the mat indentation, or the outline of it.  We had removed the

7         mat at this point to see if anything was underneath it.

8    Q    Okay.  So, this is your photograph of what was all in that area?  It looks

9         like this was the door, well, like the threshold, so to speak?

10   A    The threshold.  I'm shooting down at a downward angle.  This is the

11        actual concrete pad.  The rug, if you will, was taken up and you can see the

12        outline of that up close to the house.

13   Q    There's basically a discoloration where the rug had been?

14   A    Yes.

15   Q    The mat that said 'home' on it?

16   A    Right.

17   Q    Okay.  And then State's exhibit '63'.  Is this that same area, just closer

18        up of that darker spot?

19   A    Yes.

20   Q    And, again, we can still see some blood and broken glass in this

21        picture as well?

22   A    Right.

23   Q    State's exhibit '64'.  Is this the threshold area that we just looked at in

634

1     the other two photographs before things were removed?

2   A  Yes.

3   Q  Again, does there appear to be glass on the threshold here, the metal

4     threshold?

5   A  Glass and what appeared to be blood.

6   Q  State's -- well, I'm going to show you '65', '66', and '67'. You can take

7     a look at those and put those in reference for you.

8   A  Again, this is the concrete pad. The mat has been removed. It shows

9     the threshold. It shows broken glass and what appears to be blood. It also is

10     of a fragment and it appears to be a lead fragment. This is depicted by

11     picture, well, tent number eight.

12   Q  Now, if you'll notice on '67' and '66' here, even though it's tent right

13     they seem to be in slightly different spots both depicted in '65'; correct?

14   A  Right.

15   Q  Okay. What are those tents signifying? What do you see those tents

16     marking?

17   A  Well, there are multiple fragments in the same general area.

18   Q  We're talking about little pieces of bullet, so to speak?

19   A  Yes.

20   Q  Do these appear to be the copper part or the lead part of the bullet?

21   A  This is the lead.

22   Q  So, when you talk about that copper, there's actually lead inside that

23     copper?

1   A    Right.

2   Q    I'll put these up for the jury. '65' is the concrete pad where it meets the

3        threshold, the wide shot; correct?

4   A    Yes.

5   Q    And then '66' is your tent eight closer to blood with what appeared to

6        be bullet fragments?

7   A    Yes.

8   Q    And '67' would be slightly further away from the bigger pool of blood

9        with lead fragment?

10  A    Yes.

11  Q    I think we're good with the pictures now.  All right.  Now, obviously

12       those pictures weren't chronological.  Some were interspersed and that type

13       of thing.  When you took those photographs and tented those various objects

14       that we've talked about did you then collect those items?

15  A    Yes.

16  Q    And when you collect something, such as a casing, bullet, or bullet

17       fragment at a scene do you do anything to make sure that you don't

18       contaminate that evidence?

19  A    You wear protective gloves.

20  Q    Okay.  You would have protective gloves on your hands?

21  A    Yes.  You try to use -- no, you do use envelopes that have never been

22       used before so that they're in pristine condition.

23  Q    Okay.  So, you've got envelopes and bags, depending on the size of

1 the evidence; correct?

2 A Yes.

3 Q Okay. It's not like you recycle them; correct?

4 A No.

5 Q Is it fair to say that once a piece of evidence has been inserted into a

6 bag or an envelope no other piece of evidence goes in there; right?

7 A No.

8 Q All right. You obviously collected a number of items?

9 A Yes.

10 Q All right.

11 MRS. KOHLRIESER: Your Honor, for the

12 record, and I'm still going to show them to Mr. Rion, but prior to the

13 commencement of the taking of evidence I did give him a complete exhibit list

14 that describes what each exhibit is and he has had the opportunity to review

15 the same.

16 THE COURT: Is that correct, Mr. Rion?

17 MR. RION: Let me look, but my sense is

18 that that's an accurate statement. It is, your Honor.

19 THE COURT: Okay.

20 Q All right. Let's go through the first batch here.

21 THE COURT: Just a second. Just a

22 second. Issue? You need a break?

23 MRS. KOHLRIESER: That's the sign for a

1    break.

2    THE COURT:  Well, would a drink of water

3    do it?

4    JUROR:  That's fine.

5    THE COURT:  How many people want

6    water?

7    MRS. KOHLRIESER:  I know it's not the

8    most thrilling part of the trial.

9    THE COURT:  But, as far as a break, is

10   everybody -- we'll probably take a break after the direct examination.  Anyone

11   else need water?  Anyone else?  All right.  Continue.

12   Q    Are we all good, Detective?

13   A    We're great.

14   Q    Okay.  State's exhibit '68'.  Can you take a look at that and tell me if

15   you recognize that?

16   A    It's a clear plastic envelope and it has a manila envelope inside.  It's

17   depicted as a Winchester nine millimeter, which would be number one in the

18   photo on the patio.  It's a piece of property that I had collected at the scene.

19   Q    Is there writing on the back of it?  Your handwriting?

20   A    Yes.

21   Q    It looks like an ink pen perhaps?

22   A    Right.

23   Q    Saying what that is?

1    A    Right.

2    Q    Okay. Was that something you would have done at the scene to tell

3    you where you found this?

4    A    Yes.

5    Q    You said that's what's depicted with tent number one in the photos?

6    A    Yes.

7    Q    Okay. Now, you didn't put it in the plastic bag that we see; did you?

8    A    No.

9    Q    Okay. You would have put it in the manila envelope?

10   A    Yes.

11   Q    They've changed computer systems over at the Police Department

12   since you left. Are you aware of that?

13   A    I do now.

14   Q    There's a couple of tags on that envelope. I just want to make sure

15   we're clear. I'm going to keep referring to '68'. But, it goes to each of these

16   that we have to deal with here in a second. There appears to be a white

17   sticker with red ink on it.

18   A    Right.

19   Q    Was that the type of property stickers they used when you were in the

20   detective bureau?

21   A    Yes.

22   Q    But, then there's a white sticker with black printed, well, not

23   handwriting, but computer generated writing stuck over that; correct?

1    A    Right.

2    Q    And basically that duplicates what was on your other sticker?

3    A    Right.

4    Q    What are those stickers for?

5    A    Well, it's to identify what was inside.

6    Q    Okay.  Does it also track the evidence?

7    A    It tracks it.  Now it's bar-coded, so obviously it's done with laser.

8    Q    All right.  Back in 2009 when you were in the I.D. bureau and handling

9    evidence once you put something in the envelope, well, did you seal the

10   envelope?

11   A    Sealed it and then you tried to put your initials over top of the tape.

12   Q    Okay.  I see black initials that say D.K.M.  Would that have been your

13   initials?

14   A    Yes.

15   Q    Okay.  Does that tell you that you're the one that put this in evidence?

16   A    Yes.

17   Q    Okay.  Now, there's -- and we'll get into that with other witnesses.  But,

18   there's a bunch of other handwriting all over this envelope; isn't there?

19   A    Yes.

20   Q    That's not yours?

21   A    Right.

22   Q    Okay.  The plastic envelope has other initials that aren't yours, too;

23   correct?

640

1     A    That's correct.

2     Q    Okay.  So, '68' you said was a bullet that you collected at 436 East

3     McKibben?

4     A    Yes.

5     Q    Okay.  '69'.  Again, the same type of packaging we've talked about

6     extensively with exhibit '68'?

7     A    Yes.

8     Q    Same type of new computers, plastic bags not yours, and that type of

9     thing?

10    A    Yes.

11    Q    The manila envelope, however, that's inside here, is that what you

12    would have put --

13    A    Yes, that's mine.

14    Q    Okay.  What is this piece of evidence?

15    A    That is the Winchester nine millimeter, which is number one in the

16    photo on the patio, that was collected on the 23rd of February.

17    Q    Okay.  Now, if you look at -- let's look at '68' and '69' just a second.

18    You know, I can see through here.  We'll cut them open if we need to.  Can

19    you see a number written on the back of that envelope?  Do you see the

20    number symbol?

21    A    Number.

22    Q    Okay.  Can you tell what's written after that?

23    A    It looks like number one.

1  Q  Is there a letter?

2  A  It looks like number one, maybe A.

3  Q  Okay.  Now look at exhibit -- well, excuse me.  That was '69'.  Look at

4  '68'.  Can you see similar markings on that one?

5  A  One B.

6  Q  Okay.  So, does that tell you that we're talking about two different

7  objects here with tent one?

8  A  Yes.

9  Q  All right.  State's exhibit '70-A'.  What is that?

10  A  It's a manila envelope inside of a plastic container.  It's number three in

11  the photo by the body on the patio at 436 East McKibben Street.  My initials.

12  It is a spent cartridge - I'm sorry - spent bullet.

13  Q  Okay.  That's one that I want to go back and ask you just a second.  I

14  apologize.  I don't have my notes up here with me.  '68' and '69' you identified

15  as Winchester nine millimeter.  Are these bullets?

16  A  Shell casings.

17  Q  Okay.  Both of these are shell casings?

18  A  Yes.

19  Q  Okay.  So, those would have been the two shell casings that we saw --

20  A  Together on the patio.

21  Q  Okay.  I guess west of the victim's feet?

22  A  Yes.

23  Q  Okay.  So, '68' and '69' are the actual casings.  Okay.  '70-A' is a

1    bullet; correct?  A spent bullet?

2    A   Yes.

3    Q   And is that the one that was found behind Mr. Warrington's body, right

4    there by his jacket?

5    A   It was by his body; yes.

6    Q   All right. '70-B'?

7    A   A manila envelope within a plastic container.  It would have my initials

8    on it and dated on the 23rd.  It's a spent bullet located by the igloo cooler.

9    Q   Okay.

10    A   It's number two in the photo.

11    Q   All right.  So, this would be what we saw on the other side of that door

12    and the igloo is propping it up and you can see it on the other side?

13    A   Yes.

14    Q   Okay.  Then, lastly, State's exhibit '71'.

15    A   A manila envelope inside a plastic container.  This is number four --

16    Q   Detective?  Do you mean -- say that again.

17    A   A manila envelope within a plastic --

18    Q   Within a plastic.  Okay.  I heard you wrong.  I'm sorry.  Go ahead.  It's

19    been a long day.

20    A   It's number four in the photograph on the tent.  This is a spent bullet

21    taken from the freezer at 436 East McKibben Street on the 23rd of February.

22    Q   Okay.  Now, just for the record so everything is clear, '68', '69', '70-A',

23    '70-B', and '71' are all in plastic envelopes; correct?

1    A    Yes.

2    Q    Okay. Within each one of them there is a manila envelope containing

3    the actual evidence?

4    A    Yes.

5    Q    Okay. And you bagged the actual manila envelope and sealed that;

6    correct?

7    A    Yes.

8    Q    And put your identifying information on it; correct?

9    A    Yes.

10   Q    Okay. All right. I'm going to do this in a group. I'm going to hand you

11   State's exhibits '72', '73', '74', '75', and '76' and ask you to take a look at each

12   one of those. Tell me when you're done.

13   (WHEREUPON, witness reviewed exhibits.)

14   A    These are the manila envelopes, not in plastic. They're tagged by me,

15   collected by me, identified by me, and sealed by me. 436 East McKibben

16   would be on all of them, which are the items collected.

17   Q    And does each one of them also contain a marking somewhere on

18   there that indicates what tent they're associated with in those photographs?

19   A    This is a fragment. This would be five A.

20   THE COURT:  Which exhibit number?

21   MRS. KOHLRIESER:  '72'.

22   THE COURT:  Okay.

23   Q    State's exhibit '73'?

1    A    Fragment, five B

2    Q    So, when you say five A and five B, you mean these are the two

3         fragments that were marked by tent number five?

4    A    Yes.

5    Q    Okay.  Go ahead.  State's exhibit '74'?

6    A    Would be another fragment, tent number six.

7    Q    Okay.  And State's exhibit '75'?

8    A    Another fragment, eight A.

9    Q    Okay.  And State's exhibit '76'?

10   A    Eight B, fragment.

11   Q    Are those those two fragments that you found kind of near the mat and

12        threshold?

13   A    On the patio mat.

14   Q    Yes.  All right.  Again, these were all collected by you and they don't

15        appear to have been reopened; do they?

16   A    No.

17   Q    Now, all these exhibits that we've just talked about, '68' through '76',

18        those are all depicted in photographs that we went over; correct?

19   A    Yes.

20   Q    Now, once you've gone through the scene and taken your

21        measurements, and you've taken your photographs, and you've collected

22        actual physical items and you believe that you've gotten everything you can

23        out of this, what do you do with the evidence?

1    A    It's placed in my vehicle.  The vehicle is locked up.  Then I take this

2    evidence to the Police Department.  It will either be locked into a locked closet

3    where there's only two people that have keys and then, depending on if I

4    have time, then it is documented in the proper way within the computer

5    system and then placed into the actual evidence room of the Police

6    Department.

7    Q    What do you mean if you have time it's put into the computer system?

8    A    Sometimes at a crime scene you don't have much time.  There's other

9    things to do.  You want to secure the property so you know where it is and so

10    it's secure and we can come back to it and nobody's tampering with it.  You

11    might have to go out into the field and do something else and then come back

12    and sit down at the desk and do the typing and do the actual processing and

13    documentation, et cetera.

14    Q    Would you have changed your gloves when you were out there at the

15    scene collecting these various items?  Would you have repeatedly changed

16    your gloves to avoid cross contamination?

17    A    If it was necessary; yes.

18    Q    Okay.  And you said the main thing is get that evidence secured?  So,

19    get it into that locked room, or, closet, depending upon where you're going to

20    store it; correct?

21    A    Yes.

22    Q    And then you may go back actually and do your typing at a later date?

23    A    Yes.

646

1   Q.  Now, you said only two people have keys to those storage locations.

2  Who would those two people have been on February 23rd, 2009?

3  A.  Myself and the other identification officer, Ken Whitney.

4  Q.  And, in fact, Officer Whitney came out at some point to 436 East

5  McKibben to assist you; correct?

6  A  Yes.

7  THE COURT:  Just a second.

8  JUROR NUMBER THREE:  Can I be excused for a few minutes?

9  THE COURT:  Yea.  Let's take a break.

10  We'll stand in recess for fifteen minutes or so.  Remember the admonitions.

11  Don't discuss the matter with anybody - among yourselves or with others.

12  Don't formulate or express any opinions.  Have no contact with the

13  participants or the media.  We'll stand in recess.

14  (WHEREUPON, COURT WAS IN RECESS.)

15

16  THE COURT:  Okay.  We're reconvening

17  in Case Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The

18  defendant is present in Court with counsel.  The State is present.  The jurors

19  have returned from the recess.

20  The recess, the record will show, was necessitated by a juror who

21  wasn't feeling well.  I'm not trying to put too much of a spotlight, but that was

22  Mrs. Krites.  Right?

23  JUROR NUMBER THREE:  Yes.

1    THE COURT:  I understand you're not

2    feeling real good.

3    JUROR NUMBER THREE:  I feel a lot better, but queasy yet.

4    THE COURT:  Okay, I understand, too,

5    that you've experienced this feeling before and it has passed in the future, or,

6    in the past and so you think this will be all right?

7    JUROR NUMBER THREE:  Yes.  Yes.

8    THE COURT:  You'll be all right?

9    JUROR NUMBER THREE:  Yea, in a couple of hours I'll be okay.

10   THE COURT:  It's not something that lasts

11   days and days and days?

12   JUROR NUMBER THREE:  Oh, no.  No, no.  Thank goodness.

13   THE COURT:  Okay.  We're at about

14   three-thirty in the afternoon.  I've discussed it with counsel.  We'll go ahead

15   and take an early recess today for the evening.  Detective Marik is still on the

16   stand and still in the direct examination.  We'll take an early recess.  This will

17   all even out in the end, perhaps, because we stayed late one day and we go

18   early one day.  So, there might be some other late days in the future.  We're

19   trying to get through the case, but I also need to give everybody, the parties,

20   plenty of time to ask the questions they need to ask.  So, again, I appreciate

21   your patience, ladies and gentlemen of the jury.  We'll recess until eight

22   forty-five in the morning.

23   Now, if any juror, and I'm not just talking about Mrs. Krites, but if any

1   juror feels ill at any time, let us know. But, certainly in the morning, Mrs.

2   Krites or anyone, if you feel like you can't continue because of health call and

3   let us know.

4         But, remember the admonitions. Don't discuss the case among

5   yourselves or with anyone else. Don't reach any conclusions or express any

6   opinions. Don't pay attention to any media accounts of the case. Don't do

7   any independent investigations. No communications over the Internet or

8   Facebook. If you ever feel like someone has violated any of these rules in

9   your presence it's okay to be a tattle-tale in this situation and let Monica know

10   that someone said something out in the hallway, or said something to you, or

11   tried to make contact with you, or other jurors talked. I'm not trying to set you

12   guys up to be tattle-tales on each other, but it's important that everybody be

13   open and completely honest about all of this stuff so we don't have a problem

14   later on.

15         So, we'll start up at eight forty-five in the morning. We'll continue with

16   Detective Marik. Everybody get a good night's sleep. Mrs. Krites, especially

17   you.

18         JUROR NUMBER THREE: I promise.

19         THE COURT: You're good for getting

20   home?

21         JUROR NUMBER THREE: Oh, yes.

22         THE COURT: Okay. Again, anybody, let

23   us know if there's a problem at any time, but especially tomorrow morning

1    when we continue with this.

2    Anything from counsel before we break for the day?

3    MR. RION:  No, your Honor.

4    MR. MILLER:  No, your Honor.

5    THE COURT:  Okay.  Get some rest.  Was

6    it too hot in here?  It got warmer this afternoon; didn't it?  I don't know --

7    MRS. KOHLRIESER:  I brought a fan in,

8    your Honor.

9    THE COURT:  I know the temperature

10   outside got cooler.  I don't know if the computer that runs the heating thought

11   it should get warmer in here.  I started getting warm, too.  I'll try to see if I

12   can't get maintenance to make it cooler in here.  Again, dress in layers and if

13   it gets too warm you can take a sweater off.  Or, bring a sweater and if it gets

14   too cold you can put the sweater on.  So, we'll work on that.

15   So, we'll break for the day and we'll see everybody at eight forty-five.

16   **(WHEREUPON, COURT RECESSED FOR THE DAY AT 3:55 P.M.)**

17

18

19

20

21

22

23

1     FRIDAY, SEPTEMBER 11th, 2015

2     8:52 A.M.

3

4     THE COURT: All right. Today is

5     September 11th, 2015. We're reconvening in Case Number CR2014 0139,

6     State of Ohio -vs- Markelus Q. Carter. The record will reflect the defendant is

7     present in Court with his attorney. The State is present.

8     We've brought one juror in, number seven on the list, Miss Brown. The

9     reason I brought you in here individually, is I understand you had

10    contacted the bailiff after we had recessed yesterday afternoon. You did

11    exactly what you're supposed to do by doing that. I just wanted to put it on

12    the record. We have to make a record of all these things just so everything is

13    clear. If you could just kind of share with us what you shared with Monica

14    when you called and then I might have some questions.

15    JUROR NUMBER SEVEN: Okay. As I was leaving last night at the final

16    recess I was walking to my car, which was parked between the attorney office

17    across the street and the Fat Cat Diner, about three-quarters of the way

18    down, but I was just walking off of the sidewalk into the parking lot and I was

19    approached by two men. One of them says to me, and I quote, "Is you a

20    juror," in a very kind of angry tone. I was a little frightened and I put my head

21    down and walked as fast as I could to my car and left. As I returned home I

22    got the phone number for the Courthouse and called Monica.

23    THE COURT: Did you recognize these

651

1    people as having seen them in the Courtroom or around the Courthouse any

2    time earlier?

3          JUROR NUMBER SEVEN:   Not at all.  Not at all.

4          THE COURT:   Okay.  That kind of thing

5    shouldn't happen.  I need to basically know if you feel that experience now is

6    going to prohibit you from fairly and impartially sitting as a juror in this case

7    and being fair on both sides.  Do you feel that that's going to interfere --

8          JUROR NUMBER SEVEN:   No.

9          THE COURT:   -- at all with you?  So, it's

10   not going to have any impact?  You can set that aside?  Here's what I'll do is,

11   well, just for general peace of mind and safety I'll just have a deputy out when

12   the jurors are excused.  But, certainly if anything like that happens again you'll

13   let us know?

14         JUROR NUMBER SEVEN:   Absolutely.

15         THE COURT:   Okay.  Anything else

16   happen that you feel is going to impact your ability to be fair and impartial?

17         JUROR NUMBER SEVEN:   No, sir.

18         THE COURT:   And you had no idea who

19   these persons were?  There were two, but only one spoke?

20         JUROR NUMBER SEVEN:   Only one spoke.

21         THE COURT:   Okay.  Does the State have

22   any questions for the record?

23         MRS. KOHLRIESER:   No, your Honor.

1     THE COURT:  Does the defense have any

2  questions for the record?

3     MR. RION:  Just one question.  Do you

4  attribute those people to being with either side of the case?

5     JUROR NUMBER SEVEN:  No.  I would have no idea.

6     MR. RION:  All right.  Thank you.

7     THE COURT:  All right.  Well, thank you

8  very much.  Any other concerns?

9     JUROR NUMBER SEVEN:  No, that's it.

10     THE COURT:  Okay.  Well, you can join

11  your fellow -- well, actually you can stay and go in your seat and we'll bring

12  the others in.

13     MRS. KOHLRIESER:  Actually, your

14  Honor, can we address something before we bring everyone in?

15     THE COURT:  All right.  All right.  Go back

16  and join your jurors and we'll have you in in a minute; okay?

17     (WHEREUPON, juror was excused from the Courtroom.)

18     THE COURT:  Okay.  Miss Brown has left

19  the room.  I will get with the Sheriff's Department as soon as I can this

20  morning and we'll just have a person, a Sheriff's Deputy, out there when the

21  jurors are excused for the day.  Assuming they're all in that parking lot, and I

22  don't know if they're all in that parking lot, but we'll have someone out there

23  and try to prevent anything like that happening.

1    Mrs. Kohlrieser, did you have something you wanted to put on the

2    record?

3              MRS. KOHLRIESER:  Yes, your Honor.

4    It's just something Detective Clark brought to my attention.  I had noticed it

5    myself a little bit, but was running around and doing things afterwards.

6    Detective Clark had raised that a number of individuals who sat in the Court,

7    as well as people who weren't in Court but came up to these individuals and

8    were socializing and things of that nature, well, literally right on the

9    Courthouse steps in front as, you know, jurors were going out and, in fact, it

10   was for so long that Detective Clark actually escorted one of our witnesses

11   out who didn't feel comfortable because it was members of the defendant's

12   family and, granted, I don't know who everyone is, but sitting on the

13   defendant's side, not that that is dispositive of the issue, but just in general

14   the sense of uncomfortability.  Witnesses coming here shouldn't have to run a

15   gauntlet, nor should jurors have to run a gauntlet.  I don't know who

16   approached her, and I don't know -- well, I can safely say that no one from the

17   prosecution or the Police Department did that, and I doubt highly from the

18   Warrington family that happened, but in any regard, well, I guess I would just

19   ask that once there are people in the gallery and that type of thing, well, if the

20   Court could just instruct them to make sure that there's no contact with the

21   jurors and they give them ample space to get by.  They shouldn't be having to

22   overhear any conversation or anything like that.  When everybody is trailing

23   down them steps together, you know, because jurors aren't sequestered yet

1    and they're not deliberating yet and there's no one going down there with

2    them, well, you know how narrow that staircase is, and I just don't trust

3    people not to talk about things and jurors to overhear.  So, I guess I'm asking

4    the Court to admonish the gallery to just, you know, give jurors distance or

5    otherwise make accommodations for the jurors to go down the back steps or

6    something.

