FILED
COMMON PLEAS COURT

2016 MAR 28 PM 1:05

ALLEN COUNTY OHIO
MARGIE M. MILLER
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

------------------------------------------------------------------

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO.  CR2014 0139 |
| Plaintiff | * | |
| -VS- | * | **TRANSCRIPT -**  JURY TRIAL |
| **MARKELUS Q. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

------------------------------------------------------------------

A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio  45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

(VOLUME 5 OF 10)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# TABLE OF CONTENTS

## (VOLUME 5 OF 10)

**FRIDAY, SEPTEMBER 11, 2015 - CONTINUED -**

STATE'S SIXTEENTH WITNESS - CONTINUED
KEVIN DELONG - KOHLRIESER ........ 803
- RION ........ 813
- KOHLRIESER ........ 816

STATE'S SEVENTEENTH WITNESS -
ROSALIND JOHNSON - KOHLRIESER ........ 817
- RION ........ 827

JURY EXCUSED FOR DAY AT 3:34 P.M. ........ 831

COURT RECESSED FOR THE DAY AT 3:43 P.M. ........ 839

**MONDAY, SEPTEMBER 14, 2015 -**

COURT COMMENCED AT 9:46 A.M. ........ 839

STATE'S EIGHTEENTH WITNESS -
PHILIP KLEMAN - MILLER ........ 840
- RION ........ 852

STATE'S NINETEENTH WITNESS -
KENNETH WHITNEY - KOHLRIESER ........ 858
- RION ........ 890
- KOHLRIESER ........ 914
- RION ........ 930

STATE'S TWENTIETH WITNESS -
I.D. OFFICER MICHAEL CARMAN - KOHLRIESER ........ 939

JURY EXCUSED FOR THE DAY AT 4:46 P.M. ........ 957

DISCUSSION REGARDING LOG SHEETS AND
CHAIN OF CUSTODY ........ 957

COURT RULING REGARDING LOG SHEETS AND
CHAIN OF CUSTODY ........ 970

FURTHER DISCUSSION REGARDING LOG SHEETS AND CHAIN OF CUSTODY 971

COURT RECESSED FOR DAY AT 5:21 P.M. 983

VOLUME FIVE CONCLUDED 983

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**NOTE:** THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE
PARTIES AND RULED UPON BY THE COURT FOR ADMISSION
INTO EVIDENCE. SAID EXHIBITS HAVE BEEN FILED WITH THE
ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER
TO THE THIRD DISTRICT COURT OF APPEALS. HOWEVER,
ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED
WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT
THE ALLEN COUNTY COMMON PLEAS COURT AND ARE
AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET
AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF,
INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM
DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH
VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN
STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT 436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436 MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET
BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT
BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN
STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER
DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON
LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF
DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF
DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP)
WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH
MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH
MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD
AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT
436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH
MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT
436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE
AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436
MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT
436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN
FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN
STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND
LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR
MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS
ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT
ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT
ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR
MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM (ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFEL IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSC79 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK
AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN
STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK
EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT
436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND
PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULUM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
HEAD/NECK;

**- DEFENDANT'S EXHIBITS -**

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT 122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - **(NOT ADMITTED BY COURT)**;

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A. MOORE;

DD - JUDGMENT ENTRY ON SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R. FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON **(WITHDRAWN BY THE DEFENSE)**;

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS- STEPHEN UPHAM, LUCAS CO. CASE NO. G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR VICKIE BARTHOLOMEW;

**<u>COURT'S EXHIBITS</u>** -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW) BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED A.C.S.O. OFFENSE REPORTS;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

803

1         THE COURT: Okay. Again, just for the

2    record, I've got to note that we're reconvening in CR2014 0139, State of Ohio

3    -vs- Markelus Carter. The defendant is present with counsel. The State is

4    present. The jurors have returned.

5         We are in the middle of the testimony of Mr. DeLong. Mrs. Kohlrieser,

6    you may continue.

7         **DIRECT EXAMINATION OF KEVIN DELONG CONTINUED**

8    **BY MRS. KOHLRIESER:**

9    Q   Before we get into your visual aids, I just want to clear a couple of

10    things up. First, in your employment do you travel quite frequently?

11    A   Yes.

12    Q   What kind of places do you travel to?

13    A   I've been to China several times, Hong Kong, Croatia, Germany.

14    Q   Do you travel within the U.S. as well?

15    A   Yes. Yes, places within the U.S., but all over, yea.

16    Q   Okay. And do you travel often?

17    A   Yes.

18    Q   We're taking you a little bit out of order, correct, because today is the

19    only day we have you?

20    A   Yes.

21    Q   And for the record, are you receiving any remuneration for your

22    services today?

23    A   No.

1    Q. All right. And L.P.D. did pay you all those years that you worked for

2    them, correct?

3    A. They did. They did do that.

4    Q. Now, let's talk about what we have up here. Specifically I'm going to

5    ask you what types of information relevant to the Warrington homicide had

6    you found by the time you talked to Detective Clark.

7    A. Okay. So, this was one of those pieces. Did you want me to list them

8    all now, or just kind of explain them as I go through?

9    Q. Why don't you explain them as you go through them?

10    A. Okay. So, this was one of the pieces here. There were multiple

11    screens.

12    THE COURT: Do you want the pointer?

13    A. What this is is pieces from a website that were stored on -- I want to

14    make sure I don't burn my eye out here - oh, there we go -- okay, so what we

15    have here is this is the Allen County Auditor's website as it appeared back in

16    2009. It's a little bit different than what it looks like now. This is not a -- this

17    was what was stored actually on the drive. The forensic equipment that we

18    use does not reach out to the Internet. For obvious reasons we don't want to

19    contaminate the current evidence set or show something that may confuse

20    us. You can tell this by seeing these X's here. There are some images that

21    are clearly missing here and here because those typically would require an

22    Internet connection to bring those in. Since I was investigating this in a

23    non-environment, or, Internet environment those images aren't going to

805

1 appear there. Just the raw data that was stored on the drive itself. So, in this

2 particular case I came across part of, and I won't really go into all of this down

3 here, but it was a browser called Safari and it was a cash data base that was

4 in here. A blob - that's a blob if you see that there - that just means that

5 there's a blob of data. That's exactly what it means. I don't create the terms.

6 I just kind of relay what they are. It's just a blob of data that was stored. This

7 is what was stored there was this image of this website. So, here where I

8 have this line first, you can see I underlined, and this red line here is what I

9 put in for visual reference so that you could see it a little bit better and this red

10 arrow I also included this across this so that you could see when the search

11 was performed. So, this information here was not stored as part of the file

12 externally. This was internal within the file itself. You can see that 2-17 of

13 2009 at eleven twenty with fifty seconds A.M. eastern, that's the server, the

14 Allen County Auditor's server stamps that when it's sent to the local machine.

15 So, that's how it's stored in the code there. You can see the address, or, the

16 name of the individual here that I underlined, and the 436 McKibben. Then

17 we go under here and what this is is it says 'with owner'. What that means,

18 and based off of my individual testing of this separately, is that you can

19 search multiple things within the Allen County Auditor's website. You can

20 search for an individual address. You can search for a lot number. You can

21 search for first names, last names, or whatever you would like to search for

22 within that website. You can still do that today as well. So, what was the

23 search that was conducted here that was performed on February 17th of

1   2009 is that the owner category was used and the last name of Burkholder

2   was searched.

3   Q   Okay.  Does it also identify a parcel I.D. for 436 East McKibben?

4   A   Yes, it does.  The parcel I.D., you can see here in the second column,

5   it says 'parcel I.D.'.  We have that right here.

6   Q   That's one type of thing that you found there?

7   A   Yes.

8   Q   Was that the only one that you saw, or were there multiple ones of this

9   nature?

10  A   There were multiple screens, obviously, with the search for Burkholder.

11  There was obviously more than just a few Burkholders here within Allen

12  County.  But, the next slide that I want to show you - there we go, yea, go

13  ahead, just one forward - is this.  Now, this was stored in a different location.

14  This was actually in another blob.  If you watched the other location, it was

15  actually in a different place there.  This was an image file located within a

16  data base.  So, what this shows here is some of the plot locations of the

17  addresses that were looked up.  If you could go back one slide?  I'm sorry,

18  Tony.  Oh, it's not up there.  Normally there's a menuing system right here.

19  I'm sorry.  It is right here.  Right here - this site function is where it shows

20  'map', here.  You can click this function and that would take you to a map of

21  whatever area of interest that you were looking at.  So, if you could move

22  forward again for me?  Sorry.  So, this red line I did not put in there.  This was

23  actually all part of the image that you see here.  Based on my individual

1   testing on this is that you have to be looking at a specific location.  In this

2   case it was the 436.  When you click 'map,' it will automatically highlight that

3   for you.  So, it shows you, hey, this is the plot that we're looking at.  I did do

4   some research on this and did confirm that that was 436 East McKibben.

5   Q   Okay.  And, again, it shows McKibben Street up there at the top of

6   that; correct?

7   A   Yes.  Yes.

8   Q   It basically shows each parcel of property?

9   A   Correct.

10   Q   And in-between nine and ten there's an opening there and between

11   seven and eight.  Do those reflect alleyways?

12   A   Yes.  Yes.

13   Q   Thank you.  Carry on.

14   A   Okay.  I think if we go backwards several?  Sorry.  A little out of order.

15   One more.  Yea, this one here.  So, also when I was looking through some of

16   the pieces of information here you can see that there's a user name here of

17   Markelus Carter on this particular information.  I think this was the Mac on this

18   one.  Yea, it was.  It's a Macintosh HD.  I've just now broken your laser

19   pointer.  I'm sorry.  There we go.  You can see a Google search here.  So,

20   how we can tell it's a Google search is we always look for this little Q.  Some

21   people call it the question - what's the question you ask Google.  It actually

22   means query.  So, we can look and say, well, what was looked for.  So, the

23   word Lima plus Refinery, and that wasn't a plus, but that was a space that

1  was put in there.  If it's looking for more than one word it will put this plus in

2  here and search for that particular information.  There was other ones also

3  that I found, searches for Sonya Burkholder, and searches for Ken

4  Warrington also were found in Google searches.

5  Q  And there were -- well, was more than one Lima Refinery search?

6  A  This one yielded a lot of different hits.  So, you know, you don't need to

7  necessarily search for something more than once, but multiple results will

8  come through.  So, if you've ever searched any search end before, you know,

9  you can just keep clicking the next page and then your next search of results

10  will come up.  That's what happened in this case as well.

11  Q  Okay.  So, again, this is an example of stuff that you found?

12  A  Yes.

13  Q  Okay.  Now, let's talk about what's at the bottom here.

14  A  Okay.  So, at the bottom, also on the Macintosh computer here, you

15  can see again that the user name is Markelus Carter that was logged in at the

16  time of this.  So, what we're looking at here is a synchronization from a palm

17  device.  A palm device, well, think of it as the modern iPhone or the modern

18  Android phone.  It was the early Smart devices that were out.  This is a

19  portion of the contact sync. that occurred with that device.  You can see here

20  that the name that was listed out was Kenneth and Faye Warrington.  It gives

21  an address here of Lima, Ohio and a postal code.  The phone number here is

22  preceded by this star six seven.  This is how it was stored within the device

23  itself.  The e-mail address is also stored there.

1  Q    What other types of things did you find?

2  A    Goodness.  Okay.  So, there was also information -- I'm trying to do

3       this from memory.  It's been a minute ago since I've done that.  I think that's

4       the general sum of what I located from back then.

5  Q    Okay.  Did you also find -- did you also look at a digital camera?

6  A    Yes, a digital camera.

7  Q    Okay.  What kind of things did you find on there?

8  A    Okay.  So, the digital camera had the memory.  When we reviewed, or,

9       I reviewed the internal memory on that and there were multiple images of

10      what appeared to be some type of underpasses and a few street locations

11      within Lima.  Then the one that caught my attention was a truck parked out in

12      front of the residence at 436 East McKibben.  Yea, those were the images

13      that I located.

14  Q    All right.  I'm sorry, but did you explain what the six seven --

15  A    I did not.  Thank you.

16  A    I didn't know if I missed it or if you missed it.

17  Q    My apologies.  So, the star six seven is put in place to block caller I.D.

18      If you dial star six seven prior to a phone number then it's blocked from the

19      caller I.D. displaying who the caller is.

20  Q    And, again, the slides that we showed me are examples of things that you

21      found?

22  A    Yes.  Yea, they're examples.

23  Q    They're not all encompassing?

1   A   No. No, Not at all.

2   Q   Okay. So, just so I understand, you said there were also Google

3   searches for individuals?

4   A   Yea, the Google searches were specifically, well, I show the one for

5   Lima Refinery. Sonya Burkholder was one of the searches. Also, Ken

6   Warrington was also Google searched as well.

7   Q   And you provided all this information to Detective Clark in January of

8   2010?

9   A   Yes.

10   MRS. KOHLRIESER: Just a moment.

11   (WHEREUPON, Court went off the record briefly.)

12   Q   Now, I realize it's been a few years, but I'll hand you a few exhibits

13   here. They're a little out of order. I apologize. I'll have you look at State's

14   exhibits '142', '143', '144', and then '6'.

15   A   Okay.

16   Q   Take a look at those for me.

17   (WHEREUPON, witness reviewed photographs.)

18   A   Yes.

19   Q   Do you recognize those exhibits?

20   A   I do. These are the images from the digital camera that I originally

21   recovered.

22   Q   And when you say recovered, from the defendant's home?

23   A   Yes, from the camera that was in the home; yes.

1    Q    State's exhibit '142', and I can hand you the exhibit back, if that helps.

2    But, can you tell the folks what we're looking at here?

3    A    Right.  It's not displayed well from the overhead projector here.  It

4    appears to be some type of an underpass on the roadway.  What I could see

5    in the original was that the roadway was there -- thank you; it does much

6    better than swinging my arm around.  So, the roadway appears to be here.

7    You can see coming up the hill and then the underpass right here and the

8    walls located for that underpass on either side of it.

9    Q    The next picture, '143', is even better.  Again, is this from the same

10   series of photographs that you found?

11   A    Yes.  Yes, it was.

12   Q    Okay.  Can you make out what this is?

13   A    No.

14   Q    Again, we're just looking; right?  Okay.  Now, State's exhibit '144'.

15   Okay.  Can you make out at all what this is now?

16   A    This one I can, being familiar with the area.  This is a picture taken at

17   the intersection.  I think on the actual print you can read the street sign.  It

18   says North Street there.  Then, of course, Jackson Street is pretty clear of

19   where we're sitting here on.

20   Q    Okay.  So, whoever is taking this picture is facing north --

21   A    Northbound.

22   Q    -- on Jackson Street?

23   A    Correct.  Sitting right at the intersection of North there.

1   Q   And that's just a few blocks away from here?

2   A   Correct.

3   Q   And the last is State's exhibit '6'.  What do we see there?

4   A   So, this was the truck that was parked at the residence there from

5   other images that I've seen of 436 East McKibben of that residence.

6   Q   Now, these four photographs that we've just gone over, '142', '143',

7   '144', and '6', were found on the defendant's camera; correct?

8   A   Correct.

9   Q   What, and I'll hand them back to you in case you need it, what date is

10   time stamped on there?

11   A   It is January 9th, 2009.

12   Q   Would that have been a date that you put on there?

13   A   No.  No, this is stored internally by the camera.  So, this can be

14   represented in two different ways.  Obviously it can be displayed on the actual

15   image itself.  It's what we call metadata.  Without being too nerdy about it, it's

16   data stored within data.  This camera just happens to show that date.  We can

17   also confirm that by looking in the actual data of the photo and it will display

18   that same date there as well, which I did do in this case as well.

19   Q   Okay.  The metadata confirms this date?

20   A   Yes.

21   Q   Because your camera can actually display the wrong date; correct?

22   A   Yes.

23   Q   Okay.  And, again, these printouts, do they truly and accurately reflect

1     what you found on the camera?

2   A  Yes.

3     MRS. KOHLRIESER:  Give me just a

4 moment.

5     (WHEREUPON, Court went off the record briefly.)

6   Q  Investigator - sorry, it's not Investigator DeLong anymore - Mr.

7 DeLong, do you have a way of printing up your slides for us?

8   A  Yes, I do.

9   Q  Would you print those before you leave today?

10   A  Absolutely will for you.  Yes.

11   Q  Okay.  At this time I wouldn't have any questions in relation to that.

12     MRS. KOHLRIESER:  No further

13 questions.

14     THE COURT:  Okay, Mr. Rion, questions?

15     MR. RION:  Thank you, your Honor.  Just a

16 few.

17           <u>CROSS EXAMINATION</u>

18 BY MR. RION:

19   Q  Good afternoon, sir.

20   A  Good afternoon.

21   Q  A couple of questions.  There was an address of the Warrington's, a

22 phone number, and e-mails and things like that, correct, as one of the images

23 you had?

1     A    Yes.

2     Q    Did I hear you right - it would be like if I plugged my phone into my

3    computer the information from an address book would then transfer over to

4    the computer itself and then you were extracting that information from that?

5     A    Correct; yea.

6     Q    Is that what that was?

7     A    That method there; yes.

8     Q    That's what that image appeared to be and how it got there?

9     A    The information? I guess I'm confused on what -- Mr. Warrington's

10   name?

11     Q    In other words, it seemed to you, if I heard you right and if not, please

12    correct me, that there was information, an address thing on a phone or

13    something, and it was then -- well, why don't you just say it so I'm not putting

14    words in your mouth.

15     A    Okay. So, information from a handset, and in this case based off of

16    the files that were there it was a palm.

17     Q    A palm is like an address book?

18     A    Yea. Think of it -- well, it was one of the first Smart phones that was

19    out there prior to I.O.S. being released.  I don't want to get into all of that.

20    But, yea, it's a Smart device where it can store contact information, notes, or

21    whatever you needed it to store, that the modern phone would store.

22     Q    When you extracted it was it from the palm or was it from the

23   computer?

1  A   It was from the computer system that I showed there.

2  Q   Which would be then consistent with plugging, or, synchronizing or

3  plugging your phone in --

4  A   Yea, exactly. Exactly. I was a little unclear. Sorry. Yea.

5  Q   And you searched how many different pieces of equipment roughly?

6  I'm not going to hold you to it.

7  A   Yea. It was a considerable amount. I would say more than ten pieces

8  of equipment.

9  Q   We're talking a lot of thumb drives and a lot of computers?

10  A   Yes.

11  Q   Every piece of electronic device in that house that would hold

12  information you believe you accessed and looked at?

13  A   I believe I looked through a good majority of it; yea.

14  Q   As far as -- the only part that you have is that those images were on

15  the camera. Who took them and for what purpose they were taken you are

16  not aware; correct?

17  A   No.

18  Q   Okay.

19  MR. RION:  Nothing further. Thank you.

20  THE COURT:  Okay. Any redirect?

21  MRS. KOHLRIESER:  If I could have just a

22  moment?

23  (WHEREUPON, Court went off the record briefly.)

1     **REDIRECT EXAMINATION**

2     **BY MRS. KOHLRIESER:**

3     Q.   The only thing for the record that I would ask, your Honor, is, Mr.

4     Delong, and please correct me if I'm wrong, but the slides that you showed

5     us, there was three of them; correct?

6     A.   Yes.

7     Q.   Okay.

8     MRS. KOHLRIESER: I guess, your Honor,

9     for the record, and that's what I was conferring with Mr. Rion about, was

10     actually having him print those off and marking them as exhibits and I have

11     '165', State's exhibit '165' would be the first thing that we saw with the

12     Auditor's website. Then '166' would be the plot map, I'll call it. Then '167'

13     would be the information that was just up there regarding the Husky searches

14     and the Warrington information. That way we don't have to keep Investigator

15     Delong --

16     THE COURT: So, you're going to have --

17     well, what you're saying is you'll have a hard copy.

18     MRS. KOHLRIESER: We'll have hard

19     copies with those exhibit numbers on them and we won't delay Mr. Delong

20     here any longer.

21     THE COURT: Any objection to that, Mr.

22     Rion?

23     MR. RION: No.

1   THE COURT:  Okay.  I think we did that

2   with your exhibit 'C'.  Okay.  I'll allow that.  Those have been identified then as

3   '165', '166', and '167'.  Those will be reserved for the hard copy of his slides.

4   MRS. KOHLRIESER:  Yes, your Honor.

5   THE COURT:  Okay.

6   MRS. KOHLRIESER:  With that, the State

7   would have no questions.

8   THE COURT:  Oh, okay.  All right.  You

9   may step down.

10   A       Thank you.

11   THE COURT:  Good seeing you.

12   MRS. KOHLRIESER:  Your Honor, can I

13   step out to see if our next witness is here?

14   THE COURT:  You sure can.  Who might

15   that be, or are you going to let me know when you see if they're here?

16   MRS. KOHLRIESER:  Well, we have two

17   waiting.  So, if the one I want to go with isn't here, we'll go with the other.

18   (WHEREUPON, Court went off the record briefly.)

19   MRS. KOHLRIESER:  The State would call

20   Rosalind Johnson.

21   WHEREUPON, called to appear as a witness in this proceeding was one:

22   ROSALIND JOHNSON

23   who, having been duly sworn by the bailiff herein, testified as follows:

1  BAILIFF:  She has an objection.

2  THE COURT:  Okay.  This witness has

3  requested not to be photographed by the media.  So, I would order that the

4  media respect that request.  The State may inquire.

5  MRS. KOHLRIESER:  Thank you.

6  DIRECT EXAMINATION

7  BY MRS. KOHLRIESER:

8  Q    Good afternoon, Miss Johnson.  How are you?

9  A    All right.

10  Q    Can you state your name for the record and spell your first name for

11  us?

12  A    Rosalind, R-O-S-A-L-I-N-D.

13  Q    And, Miss Johnson, well, your last name is Johnson?

14  A    Yes.

15  Q    How old are you, Miss Johnson?

16  A    Fifty-eight.

17  Q    Now, Miss Johnson, back on February 23rd of 2009 where were you

18  living?

19  A    448 East Pearl Street, Lima, Ohio.

20  Q    448 East Pearl?

21  A    Yea.

22  THE COURT:  Could you move up closer

23  to the microphone just so we can hear good?

1   A    Oh, okay.

2        THE COURT:  Thanks.

3   Q    And who were you living with at the time there?

4   A    My mother.

5   Q    And what kind of condition was your mother in?

6   A    She was sick.

7   Q    All right.  Now, on that particular morning, February 23rd, 2009, do you

8        remember learning at some point that there had been a shooting in your

9        neighborhood?

10  A    Well, I had woke up out of my sleep and had heard some gunshots.

11  Q    Okay.

12  A    And I just got up and looked out the window and I had seen a person,

13       but I couldn't tell who, you know.  I just seen a person coming out the alley.

14       They had a hoodie jacket on, a camouflage jacket.  I just laid on back down

15       and went to sleep.  The next day that's when the kids said somebody had got

16       shot or something.  But, I didn't take it no farther than that, you know.

17  Q    I'm sorry?  You didn't what?

18  A    I didn't take it no farther.  I didn't go over there to see it or nothing like

19       that.  That's all I seen.

20  Q    Okay.

21  A    That's all.

22  Q    Let's back up a little bit.  Do you remember about what time you went

23       to bed that day?

618

1    A    It was probably about the early part of the morning.

2    Q    Okay. One/two o'clock in the morning? Is that what you mean?

3    A    Yea.

4    Q    Okay. And where did you sleep?

5    A    On the couch.

6    Q    Okay. Is this a one story or a two story home?

7    A    A two story.

8    Q    And the couch, is it on the first or second floor?

9    A    The first floor.

10   Q    And you said you heard what?

11   A    I heard some gunshots. That's what woke me up.

12   Q    Okay. You're sleeping on the couch. Any idea how many you heard?

13   A    Well, no. I just heard -- it was more like pop, pop, pop. That's what

14   woke me up.

15   Q    Okay. So, more than one?

16   A    Yes.

17   Q    Now, did you jump up right away and go to the window?

18   A    No. I sat up for a minute, 'cause, you know, when you first wake up. I

19   just sat there for a minute, but then I got up and looked out the window.

20   Q    Okay. Let me ask you – what kind of window are we talking about? Is

21   it a small window? Big window? What?

22   A    It's a big picture window.

23   Q    And is that in the same room as the couch that you're sleeping on?

1   A   Yes.

2   Q   Now, you said that you saw someone coming out of the alley. What

3   alley? Where's that alley in relation to your house?

4   A   Across the street from my mom's.

5   Q   Okay. Let me bring this over here for you. All right. Miss Johnson,

6   would you mind stepping down here for me? I'm just going to draw Pearl

7   Street.

8   THE COURT:  Well, if we're going to do it

9   this way, maybe put the easel in front of the Bench and then turn the

10  microphone around.

11  MRS. KOHLRIESER:  Yes, sir.

12  THE COURT:  I mean, point it towards the

13  jurors. Then she can stand to one side and have the microphone close to

14  her.

15  Q   All right. Come on over, Miss Johnson.

16  MR. RION:  Your Honor, is it okay if I stand

17  over here?

18  THE COURT:  Yea, that's fine.

19  Q   If you'll stand right here for me so that microphone gets you? Okay?

20  Let's call this Pearl Street. Do you know what road is a block up?

21  A   That's an alley. Are you talking about the alley?

22  Q   No, no. What's the next street up?

23  A   Oh, there's Jackson.

1  Q  Okay. Does Jackson run along the side of Pearl?

2  A  It runs -- well --

3  Q  Okay. Let's say this is Pearl and this is the alley.

4  A  Okay.

5  Q  Okay? Let's keep it simple. Okay? Does the alley stop here, or does

6  it go all the way through?

