IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

----------------------------------------------------------------

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO. CR2014 0139 |
| | * | |
| Plaintiff | * | |
| | * | **TRANSCRIPT -** |
| -VS- | * | **JURY TRIAL** |
| | * | |
| **MARKELUS Q. CARTER** | * | |
| | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

----------------------------------------------------------------

A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio 45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

(VOLUME 6 OF 10)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# T A B L E   O F   C O N T E N T S

## (VOLUME 6 OF 10)

**TUESDAY, SEPTEMBER 15, 2015 -**

COURT COMMENCED AT 8:56 A.M. ... 984

STATE'S TWENTIETH WITNESS CONTINUED -
I.D. OFFICER MICHAEL CARMAN - RION ... 985
- KOHLRIESER ... 1001
- RION ... 1010

STATE'S TWENTY-FIRST WITNESS -
I.D. OFFICER GREGORY ADKINS - KOHLRIESER ... 1012
- RION ... 1024
- KOHLRIESER ... 1032

DISCUSSION REGARDING EVIDENCE/TESTIMONY
OF NEXT STATE'S WITNESS ... 1034

STATE'S TWENTY-SECOND WITNESS -
JOSEPH MOORE - MILLER ... 1040
- RION ... 1052
- MILLER ... 1069
- RION ... 1075

STATE'S TWENTY-THIRD WITNESS -
CARLOTTA WILLIAMS - MILLER ... 1079
- RION ... 1103
- MILLER ... 1112

STATE'S TWENTY-FOURTH WITNESS -
MATTHEW CONGLETON - MILLER ... 1114
- RION ... 1140

STATE'S TWENTY-FIFTH WITNESS -
KEVIN KRAMER - KOHLRIESER ... 1144

DISCUSSION REGARDING MOTION FOR MISTRIAL ... 1181

COURT RULING - MOTION FOR MISTRIAL UNDER
ADVISEMENT ... 1196

JURY EXCUSED FOR THE DAY AT 4:31 P.M. 1198

COURT RECESSED FOR THE DAY AT 4:32 P.M. 1198

VOLUME SIX CONCLUDED 1198

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**NOTE:**   THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE.  SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS.  HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT 436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436 MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM (ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS TO AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S CRUISER.

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFLE IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSCT9 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT 436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULUM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
HEAD/NECK;

**- DEFENDANT'S EXHIBITS -**

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT 122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - **(NOT ADMITTED BY COURT)**;

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A. MOORE;

DD - JUDGMENT ENTRY ON SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R. FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON **(WITHDRAWN BY THE DEFENSE)**;

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS- STEPHEN UPHAM, LUCAS CO. CASE NO. G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR VICKIE BARTHOLOMEW;

**<u>COURT'S EXHIBITS</u>** -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW) BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED A.C.S.O. OFFENSE REPORTS;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1   TUESDAY, SEPTEMBER 15, 2015

2   8:56 A.M.

3

4   THE COURT: All right. Today is the 16th

5   of September, 2015 - excuse me - the 15th of September. I'm a day ahead of

6   myself. It's the 15th of September, 2015. We're reconvening in CR2014

7   0139, State of Ohio -vs- Markelus Q. Carter. The record should reflect the

8   defendant is present in Court with his attorney. The State is present. All the

9   jurors have returned from the evening recess.

10  Welcome back, ladies and gentlemen of the jury. I hope you got a

11  good night's sleep. It's beautiful weather outside. I'm going to ask - is there

12  any juror who feels like there's been a violation of any of the rules that we've

13  said in terms of your behavior after you leave the Courthouse? Has anybody

14  been influenced by anything in the media or feel that they can't continue to be

15  fair and impartial? All right. Very good.

16  We'll continue with the State's case. I.D. Officer Carman was on the

17  stand. I believe the direct examination was completed. So, Mr. Rion, you

18  may inquire.

19  MR. RION: Your Honor, do you know what

20  letter we're on?

21  THE COURT: 'Z'. You're at 'Z'. After 'Z'

22  just start doubling with 'AA' and 'BB'.

23  MR. RION: Thank you.

1   CROSS EXAMINATION OF L. D. OFFICER MICHAEL CARMAN

2   BY MR. RION:

3   Q  Good morning, sir.

4   A  Good morning.

5   Q  I'm going to hand you what's been marked as Defendant's exhibit 'Z'.

6   Were those documents turned over last night and this morning?

7   A  Yes.

8   Q  Between Defendant's exhibit 'M', which is the log you looked at

9   yesterday, and State's exhibits '169' and '170', do we now have the complete

10   property log as it relates to the relevant parts of this case?

11   A  Yes.

12   Q  The Lima Police Department has given everything that it has that can

13   document where things were or were not as it relates to this case?

14   A  To the best of my knowledge; yes.

15   Q  Now, the documents that were turned over this morning were found

16   last night and they deal with what year?

17   A  This exhibit -- well, I don't know what that letter is.

18   Q  'Z'.

19   A  That's a 'Z'? Okay. Exhibit 'Z', -- these are pertaining to, well, the year

20   of the case or the year of the --

21   A  Just the year of when the evidence is being documented.

22   Q  Okay. Specifically on this exhibit it is documented from 7-21 of '15 is

23   the last entry.

```
 1    Q.   Okay.  And the first entry?

 2    A.   The first entry is 9-9 of '15, 2015.

 3    Q.   So, the documents that you were able to find deal with information

 4         related to 2015 for the evidence, correct, and not for 2009, '10, '11', '12', '13

 5         or '14, correct?

 6    A.   The document that I'm looking at now, this is specific to item number

 7         one oh three, which is the L.P.D. item number one oh three.

 8    Q.   And there's multiple pages to Defense exhibit 'Z'.

 9    A.   Yes.

10    Q.   Is it the same time frame for each of those pieces of evidence?

11    A.   Yes.

12    Q.   Different piece of evidence, same time frame?

13    A.   Correct.

14    Q.   So, that's 2015.  Now, State's exhibit '169' that was shown yesterday

15         to the jury, let's deal with this signature line down here.  Who generates this

16         document?

17    A.   That is a -- which one?  Are you talking about the entire document?

18    Q.   Yes.

19    A.   That document is generated by B.C.I.

20    Q.   Okay.  And '170', as well, is a B.C.I. generated document?

21    A.   Yes.

22    Q.   So, these are really B.C.I.'s property logs and not necessarily the Lima

23         Police Department's property logs; correct?
```

986

```
 1    A   No.

 2    Q   Let me state it another way.  This is a receipt that's given to you, or an

 3        officer, by B.C.I.?

 4    A   Yes.

 5    Q   And you talked about this whole concept of redundancy; right?

 6    A   Yes.

 7    Q   Now, these are the only two documents that relate to, or, that were in

 8        the file as it relates to documents produced by B.C.I., or receipt material?

 9    Q   This is the chain of custody record as we have it; correct?  Just so there's no

10        confusion, these two documents, '169' and '170', and Defendant's exhibit 'Z'

11        and Defendant's exhibit 'M', which is the computer logs, that's the record that

12        we have in this case for property logs; correct?

13    A   No.  This is specific to these items.

14    Q   Yea.  Correct.

15    A   It wouldn't be every piece of item on there.

16    Q   I understand.  Evidence, relevant items, that we're talking about in this

17        case?

18    A   That we have discussed in this case; yes.

19    Q   Okay.  So, for example, in 2014 -- well, referring to Defendant's 'M',

20        and I'll just show you, it appears as if in 2010 some items went from Bowling

21        Green, from B.C.I., back to the crime lab; correct?  I'm sorry, back to the

22        property room.

23    A   This one you're showing me right now is specific to one item.
```

987

1   Q   Correct.

2   A   Which would be on the top right hand corner. I can't see it. But, yes, it

3       did go to Bowling Green.

4   Q   Okay. So, just as an example --

5   A   Bowling Green, which is B.C.I., the lab.

6       MRS. KOHLRIESER: What item? What

7       item is that, Mr. Rion?

8       MR. RION: This would be one oh one nine, the

9       casings.

10  Q   Okay. So, here, if we just look at this as an example, this is Defense

11      exhibit "M"; correct?

12  A   Yes.

13  Q   This is what you provided to the Court, to us, as the property log for

14      this case; correct?

15  A   Yes.

16  Q   And this appears to be the shell casings that were found over on

17      McKibben; correct?

18  A   I have to take you at your word. I can't see it.

19  Q   Winchester, nine millimeter.

20  A   Oh, yes. Okay. Yes. What item number is it?

21  Q   It's one oh nine.

22  A   One oh nine? Okay. That's specific to that piece of evidence; yes.

23  Q   This is on the concept of redundancy for a second.

886

1   A   Uh-huh.

2   Q   The logs that you have -- you don't have -- you said yesterday that you

3       prefer this redundancy method because it creates, or, allows you to have a

4       second way of looking at things.  You don't have a record then of this transfer

5       in 2010 from a redundancy point of view; correct?

6   A   Which specific transfer?

7   Q   This issue from Whitney to Bowling Green in 2010.  So, Bowling Green

8       to Whitney in 2010, April of 2010.

9   A   I have it right there.  Is that what you're talking about?

10  Q   Well, remember yesterday you said that you have two ways of

11      documenting information?  You have the computer and then you have this

12      paper trail that creates, and I think the term that was used was redundancy.

13  A   I do remember that word; yes.

14  Q   Okay.  The whole idea that you were talking about in showing State's

15      exhibit '169' and '170' is that you keep this redundancy so that everything is

16      documented; correct?

17  A   You always have paperwork.  The computer is becoming the

18      paperwork nowadays.  Okay?  So, to avoid the issue of a computer crash, or

19      a failure, or a server failure, we try to keep paperwork on hand.

20  Q   Right.  That's what you said yesterday.

21  A   Is that the question you're asking?

22  Q   That's what I heard you say yesterday.

23  A   Yes.

686

1  Q    My only point today is that that's the only paperwork you have on hand

2  and you would agree that it does not document all these transfers back and

3  forth as well as it could; correct?

4  MRS. KOHLRIESER:  Your Honor, can we

5  approach just a moment?

6  THE COURT:  Sure.

7  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

8  the record, as follows.)

9  MRS. KOHLRIESER:  I'm really not trying

10 to be obtuse here, but what I had do him do was if it wasn't in the computer log I

11 had him go get the paperwork for it to show that that transfer happened and

12 when it happened.  I didn't have him go pull all the things, like the B.C.I.

13 paperwork that he gets, on everything if it was in the log that we already gave

14 him.  So, I think there may be some misconstruing - not intentionally - but, I

15 thought I needed to account for where everything went, the chain of custody,

16 and that's what I was doing.  But, I didn't have him go back and pull every

17 evidence submission sheet or every evidence return sheet on all of the

18 evidence here because if it was involved on 'M' I didn't have him pull that.

19 That's what I thought the Court was wanting me to do was if I had paperwork

20 to fill gaps then I gave that paperwork to fill the gap.  That's what I did.  I don't

21 know if --

22 THE COURT:  Well, I'll let you ask him

23 those kinds of questions on redirect.

1     MRS. KOHLRIESER: Okay. Well, I just

2 didn't want (inaudible).

3     THE COURT: So, you're saying there are

4 other B.C.I. receipt forms --

5     MRS. KOHLRIESER: Absolutely.

6     THE COURT: -- that you didn't provide?

7     MRS. KOHLRIESER: I only gave the ones

8 that there was a gap. If it was in 'M' I thought, 'okay, it's covered; he has

9 that'. I was only going to find paperwork that would cover the gaps. I was

10 here till, I don't know, eight-fifteen last night trying to do that right after Court.

11     THE COURT: I don't know what his

12 answer to your next question is going to be, but they're saying there's other

13 receipt returns.

14     MR. RION: Okay, I understand.

15     THE COURT: All right.

16     (WHEREUPON, Court continued on the record, as follows.)

17     THE COURT: Go ahead.

18 Q You told the Court and the jury they have in possession the chain of

19 custody logs; correct?

20 A Yes.

21 Q Okay. This redundancy method that you said there was a back-up set

22 of paperwork that you keep as a log doesn't cover all of the transactions;

23 does it?

166

1   A   Specifically what?

2   Q   It doesn't cover every transaction.

3   A   This here?

4   Q   No.  Generally.

5   A   Well, generally it does cover every transaction.

6   Q   Okay.  So, you have a redundancy log for every transaction; correct?

7   A   I'm not sure what your question is.

8   Q   Do you have a redundancy log for every transaction?

9   A   We generally have paper back-up for the computer system, which is

10      our log.

11  Q   And that's been provided; correct?

12  A   Yes.

13  Q   All right.  I'll leave that.  Let's deal with what we can tell from this.

14  Now, this is the shell casings that are -- I'll hand you -- what State's exhibit is

15  that?

16  A   '73'.

17  Q   And what does that appear to be?

18  A   It states on the evidence tag that it's a fragment.

19      THE COURT:  That's '68' or '69'.

20  Q   Here's '68'.  What is State's exhibit '68'?

21  A   '68' is documented as a Winchester nine millimeter casing, I believe.

22  Q   Okay.  Are you able to line that up with this?

23  A   Well, that's one oh nine.  You'd have to go to one oh eight.  This is

1  the documentation for item number, L.P.D. item number one oh eight.

2  Q  Okay.  Now, let's just go through the history of one oh eight.  One oh

3  eight would show that it went from Marik on February 23rd into the crime lab;

4  correct?  I'm sorry.  Into the property room; correct?

5  A  Yes.

6  Q  And then on the 24th it went from Marik to B.C.I.; correct?

7  A  Yes.

8  Q  Then, looking down further, it shows that it came back in April.  Let's

9  see.  In September it went from Bowling Green to the property room; correct?

10  A  Yes.  September 3rd; yes.

11  Q  Then, in November it looks like it goes again from the property room to

12  Bowling Green.

13  A  November 5th on the screen; yes.

14  Q  Then in April, from Bowling Green back to the property room; right?

15  A  April 22nd; yes.

16  Q  Then it says in May it goes from the property room to Detective Clark

17  over here; right?

18  A  It says it was transferred from C block, which was part of our property

19  room, to Detective Clark; yes.

20  Q  And then it shows from May to October it's out; correct?  That's what it

21  shows?  So, in May it shows it goes to Clark?

22  A  Yes.

23  Q  And then it doesn't get returned, Adkins doesn't return it until October;

994

```
 1   correct?
 2   A    Yes, that's what is showing.
 3   Q    In looking at all the documents you have you have no explanation as to
 4   where it is from May until October; correct, with no documentation?
 5   A    Well, it goes to Detective Clark.  Detective Clark would have to
 6   document where it goes from there.  Once it leaves our possession it's
 7   documented either to another agency, or a Detective, or a Court.
 8   Q    My point is, from May until October you have no idea where it is from a
 9   log point of view from the property room?
10   A    From that log it doesn't show where it was; no.
11   Q    So, I could ask Detective Clark.  But, clearly it looks like from May until
12   October it's not there in the property room; fair?
13   A    According to that document; yes.  That's not uncommon.
14   Q    Now, I want to show you item, or exhibit, number fourteen - a pair of
15   gloves.
16   A    Okay.
17   Q    Okay?  So, there was testimony -- let's look at the documentation of
18   the pair of gloves that I'll just tell you were allegedly found in Markelus' house.
19   Okay?  Let's just use that as the assumption; all right?
20   A    Okay.
21   Q    From here, well, on February 23rd who was it that had possession of
22   those and who then turned them into the property?
23   A    According to the log it says Detective Clark.
```

1   Q   Okay.  And not Detective Whitney; correct?  Or, Officer Whitney?  It

2       doesn't say that?

3   A   Well, it was created by Officer Whitney, the K.W., which means that he

4       was the one that documented it into the computer.

5   Q   Okay.  So, K.W. is Officer Whitney?  So, he acknowledges that it was

6       Clark who gave it to him to put into the property room at seven-thirty on

7       February 23rd; correct?

8   A   No.  It states that it was transferred to the detective bureau.  I can only

9       assume that it was secured in the I.D. locker.

10  Q   I don't want you to assume.  Okay.  So, Clark has it at the detective

11      bureau, or, who has it?

12  A   According to this document it was transferred from Tim Clark, which is

13      Detective Clark, to the detective bureau.

14  Q   Okay.  And the detective bureau is different than the property room?

15  A   Correct.

16  Q   Is it in the same building?

17  A   Yes.

18  Q   Different floor?

19  A   No, same floor.

20  Q   Same floor, but different area?

21  A   A wall or two between.

22  Q   Then, two days later, on the 25th, it goes from Clark to Marik; correct?

23  A   Yes.

595

1    Q    So, during those two days it seems as if the detective bureau has

2    possession of those gloves.

3    A    I don't know. I wasn't there.

4    Q    I'm just talking from the log. I'm asking you to testify as to what you're

5    looking at. That's the way it looks on paper; correct, from the documentation?

6    A    According to the documentation from the 23rd to the 25th; yes.

7    Q    So, then it shows it goes to where, probably B.C.I. on March 13th of

8    2009?

9    A    Your hand is covering it. Yea, transported to B.C.I. B.G.

10   Q    And then we have State's exhibit '169' and '170' which will show, in

11   fact, that on March 3rd -- well, looking at '169' here, State's exhibit '169', does

12   that indicate anything about when B.C.I. received it?

13   A    Item number fourteen, which I don't recall -- well, let me find the lab

14   number.

15   Q    That's not it. We're on a different --

16   A    Okay. Without looking at the lab number, B.C.I. gives item number

17   fourteen another lab number, and I don't know what that item number is.

18   Q    Okay. Does this have --

19   A    This document here, exhibit '169', gives item numbers. However, they

20   don't coincide with the L.P.D. item numbers. Once they take it in their

21   possession the first item that they bring in, even though our item number may

22   say twenty-five, it's number one for them.

23   Q    State's exhibit '132'. Does that appear to be a pair of gloves?

966

997

1    A    Yes, it's one pair of black gloves, item number fourteen, which is the
2    L.P.D. item number, and then it is documented as item number eighteen from
3    B.C.I. So, on this paperwork here, this evidence receipt log from B.C.I., item
4    number eighteen, which is the same as this is documented as being received
5    and brought back by Officer Goedde on 9-3 of 2009. It's got his signature
6    affixed.
7    Q    What about March 13th of 2009?
8    A    On this piece of paper?
9    Q    On any of the logs. Sure.
10   A    This is just a return receipt documentation. That wouldn't have that on
11   it.
12   MRS. KOHLRIESER: Your Honor, for the
13   record, if Mr. Carman could just say what exhibit he's looking at?
14   A    I'm sorry. This one here was '169'.
15   Q    So, this is showing that on September 3rd of 2009 that this property
16   was allegedly returned; correct?
17   A    It's showing it was returned.
18   Q    But, this is a B.C.I. sheet saying they gave it to an officer; right?
19   A    They gave it to a law enforcement officer that works for the Lima Police
20   Department. His name is Officer Goedde.
21   Q    No documentation as to what happened once Goedde got it as far as
22   driving it back and putting it back in the property room; correct?
23   A    It wasn't logged at that time. That's the reason we keep the

1 paperwork.

2 Q Let's go to State's exhibits '130' and --

3 A '131'?

4 Q -- '131'. Same sort of questions.

5 A Which one?

6 Q Find the corresponding property in Defendant's exhibit 'M'.

7 A I've got our item number two fifteen and two fourteen.

8 Q Again, looking at that, that would be that then?

9 A That's two fifteen. That's the one I have in my hand. That's State's

10 exhibit '131'.

11 Q Okay. That's going to be the camouflage shirt; correct?

12 A Yea. It says it's a camouflage shirt on the evidence tag, which is the

13 L.P.D. evidence tag. It's marking it as item number two fifteen. The B.C.I. lab

14 number is item number twenty-four.

15 Q And this would indicate that it was received on the 23rd; correct?

16 A It states that Whitney, Officer Whitney, at the time, transferred it to the I.D.

17 Bureau.

18 Q And as far as the property log goes, between February of 2009 and

19 December of 2013 is there any activity?

20 A As far as that piece of document; no.

21 Q And we know that's not true; correct?

22 A That specific item?  The lab number documents the lab submission

23 tag.  It says a submission date of 12-12 of '13, which it states 12-12 of '13 on

1        there.  Is that what you're asking?

2   Q   You're saying it never -- well, was it -- was it taken out in

3        September?

4   A   Excuse me?

5   Q   Did it leave before 2013?

6   A   According to this; no.

7   Q   Well, according to your other logs?

8   A   I don't have any other logs pertaining to this.  This is a return receipt.

9        But, this specific item, this specific item is L.P.D. number two fifteen.

10       THE COURT:  Why don't you give the

11       State's exhibit number, the red exhibit number?

12  A   I'm sorry.  Exhibit -- State's exhibit '131', which has a lab, a B.C.I. lab

13       number, or, lab sticker above it designating it as item number twenty-four,

14       which states that it was submitted on 12-12 of '13, which is the same

15       documentation on this monitor.

16  Q   So, '169' and '170', in 2009, is there any indication that that document,

17       these clothes, were involved on that?

18  A   Item number twenty-four specifically?  I'm sorry, State's exhibit '131'?

19  Q   Yea.

20  A   Which is B.C.I. item number twenty-four.  Give me just a second here.

21       No, it does not show a return receipt from B.C.I.

22  Q   The same with State's exhibit '130'?

23  A   State's exhibit '130', which is another camouflage shirt, item number

666

1     two fourteen for L.P.D., which has a B.C.I. number of item number

2     twenty-five, it states the submission date was on 12-12 of '13 from our

3     department to B.C.I. This is a return receipt that you're asking me to look for

4     on this one.

5     Q. I'm just asking you whether or not there's any documentation as to that

6     transfer.

7     A. The documentation on this piece of paper in front of me, or, on the

8     monitor states that it was transferred from the property room to I.D. Officer

9     Adkins on 12-12 of '13. That's when it was taken to B.C.I.

10     Q. Now, you say your property room has been moved twice since 2009?

11     A. Once.

12     Q. Once? What year was that?

13     A. It would have been the fall of last year, or the year prior. I can't

14     remember.

15     Q. You're going through a period of transition with your property room,

16     and the documentation, and the monitoring, or, the documentation of the

17     evidence; is that correct?

18     A. No, there's no transition.

19     Q. Has there been a transition over the last six years?

20     A. We have switched from one computer system to another. Other than

21     that, nothing has changed.

22     Q. And we have the two item numbers -- well, when were you in charge of

23     the property room?

1    A   I became an I.D. Officer in April of 2012.

2    Q   2012? You were not involved before that time period?

3    A   No, sir.

4    Q   So, events -- what were you doing in 2010 and 2011?

5    A   I was on patrol, third shift, as a patrolman.

6        MR. RION:  I have nothing further.  Thank

7    you.

8        THE COURT:  Redirect by the State?

9        MRS. KOHLRIESER:  Just briefly, your

10   Honor, if I could have a minute to kind of get my act together.

11       THE COURT:  Sure.

12                   REDIRECT EXAMINATION

13   BY MRS. KOHLRIESER:

14   Q   Hello again.

15   A   Hi!

16   Q   Officer Carman, Defendant's exhibit 'M', you were asked about

17   that, correct?

18   A   Yes.

19   Q   And Defendant's exhibit 'Z'; correct?

20   A   Yes.

21   Q   Could you, I guess, explain for the jury, I mean, just to refresh them, so

22   briefly what 'M' is. Who prepared it and what does it purport to be?

23   A   'M' is the printed copy of what is in the computer system at this

1    time for chain of custody for specific items of evidence.  They asked for the
2    chain of custody for the items pertaining to this case and that's what this is.
3    Q   Who is they?
4    A   The defense attorney.
5    Q   Okay.  Now, I think it was last week, perhaps, was it brought to your
6    attention that things were seemingly missing from Defense exhibit 'M' as far
7    as the chain of custody goes, where the evidence was at each time and when
8    it came back?
9    A   Yes.
10   Q   You were previously shown State's exhibits '169' and '170'.  What was
11   the purpose in providing those?
12   A   That was to show the documentation on paper that appeared to be
13   missing, or, was missing from State's exhibit 'M'.
14   Q   And then last night, yesterday evening and into the night, did you and I
15   meet?
16   A   Yes.
17   Q   And did we go through the exhibits that the State has put before the
18   Court thus far?
19   A   Yes.
20   Q   What were we doing?
21   A   We were confirming that everything that was requested was there.
22   Q   And is Defendant's exhibit 'Z' some of that documentation?
23   A   Yea.  Exhibit 'Z' is an addition to that was not part of this original

1    exhibit 'M' or '169' or '170'.

2    Q.   And just to short-cut, so to speak, what's contained in Defendant's

3    exhibit 'Z', well, that's actually something you prepared?

4    A.   It's what I -- I did a screen shot because what this is is this is --

5    Q.   I meant data entry.

6    A.   I'm sorry? What now?

7    Q.   Did you put that data in there?  Would you have typed the information

8    that's in there?

9    A.   I didn't last night, but, previously; yes.

10   Q.   Previously?  Okay.  What was missing that prompted you to do that

11   last night?

12   A.   On exhibit 'Z' were specific items, which was the documentation from

13   7-21 of '15 when I took the items to Bowling Green, to B.C.I. Bowling Green,

14   and this document, exhibit 'Z', shows for each item that I had logged in the

15   history, which is separate from the actual chain of custody log.

16   Q.   Okay.  Can you explain why you logged that in the history, yet it

17   wouldn't be on there?  I mean, why was it that you put that in there like that?

18   A.   In September of 2014 we did a change over from an older computer

19   system that had been in existence for years, before I even started on the

20   department, to a new system.  In that change over they took all the existing

21   documents, chain of custody documents, property documents, locations,

22   everything, and they put it on a file and they transferred it to this new system.

23   In doing so upon using the new system we discovered that there was a flaw

1  in the chain of custody. It was a flaw that needed fixed.

2  Q  A flaw in your chain of custody, or a flaw in the computer's?

3  A  No, a flaw in the computer's chain of custody.

4  Q  The recording of it?

5  A  The recording of it; yes. So, therefore, exhibit 'Z' shows, because I

6  knew of the existence of that flaw and it wasn't documenting the chain of

7  custody when we moved things from one place to another, I documented it in

8  the history. There's a comment section on each individual piece of item if you

9  need to add comments. You can add a paragraph. You can add a book if

10  you want to. But, I simply put on this date, which was 7-21 of '15, for this

11  specific item, that I took it to B.C.I. Bowling Green and I put my name on it.

12  Q  Okay. I'm going to hand you State's exhibits '68' through '71' and ask

13  you to take a look at those and tell me when you're done.

14  (WHEREUPON, witness reviewed exhibits.)

15  A  Okay.

16  Q  Do State's exhibits '68' through '71', well, are they what is reflected in

17  Defendant's exhibit 'Z'?

18  A  I'm sorry, I've got to go through the numbers here.

19  Q  That's okay. Take your time.

20  A  Yes, they do.

21  Q  Okay.

22  A  Yes.

23  Q  Okay. So, Defendant's exhibit 'Z' pertains to '68' through '71'?

1    A    Yes.

2    Q    Okay. Thank you. I'll hand you what's been previously marked as

3         State's exhibit '172' and ask you to take a look at that.

4    A    Okay.

5    Q    Now, State's exhibit '172' is a number of pieces of paper; correct?

6    A    Yes. Different.

7    Q    And do the documents that constitute Defendant's exhibit 'Z' also make

8         up part of State's exhibit '172'?

9    A    Yea, they appear to be. Let me check. Yes.

10   Q    Now, there's some additional papers; correct?

11   A    Yes.

12   Q    What are those additional papers in '172'?

13   A    These are B.C.I. submission, evidence submission forms.

14   Q    What does that mean?

15   A    When we submit evidence, when I take evidence to Bowling Green,

16        B.C.I. Bowling Green, for it to be analyzed, whatever it's being analyzed for,

17        this is the sheet of paper that is printed off and given to me showing receipt,

18        that B.C.I. received these items. It also gives the B.C.I. lab number pertaining

19        to our number and also corresponding item numbers to our item numbers.

20   Q    Okay. I want to make sure we're clear. The item numbers that you

21        see on those sheets, those are the item numbers that B.C.I. assigned to your,

22        I guess, L.P.D.'s item numbers?

23   A    Yes.

1005

Q Is that what you were saying - it may be our item one, but they may number it twenty-five, or whatever?

A Yea. If you bring in -- well, the very first piece of evidence that is given to the receiving person, well, if it's item number two fifteen, for example, it's item number one for them because it's the first item they're receiving.

Q Okay. So, is that the sheet that you're given for your records?

A Yes, and I sign it that they received it.

Q State's exhibit '169', for example, that return sheet.

A Yes.

Q Is that something that's given to you, or, whoever is picking up the evidence from the law enforcement agency?

A Yes.

Q Okay. Would, in this case, for '169' Officer Goedde have gotten that from B.C.I.?

A Yes.

Q And, again, is that a copy to keep for records?

A Yes. This is our record of our receipt.

Q When Officer Goedde would have brought that stuff back would exhibit '169' be something he brought back with him to give to the I.D. Bureau?

A Yes.

Q And is this kept as part of the I.D. Bureau's records?

A It's kept in a log; yes.

Q In fact, do you have --

1   A    We have a binder.

2   Q    You have a binder with evidence returns?

3   A    Yes.

4   Q    Do you have a binder with evidence submissions?

5   A    Yes, by year.

6   Q    And so we're clear, State's exhibit '172', along with '169' and '170',

7 were those to fill the gaps in Defendant's exhibit 'M'?

8   A    Yes.

9   Q    And then you were asked particularly about '130' and '131'. Would you

10 take a look at these for me? Let's take '130' first. When B.C.I. receives an

11 item do you know what they do to identify it?

12   A    Yes.

13   Q    What do they do?

14   A    Before they receive it -- well, to give you an example, this yellow tape, I

15 don't know in 2009 what their policy --

16   Q    I guess, how they track it. Let me ask you that.

17   A    Oh, how do they track it?

18   Q    Yes, how do they track it.

19   A    They track it by affixing, and I call it an evidence label, but it's a B.C.I.

20 evidence label, a tracking label, on it. Each year it changes colors. It must be

21 easier for them to keep track of it. But, this year, specifically on State's

22 exhibit '130' it is white and it has a submission date, the department that

23 submitted it, and it gives an agency number, which is the report number, our

1   report number.

2   Q   Now, the one on exhibit '130' is what?  Can you look all over '130', the

3   packaging of '130', and tell me if you see any other B.C.I. sticker?

4   A   No, I do not.

5   Q   The same thing with State's exhibit '131'.  Is there a B.C.I. sticker on

6   that?

7   A   Yes.

8   Q   What color is it?

9   A   Well, there's two of them on there.

10   Q   Okay.  What color are the B.C.I. stickers?

11   A   On State's exhibit '131' there's a green sticker, or light green, and then

12   there's a white sticker.  They're exactly the same size in dimension, but just

13   different colors.

14   Q   Okay.  What are the two dates on those stickers?

15   A   On the light green one 12-12 of '13, submitted by Lima Police

16   Department, and it's got our agency number on there.

17   Q   Okay.  And the white one?

18   A   The white one is submitted 12-12 of '13.

19   Q   Okay.  So, one day apart?

20   A   No - the same day.

21   Q   Okay.  Do you see, other than 2013, do you see any other evidence

22   stickers on there from B.C.I.?

23   A   No.  Usually they keep them at the top so they're easily found.

1  Q  Okay.  Now, let's take '131' as an example here.  Do you see your

2  initials on that packaging?

3  A  Yes.

4  Q  Do you see your initials only once?

5  A  It's been opened multiple times so give me a second here.

6  Q  Okay.  So, yours or Officer Adkins.

7  A  I see Officer Adkins.  I also see my initials on there.

8  Q  Okay.  Do you see any other initials on that packaging?

9  A  There's initials from B.C.I.  I don't know the specific person, but I

10  recognize the way they initial stuff.

11  Q  Okay.  What's the date on that?

12  A  This one up here is 1-13 of '14.

13  Q  Okay.

14  A  This one here is separated because this was the original seal, but it

15  appears to be 1-13 of '14.

16  Q  Okay.  And are there initials up here at the top?

17  A  Oh, yea.  At the white B.C.I. label there's also initials of 1-13 of '14.

18  Q  Okay.  Turn it over.  Do there appear to be some initials just above

19  your thumb there, where there would have been tape at one time?

20  A  Yea.  The tape's not here.  Yea, there's initials and then there's a date

21  underneath, at the bottom.  Normally they write their initials at the top or the

22  bottom edge of the tape and then the other side you write the date.

23  Q  So, in looking at State's exhibits '130' and '131' do you have any

1    reason to believe that these were sent, and Defendant's exhibit 'Z',

2    Defendant's exhibit 'M', State's exhibits '169' and '170' and '172', do you have

3    any reason to believe that other than the dates that we've talked about those

4    were sent to B.C.I. at some other time?

5    A   No.

6    MRS. KOHLRIESER: Just a moment.

7    THE COURT: Okay.

8    (WHEREUPON, Court went off the record briefly.)

9    Q   One last thing, Officer Carman. The numerous times that we've gone

10   over things, are you confident that we have the chain of custody, we meaning

11   the State, the Lima Police Department, the chain of custody covered for each

12   piece of evidence that's been placed up here?

13   A   Yes.

14   THE COURT: Any other questions on

15   redirect?

16   MRS. KOHLRIESER: Oh, no. I'm sorry,

17   your Honor. I thought I said that. I apologize.

18   THE COURT: Okay. All right, Mr. Rion,

19   any recross examination?

20          RECROSS EXAMINATION

21   BY MR. RION:

22   Q   Sir, you said there was a flaw in the chain of custody. Did that just

23   deal with things that were being entered in 2012, 2013, and 2014?

```
 1    A    I never stated there was a flaw.
 2    Q    I wrote down your words - dealing with the computer system and the
 3         way it was transferring information, I think.  You said something about a flaw
 4         in the chain of custody.
 5    A    Oh, okay.  I may have said that; yes.
 6    Q    So, what did you mean by that?
 7    A    I meant that -- in the new system?
 8    Q    You said it and so I'm working off your words.
 9    A    In the new system, the computer system that we went to in the month
10         of September of '14 I discovered that it wasn't logging properly the chain of
11         custody, which is State's exhibit 'M'.  It wasn't properly logging in this system.
12         It did, however, -- it would log in the history, which is a separate tab, you
13         might say, from the chain of custody.
14    Q    And what you mean is if you are entering data in manually in 2012,
15         2013, and 2014 it may have problems logging that information in; correct?
16    A    No.
17    Q    Is that what you mean by that?
18    A    No.  Prior to 9, September of 2014, we did not have this new system.
19    Q    Right.  The flaw that you were referring to was when you were putting
20         data in after that date that you mentioned; correct?
21    A    As of December, or, September of 2014 when this computer went
22         active that's when this specific problem was found.
23    Q    The specific problem was that when you would manually type
```

1    information in after that date it was going to the history section and not in the

2    log section; correct?

3    A   Actually we didn't manually. It's a scan system.

4    Q   Okay. I'm not trying to play words.

5    A   But, yes, it would go into the history and not the chain of custody log.

6    Q   But, as far as the way data was entered in 2009, 2010, and 2011 the

7    flaw in the system would not have been the computer error; correct?

8    A   Correct.

9    MR. RION: Okay. Nothing further.

10    THE COURT: Okay. You may step down.

11    A   Thank you.

12    THE COURT: Next witness for the State?

13    MRS. KOHLRIESER: The State would call

14    I.D. Officer Adkins, your Honor.

15    THE COURT: Is it Greg? Greg Adkins?

16    MRS. KOHLRIESER: Greg. Yes, your

17    Honor.

18    WHEREUPON, called to appear as a witness in this proceeding was one:

19    **I.D. OFFICER GREGORY ADKINS**

20    who, having been duly sworn by the bailiff herein, testified as follows:

21    BAILIFF: He has an objection.

22    THE COURT: Okay. This witness has

23    requested not to be videotaped or his picture taken by the media.

1    DIRECT EXAMINATION

2    BY MRS. KOHLRIESER:

3    Q    Good morning.

4    A    Good morning.

5    Q    Can you state your name for the record, please?

6    A    It's Gregory Adkins.

7    Q    Please tell these people where you are employed.

8    A    The Lima Police Department.

9    Q    And how long have you been with the Lima Police Department?

10   A    Fifteen years.

11   Q    And where are you currently assigned?

12   A    The I.D. Bureau as an I.D. Officer.

13   Q    How long have you been assigned to that unit?

14   A    Six years.

15   Q    Do you recall when you started?

16   A    It was March of 2009.

17   Q    Okay.  We've heard from Kenny Whitney and Michael Carman.  Would

18   your duties be roughly the same as what Mr. Whitney's were and what I.D.

19   Officer Carman's are now?

20   A    We process crime scenes, photograph, collect evidence, collect

21   fingerprints, and manage the property room; correct.

22   Q    All right.  Now, you said you started in March of 2009.

23   A    Correct.

1   Q   So, you weren't officially in the I.D. Bureau on February 23rd, 2009?

2   A   No, ma'am.

3   Q   Now, after March of 2009 did there come a time when you took -- well,

4   let me ask you this.  Let me back up a second.  Are you familiar with the Ken

5   Warrington murder investigation?

6   A   Yes.

7   Q   Okay.  And was there a time in September of 2009 where in your

8   capacity as an I.D. Officer you received back a number of items that were

9   sent to B.C.I. in the Ken Warrington murder case?

10   A   Yes.

11   Q   Okay.  I specifically want you to look at State's exhibit '169', please.

12   Do you recognize that document?

13   A   Yes.

14   Q   What do you recognize it to be?

15   A   This is a return receipt from B.C.I.

16   Q   Okay.  And do you recall seeing that item prior to today?

17   A   Yes.

18   Q   What date does it reflect that items were returned from B.C.I.?

19   A   September 3rd, 2009.

20   Q   And are those the items that you came into receipt of?

21   A   Correct.

22   Q   Could you explain to the jury how it was that you came to be in receipt

23   of those items on September 3rd of 2009?

1    A    On September 3rd, 2009 Officer Goedde had delivered items to B.C.I.

2    from the drug unit and they gave him items to return.  He notified me upon his

3    return that he had a significant amount of items and that he needed help

4    unloading them from his vehicle.  We helped him unload the items from the

5    vehicle.  We put them on a multi-tiered cart and put them into the property

6    room.

7    Q    Okay.  The property room, is that the one that's secured and only

8    certain people have keys to?

9    A    Correct.

10   Q    And did Officer Goedde give you what is now marked as State's exhibit

11   '169?'

12   A    Correct.  That was included with the items that were returned.

13   Q    And is there a place where you would have kept State's exhibit '169?'

14   A    Yes.

15   Q    And where is that?

16   A    We have a binder that we keep our return receipts in.  In 2009 we kept

17   the return receipts and the submission sheets to B.C.I. in the same binder.

18   We have since separated that in the following years.  But, in 2009 we were

19   keeping them together in a binder in our office.

20   Q    Okay.  I'm not going to go into significant questions, but we've heard

21   testimony about a redundancy system.  Is that what State's exhibit '169', well,

22   part of what it is?

23   A    Yea.  It would be a back-up in case for some reason we lost track of

1   the property or something of that nature and we can always reference back to
2   the paper log and see, you know, did it come back from the lab. We can
3   reference the date it came back from the lab and use that to say when it came
4   back from the lab.
5   Q   Are there times when something may have come back from the lab but
6   you didn't necessarily log it in the computer system?
7   A   Yes. We didn't always -- I mean, with this particular incident there was
8   a significant amount of property and the entries were manual entries into a
9   computer system. They were data entries. We weren't able to get it to that
10  day and so we would get to it when we had the opportunity to, the first
11  opportunity.
12  Q   And are there times when things got missed in the computer system?
13  A   Yes.
14  Q   Okay. And State's exhibit '169', would that be an example of the way
15  to make sure you can track stuff still?
16  A   Yes, it would.
17  Q   I'm going to hand you State's exhibit '130', '131', and '132'. I'm also
18  going to hand you Defendant's exhibit 'M'. Have you seen Defendant's
19  exhibit 'M' before? Do you know what it is, I should say?
20  A   It looks like the C.M.I., which is our newest computer program tracking
21  report.
22  Q   Feel free to refer to exhibit 'M' if you need to. But, State's exhibits
23  '130', '131', and '132', was there a time when you were asked to transport

1016

1  those to the state crime lab for testing, to B.C.I.?

2  A  Yes.

3  Q  And did you, in fact, do that?

4  A  Yes, I did.

5  Q  So, you personally would have driven these items up there; correct?

6  A  Correct.

7  Q  When you go to take something to B.C.I. do you open it first?

8  A  No.

9  Q  Why not?

10  A  We have no need to open it, especially if it's going to go for testing.

11  We want to leave it in a sealed state as much as possible to preserve any

12  evidence that might be present.

13  Q  Okay. When it comes back from B.C.I. do you open it?

14  A  No.

15  Q  Why not?

16  A  Again, we don't have reason to open it. B.C.I. can testify to what

17  they've done to it. Unless it's requested by the prosecution or the defense to

18  open it to be examined we have no purpose in opening it. It remains sealed

19  with B.C.I.'s analyst's signature on it. If something is amiss in the package at

20  that point it can be seen that it was sealed and they can be questioned about

21  what might be amiss.

22  Q  Okay. Are you aware of whether these exhibits before you now that

23  I've just referenced, as well as a number of other items in this case, have

1    been viewed by the prosecution and/or defense?

2    A    Yes.

3    Q    Has that happened multiple times?

4    A    Yes, that's happened numerous times.

5    Q    And, in fact, on these items, and feel free to pick them up and look at

6    them, do you see your initials on some of them as having opened them and

7    sealed them back?

8    A    Yes.

9    Q    You just had State's exhibit '131'. Are your initials on that?

10    A    Yes, ma'am.

11    Q    Okay.  Look at the other two, please.  Are your initials on either one of

12    those bags?

13    A    Yes.

14    Q    If you could, hold it up -- hold one of these up and show us what your

15    initials look like.

16    A    My initials are rather unique.  It's pretty sloppy handwriting.  But, this

17    right here and this up here and this right here are my initials.

18    Q    Okay.  Would you agree that it's fairly hard to make out any actual

19    letters in your initials there?

20    A    I would.

21    Q    Okay.  On this specific one can you at least read the date for us?  On

22    State's exhibit '130'.

23    A    8-22 of '15.  Well, that might be 27.

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | 8-27. |
| 3 | Q | And you're now looking at exhibit '132'? |
| 4 | A | Correct. |
| 5 | Q | For the 8-27? |
| 6 | A | It has 8-27-15 also on this 9-2 of '15. |
| 7 | Q | Now, I'm going to show you a couple of things here on Defendant's |
| 8 | | exhibit 'M'. Would you take a look at this page here and tell me - does that |
| 9 | | appear to be from the Ken Warrington homicide case, in looking at that C.F.S. |
| 10 | | number there, that case number? |
| 11 | A | Yes, it does. |
| 12 | Q | Okay. What item number are we looking at? |
| 13 | A | This would be item number fourteen. |
| 14 | Q | Okay. I apologize. I actually turned to the wrong thing. Let's look at |
| 15 | | one oh eight. Again, does that appear to be, again, the Ken Warrington |
| 16 | | murder investigation? |
| 17 | A | Yes, it does. |
| 18 | Q | And item number what? |
| 19 | A | One oh eight. |
| 20 | Q | And what does that say it is? |
| 21 | A | Winchester nine millimeter. |
| 22 | Q | And would that be State's exhibit '68'? |
| 23 | A | Yes. |

1   Q   And then if you'll turn the page to item number one oh nine?  Again,

2       the same case number?

3   A   Yes.

4   Q   And does that appear to be State's exhibit '69'?

5   A   Yes, it does.

6   Q   Now, let's put something up here for the jury and if you need to see it I

7       can give it to you.  Looking specifically at item number one oh eight, okay,

8       let's take a look here.  Do you see your first entry on item one oh eight?

9   A   Yes.

10  Q   Roughly the third line here?

11  A   Correct.

12  Q   And what is that information telling us?

13  A   It's telling us that I received that from Officer Goedde who brought it

14      back from Bowling Green, the crime lab.

15  Q   Okay.  Now, at this time in 2009 was Kenneth Whitney still an I.D.

16      Officer?

17  A   Yes, he was.

18  Q   Okay.  So, what's the next log show us?

19  A   It shows that Kenny Whitney took it to Bowling Green on November

20      5th, 2009.

21  Q   Okay.  And the return date on that?

22  A   April 22nd, 2010.

23  Q   Okay.  Now, the next entry, what do we see here?

1   A   It's showing where the item was taken from C block property room and

2       given to Detective Clark.

3   Q   Okay.  And the entry right after that?

4   A   It shows where it was placed back in C block property room.

5   Q   Okay.  Some, what, five months later?

6   A   Correct.

7   Q   Do you see something similar on one oh nine here as far as where this

8       goes with the 2010 transfers?

9   A   Yes.

10  Q   Okay.  Again, there's that May 19th, 2010 to Tim Clark?

11  A   Correct.

12  Q   Do you recall what that was for?

13  A   No, I do not.

14  Q   That would be something that Detective Clark would have to testify to?

15  A   Correct.

16  Q   But, you would have just said, 'hey, Detective Clark, here you go?'

17  A   No.  He would have requested that from me.

18  Q   And in 2014 did you actually examine a piece of evidence in this case?

19  A   I did examine a box of shell casings, or, shells.

20  Q   Okay.  Let me show you State's exhibit '129'.  I'd ask you to take a look

21      at that.  Feel free to open it up and get clear in the paper bag there.  It's not

22      biological so you probably don't need gloves.  Okay.  Do you see your initials

23      anywhere on there?

1  A  Yes.

2  Q  And what were you looking at State's exhibit '129' for?

3  A  I dusted this in an attempt to find latent fingerprints.

4  Q  Is that something that you've been trained to do?

5  A  Yes.

6  Q  And in this case you were trying to see if that box would have any

7  fingerprints on it?

8  A  Correct.

9  Q  Did it have any usable prints?

10  A  No, it did not have any usable latent prints.

11  Q  Did that surprise you?

12  A  No.

13  Q  Why not?

14  A  A significant amount of time had passed and latent prints are fragile.

15  They're made up of water and oils and they can evaporate and be absorbed

16  by the substrate that they're on.

17  Q  Okay.  Is it also possible for someone to touch something and not

18  leave a usable print?

19  A  It's very possible.

20  Q  Okay.  Explain to the jury what you mean by a usable print.

21  A  A usable print would have significant ridge detail that would be

22  sufficient for examination and comparison.  We look at the ridge detail and

23  how certain what we call minutia points, or points of identification, are in a

1  fingerprint and if there is not significant or sufficient ridge detail then we're not
2  able to use the fingerprint if the area isn't big enough, or if it's like a smudge,
3  or the latent print might be real light where we might not be able to pick up a
4  big portion of the fingerprint.
5  Q     Okay.  That's determined by a number of variables; correct?
6  A     Correct.
7  Q     Okay.  So, for instance, if I touch this mic., depending upon my
8  make-up or the make-up of this mic. I may or may not leave a print?
9  A     That is correct.
10  Q     Might I leave a smudge?
11  A     You might leave a smudge.
12  Q     So, you found nothing usable on that particular exhibit?
13  A     That is correct.
14  Q     And without, and again, we've kind of belabored the point, but without
15  going into much detail, did you also assist myself and I.D. Officer Carman in
16  going through the chain of custody on a number of these items?
17  A     Yes, I did.
18  Q     And have you participated in or been made aware of through Officer
19  Carman about numerous times the prosecution and defense have looked at
20  various pieces of evidence in this case?
21  A     Yes.
22  Q     In fact, you participated in some of that?
23  A     Correct.

```
 1          MRS. KOHLRIESER:  Just one moment.

 2          (WHEREUPON, Court went off the record briefly.)

 3     Q    These times that things were being opened and closed, particularly the

 4     exhibits that I've shown you today, were those after these items had all been

 5     tested?

 6     A    Correct.  Yes.

 7          MRS. KOHLRIESER:  Nothing further.

 8          THE COURT:  Okay, Mr. Rion, questions?

 9                        CROSS EXAMINATION

10     BY MR. RION:

11     Q    Sir, were you in charge of the property room in 2009?

12     A    I assisted in the property room.

13     Q    Did you have a key?

14     A    Yes.

15     Q    So, who else had a key?

16     A    I.D. Officer Whitney.

17     Q    That's it?

18     A    As far as I know.

19     Q    What about Marik?

20     A    He had a key up to a certain point.

21     Q    Was that in 2009?

22     A    Yes.

23     Q    So, if Officer Marik said that there were only two keys at that time,
```

1  you're saying that that's not accurate?

2  A  Well, he turned his key over to me.

3  Q  When?

4  A  I don't know.  I can't recall the date.

5  Q  What year?

6  A  In 2009.

7  Q  Before or after October?

8  A  I don't know.

9  Q  In September of 2009 there were a series of objects that were put into

10  the property room; is that your testimony?

11  A  Yes.

12  Q  And did you do it yourself or did you give it to somebody?

13  A  I assisted.  I'm not sure if I.D. Officer Whitney assisted or not.  But, I

14  know I assisted Officer Goedde.

15  Q  And do you know whether or not you were an I.D. Officer at that time?

16  A  I was an I.D. Officer at that time.

17  Q  With a key?

18  A  I would say yes.

19  Q  Okay.  Well, I just asked you whether you had a key in October and

20  you said you couldn't recall.  So, now did you have the key in September, or

21  no?

22  A  I'm assuming I did because I had access to the property room.

23  Q  Well, this is a serious case.  I'm just asking --

1    A    I understand.

2    Q    If you don't recall, then you can say you don't recall.  Assumptions are

3         not evidence.

4    A    I'm saying I probably did because I had access to the property room.

5    So, yes, I had a key.

6    Q    But, you don't recall whether Whitney was there or not?

7    A    I can't recall whether Whitney was there.

8    Q    You don't recall whether it was Whitney's responsibility to put it in or

9         whether it was your responsibility?

10   A    It could have fell on either one of us.

11   Q    Or him if you weren't the officer at that point.

12   A    We both were in the property room at that point, I mean, as far as --

13   Q    So, Marik was out by then?

14   A    Yes.

15   Q    So, Marik was not an I.D. Officer in September of 2009?

16   A    No.

17   Q    You know what G.S.R. is; correct?

18   A    Correct.

19   Q    G.S.R. is a very sensitive thing to handle; correct?

20   A    As far as I know it is.

21   Q    It can be transferred to other items very easily; correct?

22   A    I would assume.

23   Q    Officers spend a lot of time with their weapons; correct?

1   A   Correct.

2   Q   And if an officer has a weapon that's been fired and he touches that

3       weapon he could have G.S.R. on his hands; couldn't he?

4       MRS. KOHLRIESER:  Your Honor?  At this

5       point I'm going to object because it's all speculation.  There's not been one

6       qualification as to G.S.R. expertise or anything like that.  He's aware that

7       G.S.R. exists.  But, how it transfers and things of that nature, well, I think

8       that's more appropriate for an expert.

9           THE COURT:  I'll sustain it.  If you can set

10      a foundation for his ability to testify to these matters I'll let you continue.  But,

11      otherwise, the objection will be sustained.

12  Q   You have been trained as an evidence collection, well, one of two

13      evidence collection officers in the Police Department; correct?

14  A   Yes.

15  Q   Your job is to process crime scenes; correct?

16  A   Correct.

17  Q   And process means that you're there to collect evidence; correct?

18  A   Yes.

19  Q   Do you have specialized training for that?

20  A   Yes.

21  Q   And the specialized training, does it deal with the collection of evidence

22      as it relates to things that could potentially have gunshot residue on them?

23  A   Yes.

```
 1   Q   And how many crime scenes have you processed in the last four
 2       years?
 3   A   Hundreds.
 4   Q   Now, at a very rudimentary level, gunshot residue is very fine particles
 5       of various chemicals; correct?
 6   A   Correct.
 7   Q   Microscopic; correct?
 8   A   Correct.
 9   Q   And they can be transferred from -- well, if something has these
10       microscopic particles on it and somebody, or, something with gunshot residue
11       comes in contact with it -- so, if this has gunshot residue on it and this doesn't
12       and I go like this I can be transferring gunshot residue; correct?
13   MRS. KOHLRIESER:  Your Honor, same
14       objection.
15   THE COURT:  I'm going to overrule it.  If
16       he doesn't know the answer he can say he doesn't know.
17   A   Yes, it could be transferred.
18   Q   That's a danger; correct?
19   A   Correct.
20   Q   Now, officers carry weapons often; correct?
21   A   Correct.
22   Q   Daily?
23   A   Yes.
```

1028

1    Q    They shoot them often?  Well, how often do they discharge their

2    weapons, say on the range and just for training and things like that?

3    A    Most officers qualify at least once a year.  It depends on the officer as

4    to how often he shoots his weapon.

5    Q    Do a lot of officers, just for fun, even go out on weekends to the range

6    and practice?

7    A    I would assume.

8    Q    Well, do you know?

9    A    Yes.

10    MRS. KOHLRIESER:  Objection to

11    relevance, your Honor.

12    THE COURT:  Okay.  I'll sustain the

13    objection.  The jury will be instructed to disregard it.

14    Q    If you touch a weapon that's been discharged there's a potential you

15    can get gunshot residue on your hand; correct?

16    A    If the weapon hasn't been cleaned.

17    Q    If you touch really any item that's been in the proximity of a discharged

18    weapon you can get it on whatever you're touching it with; correct?

19    A    I'm not sure.

20    Q    Well, it's going back to the transfer.  So, gunshot residue can be

21    transferred.  You can't see it.  So, it's a very sensitive issue; correct?

22    A    Correct.

23    Q    Okay.  You weren't involved in this case back in 2009; were you?  In

1 other words, you were not at the crime scene; were you?

2 A No, I was not.

3 Q You were not over on Eureka Street; were you?

4 A No, I was not.

5 Q You don't know whether it was your responsibility or not in September

6 of 2009 to log items into evidence; do you?

7 A Well, I was one of the people that it was the responsibility of. It was

8 myself or I.D. Officer Whitney.

9 Q And why it is that items didn't get logged in, you don't have an

10 explanation for; do you?

11 A I can't answer that. I don't know.

12 Q And you don't even recall whether Whitney was there when you were

13 there?

14 A When we received the items?

15 Q Uh-huh.

16 A No, I don't recall.

17 Q Do you remember what day of the week it was?

18 A It was September 3rd. I don't know what day it was.

19 Q You said that in 2014 that you tried to do some fingerprint analysis on

20 a box?

21 A Correct.

22 Q Some five years after the Warrington issue?

23 A Correct.

1   Q.  And was there a time -- when did you become -- are you in charge of

2   the I.D. Bureau now?  Or, is it a dual --

3   A.  It's a mutual.

4   Q.  It's a dual between you and --

5   A.  I.D. Officer Carman.

6   Q.  Just the two of you?

7   A.  Correct.

8   Q.  Is there usually just two?

9   A.  Yes.

10   Q.  When you are at a scene now and you collect evidence and you're the

11   only one that touches it, and you're the only one that photographs it, and

12   you're the only one that puts it in his car, and you're the only one that takes it

13   down to the station, whose name do you put on as far as who entered the

14   evidence into the room?

15   A.  As far as on the property label?

16   Q.  No.  In the logs.

17   A.  In the logs?  That would be the person that collected it.  That would be

18   myself.

19   Q.  That would be you?

20   A.  Yea.

21   Q.  You wouldn't put another officer's name if you're the one that did all of

22   that work - you exclusively?

23   A.  No, I wouldn't.

1    Q. Not only would you not, but that would be -- the protocol is as you've

2    just described; right?

3    A. That's how I would do it.

4    Q. That's how you were trained to do it?

5    A. Well, that's how I would do it. You know, it's my personal way of doing

6    it. Now, how other officers do it, well, I can't answer for that.

7    Q. You mean there's no training on this issue? There's no protocol?

8    A. The officers are trained when you first get on the Police Department on

9    how to fill out property slips.

10   Q. I'm not talking about property slips. If you're in charge of the evidence

11   room --

12   A. As far as --

13   Q. -- and you're the one that allegedly does everything with the evidence

14   and nobody else touches it, whose name do you put on there as to who

15   submitted that evidence into property?

16   A. That would be the person that collected it.

17   Q. Thank you.

18   MR. RION: Nothing further.

19   THE COURT: Okay. Any redirect?

20   MRS. KOHLRIESER: Just briefly.

21                    REDIRECT EXAMINATION

22   BY MRS. KOHLRIESER:

23   Q. You were asked about the key. I want to make sure I understood.

1   Was your testimony that you didn't have a key to the evidence room until

2   Detective Marik gave you his?

3   A   Correct.

4   Q   So, whatever date that was would have been the date that you would

5   have been in charge of being able to get in that room; correct?

6   A   Correct.

7   Q   And although you may not recall who was with you on September 3rd,

8   2009 do you recall receiving those items from Officer Goedde, those ones in

9   State's exhibit '169'?

10   A   Yes.

11   Q   And do you recall those items being secured in the evidence room?

12   A   Yes, they were.

13   MRS. KOHLRIESER:  Nothing further.

14   THE COURT:  Any recross examination?

15   MR. RION:  No, your Honor.

16   THE COURT:  All right.  I.D. Officer, you

17   may step down.  Thank you.

18   A   Thank you, sir.

19   THE COURT:  We'll take a morning break.

20   Ladies and gentlemen of the jury, remember the admonitions that I've been

21   giving you.  Don't discuss the case among yourselves or with anyone else.

22   Don't formulate or express any opinions.  Have no contact with anybody

23   involved in the case.  We'll stand in recess until about, oh, ten forty - about

1    twenty minutes. Ten forty. We'll stand in recess.

2    (WHEREUPON, COURT WAS IN RECESS.)

3

4    THE COURT:  Okay. I want the record to

5    reflect we're reconvening without the jury in CR2014 0139 this 15th of

6    September, 2015. The case is State of Ohio -vs- Markelus Carter. The

7    defendant is present with counsel and the State is present. Again, the jurors

8    have not been returned from the recess.

9    Counsel for the State and the defense approached me in chambers

10   and indicated, or, the State had indicated the next witness would have some

11   testimony and they wanted to let me know what was going on. We'll just put it

12   all on the record then. So, Mrs. Kohlrieser, do you want to explain, or Mr.

13   Miller, want to explain your next witness and what you intend the testimony to

14   be from the witness and then Mr. Rion can put on the record anything he

15   wants to.

16   MR. MILLER:  Yes, your Honor. The next

17   witness, among other things, we expect him to testify as to the amount of

18   cocaine that was found in Mr. Carter's house during the search warrant on

19   February 23rd, 2009. Now, the purpose of that particular part of the

20   testimony is, in essence, to corroborate or to show that Mr. Moore is, in fact,

21   talking about Mr. Carter. The way this came about was Mr. Moore was in jail

22   with Mr. Carter and overheard Mr. Carter initially talking to another person in

23   jail about this particular case and giving specific details about the case,

1 specifically the murder.  Within the context of that conversation Mr. Carter

2 mentioned the amount of cocaine that was pulled out of his house during the

3 search warrant.  Essentially what this is it's it's tantamount to a confession to

4 the murder.  This particular testimony, the cocaine, will corroborate Mr.

5 Moore's testimony in that he knows specific details that only Mr. Carter would

6 know at the particular time that this conversation took place.  In other words,

7 he's not making it up.

8 THE COURT:  So, you would offer that

9 testimony, if that's the testimony, towards the credibility of the witness then?

10 MR. MILLER:  Correct.  For no other

11 purpose.  And we would ask for an instruction in that regard.  It's an

12 independent corroboration of the testimony.

13 THE COURT:  Mr. Rion?

14 MR. RION:  Your Honor, one of my main

15 problems with this that I didn't raise in chambers is the following - if the Court

16 lets in that first piece of information that there were sixteen grams of cocaine

17 or whatever, which I think the number is slightly different, then the

18 government is going to have to put into evidence the sixteen grams of

19 cocaine through extrinsic evidence to prove what Mr. Moore is saying

20 otherwise it really wouldn't be relevant for him to get up there and say there

21 was sixteen grams.  The only way that that becomes relevant is if there's

22 confirmation that there was, in fact, something close to sixteen grams.  So,

23 now we have to use extrinsic evidence to prove something about the veracity.

1   It's really a way for them to bolster their own witness.  I think it's very

2   prejudicial.  I think under 403 the Court should give a long thought on whether

3   it should be allowed.  But, I also don't believe that extrinsic evidence can be

4   utilized to then verify what he's saying.  If the Court finds that he couldn't do

5   that then what would be the point of him stating that in the first place?  So, we

6   would object on all those grounds.

7                    MR. MILLER:  The way -- Mr. Rion is quite

8   right.  The other way that we would bring that evidence in would be through

9   Mr. Clark, or, Detective Clark, when he testifies.  I expect him to testify that,

10  'yea, there was just about that exact same amount located that was pulled out

11  of the house'.  The other way this comes in is Mr. Carter, in his statement,

12  which the jury has already seen, says, and also, I think, also in the phone

13  calls during the stand-off, he mentions that he has been doing things right for

14  seventeen years.  That he's trying to do things right and so forth and that he's

15  straightened up his act and he's trying to live for his kids, but yet, in fact, we

16  find seventeen grams - and that's not the actual number - but, like seventeen

17  grams of cocaine in the house.  So, in other words, there's a couple of

18  different ways that I think this comes in.

19                    MR. RION:  The Court should note that it

20  was specifically excluded by agreement - evidence of the cocaine was

21  supposed to be extracted from the tape and not brought in for this specific

22  purpose of it being inflammatory and prejudicial.

23                    MRS. KOHLRIESER:  Your Honor, there's

1    no discussion of the cocaine that was found in his house at that time.  There's

2    discussion about he used to cook cocaine.  But, at that point they hadn't

3    searched the house.  They didn't know there was cocaine there.

4          MR. MILLER:  They hadn't even searched

5    the house yet.

6          MRS. KOHLRIESER:  And, again, he's

7    trying to act like he's on the up and up and we find out, in fact, that, no, he's

8    not.

9          THE COURT:  Okay.

10          MRS. KOHLRIESER:  We're in no way

11    trying to show acting in conformity - you know, like he's a bad guy, he's a

12    dope dealer, and he must be a killer.  It's not anything like that.

13          THE COURT:  You just simply want it as

14    part of the information that the witness would have that goes directly to the

15    crimes charged in this case?  You would want that just to lend to his

16    credibility?

17          MR. MILLER:  To Joey Moore's credibility

18    and, I guess, also in a way as explained to the defendant's credibility when he

19    says on the video that he has shaped up, so to speak.

20          THE COURT:  Okay.

21          MR. MILLER:  And, again, we would ask

22    for a limited instruction on that.  We have no problem with that whatsoever.

23    So, if there's, you know, any outside the margin activity the Court can give

1   that instruction to the jury. The State has no problem with that.

2   THE COURT: All right. I'm thinking about

3   it here for a second. And you, the State, would intend then to have some

4   further evidence, perhaps from Detective Clark or otherwise, that indeed there

5   was an amount of cocaine found?

6   MRS. KOHLRIESER: We would very

7   narrowly do that, your Honor, by simply having Detective Clark say, yes, in

8   fact, this X amount was found in his home'. That's it. That's why we didn't

9   show pictures of it, even though Officer Whitney took pictures of it. That's

10   why we haven't even brought it in or anything like that. It's very narrow.

11   We're not going to have him elaborate on that or anything of that nature.

12   THE COURT: Okay. I've been looking

13   over, and it's not really, it doesn't fit really specifically in any evidence rule. I

14   looked at 404 (B) that talks about other crimes, evidence of other crimes of

15   the defendant. It can't be used to show his character or that he acted in

16   conformity with the character. The rule, 404 (B), gives a list of admitting that

17   type of evidence for other purposes. My understanding of the case law is that

18   the 404 (B) list is not exhaustive. It is a list of some of the reasons that that

19   type of evidence could be in there. The specific listed reasons that other

20   crimes, evidence, can be used don't necessarily fall into place here. I

21   understand this evidence of the possession of the drugs will be in the context

22   of other evidence specific to the crimes that are charged in this case. To that

23   extent it may lend itself to the witness testifying as to this so we know the

1    identity of the person who he's saying said these things. It could go to show

2    his identity or his knowledge of the events of this case - the defendant's, I'm

3    speaking of, the defendant's identity or the defendant's knowledge. But,

4    again, it doesn't fit into that exactly in the typical way that it applies.

5    I find the evidence would be relevant under 401 because it would,

6    perhaps, the proponent at least is saying that it would make the testimony of

7    that witness more or less believable. So, again, with the other statements he

8    makes I think it's relevant. The defense points out that under 403 relevant

9    evidence still could be excluded if it's prejudicial. I think the State, all the

10    evidence the State presents is probably prejudicial in some regards. But, is it

11    so prejudicial that the danger of unfair prejudice outweighs the probative

12    value? In this case it's a credibility value.

13    So, I'm going to go ahead and allow the State to present that

14    testimony. I will give a limiting instruction in the nature of a 404 (B) limiting

15    instruction, but perhaps a little bit more specific, that they can use that

16    evidence only in deciding the credibility of the witness who testifies.

17    So, the exceptions will be noted for that. Anything else?

18    MR. MILLER: No, sir.

19    THE COURT: Okay. Are we ready to go?

20    Let's get the jurors in.

21    (WHEREUPON, jury was returned to the Courtroom.)

22    THE COURT: The record will show then

23    that we're still on the record and the jurors have been returned to the

1    Courtroom.  Ladies and gentlemen of the jury, we extended the recess for

2    you folks a little bit.  We were already on the record for some procedural

3    matters that the Court had to take up.  So, we got you back in here and we'll

4    continue with the State's case.  The State may call their next witness.

5               MR. MILLER:  Joey Moore.

6    WHEREUPON, called to appear as a witness in this proceeding was one:

7               J O S E P H   M O O R E

8    who, having been duly sworn by the bailiff herein, testified as follows:

9               BAILIFF:  He has an objection.

10              THE COURT:  Okay.  This witness has

11   indicated an objection to being photographed or his image being in the media.

12   Superintendent Rule 12 provides that the witness has that right.  So, I would

13   ask the media to comply with his right and not put either his photograph or

14   video in the media.  Go ahead.

15                        DIRECT EXAMINATION

16   BY MR. MILLER:

17        Q.   Mr. Moore, can you state your full name for the record?

18        A.   Joseph Moore.

19        Q.   Okay.  I'm going to tell you to do exactly what I've told other witnesses

20   to do when they come in here.  I'm going to ask you to scoot right up to this

21   microphone right here and speak good and loud into that microphone

22   because it does two things - amplifies your voice so everybody can hear and

23   it also records your voice so Sue over here can later transcribe what's said in

| | | |
|---|---|---|
| 1 | | this Courtroom. Okay? |
| 2 | A | Okay. |
| 3 | Q | Just speak right into that so everybody can hear.  Say again your |
| 4 | | name for the record. |
| 5 | A | Joseph Moore. |
| 6 | Q | Okay.  Joseph Moore, do you go by Joey? |
| 7 | A | Yea. |
| 8 | Q | Can I call you Joey? |
| 9 | A | Yea. |
| 10 | Q | Okay.  Do you have a criminal record, Joey? |
| 11 | A | Yes, I do. |
| 12 | Q | Okay.  What does that criminal record -- does it include felonies? |
| 13 | A | Yea, felonies. |
| 14 | Q | Misdemeanors? |
| 15 | A | Misdemeanors and felonies. |
| 16 | Q | Okay.  Why don't you give us an idea of what that record includes? |
| 17 | A | Theft; Receiving Stolen Property; stuff like that. |
| 18 | Q | Okay.  Do you have a drug problem? |
| 19 | A | I used to have a drug problem. |
| 20 | Q | You say you used to?  What kind of drugs were you addicted to? |
| 21 | A | Heroin.  I used to be really bad on heroin. |
| 22 | Q | Okay.  Is heroin pretty bad around here? |
| 23 | A | Yea, it's real bad. |

| | | |
|---|---|---|
| 1 | Q | Okay.  How did you get hooked on heroin? |
| 2 | A | Pain killers.  I started taking painkillers. |
| 3 | Q | Where did you get the painkillers? |
| 4 | A | The hospital. |
| 5 | Q | Okay.  Explain how that works.  How do you go from painkillers to |
| 6 | | heroin? |
| 7 | A | Well, you can't get painkillers no more so really the only option is |
| 8 | | getting heroin.  It's like the next best thing is heroin.  So, it was just easier to |
| 9 | | get. |
| 10 | Q | Is it cheaper? |
| 11 | A | Cheaper. |
| 12 | Q | Cheaper than the pills? |
| 13 | A | Yea. |
| 14 | Q | Did you have a criminal record before you became addicted to heroin? |
| 15 | A | No. |
| 16 | Q | None? |
| 17 | A | No. |
| 18 | Q | Okay. |
| 19 | A | All my cases were from me being on drugs. |
| 20 | Q | Now, you said you have, you know, theft cases and receiving stolen |
| 21 | | property cases.  I'll just ask you - were you stealing things and getting things |
| 22 | | to sell for your drug addiction? |
| 23 | A | Yea. |

1042

1  Q  Okay.  When did you start on pills?

2  A  I was about twenty, twenty years old.

3  Q  When you were twenty?  How old are you now?

4  A  Thirty-five.

5  Q  Fifteen years ago?

6  A  Yea.

7  Q  So, when you were twenty you started on the pills and things went

8     downhill after that?

9  A  Right.

10  Q  Now, I assume that during the course of these last fifteen years or so

11     that you've had a drug problem that has led to your criminal record that you

12     spent some time here in the Allen County Jail?

13  A  Yes.

14  Q  Have you also been to prison?

15  A  Yes.

16  Q  How many times have you been to prison?

17  A  Twice.

18  Q  Twice?  How long the first time?

19  A  A year.

20  Q  How long the second time?

21  A  A year.

22  Q  Okay.  Although you may not know, I'm going to ask you to give us an

23     idea of how many days over those fifteen years because of your drug

```
 1   addiction and the things it led you to do, how many days have you spent in
 2   the Allen County Jail?  Do you have any idea?
 3   A   Probably -- I'd say over a year or two years.
 4   Q   Okay.
 5   A   I've spent quite a bit of time in the Allen County Jail.
 6   Q   And because of your record you've spent quite a bit of time
 7       incarcerated, whether it be here at the Allen County Jail or --
 8   A   Right.
 9   Q   By your estimation here, a total of three years?
10   A   Right.
11   Q   When was the last time you were in the Allen County Jail?
12   A   I'm not sure.  Like almost a year ago.
13   Q   Okay.
14   A   Ten months ago.
15   Q   Ten months ago or something like that?
16   A   Yea.
17   Q   While you were in the Allen County Jail did you get some write-ups?
18   A   Yea, I got a couple of write-ups.
19   Q   Okay.  Well, for what kind of things?
20   A   This one kid owed me two honeybuns.
21   Q   What's a honeybun?
22   A   They're like little cake things you eat.
23   Q   Okay.
```

1   A   You can get them in the commissary.  Well, he didn't want to pay them

2     to me.  So, I went in his cell and I took them.

3   Q   Okay.

4   A   I didn't really think I was stealing.  But, he wouldn't pay me what he

5     owed me.

6   Q   Okay.

7   A   So, I got a write-up for that.

8   Q   Okay.  Is that kind of how it works in jail?

9   A   Yea.

10   Q   Okay.  All right.  Now, you said you've been out of jail maybe a year or

11     so.  Since you've been out where have you been living?

12   A   My mom's house.

13   Q   Okay.  Since you've been out are you still battling this addiction?

14   A   Still battling it, but I'm staying clean though.

15   Q   Okay.  Day to day stuff?

16   A   Every day.

17   Q   Every day?

18   A   Yea.  Raising my kids.

19   Q   You've got a couple of kids?

20   A   Yea, I've got two kids.

21   Q   Okay.  Do you have custody of them?

22   A   I do now.  I'm going through a divorce right now, but it's supposed to

23     be shared parenting.

1   Q   Okay.  So, you've got a shared parenting situation?

2   A   Yea.

3   Q   Do you have a job?

4   A   No, I don't.

5   Q   Are you working towards that?

6   A   Yes.

7   Q   Was there a time you had a suspended license?

8   A   I used to have a suspended license.  I've got my license now, though.

9   Q   You did?

10  A   Uh-huh.

11  Q   Did you have to pay a reinstatement fee?

12  A   Yea, I had to pay all of that.

13  Q   Okay.  You got that back?

14  A   Uh-huh.

15  Q   You've got insurance for the car?

16  A   I've got insurance and all that good stuff.

17  Q   So, generally since you've been out has life taken a trajectory in the

18      right direction?

19  A   Yea.

20  Q   Still a struggle, though?

21  A   Every day.

22  Q   Now, you're here today under subpoena from the prosecution; correct?

23  A   Correct.

1   Q   As you would say, it's my subpoena, so to speak?

2   A   Uh-huh.

3   Q   Has anybody from the prosecution or the Lima Police Department

4       promised you anything in exchange for your testimony today?

5   A   No.

6   Q   When you first came to give this information to the Lima Police

7       Department did anybody give you anything in exchange for that information

8       way back when you gave you that?

9   A   No.

10  Q   No?

11  A   No.

12  Q   Nothing promised to you whatsoever?

13  A   No.

14  Q   Now, you have spent considerable time incarcerated, as you've

15      explained, here at the Allen County Jail and in prison.  I would assume that

16      when you're on drugs you don't have a real good concept of time.  Is that

17      pretty accurate?

18  A   Yea.

19  Q   But, I want to take you back to 2009.  Were you in the Allen County Jail

20      in 2009?

21  A   Yes.

22  Q   Do you -- well, let me ask you this.  What were you in for back in 2009?

23  A   I think it was Receiving Stolen Property, I think.

1   Q   Okay.

2   A   I'm pretty sure.

3   Q   You've had a few of those?

4   A   Yea.

5   Q   Kind of hard to keep them all straight?

6   A   Yea.

7   Q   Okay.  Fair enough.  Were you in jail during that time period with a guy

8       named Markelus Carter?

9   A   Yes.

10  Q   Do you see Markelus Carter here in the Courtroom today?

11  A   Yes.

12  Q   Where is he seated?

13  A   Right there.

14  Q   Can you describe an article of clothing he's wearing?

15      MR. RION:  Your Honor, we've already

16      stipulated to that.

17  A   A gray sweatshirt.

18      THE COURT:  So noted.

19      MR. MILLER:  That's fine.

20  Q   Now, when you were in the jail back in 2009 with Mr. Carter did you

21      hear him talk about a murder?

22  A   I heard bits and pieces of things he was talking about.

23  Q   Okay.

1   A   The first thing he said --

2   Q   Well, just a second.  Let me ask you a question.  Did it relate to a

3       murder?

4   A   Yes.

5   Q   Okay.  Go ahead and tell us what he said relating to a murder.

6   A   The first thing that he was saying was that they found sixteen grams of

7       crack in his house.

8   Q   They, being who?

9   A   The police.

10  Q   Okay.

11  A   And then something about disassembling a Mac-10.  Then he said that

12      the police was --

13  Q   Do you know what a Mac-10 is?

14  A   A Mac-10 is a gun.

15  Q   Okay.

16  A   They was accusing him of following his wife to stores and stuff.

17  Q   Okay.

18  A   Then he said something about they don't have enough evidence on

19      him.  I met up with him again and then I got to asking him about the case and

20      asked him if he did it and that's when he said, "I smoked the bitch."

21  Q   Now, you asked him if he did it.  What did he mean by that?

22  A   If he killed her.

23  Q   Killed who?

1   A    His girlfriend.

2   Q    His girlfriend or his girlfriend's --

3   A    I'm sorry.  His girlfriend's boyfriend.

4   Q    Okay.

5   A    Yea.

6   Q    And what did he say?

7   A    He said, "I smoked that bitch."

8   Q    Okay.  Now, did he give you the context or anything to that - I mean,

9   was it the girlfriend, or was it the girlfriend's boyfriend?  Was there anything

10  else he said about the context of how this happened?

11  A    Not really, no.  He didn't really talk to too many people.

12  Q    Pretty quiet?

13  A    Yea.  He used to sleep underneath the television in the jail cell

14  because sometimes they put mats on the floor and so not everybody got a jail

15  cell.

16  Q    Okay.

17  A    So, he really didn't talk to too many people.

18  Q    Okay.  What did you do when you learned this information?

19  A    I took a kite and put it downstairs so I could tell a detective.

20  Q    What's a kite?

21  A    A kite is a piece of paper they give you if you have information on

22  another crime and you send it downstairs and you can talk to a detective

23  about it.

1　Q　Are you a little nervous today?

2　A　Yea, I am. Yea. Sorry.

3　Q　That's all right. Have you ever done this before?

4　A　No.

5　Q　Okay. All right. It's understandable. Now, when you sent this kite

6　down what happened after that?  Did somebody get in contact with you?

7　A　Yes.

8　Q　Do you remember who got in contact with you about this kite?

9　A　Detective Clark.

10　Q　Okay. I understand you're a little nervous. But, I want you to try to

11　recall – did you hear Mr. Carter say anything about computers?

12　A　Something about a laptop - that he hoped they didn't find his laptop.

13　Q　Okay.

14　A　I remember making a comment about that. I can't remember what I

15　wrote down. But, something about how he hoped they didn't find the laptop.

16　Q　When you say you wrote it down, --

17　A　On the kite.

18　Q　On the kite?

19　A　Yea.

20　Q　And, again, a kite is a piece of paper you send out if you want to talk to

21　a police officer?

22　A　Correct. Yea.

23　MR. MILLER:　Just a second, your Honor.

1  (WHEREUPON, Court went off the record briefly.)

2  Q  I've got to talk in this microphone, too, so I've got to get back over

3  here. Did you, in fact, talk to Detective Clark about this information?

4  A  Yes.

5  MR. MILLER:  One second, your Honor.

6  MRS. KOHLRIESER:  Sorry.

7  THE COURT:  Okay.

8  (WHEREUPON, Court went off the record briefly.)

9  MR. MILLER:  I have no further questions.

10  THE COURT:  Okay.  Mr. Rion, any

11  questions?

12  CROSS EXAMINATION

13  BY MR. RION:

14  Q  You spoke to Detective Clark in 2009; correct?

15  A  Right.

16  Q  You didn't tell him the statement 'smoked the bitch'.  You originally said

17  about the girlfriend and then about the boyfriend.  You didn't tell him that

18  statement then; did you?

19  A  No.

20  Q  In 2010 you didn't tell him that statement; did you?

21  A  I can't remember the exact dates like when I said what.  But,

22  everything I ever said was true.

23  Q  Uh-huh.  Did you lie to officers?  You mentioned this honeybun

1    incident.  That was just in 2015, a couple of months ago.  Did you lie to

2    officers about that?

3    A    That was about a honeybun.  This ain't about --

4    Q    Sorry.  Sorry.  Did you lie to the officer about that?

5    A    That was about a honeybun.

6    Q    Did you lie to the officer?

7    A    About a honeybun?  Yea, I did.

8    Q    Did you tell him that you didn't steal it from this guy, or take it from this

9    guy, but that it fell out of your shoe while you were sitting there talking to him?

10   A    That's correct.

11   Q    Did you ever do anything dishonest with Detective Clark?

12   A    Did I ever do anything dishonest with him?

13   Q    Yea.

14   A    No.

15   Q    Did you ever steal from him?

16   A    No.

17   Q    Did you ever use him as a --

18   A    If he owed me two honeybuns and didn't pay me --

19   Q    Sorry.  Sorry.  Sorry.

20   A    I'm sorry.  I'd take them from him.

21   Q    Sorry.  Sorry.  Did you steal from Detective Clark?

22   A    If he owed something to me I would probably take it.

23   Q    Does he owe you anything?

1   A   No, he don't.

2   Q   Well, in 2009 when you're not talking to him about smoking the bitch

3       he gave you some cigarettes; right?

4   A   One time; yea.

5   Q   And when he gave you the cigarettes he left some matches on the

6       table where you were; correct?

7   A   Correct.

8   Q   And when you didn't think anyone was watching you took some of

9       those matches and put them in your pocket; didn't you?

10  A   I can't remember.

11  Q   And then when he gave you a cigarette you took half of it and folded it

12      up in a certain way and hid it in your sock so you could transport contraband

13      back into the jail; didn't you?

14  A   I might have.

15  Q   Do you recall it, or not?

16  A   I can't recall.

17  Q   Do you realize it was all on video?

18  A   Yea.

19  Q   Okay.  Do you want me to play the video?

20  A   I believe you.

21  Q   I'm not testifying.

22  A   Oh, I believe you.  I probably did it.

23  Q   All right.  The jury needs to know whether or not you were deceptive to

1   the Detective or not.

2   A   Yea, I might have snuck some tobacco back to the jail.

3   Q   All right. And right before you stole from him and told him that you

4   were going to -- did you tell him that you were going to be honest and straight

5   with him about everything?

6   A   Right.

7   Q   While you're stealing from him; correct?

8   A   He gave it to me. I don't see how it's stealing.

9   Q   So, he gave you matches as contraband to take back into the jail?

10  A   No.

11  Q   He gave you cigarettes so you could hide them in your sock and take

12  them back to the jail?

13  A   No. I'm guilty of the honeybuns and I'm guilty --

14  Q   Sir? Sir? There's no question. So, in 2009 you talked to him; correct?

15  A   Correct.

16  Q   And the first time you asked to speak with Detective Clark about

17  Markelus Carter; correct?

18  A   Correct.

19  Q   So, he came over and talked to you; right?

20  A   Right.

21  Q   Correct?

22  A   Correct.

23  Q   You don't say anything about smoking the bitch; correct?

1   A   I can't remember what I said on that comment.

2   Q   You can't recall?

3   A   I think the last time I talked to him I did.

4   Q   Sorry.  The first time did you mention anything?  Yes or no.

5   A   No.

6   Q   Then a short time later, the next couple of weeks later, he brought you

7       back and you talked to him again at length; right?

8   A   Right.

9   Q   And, again, no mention of smoking the bitch; right?

10  A   Right.

11  Q   Did you ask him how he could help you?

12  A   No.  There was no -- he didn't promise me nothing.

13  Q   I didn't -- let me ask the question.  Did you ask him how he could help

14      you?

15  A   There might have been one time I said that, but he told me 'no'.

16  Q   Actually, what he told you was, 'if you find,' -- well, did he tell you that if

17      you were able to find the gun, find out where the gun is, that he didn't have

18      time for your F-5?  Did he tell you that?

19  A   I don't believe he said that.  I don't believe I found the gun, either.

20  Q   It's on tape.

21  A   I don't think I found the gun, though.  I wish I would have found it.

22  Q   Sorry.  My question was - did he tell you if you essentially help him with

23      this gun that he'll forget about this case?

1056

1      A    If it's on the film it's on the film, yea.

2      Q    Well, again, you're the one testifying.  We can either play it or you

3  testify to it.  It's the same to me.

4           MRS. KOHLRIESER:  Your Honor, the

5  witness has said he doesn't recall that.  If he wants to refresh his recollection

6  there's certainly a way to go about that instead of just saying that it's on the

7  tape.  But, to publish it in front of the jury is not how you refresh recollection.

8           THE COURT:  It's not been transcribed?

9           MR. RION:  It has not been transcribed.

10          THE COURT:  Well, we can -- if you want

11 to use it to refresh his recollection we'll play it for him if he thinks that will

12 refresh his recollection.  How long is it?

13          MR. RION:  Five seconds.  I mean, the

14 section that deals with this question is five seconds.

15          MRS. KOHLRIESER:  Well, he needs to

16 see the whole thing in context, your Honor.

17          THE COURT:  No.  Just if he wants to

18 refresh his recollection as to this specific part.  Is there a way to play it on a

19 laptop and show it to him to refresh his recollection?

20          MR. RION:  Yes, there is.

21          THE COURT:  Without showing it to the

22 entire jury?

23          MRS. KOHLRIESER:  Not with hearing it.

1    MR. MILLER:  He's got to hear it.

2    MRS. KOHLRIESER:  We don't have

3    headphones or anything.

4    THE COURT:  All right.  Ladies and

5    gentlemen of the jury, you'll be excused for a brief moment so we can do this.

6    Again, ladies and gentlemen, these types of things when we have you leave,

7    don't speculate as to what's going on.  You'll get the evidence you need.

8    Don't discuss the case among yourselves.  Stay close at hand here.  Don't

9    formulate or express any opinions about the case.  We'll have you back in

10   here shortly.  The jurors will be excused.

11   (WHEREUPON, jury was excused from the Courtroom.)

12   THE COURT:  The jurors have been

13   excused.  Just for the record, there's apparently a DVD recording of the

14   statement the defendant (sic) gave to Detective Clark.  You're showing it to

15   him, or parts of it, to refresh his recollection as to what was said?  Is that

16   correct, Mr. Rion?

17   MR. RION:  Yes, your Honor.

18   THE COURT:  Okay.  So, you can go

19   ahead.  To kind of preface this, or set this up for the record, you're going to

20   show him what?  Make sure the record shows what you're showing him.

21   MR. RION:  This is a taped statement from

22   March 13th, 2009.

23   MR. MILLER:  I can't hear it.

1   THE COURT: That's the point. It's for

2   him. What?

3   MR. MILLER: But, I can't hear it. I'm not

4   allowed to listen to it?

5   THE COURT: Yea, you can go listen to it.

6   We could have done this in front of the jury. They wouldn't be able to hear it,

7   either.

8   MR. MILLER: I know.

9   MRS. KOHLRIESER: I didn't know what

10  his speakers were like.

11  (WHEREUPON, portion of DVD recorded statement was played for witness.)

12  A       He says -- he says 'get me the gun'. But, he never says anything

13  about the F-5. He never says that.

14  MR. MILLER: Okay. That's it. That's it.

15  THE COURT: Okay. So, you've shown

16  him the portion that you want to use to refresh his recollection?

17  MR. RION: Yep.

18  THE COURT: Okay. Do you anticipate

19  any more -- well, we don't know if you're going to have to refresh his

20  recollection; do you? All right. Well, let's bring the jurors back in.

21  (WHEREUPON, jury were brought into the Courtroom.)

22  THE COURT: Again, a little instruction for

23  the jurors. You've seen already in the case from time to time when there is a

1 previous statement or a report or some writing that a witness has given. The

2 Rules of Evidence would allow if that witness is having trouble remembering

3 what they said, well, they can be shown a document to look at and read to

4 themselves to try to refresh their recollection. In this case there was a

5 previous interaction between this witness and the detective. It was not

6 transcribed in the form of a written statement or transcript that this witness

7 could read to himself to refresh his recollection. So, we took that little bit of

8 time and the witness was shown the recording. We didn't play it in front of

9 you folks because it's not being used as evidence for you to consider. It was

10 being used for the witness to view and listen to so it could help him remember

11 what occurred at that time. That's why I had you step out. So, Mr. Rion, you

12 may continue.

13 **CROSS EXAMINATION OF JOSEPH MOORE CONTINUED**

14 **BY MR. RION:**

15 Q   Sir, now that's back in 2009 you're having that conversation with the

16 detective; correct?

17 A   Yes. The video said that --

18 Q   And when you're having that meeting with the detective you were there

19 for the purpose of trying to help yourself; correct?

20 A   And he said, "I can't help you with your F-5."

21 Q   Sorry. If you could answer my question?  You were there for the

22 purposes of helping yourself; correct?

23 A   Right.  And he said he couldn't help me.

1    Q    You --

2    A    I'm sorry.  That's what the video just said.  I watched it.

3    Q    Okay.  Maybe we should play the video then because -- well, let me

4    just ask the questions, please.

5    A    Okay.

6    Q    You were there for the purpose of helping yourself; correct?

7    A    Correct.  Yes.  Of course.

8    Q    You wanted to get out?

9    A    Of course.

10   Q    And you asked him, actually numerous times, whether or not he could

11   help you; correct?

12   A    Uh-huh.

13   Q    The detective tells you, "Well, I don't have time for your F-5."

14   A    That's about all he said.

15   Q    And then you stated, or he said, "Well, if you find me the gun," and he

16   sort of nods like this; correct?  That's what was on the video that you just saw;

17   correct?

18   A    He says, "I ain't got time for your F-5."  Then he says, "Well, find me

19   the gun."

20   Q    Right.

21   A    All right.

22   Q    And nods his head?

23   A    Right.

1  Q  Now, I'm going to hand you Defendant's exhibits 'AA', 'BB', 'CC', and
2  'DD'. In dealing with the case in Allen County, there was a 2009 case, wasn't
3  there, a felony case; correct?
4  A  Correct.
5  Q  And you received what type of sentence on that?
6  MRS. KOHLRIESER:  Your Honor, I
7  apologize. I may have missed it. Did Mr. Rion say which exhibit?
8  THE COURT:  'AA', 'BB', and 'CC', but
9  they haven't been --
10  MR. RION:  'DD' is the one that he's
11  looking at now.
12  THE COURT:  Okay. None of them have
13  been identified yet.
14  A  I can't remember if I went to prison on that or not.
15  Q  Do you remember that you got judicial release on that?
16  A  After being in prison; yea. I went to prison and then got my judicial
17  release.
18  Q  Uh-huh.
19  A  Yea, I went to prison first.
20  Q  Right. And within -- well, was it within a month or so that you came out
21  on judicial release?
22  A  Oh, it was longer than a month.
23  Q  Does this appear to be the record of your sentencing in your case, your

1    sentencing entry?  Is that you - Joseph Moore?

2    THE COURT:  Which one is that?

3    MR. RION:  'DD'.

4    THE COURT:  Okay.

5    A    Yes.

6    Q    Does it appear to be a fair and accurate copy and it also shows you

7    received a judicial release in July of 2009?  Correct?

8    THE COURT:  That's still 'DD'?

9    MR. RION:  Yes.

10   Q    Does it show -- so, judicial release, to explain to the jury, is when you

11   go to prison and the Court can release you at any time for certain offenses;

12   correct?

13   A    Correct.

14   Q    And if they believe, and the prosecutor doesn't object, or whatever,

15   then you can get out on judicial release; correct?

16   A    Correct.

17   Q    And on this case you got judicial release in a short amount of time of

18   going into the institution; correct?

19   A    Correct.

20   Q    You were also serving a sentence for Van Wert County as well;

21   correct?

22   A    Correct.

23   Q    So, you had to go to prison for that case anyway; right?

1063

1   A   Right.

2   Q   So, when that case in Van Wert came up then you could get released

3   on this case if the Judge were to so let you; correct?

4   A   Correct.

5   Q   And that's exactly what happened; correct?

6   A   Correct.

7   Q   Then in 2012 you picked up another case in this county in front of the

8   same Judge; correct?

9   A   Correct.

10   Q   And it's an Assault on a Police Officer?

11   A   Correct.

12   Q   And that case was a felony of the fourth degree; right?

13   A   Right.

14   Q   Did you get probation?

15   A   Yea, I got probation, and then I violated, and then I got the W.O.R.T.H.

16   Center.

17   Q   So, first of all -- well, on the first case you were sent to prison and you

18   got judicial release and then you actually violated judicial release?  Did you,

19   or did you not?

20   A   Correct.

21   Q   So, it was shown back then that you violated judicial release and then

22   they had to deal with that.  Then in 2012 you picked up another case, but you

23   got probation on that and then you violated that and then you still don't go or to

1  prison; do you?

2  A  I've been to prison twice, you know what I mean?

3  Q  You went to prison on the Van Wert case and you got out and then you

4  went back; right?

5  A  Right.

6  Q  Correct?

7  A  Correct.

8  Q  Those were the two times you went to prison?

9  A  No. I've been -- I've been to prison twice.

10  Q  What was the other case you went to prison on?

11  A  The first was a Paulding County case - Receiving.

12  Q  Oh, a Paulding County case?

13  A  That's right.

14  Q  For Receiving Stolen Property?

15  A  That's right. I did twelve months for that.

16  Q  Okay. How long ago was that?

17  A  I can't remember. Like 2000 -- I really can't remember. It was two

18  thousand something.

19  Q  Okay. So, you've been to prison twice but, nonetheless, for the

20  Assault on a Police Officer you get probation, and you violate probation, and

21  you still don't go to prison in this Court; do you?

22  A  Due to the circumstances of the case, I got roughed up a little bit and

23  so that's why they was a little bit lenient on me for the case of Assaulting an

1   Officer.

2   Q   I see.  You think the Court was lenient on you because the Officer

3   roughed you up?  That's the point?

4   A   I believe so; yes.

5   Q   Is that in the documents anywhere?

6   A   No.

7   Q   If you could look at 'AA', 'BB', 'CC', and 'DD'?  Do these fairly reflect

8   some of the convictions that you have?

9   A   I believe there should be more than that, to be honest with you.

10   Q   Yea.  There's the Paulding County case?

11   A   Yea.  You're missing some.

12   Q   There's the Van Wert cases for the two Receiving Stolen Properties in

13   Van Wert?

14   A   I was on drugs.  When I was on drugs I caught a lot of cases.  Actually

15   you're missing some, actually.  There should be more than that.

16   Q   I understand.

17   THE COURT:  I don't mean to be too much

18   of a stickler, but could we specifically identify the exhibits so the record shows

19   it instead of just saying 'these were some of them'?

20   MR. RION:  Okay.

21   Q   'AA', Defense exhibit 'AA' is the 2012 conviction, indictment and

22   conviction in this Court; correct?

23   A   Right.

1   Q   Does that fairly and accurately reflect what you were charged with and

2       the conviction?

3   A   Correct.

4   Q   'BB' would be the violation of community controls in that case and the

5       entry that went with it; correct?

6   A   Correct.

7   Q   Does it fairly and accurately reflect what it was?

8   A   Yea.

9   Q   'CC' is the indictment from the 2009 case dealing with the Receiving

10      Stolen Property and 'DD' is the Judgment of Conviction for the 2009 case;

11      correct?

12  A   Correct.

13  Q   Do those, 'CC' and 'DD', accurately reflect the convictions that came

14      out of this Court?

15  A   Correct.

16      THE COURT: Thank you.

17  Q   It wasn't until February 19th, 2015 that you ever said one word about

18      smoking the bitch; is that correct?

19  A   Correct.

20  Q   Did you tell this officer that the reason why you didn't mention it for all

21      those years was because you never knew Markelus Carter's name?

22  A   Yea, I forgot who he was.

23  Q   Sorry. Is that why you told -- why you never said anything?

```
 1   A   Right.

 2   Q   But, nonetheless, in 2009 you requested to speak with this officer

 3       about Carter?

 4   A   Because I was downstairs in booking and he was downstairs.

 5   Q   Sir, if you could answer my question?

 6   A   Right.

 7   Q   You sent a kite over; didn't you?

 8   A   Right.

 9   Q   And the kite said I want to talk to you about Carter, Markelus Carter?

10   A   Right.

11   Q   Correct?

12   A   Correct.

13   Q   So, you obviously knew his name then.

14   A   Right.

15       MR. RION:  If I could have a second?

16       THE COURT:  Okay.

17       WHEREUPON, Court went off the record briefly.)

18   Q   Your testimony was that this was about somebody's wife - about

19       Markelus' wife?  Is that what you said?  You used the word 'wife'?

20   A   Girlfriend.

21   Q   No. I think on direct you used the word 'wife'; did you not?

22   A   I didn't mean to say wife.  Girlfriend.

23   Q   You didn't mean to say girlfriend, or, you didn't mean to say wife?
```

8901

1    A    No.

2    Q    So, that was wrong what you said on direct examination?

3    A    His girlfriend. I'm pretty sure you get the gist of it.

4    Q    And you said something about there was this Mac-10 in the house.

5    That was your testimony?

6    A    Correct.

7    MR. RION:  Nothing further.

8    THE COURT:  Okay. Any redirect?

9    MR. MILLER:  Yes.

10    REDIRECT EXAMINATION

11    BY MR. MILLER:

12    Q    Joey, in 2009 when Detective Clark first interviewed you you were on

13    drugs; were you not?

14    A    Correct.

15    MR. RION:  Objection. Leading.

16    THE COURT:  That's sustained.

17    Q    All right. Were you on drugs in 2009 when Detective Clark interviewed

18    you?

19    A    Yes.

20    Q    Now, you have personal experience being a heroin addict; right?

21    A    Correct.

22    Q    Do you want to leave a whole lot of things lying around when a heroin

23    addict is around?

```
 1   A   No.
 2   Q   Why not?
 3   A   Steal it.
 4   Q   Steal it; right?
 5   A   Right.
 6   Q   Are you still on heroin now?
 7   A   No.
 8   Q   Are you comfortable doing this today?  Are you comfortable doing this?
 9   A   Yea, I'm comfortable other that dude drilling me right here.
10   Q   Okay.
11   A   You know, other than that, he's starting to piss me off a little bit, to be
12       honest with you.
13           MR. RION:  Objection.
14   Q   Understood.
15   A   I'm sorry for saying that.
16   Q   Understood.
17           THE COURT:  Overruled.  The objection is
18       overruled.
19   Q   Now, defense counsel made a big deal about --
20           MR. RION:  Objection.
21   Q   Okay.  The defense counsel questioned you about whether or not
22       Detective Clark asked you about finding a gun.
23   A   Correct.
```

1   Q   Did you ever find a gun?

2   A   Never found a gun.

3   Q   Did you ever tell Detective Clark that you found a gun?

4   A   I never told him I found a gun.

5   Q   Now, you were kind of in the mode in 2009 of trying to help yourself.

6   A   Correct.

7   Q   Would you have been able to help yourself by lying to Detective Clark

8   and saying "I found a gun"?

9   A   Correct.

10  Q   But, you didn't do that?

11  A   No.

12  Q   Do you remember why Markelus said that he shot the bitch, or,

13  smoked the bitch is I think what you said.  Do you remember him saying why

14  he did that?

15  A   No.

16  Q   Okay.  What did you take it to mean, the testimony on cross, about

17  Detective Clark nodding his -- well, this whole thing about Detective Clark

18  nodding his head and he said, well, before that he said he didn't care about

19  your F-5's.  What did you take that to mean?

20  A   That means you can't help me.  He said, "I don't have time for your

21  F-5's."  That means I can't help you.

22  Q   That's how you took that?

23  A   That's how I took it.  And the only reason why I got judicial release --

1    MR. RION: Objection. Objection, your

2    Honor.

3    Q    Hold on. Hold on.

4    THE COURT: Okay. Sustained. Just

5    answer the questions.

6    Q    Now, defense counsel mentioned these judicial releases. Were some

7    of those in Van Wert County?

8    A    Yes.

9    Q    That had nothing to do with this county whatsoever?

10   A    No.

11   Q    Were some of them in this county?

12   A    Yes.

13   Q    Did any of them have anything to do with your testimony today?

14   A    No.

15   Q    Did any of them have anything to do with your talk with Detective Clark?

16   A    No.

17   MR. MILLER: One second.

18   (WHEREUPON, Court went off the record briefly.)

19   Q    Now, you were asked on cross examination about why you came

20   forward with this information about "smoking the bitch", okay, late, and why

21   you didn't tell Detective Clark that earlier. I think you said, and correct me if

22   I'm wrong, but you just didn't know Markeius' name at that time.

23   A    And his face. I was downstairs in booking and he was downstairs in

1 booking and that's when I saw him and he said his name and that's when it
2 clicked.
3 Q  And then you had a name with a face?
4 A  Exactly.
5 Q  Okay. Before then you just had a face?
6 A  Right.
7 Q  Now you had a name and a face?
8 A  'Cause that was back in 2009; you know. I mean, that was a long time
9 ago.
10 Q  Well, again, had you -- again, back when you were on heroin you were
11 in the mode of helping yourself.
12 MR. RION:  Objection. Leading.
13 THE COURT:  Sustained.
14 Q  Were you in the mode of helping yourself back in 2009?
15 A  Yes.
16 Q  Okay. This information could have been helpful to you --
17 MR. RION:  Objection. Leading.
18 Q  Could this information been helpful to you earlier had you had it?
19 A  Yes.
20 Q  But, you didn't have it?
21 A  No.
22 Q  Is it true that you wanted to wait -- well, you waited until you had the
23 accurate information before --

1    MR. RION:  Objection.

2         THE COURT:  Sustained.  That's leading.

3    Q    Have you ever lied to Detective Clark --

4    A    No.

5    Q    -- about this case whatsoever?

6    A    No.

7    Q    Have you ever sent down a kite that wasn't true?

8    A    Never sent down a kite that wasn't true.

9    Q    Why not?

10   A    Not the right thing to do.

11   Q    Would it help you to send a false kite?

12   A    No, 'cause they would know if it was a lie the half the time.  If I say

13   something they know if it lines up with what they got.

14   Q    Would it blow your credibility?

15   A    Exactly.

16        MR. MILLER:  One second, your Honor.

17        THE COURT:  Okay.

18   (WHEREUPON, Court went off the record briefly.)

19   Q    Now, even after Detective Clark made clear to you and you understood

20   that you weren't going to get any help from Detective Clark did you continue

21   to provide information to him on this case?

22   A    Yes.

23   Q    Did that include five years later when Detective Clark spoke to you

1074

1    again?

2    A    Yes.

3    Q    Have you ever gotten any case consideration --

4    A    No help whatsoever.

5    Q    Hold on.  Have you ever gotten any case consideration from the

6    prosecutor's office or the police for the info. you've testified about today?

7    A    Right hand on God, I've never gotten no help from you guys on any of

8    my cases I caught.  God's honest truth.

9    Q    Okay.

10   MR. MILLER:  No further questions.

11   THE COURT:  Recross?

12   **RECROSS EXAMINATION**

13   **BY MR. RION:**

14   Q    Even in 2015 you asked the officer for help; right?  Even in 2015,

15   February 15th, 2013 (sic), you're asking this officer how he can help you;

16   correct?

17   A    Correct.

18   Q    And you say to him, you can either help me now or sometime in the

19   future; correct?  Something like that?

20   A    Correct; yea.

21   Q    You're looking for help from that man.  You were looking in 2009;

22   correct?

23   A    Yea.

1    Q    You were looking in 2015; correct?

2    A    Right.

3    Q    And you said either then, in February, or sometime in the future.

4    A    And I didn't get help in the future or back then.

5    Q    You've got an awfully long record; don't you?

6    A    Yes, I do.

7    Q    You've been to prison multiple times?

8    A    Yes.

9    Q    And did this prosecutor object to you getting out on judicial release?

10   A    I was in a program in prison and --

11   Q    If you could -- sorry.

12   A    I had award letters and --

13   Q    Let me ask it this way.

14        MR. MILLER:  Your Honor, I'm going to

15   object.  There's no foundation that I had anything to do with this case.

16        THE COURT:  I'm going to let the cross

17   examination go.  Go ahead.

18   Q    Let me put it to you this way - you're not aware of any motions in

19   opposition filed to your release; are you?

20   A    No.

21        MR. RION:  Nothing further.

22        THE COURT:  Okay.  Mr. Moore, you may

23   step down.  Thank you for coming in.  Before we call the next witness I want

1  to instruct the jurors.  Ladies and gentlemen of the jury, the last witness

2  testified regarding statements that he said he overheard regarding the

3  possession of drugs.  The charges in this case are not about drug

4  possession.  The evidence that the witness stated he overheard regarding the

5  possession of drugs, if believed, cannot be used to prove the character of the

6  defendant, who the witness said made those statements, or that the

7  defendant acted in conformity with that character.  If you believe that

8  evidence of possession of cocaine that can be considered only in your

9  deciding the credibility or believability of this last witness.  For example, to

10  show his credibility in the identity of who he said made those statements or

11  his testimony would go to if the speaker, the maker of those statements, knew

12  what he was talking about or what he was saying.  So, again, that evidence is

13  not to be used to prove the character of the defendant who this witness said

14  made those statements, if you believe that, well, they

15  can't be used to show his character or that he acted in conformity.  It goes

16  only to the credibility or believability of the witness.  Okay?

17  Next witness for the State?

18  MR. MILLER:  Your Honor, may we

19  approach?

20  THE COURT:  You may.

21  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

22  the record, as follows.)

23  THE COURT:  You don't have a brief one?

1    MR. MILLER:  No.

2    THE COURT:  Okay.

3    MR. MILLER:  We have B.C.I. guys and

4    they're all pretty long.

5    THE COURT:  Okay.  All right.  So, we'll

6    take our lunch break now.  Okay.

7         (WHEREUPON, Court continued on the record, as follows.)

8    THE COURT:  All right.  I lost track of the

9    time, folks.  We're close enough to the lunch hour.  They said the next

10   witnesses will probably take a little longer than ten/fifteen minutes.  So, we'll

11   break for lunch.

12        Remember the admonitions I've given you each time.  I'm going to

13   repeat them just so the record shows.  You're not to talk about the case with

14   anyone – no family members or friends.  Don't post anything on social media

15   about the case.  Don't do any independent investigating.  Don't formulate

16   opinions or express opinions or have any contact with persons involved in the

17   case.  Disregard anything on the media.  Don't look at the media about the

18   case.  Follow those instructions all throughout the case.

19        Let's get back at one o'clock and we'll get started with the rest of the

20   case.  We'll stand in recess.

21        (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

22

23

1 THE COURT: It's the afternoon of the 15th

2 of September, 2015. We're reconvening in CR2014 0139, State of Ohio -vs-

3 Markelus Q. Carter. The record will show the defendant is present with

4 counsel. The State is present. The jurors have returned from the noon

5 recess.

6 We'll continue with the presentation of the State's case-in-chief. The

7 State may call their next witness.

8 MR. MILLER: Carlotta Williams.

9 WHEREUPON, called to appear as a witness in this proceeding was one:

10 C A R L O T T A   W I L L I A M S

11 who, having been duly sworn by the bailiff herein, testified as follows:

12 BAILIFF: She has an objection.

13 THE COURT: Okay. The witness has

14 expressed an objection to being photographed or her image appearing on

15 video. So, I would instruct the media to respect that and not have her

16 photographed or her picture in the media. All right? Mr. Miller?

17 DIRECT EXAMINATION

18 BY MR. MILLER:

19 Q Miss Williams, can you state your full name for the record?

20 A Carlotta Williams.

21 Q Carlotta, do you know a person named Markelus Carter?

22 A Yes.

23 Q Is he in the Courtroom today?

1   A.  Yes.

2   Q.  Can you point to him and describe an article of clothing?

3   A.  White long-sleeved shirt, grayish vest, tie, glasses.

4   MR. MILLER:  Okay.  Let the record reflect

5   she's identified the defendant.

6   THE COURT:  Okay.  So, noted.

7   Q.  When did you meet Mr. Carter?

8   A.  Maybe 2010 or '11.

9   Q.  Okay.  Well, did you know him before 2010 or '11?

10  A.  No.

11  Q.  Not at all?

12  A.  Huh-uh.

13  Q.  How would you describe your relationship with him?

14  A.  We had a pretty good friendship.  You know, he was somebody I could

15  rely on.  He's smart, you know, smart business-wise.

16  Q.  Good with computers?

17  A.  Yea, most definitely.  Yea.

18  Q.  Let me take you back a little bit because I want to remind you -- well,

19  do you remember when he went to jail back in 2009?

20  A.  Yea.

21  Q.  Okay.  Did you know him before he went to jail?

22  A.  Hold up.  I met him --

23  Q.  I want to get the time reference right.

0801

1   A    Yea. Sorry. I met him -- I moved back from Cincinnati in 1999 and so I
2   met him around that time, between 1999 and 2000. I'm sorry.
3   Q    Okay. So, in '99 and not in 2009?
4   A    No. Right.
5   Q    Okay. I just asked you if you remember when he was arrested back in
6   February of 2009. Do you remember that?
7   A    Yes.
8   Q    Okay. We've done this with a couple of witnesses, but we're going to
9   go back in time and I want to use that point and time as sort of a reference
10  point. Okay?
11  A    Uh-huh.
12  Q    Okay. Now, you've described your relationship with him as, well, you
13  mentioned something about a business relationship.
14  A    Yea, I always asked him for business advice, you know. He was really
15  good at everything.
16  Q    Okay.
17  A    So, I relied on a lot of things.
18  Q    Okay. Did you rely on him for computer type stuff?
19  A    Well, yea.
20  Q    And other things?
21  A    Yea.
22  Q    Now, back in that, and before the time of his arrest and, again, I want
23  to use that as sort of a reference point so when we go backwards in time,

1   Okay, you have a reference.

2   A   Okay.

3   Q   Before his arrest in 2009 did he have children?

4   A   Yes.

5   Q   Do you know how many?

6   A   Two.

7   Q   Were they boys?  Girls?

8   A   One boy and one girl.

9   Q   Okay.  Do you know their names?

10   A   Tarah and Markie Carter.

11   Q   Okay.  Now back, again, before his arrest do you know if Markelus was

12   with a lady named, well, back then it would have been Sonya Burkholder?

13   A   Before the arrest?

14   Q   Yes, before the arrest.

15   A   With her like how?

16   Q   Well, did he know somebody named Sonya Burkholder?

17   A   Yes.

18   Q   Okay.  And was Sonya the mother of his children?

19   A   Correct.

20   Q   Did he talk to you about Sonya?

21   A   Some; yea.

22   Q   Okay.  What did he say about Sonya?

23   A   He didn't agree with the parenting skills of hers.  He didn't appear to

```
 1   Refinery.
 2   Q   Okay.  By the way, are you married?
 3   A   Yes, I am.
 4   Q   Who are you married to?
 5   A   Don Bodiker.
 6   Q   Is that the guy that just left?
 7   A   He just left; yes.
 8   Q   Okay.  So, you were employed with --
 9   A   He was my boss.
10   Q   He was?
11   A   Yes.
12   Q   Okay.  All right.  I'm sorry - what was your job title?
13   A   I was supervisor of third shift.
14   Q   Okay.  Back in December of 2007 did you know an individual named
15       Sonya Burkholder?
16   A   Yes, sir.
17   Q   How did you meet Sonya?
18   A   Through work.  She got hired at the Refinery as a security guard.
19   Q   Also with Allied Barton?
20   A   Yes, sir.
21   Q   Okay.  Did she work for you?
22   A   For a time, yea, until she became a supervisor herself, but off and on
23       she would work night shift with me if needed.
```

1    Q.  Okay.  So, I take it from what you just said she did not come in as a

2    supervisor with Allied Barton?

3    A.  No, sir.

4    Q.  If you recall, what did she come in as?  What was her title?

5    A.  Security guard.

6    Q.  Security guard?

7    A.  Uh-huh.  Officer.  Yea.

8    Q.  And then she became a supervisor?

9    A.  She ended up a supervisor, yea, down the road later on.

10   Q.  Yes.  After some period of time she, well, would you call it a

11   promotion?

12   A.  Yes, it is a promotion.

13   Q.  Okay.  Somewhere down the road after she started she was promoted

14   to supervisor?

15   A.  Right.

16   Q.  Do you recall how many people she supervised?

17   A.  Normally on a shift it was between two and three.

18   Q.  Okay.  How would you describe, again, back in 2007, how would you

19   describe your relationship with Sonya?

20   A.  It was -- we were on good terms as employees.

21   Q.  Okay.  At some time -- well, would you describe it as a work

22   relationship or something more?

23   A.  Not in the beginning, but later on, yes, we talked a lot and we became

1    kind of friendly; yes.

2    Q.   Okay.  Would you say she looked at you as sort of a confidante?

3    A.   Yes, sir.

4    Q.   Would she talk to you on occasion about her children's father -

5    Markelus?

6    A.   No, not so much.

7    Q.   She didn't talk about him at all?

8    A.   Well, no, not really.

9    Q.   Okay.  Was there a time in December of 2007 that Sonya and her

10   children came to live with you and Don?

11   A.   Yes, sir.

12   Q.   How did that come about?

13   A.   I relieved her at ten o'clock from her shift.  She briefed me and she left.

14   Q.   Do you remember the date of this?  Do you remember the date of what

15   you're describing?

16   A.   Not exactly.  It was -- they were on either snow break, the children, or

17   the Christmas break.  I don't really recall the exact date.  All I know is it was

18   winter.  It was December.

19   Q.   Okay.  2007?  Was it before Christmas?

20   A.   Yes, uh-huh.

21   Q.   Okay.  Because you mentioned the kids were on Christmas break.

22   Was it before Christmas?

23   A.   Before Christmas; yea.

1    Q.   Okay.  Tell me what happened.

2    A.   She left and went home, or so I assumed.  She left the Refinery.

3    Between ten, my shift that started at ten P.M., and eleven, I don't remember

4    the exact time --

5    Q.   That's okay.

6    A.   -- we got a phone call and my co-worker answered the phone and she

7    said, "Oh, okay."  She turned to me and she said, "Krista, you have a phone

8    call.  Sonya's calling."

9    Q.   Okay.  So, you described her leaving and your shift starting at ten.  Did

10   your shift start after Sonya's?

11   A.   Yes, my shift started after Sonya's; yea.

12   Q.   Okay.

13   A.   She worked second shift and I worked third shift.

14   Q.   As a third shift supervisor, right?

15   A.   Yea.

16   Q.   Okay.  Got it.  All right.  Okay.  I'm caught up.  Go ahead with your

17   story.

18   A.   She answered the phone, or, I answered the phone and Sonya was on

19   the phone and she said, --

20        MR. RION:  Objection to this as hearsay.

21        MR. MILLER:  It's not offered for the truth

22   of the matter.  She's describing what occurred that night.

23        THE COURT:  I'm going to overrule the

Case: 3:19-cv-00240-JZ Doc #: 7-7 Filed: 07/16/19 124 of 316. PageID #: 1751

1  objection and let her testify.  Go ahead.

2  Q  Go ahead

3  A  Proceed?

4  Q  Proceed.

5  A  She said, "Krista, I need help.  Could you come down on Kibby Street?

6  I need to talk."  So, I said, "Well, I really can't leave.  You know I'm on duty."

7  She said, "Please, please come."  I remember that exactly because she was

8  crying at the time.

9  Q  On the phone?

10  A  Yes.

11  Q  Okay.

12  A  So, I left the gatehouse and I went down there.  She was sitting in her

13  vehicle.  She came out of her vehicle and I saw her face and she was just

14  shaking, very, very much shaking.

15  Q  Was she crying?

16  A  Yea.

17  Q  You know, people can cry hard, or not so hard.  How would you

18  describe her crying?

19  A  It was a normal sobbing.

20  Q  Okay.  A sobbing type cry?

21  A  Sobbing; yea.

22  Q  Okay.  Then what happened?

23  A  I said, "What happened to your face?"  She said --

1    MR. RION:  Objection.

2    THE COURT:  Overruled.

3    Q    Go ahead.

4    A    She said, "Markelus hit me and he put a gun in my face." I said,

5    "Why?"  She said, "He kicked me out of the house and I want my children."

6    Q    Were the children with her at the time?

7    A    No, sir.

8    Q    You mentioned her face.  Did you observe any, well, what you would --

9    A    She was --

10   Q    Krista, one second.  Okay?  Again, you're not the only one that does

11   this because it's usual.  What happens is that in usual conversation I will

12   begin to ask something and then you will anticipate what I'm going to ask and

13   you'll answer.

14   A    Okay.

15   Q    That happens in conversation every day.  The problem with doing that

16   in here is that we have a Court Reporter who needs to take down and

17   eventually sometimes type up what is said.  If we're talking over each other

18   that's very difficult for her to do.

19   A    I'm sorry.

20   Q    No, no, don't apologize.  It's very easy to fall into that conversational

21   mode.  So, please just wait until I ask my question and then I'll give you all the

22   time to answer.  Okay?  Okay.  Did you notice anything about her face, any

23   injuries?

1    A    Yes, sir.

2    Q    Okay.  What did you notice?

3    A    She was scratched up and kind of, well, like there was crusted blood

4    on her face, the left side of her face, and she was holding her chest.

5    Q    Okay.  Where did this meeting take place?  I mean, you described a

6    parking lot, I think.  But, were you in a car or outside of a car?

7    A    It was across the street.  There was a car wash, or a laundromat, or

8    something, yea, in that matter and she was parked right there.

9    Q    Okay.  When you had this conversation with her were you and she in

10    the car or out of the car, or, a car?

11    A    She came out of her car.

12    Q    Okay.  Were you in a car?

13    A    Her car?

14    Q    No.  Were you in a car?

15    A    Yes.  Yes.

16    Q    Did she get in the car with you when you had this conversation or did

17    you get out to meet her?

18    A    At first we were out, standing outside, and I got cold and I said, "Make

19    it quick, I've got to go back to work."

20    Q    Okay.  And that's when she told you what happened, I

21    suppose?

22    A    That's what happened.

23    Q    According to her that's what's happened, that's what she told you?

1   A   Yes.

2   Q   Now, what happened after that?

3   A   That same night?

4   Q   Uh-huh.  Just tell me what happened after that.

5   A   Okay.  I told her -- well, first of all, there was a police officer and he told

6   me that they were going to take her to the police station.  I said, "Okay," I told

7   Sonya, I said, "After my shift I'm going to come up to the police station and we

8   can talk."

9   Q   Okay.  Did you do that?

10  A   Yes, sir.

11  Q   Okay.  What happened?  I don't need to know what you talked about,

12  but after you spoke with her what happened after that?

13  A   I had to leave and I went back to my workplace.

14  Q   Okay.  Now, eventually you got off of work; correct?

15  A   At six o'clock in the morning.

16  Q   At six o'clock?  We started this conversation with me asking, you know,

17  generally how Sonya came to live with you.  Did she come to live with you

18  after this particular incident that you've described?

19  A   Yes, sir.

20  Q   Okay.  How soon after, if you recall?

21  A   That same day.

22  Q   Okay.  So, you got off at six A.M.?

23  A   Yes, sir.

1    Q    And she came to live with you that same day?

2    A    That same day.

3    Q    Now, did the kids, Markie and Tarah, come and live with you as well?

4    A    Yes, sir.

5    Q    Okay. I suppose that would be you and Don, your husband?

6    A    Yes.

7    Q    So, I suppose because she was living with you that you had the

8    opportunity to continue to observe her face? Did you continue to observe

9    injuries on her face? Did you continue to observe injuries on her face?

10   A    Yes, sir.

11   Q    Okay. Had you noticed any of those injuries that you've described

12   today before you went to meet her after her call? That's a bad question. The

13   injuries that you've described, did you observe those injuries on her prior to

14   her calling you that night?

15   A    No, sir.

16   Q    How long did Sonya and the kids stay with you and Don?

17   A    Approximately nine months.

18   Q    At the end of the nine months where did they go; if you know?

19   A    My husband talked her into getting ahold of Habitat for Humanity to

20   build her a house.

21   Q    Okay.

22   A    And the house was completed and she moved in.

23   Q    Okay. Do you know where that house was, or, is?

```
 1    A    Yes.  It was behind Schoonover's Park on the south side.

 2    Q    Was it on a street called McKibben?  Not sure?  That's okay if you're

 3         not sure.

 4    A    I'm not sure; no.

 5    Q    Okay.  That's fine.

 6    A    I don't know the name of the street.

 7    Q    Okay.  We're just trying to narrow it down.  But, she moved out into a

 8         Habitat for Humanity house?

 9    A    Yes, sir.

10    Q    Okay.  Somewhere over by Schoonover Park?

11    A    Right.

12    Q    Okay.  Had you ever met -- in the time that you've known -- how long

13         have you known Sonya?

14    A    She was hired in on a shut down and from then on she was kept

15         working for Allied Barton.  There was a short period of time where she went

16         over to the chemical side for a shut down and then she came back.  Our boss

17         wanted her back because she was a very conscious worker and from then on

18         we were pretty much working together.

19    Q    Okay.  So, she went over to the chemical side and then your boss

20         wanted her back?

21    A    Uh-huh.

22    Q    Was your boss Don?

23    A    Yes.
```

1   Q   Okay. And he wanted her back and so --

2   A   Yes.

3   Q   -- he hired her back; is that right? He hired her back?

4   A   Well, she never lost a job for Allied Barton. It was just --

5   Q   Placement?

6   A   Replacement; yea. She was placed someplace else at one time.

7   Q   Okay. But, did you know her -- have you known her for a number of

8   years?

9   A   Before that?

10  Q   Yes, before this incident. How long had you known her before

11  December of 2007?

12  A   Well, from the time she started working until -- well, I really don't

13  remember. Maybe three years.

14  Q   Okay.

15  A   Approximately; yea.

16  Q   We're going back some time. So, that's fine. Okay. During that time

17  that you worked with Sonya out at the Refinery did Markelus Carter ever

18  come out to the Refinery?

19  A   One time.

20  Q   One time? Can you describe that time?

21  A   Yes, I remember it pretty clear. Sonya got a phone call and she said to

22  me, "Markelus is coming out because Tarah has a friend and he wants to

23  know what is going to go on with her and he's going to have Tarah and her

1  friend and him in the car and he wanted," she told me, she said that he said
2  he wanted her to take her home.
3     Q    So, Sonya's at work with you?
4     A    Uh-huh.
5     Q    Now, did Markelus actually come out?
6     A    Yes, he did.  Yes, he did.
7     Q    Okay.  I want to get the picture right.
8     A    Yea, okay.
9     Q    So, he was there and she went to meet with him?
10    A    When he pulled up to the gatehouse she went outside and talked for a
11  few minutes and came back in.
12    Q    And then told you what he wanted?
13    A    Yes.  She told me that she told him to just take the friend home.
14    Q    Was he wanting Sonya to take the friend home?
15    A    She said, "He wanted me to take Tarah's friend back home."
16    Q    Okay.
17    A    She couldn't leave.  So, she told him, and I don't know exactly what
18  was said, but she came back into the gatehouse at our workplace and she
19  said, "I can't leave and I told him just to take her to," well, wherever her home
20  was.
21    Q    Okay.  What was her demeanor?
22    A    What was her demeanor?
23    Q    As she was saying this to you.

1    A    Very pleasant.

2    Q    Okay. Did she seem upset about anything?

3    A    Just at times when she --

4    Q    Well, this specific incident.

5    A    Oh, this one? Yea, she was a little upset. Yes, she was.

6    Q    Now, during the time, the nine months that Sonya and the kids were

7         living with you and Don, did Markelus ever come out to your house?

8    A    One time.

9    Q    Okay. Tell me about that.

10   A    He drove into our driveway and picked up Tarah.

11   Q    Okay.

12   A    But, he did not come in our house. It was just in the driveway and

13        Tarah went out and went into his car.

14   Q    Did you have a conversation with Sonya about that?

15   A    Yes. I told her that I don't like that and, "You tell him that I don't want

16        him even coming to Coop Road where we live."

17   Q    Okay. You didn't want him there? You didn't want him there? That's

18        the conversation?

19   A    Exactly.

20   Q    Okay. Did you know a guy named Ken Warrington?

21   A    Yes, I do.

22   Q    How did you meet him?

23   A    He was working at the Refinery. The place that he was working, well,

1   I met him when he brought paperwork up to the gatehouse that we had to

2   forward to other places in the Refinery.

3   Q   Okay.  Did you see him often out at the Refinery?

4   A   Whenever he worked.

5   Q   Whenever he worked?

6   A   Whenever his shift was, and it was night shift; yes.

7   Q   Okay.  Did you often talk to him?

8   A   I did.

9   Q   What kind of a guy was he to talk to?

10  A   Oh, things about football and about blah blah stuff -- things that don't

11  matter.

12  Q   Small talk?  Would you talk small talk?

13  A   Yea, small talk; yea.

14  Q   Was he a friendly guy to you?

15  A   Very friendly; yea.

16  Q   Now, were you aware that Ken Warrington and Sonya Burkholder were

17  in some sort of a relationship while each of them worked out at the Refinery?

18  A   Not in the Refinery, but --

19  Q   Well, I mean while they both worked there.  I know that it may not have

20  happened in the Refinery.

21  A   Yes.

22  Q   But, during that time frame that they worked there?

23  A   Not at first.

```
 1   Q   Did you become aware of that relationship?

 2   A   Yes.

 3   Q   Okay.  Did you talk to Sonya about that?

 4   A   Yea.

 5   Q   Yea.  What did you tell her?

 6   A   I said, "Sonya, this is not a good place.  Please tell him to stay away

 7       from you while we're working, or, you're not working.  It's not supposed to

 8       happen.  If you two want to be together," I said, "you tell him to get a divorce

 9       first and then make it right."

10   Q   You just gave her a little advice on that topic?

11   A   Yea.

12   Q   Both professionally and personally, it sounds like?

13   A   Uh-huh; yes, sir.

14   Q   Okay.  What was her reaction to that?

15   A   She said, "Okay, I will do that."

16   Q   Did you talk to Ken about this relationship at all?

17   A   Yes, sir.  Yes, I did.

18   Q   What did you tell him?

19   A   I said the same thing.

20   Q   The same thing?

21   A   I said, "Kenny, make it right.  Stay away.  Get a divorce and then move

22       on with your life."

23   Q   Now, Ken was not your employee?
```

1    A    No.

2    Q    I mean, you work for Allied Barton?

3    A    Yes.

4    Q    And he actually worked for --

5    A    For Husky; uh-huh.

6    Q    So, you really had no say in the work side of it, but just --

7    A    When we ran into each other that's what I told him.

8    Q    Okay.

9    A    Yea.

10   Q    Now, was that advice more of sort of friend to friend advice?

11   A    That was friendly advice.

12   Q    Okay.

13   A    A motherly advice.

14   Q    Understood.  When was the last time you saw Ken?

15   A    That was around five o'clock in the morning.  I don't know the exact

16        date.  But, he left through my gate.  I have a habit of looking out the window

17        between five o'clock in the morning, five A.M. and six A.M., when the

18        employees leave through the gate to make sure the gate goes up and the

19        turnstiles go and they can walk through the turnstiles.  That was one of my

20        jobs.  He left about five o'clock.  I looked at him and I waved and he stuck his

21        hand out of his truck and waved back and went towards the traffic light to

22        Metcalf Street.

23   Q    Is that the last that you saw him?  Is that the last that you saw him?

1  A   That's the last I saw him; yea.

2  Q   I asked you if that was the last time you saw him.

3  A   Yes.

4  Q   Was that the day that he died?

5  A   That was the day he -- yes.

6      MR. MILLER: I have no further questions.

7      THE COURT: Questions, Mr. Rion?

8      MR. RION: Thank you, your Honor.

9          CROSS EXAMINATION

10     BY MR. RION:

11  Q   Ma'am, you said that on December 17th that you received a call from

12     Sonya about what time?

13  A   Between ten P.M. and eleven P.M.

14  Q   Okay. What time did you meet with her then? What time did you meet

15     with her?

16  A   Between ten P.M. and eleven P.M.

17  Q   Okay. So, you received a call from her and then you met her shortly

18     thereafter?

19  A   Yes, sir.

20  Q   And so you met her before eleven P.M.?

21  A   Yes, sir.

22  Q   Okay. Now, you said that she was scratched up?

23  A   Yes, sir.

1   Q   Where were the scratches?

2   A   On her face.

3   Q   On her face? Where on her face?

4   A   If I recall correctly, when I faced her it was her left side.

5   Q   Okay. Where on her left side?

6   A   On her cheek.

7   Q   So, she had scratches on her cheek?

8   A   Uh-huh.

9   Q   And then you said she had crusted blood on the side of her face?

10  A   Too; yea.

11  Q   Two? Two places?

12  A   No. She had --

13  Q   Oh, as well?

14  A   As well; yea.

15  Q   Okay. Describe the crusted blood. Where was it?

16  A   She showed me a bruise on her chest.

17  Q   I'm sorry? I asked you to describe the crusted blood. Where was it?

18  A   On her left cheek, at the same place she was bruised up.

19  Q   Okay. Could you point to your cheek on where the crusted blood was

20      that you saw on her cheek?

21  A   About right here.

22  Q   Okay. Then you also said that she had bruises on her chest?

23  A   Yes, she had a bruise on her chest.

1   Q.  And these bruises on her chest were clearly visible to you;
2   correct?
3   A  When she opened her blouse she showed me the bruise; yes.
4   Q.  Okay. So, yes, clearly visible. And the place where the crusted blood
5   was on her face and the scratches on her face, that was clearly visible;
6   correct?
7   A  Visible; yes, sir.
8   Q.  Now, the police were called; correct?
9   A  Right.
10   Q.  And they came; correct?
11   A  Right.
12   Q.  And then did you stay with her while she was with the police?
13   A  No.
14   Q.  Okay. How many hours were you with her before the police were
15   called?
16   A  The police was there when I got there.
17   Q.  Okay. So, the police were already there?
18   A  Yes, sir.
19   Q.  And do you recall the officer's name?
20   A  No.
21   Q.  Was it Officer -- okay. When you saw her with the police she appeared
22   to be cooperating with them; correct?
23   A  Right.

1   Q   Like she flagged them down.  Well, they were there.  They were talking

2   about the incident and talking about the situation, et cetera; correct?

3   A   That I don't know.

4   Q   And you described -- the prosecutor asked you what she said

5   happened.  Let me get this right.  You said that she said that she hit her;

6   correct?

7   A   Yes, sir.

8   Q   And that was with his fist?  With his fist or his hand?

9   A   She did not specify that.

10   Q   And also 'he put a gun in my face'.  That was the other thing he did?

11   A   Yes, sir.

12   Q   Okay.  So, he hit her and he put a gun in her face?  Those were the

13   two things?

14   A   Right.

15   Q   And that's what she told you?

16   A   That's what she told me.

17   Q   And you don't know what she told the police?

18   A   No.

19   Q   So then she stays with you for nine months?

20   A   Approximately; yes.

21   Q   And the kids were with you, Tarah and little Markelus, Markie, they

22   were with you for just about a month or so; correct?

23   A   No - off and on, and Tarah more than Markie.

1   Q. Okay. So, after this incident on December 17th when she came, or,

2 when Sonya came to live with you did the two children also come and stay

3 that --

4   A. Yes, sir.

5   Q. -- next night or whatever?

6   A. Yes. We spent Christmas together.

7   Q. And they stayed there at the house for a couple of weeks solid;

8 correct?

9   A. Pretty much; yea.

10   Q. And then after January or so then the children were back with

11 Markelus, their father, and they would come and visit with you; correct,

12 meaning with Sonya?

13   A. Tarah, not so much; but, Markie, yea. He went back; yea.

14   Q. Now, you said that you gave advice to Sonya about committing

15 adultery. When was it that you gave her that advice?

16   A. When I noticed that they were more than a little friendly - when I saw

17 that.

18   Q. When was that?

19   A. I would have to guess, but maybe August.

20   Q. Did anything happen in November of 2008 that you're aware of?

21   A. Excuse me?

22   Q. Do you know where she was living in November of 2008?

23   A. At the house that she built with the help of that company.

1  Q   And do you know who she was living with in November of 2008?

2  A   With her children.

3  Q   Nobody else?

4  A   Not to my knowledge.

5  Q   Did you ever go over to the house?

6  A   Yes.

7  Q   Did you ever spend the night?

8  A   No.

9  Q   Did you ever see whose clothes were in the house in the closet?

10  A   No.

11  Q   So, you're a friend of Sonya's; correct?  You are a friend of Sonya's?

12  A   Yes, I am.  I was.

13  Q   And at the same time you were a friend of Sonya's -- well, I'll leave it

14  there.  Thank you.

15        THE COURT:  Any redirect?

16        MR. MILLER:  Can I have one second,

17  your Honor?

18        THE COURT:  Sure.

19  (WHEREUPON, Court went off the record briefly.)

20            **REDIRECT EXAMINATION**

21  **BY MR. MILLER:**

22  Q   Mrs. Bodiker, -- let me get to the microphone here.  Do you recall

23  testifying at a civil protection order hearing?

1   A   Yes.

2   Q   Okay.  Relating to the same subject matter that you've testified here

3   today to?

4   A   Not the murder.

5   Q   No, I mean, --

6   A   The protective hearing.

7   Q   -- the December of 2007 incident that you've talked about.

8   A   Yes.

9   Q   Okay.  I asked you about what time you got that call and about what

10   time you met Sonya.

11   A   That night?

12   Q   That night; yes.

13   A   Between ten and eleven.  The exact time?

14   Q   Do you know the exact time?

15   A   I would say it was --

16   Q   Let me ask you this - do you recall the exact time?

17   A   I was called?

18   Q   Do you recall the exact time?  Let me say it this way.  Do you recall the

19   exact time that you went out to meet Sonya?

20   A   Yes.

21   Q   You do?

22   A   Yes.

23   Q   Okay.  What was that time?

1    A    The exact time I could not tell you, but around --

2    Q    Well, let me stop you there.  Would it be helpful to you then if I showed

3    you your testimony from the C.P.O. hearing?  Would it be helpful to you in

4    recalling the exact time?

5    A    That probably would because it's been a long time.

6    Q    Oh, I understand.

7    A    Yea.

8    Q    Okay.

9    MR. MILLER:  Your Honor, may I approach

10    the witness?

11    THE COURT:  Okay.

12    MR. RION:  Can I see the document?

13    MR. MILLER:  Sure.

14    (WHEREUPON, Court went off the record briefly.)

15    Q    Mrs. Bodiker, I'm going to hand you something I want you to read to

16    yourself.

17    A    Uh-huh.

18    Q    Okay?  Silently.  It's portions of your testimony relating to the subject

19    matter that you testified to here today, specifically the December 17th, 2007

20    incident.  I think you'll get the gist of it if you pick up right here at about line

21    eleven and go down through twenty-three and then on the following page the

22    first couple of lines.  Look up at me when you're done.

23    (WHEREUPON, witness reviewed document.)

1    Q   Does that help you recall what time you went out to meet with Sonya?

2    A   Yes, but it was not two-thirty.

3    Q   Okay.

4    A   It was between ten and eleven.

5    Q   Okay.

6    A   Yea, that's not correct.

7    Q   Because you went to work at what time?

8    A   I came to work at ten o'clock - well, a quarter till. I always give enough

9    time, about fifteen minutes, to get briefed on what happened prior that I

10   should know at the work place.

11   Q   Okay. On what happened on that shift before you?

12   A   Yes.

13   Q   And then you went out and you would know what was going on at

14   work?

15   A   Right. That's how we worked.

16   Q   Okay.

17   MR. MILLER:  No further questions.

18   THE COURT:  All right. Any recross?

19   <u>RECROSS EXAMINATION</u>

20   BY MR. RION:

21   Q   Ma'am, do you recall also being asked during that same hearing where

22   you testified before whether or not you saw any blood and your answer was

23   'no blood'?

1    A    I did not testify on that; no.

2    Q    Would it help to refresh your recollection by looking at your testimony?

3    A    Probably not.

4    Q    Let me show it to you just so you can look at it.

5    A    Okay.

6         MR. RION:  Can I approach the witness?

7         THE COURT:  Sure.

8    Q    This is just to refresh your recollection.

9    A    Uh-huh.

10   Q    That's you - Krista Bodiker; correct?

11   A    Uh-huh.  Excuse me.  First of all, this is spelled wrong.

12   Q    Okay.

13   A    This is spelled -- my whole name is spelled wrong.

14   Q    Okay.  But for your name --

15   A    That's not me.

16   Q    This isn't you?

17   A    This is not me.  This person is not me.  If this is not me, it's

18        spelled wrong.

19   Q    Did you meet at a car wash on Main Street?

20   A    At the parking lot.

21   Q    At the car wash?

22   A    Yes.

23   Q    Okay.  "What place is this that you -- do you know the name of the

1   place that you came to?" "It was on Main Street. It was a car wash."

2   MRS. KOHLRIESER: Your Honor? I'm

3   going to object. It's beyond the scope. Furthermore, he's trying to read this

4   and somehow get her to answer the way he wants her to answer.

5   THE COURT: It's cross examination.

6   MRS. KOHLRIESER: It's not how you

7   refresh and it's beyond the scope, your Honor.

8   THE COURT: It's not refreshing. He can

9   cross examine using prior statements that she says those are her prior

10   statements. Overruled. Go ahead.

11   Q.   I'm just trying to establish that this was your testimony.

12   A.   Sure.

13   Q.   You deny that you said when I asked - "Well, you said that you talked

14   to her and the time was ten after two in the morning." You deny that, correct?

15   A.   Correct.

16   Q.   You were asked, "Did you see anything unusual about her?" There's

17   no mention of any -- well, just read through this. I'm going to ask you if

18   there's any mention of any blood that you saw.

19   (WHEREUPON, witness reviewed document.)

20   Q.   Feel free to read as much as you would like to read.

21   A.   No, I don't recall.

22   Q.   Okay. In looking at this would you agree with me there's no mention

23   that you testified that you saw any blood?

1    A    Okay.

2    MR. RION:  Nothing further.

3    THE COURT:  Okay. Thank you, ma'am.

4    You may step down. Okay? Does anybody on the jury need a break? I'm

5    the type that I like to keep going. But, does anybody need a break? Does

6    counsel need a break?

7    MR. MILLER:  Yes.

8    MRS. KOHLRIESER:  I think your staff

9    needs a break.

10   MR. MILLER:  I think your staff does.

11   THE COURT:  I was going to ask them.

12   Do you need a break?

13   BAILIFF:  I would like one.

14   THE COURT:  Okay. Let's take about a ten

15   minute or so break, until about five till. I want to try and keep going, but with

16   the idea, again, that I'll need to break around one o'clock. So, we might do a

17   little later, or, go a little later and have an extended -- well, maybe break

18   sooner than that and have an extended lunch. But, we'll have a recess here

19   for about ten minutes.

20   (WHEREUPON, COURT WAS IN RECESS.)

21

22

23

1       THE COURT:  We're reconvening in Case

2   Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter, on this 10th

3   day of September, 2015.  The defendant is present in Court with counsel.

4   The State is present.  The jurors have been returned from the recess.

5       We'll continue with the State's next witness.

6       MR. MILLER:  Don Hovest.

7   WHEREUPON, called to appear as a witness in this proceeding was one:

8                   D O N A L D   H O V E S T

9   who, having been duly sworn by the bailiff herein, testified as follows:

10      BAILIFF:  He has an objection.

11      THE COURT:  Okay.  This witness has

12  asked not to be photographed, as is his right under Superintendence Rule 12.

13  So, I would ask the media not to publish his image in any media.  All right.

14  Go ahead.

15  <u>DIRECT EXAMINATION</u>

16  BY MR. MILLER:

17      Q   Will you state your full name for the record, please?

18      A   Donald D. Hovest.

19      Q   Okay.  Can you spell your last name?

20      A   H-O-V-E-S-T.

21      Q   Okay.  Don, where do you work?

22      A   J&N Haulers.

23      Q   What does J&N Haulers do?

1    A    I pick trash up.

2    Q    Okay.  Were you working at J&N Haulers in February of 2009?

3    A    Yes.

4    Q    What was your route back in February of 2009?

5    A    As far as --?

6    Q    What was your route here for pick-up?  Were you a truck driver for

7    them?

8    A    Yea, I drive a pick-up around picking up trash with a dump bed on the

9    back.

10   Q    Okay.  So, you had a pick-up.  You picked up trash.  You had a pick-up

11   truck and you would pick up trash?

12   COURT REPORTER:  I'm having trouble hearing him.

13   Q    Okay.  See that microphone, Don?  Talk right into it.

14   A    All right.

15   Q    I do the same thing.  I get in trouble for it.  So, I try to do this much

16   as I can.

17   A    Okay.

18   Q    Lean right up into there and talk as loud as you can into it.

19   A    Okay.

20   Q    It does two things.

21   A    Okay.

22   Q    It records your voice so that we have a record of what's said in here.  It

23   also amplifies your voice and it projects it over certain speakers in here so

1 that everybody can hear.

2 A Okay.

3 Q Okay?

4 A All right.

5 Q You're a pretty soft-spoken guy.

6 A Yea.

7 Q So, if you don't speak into that everybody's going to have a hard time

8 hearing you.  Okay?

9 A Okay.

10 Q I think you were saying that you were a truck driver for J&N Haulers in

11 February of 2009.

12 A Yes.

13 Q And you had a pick-up truck?

14 A Yea, a pick-up with a dump, a dump on the back that I dump into the

15 packer.

16 Q That's where you put the trash as you ran around on your route?

17 A Yea.

18 Q Okay.  I want to take you back to February 23rd, 2009; okay?

19 A Yea.

20 Q You know the area of McKibben and Pearl Street here in Lima?

21 A That's my trash route; yea.

22 Q That was your trash route?

23 A Yea.

1   Q   Back on February 23rd, 2009?

2   A   Yea.

3   Q   Okay. Were you driving your route on that day?

4   A   Yes.

5   Q   While you were on your route did you hear gunshots on that day?

6   A   Yes.

7   Q   Do you do your route in the mornings?

8   A   Yea, early mornings.

9   Q   Okay. Was it during the early morning that you heard what you

10      thought to be gunshots?

11  A   Yes.

12  Q   Do you recall specifically about what time that was?

13  A   I'm not sure what time it was.  What time did I call?  Probably around

14      five something, around in there.

15  Q   Okay. Somewhere around in that area?

16  A   Yea, in that general area; yea.

17  Q   Okay. Could it have been closer to five-twenty/five-thirty, around in

18      that time?

19  A   Somewhere -- I'm not, like I said, sure on the time, but somewhere in

20      there. That's usually when I get around in that area.

21  Q   Okay. So, you're in that area around that time when you do that?

22  A   Yea.

23  Q   Okay. Now, to your left is what is marked State's exhibit '150' - one

1   five zero. Okay? Now, with the Court's permission, I'm going to ask you to

2   come out of your seat and walk up to exhibit '150'.

3   MR. MILLER: Judge, may he do that?

4   THE COURT: Yea, that's fine.

5   Q.   Okay. Don, why don't you come up and stand right there next to '150'.

6   I'm going to --

7   THE COURT: Just make sure that he

8   speaks up when he testifies.

9   MR. MILLER: Yea. I know we're going to

10  have the microphone issue. Okay.

11  Q.   Now, I have a black marker in my hand.

12  A.   Okay.

13  BAILIFF: That's a pointer.

14  Q.   Oh, it's a pointer. Do you have a marker?

15  MRS. KOHLRIESER: I have a marker.

16  BAILIFF: The markers should be up there.

17  MRS. KOHLRIESER: Your Honor, if I

18  could, I could take the microphone from this table and hold it up to him while

19  he testifies if the Court would so allow me.

20  THE COURT: No. We'll see how it goes.

21  Q.   Now I have in my hand a black marker; okay? I'm going to ask you to

22  put a black 'X' in the area where you were when you heard the gunshots;

23  okay? So, you see '150'?

1    A    Yea.

2    Q    Okay.  Here's the black marker.  Go ahead and put an 'X' in the area

3    where you were when you heard the gunshots.

4    A    Okay.  About right in here somewhere.  (Indicating.)

5    Q    Okay.

6         MR. MILLER:  Okay.  Now, for the record,

7    the black 'X' is placed on Pearl Street.  Okay?  That's just for the record in

8    case we put another 'X' somewhere.

9         THE COURT:  Well, maybe if you're going

10    to put other 'X's' then have him initial that or something.

11         MR. MILLER:  Well, okay.  We can use

12    different colors.

13         THE COURT:  All right.  Okay.

14    Q    Don, why don't you go ahead and initial that 'X' with your initials.

15    A    Okay.

16    Q    You can have a seat now.

17         THE COURT:  Pull that microphone back

18    around so you can talk in it.

19    Q    Okay, Don, you marked on exhibit '150' where you were when

20    you heard the gunshots.  When you heard what you thought were gunshots

21    what did you do?

22    A    Well, I actually had one more bag of trash that I picked up and threw in

23    and then I drove around to the back side of the park and come up the other

1   side.
2   Q.   Okay.  Why don't you stand back up and show the folks where you
3   drove?  I'm going to kind of narrate for the record here so that we know
4   what's going on.
5   A.   I went around here this way and come up --
6   Q.   Hold on one second.  Slow down.
7   A.   Okay.
8   Q.   I've got to narrate because we've got to have this on record.
9   A.   Okay.  I went down this way here towards --
10   Q.   When you say 'down this way,' you're going --
11   A.   Towards the park.
12   Q.   -- towards the park?  Towards Liberty Street?
13   A.   Liberty Street; yea.
14   Q.   Okay.
15   A.   Then I come up around and --
16   Q.   So, you turn, you make a left turn on Liberty?
17   A.   Left turn on Liberty and left turn on to McKibben.
18   Q.   Yea.
19   A.   Then I come around here and --
20   Q.   When you say you 'come around here', you went down --
21   A.   I'm not sure if I was on Jefferson or Jackson here, but one of these two
22   streets.  There's a Clark Station on Jackson.
23   Q.   Okay.

1   A   That's where I stopped and called it in.

2   Q   Okay.  Now, put that microphone right in front of your face.

3   A   Okay.

4   Q   You were kind of telling me away from the microphone what you did.  I

5       want you to say exactly what you did into that microphone.

6   A   Okay.  I went towards the park and I turned left on Liberty Street.

7   Q   Okay.

8   A   Then when I got to McKibben Street I took another left.

9   Q   Okay.

10  A   Then it was either Jefferson or Jackson that I turned to the right on to

11      go to the Clark Station and that's where I called.

12  Q   Okay.  When you say you went to the Clark Station, well, why did you

13      go the Clark Station?

14  A   That's where my next transfer was and I wasn't sure who was out there

15      or what was going on.  That's the reason why I waited until then to call.

16  Q   So, you wanted to get out of the area?

17  A   Yea.  Yea.

18  Q   Okay.  So, you went to the Clark Station?

19  A   Yea.

20  Q   And what did you do at the Clark Station?

21  A   I called 9-1-1.

22  Q   You called 9-1-1?

23  A   Yea.

1   MR. MILLER: No further questions.

2   THE COURT: Mr. Rion, any questions?

3   CROSS EXAMINATION

4   **BY MR. RION:**

5   Q   You said you heard some shots; right?

6   A   Yes.

7   Q   What did they sound like?

8   A   Well, just one right after another. I don't know. Rapid succession I

9   guess you would call it.

10  Q   How many?

11  A   Probably six - something like that. I'm not sure.

12  Q   You were - let me get my bearings here - you were right here when

13  you heard them; correct?

14  A   Yes.

15  Q   And then how long did it take you to drive around and get up to the

16  station? Estimate it. In other words, the time between when you heard the

17  shots and the time that you called 9-1-1.

18  A   Ten/fifteen minutes at the most. I didn't drive real fast.

19  Q   Okay. Thank you, sir.

20  THE COURT: Any redirect?

21  MR. MILLER: No, sir.

22  THE COURT: Okay. Thank you, sir.

23  You're done. You may step down. Next witness?

1        MRS. KOHLRIESER:  The State would call

2    Bob Sarchet, your Honor.

3        WHEREUPON, called to appear as a witness in this proceeding was one:

4             R O B E R T   S A R C H E T

5    who, having been duly sworn by the bailiff herein, testified as follows:

6        BAILIFF:  He has an objection.

7        THE COURT:  Does?

8        BAILIFF:  Yes.

9        THE COURT:  Okay.  This witness also

10   has requested not to be photographed.  So, I'll order the media not to publish

11   his image.

12             DIRECT EXAMINATION

13   BY MRS. KOHLRIESER:

14   Q    I'm checking the clock so I can say good morning to you.  Could you

15   state your name for the record and spell your last name?

16   A    Robert Sarchet, S-A-R-C-H-E-T.

17   Q    And, Mr. Sarchet, where are you employed?

18   A    I was employed at the Lima Police Department.  I retired in December

19   of 2011.

20   Q    December of 2011?

21   A    Yes.

22   Q    And how long were you with the Lima Police Department, if you recall?

23   A    Thirty-five years.

1  Q  And what were your duties with the police department?

2  A  The entire time I was a street officer handling, on third shift, handling

3     calls for service.

4  Q  So, if someone called the police station and needed help you might get

5     sent out?

6  A  Yes.

7  Q  Okay.  You said third shift?

8  A  Yes.

9  Q  What hours was third shift when you were working there?

10 A  Eleven P.M. to seven A.M.

11 Q  And you were working that shift back in February of 2009?

12 A  Yes, I was.

13 Q  And at that time, and I think maybe for a large part of your time there,

14    what was the general area that you were assigned in the City?

15 A  I worked the downtown beat, which consisted primarily from Grand

16    Avenue to Elm Street, and Pine Street over to Jameson, and the downtown

17    business district.

18 Q  Okay.  Did that include the area of North Jackson, East Pearl, and East

19    McKibben?

20 A  That was a couple of blocks east of my area, but it wasn't uncommon

21    for me to get pulled from my area to work another area.

22 Q  So, basically that butted right up against your area; correct?

23 A  Right.  Yes.

554

1    Q.   Now, I want you to look real quick at what's been marked as

2    State's exhibit '150' there.  Do you see that?

3    A.   Yes.

4    Q.   Okay.  Do you recognize what that aerial photo is covering?

5    A.   Yes.

6    Q.   What area would that be?

7    A.   This would be the area where I was dispatched to a call.  It would be

8    just east of my area.  My area stopped at the railroad tracks at Pine Street.

9    This was just a block or two over from my area.

10   Q.   Okay.  Let me stop you there.  Make sure you speak up since we're

11   away from the microphones so all the jurors can hear you.  You pointed to,

12   well, if you're facing it, the left hand side of State's exhibit '150', correct, when

13   you were saying 'my area' and you made a hand gesture?

14   A.   Yes.  Right.

15   Q.   Okay.  The last complete, I guess, north and south road we can see on

16   '150' is Jackson Street, correct?

17   A.   Right.

18   Q.   Okay.  Are you talking about just to the west of that would be primarily

19   where your beat ended, so to speak?

20   A.   That's correct.

21   Q.   Okay.  Is there a railroad track near here that we just can't see on the

22   side there?

23   A.   Yes.  It's just right -- it would be right here west of Jackson.

1  Q.  Okay.  So, just west of Jackson, but is before you get to the next

2  street, which would be Wayne Street?

3  A.  No, Union.

4  Q.  Excuse me.  Union.  Sorry.

5  A.  Yes.

6  Q.  Okay.  So, right off this map would be railroad tracks; correct?

7  A.  That's right.

8  Q.  Okay.  And at the bottom, or, I guess towards the bottom of this map

9  do you see where it says 'Pennsylvania' down here?

10  A.  Yes.

11  Q.  Is that a railroad as well?

12  A.  Yes.  That's a railroad track that intersects down here at Union and

13  Wayne Street.

14  Q.  Okay.  Just a few blocks north, in fact, there's another set of railroad

15  tracks; correct?

16  A.  Those are the same tracks.  They go up and then it splits off.

17  Q.  All right.  Thank you.  You can have a seat.  All right.  Let's go back to

18  February 23rd, 2009.  You said you were working third shift; correct?

19  A.  Yes.

20  Q.  Now, at approximately five-eighteen were you made aware of a call

21  involving the 400 block of East Pearl?

22  A.  Yes.

23  Q.  Okay.  Can you explain to the jury what kind of a call that was?

1  A   Yes.  I was dispatched to the 400 block of East Pearl to investigate the

2  report of shots being fired in the area.

3  Q   Is that what you mean by sometimes you were called a little bit outside

4  of your area?

5  A   Yes.

6  Q   So, would it be fair to say that you were fairly familiar with Pearl and

7  McKibben and that area?

8  A   Yes.

9  Q   Okay.  Now, you got a call for shots fired?

10  A   Yes.

11  Q   And where were you, if you recall, when that actual call came in?

12  A   I was in the area of Main and McKibben.

13  Q   Okay.  So, McKibben, but a few blocks to the west?

14  A   Yea.  I was about three or four blocks to the west of that.

15  Q   Okay.  And Pearl Street is actually south of McKibben?

16  A   Yes.

17  Q   What did you do when the dispatch came over for shots fired in the

18  400 block of East Eureka, or, East Pearl?

19  A   I drove down Main Street to Pearl and then cut east and went over to

20  Pearl Street.

21  Q   So, Main Street, which is actually right outside this Courthouse;

22  correct?

23  A   Yes.

557

1    Q    And you went down Main Street to Pearl?

2    A    Yes.

3    Q    Okay. And then went up Pearl to the 400 block?

4    A    Went east on Pearl; right.

5    Q    Okay. Did you notice anything -- well, I guess, when you go on a shots

6         fired call, you've gone on them before, I assume?

7    A    Yes.

8    Q    Many times?

9    A    Yes.

10   Q    How would you go about -- and all you know is that there's shots fired

11        in this general vicinity. How do you handle that?

12   A    Well, you roll down all the windows in the cruiser. You drive slow. You

13        look for anybody moving. You look for anybody running from the area. You

14        look for any cars leaving the area. You also look at the ground for spent shell

15        casings or anything out of the ordinary. Sometimes you find somebody laying

16        that's been shot, laying on the ground. Just anything out of the ordinary that

17        would indicate shots were fired.

18   Q    Okay. Did you basically follow that same routine for this call?

19   A    Yes.

20   Q    Okay. Did you, and I'm trying to make this for the record here, head

21        east on Pearl then?

22   A    Yes.

23   Q    From there, once you got to the 400 block of East Pearl, where did you

558

1 drive to?

2 A I just drove real slow down to Liberty. I turned north on Liberty and

3 then come back west on McKibben. I circled the block real slow, maybe one

4 or two miles an hour. I stayed in the area about ten minutes checking for

5 anything out of the ordinary and I didn't find anything.

6 Q Okay. So, just, again, for people who may not be as good at directions

7 as you, you're driving down Pearl?

8 A Yes.

9 Q If you're facing it, the right hand side of the map?

10 A Driving down Pearl east to Liberty.

11 Q At Liberty do you take a left hand turn?

12 A Yes. It only goes left. There's a house right here. There's no road.

13 There was a church that used to have a little parking lot here. Liberty only

14 goes north. Liberty only goes the one block to McKibben.

15 Q Okay. Then you take a left on McKibben?

16 A Right.

17 Q Because to the right of all of that is Schoonover Park; correct?

18 A Yes. Right here.

19 Q So, in the top right hand corner of State's exhibit '150' that's what we

20 see, and I guess even towards the middle that's all Schoonover Park?

21 A That's right.

22 Q Thank you. Do you remember what kind of night it was?

23 A It was cold. There was snow on the ground. It was a real cold night.

1    Q   Now, do you know whether any other dispatches were received or any

2    calls went out with multiple callers calling in for shots fired?

3    A   No, not until six thirty-nine there was another call dispatched. But, at

4    five-eighteen there was just that one call.

5    Q   Okay. Now, would it surprise you if only one, given it's a populated

6    area; correct?

7    A   Yes.

8    Q   Is that uncommon when you have shots fired that maybe not

9    everybody that heard them called?

10    A   Yea. But, also in that area there's trains banging together a lot and so

11    you do get some sounds that maybe people were just thinking 'well, that

12    could be a train' or something. Sometimes you'll get three or four callers

13    calling in. Sometimes they'll be shots fired in an area and nobody will call in.

14    Q   Okay. But, you're saying that around that, because of the tracks that

15    we talked about, there's a lot of clackety-clack type of banging around?

16    A   Yea. I think there's a switching station up there north of Pearl and

17    McKibben where they bang, well, they're connecting trains and they bang into

18    each other and you can hear them.

19    Q   Okay. Now, in the time that you were driving around you failed to see

20    anything about of the ordinary, you said, I believe?

21    A   That's right.

22    Q   You just mentioned six thirty-nine. So, a little over an hour later, an

23    hour and a half almost, but before your shift ended you said another call

1  came in for that area?

2  A  Yes.

3  Q  What was the nature of that call?

4  A  They got a call at 436 McKibben of a report of a possible shooting

5  victim.

6  Q  Okay. That call came in. Was that roughly in the same area as Pearl?

7  A  Yea. It's one block north of Pearl.

8  Q  So, when you heard that call go out over the dispatch what did you

9  think?

10  A  That somebody did hear shots fired at five-eighteen. I responded to

11  that location and assisted the other officers with the investigation.

12  Q  So, you actually went to 436 East McKibben then?

13  A  Yes.

14  Q  Is that here in Lima, Allen County, Ohio?

15  A  Yes, it is.

16  Q  What did you observe upon your arrival?

17  A  I observed a victim, later identified as Kenneth Warrington, who was

18  laying on a concrete pad. It was up a little bit from the road. There's like a

19  hill. I got out of my car and I walked up there and I could see him laying on

20  the pad and I observed that he was bleeding from his head.

21  Q  Okay.

22  A  Or, had bled from his head.

23  Q  All right. I'm going to show you what has previously been marked as

561

1    State's exhibits '157' and '158' and ask you to take a look at those for me.

2    Before we talk too much about them, you actually stayed to help in whatever

3    way you could at that address; correct?

4    A    That's right.

5    Q    Okay.  Did you also photograph what you saw?

6    A    Yes.

7    Q    Are you aware whether I.D. officers were actually called out as well?

8    A    Yes.

9    Q    So, your activities were aside from the identification officers; correct?

10   A    Right.  I took photos.  As soon as I got there I started snapping photos.

11   Q    Okay.  At that time of night are there any officers available right then?

12   A    No.  They had to call them in.

13   Q    So, you're snapping them to get what it looks like at that moment?

14   A    Right.

15   Q    Okay.  Do they fairly and accurately -- '157' and '158', do they fairly

16   and accurately represent what you observed at that call at approximately six

17   thirty-nine A.M., in the morning?

18   A    Yes.

19        MR. RION:  Can I see what you have?

20        MRS. KOHLRIESER:  Oh, I'm sorry.

21   Q    State's exhibit '157'.  What are we looking at here, Mr. Sarchet?

22   A    That is a picture, or, a photograph of Mr. Warrington laying on the

23   concrete pad on the west side of 436 East McKibben.

1   Q   This dark part that we see going from his body down the pad there,

2   what did you believe that to be at the time?

3   A   I believed that to be blood.

4   Q   Did Mr. Warrington appear deceased?

5   A   Yes.

6   Q   And is that exactly how you found it as far as things propped up

7   against the door and what looks like glass there?

8   A   Yes.

9   Q   And you didn't disturb that scene?

10  A   No.

11  Q   State's exhibit '158'. What are we looking at in this picture?

12  A   You're looking at the concrete pad where Mr. Warrington was laying.

13  That is looking, to the south, to be a car parked just south of that concrete

14  pad.

15  Q   Okay.  It appears to still be dark outside at this time?

16  A   Yes.

17  Q   Now, that concrete pad that we've talked about, and you said there's a

18  little ridge there, is that actually an alleyway that goes through there?

19  A   Yes, there's an alleyway just to the west of that pad.  It comes up at an

20  incline.

21  Q   Now, given what you and -- well, did other officers respond as well?

22  A   Yea, Officer Douglass -- the first call?

23  Q   No, no.  The six thirty-nine call.

1    A    Yes, there were several officers there.

2    Q    And is that typical for something of this nature?

3    A    Yes.

4    Q    And given what you observed and other officers observed is this the

5    type of scenario that calls for a supervisor or someone higher up to be called?

6    A    Yes.

7    Q    Why is that?

8    A    Just so they can call the shots - call I.D., call in others. I believe the

9    supervisor beat me there to the scene. He automatically called for I.D. and

10   detectives to respond to the scene.

11   Q    You said you assisted. Obviously we heard you say that you took

12   pictures. Did you do anything else to secure the scene?

13   A    Yes. I hung crime scene tape up around the house at 436 East

14   McKibben and made sure nobody entered the crime scene.

15   Q    Okay. Is it part of your role as an officer to make sure nobody touches

16   anything?

17   A    That's correct.

18   Q    That's for the crime scene guys to handle; correct?

19   A    Right. That's correct.

20   Q    Okay. It's not your role or other uniform officers' roles to actually

21   collect evidence? If there's a bullet there you don't pick it up; right?

22   A    No.

23   Q    Okay. Did you participate in questioning any neighbors in the area?

1   A.   Yes.

2   Q.   Okay.  Had those neighbors called the police, to your knowledge, of

3   the shots fired?

4   A.   No.  They didn't call the police.  One of the neighbors across the street

5   wanted to know if there was a problem over there at 436.  She came out of

6   her house and stood on her porch and called me over and wanted to know if

7   there was a problem over there.  I told her that there had been.  I asked her if

8   she had heard anything or seen anything during the night.

9   Q.   Okay.  I'm going to stop you there because I don't want you to tell me

10  what she said.

11  A.   Okay.

12  Q.   But, did you ever learn who did, in fact, call the police that night, the

13  five-eighteen call?

14  A.   Yes.

15  Q.   Okay.  Who was that person?

16  A.   His name was Don Hovest.

17  Q.   Did you make contact with Mr. Hovest?

18  A.   I tried calling him, but it went to voicemail.  So, I left a message for him

19  to call me back and if I wasn't there, because I was ending my shift, to ask for

20  the detective bureau.

21  Q.   Okay.  Had Mr. Hovest left his identifying information with dispatch or

22  something?  Is that how you knew who called?

23  A.   Yes, he left his phone number and his name and I called the

1   number that he left and that's when it went to voicemail.

2   Q   Other than following up with Mr. Hovest and talking to the neighbors

3   across the street and what you've already testified to at the scene, did that

4   basically end your involvement in this case?

5   A   Yes.

6   Q   I apologize, I'm not sure if I asked you this or not, but State's exhibit

7   '150,' that we just saw, the big diagram there, does that, given your knowledge

8   and experience of the scene, does that fairly and accurately represent the

9   area of the 400 block of East McKibben and East Pearl Street?

10  A   Yes, it does.

11  Q   From Jackson, I guess, to Liberty?

12  A   Yes.

13  Q   Thank you.

14          MRS. KOHLRIESER:  No further

15  questions.

16          THE COURT:  Okay, Mr. Rion?

17  CROSS EXAMINATION

18  BY MR. RION:

19  Q   Good morning, sir.

20  A   Morning.

21  Q   I just have a few questions.  Looking at the State's exhibit here, can

22  you just point out to the jury where 436 McKibben is in relation to --

23  A   This is 436 right here.

566

1    Q. So, 436 McKibben is there.

2    A. Right there. There's an alley that goes through.

3    Q. This is the house right there; right?

4    A. Yes.

5    Q. And there's the shed that was attached to, well, not attached, but next

6    to it, or, behind it; correct?

7    A. Yes, there was a shed back there.

8    Q. And there's the 'X' where -- well, there's an 'X' right there; correct?

9    A. Yes.

10    Q. Okay. You were the first on scene then; correct?

11    A. On the first call, at the five thirty-eight (sic) to investigate shots fired.

12    On the second call of a possible shooting victim I was not the first officer

13    there.

14    Q. Okay. So, you were there and were assisting others?

15    A. Right.

16    Q. Okay, let's start at the first call. You get there -- well, about what

17    time do you think you got there?

18    A. Real close to five-eighteen. It only took me a minute maybe to get to

19    the scene.

20    Q. Okay. You're looking for anything unusual; correct?

21    A. That's right.

22    Q. Any motion lights that are on?

23    A. Anything. If they would have popped on I would have noticed that.

1 Anybody walking away, or running away, cars leaving the area, dogs barking,

2 anything that was unusual.

3 Q  At that point no bright lights, no evidence of movement, no

4 dogs barking; correct?

5 A  That's correct.

6 Q  To all three questions?

7 A  That's correct.

8 Q  And you actually drove right by 436 McKibben; correct?

9 A  That's correct.

10 Q  Things appeared dark and normal?

11 A  Everything appeared to be normal from what I could see at the time.

12 Q  So, nothing stuck out?

13 A  No.

14 Q  When you went the second time did you take a series of pictures;

15 correct?

16 A  That's correct.

17 Q  Is it fair to say you were the first one on scene with a camera, I guess?

18 Did you start the cameras, or, the pictures?

19 A  Yes.

20 Q  Were you looking around at all?

21 A  Yes.

22 Q  Did you see any fresh footprints leading from the area?

23 A  Not fresh.  You know, the snow -- there was snow on the ground, but it

1    was trampled down in a lot of places because it didn't snow that night.  So,

2    the snow had already been there.  There were tire tracks in the alley.

3    Q    There were fresh tire tracks from Mr. Warrington's car.  Were you able

4    to see those?

5    A    I don't recall that; no.

6    Q    Okay.  Do you recall when it snowed last?

7    A    No, I don't.

8    Q    Or how long had that snow been on the ground?

9    A    I know it didn't snow that night.

10   Q    Right.  Okay.  Did you notice any cars driving in or out of that area?

11   A    No.

12   Q    Did anybody assist you, or did you simply, since you do the route, and

13   just leave it at that given that you didn't see anything out of the ordinary?

14   A    Officer Douglass responded to that area also.

15   Q    Okay.  So, two officers before the second call --

16   A    That's correct.

17   Q    -- did assist in trying to determine if anything at all had happened?

18   A    Yes.

19   Q    All right.  Thank you very much.

20        THE COURT:  Any redirect?

21        MRS. KOHLRIESER:  No, your Honor.

22        THE COURT:  Okay.  You're excused.

23   Thank you for coming in.  Next witness, please?

1    MR. MILLER:  Missy Page.

2    WHEREUPON, called to appear as a witness in this proceeding was one:

3                           M E L I S S A   P A G E

4    who, having been duly sworn by the bailiff herein, testified as follows:

5    BAILIFF:  She has an objection.

6    THE COURT:  Okay.  This witness is also

7    exercising her right not to be photographed or at least to be published in the

8    media.  So, I would order the media to comply.

9    **DIRECT EXAMINATION**

10   **BY MR. MILLER:**

11   Q    It's still morning.  Good morning.

12   A    Morning.

13   Q    I'm going to ask you to do the same thing we've had a number of

14   witnesses do and that is to talk right into this microphone, okay, because it

15   both records and amplifies your voice so everybody can hear you and we're

16   picking up everything that's being said in the Courtroom on the recording

17   device.  Okay?

18   A    Okay.

19   Q    Can you state your full name for the record?

20   A    Melissa Page.

21   Q    Melissa Page?  Okay.  Do you go by Missy?

22   A    I do go by Missy.

23   Q    Okay.  Is it okay for me to call you Missy?

1    A    Yes.

2    Q    All right. Now, Missy, where do you work?

3    A    Lima Police Department.

4    Q    In what capacity?

5    A    Third shift dispatcher.

6    Q    Okay. What does a dispatcher go?

7    A    Calls emergency calls for police, E.M.S., and fire.

8    Q    Okay. Scoot up close to that microphone, okay, because I know I can

9    barely hear you and if I can barely hear you then everybody here is going to

10   have a hard time hearing you. Okay?

11   A    Okay.

12   Q    Feel free to talk as loud - well, within reason - as loud as you want;

13   okay? Speak right in there and speak up. All right? Now, I asked you your

14   occupation. I'm going to ask you to repeat the answer to that question. What

15   is your occupation?

16   A    Third shift dispatcher.

17   Q    Okay. With who?

18   A    The Lima Police Department.

19   Q    The Lima Police Department? What does a dispatcher do?

20   A    We answer and dispatch calls for police, fire, and E.M.S.

21   Q    Okay. Police, fire, and E.M.S. being emergency medical services?

22   A    Emergency medical services; uh-huh.

23   Q    Or E.M.T.'s they're also known as?

571

1   A   Uh-huh, paramedics.

2   Q   Paramedics and that sort of thing?

3   A   Uh-huh.

4   Q   Does that include receiving and dispatching for 9-1-1 calls?

5   A   Yes.

6   Q   Okay. Were you working as a dispatcher on February 23rd, 2009?

7   A   I was.

8   Q   Okay. Were you working third shift?

9   A   I was.

10   Q   And when is third shift - from when to when?

11   A   Eleven P.M. to seven A.M. the next morning.

12   Q   Okay. Did you, during that shift, take a 9-1-1 call for shots fired in the

13   area of 436 - I'm sorry - did you take a 9-1-1 call for an emergency at 436

14   East McKibben?

15   A   I did.

16   Q   Okay. I'm going to hand you what has been marked as State's exhibit

17   '9'. Have you had an opportunity to hear that dispatch?

18   A   Yes.

19   Q   I'll hand you what has been marked as State's exhibit '9'. What is

20   State's exhibit '9'?

21   A   436 East McKibben 9-1-1 calls.

22   MR. MILLER:   Your Honor, can we have a

23   moment to cue it up?

1  THE COURT:  Sure.

2  (WHEREUPON, Court went off the record briefly.)

3  THE COURT:  Now, is this similar - does it

4  have an icon for the specific call or is it just one call?

5  MR. MILLER:  Yea, there are two icons on

6  there and it will be the second one, or the one to the right.

7  THE COURT:  Okay.

8  (WHEREUPON, State's exhibit '9' was played in open Court.)

9  Q  Okay.  First of all, is that a true and accurate copy of your dispatch --

10  A  Yes.

11  Q  -- to 436 East McKibben on February 23rd, 2009?

12  A  It is.

13  Q  Okay.  There was a little bit of police talk in there.  You say code three

14  on the phone  What does that mean?

15  A  Emergent - lights and sirens.

16  Q  That means whoever is going turn on your sirens and lights and get

17  there, right?

18  A  Uh-huh.

19  MR. MILLER:  One second.

20  (WHEREUPON, Court went off the record briefly.)

21  MR. MILLER:  No further questions, your

22  Honor.

23  THE COURT:  Mr. Rion, questions?

1    MR. RION:  No questions.

2         THE COURT:  Okay.  Miss page, thank

3    you for coming in.  You're excused.  Do you have another witness ready that

4    we might be able to get to?

5         MRS. KOHLRIESER:  I believe so.

6         THE COURT:  Okay.  Who would that be?

7         MRS. KOHLRIESER:  Officer Matt

8    Douglass, your Honor.

9         THE COURT:  Okay.

10   WHEREUPON, called to appear as a witness in this proceeding was one:

11        O F F I C E R   M A T T H E W   D O U G L A S S

12   who, having been duly sworn by the bailiff herein, testified as follows:

13        BAILIFF:  He has no objection.

14        THE COURT:  Okay.  Go ahead.

15               **DIRECT EXAMINATION**

16   BY MRS. KOHLRIESER:

17   Q    Could you state your name for the record and spell your last name?

18   A    Yes, it's Matthew R. Douglass, D-O-U-G-L-A-S-S.

19   Q    And obviously the jury can see what you're wearing.  But, for the

20        record, can you tell us your place of employment?

21   A    Yes.  I work for the Lima Police Department.

22   Q    And how long have you been with the Lima Police Department?

23   A    Eleven and a half years.

574

1    Q    What's your current position?

2    A    My current position is a school safety officer and Safety City officer.

3    Q    So, you get to work with kids a lot?

4    A    Yes.

5    Q    How long have you been the Safety City and school resource officer?

6    A    Approximately a year and a half now.

7    Q    Now, were you working as a regular patrol officer back in February of

8         2009?

9    A    Yes, I was.

10   Q    And specifically were you working the morning of February 23rd,

11        2009?

12   A    Yes.  I worked third shift.

13   Q    And that's eleven P.M. to seven A.M.?

14   A    Yes, it is.

15   Q    So, you would have actually come into work on the 22nd, but the

16        majority of your hours would be on the 23rd?

17   A    Yes, that's correct.

18   Q    Now, at approximately five-eighteen did you have occasion to respond

19        to a shots fired call in the 400 block of East Pearl?

20   A    Yes, I did.

21   Q    Where were you when that call went out?

22   A    I was around the intersection of Cole and Diller when the call went out.

23   Q    Okay.  Approximately how far away is that from --

1    A    I'd say probably three miles, maybe four miles.

2    Q    Okay.  Did you respond to that call?

3    A    Yes, I did.

4    Q    And do you know approximately how long it took you to get there?

5    A    Probably about maybe ten minutes maybe - twelve minutes,

6         somewhere in there.

7    Q    You didn't go lights and sirens blazing?

8    A    No.

9    Q    Why not?

10   A    We actually handle, on thirds, we handle a lot of shots fired calls which

11        a lot of times when we check the area we don't find anything and we go back

12        in service.  I mean, we do go fairly quickly.  At nighttime it's easier to get

13        around because there's less traffic.  But, unless our dispatchers tell us to go

14        code three, which is lights and sirens, we don't normally go lights and sirens.

15   Q    So, if there was a red light or something you would have stopped for it?

16   A    I would stop for it.  If there was some reason to step it up and go

17        through the red light then we would.

18   Q    Like if you got more information coming in or something of that nature?

19   A    Yes.

20   Q    Okay.

21   A    Yes, that's correct.

22   Q    Do you recall whether another officer also responded to that?

23   A    Yes.  Officer Sarchet was already in the area while I was on route to

1    the call.

2    Q    And while you were on route to the call did you get information from

3    Officer Sarchet regarding his findings?

4    A    Yes.  He had told me that he hadn't found anything and told me that I

5    could go ahead and disregard.

6    Q    Okay.  Do you recall where you when you disregarded?

7    A    Yes.  I was actually on McKibben heading eastbound and I was almost

8    to Jackson Street.

9    Q    Okay.  So, would you have been to the west of Jackson Street on

10    McKibben?

11    A    No.  Yes, I was on the west side.  I'm sorry.

12    Q    So, you never crossed over Jackson Street and actually got in the 400

13    hundred block of East McKibben?

14    A    No.  It actually goes Jackson and then Jefferson.  So, I was told to

15    disregard right as I was approaching Jackson and McKibben.

16    Q    Now, let me ask you – when you were on McKibben approaching

17    Jackson did you see any traffic?

18    A    Yes.  There was one car that was crossing the railroad tracks and that

19    would have been in the 300 block as I was coming eastbound.  I noticed that

20    that vehicle was coming from that area where we were sent for the shots fired

21    call.  I had noticed that there was a headlight missing on that car.

22    Q    Okay.  Did you also notice its plate?

23    A    Yes, I did.

1    Q    Is that something common for you to just kind of take plates in your --

2    A    Usually when we're going to a call like that you want to make sure you

3         pay attention to everything around you.  As I was passing the car I just

4         glanced at the front license plate as I passed it and then I turned around.

5         After he had told me to disregard I had just followed it for a little while and

6         then just pulled off of it then.

7    Q    Okay.  Other than having a headlight out, was that car, well, was it

8         flying out of there or was it doing anything to raise concern?

9    A    No.  It was just leaving the area.

10   Q    When you say the railroad tracks are you talking about the ones that

11        run north and south?

12   A    Yes.  That would be just to the east of Jackson on McKibben.

13   Q    East of Jackson?

14   A    I'm sorry.  To the west.  Sorry.

15   Q    All right.  Let's just -- we have a map here.

16   A    Okay.

17   Q    I wasn't planning on using it with you, but let's just do it.  Feel free to

18        step on down, Officer Douglass.  If you will, make sure you raise your voice

19        enough for the jury and the Court Reporter to hear you.  Okay.  Take a look at

20        State's exhibit '150'.  Do you recognize what that aerial shot is of?

21   A    Yes, I do.

22   Q    Okay.  What is that?

23   A    That is the City of Lima and that would be the area where we were

```
 1                  sent to the initial shots fired call.

 2    Q    Okay.  As you're facing exhibit '150' do you see Jackson Street there

 3         to the left?

 4    A    Yes.

 5    Q    Okay.  Do you also see McKibben Street here?

 6    A    Yes.

 7    Q    It's kind of a little above the middle, I guess.  And where Jackson and

 8         McKibben crosses?

 9    A    Yes.

10    Q    And is that where you said you were called off?

11    A    Yes.  I was coming from this direction here.  The railroad tracks are

12         right about right here.  So, it's actually off the picture right here.  So, as I'm

13         coming across here the car had came across and through here and that's

14         when I passed it and that's when I was also told to disregard by Officer

15         Sarchet.  So, I had only made it to about right here.

16    Q    So, you were basically in the intersection of McKibben and Jackson

17         and turned around and went back towards that car; correct?

18    A    Yes.

19    Q    Okay.  When you say the tracks are actually off, do you mean, again,

20         looking at '150', that they would be to the left of where the map drops off?

21    A    They would be to the left where the map drops off.

22    Q    All right.  Thank you.  Now, after being called off and you said you

23         followed the car for a bit and then disregarded it, at six thirty-nine did
```

1 another call come in involving roughly that same area that we just discussed?

2 A  Yes.

3 Q  What was that?

4 A  There was a shooting victim that was located at 436 East McKibben.

5 Q  And when you heard that call go out what did you think?

6 A  I believed that the shots fired call that myself and Sarchet had

7 responded to earlier was related to that.

8 Q  And you said 436 East McKibben?

9 A  Yes, I believe that was the address.

10 Q  And for the record, is that here in Lima, Allen County, Ohio?

11 A  Yes, it is.

12 Q  And did you respond to that call?

13 A  Yes, I did.

14 Q  What did you notice upon arrival?

15 A  When I arrived on location myself and several other officers responded

16 up to the house and I observed Mr. Warrington laying on, well, it would have

17 been the west side of the house.  He was laying right by the entry door there.

18 Q  Okay.  Upon noticing that what, if anything, did you do?

19 A  I began assisting another officer.  I believe it might have been Officer

20 Woodruff.  We started to put crime scene tape up and basically kept a

21 perimeter and didn't allow anyone else to go in front of that, right where the

22 crime scene was.

23 Q  All right.  Let's explain that a little bit for folks who may not be familiar

1   with those types of terms.  When you say crime scene tape you're talking

2   about the yellow tape that says 'crime scene'?

3   A   Yes.  Yes, the yellow caution tape.

4   Q   Okay.  When you say perimeter, well, what were you doing?  How do

5   you know what to cordon off?  Why do you make that decision?

6   A   We usually do an area large enough that in case there's other

7   evidence around we want to make the crime scene large enough that if we do

8   find other evidence that it's going to be inside the scene and that no one else

9   can go inside of that area.

10   Q   Okay.  So, that tape basically establishes the area where there may be

11   evidence?

12   A   Yes.

13   Q   And, I guess, lay people aren't allowed to go in and out of that area?

14   A   That's correct.

15   Q   Is a crime scene log also kept?

16   A   Yes, it is.

17   Q   And what does a crime scene log do?

18   A   A crime scene log basically keeps track of who goes within the crime

19   scene tape – who enters the actual crime scene.  They keep track of when

20   they go in and when they come out.

21   Q   And is it usual for uniformed officers to kind of stand by that perimeter

22   to make sure no unauthorized people come in?

23   A   Yes, that's correct.

1  Q  And did you take on that duty as well?

2  A  Yes.

3  Q  At some point was a decision made regarding calling a supervisor and

4  getting perhaps detectives and that out?

5  A  Yes.

6  Q  Fairly quickly?

7  A  Yes, it was fairly quickly.

8  Q  Now, how long did you say you've been an officer?

9  A  All together for approximately sixteen years.

10  Q  I asked this of Officer Sarchet, but I'll ask it of you as well, once you

11  know that I.D. is coming, I.D. officers are coming and detectives are coming,

12  do you touch anything?

13  A  No.

14  Q  When you roll up on a scene like this would you have touched

15  anything?

16  A  No, I wouldn't have.

17  Q  And is that something all officers attempt to do?  You don't want to

18  disturb --

19  A  Yes, you don't want to disturb the crime scene or any evidence that

20  may be laying around.

21  Q  And do you recall whether anyone was home at 436 East McKibben?

22  A  Yes.  I believe Sonya and her daughter, who I believe was Tarah, were

23  both there.

1   Q. So, two women?

2   A. Yes.

3   Q. And did they remain at that scene while it was being processed by I.D.

4   and things of that nature?

5   A. They were at the scene at first and then I ended up transporting them

6   to the Lima Police Department.

7   Q. So, you actually drove them to the police department?

8   A. Yes, I did.

9   Q. And other than taking them to the police department and having to type

10  up a report and that type of thing did that end your involvement with this

11  investigation?

12  A. Yes, it did.

13  Q. Now, the information about the car that you saw, were you able to

14  actually get a license plate and description of the car?

15  A. Yes. I was actually able to have our dispatchers -- when I passed it

16  initially I ran the plate and had the dispatchers mark and hold it just because I

17  wanted to make sure it didn't have anything to do with the call.

18  Q. Did you pass that information on to supervisors or to the detectives?

19  A. Yes, I did.

20  MRS. KOHLRIESER: Just a moment.

21  THE COURT: Okay

22  (WHEREUPON, Court went off the record briefly.)

23  MRS. KOHLRIESER: No further

1          questions.

2          THE COURT:  Okay.  Questions, Mr.

3          Rion?

4          MR. RION:  Just very briefly.

5          CROSS EXAMINATION

6          BY MR. RION:

7     Q    Do you recall who took over the information about the vehicle that you

8          saw?

9     A    No.  When I did my initial report I included that information in my report

10         about the vehicle.

11    Q    And are you aware of whether or not it ended up being something

12         relevant or not relevant?

13    A    I believe it was non-relevant to the case.

14    Q    Just a random person driving?

15    A    Yes, I believe so.

16    Q    And you drove Tarah and Sonya to the police station?

17    A    Yes, I did.

18    Q    Were you involved in taking Tarah's phone from her, or collecting her

19         phone at all?

20    A    No.  No, I don't believe so.

21    Q    So, you just simply drove them there?

22    A    Yes.

23    Q    Okay.  Thank you, sir.

1    THE COURT:  Any redirect?

2    MRS. KOHLRIESER:  No, your Honor.

3    THE COURT:  Okay.  Patrolman, you're

4    excused.  Thank you for coming in.  Do you have a witness perhaps that

5    would only be within a half hour?

6    MRS. KOHLRIESER:  Yes, we do.

7    Probably about fifteen minutes, your Honor.

8    THE COURT:  Next witness then?

9    MR. MILLER:  Calvin Woodruff.

10   WHEREUPON, called to appear as a witness in this proceeding was one:

11   C A L V I N   W O O D R U F F

12   who, having been duly sworn by the bailiff herein, testified as follows:

13   BAILIFF:  He has an objection.

14   THE COURT:  Okay.  This witness does

15   not wish to be photographed.  So, I'll order that the media not publish his

16   image.  Go ahead.

17   MR. MILLER:  Thank you, your Honor.

18   **DIRECT EXAMINATION**

19   **BY MR. MILLER:**

20   Q    Will you state your full name for the record, please?

21   A    Calvin Woodruff.

22   Q    Calvin, where do you work?

23   A    I currently work at the Lima Fire Department.

1    Q    Where did you work back on February 23rd of 2009?

2    A    The Lima Police Department.

3    Q    So, you went from the police department to the fire department?

4    A    I did.

5    Q    Were you actually working on February 23rd of 2009?

6    A    I was.

7    Q    For the Lima Police Department?

8    A    Correct.

9    Q    Were you dispatched to 436 East McKibben here in Lima, Allen

10   County, Ohio on that day?

11   A    I was.

12   Q    Do you recall about what time you were dispatched out there?

13   A    It was early morning.  I'm not real sure.

14   Q    Okay.  Do you recall the nature of the call?

15   A    I believe it was for a possible shooting victim.

16   Q    Okay.  Where were you when you got the call?

17   A    I was sitting actually close to the station, I believe, there on Central,

18   between Market and High.

19   Q    Okay.  When you got the call did you proceed directly to the scene?

20   A    I did.

21   Q    Can you describe just in general terms when you arrived at the scene

22   what you observed, just in general terms?

23   A    There were several of us police officers that arrived about the same

587

1    time.  When we arrived it was kind of dark.  They said something about, on

2    the call, about a porch.  We didn't observe anything on the front porch.  At the

3    side of the house we observed a victim laying there on the west side of the

4    house.

5        Q   You say you did observe the victim laying there?

6        A   We did, as we walked up.

7        Q   You're using the pronoun 'we'.  Did you?

8        A   I did.  Correct.

9        Q   Okay.  Let me present you with a couple, or, three pictures here.  The

10   first one is State's exhibit '3'.  The other would be State's exhibit '4', and then

11   the other one I will use will be State's exhibit '157'.  Now, I'm going to hand

12   these to you and I'm going to hand them to you as a group.

13       A   Okay.

14       Q   Okay?  I'm going to ask you to take a look at these pictures.  Just let

15   me know when you're done with that, okay?

16       A   Okay.

17       Q   Finished?

18       A   I am.

19       Q   Now, starting with State's exhibit '3'.  What are we looking at with

20   State's exhibit '3' and then I'll publish these as we go?

21       A   Okay.  That would be the front of the house where we found the victim.

22       Q   Okay.  When you say the front of the house where you found the

23   victim, --

1   A   Facing towards the street.

2   Q   Okay. Is that 436 East McKibben?

3   A   Yes.

4   Q   That's the front of the house?

5   A   Correct.

6   Q   And State's exhibit '4'? What are we looking at there?

7   A   That's kind of the side of the house where the alley is that runs next to

8   the house.

9   Q   Now, as you look at the house from the vantage point of where that

10  picture was taken is there, in fact, a slight rise to the house?

11  A   There was.

12  Q   A grade towards the house, or, in other words, up?

13  A   Yes, there was.

14  Q   Then State's exhibit '157'. What are we looking at there?

15  A   That is how we initially found the victim, or, how we found the victim.

16  Q   Now, do each of these, State's exhibit '3', State's exhibit '4', and

17  State's exhibit '157', truly and accurately depict the scene in the picture as it

18  was on February 23rd, 2009?

19  A   They do.

20  Q   Now, you've described going out to the scene, arriving at the scene,

21  and observing the victim. What did you do after that?

22  A   As we came upon the victim I observed that there was blood coming

23  from the victim – however, that blood was frozen.

1    Q.    Okay.

2    A.    It was crystallized on top.  There was no movement.  Like I said, the

3    blood was frozen solid at that time.

4    Q.    Okay.  Did you participate in securing the scene?

5    A.    Yes.  At that time our job, or, my job was to secure the scene and

6    preserve any evidence to make sure that nothing was messed with.

7    Q.    Sort of to preserve the integrity of the scene?

8    A.    Correct.

9    Q.    Now, in doing that is it typical that it's referred to in what's in the police

10    business as a crime scene log?  You're familiar with that term?

11    A.    I am.

12    Q.    Is it typical that a crime scene log would be started?

13    A.    Yes.

14    Q.    What is a crime scene log?

15    A.    The crime scene log is to log who is in the crime scene, was ever in

16    the crime scene, when they came, when they arrived at the crime scene, and

17    when they left the crime scene.

18    Q.    Okay.  Is there usually one person tasked with the duty of keeping a

19    crime scene log?

20    A.    That way there's no confusion.  That one person has the

21    clock and they are the one that is in charge of allowing people in and out.

22    Q.    So, you said the one person with the clock.  Do you physically have a

23    clock, or do you have a watch, or something?

1   A   I believe I had a cell phone, I believe.

2   Q   Okay.

3   A   Yes.

4   Q   Some sort of time instrument so that when somebody comes to the

5   scene you check the time and then what do you do?

6   A   I would log the time. I would put their name down and the time that

7   they were in. When they leave the scene I would then, or, they would then

8   have to come see me and I would, again, log, by looking at that same

9   instrument, when they left.

10   Q   Okay. So, it's something akin to punching a time clock in and out?

11   A   Correct.

12   Q   For folks that are coming in and out of the crime scene?

13   A   Correct.

14   Q   Now, were you the one that actually kept the log at this particular crime

15   scene?

16   A   I was.

17   Q   I'm going to hand you what's been marked as State's exhibit '10'. Just

18   take a look at State's exhibit '10' and let me know when you're done

19   reviewing it.

20   A   Okay.

21   Q   What is State's exhibit '10'?

22   A   That is my crime scene log that I had started with this crime scene.

23   Q   Just for the record, how many pages does State's exhibit '10' contain?

1  A    There's two pages.

2  Q    Two pages? Okay. It's your crime scene log that you started for 436

3       East McKibben?

4  A    It's the one that I started and finished; correct.

5  Q    And finished?

6  A    Yes.

7  Q    Now, just because -- well, I want to ask you a question here, and I

8       should have asked you when I was standing up there. So, I'm going to

9       approach you. We have, clearly, a time in column and a time out column.

10  A   Uh-huh.

11  Q   But, the times are denoted in such a fashion -- well, for example, if you

12      look at Patrolman Hile, it says three zero six nine.

13  A   Uh-huh.

14  Q   What does that mean?

15  A   It's military time. That would be six thirty-nine in the morning.

16  Q   So, you're running this on a military clock, or, a twenty-four hour clock?

17  A   A twenty-four hour clock; correct.

18  Q   Okay. So, just by way of example, for the record, well, what's the last

19      time out?

20  A   The last time out would be -- the last time out on the crime scene log?

21  Q   Yea.

22  A   Okay. It would be eleven forty-seven.

23  Q   Okay. That's eleven forty-seven A.M.?

1   A   A.M.: correct.

2   Q   Okay. Is this a true and accurate copy of your crime scene log?

3   A   It is.

4   Q   Now, you mentioned that eleven forty-seven was the last, well, I call it

5   time out. In other words, the last time somebody left. Is that when the scene

6   would have been cleared?

7   A   Correct.

8   Q   What does cleared mean in police parlance?

9   A   It means that, well, the detectives, or I.D., or whoever, well, that's when

10   they were done processing the scene at that time.

11   Q   Okay. In other words, done? I mean, there may be some follow-up,

12   but, in essence, for your purposes we're clearing the scene?

13   A   Correct. Correct.

14   Q   Okay.

15   MR. MILLER: I have no further questions.

16   THE COURT: Okay, Mr. Rion, any

17   questions?

18   MR. RION: Just a few.

19   CROSS EXAMINATION

20   BY MR. RION:

21   Q   Good morning, sir.

22   A   Morning.

23   Q   People are there. Officers are at the scene essentially from six

```
 1    thirty-nine until eleven forty-seven; is that about right?

 2    A    That's correct.

 3    Q    So, three/four hours?  Somewhere in there?  You

 4    were in charge of the perimeter, I guess, but who was in charge of the crime

 5    scene itself?

 6    A    Let's see.  We had Sergeants there that would have been in charge

 7    initially and then the detectives and I.D. come and take over the crime scene.

 8    Q    Okay.  So, would that be Detective Clark?

 9    A    I'm not -- I don't recall exactly who was the detective.

10    Q    If you could look at your report would that refresh your recollection?

11    A    It would.

12         (WHEREUPON, witness reviewed report.)

13    A    Okay.

14    Q    Let me know when you're done.

15    A    Okay.

16    Q    After looking at your report does that refresh your recollection as to

17    who was in charge of the crime scene?

18    A    I guess I'm not exactly understanding your question.

19    Q    What would be the -- well, when Detective Clark showed up what did

20    he do?

21    A    He would be the one that would start the investigation.

22    Q    Okay.  And was it turned over to him at that point, the investigation?

23    A    He was the detective that showed up; yes.
```

1   Q   In other words, your language on this sheet is that when Detective

2   Clark arrived the crime scene was turned over,' -- when I.D. detective Marik

3   and Detective Clark arrived the crime scene was turned over to them'. What

4   does that mean?

5   A   It means that they are the ones that are now directing us on what to

6   do.

7   Q   Okay.

8   A   They are the ones that, I guess, are the people that are calling the

9   shots, I guess.

10   Q   And who there was primarily responsible for the collection of evidence,

11   like the evidence crew?  Who would do that?

12   A   That would be the I.D. bureau.

13   Q   So, that would be Detective Marik?

14   A   Correct.

15   Q   Okay.  And do you recall anybody else that would have been with him

16   that would have -- well, would he have been in charge at that point for the

17   collection of evidence?

18   A   I believe so; yes.

19   Q   So, you stayed there the entire time; correct?

20   A   Correct.

21   Q   When you were there there were approximately nineteen individuals or

22   so that came and went?

23   A   Correct.

1  Q  Mostly police officers, detectives, and doctors were there, coroner's

2  office people, and quite a few of them from the Prosecutor's Office as well;

3  correct?

4  A  Correct.

5  Q  And did you notice any unusual footprints, tire tracks, or anything that

6  came to light that you saw?

7  A  Not necessarily. That alley looked like it was pretty well used at the

8  time. I saw nothing out of the ordinary, I guess. But, that wasn't necessarily

9  part of my job, either. I mean, I secured the scene and --

10  Q  You were to keep the neighbors and anybody else from trying to

11  wander in and doing something. Once the scene was released by eleven

12  forty-seven then anybody could come in at that time that wishes to; correct?

13  A  Sure.

14  Q  Like, there's no restrictions for anyone at that point?

15  A  Correct.

16  Q  Thank you, sir.

17  THE COURT: Okay. Any redirect?

18  MR. MILLER: No, sir.

19  THE COURT: All right. You're free to go.

20  Thank you for coming in.

21  A  All right. Thank you.

22  THE COURT: Do you have another quick

23  one?

1    MRS. KOHLRIESER:  It's the I.D. Officer.

2         He's very lengthy.

3         THE COURT:  Okay.  Well, we anticipated

4    this.  We're going to take a little extended lunch period.  Now, I've got a one

5    o'clock to one-thirty.  It's a little after -- about ten after twelve, give or take.

6    So, we'll go until one about one forty-five.  It will be a little extended because I

7    have another docket that I don't want to let go.

8    So, ladies and gentlemen of the jury, we'll break now until one

9    forty-five.  Remember the admonitions.  Don't discuss the case among

10   yourselves or with anyone else.  Don't watch, listen to, or read any media

11   accounts.  Don't do any independent research.  Don't go on the Internet.

12   Don't formulate or express any opinions.  We'll see everybody back at one

13   forty-five.

14   (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

15

16   (VOLUME THREE CONCLUDED.)

17

18

19

20

21

22

23

1 like her very much, for different reasons.

2 Q He didn't like her very much for different reasons?

3 A Yea.

4 Q Okay. I'm going to tell you the same thing I've told just about every

5 witness that's come in here to testify. Talk right into that microphone; okay?

6 A Okay.

7 Q You've got to talk right into it because what you say is being recorded

8 and that way everybody can hear you.

9 A Okay.

10 Q Okay? So, you were talking about Markelus used to talk to you about

11 Sonya.

12 A Yea; some. Yea.

13 Q So, what kinds of things did he say about Sonya?

14 A He just wasn't in agreement with her parenting skills, her life-style, and

15 the way she did things.

16 Q Like, well, can you give us some examples if you can think of any?

17 A Yea, his parenting skills was very different than her parenting skills.

18 Q In what way?

19 A They were more stable and they were more grounded. You know what

20 I'm saying? Like they went to private schools and stuff. He tried to give them

21 the best education.

22 Q That was important to him; right?

23 A Yea, most definitely.

1   Q   And what about Sonya?

2   A   In what reference?

3   Q   Well, what did he say about her parenting skills?

4   A   I don't remember precisely like --

5   Q   In general terms.

6   A   Like I said, she wasn't as, well, the type of parent to, like, be, you

7       know, stable.

8   Q   Strict?

9   A   Well, yea.

10  Q   I don't want to put words in your mouth. I'm just trying to --

11  A   Well, yea, she -- I mean, I don't know her personally as far as, you

12      know, --

13  Q   Well, what did he say about her?

14  A   He didn't -- I mean, they probably could do way more with her than

15      with him.

16  Q   What do you mean?

17  A   Just as far as anything, like, you know, if maybe, for example, if Tarah

18      wanted to go somewhere he may object and the mom may say yea, of

19      course'. You know, he was the more, you know, stricter parent than she was.

20  Q   Okay. I think I got it. Thank you. Did Markelus ever talk to you about

21      Sonya dating?

22  A   Yea. He didn't -- well, yea.

23  Q   Okay. What did he say about Sonya dating?

1    MR. RION:  Objection.  I'm just wondering

2    if we could have a time frame.

3         MR. MILLER:  Well, this is -- okay.

4    Q    This is before, again, using this time frame, Carlotta, prior to his arrest

5    in 2009, okay, and until I change that time frame I want to talk about that time

6    frame.  Okay?

7    A    Okay.

8    Q    So, prior to his arrest in 2009 did Markelus talk to you about Sonya

9    dating?

10   A    At the time -- before his arrest; correct?

11   Q    Correct.

12   A    Are you saying the time period she lived with him?

13   Q    Yes, because there was a period of time that she did live with him.

14   A    Yea, like I say, he, of course, he wouldn't condone her dating while she

15   resided in the house.

16   Q    Okay.

17   A    I believe there was a conflict of interest there.

18   Q    Is that what he told you?

19   A    That's how I feel.  I mean, I would have been in the same situation.

20   But, I mean, he wouldn't agree with her dating while living there, most

21   definitely.

22   Q    Okay.  But, at the same time, -- well, do you know whether or not

23   Markelus and Sonya were getting along, and again this is prior to his arrest,

1  while she was living in that house, and at that house being 122 East Eureka?

2  A  Okay.

3  Q  Were they getting along?

4  A  I think they probably had disagreements from time to time.

5  Q  Okay. Let's talk about, again, this time frame before he was arrested

6  in February of 2009. Prior to that.

7  A  Okay.

8  Q  What was Markelus' relation, and you touched upon it, but what was

9  Markelus' relationship with his kids like?

10  A  I believe it was a good relationship with the kids. They respected him,

11  and like I say, they took orders.

12  Q  Was he strict?

13  A  Yea. I mean, he, kind of like, you know, most fathers are, you know.

14  Q  You have children; correct?

15  A  Correct.

16  Q  Was he stricter than you with the kids?

17  A  Most definitely. I'm soft. Yea.

18  Q  Okay. Is it fair to say he was the disciplinarian?

19  A  Correct. Yea.

20  MR. RION:  I'm just going to object to the

21  leading nature.

22  A  'Scuse me?

23  MR. RION:  Sorry. I'm talking to the

9801

1     Judge.

2   A   Oh, okay. I'm sorry.

3   Q   Now, how often, again, prior to his arrest in 2009, okay, how often was

4   Markelus with the kids?

5   A   All the time.

6   Q   All the time?

7   A   Yea.

8   Q   Prior to his arrest in 2009, again, that time frame, did Markelus

9   approve of his kids being around other men?

10   A   No.

11   Q   He didn't like that?

12   A   No.

13   Q   Did he talk to you about that?

14   A   Yea, and the reason why he didn't, you know, approve of it was

15   because I don't think he approved of the guys she chose to date. They didn't

16   meet up to a father figure standard. So, he didn't agree with guys around her

17   children, or, around his children.

18   Q   Again, prior to his arrest in 2009 did Markelus talk to you about his

19   relationship with women?

20   A   Yea.

21   Q   Okay. What kinds of things did he say about his relationship with

22   women?

23   A   Just basically he really has a big heart on helping anyone who needs

1    help.  Like, he has been there for me, like, a whole, whole lot.  Normally I

2    don't think he felt appreciated of that.

3    Q    Okay.  Was this true of Sonya as well?

4    A    Yea, I believe so.  He was really there for her.

5    Q    How many conversations did you have with him about this subject that

6    I just mentioned, his relationship with women?

7    A    It depends on who he's dealing with at the time.

8    Q    Did he have girlfriends at the time?

9    A    He had friends.

10   Q    Okay.  Did he have girls that he wanted to date at the time?

11   A    No, I don't think he -- I mean, I don't think that he ever mentioned like

12   he was dating someone or anything like that.

13   Q    Did you feel at the time prior to February of 2009 that he wanted to

14   date you?

15   A    I don't feel like he ever wanted to date me.

16   Q    You don't?

17   A    No.

18   Q    Okay.  Now, let's move up in the time frame to around two or

19   three nights before his arrest in 2009.

20   A    Okay.

21   Q    Did you have a conversation with Markelus during this time frame?

22   A    Yes.  Sometime before that, yea.

23   Q    Okay.  Was it a phone call or did you talk to him in person?

1    A    A phone call.

2    Q    Okay.  Was this phone call unusual?

3    A    It just seemed like he was really agitated because he, you know, he

4    was like kind of, well, didn't understand why I would pick, you know, someone

5    like David to be in my life and around my children's lives.

6    Q    Who's David?

7    A    David Evans.  It's my daughter's father.

8    Q    Okay.  He was agitated because -- well, why again?

9    A    Just because of, you know, him, because I went through like so much

10   with him and, you know, he was absolutely right, like he was a terrible person

11   to have around myself and my children.  So, he just like didn't even

12   understand that when it came to me.

13   Q    Was this phone call different than the other phone calls that you had

14   with Markelus?

15   A    Yea, kind of.  He just seemed kind of more sensitive, you know.

16   Q    Upset?

17        MR. RION:  Objection.  Leading.

18        MR. MILLER:  She can say yes, or no.

19        THE COURT:  Well, that's leading.  So,

20   sustained.

21        MR. MILLER:  I didn't suggest an answer.

22        THE COURT:  Yea, you gave her the

23   answer.  It's leading.

1   Q   Okay.  What was his demeanor during the phone call?

2   A   He just basically, during the phone call, it's just like he helps so many

3   people out and every time he doesn't get that respect, well, he probably felt

4   like, you know, that people would probably use him, you know, because I

5   said, he has a big heart.  You know, he'll help anyone who needs help.  You

6   know, he helped me out so much.  So, if you don't feel appreciated you could

7   tend to feel a certain kind of way about it.

8   Q   And, again, was this different than the other phone calls that you had

9   with him?

10  A   To me it was a little bit.

11  Q   In what way?

12  A   Like I said, he seemed more, a little more upset because, like, I would

13  call, you know, mostly I think because I would call him when something was

14  going on between me and David and I would pretty much call him to come to

15  my defense or to vent.

16  Q   How would you describe this conversation between you and him on

17  that phone call?

18  A   I probably got a little offended because, you know, the truth hurts.

19  Q   Okay.

20  A   Because I know that, you know, choosing him, was most

21  definitely a bad choice.

22  Q   And when you say 'him', you mean David?

23  A   David; yes.

1    Q    Now, you say you got offended.  Did you get a little angry?  How would

2         you describe offended?  Tell me how you felt about it.  What did you say back

3         to Markelus?

4    A    I don't exactly remember what I said back but, I mean, you know, I just

5         probably agreed, you know, about choosing David because, you know, he

6         was just a horrible person and, you know, if you're calling someone to your

7         defense they're going to speak their mind about it at some point and time.

8    Q    Do you remember the day of Markelus' arrest?

9    A    Yea.

10   Q    Did he call you that morning?

11   A    Yea.  It was like before I took my daughter to school.

12   Q    Okay.  How many times did he call you?

13   A    I really don't remember how many times he definitely called me.  He

14        called me a lot of mornings, you know.

15   Q    Did he call you that morning?

16   A    Yes.

17   Q    Did he call you an unusual amount that morning?

18   A    Probably a few times.  I don't remember the exact number.

19   Q    Did he call you -- well, a few times?  Was it an unusual amount?

20   A    Yea.

21   Q    Did you answer his calls?

22   A    No, because I was still with David and so I didn't answer.

23   Q    Did you learn he was arrested later that day?

1601

1  A  Yea, I learned that.

2  Q  How did you learn that?

3  A  On the news.

4  Q  Now, after his arrest in February of 2009 did Markelus contact you?

5  A  Yes.

6  Q  How did he contact you?

7  A  Through his mother.

8  Q  Tell us about that.

9  A  Well, just basically he wanted to speak with me. Eventually I agreed to

10  go see him.

11  Q  You say eventually you agreed to go see him?

12  A  Uh-huh.

13  Q  Were you willing to go see him at first?

14  A  No, because, like I said, I was dealing with David and, you know, David

15  used to physically abuse me and so I would pretty much not try to do anything

16  to make him mad.

17  Q  Did you eventually go down to the jail to see Markelus?

18  A  Yes.

19  Q  Why did you do that?

20  A  Because I was under the impression that he wanted to speak with me

21  about something that I needed to know about David Evans at the time and

22  that was important to me.

23  Q  When you got down to the jail did you learn whether or not he really

1   wanted to talk to you about David Evans?

2   A   Yea.  No, we didn't talk about him.

3   Q   You didn't talk about him?

4   A   No.

5   Q   How did you feel about that?

6   A   At the time I didn't really have a certain feeling at that time and

7       moment.

8   Q   How did you get down to the jail?

9   A   Ruby took me.

10  Q   Who's Ruby?

11  A   Carter.  His mother.

12  Q   What happened when you got to the jail?

13  A   I got there and, you know, he asked me how I was doing.  Then there

14      was a note put up to the window.

15  Q   Who put the note up to the window?

16  A   Markelus did.

17  Q   What did the note say?

18  A   He basically needed an alibi for different times throughout the night.

19  Q   What times?

20  A   Probably through maybe one to six.

21  Q   Do you remember what the note specifically said?

22  A   All I remember is maybe at one time watching a movie, Hero and

23      maybe Captain Something.  I don't really remember anything after that.

```
 1   Q   Did you get the impression he wanted you to tell the police that?
 2   A   Yes.
 3   Q   Okay.
 4   A   If it was asked of me.
 5   Q   It was asked of you?
 6   A   If it was asked of me; yes.
 7   Q   If who asked you about it?
 8   A   Like if someone would come to me, you know, and ask me --
 9   Q   Meaning the police?
10   A   Correct.
11   Q   Were you willing to do that?
12   A   No.
13   Q   Why not?
14   A   Because it's wrong to -- yea, that was just wrong and that's, like, not
15       something that --
16   Q   Were you with Markelus the night before he was arrested between one
17       and six?
18   A   No.
19   Q   Is that why you were not willing to do that?
20   A   Right.
21   Q   How did you feel when he put that note up to the window?
22   A   Well, I felt kind of, you know, shocked.  I really didn't know at the
23       time, you know, what it was he was asking of me to, like, -- you know, I just
```

1094

1    didn't know what to think about it at the time. I was just kind of confused.

2  Q  Did you know you were going down to the jail -- when you went to the

3    jail did you know you were going down to the jail so Markelus could ask you

4    for an alibi?

5  A  No.

6  Q  Why did you think you were going down to the jail?

7  A  To talk about David Evans.

8  Q  Did you see Markelus' mother any time after you went to the jail after

9    Markelus was arrested?

10 A  Yea.

11 Q  How many times?

12 A  There was a few times.

13 Q  How often had you seen Ruby Carter prior to that?

14 A  Not that often.

15 Q  Did her contact with you become more so after you visited Markelus at

16   jail as you've described?

17 A  Before and after.

18 Q  Yes.

19 A  Yea.

20 Q  It became more frequent?

21 A  It wasn't, like, out of control.

22 Q  It wasn't what?

23 A  It wasn't, like, out of control.

1   Q   I understand that. My question is this - after you went to the jail and

2   Markelus put the note up to the window did Ruby Carter's contact with you

3   become more frequent than it had been prior to that time, prior to him putting

4   the note up to the window?

5   A   Yea, a few times.

6   Q   Did it become more frequent?

7   A   Yea, I seen her a few times.

8   Q   Did you have contact with Markelus' son after --

9   A   Yes, I'm sorry.

10   Q   -- after you went to the jail and Markelus put the note up to the

11   window?

12   A   Yea.

13   Q   Where?

14   A   At my house.

15   Q   How many times?

16   A   Quite a bit.

17   Q   Was this unusual?

18   A   Under the circumstances; yes.

19   Q   It was unusual?

20   A   Yes, I mean, yea.

21   Q   What did Markelus' son, Markie, want when he came to visit you at

22   your house after Markelus put the note up to the window at the jail?

23   A   Like after that happened?

```
 1   Q   You mentioned that Markie came to your house several times after you
 2       visited Markelus at the jail.  What did Markie want?
 3   A   He wanted -- well, Markelus wanted to see me again.  He wanted me
 4       to come and see him.
 5   Q   Did you go back down to see him?
 6   A   No.
 7   Q   During any of these visits to your house did Markie ever give you a
 8       letter --
 9   A   Yes.
10   Q   -- from Markelus?
11   A   Yes.
12   Q   The letter was from Markelus?
13   A   Yea.
14   Q   What did it say?
15   A   Just basically -- like in the letter it stated that he just wanted me to stop
16       lying about everything and he understands, you know, what I was going
17       through because the police, or detectives, like, you know, was --
18   Q   Did you ever lie to the police?
19   A   No.
20   Q   What was your reaction to his letter?
21   A   I was kind of upset from it.
22   Q   Why?
23   A   Because I didn't lie.  Then, secondly, my --
```

1  Q  Just a minute. Did you keep the note?

2  A  No; huh-uh.

3  Q  Why not?

4  A  'Cause I wasn't allowed to.

5  Q  What do you mean you weren't allowed to?

6  A  Well, Markie took it back.

7  Q  Was there anything else written in that note, or letter, that Markie gave

8  you, that you read, from Markelus that Markie did not allow you to read?

9  A  Well, there was -- he was -- the letter was, well, whatever Markelus

10  wrote him. Then he folded it up where I was supposed, where I read at, and

11  so it wasn't -- yea.

12  Q  Were you allowed to read that portion of the letter that was folded

13  over?

14  A  No.

15  Q  Who told you that you couldn't read that part?

16  A  Well, Markie just told me that I was only allowed to read from where it

17  was sectioned off.

18  Q  So, you were only allowed by Markie to read a portion of that letter?

19  A  Yea.

20  Q  Did you see Markie again after he brought that letter down to your

21  house?

22  A  Yea.

23  Q  What did he want?

1    A    To go visit his dad.

2    Q    Did you go back down to visit his dad?

3    A    I didn't.

4    Q    You did not?

5    A    No.

6    Q    Did you ever see Markelus Carter with a gun?

7    A    Yes.

8    Q    Tell me about that.

9    A    Well, one time I was like seven months pregnant and I was dealing

10   with my daughter's father, David Evans, and my house was getting broken

11   into a lot because of his activities in the streets and I would always call

12   Markelus, like I said, to help me or he just made me feel protected.  So, I

13   called him because there was a break-in happening at the time I walked in my

14   house.  They were trying to come in the back window.  I had answered the

15   door and so I had called him and he came down to, you know, check

16   everything and to make sure everything was okay and he made me call the

17   police and tell them the truth on why my house was getting broken into.

18   Q    And he had a gun?

19   A    Well, yea.  I mean, because -- yea.

20   Q    And this was before he was arrested in 2009; correct?

21   A    Well, yea.

22   Q    I'll show you what's been marked as State's exhibit '139'.  Did the gun

23   look like this?

1    A    I'm pretty for sure.

2    Q    Did the gun look like that?

3    A    Yea.

4    Q    Is that a yes?

5    A    Yes.

6    Q    Have you ever seen Markelus wearing camouflage clothing?

7    A    Well, yea.

8    Q    How often?

9    A    Well, a lot.  Like he, you know, he wasn't the type of person who like

10    really be dressing up all the time and so he would wear t-shirts and different

11    things and jeans.

12    Q    Did he have a hoodie, a camouflage hoodie?

13    A    I'm pretty for sure.

14    Q    You're pretty for sure, or he did?

15    A    I believe he did.

16    Q    I'll show you what's been marked as State's exhibit '101'.  Do you see

17    that?

18    A    Yes.

19    Q    Did the hoodie that Markelus had that you've just described have that

20    same pattern?

21    A    Yea.

22    Q    Is that a yes?

23    A    I mean, -- yes, because, I mean, --

```
 1    Q   Is that a yes?

 2        MR. RION:   Objection.  I think she's trying

 3    to explain.

 4    Q   I just asked - did it look like that?

 5    A   Yes.

 6    Q   Okay.  Did Markelus ever talk to you about Sonya being engaged?

 7    A   Yes.

 8    Q   When?

 9    A   When she got engaged.

10    Q   Well, let me take you back to February of 2009, the day he was

11    arrested.  Was it prior to that day?

12    A   Yes.

13    Q   Or that month --

14    A   Yes.

15    Q   -- of the day he was arrested?  It was prior to that?

16    A   Yes.

17    Q   Okay.  It was prior to that.  How soon before the day he was arrested

18    did Markelus talk to you about Sonya being engaged?

19    A   It was a little bit before all that happened.

20    Q   A week?

21    A   I'm not for sure if it was that soon.  Maybe a couple of weeks before

22    that.

23    Q   A couple of weeks?
```

1    A    Maybe so.

2    Q    Did Markelus Carter ever tell you that he did not kill Ken Warrington?

3    A    Yea.  He said you guys have the wrong person and he just said that

4    you guys were looking --

5    Q    Well, did he --

6         MR. RION:  Objection.  She's allowed to

7    answer the questions that are being asked.

8         MR. MILLER:  She's not answering the

9    question that was asked.

10        THE COURT:  Ask the question again.

11   Q    Did Markelus ever tell you that he did not kill Ken Warrington?  Did he

12   ever say 'I did not kill Ken Warrington?

13   A    No, not in that aspect he didn't.  But, he just stated that you guys was

14   after the wrong person.  You all focused on him and you didn't focus on the

15   right person.

16   Q    This letter that Markie brought to you, do you recall when that was?

17   A    It was probably in June because --

18   Q    June of what year?

19   A    Last year - two thousand and --

20   Q    Last year in June?

21   A    Yea.

22   Q    Markie brought you that letter?

23   A    Yes.

1    Q    Did you contact Detective Clark?

2    A    I did.

3    MR. MILLER:  No further questions.

4    THE COURT:  Okay, Mr. Rion, any

5    questions?

6    MR. RION:  Just a few.

7    THE COURT:  Okay.

8    CROSS EXAMINATION

9    BY MR. RION:

10    Q    Good afternoon.

11    A    Hi!

12    Q    Let's start with a couple of things.  You were interviewed by Detective

13    Clark way back when this whole thing started; correct?

14    A    Correct.

15    Q    And that was back in 2009?

16    A    Yes.

17    Q    Do you recall him talking to you about Rosalind Johnson?

18    A    Yes.

19    Q    And do you recall him reading to you or conveying to you all the

20    information that Rosalind had conveyed to him about the case?

21    A    I don't recall him reading anything to me.  I don't remember.

22    Q    Do you recall him going through the things that she said to him?

23    A    As far as the interview?

1    Q    Right.  In other words, during your interview with Detective Clark do
2    you recall Detective Clark telling you what Rosalind Johnson had told him?
3    A    It could be possible.  I really don't remember that far back as the
4    interview.
5    Q    Did you, in preparation with the State for your testimony, did you go
6    over your statement at all?
7    A    Yes.
8    Q    Okay.  So, did you watch the video?
9    A    No.
10    Q    Okay.
11    A    Not with me he didn't.  I never watched a video.
12    Q    I see.  So, you just went over -- did you even realize you were being
13    recorded?
14    A    I'm pretty sure I was.  I realize that anything is possible when being
15    interviewed in any type of way.
16              MR. RION:  Well, your Honor, I hate to do
17    this, but I'd like -- it's an important question to me and I would like for her
18    recollection to be refreshed.  It'll take just five minutes.
19              THE COURT:  Well, she said she didn't
20    see the video, or, watch her video.  How would you refresh her recollection?
21              MR. RION:  Well, by showing it.  The
22    question was about Rosalind Johnson's statement.
23              THE COURT:  Oh.  That's only on the

1   video?  There's nothing transcribed?

2   MR. RION:  Correct.

3   THE COURT:  Okay.  Ladies and

4   gentlemen of the jury, I'll let you go for a few minutes.  Remember the

5   admonitions I've been giving.  Stay close.  It shouldn't take too long; okay?

6   Do not discuss the case among yourselves or with anyone else, or

7   express or formulate any opinions.  The jury will be excused.

8   (WHEREUPON, jury was excused from the Courtroom.)

9   THE COURT:  Okay.  The jurors have left

10  the Courtroom again.  Just for the record, so we're clear here, you want to

11  show Miss Williams the recording of her interview with Detective Clark to

12  refresh her recollection as to what occurred during that; is that correct?

13  MR. RION:  Yes, your Honor.

14  (WHEREUPON, witness reviewed DVD of portion of her interview.)

15  THE COURT:  Okay.  We'll bring the jurors

16  back in.  Wait until the jurors are in here before you ask questions.

17  (WHEREUPON, jury was returned to the Courtroom.)

18  THE COURT:  Okay.  Please be seated.

19  Mr. Rion, you can continue.

20  CROSS EXAMINATION OF CARLOTTA WILLIAMS CONTINUED

21  BY MR. RION:

22  Q   Did that help you to refresh your recollection?

23  A   Yes, it does.

1   Q   And do you recall now whether or not Detective Clark essentially read

2       to you Rosalind Johnson's statement back in 2009?

3   A   Correct.

4   Q   He did?

5   A   Yes.

6   Q   And the information that he provided you dealt with a camouflage shirt;

7       correct?

8   A   Yes.

9   Q   I'm showing you what's been marked as Defense (sic) exhibit '131'.

10      THE COURT:  I think it's a State's exhibit.

11  Q   Sorry.  It's State's exhibit '131'.  Are these the type of shirts that you

12      were referring to?

13  A   Yes.

14  Q   This is a short-sleeved one?

15  A   Yea.

16  Q   It would be another example of the type of shirt that he has?

17  A   Yea.  He just like never -- he wore that type of stuff all the time.

18  Q   Sort of casual loose clothes?  Is that what you mean by that?

19  A   Yea.  He never been an over the top dresser or anything.  He just

20      dressed casual down - jeans, t-shirts.

21  Q   Do you have a time frame as far as -- let's see, you've known him for

22      ten years, I guess; right?

23  A   Yes.

1  Q  So, when you were asked if you have ever seen him in a shirt like that,

2  or something like that, it's just during that ten year period; correct?

3  A  Yes.

4  Q  Do you recall the exact designs that he had on his shirts?

5  A  Just -- I mean, he would wear plain t-shirts, maybe stripes, and

6  camouflage at times.

7  Q  How would you describe -- I guess there's different times or phases of

8  this relationship that Sonya had with Markelus; is that fair?

9  A  Yes.

10  Q  Let's talk about before 2005.  Did you know them back then?

11  A  Yes.  I've been knowing him -- I mean, I met him through my boyfriend.

12  So, I've been knowing him ever since.  So, yea.

13  Q  And at that point -- well, at some point did she move out of her house?

14  Did they stop living together in like 2004/2005 or somewhere in that range?

15  A  Yes.

16  Q  And before that how would you describe their situation?

17  A  I don't know Sonya personally.  She was just always really quiet.  Me

18  and her never really conversated that much, or at all.

19  Q  Okay.  You used to work with her a little bit at the Refinery; correct?

20  A  Yes.

21  Q  And how long did you work with her there?

22  A  How long?

23  Q  Did you work with her; yea.

1   A   I worked for a shut down period from the months of maybe August

2 through November.

3   Q   What year?

4   A   2006. 2006. It was right after my mother died.

5   Q   And at that point, in 2006, so Markelus and Sonya are living together

6 again at that point; correct?

7   A   Correct.

8   Q   And you said there was not a -- well, how would you describe their

9 relationship while they were living together during that time period?

10   A   She needed help. She had lost her house and stuff and she didn't

11 have nowhere to go. So, he opened his doors back up to her.

12   Q   Was the reason they were living together was because they were in

13 love with each other and they were cohabitating, or was it because she didn't

14 have anywhere else to go?

15   A   It wasn't because they were in love or any of that stuff. She just

16 needed help. She had hit a hard spot in her life.

17   Q   So, then she leaves in 2007. Do her and Markelus talk a lot over those

18 next couple of years?

19   A   After she left the house?

20   Q   After she left in 2007, let's say. She moved in in

21 2005 to 2007. She leaves in 2007. How would you describe their situation

22 after that?

23   A   I think they had a relationship, you know, as far as the kids and

1     discussions about their kids, as far as I know.

2   Q  Was that about as far as it went?

3   A  To my understanding.

4   Q  Now, would you say that Markelus is a good father?

5   A  Yes.

6   Q  Would you say that Markelus -- the prosecutor's last question to you

7     was whether or not Markelus told you what did or didn't happen on that day.

8     Explain the answer that you gave.

9   A  Just as far as if he told me if he murdered someone or not?

10   Q  I think that was the question that they had asked.

11   A  Yea, he never told me he murdered anyone.  He just always stated

12     that they were going after the wrong person - they were focused all on him

13     and not focused on who really did it.

14   Q  Now, in two thousand --

15     MR. RION:  If I could just have a second,

16     your Honor?

17     (WHEREUPON, Court went off the record briefly.)

18   Q  How old are your kids?

19   A  How old are my kids?

20   Q  Yes.

21   A  Twenty-two, eighteen, and six.

22   Q  Okay.  So, we're talking about the six year old that dealt with the time

23     when Markelus came over to your house?  What year was it that Markelus

1   came over to your house to protect you against someone trying to break in?

2   A   I was like seven months pregnant in 2008.

3   Q   2008?

4   A   Uh-huh.

5   Q   When you were talking to the officers back in 2009 did you describe --

6   well, they asked you then about whether or not you had ever seen Markelus

7   with a weapon; correct?

8   A   Possibly. I don't really remember. It's very possible they asked me

9   that.

10   Q   And did you tell them then that it was just a pistol, just a regular pistol?

11   A   Could have. I mean, I'm not a big expert on guns. So, it's possible I

12   said that.

13   Q   Okay. I mean, it's sort of an important question. So, did it just look like

14   a pistol to you?

15   A   Well, no, it didn't look like -- are you just talking about like a little bitty

16   handgun?

17   Q   No. I mean, there are big pistols and little pistols. I mean, I'm trying to

18   -- well, what color was it?

19   A   I believe it was black. I'm pretty for sure.

20   Q   So, a black handgun?

21   A   You hold it in your hand; yea.

22   Q   Right.

23   A   Yea.

1  Q  Anything else you can say about it, or is that what it was?

2  A  I mean, it's a gun you can hold in your hand.  Is that what you're asking

3  me?

4  Q  Well, I'm asking you to describe what you saw back then, if you can

5  recall.  Is that what it was - a black handgun?

6  A  Well, yea, to my memory it looked like the picture he showed on the

7  projector screen.

8  Q  Okay.  If I showed you another picture would it look like that as well?

9  A  Would it look like the same thing to me?

10  Q  Yea.  In other words, different people have different varying degrees of

11  what a gun looks like; right?  I mean, there are people on this jury that could

12  clearly tell you every type of gun --

13  MR. MILLER:  Judge, I'm going to object.

14  This is calling for speculation.

15  THE COURT:  Well, I'm going to sustain

16  the objection in terms of what the people on the jury might know.  You can

17  ask her questions.

18  Q  I guess my question to you is - back in 2009, well, I'm trying to get a

19  description of the weapon as best as you can remember it from back then as

20  far as the color and what it was.  What can you tell this jury it looked like?

21  A  I believe it was a black gun.  I was going through a lot that day.  I was

22  seven months pregnant and somebody was trying to break into my house.

23  He came over to help me.

1    Q  You said that this conversation that you were having with Markelus

2    sometime before February 23rd, well, were you guys talking -- you said that

3    with David Evans there was some domestic violence issues that you and he

4    had?

5    A  Yes.

6    Q  And were you guys -- was that common knowledge?  Were you guys

7    talking about that?

8    A  I'm pretty sure because I used to talk to him about everything.

9    Q  Thank you.

10    A  You're welcome.

11    THE COURT:  Any redirect?

12    REDIRECT EXAMINATION

13    BY MR. MILLER:

14    Q  Carlotta, Mr. Rion showed you a tape to refresh your recollection about

15    an interview you gave to Mr. Clark.

16    A  Yes.

17    Q  That tape that he showed you, was that your -- was that the first time

18    you talked to Detective Clark?

19    A  No.

20    Q  No?  Do you know how many times you talked to Detective Clark prior

21    to that recorded interview?

22    A  Probably a few times.

23    Q  Okay.  There was some reference to Rosalind Johnson when Mr. Rion

1   was asking you questions.

2   A   Uh-huh.

3   Q   Did you tell Detective Clark about Rosalind Johnson?

4   A   Yes.

5   Q   So, you gave information that Rosalind, or, that Rosalind Johnson may

6   have information about this case to Detective Clark; is that correct, or not

7   correct?

8   A   Correct.

9        MR. MILLER:   One second, your Honor.

10       (WHEREUPON, Court went off the record briefly.)

11  Q   One other question, but I've got to get to this microphone.  You

12  mentioned David Evans here a number of times in your testimony.

13  A   Correct.

14  Q   Do you remember the day Markelus was arrested --

15  A   Yea.

16  Q   -- in February of 2009?

17  A   Uh-huh.

18  Q   The night before Markelus was arrested where was David?

19  A   He was at home with me.

20  Q   With you?

21  A   Yes.

22       MR. MILLER:   No further questions.

23       THE COURT:   Okay.  Any recross?

1    MR. RION: Nothing further. Thank you.

2    THE COURT: All right. Miss Williams,

3    thank you for coming in. You're excused.

4        A    Okay. Thank you.

5    THE COURT: All right. Next witness for

6    the State?

7    MR. MILLER: Matt Congleton, if he's out

8    there. I haven't had a chance to check.

9    THE COURT: Anybody can stand up and

10    stretch, if you want to.

11    MRS. KOHLRIESER: Your Honor, do you

12    mind if I step out of the room just a minute to make sure some other

13    witnesses are present?

14    THE COURT: That's fine.

15    WHEREUPON, called to appear as a witness in this proceeding was one:

16                    MATTHEW CONGLETON

17    who, having been duly sworn by the bailiff herein, testified as follows:

18    BAILIFF: He has an objection.

19    THE COURT: Okay. This witness has

20    also let us know that he has an objection to being photographed. So, I would

21    ask the press to respect that and not film him or photograph him for the

22    media. Mr. Miller, go ahead.

23    MR. MILLER: Thank you.

1    DIRECT EXAMINATION

2    BY MR. MILLER:

3    Q.   Mr. Congleton, can you state your full name for the record?

4    A.   Sure.  My name is Matthew -- My name is Matthew Congleton.  It's

5    spelled C-O-N-G-L-E-T-O-N.

6    Q.   Okay.  Mr. Congleton, where are you employed?

7    A.   I am employed with the Bureau of Criminal Investigation Crime

8    Laboratory in London, Ohio.

9    Q.   And do you do something special at that lab, or, something specific, I

10   should say?

11   A.   Well, within that laboratory I am a forensic scientist.  Within the crime

12   laboratory I work in the trace evidence unit.  We analyze things like paints,

13   glass, fibers, headlamp analysis for on/off determination, footwear

14   impressions.  We also do gunshot residue analysis.

15   Q.   Okay.  Let's talk about your education for a moment.

16   A.   Sure.

17   Q.   Do you have a college degree?

18   A.   Yes, I do.  I have a Bachelor of Science degree in Chemistry from

19   Michigan State University.

20   Q.   Do you have any degrees beyond that?

21   A.   I do not currently have any degrees beyond that.  I do have training

22   with the Florida Department of Law Enforcement where I served an

23   internship.  I then, after that internship, gained employment and went through

1116

1   a forensic chemistry program to become certified as a forensic chemist in
2   their state with the Florida Department of Law Enforcement.  After working
3   with the Florida Department of Law Enforcement I applied for and gained
4   employment with the Attorney General's Office in the Bureau of Criminal
5   Investigation in their chemistry unit in the forensic laboratory.  In 2010 I
6   transferred from the chemistry unit into the trace evidence unit, which I
7   explained my duties there.  Within that unit I've undergone several courses at
8   Hooke College of Microscopy in Chicago, Illinois.  I also underwent our
9   laboratory training program to become certified to do gunshot residue
10  analysis for the State of Ohio.
11     Q.   Okay.  Have you testified as an expert witness in the area of forensic
12  science, and specifically gunshot residue?
13     A.   Yes, I have.
14     Q.   And in which Courts?
15     A.   Knox County, Greene County, Franklin County probably close to a
16  dozen times, Adams County, Brown County, and I'm sure there's other
17  counties that I can't remember off the top of my mind, and then this is my first
18  opportunity to testify in gunshot residue in Lima, Ohio.
19     Q.   Okay.  Have you testified in Lima, Ohio about any other areas of
20  expertise?
21     A.   I have testified with regards to my chemistry experience in drug
22  chemistry analysis.
23     Q.   Okay.  But, that was in chemistry experience?

1    A    That was chemistry experience.

2    Q    Okay. Now, back to the area of forensic science, and specifically

3    gunshot residue. In each of those Courts that you have testified in have you

4    been certified as an expert in the area of gunshot residue?

5    A    Yes, I have.

6    Q    I'm going to hand you, well, it's marked State's exhibit '36' (sic).

7    There's actually three pages to it. The third page -- I'm going to direct your

8    attention to the third page for the time being.

9    A    Uh-huh.

10    Q    We'll talk about the rest of the report here in a second, or, the rest of

11    the document.

12            THE COURT:  '36'?

13            MR. MILLER:  I'm sorry, '136'.

14            THE COURT:  '136'. Okay.

15    Q    '136'. Do you see the third page of '136'?

16    A    Yes, I do.

17    Q    And what is that?

18    A    This third page is a curriculum vitae which gives a list of some of my

19    qualifications and some of the training programs I've undergone while I have

20    been with the Bureau.

21    Q    And --

22    A    And actually before I was with the Bureau as well.

23    Q    What is a curriculum vitae, just in general terms?

1    A    The common word would be resume.

2    Q    Okay. Is that a true and accurate copy of your curriculum vitae? It's

3    your C.V.?

4    A    My C.V.

5    Q    Is that a true and accurate copy of your C.V.?

6    A    It is a true and accurate copy as of 2010. I've had other classes that

7    aren't on this since then. This has been updated since that time.

8    Q    Okay. So, you would have additional experience than what's on that?

9    A    Yes. My Hooke College Microscopy courses, for example, are not on

10    this currently.

11    Q    And you continue to take, well, I call them continuing education

12    classes, but you continue to take training and classes and so forth?

13    A    Yes. It is required for our laboratory to remain a certified laboratory.

14    Q    And you are up to date on your training in that regard?

15    A    Yes.

16    MR. MILLER:    Your Honor, at this time I

17    would move to have Mr. Congleton certified as an expert in the area of

18    forensic science gunshot residue.

19    THE COURT:    Do you want to be heard,

20    Mr. Rion?

21    MR. RION:    No objection.

22    THE COURT:    Okay. For the record the

23    Court will find that Mr. Congleton is a certified expert in forensic analysis

1    trace evidence, including gunshot residue.

2    Q   Do you know, Mr. Congleton, were you asked to perform testing in this

3    particular case?

4    A   Yes.

5    Q   Yes?  Okay.  What type of testing were you asked to perform in this

6    particular case?

7    A   For this particular case that we're going to discuss today I did gunshot

8    residue analysis, which means I took evidence and I looked for the presence

9    of gunshot residue on certain items.

10   Q   Okay.  And did you collect -- that's okay.  Take your time.  Are you

11   ready?

12   A   I'm ready.  Let's go.

13   Q   Okay.  All right.  Let's talk about the testing for gunshot residue for a

14   second.

15   A   Certainly.

16   Q   Okay?  In general terms.  How do you test for gunshot residue?

17   A   Certainly.  For the purpose of looking for gunshot residue I'm either

18   looking for gunshot residue on an item or from a collection kit that was used

19   by a police officer and that was brought into the laboratory.  What I tested was

20   clothing and also sample stubs that were collected by crime scene agents

21   previously.  For the purpose of testing clothing the first thing I do with that

22   type of test is I remove the packaging from our vault and I sign in to my name.

23   I then make sure that the integrity of that evidence is present.  Is this

1 working?

2 THE COURT: Yea. It just gives a little

3 feedback. Yea, it's working good.

4 A Okay. As long as everybody can hear me. Once I have evidence in

5 my possession I then check the evidence to make sure the integrity of the

6 evidence is present, which means that I ensure that the packaging is still

7 sealed and still in the same condition as when it was submitted to the Crime

8 Laboratory. After doing that I enter into the evidence and I use sample stubs

9 to collect any gunshot residue that may be present on, in this case, clothing

10 for what we're talking about right now. After making that collection I will take

11 those sample stubs which were used on the clothing to collect any possible

12 gunshot residue that might be there and I place those stubs in a scanning

13 electron microscope. A scanning electron microscope is like any other

14 microscope. It makes small things bigger on a screen so you can see them.

15 What this microscope also will do is when particles are found that look like

16 they have the potential to be a gunshot residue particle that instrument will

17 also give me a chemical breakdown of what that particle contains. When a

18 firearm is discharged three separate chemicals in the primer of ammunition

19 condense through, as a firearm is discharged, heat and pressure cause the

20 material in the primer area of ammunition to go into a gastrous phase. When

21 that gas condenses particles are made. Those particles deposit on materials

22 that I test. Those materials will contain lead, barium, and antimony and will

23 have a rounded shape. So, when my evidence is on the scan electron

1      microscope if a particle looks to have the right shape for a gunshot residue

2      particle and the right elements I will then take a closer look at the elemental

3      chart of what that particle contains.  If it's rounded and has the right shape,

4      we call it morphology, and it contains those three elements, lead, barium, and

5      antimony, which are highly indicative of a firearm having been discharged,

6      then we have a positive finding for gunshot residue.  If I do not see those

7      types of particles then we have not found gunshot residue.

8      Q    Now, what if you find those kinds of particles and you find other

9      particles?

10     A    Other particles are okay.  They're expected.  You have to remember

11     that I'm using -- well, the type of stub I use is an adhesive stub.  I will dab,

12     and in this case for example I am using clothing, stubs are brought to me from

13     police officers.  They have often dabbed a person or some object in the field

14     that I don't have access to.  Those adhesive stubs, will hold on

15     to other materials, other microscopic materials, fibers, all sorts of debris, and

16     so it is not uncommon to find other materials along with your gunshot residue.

17     Q    Now, that's how you do the collection process.  Then you test what

18     you've collected?

19     A    Right.

20     Q    Is that correct?

21     A    Yes.

22     Q    Now, in your lab do you have certain controls in place to make sure

23     that the lab instruments are reading correctly?  I may not use the right terms,

1121

1    but that they're --

2    A    Sure.

3    Q    In other words, are there measures in place at the lab to make sure

4    you're getting accurate results?  I guess that should be the question.

5    A    Oh, absolutely.  When I open evidence that I'm going to -- when I open

6    evidence I'm going to test for gunshot primer residue we do it in a clean

7    space, a space that's just been cleaned, over a brown paper that is new and

8    fresh off the roll so we know we're guaranteed a clean working environment

9    and a clean working space that we're going to set our evidence on.  After

10   taking my sample I seal the container so it's air tight and set it aside.  I do one

11   collection stub at a time.  Only one stub would then be opened during

12   collection at a time.  Those stubs are labeled immediately with exactly the

13   unique B.C.I. tracking number, the item number, what part of the garment was

14   tested, and then set aside until I take it to a scanning electron microscope.

15   That's for the collection.  After collection, with our scanning electron

16   microscope, we rely, since we rely so heavily on that instrumentation to tell us

17   what is there and what is contained within the materials we find, we have a

18   standardized quality control system we follow.  At the beginning of every

19   month our scanning electron microscope, or, excuse me, the x-ray detector

20   which tells me the elements that the microscope sees, is calibrated.  It must

21   past calibration.  It must show it is working in a proper way.  We also run a

22   known standard that contains a hundred or so, I believe a hundred and three,

23   gunshot residue particles.  We run that every month on a known blank.

1   Every G.S.R. particle on that standard the location is known and I have to see

2   the right particles in the right location at the beginning of every month before I

3   run actual case work.  If those two standards aren't met then we're not

4   running case work on that instrumentation.  Other quality controls within our

5   instrumentation include what we do with every single run of evidence.  Every

6   single run we run a known.  The first sample that's run is a known positive -

7   this lets me know that the instrument is working - then a response for what I'm

8   looking for from something that is known.  We then run in our samples.  We then

9   run another known, part of another stub that's known to contain gunshot

10   residue, again to see if the instrument is working both before and after we run

11   our test samples.  After that, the last stub that we run, the last sample we run,

12   is a known negative.  We know it does not contain any gunshot residue

13   particles.  The reason we do that is to assure ourselves that every single time

14   and every single sample we look at no contamination, no cross transfer is

15   taking place between samples.  In the several years I've been doing gunshot

16   residue analysis my negative stub has never come back in a positive way.

17   It's always been negative, just like expected.

18   Q.   Okay.  And that tells you what it comes back as expected?

19   A.   What it tells me is that the instrument is working, that the instrument is

20   working properly, actually, and it also tells me that all my samples are

21   behaving as expected and that there's no contamination issues, there's no

22   reason to doubt in any way my findings at all.

23   Q.   Does that give you a measure of confidence in your findings then?

1123

1     A     Yes.  It lets me know that my findings are correct.

2     Q     Okay.  Now, back to this particular case.  Did you follow that procedure

3           in this particular case?

4     A     Yes, I did.

5     Q     And I think you mentioned it because you mentioned that you've never

6           had a negative stub come back positive.

7     A     Correct.

8     Q     Was that the case in this particular testing environment as well?

9     A     Yes.

10    Q     Okay.  So, that's in general.  Do you also do like weekly or monthly

11          calibrations?

12    A     We do the monthly calibration and the monthly check with a standard

13          gunshot residue collection.  With that collection we know exactly where each

14          gunshot residue particle is on our sample stub.  That map that we get when

15          we run the instrument with that has to match our known map of where those

16          particles are.

17    Q     Okay.  Very good.  That is the summary of the controls you have in

18          place in your lab --

19    A     Uh-huh.

20    Q     -- for gunshot residue?  Okay.  Now, again, back to this case.  Did you

21          perform a gunshot residue analysis or testing in this particular case?

22    A     Yes, I did.

23    Q     You mentioned that.  Did you find gunshot residue on any items

1124

1    submitted for your testing?

2    A    Yes, I did.

3    Q    Okay. We'll get to your report here in a second.  But, can you

4    generally explain what you found gunshot residue on?

5    A    Certainly.  In this case I found gunshot residue on a pair of gloves.  I

6    also found gunshot residue on a short-sleeved camouflage shirt and a

7    long-sleeved camouflage shirt.

8    Q    Okay. I'm going to hand you back now what is marked as -- did you

9    write a report after you performed your testing?

10   A    Absolutely. Any time I test evidence I always generate a report of my

11   findings.  That report is necessary.

12   Q    And you do that after every test you run?  Is that common?

13   A    Yes.  Almost every test I run there's --

14   Q    Are there some exceptions?

15   A    There are some rare exceptions.

16   Q    All right.  Were those exceptions in place in this case at all?

17   A    No, not in this case at all.

18   Q    Now I will hand you what has been, hand you back what has been

19   marked as State's exhibit '136'.  I may have said '36' last time.  It's '136'.

20   A    Okay.

21   Q    Will you take a look at that, please?

22   A    Uh-huh.  Okay.

23   Q    Okay?  I'm going to put it up on the screen here.

1    A    Certainly.

2    Q    Can you look up here for a second?  It's what's been marked as

3    State's exhibit '136'.  I'll try to step out of the way.  We're going to see a

4    portion of it here.  Now, we have here on State's exhibit '136', well, I guess

5    what I would call the top portion of your report that we've identified.  We have

6    certain items there that are identified as submitted on December 12th of

7    2013; correct?

8    A    Yes.

9    Q    Just, for the record, what are those items that were submitted to you

10    for testing on that particular date?

11    A    Certainly.  As you can see, I was submitted a camouflage sweatshirt,

12    two black gloves, one pair of camouflage pants, and twenty-four is a

13    camouflage shirt and that is the short-sleeved one, and twenty-five contained

14    the long-sleeved camouflage shirt.

15    Q    Okay.  Now, did you find gunshot residue on all of these items?

16    A    No, I did not.

17    Q    Okay.  You touched on it before, but which items did you find gunshot

18    residue on?

19    A    Certainly.  Item number eighteen, two black gloves; item number

20    twenty-four was the short-sleeved camouflage shirt; and item number

21    twenty-five, which is a long-sleeved camouflage shirt.

22    Q    Now, we're just looking at the first page of your report.  There's actually

23    two pages plus the C.V.; correct?

1126

```
 1    A    Correct.

 2    Q    So, a total of three pages.  Moving down the report we find an area

 3         that's titled 'findings'; correct?

 4    A    Correct.

 5    Q    Is that where you set forth your findings with respect to the tests you

 6         did on these items?

 7    A    Yes.  The findings indicate the results from the tests I did when I

 8         looked for the presence of gunshot primer residue.

 9    Q    Okay.  Now, in this area we see things like item twenty and item

10         twenty-five.  What are those referencing?

11    A    The items in the findings are obviously referencing the item numbers

12         above in the submitted area.

13    Q    For the record, that's what that's referencing?

14    A    That's what that means; yes.  There's a description before the item

15         number.  For example, we'll use the last one, twenty-five.  That description is

16         referring to item twenty-five above under 'submitted'.

17    Q    Okay.  Now, is this a true and accurate copy of your report?

18    A    Yes.

19    Q    State's exhibit '136'?

20    A    Yes.

21    Q    Okay.

22         MR. MILLER:   One second, your Honor,

23         please.
```

1127

1    THE COURT: Okay.

2    (WHEREUPON, Court went off the record briefly.)

3    Q    I'm going to take one second and gather a couple of items and then I'm

4    going to have you take a look at them; okay, Matt?

5    A    Sounds good.

6    Q    Okay. Let's do it this way. Now actually, Matt, I've handed you three

7    items, State's exhibit '130', State's exhibit '131', and State's exhibit '132'.

8    A    Uh-huh.

9    Q    Now, running from, I think, your right hand as you have it right now,

10   can you please pick that package up?

11   A    Certainly.

12   Q    And can you tell me whether or not you see any kind of B.C.I.

13   identification on that?

14   A    Certainly. I recognize this item from our B.C.I. tag which was placed

15   on this item when it was first brought into our laboratory system. That unique

16   tracking number that was assigned to it is 09-20621. This is item nineteen

17   within that case.

18   Q    Item nineteen?

19   A    Item eighteen.

20   Q    Eighteen?

21   A    Eighteen - 18.

22   Q    And that's thoroughly marked on the sticker; correct?

23   A    Yes.

1128

1    Q.   Okay.  Now, just for clarification, and I'm going to digress here a

2    second, that item eighteen is B.C.I.'s number eighteen?

3    A.   Yes.

4    Q.   Does that necessarily correspond with the agency's evidence number?

5    A.   No, it does not.

6    Q.   And by agency, it would be the agency submitting, I mean the agency

7    submitting the items for testing.

8    A.   Right.  We start our numbering at one, regardless of what's brought to

9    us, and so it's one, two, three, four, five, and so on.

10   Q.   The Lima Police Department's evidence item number would be

11   something different than eighteen?

12   A.   Yes, it's probably different than eighteen.

13   Q.   All right.  Now, can you remove the items?  I think all those bags are

14   open.  I'll do it for you.

15   A.   All right.

16   Q.   Item eighteen is opened and it's before you.  Are those the black

17   gloves that you tested?

18   A.   Yes, they are.

19   Q.   All right.  Now --

20   THE COURT:  Do you want to refer to the

21   exhibit marking for this case so that we know?

22   MR. MILLER:  I'm sorry.

23   Q.   State's exhibit 132.

1    THE COURT:  Okay.

2    Q    Okay?  Sorry.  The next one is State's exhibit '131'.  Do you see a

3    B.C.I. sticker on that?

4    A    Yes, I do.  Again, it's right here.  It has the same laboratory case

5    number.  The number starts with 09-2, plus four more digits.  This is item

6    twenty-four as submitted to the laboratory.

7    Q    And in twenty-four we have, well, is that a camouflage shirt?

8    A    It is a camouflage shirt.

9    Q    And is this an item you found gunshot residue on?

10    A    Yes, it is.

11    Q    And State's exhibit '130'?  Is that also a camouflage shirt?

12    A    Yes.

13    Q    And is that something that you found gunshot residue on?

14    A    Yes, it is.

15    Q    Now, we mentioned, I believe we did, but just for clarification on the

16    record, we mentioned there were items that you did not find gunshot residue

17    on.  Are those items contained in your report, State's exhibit '136', as well?

18    A    They are.

19    Q    Now, you mentioned two ways that evidence comes to you for testing.

20    One -- well, can you just explain those again?

21    A    Two ways evidence comes to me?

22    Q    Yes.

23    A    The only way I really know of is an agency will submit that evidence to

1    our laboratory.

2         Q.   Okay.  Maybe my question wasn't real artful.  I guess I should say this,

3    these samples you test are collected in two different ways.

4         A.   Oh.  Got it.

5         Q.   It's my fault.  That was a bad question.  Go ahead.

6         A.   Yes.  I explained the first way which is where an item is brought to the

7    laboratory and I take gunshot residue samples from the item.  The other way

8    is when a crime scene agent, or a police officer or investigator, uses the same

9    type of sample stub I would use at the laboratory that they do out in the field

10   and they do it from a person at a crime scene or they do it from an object at

11   the crime scene and then they bring me the sample, at which case I would

12   then examine their collection for the presence or absence of gunshot primer

13   residue.

14        Q.   Now, State's exhibit '130', State's exhibit '131', and State's exhibit

15   '132', where were those samples collected before they were tested?

16        A.   Are those the three we just looked at?

17        Q.   Yes.

18        A.   Okay.  Those samples were collected at the Bureau by myself.  I

19   received the actual articles of clothing.  That clothing was submitted to the

20   laboratory and came into my possession.  Once it was in my possession I

21   took my own samples to look for the gunshot residue.

22        Q.   In other words, those samples were not collected in the field?  They

23   were collected in your lab; is that correct?

1   A   They were collected in the lab by me.

2   Q   Okay.  Now, that's not all of the samples that you tested, is that

3   correct, in this particular case?

4   A   That is correct.

5   Q   Okay.  You actually tested a number of other things.  I'm going to hand

6   you what has been marked as State's exhibit '137'.  '137'.

7   A   Okay.

8   Q   Let me ask you if you recognize that document.

9   A   Yes, I do.

10   Q   Okay.  What is that?

11   A   This document is another report I wrote.  It is a report of my findings

12   when I looked for gunshot primer residue on samples taken from a vehicle.

13   Q   Okay.  Do you know which vehicle it was?

14   A   This was submitted as having come from Markelus Carter's vehicle -

15   all of these samples.  The report represents my findings in regards to testing

16   those samples that were brought to the laboratory.

17   Q   Okay.  With this particular report we'll just cut right to the chaste.  Did

18   you find any gunshot residue on the vehicle tested in this report?

19   A   I did not find any gunshot residue on those samples.

20   Q   Okay.  Is that a true and accurate copy of your report with respect to

21   the testing you did on the samples taken from that vehicle?

22   A   Let me just see the signature page so I can verify and just make sure I

23   check it all.  Yes, that's a true and accurate copy.

1    Q   Okay. Thank you. Now, are you aware of anyone else at B.C.I. doing

2    any gunshot residue testing in this case?

3    A   Specifically with evidence in regards to this case there was one other

4    analyst; yes.

5    Q   Do you know who that analyst was?

6    A   Yes.

7    Q   Who was that analyst?

8    A   That was my co-worker, Dan Davison, in the Bowling Green, Ohio

9    laboratory.

10   Q   Okay. Are you aware of what he tested and what results he got?

11   A   Yes.

12   Q   Okay.

13       MR. RION:   Your Honor, I have no

14   objection, to save time, for this witness to go into those results. Otherwise

15   we'd have to bring in a whole other witness to talk about the same thing.

16       THE COURT:   Okay. Thank you.

17   Q   So, Dan Davison also did some gunshot residue testing in this

18   particular case?

19   A   Yes, he did.

20   Q   And do you know the results of those?

21   A   Yes. He did testing on stubs that were collected in the field off of

22   Markelus Carter and he did not find any gunshot residue on those samples.

23   Q   Thank you.

1133

1    A    I'm basing that on his report, which I read.

2    Q    Okay.

3    A    Just to be thorough.

4    Q    Okay. Thank you. Now, with respect to gunshot residue and the

5    findings, specifically the findings, you make up, and there's a note actually

6    and I think it's probably in every one of your reports, and I'll just read a portion

7    of it because I think you'll get the gist of it. It says, "A finding of particles

8    highly indicative of gunshot primer residue' on a person's hands means that

9    an individual either discharged a firearm," and can you go ahead and finish

10   that? Do you want me to read it all?

11   A    "Discharged a firearm, or was in the vicinity of somebody who

12   discharged a firearm, or came into contact with a person or object that was

13   near a firearm when the firearm was discharged."

14   Q    Okay. In general lay terms what does that mean? Why do you have

15   that note in your report?

16   A    That note is in the report to clarify what a positive or negative finding

17   actually means. So, in this case we had some clothing where I did find

18   gunshot primer residue. That's great. What does it mean? Well, it means

19   one of three things. It means, well, we know the clothing didn't fire a firearm,

20   but the person wearing the clothing could have fired the firearm; or the

21   clothing could have been right next to somebody who fired a firearm; or that

22   clothing could have come into contact with something that was near a firearm

23   when it was discharged.

1      Q      In other words, really all you can say is that that clothing was near a
2      discharged firearm?
3      A      Yes.
4      Q      I want to ask you a couple of, well, I term them miscellaneous
5      questions because they're not necessarily relating to your report.
6      A      Okay.
7      Q      But, they may be important here. Is gunshot residue more likely or
8      less likely to stick to a smooth surface?
9      A      Generally speaking -- well, when a firearm is discharged the gases that
10     escape the firearm turn into particles. Those particles then settle on whatever
11     is present, whether it's smooth or not smooth. A smoother object obviously
12     would have less adhesion power - it would give the particles less
13     stick-to-itiveness than a rougher surface. So, that's kind of how it would work.
14     They would be less likely to hang on for as long amongst disruption.
15     Q      Okay. When you say amongst disruption what do you mean?
16     A      Well, what I mean is that if there were gunshot residue particles sitting
17     on top of something it will stay there until it's disrupted. In other words, what I
18     mean is that something has to make the particles move, whatever that force
19     is. Without a force to make it move, regardless of the surface, it will still
20     remain on that surface.
21     Q      Okay. Okay. I understand. Is gunshot residue, when it sticks to
22     something - that's my term, a lay term - when it sticks to something, well, if
23     that something is moved around is gunshot residue shed? Does it fall off as

1     the movement occurs?

2   A   Generally speaking; yes.  The more an object or person moves, or it

3     rubs up against something or themselves, the more likely you will have

4     gunshot residue shed and continue to be shed from whatever surface it might

5     be.

6   Q   Can you wash gunshot residue off of something?

7   A   Yes.

8   Q   Can you wash it off of clothes?

9   A   Yes.

10   Q   Can you wash it off of your hands?

11   A   Yes.

12   Q   And I suppose then you can wash it off of your face?

13   A   Yes.

14   Q   With normal soap and water?

15   A   Yes.

16   Q   Does gunshot residue degenerate over time?

17   A   No.

18   Q   Okay.  You know what I mean by degenerate?

19   A   Yes.

20   Q   That's my term.

21   A   It does not break down.  Gunshot residue particles will remain intact

22     and present for years and years and years.

23   Q   Are you familiar with the term called secondary transfer?

1   A     Yes, I am.

2   Q     What does that mean?

3   A     Certainly.  Secondary transfer -- well, like, if something has gunshot

4   residue particles, an object or person, it got there one of three ways.  The

5   third way is that something came into contact with the object to find the

6   particles on it - it came into contact with an object that was near a firearm

7   when it was discharged.  That's what we mean by secondary transfer.  I'll give

8   you an easy example.  If I discharge a firearm today in this Courtroom and

9   somebody comes into this Courtroom tomorrow when none of us are here

10  and they touch this Bench top, well, they might get secondary transfer from

11  the gunshot residue particles that were here from when I fired the firearm the

12  day before.  That's an example of a secondary transfer.  Something or

13  somebody came into contact with something that was near a firearm when it

14  was discharged and, therefore, had particles on it.

15  Q     If I discharge a firearm and rub it against my clothes would my clothes

16  then get, in theory, would my clothes then get gunshot residue on them?

17  A     That's quite possible; yes.

18  Q     If I shot a firearm and did not rub it against it my clothes would I, in

19  theory, have gunshot residue on them?

20  A     That's a very likely possibility.

21  Q     Does B.C.I. take unsealed evidence?

22  A     When we take evidence into the crime laboratory we take it in in a

23  sealed condition.  So, when an officer physically brings us an item we do not

1 accept it in an unsealed condition.

2 Q Okay. If an agency were to submit, based on what you know about

3 B.C.I.'s protocols, and if you don't know you don't know, but if an agency

4 were to submit items to B.C.I. would they have to be sealed or unsealed?

5 A They would have to be sealed. We're --

6 Q Okay. Go ahead.

7 A We're not going to -- if somebody brings evidence into the lab we will

8 not accept it unless it is in a sealed condition.

9 Q Now, when you say lab, I may be thinking of something else. I think of

10 lab as the very area you work in.

11 A Well, when somebody brings evidence to our evidence, any of our

12 evidence intake areas, which are often times attached to our lab, again, that

13 evidence intake, that staff, will not accept evidence that is not in a sealed

14 condition.

15 MR. MILLER: Can I have one minute?

16 (WHEREUPON, Court went off the record briefly.)

17 MR. MILLER: Your Honor, I have no

18 further questions.

19 THE COURT: Okay. I'll tell you what - I'll

20 give you a full chance to cross examine, Mr. Rion, but we'll take an afternoon

21 break now for about fifteen minutes, or until three o'clock. We'll stand in

22 recess.

23 Remember the admonitions I've been giving you. Don't discuss the

1    case or express or formulate any opinions about the case.  We'll see you at

2    three o'clock.

3    (WHEREUPON, COURT WAS IN RECESS.)

4

5    THE COURT:  We're reconvening then in

6    CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The defendant is

7    present with counsel.  The State is present.  The jurors have returned from

8    the afternoon recess.  It's still the 15th of September, 2015.  We're still in the

9    State's case.  Matthew Congleton is on the stand.  Mr. Rion, you may inquire.

10    MR. RION:  Thank you, your Honor.  Your

11    Honor, I believe that there is a stipulation.  There was a test done on March

12    19th, 2009 from a crime lab individual by the name of Daniel Davison, who is

13    a forensic scientist.  I believe that there is a stipulation that he is certified as

14    an expert in this field and that his report is accurate as far as the results

15    found.  Correct?

16    MR. MILLER:  Yes.  Oh, go ahead.

17    MRS. KOHLRIESER:  The State would so

18    stipulate.  I guess I might not have caught the exhibit number.  I apologize.

19    MR. RION:  It's Defendant's exhibit 'BB'.

20    THE COURT:  Okay.

21    MRS. KOHLRIESER:  The State would

22    stipulate to the admission of that.

23    THE COURT:  You already had a 'BB'.

1          MR. RION:  I did?

2          MRS. KOHLRIESER:  You had 'AA'

3     through 'DD'; correct?

4          THE COURT:  Yea.

5          MR. RION:  Oh, that's right.

6          MRS. KOHLRIESER:  So, 'EE' then?

7          MR. RION:  It would be 'EE', then.

8          THE COURT:  That's Mr. Davison's report?

9          MR. RION:  That is.

10                    CROSS EXAMINATION

11     BY MR. RION:

12          Q     Sir, referring to Defendant's exhibit 'EE', this goes to the gunshot

13     residue that was, the test that was done on Markelus' hands and face;

14     correct?

15          A     Yes.

16          Q     I think the jury has seen the actual -- it was on video when they

17     swabbed him for that.  But, is the idea that if there is gunshot -- if his face or

18     hands were in the proximity of a discharged weapon that it's possible that you

19     would have some residue on the face or the hands; correct?  That's the

20     theory?

21          A     Yes.  After that firearm was discharged, until disrupted, there is a very

22     strong likelihood to find gunshot primer residue on the skin, on exposed skin.

23          Q     And obviously, I guess, the more times a gun is fired the more the gunshot

1 residue, theoretically, would be in the area.  Is that a fair statement, generally

2 speaking?

3 A  Generally speaking, yes.

4 Q  And this has the same sort of three thoughts about it, that the presence

5 of gunshot residue means either the person themselves discharged the

6 weapon, they were next to someone who discharged the weapon, or handled

7 an item with gunshot primer residue on it.  Those are the three possibilities;

8 correct?

9 A  Right.

10 Q  And in this instance on Defendant's exhibit 'EE', on Mr. Carter's hands

11 and face, there were no, there was no gunshot residue found; correct?

12 A  That is correct.  Dan did not find gunshot residue on those stubs.

13 Q  And we're relying upon his report.  Richard Cordray was the Attorney

14 General at the time?  Your report is going to say Mike DeWine.  But, it's the

15 same office, but different elected official; correct?

16 A  Correct.

17 Q  Now, that was done on March 19th, 2009; correct?

18 A  Uh-huh.

19 Q  You did a series of reports in November.  The first one you did, I

20 guess, was November 17th, 2014, well, one of the tests you did.

21 A  Uh-huh.

22 Q  Defendant's exhibit 'FF'.  On November 17th, 2014 --

23 A  Uh-huh.

1    MR. RION:  Do you have the report?

2    MR. MILLER:  It should be up there.

3    MRS. KOHLRIESER:  It should be '137'.

4    MR. MILLER:  It's '137'.  It should be up

5    there.  Oh, Jon, I walked off with it.  Here you go.

6    Q    You did a report and the State marked it.  So, we'll just use the State's

7    and we won't have two reports.  I would withdraw Defendant's exhibit 'FF'.

8    On November 17th, 2014 you did a G.S.R. test on what appears to be Mr.

9    Carter's vehicle; correct?

10    A    Correct.

11    Q    And that test was ten months or so after State's exhibit '136', the test

12    on the camouflage and the gloves; correct?

13    A    Yes.

14    Q    I guess the idea could have been if there was gunshot residue on the

15    gloves and then if the gloves were used to open a car door, or put hands on a

16    steering wheel or to other areas, the driver's side door, well, there's a series

17    of areas that were tested; right?

18    A    Right.

19    Q    The steering wheel, the driver's -- well, what are the areas tested?

20    A    In this case, and now I'm going on what the stubs were marked that

21    were submitted to me.  These stubs were collected by someone else.

22    Q    I understand.

23    A    Thirty, item thirty, came from steering wheel.  Item thirty-one came

1     from driver's door interior, below window.  Thirty-two came from Carter's

2     vehicle, and that was the entire description.  Item thirty-three came from

3     driver's door handle.

4     Q     And in your testing of those materials, those various submissions,

5     there was no gunshot residue found; correct?

6     A     Correct.  On those stubs that were submitted to the laboratory I did not

7     find any gunshot primer residue.

8     Q     On your exhibit there, State's exhibit --

9     A     '136'.

10    Q     -- '136', the three possibilities, obviously the person who shot, the

11    person was around someone who was shot, or handled, the item was

12    handled, the item handled came into contact with something with gunshot

13    primer residue on it; correct?

14    A     Uh-huh.

15    Q     So, if I had gunshot residue on my hands, as an example, and there

16    was a shirt on the ground and I pick it up and inside it to lay it somewhere

17    and take a picture of it and put it in a bag and seal it and then send it to you

18    five years later --

19    A     Okay.

20    Q     It's a hypothetical.  So, if the hypothetical is if the person who picked

21    that up had gunshot residue on their hands there's a contaminated

22    connection there.  Your findings would be consistent with that hypothetical;

23    would they not be?

1    A    Yes, it would be consistent with the third hypothetical -- it came in

2    contact with something that had gunshot primer residue on it.

3    MR. RION:  Thank you.  Nothing further.

4    THE COURT:  Any redirect?

5    MR. MILLER:  No, sir.

6    THE COURT:  All right.  Sir, you are

7    excused.

8    A    Thank you, your Honor.  Am I excused from Court --

9    THE COURT:  Yea.

10    A    -- for the duration?

11    THE COURT:  Just make sure you don't

12    have any exhibits with you; okay?

13    A    Thank you.

14    THE COURT:  Next witness?

15    MRS. KOHLRIESER:  Kevin Kramer, your

16    Honor.

17    WHEREUPON, called to appear as a witness in this proceeding was one:

18    K E V I N   K R A M E R

19    who, having been duly sworn by the bailiff herein, testified as follows:

20    BAILIFF:  He has no objection.

21    THE COURT:  Okay.  Thank you.  Go

22    ahead.

23    MRS. KOHLRIESER:  Thank you.

1    DIRECT EXAMINATION

2    BY MRS. KOHLRIESER:

3    Q    Good afternoon.  Could you state your name for the record, and spell

4    your last name for me?

5    A    Kevin Kramer, K-R-A-M-E-R.

6    Q    And where are you currently employed?

7    A    I'm a forensic scientist in the firearms section at the Ohio Bureau of

8    Criminal Investigation, also known as B.C.I.

9    Q    How long have you been with B.C.I.?

10    A    For about two years now.

11    Q    And what department do you work in?

12    A    I work in the firearms section of the Crime Lab.

13    Q    What are your responsibilities in the firearm section?

14    A    My main duties in the firearm section include testing firearms for

15    operability and determining if fired bullets and fired cartridge cases were fired

16    by a particular firearm.

17    Q    And what is your educational background to do something like this?

18    A    I have a Bachelor's Degree in Forensic Science from the University of

19    Findlay and a Master's Degree in Forensic Science from Marshall University.

20    Q    Okay.  And any specific training in firearms, particularly with the

21    identification of fired bullets and casings to a particular firearm, that you've

22    received?

23    A    After I graduated from Marshall I was employed with the Columbus

1   Police Crime Lab in their firearm section and there I underwent in-house
2   training under the mentorship of senior examiners.  It included numerous
3   required readings, observation of senior scientists, hands-on practicals, and
4   written and verbal tests.
5   Q    Are you familiar with the term ballistics?
6   A    Yes, ma'am.
7   Q    I guess, well, how would you define that word, so to speak, in relation
8   to firearms?
9   A    Ballistics is sometimes commonly referred to what we do in a forensic
10   lab, which is firearms identification.  Technically ballistics would be the study
11   of the path of the flight of a bullet.  Ours is somewhat related in that we're
12   looking at the identification, the markings that are left from the barrel of the
13   gun on to the bullet or the interior surface of the firearm on to the cartridge
14   cases.
15   Q    Okay.  So, you do a little bit of both of those?
16   A    Yes, ma'am.
17   Q    Or a lot of both of those?
18   A    Yes, ma'am.
19   Q    Now, have you testified in Court as an expert in the area of firearms
20   and ballistics before?
21   A    Yes, ma'am.
22   Q    Do you know how many times you've testified?
23   A    Approximately twelve times previously.

1   Q   And have you ever testified in Allen County?

2   A   Yes, ma'am.

3   Q   Do you recall what Courtroom it was?

4   A   It may have been this one. I don't recall.

5   Q   Okay. And were you qualified as an expert in the area of firearms and

6       ballistics?

7   A   Yes, ma'am.

8   Q   Do you recall the case name by chance?

9   A   I don't recall specifically.

10  Q   Was it Brandon Lyle? Would that sound correct?

11  A   That does sound familiar.

12          MRS. KOHLRIESER:  Your Honor, at this

13      time the State would move to have Mr. Kramer qualified as an expert in the

14      field of firearms identification and ballistics.

15          THE COURT:  Okay. Any objection?

16          MR. RION:  No objection.

17          THE COURT:  Okay. So, for the record,

18      Mr. Kramer will be found to be qualified to testify as an expert in forensic

19      firearm ballistic bullet and casing analysis.

20          MRS. KOHLRIESER:  Thank you.

21  Q   If you would explain for the jury, who may not be familiar, in general

22      how a firearm works, specifically the difference between, say, a

23      semi-automatic firearm and a revolver?

1    A    A revolver is going to have a rotating cylinder.  The cartridges are

2    loaded into that cylinder and then the cylinder is closed into the firearm.  Most

3    revolvers then can fire in single or double action.  In single action the shooter

4    would have to cock the hammer, which would be above the grips on the rear

5    of the firearm, and then pulling the trigger would release the hammer to strike

6    the primer of the cartridge and discharge the bullet.  In double action, with

7    one long pull of the trigger the hammer would cock and drop on its own.  So,

8    with each pull of the trigger the cylinder rotates, aligning one of the cartridges

9    with the barrel, and the hammer is either manually cocked or cocked with

10   double action and falls and strikes the cartridge.  So, you would have to pull

11   the trigger to fire the next cartridge.  The cartridge cases remain in the

12   cylinder until the shooter removes the fired cartridge cases, whereas in a

13   semi-automatic pistol the cartridges are loaded into a magazine and that

14   magazine is then inserted into the grips of the pistol.  The shooter then has to

15   grip the top part of the pistol, which is called the slide.  By pulling that

16   rearward and releasing it it's going to set the firing pin, readying it to fire, as

17   well as on its forward path.  The slide is going to remove the top round in the

18   magazine and feed it into the chamber.  At this point the pistol is ready to be

19   fired.  By pulling the trigger that firing pin is going to be released, striking the

20   primer of that cartridge which will ignite the gun powder in the cartridge.  The

21   gun powder is going to undergo a reaction.  It's going to convert from a solid

22   to a gas.  This expansion of gas is what's going to push the bullet down the

23   barrel and out towards its target.  All of that pressure that's pushing the bullet

1    in that direction is also pushing back on the firearm.  So, it's going to
2    automatically cycle the slide and so on its rearward path it will automatically
3    extract and eject the fired cartridge case from the chamber, reset that firing
4    pin on its rear path, and on its path forward remove the next round from the
5    magazine into the chamber.  So, in summary, with each pull of the trigger a
6    bullet is fired and a cartridge case is automatically ejected and the next round
7    in the magazine is fed into the chamber.
8    Q    Okay.  Let's break that down just a little bit.  I'm going to show you two
9    exhibits here.  State's exhibit '115-B' and '119'.  Can you tell a semi-automatic
10   versus a revolver in let's say '115-B'?
11   A    Yes, ma'am.  That appears to be a revolver.
12   Q    Okay.  Let me publish this for the jury here.  Now, obviously you're not
13   touching it.  Tell me here why you think this appears to be a revolver?  Feel
14   free - I've got this little light here that you can use to point.
15   A    That part that the light is on is the cylinder.  That's where the cartridges
16   are loaded into.  That's that rotating part that will align one of the cartridges
17   with the barrel.  There's the hammer on the back.  That can be cocked in
18   single action, or with one pull, if this is a double action revolver, it could both
19   cock and drop the hammer.
20   Q    Okay.  State's exhibit '119'.  Does this appear to be a revolver or a
21   semi-automatic handgun?
22   A    That is a semi-automatic pistol.
23   Q    Okay.  Now, you talked about bullets can be loaded into a magazine

1 and the magazine would be placed in the grip part.  Can you show us on
2 State's exhibit '119' where it appears the magazine would be loaded in this
3 gun?
4 A      There would be an opening at the bottom of the grips.  It's called the
5 magazine well.  It would be inserted into that part of the firearm.
6 Q      Okay.  That's how you get the bullets in there; correct?
7 A      Correct.
8 Q      All right.  Then you mentioned about a slide that the shooter has to pull
9 back?
10 A      Yes, ma'am.
11 Q      Can you approximate, if you can't see it directly, but where the slide
12 typically is on a handgun such as this?
13 A      It would be this whole top part right here.
14 Q      And it's called a slide because it slides backwards and forward?
15 A      Correct.
16 Q      Okay.  I am not a gun person, so bear with me.  All right.  Now, I want
17 to ask you a little bit about bullets.  Again, I'm not a gun person.  I imagine
18 there's some other people on the jury who aren't.  I'm going to hand you
19 what's been marked as State's exhibit '129'.  There are gloves there, if you
20 prefer.  If you will, it's a bag within a bag within a bag, open this up.  I will
21 have you pull it out of there what we have.
22 A      It's marked as State's exhibit eight.  It is a box of Winchester nine
23 millimeter cartridges.  There are five cartridges inside of it.

1   Q.  Okay.  Hold on just a moment.  When you talked about State's exhibit

2   eight, that's on the brown paper bag?

3   A.  Yes, ma'am.

4   MRS. KOHLRIESER:  I guess, your Honor,

5   at this time I would ask the Court to take judicial notice that this exhibit, which

6   is now State's exhibit '129' was previously, in another case, State's exhibit

7   eight, just for the record.

8   THE COURT:  There's another red sticker

9   on there is what you're saying?

10  MRS. KOHLRIESER:  There is.

11  THE COURT:  Okay.  But, it's exhibit '129'

12  for this case?

13  MRS. KOHLRIESER:  Yes.  The plastic

14  bag that was on the outside is labeled '129', but there is a State's exhibit

15  sticker from a previous issue on that.

16  THE COURT:  Okay.  We'll notice that.  It's

17  clear on the record.

18  MRS. KOHLRIESER:  Okay.  Thank you.

19  Q.  If you would, and I didn't mean to cut you off, I apologize, please hold

20  that up and explain what was in that brown paper bag.

21  A.  It's a box of Winchester nine millimeter Luger cartridges.

22  Q.  Okay.  If you'll pull those out of there?  How many did you say you were

23  present in the box?

1    A   There are five.

2    Q   Okay.  Can you just hold up one of those up for me?  Actually, can I have

3    a bullet?

4    A   Sure.

5    Q   I'm going to put this on the screen just so the jury can see it a little bit

6    better.  All right.  As best you can, explain what you're talking about when a

7    bullet gets fired - what parts we have here and what happens with those

8    parts.

9    A   This is a complete cartridge.  So, when I refer to a cartridge I'm

10   considering a non-fired ammunition.  It has four main components.  There's

11   the cartridge case.  It is shaped like a cup and it's going to house the other

12   components.  Inside the cartridge case is our gunpowder, or our propellant,

13   our energy to fire our bullet.  On the open end of the cartridge case is the

14   bullet.  That's the actual part that will travel down the barrel and out towards

15   its target.  On the opposite end, you can't view it here, is the primer.  That's

16   going to contain the shot sensitive substance that when struck is going to

17   ignite the gunpowder.

18   Q   Now, in looking at this exhibit, State's exhibit '129', and again feel free

19   to pick them up and look at them, I've heard of copper jacket and full metal

20   jacket and that type of thing.  Can you explain what type we have here and

21   what that means?

22   A   These are full metal jacket cartridges.  There are basically two types of

23   cartridges - hollow point and full metal jacket.  A hollow point is going to have,

1   as it would sound, a hollow point at the end of the tip of it.

2   Q.  Okay.  Is there actually copper at the tip of the bullet?

3   A.  The typical jacket is made of copper.

4   Q.  Okay.  What's inside of that?

5   A.  Usually it's coating lead.  A jacketing is used to prevent fouling.  Lead

6   is a softer metal.  So, using a copper jacket prevents fouling in the barrel.

7   Q.  Okay.  Now, the first thing that you described when we were talking

8   about, well, I shouldn't say the first thing, but one of the things you described

9   when a bullet is fired from a gun you talked about the casing.  What, in a

10  semi-automatic, what happens to the casing when a bullet is fired properly?

11  A.  When a semi-automatic is fired, in most semi-automatic pistols the port

12  that it's going to eject out of is on the top and open to the right side of the

13  pistol.  So, the rearward motion of the slide and when it hits the ejector is

14  going to cause it to hit the ejector going rearward and also flip out to the right.

15  So, it's going to generally go to the rear and to the right.

16  Q.  Now, you say generally.  Are there exceptions to that?

17  A.  Obviously anything can happen.  Once it does start to exit it could hit

18  something and bounce in any direction.  But, generally speaking, if it's

19  unimpeded it will go to the right and to the rear.

20  Q.  I'm going to hand you what has previously been marked as State's

21  exhibit '68'.  Before you take that out of there, do you see any initials that look

22  familiar to you on that exhibit?

23  A.  Yes, my initials and the date that I sealed it.

1    Q   What color ink is that?

2    A   Red.

3    Q   Okay. And the K.K., is that what I'm seeing?

4    A   Yes.

5    Q   And the date on there?

6    A   August 4th, 2015.

7    Q   Okay. If you would, pull the envelope inside that plastic out for me? If

8    you would, wherever you can, I guess, cut open that envelope. Pull out

9    what's in there. What do you have in your hand there?

10    A   It is a fired cartridge case that I examined relative to this case.

11    Q   Okay. Is that what you're talking about, the little cup like thing?

12    A   Yes, ma'am.

13    Q   Okay. Can you kind of hold it up? I don't know if the jury can see it.

14        MRS. KOHLRIESER:   Your Honor, with

15    your permission, could he step down just to kind of --

16        THE COURT:   That's fine.

17    Q   Can you step down and kind of take it by the jury there to see? If you

18    would particularly show, I guess, the hollowness, or the cupping, or whatever

19    you call it.

20    A   It's empty on the inside. The propellant that was inside it has burned

21    and is gone. The bullet that would have been seated in the open part is now

22    also gone. The primer on the rear has a firing pin impression on it.

23    Q   A firing impression on it?

1   A   Correct.

2   Q   Okay.  Thank you so much.  If you could put that back in the envelope?

3   State's exhibit '68' is what you were referring to that's ejected from a

4   semi-automatic?

5   A   Yes, ma'am.

6   Q   In a revolver what happens with the casing?

7   A   The cartridge cases will remain in that cylinder until the shooter would

8   open that cylinder and remove them.

9   Q   Okay.  So, you have to manually do that yourself?

10   A   Yes, ma'am.

11   Q   All right.  Now, let's talk about, and I apologize, the word you used for

12   the end of that casing is what for a fired casing?  What are you looking at?

13   A   The firing pin impression.

14   Q   Impression?  Okay.  Now, are you able to look at casings and compare

15   them to a firearm to determine whether that was fired from that firearm?

16   A   Yes, ma'am.

17   Q   Okay.  How do you go about doing that?

18   A   In examining an evidence cartridge case and comparing to a firearm I'll

19   first look at the class characteristics of the cartridge case.  Class

20   characteristics are things that are common to an entire group.  So, all the nine

21   millimeter cartridge cases would be in the same group.  They all could have

22   been fired by any nine millimeter gun.  So, I'll further look at, well, usually the

23   caliber is stamped right on to the cartridge case.  I also can look at the shape

1    of the firing pin impression - whether it is square, circular, or elliptical, as well

2    as the breech face pattern.  That would be the surface surrounding where the

3    firing pin protrudes to strike that primer.  There has to be an opening for it to

4    get through.  That surface surrounding it is the breech face.  That will also

5    leave an impression surrounding that firing pin impression.

6    Q    Okay.

7    A    So, if those class characteristics are in agreement with a submitted

8    firearm I know at that point that this gun is at least a candidate for having fired

9    it.

10   Q    Okay.  A candidate?

11   A    Correct.

12   Q    All right.  What do you mean by that?

13   A    That it's possible that it could have fired this.  I can't uniquely say at

14   this point, just based on class characteristics, that it was this firearm.  But, I

15   can't rule it out at this point.

16   Q    Okay.  Now, let's talk about rifling.  What is rifling?

17   A    Rifling is the spiral grooves on the interior surface of a barrel.

18   Manufacturers put rifling in barrels to impart spin on the bullets.  Imparting

19   spin on them gives them stability in flight so that it can shoot more accurately.

20   Q    Okay.  A casing wouldn't get rifling on it; correct?

21   A    Correct.

22   Q    So, what part of the bullet, the cartridge, gets rifling on it?

23   A    Only the projectile is the actual bullet that travels down the barrel

1    engaging that rifling and exits towards its target.

2    Q    Are there times when a bullet is fired that the copper jacketing may

3    separate from the bullet itself?

4    A    That is possible.

5    Q    Now, that rifling, is that what allows you to tell when a bullet has been

6    fired from a certain firearm?

7    A    Yes, ma'am.

8    Q    Is that something fairly unique to each gun?

9    A    Yes, ma'am.

10    Q    All right.  Now, let's say we don't have a firearm.  Are you able to, say,

11    take two bullets and determine whether they've been fired from the same

12    weapon?

13    A    We can determine if two firearms were used or one firearm was used.

14    Q    What do you mean by that?

15    A    So, if we have two bullets we can compare the class characteristics

16    first, so the caliber of the bullet, the direction of the twist or the rifling - is it to

17    the right or to the left, the number of what are called lands and grooves.  So,

18    when I referred to the rifling earlier, the lower area is called grooves and

19    in-between those lower areas are raised areas called lands.  So, count the

20    number of those and measure the widths of those.  If all that is in agreement

21    we know it's possible that one gun could have fired those.  In order to

22    uniquely say that one gun did fire both of these bullets I would have to put

23    them on the comparison microscope and that is a microscope that's basically

1     two microscopes joined together.  So, I can put on one the left stage and one

2     on the right stage and I can view them in one field of view under the same

3     magnification and the same lighting.  I'm looking for individual characteristics.

4     These are tiny imperfections and defects on the surface of the barrel that are

5     imparted on to the bullet.  They're like the firearm's fingerprint.  They're

6     unique to that firearm.  I look for an agreement of those individual

7     characteristics on the rifling on each bullet.

8     Q.   Now, when you say unique to that firearm, how does that happen?

9     What about the manufacturing process makes it unique to each firearm; if you

10     know?

11     A.   In the manufacturing process there's always a little bit of variation from

12     one barrel to another.  The same tool may be used, but you're using two

13     really hard metals that are scraping against each other and so that tool is

14     going to wear over time and have different chips and things in it.  It's going to

15     have just a different experience with each barrel that it passes through.

16     Q.   Now, you also talked about when you're talking about firearms, we see

17     semi-automatics, or revolvers, or fully automatic, or whatever it happens to

18     be, this concept of the gunpowder and then the explosive mechanism;

19     correct?

20     A.   Correct.

21     Q.   Okay.  Now, are you familiar with BB guns, air pistols, paintball guns,

22     and that type of thing?

23     A.   Yes, ma'am.

1  Q  Do they fire in the same manner as an actual firearm would?

2  A  A firearm uses gunpowder, or what's called a combustible propellant,

3  whereas air rifles and BB guns use compressed air.

4  Q  Okay. When you say combustible, what does that mean?

5  A  Basically like a tiny explosion - something that can ignite, something

6  that can catch fire.

7  Q  Okay. But, BB guns, air pistols, and paintball guns react to

8  compressed air and not a combustible?

9  A  That is correct.

10  Q  Okay. I just want to make sure I'm straight. All right. Now, in July of

11  this year were you assigned a case involving a suspect by the name of

12  Markelus Carter?

13  A  Yes, ma'am.

14  Q  And what were you asked to do?

15  A  The case had previously been re-worked, or, had been worked, and so

16  I was asked to re-work the case.

17  Q  Okay. You were asked to re-work the case; correct?

18  A  Yes, ma'am.

19  Q  When you say re-work, do you mean from a firearms perspective, a

20  ballistics perspective?

21  A  Yes, ma'am.

22  Q  Okay. Do you know the first person to examine the things you

23  were called upon to re-examine was?

1    A    Yes, ma'am.

2    Q    And who was that?

3    A    Todd Wharton.

4    Q    And do you know whether he's still employed at B.C.I.?

5    A    He is not.

6    Q    Do you know where he is actually?

7    A    I believe he has a job in Florida now.

8    Q    Okay.  All right.  That was the first person.  Was there another person

9         before you?

10   A    Yes, ma'am.

11   Q    Okay.  Who was that?

12   A    Heather Williams.

13   Q    Okay.  And Miss Williams examined these things some time later after

14        Mr. Wharton?

15   A    Yes, ma'am.

16   Q    Okay.  And I understand, and I don't want to get too personal here, but

17        that Miss Williams has actually taken a leave of absence due to a personal

18        health issue?

19   A    Yes, ma'am.

20   Q    And do you know whether that's why you were asked to do a third

21        examine - because they're kind of out of the picture?

22   A    That is exactly why; yes.

23   Q    Okay.  So, you were asked to examine a number of items for purposes

1  of testifying here today?

2  A  Yes, ma'am.

3  Q  And did you generate a report of your findings in that case?

4  A  Yes, ma'am.

5  Q  Now, before we get to this exhibit, Mr. Wharton - excuse me - Mr.

6  Kramer, when you're asked to -- well, when you're given a firearm and you're

7  given some ballistics, bullets, casings, whatever it happens to be and you're

8  asked to compare these to see if these bullets were discharged from this

9  firearm do you test-fire that weapon as well?

10  A  Yes, ma'am.

11  Q  Okay.  How do you go about doing that?

12  A  In performing an operability exam I'll first make sure that the firearm is

13  not loaded.  I will then examine it visually just making note of the things like

14  the make, model, caliber, and serial number of the firearm.  I'll then examine it

15  mechanically to make sure that it's working properly and that it's in a safe

16  condition to fire.  Once I've determined that I'll test-fire into our water tank.  I'll

17  collect the cartridge cases if they're ejected from the firearm if it's a

18  semi-automatic.  I'll also collect the bullets from inside the water tank.  We

19  use water because it safely slows down the bullet, as well as leaves it in

20  a pristine condition to look at that rifling later for comparison.

21  Q  Okay.  So, I'll hand you now State's exhibit '138' and ask you to take a

22  look at that.  Tell me when you're done.

23  A  Yes, ma'am.

1   Q   Do you recognize State's exhibit '138'?

2   A   I do.

3   Q   And what is that?

4   A   It's the report I generated in regards to this case.

5   Q   Okay. And does that fairly and accurately reveal the results of your

6   testing and what you did?

7   A   Yes, ma'am.

8   Q   Okay. Also attached to that is, I guess, your curriculum vitae, or

9   basically your resume?

10   A   Yes, ma'am.

11   Q   Your professionals?

12   A   Yes.

13   Q   Let's talk about State's exhibit '138' just a little bit. First off, let's just

14   talk about when this was submitted to you. Is that evidenced on your report?

15   A   Yes. The submission date shows it was sent to B.C.I. on July 21st of

16   this year.

17   Q   And, I'm sorry, I guess that was sort of a poorly worded question.

18   When I say you, I meant B.C.I. in general. That's not necessarily the day you

19   tested it; correct?

20   A   Correct.

21   Q   Okay. So, you were asked to look at -- well, we see these numbers

22   here on the side. Do you see what I'm talking about?

23   A   Yes, ma'am.

1     Q    Okay. Where do those numbers come from?

2     A    When evidence is submitted to our evidence receiving department that

3     case will be assigned a unique case number, as well as an item number for

4     each different item submitted.

5     Q    Okay. When things are submitted repeatedly to the lab do you have a

6     way of tracking that, so to speak? Do you have a computer that you can go in

7     and look and see where all it's been?

8     A    When a number, an item number is assigned to that item a bar code is

9     generated for that item and it's placed on the bar code and then electronically

10     we keep track of the chain of custody of that item to see where it travels.

11     Q    Okay. So, for instance, State's exhibit '68', do you see a B.C.I.

12     barcode on that?

13     A    Yes, ma'am.

14     Q    Just point that out to the jury what they're looking at. It's that that

15     purple lilacy (sic) color there?

16     A    Yes, ma'am.

17     Q    Okay. That's your tracking number?

18     A    Correct.

19     Q    And when I say you, I mean B.C.I.

20     A    Correct.

21     Q    Okay. All right. So, these numbers would be the numbers assigned by

22     B.C.I. to each item of evidence; correct?

23     A    Yes, ma'am.

1   Q   Okay.  So, submitted was, well, let's go with item twenty-six.  What is

2       that?

3   A   A Glock, model nineteen, semi-automatic pistol, serial number

4       EFX534US.

5   Q   Okay.  And does that indicate there that this originally had a different

6       B.C.I. number?

7   A   Yes, ma'am.

8   Q   Okay.  What was the previous number?

9   A   Originally item number one.

10  Q   Okay.  Now, it appears that most of your items, if not all of them, had

11      previous numbers; is that correct?

12  A   Yes, ma'am.

13  Q   Okay.  What's the purpose of denoting those in your report?

14  A   Sometimes when evidence gets submitted multiple times it's

15      convenient for our evidence receiving department to just assign it a new

16      number because when it comes sealed so many times there's not a place to

17      initial and date.  So, we still want to reference that old number and say this is

18      the same one that was submitted previously, but here's the new number.

19  Q   Okay.  So, these items that you're looking at, you testified you were the

20      third one to examine these; correct?

21  A   Yes, ma'am.

22  Q   Are these items, I guess, identical with the exception for whatever

23      testing may have been done to what Miss Williams and Mr. Wharton tested

1   previously?

2   A   They examined the same evidence that I examined.

3   Q   Okay.  Now, in this report, and I'll have you just take a look at it and

4   you can explain it, but let's have you identify a few exhibits to go along with it.

5   State's exhibit '68', I believe you've already testified it's something that you

6   tested.

7   A   Yes, ma'am.

8   Q   And is that reflected in the report, in State's exhibit '138', as an item

9   that was submitted to you?

10   A   Yes, ma'am.

11   Q   And that was a casing?

12   A   Yes, ma'am.

13   Q   State's exhibit '69'.  Do you recognize that?

14   A   Yes.  It has a B.C.I. bar code on it and my initials and the date I sealed

15   it.

16   Q   Again, that's a manila envelope in plastic?

17   A   Yes, ma'am.

18   Q   And your initials in the red bag there?

19   A   Yes, ma'am.

20   Q   Okay.  And, again, that's an item that's reflected in your report, State's

21   exhibit '138'?

22   A   Yes.  It's item number thirty-four in my report.

23   Q   Okay.  Now, on '68' and '69', do you see previous indications from

1    B.C.I. of a different item number?

2    A    Yes, ma'am. There's a blue bar code.

3    Q    On both of those?

4    A    Yes, ma'am.

5    Q    And is that also reflected in your report in the parenthesis there?

6    A    Where it says original item number such and such; yes.

7    Q    And that's the type of tracking you were talking about; correct?

8    A    Yes, ma'am.

9    Q    Okay. Item '70-A'. Do you recognize that?

10        THE COURT: Whoa. Whoa. Whoa.

11        '70-A'?

12        MRS. KOHLRIESER: Yes, your Honor.

13    Q    Do you recognize that?

14    A    Yes, ma'am. It has a B.C.I. bar code. It's item number thirty-six and

15        my initials and the date that I sealed it.

16    Q    Does that, likewise, have a previous indication on it, perhaps on the

17        back side?

18    A    Yes, it also has a blue bar code on it, on the envelope inside.

19    Q    Okay. State's exhibit '70-B'?

20    A    This also has a B.C.I. bar code, my initials, and the date I sealed it.

21    Q    Okay. Does that, again, have a previous identification from B.C.I., a

22        blue sticker?

23    A    Yes, ma'am.

1    Q    Okay. And '71'?

2    A    Also has a B.C.I. bar code, the date, my initials, and a previous blue

3    label on the envelope inside.

4    Q    Okay. Again, '68' through '71' were items that were submitted to you,

5    or submitted to the lab, in July of 2015 and that's what you generated your

6    report for?

7    A    Yes, ma'am.

8    Q    Okay. There was some confusion before. State's exhibit '129'. Was

9    that also something that was submitted to you?

10   A    It was submitted as item number thirty-nine to me.

11   Q    Does that also have your initials and the date and things of that

12   nature?

13   A    Yes, ma'am.

14   Q    And it's the box of ammunition?

15   A    Yes, ma'am.

16   Q    Okay.

17   MRS. KOHLRIESER:   At this point, your

18   Honor, I believe the parties have a stipulation that the seven bullets that were

19   originally in State's exhibit '129', well, two of them were used during the

20   original testing by Todd Wharton, and that Mr. Kramer was able to review his

21   report and that's why we have the five bullets left.

22   THE COURT:   The defense stipulates to

23   that?

1      MR. RION:  That's always been my

2      understanding.  Yes, your Honor.

3      THE COURT:  Okay.  All right.  Thank you.

4      The record will show that stipulation then.

5      MRS. KOHLRIESER:  Thank you.

6   Q   And were you able to look at Mr. Wharton's report to confirm the

7      stipulation that I just put on the record?

8   A   Yes, ma'am.

9   Q   Okay.  All right.  Feel free to take a look at your report there.  State's

10     exhibits '68' and '69', which are your B.C.I. items thirty-five and thirty-four,

11     and previously four and three; correct?

12  A   Yes, ma'am.

13  Q   Okay.  Those are casings?

14  A   Yes, ma'am.

15  Q   Were you able to compare these casings to one another?

16  A   Yes, ma'am.

17  Q   Okay.  And what determinations, if any, did you make as far as

18     identifying those two casings in relation to each other?

19  A   I determined they were fired by the same firearm.

20  Q   All right.  How are you able to make that determination?

21  A   First, looking at class characteristics.  All those were in agreement and

22     so I knew it was a possibility.  Then I put them on the comparison microscope

23     and I looked for those individual characteristics that are either in the firing pin

1168

1    impression or the breech face pattern that I described earlier and there were

2    matching individual breech face characteristics on these cartridge cases.

3    Q    Okay.  Now, '70-A', '70-B', and '71', are those each bullets?  Feel free

4    to look.

5    A    They're listed as bullets in my report; yes.

6    Q    Okay.  When I say bullets, are these complete unfired cartridges or

7    fired bullets?

8    A    These are the fired bullets.

9    Q    Okay.  And were you able to examine all three of those?

10    A    Yes, ma'am.

11    Q    And, for the record, State's exhibit '70-A' was B.C.I. item what

12    number?

13    A    Thirty-six.

14    Q    And previously B.C.I. item number what?

15    A    Number five.

16    Q    Okay. '70-B' was B.C.I. item number what?

17    A    Thirty-seven.

18    Q    Previously?

19    A    Number six.

20    Q    Okay.  And '71' is B.C.I. item number what?

21    A    Thirty-eight.

22    Q    And previously?

23    A    Seven.

1    Q    Okay.  Were you able to compare those bullets and those casings to
2    the nine millimeter firearm that was submitted to you?
3    A    Yes, ma'am.
4    Q    Those bullets and casings, were you able to determine whether they
5    were fired from that firearm?
6    A    I determined they were not fired by the Glock pistol.
7    Q    Okay.  So, those don't belong to the Glock, so to speak?
8    A    Correct.
9    Q    All right.  Were you able to tell anything about those three bullets in
10   relation to one another?
11   A    I compared those bullets to each other and determined they were all
12   fired by a single firearm.
13   Q    All right.  So, they came out of the same firearm is basically what
14   you're saying?
15   A    Yes, ma'am.
16   Q    Now, when you were doing this testing, well, prior to reaching your own
17   conclusions did you review Mr. Wharton or Miss Williams reports?
18   A    I did not.
19   Q    Why is that?
20   A    Until I get to my results I don't have access to their notes or their
21   findings.
22   Q    Would it be safe to characterize it as not cheating?  Doing your own
23   work?

1    A    That's correct.

2    Q    Okay.  Maybe cheating is a little harsh.  After you were able

3         to draw your own conclusions was that when you were able to see the other

4         reports?

5    A    Yes, ma'am.

6    Q    Now, in looking at State's exhibit '129' what B.C.I. lab number were

7         you given on that?

8    A    Thirty-nine.

9    Q    Okay.  And its previous number?

10   A    Two.

11   Q    And it has one more number; correct?

12   A    Yes, ma'am.

13   Q    What was that?

14   A    Twenty-seven.

15   Q    Okay.  That was the bullets that you took out and showed, or, I showed

16        on the screen; correct?

17   A    It's the live rounds; yes.

18   Q    Were you able to - excuse me - in looking at these bullets that are

19        unfired and looking at State's exhibits '68' and '69', those casings, are they

20        the same manufacturer and the same caliber?

21   A    They're both Winchester and both nine millimeter Luger.

22   Q    Okay.  When you say nine millimeter Luger, what does that mean?

23   A    So, calibers can be just specific or general.  Nine millimeter would be a

1    general.  So, it can encompass several nine millimeter calibers that would be

2    in a family.  Whereas nine Luger is a specific cartridge.

3          Q.   Okay.  When we say a nine millimeter, do you have to have a nine

4    millimeter weapon to fire them?

5          A.   Yes, ma'am.

6          Q.   Okay.  Now, even though those bullets and casings did not come from

7    the firearm that was submitted to you, the Glock, I believe it was --

8          A.   That's correct.

9          Q.   Okay.  Is there a thing called a list of candidates, so to speak - I

10   believe you said something about it much earlier in your testimony - that could

11   have fired those bullets and casings?

12              MR. RION:  Can we approach, your

13   Honor?

14              THE COURT:  Okay.

15        (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

16   the record, as follows.)

17              MR. RION:  We're getting beyond his

18   report here a little bit.

19              MRS. KOHLRIESER:  I'm sorry?

20              MR. RION:  We're getting beyond his

21   report as far as what he will testify to.  The report was just submitted.  I

22   thought the purpose of the report was to show that these missiles didn't shoot

23   the gun and that they're both all three fired from the same weapon.  I think

1    that's in his findings.

2    MRS. KOHLRIESER:  Well, the extent of

3    his ability, I mean, his expertise in the area, the types of guns that can fire

4    these I think is well within his --

5    MR. RION:  That's not in the report. That's

6    the problem.  This guy -- I'm sort of doing the State a favor by not objecting to

7    the late report, which was consistent with the other one.  So, I wasn't all

8    surprised on that.  If he's going to go into other areas, though, I don't think

9    that's fair.

10    MRS. KOHLRIESER:  It's not a different

11    area.  It's simply what types of guns could have fired these bullets.

12    MR. RION:  I don't know.  I have no notice

13    on this.  So, I have had no time to prepare for it.

14    THE COURT:  He didn't write a report to

15    that, right?

16    MRS. KOHLRIESER:  (Inaudible).

17    COURT REPORTER:  I can't hear her.

18    MRS. KOHLRIESER:  He wrote a report

19    about what these are, what caliber they are, and that type of thing.  I think the

20    extrapolation is this type of caliber can be fired from what type of gun.

21    THE COURT:  I'll overrule the objection

22    and allow you to do it.

23    (WHEREUPON, Court continued on the record, as follows.)

1    THE COURT:  Go ahead.

2    Q    I apologize.  Let me start again.  Are you able to determine, I guess, a

3    list of possible candidates for what type of guns could have fired State's

4    exhibits '68' through '71'?

5    A    At B.C.I. and crime labs across the country we have a data base that's

6    maintained by the F.B.I. called the G.R.C.  It stands for general rifling

7    characteristics.  So, we can input into it nine millimeter caliber, right hand

8    twist, six lands and grooves, and that will develop a list of manufacturers that

9    produce that caliber of firearm with those rifling specifications.

10    Q    Okay.  And are you familiar with a firearm commonly referred to as a

11    Mac-10?

12    A    I've heard of such a firearm and have fired that firearm before, or a

13    similar type of firearm.

14    Q    Okay.  I'm going to hand you what has previously been marked as

15    State's exhibit '139'.

16    MR. RION:  May we approach again, your

17    Honor?

18    THE COURT:  Okay.

19    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

20    the record, as follows.)

21    MR. RION:  Okay.  Now, I don't believe this

22    picture was given to me as discovery.  I think that now we're going into a guy

23    testifying about a whole area that I'm not even prepared, or could be

1   prepared, to cross examine him on as far as general characteristics and

2   which bullets came from. I think this is not fair.

3        MR. MILLER:   I think the foundation has

4   been laid that he has personal experience firing and is familiar with this

5   firearm. While, you know, there's not a reference to a Mac-10 in his report he

6   can certainly testify that in his occupation he has fired this firearm, is familiar

7   with the firearm, and this is what the firearm looks like in terms of a Mac-10.

8        Terri, if you have anything to add, go ahead.

9        MRS. KOHLRIESER:   We did previously

10   use this with Carlotta Williams.  You've seen it.

11        MR. RION:   Okay.  It was put up without

12   me seeing it beforehand.  It was not shown to me before it was displayed to

13   the jury and I was surprised by it.  I've never seen this picture before.  I've

14   never -- there's no report this is, or, that Carlotta thinks that it was this type of

15   weapon.  This is all new.

16        MR. MILLER:   Joey Moore.

17        MR. RION:   I know what Joey Moore says.

18   But, Carlotta didn't say that.  For him to testify about some type of, or, what

19   type of weapons are consistent with the rifling thing, well, frankly this is an

20   area of expertise.  It's not in his report.  It's not fair to go into it at this point.

21        MRS. KOHLRIESER:   We have to give a general

22   nature - it's not specific things - we have to give a general nature of his report.

23   He's a firearms expert.  As far as this goes, at the beginning of trial, on 9-8-15

1    before we even brought a juror in, I handed Mr. Rion a copy of the exhibit list,

2    which you, yourself, have before you, Judge, and if you look at State's exhibit

3    '139' it's listed 'photo of Mac-10'.

4                MR. MILLER:  In addition, Joey Moore, I

5    believe, in one of his recorded statements references specifically a Mac-10.

6    So, the Mac-10 itself is not something new to Mr. Rion in that sense.  There

7    are references to it.

8                MR. RION:  It is from an expert point of

9    view and it is from credible witnesses like Carlotta Williams.  So, I object.

10               THE COURT:  Okay.  Objection is

11   overruled.  I'll allow it.  Exception is noted.

12   (WHEREUPON, Court continued on the record, as follows.)

13               THE COURT:  Go ahead.

14   Q.  Sorry.  Let's try it again.  State's exhibit '139'.  Will you take a look at

15   that?  Are you familiar in general with what type of thing is depicted in State's

16   exhibit '139'?

17   A.  That firearm is consistent in style and appearance with what's

18   described as a Mac-10 style of firearm.

19   Q.  Okay.  When you say the style, and I believe I showed you State's

20   exhibit '119', the Glock that you actually tested; correct?

21   A.  Yes, ma'am.

22   Q.  How is that style different?

23   A.  Ultimately you're going to achieve the same thing.  The main difference

1   is that instead of a slide it has a bolt with a bolt handle, a small knob, on top

2   of it.  So, instead of pulling the slide rearward you pull the knob rearward and

3   it's going to pull the bullet back.  That's going to cock an internal hammer in

4   this firearm and then the bullets would be in a forward path and it's going to

5   similarly take the next round in the magazine and feed it into the chamber.

6   Pulling the trigger is going to release the hammer, which is going to strike the

7   firing pin, igniting the cartridge.  That's how it operates.  Similarly, it's going to

8   cause the bullet to travel rearward and automatically extracting or ejecting the

9   cartridge case and then on its forward path the bullet will remove the next

10  round from the magazine into the chamber.

11  Q   Okay.  Now, does it appear the grip style is different here?

12  A   Yes, ma'am.

13  Q   Okay.  And when I say that, between '139' and '119'.  The same thing,

14  I guess the nozzle of the gun, and I don't know if that's the right word, but the

15  front of the gun where the bullet actually comes out?

16  A   The muzzle under the barrel.

17  Q   The muzzle?  Thank you.  I knew that wasn't the right

18  word.  But, the muzzle end of the gun?

19  A   Yes, ma'am.

20  Q   They're slightly different?

21  A   On a Mac-10 style the muzzle is protruding a little bit, whereas on the

22  semi-automatic pistol, the Glock pictured here, is almost flush with the front

23  end of the pistol.

1177

1    Q.   I'm putting up '139' and '119'.  Is this what you're talking about - the

2    muzzle sticking out more on '139' than it is in '119' here?

3    A.   Yes, ma'am.

4    Q.   And in 2009 was there any kind of Mac-10 that could have fired State's

5    exhibits '68' through '71'?

6    A.   In reviewing Todd Wharton's report and notes and Heather's report

7    and notes there was a candidate of that Mac-10 style of weapon that was on

8    the list generated by the G.R.C.

9    Q.   Do you remember the name of that?

10         MR. RION:  Objection.

11         THE COURT:  Overruled.  Go ahead.

12    A.   There was Masterpiece Arms.  They produce a similar style weapon as

13    a Mac-10.  Also, there was Cobray.  They have changed names several

14    times.  So, they appear multiple times, but they're the same manufacturer.

15    Q.   Okay.

16         MRS. KOHLRIESER:  Just a moment.

17         (WHEREUPON, Court went off the record briefly.)

18    Q.   All right.  I apologize.  In State's exhibits '70-A', '70-B' and '71', are

19    they the same bullet type as in State's exhibit '129', the box of Winchester

20    ammo.?  By that I mean, I guess, the hollow point versus the full metal jacket.

21    A.   They're a full metal jacket, as was the box of ammunition.

22    Q.   Okay.

23         MRS. KOHLRIESER:  No further questions

1    at this time, your Honor.

2    THE COURT:  Okay.  Cross examination?

3    MR. RION:  Can we approach, your

4    Honor?

5    THE COURT:  Yea.

6    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

7    the record, as follows.)

8    MR. RION:  I'd like to at least break for the

9    evening given the surprise of the disclosure.

10    MR. MILLER:  I didn't hear him.

11    THE COURT:  He wants to break for the

12    evening based upon the picture of the Mac-10.

13    MR. RION:  With regard to the rifling issue

14    that they're talking about.  I mean, this is brand new to me.  So, the idea that

15    there's testimony about the consistency of a Mac-10 rifling in this case is not

16    disclosed in his report and I'm not prepared.

17    MR. MILLER:  Judge, the rifling issue is not

18    the -- I mean, that is the subject of the report.  I mean, that's how they

19    determine -- I think it's pretty clear that's how they determine, for example,

20    that the Glock wasn't the gun used.  So, rifling is -- I mean, that's not their job

21    to --

22    MR. RION:  No.  The report says what it's

23    not.  It doesn't say what it is.  Now he's going a whole other way with this and

1    this is a whole other set of testimony that, frankly, I'm not prepared for and I

2    don't know if I can be prepared for by tomorrow.

3              MRS. KOHLRIESER:  Your Honor?

4              MR. RION:  But, any way, at least I'm

5    asking for us to break for the evening.

6              MRS. KOHLRIESER:  The State doesn't

7    have a problem with breaking for the evening to give him time to prepare.  I

8    do want to address just a couple of things on the timeliness issue.

9              MR. RION:  We can do that outside the

10   presence of the jury if we're going to break.

11             MRS. KOHLRIESER:  Fine.

12             THE COURT:  Okay.

13   (WHEREUPON, Court continued on the record, as follows.)

14             THE COURT:  We'll take a -- we'll take a

15   short break here, ladies and gentlemen.  I have to speak with counsel.

16   Instead of doing the whispering thing we're going to give you a break.  Stay

17   tuned.  Don't go anywhere too far.  Remember the admonitions.  Don't

18   discuss the case among yourselves or formulate or express any

19   opinions.  Stay close to the jury room and we'll let you know where we're

20   going to go.  Okay?  The jury will be excused.  Mr. Kramer, too, you can step

21   down from the witness stand.  We'll have you step out in the hall and wait.

22   Okay?

23   (WHEREUPON, jury and witness were excused from the Courtroom.)

1      THE COURT: The jurors have been

2   excused. It's now a little after four o'clock in the afternoon. Mr. Rion, maybe

3   you would just go over quickly, if you can, I think we had most of it on the

4   record before at the Bench conference, but you're asking to recess for the

5   evening and before your cross examination?

6      MR. RION: Where's that report?

7      MRS. KOHLRIESER: It's up there maybe.

8   Sorry. This is a copy of it. But, no, it should be up there unless he walked

9   away with it. I have a copy of it. I don't have a problem. Tony, will you go

10   check with him? Did you find it, Jon?

11      MR. RION: I'll refer to the copy of the

12   report.

13      THE COURT: Okay. I'm just trying to find,

14   well, what number was that?

15      MRS. KOHLRIESER: '138', I believe, your

16   Honor.

17      THE COURT: Okay. All right.

18      MR. RION: Your Honor, at this point I

19   think I have to ask for a mistrial and I'll do so on two bases. Number one, the

20   report that's dated August, 2015, clearly not within the realm of deadlines for

21   discovery under Rule 16, was provided. It was conveyed and believed by the

22   defense that this expert was simply filling in the shoes of prior experts who did

23   work in 2009 - a report by Todd Wharton, which I will need to mark so the

1    Court has that exhibit.

2        THE COURT:  You had Wharton's report,

3    previous report, and was there a previous report from a Williams?

4        MR. MILLER:  Heather Williams.

5        THE COURT:  The defense had both of

6    those?

7        MR. MILLER:  Yes.  Absolutely.

8        MR. RION:  We did?

9        MRS. KOHLRIESER:  Uh-huh.  And

10   they're identical.

11       MR. RION:  And I will submit -- well, are we

12   on 'FF'?  Is that where we are?  I'm going to make this 'GG'.

13       THE COURT:  Well, you had 'FF', but you

14   withdrew it.

15       MR. RION:  Okay.  So, I'll make this 'FF'.

16       THE COURT:  Congleton's report was just

17   a duplicate.  You withdrew that.  'FF' would be Wharton's?

18       MR. RION:  Yes, your Honor.

19       THE COURT:  Okay.

20       MR. RION:  I'll submit that so it's provided.

21       Your Honor, this witness is now attempting to go into -- those reports

22   essentially state three things.  They state that the bullets found at the scene

23   were fired from the same weapon, that the shell casings also came from the

1 same gun, and that neither of those bullets nor those casings are the nine

2 millimeter found at Mr. Carter's house. That's what the report shows. Now,

3 today, for the first time, when Carlotta Williams testified the State puts an

4 image of a Mac-10 on the screen. The picture had not been disclosed to

5 defense counsel prior to today. It was not shown to counsel before it was

6 displayed to the jury. By the time it was in front of the jury it was too late to

7 undo the effect of it. So, now this witness wants to come in and have a whole

8 opinion as to the consistency of a Mac-10 to their grooves, to the rifling of

9 what was found at the scene, of the bullets found at the scene. I think -- well,

10 that's clearly what he has been testifying to.

11 He also testified just now that in reviewing Wharton's report there is

12 some mention to Mac-10's in the report and that there are various things. In

13 looking at Wharton's report I don't see any mention of Mac-10's being

14 consistent with this.

15 I'll tell you, your Honor, this comes as a complete surprise for a series

16 of reasons. Carlotta Williams never testified or gave statements to the police

17 in reference to a Mac-10 ever. There's been no disclosure by the State. If

18 that, in fact, if they had a conversation with her, or an interview with her to

19 that effect, it's unknown to the defense. Joey Moore clearly testified to it, but I

20 don't see Joey Moore as being a credible witness. This comes as a complete

21 surprise. It's a complete surprise. Frankly, --

22 THE COURT: Well, did you have Joey

23 Moore's -- you had Joey Moore's statements all along. You knew he might --

1   MR. RION:  Joey Moore stated that a

2   Mac-10 -- the original statement was something about they didn't find a

3   Mac-10 or something to that effect.  That's the only reference about a Mac-10

4   in this case.  Now, frankly, if you look at all of the detective's testimony - I'm

5   sorry - the detective's statements throughout, and I believe it goes to Carlotta

6   Williams and others, I'm going to look tonight, but I think the testimony, the

7   evidence, gained by Detective Clark says that it was a silver and black nine

8   millimeter handgun, which would be inconsistent with a Mac-10.  So, the

9   whole -- I mean, he states on multiple occasions, Detective Clark does, I'm

10  looking for a silver and black nine millimeter'.  He says that to Joey Moore in

11  his testimony, or, in his taped statements.  The whole idea that now we're

12  going into, that we're going to have an expert testify as to the consistency of a

13  Mac-10 to the rifling and grooving is not in his report.  I haven't spent a

14  second preparing for it and, frankly, I wasn't put on notice of it.  This report,

15  generated in August of 2015, does not deal with this issue whatsoever.  It's

16  an entire other area.  So, I just think it's -- I don't know how I can effectively

17  cross examine this witness on this issue given the scope that the report

18  indicates is what the areas that he's going into are.  I don't know how to

19  resolve that within a night's study.

20  THE COURT:  Response from the State?

21  MRS. KOHLRIESER:  Yes, your Honor.

22  Number one, as to the timeliness of Mr. Kramer's report, I have in e-discovery

23  it was placed in Mr.., well, it's kept as Mr. Barbado, who was on this case

1    previously with Mr. Rion's office, but he left, and the discovery has always

2    been given to that and my understanding was that was an agreement with Mr.

3    Rion, on August 11th, 2015.  I have it right here.  I can go into my e-discovery

4    and check it right away when it was placed in his box.  So, that would put the

5    twenty-one days at September 1st, a full week prior to trial.

6    Now, a couple of things.  As to the Mac-10 photo, he said it wasn't

7    shown to counsel prior to publishing it to the jury.  I apologize.  I don't know

8    whether Mr. Miller did that or not.  But, the same thing has happened with a

9    number of exhibits, both on Mr. Rion's part, my part, and Mr. Miller's part.

10    You sometimes get ahead of the game, so to speak.  However, as I was

11    noting up at the Bench, at the beginning of this trial I provided what I would

12    say was a nearly complete exhibit list.  I will admit I have added and Mr. Miller

13    has added a number of exhibits to this.  However, we had up to '158'.  Again,

14    as I prepared for different witnesses and things like that I would make, well,

15    like I guess with the pictures, '115-A' or '115-B'.  So, things have had to be

16    added.  However, what's always been on that list, and I gave the Court a copy

17    of that list, I gave Miss Thomas a copy of our proposed exhibit list, again, and

18    really I don't have to do it for defense counsel and I don't have to do it for the

19    Court.  But, especially with the sheer number of exhibits, we were just open

20    and upfront about what we're using here.  They have descriptions and they

21    have witnesses who are going to identify them listed next to them.  I would

22    specifically point out in looking at exhibit '139', which is typed on here, this

23    isn't an add on, this was originally on here on September 8th, it says 'Mac-10

1    photo, and it says 'Kramer/C. Williams'.  The only Williams that we have is

2    Carlotta Williams.  I believe Williams may be the name of one of his

3    witnesses.  But, in any event, that certainly was out there.  I actually made

4    attempts to show Mr. Rion various, well, particularly photographic evidence

5    and things like that in this case.  At any point he has been able to come to me

6    and say, 'hey, who are you calling next', or, 'hey, what are you going to do

7    next', or, 'what exhibit are you using', and that type of thing.  We have had,

8    with the exception of maybe a little stumble yesterday, which I have

9    apologized for, we have had this very open communication with each other, I

10   believe.  I've always told him, 'look, here's kind of where we're going with

11   this', or, 'here's probably going to be our next witness'.  I've even told him

12   when we may switch things up, like for instance after lunch today and that

13   type of thing, in an effort to disclose all those types of things.

14   I think it's quite clear in State's exhibit '138', his report and his C.V.,

15   both of which were given, we're talking about a firearms expert.  He's going to

16   testify about firearms.  I didn't specifically have him -- in his report he never

17   mentioned anything about how he goes about comparing those things or that

18   type of thing.  He doesn't explain rifling.  He doesn't explain casings.  He

19   doesn't explain all of that.  I mean, it's understood that firearms is what he's

20   going to be testifying about.

21   As to this issue of this black and silver gun, quite frankly Detective

22   Clark, and he will testify to this as well, was for quite awhile looking for, one of

23   the things that he was potentially looking for, and the reason it got out there is

1  because in statements that the defendant's son, whose name I believe is

2  Markelus Carter and he goes by Markie Carter, said, 'yea, my dad had a third

3  gun - he had two nine's'. He described that second nine that we didn't find in

4  the house as, I believe, a black and silver nine. I don't want to misrepresent.

5  So, that was there. However, Joey Moore, in his statement, and if the Court

6  wants a copy of it somewhere around here and I'll be happy to give it

7  to you, he mentions in one of his initial, well, I think in his initial contact with

8  Detective Clark that 'my Mac-10 was broken down in parts - they didn't find it'.

9  That's the nature of the Mac-10. What happens when, you know, as we

10  begin prepping for trial and things like that and we're really getting, you know,

11  aggressive, so to speak, and we're sitting down with everybody and, you

12  know, Detective Clark, well, his brain can only go so much, and Mr. Miller and

13  myself, we, you know, again, we're trying to think like the defense and what

14  angles can they come at and that type of thing and we talk to them and we

15  ask them, you know, to tell us what they know and we ask them various

16  questions and that's when Carlotta discloses about this Mac-10. I believe it

17  was a simple question Mr. Miller had about 'have you ever seen him with

18  guns yourself'. Then she described it in the whole nature as you heard her

19  testimony.

20  What I would note here as to Joey Moore, Carlotta Williams, and Mr.

21  Kramer himself is that this defendant, although he has privately retained

22  counsel, has sought funds for Court monies to get investigators. He's got

23  investigators. I personally met three of them. We've heard from numerous

1   witnesses about the investigators repeatedly coming out to their house.  I
2   believe one of those investigators is a process server - perhaps someone
3   who works for Mr. Rion's office.  But, again, lots of witnesses coming to us
4   about these investigators.  You know, Judge, we talked about this in
5   chambers about how they're representing themselves or what not and those
6   issues.  They have been beating feet.  To their credit, they have been going
7   every which way talking to people.  We've always disclosed Joey Moore's
8   name.  We've always disclosed Carlotta Williams name.  Todd Wharton was
9   initially known.  Then we went to Heather Williams.  It was only upon Heather
10  Williams becoming gravely ill that Kevin Kramer was involved.
11          THE COURT:  Let me stop you there and
12  I'll let you continue because I thought Mr. Kramer had mentioned from either
13  Wharton or Williams that they generated a list - and I forget what he called it -
14  but, it was like a G.R.S. or some registry.  Is that actually something that
15  exists that either Wharton or Williams generated as a list of candidates and
16  was that provided to the defense?
17          MRS. KOHLRIESER:  Your Honor, I'm
18  going to apologize for this part, if you want Mr. Kramer to come in he can.  My
19  understanding of that is it's kind of like their laboratory notes that they do.
20          THE COURT:  Whatever it is, does it exist,
21  and was that part of either Wharton's or Williams?
22          MRS. KOHLRIESER:  I don't know what he
23  means by generated.  I don't know if it was printed off or something like that.

1188

1    It wasn't -- I don't believe, and Mr. Miller is going to check, again, but with the

2    extensive discovery and everything that I've gone through I don't believe that

3    was a list that was provided to our office for us to then provide in discovery.

4    Mr. Miller's not quite sure. He's looking. He doesn't think it was, either. But,

5    that was sort of like a laboratory note.

6    THE COURT:  But, isn't that basically

7    Kramer saying this is a candidate for these casings because it's on this list

8    that was somehow created?

9    MRS. KOHLRIESER:  Yes.  I would also

10   reveal to the Court and to Mr. Rion that, again, if you question him and things

11   like that, well, I believe there are a hundred and thirty some candidates on

12   that list.  So, this purported damage --

13   THE COURT:  Well, I just want to know if

14   that list exists either --

15   MRS. KOHLRIESER:  I don't know if it's a

16   list on a computer or if it's a list that's actually been printed.

17   THE COURT:  If it's a list on a computer

18   perhaps it can be printed off.  But, you're representing --

19   MRS. KOHLRIESER:  Oh, I'm sure he can

20   access it through B.C.I. stuff.

21   THE COURT:  But, you don't know --

22   you're saying that you don't think that's been provided before?

23   MRS. KOHLRIESER:  I really don't think

1 so, your Honor. It was only, again, when we sat down with Mr. Kramer and

2 we were talking about things, and we talked to Carlotta Williams and we had

3 Joey Moore's report, that that was one of the things that we asked him about.

4 Like I said, I believe -- well, I know it's over a hundred, but I want to say it's

5 like a hundred and twenty something or a hundred and thirty something guns

6 and this is just one of them. But, with that said, --

7 THE COURT: Okay. But, you don't have

8 a hundred and twenty pictures of guns. You have the picture of one and

9 that's apparently on that list; right?

10 MRS. KOHLRIESER: Yes. And, again,

11 that goes to Carlotta Williams and what she was saying she had seen

12 something similar to.

13 THE COURT: And nothing in Carlotta

14 Williams' prior statements that were provided in discovery was there mention

15 or a description of a Mac-10?

16 MRS. KOHLRIESER: No. We didn't know

17 that, either, your Honor. At any point she had not revealed that. Again, I

18 don't know what was asked of her. It was simply in trial prep. within the last

19 week or two that, again, Mr. Miller just casually said, 'hey, have you ever seen

20 him with a gun'.

21 MR. MILLER: It was a question that Mr.

22 Rion and/or his associates could have asked her. They've met with her a

23 number of times.

1   MRS. KOHLRIESER:  Yea.  It was just,
2   you know, Mr. Miller saying, 'hey, by the way, have you ever seen him with a
3   gun'.  Again, we didn't know if she was going to say 'yes' or she was going to
4   say 'no'.
5                   MR. MILLER:  It was just a natural trial
6   prep. question given Mr. Moore's testimony.
7                   MRS. KOHLRIESER:  In any event, your
8   Honor, I think a mistrial is an extreme step.  Number one, I don't think we've
9   violated the discovery rules at all or that type of thing.  The picture of the
10  Mac-10 hasn't actually been admitted as an exhibit yet.  It's been shown and
11  that type of thing.  But, in the scheme of things this is one part of it and it's not
12  outside of his realm of expertise or what's expected of him to testify.  I just
13  think the extreme measure of a mistrial in all the lines of possible sanctions,
14  should you think one is necessary here, which again the State would think
15  not, and I think there's case law that says the least prejudicial one, so to
16  speak, is what the Court needs to do, but I would even submit to you that we
17  haven't violated discovery much less warrant a mistrial, your Honor.
18                  THE COURT:  Okay.  Quickly, final word,
19  Mr. Rion, since it was your motion.
20                  MR. RION:  Your Honor, again, expert
21  reports are created for a reason.  They're created so that both sides have the
22  ability to not only prepare and gain the knowledge they would need to cross
23  examine, but so that they can hire experts that they would need for those

1  various issues.  Whether this is -- I mean, he talks about a polygonal pattern

2  as opposed to six grooves and this type of stuff.  This is not something I can

3  learn in a night.  On top of that, I'm going to need an expert now to see if, in

4  fact, what's being said is true.  On top of that, I mean, the State clearly knows

5  that there was a list of -- well, she listed how many different guns were on that

6  list - so, she's seen this list - to be able to refer to what Wharton was talking

7  about on information and underlying data that we don't have and have never

8  had.  It's just --

9  MR. MILLER:  Your Honor?

10  THE COURT:  Just a minute.  Let him

11  finish.

12  MR. RION:  So, it goes to the expert's

13  report.  I'm telling you, I mean, our expert -- we hired an expert, a gunshot

14  expert.  I could have asked them to go into some of these issues.  We didn't

15  hire an expert on discharge of firearms, a firearms expert, because we didn't

16  realize that that was going to be an issue.  The report that we have was that

17  the guns aren't Markelus'.  So, there isn't really a lot of thought that needs to

18  go into that.  That where it seems is what the issue is in this case.  So, I'm

19  just not on notice that this issue is an issue and to effectively cross examine

20  and to prepare a defense of my own I don't see how I can do it.  I'm that

21  footed.

22  THE COURT:  Quickly.

23  MR. MILLER:  Your Honor, we're not

1   obligated to lay out our trial theory for the defense.  He has had access to

2   Kevin Kramer.  He has had access to all of the B.C.I. experts.  By way of

3   example, he has subpoenaed many B.C.I. people.  In addition to that he has

4   received, and now this is in the G.S.R. context, but he has requested and

5   received Matt Congleton's entire file.  The questions that were asked about

6   the Mac-10 of the B.C.I. folks were asked during trial preparation, the same

7   type of preparation that Mr. Rion could have gone through and the same

8   questions he could have asked.  Again, he's had unfettered access to B.C.I.

9   in the sense that, you know, he's received, well, in Matt Congleton's case the

10  entire case file from Matt Congleton, which was no problem.  But, you know,

11  again, we're not obligated to lay out our entire trial plan.

12          THE COURT:  Well, let me ask.  Criminal

13  Rule 16 says, "An expert witness for either side shall prepare a written report

14  summarizing the expert witness' testimony, findings, analysis, conclusions, or

15  opinions and shall include a summary of the expert's qualifications."  Has Mr.

16  Kramer done that?

17          MRS. KOHLRIESER:  Yes, your Honor.

18          THE COURT:  Obviously he did.

19          MRS. KOHLRIESER:  Yes.

20          THE COURT:  But, does that include --

21  does that summarize his testimony, his findings, his analysis, his conclusions,

22  or his opinions?

23          MR. MILLER:  It does summarize them in

1193

1    the sense that he makes --

2    THE COURT:  Does it contain anything

3    about his conclusions as to that picture of the Mac-10 and/or whether the

4    casings could have been fired from a Mac-10?

5    MR. MILLER:  He hasn't -- he hasn't made

6    a conclusion as to the picture.  This is an extension of his analysis and

7    opinions --

8    THE COURT:  But, what's his conclusion?

9    MRS. KOHLRIESER:  The only conclusion

10   he has is that --

11   MR. MILLER:  The rifling.

12   MRS. KOHLRIESER:  Beyond the fact that

13   these don't match, but the casings match each other and the bullets match

14   each other, his conclusion that's at issue at this point is him saying that

15   among the list of possible firearms that could have fired these bullets is, in

16   fact, a Mac-10, at least two of them by two different manufacturers.

17   THE COURT:  But, that's not summarized

18   in his report.

19   MR. MILLER:  It is in a sense because his

20   report talks about --

21   THE COURT:  How is it?  How is it

22   summarized in his report?  Show me how it is summarized in his report.

23   MR. MILLER:  Your Honor?  Here's how

1    it's summarized, so to speak.  On the second page, the third paragraph, I

2    guess from the bottom of this.

3        MRS. KOHLRIESER:  Do you have one,

4    your Honor?

5        MR. MILLER:  Do you have one, your

6    Honor?

7        THE COURT:  No.  That's a copy.  I don't

8    know where '138' is at.

9        MRS. KOHLRIESER:  Here it is, '138'.

10       MR. MILLER:  I'm going to put it up here,

11   Judge.

12       THE COURT:  Okay.  Second page?

13       MR. MILLER:  Do you see Kevin's

14   signature?

15       THE COURT:  Yep.

16       MR. MILLER:  Then, one, two, three

17   paragraphs up.  Okay?  "Examination of the three fired bullets," so on and so

18   forth, "revealed that they are consistent with nine millimeter Luger full metal

19   jacketed bullets fired from a conventional rifled barrel having six lands and six

20   grooves, right hand twist."  Okay?  Now, what he's testifying to in the sense of

21   the Mac-10 is that the Mac-10 is consistent with the markings, the six lands

22   and the six grooves, on those bullets.  So, in essence, his testimony is

23   summarized in there.  I guess in my mind, your Honor, the question when you

1   read that paragraph and you also read in the paragraph that the Glock did not

2   make those markings the natural question is what guns could have. That's

3   just an extension of the summary that's right there. I mean, we're not

4   concluding --

5   THE COURT: Then there are

6   approximately a hundred and twenty guns that could have made those?

7   MRS. KOHLRIESER: Yea. That's why I

8   guess I revealed that to, you know, to Mr. Rion, it's a hundred and twenty or a

9   hundred and thirty or something of that nature, because this can work out in

10   his benefit, too. Yea, that's on the list, but so are a hundred and twenty some

11   others.

12   THE COURT: Okay. Here's what we're

13   going to do. I want someone to get that -- well, I forget what he called it. I

14   thought it was G.R.S. or something.

15   MR. MILLER: The candidate list.

16   THE COURT: The candidate list?

17   MR. MILLER: We'll call it that.

18   THE COURT: Get that and disclose that to

19   the defense. We're going to break for the evening. I'll decide in the morning

20   whether to go forward with cross examination, or grant a further continuance,

21   or what have you. So, I'll take it under advisement. Get that much, at least,

22   and then we'll talk about it in the morning. Okay?

23   MRS. KOHLRIESER: Oh, we've got to

1   bring the jury back in.

2   THE COURT: Yea. We'll bring the jury

3   back in and I'll let them go for the day. At least get that much now. I'm

4   acting, again, under Criminal Rule 16, the regulation of discovery, section L,

5   in terms of all of the different things that are available in there. So, I'm going

6   to study on that. Let's bring the jury back in.

7   (WHEREUPON, jury was returned to the Courtroom.)

8   THE COURT: The jury has been brought

9   back into the Courtroom. Sorry, ladies and gentlemen, for the musical chairs

10  and keeping you in waiting. I'm not going to do that any more. We're going

11  to excuse you for the evening. An issue has come up that the Court has to

12  deal with. We'll deal with that and not try to use up any more of your valuable

13  time. So, we're going to break for the evening. We'll continue tomorrow.

14  We'll let you know where we're going tomorrow morning. Is eight forty-five

15  working for everybody? Let's start up at eight forty-five.

16  Remember the admonitions. Don't discuss the case with anyone,

17  including friends and family. Don't pay attention to any media accounts.

18  Don't do any independent research. Don't formulate or express any opinions

19  and have no contact with the parties involved.

20  Just make sure, as you've done all along, any issues that come up, or

21  concerns, let Monica know and she can convey those to me.

22  So, I want everybody else to stay here on the record. But, the jurors

23  will be excused until eight forty-five tomorrow morning. Okay? Have a good

1   evening.

2   (WHEREUPON, JURY EXCUSED FOR THE DAY AT 4:31 P.M.)

3   THE COURT:  The jury has left.  I just

4   want, again, to reiterate here.  I don't know if Mr. Kramer can do it here with --

5   MRS. KOHLRIESER:  We can have it in

6   two minutes, your Honor.

7   THE COURT:  Get that.  Provide that.  First

8   thing in the morning -- well, be here by eight-fifteen, a half hour ahead, and

9   we'll talk about this.  Get that.  I'm going to take your representation that you'll

10  get that, that candidate list that he's referred to, to Mr. Rion so Mr. Rion will at

11  least have that and see, or, study on that and then we'll talk in the morning as

12  to what we do next.  Okay?

13  So, there's a Motion for a Mistrial.  I think there's a Motion for a Mistrial

14  or, in the alternative, a continuance.  The first thing you wanted was to break

15  for the evening so you can study on this.  I'm granting that part of it.  But, we'll

16  go into this in more detail.  Be prepared by eight-fifteen.  Okay?  I'll be here

17  earlier.  If you get here at eight we can go in sooner than that.  But, I want to

18  take care of this before eight forty-five.

19  Okay.  See you tomorrow morning.

20  (WHEREUPON, COURT RECESSED FOR THE DAY AT 4:32 P.M.)

21

22  (VOLUME SIX CONCLUDED.)

23