7        THE COURT:  Yea, I can make those

8    kinds of accommodations for the jurors to use another exit.  I mean, it's a free

9    world.  Anybody can stand on the front steps of the Courthouse and talk.  The

10   jurors have been instructed to disregard anything like that.  Unless I know of a

11   specific incident, or, where we can identify a specific person, well, I'm not

12   going to make that general admonishment.  The jurors are admonished and

13   I'm going to trust the jurors will follow the instructions.  So, I understand the

14   concern.  We'll keep our eyes posted.  I'll have my security staff keep their

15   eyes open and ears open.  If there seems to be some type of intentional,

16   deliberate contact by anybody with any of the jurors, if we can identify a

17   specific incident, we'll deal with that accordingly.  It could possibly arise to a

18   possible criminal matter.  But, I'm not suggesting that at this point.  People

19   are allowed to be on the sidewalk and be in front of the Courthouse.  What I'll

20   do is probably have the jurors maybe go through a different door.  I've talked

21   to the bailiff about that already.  We may make some other accommodations

22   for a couple of the jurors who I know are smokers.  We might find a different

23   location where they can go smoke instead of the front steps to try to avoid

1  all of that.

2  MRS. KOHLRIESER:  I guess it was just

3  concerning because it was forty-five minutes before Detective Clark could

4  escort the witness out.  I mean, they just gave up waiting.  We're talking about

5  forty-five minutes they were loitering on the sidewalk at that point and then it's

6  like intentions are clear.

7  THE COURT:  Okay, I note it for the

8  record.  Anything else?

9  MRS. KOHLRIESER:  No, your Honor.

10  THE COURT:  Anything?  Okay.  Let's

11  bring the jurors in.  Is Detective Mark still here?

12  MRS. KOHLRIESER:  He is here.

13  (WHEREUPON, jury and witness were brought into the Courtroom.)

14  THE COURT:  All right.  We're reconvening

15  with all the jurors present in CR2014 0139 this 9-11-2015.  It's State of Ohio

16  -vs- Markelus Q. Carter.  The defendant is present with counsel.  The State is

17  present.

18  Ladies and gentlemen of the jury, welcome back.  We've got a full day

19  in store.  We'll try to make sure we try to get a reasonable end of the day time

20  because of the weekend starting.  I'll have some instructions for you,

21  obviously, at the end of the day when we start the weekend.

22  I just want to ask - is there anyone on the jury who feels like they were

23  present or have been unable to follow my admonitions not to discuss the

1    case?  Does anybody feel they've been exposed to anyone else who had

2    information about this case that would prevent you from being fair and

3    impartial?  Anybody?  Any situations?  Okay.

4    All right.  We'll continue.  When we left off -- oh, by the way, Mrs.

5    Krites, are you feeling better?

6    JUROR NUMBER THREE:  Much.  Thank you.

7    THE COURT:  Okay.  All right.  Detective

8    Marik was on the stand.  The State was, I think, close to ending their direct.

9    MRS. KOHLRIESER:  Yes, your Honor.  I

10   will represent to the Court that I have a few more questions.

11   THE COURT:  Okay.  All right.

12   MRS. KOHLRIESER:  But, also, in

13   preparing for today I actually left two of my exhibits over at the office and so

14   Mr. Miller is actually running back to get those.

15   THE COURT:  Okay.  All right.

16   MRS. KOHLRIESER:  They're for

17   Detective Marik.

18   THE COURT:  Okay.  All right.  Well,

19   Detective, you can take the stand again.  You're still under oath from

20   yesterday.  Mrs. Kohlrieser, you can continue.  Can you go forward and

21   inquire without those exhibits?

22   MRS. KOHLRIESER:  Yes.

23   THE COURT:  Okay.

1    MRS. KOHLRIESER:  In case there was a

2    little bit of a stutter, I wanted everybody to know why.  It's my fault.

3    **DIRECT EXAMINATION OF DET. DONALD MARIK CONTINUED**

4    BY MRS. KOHLRIESER:

5    Q    All right.  Detective Marik, I apologize.  I don't quite recall exactly

6    where we left off.  So, it might not flow a little bit.  We talked about collection

7    of various pieces of physical evidence at the scene at 436 East McKibben, if

8    you recall, correct?

9    A    Yes.

10    Q    Okay.  One thing I did not have you identify previously, and I'll do that

11    right now, is State's exhibit '77'.  I'd ask you to take a look at that and tell me

12    if you recognize what that is.

13    A    It's a brown bag.  It's sealed.  It has my signature and a property tag.

14    It's an American Electric Power bill.  It's dated February 23rd, 2009.

15    Q    Okay.  Would that be the power bill that we saw depicted in the

16    photograph earlier on the counter --

17    A    Yes.

18    Q    -- at 436 East McKibben?

19    A    Yes.

20    Q    Now, again, forgive me if I repeat.  Once you collected all those things

21    and I believe you described the evidence storage system and things of that

22    nature, all this stuff when it goes into storage remains in the bags that it's

23    collected in, correct, the envelopes?

658

1    A    Yes.

2    Q    And they're kept in their own space, for lack of a better term, for each

3    particular case?

4    A    Yes.

5    Q    Now, the following day did you attend the autopsy of Ken Warrington?

6    A    I did.

7    Q    And is that standard procedure for someone, particularly an I.D.

8    Officer, to attend the autopsy on a suspicious type of death?

9    A    To photograph it and also to collect any evidence given to me by the

10    pathologist; yes.

11    Q    Okay. So, you actually take photographs during the autopsy?

12    A    Yes.

13    Q    Does the coroner, or her assistant, also take photographs?

14    A    Yes.

15    Q    And you said to collect evidence. Such as?

16    A    Anything in the autopsy related to the death, such as projectiles. We

17    also take a blood sample and anything pertinent to the case. We also collect

18    the clothing that the deceased was wearing.

19    Q    Okay. So, if the deceased comes in with clothes on, -- well, I assume

20    Mr. Warrington came in that way?

21    A    Yes.

22    Q    The coroner actually removes those and gives them to you for

23    evidence collection?

1   A   Yes.

2   Q   And are they treated the same way you treat the evidence at the actual

3   scene?  Separately bagged and that type of thing?

4   A   Yes.

5   Q   So, in this case did you collect Mr. Warrington's clothes?

6   A   Yes.

7   Q   You said also particularly in a shooting death sometimes there's

8   actually bullets and fragments left in the body?

9   A   Yes.

10   Q   And the coroner will remove those?

11   A   Yes.

12   Q   And then you get them?

13   A   Yes.

14   Q   Again, do you place them in evidence just like you do every other

15   item?

16   A   Yes.

17   Q   And in this case were more bullets or fragments found during the

18   autopsy?

19   A   I do not believe any were found.

20   Q   You had found the two shell casings there, and I believe three bullets,

21   you said.  Did it appear that Kenneth Warrington was shot more than once?

22   A   Yes.

23   Q   More than twice?

099

1   A   Yes.

2   Q   Do you, off the top of your head, remember how many times it was?

3   A   There were a number of entrance and exit wounds.

4   Q   Okay. So, after you attend the autopsy and you're informed of the

5   number of wounds and that type of thing, but no other bullets or fragments

6   were recovered from Mr. Warrington's body, what do you do?

7   A   I return to the Police Department from that point. Or, if I had to drop off

8   anything to Bowling Green at the Bureau of Criminal Investigation, from

9   Toledo to Bowling Green and then back to Lima.

10  Q   That was part of your job as an I.D. Officer as well; correct?

11  A   Yes.

12  Q   To take evidence from the evidence room to whatever state crime lab?

13  A   Yes.

14  Q   And I guess for those of us who, you know, watch T.V. and see C.S.I.

15  and things like that, your job as the I.D. Officer is the collection of evidence;

16  correct?

17  A   Yes.

18  Q   You don't check for DNA trace and that type of stuff; correct?

19  A   No.

20  Q   Okay. We have a state crime lab that does that?

21  A   Yes.

22  Q   Now, in this particular case once you returned back to station did you

23  ever go back out to 436 East McKibben that day?

1   A   Yes.

2   Q   Okay.  What was the purpose?

3   A   The purpose was to look for fragments, shell casings, and spent bullets

4       that may have been missed.

5   Q   Okay.  And when you went back out there -- now, by this time, though,

6       the scene was released; correct?

7   A   Yes.

8   Q   Okay.  So, the crime scene tape is down and whoever is free to come

9       and go?

10  A   Yes.

11  Q   Okay.  So, when you went back out there were you able to find

12      anything additional?

13  A   We looked and, no, we did not find anything.

14  Q   Did you take any additional measures for assistance in locating

15      anything?

16  A   I thought that possibly if we melted some of the snow that we might

17      find something and at that time I had summoned the fire department and they

18      sent a pumper from the north end.  They sent a pumper and a couple of

19      firefighters and they gently used the water from the hose and melted down a

20      section of the alley with the water in order for us to see if we missed any

21      bullets or if we missed any shell casings.  The snow was covering everything

22      and we thought, 'well, let's give it a try and see what we can do'.

23  Q   Okay.  Like something might have fallen into the snow, or, gotten

1 obscured by it or something?

2 A Yes.

3 Q Stepped on even?

4 A Yes.

5 Q Okay. And you didn't, in your search at the time, didn't find anything?

6 A We scoured the gravel and could not find anything.

7 Q That was going to be my next question to you. That alleyway there,

8 that parking area, that's not concrete or asphalt or anything; is it?

9 A It's loose gravel.

10 Q Loose gravel? Okay. Now, Detective Mark, did you ever go through

11 the cooler and duffel bag that were found there next to Mr. Warrington's

12 body?

13 A Yes.

14 Q Okay. What types of things did you find inside?

15 A The gym bag had a number of clothing items. I remember there were

16 some towels, wet towels. It just related to changing clothes perhaps.

17 Q Okay. Like maybe there was a shower at work or something where he

18 could have changed or something?

19 A Yes.

20 Q Okay.

21 A The cooler essentially had some papers in it, some food items, things

22 related to probably what he had at work, I assuming.

23 Q Okay. Did you also find the victim's wallet?

1     A    Yes.

2     Q    Was there any money in any of these items?

3     A    Yes.

4     Q    Do you remember off the top of your head approximately how much

5    money?

6     A    I thought it was one hundred sixty-six dollars in U.S. currency.

7     Q    Okay.  And all that money was still there; correct?

8     A    Yes.

9    MRS. KOHLRIESER:  If the Court would

10    give me just a moment?  I'm sorry.

11    THE COURT:  Okay.

12    (WHEREUPON, Court went off the record briefly.)

13     Q    Detective Mark, I'm going to hand you what's now marked as State's

14    exhibit, excuse me, State's exhibit '159' and ask you if you recognize that.

15     A    That would be the contents of the cooler.  This photograph was taken

16    with the amount of items displayed on the floor so that we could get an idea of

17    everything that was in there, including the money, the wallet, the credit cards, a

18    book, and several other items, food items, perhaps.

19     Q    Okay.  And did you also look inside some of those items to see what

20    was inside there?

21     A    Yes.

22     Q    All right.  This is State's exhibit '159' which we previously referred to?

23     A    Yes.

1  Q.  Okay.  And is this what you were talking about it looked like some

2  lunch items, perhaps, and these look like smaller bills here; correct?

3  A.  Yes.

4  Q.  And did you look inside also a tin that was found inside these?

5  A.  Yes, we looked inside all of the items.

6  Q.  State's exhibit '160'.  Take a look at that for me.  Do you recognize

7  that?

8  A.  Yes.  It's a color photograph of the tin.  It was displayed on the floor

9  and there were a number of items inside this tin.  It looks like maybe a pen,

10  an aspirin bottle, business card, a watch, maybe a pen, a prescription bottle.

11  It looks like maybe a pen knife.  I'm not sure.

12  Q.  Okay.  Again, this is so the jury can see '160'.  Is this what you were

13  talking about, the tin and the various contents?

14  A.  Yes.

15  Q.  Just run of the mill stuff that someone might carry around with them?

16  A.  Yes.

17  Q.  And then did you also find the victim's identification and work badge?

18  A.  Yes, I did.

19  Q.  I'm showing you State's exhibit '162'.  Do you recognize that?

20  A.  It's a color photograph of a ten dollar bill, a five dollar bill, a one dollar

21  bill, driver's license, Lima Refinery Husky identification tag with Ken

22  Warrington, and his wallet and a couple of other plastic cards.

23  Q.  Okay.  Before I put that up, would you look at State's exhibit '161'.  Do

1  you recognize that?

2  A  It's a color photograph of three fifty dollar bills and two charge cards,

3  or, debit cards.

4  Q  So the jury can see what we're talking about, exhibit '161'. Are these

5  the larger denomination bills, the fifty dollar bills, that you were just looking

6  at?

7  A  Yes.

8  Q  Okay. And are these the credit cards of Ken Warrington's?

9  A  Yes.

10  Q  And exhibit '162', does that show the driver's license and Husky

11  Refinery badge?

12  A  Yes.

13  Q  And then the ten, five, and one you were just talking about?

14  A  Yes.

15  Q  Now, State's exhibits '159', '160', '161', and '162', do they fairly and

16  accurately represent the contents of the cooler and the wallet as you found

17  them on February 23rd, 2009?

18  A  It does.

19  Q  I guess you displayed everything.  But, this is what is in there;

20  correct?

21  A  Yes.

22  Q  With the exception of perhaps transporting some of the evidence that

23  was collected for various testing and things of that nature and general

1   maintenance of the property room, did you have any other involvements with

2   this case in investigating it?

3   A   I was at 122 East Eureka Street that night.

4   Q   Okay.

5   A   I did very little there outside of placing bagged property within the

6   property van and then transporting it to the Police Department and locking

7   that up into a closet.

8   Q   Okay.  And in doing that did you wear any gloves or anything that you

9   had worn at the crime scene?

10   A   No.  I never handled the property there.

11   Q   Okay.  So, you -- well, was there any chance you cross-contaminated

12   things from 436 East McKibben to 122 East Eureka?

13   A   No.

14   MRS. KOHLRIESER:  Nothing further.

15   THE COURT:  Okay.  Mr. Rion, you may

16   inquire.

17   MR. RION:  Thank you, your Honor.

18   **CROSS EXAMINATION**

19   **BY MR. RION:**

20   Q   Good morning, sir.

21   A   Morning.

22   Q   You were in charge of the crime scene for the address on McKibben,

23   but not for over on Eureka, correct?

1   A   Correct.

2   Q   And who was in charge over there from a property point of view?

3   A   The only thing I did was handle the property.  I handled the bagged

4   property and took it to the Police Department only.

5   Q   Was Whitney in charge of that scene?

6   A   I believe he was.

7   Q   Okay.  So, let's talk about McKibben for a second.  We've seen

8   pictures of the outside.  We've seen pictures of the living room area.  Did you

9   go into the attic?

10   A   At 436 East McKibben?

11   Q   Yes.

12   A   No, I did not.

13   Q   You did not.  Did you take any pictures of any of the bedrooms?

14   A   No.

15   Q   Did you search the bedrooms?

16   A   I would have gone into the bedrooms, I believe, but not searched them.

17   Q   Did you document what clothing was where and of whose, or, any of

18   the clothing in any of the rooms?

19   A   No.

20   Q   Do you have any recollection of the clothing in any of the rooms?

21   A   No.

22   Q   Did you search the drawers looking for any type of weapons in the

23   bedrooms?

899

1    A    No.

2    Q    I'm going to hand you what's been marked as defense exhibits 'C', 'D',

3    'E', 'F', and 'G'.

4    THE COURT:  Now, is this the same 'C'

5    that was previously identified?

6    MR. RION:  Oh, I already had a 'C'?

7    THE COURT:  Yea, you had a 'C'.

8    previously.  That was the computer photo that you said you were going to get

9    printed.

10    MR. RION:  Yes.  So, 'C' would be the --

11    THE COURT:  'C' was the one that was

12    displayed on the computer before.

13    MR. RION:  Shown on the computer?  That

14    is that.

15    THE COURT:  Okay.  All right.

16    Q    First, I'm handing you defense exhibits 'C', 'D', 'E', and 'F'.  Do those

17    appear to be pictures that you took the morning of February 23rd, 2009?

18    A    They are.

19    Q    And you created digital images; correct?

20    A    I did.

21    Q    And so these are print-outs from the digital images?

22    A    Yes.

23    Q    And do they appear to be fair and accurate pictures of what you saw

1      that day?

2      A      Yes.

3      MRS. KOHLRIESER:  Your Honor, the

4      State would stipulate that those are pictures that Detective Marik took on that

5      day.

6      THE COURT:  Okay.  Thank you.

7      Q      I'm showing you defense exhibit 'C'.  Does that appear to be -- first of

8      all, do you see the tire tracks here that come and sort of line up with the

9      truck?

10     A      Yes.

11     Q      Those appear to be fresh prints; correct?

12     A      Yes.

13     Q      So, if we're looking right here, as an example, you can see a print that

14     goes in and it looks different than the rest of the snow; right?

15     A      Yes.

16     Q      And there were no other fresh tire prints as those, or, that

17     were competing with those prints; correct?

18     A      Yes.

19     Q      That would lead you to believe that nobody else drove across those

20     prints after Mr. Warrington drove in; is that a fair conclusion?

21     A      Well, they didn't drive across the middle.  You can tell that.  Also, on

22     both sides of the two tracks there.  So, --

23     Q      In other words, these prints here that we can see right there, it doesn't

670

1    appear that prints from tires of trucks or cars or anything appeared over those

2    prints after that would have packed in the snow; correct?

3         A    Well, certainly not in the middle or the sides; no.

4         Q    Okay.  All right.  I want to draw your attention to the shed here.  Have

5    you had a chance to go out recently to the scene at all?

6         A    No.

7         Q    Do you see any motion light on the shed?

8         A    Not in that particular photograph; no.

9         Q    Just so it's clear, this is the house there at 436 McKibben; correct?

10        A    That would be the south side of the house.

11        Q    The south side of the house?  That's the shed next to it.  That's 'C'.

12   I'm showing you defense exhibit 'D'.  Would this be another view of the south

13   side of the house and the shed as well?

14        A    Yes.

15        Q    And, again, up here you do not see any motion detector; correct, a light

16   with a motion detector?

17        A    No, I don't see a light there.

18        Q    That was 'D'.  I'm showing you defense exhibit 'F'.  Looking both at the

19   south side of the house and the south side of the shed.  No motion detectors

20   and lights on that side; correct?

21        A    There does not appear to be.

22        Q    Finally, defendant's exhibit 'E'.  Now, this would show -- well, it's a

23   pretty good view of both, -- again, that's the south side of the house; correct?

1    A    Yes.

2    Q    And this would be, I guess, the north side of that shed; correct?

3    A    Yes.

4    Q    On this roof here do you see any light, any motion detecting light?

5    A    No.

6    Q    And this is exactly the way it was on February 23rd, 2009; correct?

7    A    Yes.

8    Q    And that's the day that picture was taken?

9    A    Yes.

10   Q    And in this picture you can see -- well, is this a window right here?

11   A    I believe it is.

12   Q    And is that a window into a bedroom; do you recall?

13   A    I think the bedrooms were on the south side.

14   Q    Now, you took some pictures and I want to draw your attention to

15        State's exhibits '21' and '22'. Do you recall these two exhibits?

16        MR. RION: Your Honor, is it okay if I

17        approach the witness?

18        THE COURT: Yea, that's fine. Yea, that's

19        fine.

20   A    These are the color photographs that I took and it would be the edge of

21        the concrete pad. It depicts the concrete, what appears to be blood, snow,

22        and what I thought was some type of ash/tobacco, if you will, in the snow.

23   Q    Let me show the jury so they know what we're talking about. There

1  were some things -- the prosecutor brought up a couple of things.  Number

2  one, there appeared to be some blood here; correct?

3  A  Yes.

4  Q  And then here it looked like there was some fresh -- well, somebody

5  had smoked a cigarette?  There was some ashes from tobacco at that point;

6  correct?

7  A  Possibly.  I'm not sure what it was because it was never tested.  It just

8  looked like ash.

9  Q  Somebody smoked a cigarette there.  You know, it hadn't been

10  trampled in the snow; correct?  It looked fairly recent?

11  A  Yes.

12  Q  And then right here there's what looks like a footprint; correct?

13  A  Yes.

14  Q  Now, to put it in perspective, looking at now State's exhibit '21', the

15  same view where we were before; correct?

16  A  Yes.

17  Q  Now, I'd like to hand you what's been marked as defense exhibits 'G',

18  'H', 'I', 'J', 'K', and 'L'.  We need to turn the light on for just a little bit.

19  (WHEREUPON, witness reviewed exhibits.)

20  Q  I'd like for you to look at those.  Do those appear to simply be images,

21  maybe blown up, from exhibits '21', and '22', pictures that you took of that

22  area that you just described?

23  A  They are.

1    Q    Okay.  Looking at, for example, defendant's exhibit 'H', does it appear

2         as if inside the footprint there appears to be some blood?  You have other

3         images there if you need to look at them closer.

4    A    One appears to be blood, and I believe the other two probably are

5         leaves underneath the footprint.  Brown leaves.

6    Q    So, right here, for example, that appears to be blood?

7    A    Yes.

8    Q    And these discolorations there appear to be things underneath the ice;

9         correct?

10   A    Yes.

11   Q    Was this piece of -- was that blood collected; do you know?

12   A    I do not believe it was.

13   Q    We do not know whose blood that is; correct?

14   A    Yes.  Correct.

15   Q    Looking at defense exhibit 'I', well, it sort of shows three things.  It

16        shows right here it looks like -- does that appear to be blood on the concrete

17        slab?

18   A    It appears to be.

19   Q    And then that trail, I guess, continues out into that other piece of area

20        with the ashes in-between; correct?

21   A    Yes.

22   Q    I think I asked you, but just in case I didn't, defense exhibits 'H', 'I', 'J',

23        'K' and 'L', well, 'G', 'H', 'I', 'J', 'K' and 'L', those all fairly represent -- well,

674

1 these are your images, but just blown up to a greater degree; correct?

2 A Yes.

3 Q And they're fair and accurate representations of pictures you took on

4 that day?

5 A Yes.

6 Q The jury saw a lot of pictures. I'm not going to put them up there

7 again. But, we saw pictures of broken glass from the storm door; correct?

8 A Correct.

9 Q Did it appear as if the blood was on top or underneath the broken

10 glass?

11 A I don't have an opinion of that. I can't tell one way or the other. That

12 was something I never examined on that particular day.

13 Q You had the opportunity to -- you took a stick, a dowel rod, and you

14 were able to create some angles through the door. Do you recall that?

15 A Yes.

16 Q If I could hand you State's exhibits '33','39', and '43'? Are these the

17 images -- you can look at them. Sorry. I'll put them up on the screen. State's

18 exhibit '43', as an example, would show -- well, does this appear to be a rod

19 or a stick, a dowel rod, that you put in through the entry, the bullet entry into

20 the door?

21 A Yes.

22 Q And the height right here, well, the height is how high?

23 A I can't tell from this photograph.

1  Q  Let me hand you all of your photographs.  You measured the height;

2  correct?

3  A  Yes.

4  Q  Was it four feet five inches maybe?  I'll hand you all of your pictures so

5  you can refresh your recollection.

6  A  It's between four feet five and four feet six inches.

7  Q  Okay.  It's rising at a fairly -- well, were you able to figure out the angle

8  of how high it was rising?

9  A  No.  Although it depicts the bullet hole, I don't believe that is a fair and

10  accurate -- it was in a downward position.

11  Q  What do you mean?

12  A  Well, the dowel rod indicates the hole.  But, it's my opinion it didn't

13  come from an upward angle.

14  Q  It came from a downward angle?

15  A  It came from, in my opinion, it came from a horizontal angle.

16  Q  Okay.  So, this dowel rod is not depicting the trajectory of the bullet

17  then?