7  A  Okay. This is Pearl.

8  Q  Okay.

9  A  Are you talking about across the street from my mom's?

10  Q  Where did you see the person in relation to the alley?

11  A  In front of my mom's house. Okay. The alley goes straight

12  through to McKibben Street.

13  Q  Okay. So, this alley would go to McKibben here?

14  A  Yes.

15  Q  Okay. Let's write McKibben. Okay. And your house is where?

16  A  Sitting right here.

17  Q  Okay. Is it on this side of the alley, or this side of the alley?

18  A  On this side.

19  Q  Excuse me. Not the alley. Pearl Street. If you're driving along Pearl

20  here -- okay, let's say I'm driving along Pearl. I've just come from Jackson

21  and I'm going down Pearl.

22  A  Okay.

23  Q  Like Faurot Park is over here - not Faurot Park, excuse me -

1   Schoonover is over this way, right?  Down this way?

2   A   Yea.

3   Q   Okay.  So, if I'm driving towards the park where is your house?

4   A   It would be sitting right here.  Okay.  If you're coming down by

5   Schoonover and you come back this way to Pearl Street -- is that what you're

6   trying to say?

7   Q   Okay.  Yes.  Whatever direction you want to go.

8   A   Okay.  'Cause I don't know directions.  If you're coming from that

9   dead-end, from Kibby to the dead-end where the park is and come back up

10  Pearl Street my house, our house, would be sitting right here.  It's right across

11  from the alley.

12  Q   Right across from the alley?

13  A   Yea, across from the alley.

14  Q   Okay.  So, not next to it?

15  A   No, it was across.

16  Q   Okay.  So, if the alley stops on Pearl Street here, okay, and this whole

17  thing is Pearl Street, you would actually be right here?

18  A   Yea.

19  Q   Okay.  So, this is your house on Pearl Street?

20  A   Yea.

21  Q   So, across from the alley?

22  A   Yea, across from the alley.

23  Q   All right.  Okay.  Can you take this marker and show me when you

1   looked out that window and saw that person, well, where was that person?

2   A    At the end of the alley just coming around.  I think he was at the end

3   right here, turning, going back towards McKibben.

4   Q    Okay.  Turning?

5   A    Yea.

6   Q    Going out this way away from your house?

7   A    Coming out of the alley from McKibben Street.

8   Q    Okay.

9   A    Coming out of the alley and turning right.

10  Q    Okay.  All right.  Thank you.

11  A    I'm not good with that.

12  Q    Yea.  You're not good with that?  That's all right.  I'm not very good at

13  it, either.  That's okay.  Okay.  So, you're not necessarily good with north,

14  south, east, and west, the directions?  That's okay.  I won't question you any

15  more about directions.  You saw a person coming out of that alley across

16  from your window?

17  A    From the picture window.  From my picture window.

18  Q    Okay.

19  A    They was coming towards, coming across from the alley and they

20  turned.

21  Q    Coming towards your house?

22  A    Yea.  Yea, to the end of the alley and they turned right.

23  Q    Okay.  They turned right?

1   A   Yea.

2   Q   All right. Gotcha. All right. Sorry about that. And you say a person.

3   Q   Were you able to tell if it was a man? A woman?

4   A   I couldn't tell you. I really can't tell you that. The only thing I know is I

5   just glanced out the window and seen a person with a hoodie on, a

6   camouflage hoodie on.

7   Q   I'm sorry? A camouflage hoodie?

8   A   A camouflage hoodie on. It was like an army style. That's all I seen. I

9   went back and laid down. Didn't think nothing else of it. That's all I can say

10   because that's all I seen.

11   Q   All right. That's absolutely fine.

12   A   I mean, it's as simple as that. I didn't see nothing.

13   Q   That's fine. Don't worry about it. All right. Could you see the person's

14   face at all?

15   A   No.

16   Q   Did you see the person's hands?

17   A   No.

18   Q   Did you see where the person's hands were?

19   A   In their pocket.

20   Q   The pocket of the hoodie?

21   A   Like on the side, like I got this hoodie on. When they turned they had

22   their hands in their pocket and they had the hoodie on so I didn't get to see

23   nothing, no face or nothing, but they had their hand in their pocket when they

1  turned.

2  Q  Is there a street light out there?

3  A  It's a street light; yea.

4  Q  Were you able to see that this was camouflage?

5  A  Yea.

6  Q  Let me hand you what's been marked as State's exhibit '101'. Do you

7  see what's depicted in that picture?

8  A  Yea.

9  Q  Does that appear to be a camouflage something or other?

10  A  Well, something; yea. It was like that, but I ain't going to say it was all

11  the way like that.

12  Q  Was the pattern similar?

13  A  Like the pattern of it.

14  Q  The pattern of it is similar?

15  A  Like an army; yea. Army style.

16  Q  Okay. So, let's put this up here just so the jury can see it. So, this

17  type of camouflage pattern?

18  A  Yea.

19  Q  And at some point did a police officer, or a detective, or someone

20  come to your house and ask you if you seen anything that night?

21  A  Yea. That's why I'm sitting up here.

22  Q  Okay. So, somebody from the police came to you and you told them

23  what you heard and saw?

```
 1    A    Yea.  The same story I'm telling now I told them that next day 'cause

 2    the kids had got out of school, I mean, was going to school and they come

 3    running through the alley 'cause they always go to school that way and said

 4    there was a dead man there.  I didn't want to -- I ain't trying to see all that.

 5    So, when the detective was coming around I just told him what I had seen,

 6    you know, from just that instant.  You know, I had never seen nothing like that

 7    happen in our neighborhood like that.  So, that's why I'm here.

 8    Q    Okay.  Just a minute.

 9              (WHEREUPON, Court went off the record briefly.)

10              MRS. KOHLRIESER:  Nothing further from

11    me, your Honor.

12              THE COURT:  Mr. Rion, any questions?

13              MR. RION:  Just a few.

14                    CROSS EXAMINATION

15    BY MR. RION:

16    Q    Good afternoon.

17    A    Good afternoon.

18    Q    Okay.  I just have really just one -- the one thing that you saw clearly,

19    well, was it -- the person, and tell me if I'm wrong the way you described it to

20    Detective Clark on that day, you saw a person wearing a waist long

21    camouflage jacket; correct?

22    A    Yea, by the waist.  Like a shorter jacket.

23    Q    With the hood up?
```

1      A   Yea.

2      Q   Over the head?

3      A   Yea.

4      Q   And today you're saying that he had his hands in the jacket pockets;

5      correct?

6      A   Yes. His hands was in the jacket pockets then.

7      Q   And that jacket with the hood, that's what you saw?

8      Then the person ran to the right and that the end of it; correct?

9      A   That was the end of it. I didn't see him no farther.

10     MR. RION:  That's all I have. Thank you.

11     THE COURT:  Any redirect?

12     MRS. KOHLRIESER:  No, your Honor.

13     THE COURT:  Okay, Miss Johnson, thank

14     you. You're excused. Next witness?

15     MRS. KOHLRIESER:  Can we approach

16     just a moment, your Honor?

17     THE COURT:  Sure.

18     (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

19     the record, as follows.)

20     MRS. KOHLRIESER:  The next four

21     witnesses are lengthy.

22     THE COURT:  (Inaudible.)

23     MRS. KOHLRIESER:  Yea.

828

1    THE COURT:  You don't have a quick

2    one?

3    MRS. KOHLRIESER:  No.  She was my

4    quick one.  It's the weekend.

5    THE COURT:  Okay.

6    MRS. KOHLRIESER:  Sorry.  I really don't

7    have any I can switch from here on out.

8    THE COURT:  Okay.

9    (WHEREUPON, Court continued on the record, as follows.)

10   THE COURT:  All right.  They've informed

11   me that the next witnesses that they have ready to go are going to be rather

12   lengthy.  It's just kind of been a weird day, a choppy day.  I know there's been

13   a lot of breaks, but we're going to break early.  It's been a long week for a lot

14   of us.  There's a lot of information and there apparently is a lot more to come.

15   But, we're going to break early today for the weekend and resume on Monday

16   morning.

17   Now, a couple of things.  I've given you these admonitions each time.

18   Pretty soon you're going to be able to repeat them back to me.  But, it's very,

19   very important always that you follow those admonitions.  When we go for a

20   weekend I'm not going to sequester you away in a hotel.  You're going to be

21   free to have your lives for the weekend.  You'll come into contact with people.

22   The urge might be to start talking to your friends and family about what you've

23   been listening to for the last few days.  I'm going to instruct you not to do

1    that.  I know that human instinct is that you want to tell people what's going
2    on.  People are going to be asking you.  Quite honestly, unless you tell them,
3    nobody is going to know you're a juror in this case.  But, don't talk about the
4    case.  Don't formulate any opinions.  You've heard a lot of information.  But,
5    obviously you haven't heard it all yet and so it wouldn't be fair if you started
6    deliberating and started trying to reach conclusions based upon some of the
7    evidence and not all of it.  You haven't got instructions yet.  Don't do any
8    independent investigating of the scene.  Don't get on the Internet.  Don't do
9    anything on Facebook, or Twitter, or anything like that regarding this case.
10   The media may have some things in it.  Don't pay attention to any of those
11   accounts.  I know it's impossible to completely shield yourself.  I'm not
12   expecting you to hole up in your house and not go anywhere.  But, you've got
13   to be diligent in not letting yourself be exposed.  That includes putting yourself
14   in a situation.  If you come upon people and they start talking about this case,
15   move away.  If you feel like someone is trying to give you information about
16   this out of the Courtroom, again, make note of that and let us know.  The
17   main thing is that we have to maintain your fairness and your impartiality
18   throughout the whole case.  Until you get all of the evidence and you get the
19   instructions I don't want you exposed to anything outside of the Courtroom.
20   You have to decide the case on what you hear in the Courtroom.
21   We'll have a full week into next week.  There's one logistical issue that
22   I have the responsibility for.  We have a brand new Grand Jury coming in on
23   Monday and I have to swear the Grand Jurors in at nine o'clock.  So, we'll

1    have you guys come back around nine-thirty. Not around. Let's make it

2    nine-thirty and I'll try to get through the Grand Jury swearing in by nine-thirty.

3    So, we'll recess over the weekend until nine-thirty on Monday morning.

4    Anything from counsel?

5    MRS. KOHLRIESER: Not for the jury, your

6    Honor.

7    THE COURT: Okay. We'll stay on the

8    record then. Anything from the defense?

9    MR. RION: No.

10    THE COURT: Ladies and gentlemen of

11    the jury, you're excused for the weekend. Enjoy the weekend. Get plenty of

12    rest and nutrition. Take care of yourselves. We'll see you Monday.

13    (WHEREUPON, JURY WAS EXCUSED FOR THE DAY AT 3:34 P.M.)

14    THE COURT: All right. The jurors have

15    been recessed for the weekend. Anything from the State?

16    MRS. KOHLRIESER: Your Honor, quite

17    honestly, it's just one minor thing that I've been meaning to do. I meant to do

18    it at the beginning of trial. Just because some of this evidence crosses over

19    from previous hearings, as well as a prior trial of the defendant, on each

20    State's exhibit sticker I've put the first day of trial because I didn't know what

21    date I would actually introduce them. So, each one of these, for the record

22    purposes, for this trial have the date of 6-8-15 on them. I'm just trying to keep

23    the record straight. That's all.

1    THE COURT:  Okay.  All right.  That's in

2    the record.

3    MRS. KOHLRIESER:  Other than that, I'm

4    good.

5    THE COURT:  Mr. Rion?

6    MR. RION:  On that point, I think we

7    resolved this at a prior time, but are all the transcripts from the other motions

8    and hearings under this case record as well for purposes of appeal if

9    necessary?

10    THE COURT:  They're not in the master

11    file.  They may be in another file in the Clerk's Office.  Were they filed in this

12    case?  I don't know.

13    MRS. KOHLRIESER:  I think at some point

14    maybe you took judicial notice of them for the suppression.  The whole thing

15    with the suppression on a lot of issues was that it was like a collateral

16    estoppel, or judicial estoppel, or whatever you want to refer to it as.

17    THE COURT:  Well, I know, or, I believe

18    there's transcripts prepared.  We will search for that and make sure that they

19    are a part of the record in this case.

20    MR. RION:  Okay.  Thank you.

21    THE COURT:  Do you have copies of

22    them, by the way?

23    MR. RION:  I do.

1    THE COURT:  Okay.  Well, then, the

2    originals exist somewhere.  I don't know off the top of my head whether they

3    were ever made officially a part of CR2014 0139.

4          MRS. KOHLRIESER:  It's been awhile.

5          THE COURT:  But, we'll locate those.

6    Those were the transcripts from the other oral hearings in the other matters,

7    the other cases?

8          MR. RION:  Yes, your Honor.

9          THE COURT:  We'll try -- yea, we've got

10   some time here this afternoon and we'll try to look at that and make sure

11   that's all cleared up.

12         MRS. KOHLRIESER:  Lastly, if we could

13   just, off the record, maybe address some logistical things for the upcoming

14   week, in chambers?

15         THE COURT:  Okay.  Well, we can do it

16   right here on the record because that was going to be my next point.

17         MRS. KOHLRIESER:  Okay.

18         THE COURT:  Again, I don't know how

19   long the State's case will last.  I know both the State and the defense have

20   subpoenaed some persons who are incarcerated.  We had some previous

21   discussions and I don't think they're officially on the record in terms of the

22   logistics of that as far as transportation.  I know the majority of those folks

23   may be in Allen County institutions.  So, the logistics aren't that difficult other

833

1    than for security purposes and housing purposes and the separation of

2    witnesses purposes that I ordered. We didn't want the whole group all

3    housed, say, down in booking waiting in the same cell area because of the

4    separation of witnesses and other logisticals. Also, for security purposes the

5    Sheriff's Department and the jail had indicated that, you know, bringing them

6    in and in the Courtroom, since these people are currently, as I understand it,

7    some of them currently are inmates, we may have to step up and have an

8    extra deputy in the room. I think that will become obvious why we're doing

9    that if these people are inmates. We talked about when you need those

10   people here, Mr. Rion. I understand you had access to them via telephone. If

11   you guys have any idea, so I can -- well, the Sheriff's Department needs to

12   know and it's best if we have about a twenty-four hour notice as to when we

13   need those people. Now, if you need four or five of them in the same day we

14   may have to work with, well, okay, we'll have a couple of them here in the

15   morning and a couple of them here in the afternoon. I'm going to have

16   trouble, I mean, with manpower going back and forth. Perhaps we can bring

17   some here and when we take those back we can bring two more back. I'm

18   just trying to get a grip on this.

19          MRS. KOHLRIESER: I understand, your

20   Honor. I don't anticipate --

21          THE COURT: Does the State have their

22   person?

23          MRS. KOHLRIESER: Yes. That's all

1        arranged.

2        THE COURT:  That person is here?  That's

3        been arranged.  So, we're really talking about the defense witnesses who I

4        think all but one are housed in Allen County.  Right?

5        MR. RION:  Yes.

6        THE COURT:  So, it's not that big of a

7        deal.  But, the prison system in the past has always said they want

8        twenty-four hour notice.  Now, we can say in twenty-four hours -- well, it looks

9        like we're Monday and Tuesday at least in the State's case probably.

10        MRS. KOHLRIESER:  Judge, quite frankly,

11        when I was looking at it just now, and I apologize for interrupting, but I don't

12        anticipate, well, at the earliest we'll be done probably Wednesday morning, at

13        the earliest.  But, I suspect, as everything else in this trial has gone, that we

14        will probably go into Wednesday.

15        THE COURT:  Maybe -- well, I don't know

16        what your order of witnesses is, Mr. Rion, but maybe we'll plan on having

17        some of your inmate witnesses available Wednesday afternoon, or

18        Wednesday morning.  I don't know.  You guys think about it.  If you know kind

19        of an idea of how you want to present witnesses, if any, Mr. Rion, maybe you

20        can let me know.  Monday would be at least twenty-four hours in advance.  It

21        would be great, and there's no way of knowing, to say, 'okay, I need these

22        people on Wednesday, and I'll need these people on Thursday, and I'll need

23        these people on Friday'.  That may not be possible.

1    MRS. KOHLRIESER:  Your Honor, I think if

2    we schedule at least a couple for Wednesday afternoon, and by a couple of

3    them I mean for the defense, even if something were to go awry I'm sure the

4    jail could keep them in booking one night.

5        THE COURT:  Oh, yea.

6        MRS. KOHLRIESER:  That's not going to--

7        THE COURT:  I don't think it's as big a

8    problem if there's two or three of them here.  I think there were like, what, five

9    or six total listed?

10       MR. RION:  There are.

11       THE COURT:  That was more the logistical

12   problem because they house them separately from the general population,

13   usually in booking, and booking is close quarters.  Let's try to take care of that

14   first thing Monday or Tuesday so we have twenty-four hour notice.

15       Is that the logistical thing you guys wanted to bring up?

16       MRS. KOHLRIESER:  Yes.

17       THE COURT:  Okay.  All right.  I just got a

18   stack at the afternoon break, a stack of subpoenas that I believe the majority

19   were defense subpoenas, with the returns.  So, if you want to take a look at

20   what's been returned so you know who's been served and who may not have

21   been served?

22       MR. RION:  I know.

23       THE COURT:  You got those?

1    MR. RION: Well, yea. I got them before I

2  know.

3    THE COURT: Okay. Because you have a

4  person who's doing the serving?

5    MR. RION: Right.

6    THE COURT: Okay. All right. So, are we

7  good?

8    MRS. KOHLRIESER: Just one last thing.

9  In light of some of the questions that were raised in Don Marik's testimony,

10  particularly by defense exhibit 'M', your Honor, I'm just putting the Court on

11  notice and not to address it substantively now, but over the lunch hour we

12  went over to L.P.D. to see where that gap was and things like that and the

13  representation was that there was a switch in computers in the way they used

14  to do things versus the way they do things now. They were able to find some

15  actual papers that establish the full chain of custody on those whereas before

16  he just printed what was in the current computer system. I did give those

17  documents to Mr. Rion. But, obviously he hasn't had a chance to look at

18  them, digest them, or take them in. So, that may be something on Monday

19  morning we have to address ahead of time.

20    THE COURT: Okay.

21    MR. RION: Your Honor, that could be very

22  problematic, obviously.

23    THE COURT: Okay. Well, let me know.

837

1    MRS. KOHLRIESER: I guess what I'm

2    getting at is would you like us to be here at eight-thirty to discuss that and

3    then you can swear in the jurors?

4    THE COURT: Well, I don't have my

5    Monday schedule. I have to swear in the Grand Jury and go through the

6    Grand Jury voir dire at nine o'clock. It shouldn't take more than a half hour. I

7    think I may have an eight o'clock pre-trial in another matter. So, that might be

8    fodder for the noon hour on Monday. Be prepared. Or, stay late Monday if

9    that's an issue that we need to talk about.

10    MRS. KOHLRIESER: I just wanted you to

11    be aware of it.

12    THE COURT: Yea. We've got to squeeze

13    all this stuff in when we have breaks because I'm trying to keep my docket

14    flowing on the other matters, which isn't working very well. But, we're trying.

15    So, anything else? You've got a copy of the draft of the jury instructions.

16    We're not going to talk about that until we get towards the end. But, that's

17    just a work in progress. You have that. You can examine that and if you

18    have any requests for instructions or objections to instructions we'll certainly

19    put all of that on the record.

20    Anything else?

21    MRS. KOHLRIESER: Not from the State.

22    THE COURT: Enjoy the weekend. We'll

23    see you Monday morning.

1    MR. RION: What time, your Honor?

2    THE COURT: Oh, I have the jurors

3  coming at nine-thirty. So, nine-thirty is fine because we're not going to get to

4  much more before then. All right. We are in recess.

5    **(WHEREUPON, COURT RECESSED FOR THE DAY AT 3:43 P.M.)**

6

7

8    **MONDAY, SEPTEMBER 14, 2015**

9    **9:46 A.M.**

10

11    THE COURT: Today is the 14th of

12  September, 2015. We are reconvening in Case Number CR2014 0139,

13  which is captioned The State of Ohio -vs- Markelus Q. Carter. The record

14  should reflect the defendant is present in Court with his attorney. The State

15  has returned and they are represented by the Prosecuting Attorney's Office.

16    The jurors have all returned from the weekend recess.

17    Welcome back, ladies and gentlemen. I trust you all got nice rest and

18  had a nice weekend. I'm going to ask - is there any juror that feels that over

19  the weekend they were unable to follow the instructions of the Court or feel

20  like they've been exposed to something, either through the media, individuals,

21  or anything like that that would cause concern and prevent them from being

22  fair and impartial in this case? Anyone? All right. Very good. Everybody

23  feeling good? Healthy? All right. Okay.

1    We are in the State's case.  We will continue.  The State may call their
2    next witness.
3         MR. MILLER:  Phil Kleman.
4         WHEREUPON, called to appear as a witness in this proceeding was one:
5                               PHILIP KLEMAN
6    who, having been duly sworn by the bailiff herein, testified as follows:
7         BAILIFF:  He has no objection.
8         THE COURT:  Okay.  Thank you.
9         MR. MILLER:  Thank you, your Honor.
10                          DIRECT EXAMINATION
11   BY MR. MILLER:
12   Q    Mr. Kleman, can you state your full name for the record, please?
13   A    Philip William Kleman.
14   Q    Phil, where are you currently working?
15   A    I'm retired right now.
16   Q    Where did you retire from?
17   A    The Lima Police Department.
18   Q    And how long were you with the Lima Police Department?
19   A    Thirty-six and a half years.
20   Q    During a period of that time were you a detective with the Lima Police
21   Department?
22   A    Yes, I was.
23   Q    And from when to when were you a detective?

1    A    About 1992 until the middle of 2012.

2    Q    Okay.  So, during the month of February, 2009 you were a detective

3    with L.P.D.; is that correct?

4    A    That is correct.

5    Q    Now, during that February of 2009 were you called to assist with the

6    investigation of a homicide in which the suspect was Markelus Carter?

7    A    I was.

8    Q    Okay.  What did you do during the course of your role in the

9    investigation?

10   A    I initially went to the crime scene and was there for about four minutes

11   and then I left and went to the station.

12   Q    Did you collect any evidence when you were out at the crime scene?

13   A    No.

14   Q    Okay.  So, you went back to the station and then what did you do?

15   A    Eventually, around nine-thirty in the morning, I had the opportunity to

16   interview Mr. Carter.

17   Q    Okay.  Prior to that did you have the opportunity to talk to a lady

18   named Sonya Burkholder?

19   A    Very briefly I did.

20   Q    Okay.  And did you -- well, at this time, of course, you understood it to

21   be a homicide; right?

22   A    Yes.

23   Q    A homicide investigation.  Was there anything during the course of

1    your brief conversation with Miss Burkholder that would cause you at that

2    time to suspect her of this homicide?

3    A    No.

4    Q    Okay. Did you also have the opportunity to talk to, well, prior to talking

5    to the defendant, did you talk to at that time a young lady named Tarah

6    Carter?

7    A    Yes, I did.

8    Q    Okay. Was there anything during the course of that conversation that

9    would cause you to suspect her of the homicide?

10    A    No.

11    Q    Now, you mentioned that you had the opportunity to interview Markelus

12    Carter. Did you know Markelus Carter prior to this February 23rd, 2009

13    incident?

14    A    Yes, I did.

15    Q    Okay. Just briefly, how did you know Markelus Carter prior to this?

16    A    Well, I knew his family for a number of years and then I also knew him

17    from being involved with him on different past incidents there at the Police

18    Department, including one where we did a drug raid on his house years

19    before.

20    Q    Okay. Would that have been in 1995?

21    A    Yes.

22    Q    What was your role in that, as you put it, drug raid?

23    A    I was a member of the S.W.A.T. team when we made the entry into

1       the house and then the subsequent search of the house.

2   Q   Okay.  I'm going to hand you what has been marked -- well, let me ask

3       you this.  After that incident did you have any other occasions to be involved

4       with or have any other contact with Mr. Carter?

5   A   Nothing in particular; no.

6   Q   Okay.  Let me hand you what has been marked as State's exhibit '99'.

7       I'd ask you to take a look at it and then just look up at me when you're

8       finished taking a look at it; okay?

9   A   Okay.

10      (WHEREUPON, witness reviewed document.)

11  Q   Finished?

12  A   Yes.

13  Q   Okay.  Now, what is State's exhibit '99'?

14  A   It's the Judgment Entry of Sentencing/Conviction on Markelus Carter,

15  Q   Carter.

16  Q   Okay.  Go ahead.

17  A   The case number on that was CR95 06 0268.

18  Q   Okay.  That's a '95 case.  Is the Markelus Q. Carter noted on that

19      Judgment Entry the same Markelus Q. Carter that sits here today?

20  A   Yes, he is.

21  Q   And can you just describe an article of clothing that --

22      MR. RION:   Your Honor, we would

23      stipulate it.

1    THE COURT:  Okay.  Let me add, also

2    with that then, I'm going to instruct the ladies and gentlemen of the jury that

3    the evidence of the prior conviction in 1995 for the offense including the Illegal

4    Possession of Drugs is given only for a limited purpose.  As you were

5    instructed early on, one of the counts in this charge, in this case, that Mr.

6    Carter is alleged to have committed is Having a Weapon While Under

7    Disability.  So, the evidence of his prior conviction is only received for

8    purposes of that charge.  It was not received and you may not consider it to

9    prove the character of the defendant in order to show that he acted in

10   conformity with that character.  If you find the evidence of the previous

11   conviction is true and that the defendant was convicted of that previous

12   offense you can consider that evidence only for the purpose of deciding

13   whether it proved the defendant's knowledge of circumstances surrounding

14   the offense charged in Count Two that he had previously been convicted of a

15   felony offense involving the illegal possession of a drug of abuse.  That's the

16   reason why that type of evidence was presented and that's the only reason,

17   the only thing that you can consider it for.  Okay?  Go ahead.