18  A  It is, but it is still in a fashion that you would have to push it all the way

19  through in order to get -- I placed that in there to show to there that there was a bullet

20  hole there.

21  Q  And is that the bullet hole, or, bullet that you believe went into the

22  freezer?

23  A  It is.

1 Q If you look at the picture of the freezer, the height of the entrance into

2 the freezer mechanism just beyond the door is four foot three inches?

3 A Yes.

4 Q So, from the door to the freezer the bullet goes down two inches within

5 a matter of, say, a foot and a half, correct?

6 A It drops.

7 Q And that would be consistent with the trajectory that you have put in

8 there, correct?

9 A It does drop a little.

10 Q Two inches within a couple of feet; correct?

11 A Yes.

12 Q If you could open State's exhibit '68', just the plastic bag there?

13 State's exhibit '68', is this the envelope that contains one of the shell casings

14 that was on the cement slab?

15 A I'd have to see the envelope. It's a shell casing. A Winchester nine

16 millimeter. It was on the patio.

17 Q So, yes?

18 A Yes.

19 Q Now, I want to talk about the property room for a minute. You're in

20 charge of the property room; correct?

21 A Co-in charge, I would say.

22 Q You and Officer Whitney?

23 A Yes.

1   Q     And from 2009 until now have you changed property rooms?

2   A     I left in 2012.  I'm assuming by looking at the bar codes that are used

3  now that something was changed.  What exactly, I don't know.

4   Q     Do you know if the facility has changed at all?  Do you have any idea

5  of what's happened in the property room since 2012?

6   A     I know there was a remodeling that was done.

7   Q     So, all the property was moved while it was remodeled and then put

8  back either there or in another place; correct?

9   A     I can only assume it was.

10   Q     And the idea with property rooms is that -- well, is there a protocol?

11   A     Yes.

12   Q     And the protocol would be -- well, let's assume that this object is found

13  here.  It's collected by somebody that's qualified to collect it.  It's bagged.  It's

14  taken to a property room.  It's registered in, or, logged in to the property room

15  and it sits there; correct?

16   A     Yes.

17   Q     That's the idea; right?

18   A     It's housed within a certain area in the property room.

19   Q     Then if somebody wants to look at it they would have to talk to you or

20  Officer Whitney; correct?

21   A     Yes.

22   Q     And then you would get it for them, log it out to them, and they would

23  do whatever they're going to do with it, and then whenever they were done

1    they would bring it back to you and you would log it back in; correct?

2    A    Yes.

3    Q    And that is crucial for the integrity of the evidence; correct?

4    A    Yes.

5    Q    That allows documentation as to where evidence is at all times; right?

6    A    Yes.

7    Q    So, if we use just this casing, for example.  I'm going to hand you

8    what's been marked as Defendant's exhibit 'M'.  Does this appear to be the

9    property log in this case?  I'm going to save that casing until later.  Just

10   answer that question.

11   A    It appears to be.

12   Q    And does this appear to be the log dealing with one of the nine

13   millimeter casings?

14   A    It would be, I'm assuming, the updated version of the property room

15   chain of custody.  It looks like it is of the Winchester nine millimeter.

16   Q    Okay.  And just so I can show the jury for a second, as it relates to

17   Defendant's exhibit 'M' dealing with the, well, chain of custody of this, well,

18   the way it would work is, for example, it was transferred from you to C block.

19   What is C block?

20   A    It was an area where the property was stored.

21   Q    Okay.  And then it would go from C block on February 23rd and on

22   February 24th it was transferred to Bowling Green; correct?

23   A    Yes.

1   Q     And then from Bowling Green back to some officers.  Would those be

2   people that gave it to you, you or Whitney?  In other words, it was transferred

3   from Bowling Green to at least two individuals.  Who would that be; if you

4   know?

5   A     The property was picked up by Officer Goedde and it was received into

6   property by Identification Officer Adkins.

7   Q     Okay.  That's another Officer - Adkins?

8   A     Yes.

9   Q     So, there's Whitney -- so, it's not just you and Whitney?  Adkins is also

10   in that chain?

11   A     Yes.

12   Q     And would Carman also be in that chain?

13   A     Yes.

14   Q     And would K.W. also be in that chain?

15   A     Yes.

16   Q     And then would Don also be in that chain?

17   A     Yes.

18   Q     When I say chain, they had authority to enter the property room?

19   A     They had authority to handle the property from transportation to the

20   property room, et cetera.

21   Q     Okay.  So, now this shows that from C block it went to Detective Clark

22   on May 19th, 2010; right?

23   A     He obtained it and then transferred it to Officer Adkins.

1    Q      Outside of the property room; correct?

2    A      Yes.

3    Q      Between May and October where was this because it doesn't go --

4    Adkins doesn't put it back into the property room until October of 2010, some

5    five months later, correct, according to your records?

6                                    MRS. KOHLRIESER:   Your Honor, may we

7    approach just a moment?

8                                    THE COURT:   Sure.

9    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

10   the record, as follows.)

11                                   MRS. KOHLRIESER:   Just a couple of

12   things.  Obviously the first part of the exhibit has Don's name on it.  These

13   records were just obtained.  It's a totally new system.  Don said he's

14   assuming that's what happened.  He's trying to ask him about what other

15   people did and things of that nature and Don, well, clearly in 2014 he was not

16   even remotely in charge of this.  He did say he's assuming this.  He's

17   testifying by talking about assumptions.

18                                   THE COURT:   I'm going to overrule it.

19   (WHEREUPON, Court continued on the record, as follows.)

20                                   THE COURT:   Okay.  Continue.

21   Q      That's the way it appears; correct?

22   A      Yes.

23   Q      Okay.  And you worked with chain of custody and chain of custody

1    logs in the property room for how many years?

2    A       I was briefly in there for six months.

3    Q       But, you were in charge at that time?

4    A       Co-charge; yes.

5    Q       You and Officer Whitney?

6    A       Yes.

7    Q       And the logs that you kept, the chain of custody logs, and transfers

8    from and transports to, record created by, date, and comments, well, that's a

9    fairly common diagram; correct?

10   A       Yes.

11   Q       That's how the logs would look?  In the olden days I suppose it was

12   written in; right?

13   A       Yes.

14   Q       People would write it.  Now, corresponding to those dates should there

15   also be on the actual envelope itself dates that would correspond roughly?  In

16   other words, do you have to put your initials on the envelope every time that

17   envelope is opened?  Is that the protocol?

18   A       After it's sealed.  When the person seals it then their initials go over the

19   top of the paper and also the cellophane.

20   Q       Just trying to get to -- so, the protocol would be you collect that at the

21   scene and you put it in a bag and you seal it and you put your initials on it;

22   right?

23   A       Yes.

1    Q       If then I'm a detective and I get it from you and then I open it to look at

2    it or to send it wherever it goes, then when I reseal it, if I was a detective or if I

3    was somebody at B.C.I. or if I was whoever, when I reseal it I put my initials

4    on where I reseal it; correct?

5    A       Yes.

6    Q       That's the protocol.  Just looking at this, as an example, for 2010

7    where we saw the property was taken out in May and returned in October, do

8    you see any markings that would show that this envelope was opened in any

9    time in 2010?

10   A       Looking in detail, I can't tell.  There's a date on this.  I can't tell what it

11   is.  It quite possibly could be June 21st maybe.

12   Q       Okay.  Let me talk to you about -- well, are you referring to this part

13   right here?

14   A       Yes.

15   Q       Also on Defendant's exhibit 'M', so I don't have to recall you, but the

16   jury hasn't seen this piece of evidence yet, but I assume that they will at some

17   point, this deals with, well, it looks like black gloves; correct?

18   A       Yes.

19   Q       Just to go through some examples, Clark, Tim Clark, February 23rd to

20   Detective Bureau.  Who's K.W.?  Is that Whitney?

21   A       Ken Whitney.

22   Q       Okay.  Then two days later received from Tim Clark to you and then

23   Ken documented that; correct?

1   A      Yes.

2   Q      So, then on March 13th, 2009 it goes from C block, which is

3   someplace in the property room; right?

4   A      Yes.

5   Q      To an Officer Hammond and Officer Adkins documented that transfer;

6   right?

7   A      Yes.

8   Q      Does it show the black gloves ever being returned to the property room

9   from March 13th?  The next thing I see is December 12th where they start off

10  in the property room and go to Adkins.  Does it show when and who returned

11  the gloves from March 13th so that they could then be taken from the property

12  room in December?  Do you understand the question?

13  A      Yes.

14  Q      Is there any documentation as to what happened between March 13th

15  and December 12th, March 13th, 2009 and December 12th, 2013?

16  A      Hammond is a B.C.I. agent.  He would have had these gloves given to

17  him to take to B.C.I. and that would have been around March 13th and then

18  returned on or about December 12th, I'm assuming.

19  Q      Well, that doesn't show that, though.  That shows from C block to

20  B.C.I. in 2009; right?  To B.C.I.?

21  A      Right.

22  Q      Right?  Okay.  So, we know that Hammond is B.C.I.?

23  A      Right.

1    Q        Okay.  Now, they're at B.C.I. presumably somewhere around this, and

2    we'll bring in B.C.I. to talk about it.  But, then somehow they're back in the

3    property room to be taken out four years later.  There's no record of when or

4    how they were returned to the property room.  Do you agree with that?

5    A        I can't answer how, or, the problem with this.  I can't answer that.  I

6    don't know.

7    Q        The record seems to be, as we're looking at this, against protocol;

8    correct?

9    A        Yes, sir.

10   Q        It's not showing it being documented as returning so they can be

11   removed again four years later.  Would you agree with that?

12   A        It does look like it has a problem with protocol.

13   Q        Also, if we look at Defendant's exhibit 'M', -- just as another example.

14   I'm not going to go through every page of this.  But, just as another example,

15   dealing with the camouflage.  It would show here, again, --

16                          MRS. KOHLRIESER:   Jon Paul, what item

17   number is that so I can find it?

18                          MR. RION:   It's number two thirteen.

19   Q        Same issue.  I.D. Bureau, that's you guys, to Hammond, and that's

20   B.C.I., in March of 2009.  Then, once again, the next thing we see in the

21   property room as far as identification is that in 2013 we're showing from

22   property room to Adkins, and the record created by Officer Carman.  Same

23   question and same answer, I assume?

1  A  What's the question?

2  Q  This would appear to be inconsistent with your protocol as far as the

3  way this is being documented; correct?

4  A  I can't answer for -- my name is not on there, and so I can't answer for

5  what these officers did.

6  Q  Same question, though - as far as your knowledge being in charge of

7  the property room, the deal with the property room is you document when it's

8  in and when it's out and when it returns and when it goes out again; correct?

9  A  Yes.

10  Q  That does not appear to demonstrate that protocol, at least from what's

11  in the records that you say are those records; correct?

12  A  Yes.

13  Q  At the time that you documented the scene on McKibben were you

14  given any operative facts about any statements of any witnesses?

15  A  While I was at the scene of East McKibben?

16  Q  Yes.

17  A  No.

18  Q  So, your investigation and documentation of the evidence is separate

19  from, say, Detective Clark or another officer's responsibility of interviewing

20  people and the two of you don't collaborate as far as 'hey, look for this', or,

21  'make sure you document that', et cetera?

22  A  That's correct.

23                            MR. RION:   Can I have one second?

1        THE COURT:   Sure.

2    (WHEREUPON, Court went off the record briefly.)

3    Q      You were over at the Eureka site later that day, but you were simply

4    there to take evidence that had already processed and bagged and take it to

5    the property room, or, to the Police Station; correct?

6    A      Yes.

7    Q      You described that there's a closet that's separate from the property

8    room.  Do you recall that testimony yesterday?

9    A      Yes.

10   Q      Is the closet close to the property room?

11   A      No.

12   Q      Is it in the same building?

13   A      It was in my office at the time.  It was an office closet.

14   Q      Okay.  When I think of a closet I just think of a regular closet.  You said

15   it had a lock on it.  Am I imagining correctly, or is there something special

16   about the closet?

17   A      It's a closet with a deadbolt lock on it.

18   Q      Okay.  And that closet is utilized often for the storage of evidence until

19   it is processed into the property room proper; correct?

20   A      It's a part-time transfer.

21   Q      So, not just for this case, but for every case in the county where

22   evidence is collected it may end up in that closet before it goes to the property

23   room; is that correct?

1 A  Not every time; no.

2 Q  No.  It may?  It's possible?  In other words, a lot of evidence would flow

3 through your office and then into the property room?

4 A  Right.  But, not necessarily through that property closet.

5 Q  I understand.  Not every day.  And that evidence can range from cases

6 involving drugs; correct?

7 A  Yes.

8 Q  Cases involving weapons?

9 A  Yes.

10 Q  A whole variety?  Anything that could possibly come through as a

11 significant case where property has to be kept could, not always, but could

12 pass through that property closet on its way to the property room; correct?

13 A  Only if it does not need dried.  If you have something that has

14 biological evidence on it you have to let it dry and that's not proper protocol to

15 place it in there.  It doesn't dry properly.

16 Q  There are times when property such as clothing, et cetera, well, do you

17 have like a table in the property room or in your office where things can be

18 documented with pictures?  In other words, the clothing after it's dried, for

19 example, you spread it out and you can take a picture of it and it's for

20 evidentiary value?

21 A  Yes.

22 Q  Is that in your office or is that in the property room or right outside the

23 property room?

1    A       It's, as I recall, it's separate.  It was in another room.

2    Q       Okay.  When you were there in 2012 these plastic bags were not in

3    service; correct?

4    A       No.

5    Q       So, what we would have are these manila envelopes with the

6    handwriting on it; correct?

7    A       Yes.

8    Q       And they weren't sealed by a vacuum seal or anything at that time;

9    correct?

10   A       No.

11   Q       Thank you, sir.

12                               THE COURT:   Okay.  Any redirect?

13                               MRS. KOHLRIESER:   Just a couple of

14   follow-ups.

15                    **REDIRECT EXAMINATION**

16   **BY MRS. KOHLRIESER:**

17   Q       Detective Marik, you left the Lima Police Department in 2012; correct?

18   A       Yes.

19   Q       And the logs that Mr. Rion showed you just now, being marked as

20   Defendant's exhibit 'M', that's not at all what they looked like when you were

21   in charge of the property room; is it?

22   A       No.  No, it's not.

23   Q       Now, you still have, obviously, you have some dealings with the Lima

1    Police Department; correct?

2    A      Sometimes.

3    Q      You've been up there recently?

4    A      Yes.

5    Q      Okay.  And you're aware that they've remodeled and they've updated

6    their computers?

7    A      Yes.

8    Q      Okay.  Now, Mr. Rion showed you -- let's look at item one oh eight in

9    Defendant's exhibit 'M'.  Take a look at that for me for just a second.  Now,

10   understanding that this isn't quite the way you necessarily did it, but it says

11   'record created by' and let's take, for instance, and I'll put it up here, it would

12   be Adkins and Goedde on the third line down.  Let's take a look at the third

13   line here; okay?  Now, that says Goedde.  He would have been an officer in

14   the drug unit; correct?

15   A      Yes.

16   Q      Okay.  And the drug unit had their own type of property system for drug

17   evidence; correct?

18   A      Yes.

19   Q      Okay.  So, were there times when, say, someone from the drug unit

20   was going to run to B.C.I. in Bowling Green for things to be tested and they

21   would also run stuff up for the I.D. Bureau?

22   A      Yes.

23   Q      Now, when they did that they basically just took the envelope as is;

1    correct?

2    A      Yes.

3    Q      They wouldn't open it up and make sure that what you had put on this

4    envelope was, in fact, what they were taking up there; would they?

5    A      They kept it sealed.

6    Q      Okay.  So, when it gets checked out to somebody it doesn't

7    necessarily mean that the envelope even gets opened; correct?

8    A      It does not get opened.

9    Q      Okay.  So, just because we see that logged part that doesn't mean that

10   that person opened that piece of evidence; correct?

11   A      That's correct.

12   Q      And is that what you're talking about - if they do open it and reseal it

13   that's when they initial it and date it?

14   A      Yes.

15   Q      Okay.  In fact, you have had a chance to look at some of these exhibits

16   since you took them into evidence; correct?

17   A      Yes.

18   Q      In fact, just last week Mr. Miller and myself were over there to look at

19   exhibits with you and the I.D. Bureau; correct?

20   A      Yes.

21   Q      And, if you recall, there were things that we didn't even open; were

22   there?

23   A      Nothing was opened.

1    Q        I think we were simply marking them at that time; right?

2    A        Yes.

3    Q        Now, the plastic envelope that State's exhibit '68' is and then there's

4    the manila envelope inside which Mr. Rion opened, those initials and dates on

5    there are from what years - just on the plastic part?

6    A        The initials look like M.L.C., July 21st, 2015.  Then there's another seal

7    at the top with K.K., August 4th, August 4th of 2015.

8    Q        Okay.  Now, there's also some other officers that were referenced.  I

9    guess if you would, for the jury, in 2009, and I think you said six months, you

10   were basically covering a vacated spot; correct?

11   A        Yes.

12   Q        Who had left that position?

13   A        Dave Hammond.

14   Q        Okay.  Where did he go?

15   A        The Bureau of Criminal Investigation.

16   Q        Okay.  The State crime lab?

17   A        Yes.

18   Q        But, he was an Identification Officer for the Lima P.D. for a number of

19   years; correct?

20   A        Yes.

21   Q        Okay.  Now, would it be uncommon, to your knowledge, for Officer

22   Hammond, even though he switched to Bowling Green to the B.C.I. facility

23   there, to transport evidence to Bowling Green for the Lima Police

1    Department?

2    A      He's a local agent and so it's not uncommon to call upon him if we

3    needed him for something and it's not uncommon for him to transport.

4    Q      Okay.  He actually lives here in Lima even though he works in Bowling

5    Green; correct?

6    A      Yes.

7    Q      And, as a courtesy, if we need something taken he'll often times take it

8    for us; correct?

9    A      Yes.

10   Q      Okay.  Do you recall the officer that replaced you in the I.D. Bureau?

11   A      It was Greg Adkins.

12   Q      Okay.  So, the Adkins we saw on Defendant's exhibit 'M' would be the

13   person who became the property officer and replaced you; correct?

14   A      Yes.

15   Q      And you were actually doing double duty; weren't you?

16   A      Yes.

17   Q      You were being a detective and being a property officer?

18   A      Yes.

19   Q      Okay.  Are you aware of whether or not Officer Kenny Whitney retired

20   as well?

21   A      Officer Whitney retired.

22   Q      You don't have to recall the year.  That's okay.

23   A      He retired two weeks after I did in 2012.

1  Q      Okay.  And do you know who replaced him at the Lima Police

2  Department as the second I.D. officer?

3  A      Mike Carman.

4  Q      Okay.  So, when we see Adkins and Carman, those are L.P.D.'s

5  current I.D. officers; correct?

6  A      Yes.

7  Q      And they were the direct replacements for you and Officer Whitney?

8  A      Yes.

9  Q      And you were Dave Hammond's immediate replacement; correct?

10  A      Part-time; yes.

11  Q      Okay.  Part-time?  Gotcha.  Now, that closet you mentioned, at the

12  time that you were an I.D. officer that, in fact, was the I.D. Bureau where that

13  closet was; correct?

14  A      Yes.

15  Q      Okay.  But, that's not where the entire evidence storage was; correct?

16  A      No.

17  Q      That was actually housed in a separate room in the basement of the

18  Lima Police Department?

19  A      The basement and we also utilized locked storage on the second floor.

20  Q      Yes, the upstairs storage.  And often times that's where murder

21  evidence went, correct, the upstairs storage?

22  A      Yes.

23  Q      Now, regardless of whether it was the basement, the upstairs

1    storage, or the closet, were those all locked rooms?

2    A      Yes.

3    Q      Okay.  Who would have keys to those locked rooms at any given

4    moment of time?

5    A      It would be the Identification Officers and potentially one of the higher

6    supervisors at the Police Department.

7    Q      And that would be it; correct?

8    A      That would be it.

9    Q      Okay.  When I talk about the drug unit, they had their own storage for

10   drug related items; correct?

11   A      They're off site; yes.

12   Q      They're off site.  Okay.  So, they wouldn't have keys to your storage?

13   A      No.

14   Q      Now, when these items are in the closet do you just throw them all in

15   there?

16   A      No.  They're placed in one separate area so we know where they are.

17   They're usually placed in a box so when we go back in to inventory everything

18   it's right there and right in front of us.  We know exactly where everything is.

19   Q      Okay.  And their bags are closed over; correct?

20   A      Yes.

21   Q      So, it's not just, you know, --

22                                    MR. RION:  Objection.  It's leading.

23                                    THE COURT:  It is leading.

1                          MRS. KOHLRIESER:  Okay.  I apologize.

2   Q      Was there a risk of cross-contamination in that closet?

3   A      No.

4   Q      Was it maintained in a way to prevent that?

5   A      Yes.

6   Q      Were there times that, and I'm just going to show you State's exhibit

7 '77' as a reference point, these white stickers with the red writing on them,

8 was there a time when you would seal this and then you would fill this sticker

9 in at a later time?

10   A      Yes.

11   Q      And is that what you wrote on the back to make sure what this item

12 was?

13   A      It's also to refresh my memory as to what was in there.

14   Q      Okay.  Now, let's talk a little bit about these photographs that Mr. Rion

15 went over with you.  Let's look at State's exhibit '33'.  You tell me if you need

16 to see it.

17   A      The photograph is of the left side of the house.  It would be the

18 entrance door into that home.  It was the door with blood and indentations on

19 it and also the dowel rod through the bullet hole.

20   Q      Okay.  The dowel rod is obviously much longer than a bullet; correct?

21   A      Yes.

22   Q      I'm sorry.  My pictures are all out of order here.

23   A      Terri?

1     Q       Thank you. Let's look at State's exhibit '47' for a second. I'll show it to

2     you up close, Detective Marik. What is '47'?

3     A       That's the kitchen door. It would be the inside. Again, that's the

4     interior door. It's a metal door. It's got the tape measure between four foot

5     four and four foot five. It's also showing the jagged, well, it would be the exit

6     of the projectile.

7     Q       Okay. So, that's basically the exit wound from what we saw on the

8     previous picture?

9     A       Yes.

10     Q       And that's the one that ended up going into the freezer?

11     A       Yes.

12     Q       Okay. Now, I realize you're not a ballistics expert, but do you know

13     what happens when a bullet hits a hard object? Does it stay on the same

14     trajectory all the time?

15     A       It loses energy if it hits something of a hard mass, such as this metal

16     door. It's obviously going to drop a lot of energy and either fragment or

17     continue on at a slower, well, slower velocity.

18     Q       Okay. So, when you're putting - you can turn the lights back on, Sue -

19     when you're putting those dowel rods in there you're simply showing up holes

20     and where they ended up; correct?

21     A       Right.

22     Q       Okay. That's not for sure some certain trajectory that it came from or

23     some ability to tell necessarily where the shooter was exactly standing or that

1     type of thing; is it?

2     A      Right.  I'm not qualified exactly into that study.

3     Q      You're simply pointing out the holes?

4     A      Yes.

5     Q      Now, Mr. Rion also showed you what appeared to be blood in what he

6     referred to as a footprint.  I'll show you State's exhibit '22'.

7     A      Yes.

8     Q      Let's assume for a minute that that is a footprint.  Is there anything

9     there that would have been identifying for you?  Are there ridge details or any

10     kind of that type of thing where you could tell size or anything of that nature?

11     A      Size?  Potentially.  But, it's my opinion that that is an old footprint

12     because of the ice that's in it.

13     Q      It looks sort of like it had melted?

14     A      Yes, melted and refroze.

15     Q      Mr. Rion also referred to that picture and the one just before it.  The

16     one you can actually see is exhibit '22' where we've got some spots of what

17     appear to be blood here on the pavement and then when he asked you about

18     possibly blood in this print itself.