18       MR. MILLER:  Thank you, your Honor.

19       MR. RION:  Your Honor, may we approach

20   on that while we're giving the instruction?

21       THE COURT:  Sure.  Sure.  Sure.

22   (WHEREUPON, Court and counsel had a briefly discussion at the Bench, on

23   the record, as follows.)

1   MR. RION: Since the jury is about to hear

2   about the .357, which I think he was convicted of, as well would it make some

3   sense to indicate to them that the Weapons Under Disability in this charge is

4   different than the charge in which --

5   MR. MILLER: I have no problem with that.

6   THE COURT: Well, there's not going to be

7   evidence that (inaudible).

8   MR. RION: I guess we could just say that

9   in this case the gun that's being alleged --

10  THE COURT: I'll wait until after the

11  evidence comes out.

12  MR. RION: Fair enough. Okay.

13  MRS. KOHLRIESER: Yea.

14  (WHEREUPON, Court continued on the record, as follows.)

15  THE COURT: Okay. Go ahead.

16  Q   I'm going to hand you now, Phil, what has been marked as State's

17  exhibit '11' - I'm sorry - '100', and I'll just have you read the caption to it when

18  I hand it to you. Okay? One second. Phil, I'm handing you, like I said, what's

19  been marked as State's exhibit '100'. Just read the caption.

20  A   This matter comes on the -- do you want --

21  Q   Just the caption, this part right here.

22  A   Oh, I'm sorry. The State of Ohio was the Plaintiff, versus Markelus

23  Carter. The case number is CR95 06 0268. It's the -- do you need the rest of

1    it read?

2  Q  Yea.

3  A  This section here?

4  Q  That section right there.

5  A  It's the entry to correct clerical error in Judgment Entry of Sentencing.

6  Q  So, it sounds as though State's exhibit '101' (sic) is simply an

7    amendment to State's exhibit '99' to correct a clerical error?

8  A  Yes.

9  Q  Okay. Now, back to your involvement with this homicide case. You

10    mentioned you had an opportunity to interview Mr. Carter. I'm going to hand

11    you now what has been marked as State's exhibit '98'. Will you please tell

12    the jury what State's exhibit '98' is?

13  A  It's a DVD hard disc of the defendant's statement that I had taken from

14    him the morning of the interview.

15  Q  Now, is that exhibit there a complete copy of your interview with Mr.

16    Carter?

17  A  No, it's not.

18  Q  Okay. Have there been some things edited out of that?

19  A  Yes, there was.

20  Q  Okay. What were those types of things?

21  A  Things that would not be allowed to be presented in Court.

22  Q  Now, do you recall what time of day, or, what time it was on February

23    23rd, 2009 when you began your interview with Mr. Carter?

1    A    It was right approximately at nine-thirty in the morning.

2    Q    Okay.

3    MR. MILLER:  With that, your Honor, we'll

4    show the DVD.

5    THE COURT:  Okay.  Go ahead.

6    MR. MILLER:  As soon as I can get the

7    computer to pick up here.

8    MRS. KOHLRIESER:  Sorry, your Honor.

9    The computer went to sleep.

10   THE COURT:  It seems like we've been

11   down this road before.

12   MRS. KOHLRIESER:  Modern technology

13   is wonderful.

14   THE COURT:  Again, this is exhibit '98'?

15   MR. MILLER:  Correct.

16   THE COURT:  We're not hearing it.

17   MRS. KOHLRIESER:  I know.

18   (WHEREUPON, State's exhibit '98' started playing in open Court.)

19   MR. RION:  Your Honor, I ask that it be

20   restarted.

21   MR. MILLER:  We can do that.

22   THE COURT:  Can you rewind it and start

23   it up again?

1    MR. MILLER:  We just did.

2    MRS. KOHLRIESER:  We just did.

3    THE COURT:  Okay.

4    (WHEREUPON, State's exhibit '98' was played in open Court.)

5    MR. MILLER:  Can we approach one

6    second?

7    THE COURT:  Sure.

8    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

9    the record, as follows.)

10    MR. MILLER:  I was watching the jury and

11    there may be a juror that needs a break.  You might want to inquire.

12    MRS. KOHLRIESER:  We have five or six

13    more minutes.

14    MR. MILLER:  Yea, but she was trying to

15    get -- I think she was trying to get someone's attention right now.

16    MRS. KOHLRIESER:  Yea, there's about

17    five or six more minutes on this.

18    THE COURT:  Okay.

19    (WHEREUPON, Court continued on the record, as follows.)

20    THE COURT:  Turn on the lights.  We're

21    going to take a break, ladies and gentlemen of the jury.  How much more do

22    you anticipate of this?

23    MRS. KOHLRIESER:  The video has

1  approximately five to six more minutes, your Honor.

2          THE COURT:  Okay.  Well, let's take a

3  break.  We're trying to time this.  I know we got a later start than usual.  We'll

4  take a short break.  Let's go about fifteen minutes.

5          Now, Monica had to step out on something and so Susan is going to

6  do double duty here.  You folks can go to the jury room.  Susan will come

7  around if you need anything, or we may have another staff person.  Monica

8  will be back this afternoon.

9          Remember the admonitions.  Don't discuss the case among

10  yourselves or with anyone else.  Don't formulate or express any opinions.

11  Have no contact with any persons involved in the case.

12          We'll stand in recess until a quarter till twelve.

13          (WHEREUPON, COURT WAS IN RECESS.)

14

15          THE COURT:  For the record then we're

16  reconvening in CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The

17  defendant is present with counsel.  The State is present.  The jurors have

18  returned from a morning recess.

19          We'll continue then.  You can continue with the presentation of the

20  State's evidence.

21          MR. MILLER:  Thank you, your Honor.

22  (WHEREUPON, State's exhibit '98' continued to be played in open Court.)

23          MR. MILLER:  Okay, your Honor.  I think

1   that's all there is on that.

2   **DIRECT EXAMINATION OF PHILIP KLEMAN CONTINUED**

3   **BY MR. MILLER:**

4   Q.  Mr. Kleman, I probably should ask, or, should have asked you this

5   before we started the interview.  Who's the other guy in the room with you

6   during the interview?

7   A.  Sergeant Ched Godfrey.

8   Q.  Okay.

9   A.  He's with the Lima Police Department.

10   Q.  Okay.  Is he still with the Lima Police Department?

11   A.  Yes.

12   Q.  Now, during the course of this interview we hear several things about,

13   you know, Ched at one point says, you know, 'I'll take you home'.  Was the

14   defendant free to leave --

15   A.  Yes, he was.

16   Q.  -- during this interview?

17   A.  Yes, he was.

18   Q.  Now, is what we've seen here a true and accurate copy of the edited -

19   we mentioned that it was edited - the edited interview?

20   A.  Yes.

21   MR. MILLER:  One second, your Honor.

22   THE COURT:  Okay.

23   (WHEREUPON, Court went off the record briefly.)

1    MR. MILLER: I have no further questions.

2    THE COURT: Okay. You'll have some

3    questions. I think because of the time we may break for lunch now and then

4    I'll allow you to inquire after lunch. Is that fair?

5    MR. RION: That's fair, your Honor. Thank

6    you.

7    THE COURT: Okay. I do want to give an

8    instruction, though. I met with counsel during the break, folks. You heard on

9    the DVD recording of the statement this discussion of a .357 hand gun that

10   was discussed. If you find that evidence to be believable, then I'm going to

11   instruct you that that weapon is not the subject of the second count where the

12   defendant is alleged to have a weapon under disability. It's not referring to

13   the .357 that was discussed. So, if you find that evidence to be believable,

14   don't consider that .357 when you're considering Count number Two. All

15   right?

16   Okay. We'll break for lunch. I'm going to extend it just a little bit

17   because I've got a couple of other things that I've tried to squeeze in over the

18   lunch hour to keep the rest of my docket going. We'll go until one-fifteen. So,

19   it's an hour and fifteen minutes.

20   Remember the admonitions I've been giving you. Don't discuss the

21   case among yourselves or with anyone else. Don't express or formulate any

22   opinions about the case. Have no contact with the parties. Don't let yourself

23   be exposed to any conversations out in the hallway or wherever about the

1    case. Don't pay attention to any media accounts.

2    We'll reconvene at one-fifteen; okay? We'll stand in recess.

3    (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

4

5    THE COURT: Okay. We're reconvening

6    after the noon recess this 14th day of September, 2015 in Case Number

7    CR2014 0139, State of Ohio -vs- Markelus Q. Carter. The defendant is

8    present with counsel. The State is present. The jurors have returned from

9    the noon recess.

10   Welcome back. We'll get started. We'll continue with the presentation

11   of the State's case. Detective Kleman, retired Detective Kleman, is on the

12   stand. He is subject to questions by Mr. Rion?

13   MR. RION: Thank you, Judge.

14   **CROSS EXAMINATION OF PHILIP KLEMAN**

15   **BY MR. RION:**

16   Q    Good afternoon, sir.

17   A    Good afternoon.

18   Q    First, the jury heard that there were some, and saw, that this was an

19   edited tape; correct?

20   A    That is correct.

21   Q    Is it your understanding, just so the jury understands, that no evidence

22   was excluded by the Court for this jury to hear; correct?

23   A    That is correct.

1  Q  And is it fair to say that the information that was edited out did not deal

2  directly with this case, but with other matters?

3  A  I will give you that.

4  Q  Okay.  There was a point on the tape where you had asked Markelus

5  Carter about his text messages with Tarah on the morning of the 23rd.  Do

6  you recall that?

7  A  Yes.

8  Q  And before he showed you his phone you told him, well, when he said

9  that he texted her twice at six forty-nine and six fifty-eight, whatever the times

10  were, you had asked him about, well, what did she say back; correct?

11  A  That is correct.

12  Q  And he said, "I didn't hear back from her." correct?

13  A  Yes.

14  Q  Or something - I mean, it's on the tape - but, something to that effect.

15  You said, "Well, that's interesting because I talked to her and she said that

16  she had texted you back."  Do you recall something to that effect?

17  A  I think I implied that she had talked to him by text; yes.

18  Q  Now, did you have any information at that time that she had texted

19  him, or was that just an investigative technique?

20  A  That was an investigative technique to see how he would respond.

21  Q  So, in other words, you, yourself, hadn't looked at her phone; correct?

22  A  That is correct.

23  Q  But, at that time you didn't have any information that she had texted.

1  You were trying to just engage him with possible information to see how he

2  responded to it?

3  A  Yes.

4  Q  Okay.  So, in other words, his answer to you of 'to the best of his

5  knowledge she did not respond' was a truthful one?

6  A  Yes.

7  Q  Okay.  Now, you asked him a series of questions.  You asked him,

8  obviously, his name, his address, his e-mail, and to all those he gave you

9  answers; correct?

10  A  Yes.

11  Q  They were verifiable?

12  A  I never verified them; but, I would assume they would be, or, could be.

13  Q  Others did?  Okay.  That Mark went to school and the timing of when

14  he took him; correct?

15  A  Yes.

16  Q  What he drove and the grades that Tarah had.  All that information was

17  provided; correct?

18  A  Yes.

19  Q  And Markelus Carter was there, which you would say was voluntary,

20  voluntarily that morning; correct?

21  A  Yes.

22  Q  In other words, he wasn't in custody?

23  A  That is correct.

1   Q   There wasn't a need at that point to even read him his rights because

2       he wasn't in custody; correct?

3   A   That is correct.

4   Q   We've seen the video of when they stopped his car and they put him in

5       the cruiser and they brought him down.  But, you were very open with him

6       that he didn't have to leave (sic) and, in fact, indicated to him that he was

7       going to be leaving later on that day; correct?

8   A   That is correct.

9   Q   Okay.  Now, the total interview lasted, what, over two hours?

10  A   Maybe a little bit over two hours.

11  Q   And prior to the conversation, the taped conversation beginning, you

12      had a conversation with him before the video conversation; correct?

13  A   I do not recall that; no.

14  Q   Okay.  If I could just show you the first page of your report maybe to

15      refresh your recollection?

16          MR. RION:  May I approach the witness?

17          THE COURT:  Sure.

18  Q   It's really up to the word 'during' there.  The first sentence of the

19      second paragraph is I think all --

20  A   At the beginning of the interview --

21  Q   No, no.  I'm sorry, sir.  Just read it to refresh your recollection.

22  A   Oh, I'm sorry.

23      (WHEREUPON, witness reviewed document.)

1    A    Okay.

2    Q    Does that refresh your recollection at all?

3    A    It really does not.

4    Q    From your report does it appear that you had a limited conversation

5    with Mr. Carter?

6    A    I'm not going to say I didn't have a limited conversation; but, I do not

7    recall what it would have been.

8    Q    So, information conveyed to Markelus that his, that you explained to

9    him that his daughter was fine and was with her mother, you don't recall

10    telling him about Tarah and that she was okay?

11    A    I remember saying that to him on the tape.  But, prior to that, I do not

12    recall.

13    Q    What time did the interview begin; do you recall?

14    A    I believe it was right around nine-thirty in the morning.

15    Q    That's when the interview began, or that's when he arrived at the

16    station?

17    A    I wasn't there when he arrived.  I wasn't present when he arrived at the

18    station.

19    Q    Do you know how long he was at the station before your interview

20    began?

21    A    I do not.

22    Q    Now, you were there with Sergeant Godfrey; correct?

23    A    For part of the interview; yes.

1  Q  And was it your understanding that Godfrey was involved with

2  Markelus Carter in a case involving Sonya?

3  A  I actually realized that during the interview.

4  Q  Okay.  So, prior to that you did not realize it?  But, as early as the week

5  before Godfrey and Mr. Carter, Sergeant Godfrey and Mr. Carter had had an

6  on-going discussion about Sonya Burkholder and the incident from 2012 (sic),

7  December, correct?

8  A  I don't know what they had prior to - just what I learned during that

9  interview with him when they were discussing it.

10  Q  So, you were not involved with the investigation of Sonya Burkholder

11  as it relates to the other case that was talked about?

12  A  I wasn't even aware of it.

13  Q  You weren't even aware of it.  And other than being at the scene for

14  four minutes do you have -- well, at that point on February 23rd did you have

15  a lot of information or were you just starting this investigation at that time?

16  A  It was just starting.

17  Q  And other than interviewing Mr. Carter is that essentially what you did

18  in this case?

19  A  For the whole investigation?

20  Q  Yes.

21  A  No.  I talked to his son also.

22  Q  Afterwards?

23  A  Yes.

1    Q. So, it was a little unclear, but then after the two hours and some

2    minutes conversation eventually Mr. Carter left the police station and went on

3    his way; correct?

4         A    That is correct.

5    MR. RION:  Nothing further.  Thank you,

6    sir.

7    THE COURT:  Any redirect?

8    MR. MILLER:  No, sir.

9    THE COURT:  All right.  Detective, you

10   may step down.  Thank you.

11        A    Thank you.

12   THE COURT:  Next witness for the State of

13   Ohio?

14   MRS. KOHLRIESER:  The State would call

15   Kenny Whitney.

16   WHEREUPON, called to appear as a witness in this proceeding was one:

17                **K E N N E T H   W H I T N E Y**

18   who, having been duly sworn by the bailiff herein, testified as follows:

19   BAILIFF:  He has no objection.

20   THE COURT:  Okay.  Thank you.

21              <u>**DIRECT EXAMINATION**</u>

22   **BY MRS. KOHLRIESER:**

23   Q. All right.  Could you state your name for the record, please?

1    A    Kenneth E. Whitney.

2    Q    And what's your current occupation?

3    A    I'm retired.

4    Q    Where are you retired from?

5    A    From the Lima Police Department.

6    Q    Okay.  And just prior to retiring what division were you in there?

7    A    I was in the Identification Bureau.

8    Q    And how long, if you recall, had you been in the Identification Bureau?

9    A    For twenty-one years.

10   Q    Now, we heard from Don Marik earlier this week.  Did you ever work

11   with Detective Marik specifically in the I.D. Bureau?

12   A    Yes, I did.

13   Q    I imagine over the twenty-one years in his capacity as a Detective you

14   worked with him as well?

15   A    Yes.

16   Q    Now, I want to direct your attention to February 23rd of 2009.  Were

17   you made aware that there was a homicide on East McKibben?

18   A    Yes, I was.

19   Q    And how was it, if you would explain to the jury, how you got involved

20   with it.

21   A    When I reported for duty that morning my supervisor told me that there

22   had been a shooting over at 436 East McKibben Street and that Detective

23   Marik was there and that I was to go and offer assistance to him.

1  Q  What time would you have come in that morning roughly?

2  A  Approximately eight A.M.

3  Q  And so you actually went from the Police Department to the scene?

4  A  Yes, that's correct.

5  Q  You weren't called at home and that type of thing?

6  A  No.

7  Q  All right.  Now, when you got to the scene did you assist Detective

8     Marik in collecting various items of evidence?

9  A  Yes, I did.

10  Q  And did you wear gloves when you were doing this?

11  A  Yes.

12  Q  And did you frequently change your gloves during that time?

13  A  Yes, that's correct.

14  Q  When you're at a crime scene and you're processing various pieces of

15     evidence is that your normal procedure, you would change gloves with the

16     collection of various pieces of evidence?

17  A  Yes.  I would take a whole box of gloves with me because it's very

18     important that you change gloves in-between any items that you're handling.

19  Q  So, what types of things were you assisting with out there?

20  A  Well, I was assisting with items that had been in the duffel bag and a

21     cooler.

22  Q  And did you find whether these items appeared to belong to the victim

23     or someone else?

1    A    They appeared to belong to the victim.

2    Q    And was that largely what you did out at that scene?

3    A    Yes. I also prepared the body to be removed to the coroner's office.

4    Q    Okay. What do you mean you prepared the body to be removed?

5    A    I secured clean bags over the hands of the victim. When the mortuary

6    service arrived we wrapped him in a clean sheet and placed him in a new

7    body bag.

8    Q    Okay. And do you wear gloves while you're doing this?

9    A    Yes.

10   Q    Okay. When you're done doing that do you remove those gloves?

11   A    Yes.

12   Q    And is that a standard to place bags over a victim's hands like this in a

13   murder investigation?

14   A    Yes, it is standard operating procedure.

15   Q    Now, after you finished at the scene on McKibben -- well, where did

16   you go?

17   A    From there I went to the Lima Police Department, the Identification

18   Bureau.

19   Q    Okay. Were you asked to participate in the execution of a search

20   warrant at 122 East Eureka that day?

21   A    Yes, I was.

22   Q    And what did you do that?

23   A    Yes.

1   Q   What did you do upon arriving at 122 East Eureka?

2   A   I met with Detective Clark and Miller.  They were present at the scene.

3       At that time I was asked to photograph evidence, and to help search for

4       evidence, and to help collect and package evidence.

5   Q   Okay.  In fact, were a number of items collected?

6   A   Yes.

7   Q   Were a number of pictures taken?

8   A   Yes.

9   Q   And do you know whether a second search warrant of that same

10      house was received that day?

11  A   Yes.

12  Q   And did you participate in a search pursuant to that search warrant?

13  A   Yes, I did.

14  Q   And were a number of items also collected pursuant to the second

15      search warrant?

16  A   Yes.

17  Q   All right.  I'm going to hand you a number of photographs, starting with

18      State's exhibit '102' and all the way to State's exhibit '129-C' (sic).  I'd ask you

19      to take a look at all of those and tell me when you're done.

20      (WHEREUPON, witness reviewed photographs.)

21  A   Okay, I'm done.

22  Q   All right.  Exhibits '101' (sic) through '129-C' (sic), do those fairly and --

23      excuse me, '128-C'.  I think I labeled them that way.  '128-C'.  Yes.  It should

862

1   be '128-C' and not '129-C'.  Sorry about that.  Exhibits '101' (sic) through

2   '128-C', do they fairly and accurately represent the home at 122 East Eureka

3   Street on February 23rd, 2009 when you participated in those searches of it?

4   A   Yes, they do.

5   Q   All right.  Let's take a few moments to go through these.  State's exhibit

6   '101' (sic).  What are we looking at in this picture?

7   A   We're looking at an exterior view of 122 East Eureka Street.

8   Q   State's exhibit '103'.  What are we looking at here?

9   A   A closer view of the front porch of 122 East Eureka.

10  Q   And, in fact, you can actually see the address above the mailbox;

11  correct?

12  A   Yes.

13  Q   State's exhibit '104'.  What are we looking at in this picture here?

14  A   A photograph of the front living room of 122 East Eureka.

15  Q   State's exhibit '105'?

16  A   A different angle of the same room.

17  Q   Okay.  And do you see this couch here?

18  A   Yes.

19  Q   Can you tell what that is in the photo on the table?

20  A   It looks like a laptop computer.

21  Q   And were there a number of electronic items in the house?

22  A   Yes.

23  Q   And did you seize those yourself?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Do you recall who was in charge of that part of the search? |
| 3 | A | I believe Lieutenant Baker arrived to oversee that. |
| 4 | Q | Okay.  Was Investigator DeLong there from Crime Technology? |
| 5 | A | I don't recall.  He could have been. |
| 6 | Q | Okay.  But, it wasn't your job? |
| 7 | A | No. |
| 8 | Q | Okay.  State's exhibit '106'.  What are we looking at here? |
| 9 | A | Okay.  That's an ammunition box, Winchester, on a living room shelf. |
| 10 | Q | Okay.  So, when you say a box, are you talking about this object right |
| 11 | | here in the white, the box with the red writing? |
| 12 | A | Yes. |
| 13 | Q | And you said that was what type of box? |
| 14 | A | Winchester ammunition. |
| 15 | Q | Ammunition?  State's exhibit '107'. |
| 16 | A | Okay.  That's the same bookcase, but just a wider angle view of that. |
| 17 | Q | This is where the ammunition box was found? |
| 18 | A | Yes. |
| 19 | Q | State's exhibit '108'? |
| 20 | A | Okay.  That's the other end of the same living room at 122 East |
| 21 | | Eureka. |
| 22 | Q | Okay.  Can you tell what room leads next there? |
| 23 | A | The kitchen. |

| | | |
|---|---|---|
| 1 | Q | State's exhibit '109'. What are we looking at here? |
| 2 | A | Okay. That's a view of the kitchen table. |
| 3 | Q | Okay. And were there items found on this particular kitchen table that |
| 4 | | you eventually collected? |
| 5 | A | Yes. |
| 6 | Q | Okay. Are you able, or, do you recall this object next to, well, it looks |
| 7 | | like a laundry basket with a stack of white objects here? Do you recall what |
| 8 | | this was? |
| 9 | A | There was some paperwork there. |
| 10 | Q | Okay. And this black object on the other side here?  Do you recall |
| 11 | | what that is? |
| 12 | A | That's a pair of black gloves. |
| 13 | Q | And did you recover those black gloves as well? |
| 14 | A | Yes. |
| 15 | Q | All right.  State's exhibit '110'.  What are we looking at here? |
| 16 | A | It's a photo of some of the paperwork that was on the kitchen table. |
| 17 | Q | Okay.  And were you able to tell what kind of paperwork this top sheet |
| 18 | | is, or, what that appeared to be to you? |
| 19 | A | I don't recall. |
| 20 | Q | Did you then proceed to take various pictures of that paperwork? |
| 21 | A | Yes, I did. |
| 22 | Q | Okay.  State's exhibit '111'? |
| 23 | A | Yes. |

1 Q I'm just going to hand you State's exhibit '111' for a second. I'd ask

2 you to take a look at that. Can you see what State's exhibit '111' appears to

3 depict?

4 A It looks like some type of e-mail messaging.

5 Q Okay. Can you read who it's from?

6 A From Ken Warrington.

7 Q And who is it to?

8 A To Sonya Burkholder.

9 Q And what it's dated?

10 A Sunday, December 16th, 2007.

11 Q Okay. Thank you. This was found on the table in 122 East Eureka?

12 A Yes.

13 Q State's exhibit '112'. Is that another page in those e-mails?

14 A Yes.

15 Q State's exhibit '113'?

16 A Yes.

17 Q Yes what?

18 A Another page of what appears to be e-mails.

19 Q Okay. And State's exhibit '114'?

20 A Yes, another page of e-mails.

21 MRS. KOHLRIESER: Can you all see

22 where I'm standing? Okay. Sorry. There's no easy way to do this. I

23 apologize.

998

1   Q   Okay.  State's exhibit '115-A'.  I'll have you take a look at this for me.

2       Do you recognize what room that is?

3   A   Yes.

4   Q   Okay.  What is that room?

5   A   That's the rear what I call the studio room at 122 East Eureka.

6   Q   Why do you call it a studio room?

7   A   Just based on the keyboards and various equipment that appears.

8       There appears to be a mixer board possibly.

9   Q   Although it's kind of blurry, does this appear to be some kind of

10      computer equipment in the middle here?

11  A   Yes.

12  Q   State's exhibit '115-B'.  Do you recognize what that is?

13  A   Yes.  That's in the studio room.  Next to a keyboard there is a revolver

14      there.

15  Q   Okay.  Is that the same keyboard area that we were just looking at in

16      State's exhibit '115-A'?

17  A   Yes.

18  Q   Did you collect that revolver?

19  A   Yes, I did.

20  Q   Do you recall off the top of your head what caliber revolver that was?

21  A   It was a Smith and Wesson .357 magnum.

22  Q   Okay.  State's exhibit '116'.  What are we looking at here?

23  A   Another angle of the same studio room.

1  Q  State's exhibit '117-A'. What are we looking at here?

2  A  Okay. That's some camouflaged clothing that was found in the

3  residence.

4  Q  Okay. I apologize. I want to get something out here. All right. There

5  appears there's two types of camouflage in this picture?