19     A      Yes.

20     Q      Were you able to make some kind of determination that that was a

21     trail, which was Mr. Rion's word?

22     A      In my opinion it was not a trail.

23     Q      And when looking at the crime scene as a whole, and obviously we've

1    seen a number of pictures and I'm not going to put them back up there, did it

2    appear as if Mr. Warrington had lost a fair amount of blood?

3    A    Yes.

4    Q    I'm sure you've probably seen bloodier scenes; correct?

5    A    Yes.

6    Q    But, it's fair to say that there was a decent amount of blood?

7    A    Yes.

8    Q    Some was splattered on the door?

9    A    Yes.

10   Q    And then obviously on the patio where he went down?

11   A    Yes.

12   Q    Now, the majority of your pictures were taken around the perimeter of

13   the crime scene; correct?

14   A    Yes.

15   Q    But, you also said you took some pictures to kind of try and get the

16   area of the other homes?

17   A    Yes.

18   Q    You didn't go investigating those houses, though; did you?

19   A    No.

20   Q    Or documenting things with them.  State's exhibit '11'.  Do you

21   remember me asking you about the house that was back there?

22   A    Yes.

23   Q    Did you document that and whether there were any motion lights on it

1    or anything of that nature?

2    A    No, I did not.

3    Q    And can you tell from your photographs whether there was or there

4    wasn't?

5    A    If this is the house that's on Pearl Street, which is in the background of

6    436, I can't make a determination if there's lights on there or not, or even if

7    the house still exists today.

8    Q    Okay.  So, there could have been, but you --

9                              MR. RION:   Objection.  Leading.

10                             THE COURT:   Sustained.

11                             MRS. KOHLRIESER:   Okay.

12   Q    Could there have been?

13                             MR. RION:   And calls for speculation.

14                             MRS. KOHLRIESER:   It goes directly to --

15   Q    Well, you don't know one way or the other?

16   A    Yes, that's correct.

17   Q    So, there could have been a light?

18                             MR. RION:   Objection.

19                             THE COURT:   I'm going to sustain the

20   objection.

21   Q    And then, lastly, when we're talking about this area, again, and Mr.

22   Rion was asking you some questions about the tire marks for the vehicle that

23   belonged to Mr. Warrington - do you recall those questions?

1   A       Yes.

2   Q       Again, was this a nice fresh powdery snow?

3   A       It had probably snowed in the last couple of days.  It did not snow that

4   night.  But, it was still somewhat powdery if one did not walk through it or

5   drive through it, et cetera.  This snow was the type that appeared, well, it had

6   snowed and then there was some thawing action and then froze again.  There

7   was no recent snow on that particular day.

8   Q       Was it a hard packed type of snow and ice?

9   A       Yes.

10  Q       I'm sorry.  Just a couple of follow-ups.  When we were talking about

11  the door and the entry wound into the door, as I keep calling it, and the exit

12  wound, when a bullet, from your experience and training as an I.D. officer and

13  being on the street, have you fired a weapon?

14  A       Yes.

15  Q       Many times?

16  A       Yes.

17  Q       Okay.  Do bullets deflect when they hit something?  Do they go

18  different places at different times?

19  A       Yes.

20  Q       Then, again, I apologize as these exhibits are all out of order, but in

21  looking at State's exhibit '47' one more time for me, -- okay?

22  A       Yes.

23  Q       In this, I guess, shredding of the door, or whatever you want to call it,

1   can you tell whether that was going up, or down, or straight, or sideways, or

2   any of that?

3   A       From that photograph it's still in a motion to go straight.  It's peeled in a

4   somewhat downward motion.  Again, that's a metal door.

5   Q       Sure.  Steel entry door?

6   A       Steel door; right.

7   Q       The evidence, again, once it's bagged, whether it gets moved from a

8   closet to the C block or wherever it goes, does it remain bagged and sealed

9   unless someone actively has to open it?

10  A       That's correct.

11  Q       And you can see the areas -- can you see the areas where someone

12  has opened it?

13  A       You can see it, yes, and then after it's resealed.

14  Q       Okay.  So, if I were to just come in your evidence room and take

15  scissors and cut this bag open someplace and say I don't seal it or anything

16  like that or I don't initial it, well, would you be able to tell that it was damaged

17  upon looking at it?

18  A       Yes.

19  Q       If you found an item like that would you make attempts to figure out

20  how that would have happened?

21  A       I would be concerned about it.

22  Q       Because, again, only certain people have a key to that room?

23                              MR. RION:  Objection.  Leading.

1           THE COURT:   And it's been asked and

2  answered a couple of times.  So, sustained.

3  Q     All right.  Lastly I'm going to show you, again, Defendant's exhibit 'M'.

4  It's the chain of custody reports and specifically for item number one oh eight.

5  I'm going to put this up here.  You can read it when I put it up here.  I'll ask

6  you about this first couple of dates.  Okay.  This first one is you placing it in --

7  excuse me.  What is this first one?

8  A     It's transferred from me and transferred to C block.

9  Q     Okay.  That would be what?  What's C block?

10  A     That would be technically the property room.

11  Q     Okay.  And then the very next transfer is what?

12  A     It comes from me taking it out of C block and transferring it to Bowling

13  Green to the crime lab.

14  Q     So, when you say Bowling Green you're referring to B.C.I.?

15  A     The crime lab; yes.

16  Q     What date is that?

17  A     February 24th, 2009.

18  Q     And is that what you were referring to when you said about the autopsy

19  you may have had a stop?

20  A     Yes.

21  Q     Okay.  In fact, did you drop off evidence at Bowling Green on that day?

22  A     Yes.

23           MRS. KOHLRIESER:   Nothing further at

1    this time.

2                        THE COURT:   Okay.  I'll give you a full

3    chance to do recross.  Do you know, or, anticipate how long it might be?

4                        MR. RION:   Less than five minutes, your

5    Honor.

6                        THE COURT:   Well, I mean, I don't want to

7    limit you at all.

8                        MR. RION:   I know.

9                        THE COURT:   But it's about close to time

10   for a break.  Would you rather -- do you think five minutes or so?

11                        MR. RION:   Just so there's no -- I don't feel

12   like -- well, depending on his answers, so it might be a little longer.

13                        THE COURT:   All right.  All right.  Well,

14   let's take a break.  That's fair if we take a break before you do recross?

15                        MR. RION:   Yea, that's fine.

16                        THE COURT:   All right.  Let's take a break,

17   folks.  Remember the admonitions.  Don't discuss the case among yourselves

18   or with anyone.  Don't formulate any opinions, express any opinions, or have

19   any contact with anyone.  Again, if you ever feel like someone is having

20   improper conversation or contact in proximity to you that would affect your

21   ability to be fair and impartial, well, bring it to our attention.

22        We'll stand in recess for fifteen minutes.

23   (WHEREUPON, COURT WAS IN RECESS.)

1        THE COURT:   We're reconvening this 11th

2   of September, 2015 in CR2014 0139, State of Ohio -vs- Markelus Q. Carter.

3   The defendant is present with counsel.  The State is present.

4        The Court has, on its own motion, brought in juror, well, she's actually

5   juror number two on the list, but I know she's been sitting in one because of

6   the logistics of it.  Mrs. Coon, I brought you in here.  I'm kind of, well, I don't

7   know how to say it, it's uncomfortable for me to ask some questions and I

8   want to do this with the utmost respect, but the Court has noticed that it

9   seems like you shut your eyes at times.  Have you been able to -- are you

10  paying attention?  Are you hearing everything?

11  JUROR NUMBER TWO:   Oh, yes.  I have allergies and my eyes itch and

12  burn a lot.

13        THE COURT:   Oh, okay.

14  JUROR NUMBER TWO:   I've found if I close them for a few seconds it

15  relieves that.

16        THE COURT:   Okay.  I mean, this is my

17  impression.  So, please don't take any disrespect.

18  JUROR NUMBER TWO:   I'm sorry.

19        THE COURT:   You haven't been asleep or

20  anything; right?

21  JUROR NUMBER TWO:   No.  I can hear everything.

22        THE COURT:   Okay.  I know this isn't

23  maybe the most exciting part of the case that we've been through and the

1    lights go off.  But, you've been able to hear everything?

2    JUROR NUMBER TWO:  Yes.

3                              THE COURT:  And the shutting of your

4    eyes is just because of allergies?

5    JUROR NUMBER TWO:  Yes.  It just relieves that a bit.

6                              THE COURT:  Okay.  Okay.  All right.  So,

7    you've been able to pay attention?  It hasn't interfered with your ability to

8    listen and be fair and impartial or anything like that?

9    JUROR NUMBER TWO:  Yes; uh-huh.

10                             THE COURT:  I'm sorry then that I asked

11   those questions.

12   JUROR NUMBER TWO:  That's fine.

13                             THE COURT:  But, when I see -- and I look

14   over occasionally and if I see something, well, I noticed that one juror, you

15   know, was kind of wiggling around and needed a break, or somebody needs

16   a drink, or someone's not feeling well.  I'm trying to make sure -- well, my

17   eyes are everywhere.  So, I noticed that.  But, that's not -- you haven't been

18   dozing off or anything; right?

19   JUROR NUMBER TWO:  No.  That's just the allergies affecting --

20                             THE COURT:  Okay.  All right.  Well, I

21   brought you in here alone because I didn't want to ask these kinds of

22   questions in front of everybody.  Okay.  So, you've been able to pay attention

23   to everything?

1   JUROR NUMBER TWO: Oh, yes.

2                           THE COURT: Okay. Good. Anything

3   from counsel to follow-up?

4                           MRS. KOHLRIESER: No, your Honor.

5   Thank you.

6                   MR. RION: No, sir.

7                           THE COURT: Okay. Sorry for the

8   inconvenience. Let's bring everybody else in. The witness can take the

9   stand. If that helps your allergies, continue to do that. Okay?

10  (WHEREUPON, jury was returned to the Courtroom.)

11                          THE COURT: The jurors have returned to

12  the Courtroom. Ladies and gentlemen of the jury, it's happened in this case

13  now a couple of times. Sometimes it happens and sometimes it doesn't when

14  the Court has individual jurors in here to talk to them about certain things that

15  have come up. I told you in the beginning if there was ever any

16  uncomfortable or embarrassing, well, something that you wanted to share

17  with the Court we would do that on a one to one basis. So, I've done that

18  now in this case. The point is, those jurors that have talked with me

19  individually, well, I don't want that shared with other jurors. The other jurors, I

20  don't want you to feel left out if you're not individually asked any questions.

21  But, I also don't want you to speculate as to what's going on. If there's a

22  concern that everybody needs to know about I'll let everybody know. But, I'm

23  trying to make sure anything that might be confidential is kept confidential.

1    But, if it's evidence and it's important to the case all of you will know it.  So,

2    just put out of your mind and don't consider for any reason the fact that

3    maybe on a couple of occasions I've had to talk to individual jurors.  That's

4    just the way we're going to do it.  Okay?

5        So, we've still got Detective Marik.  I think we're at the point where the

6    defense can ask some questions on recross examination.  Mr. Rion?

7                        MR. RION:   Thank you, your Honor.

8                    **RECROSS EXAMINATION**

9    **BY MR. RION:**

10   Q     I'm going to mark this as Defendant's exhibit 'N'.  I'll put a sticker on it

11   in a minute.  It's awfully crude, but let's just assume for a second, sir, that this

12   is the shed and this is the south side of 436 McKibben; okay?

13   A     Yes.

14   Q     And this is the roof and that would be, then, the north side of the shed;

15   all right?  Let's assume that these marks here are to represent markings

16   somewhere on the shed itself indicating a motion light, motion detector with a

17   light attached to it.  When you were at the scene on February 23rd, 2009 did

18   you see any motion detector and light that would be consistent with the

19   representation made in Defense exhibit 'N'?

20   A     Referring to the photographs that I took it did not appear that there was

21   one there.

22   Q     And, also, your independent recollection of that night/day, also you

23   have no independent recollection of a motion detector being on the roof of

1    that shed; correct?

2    A        None noted.

3    Q        So, the pictures that the jury saw of that shed, well, those were

4    pictures of the shed as it existed that day; correct?

5    A        That's what I saw; yes.

6    Q        Thank you.

7                                    MR. RION:   Nothing further.

8                                    THE COURT:   That was quicker than five

9    minutes.  Thank you.  All right.  You may step down, Detective.  The State

10   may call their next witness.

11                                   MR. MILLER:   Doctor Maneesha Pandey.

12                                   THE COURT:   Now, make sure you get all

13   these exhibits.  Keep track of your exhibits.  Detective, you don't have any

14   exhibits with you; do you?

15   A        No, sir.

16                                   THE COURT:   Okay.  All right.

17   WHEREUPON, called to appear as a witness in this proceeding was one:

18              D O C T O R   M A N E E S H A   P A N D E Y

19   who, having been duly sworn by the bailiff herein, testified as follows:

20   BAILIFF:   She has no objection.

21                                   THE COURT:   Okay.  Thank you.  Okay,

22   Mr. Miller, when you're ready.

23                                   MR. MILLER:   Thank you, your Honor.

1          **DIRECT EXAMINATION**

2     **BY MR. MILLER:**

3     Q     Doctor Pandey, good morning.

4     A     Good morning.

5     Q     Will you state your full name for the record, please?

6     A     My name is Maneesha Pandey.

7     Q     Okay.  Where are you employed, Doctor Pandey?

8     A     I'm employed at the Lucas County Coroner's Office in Toledo, Ohio.

9     Q     And what is your title, if you have one?

10    A     I'm a Deputy Coroner and a Forensic Pathologist.

11    Q     How long have you been a Deputy Coroner and a Forensic

12    Pathologist?

13    A     For about eight years, eight/nine, around nine years.

14    Q     What are your job duties as a Deputy Coroner and Pathologist?

15    A     My job duties include performing postmortem examinations to

16    determine cause and manner of death.

17    Q     Okay.  Are those commonly referred to as autopsies?

18    A     Yes.

19    Q     How many -- do you mind if I call them autopsies?

20    A     Yes, that's fine.

21    Q     Okay.  How many autopsies have you performed over your last eight

22    years or so in the capacity of your employment?

23    A     I've performed about two thousand eight hundred autopsies.

1  Q    Okay.  Did many of those autopsies involve gunshot wounds?

2  A    Yes.

3  Q    Let's talk for a moment about your education.

4                        MR. RION:  Your Honor, I'm willing to

5  stipulate that this doctor is an expert in the field of forensic pathology and that

6  she be accepted as an expert in that field for the jury's determination.

7                        THE COURT:   Okay.  Are you satisfied

8  with that, Mr. Miller?

9                        MR. MILLER:  Yes.  I would like to, and I

10  appreciate that, but I would like to just, if we're going to get right to that,

11  submit her C.V. and have her identify that for the record.

12                        THE COURT:  That's fine.  The stipulation

13  will be noted for the record that Doctor Pandey is an expert in Forensic

14  Pathology.

15                        MR. MILLER:   Just so we can complete the

16  record with her C.V.

17                        THE COURT:  Yea.  Okay.

18  Q    Doctor, I'm going to hand you what has been marked as State's exhibit

19  '78'.  Can you identify that document, please?

20  A    Yes.

21  Q    What is that document?

22  A    Exhibit '78' is my C.V.

23  Q    Okay.  What is a C.V.?

1    A    A C.V. is a curriculum vitae which basically summarizes my

2    educational background and my certifications as well as clinical experience.

3    Q    Okay.  Let me ask this - I assume that you have to go through some

4    continuing education and you're constantly being trained on certain things

5    and going through an educational process.  So, I have to ask, is that an

6    updated C.V. or do you have any training above and beyond what's noted on

7    that?

8    A    This is a 2013 C.V.

9    Q    Okay.

10   A    So, beyond that it's more or less similar.

11   Q    Okay.

12   A    But, I just have more experience.

13   Q    Right.  Okay.  So, you actually have more experience and training

14   beyond what's on that C.V.?

15   A    Yes.

16   Q    Okay.  But, other than that, that's a true and accurate copy of your

17   C.V.?

18   A    Yes.

19   Q    Okay.  Thank you very much.  What does -- you talked about

20   autopsies.  What's the purpose of an autopsy?

21   A    The purpose of an autopsy is primarily to determine the cause of death

22   of the individual we are doing the autopsy on.

23   Q    Okay.  Do you, personally, when you're doing an autopsy, follow

1    certain steps when you do an autopsy?

2    A      Yes.

3    Q      Can you please, just generally speaking, take us through the steps that

4    you follow when you perform an autopsy?

5    A      Okay. An autopsy, when we are doing one, basically what happens is

6    we have a deceased individual who comes to our facility. The death is

7    reported. The deceased individual is basically wheeled into the morgue area

8    where we do the autopsy. They're in a sealed body bag. So, once we

9    identify whose body it is, you know, sealed and with the identification I.D. on it

10   we open up the body bag. Once the body bag is opened we'll do what we call

11   an immediate external examination and we'll take immediate photos like as

12   how they have appeared to us so that nothing is changed. The primary

13   purpose of that is to know that this is how the body was recovered from the

14   scene and this is how it has come to us. After we have documented that in

15   my diagram, as well as photographically, we will start identifying, while we're

16   diagramming, any injuries, any kind of natural disease process, any kind of

17   blood, any kind of problems with the body in terms of, well, so that it can help

18   me determine the cause. Then we will go ahead and undress the individual

19   and we will collect clothes or examine the clothes, depending upon what the

20   case is. If there is law enforcement at the time of the autopsy, attending the

21   autopsy, they will take the clothes with them as evidence. Then we will wipe

22   off the body to examine the injuries more clearly and basically in more detail.

23   We will be looking at the front, the back, and the sides of the body to, you

1  know, determine any kind of injuries once again or any natural processes

2  because sometimes we see those, like for instance if there is a cancer, or

3  glaucoma, or something, or if there's like gunshot wounds or stab angles of

4  the injuries, or any kind of trauma, even, like blunt force injury like contusions,

5  bruises, and scrapings.  After that we take photographs again.  At every stage

6  we are taking multiple photographs to document because photographs are a

7  true documentation.  I am, at the same time, diagramming.  We will go ahead

8  and basically set up the body at that point to perform the internal examination.

9  So, all that what I've talked about was an external examination.  Then we'll do

10  an internal examination.  We make a Y shaped incision and we go inside the

11  body, the chest, and the abdomen, and the brain to see if there are any

12  injuries or any kind of disease processes.  For instance, if you have a gunshot

13  wound to see if there's any kind of projectiles or anything.  But, prior to that,

14  and especially for gunshot wounds, we also x-ray the body to see if there's

15  any kind of projectiles in there to be able to recover them.  If it's just a normal,

16  like motor traffic crash, we will go inside and document what kind of injuries

17  there are internally.  This also helps us to see the path and the whole

18  description of where the injury is, and how it is, and how it is all contributing to

19  the cause of death - did the person bleed a lot, did they have small injuries,

20  did they have big injuries, did it affect any major organs, or there's, you know,

21  blood clots sometimes and the lungs or the abdominal organs are floating in

22  their own blood.  So, that is like a very major part for determining the cause of

23  death.  I will also at the same time take some samples of blood, the eye fluid,

1    the urine, and stomach contents to send to toxicology.  We send those to

2    toxicology and they will then go ahead and do the toxicology labs, the

3    toxicology tests.  So, once the toxicology tests come back and after I have

4    reviewed all of my autopsy findings in terms of documentation of injuries or

5    disease processes I perform, well, I basically make an autopsy report and

6    examine everything, including investigation reports, to basically come up with

7    a cause of death.

8    Q      Okay.  Now, hearing all of that, and I know we have a stipulation as to

9    your credentials, but hearing all of that your education includes a medical,

10   well, a doctorate in medicine; correct?

11   A      Yes.

12   Q      In other words, you're an M.D.?

13   A      Yes, I'm an M.D.

14   Q      Okay.  And then you have more training beyond that to become a

15   Forensic Pathologist?

16   A      Yes.

17   Q      Is that correct?

18   A      That's correct.

19   Q      Okay.  I'm going to hand you what has been marked as State's exhibit

20   '96'.  I'm going to represent to you that it is a certified copy of a death

21   certificate; okay?

22   A      Okay.

23   Q      Would you please read me the decedent's name on that death

1    certificate?

2    A      Okay.  On exhibit '96' the decedent's name is Kenneth Orman

3    Warrington.

4    Q      Okay.  On the, I guess, back, it's actually underfolded, the second

5    page, do you see the decedent's birthday, his date of birth?

6    A      Yes.

7    Q      Can you please read that?

8    A      It's July 11th, 1955.

9    Q      Thank you.  Now, we've just mentioned the name here of Kenneth

10   Warrington.  On or about February 24th of 2009 did you perform an autopsy

11   on an individual named Kenneth Warrington?

12   A      Yes.

13   Q      Did you prepare a report after performing that autopsy?

14   A      Yes.

15   Q      Is that usual?

16   A      Yes.

17   Q      Do you prepare a report after every autopsy?

18   A      That's correct.

19   Q      Okay.  I'm going to hand you what has been marked as State's exhibit

20   '79'.  Do you recognize that document?  Take your time looking at it.  It's

21   multiple pages; is it not?

22   A      Yes.

23   (WHEREUPON, witness reviewed document.)

1    A      Yes.

2    Q      What is that document?

3    A      Exhibit '79' is a case summary, and report of autopsy, toxicology

4    results, and photographs of Kenneth Warrington which were generated by the

5    Lucas County Coroner's Office.

6    Q      Okay.  Did you actually prepare that report?

7    A      Yes.

8    Q      Okay.  In connection with the autopsy of Kenneth Warrington?

9    A      Yes.

10   Q      Let's leave that right here just in case we need to refer to that.  Okay?

11   I should ask you - is that a true and accurate copy of your report?

12   A      Yes.

13   Q      When you prepare a report, generally speaking, do you have a certain

14   system that you follow in preparing your report?

15   A      Yes.

16   Q      Can you explain that system?

17   A      Any report we will have to, once again, as we are doing the autopsy

18   that's how we prepare the report.  We'll have an external examination and an

19   internal examination documented.  The external examination we sub-divide it

20   into the name of the deceased, the age, and when the autopsy was

21   performed, as well as all those people who attended it.  So, these are all

22   sub-headings.  Then externally how did the person appear in terms of age,

23   height, weight, the clothing they were wearing, and if there was any kind of

1    any defect on the body in terms of evidence of injuries, which is another

2    sub-heading.  Then you have an internal examination which is then divided

3    into each system, like cardiovascular system, the respiratory system, the liver,

4    and the endocrine system.  Then, at the end if I have evidence like in terms if

5    there was anything special done, for instance, any radiology was done.

6    Q       Okay.  So, in both the examination portions of the autopsy and also in

7    writing your report you follow certain systems?

8    A       Yes.

9    Q       A certain pathway, if you will?

10   A       Yes.

11   Q       Okay.  Now, referring to your report, you mentioned a case summary.

12   Is the case summary the first page of the report?

13   A       Yes.

14   Q       Okay.  And on the case summary do you list the cause of death?

15   A       Yes.

16   Q       What is the cause of death listed in your report for Mr. Warrington?

17   A       The cause of death for Kenneth Warrington is listed as multiple

18   gunshot wounds.

19   Q       Uh-huh.  And the manner of death?

20   A       Homicide.

21   Q       You also had noted, I think, on the case summary blunt force trauma.

22   Did you note blunt force trauma on Mr. Warrington as you did the autopsy?

23   A       Yes.

1  Q      Okay.  Can you, and we're going to get into some pictures and so

2  forth, but can you just generally describe those injuries?

3  A      Yes.  Kenneth Warrington had blunt force trauma, like a scraping, off

4  his left forehead and around his left eye, both the knees, and the left leg.