6  A  Yes.

7  Q  State's exhibit '117-B'. What do we have here?

8  A  That's a picture of the closet in the north second floor bedroom at 122

9  East Eureka.

10  Q  Okay. Is that the same bedroom where you would have found the

11  camouflage in the previous picture?

12  A  Yes, the same room.

13  Q  Now, there appears to be an object up in the top of this closet. It looks

14  like a box. Is that, in fact, what it is?

15  A  It was like a wooden chest.

16  Q  Okay. State's exhibit '117-C'. What are we looking at here?

17  A  It's a close-up of the wooden chest.

18  Q  Now, was that chest brought down and looked inside?

19  A  Yes.

20  Q  State's exhibit '118'.

21  A  That's a view looking into the wooden chest.

22  Q  And can you tell the jurors what items are actually in this chest? Look

23  at these, I guess, one, two, three, four silver items up front. Can you tell the

1     jury what those turned out to be?

2   A   Those appear to be game controllers.

3   Q   Okay.  And this black object towards the back of the chest, what was

4     that?

5   A   That was a nine millimeter pistol.

6   Q   Okay.  Now, again, as you're collecting these things eventually did you

7     wear gloves during this time?

8   A   Yes.

9   Q   Did you change your gloves frequently?

10   A   Yes, I did.

11   Q   State's exhibit '119'.  What are we looking at here?

12   A   That's a close-up of the nine millimeter pistol recovered from the

13     wooden chest.

14   Q   Okay.  What's it sitting on top of?

15   A   clipboard.

16   Q   Okay.  I'm going to scoot this picture down a little bit.  Can you tell, if

17     you know, who's holding that clipboard?

18   A   Detective Clark.

19   Q   Okay.  Detective Clark doesn't appear to be wearing gloves; does he?

20   A   That's correct.

21   Q   Who took this photograph?

22   A   I did.

23   Q   Did Detective Clark handle that weapon during the photographing of

1        this picture, or was that you?

2   A  He did not. I did.

3   Q  State's exhibit '120'. What do we have here?

4   A  That's a picture of the bedroom on the second floor at 122 East

5       Eureka.

6   Q  Okay. State's exhibit '121'. What are we looking at here?

7   A  Another picture of the same north bedroom.

8   Q  Now, on that is this wooden chest; correct?

9   A  Yes.

10   Q  This is the same bed where the camouflage clothing was found?

11   A  Yes.

12   Q  State's exhibit '122'. What do we have here?

13   A  A photograph of a bedroom at 122 East Eureka, second floor.

14   Q  Okay. And exhibit '123'?

15   A  A photograph of the laundry room at 122 East Eureka.

16   Q  And '124'?

17   A  A photograph of the second floor hallway at 122 East Eureka.

18   Q  Where we see this wooden floor and stuff, is that the stairs leading

19       down?

20   A  Yes, that's a banister.

21   Q  And '125'?

22   A  Another photograph of a bedroom at 122 East Eureka.

23   Q  This is a different bedroom; correct?

1   A   Yes.  It would be the south bedroom.

2   Q   And '126'?

3   A   Another photograph of the bedroom at 122 East Eureka.

4   Q   And State's exhibit '127'?

5   A   That would be a photograph of the basement staircase at 122 East

6   Eureka.

7   Q   All right.  Exhibit '128-A'?

8   A   That's a photograph in the basement at 122 East Eureka.

9   Q   And '128-B'?

10   A   A photograph of a black powder rifle recovered from the basement at

11   122 East Eureka.

12   Q   Okay.  And what condition was that rifle in?

13   A   It wasn't in real good condition.

14   Q   It was broken; correct?

15   A   Yes.

16   Q   And State's exhibit '128-C'.  What are we looking at here?

17   A   That's more camouflage clothing.  That was found in the basement.

18   Q   Okay.  And then State's exhibit '101'.  I know I'm a little out of order

19   here.  I apologize.  What are we looking at here?

20   A   Camouflage clothing.

21   Q   And does that relate back -- is that in the same area where there were

22   some earlier photographs of camouflage?

23   A   Yes.

1   Q. And that was found in that room, the bedroom?

2   A. Yes, in the north bedroom.

3   Q. Okay. All right. I believe you testified that you collected a number of

4   items; correct?

5   A. Yes.

6   Q. Okay. When you go about collecting these items, well, describe for the

7   jury how you do that.

8   A. Like I said, I take a whole box of gloves in with me so there isn't going

9   to be any problem with running out of gloves. I then photograph the

10   evidence. You know, I try to take a long range shot and then a close-up shot.

11   I then don a pair of clean latex gloves and collect the item and put it in a clean

12   paper bag that's never been used before and then I fold the top of the bag

13   over.

14   Q. Okay. Do you also later seal those with some sort of tape or

15   something of that nature?

16   A. Yes. Back at the station I seal them with black and yellow evidence

17   tape.

18   Q. Do you initial that?

19   A. Pardon?

20   Q. Do you initial that usually, or the bag somewhere?

21   A. Yes.

22   Q. Okay. When you have multiple items like this is it uncommon, for

23   instance, for Detective Marik in the I.D. Bureau with you when you get back to

1 the station to help you with this process?

2 A Well, sometimes there's some help in filling out the evidence labels

3 that have to be stuck on the bag.

4 Q Okay. When you talk about an evidence label, and I'm just going to

5 use State's exhibit '132' as an example, but when you say evidence label,

6 well, could you show the jury on State's exhibit '132' what you're talking about

7 when you say evidence label?

8 A This red and white label.

9 Q Are you aware -- you still have a part-time position at the Police

10 Department, correct?

11 A Yes.

12 Q What do you do now?

13 A I work in the fingerprint section.

14 Q How often do you work there?

15 A Oh, just once a week, volunteer.

16 Q Are you aware of whether they have different evidence labels now?

17 A Yes, they do.

18 MRS. KOHLRIESER: If the Court would

19 indulge me just a minute?

20 (WHEREUPON, Court went off the record briefly.)

21 Q Let's start with State's exhibit '129'. I'll have you look at State's exhibit

22 '129'. Tell me if you recognize that.

23 A Yes, that's a paper bag. Yes, I recognize it.

1   Q   It's actually a plastic bag; correct?

2   A   Well, right. It's plastic containing a paper bag.

3   Q   Did you have anything to do with cutting the plastic bag together there?

4   A   No, I did not.

5   Q   I'm going to ask you to open up State's exhibit '129' for me.

6       THE COURT:  Do we have rubber gloves?

7       BAILIFF:  In the cupboard.  No?

8   Q   There's actually a plastic bag within a plastic bag; correct?

9   A   Yes.

10  Q   Okay.  Did you have anything to do with that plastic bag?

11  A   No.

12  Q   If you would find, I guess, a safe place that doesn't appear to be too

13      marked on and open up that plastic bag?  Okay.  Now we're to the brown

14      bag; correct?

15  A   Yes.

16  Q   There's actually a State exhibit marker on that from another occasion;

17      correct?

18  A   That's correct.

19  Q   Okay.  Now, can you tell on this bag who filled out that evidence

20      sticker?

21  A   Detective Marik.

22  Q   Okay.  Do you see your initials on that bag anywhere?

23  A   Yes, I do.

1    Q    Can you open that bag up and pull out the item that's in there?  I'll ask

2    you, Mr. Whitney, while you're doing that, are you aware of whether any of

3    these exhibits have been opened previously?

4    A    Yes, they have been.

5    Q    For review by various people?

6    A    Yes.

7    Q    Okay.  If you would, -- well, here's a box of gloves, if you would feel

8    more comfortable.  Remove what's in State's exhibit '129' for us.  Do you

9    want to hold that up for the jury and explain to them what that is?

10   A    That's an ammunition box, Winchester.

11   Q    All right.  And can you tell me the caliber as listed?

12   A    As listed it's a nine millimeter Luger, a hundred and fifteen grain full

13   metal jacket.

14   Q    Okay.  You can put that back in the bag now.  I appreciate that.  And

15   also back in the other plastic.  State's exhibit '129', is that an item you

16   collected on February 23rd, 2009 from 122 East Eureka?

17   A    Yes, it is.

18   Q    And that's actually what we saw depicted in an earlier photo?

19   A    Yes.

20   Q    Okay.  State's exhibit '130'.  Can you take a look at that and tell me

21   what it is?

22   A    It's a shirt, camouflage, long sleeved.

23   Q    Okay.  And who filled out that evidence sticker?

1    A   I did.

2    Q   Okay. Can you tell us where that shirt was found? Excuse me. Was

3    that shirt found at 122 East Eureka?

4    A   Yes, it was.

5    Q   And where was this particular shirt located?

6    A   This is the shirt from the basement.

7    Q   What item number did you give that one?

8    A   This is item 214.

9    Q   And, Mr. Whitney, are you sure that 214 was collected from the

10   basement?

11   A   No. 214 was collected from the north second floor bedroom, on the

12   bed.

13   Q   Okay. How are you able to tell that?

14   A   Because it's item 214.

15   Q   Okay. So, you misspoke about the basement?

16   A   Yes, I did.

17   Q   Okay. So, this is actually the one we saw in the photograph on what

18   appeared to be like a futon type of bed?

19   A   Yes; uh-huh.

20   Q   All right. And does this appear to have been opened a few times

21   itself?

22   A   Yes.

23   Q   Actually, if you would, open this up for me, please. Let's show them

876

1    what it looks like.  Is that the long-sleeved camouflage t-shirt?

2    A    Yes.

3    Q    Okay.  Please put that back in the bag now for me, if you would.

4    State's exhibit '131'.  I'd ask you to take a look at that for me.  I'd ask you to

5    take a look at that and tell me who filled out that evidence sticker.

6    A    I filled it out.

7    Q    Okay.  What does it appear to be?

8    A    It's a camouflage shirt, item 215.

9    Q    Okay.  Where was it recovered?

10   A    From the same futon on the second floor north bedroom at 122 East

11   Eureka.

12   Q    Okay.  If you would?  Are you aware whether all this stuff has been

13   tested that you're --

14   A    Yes, it has been tested.

15   Q    Okay.  This is the short sleeve camouflage t-shirt; correct?

16   A    Yes.

17   Q    Okay.  Please put that back in the bag.  State's exhibit '132'.  I'd ask

18   you to take a look at that.  Now, who filled out that sticker?

19   A    Detective Clark.

20   Q    And did Detective Clark -- well, we already talked about it, he was at

21   the search; correct?

22   A    Yes.

23   Q    Did he also assist in filling out some of these evidence stickers for you

```
 1   back at station?

 2   A   Yes, he did.

 3   Q   Okay.  If you would please open State's exhibit '132', please?  Hold

 4   those up.  What are those?

 5   A   A pair of black leather gloves.

 6   Q   Okay.  Where were those located?

 7   A   They were on the kitchen table.

 8   Q   Is that the table that had the e-mails and the black gloves on

 9   it?

10   A   Yes.

11   Q   Okay.  Go ahead and put those away.  And, again, when we say this

12   we're still talking about 122 East Eureka; correct?

13   A   Yes, that's correct.

14   Q   Okay.  State's exhibit '133'.  I'd ask you to take a look at this and tell

15   me if you recognize that.

16   A   Yes.  This is a paper from 122 East Eureka.

17   Q   Okay.  Was that in the stack of papers on the table there?

18   A   It came from the kitchen table.

19   Q   The kitchen table?  Okay.  Can you read that top left hand corner for

20   the jury, please, what's written on it?

21   A   Here?  Or, here?

22   Q   Your top left here.

23   A   Okay.  Human Resources - Pam Callahan, 2630.
```

1    Q.  Okay.  And to the right of that?

2    A.  One (sic) represent one-half of a pending lawsuit which may include

3    your company.

4    Q.  Okay.  Thank you.  That first 'one', there, could that possible be an '1'?

5    A.  Okay.  Yea.

6    Q.  Was that your interpretation?

7    A.  Yea, it looks like 'I represent one-half of a pending lawsuit which may

8    include your company'.

9    Q.  Okay.  Thank you.  State's exhibit '134'.  Do you recognize that

10   exhibit?

11   A.  Yes.

12   Q.  Okay.  What is that?

13   A.  That's some e-mails.

14   Q.  Okay.  Do those appear to be e-mails that you photographed that we

15   showed just a few moments ago?

16   A.  Yes.

17   Q.  And who do they appear to be between?

18   A.  From Sonya Burkholder to Ken Warrington.

19   Q.  And do those appear to be a series of back and forth between the two

20   of them?  Feel free to open it up, if you need to.

21   A.  Yes, it appears to be back and forth between the two of them.

22   Q.  And where were those e-mails found?

23   A.  On the kitchen table at 122 East Eureka.

1   Q   Okay. State's exhibit '135'. I'd ask you to take a look at that. Do you

2   recognize where those documents came from?

3   A   Yes. They were also on the kitchen table.

4   Q   Okay. And, again, all these items that I've been showing you are items

5   that you collected at 122 East Eureka?

6   A   Yes.

7   Q   And, again, this is one that someone else filled out the tag for?

8   A   Detective Clark did.

9   Q   Please feel free to open State's exhibit '135' for me. There's a lot of

10   tape on there, isn't there? Okay. Would you pull those out for me? If you

11   would, can you just read this first sentence for me on the first page of the

12   documents in '135'? Read it out loud to the jury, please.

13   A   Before the Court is Case Number DR2007 0674 in the matter of Sonya

14   R. Burkholder.

15   Q   Okay. I apologize. Does it appear to have a date on it anywhere? It

16   references a December 18th, 2007 Order; correct?

17   A   Yes.

18   Q   Okay. Thank you. All right. Now, amongst those pages would you

19   take a look at this one and tell me the case number of that item.

20   A   The case number is DR2007 0674.

21   Q   Who were the parties?

22   A   Sonya R. Burkholder versus Markelus Carter.

23   Q   Okay. Is there -- excuse me, in the caption here can you tell me what

1     the caption reads?

2   A   Notice of completion of transcript.

3   Q   Okay. What's the file-stamp on that?

4   A   Filed 2008, February 4th, at nine thirty-four A.M.

5   Q   Thank you. Now, the next series of documents. Can you read the case

6     number and the parties?

7   A   The case number is DR2007 0674. It's stamped 2008, January 30th,

8     at ten fifty-nine A.M.

9   Q   Okay. Who are the parties?

10   A   Sonya R. Burkholder versus Markelus Q. Carter.

11   Q   Okay. What does that caption read?

12   A   Magistrate's Decision.

13   Q   Okay. This next series, can you read what that purports to be?

14   A   Order of Protection.

15   Q   And does it list the parties on there? I know this is a little different from

16     the last documents.

17   A   Yes.

18   Q   Okay. Who are the parties?

19   A   Petitioner is Sonya R. Burkholder versus respondent, Markelus Q.

20     Carter.

21   Q   Okay. Can you read the date on there?

22   A   The file date is 2008, March 19th, at ten twenty-six A.M.

23   Q   Okay. Thank you. All right. This is the next series of documents in

1     State's exhibit '135'.  Do you recognize what kind of report that is?

2     A   Yes.  It's a Lima Police Department report.

3     Q   What's the date that report was taken?

4     A   It was taken December 17th, 2007.

5     Q   Does it say which officer was making that report?

6     A   Yes, Officer Hile.

7     Q   Does that indicate who the victim is?

8     A   The victim is Sonya R. Burkholder.

9     Q   And does it indicate who the suspect is?  I'm not sure how they called

10    that suspect.

11     A   The suspect is Markelus Q. Carter.

12     Q   And that's roughly three pages there?

13     A   Yes.

14     Q   Does that appear to be all Sergeant - excuse me - Officer Hile, at that

15    time, his report; correct?

16     A   Yes.

17     Q   Now, I'm not going to go into things at length, but can you look at some

18    of these?  What do they appear to be to you?  Are they legal documents?

19     A   Yes, Court papers.

20     Q   And who do they appear to be filed on behalf of?  Does it say who the

21    attorney represents?

22     A   City of Lima versus Markelus Carter, defendant.

23     Q   Okay.  But, down here, the attorney is who?

1    A    Kenneth J. Rexford.

2    Q    And who does he represent?

3    A    Attorney for defendant, Markelus Carter.

4    Q    Okay.  This is a City of Lima case?

5    A    Yes.

6    Q    All right.  I'll hand you another series of documents.  Can you tell me --

7    these appear to be some kind of handwritten form; correct?

8    A    Yes.

9    Q    Okay.  And, again, who is the petitioner?

10   A    Sonya R. Burkholder.

11   Q    Who is the respondent?

12   A    Markelus Q. Carter.

13   Q    And what date was it filed?

14   A    2007, December 18th, at one thirty-two P.M.

15   Q    All right.  And you're aware there's other documents similar to that in

16   here; correct?  In State's exhibit '135'?

17   A    Pardon?

18   Q    Are there documents similar to this one that seem to follow that?

19   A    Yes.

20   Q    Now, I'm going to hand you one last thing.  Can you read, well, actually

21   the very top of that?  What Court does that appear to be filed in?

22   A    The Allen County Court of Appeals of the Third Appellate Judicial

23   District of Ohio.

1  Q  Okay. Then what date is stamped on there as filed?

2  A  2008, September 15th, at eight thirty-four A.M.

3  Q  Okay. What's the case number on that?

4  A  The case number is 1-08-20.

5  Q  Okay. Can you read the parties and their positions?

6  A  Sonya R. Burkholder, Plaintiff/Appellee versus Markelus Carter,

7  Defendant/Appellant.

8  Q  Okay. This sentence here, we'll just start in the middle with 'and it is',

9  can you read that for us?

10  A  "And it is the Judgment and Order of this Court that the judgment of the

11  trial Court is affirmed with costs to appellant."

12  Q  Okay. Thank you. And then, lastly, this set of documents appears to

13  be -- well, what's it called?

14  A  Brief of Plaintiff/Appellee, Sonya R. Burkholder.

15  Q  Is that, again, in the Third Appellate District which you just read?

16  A  Yes.

17  Q  Same parties and same case number?

18  A  Yes, same parties and same case number.

19  Q  Okay. Thank you. And, again, State's exhibit '135' is a compilation of

20  a lot of documents, correct?

21  A  Yes.

22  Q  And all these were collected from where?

23  A  From the kitchen table at 122 East Eureka.

1  Q  And each of these items when you were searching and collecting
2  them, did you bag them separately?
3  A  The documents, I think I put all of those in the same bag.
4  Q  Okay. You put the paperwork in the same bag?
5  A  Right.
6  Q  Okay. Gotcha. Now, once everything is collected you took it where?
7  A  I took it to the Lima Police Department, the Identification Bureau.
8  Q  Did you put it in a secure area?
9  A  Yes, I did.
10 Q  Detective Marik talked about a closet and an evidence room. Do you
11 know what I'm referring to when I say closet?
12 A  Yes.
13 Q  Can you explain for the jury kind of how your process went with that
14 closet, what that was used for?
15 A  The closet had limited access. Myself and the other Identification
16 Officer, which would have been in that case Detective Marik, we each had a
17 key to that closet. No one else did except maybe the Major of Staff Services
18 who kept the master key.
19 Q  Okay.
20 A  We would secure evidence in there prior to finally sealing it and placing
21 an evidence label on it.
22 Q  Okay. Now, when you say finally sealing it, you mentioned about
23 folding the bag over.

1   A   Yes.

2   Q   Could you explain to the jury what you mean by that?

3   A   Well, when you put an item in a paper bag most people fold it over and

4   crease it.

5   Q   What was the point of that?

6   A   Just to make sure that that item is staying in that sack while it's being

7   transported and it doesn't fall out.

8   Q   And particularly with clothing, or ballistics, and that type of thing are

9   each of those things bagged separately?

10   A   Yes.

11   Q   Then eventually, once everything is completely sealed and initialed

12   and things of that nature, are they then placed into, I guess, the bigger

13   evidence room?

14   A   Yes.  Once we finalize, put the evidence tape and the evidence sticker,

15   then we move it over to, well, in this case it went to C block property room,

16   which had been part of the old jail which we converted to a property room.

17   Again, there's limited access to that property room.  Myself and the other

18   Identification Officer and the master key kept with the Major of Staff Services,

19   we were the only three people that had keys to that property area in the entire

20   department.

21   Q   What types of things do you do when someone, either you or your

22   fellow I.D. officer, takes items out of the evidence room?  What do you do to

23   track that type of information?

988

1    A    I prefer a written log. We also have a back-up system that can be

2    used in the computer. I prefer paper logs myself. In case there's a problem

3    with the computer system you have something to fall back on. It's kind of a

4    redundant type system.

5    Q    Okay.

6    A    We would log those on the paper log, the chains of evidence.

7    Q    Would it be fair to call it you old school?

8    A    Yes, I think it would be.

9    Q    Okay. So, your preference was paper, to write down what it was;

10    correct?

11    A    Yes.

12    Q    And I think you used the word redundant with the computer system?

13    A    Yes.

14    Q    Was that also something that you would do is eventually put it in the

15    computer system as well?

16    A    Yes, as we had time. We had a lot of cases, all forms of crime. As we

17    got time then we would sit down and go through the paper logs and enter

18    them one at a time, because you can only enter one at a time, into the

19    computer system and then check it off the list and then go to the next item

20    and check it off and so forth.

21    Q    Okay. Now, I'm just going to refer to you as Officer Whitney because

22    you still are. Are there times when myself or another prosecutor or defense

23    counsel would want to look at evidence?

1    A    Yes.

2    Q    Okay.  When those items get brought out of the secured facility, well, if

3    they're opened what happens to them once that's done?  Say I'm looking at it.

4    Say I call you and I say, "Hey, I want to look at items one, two, and three."

5    A    Okay.  Well, the same process.  You put on a clean pair of latex gloves

6    and handle the item.  Then when it was done being examined it would go

7    back into the package and it would be resealed and a date and initials affixed

8    to it showing that on a particular occasion someone gained access to that

9    evidence.

10   Q    Okay.  And then would it return back to the evidence storage system?

11   A    Yes.  When you're done then it's returned back to the property room.

12   Q    And now there were a few items that were collected at 122 East

13   Eureka that were previously used for something, well, not this case; correct?

14   A    Correct.

15   Q    Okay.  I believe one of those we referred to had another exhibit sticker

16   on it; correct?

17   A    Yes.

18   Q    When those are admitted into Court who keeps ahold of that evidence;

19   if you know?

20   A    When they're admitted into Court?

21   Q    Uh-huh.

22   A    Then the Court would have custody of the item, or, items.

23   Q    Were there times when you would get notice from the Court that these

1  items were going to be released if you wanted to pick them up?

2  A  Yes.

3  Q  So, let's say Mrs. Thomas would contact you.  Let's use her as the

4  example.  She'd say, "This trial here is done.  Do you want these exhibits

5  back?"  What would you have done?

6  A  Make arrangements with Mrs. Thomas to pick up the items and then

7  physically come over here and she would usually have me sign some

8  paperwork that it was being returned to us and then I would take it back and

9  place it in the evidence room.

10  Q  Okay.  Would you also document that in some form?

11  A  Yes.  That would also be written down, some notes, to be added to the

12  computer system as we had time.

13  MRS. KOHLRIESER:  Nothing further at

14  this time, your Honor.

15  THE COURT:  Okay.  Very good.  Mr.

16  Rion, questions?

17  MR. RION:  Your Honor, would you mind if

18  we took a break so I could get things situated?  Is that okay with the Court?

19  THE COURT:  It's a good time, I guess, for

20  the afternoon break.  Ladies and gentlemen of the jury, remember the

21  admonitions that I've been giving you all along.  Don't discuss the case or

22  formulate or express any opinions.  Have no contact with the participants.

23  Don't express or formulate any opinions.

688

1    We'll stand in recess for fifteen, or until about a quarter till.

2    (WHEREUPON, COURT WAS IN RECESS.)

3

4         THE COURT:  Reconvening then this 14th

5    of September, 2015 in CR2014 0139, State of Ohio -vs- Markelus Q. Carter.

6    The defendant is present with counsel.  The State is present.  The jurors have

7    returned.

8         We'll continue then.  I believe, Mr. Rion, you have an opportunity to

9    cross examine Mr. Whitney, if you wish.

10        MR. RION:  Yes, your Honor.

11                        CROSS EXAMINATION

12   **BY MR. RION:**

13   Q    Sir, what time did you arrive at the scene?

14   A    At 436 East McKibben?

15   Q    No.  Sorry.  Over at 122 Eureka.

16   A    I arrived approximately twelve-seventeen P.M.

17   Q    And when you arrived other officers were already there;

18   correct?

19   A    Correct.

20   Q    And did you have any perimeter log developed?

21   A    I don't recall whether there was a perimeter log kept on East Eureka

22   Street.

23   Q    Do you have your notes here so you can refresh your recollection?

1   A   No, I do not.

2   Q   To the best of your memory there was not any type of perimeter log to

3   figure out who was entering and exiting; correct?

4   A   We had a patrol officer stationed at --

5   Q   Sir, if you would just answer my question?

6   A   I don't recall whether there was a log kept.

7   Q   Now, you brought up two concepts that you stated are very crucial in

8   this case.  Number one was the idea that -- well, first of all, did anybody else

9   touch any of the evidence, other than you?

10   A   No.

11   Q   So, you were in charge of the evidence and only you touched the

12   evidence in Markelus' house on that day on February 23rd around

13   twelve-seventeen P.M.; correct?

14   A   Detective Clark may have touched some of the items on the kitchen

15   table.

16   Q   Okay.  But, other than on the kitchen table and Detective Clark may

17   have touched them, but other than him nobody else; correct?

18   A   Correct.

19   Q   You collected all the evidence?

20   A   Yes.

21   Q   And nobody else?

22   A   Correct.

23   Q   And you said that one of your rules, since you're the only one that

1   touched the evidence, is that you always wear gloves; correct?

2   A   Yes.

3   Q   And the reason for that is something that's called cross contamination;

4   right?