5  Q      You mentioned gunshot wounds.  Do you recall how many gunshot

6  wounds Mr. Warrington had?

7  A      There were six.

8  Q      Okay.  We'll get to those.  But, there were six?

9  A      Yes.

10  Q      A total of six entrances?

11  A      Entrances.

12  Q      We'll talk about those in more detail here in a moment.  On your case

13  summary do you also note the place of death and time, and the date and time

14  of death?

15  A      Yes.

16  Q      Okay.  Can you tell me what the place of death is noted on your

17  report?

18  A      Place of death in Kenneth Warrington's case summary report is house,

19  436 McKibben, Lima, Ohio  45801, Allen County.

20  Q      Okay.  And the date of death?

21  A      Date of death is 2-23-09.

22  Q      Okay.  Now, let me get to something here.  You have a time of death;

23  right?

1    A      Yes.

2    Q      How do you determine -- how do you come upon the time of death?

3    As you've explained it, people come to you and they're already deceased.

4    So, how do you go about determining the time of death?

5    A      The time of death in this case was something which was reported to

6    our office from Allen County Coroner's Office.

7    Q      Okay.  Also, you have on there the time of injury also on your case

8    summary report.

9    A      Yes.

10   Q      Is that also something that's reported to you from the Allen County

11   Coroner's Office?

12   A      Yes.

13   Q      Let's just be clear - you're from the Lucas County Coroner's Office;

14   correct?

15   A      That's correct.

16   Q      But, you're getting information from the Allen County Coroner's Office?

17   A      Yes.

18   Q      Can you explain, if you know, the relationship between the Allen

19   County Coroner's Office and the Lucas County Coroner's Office?

20   A      Yes.  Lucas County Coroner's Office is one of the larger forensic

21   pathology hubs, so to speak, in terms of we cater to about eighteen northwest

22   Ohio counties.  So, all the natural deaths which are happening in all eighteen

23   northwest Ohio counties, including Allen County, all those cases are brought

1    to the Lucas County Coroner's Office to determine, or, to basically do

2    autopsies and determine cause of death.

3    Q      Okay.  So, in other words, there's a professional relationship between

4    Allen County and Lucas County and the Lucas County Coroner's Office does

5    the autopsies for deaths that happen here in Allen County?

6    A      Yes.

7    Q      All right.  Now, let's talk about the autopsy itself.  When Mr. Warrington

8    was presented to you was he clothed or unclothed?

9    A      He was clothed.

10   Q      Okay.  I assume the clothes have to be removed for the autopsy to be

11   performed?

12   A      Yes.

13   Q      Okay.  Did you have an opportunity to look at the clothes during the

14   course of the autopsy?  Is that something you generally do?

15   A      Yes.

16   Q      Now, once the clothes are removed you begin your examination;

17   correct?

18   A      That's correct.

19   Q      Now, we've touched on it, but can you, in general terms, explain Mr.

20   Warrington's injuries that you found during the autopsy?  Let's start

21   specifically with the gunshot wounds.

22   A      Okay.

23   Q      Can you go ahead and explain those?

1   A      Oh, should I go ahead?  Okay.  Yes.

2   Q      Yea, go ahead and explain those.

3   A      Mr. Warrington had multiple gunshot wounds.  Basically my

4   examination did actually start before the clothes were removed because I was

5   examining how he was.  Most of his clothes were blood soaked because of

6   the injuries.  Once we removed the clothes we identified there were six

7   gunshot wounds on Mr. Warrington.  They were located on the chin, the right

8   forearm, on the left chest, two in the back, and the right buttock.  So that is, I

9   think I've got one, two, three, four, five and six on the back.  All these wounds

10  had exit wounds associated with them.  So, there was a total of twelve holes

11  on Mr. Warrington.

12  Q      Are you familiar with the term through and through when talking about

13  gunshot wounds?

14  A      Yes.

15  Q      Okay.  What does that mean?

16  A      That means that all the gunshot wounds were exited.  So, there was an

17  entrance and it went through the body and came out on the other side.

18  Q      Were all of these gunshot wounds to Mr. Warrington through and

19  through?

20  A      Yes.

21  Q      Were you able to recover any projectile from the autopsy?

22  A      No.

23  Q      So, although he had six entrance wounds, how many exit wounds

1    would he have?

2    A      He had six exit wounds.

3    Q      Okay.  So, a total of, if you're counting all the wounds, a total of twelve

4    gunshot wounds?

5    A      Yes.

6    Q      Six entrance and six exit?

7    A      Yes.

8    Q      Now, we've talked about the blunt force trauma.  The blunt force

9    trauma you observed, again, was to the left side of the head and to both legs?

10   A      Yes.

11   Q      Was that, taking into account the gunshot wounds and the blunt force

12   trauma, were there any other injuries that you noted to Mr. Warrington?

13   A      No other significant injuries.

14   Q      Okay.  I'm going to hand you now what has -- well, let's finish with that.

15   I'll hand you a series of pictures.  They are State's exhibits '80', -- well, they

16   should be '80' through '94'.  Now, I'm going to hand you these in one stack.

17   I'm going to ask you to take a look at them and then when you're done taking

18   a look at them just give me a head nod and I'll ask you some questions about

19   them.  Okay?

20   A      Okay.

21   (WHEREUPON, witness reviewed photographs.)

22   A      Okay.

23   Q      I moved on you; didn't I?

1    A    Yes.

2    Q    Okay.  I'm going to move my base of operation to over here so that I

3    have access to this Doar machine and I'm not walking back and forth

4    constantly.  Now, you've had an opportunity to take a look at those exhibits?

5    A    Yes.

6    Q    Can you tell us generally what those exhibits are?

7    A    Exhibit '80' through exhibit '94', they are all post-mortem, or, autopsy

8    photographs of Kenneth Warrington as he was and as it was documented at

9    the time of autopsy at the Lucas County Coroner's Office.

10   Q    Okay.  Those photographs you mentioned that you take during the

11   autopsy, are those made a part of your report?

12   A    Yes.

13   Q    And that would be the case in Mr. Warrington's situation as well?

14   A    Yes.

15   Q    So, the exhibits that I've handed to you, are those all of the

16   photographs you took during the autopsy?

17   A    No.  They're just some of the photographs.

18   Q    Okay.  Now, I handed you earlier your complete report.  Are the other

19   photographs attached to the report?

20   A    Yes.

21   Q    Okay.  So, what we're going to look at here is a sampling of the

22   photographs you took; is that correct?

23   A    Yes.

1  Q      Do all of them truly and accurately depict Mr. Warrington's body at the

2  time you took those photographs?

3  A      Yes.

4                          MR. MILLER:  One second, your Honor.

5                          THE COURT:  Okay.

6  (WHEREUPON, Court went off the record briefly.)

7  Q      Okay.  Now, Doctor Pandey, what I would like to do - you've described

8  these exhibits in general terms - but, what I would like to do is go through

9  them one by one and have you explain what we're looking at in each picture

10  and how it relates and why it's important to Mr. Warrington's autopsy.  Okay?

11  A      Okay.

12  Q      I will now present State's exhibit '80'.  I apologize if I'm in anybody's

13  way.  I'm going to try to stay out of the way.  What are we looking at here in

14  State's exhibit '80'?  Just give me a second here to get this adjusted.  What

15  are we looking at here in State's exhibit '80'?

16  A      Exhibit '80' is a photograph of Kenneth Warrington as he arrived at our

17  Lucas County Coroner's Office.  This is when the body bag was removed.

18  You can see him all blood stained and blood soaked.  His jacket is over his

19  head.  You can see a t-shirt and you can see a lot of blood on him.

20  Q      That's the upper portion of his body?

21  A      Yes.

22  Q      State's exhibit '81'?  What are we looking at in State's exhibit '81'?

23  A      Exhibit '81' is the lower portion of Kenneth Warrington when we

1   removed the bag.  This is how he presented to us.  You can see his shoes

2   and you can also see on his right ankle an identification band which is labeled

3   by the Allen County Coroner identifying him as Kenneth Warrington.  You can

4   see he's wearing a set of black pants.  That's it.  You can see some blood

5   there as well.

6   Q     Okay.  Taking into account together State's exhibit '81', I'm sorry, '80'

7   and '81', they depict how Mr. Warrington would have been presented to you;

8   is that correct?

9   A     Yes.

10   Q     Prior to performing the autopsy?

11   A     Yes.

12   Q     All right.  State's exhibit '82'.  Can you tell us what State's exhibit '82'

13   is?

14   A     Exhibit '82' is a photograph of Kenneth Warrington after we removed

15   his clothes and cleaned him up to better examine his body and to document

16   injuries.  Here you can see the top portion of Kenneth Warrington.  Actually

17   you can even see that there is a little darkness on the right forehead, if you

18   can see that.  That's the contusion/abrasion he had, scraping of the skin.

19   Right there.

20   Q     Okay.  So, we're working through the process now, are we not?  He's

21   presented to you clothed and you have to unclothe the body and begin the

22   process of the examination; correct?

23   A     Yes.

1   Q     We're moving through that process step by step?

2   A     Yes.

3   Q     Now, State's exhibit '83'.  State's exhibit '83'.  What are we looking at

4   here?

5   A     Exhibit '83' is the unclothed lower portion of Kenneth Warrington.  Here

6   you can see that there's an identification band on the right ankle, as well as

7   on this photograph there's some darker areas on both knees and on the legs.

8   Those are presenting the blunt force trauma, basically the injuries to his leg

9   and knees.

10  Q     Okay.  And, again, continuing through the process here?

11  A     Yes.

12  Q     State's exhibit '84'.  It doesn't show up real great.  Okay.  What are we

13  looking at here?

14  A     Exhibit '84' is a zoomed in photograph of Kenneth Warrington's legs to

15  identify, to better see and document his injuries.  So, here you can see darker

16  areas on his right leg and the left leg.  Basically they're presented -- well, I

17  don't know if I can use this probe.

18  Q     Sure.  Absolutely.

19                         THE COURT:   Would you rather have a

20  laser pointer?

21  A     Yes.  Here you can see in the middle of the photograph, towards, or,

22  on the right side of the leg.  This is the darker area that's signifying injury and

23  then there's another darker area on the left knee in the photograph signifying

1    injury.  There is something else here, but it's not coming out very clearly on

2    the photograph, but there were injuries to his leg and knees.

3    Q       State's exhibit '85'.  Again, Doctor, as you go through the autopsy you

4    document injuries; right?

5    A       Yes.

6    Q       We're starting that process now, it appears to me.  Is that correct?

7    A       Yes.

8    Q       In terms of what we're looking at in the pictures?

9    A       Yes.

10   Q       Now, you have on this State's exhibit '85' labels.

11   A       Yes.

12   Q       Well, what I call labels.  They have letters on them.

13   A       That's correct.

14   Q       Okay.  What are those?

15   A       Anytime when we have more than a few injuries and they're in different

16   parts of the body we identify them with letters and we put labels next to the

17   injury, for instance, in this case, gunshot wounds for a description and for the

18   report of the autopsy it's easier to keep it all straight and it's easier to describe

19   also to another person that these are the injuries which he had.

20   Q       Okay.  Now, when you begin to document your injuries on a body do

21   you start in one area of the body in particular, according to your method?

22   A       Yes.  We will just basically start from one end to the other end and

23   encompass the entire body.  So, I usually start from the head and neck.

1    Q      So, you start at the head and neck and work which direction?

2    A      Going towards the legs.  However, it also depends on where the

3    injuries are more clustered.  But, it's mostly like even for description purposes

4    the head and neck and then we go to the chest area and then the extremities.

5    Q      In fact, isn't it true that your report follows that sort of method?  It starts

6    with the head and neck and then you work your way down describing the

7    injuries and working your way down the body and that's how your report is

8    written; isn't that correct?

9    A      Yes.

10   Q      Okay.  So, let me ask you something about these labels, as I call them,

11   that have letters on them.  Are you suggesting in any way with the sequence

12   of these letters, and we're talking about all the gunshot wounds, the sequence

13   of gunshots?

14   A      No.

15   Q      No?  Okay.  I just wanted to make that clear.

16   A      Yes.

17   Q      You're not suggesting, for example, we're going to see a label with A

18   on it, and you're not suggesting that that's the first gunshot?

19   A      No.

20   Q      Okay.  I just wanted to make that clear.  That just happens to be what -

21   the first injury that you document during the course of your autopsy?

22   A      That would be just the injury which was easier to place an A on at the

23   time.  For instance, in this case I believe the A is on the back.  So, when the

1    body is turned, well, that's the part that you don't keep seeing again and

2    again.  So, you want to identify that immediately and get photographs

3    because once the body is back, again, on the back then you can't see the

4    back again.  So, that's the reason they were given the earlier letters.

5    Q      Okay.  I just didn't want any confusion about, you know, well, any

6    suggestion about the sequence of gunshots.  It's really more for your process.

7    The sequence of the labels are more connected to your process?

8    A      Yes.  It's all more for documentation.

9    Q      Okay.  Very good.  Okay.  Let's go back to State's exhibit '85'.  What

10   are we looking at here?

11   A      Exhibit '85' is, once again, the top portion, the top half of Kenneth

12   Warrington after he is unclothed.  Here you can see that there are three

13   letters and one of the letters is identified as G on the left chest.  This one.

14   This is a gunshot wound.  This is the exit gunshot wound.  Then we have a

15   letter which is -- well, I can't really read this one.  But, it's signifying the injury

16   over here.  That's a gunshot wound to the chin as well as a letter which is

17   labeled as J.  There is an exit over here.  You can't really see it very well.

18   But, it's right next to J.  So, we've got three gunshot wounds here.

19   Q      Okay.  Okay.  We will talk about these in a little bit, how these wounds

20   correspond to each other.  But, for our purposes now we're just moving

21   through the examination and you're labeling these particular wounds; is that

22   correct?

23   A      Yes.

1   Q      Okay.  As we look at this picture, as we stand or sit and look at this

2   picture, the head of Mr. Warrington is to the left?

3   A      Yes.  It's turned towards the left side.

4   Q      So, just for reference sake, letter J, what part of the body is letter J on?

5   A      Letter J is on the right neck.

6   Q      Okay.

7   A      The right side of the neck.

8   Q      It gives us some scale.  Okay.  Now I'm going to show you what has

9   been marked as State's exhibit '86'.  What are we looking at here in State's

10  exhibit '86'?

11  A      Exhibit '86' you can see Kenneth Warrington's lower portion of his

12  face, from the right side, and the neck area.  You can also see a scale with

13  the number A147-09.  That's our autopsy number which was assigned to

14  Kenneth Warrington.  That just means that it's the hundred and forty-seventh

15  autopsy of that year.  So, here you can see on the neck that there is a metal

16  probe which is going through Kenneth Warrington's neck.  This is actually

17  giving you the direction of the gunshot wound.  So, this was a through and

18  through gunshot wound and so here we can see there was an entrance here

19  on the chin and the probe goes through that and it went through the inside

20  and it comes out.  So, that means that this entrance is connected to the exit

21  over here.  It is also at the same time telling you that it is going from the right

22  side.  Basically it's coming from the left side of the chin towards the right side

23  of the neck and is going downward and front to back.  So, that is basically

1    documenting the direction and the path of Kenneth Warrington's gunshot

2    wound on the chin and the right side of the neck.

3    Q       Okay.  Now, you've described that injury - where it entered, where the

4    projectile entered, where it exited, and generally the path.  Is that injury

5    consistent with someone sort of tilting their head to the right and back, thus

6    exposing their chin?

7    A       Yea, that injury is basically consistent with the chin being exposed -

8    whether there in the back or not.  But, it's like the chin has to be exposed for

9    that injury to happen.  The bullet has to hit at an angle to be able to go

10   because the entrance wound had an abrasion, basically a scraping, on the

11   top portion.  So, this is how the projectile entered.  So, for it to enter the body

12   would have to be in a certain way.  So, depending on what it was, it entered

13   and it exited out on the right side of the neck.

14   Q       So, the chin would have to be exposed?

15   A       Yes.

16   Q       Is it consistent with sort of to the right and chin up type position?  I'm

17   not saying, or, I'm not asking you if that's exactly how this happened.  I'm just

18   asking you is that injury consistent with that position?

19   A       It could happen like that also; yes.

20   Q       State's exhibit '87'.  I think here, Doctor, you'll be able to tell what letter

21   that was that you couldn't quite read on the last one because of the angle.

22   State's exhibit '87'.  What are we looking at here with State's exhibit '87'?

23   A       Exhibit '87' is Kenneth Warrington's top half.  Here you can see

1    Kenneth Warrington from his left side.  So, you see the lower portion of his

2    chin on the photograph.  There's a letter which is labeled as I.  Here you can

3    see the gunshot wound to the chin.  You can see how it's round.  I'm not sure

4    how clearly it's coming; but, it is round here.  That's how we know it's an

5    entrance.  As we go down to the chest we can see that there is a letter G,

6    which we had seen previously.  This is another -- it's a little irregular.  This is

7    another gunshot wound.  Here we see another gunshot wound.  This is letter

8    H.  This is on the left chest, the left lateral chest, near the left axillar.  So,

9    under the armpit.  So, this is designated letter H.  This is also a little round.

10   So, this is an entrance wound to the left chest.  It goes -- this connects -- you

11   know, we made the Y shaped incision and we saw that it was connecting with

12   G.  So, this is how this gunshot wound was going - from H to G, from left

13   chest, left lateral chest, basically left axillary area, under the armpit, going

14   towards the left nipple and into the center of the left chest.  This was going

15   from left to right, downward, and this one was going back to front.

16   Q       Okay.  Is that injury consistent with somebody having their left arm

17   raised?

18   A       That injury is consistent with basically the arm being in an open

19   position because that area has to be exposed for the bullet to enter.

20   Q       Okay.  By open position --

21   A       It could be any way, but basically it just has to be open.

22   Q       Raised up?  Okay.  Like, okay, with the elbow out, so to speak?

23   A       Yes.

1    Q     Okay.  Now, State's exhibit '88'.  Here is I think where you were talking

2    about the letter A.  What are we looking at on State's exhibit '88'?

3    A     Exhibit '88' is Kenneth Warrington's photograph of his lower half of his

4    torso.  You can see that there's another placard there which is designated

5    with A147-09.  That's, once again, our autopsy number designated to

6    Kenneth Warrington.  As I move this laser pointer you can see that this is

7    letter A which is next to a round injury, which is an entrance gunshot wound.

8    Then there's another letter, B, which is also next to a round injury, which is

9    another entrance wound.  You can see those like more towards the midline,

10   the middle, the letter B.  This is more towards the outside and to the left of

11   Kenneth Warrington's back.  Here you can see this is the buttocks over here

12   and you can see that this is the top.  This would be what is termed as right

13   side of Kenneth Warrington, top portion of the photograph.  The lower portion

14   is the left side of Kenneth Warrington.

15   Q     So, we're looking at his lower back at this point?

16   A     Yes.

17   Q     Okay.  State's exhibit '89'.  You can see all the labels.  State's exhibit

18   '89'.  What are we looking at here?

19   A     This is Kenneth Warrington.  Again, exhibit '89' is Kenneth

20   Warrington's photograph from the right side of his body.  This is what I call,

21   well, it's a side view in which you can see the top portion.  You can see the

22   lower half of the chin, as well as the letter J, which was the right side, the right

23   neck exit wound, gunshot wound.  Here you can see that there is two letters

1   here. I actually can't read them from this far away.

2   Q      We'll get to them on the next picture, I think.

3   A      Okay. But, these are two letters which are designated to the exit

4   wounds. You can see that there is bruising around the exit wounds. There's

5   another letter here, which is another gunshot wound. So, we have in this

6   photograph one, two, three, four gunshot wounds, plus another, well, you can

7   see a letter here which is designating that gunshot wound to the middle of the

8   chest. Remember that one which was going from under the armpit towards

9   the middle of the chest? So, that's that wound right here.

10  Q      Okay. So, now, again, we're working our way down the body; right?

11  A      Yes.

12  Q      We're looking at the back. Now, you know, we're in the midsection of

13  the body and we're looking at the back and now we've turned him and looking

14  somewhat at the front.

15  A      And the right side.

16  Q      And the right side. I'll ask you if you're able to read those labels in

17  State's exhibit '90'. State's exhibit '90'. What are we looking at here?

18  A      Exhibit '90' is the two abdominal wounds we had seen in the last

19  photograph. These are the zoomed in versions basically to identify the

20  photographs better and the wounds better. This is designated with letter E,

21  which is corresponding to an exit wound, and the letter F, which is

22  corresponding to an exit wound. So, we have two gunshot wounds to the

23  right lower aspect of Kenneth Warrington's abdomen.

1  Q      Okay.  So, in fact, we have two on the back, labels A and B, I believe

2  they were, and we have two entrance wounds.

3  A      Yes.

4  Q      And now on the front in the abdomen area we have two exit wounds; is

5  that correct?

6  A      Yes.

7  Q      Are A and B in any way connected to E and F?

8  A      Yes.

9  Q      How are they connected?

10  A      They are connected by basically once we did the reflection of the skin

11  inside we could see how the path was going in terms of noticing, you know,

12  where the hemorrhage is and how all the organs are getting connected.  I'm

13  going to have to reference to the report to be absolutely sure which one was

14  matching with which letter.  Okay.  Letter A, which we had seen in the back

15  which was towards the left side of the lower back and it went through the skin,

16  soft tissue, muscles of the left back, and we could see as we had opened up

17  the body that it then hit one of the organs, the adrenal gland, and the left

18  kidney was also hit in this one, and the aorta, which is one of the major

19  vessels in the abdomen, that was hit, as well as it came out on the anterior

20  abdominal wall and the wound, which it corresponded, the exit wound is

21  designated with letter F.  So, it's more towards the center.  This is letter F,

22  which is corresponding with letter A on the back.  The back is the lateral side.

23  This one was going left to right, and back to front.  This one was actually

1    associated with a lot of blood in his abdomen.

2            For letter E, that was connecting with letter B on the back.  That was

3    on the right side of the back.  Basically that was the midline back.  We had

4    seen there were two wounds - one was more outside and one was more

5    inside.  So, this was more in the midline, letter B.  This corresponded -- this

6    went through skin, soft tissue, muscles of right side of back.  This one was

7    actually hitting muscles and soft tissues and the back muscles, the mesentery

8    again, and exited out to letter E.  So, B was with E and A was to F.

9    Q      Okay.  State's exhibit '91'.  Again, your process is to go from head to

10   lower body as you make your examination; correct?

11   A      Yes.

12   Q      Okay.  State's exhibit '91'.  What are we looking at here?

13   A      Okay.  Exhibit '91', once again, you can see our autopsy placard.  This

14   is a photograph of Kenneth Warrington's right thigh.  Basically you can see

15   the curvature of your abdomen, you know, the lower portion.  This is the right

16   side.  The top portion of the photograph is the right side of Kenneth

17   Warrington.  It comes down into the buttocks and they will curve out.  So,

18   here you can see that.  Then the legs come on down there.  Here you can

19   see the genital area as well.  So, we had Kenneth Warrington on his side and

20   here we identified and basically have labeled two gunshot wounds.  One is

21   labeled letter C and the other is D.  This gunshot wound is the entrance.  So,

22   letter C is the entrance.  You can see it's more round.  This is more bigger.

23   These are both connected.  When you put a probe through them they were

1    actually connecting.  These were going through the skin and underlying soft

2    tissue.  So, entrance and exit.  So, we can see two gunshot wounds here.

3    Q       Is that kind of on the right buttocks?

4    A       Right buttocks and upper right thigh.

5    Q       Okay.  State's exhibit '92'.  Now, we've moved down the body.  But,

6    you also examined the extremities; correct?