5   A   Yes.

6   Q   Which means that if I touch, say this is a weapon, if I touch this

7   weapon, put it down, and then come over here and touch this envelope, well,

8   this envelope could contain things that were on that weapon; correct?

9   A   Yes, that's correct.

10   Q   So then if I took this envelope and sent it off to the lab to be tested and

11   it comes back that there is gunshot residue on that envelope that could have

12   been caused by the person who touched this who then handled that and then

13   sent it off at a later time; correct? That's the concern; right?

14   A   Yes, that could happen.

15   Q   And you're telling this jury that you are certain that nobody touched any

16   evidence without gloves on, except for possibly Detective Clark in the kitchen,

17   on that day; correct? That's your testimony?

18   A   Yes.

19   Q   So, there was a -- I'm sorry, which exhibit are we on?

20   THE COURT: I think you're on 'O'. Is that

21   right, Susan?

22   MRS. KOHLRIESER: I think 'N', your

23   Honor, 'N' as in Nancy.

1   COURT REPORTER:  No. It's 'O'.

2   THE COURT:  No. They've identified 'N'.

3   We're on 'O'.

4   MR. RION:  So, we're up to 'O'?

5   MRS. KOHLRIESER:  For my records,

6   what was 'N'?

7   THE COURT:  The diagram of the house

8   and the shed.

9   MRS. KOHLRIESER:  Oh, that's right.

10   Sorry.

11   Q   Now, there was a case to the .357 that was seized; correct?

12   A   Pardon?

13   Q   There was a gun case for the .357 magnum that was seized; correct?

14   A   There was a soft case that was collected.

15   Q   Okay. And you took a picture of that; correct?

16   A   Yes.

17   Q   You took the picture?

18   A   Yes.

19   Q   Whose hand was in that picture?

20   A   I believe that is Detective Clark's hand.

21   Q   I'm showing you what's been marked as Defendant's exhibit 'O'.

22   That's not in the kitchen; correct?

23   A   That particular item, I believe, was in the rear studio room at 122 East

1  Eureka.

2  Q  And I see a hand there.  It's touching the object; correct?

3  A  Yes.

4  Q  And there's no glove on that object, or, on that hand; correct?

5  A  Correct.

6  Q  I see a wedding ring or some type of ring right there; correct?

7  A  Yes.

8  Q  Or a class ring maybe.  That would be against your policy; correct?

9  A  Yes.  I would have to say that the hand should have been gloved.

10  Q  And it would be against your testimony from five minutes ago that

11  every piece of evidence that was seized in that case was only handled with

12  gloves except for some items in the kitchen.  Now, let me hand you -- would

13  you agree with that statement?

14  A  Yes, sir.

15  Q  You testified just ten minutes ago, or five minutes ago, that you,

16  yourself, was the one that collected all of the evidence.  When I say collect

17  the evidence, does that mean that you would put it in the bag and then put

18  your initials on it and seal it so they know it's you?

19  A  Yes.

20  Q  What are your initials again?

21  A  K.W.

22  Q  K.W.?  So, I'll just hand you Defendant's (sic) exhibit '129' as an

23  example.  If you could just look at the initials on the bag, particularly on the

1   seal itself? First of all, what is '129'?

2   A   It's the ammunition box, Winchester.

3   Q   Okay. Do you see a date there on the front of 2-23-09?

4   A   Yes.

5   Q   That's the date of the search?

6   A   Yes.

7   Q   And does it appear as if there's a seal that's been placed on that date

8   on that box on the front there?

9   A   There's an evidence label.

10  Q   Sorry. If you could look at -- I'm looking at right here.  Does it show

11  there who sealed the bag on 2-23-2009?

12  A   There's the initials D.K.M.

13  Q   So, that wouldn't be you; correct?

14  A   No.

15  Q   So, he's the one that sealed that, and not you?

16  A   That's what I gather from that, yes, sir.

17  Q   Do you see your initials on 2-23-09 on there anywhere?

18  A   Yes, I do.

19  Q   Let me see where you are.

20  A   Right there.

21  Q   So, you sealed it?  You wrote this?  Okay.  That's not on the seal.

22  That's just up on the corner?

23  A   Yes, indicating that I collected it.

1   Q  What do you think is inside that bag?

2   A  There's a box, an ammunition box, Winchester.

3   Q  How many rounds are in it?

4   A  There were seven live nine millimeter rounds.

5   Q  Is that what you expect is inside here?

6   A  Yes.

7   Q  If you could open it up?  Now, to go back to -- well, before you open it,

8   let's go off the idea.  The person that put the seal on that on 2-23-09, well,

9   was that you or somebody else?

10  A  I use black and yellow evidence tape.  So, I would say that was

11  Detective Marik.

12  Q  Okay.  So, again, contrary to your testimony a little bit ago, this would

13  show that other people were collecting evidence and putting seals on things

14  other than yourself on 2-23-09 at the Eureka address; correct?

15  A  No.

16  Q  Why do you say that?

17  A  Because I collected it.  Detective Marik apparently put the seal on it

18  and the evidence sticker.

19  Q  So then why on the box itself would it have Detective Marik's initials

20  and the date?  Do you know?

21  A  Good question, other than he wanted to initial it prior to putting a final

22  seal on that item.

23  Q  You told this jury five minutes ago that there were seven rounds in that

968

1    box.  If you could open up the box, please?  How many rounds are in the
2    box?
3    A    There are now five rounds in this box.
4    Q    Now, common sense would say that whoever found this box would be
5    the one that would put their initials on it.  Should I not be using common
6    sense?  Like, if you collected those, there should be your initials on there;
7    wouldn't that make sense?
8    A    Yes.
9    Q    Another thought that you had on direct examination was the idea that
10   you take pictures from things far away and then develop closer pictures;
11   correct?
12   A    Yes, sir.
13   Q    And the reason for that is -- well, is that what?
14   A    Well, just so you can orient the object with the other items in the room.
15   Q    I'll hand you what's been marked as Defendant's exhibit 'P'.  Would
16   that be -- what is Defendant's exhibit 'P'?
17   A    It's the shelf unit in the front living room at 122 East Eureka.
18   Q    And does that fairly and accurately represent the property as you saw
19   it on that day?
20   A    Yes, minus the ammunition box which had already been collected.
21   Q    Excuse me?
22   A    It's minus the ammunition box that had already been collected.
23   Q    Collected by who?

```
 1    A    By myself.

 2    Q    By yourself?  Even though someone else initialed it.  Now, did you take

 3         a picture of Defense exhibit 'P' from a distance?  Do you have any full view of

 4         the room, a picture, a full view picture of this shelf with that evidence box, or,

 5         with that ammunition box in it?

 6    A    A full view?

 7    Q    Yes.

 8    A    No.

 9    Q    You took a picture of the room after you removed evidence from it?

10    A    Yes.

11    Q    Well, what I see here in Defense exhibit 'Q' is that same area; correct?

12    A    Yes, sir.

13    Q    And now there's a box of shells in that picture; correct?

14    A    Yes, sir.

15    Q    And though you said before that you take pictures from a distance and

16         then move above close, you're telling this jury in this instance you went close and

17         then to a distance?  Is that your testimony?

18    A    My testimony is that I took two pictures - one from standing back and

19         one from close range.

20    Q    And you're saying -- well, I thought you testified on direct examination

21         that you start with pictures standing back and then you take it from close

22         range.  Did I mishear that that's your procedure?

23    A    Yes, it is.  That's standard procedure.
```

868

1    Q   That's standard procedure?  Defendant's exhibit 'R'.  Now, where was

2 the claim that the camouflage t-shirt and long sleeved shirt, well, were found

3 where?

4    A   The two camouflage t-shirts and a pair of camouflage sweatpants were

5 recovered from the futon in the second floor north bedroom at 122 East

6 Eureka.

7    Q   From the futon itself?

8    A   Yes.

9    Q   That's where you found them personally?

10    A   Yes, I did.

11    Q   You did?  I'll hand you what's been marked as Defense exhibit 'R'.  Is

12 this the futon?

13    A   Yes, sir.

14    Q   Do you see any camouflage on the futon?

15    A   No, sir.

16    Q   I'll move it over here.  Do you see any camouflage over there?

17    A   No, sir.

18    Q   Was this the faraway view of the futon?

19    A   Mid-range.

20    Q   Mid-range?  Was there a far away view?

21    A   I believe.

22    Q   I'll be happy to show you all of your pictures and you can look through

23 them.

```
 1    A    It depends on how far.

 2    Q    Is there a picture that is further away than this mid view range of the

 3         futon?

 4    A    I believe the one you just showed prior to that.

 5    Q    This is the same picture.  Sorry.  I just moved it over.

 6    A    Oh.  Well, now I can see more.

 7    Q    Let me do it this way.  Defendant's exhibit 'R', is that the far away

 8         picture of the futon when you were doing your evidence collection on that day,

 9         February 23rd, 2009?

10    A    Yes, it is.

11    Q    Is there one that's further away than that, if you recall?

12    A    No, sir.

13    Q    All right.  Now, using your principle of going far and then to close, in

14         the far view do you see any pictures of a camouflage shirt?

15    A    No, sir.

16    Q    When I get to the close view, Defendant's exhibit 'S', do you see here,

17         well, you can see the corner of the futon is right there?

18    A    Yes, sir.

19    Q    This wasn't the place where that shirt was found; was it?  Somebody

20         spread it out; haven't they?

21    A    That's how I found it.

22    Q    That's how you found it?  Does that mean that somebody -- okay.  You

23         didn't find -- when you entered the room you didn't see that?
```

1    A    No.

2    Q    So, that's an altered view.  You said this is how you found it when you

3    entered that room.  Just like that?  Spread out just like that?

4    A    Yes.

5    Q    Okay.  What about the pants?  Were the pants in the same location

6    they were found when you took a picture of it?

7    A    Yes.

8    Q    They were?  All right.  So, if I have a close-up view of the pants, okay,

9    on the futon that would be as you found them on that day; is that

10    correct?

11    A    Yes.

12    Q    All right.  Going to Defendant's exhibit 'I'.  Now, I see that you can still

13    see the futon here, the corner.

14    THE COURT:  Defense exhibit 'C'?

15    MR. RION:  'I'.

16    THE COURT:  'I'?  Okay.

17    Q    Now I'm showing that there is a camouflage sitting right there.  You're

18    saying that's how you found it?

19    A    Yes.

20    Q    We're now looking at Defendant's exhibit 'S' and Defendant's exhibit

21    'I'.  There's no way you found these two things in this condition; would you

22    agree?  I mean, they're potentially on the same place in the photos.

23    A    I would agree with you.

1  Q  Which means -- well, you can see that there's a book, or, you can see

2  a piece of wood and like a book or something there and then in Defendant's

3  exhibit 'I' the same book, the same thing, but a different piece of clothing.

4  That's inconsistent, isn't it?  Do you know why your pictures aren't accurate?

5  A  Other than the one item may have been moved a little bit.

6  Q  By who?

7  A  By myself for the picture.

8  Q  Oh, I see.  That's your explanation?

9  A  Yes, sir.

10  Q  Are you telling the jury that one item was moved by yourself?  Is that

11  what you're telling the jury?  Or, you don't have an explanation?  Is that your

12  explanation?

13  A  It would appear that it was moved a little bit.

14  Q  I'm not asking you to guess, sir.  I'm asking you if you have an

15  explanation.

16  A  Yes, it was.  It would have been moved.

17  Q  Just slightly?  That's your testimony?

18  A  Yes.

19  Q  So, that's your testimony that it was just moved slightly, but both items,

20  you're telling this jury, that both these items were on the futon and just moved

21  slightly for purposes of you documenting pictures?  That is your sworn

22  testimony?  Not that you can't explain it, but you're telling them that that's

23  your sworn testimony; correct, because I'm about to show you another image.

1    A    Yes, that's my testimony.

2    Q    Going back to the long view, Defendant's exhibit 'R', that's the futon;

3    correct?

4    A    Yes.

5    Q    Without any camouflage clothing on the bed in the long view; correct?

6    A    Yes, sir.

7    Q    What is this item right here?

8    A    It appears to be an item of clothing.

9    Q    Pardon me?

10    A    It appears to be an item of clothing.

11    Q    Does it appear to be an item of camouflage clothing? Can you tell?

12    A    Yes, it does appear to be an item of camouflage clothing.

13    Q    But, that's not the item that we're looking at because you've already

14    sworn under oath that it wasn't like that; correct?

15    A    Correct.

16    Q    Now, going back to Defendant's exhibit 'R', if that's the case you're

17    saying you have no idea who would have moved that to there or that even to

18    here because that wasn't there when you took this picture; correct? When

19    you took the long view of the room, before anybody removed anything, there

20    was no camouflage clothing on the floor because you're saying it was up on

21    the bed. That's your testimony; correct?

22    A    Yes, sir.

23    Q    All right. Now, what is this here, this box?

1    A    That's a wooden chest.

2    Q    What was inside that wooden chest?

3    A    That's the chest that had the nine millimeter pistol.

4    Q    The nine millimeter pistol; right?

5    A    Yes, sir.

6    Q    And was that there originally?

7    A    No.

8    Q    It was in the closet; right?

9    A    Yes, sir.

10   Q    And who moved it from the closet to the bed?

11   A    Detective Leland moved it.

12   Q    Detective Leland? Why is it that Detective Leland would move a nine

13       millimeter box, and this could be filled with gunshot residue and everything

14       else, from a closet on to the bed and right next to the camouflage stuff?

15       Looking at this here, that's the same box that had the nine millimeter pistol in

16       it; right?

17   A    Yes, sir.

18   Q    Do you know whether or not that nine millimeter was not involved in

19       this case or not?

20   A    I do not believe that it was.

21   Q    So, just so the jury is clear, there was a pistol in there, but you believe

22       it was not involved in this case, but, nonetheless, it's placed in this close

23       proximity to this box by Detective Leland now; right?

1    A    Yes, sir.

2    Q    So, now Detective Leland is also touching stuff there at the scene and

3    not just you?  Is that your testimony now?

4    A    He moved the box.

5    Q    That's your testimony?  Somebody else is moving your evidence, other

6    than you with your gloves on?  Same thing - would you agree with me that it

7    would not make a lot of sense to take the box that has a pistol in it and could

8    have gunshot residue all over it and put it right next to a piece of camouflage

9    clothing that you might send off to get tested?  That would not be the way you

10    would do it; correct?  Correct?

11    A    As long as the two items didn't intermingle.

12    Q    Why else would you put a box, Defendant's exhibit 'U', -- well,

13    Defendant's exhibit 'U', that's where the box was found up in the closet; right?

14    A    Yes, sir.

15    Q    And somebody took it down from there -- Detective Leland, you said?

16    A    Yes, sir.

17    Q    Now, is that -- that's not in your report; is it?

18    A    No, sir, it's not.

19    Q    Nor is it consistent with what you testified to earlier when you said you

20    were the only one who handled evidence; correct?

21    A    The evidence itself -- not necessarily what --

22    Q    So, Detective Leland, now you're saying, took this box and put it on the

23    bed; right?

```
 1    A     Yes.

 2    Q     Now, you're saying that it wasn't Detective Leland who then moved it,

 3          opened the box and took the gun out?  Is that your testimony?

 4    A     I removed the weapon.

 5    Q     You did.  Were you the first -- you got there after -- 'V' is a picture of

 6          the .357 that was found.  It's the .357?  Do you see that?  That's what that is;

 7          right?

 8    A     Yes, sir.

 9    Q     It was put on a table?  Where is this table?  I mean, it wasn't found

10          there; right?  Someone moved it somewhere and then took another picture of

11          it?

12    A     I don't recall where that picture was taken.

13    Q     You would agree with me that's not where it was found; right?

14    A     No, that's not where it was found.

15    Q     So, somebody moved the weapon and put it on a table and took a

16          picture of it.  I'll show you 'W', Defendant's exhibit 'W'.  I just have a black and

17          white of this one for some reason.

18          (WHEREUPON, counsel for defendant and counsel for State of Ohio have a

19          brief discussion off the record.)

20          (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

21          the record, as follows.)

22          MR. MILLER:  We're going to object to

23          that.
```

1    MRS. KOHLRIESER:  Ken didn't take that

2    picture.

3    MR. MILLER:  Kenny didn't take that

4    picture.

5    MR. RION:  Okay.

6    (WHEREUPON, Court continued on the record, as follows.)

7    Q    Do you even know whether or not this picture was taken at the scene?

8    A    Yes, I do now recall where it was taken.

9    Q    Where was it taken?

10   A    It's actually on the floor of the studio room.

11   Q    So, you took the gun off the counter where it was where you took a

12   picture of it, right?

13   A    Yes, sir.

14   Q    And then you say you put it on the floor and took another picture of it?

15   A    That's what it looks like, sir.

16   Q    You said that you recalled, or are you guessing?

17   A    That's what I recall.

18   Q    Do you have a wooden table back at your lab or at your I.D. place,

19   right?

20   A    A wooden table?

21   Q    Yes. I'll show you Defendant's exhibit 'W'.

22   MRS. KOHLRIESER:  Your Honor, before

23   he publishes those I would appreciate it if he would show the witness,

1     whether the witness can even identify the pictures.

2     Q    Defendant's exhibit 'W'. Do you recognize that table?

3     A    Yes. It looks like a table in one of the interview rooms in the Detective

4     Bureau.

5     Q    Okay. And Defendant's exhibit 'W', does this look like a picture of the

6     camouflage pants that you seized?

7     A    Yes, sir.

8     MRS. KOHLRIESER:  Your Honor, I'm

9     going to object to the form of the question because he's asking do you, or,

10    does it look like it. He hasn't asked him 'do you know if it is' or if he knows

11    when that photo was taken or anything like that.

12    MR. RION:  All right. I'll ask that.

13    THE COURT:  All right. Okay. Let him --

14    MR. RION:  I'll ask him directly.

15    Q    Is that the pair of pants -- is that the pair of pants contained in State's

16    exhibit -- is that the pair of pants that we've been talking about in this case

17    that were seized from the bedroom?

18    A    It appears to be them; yes.

19    Q    And you weren't involved in taking this picture; correct?

20    A    No.

21    Q    So, you don't know what procedures were used as far as this wood

22    and what had been on that piece of wood right before this picture was taken

23    and so forth; correct?

1   A   No, I'm not aware.

2   Q   That's another possibility for cross contamination when you take a

3       piece of evidence and put it on a table and then take another piece of

4       evidence and put that on the table; correct?

5   A   It could be; yes.

6   Q   Now, in the basement -- you took pictures of the basement; right?

7   A   Yes, sir.

8   Q   Same question - well, are we up to 'X' now?

9       THE COURT:  Correct.

10      MRS. KOHLRIESER:  Can I see that?

11  Q   Is that the far away picture of the basement?

12  A   Yes, sir.

13  Q   Is that the way you would have seen it before you opened things up

14      and searched things?

15  A   Yes.

16  Q   Again, do you see any camouflage apparel in that picture?

17  A   No, sir.

18  Q   Then, getting a little closer, there's a red thing here and I think there's

19      a computer thing there.  But, in looking at Defendant's exhibit 'Y', well, that's

20      the red thing; right?

21  A   Yes, sir.

22  Q   And now I see a piece of camouflage of something that was found in

23      the basement; right?

1    A    Yes, sir.

2    Q    Why is it not in Defendant's exhibit 'X'? Do you know?

3    A    Because that picture was taken after it was collected.

4    Q    After it was collected? So, you went, again, instead of going far away

5    to close up or you're saying you went from close up to far away? Is that your

6    testimony?

7    A    Yes, sir.

8    Q    State's exhibit '131'. State's exhibit '131', I believe is a camouflage

9    t-shirt. Where does it show -- is it showing any markings on there from 2009?

10    A    There's an evidence label.

11    Q    I'm sorry. I'm talking about the seals on the evidence -- the evidence

12    seals that have been reopened and all of that stuff. Let me ask it to you

13    another way - do you see anything with your initials on it from 2009?

14    A    I might have to cut it a little further.

15    Q    Please.

16    A    Well, where I would expect to find it, I don't. Oh, here we go. I wrote

17    'SS', short-sleeved.

18    Q    Sir, that's not what my question was to you. I'm looking for your initials

19    in 2009.

20    A    Okay. Let me continue.

21    Q    Please do.

22    A    No, I don't see anything other than the 'SS' that I wrote.

23    THE COURT:  Make sure that loose tape

016

1     stays with it. You can put it inside it.

2           MR. RION: I'm going to put this loose tape

3 in here. The jury will have it so they can look at it.

4     Q   You're telling me that this bag contains this shirt, this camouflage

5 short-sleeved t-shirt?

6     A   Yes, sir.

7     Q   The one that we talked about that relates to the futon. There's no

8 evidence on this bag as to who seized it, took it, and who sealed it; do you

9 agree?

10    A   No, I don't agree with that.

11    Q   I'll ask it again. The protocol for sealing a bag so that it can be

12 preserved for evidentiary value is that you would seal it and put the date and

13 your initials on it; correct?

14    A   Yes, sir, that's standard procedure.

15    Q   And that is the procedure; right? There's not another procedure.

16 That's the procedure; right?

17    A   You would put an evidence label on it also.

18    Q   Okay. And you testified during direct examination that if anybody in

19 the world wanted to look at that piece of evidence it would be unsealed,

20 looked at, resealed, reinitialed, and redated. That's the procedure; correct?

21    A   Yes, sir.

22    Q   In this case there is no seal that bears initials and/or a date; correct?

23    A   My evidence label is on it.

116

1   Q   Does it have a date?

2   A   Yes, sir.

3   Q   You're talking about this label here?

4   A   Yes, with my name and the date of 2-23-09.

5   Q   It's not over a seal, though; correct?  Correct?

6   A   No.  I agree.  It's not over the seal.

7   Q   Now, when you took evidence on this date you didn't -- well, let's go

8   back to the, back to the shell casings here.  Let's see.  Well, you had a log, or

9   a written report that you submitted that dealt with the property that was seized

10  from the scene; correct?

11  A   Yes, sir.

12  Q   And it wasn't written on the day that this happened; was it?

13  A   No, sir.

14  Q   In fact, you didn't even write your evidence report for two days after the

15  search was completed; correct?

16  A   Yes, that's correct.

17  Q   How many officers were there that day?

18  A   Myself, Detective Leland, Detective Miller, Detective Clark, and Officer

19  Eichert.

20  Q   Is that just from memory?

21  A   Yes, sir, that's what I recall.

22  Q   It's not written down anywhere?

23  A   It should be in my report.

1   Q   It should be; right?

2   A   Yes, sir.

3   Q   And that report was something that you wrote down two days later,

4   correct?

5   A   Yes, sir.

6   Q   Godfrey, Clark, Miller, Kleman, Eichert, --

7           MRS. KOHLRIESER:  Your Honor, is he

8   asking a question or is he attempting to refresh the witness's recollection?

9           THE COURT:  I hope he's asking a

10  question.

11  Q   Those people were present; correct?

12  A   Yes, sir.

13  Q   Were there any other officers there?

14  A   At one point Lieutenant Baker showed up at the scene.

15  Q   I'll show you your report.  Lieutenant Baker is not mentioned; correct?

16  A   No, he's not mentioned.

17  Q   And you say that there's a back-up paper, chain of custody log,

18  somewhere?

19  A   There would be notes, handwritten notes, showing chains.

20  Q   Do those notes still exist?

21  A   Yes, sir.

22  Q   They do?  Okay.  Thank you.

23          THE COURT:  Any redirect?

1    MRS. KOHLRIESER:   Yes, your Honor.

2    REDIRECT EXAMINATION

3    BY MRS. KOHLRIESER:

4    Q    I'm handing you what's been marked State's exhibit '10'.   I'd ask you to

5    take a look at that and tell me if you recognize it.

6    A    It's a Lima Police Department crime scene entry report.

7    Q    Crime scene entry report; correct?

8    A    Yes.

9    Q    Do you recognize that type of document?

10   A    Yes.

11   Q    And when are those types of documents used for the Lima Police

12   Department?   When were they used back in 2009, I should say?

13   A    At your major crime scenes.

14   Q    At an actual crime scene; correct?

15   A    Yes.

16   Q    Did you participate in a number of searches of various houses, cars,

17   things of that nature throughout your career?

18   A    Yes.

19   Q    Were crime scene logs used for search warrants at, say, a drug house

20   or something of that nature; to your knowledge?

21   A    No, I don't believe they were.

22   Q    So, perimeter logs, as I believe Mr. Rion refers to them, are for crime

23   scenes; correct?

1   A   Yes, ma'am.

2   Q   Did you have any evidence that 122 East Eureka was the scene of a

3   crime?

4   A   No.

5   Q   Were you looking for evidence of a crime?

6   A   Yes.

7   Q   In fact, when you first went out there were you looking --

8     MR. RION:  Objection.  Leading.

9     MRS. KOHLRIESER:  I haven't even

10   asked my question, your Honor.

11     THE COURT:  Okay.  Go ahead and ask.

12  Q   When you went out there at first, that first search warrant, do you know

13  whether that was for a Weapons Under Disability case and looking for

14  firearms and ammunition?

15  A   I don't recall.

16  Q   But, there were multiple search warrants executed at that house that

17  day; correct?

18  A   Yes.

19  Q   Now, multiple photographs were taken at the Eureka Street home;

20  correct?

21  A   Yes.

22  Q   Let me just ask you this - when you're taking photos at, say, a crime

23  scene that's being investigated versus during the search of a house do you

1  follow exactly the same protocol in taking pictures at both the long shot, and

2  close, close, close, and that type of thing?

3  A  I try to.

4  Q  But, do you always do it?

5  A  No.

6  Q  Defendant's exhibit 'W' that you were shown, did you take that

7  photograph?