7    A       Yes.

8    Q       Okay.  State's exhibit '92' -- well, being what, the arms and legs?

9    A       Arms and legs; yes.

10   Q       State's exhibit '92'.  What are we looking at in State's exhibit '92'?

11   A       Exhibit '92' is Kenneth Warrington on his back.  Here you can see,

12   well, the lower portion of the photograph shows you a portion of his face and

13   his right ear.  This is the right shoulder.  The whole hand has been, the arm,

14   has been lifted up to better document his injury.  This is the right elbow.  It

15   keeps going up and here you see a placard with our autopsy number and you

16   see two holes.  One is on the thumb side and one is on the little finger side.

17   So, this is the thumb side.  This is the entrance, one entrance wound, and this

18   is the exit.  They were both connected.  We know that because once we did

19   the x-ray and we put the probe in they were both connected wounds.  So,

20   entrance and exit wounds.

21   Q       Okay.  Now, you mentioned the thumb side and the pinkie side.

22   A       Yes.

23   Q       The thumb side, is that where the entrance wound was?

1    A     Yes.

2    Q     And the pinkie side was where the exit wound was?

3    A     Yes.

4    Q     State's exhibit '93'.  What are we looking at in State's exhibit '93'?

5    A     Exhibit '93' is, once again, Kenneth Warrington's right forearm.  So,

6    here you can -- and this is a zoomed in version of the previous photograph to

7    better document the injuries.  Here you can see our placard, which is resting

8    on his right elbow.  You can see the letter K and the letter L.  So, these are

9    designated with letters K and L.  So, this is the entrance, which is the thumb

10   side, and this is the exit, which is the little finger side.

11   Q     Okay.  State's exhibit '94'.  What are we looking at in State's exhibit

12   '94'?

13   A     Exhibit '94' is the x-ray of Kenneth Warrington.  We do all the x-rays for

14   the gunshot wounds to see if there's any kind of projectile or any kind of

15   trauma.  So, in this case you can see that there's a fracture of one of his

16   forearm, the upper right upper extremity, bone.  So, that fractured as a result

17   of the gunshot wound and was going through the soft tissue and fractured the

18   bone and exited out.

19   Q     So, in my lay terms, that's a broken forearm due to this gunshot wound

20   we just discussed with L and K, labels L and K; correct?

21   A     Yes.

22   Q     Okay.  Now, we have talked about a lot of injuries here.  I'm going to

23   hand you what has been marked as State's exhibit '95'.  Will you explain what

1   that is?

2   A       Exhibit '95' is a summary of the gunshot wounds.  This was reviewed

3   by me at the Lucas County Coroner's Office prior to preparation for this case.

4   It's for Kenneth Warrington, with autopsy number 147-09 in 2009.

5   Q       You've had an opportunity to review that?

6   A       Yes.

7   Q       Does that truly and accurately depict, or summarize, if you will, the

8   gunshot wounds that Mr. Warrington suffered?

9   A       Yes.  It's an accurate summary of the multiple gunshot wounds which

10  Kenneth Warrington had got.

11  Q       Does it accurately depict, or summarize, the gunshot wounds that you

12  explained in your report connected to Mr. Warrington's autopsy?

13  A       Yes.

14  Q       I'll just publish this now.  Let's just take by way of example, well, you

15  can see here we have the letters, and I guess as we look at it it's the left hand

16  column and those letters correspond with your labels that you reference in

17  your report?

18  A       And on the body; yes.

19  Q       And on the body.  Then what's the next column to the right?

20  A       That's entrance or exit.

21  Q       Okay.  Then area of the body?

22  A       And the location of the wounds.  So, area of the body.

23  Q       And then the wound direction; is that correct?

1  A  That's correct.

2  Q  Okay.  We won't go through each one.  But, this is a summary of your

3  findings?

4  A  Yes.

5  MR. MILLER:  One second, your Honor.

6  THE COURT:  Okay.

7  (WHEREUPON, Court went off the record briefly.)

8  Q  Now, as you mentioned, or I think you've already mentioned, all these

9  gunshot wounds go through and through?

10  A  Yes.

11  Q  And you did not recover any projectiles at the autopsy?

12  A  No.

13  Q  Of these gunshot wounds -- well, let's just talk about all of the injuries.

14  I mean, there was some blunt force trauma to the body; correct?

15  A  Yes.

16  Q  In reference to all of the injuries to the body which ones, in your

17  opinion, were fatal; if any?

18  A  In my opinion all of them because that's the reason it's determined as

19  multiple gunshot wounds.

20  Q  Okay.  The blunt force trauma injuries would not be fatal; would they?

21  A  No.

22  Q  But, in reference to the gunshot wounds all of them would be fatal?

23  A  Yes.

1    Q       I mean, is it true that really any gunshot wound can be fatal?

2    A       That's correct.

3    Q       Did you have an opportunity to examine, -- I think I already asked you

4    this and I think you stated earlier that you had the opportunity to examine the

5    clothing that Mr. Warrington was wearing prior to, or, when he was presented

6    to you?

7    A       Yes.

8    Q       Did the holes -- did you examine the holes in the clothing?

9    A       Yes.

10   Q       I should have asked you - were there holes in the clothing?

11   A       Yes.

12   Q       Okay.  You had an opportunity to examine those holes?

13   A       Yes, I did.

14   Q       Did they correspond with the injuries?

15   A       They did.

16   Q       And when I say injuries I mean gunshot wounds.

17   A       Yes.

18   Q       Was that noted in your report?

19   A       It is.

20   Q       Now, the blunt force trauma that we've talked about, I'm going to use

21   the word scrapes; okay?  I don't know whether they were scrapes.  But, the

22   blunt force trauma, the scrapes, that are noted in your report and we see in

23   the pictures could you determine during your autopsy whether or not those

1    were old or new injuries?  Could you make any kind of determination in that

2    regard?

3    A     Yes.

4    Q     What was your determination?

5    A     They were all red and they were all newer injuries in terms of they

6    happened at the same time as the gunshot wounds, and especially the

7    forehead because underlying the forehead when we removed the scalp there

8    was what is termed a subgaleal.  There was an injury to inside of the scalp

9    also.  There was red and bleeding which was associated with it.  It's all fresh

10    injuries.

11    Q     Okay.  Just to summarize, the cause of death was multiple gunshot

12    wounds?

13    A     Yes.

14    Q     Manner of death was homicide?

15    A     Yes.

16    Q     Shot by another person?

17    A     That's correct.

18                        MR. MILLER:  One second, your Honor.

19    (WHEREUPON, Court went off the record briefly.)

20                        MR. MILLER:  I have no further questions.

21                        THE COURT:  Okay.  Any questions, Mr.

22    Rion?

23                        MR. RION:  Just a few, your Honor.  Thank

1    you.

## <u>CROSS EXAMINATION</u>

3    **BY MR. RION:**

4    Q      Good morning.

5    A      Morning.

6    Q      I just have a few questions.  You said that there were -- I heard you

7    say two basic areas where there was what you referred to as blunt force

8    trauma; correct?

9    A      Yes.

10   Q      On the forehead.  Was it the left side of the forehead?

11   A      Yes.

12   Q      And then also was it the left leg?

13   A      On legs and knees.

14   Q      Okay.  Do you have an opinion as to whether or not those injuries were

15   the result of a struggle or simply the result of falling after being shot?

16   A      I can't say how it happened, but I can say that it happened when the

17   person hit something.  Basically his skin hit an area.  That's on the larger

18   area.  So, he probably fell.

19   Q      Okay.  So, the blunt force trauma to the forehead and to the legs would

20   be consistent with somebody falling?

21   A      Yes.

22   Q      And there's nothing that you saw in those injuries that would be

23   consistent with somebody having a struggle?

1    A    No.

2    Q    Okay.  Second, do you know what the term stippling and gun powder --

3    well, let's deal with stippling.  What is stippling?

4    A    Stippling is the presence of injury around a gunshot wound which

5    happens because of the gun powder, which injures it.  So, it happens when

6    the gun is at a certain range.  It's called intermediate range.

7    Q    And if the gun is right next to the person would there be evidence that

8    you would expect to find on the body if the barrel of the weapon was very

9    close to the person?

10   A    Yes.

11   Q    And were any of those findings found?

12   A    No.  There was no soot or stippling on either of the gunshot wounds.

13   Q    So, from that can you tell that the gun was some distance away from

14   the body?

15   A    Yes.

16   Q    And how far no one knows.  But, we know that it would be likely maybe

17   outside of two to four feet?  Is that fair?

18   A    Basically a gun, how far it is, I would not be able to say because if

19   there is no soot or stippling, well, that is the only thing I could say that it is

20   near to the body.  However, you have to also understand that the person is

21   wearing clothes and we may not necessarily see those unless they're really

22   close, maybe, like if it's right on the body then we could probably see the soot

1   traveling into the gunshot wound.  But, if they are closer stippling may not

2   happen on the body if there is clothes or anything.

3   Q       Maybe you could see evidence then on the clothing.  You didn't see

4   any evidence on the clothing of any type of gunshot residue or gun powder or

5   burning of the clothes or anything like that; correct?

6   A       I can't make that out because normally you don't see with the naked

7   eye.  You either have to check for it or because it was all blood soaked we

8   couldn't see anything.

9   Q       So, you have no information to say that it was there; correct?

10  A       No, I don't have any information.

11  Q       Okay.  And as it relates to the wound to the neck area, you didn't see

12  any type of evidence of a close shot wound with that injury; correct?

13  A       Yea, that was not a close shot.

14  Q       The only other thing, and some of the jurors may not have seen people

15  that are deceased before but, for instance, there were a lot of markings, like

16  on the back.  Around the wounds there were, you know, fairly large areas of

17  redness.  Someone could think that that was a bruise or something like that.

18  What was the cause of the discoloration of the body other than the wounds

19  themselves?

20  A       The discoloration, basically it's red or purple, and it happens when the

21  blood pools on the dependent part.  It's called lividity.  So, that's what we see

22  in dead bodies especially if they were laying for a certain time.  They can

23  either blanch or not blanch.  In this case we had pooling of blood on the back.

1   Q      Okay.  So, that shouldn't be confused as bruising or any type of blunt

2   force trauma, as you've called it; correct?

3   A      That's correct.

4   Q      So, the only injuries were the ones that you identified to the

5   prosecutor?

6   A      Yes.

7   Q      Thank you for your time.

8   A      Thank you.

9                               THE COURT:  Any redirect?

10                              MR. MILLER:  Just very briefly, your

11  Honor.

12                      **REDIRECT EXAMINATION**

13  **BY MR. MILLER:**

14  Q      Doctor Pandey, these blunt force injuries that you've described and

15  that are noted in your report on the lower extremities, in other words on the

16  legs, are those consistent with somebody hitting rough pavement?

17  A      They're just basically consistent with the body hitting a hard surface.

18  Q      Okay.

19                              MR. MILLER:  Nothing further.

20                              THE COURT:  Okay.  Any recross?

21                              MR. RION:  No, your Honor.

22                              THE COURT:  All right.  Thank you,

23  Doctor.  I know you've been here awhile.  You're excused.

1    A      I'm excused?  Thank you.

2                              THE COURT:  Okay.  All right.  It's twelve

3    o'clock noon.  Let's take our noon recess.  Ladies and gentlemen of the jury,

4    you'll be excused for lunch.  Again, the same instructions that you not discuss

5    the case among yourselves or with anyone else.  Don't pay attention to any

6    media - written, television, or radio.  Don't make any communication over the

7    Internet or Facebook.  Don't discuss the case with anyone.  Don't formulate or

8    express any opinions.

9          Let's reconvene at one o'clock.  We'll stand in recess.

10   (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

11

12                              THE COURT:  Okay.  We're reconvening

13   this 9-11-2015 with Case Number CR2014 0139, State of Ohio -vs- Markelus

14   Q. Carter.  The defendant is present in Court with counsel.  The State is

15   present.  The jurors have all returned from the noon recess.

16          We'll continue with the presentation of the State's case.  The State

17   may call their next witness.

18                              MRS. KOHLRIESER:  Thank you, your

19   Honor.  The State would call Sergeant Curt Hile.

20   WHEREUPON, called to appear as a witness in this proceeding was one:

21                  S E R G E A N T   C U R T I S   H I L E

22   who, having been duly sworn by the bailiff herein, testified as follows:

23                              THE COURT:  Mrs. Kohlrieser, maybe you

1    would want --

2    BAILIFF:   He has no objection.

3                              THE COURT:   -- to get these exhibits.

4                              MRS. KOHLRIESER:   Oh, I'm sorry.

5                              THE COURT:   Have a seat.  Okay.

6    Whenever you're ready.

7                              MRS. KOHLRIESER:   Thank you, your

8    Honor.

9                    **DIRECT EXAMINATION**

10   **BY MRS. KOHLRIESER:**

11   Q      Would you state your name for the record?

12   A      It's Curtis, C-U-R-T-I-S, and the last name is Hile, H-I-L-E.

13   Q      Okay.  And although I can see your uniform, for the record would you

14   tell us where you're employed?

15   A      Lima, Ohio Police Department.

16   Q      And how long have you been with the Lima Police Department?

17   A      Oh, about thirteen years or so.  I worked at another agency shortly

18   before that, too.  So, about fourteen years as a police officer.

19   Q      You were actually with the parks department, I believe?

20   A      Yes.  Yep.

21   Q      And what is your, and you might have said, I apologize, your current

22   position?

23   A      I'm a patrol Sergeant.

1  Q      What does a patrol Sergeant do?

2  A      You're assigned to a shift and you supervise the operations of that

3  shift.

4  Q      So, if, say, you're in charge of the shift today and a homicide occurs

5  would you be who the street cops call?

6  A      I would be the on duty supervisor and the on scene supervisor until an

7  investigator arrived; yes.

8  Q      Okay.  When did you get promoted to Sergeant; if you remember?

9  A      I believe about four years ago.  I think it was about September of 2011.

10  Q      Prior to that time were you a routine patrol officer?

11  A      That was it.  A patrol officer; yes.

12  Q      And were you in the position as a patrol officer on February 23rd of

13  2009?

14  A      Yes, I was.

15  Q      And were you working that day?

16  A      Yes.

17  Q      And what shift were you working at that time?

18  A      I believe I was on third shift - twenty-three hundred to oh seven

19  hundred.  So, eleven P.M. to seven A.M.

20  Q      Thank you.  I was just about to ask for the non-military time.  Around

21  six thirty-nine that morning did you respond to a call at 436 East McKibben?

22  A      Yes, I did.

23  Q      What did you observe when you arrived?

1    A        We got a call, a man down call.  We arrived on the scene.  We found a

2    man on the west side of the house by a side door, on a sidewalk.  He was

3    obviously deceased.

4    Q        All right.  Do you know whether anyone was home at that time?

5    A        We immediately arrived to the house and we later discovered that

6    there were some people inside the house; yes.

7    Q        Do you remember, well, if not their names, but how many and whether

8    they were male or female?

9    A        I believe there were three people there - two females and a young

10   male.  I believe there were three people there.

11   Q        At the February 23rd homicide incident?

12   A        At the homicide incident I thought there were three people there; yea.

13   Q        Okay.

14   A        I believe there were two children and a mother, if I remember.

15   Q        Okay.  Could you be wrong about that?

16   A        I could be.  I could be; yes.

17   Q        Okay.  But, there were civilians there?

18   A        There were people there; yea.  Absolutely.

19   Q        All right.  Now, the mom there, did you recognize her at all?

20   A        Initially I did not.

21   Q        And at some point while you were there at McKibben on February 23rd

22   of '09 did you enter the kitchen area of the home?

23   A        Yes, I did.

1   Q      And was there anything in the kitchen area that caught your eye?

2   A      There was a utility bill laying on a, well, I guess for lack of a better

3   word, like a bar area or a kitchen counter.  It was out in obvious view.  It had

4   Markelus Carter's name on it.

5   Q      Okay.  I'm going to show you what's been previously marked State's

6   exhibit '7'.  I'd ask you if you recognize what's depicted in that photo.

7   A      Yes. Yep.

8   Q      And what is that?

9   A      That's an electric bill from American Electric Power with Mark Carter's

10  name.

11  Q      Does it also have an address on it?

12  A      Yes, it did.

13  Q      What address was that?

14  A      It was the East Eureka Street.  102 East Eureka, I believe it was.  122

15  East Eureka.

16  Q      Okay.  Now, when you saw this bill sitting there why did that catch your

17  eye?

18  A      Well, I thought the female that was at the house looked familiar and I

19  didn't really know why.  But, when I saw the bill and the address I

20  remembered an incident from a couple of years prior that the female I'm

21  speaking of, Burkholder, was involved in the incident with Mark Carter on that

22  East Eureka Street address.

23  Q      Okay.  So, when you saw the name Mark Carter and you saw the 122

1   East Eureka --

2   A       Bells went off in my head that that's who this lady is.

3   Q       Okay.

4   A       I just couldn't put it together until, -- and then that's what rang in my

5   head and I said, 'oh, okay, that's where I know her from'.

6   Q       And you've had occasions like that before where you see somebody

7   and say --

8   A       Oh, absolutely.  Yep.  Something triggers my mind and I'm like, 'oh,

9   that's where I know you from'.

10  Q       Now, you said that December 17th - excuse me - you said

11  approximately two years ago.  If I said the date of December 17th, 2007;

12  would that sound correct to you?

13  A       Yes.

14  Q       All right.  If you can, explain to these folks sitting here in the jury box

15  how it was that you were involved in that particular matter back in 2007.

16  A       In 2007?  I was traveling northbound on Main Street in about the four

17  hundred block of South Main, which is real close to Eureka Street, by the

18  Central Fire Station on South Main Street when I noticed a car behind me

19  flashing their bright headlights.  So, I continued and then I eventually pulled

20  over as they were continuing to flash their lights.  That's when I came into

21  contact with Sonya Burkholder.  She explained to me that there had been an

22  incident between her and Mr. Carter at their residence on East Eureka Street.

23  Q       When Sonya Burkholder -- well, I guess when you stopped and

1    actually engaged with the person who was flashing their lights at you you said

2    that was Sonya Burkholder?

3    A       Yes.

4    Q       And how would you describe the way she approached you and her

5    demeanor?

6    A       She was animated, concerned, and obviously glad to see a police

7    officer because she needed help.

8    Q       Was she upset?

9    A       She was upset.

10   Q       What did she tell you -- what did she explain to you was why she

11   needed help?

12   A       She explained to me that she and Mark had gotten into a fight at the

13   house.  During that fight he had some kind of hand gun and that he had hit

14   her and that the kids were still inside the house and she was concerned for

15   their safety.

16   Q       Okay.  Do you remember about what time of night or early morning this

17   was?

18   A       Well, I want to say approximately three A.M.

19   Q       If I showed you your report would that refresh your recollection as to

20   that time?

21   A       Yes, it would.

22   Q       Is that something that you note on your report?

23   A       Yes.  Yes.

1    Q    So you're not left guessing?

2    A    Absolutely; yea.

3    Q    I'll just have you take a look at that.  When you get done, let me know.

4    A    Okay.

5    (WHEREUPON, witness reviewed document.)

6    A    The time is two twenty-five in the morning.

7    Q    Okay.  So, would that have been when contact was initiated with you?

8    A    That's when she would have made contact with me; yes.

9    Q    Okay.  Now, she said that she had been struck.  Did you notice any

10   injuries to her?

11   A    I didn't notice any obvious injuries on her; no.

12   Q    Okay.  When you say obvious, what do you mean by that?

13   A    She wasn't -- she wasn't spewing blood anywhere.  She didn't look as

14   if she needed immediate medical attention from paramedics.

15   Q    Okay.  Now, when she tells you about Markelus Carter having this gun,

16   hitting her, and there's two children in the home, what's going through your

17   mind as an officer?

18   A    At that point my focus shifts from, well, not to sound unsympathetic to

19   Sonya's situation, but she's safe now.  She's with the police.  She's safe.  My

20   immediate attention and focus shifts to making sure what we have to do to

21   make sure these children are safe inside the house.

22   Q    So, I would assume, have you been flagged down by people before?

23   A    Sure.

1    Q      Flagged down in states of distress?

2    A      Yes.

3    Q      Have you, in your thirteen years, been called to domestic violence

4    situations?

5    A      I'm sorry?

6    Q      Have you been called to domestic violence situations in your thirteen

7    years as an officer?

8    A      Multiple.

9    Q      When you have an issue like this -- let me ask you this - once she tells

10   you this what is your response?

11   A      Well, I immediately start trying to gather more information about what's

12   going on inside the house, how old the children are, more details about the

13   incident so we can gather as much information as we can before we

14   approach his house to try to make contact with Mr. Carter.

15   Q      Okay.  Now, when you say 'we', was there any other officer with you at

16   that time?

17   A      Not when I was initially talking to her; no.  But, other officers responded

18   to the scene when I put out that call.

19   Q      So, you put out a call of what?

20   A      I put out a call of exactly what had happened - that I had been flagged

21   down and there was an alleged domestic violence incident on East Eureka

22   Street.  We don't respond to domestic violence situations by ourselves.

23   Q      So, that's protocol?

1   A     Yes.

2   Q     You don't go to a domestic violence alone?

3   A     Absolutely.

4   Q     Okay.  So, you call for back-up?

5   A     Sure.

6   Q     And do they arrive?

7   A     Yes.

8   Q     And when they arrive what do you do then?

9   A     I explained the situation to them.  Then at that point we go to the house

10  to try to get Mr. Carter's side of the story to find out what's going on.

11  Q     Okay.  Are these other street officers like yourself that are backing you

12  up?

13  A     Sure.  Yes.

14  Q     Okay.  Go ahead.  So, then did you then approach the home at 122?

15  A     We went to the house.  Obviously, I mean, we don't just stroll up the

16  front walk and approach the house that we've been told that somebody has a

17  gun inside of.  I mean, we approached the house from the sides and tried to

18  observe what's going on inside as much as we can.  Keep in mind it's very

19  cold this night.

20  Q     Do you recall how many there were of you at this point?

21  A     I think there was probably myself and two more.  So, three, three

22  officers.

23  Q     Okay.  Go ahead.

1  A       So, we go to the house.  We knock on the door.  We don't get an

2  answer.  We continue to knock.  We continue to not get an answer.  I know

3  we can't really see much going on inside the house at that point.  Keep in

4  mind it's very cold outside.  So, that's when we walked away from the house

5  and go back to our patrol cars to determine what we're going to do next.

6  Q       Okay.  So, once you're getting no response and you go back to your

7  patrol cars what do you guys decide to do?

8  A       We call the on-duty supervisor, Sergeant Craig Stevenson, and I

9  explain the situation to him.

10  Q       Okay.  What was Sergeant Stevenson's order?

11  A       Initially I believe we tried to get a key from Sonya for the house so we

12  could go check the welfare and see what was going on inside the house.  She

13  told us that no one on the outside had a key.  So, I explained that situation to

14  him.  I even used her phone to make some phone calls to try to get someone

15  to answer the phone inside the house.  I didn't receive any answers on the

16  phone, either.

17  Q       Okay.  Did she have a number for someone inside the house?

18  A       Yes.  Yes.

19  Q       Okay.  Do you remember who that was?

20  A       I think it may have been her daughter, Tarah.

21  Q       Okay.

22  A       Yea.

23  Q       But, no one answered?

1    A      No one answered the phone.

2    Q      Now, once no one is answering and you don't have a key do you relay

3    all this information to Sergeant Stevenson?

4    A      Sure.  Absolutely.

5    Q      Just for the record, Sergeant Stevenson is no longer alive; correct?

6    A      Correct.

7    Q      So, he can't explain his decisions; correct?

8    A      Sure.

9    Q      But, nevertheless, he's your supervisor and you have to do what he

10   says?