8  A  No, I did not.

9  Q  Do you know when that photograph was even taken?

10  A  No.

11  Q  Do you know whether Prosecutor Miller took that photograph?

12  A  He may have.

13  Q  Do you know even when this photograph was taken? 2009 versus

14  2014?

15  A  No, I don't know.

16  Q  You were also shown Defendant's exhibit 'T'. I think we went through

17  that quite extensively. Let's take a look at this box in Defense exhibit 'T'. Is

18  the nine millimeter Glock you found in that box still there?

19  A  No.

20  Q  So, this photo was taken before of after that gun was secured by you?

21  A  It was taken after.

22  Q  Thank you. State's exhibit '106' and '107'. You said you attempt to

23  take the shots ahead of time, but you don't always do it. The photo on the

1　right, well, excuse me, as you're looking at it the photo to the left, this one

2　right here where my hand is, State's exhibit '106', is that how you found that

3　box of ammunition at 122 East Eureka?

4　A　Yes.

5　Q　So, was this photo the full shot?

6　A　Yes.

7　Q　Before or after?

8　A　Taken after.

9　Q　And did you take numerous photos at 122 East Eureka?

10　A　Yes.

11　Q　I believe you were shown this also by the defense, but I'll use State's

12　exhibit '117-A'. What are we looking at in that photo?

13　A　Camouflage clothing.

14　Q　Okay. Was that photo taken after State's exhibit '101'? In other

15　words, did you find '101' like this? This is '101' up here.

16　A　Yes, I found '101' like that.

17　Q　Okay. And, in fact, I'm just going to show you them up close here.

18　Take a look at State's exhibit '101', particularly at the bottom there. Can you

19　see a different type of camouflage at the very, very bottom there?

20　A　Yes.

21　Q　Now, I realize that it's somewhat blurry here, but if you look at the

22　actual picture itself, at the very, very bottom here where my fingernail is

23　there's actually a different type of camouflage there?

1   A   Yes, there is.

2   Q   Would that be the same type as depicted in '117-A'?

3   A   Yes, it does appear.

4   Q   Were those pants found in '117-A', were those underneath the

5       camouflage t-shirt that you showed us in '101'?

6   A   Yes.

7   Q   All right. So, the t-shirt was removed and then you took a picture of the

8       pants?

9   A   Yes, that's correct.

10  Q   I believe you said, or, you were asked a number of questions, I should

11      say, about Detective Clark holding that gun case open.  Do you know what

12      the purpose of that picture was, why he was holding that gun case open like

13      that?

14  A   Just to show that it was empty.

15  Q   So, there was nothing inside of it; correct?

16  A   Yes.

17  Q   So, when Mr. Rion saw State's exhibit, or, excuse me, Defendant's

18      exhibit 'O', the gun case for the .357, do you know whether in fact that was

19      the gun case for the .357?

20  A   I don't know that for sure.

21  Q   Okay. Would you expect in a gun case, in your experience,

22      knowledge, and things of that nature, to find G.S.R., gunshot residue?

23  A   Yes, I think that's a logical conclusion.

816

1   Q. So, would that be helpful in a murder investigation to test that gun case

2   for gunshot residue? Would that tell you anything other than it's a gun case

3   that has a gun?

4   A. No, it wouldn't tell us anything.

5   Q. And you were asked a number of questions - you can turn the lights

6   back on, Sue - you were asked a number of questions about sealing it and

7   your initials and things like that on these various items. You mentioned, and

8   let's just take State's exhibit '131', which I believe is what Mr. Rion was asking

9   you about. Am I correct? Was that the one? Did he ask you about '130' or

10  '131', that shirt? Do you remember? Yea, it's '131'. Okay. Is there a

11  difference between collecting evidence and sealing the evidence?

12  A. Yes.

13  Q. Okay. So, when you say that you collected '130' and '131', which are

14  the camouflage shirts, what do you mean by collecting it? Explain that to the

15  jury.

16  A. Putting the pair of gloves on, like I said before, and putting it in a clean

17  paper bag and then folding the top of the bag over.

18  Q. So, when we see these folds here, these lines on State's exhibit '131',

19  for instance, is that what you're talking about - folding the bag over?

20  A. Yes.

21  Q. Okay. So, these folds here would have been what you did?

22  A. Yes.

23  Q. Okay. Now, do you put tape and things of that nature on them while

1 you're out there collecting evidence?

2 A No.

3 Q Why not?

4 A Well, when I get back to the station I have to re-examine the item to

5 record like the brand and the size and what the item looks like on the log

6 sheet.

7 Q Okay.  So, the log sheets.  Is that what you were referring to when I

8 believe Mr. Rion asked you about doing it on February 25th of 2009?

9 A Yes.

10 Q Okay.  So, it's at that point, I guess, and any time you collect it, you

11 open the bag and get the item back out and document the name brand of the

12 clothing or what have you?

13 A Yes, ma'am.

14 Q Okay.  Do you wear gloves when you're doing that?

15 A Yes.

16 Q Is that what, well, I guess I was asking you earlier, is that the type of

17 thing that Detective Marlik or Detective Clark might have assisted you with in

18 labeling these things?

19 A I would have wrote down, you know, the description of the items on my

20 log.  But, they may have assisted me far as filling out any evidence stickers or

21 sealing an item.

22 Q Or sealing the item?

23 A Yes.

1  Q Okay. So, just because your initials aren't on the tape doesn't mean

2  you didn't collect the item; correct?

3  A Correct.

4  Q It just means that you didn't tape it closed?

5  A Right.

6  Q And the evidence stickers that were put on, this red and white sticker,

7  is that done at the same time the sealing is being done on the items?

8  A Yes.

9  Q You were asked about Defendant's exhibit 'U'.

10  THE COURT: No. That's 'V'.

11  MRS. KOHLRIESER: It's 'V'? It is 'V'?

12  THE COURT: That's 'V' on my log.

13  MRS. KOHLRIESER: I didn't write these

14  letters, your Honor.

15  THE COURT: Well, let's make sure it

16  looks like a 'V'.

17  Q Why would you -- what's the purpose in taking the gun from wherever

18  you found it, the gun that's depicted here, and taking that picture on what you

19  now believe was the floor and taking it where it was actually found? What

20  would be the purpose of this shot?

21  A To record the make and model and caliber and to show that the gun is

22  loaded.

23  Q Okay. So, let me ask you - when you find something, well, let's say

1   your crime scene is right here and you find these scissors under a box like

2   that, would you photograph those scissors just as they are found?

3   A   No.

4   Q   You wouldn't photograph them in the state that they were found in?

5   A   Well, yea.

6   Q   Okay.  So, again, let's say someone's been stabbed to death and we

7   think maybe they're stabbed to death from scissors.  If you found scissors in

8   this room like this, and this was your suspected area, would you photograph

9   the scissors in the state they're found under that box?

10  A   Right.  Yes.

11  Q   Would you pull them then, and not in all cases, but in some, perhaps pull them

12  out, like you did with the gun, and take a separate picture of them?

13  A   Yes.

14  Q   And you said this picture is showing the make and model of the gun,

15  as well as the fact that it's loaded?

16  A   Yes.

17  Q   Could you see all of that given the placement of it originally on that

18  desk there?

19  A   No, because of the angle.

20  Q   But, you don't do this in every case, correct, I mean pull it out and

21  photograph it somewhere else?

22  A   No, not in every case.

23  Q   Now, when you're at a search, or even a crime scene for that matter,

1     are there other officers who are actually helping you look for stuff?

2   A   Yes.

3   Q   Okay. So, let's say I'm your other officer helping you look. You're

4     doing the back of the room and I'm doing the front of the room. I find these

5     scissors like this. What are those officers, such as Detective Clark and

6     Detective Miller, what are they supposed to do when they find evidence like

7     that?

8   A   They're supposed to let me know so I can take a picture of it.

9   Q   Okay. Do they go pick it up and say, 'hey, Kenny, look what I found'?

10   A   No.

11   Q   Okay. They come and get you? They may find it, but they come and

12     get you to tell you about it; correct?

13   A   Yes.

14   Q   And then you're the one that collects it?

15   A   Yes.

16   Q   And then within a day or two does someone actually seal the bag that

17     you would put those in?

18   A   Yes, after recording the pertinent information.

19   Q   Okay. When you say pertinent do you mean like the name brand and

20     that type of stuff is what you're talking about?

21   A   Yes.

22   Q   So, when you talked about Detective Leland actually physically getting

23     that box out of the closet and bringing it down for pictures, would Detective

1   Leland have touched that gun itself once he opened that box and saw a gun

2   inside of it?

3   A    No, he did not.

4   Q    Okay. What did he do?

5   A    He had me come to take a photo.

6   Q    Okay. Then who removed that gun?

7   A    I did.

8   Q    Okay. The gun found on the desk, who moved that gun?

9   A    I moved it.

10   Q    Okay. Who put those guns in the bags?

11   A    I did.

12   Q    Okay. The camouflage clothing that you found, be it in the basement

13   or on the futon, who collected those items?

14   A    I did myself.

15   Q    Who put them in the bags?

16   A    I did.

17   Q    To your knowledge, did anybody else touch those items?

18   A    No.

19   Q    You were asked about, and I don't have the number in front of me, but

20   State's exhibit '129,' correct?

21   A    Yes.

22   Q    Let's talk about that outer bag for just a second. Can you tell me the

23   initials and date of what's written in red on that on that outer bag?

1   A   K.K., 8-4 of '15.

2   Q   And the black marks down there at the bottom?  Can you make out

3   those initials or a date?

4   A   It looks like M.N., 072675.  Then a date of 9-13 of '15.

5   Q   9-13?  Excuse me.  9 what?

6   A   9-13 of '15.

7   Q   Let me see.  Okay.  It's kind of messy handwriting; correct?

8   A   Yes.

9   Q   Okay.  We'll let that go.  Okay.  But, there's some other initials at the

10  bottom of that plastic; correct?

11  A   Yes.

12  Q   Any other initials or dates on that piece of plastic?

13  A   No.

14  Q   Okay.  The next piece of plastic that was in there, can you tell me what

15  the red is?

16  A   K.K., 8-4 of '15.

17  Q   Okay.  There appears to be some black down here at the bottom right

18  around the K.K.  Can you tell me the date or initials on that, or is it too

19  messy?

20  A   There's some initials, but I can't make them out.  The date is 4-3 of '15.

21  Q   Okay.  Can you see anything up there at the top?  If you can't read it,

22  just say so.

23  A   No, I can't make it out.

1   Q   Okay.  Can you make out a date or anything, or no?

2   A   No, I can't.

3   Q   Okay.  Is there some pinkish color down there by your left hand?

4   A   There's a date of 2-26 of '14.

5   Q   Okay.  Now, on the actual brown bag itself, take a look at that, please.

6       Are there multiple initials and multiple dates on that brown bag?

7   A   Yes.

8   Q   Do you know in looking at any of this whether it's been sent to B.C.I.?

9   A   Yes, it has been.

10  Q   What is B.C.I., for the record?

11  A   It's the Ohio Bureau of Criminal Investigation.

12  Q   And if these people go 'I still don't know what that means', well, what

13      do they do?

14  A   They test objects.  They do various tests on items for police

15      departments.

16  Q   Okay.  Are there a number of indicators that this went to B.C.I.?

17  A   Yes.

18  Q   So, some testing may have been done with State's exhibit '129'?

19  A   Yes.

20  Q   And do you know whether B.C.I., back in 2009, was test firing weapons

21      to make sure they were operable?

22  A   I don't know at that time.

23  Q   All right.  Do you know whether they would have used various pieces

1   of ammo, sent to them by an agency for various testing?

2   A   Yes, if we sent casings or ammo, to be tested.

3   Q   Okay.  So, the fact that there are five rounds in that box, does that tell

4   you automatically that the seven that was written on there is a mistake, or

5   could two of those have been used for something else?

6   MR. RION:  Objection to the question.

7   THE COURT:  It's very leading.  Can you

8   rephrase it?

9   Q   Okay.  Do you know whether that seven is, in fact, a mistake?

10   A   No, it's not a mistake.

11   Q   Why do you say that?

12   A   Because I personally counted the rounds when I collected it.

13   Q   But, once that's sent off to B.C.I., and other than you simply getting it

14   back and things of that nature, do you go back and count those again?

15   A   No.

16   Q   So, whatever happened to it during testing is not in your bailiwick; so to

17   speak?

18   A   Correct.

19   Q   What gets sent for testing and things of that nature, is that your

20   decision or the detectives?

21   A   The detectives decision.

22   MRS. KOHLRIESER:  Let's mark this.

23   THE COURT:  Wait.  Is that '168'?

1        MRS. KOHLRIESER:  No.  This will be

2        '171' actually.

3        THE COURT:  Okay, '171'?

4        MRS. KOHLRIESER:  '171'; yes.

5    Q.  I'll hand you what has previously been marked as State's exhibit '171'.

6        I'd ask you to take a look at that a minute.

7        (WHEREUPON, witness reviewed document.)

8    Q.  The numbers written on State's exhibit '171', and I'll hand you the bag

9        for State's exhibit '129', do those numbers, the B.C.I. number correspond to

10       the B.C.I. number on '129'?

11   A.  Yes, it does.

12   Q.  Okay.  Does the agency case number, being the Lima Police

13       Department's case number, match the investigation into Ken Warrington's

14       death - the C.F.S. number?

15   A.  Yes, it does.

16   Q.  Who authored that report?  Would you look at it, please?

17       MR. RION:  I'm going to object.

18       THE COURT:  Well, he can see who

19       authored it.  Overruled.

20       MR. RION:  He can see who's name is

21       written there as far as who authored it, but --

22       THE COURT:  Yea.  Yea, whose name

23       appears.

1   Q   Who does it purport to have been authored by?

2   A   Todd Wharton.

3   Q   Okay. And what does it purport to have tested?

4   MR. RION: Objection.

5   THE COURT: Okay, I'll sustain that one.

6   I sustained the objection.

7   Q   Do you know, Officer Whitney, who Todd Wharton is?

8   A   He is a firearms examiner for B.C.I.

9   Q   Okay. And, again, do you know why there would be five cartridges

10   versus seven cartridges in that ammo box?

11   MR. RION: Objection, your Honor.

12   THE COURT: Overruled.

13   A   They would have been used --

14   MR. RION: Your Honor, first of all, it calls

15   for speculation. Second, he's trying to read --

16   THE COURT: If he knew --

17   MR. RION: He doesn't know. He's

18   reading something that the prosecutor just handed him.

19   THE COURT: If he doesn't know, he

20   should say that he doesn't know. Don't read the report. Do you know?

21   A   I would say they were used --

22   MR. RION: Objection. It calls for

23   speculation. If he knows, he knows. If he doesn't, he doesn't. He has to

1      have personal knowledge.

2      THE COURT:  Well, I'm going to overrule

3      the objection.  You can cross him on it.

4  Q   Go ahead.

5  A   They would have been used for test-firing purposes.

6  Q   Thank you.

7      MRS. KOHLRIESER:  No further

8      questions.

9      THE COURT:  Any recross?

10      RECROSS EXAMINATION

11  BY MR RION:

12  Q   Sir, are you stating that none of this evidence was sealed until

13      February 25th?

14  A   The evidence on the table?

15  Q   The evidence that was taken from the Eureka address.  Are you

16      testifying it wasn't sealed until the 25th?

17  A   Yes, my evidence was sealed on the 25th.

18  Q   And I can go through every piece of evidence and you'll see no date on

19      it showing that it was sealed on the 25th or the 23rd; correct?

20  A   It would have been sealed when the label was put on it.

21  Q   Yea, I'm going to ask you.  Is there any documentation on any of these

22      pieces of evidence that show that they were sealed on the 25th of February?

23      Yes or no.

1   A    I guess I would have to say no.

2   Q    And do you have any -- I mean, that was six years ago; correct?

3   A    Yes, sir.

4   Q    Now, as it relates to the ammunition in this case, do you know from

5   personal experience what happened to it, where it went?

6   A    The Winchester box?

7   Q    Yes.

8   A    It went to the --

9   Q    Do you know that from your own personal experience?

10   A    Yes.

11   Q    Okay. Did you check it out?

12   A    I did not.

13   Q    So, you don't, from your own personal knowledge, sitting there, took

14   the box, and hand it to somebody; correct?

15   A    I guess I don't understand your question.

16   Q    You, yourself, did not -- did you, yourself, hand the box of ammunition

17   to somebody?

18   A    At the crime scene?

19   Q    No. Before it was sent to B.C.I. As it was being sent to B.C.I. did you

20   hand it to somebody?

21   A    No, I did not.

22   Q    Did you receive it back from somebody?

23   A    No, I did not.

1   Q  So, you don't have personal knowledge of it going out or coming back?

2   A  I do have personal knowledge.

3   Q  Did you see it? That's what I mean by personal knowledge. Did you

4  see it, hear it, feel it, touch it?

5   A  No.

6   Q  Now, Defendant's exhibit 'M'. Is Defendant's exhibit 'M' the property

7  log as it relates to this case?

8         MRS. KOHLRIESER: Your Honor, I'm

9  going to object to the scope of redirect.

10      THE COURT: I'm going to overrule it.

11   A  Well, this is some type of computer generated form.

12   Q  Is that the property log as it exists today? Or, do you even know?

13   A  The computer program property log; yes.

14   Q  Okay. Is that what was delivered upon request? Is that the

15  documentation -- is that the property log from the Allen County Lima Police

16  Department?

17   A  Yes, it appears to be.

18   Q  Does it appear to be the property log, the official property log, in this

19  case?

20   A  Yes, it appears to be the official log.

21   Q  Thank you. You testified as to State's exhibit '131' and '130'. You

22  have viewed both of these pieces of property; correct?

23   A  Yes.

1  Q  Do either of those pieces of property have a hood on them?

2  A  No, they don't.

3  Q  Do either of those pieces of property have front pockets?

4  A  I'd have to look at them again.

5  Q  Feel free.

6  A  No, they do not.

7  Q  The prosecutor -- well, there's a piece of evidence tape there.

8  A  It goes with this one.

9  Q  What year did you guys start using these bags?

10  A  I don't recall what year.

11  Q  They weren't in use in 2009; correct?

12  A  I believe we did have plastic in that year.

13  Q  You believe that these, what appear to be plastic bags, that these

14  items would be in in 2009?

15  A  I don't understand what you're asking.

16  Q  Well, I want to know what year you started putting items in plastic bags

17  as opposed to the paper bags with a bunch of tape and a bunch of numbers

18  on them?

19  A  Well, we've had plastic and paper for many years.

20  Q  Let me ask it this way - were any of the items that were seized in this

21  case show any evidence that any of them were ever put in any pieces of

22  plastic?  Do you see any markings on them that show, be it the external or the

23  internal, where it would show a date prior to 2009?  Any piece of property?

1   A    No. Those were obviously put in plastic.

2   Q    My question is - in 2009, 2010, 2011, do you see any evidence that

3   these bags were in use during those years? So, I asked you three questions.

4   In 2009 were any items in this case put in a bag like this and sealed?

5   A    I believe the documents may have been.

6   Q    Other than the documents, anything else?

7        MRS. KOHLRIESER:  Your Honor, again,

8   State's exhibit '135' was not remotely discussed in redirect. This is recross.

9   It's supposed to address things that were discussed in redirect. It's not

10  another bite of the apple, so to speak.

11       THE COURT:  I'm going to go ahead and

12  allow it.  Overruled.

13  Q    I guess let me be specific. We're talking about three things. We're

14  talking about State's exhibit '131', '130', and '132'. Were any of those pieces

15  of property sealed up in any plastic in 2009 or 2010?

16  A    No, not that I'm aware of.

17  Q    In 2011 or 2012?

18  A    Not that I'm aware of.

19  Q    The prosecutor started with the idea that when -- well, you put crime

20  tape around Markelus' house when you searched it; right?

21  A    Yes, there was crime scene tape put around it.

22  Q    And the whole purpose of creating a perimeter and for having a log of

23  who's in and who's out, whether it's a crime scene or a search of someone's

1   house, you're trying to protect the integrity of the evidence; right? That's the

2   whole purpose of it; right?

3   A    Yes, and to keep unauthorized people from entering.

4   Q    Right. So, the same logic would apply to whether it's a crime scene as

5   far as searching a sensitive area. You're trying to protect the integrity of the

6   place; right?

7   A    Yes, sir.

8   Q    There's no difference in the whole thought process, or the logic, behind

9   having a perimeter log, a perimeter log. It's the exact same logic whether it's the scene

10  itself or the place where you want to collect evidence. It's to protect the

11  integrity of the address; correct? That's why you do it?

12  A    Yes, sir.

13  MR. RION:  Nothing further.

14  THE COURT:  Okay. You may step down.

15  Counsel, please approach.

16  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

17  the record, as follows.)

18  THE COURT:  Do you have anybody real

19  quick?

20  MRS. KOHLRIESER:  Mike Carman. He'll

21  probably be all of ten minutes.

22  THE COURT:  I was going to ask - do you

23  want a similar instruction in regards to the nine millimeter gun in the closet

1    that I gave on the .357?

2    MRS. KOHLRIESER: I could care less.

3    MR. MILLER: Yes.

4    THE COURT: So, you said you have an

5    officer who will be quick?

6    MRS. KOHLRIESER: Uh-huh.

7    THE COURT: All right.

8    (WHEREUPON, Court continued on the record, as follows.)

9    THE COURT: First off, ladies and

10    gentlemen of the jury, similar to the instruction I gave you with regard to the

11    evidence of a .357 weapon that was not the subject of Count number Two,

12    the Weapon Under Disability, evidence, if you believe it, as to another

13    weapon found in the box in the closet, and I believe it was identified as a nine

14    millimeter, also is not the subject of Count number Two, the Weapon Under

15    Disability.

16    How's everybody doing? They tell me they've got another relatively

17    brief witness. Are we good? Okay. Call your next witness.

18    MRS. KOHLRIESER: The State would call

19    Michael Carman.

20    MR. RION: May we approach while they're

21    getting the witness, your Honor?

22    THE COURT: Sure.

1    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

2    the record, as follows.)

3        MR. RION:  I think this witness is dealing

4    with property log issues.  It's my belief that we have subpoenaed for property

5    logs and we have in our possession absolutely every property log that exists.

6    I think there were a couple of extra documents that were provided.  Other

7    than those extra documents, it's my understanding that's the property log.

8    Correct?

9        MRS. KOHLRIESER:  No, that's not

10   correct.

11       MR. RION:  Well, then, --

12       MRS. KOHLRIESER:  (Inaudible).

13       COURT REPORTER:  I can't hear.

14       MR. RION:  No, no, no.  I agree with that.

15   There's no written log.

16       THE COURT:  (Inaudible).

17       MR. RION:  But, before I cross him I would

18   like to know.

19       MRS. KOHLRIESER:  You subpoenaed

20   him on September 8th.  I tried multiple times to explain to the Court and to Mr.

21   Rion about how long that would take, what all was involved, and that there

22   was also some paper documentation, some written documentation.  I

23   attempted to explain all of this on the record.  Okay?  Then I got computer

1   generated logs for him from Michael, which took four hours for him to print,

2   and gave that to him. He said, "Are these your printed logs?" I said, "To the

3   best of my knowledge." Michael asked me, "Is there anything I need to do

4   because I don't want to be in violation of the subpoena." Well, when he cross

5   examined Don Marik, and I noticed, or, it was pointed out those gaps about

6   when it was returned and things like that, well, over the lunch hour I went

7   there and said, "Explain this. Where's our documentation for it?" That's when

8   they went back and they looked and there's various binders and things like

9   that where they log evidence submission to B.C.I. and evidence return from

10   B.C.I. I got the evidence returns from B.C.I. to explain those gaps and I gave

11   them to Mr. Rion. I gave one of them to him on that day and then I gave one

12   to him again then this morning once I had time to go through over two

13   hundred exhibits to see if there was any other ones with gaps. I gave him the

14   other one that I believe had a gap. So, unless there's something I've missed

15   or Investigator Carman has missed, that's what I know.

16   THE COURT:  What he's going to testify

17   about are these gaps?

18   MRS. KOHLRIESER:  (Inaudible).

19   THE COURT:  Well, then, it's going to take

20   longer than fifteen minutes.

21   MRS. KOHLRIESER:  (Inaudible).

22   THE COURT:  All right. I'm going to allow

23   the testimony.

1  (WHEREUPON, Court continued on the record, as follows.)

2  THE COURT:  All right.  Go ahead and call

3  the next witness.  I think you already did.

4  MRS. KOHLRIESER:  Yes.  Michael

5  Carman, your Honor.

6  THE COURT:  Okay.

7  WHEREUPON, called to appear as a witness in this proceeding was one:

8  I.D. OFFICER MICHAEL CARMAN

9  who, having been duly sworn by the bailiff herein, testified as follows:

10  BAILIFF:  He has no objection.

11  THE COURT:  Okay.  Thank you.

12  <u>DIRECT EXAMINATION</u>

13  BY MRS. KOHLRIESER:

14  Q  Would you state your name for the record, please, and spell your last

15  name?

16  A  Mike Carman, C-A-R-M-A-N.

17  Q  Where are you currently employed?

18  A  Lima Police Department.

19  Q  How long have you been with the Lima Police Department?

20  A  Twenty years.

21  Q  And what's your current assignment?

22  A  I'm an I.D. Officer.

23  Q  When did you become an I.D. Officer?

1    A    A little over three years ago.

2    Q    And what are your responsibilities as an I.D. Officer?

3    A    We process crime scenes. We also are keepers of the evidence.

4    Q    Okay. Now, in February of 2009 were you in I.D. at that time?

5    A    No, ma'am.

6    Q    Okay. Did there come a time much later on that the Prosecutor's

7       Office, specifically Mr. Miller and myself, requested you to transport some

8       items to B.C.I. that were collected in the investigation into the murder of Ken

9       Warrington?

10    A    Yes.

11    Q    And for the jury, B.C.I. is the state crime lab; correct?

12    A    Yes.

13    Q    Do you recall what items those were that you took to the crime lab?

14    A    Not specifically, no. I take a lot of evidence up there.

15    Q    Okay. Fair enough. I'll hand you State's exhibit '68'. I'd ask you if you

16       recognize that.