11   A      Yes.

12   Q      Okay.  So, what does he say?

13   A      Obviously he wants me to gather more intelligence about what's inside

14   the house.  Are there any more weapons?  Are there any animals inside the

15   house?  Dogs are typically what we're worried about.  The layout inside the

16   house.  So, those are the kinds of things that I started to gather from her.

17   Q      Let me ask you this - is this somewhat of an unusual situation as far as

18   what's about to happen?

19   A      About the resources we were going to call out?  It's not common.

20   Q      Let me ask you this - she comes to you with this story.  You don't see

21   any obvious injuries on her and she's told you that she's been hit.  Did that

22   strike you as odd that you didn't see any obvious injury?

23   A      No.

1   Q      Why not?

2   A      It's not uncommon.  In all the countless domestic violence situations

3   I've responded to it's not uncommon to see someone who's been struck and

4   you get there immediately after and there's no injuries on them.  They may

5   not show up for a few days.  They may not show up for a few hours.  I can

6   that it's not uncommon because it's not uncommon to have a witness say,

7   'yes, he hit her', or, 'he hit him', or, you know, someone struck someone and

8   you're looking at them and there's no injuries.

9   Q      Even sometimes the accused will tell you, 'yea, I hit her'?

10  A      Absolutely.  They'll say, 'yea, I hit them', and you go over there and

11  there's no injuries on them.

12  Q      Now, you count and texted in domestic violence situations, but have

13  you responded to bar fights or similar situations?

14  A      Oh, absolutely.

15  Q      Same type of thing?

16  A      Same kind of situations.

17  Q      I see you got a little issue going on under your left eye there.

18  A      Yes.  I struck myself in the eye with a traffic cone the other day.

19  Q      We won't go into those details.

20  A      Yea.

21  Q      Now, did you markings show up right away?

22  A      This happened Sunday evening after the fireworks show.  So, probably

23  about ten or ten-thirty.  So, this is the remnants from Sunday evening.  Really

1    the marks probably didn't really show up until about Tuesday.

2    Q      Okay.

3    A      Then they were really, really obvious.

4    Q      All right.  So, was there anything -- again, you're making these phone

5    calls, or, radio calls, or whatever, to your shift supervisor.  Is there anything

6    telling you, 'well, I don't know if she's to be believed'?

7    A      No.  I leaned on her significantly trying to make sure that this was

8    actually what had happened inside because we don't want to make a big deal

9    out of something that's not.  So, I definitely leaned on her for quite awhile

10   trying to get more information and she stayed with her story about what had

11   happened inside the house.

12   Q      Have you come across situations like that in your thirteen years as a

13   police officer where someone's coming across quite dramatic and after you

14   push them a little bit, well, not so much?

15   A      They changed their story.  Yes, absolutely.

16   Q      But, you weren't getting that vibe?

17   A      No.

18   Q      Okay.  So, tell the jury what happens next.

19   A      Next I explained the situation.  I continued to explain the situation to

20   Sergeant Stevenson.  The other thing that caught my attention that people

21   may still be inside the house was that 122 East Eureka is like three houses

22   from where she saw me.  So, she had apparently just left the house, from

23   what I could gather.  By the way she was dressed and how cold it was

1   outside, well, I didn't gather that she had been outside for very long.  So, I

2   had a good feeling that whatever had happened had just occurred.  So, I had

3   a good feeling that there was probably people still inside the house.

4   Q      All right.  Are you made aware at some point that the hostage

5   negotiation team, along with S.W.A.T., was coming out?

6   A      Yes.

7   Q      Let me ask you this - as you're doing all of this do you know where

8   Sonya Burkholder is this entire time?

9   A      No.  I left her at my car down the street probably about a block away.

10  Q      Is there a car wash, or, was there a car wash at the time?

11  A      There's a car wash at Main and Eureka.

12  Q      Okay.  Was that --

13  A      I believe that's where we staged up at with her.

14  Q      All right.  At some point did someone take her to the station?

15  A      Yes.

16  Q      Was that you?

17  A      No.

18  Q      When I say station I mean the Lima Police Department.

19  A      To the Lima Police Department.

20  Q      Was there anything about her appearance that struck you that she was

21  drunk and she didn't know what was going on?

22  A      No.

1    Q    Once, and I'm just going to say H.N.T. for short, is out there what was

2    your role at this point?

3    A    At that point we just maintained the perimeter.  To explain that better, I

4    had my car parked at Main and Eureka with the overhead red and blue lights

5    on blocking the road so nobody could drive past the scene.

6    Q    All right.  Now, in your report did you fill in the property portion of it of

7    anything that was seized?

8    A    Yes.

9    Q    Okay.  Eventually this ends; correct?

10   A    Yes.

11   Q    We've heard from Detective Neidemire.  So, I won't go into that in

12   detail with you.

13   A    Okay.

14   Q    But, once this ended do you know whether officers are able to make

15   entry into the home?

16   A    Yea.  I wasn't actually -- I didn't actually witness them go into the

17   home.  But, from what I could gather from the reports and the debrief

18   afterwards, yes, they made entry into the house.

19   Q    Okay.  Did someone put you in charge of writing down the property

20   that was found in that home?

21   A    Yes.

22   Q    Okay.  What item was that?

23   A    There was a black co2.  A co2, like BB gun, a hand gun style gun.

1   Q      Okay.  If you would read your report would it refresh your recollection

2   as to exactly what that was?

3   A      Yes.

4   (WHEREUPON, witness reviewed document.)

5   A      It's a Walther CP99 black co2 hand gun.

6   Q      Okay.  But, again, you did not see that?

7   A      I did not see it.

8   Q      Let me ask you this - have you, in your thirteen years, come across

9   real guns, co2 guns, and BB guns?

10  A      Yes.

11  Q      Are there times when just looking at them, without getting too close or

12  touching it, that you could confuse one of those BB guns or air pistols with an

13  actual gun?

14  A      Yes.  In my job I'm forced to spend my time around a gun.  I was

15  recently on a call over the weekend where three young men had BB guns and

16  looking over a fence onto the ground about four feet down I had a hard time

17  telling if that gun was a BB gun or a real gun.  It turned out to be a co2 hand

18  gun.

19  Q      And you're familiar with guns?

20  A      Yes.

21  Q      Now, once you -- let's jump back to February 23rd, 2009.  Once you

22  see this bill and you make the connection about the incident that you just

23  described what did you do with that information?

1  A       I passed it on to one of the investigators at the scene.

2  Q       Okay.  Do you remember roughly what your words were that you

3  passed on?

4  A       I believe I just told him about the incident that I just explained - that I

5  recognized Sonya from the incident that had happened on Eureka Street and

6  that, you know, they had had a, you know, history of being involved in fights.

7  So, that's just all I explained to him.

8  Q       Okay.  You didn't go into all the details about what the 2007 incident

9  was?

10  A       No.  No.

11  Q       But, just generally?

12  A       I just thought it was odd that she was living over there now and it

13  looked like another man was going to be going over there and that she had

14  been with Mark on Eureka Street.  I just thought it was odd that his utility bill

15  was at her new house.  It just seemed kind of --

16  Q       Okay.  So, you just passed on what you knew?

17  A       Yes.

18                              MRS. KOHLRIESER:   Just a moment.

19  (WHEREUPON, Court went off the record briefly.)

20                              MRS. KOHLRIESER:   No further questions

21  at this time.

22                              THE COURT:  Any questions, Mr. Rion?

23                              MR. RION:  Thank you, your Honor.

## CROSS EXAMINATION

**BY MR. RION:**

Q     Good afternoon, sir.

A     Good afternoon.

Q     Okay.  So, just a couple of things.  You have a copy of your report there?

A     I do not.

Q     Okay.

              MRS. KOHLRIESER:  I have one here.

              MR. RION:  Thank you.

Q     If you need to refresh your recollection.

A     Okay.

Q     I'd like you to turn to page two.  It says page three of three, I guess.

A     Oh, okay.

Q     It's page two of --

A     This one right here, sir?

Q     Yes, sir.

A     Okay.  All right.

Q     The last two lines, and I think you stated, but just to -- well, your impressions on that day, on 12-17-07, were, "At that time, or, at the time I spoke with Sonya she did not appear to have any visible injuries."

A     Correct.

Q     That's an accurate statement; right?

1   A       Yes.

2   Q       There was no dried blood on her face?

3   A       Not that I was -- not that I witnessed; no.

4   Q       There were no scratches on her face?

5   A       Not that I recall.

6   Q       Okay.  You gave a description of what she told you had occurred in

7   that house?

8   A       Yes.

9   Q       Essentially, if I'm understanding it correctly - and this is on page two

10  obviously for your recollection - it said 'that he punched her on the left side of

11  her face'.  That's the allegation that she made at that time; correct?

12  A       Yes.

13  Q       It doesn't say that he pistol whipped her; right?

14  A       No.

15  Q       And pistol whipped, for those that, well, I guess that's a slang term, she

16  did not say that he hit her in the face with a pistol.

17  A       No, she did not say that.

18  Q       Now, at the time -- you said you've been doing domestic violence for a

19  long time; correct?

20  A       Yes.

21  Q       That's not your focus, but it's just any officer on duty is bound to come

22  across these situations; correct?

23  A       Correct.

1   Q    Sort of the flip side of the coin is that a lot of times you get two very

2  different recitations as to what happened.

3   A    Correct.

4   Q    And sometimes it's not really for you to figure out what happened, but

5  leave it to the Courts to figure out the situation down the road; correct?

6   A    Uh --

7   Q    Let me put it another way. In many instances you're left with what I'll

8  call a he said/she said situation.

9   A    That can occur.

10   Q    Now, in this case there was some independent witnesses in the house

11  at the time; correct?

12   A    That was discovered later.

13   Q    You hadn't spoke yet with --

14   A    Yea, at that point I did not know, you know, who was where.

15   Q    So, it was at a later time then that you got further input from other

16  people that were in the house; correct?

17   A    I didn't get any further input.

18   Q    Officers, or the Courts, or somebody did; correct?

19   A    Okay. Okay.

20   Q    So, then you go to the house and eventually the house is searched;

21  correct?

22   A    As far as I know from other police officer's reports apparently it was.

23   Q    You're sort of in charge of this investigation; are you not?

1   A       Absolutely not in charge; no.

2   Q       Okay.  So, you're one of the people.  But, you reviewed the reports?

3   A       I reviewed my report.

4   Q       And as was stated, you were made aware that there was a weapon

5   found in the house?

6   A       Yes.

7   Q       And the weapon, well, you've already described the weapon.  The

8   weapon was found in the living room on a shelf in plain view; is that correct?

9   A       I can't testify to that because I didn't find the weapon.

10  Q       That was your understanding from the investigation and your review of

11  the reports?

12  A       That wasn't -- no, because I never -- that's the first time I've ever heard

13  that information.

14  Q       Okay.

15                              MR. RION:   Can I approach the prosecutor

16  for just a second?

17                              THE COURT:   Sure.

18  (WHEREUPON, Court went off the record briefly.)

19                              MR. RION:   May I approach the witness?

20                              THE COURT:   Sure.

21  Q       Attached to the report that you headlined -- was Officer Holman part of

22  the investigation from what you can tell?

23  A       I believe Officer Holman was on the S.W.A.T. team at that point and

1    time.  So, yes.

2    Q      Still speak up for the jury, not for me.

3    A      Oh, I'm sorry.  I'll sit back.

4    Q      It says here, and I know we're referring to his report, and everybody

5    understands that, - it says, 'I located a black Walther co2 power pistol lying on

6    a shelf in the living room.  The pistol was in plain view'.

7    A      That appears to be what Officer Holman wrote; correct.

8    Q      And you have no reason to -- you have no information contrary to what

9    Officer Holman put in his statement relating to this event?

10    A      No.

11    Q      In the living room, on the shelf, in plain view was this pistol; correct?

12    A      If that's what Officer Holman's report says; yes, sir.

13    Q      That's what Holman said.  Okay.  Were you responsible for taking

14    Tarah -- fast-forward now to 2009.  Did you take Tarah down to the police

15    station?

16    A      No.

17                  MR. RION:  Nothing further.  Thank you.

18                  THE COURT:  Any redirect?

19                **REDIRECT EXAMINATION**

20    **BY MRS. KOHLRIESER:**

21    Q      Just one question for you based upon Mr. Rion asking about he

22    said/she said and two different recitations.  Is that why the first thing you did

23    was try and knock on his door and talk to him?

1    A    Sure.  We would like to get his side of what happened.

2    Q    Thank you.  Oh, wait.  Sorry.  Did he give you his side?

3    A    No.

4    Q    Thank you.

5                              THE COURT:  Any recross?

6                    **RECROSS EXAMINATION**

7    **BY MR. RION:**

8    Q    There were other officers present that he obviously had contact with

9    that night; correct?

10   A    According to the report it looks like he eventually was arrested.  So,

11   yea, he must have come in contact with some other officers.  But, I don't

12   know who.

13   Q    Okay.  And phone contact and everything else?  Or, were you not a

14   part of all of that?

15   A    I wasn't part of that, sir.

16                             MR. RION:  Nothing further.

17                             THE COURT:  All right.  Sergeant, thank

18   you.

19   A    Thank you, sir.

20                             THE COURT:  You're excused.

21   A    Just leave this, sir?

22                             THE COURT:  Is that an exhibit?

23                             MR. RION:  No, it's not.

1                        THE COURT:  No, it's not an exhibit.  All

2 right.  State's next witness?

3                        MRS. KOHLRIESER:  Thank you, your

4 Honor.  The State would call Officer Aaron Montgomery.

5                        THE COURT:  As the next witness is

6 coming forward, ladies and gentlemen of the jury, when we have these

7 breaks for witnesses if you feel like you want to stand up and stretch or

8 whatever to keep the blood flowing, by all means do that.  This would be a

9 good time when nobody is on the stand.  I know after lunch sometimes it's

10 nice to get the blood flowing.

11 WHEREUPON, called to appear as a witness in this proceeding was one:

12       **P A T R O L M A N   A A R O N   M O N T G O M E R Y**

13 who, having been duly sworn by the bailiff herein, testified as follows:

14 BAILIFF:  He has no objection.

15                        THE COURT:  All right.  Thank you.  Go

16 ahead.

17                   **DIRECT EXAMINATION**

18 **BY MRS. KOHLRIESER:**

19 Q     Can you state your name for the record, please?

20 A     Yes, Patrolman Aaron Montgomery.

21 Q     Even though you just said Patrolman and we can see your uniform, for

22 the record, can you state your place of employment?

23 A     I work third shift for the Lima Police Department.  I'm a K-9 officer.

1   Q      And when did you start working with the Lima Police Department?

2   A      5-19 of '08.

3   Q      So, back on February 23rd of '09 you were a fairly new officer?

4   A      That's correct.

5   Q      Were you working that day?

6   A      Yes, I was.

7   Q      And do you recall what shift you were working that day?

8   A      That would have been first shift, seven A. to three P.

9   Q      Okay.  So, seven A.M. to three P.M.?

10  A      Correct.

11  Q      And do you recall learning of a homicide that morning?

12  A      Yes, I do.

13  Q      And were you part of the uniformed officers at the scene or anything?

14  A      No, I wasn't.

15  Q      Did there come a time that morning when you were requested to stop a

16  vehicle that was driven by Markelus Carter?

17  A      Yes, I was.

18  Q      And did you stop that vehicle?

19  A      That's correct.

20  Q      Do you recall where you stopped that vehicle?

21  A      Yea.  At the intersection of Spring and Jameson.

22  Q      Just for the record, explain to the jurors how is it that you get calls?

23  What happens?

1   A      A lot of times, well, in this situation it would have been what we refer to

2   as our Drug Unit, who a lot of times investigates either serious crimes or

3   anything relating to obviously drug investigations.  They're not in marked

4   patrol units for the reason of maybe surveillance - getting into an area or

5   watching something that we may not be able to do in a uniform, or, marked

6   cruiser.  A lot of times what they'll do is they'll either get a violation or they'll

7   have something in the investigation that requires for a marked officer in a

8   uniform and a marked patrol car to stop them so there's no confusion when

9   this person is being stopped that it's an actual police officer.  So, what

10   happened was they requested and they were giving out directions this day of

11   where they were traveling and the type of motor vehicle, a description and,

12   like I said, the direction of travel and then they asked for me to stop it

13   because I'm in a marked L.P.D. patrol car.

14   Q      Okay.  So, when an investigative unit, whether it's the Drug Unit or

15   detectives, say, 'hey, we want you to stop this car', you follow their directions?

16   A      Yes.

17   Q      Okay.

18   A      Yep.

19   Q      Now, can you describe for the jury what happened when you stopped

20   that vehicle?

21   A      I stopped it at the intersection of Spring and Jameson facing

22   westbound.  I approached on the driver's side.  I gave my name, who I was,

23   and I asked for identification from Mr. Carter, who was the driver of the motor

1    vehicle that day.  Then as I spoke with him and requested his identification,

2    insurance, and registration then one of the investigative officers came up on

3    the driver's side and then asked for Mr. Carter to exit.

4    Q       And within seconds, or a minute or so of that stop, did other, well, I

5    guess what we'll call plain clothes investigators show up as well?

6    A       Yes.  There was probably maybe four or five, maybe, right in there,

7    three to five.

8    Q       Do you recall Detective Clark showing up?

9    A       Yes.  Yes.

10   Q       Now, once they show up are they dealing primarily with talking with

11   him?

12   A       Yea.  I kind of -- well, at that point when I'm stopping a car for an

13   investigative unit there's obviously something that they know that I may not.

14   So, I kind of just do what I need to do until they kind of take over.  I kind of

15   step back and at that point they were talking to Mr. Carter.

16   Q       Shortly thereafter were you asked to drive Mr. Carter to the police

17   station?

18   A       Yea, that's correct.  I transported him from the traffic stop there at

19   Spring and Jameson to L.P.D.

20   Q       And that was in your cruiser?

21   A       That's correct.

22   Q       Now, in this type of situation do you allow him to ride in the front seat?

23   A       No.  Our policy is we don't allow anybody to ride in the front seat.

1   Q      So, he was in the back?

2   A      That's correct.  I don't believe he was handcuffed.

3   Q      Now, the person that you described as stopping and things of that

4   nature, and you kind of did a hand gesture a few minutes ago, do you see him

5   in Court today?

6   A      Yea.  Right here - Mr. Carter.

7   Q      Could you describe something he's wearing?

8   A      A vest with a tie and a light blue shirt.

9   Q      Okay.  The stop of the defendant's vehicle and the subsequent

10  transport, were those things recorded?

11  A      That's correct.

12  Q      I'm going to hand you what's been previously marked as State's exhibit

13  '97'.  I'd ask you to take a look at that.

14  A      Yep.

15  Q      Now, for the record, what physically are you holding?

16  A      It's just a DVD.  It's going to be my cruiser video, I believe, the day the

17  traffic stop occurred.

18  Q      And you've actually had a chance to review that?

19  A      Yes, that's correct.

20  Q      Now, back in 2009 did we have convenient little DVD recordings?

21  A      No.  They would have been tapes at that point.

22  Q      VHS tapes?

23  A      That's correct.

1  Q     So, this would be a conversion of those tapes to this?

2  A     Yes.

3                          MRS. KOHLRIESER:  Your Honor, at this

4  time I'm going to attempt to play State's exhibit '97'.

5                          THE COURT:  Okay.

6                          MRS. KOHLRIESER:  It was working a few

7  minutes ago, your Honor.  It seriously was working right before we came in.

8                          THE COURT:  Do you want to take a short

9  recess and get the equipment in order?

10                         MRS. KOHLRIESER:  Here's my concern,

11  your Honor, because our next witness has some technology that he's bringing

12  to help demonstrate some things and we're going to need a short break to

13  hook him up.  All right, your Honor, if we could have a short recess.  I

14  apologize.

15                         THE COURT:  All right.  Ladies and

16  gentlemen of the jury, this happens, unfortunately.  I can't program my VCR

17  at home.  So, we'll take a short break so they can figure this out.  It's not the

18  Court's equipment, I'll tell you that much.  It's the prosecutor's equipment.

19         Remember the admonitions.  Don't discuss the case among

20  yourselves or with anyone else.  Stick around close by.  I don't think that it

21  should take very long.  All right.  We'll stand in recess.

22  (WHEREUPON, COURT WAS IN RECESS.)

23

1    THE COURT:   Back on the record in

2  CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  It's September 11th,

3  2015.  The defendant is present with counsel.  The State is present.  The

4  jurors are all back.  Patrolman Montgomery is on the stand.

5         We've got the electronic issues resolved, we hope.

6                          MR. MILLER:   I think all I have to do is

7  push a button.

8                          THE COURT:   You may continue then.

9  **DIRECT EXAMINATION OF PTL. AARON MONTGOMERY CONTINUED**

10  **BY MRS. KOHLRIESER:**

11  Q      Before he pushes it, do you see some numbers up there at the top?

12  Now, again, this is a DVD that copied your VHS tapes; correct?

13  A      That's correct.

14  Q      Okay.  I'm not going to get into too much.  Is the date reflected up

15  here?

16  A      Yea, 2-23 of 2009.

17  Q      Okay.  Can you see the time on there?

18  A      It looks like eight forty-eight, which would be zero eight forty-eight in

19  the morning, I believe is what it says.

20  Q      Okay.  Does it have milliseconds - it's eight forty-eight and -- well,

21  seconds, not milliseconds.

22  A      Yea; correct.

23  Q      Okay.  Now I'm going to play it.  For the record, we're starting at one

1    oh seven forty-nine on the ticker here at the top.

2    (WHEREUPON, State's exhibit '97' was played in open Court.)

3                                    THE COURT:   Do you want to turn it up a

4    little so we can hear it?

5                                    MRS. KOHLRIESER:   It's just radio traffic.

6                                    THE COURT:   Oh.

7    (WHEREUPON, State's exhibit '97' continued to be played in open Court.)

8    Q       What road are you now turning on?

9    A       Metcalf and Spring.  We go right and westbound on Spring, I believe.

10   (WHEREUPON, State's exhibit '97' continued to be played in open Court.)

11   Q       Do you know whose cars those are you're passing?

12   A       I'm sorry?

13   Q       Do you know whose cars those are you're passing?

14   A       Yea.  That's some of the detectives and other investigative officers.

15   (WHEREUPON, State's exhibit '97' continued to be played in open Court.)

16   Q       Is that you we see in the shot at this moment at eight fifty-two?

17   A       That's correct.

18   (WHEREUPON, State's exhibit '97' continued to be played in open Court.)

19   Q       Who's the gentleman who just crossed over --

20   A       Jason Bugh -- Investigator Jason Bugh.

21   (WHEREUPON, State's exhibit '97' continued to be played in open Court.)

22   Q       What's Investigator Bugh doing now?

23   A       Performing a pat-down to make sure there's no weapons in his

1  possession on the exterior of his clothing that he might feel.

2  Q      And who just pulled up in front of the black car?

3  A      It looks like Detective Clark, I believe.

4  (WHEREUPON, State's exhibit '97' continued to be played in open Court.)

5                          MRS. KOHLRIESER:  For the record, your

6  Honor, I'm stopping the tape at I believe the L.P.D. cruiser time of eight

7  fifty-eight, excuse me, eight fifty-nine and twenty-eight seconds.  The clock at

8  the bottom is one eighteen twenty-seven.

9                          THE COURT:  Okay.

10  Q      Now, does the video that we just watched truly and accurately reflect

11  your interaction with the defendant that day?

12  A      Yes, it does.

13  Q      And just a couple of things.  The various men that we see moving in

14  and out of the shots once the defendant's vehicle is stopped, are any of those

15  what I would call civilians?

16  A      No.  Those were all police officers.

17  Q      Okay.  And is that what you were talking about - the Drug Unit?

18  A      Yes, that's correct.

19  Q      Unlike Detective Clark who shows up a little bit dressier, they typically

20  dress down like we see in the video?