17    A    Yes, I do.

18    Q    What is that?

19    A    This is one of the pieces of evidence that I took up that day.

20    Q    How do you know that you took that up?

21    A    Because B.C.I. required me, well, since it's been opened multiple times

22       and there's different initials and seals on the envelope, the initial envelope, I

23       was required to place it in this envelope, which it was sealed at that time and

1 it has my initials on it.

2 Q. Okay. So, for the record, there's actually a manila envelope inside of a

3 plastic bag; correct?

4 A. Yes.

5 Q. And it's your testimony that the plastic bag is your doing?

6 A. Yes. B.C.I., it's their policy.

7 Q. Okay. Do you know why that is?

8 A. It's to maintain chain of custody. That way if there's an issue with

9 packaging that is opened multiple times, well, sometimes the tape will cover

10 an initial or a date, that way they know when they received it on the date that I

11 gave it to them that it was sealed.

12 Q. Okay. So, your easiest way of doing that, I guess, was to put it in the

13 plastic?

14 A. Yes.

15 Q. Okay. State's exhibit '69'. Do you recognize that?

16 A. Yes.

17 Q. What is it?

18 A. This is a, it's a Winchester, it's another evidence that I took up to B.C.I.

19 that day.

20 Q. Okay. Did you do the same thing with this that you did with State's

21 exhibit '68'?

22 A. Yes. It's got my initials and date on it.

23 Q. Okay. So, I'm just going to call it what it is, that chicken scratch down

1    there on the bottom in black on the plastic.

2    A   Yes.

3    Q   That's yours?

4    A   Yes.  My initials are M.L.C.

5    Q   Okay.

6    A   And then the date.

7    Q   All right.  State's exhibit '70-A'.  What's that?

8    A   It's a different item, but the exact same thing, same date, and same

9    initials.

10    Q   Same reasons?

11    A   Yes.

12    Q   Okay.  State's exhibit '70-B'.

13    A   It's an additional piece of evidence that I took up that day - same

14    initials and same date.

15    Q   Same reasons?

16    A   Yes.

17    Q   And State's exhibit '71'?

18    A   My initials, same date, same type of packaging that was required by

19    B.C.I.

20    Q   I'll hand you what's been marked as State's exhibit '129'.  I'd ask you

21    to take a look at that.  Do you recognize it?

22    A   It's got my initials and the same date.  This is another one, another

23    piece of evidence that I had to, again, put into a new sealed bag when they

1    received it.

2    Q    Is that the same day, 7-21?

3    A    Yes.  Same date and same initials.

4    Q    And that's the outer bag?

5    A    This is the outer bag; yes.

6    Q    What color is the B.C.I. sticker on that outer bag?

7    A    It's a purplish lavender, I guess.

8    Q    Okay.  Does that have the actual State's exhibit '129' on it, that outer

9    bag?

10   A    Oh, I'm sorry.  Yes.

11   Q    Okay.  There's a plastic bag inside of that?

12   A    Yes.

13   Q    Okay.  Take it out, please.  Any markings that you recognize on that

14   bag?

15   A    My initials.

16   Q    Okay.  What date?

17   A    There's two different ones.  My initials are on two different places and

18   two different dates.

19   Q    Okay.  What dates are those?

20   A    The date is 2-14 of '14.  There's also a 9-20 of '14 and 9-13 of '15.

21   Q    9-13 of '15?

22   A    I'm sorry.  Hold on just a second here.

23   Q    For the record, your writing is fairly messy; would you agree?

1    A    Yea.

2    Q    Okay.  Would that be 9-3 of '15?

3    A    I'm sorry.  Yea, it could be.  It appears to be a 13, but it could be also a

4    3.

5    Q    In preparation for this trial did you open any of this evidence to allow

6    myself and Mr. Miller to look at it?

7    A    I opened multiple pieces of evidence.

8    Q    And that would have been -- would that have been in the week prior to

9    this trial?

10    A    Yes.

11    Q    Okay.  Inside of that plastic bag --

12    A    Do you want this taken out?

13    Q    Uh-huh.  Do you see your initials anywhere on this brown paper bag?

14    A    Yes.

15    Q    And does that have a corresponding date?

16    A    Yea, 9-3 of '15 is on this one.  It's clearly marked.  The other one

17    appeared to be a 13, but it's a 3.

18    Q    Okay.  And those are all in black; correct?

19    A    Yes, black permanent marker.

20    Q    Okay.  Feel free to put that back in there.  State's exhibit '131'.  I'd like

21    to have you take a look at that.  Are your initials anywhere on that?

22    A    Yes.

23    Q    Multiple places, or just once?

1   A   I see one.  Again, there's so many times this was opened.  I see one
2       specifically.  But, it has been opened multiple times.
3   Q   Okay.  State's exhibit '130'.  Are your initials anywhere on that?
4   A   My initials are at the top and my initials are also at the bottom.
5   Q   State's exhibit '132'.  Do you see your initials anywhere?
6   A   I do see my initials; yes.
7   Q   Okay.  Do you recognize any initials belonging to your partner?
8   A   Yes.
9   Q   Okay.  Who is your partner?
10  A   I.D. Officer Greg Adkins.
11  Q   Okay.  Are you familiar with his handwriting?
12  A   Yes, I am.  It's worse than mine.
13  Q   Okay.  What's it dated?
14  A   8-27 of '15 on this one.
15  Q   And, again, that package has been opened multiple times as well?
16  A   Yes.
17  Q   So, specifically when I was asking of the first ones, State's exhibits '68'
18      through '71', those were items that you transported to the lab?
19  A   Yes.
20  Q   When you transport these things to the lab, or others for L.P.D. to
21      transport them to the lab, do you open them?
22  A   No, ma'am.
23  Q   What do you do?

1 A  I log them out of the property room, log them to the location that they

2 are going and who takes them. I am not always the person that takes them.

3 But, in this case, I took those.

4 Q  I'm going to hand you what has been previously marked as

5 Defendant's exhibit 'M', as in Mary. Do you recognize what Defendant's

6 exhibit 'M' appears to be?

7 A  It's a printed off copy of a chain of custody for items of evidence

8 pertaining to this case. This is specifically to our new computer system.

9 Q  Okay. Do you know who printed those off?

10 A  I did.

11 Q  Okay. How long did it take you?

12 A  To get this stack it took me about six hours.

13 Q  Okay. And you said our new computer system. When did you get this

14 computer system?

15 A  I believe it was September of '14 is when it went into effect.

16 Q  All right. What was your old system?

17 A  It was a computer system also. It was called Windstorm.

18 Q  Okay. Even with these systems, these computer systems, do you

19 keep written paperwork?

20 A  Yes, we always keep written paperwork.

21 Q  And did you find written paperwork in this case? In the murder of Ken

22 Warrington did you find written paperwork in this case?

23 A  I found the B.C.I. submission and return receipts.

1  Q  What do you mean by B.C.I. submission and return receipts?

2  A  B.C.I., which is the Bureau of Criminal Investigation, located in, well,

3  the one that I specifically go to is the one in Bowling Green, and anytime they

4  receive an item there's a piece of paper attached to it which also has their

5  type of an evidence label, which is the one that you spoke of that was the

6  pinkish or lavender color. It has the item number, their number which they

7  attach to it when an item comes in. It could be a new case or it could be an

8  old case. Then they have specific item numbers for each evidence. But,

9  once that's all done then they print off a piece of paper, which is called a

10  submission sheet, that documents the item was submitted and that they

11  received it. I also affix my signature to it, which is an electronic signature, and

12  it's usually at the bottom of the page.

13  Q  Okay. Do you know whether various items of evidence were returned

14  from B.C.I. to our lab, excuse me, to L.P.D.'s evidence room in this case of

15  Ken Warrington's murder?

16  A  Can you clarify that question?

17  Q  Do you know whether items of evidence were sent to B.C.I. and then

18  later returned?

19  A  Yes.

20  Q  Okay. And you were able to find the actual logs for those?

21  A  Yes.

22  Q  I'm going to direct your attention, specifically if you want to follow along

23  with me, to Defendant's exhibit "M". Let's talk about item fourteen. That

1   would be L.P.D.'s item fourteen.

2   A   Okay.

3   Q   Did there come a time when you learned that there was something

4   missing from Defendant's exhibit 'M' in relation to the logs?

5   A   Yes.

6   Q   Okay. If you can, explain that for the jury, please.

7   A   Okay. In this log book, which is the one I printed off from our new

8   system, it states that - let me get the right dates here - it states that the item

9   was taken, item number fourteen, was transported to B.C.I. in B.G. by Officer

10   Hammond and that Adkins created this report. Then, and I'm trying to find it

11   here, the discrepancy was that it didn't show that it returned back to the

12   station, I believe.

13   Q   Okay. Were you able to find written documentation that it, in fact, had

14   returned to the station?

15   A   Yes. We keep a binder with all the B.C.I. submission and return

16   receipts, which a return receipt is when I pick up an item from B.C.I. They

17   scan it and I sign that I received it and then there's a printed copy. When I

18   say a B.C.I. return receipt that's what I'm speaking of. I did find that in our log

19   books.

20   Q   Okay. Do you recall when those items would have been returned?

21   A   Off the top of my head I don't recall. I would have to see the

22   paperwork.

23   Q   That's exactly what I'm looking for. I apologize. Did you find another

1      item similar, specifically, I believe, item two thirteen?

2    A   Yes. We located the B.C.I. return receipt for that item also.

3    Q   Okay. And item two thirteen, do you recall, or you can look at

4      Defendant's exhibit 'M', is what?

5    A   It's a 2X camouflage, is what's in the description.

6    Q   Okay. Did that have a similar gap as you've just explained?

7    A   Yes.

8    Q   On Defendant's exhibit 'M' it shows a similar gap; correct?

9    A   Yes, the exact same gap.

10    Q   And you were able to find a sheet of a return from B.C.I. by one of the

11      Lima Police Department officers?

12    A   Yes. I believe when you located it it was in September of the same

13      year that it was returned.

14    Q   In 2009?

15    A   Yes. But, I don't remember the specific date. It's on the paperwork.

16    Q   Okay. Gotcha. All right. In looking at that can you explain for the jury

17      why there would be a discrepancy in this?

18    A   Well, --

19    Q   Or what appears to be a discrepancy, I guess I should say.

20    A   What appears to be a discrepancy. However, we have paperwork that

21      explains it, hard paperwork. It's a redundant system. You have paperwork.

22      You always have paperwork. Then when you get the paperwork or the items

23      back to station, well, as soon as possible we like to put it into the computer

1    system.  So, that way you have two records of the item being transferred or

2    wherever it goes that is documented because if the computer crashes you still

3    have paperwork.

4    Q    Okay.  So, what would you feel, I guess, would be more reliable - the

5    paperwork or the computer?

6    A    I feel the paperwork.

7    Q    Okay.  Why is that?

8    A    Because clearly in this case here for some reason the item wasn't

9    documented in the computer, but we have the paperwork that documents

10   that.

11   Q    I'm showing you State's exhibit '169' and I would ask you if you

12   recognize that.

13   A    Yes.

14   Q    What is that?

15   A    This is the B.C.I. return submission sheet that I was speaking of

16   earlier.

17   Q    Okay.  Let's put it up here for the jury to see and we'll have you explain

18   it a little bit.  We'll just do it column by column.  Okay.  Let's talk about this

19   first column here.  It says 'lab case'.

20   A    Yes.

21   Q    What lab is that referring to?

22   A    B.C.I. crime lab.

23   Q    Okay.  And then the item number.  Whose item number would that be?

1    A    B.C.I. crime lab number.

2    Q    And then there's an abbreviated, I guess, description?

3    A    Yes.

4    Q    Now, looking further where it says 'department case number', what

5    would that be referring to?

6    A    That would be our case number.

7    Q    Okay. And on here do you recognize the case number for the Kenneth

8    Warrington murder?

9    A    Yea. It's under the department case number. It's 095098.

10   Q    Okay. So, let's talk specifically about State's exhibit '132'. I'll give that

11   to you. What item is that, not item number, but physically what is that in that

12   bag?

13   A    It's one pair of black gloves.

14   Q    Okay. What item number is that from L.P.D.?

15   A    From the Lima Police Department it's item number fourteen.

16   Q    Would that be one of the ones that shows a gap in Defendant's exhibit

17   'M'?

18   A    Correct.

19   Q    Okay. Do you see, in looking at State's exhibit '169', -- well, let me ask

20   you this first. What item was B.C.I.'s assigned number?

21   A    B.C.I.'s assigned item number was eighteen for our fourteen.

22   Q    Okay. Can you pull that up and tell us how you can tell what that item

23   number is?

1   A   We have evidence labels. The first line is always the report number.

2   After the report number, which is 5098, there's a dash and then it would be

3   the item number. The first item that's collected, or sealed, or whatever the

4   officer that's collecting it would go to one, or 001, and then the second, third,

5   and so on. This one says fourteen. Then when it was submitted to B.C.I.,

6   well, B.C.I. has an evidence label, or, an evidence tag label, and it's item

7   number eighteen.

8   Q   What color is that B.C.I. sticker?

9   A   Light blue.

10   Q   Okay. So, State's exhibit '169', do you see item, B.C.I. item number

11   eighteen being returned?

12   A   Yes. It's right here.

13   Q   Would you step down here and point to it for me? Okay. And does

14   this also show the date of return?

15   A   It shows it was returned on 9-3 of 2009 at eight fifty-two oh four A.M. If

16   you slide it over it'll say 'received by' and then it will have the officer's initials.

17   Q   Okay. Before we get that it says 'returned by'. Can you read that

18   name?

19   A   Elaine Dirk - I can't pronounce it - Dirkshire or Dirkshield.

20   Q   Okay. Do you know who Elaine is?

21   A   Yea. Elaine is in B.C.I. receiving. There's usually two ladies, well, it's

22   always been ladies, I've never had a male there, but two ladies and Elaine

23   actually has retired by now, but she's the one that received it.

1 Q Okay. Then you said if I scooted it over I would see what?

2 A The same date and time and then it's got Officer Tim Goedde's

3 signature on it.

4 Q Okay. Back in '09 do you know where Officer Goedde was assigned,

5 what unit he was assigned to?

6 A I believe he was with the Task Force, the Drug Task Force.

7 Q Let me -- actually let me just ask you this and I'll show you State's

8 exhibit '169'. In the Ken Warrington case, well, what's that C.F.S. number,

9 that call for service?

10 A Our C.F.S. number?

11 Q Yes.

12 A 095098.

13 Q Okay. The ones that are assigned to Ken Warrington that were

14 returned on that date, can you tell me what B.C.I. item numbers are for each

15 one of them? Just read them into the record.

16 A It would be starting with thirteen. Do you just want the specific

17 number?

18 Q Sure.

19 A Thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen,

20 twenty, twenty-one, number two, number three, four, five, six, seven,

21 eight, and nine. It stops at nine.

22 Q Okay. There's a couple of other cases on there, too; correct?

23 A Yes. There's an '08 case and another '09 case.

1   Q   State's exhibit '170', let me show you that, what does that appear to

2       be?

3   A   It is another B.C.I. return receipt.

4   Q   Okay.  Similar to '169'?

5   A   Yes.

6   Q   Are there any items from the Ken Warrington homicide on that one?

7   A   There are two.

8   Q   Okay.  What are they?

9   A   Items numbered, B.C.I. item number one and B.C.I. item number one

10      point one.

11  Q   And when were those returned to the Lima Police Department?

12  A   Those were returned on 9-15 of 2009 at eleven forty-eight A.M.

13  Q   Okay.  Now, Officer Carman, in this case your initials are on quite a

14      few items, correct?

15  A   Yes.

16  Q   Are there items back at station that also were involved in this that

17      would also have your initials?

18  A   Yes.

19  Q   Is it your decision as to what to bring to trial?

20  A   No.

21  Q   Who makes that decision?

22  A   The detectives and the prosecutors.

23  Q   In this case have you had occasion to open up any items in the Ken

1    Warrington homicide investigation?

2    A    Yes.

3    Q    Okay.  Do you know how many items and how many times?

4    A    I believe I opened all of them at one point and time, and at least three

5    times.

6    Q    Okay.  What were the purposes of opening those items?

7    A    The defense attorney wanted to see each particular item and so I

8    opened every single item, at least three times, on three different days, three

9    different occasions.

10    Q    Okay.  And you did that at the defense attorney's request?

11    A    Yes.

12    Q    In your experience as an I.D. Officer you said that B.C.I. required you

13    to reseal these things because of how many times they'd been opened?

14    A    Yes.  If they've been opened after they have been submitted and

15    returned they're required to be resealed.

16    Q    Okay.  All right.  So, B.C.I., does it take evidence that hasn't been

17    sealed?

18    A    No.

19    Q    Are they pretty particular about that, in your experience?

20    A    Very particular.

21    Q    And are you aware of whether most of the opening and closing of

22    these various pieces of evidence that we've talked about and the ones you

23    have back at station, well, has that happened largely after all the testing has

1 been done, like when the defense is looking for things and stuff like that?

2 A Yes.

3 MR. RION: I'm going to object. I don't

4 know if he has personal knowledge.

5 Q Okay. In the time that you've been there has largely the opening

6 occurred after the items had been tested?

7 A The items that I opened for the defense attorney was after testing had

8 taken place; yes.

9 Q Thank you.

10 THE COURT: Counsel, approach.

11 (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

12 the record, as follows.)

13 MR. RION: It's going to be awhile.

14 THE COURT: (Inaudible).

15 COURT REPORTER: I can't hear you.

16 THE COURT: You can't? But, now can

17 you?

18 COURT REPORTER: Yes.

19 THE COURT: Okay. We're going to break

20 for the evening. Okay.

21 (WHEREUPON, Court continued on the record, as follows.)

22 THE COURT: Okay. I'm going to allow

23 the defense to ask questions, but we're going to do that tomorrow because

1    they've indicated it might be awhile. I've already kept you a little longer than I

2    anticipated. So, we're going to break for the evening, folks.

3        Remember the admonitions I've been giving you. Don't discuss the

4    case among yourselves or with anyone, family, or friends. Don't post

5    anything about it on social media or the internet. Don't pay any attention to

6    any media accounts of the case. Don't do any independent investigating.

7    Don't formulate or express any opinions.

8        Is eight forty-five good for everybody? We'll start up at eight forty-five.

9    So, the jurors will be excused. I want counsel to remain on the record. The

10   witness will be excused until tomorrow. You're still under oath and you're still

11   supposed to come back tomorrow at eight forty-five. The jurors are excused

12   for the evening.

13   (WHEREUPON, JURY WAS EXCUSED FOR THE DAY AT 4:46 P.M.)

14       THE COURT:  Okay. We're still on the

15   record. The jurors have left the room for the evening recess. I just want to

16   make sure the record is clear on some discussions we had here at chambers.

17   Our sound system leaves a lot to be desired. We actually had it scheduled

18   for someone to come in and fix it and they were here last Tuesday and we

19   couldn't get to it. So, I just want to make sure.

20       I know there was an issue with regard to some of the exhibits that Mr.

21   Rion had subpoenaed on behalf of the defendant. He had subpoenaed I.D.

22   Officer Carman to bring in the items. I understood Defendant's exhibit 'M'

23   was those items. But, then I understand now, based on the testimony of I.D.

1  Officer Carman, that at least '169' and '170' of the State's exhibits might be

2  some supplemental information as to the chain of property. There was a

3  subpoena for all of the chain of property items and then there was a Motion to

4  Quash. I think we had a discussion, and I'm not sure if it was on the record or

5  off the record, but we had a discussion last week about that. It was my

6  understanding that at least for the time being Defense exhibit 'M', which has

7  already been used and utilized with a couple of witnesses, satisfied the

8  request. But, now we've got the additional.

9  Where are we at from the State's point of view on the subpoena and

10  what has been provided?

11  MRS. KOHLRIESER:  Your Honor, back

12  when the subpoena was issued, well, it was issued at like eight-thirty/nine

13  o'clock in the morning. It was served at twelve-thirty.

14  THE COURT:  The day of trial. The first

15  day of trial. I understand.

16  MRS. KOHLRIESER:  The day of trial; yes.

17  Okay. That was on the heels of our discussion in here about the casings that

18  had been sent to England and trying to track those down and things of that

19  nature. The subpoena also referred to the Lucious Upshaw case.

20  THE COURT:  Right.

21  MRS. KOHLRIESER:  Okay. So, what

22  happens is I don't know that subpoena has gone out. I'm in here. But,

23  apparently Mr. Rion arranged to have it done. I get a text from I.D. Officer

1    Carman, I believe it was him - and it might have been Detective Clark, I
2    apologize - but, one of us did about what it all it was asking for and things of
3    that nature and I told him that I would figure it out because he said he wanted
4    to be in compliance with the subpoena. I discussed it with Mr. Rion briefly. I
5    attempted to bring it up on the record here and I specifically said about
6    quashing the subpoena as far as the Lucious Upshaw case and things of that
7    nature. But, it was given, I guess, a somewhat short talk at that time because
8    the parties thought that we could work it out and the Court kind of left it up to
9    us to do that. I talked to Mr. Rion at some point, I believe that afternoon, but
10   maybe the next day, I'm sorry, my memory is foggy on that part, but the I.D.
11   officer came up, I.D. Officer Carman came up with this accordion file and in it
12   was what has now been marked as Defendant's exhibit 'M', as well as a
13   second copy. I gave one to Mr. Rion and told him that he printed out the
14   computer logs, the chain of evidence of everything in this case. I believe it
15   was the next day. But, anyhow, I attempted at that time to explain to Mr.
16   Rion, and I also said something on the record, I do believe, that like, 'look,
17   we're talking about a vast array of various things'. I don't know -- and
18   especially at that time I didn't know entirely how all the different logs they
19   keep and what they keep of and things of that nature. Okay. So, I tell Mr.
20   Rion, "I believe this is the chain of custody of these things in this case." He
21   doesn't push the Lucious Upshaw issue at that point. That doesn't go
22   anywhere really. I think I got him the chain of evidence logs for the casings in
23   the Lucious Upshaw case. I believe I gave those to him at some point.

1  Anyhow, over the lunch hour when it was brought up during Detective Mark's
2  testimony about these items of evidence and that gap showing '09 and '13, I
3  believe it is, and I believe it was on two items of evidence, I am texting Officer
4  Carman and going, "Hey, what is this gap here," because, obviously, in my
5  opinion, they came back to L.P.D. "Where's our documentation of that?" We
6  went over on the lunch hour and they had just begun to find some things.
7  They noted that I.D. Officer Whitney, as he said, maintained notes on various
8  things. They didn't know where all of his notes were, to be quite honest,
9  because I.D. Officer Whitney kind of had his own way of doing things as well.
10  They were able to find what's now been submitted as State's exhibit '169',
11  or, State's exhibit '169'. When we came back I explained to Mr. Rion, I said,
12  "Look, somehow it didn't get logged into the computer. We have a new
13  computer system. They were trying to get used to that and there's some
14  problems with that system. They did find these because they keep a log of
15  whenever somebody returns items from evidence, or, from B.C.I., excuse me,
16  to be returned back to the evidence room, they keep it, who brought it back,
17  and that type of thing, and what all they were." I gave him a copy of State's
18  exhibit '169'. I then went through this weekend trying to find, you know, if
19  there were any other gaps besides those items. I think I might have noticed
20  what's our item, or, B.C.I. item one and that's what State's exhibit '170'
21  reflects and I gave that to Mr. Rion today.
22  The State's position, again, I tried to tell him of the voluminous nature
23  of this, the number of hours that would go in to try and find every last piece of

096

1  documentation for it because over the years the changes that have been

2  made and things of that nature.  I never attempted to misrepresent in any

3  way, shape, or form.  I told him that it would be a long process because that's

4  what I.D. Officer Carman was concerned about.  If you'll give me just a

5  minute, your Honor, I can more specifically look up what that -- well, he

6  wanted to know are we talking about every piece in this case.  I thought

7  initially he was just more interested in the casings because of the issue that

8  arose with that and things of that nature.  It was Friday when I was texting

9  about, you know, you need to find out where the gaps are in these' and

10  things of that nature.  He found those gaps.

11  What I don't want to happen here is I don't know if I've missed

12  something or I.D. Officer Carman has missed something that perhaps Mr.

13  Rion has found in, well, I'll just refer to Defendant's exhibit 'M', because that's

14  easier, that shows a gap like that and we haven't given him, because of

15  oversight on our part, we haven't given him proof that those items came back

16  to L.P.D. or something of that nature.  If Mr. Rion wants to share anything that

17  he found there that would show these gaps I will be happy to go back and

18  individually check those and get I.D. Officer Carman or I.D. Officer Adkins to

19  check those so that there's no surprise one way or the other.  I mean, if he's

20  truly seeking where these things went, again, unless there's something I'm

21  missing, and I don't purport to be the greatest at this, I might have missed

22  something.  It's not intentional.  Officer Carman might have missed

23  something.  It's not intentional.  So, if Mr. Rion has something that he's

196

1  interested in knowing about, if he can tell me specifically which one it is I will

2  be more than glad to tonight run that information down for him so that we can

3  get the truth of all of this.

4  THE COURT:  Well, let me ask it this way.

5  Of the items that have been identified thus far by any witness that may have

6  gone, or, traveled to B.C.I. and back, do you believe that State's exhibits

7  '161', '169', and '170', in combination with Defense 'M', accurately portrays

8  the chain of custody for those particular items?