21  A      Yes.

22  Q      And at some point did it appear on the video to you and is it your

23  recollection that Detective Clark was actually attempting to speak with the

1  defendant?

2  A      Yes.

3  Q      And once you got to the station the video ends.  Where did you take

4  him to?

5  A      I just remember taking him into L.P.D.  There was another investigator

6  or detective and I don't remember, or, recall if he was directly taken upstairs,

7  but I know he was secured either in a holding cell downstairs or upstairs.

8  Q      But, you didn't actually place him under arrest; did you?

9  A      No, he was never placed under arrest.

10 Q      So, I guess, the contents of how that stop and everything was decided,

11 that's beyond you?

12 A      That's correct.

13                          MRS. KOHLRIESER:   Nothing further at

14 this time.

15                          THE COURT:   Questions, Mr. Rion?

16                     **CROSS EXAMINATION**

17 **BY MR. RION:**

18 Q      Good afternoon, sir.

19 A      Hi.  How are you?

20 Q      I'm fine.  Yourself?

21 A      Good.

22 Q      I have very few questions.  The tape is fairly self-explanatory.  That's

23 your voice in the front; correct?

1    A      That's correct.

2    Q      And you didn't have a reason to stop him?  You were just following

3    orders of what other people told you to do; is that correct?

4    A      That's correct.

5                                    MR. RION:  Nothing further.

6                                    THE COURT:  Okay.  Any redirect?

7                                    MRS. KOHLRIESER:  No.

8                                    THE COURT:  Okay.  Officer, you're

9    excused.  Thank you.

10   A      Thank you.

11                                   THE COURT:  Next witness?

12                                   MRS. KOHLRIESER:  The State's calling

13   Kevin DeLong.  He's the one that I said may have to hook up some things.

14   But, given his area of expertise --

15                                   THE COURT:  You'll see if he can do it real

16   quick?

17                                   MRS. KOHLRIESER:  Yes.

18                                   THE COURT:  Okay.

19                                   MRS. KOHLRIESER:  You might want to

20   stretch, but I don't think we'll need a break.

21                                   THE COURT:  Yea, again, folks, if you feel

22   like standing up and stretching now is the best time to do it, when we're

23   in-between witnesses.

1    WHEREUPON, called to appear as a witness in this proceeding was one:

2                                  **K E V I N   D E L O N G**

3    who, having been duly sworn by the bailiff herein, testified as follows:

4                                            MRS. KOHLRIESER:   If I could have just a

5    second, your Honor?

6                                 **DIRECT EXAMINATION**

7    **BY MRS. KOHLRIESER:**

8    Q      Good afternoon.

9    A      Good afternoon.

10   Q      Would you state your name for the record?

11   A      Kevin DeLong.

12   Q      And can you tell these folks what your current occupation is?

13   A      I'm the vice-president of global training for mobile forensics for a

14   company called Syntricate.

15   Q      What do you do for them?

16   A      I develop all the research and development of the curriculum and we

17   teach multiple three letter agencies from around the globe.

18   Q      Multiple three letter agencies?

19   A      Yes.

20   Q      Would you tell us an example?

21   A      Our clients are C.I.A., F.B.I., Secret Service - okay, one more than

22   three letters, but the major agencies from not only the United States, but the

23   U.K., Germany, Croatia, and multiple countries throughout the world.

1   Q      And where were you employed prior to going with this company?

2   A      Lima Police Department.

3   Q      Okay.  And what did you do for the Lima Police Department?

4   A      I worked in a digital forensics lab where we managed the intake of

5 digital evidence, processed the evidence, occasionally went on search

6 warrants and collected the evidence and kind of interpret all the data that we

7 found to make it easier for someone who's non tech. savvy to understand

8 exactly what happened on the system.

9   Q      How long were you with the Lima Police Department?

10   A      Just shy of fifteen years.

11   Q      And when did you leave?

12   A      In July of 2012.

13   Q      And why did you leave?

14   A      The private sector offered me a little bit better financial future.

15   Q      Okay.  Before that, while you were employed at L.P.D., you had side

16 jobs; correct?

17   A      Yes.

18   Q      What kind of things did you do computer and mobile device wise?

19   A      The company that I eventually ended up going to work for full-time I

20 contract work with them and so when I had days off from the Police

21 Department I would go and travel and teach for them a new thing for mobile

22 forensics.

23   Q      Okay.  Have you taught any college courses?

1    A      Yes.  I was an adjunct professor at Ohio Northern University in Ada for

2    several years.

3    Q      And what did you teach there?

4    A      It was an introductory course to computer forensics and with a little bit

5    of mobile forensics mixed in.

6    Q      What do you mean by computer forensics and mobile forensics?

7    A      So, computer forensics and mobile forensics, well, you kind of think of

8    technology as just technology.  They're actually very separate on how a lot of

9    the technologies work.  So, computer forensics typically deals with desktop

10   computers, laptop computers, and things of that nature.  When we start

11   talking mobile forensics, mobile forensics are more of like the cellular devices,

12   along with I-Pads and any android tablets, windows tablets, and stuff like that.

13   Q      I guess smaller hand-held type, well, that promotes themselves to go?

14   A      Yea.

15   Q      Okay.  All right.  Now, which division of the Lima Police Department

16   were you assigned to prior to leaving?

17   A      Technology crimes unit.

18   Q      And did that also -- was part of that part of the P.A.C.E., the P.A.C.E.

19   unit?

20   A      Yes.

21   Q      Okay.  Can you explain to these folks what the P.A.C.E. unit is?

22   A      Okay.  P.A.C.E. was a pro-active crime enforcement unit.  So, kind of

23   our role was to go out and obviously be pro-active within the community to

1     build relationships with the community and respond to crimes.  A lot of it

2     ended up being narcotic investigations and things of that nature.

3     Q      Now, with, and I'll just call it technology in general, what sort of

4     specialized training or education do you have to do that kind of stuff?

5     A      Okay.  So, initially I started going to some of the police department

6     sponsored events - the N.W.3-C, which is the National White Collar Crime

7     Center, where I received my initial training in computer forensics.  There was

8     multiple stages of training through them.  Also, some sponsored training

9     through the F.B.I.  Then I started attending some of the vendor based training

10     to utilize how their tools function, how they interact with the data and the

11     software, from guidance software to access data software where I'm

12     employed now.  So, it's been multiple courses throughout.  I think I got started

13     right around 2002/2003.

14     Q      But, now your job is to train people?

15     A      Yes, and to develop the curriculum to do that.

16     Q      Do you still get some sort of training, or do you figure it out yourself?

17     A      Yea, that's the trick.  The training doesn't exist and so we create it.  We

18     do the initial research and development.  If a new phone or new device

19     comes out and we can't figure out how it's storing the data we actually start

20     reverse engineering it - how does it work; how is it storing the data.  Then we

21     create the curriculum and we actually create curriculums for a lot of the

22     universities across the United States, as well as, you know, some of the

23     government agencies and private sector.

1   Q      So, you teach the teachers?

2   A      Yes.

3   Q      Okay.  I'll hand you what's been previously marked as State's exhibit

4   '163'.  I'll have you take a look at that.

5   A      Certainly.

6   Q      For the record, does that appear to be a two page document, front and

7   back?

8   A      It does indeed.

9   Q      And do you recognize that?

10   A      Yes, I do.

11   Q      What is that?

12   A      It is my C.V., or experience in the technology realm.

13   Q      Does it list your work experience?

14   A      Yes, it does.

15   Q      Does it list your computer training and mobile technology training and

16   things of that nature?

17   A      It does.

18   Q      Now, over the years that you've been doing this how many computer

19   forensic examinations would you say you've performed over the years?

20   A      Oh, goodness.  I would go in the hundreds.

21   Q      Okay.  What about cellular phones, Smart phones, whatever you want

22   to call them, I-Pads?

23   A      Those are a little quicker normally to do.  So, we're probably coming up

1    to the thousand point.

2    Q        And do you have any sort of certifications?

3    A        Yes.  I hold an access data mobile examiner certification.  I also hold a

4    mobile examiner certification, which is from a private organization.  Then I

5    also have the access data certified computer examiner certification as well.

6    Q        How do you get those certifications?

7    A        You take a series of tests.  They present you with a data set or a

8    scenario.  I'll give you the most challenging one that I went through and it was

9    a scenario base.  You get sent some mobile devices and you have to process

10   them in a certain way to get expected results through a scientific method

11   where they can compare the data that I received based on the data that the

12   certifying body knows that they put on there.  So, if you obviously get those

13   results back and you can present it in that fashion and you know they handle

14   it in a certain way.  So, that process was probably about three months of just

15   that certification alone.

16   Q        And have you ever testified in Court as an expert in forensic computer

17   analysis and mobile data forensic technology?

18   A        Yes, I have.

19   Q        Do you know approximately how many times you've testified?  I'll

20   spring this one on you.

21   A        Yea, I'm not sure how many, but it was here in Allen County.

22   Q        So, you've been qualified as an expert in Allen County?

23   A        Yes.

1          MRS. KOHLRIESER:   Your Honor, at this

2    time I would move to have him qualified as an expert in forensic computer

3    analysis and mobile data forensic technology.

4          THE COURT:   Mr. Rion, anything?

5          MR. RION:   No objection.

6          THE COURT:   Okay.  Well, with no

7    objection, the Court will put on the record and make the finding that Mr.

8    Delong is qualified to testify as an expert in the computer and mobile

9    forensics.

10          MRS. KOHLRIESER:   Thank you.

11   Q      Now, in February of 2009 were you assigned to the investigations

12   division at that time?

13   A      Technology unit; yes.

14   Q      Technology.  And specifically on February 23rd, 2009 were you asked

15   to participate in the execution of a search warrant at 122 East Eureka?

16   A      Yes, I was.

17   Q      And did you do that?

18   A      I did.

19   Q      All right.  What was your role during that search?

20   A      My role was to handle all the technology based pieces of evidence that

21   we came across - computer systems; mobile devices; flash drives; anything

22   that had to support technology or could possibly contain evidence that may

23   support the investigation.

1    Q      Okay.  And were a number of items that I'll just refer to collectively as

2    electronic technology seized --

3    A      Yes.

4    Q      -- during this search?

5    A      Yes.

6    Q      And you would have been the person that seized them?

7    A      Yes.

8    Q      Why is that?

9    A      There's a certain way that you have to handle pieces of electronics.

10   Even though you may not think a computer system is doing anything as it's

11   just sitting there, you know, no one is using it, well, it's actually doing quite a

12   bit.  So, it's just a way they have to collect it - shut down the machines and

13   collect the machines.  So, I was trained in that and so I was the one that

14   ultimately felt responsible for those collections.

15   Q      And the purpose being to keep it as it is?

16   A      Yea, keep it as it is as much as possible.  Absolutely.

17   Q      Now, once that evidence was seized were you tasked with analyzing

18   all of that?

19   A      Yes.

20   Q      Okay.  All right.  I'm going to hand you what's been previously marked

21   as State's exhibit '102' and ask you whether you recognize that as the house

22   that was searched?

23   A      Oh, absolutely.  Yea.  This was the house that we served the search

1    warrant at.

2    Q        Okay.  On February 23rd of 2009?

3    A        Yes.

4    Q        Is that what we see on the big screen here?

5    A        Yes.

6    Q        All right.  Again, when these searches happen is there someone that

7    keeps like an evidence log of what's being taken?

8    A        Yes.

9    Q        Do you recall off the top of your head who that person would have

10   been?

11   A        I'm not sure back in 2009 who that would have been.

12   Q        I'll show you State's exhibit '105'.  I'd ask you to take a look at that.

13   A        Oh, certainly.

14   Q        Do you recognize what's depicted there?

15   A        Yes.  There's a laptop.  This appears to be the front room of the

16   residence, or, the living room of the residence with a laptop that's on a stand

17   there.

18   Q        Okay.  Was that seized during the search?

19   A        Yes.

20   Q        Is this what you're talking about in the middle of the picture on the little

21   table there?

22   A        Yes, right there.

23   Q        And then State's exhibit '108'.  I'd ask you to take a look at that.

1    A    Certainly.

2    Q    Do you recognize that?

3    A    Yes, I do.  This, I think, if memory serves me correctly, I can't see the

4    front door, but I believe this was the door that was directly off of the porch.

5    You walk into this area and then the staircase, the dining room, and then the

6    front room kind of off of that.

7    Q    For the record, these last few exhibits I've shown you were all

8    photographs; correct?

9    A    Correct.

10   Q    And do they fairly and accurately reflect what 122 East Eureka looked

11   like on the day you searched it?

12   A    Yes.

13   Q    Does this one show another computer in this picture?

14   A    Yes.

15   Q    There's multiple items here as well.  Do you recognize what those are?

16   A    Correct.  I see the computer system there.  There were multiple things

17   that were on top of the desk as well.  We collected flash drives and multiple

18   things throughout.

19   Q    The bigger boxes lying in the middle of the picture there, are those

20   what I guess are commonly called computer towers inside there?

21   A    Correct.

22   Q    Okay.  What's a computer tower's function?

23   A    It's just a computing device.  Typically they can be used in any type of

1    environment - home environment; office environment.  Can you clarify the

2    question a little bit?

3    Q      Okay.  I guess, well, what's housed in a computer tower?

4    A      Oh, goodness.  Hard drives for storage of digital evidence.

5    Q      Is it basically the meat of the computer?  The monitor is just what you

6    look at; right?

7    A      Right.  Right.  That's where you're just seeing it with the monitor.  They

8    keyboard and stuff are all extra.  So, the meat of the computer, as you put it,

9    was exactly the tower.

10   Q      And exhibits '115' and '116'.

11   A      Yea.  This appears to be the back room, or what appeared to me as a

12   studio of some type of that residence as well with multiple computer

13   components there as well.

14   Q      And were those seized as well?

15   A      Yes, they were all seized.

16   Q      And '115' and '116', do they fairly and accurately depict what you saw

17   that day in that house?

18   A      Yes.

19   Q      All right.  There were other items as well that I'm not showing you

20   pictures of; correct?

21   A      Oh, yes.

22   Q      Were there small items, too, that we can't see that are forensic

23   technology?

1  A      Yea.  If I recall, there were thumb drives.  You know, generally so

2  large.

3  Q      What's housed on a thumb drive?

4  A      Data can be stored on there.  The amount depends on the size of the

5  architecture of the device itself.  Portable hard drives, which is just, I don't

6  know, they're normally about wallet sized, a man's wallet size, and they can

7  store, again, any amounts of data as well on that.

8  Q      Okay.

9  A      They're designed to be portable so you can move the data around.

10  Q      So, you had quite a few items that you were tasked with looking at?

11  A      Yes.  Yes.

12  Q      Okay.  Now, at that time what was your work load like?

13  A      The entire time I was in the lab at L.P.D. generally we were looking at

14  several months behind to even start the case due to just the work load.

15  Q      Okay.  Now, did you also do computer and mobile exams for agencies

16  other than the Lima Police Department?

17  A      Yes.  We had just formed a task force and so we were doing computer

18  exams for the Allen County Sheriff's Office, with Defiance County, and we

19  were in works with getting information or data from the Wapak Police

20  Department and the Celina Police Department.  So, we would do them for

21  multiple different agencies.  Because the State agency was so far behind,

22  even more so than what we were at that time, it was easier to bring

23  something locally to be processed.

1   Q    When you say 'we', in 2009 who was we?

2   A    Me and Scott Leland was also there, I believe, at that time.  Maybe not.

3  I also had a couple of part-time guys that would come in and out.

4   Q    Okay.  Scott Leland was actually a detective at the time; wasn't he?

5   A    Yes.  Yes, he was.

6   Q    Was his primary focus --

7   A    His primary focus was a detective investigating crimes.  He was just

8  starting to kind of move over into the technology and so he would come out to

9  the lab occasionally.

10   Q    Okay.  Was he actually still going through training and things of that

11  nature?

12  A    Yes.

13   Q    And, now, these types of exams that we're talking about here, do they

14  take a few minutes?

15  A    Wow.  If everything went like C.S.I. on television it would make my job

16  a lot easier.  But, it doesn't.  Unfortunately, the volume of data that you're

17  looking through -- well, you know, if you imagine just a simple sixteen gig,

18  which a gig is the way we determine how much data that the device can

19  store, so a sixteen gig, just a phone, imagine that, if you would actually print

20  out line per line all the code that would be in there, well, it would be taller

21  than, oh goodness, the Empire State Building paper-wise.  That's a thumb

22  drive that we would be looking at.  So, when you're talking about the hard

23  drives and that, well, the volume of data just starts really picking up.  Now,

1    granted we have a little bit of technique to help us a bit in those searches.

2    But, it does take awhile to do those.

3    Q        Okay.  Now, describe for these folks here on the jury what you would

4    do in a computer exam.  You have a computer.  I say, "Examine this, please."

5    What do you do?

6    A        First we try to gain as much information about the particular case that

7    we can from the investigators.  A lot of times I'll walk in on the scene and not

8    really have an understanding of what crime occurred.  So, you gather the

9    information as much as we can to help narrow our search down a little bit

10   from that perspective.  Then what we do is we take the systems individually

11   and do a full, well, what I call a work up on them.  You take a look at them for

12   damage or anything of that nature.  You see what types of storage that they

13   have, and the makes and models, and make sure that the device even

14   functions in the first place.  Then we'll start removing the hard drives from

15   inside, which are the storage mechanisms of the computer systems.  Then we

16   do what's called a forensic image of those.  What a forensic image is is, well, I

17   guess imagine if you could clone yourself exactly down to the smallest

18   molecule and it's an identical copy of yourself.  That's what we do with the

19   data that exists on that hard drive.  We take it literally from the very first tiny

20   bit of information and copy it exactly from the beginning to the end and that

21   way we're working with a copy and not the original data set when we go to

22   look at it later on.

23   Q        Why?

1    A      Just so we don't change the original evidence.  Evidence doesn't like

2    to live on hard drives too long.  It likes to be spinning all the time.  If you leave

3    them sit for awhile there's a chance of contamination/corruption that can

4    happen.  So, we move them to a state where we can have a copy of it and

5    work with the copy and not touch the original.  So, if there is something we do

6    need to pull out and change for a scientific method or purpose we can do that

7    and not have changed the original evidence.

8    Q      Okay.  So, once you get that and, let's talk about this case, were you

9    given information about the crime that you were searching for evidence of on

10    these technological pieces?

11    A      Uh-huh.

12    Q      Okay.  Were you able to go straight away and start examining

13    everything?

14    A      No.

15    Q      Why was that?

16    A      Just because of the volume of cases that were already being

17    processed currently.  It's not like when a case comes in you just stop

18    everything that you're doing to deal with that case.  There's other cases that

19    were already in the pipeline that we were already doing investigations.  The

20    investigations were open doing searches and analysis and you just don't want

21    to stop that midway through because you have familiarity with the case and if

22    you stop it and have to go back to it, well, it just makes things a little bit

23    challenging for sure.  So, it has its place in line.  Obviously the severity of the

1    crime and stuff does tend to shift the priority around a little bit.  But, for the

2    most part things do have to wait in line to get there.

3    Q        Okay.  Did there come a point and time when you were able to actually

4    begin your investigation into this?

5    A        Yes.  Yes.  Yes, there was.

6    Q        Was there a time when, I guess, the focus of what you were looking at

7    on the computer, based upon some other things you found, shifted?

8    A        Yes, it did.

9    Q        So, did that take your attention away from the homicide for awhile?

10   A        Yes, it did.

11   Q        Were you finally able to get back into the homicide part of it?

12   A        Yes, for a short time.  Yes.

13   Q        Now, in January of 2010 were you able to sit down with Detective Clark

14   and explain, I guess, verbally to him what you had, in fact, found?

15   A        Yes.

16   Q        Among the things that you found on the various pieces of equipment

17   were you able to determine user names, passwords, and that type of thing to

18   link that information to the defendant, Markelus Carter?

19   A        Yes.

20   Q        What kind of things did you find?

21   A        One of the user names was Markelus that I had found in there.  Also,

22   there were multiple images of Markelus sitting in front of the computer system

23   as well.

1    Q       Okay.  What do you mean images of him sitting --

2    A       It appeared to be snippets of, well, it's called thumb nail cash.  So, not

3    to get too technical, what that is is anytime that an image is taken on the

4    machine, even if the machine has a webcam hooked up to it, it's stored

5    somewhere on the machine.  Whether the user has access to certain areas or

6    not is a different story.  In most cases the user is not aware of these things

7    that are even going on.  Sometimes they are.  Sometimes they legitimately

8    take a picture of themselves.  We call them selfies now.  But, for the most

9    part, those are stored in what's called a thumb nail cash where Windows, in

10   particular, likes to store things all in one area that can quickly be referenced.

11   So, I did find some images there.

12   Q       I'm showing you what's been previously marked as State's exhibit

13   '164'.  By way of example, do you recognize what '164' is?

14   A       Yes.  Yes, it's one of those images I was just referring to.

15   Q       On State's exhibit '164' do you see the person depicted in the picture

16   sitting in Court today?

17   A       Yes, I do.

18   Q       Okay.  Can you point to him and tell us what he's wearing?

19   A       Absolutely.  He's sitting there and wearing the blue sleeves and the

20   dark blue sweater vest.

21                          MRS. KOHLRIESER:  Please let the

22   record the witness has identified the defendant.

23                          THE COURT:  Okay.  So noted.

1    Q      You could see him even though the lights were dimmed?

2    A      Yes.

3    Q      Now, for this next part, before we get into some of the details, I believe

4    you brought some visual aids for us?

5    A      Yes.

6    Q      Would you --

7    A      Where would you like me to --

8    Q      Feel free to --

9    A      If Tony wouldn't mind flipping through them I could stay here.

10   Q      Okay.

11                          MRS. KOHLRIESER:   If we could have just

12   a couple of minutes?

13                          THE COURT:   While he's hooking that up,

14   again, if anyone feels the need to stand up and stretch.  I'm just trying to keep

15   everybody fresh.

16                          MR. RION:   May we approach, your

17   Honor?

18                          THE COURT:   Sure.  Terri?

19   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

20   the record, as follows.)

21                          MR. RION:   Is this a demonstration or,

22   well, what is this?

23                          MRS. KOHLRIESER:   He's going to show

1    the --

2    COURT REPORTER:  I can't hear you, Terri.

3                              MRS. KOHLRIESER:  I'm sorry.  He's

4    going to show, for instance, what it looked like, well, the Auditor's website and

5    you could click on the house and the map and he's going to take them

6    through, you know, where he found that and what it looks like.  It's the things

7    you have in the reports.  It's just one or two of them.  We're not getting into --

8    it's just one or two of them.

9                              MR. RION:  Is he going into the website on

10   what you could possibly look at on the website?  Is that what you're saying?

11   Or, what was actually on the computer?

12                              MRS. KOHLRIESER:  That's a good

13   question.  Can I ask him?

14                              MR. RION:  Maybe we could take a break

15   because this might be --

16                              THE COURT:  Okay.

17   (WHEREUPON, Court continued on the record, as follows.)

18                              THE COURT:  All right.  I understand the

19   technology may be up and running because we have an expert in the room.

20   But, the parties have asked for a very short break so they can iron out a

21   couple of things.  I'll grant that.  I want to make sure this goes as smooth as

22   possible.  So, I'll excuse the jurors.  It shouldn't take a whole long time.  Ten

23   minutes or so at the most.  Remember the admonitions I've been giving you

1    on-going.  Don't discuss the case, formulate any opinions, or express any

2    opinions.  You folks can step out and we'll have you back in here shortly.

3          Counsel, let me know when you're ready to go.  Okay?

4    (WHEREUPON, COURT WAS IN RECESS.)

5

6    **(WHEREUPON, VOLUME FOUR CONCLUDED.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23