9  MRS. KOHLRIESER:  For those particular

10  items they definitely show when they came back from B.C.I. The problem is

11  is those item numbers are reflected in B.C.I. item numbers. They're not

12  reflected in our evidence numbers.

13  THE COURT:  I understand that.

14  MRS. KOHLRIESER:  I'll give you 'M'.

15  That's why I'm coming up to the Bench.

16  THE COURT:  I think it's right there on the

17  witness stand.

18  MRS. KOHLRIESER:  Oh.  Thank you.

19  The item numbers that you see in Defendant's exhibit 'M' are the item

20  numbers that were assigned by L.P.D. But, what you see on - I apologize -

21  exhibit '169' --

22  THE COURT:  Oh, I understand that.  For

23  example, Lima Police Department item number fourteen was B.C.I. item

1  number eighteen.

2  MRS. KOHLRIESER:  Yes.  Exactly.

3  THE COURT:  What I'm getting at is all the

4  items that the State intends to use in this case as evidence that have been

5  identified thus far that may have traveled to B.C.I. and back, well, that

6  traveling is reflected, or, you're representing is either in Defense exhibit 'M'

7  and/or '169' and/or '170' of the State's exhibits and/or on the items themselves?

8  MRS. KOHLRIESER:  I believe so, your

9  Honor.  I'll be happy to take five minutes to double-check that.  But, I do

10  believe that everything we have marked and we intend to use as evidence in

11  this case has been tracked.

12  THE COURT:  Okay.  With that

13  representation, Mr. Rion, do you want to be heard?  I see you subpoenaed --

14  there's a subpoena that's in the file that was on the first day of trial,

15  September 8th, at about eight thirty-five, or eight thirty-three is when it got

16  file-stamped on the 8th.

17  MRS. KOHLRIESER:  Your Honor, I

18  apologize, but one other thing.  Even though it's not required by Rule 16, at

19  no point before September 8th did the defense ever ask us for a chain of

20  custody on any of these items and they've had it --

21  THE COURT:  That all came up after the

22  discussion about the casings; right?

23  MRS. KOHLRIESER:  About the casings;

1      yes.

2      THE COURT:  So, obviously the defense

3  got Defense exhibit 'M'.  They got that shortly -- on the same day, the 8th?

4      MRS. KOHLRIESER:  Either that day or

5  the next day.  I apologize, your Honor.

6      THE COURT:  All right.

7      MR. MILLER:  Your Honor, you know, it did

8  come up after the casings, but it's not just related to the casings anymore.

9      THE COURT:  Well, I know.

10     MR. MILLER:  It expanded into areas --

11     THE COURT:  I understand.

12     MR. MILLER:  -- that are not relevant.

13     THE COURT:  I understand.  Then '169'

14  and '170' were provided to the defense when?

15     MRS. KOHLRIESER:  '169' was provided

16  on, I believe, Friday and '170' was provided this morning when I was going

17  through stuff.

18     THE COURT:  Okay.  All right.  Now, Mr.

19  Rion, what's your take on all of this?  What would you like the Court to do?

20     MR. RION:  The Court -- first of all, it's my

21  understanding that the rendition is accurate by the Prosecutor that based

22  upon the concern raised by these casings undisclosed to the defense going to

23  England that a subpoena, I think, was justly issued for the chain of custody

1    logs. We were informed when we received Defense exhibit 'M' that we had

2    the chain of custody logs, like the complete chain of custody logs, and there

3    wasn't a second shipment that was going to be coming. There was concern

4    that our subpoena was overly broad. So, the Prosecutor and I had a

5    conversation and instead of asking for everything whatsoever about the case

6    we orally limited the subpoena to the chain of custody logs. So, I think, as the

7    Prosecutor mentioned, that's exactly what happened. So, when we received

8    Defense exhibit 'M' I was of the opinion that we had a complete record of

9    the chain of custody logs. On Friday and then, well, was it today these two

10    other documents were added to the chain of custody logs. Where we are

11    now is that this Officer is about to get cross examined and I am working on

12    the representation that nothing else exists. It's an easy question - chain of

13    custody logs.

14    MRS. KOHLRIESER: No, it's not. It is not

15    an easy question, your Honor.

16    MR. RION: Well, just --

17    THE COURT: Just let him finish and then

18    I'll give you a chance to respond.

19    MR. RION: This was sort of the issue that

20    came up. Again, when you cross examine one witness about what you

21    believe to have the complete chain of custody logs and then you're given

22    more things, -- and I get it that this issue was sort of brought about by the

23    issue of the potential report. So, if it's being represented that I have

1   absolutely the chain of custody logs then I'll proceed on cross examination.

2   But, I believe --

3   THE COURT:  Well, I think, and let me

4   interrupt you here and I'll give you a chance, but I'm viewing this perhaps as

5   when you got Defense exhibit 'M' that was felt to be sufficient until your cross

6   examination made everybody realize that apparently there were some gaps.

7   MR. RION:  Again, it would have been --

8   it's obvious from the face of the documents.  So, it's not as if I came up with

9   something creative.

10   MRS. KOHLRIESER:  Your Honor, I --

11   THE COURT:  But, yea, it begs the

12   question why the State didn't give the B.C.I., well, I think Carman called them

13   B.C.I. return receipt sheets, but aren't part of Defense exhibit 'M'?

14   MRS. KOHLRIESER:  Your Honor, I told

15   him specifically and I told this Court as well that we were talking about

16   voluminous things.  There were handwritten things.  There were a number of

17   things and this was going to take hours, if not two to three days.

18   THE COURT:  Well, that's why I'm just

19   trying to limit it to the exhibits that the State intends to use or have been

20   identified.  I don't know, there may be some other items that are yet to be

21   identified.  You know what you intend to try to introduce into evidence.

22   MRS. KOHLRIESER:  It's all there.

23   THE COURT:  Okay.  That's what I'm

1   getting at.  Does Mr. Rion have, to the best of your knowledge now, -- well, I

2   think you mentioned that the only thing he might not have now, besides

3   Defense exhibit 'M', besides State's exhibits '169' and '170', and besides the

4   actual items and the markings thereon, there may be some notes of I.D.

5   Officer Whitney.  Where are those?

6                 MRS. KOHLRIESER:  I don't know, your

7   Honor, which is why I was trying to tell him that this was something that was

8   going to take Officer Carman two to three days.  He subpoenaed something

9   at twelve-thirty, I believe it was, when it was served on the 8th and wanting

10   them that day.

11                 THE COURT:  I understand.  I understand.

12                 MRS. KOHLRIESER:  I was trying to assist

13   Officer Carman in complying with that subpoena and trying to talk to Mr. Rion

14   about what exactly it was he was looking for.  While it may have been brought

15   on by the casing issue, the chain of custody of the camouflage, the gloves, or

16   whatever else you want to look at has always, from the start of this

17   case potentially been an issue and he could have asked for it a long time ago

18   and given us adequate time to get everything instead of, what I feel, quite

19   frankly, is he's trying to pigeon-hole me into something saying that this is it so

20   that when I find there is something else because, again, I'm human and I can

21   overlook stuff, now he can say 'no, no, no, she told me that was everything',

22   just like he's doing right now because he darn sure didn't act that way and I

23   darn sure didn't represent it that way that this was everything.

1    MR. MILLER:  The other problem, your

2    Honor, is this - it did arise with the onset of the casing issue going to London.

3    That, in and of itself, in terms of chain of custody is limited in terms of, or,

4    compared with what we're dealing with now in terms of having to run down

5    that chain of custody.  But, what Mr. Rion has done is seized upon that issue

6    and then used that issue to parlay a bigger issue and to expand now his

7    search in the chain of custody, which is completely removed from the original

8    issue.  It's my belief that it's, quite frankly, a trial tactic to bog down the

9    prosecution in spending an enormous amount of time running down things

10    that are not connected to the original issue in an effort to stick things into the

11    mud.

12    MR. RION:  Okay.  Just let me -- let me

13    respond to that.

14    THE COURT:  Just a second.

15    MR. RION:  I'm being maligned here and

16    that's not fair.  I'm not maligning the prosecutors and --

17    MR. MILLER:  Here's the issue.

18    THE COURT:  Let Mr. Rion --

19    MR. MILLER:  Here's the issue.

20    MR. RION:  Wait, wait, wait.  I am

21    speaking.  I am speaking.

22    MR. MILLER:  You could have asked for

23    if a year ago.

896

1    THE COURT:  No, let Mr. Rion speak.

2    MR. RION:  Obviously the issue of shell

3    casings going to London, unbeknownst to the defense, is something that

4    came up late.  I didn't allege bad faith.  I didn't try to say it was a trial tactic of

5    yours.  That was clearly in your file.  I asked to look at your file.  I asked to

6    look at all of the records.  It never came up.

7    MR. MILLER:  It wasn't in the file.

8    MR. RION:  It clearly came up when you

9    were going through the box, I guess.  I asked to see all the evidence.  I came

10    up three times to look at all of the evidence and I was told I had seen

11    everything.  Now, this document wasn't in there.

12    MR. MILLER:  Because the document

13    related to a totally unrelated case.

14    MR. RION:  It was in the box, according to

15    the Detective.  I am acting in good faith here.  It shouldn't be that difficult to

16    say whether or not we have chain of custody records or not.  If the property

17    room is that disorganized, well, that's sort of my argument.  So, we've asked,

18    or, we've subpoenaed the documents.  It's been however many days now.

19    When I cross examine this officer I would expect that I have all the records for

20    the chain of custody.  It's a simple request.  It's not a trial tactic.  It wasn't

21    something that was on my mind until we realized, after I had came up here to

22    look at the box three times, that there were additional documents that we

23    hadn't seen.  So, here I stand.  I am in good faith.  I am not saying that the

1  Prosecutors are in bad faith. I'm simply requesting documents under the

2  Constitution of the United States by the subpoena powers - not Rule 16 - by

3  the subpoena powers. It's that simple. When I cross examine him tomorrow I

4  will expect to have the chain of custody records. If I cross examine him and

5  then later on something else pops up, that's problematic for the case. It goes

6  to the integrity of the whole process at that point. So, that's the simple

7  request.

8  MR. MILLER:  A point that is lost in that

9  rendition is that the document that Mr. Rion is talking about about casings

10  going to London relates to the Lucious Upshaw case and not this case.

11  THE COURT:  Okay. All right. I

12  understand that. We're not going to beat that. We've already beat that dead

13  horse.

14  I'm trying to get to a point where we'll have an understanding here and

15  it will be the Order of the Court that for the items that the State intends to use

16  in evidence, whether they have already been identified or are yet to be

17  identified, I want either something similar to Defendant exhibit 'M', if they're

18  not already there, and State's exhibit '169' and '170' to be provided for each

19  one of those items in addition to what might already be on the items

20  themselves and that would show the chain of custody. I'm going to make a

21  ruling that chain of custody of items in the Lucious Upshaw case are not

22  relevant and the subpoena, well, I'm not going to force the enforcement of a

23  subpoena regarding anything regarding to the murder of Lucious Upshaw.

1   I'm not going to force a subpoena for chain of custody information either in

2   the nature of Defendant's exhibit 'M' or State's exhibits '169' or '170' for items

3   that the State clearly does not intend to use or the defense does not intend.

4   Now, if there's an item the defense wants to use in their case, if he's going to

5   present evidence, that would be an issue for him to worry about, I suppose.

6   But, if the State has anything else in the nature of Defendant's exhibit 'M' or

7   '169' and '170' for items that it intends to use, well, if they're not already there

8   and they're not clearly evident on the items themselves I'm ordering the State

9   to get those by tomorrow morning so Mr. Rion will have those.

10   Again, just so it's clear, as far as the subpoena for records pertaining

11   to the murder of Lucious Upshaw, I would quash that subpoena. At least I'm

12   not going to force the State to follow through with that subpoena because

13   that's not relevant.

14   So, is that clear?  Does everybody understand where we're going?

15   MRS. KOHLRIESER:  Yes, your Honor.

16   Just one thing in relation to that.  If there is something that Mr. Rion thinks

17   that there is a gap in that in looking at those over two hundred items or

18   whatever it is, in looking at that if he believes there's a gap and now

19   especially that he knows things like State's exhibit '169' and '170' exist, if he

20   would like to point those out to me I'm trying to facilitate that.  I am not trying

21   to --

22   THE COURT:  I mean, that would be great

23   to do.  But, see they don't have a burden.

1      MRS. KOHLRIESER:  I'm not saying that,

2      your Honor.

3      THE COURT:  He doesn't have the burden

4      to point out gaps.  You have the burden to fill gaps.  If you don't know a gap

5      exists, I don't know.  I mean, you should know your evidence better than Mr.

6      Rion knows your evidence.  You should know the chain of custody better than

7      the defense knows it.

8      MRS. KOHLRIESER:  Your Honor, I know

9      the chain of custody.  I know exactly what that property room is like and the

10     integrity of it.  So, I had no questions in that regard.

11     THE COURT:  But, I mean, you should

12     know -- you should know the existence of documents that would -- you should

13     know if there exists State produced documents.

14     MR. MILLER:  It's not -- it's not a matter of

15     whether they exist or not.  They exist.  Here's the problem.  You provide one

16     thing and it leads to two more.  You provide those two and it leads to two

17     more, which is four.  That's the problem in trying to keep up with them.  It's

18     not a matter of knowing the evidence or even knowing the chain of custody.

19     We can produce it.  She has said that.  The problem is once you produce one

20     then --

21     THE COURT:  You can or cannot?

22     MR. MILLER:  We can produce it.

23     THE COURT:  You have.  Yea.

1   MR. MILLER:  We can produce the chain

2   of custody.  We can do that.  The problem is this - and this is what I'm talking

3   about it expanding into areas that are not related to the original issue.  Once

4   you produce one piece of paper, he wants two more.  You produce those two

5   more and he wants two more.

6   THE COURT:  Whose thought is it that the

7   first piece of paper requires two more to explain it?

8   MR. MILLER:  Explain it to this case.

9   THE COURT:  How do we know that?

10  MR.MILLER:  Because it had the C.F.S. for

11  Lucious Upshaw on it.

12  THE COURT:  I've already ruled.  Let's not

13  worry about Lucious Upshaw.

14  MR. MILLER:  I know.  But, --

15  MRS. KOHLRIESER:  Tony, Tony, just let

16  it go.  Just let it go.

17  THE COURT:  There's nothing about

18  Lucious Upshaw that is going to be in this case.  Let's make that clear.

19  MRS. KOHLRIESER:  I think he's just

20  using that as an example, your Honor.

21  THE COURT:  But, you give records of the

22  Kenneth Warrington shell casings going to London.  Okay?  It's not the

23  Lucious Upshaw case.

1    MR. MILLER:  He has that.  That's the

2    point.

3    THE COURT:  He had those.  When did he

4    get those?  He got those late.

5    MR. MILLER:  He's got the chain of

6    custody.

7    THE COURT:  So, then now he's

8    wondering is there some other problem with the chain of custody of the

9    Warrington murder evidence.  So, he asked for Defense exhibit 'M'.  He gets

10   Defense exhibit 'M'.  It appears from the testimony of witnesses that perhaps

11   Defense exhibit 'M' doesn't cover everything.  Therefore, State's exhibits '169'

12   and '170' are produced to explain apparent gaps.  It's the State's burden to

13   show chain of custody.

14   MRS. KOHLRIESER:  Yes.

15   THE COURT:  I suppose if he didn't want

16   to say anything about it ever he could wait until closing argument and say that

17   there's a bunch of gaps in this stuff.

18   MR. MILLER:  But, the idea that it can be

19   produced when he produces a subpoena at eight-thirty in the morning to be

20   produced at twelve-thirty --

21   THE COURT:  Okay.  Let's forget about

22   the subpoena.  I'm not requiring you to comply with the subpoena because it

23   asks for records pertaining to a murder of Mr. Upshaw.  Let's forget about

1   that. The chain of custody is a legitimate issue; is it not?

2   MR. MILLER:  It is.  My point is is that he's

3   got it.

4   THE COURT:  Okay.

5   MR. MILLER:  He's getting it.

6   THE COURT:  Okay.  Well, that's where

7   we started - is the representation now that he has it.  I believe the answer was

8   'yes, to the best of your knowledge'.

9   MR. MILLER:  Unless he's got another

10   question about the chain of custody.

11   THE COURT:  Well, you know, --

12   MRS. KOHLRIESER:  We've been looking

13   into it, your Honor, ever since he wanted it.  But, the thing is is the short

14   notice of him wanting it on everything.  That's all.

15   THE COURT:  I understand that.  I

16   understand.  That's why I'm trying to make it less burdensome and saying

17   that you don't have to give him everything that he asked for.  Just give him

18   stuff that's related to the evidence that's been identified or that you intend to

19   use, to the extent that it's not already covered.  I don't think it's that much of a

20   burden.  I mean, it sounds like I.D. Officer Carman has said it's pretty easy - 'I

21   go down this list and I see anything that's got 095098 on it' and that fills in the

22   gap for Defense exhibit 'M'.

23   MRS. KOHLRIESER:  But, your Honor,

1    they keep those chronologically by date. So, you can't just go look up in

2    095098. That's what I'm saying. It just takes hours. That's all.

3    THE COURT: I can't help that. I can't help

4    that. They better get a better computer so they can punch in a number and

5    say give me everything for that.

6    MRS. KOHLRIESER: When the taxpayers

7    will pay for that, we will.

8    THE COURT: Well, I know it's a problem

9    because they started out with paper, the old way. I'm sort of like, and to this

10    extent only, sort of like I.D. Officer Whitney in that I like the old school. I like

11    to see paper. I'm not used to the computer age yet. But, apparently the

12    Police Department, according to the testimony, has made changes a couple

13    of times. It's not you guys' fault. But, if they're going to make changes they

14    ought to make the changes accommodate the information they have on the

15    old paper - transfer the old paper to the computer and transfer the first

16    computer over to the new computer so that when you print out a Defense

17    exhibit 'M' it doesn't have any gaps. That would be the perfect world and I

18    know we don't live in that. So, we've got what we've got. Let's go forward.

19    Any other questions or concerns about the chain of custody items that

20    we have here in Defense exhibit 'M', State's exhibits '169' and '170', and also

21    all of the chain of custody evidence that's contained upon the exhibits

22    themselves? Anything else?

23    MR. RION: Just so it's phrased properly,

there were two requests in our subpoena.  The first part was for the Upshaw

issue.  I get it.  I'm not interested in the Upshaw issue.  The second part of

that subpoena did deal with this, and I just want it clear that that part of the

subpoena wasn't quashed and it was pursuant to the subpoena power that

Mr. Carter has under the Constitution that these documents were requested.

THE COURT:  Okay.

MR. RION:  So, as long as that is clear --

THE COURT:  Yea, it's clear.  It's clearly

on your subpoena.  I would find that the State made a good faith effort by

producing Defense exhibit 'M' to comply with your subpoena and they further

made a good faith effort to continue to comply when they became aware that

there may be some gaps because of the way the computer system reads on

Defense exhibit 'M' and so they further made a good faith effort to get you

'169' and '170.'  Even though we were running late in the day and the

Prosecutor thought that I.D. Officer Carman would be brief, well, he wasn't.

But, that's another reason I'm giving you -- I was planning on giving you the

continuance to look over '169,' and '170' anyways.  This also gives the

opportunity for the State to maybe double-check and see if there's anything

else out there so they can, in good faith, comply with that subpoena.

Again, the problem arose because of the lateness of the discovery of

the trips to England to the shell casings.  It was compounded by the last

minute subpoena, which you wouldn't have known to subpoena things unless

you got the London information.  It's compounded by the fact that we're in the

1    middle of the trial and none of you folks can run about and do things while

2    you're in trial. It's compounded the problem by the fact that L.P.D. has

3    apparently changed their recording system from paper to computer at least

4    twice. So, here we are. You've got it. It's there. So, I hope there's no

5    questions about my ruling there.

6    The other thing I'm going to touch on while we're on the issue is there

7    was a subpoena to the Sheriff's Department apparently regarding some

8    firearms or conceal carry records pertaining to Miss Burkholder. There is a

9    Motion to Quash by the Sheriff's Department in the file. We had a discussion,

10    I think off the record, on that. I don't know, Mr. Rion, if you -- I understood

11    you to say don't worry about that, that you got the information you needed

12    from Miss Burkholder herself. Is that correct?

13    MR. RION: It is. She had initially stated it

14    was in 2007. It was clear, and she clarified it, that it was 2008. So, the issue

15    became moot.

16    THE COURT: Okay. So, as far as that

17    goes, then that's a moot issue.

18    Here's another issue and this is all, again, created by these late, late,

19    late subpoenas that come in. A lot of defense's subpoenas look on their face

20    perhaps to not have good service. There was a subpoena issued for -- the

21    defense subpoenaed a couple of things. I think you issued a subpoena -- I'm

22    just looking at them here. As they come in I get a quick chance to look at

23    these. There's a subpoena for the keeper of the property chain of custody for

1  Lima Police Department.  It doesn't really say what you want them to bring.

2  MRS. KOHLRIESER:  Are you talking

3  about for eight-thirty this morning, your Honor?

4  MR. RION:  I think that was just for the

5  officer to be here.  I didn't know if I needed to --

6  THE COURT:  Well, I don't know.  What

7  I'm saying is your return of service from whoever Mr. Dixon is, -- he's

8  apparently your process server?

9  MR. RION:  Yes, sir.

10  THE COURT:  He's got the proof of service

11  being served on one Agruello Harris, who I don't think --

12  MR. RION:  Agruello was served with a

13  separate subpoena.  I don't know if they put them together.

14  THE COURT:  Well, there is a subpoena

15  for Agruello.

16  MR. RION:  Right.  He was served and he

17  appeared this morning.

18  THE COURT:  And we've got the return on

19  that.

20  MR. RION:  Yea, and he appeared this

21  morning.

22  THE COURT:  But, on this other subpoena,

23  there were a couple of them, I think, I found two of them for the keeper of

1 property of chain of custody. They're defense subpoenas. The return -- you

2 might want to double-check with Mr. Dixon and see if he knows what he's

3 doing because he's returned subpoenas to the Police Department served

4 upon Agruello Harris. I don't think Agruello Harris is the keeper of the records

5 of the Lima Police Department.

6 MR. RION: No. I hope not.

7 THE COURT: That's the kind of record

8 that we've got here. I'm just pointing that stuff out. I don't know if you want

9 Agruello in or what. It looks like Agruello got served.

10 MR. RION: He did and he appeared. The

11 other one is for Officer Carman just in case I had to certify the records of

12 Defense exhibit 'M'. He appeared compliant to that.

13 THE COURT: I just want to say you don't

14 come back later and say that your witness didn't show up and I say, he was

15 served, and you say, 'well, yea, he was served', and then the record shows

16 that maybe he wasn't.

17 MR. RION: I understand. Thank you, your

18 Honor.

19 THE COURT: I mean, this is what

20 happens when it's in the middle of the trial. So, --

21 MRS. KOHLRIESER: Your Honor?

22 THE COURT: Yea?

23 MRS. KOHLRIESER: In that regard, I said

1    something to Mr. Rion today, but I'm going to put it on the record due to

2    some, I guess, apparent issues of faith between us, but I noticed there were a

3    number of subpoenas for various documents by the defense and other than a

4    brief report from some J.G.I. investigators and some CD's the State has not

5    been in receipt of any kind of physical evidence, written evidence, or anything

6    of that nature. We've gotten witnesses names. We've gotten some witness

7    addresses, but not all of them. Whether he intends to call them or not, I don't

8    know. But, you know, we can't necessarily get to somebody if we don't know

9    where to, you know, get to them to speak to them. So, with those things said

10   I guess I just wanted to put on the record that, again, no documents, other

11   than the ones I've represented, have been supplied to us.

12       THE COURT:  So, you subpoenaed some

13   documents?

14       MRS. KOHLRIESER:  No, no, no. They

15   subpoenaed some documents and things of that nature.

16       THE COURT:  I was just looking for those

17   because I don't see them in the batch of subpoenas that just came in last

18   night.

19       MRS. KOHLRIESER:  For instance, like

20   there's the thing for Coleman Behavioral Health or what have you. There's

21   just different things. Today he subpoenaed, I believe, some kites or

22   something of that nature from the jail. Even though the jail is a County

23   agency they're not us. They're not the State. They're not the Prosecutor's

1    Office. I don't have any of those documents, either.

2          THE COURT: Okay. I'm not seeing those

3    subpoenas. Maybe they haven't been returned yet.

4          MR. RION: Your Honor, the only

5    documents that we have received that may be relevant to --

6          THE COURT: Oh, here - I'm sorry - here it

7    is.

8          MR. RION: -- admission would be things I

9    received today, which is simply the indictments and Orders of Conviction for

10   Mr. Upham and for Mr. Moore. So, that's all that I have. They've received

11   everything. I thought I had been very open with them as far as who my

12   witnesses were going to be. I told them -- I was very open with

13   them about the case itself. So, these are the documents that we've received

14   to date. It's just the indictments and the convictions, which they are clearly

15   aware of for Mr. Upham and Mr. Moore.

16         THE COURT: Okay. I'm going to take

17   everybody at their word that they're trying to be open and honest about this.

18   We're trying to avoid surprises and last minute things. I know it's difficult to

19   do. But, we'll move onward and upward. Okay?

20   Is there anything that I haven't ruled upon that someone wants a ruling

21   on? Anything?

22         MRS. KOHLRIESER: Nope.

23         MR. RION: No.

THE COURT: All right. I'm trying to keep up with it. See everybody in the morning at eight forty-five. Make sure your exhibits and plastic bags and everything are together. These are your exhibits. Nothing's been admitted yet. Make sure everything is present and accounted for.

**(WHEREUPON, COURT RECESSED FOR THE DAY AT 5:22 P.M.)**

**(VOLUME FIVE CONCLUDED.)**