FILED
COMMON PLEAS COURT

2016 MAR 23 PH 1:05

IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

CLERK OF COURTS
ALLEN COUNTY, OHIO

-------------------------------------------------------------------------------

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO. CR2014 0139 |
| Plaintiff | * | |
| -VS- | * | **TRANSCRIPT -**<br>JURY TRIAL |
| **MARKELUS Q. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

-------------------------------------------------------------------------------

## A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio 45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

**(VOLUME 7 OF 10)**

689 S.T.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# T A B L E   O F   C O N T E N T S

## (VOLUME 7 OF 10)

**WEDNESDAY, SEPTEMBER, 16, 2015** -

| | |
|---|---|
| COURT COMMENCED AT 8:40 A.M. | 1199 |
| CONTINUED DISCUSSION ON MOTION FOR MISTRIAL AND/OR MOTION FOR CONTINUANCE | 1201 |
| COURT RULING ON MOTION FOR MISTRIAL AND/OR MOTION FOR CONTINUANCE | 1235 |
| STATE'S TWENTY-FIFTH WITNESS CONTINUED - | |
| KEVIN KRAMER - RION | 1248 |
| - KOHLRIESER | 1262 |
| - RION | 1271 |
| STATE'S TWENTY-SIXTH WITNESS - | |
| SGT. CHARLES GODFREY - KOHLRIESER | 1272 |
| DISCUSSION REGARDING VIEWING OF STATE'S EXHIBIT '140' | 1299 |
| COURT RULING  REGARDING STATE'S EXHIBIT '140' | 1301 |
| DISCUSSION REGARDING MOTION TO EXCLUDE KEVIN KRAMER'S TESTIMONY REGARDING A MAC-10 WEAPON | 1301 |
| COURT RULING - MOTION TO EXCLUDE TESTIMONY OVERRULED | 1303 |
| STATE'S TWENTY-SIXTH WITNESS CONTINUED - | |
| SGT. CHARLES GODFREY - KOHLRIESER | 1304 |
| - RION | 1322 |
| - KOHLRIESER | 1334 |
| - RION | 1337 |

STATE'S TWENTY-SEVENTH WITNESS -
   SGT. CAMERON SMITH - MILLER    1339
                  - RION    1348
                  - MILLER    1353
                  - RION    1353

JURY EXCUSED FOR DAY AT 3:35 P.M.    1356

COURT RECESSED FOR DAY AT 3:37 P.M.    1358


**THURSDAY, SEPTEMBER 17, 2015** -

COURT COMMENCED AT 9:32 A.M.    1359

DISCUSSION REGARDING DEFENSE'S MOTION FOR
   MISTRIAL AND STATE'S MOTION TO PLAY VIDEO
   OF HOLDING CELL INCIDENT (EX. '173')    1359

COURT RULING - MOTION FOR MISTRIAL OVERRULED    1366

COURT RULING - MOTION TO PLAY HOLDING CELL
   INCIDENT (EX. '173') ALLOWED    1369

STATE'S TWENTY-EIGHTH WITNESS -
   STEPHEN UPHAM - MILLER    1375
             - RION    1395
             - MILLER    1406

DISCUSSION REGARDING STATE CALLING A
   POSSIBLE WITNESS    1412

COURT RULING - MATTER UNDER ADVISEMENT    1416

VOLUME SEVEN CONCLUDED    1417

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**NOTE:**  THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE.  SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS.

**MOTION FOR MISTRIAL --**

**STATE OF OHIO'S EXHIBITS -**

1-M - B.C.I. REPORT FROM TODD WHARTON DATED APRIL 20, 2009 AND CURRICULUM VITAE FOR TODD WHARTON;

2-M - B.C.I. REPORT FROM HEATHER A. WILLIAMS DATED FEBRUARY 26, 2014 AND CURRICULUM VITAE FOR HEATHER A. WILLIAMS;

3-M - EXHIBIT LIST - STATE OF OHIO -VS- MARKELUS CARTER, CASE NO. CR2014 0139;

4-M - LIMA POLICE DEPARTMENT POST INCIDENT INVESTIGATION REPORT;

**DEFENDANT'S EXHBITS -**

HH - GRC DATABASE SEARCH RESULTS BY CARTRIDGE - CANDIDATE LIST OF 131 TYPES OF FIREARMS;

HH-1 - MAUFACTURER RESULTS FOR FIREARMS;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**NOTE:** THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE. SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS. HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT
     436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED
     BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND
     HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED
     BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436
     MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
     POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
     POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT
     BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM (ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFEL IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSCT9 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT 436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
HEAD/NECK;

## DEFENDANT'S EXHIBITS -

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET
AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET,
SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN
STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH
BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH
BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE
IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON
MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING
AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH WITH CAMOUFLAGE
CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT
   122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - **(NOT ADMITTED BY
   COURT)**;

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING
   AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN
    STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY
    CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE
    NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A.
    MOORE;

DD - JUDGMENT ENTRY ON SENTENCING  IN STATE OF OHIO -VS-
    JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R.
    FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON **(WITHDRAWN BY THE
    DEFENSE)**;

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS-
    STEPHEN UPHAM, LUCAS CO. CASE NO.
    G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING
FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR
VICKIE BARTHOLOMEW;

## COURT'S EXHIBITS -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND
STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW)
BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED
A.C.S.O. OFFENSE REPORTS;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

**WEDNESDAY, SEPTEMBER 16, 2015**

2

**8:40 A.M.**

3

4          THE COURT:   Okay.  The record should

5   reflect that today is the 16th day of September, 2015.  We are reconvening in

6   Case Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The

7   defendant is present in Court with his attorney.  The State is present.  The

8   jurors are not in the Courtroom.  They weren't due here just yet.  We are a

9   little bit behind where I thought we would be because I had some other

10  matters.  But, nonetheless, we'll give full consideration to the issue that's

11  before the Court here.

12          I just realized -- oh, never mind.  I thought I left something in my

13  chambers.  The record will show what was discussed yesterday on the 15th

14  right at the end of the day after the direct examination of the State's witness,

15  Kevin Kramer.  There was an oral motion and we had a bit of a discussion

16  and the Court left it with taking the matter under advisement, allowing the

17  parties to prepare to discuss it a little further this morning.

18          I will note for the record that it had been brought to my attention that

19  Mr. Rion has filed a written Motion, or at least there is a written Motion for

20  Mistrial.  I know we checked with the Clerk's Office.  I don't know if the Clerk's

21  Office has gotten it.  We gave the Clerk's Office a copy that we got over the

22  fax and I think they're going to go ahead and file-stamp that.  But, just for the

23  record we'll note that there is a written Motion for Mistrial.  I just received it

1   and I haven't read it through.  I would like to take a few minutes.  We got the

2   State a copy, too.  So, let's just take a quick few minutes.  We can go off the

3   record.  I'm going to review the memorandum that's attached to the Motion

4   and then we'll come back on the record.  Okay?

5   (WHEREUPON, Court went off the record briefly.)

6                THE COURT:  All right.  We're back on the

7   record.  The Court has reviewed the written Motion for Mistrial and the

8   memorandum supporting that.  I will note for the record, too, because

9   obviously we were all aware that there would be some issues, the Court has

10   also done some independent research.

11          Did the State have a chance to review the defense's written Motion --

12             MRS. KOHLRIESER:  Yes, your Honor.

13             THE COURT:   -- sufficient enough that

14   you'll be prepared to respond now?  I know we had some discussions

15   yesterday.  I know there's a written Motion.  It is part of the record now.  I'll

16   give each side an opportunity to reiterate or add to -- I don't want the whole

17   argument again.  We don't need you to read your memorandum, Mr. Rion.  I

18   mean, I know -- I think I've got the basis of it.  I'm going to give you an

19   opportunity because I think the Court is required to have an inquiry here.  So,

20   I may have some questions.  So, go ahead.  It is the defense's motion.  If

21   there's anything additional you want to say that's not already been said

22   yesterday, or that you haven't put in your written Motion, if you just want to

23   maybe hit your highlights or add to anything that you haven't already put in

1   writing or on the record.

2                        MR. RION:   Your Honor, I think at this point

3   I would need to call the prosecutor to the stand on the issue of -- well, this

4   Proby case that came out just two weeks ago seems to lay out the standard

5   fairly clearly.  There's a three prong test that deals with part of Rule 16

6   violations.  The Court does not have, I don't think, the report that was utilized

7   by the expert witness for his testimony as it relates to the Mac-10 that was

8   provided to us after direct examination yesterday.  I think that should be part

9   of the record because the Court needs to see how long they've had this and

10  what the document actually shows.  But, I think it's relevant for the Court to

11  know how long the prosecutors have known of this document and the

12  information contained therein and/or obviously she's subject to the knowledge

13  of her witnesses.

14                        THE COURT:   Yea, I'd like to see that.  I'd

15  also -- I know yesterday I was shown, obviously, Mr. Kramer's report that was

16  made an exhibit.  I think there was a defense exhibit --

17                        MRS. KOHLRIESER:   I have three State's

18  exhibits, your Honor.

19                        THE COURT:   -- of Mr. Wharton's report.  I

20  don't know if we ever -- there was a Williams.  I don't know if I ever saw a

21  Williams report.  Do you have that?

22                        MRS. KOHLRIESER:   I have all three

23  reports.  I was planning to --

1    THE COURT:   And then is there something

2    additional because we talked about this list of possible candidate firearms.  Is

3    that what you're referring to?

4    MR. RION:   Well, I think, or what I've been

5    able to determine what happened is that at least as early as February 26th of

6    2014 --

7    THE COURT:   That's what you've got in

8    your Motion; yea.

9    MR. RION:   -- B.C.I. conducted an analysis

10   and reached some conclusions.  Essentially what they did is they entered into

11   a data base certain findings, or, certain measurements and from those

12   measurements then compared those measurements against an F.B.I. list and

13   then drew conclusions as to weapons that would be consistent given those

14   measurements and given those findings to reach their conclusion which, after

15   analysis, they testified to.  So, that's I think what this --

16   THE COURT:   If we can, let's make that an

17   exhibit.

18   MR. RION:   I'll need a copy because this is

19   the only one I have.  This is Defendant's exhibit 'HH'.

20   THE COURT:   It's got the punch hole

21   there.  Is that the G.R.S. data base?  Is that what he called it?

22   MRS. KOHLRIESER:   G.R.C. or something

23   like that.

1    THE COURT:  G.R.C.?  The punch hole is

2    right over the letters.  I remember Mr. Kramer saying something about a G.R.

3    something or other data base.  Well, why don't we go ahead.  Monica, can

4    you make a copy?  Do you guys have -- does the State have a copy?

5    MRS. KOHLRIESER:  Yes.  We provided

6    that to Mr. Rion.

7    THE COURT:  Make a copy.

8    BAILIFF:  One?

9    THE COURT:  Yea, just one.

10    MR. RION:  I'll state that in addition last

11    night, given the raising of this issue, I was able to contact an expert who

12    currently is, though he's stationed close to here, he was in Virginia.  I couldn't

13    figure out if he was there on a case or there on vacation.  He indicated that

14    the measurements that were utilized to come up with the State's conclusion in

15    this, in his opinion, may be overly broad.  In other words, you'll see in

16    Defense exhibit 'HH' that there is a range from point zero seven one or so to

17    point zero eight nine.

18    THE COURT:  Okay.  I'll keep the one

19    that's got the green evidence sticker.  I'll give you the copy.  Let me ask, in

20    terms of making an inquiry here, who was the expert?

21    MRS. KOHLRIESER:  Todd Wharton.

22    THE COURT:  No.  The one you

23    contacted.

1     MRS. KOHLRIESER:  Oh, his?  Sorry.

2     MR. RION:   The ballistics expert, his name

3   is David Townsend.

4     MR. MILLER:  Your Honor, may --

5     THE COURT:  Just a second.  I'll give you

6   a chance.  Mr. Rion is going first here.  Was that listed -- was he listed as a

7   defense expert before?  Did you have a firearms expert before?

8     MR. RION:  We had a G.S.R. -- we had

9   contacted a G.S.R. expert, thinking that was going to be --

10     THE COURT:  Okay.  I saw that.  There

11   was a file -- there was something filed in there about getting a gunshot

12   residue expert.

13     MR. RION:  And then he was -- we actually

14   initially consulted with Mr. Townsend as related to G.S.R. and for various

15   reasons that I don't need to go into -- well, so we consulted with him as it

16   related to G.S.R.  We did not realize that there was a ballistics issue as it

17   relates to a conclusion as to a weapon and so we didn't inquire with him as

18   far as the ballistics issue.

19     THE COURT:  Let me ask you then again

20   as just a part of my consideration, did you inquire when you spoke to him last

21   night about his availability for the next couple of weeks?

22     MR. RION:  He told me that 'here's what

23   would be needed'.  You can see on State's exhibit, or, Defense exhibit 'HH'

1    that essentially there's some parameters.  There's some minimum land widths

2    of point zero seven one and maximum of point zero eight three and then

3    minimum groove widths of point zero nine seven and maximum of point one

4    oh nine.  In addition, which I'm not sure how it -- I don't know how these two

5    documents are connected since we both received them yesterday, but I'll also

6    give you 'HH-1'. 'HH-1' seems to be another thing, another document that

7    was utilized by the State's expert that deals with lands and grooves and

8    measurements, certain measurements, were assumed or calculated on the

9    top.  You can see on Defendant's exhibit 'HH' that it gives the minimum and

10   maximum land width and groove width and then from that draws certain

11   conclusions.  That's the information there that's in the data base.  This expert,

12   who I think he's nationally renowned, is of the belief that those measurements

13   are overly broad.  In other words, you can see on the top right the total hits,

14   the top right of the paper, of 'HH', it says 'total hits one thirty-one'.  I think he's

15   saying that there's a hundred and thirty-one types of weapons that could be,

16   or, that fit under the parameters that were put into the paperwork.  You can

17   also tell by looking at this front page that there's no -- you can also exclude

18   information by the shell casing itself.  In other words, the firing pin and the

19   way the casing, or the cartridge, is ejected from the mechanism can also

20   include or exclude.  It can narrow the list down if that was taken into

21   consideration.  In this case it looks like the data that was utilized to come up

22   with, well, did not include the firing pin or the cartridge into consideration for

23   the minimization of the list.  He said that he would have to look at the casings

1 and look at the bullets and do his own measurements to see if this list is

2 accurate.  So, I think it's more a question of his availability of when he gets

3 back from Virginia, which he wasn't able to, or, I wasn't able to pin that down.

4 But, secondly, he would need to then utilize the data that they utilized to see if

5 the conclusion is accurate or not.

6   I think what is very clear from this and, your Honor, if we use DNA as

7 an example, DNA is sort of similar to this.  You take certain measurements,

8 certain clinical findings, and then compare it against various data bases or

9 another base of information to then see if there is matches or not matches.  I

10 think that there's really very little difference between an opinion about the

11 match of a DNA and this.  It's just a different format.

12   In addition, it's my belief that he would testify that even given the

13 minimal information that he had that he would likely be able to determine

14 whether or not a Mac-10 would fit in this list or not if he were to look at it and I

15 think he was of the opinion from what we were able to provide to him, we

16 faxed him this list or e-mailed him this list yesterday, and thinking that he

17 would have contrary opinions.  So, it's not just a futile oh look at it and confirm

18 it's the same.  I think he would have serious concerns about whether or not

19 this list is, in fact, accurate.  I would be happy to explain it if the Court finds

20 that relevant.  But, he was of the opinion, and I was hoping to get a letter from

21 him this morning, I think it's generating as we speak, confirming that his

22 opinion would be that there's grave concern that this list should not include a

23 Mac-10.

1    So, that was what I was able to do within three or four hours last night

2    as far as consulting experts to look into it.  Your Honor, I have to frankly say

3    that is a very complex issue.  It's not simple.  It is of magnitude.  The <u>Proby</u>

4    case, which is out of Franklin County, which I didn't include there, but it lays

5    out the standard.  Essentially in that case here's what happened.  The

6    prosecutor put on a handwriting expert and after the expert testified it became

7    clear that his testimony was different than what his report was.  Defense

8    counsel objected.  But, in that case essentially there was a name that was,

9    that they were identifying for the handwriting sample, but in that sample the

10   expert actually changed his opinion to the benefit of the defendant and stated

11   that the first name he could not say was the handwriting of the person that

12   they were trying to compare it to, but the middle name is.  So, in that case the

13   Court inquired from defense counsel -- and then they asked the prosecutor,

14   'when did you find this out'.  The prosecutor said, "Well, I knew that he was

15   going to testify to that before he testified."  "Did you disclose it?"  "No."  So,

16   then he turns to defense counsel and says, "Look, there's a clear Rule 16

17   violation.  But, the third prong of the test is, 'are you prejudiced by this'."  In

18   that case the defense counsel had to admit that there was no prejudice really.

19   It was minute.  In this case had we known that this analysis had been done

20   and conclusions had been reached, maybe even back in February of 2014,

21   specifically as to a Mac-10, I'm prepared to proffer to this Court that we have

22   an expert that would be able to reach conclusions and so I believe those

23   conclusions would be of great bearing with what has been provided as of

1  yesterday to defense counsel.

2  It's also my belief that given the comments of the prosecutor yesterday

3  that the prosecutor knew that they were going into this area and they knew

4  that that information had not been disclosed.  Comments made by the

5  prosecutor to the effect of 'we don't have to tell defense counsel our entire

6  case' would be indicative that this was a trial strategy.  I'll add to that if the

7  Court notes that the picture of the Mac-10 was not provided in discovery.  It

8  had never been shown to defense counsel prior to yesterday.  Though there

9  may have been a reference in an exhibit list, well, frankly that was an exhibit

10  list and I assumed that it was going to deal with pictures that had already

11  been disclosed.

12  On top of that, I don't know if you know too much about a Mac-10, but

13  a Mac-10 is a fully automatic sub-machine gun.  It was created in the sixties.

14  MRS. KOHLRIESER:  No, it's not.

15  MR. RION:  Yes, it is.

16  MRS. KOHLRIESER:  No, it's not.

17  MR. MILLER:  No, it's not.

18  MR. RION:  Well, a Mac-10 is a fully

19  automatic sub-machine gun.  It was created in response to duplicate, I think,

20  an Uzi that was developed in Israel in the sixties.  A Mac-10 has very different

21  classifications and qualities than a semi-automatic nine millimeter pistol.  So,

22  the prosecutor said, "Well, you're on notice on this issue about a Mac-10."

23  When I heard Mac-10 I was thinking machine gun.  So, the testimony of Joey

1    Moore, or the statement of Joey Moore that there's a Mac-10, I can proffer to

2    this Court that every statement by the detective in the discovery, every single

3    one by this detective would indicate that they were looking for a silver and

4    black nine millimeter semi-automatic.  That's everyone that he asked for it.

5    On top of that, all the witnesses that we talked to are talking what they heard,

6    and the shots, and the pattern.  It was a semi-automatic.  It wasn't a

7    machine gun.  So, the idea that somehow I could anticipate that an expert

8    would be talking about a machine gun in trial is just beyond -- well, it would

9    take a lot of creative imagination to get to that point and I was just not on

10   notice of it.

11          I also submit, either under oath or if you take my proffer, that Defense

12   exhibit 'HH' was never provided.  If you read the expert reports in total the gist

13   of the report is that the weapons found in Mr. Carter's house were not those

14   that were utilized at the scene.  That's how the report reads if you read the

15   paragraphs in connection with each other.

16          This is a very -- this is turning out to be a very important factor, your

17   Honor.  I am prejudiced.  I am telling the Court though I worked until

18   eleven-thirty and woke up at three o'clock this morning, three forty-eight, to

19   continue to work to get prepared for today I am not in a position to cross

20   examine an expert witness about a Mac-10, the qualities of a Mac-10, or the

21   variations of a Mac-10 over time.  So, it will be an ineffective cross regardless

22   of how shoestringed together I can put it.  There's no other way to say it.

23          The only reason I would think that a prosecutor would have to testify

1    as it relates to the three prong test of when they were aware of this

2    information, when they were going to ask whether or not it was disclosed to

3    counsel, and I think maybe they can tell the Court.  But, those are the factors

4    that are very important for the Court's determination I think in this.

5                              THE COURT:   You had mentioned putting

6    a prosecutor on the stand.  You basically wanted to have these exhibits

7    identified and when they were disclosed?  Or, was there more information

8    that you wanted to get?

9                              MR. RION:   Let me pull up the three prong

10   test for you.

11                             THE COURT:   I've got it.  Number one -

12   whether the failure to disclose was a willful violation; whether foreknowledge

13   of the undisclosed material would have benefited the accused; whether the

14   accused was prejudiced.  Is that the same one you're talking about?

15                             MR. RION:   Yes.

16                             THE COURT:   That was originally, I think

17   in State -vs- Parson, 6 Ohio State 3d, 442.  I believe that's the same test that

18   they referred to in the Proby case.  Is that how you pronounce that?

19                             MR. RION:   Yes, your Honor, I believe.

20                             THE COURT:   I've read that case and I've

21   read some of these others.  I'm aware of that test.  I just want to -- I'm not

22   trying to limit you if there's something else you wanted to get out of the

23   prosecutor.  I don't know if we need to put them on the stand, or maybe

1   they can make representations if you would indicate what you are trying to get

2   out of them.  We're all officers of the Court.  They can make representations, I

3   think would be the same.

4                       MR. RION:   Well, that would be --

5                       THE COURT:   You just got 'HH' and 'HH-1'

6   yesterday; correct?

7                       MR. RION:  Yes.

8                       THE COURT:   Is that correct from the

9   State?

10                      MRS. KOHLRIESER:   Your Honor, the

11  State would stipulate that 'HH' and 'HH-1' were provided yesterday after the

12  jury was sent home, in accordance with the Court's instructions.  Mr. Kramer

13  had them on him when he came to testify.  I asked Mr. Rion to hang on for

14  two minutes and I copied them and gave them to him.

15                      THE COURT:   Okay.  Now, is there

16  anything else you want from the prosecutor that maybe they'll stipulate to?  If

17  not, we can put them on the stand.

18                      MRS. KOHLRIESER:   We would also

19  stipulate that prior to yesterday we had not given these documents to Mr.

20  Rion.

21                      THE COURT:   Anything else that you

22  want?  I mean, you wanted to put her on the stand.  I'm just trying to see what

23  you were --

1    MR. RION:  Well, sure.  Sure.  I mean, we

2    can be informal, but I need to know when they had these documents or were

3    made aware of this expert's testimony.  That's important, I think.

4    THE COURT:  Fair enough.  Can you

5    answer that?

6    MRS. KOHLRIESER:  Yea.  Oh,

7    absolutely, your Honor.  We were made aware of these documents, -- well, I

8    don't recall the exact date.  I know I was on vacation the week of August 16th.

9    It was the week after that sometime that we went and met with Mr. Kramer up

10   at B.C.I. and spoke to him.  It was at that time, and I can't remember how the

11   discussion came up, but it was at that time where he said, "Oh, well, the list of

12   candidates," and we inquired, "what are you talking about," and he, again, in

13   his notes, had these.  I will also say that I didn't ask him for a copy of them at

14   that point.  He just said that, "Yes, there are Mac-10's on there."  I believe two

15   different ones he talked about at that time.  That's when we first became

16   aware of it.

17   I guess for purposes of the first prong, should a Court be looking at this

18   down the road some day, the State believed -- they weren't provided by B.C.I.

19   as part of its report.  We understood that these were part of B.C.I.'s notes that

20   they keep.  They reported out, and I don't want to get into that at this point.

21   We can certainly -- I have exhibits and things of that nature.  But, at any point

22   both myself and Mr. Miller, we discussed this, albeit in a very small fashion,

23   but never thought for a second that this was anything other than their lab

1  notes, which Criminal Rule 16 does not require us to give those notes.  We

2  thought it was a note that supported one of the findings contained later in the

3  report.  I do have some exhibits for the Court.  I don't know how you want to

4  handle this.

5          THE COURT:  Okay.  Well, I'll give you a

6  chance to respond.  Anything else that you want to inquire of the prosecutor?

7          MR. RION:  There was an exhibit that was

8  shown to the jury yesterday, a picture that's been purported to be a Mac-10.  I

9  think it needs to be very clear that that picture itself had not been provided to

10  defense counsel prior to being shown to the jury.  I think that needs to be

11  clear.  I'm not talking about the exhibit list.  I'm talking about the actual

12  picture.

13          MRS. KOHLRIESER:  Your Honor?  I

14  apologize.  Again, that was something that Mr. Miller found on the Internet,

15  basically what the style of a Mac-10 looks like, particularly when Carlotta

16  Williams had indicated in our trial prep. that he had this gun and things of that

17  nature, and then we found out, in fact, there's a Mac-10 on the list of possible

18  guns.  Quite frankly, through inadvertence, neither one of us gave that picture

19  to Mr. Rion prior to trial.  However, I will say, and again I'm going to mark it as

20  an exhibit, I provided him, albeit on the first day of trial, 9-8, the first time this

21  picture was used was 9-14 or 9-15, 9-15, sorry, yesterday, the days are

22  blending together, and I can't help it he assumed what it was.  It says 'photo

23  of Mac-10'.  So, there was disclosure given that we were going to be

1     introducing that photo.  Again, it wasn't that we were keeping it from him.  If

2     any time he said, 'hey, let me see State's exhibit '152', I would have showed

3     him '152'.  It wasn't some intentional thing done on our part in any way,

4     shape, or form.  We just didn't realize that we had not shown him a copy of

5     that.

6                  THE COURT:   All right.  Anything else you

7     want to inquire of the prosecutor's office?

8                  MR. RION:   For the record, when Carlotta

9     Williams was shown that document I'd like an acknowledgement that it had

10     not been, as with other exhibits where we've been fairly good, not perfect, but

11     fairly good with showing each other exhibits and I want an acknowledgement

12     that that Mac-10 picture was thrown on the screen in front of the jury before

13     counsel even was shown it before it was published.

14                  MRS. KOHLRIESER:   Your Honor, I can't

15     attest to that.

16                  MR. MILLER:   I'll attest to that because

17     Carlotta was my witness.  You know, I frankly don't recall whether I showed it

18     to Mr. Rion before I showed it to Carlotta.  The thing is, as Mr. Rion said, I

19     think everybody has tried in this trial to be, you know, while not perfect, has

20     tried to do that while handling exhibits, as in any other trial, but particularly

21     this one where we've got nearly two hundred exhibits or whatever and

22     sometimes that's not done.  Now, that was not some nefarious thing.  I will

23     note that when the picture was shown I don't recall Mr. Rion objecting to the

1   fact that he had not seen that particular photo.  It was not until Mr. Kramer

2   took the stand and was talking about a Mac-10 that Mr. Rion objected to any

3   use of this picture whatsoever which, by the way, was some, and, you know, I

4   don't know exactly how much time, but there was, well, I don't know if Mr.

5   Kramer was the next witness after --

6                                    MRS. KOHLRIESER:   Congleton was.

7                                    MR. MILLER:   There was another witness

8   after Miss Williams.  I believe it was Congleton and then Kramer.  So, some

9   hour or two hours, I don't know, but at least another witness testified before

10  there was any objection whatsoever.  It wasn't until, and I think this is

11  important, it wasn't until Mr. Kramer took the stand and began to talk about a

12  Mac-10 that, you know, there was any objection to the use of that picture

13  whatsoever.  For the record, it was an hour or so or longer before that was

14  done.

15                                   MR. RION:   Your Honor, once the picture

16  is shown -- I can explain the situation.  The jury has the picture on the big

17  screen.  They're looking at it.  The damage is done at that point.  I really don't

18  want to highlight it while we're up at side bar while they're sitting there and

19  looking at this picture of the Mac-10.  Had it been presented to me before it

20  was published to the jury I would have objected to it because it hadn't been --

21  I mean, I think another Rule 16 specifically states that exhibits have to be

22  disclosed to counsel before trial.  It seems rudimentary.  Even the Federal

23  Law allows for that and the State of Ohio is far more.

1       The only thing I would add to it, and it's in my Motion, but there's

2  almost a pattern here, Judge.  We have the late disclosure of the shell

3  casings from the England issue.  That's fine and we dealt with that and we

4  don't need to make another record on it.  But, then that led to this chain of

5  custody issue.  You know, when we have a witness up and we believe we

6  have the chain of custody logs and that witness testifies to it and then

7  somebody else comes up and now we have more custody logs it really does

8  affect defense counsel's credibility to the jury.  When I argue a point given the

9  evidence as I know it and then the evidence changes the next day and now I

10  have to change my argument based upon now additional documents being

11  provided.  I get it that they're streaming in.  But, this simply goes to -- I mean,

12  this is an Aggravated Murder trial.  Mr. Carter can spend life without parole in

13  prison.  This isn't a traffic case where we're talking about a thirty-five dollar

14  fine.  The case, I'm telling you, from opening statements, to voir dire, to every

15  witness since, to this expert, would have been questioned and analyzed

16  differently if I had known what I believe to be a fully automatic sub-machine

17  gun was going to be the alleged murder weapon.  I get it that they don't have

18  to disclose strategy for purposes of lay witnesses.  But, for purposes of expert

19  witnesses I think it's a different standard.

20                          THE COURT:  All right.  Now, the State, do

21  you want to have a formal response?  I know we've gone back and forth a

22  little bit.

23                          MRS. KOHLRIESER:  Your Honor, I think

1   to fairly judge this case, this particular issue, I'm going to hand you a number

2   of exhibits.  I've marked it '1-M'.  I've dated it with today's date.  I've labeled it

3   'mistrial' just so we'd know what kind of motion we're talking about.  '2-M'.

4   Again, I've labeled it with today's date and 'mistrial' so we know what we're

5   talking about.  I'm showing them to Mr. Rion as we're discussing this right

6   now.  State's exhibit '3-M' and State's exhibit '4-M'.  I'll explain to the Court

7   what each of these exhibits are.

8         State's exhibit '1-M' is, I believe, 'FF', marked by the defendant.  That

9   is Todd Wharton's report.  If you look at the second page of Mr. Wharton's

10   report -- well, first off, the first page indicates findings and it has several

11   paragraphs.  The second page, then, the second full paragraph says --

12   excuse me, before I get to that let me point out this first full paragraph.

13   "Examination of the evidence bullets, submitted as items five, six, and seven,

14   revealed that they are nine millimeter Luger caliber, full metal jacketed

15   design, and fired from a barrel with conventional rifling consisting of six lands

16   and six grooves, right hand twist."  "The rifling specifications on the evidence

17   bullets," if you then go down to the second paragraph, "the rifling

18   specifications on the evidence bullets," and that's rifling specifications and not

19   anything about firing pin or anything like that - rifling specification - "on the

20   evidence bullets correspond to numerous brands of nine millimeter Luger

21   caliber semi-automatic firearms."  Now, despite what Mr. Rion may feel a

22   Mac-10 is, or believe a Mac-10 is, Kevin Kramer testified that a Mac-10 is a

23   semi-automatic handgun.  That's why it's included on that list.  I specifically

1    said, "Is a Mac-10 a possible weapon," or whatever my question was along

2    those lines, and he said, "Yes." Okay?  Referring to a semi-automatic

3    firearm. So, State's exhibit '1-M' was Todd Wharton's report. It was done

4    back in 2009. The date of his report is April 20th, 2009. The defendant was

5    indicted by the April Grand Jury of 2014. Discovery was given, including Mr.

6    Wharton's report, '1-M', on May 5th of 2014. It was placed in e-discovery.

7    Mr. Barbado, who was Mr. Rion's associate at the time and was co-counsel

8    on this case, signed up for it and things of that nature. I actually have my

9    secretary in the building if Mr. Rion does not want to acknowledge receipt of

10   that on May 5th of 2014.

11                                    MR. RION:  We acknowledge.  That's not

12   the issue.

13                                    MRS. KOHLRIESER:  Okay.  So, there's

14   that. So, again, that sentence right there says it corresponds to numerous

15   brands of nine millimeter Luger caliber semi-automatic firearms. That puts

16   him on notice that they could be talking about what brands it would

17   correspond to, which is exactly what Mr. Kramer did.

18                    Now, I would also note on this report is information regarding Todd

19   Wharton. We gave in discovery the fact that Todd Wharton was now at the

20   Miami-Dade County Sheriff's Officer in Florida and gave contact information

21   for him there. Then what happened, again, prior to the defendant being

22   indicted, if you look at State's exhibit '2-M' is Heather Williams report.

23                                    THE COURT:  I don't have '2-M'.

1                      MRS. KOHLRIESER:  Oh, I'm sorry.  I

2 walked off with them.  Sorry.  '2-M'.  I showed him all of these.  State's exhibit

3 '2-M' is the report of Heather Williams issued on February 26th, 2014.  Again,

4 Heather Williams' report was given in that same thing of discovery on May

5 5th, 2014.  Again, I have my secretary out there who does this to testify in that

6 regard if Mr. Rion does not want to acknowledge that.  If you look in her

7 findings she says, "The above listed items," which includes the ones we just

8 previously mentioned, "were re-examined and the findings concur with those

9 outlined in the report issued by Todd Wharton dated April 20th, 2009."  Again,

10 I remind you in '1-M', under findings, includes Todd Wharton's statement

11 about matches several guns.  Okay.  That's '2-M'.

12        '3-M'.

13                      THE COURT:  I don't have it.

14                      MRS. KOHLRIESER:  Again, I've already

15 showed this to Mr. Rion.  I gave him a copy.  I think he would acknowledge

16 receiving a copy of this on September 8th.  That was the exhibit list as we

17 intended it to be.  I think I pointed out to the Court, and I can't recall off the top

18 of my head what number that Mac-10 is now, '139' perhaps or something

19 along that line, --

20                      THE COURT:  '139'.

21                      MRS. KOHLRIESER:  Thank you.  Again,

22 it's listed 'photo of Mac-10'.

23        Then, lastly, I have State's exhibit '4-M'.  I apologize, but I only have a

1  highlighted -- we highlighted it for our purposes in cross examining, or,

2  excuse me, in doing the direct examination of Joey Moore yesterday. That, if

3  you'll notice, the date on that is from March 2nd of 2009. Again, that was a

4  report that was included in that discovery given to the defense on May 5th of

5  2014. If you'll look at the very bottom of that report -- well, maybe the next to

6  the last paragraph or the last paragraph - I apologize, I don't have a copy in

7  front of me, that was the only one I had in my file at the time - Joey Moore

8  specifically references hearing this defendant discussing a Mac-10.

9          Okay. Now, again, your Honor, I guess I would ask before I go on if

10  Mr. Rion, again, without having to testify, would acknowledge receipt of the

11  foregoing items that I just gave you, items '1-M, 2-M', '3-M', and '4-M'.

12                          MR. RION:  Yes, of course.

13                          THE COURT:  Mr. Rion?

14                          MR. RION:  Yes, that's right.

15                          MRS. KOHLRIESER:  On the respective

16  dates that I listed?

17                          MR. RION:  Sure.

18                          THE COURT:  Okay. One, two, and four

19  were in discovery and '3-M' was provided the day that trial started. That was

20  my understanding. Mrs. Kohlrieser; correct? '1-M', '2-M' and '4-M' were

21  provided in discovery and '3-M', the exhibit list, was provided the day the trial

22  started? Correct?

23                          MRS. KOHLRIESER:  Yes. Yes. One

1    other thing that Mr. Rion has addressed and, again, my secretary is here if

2    need be, was the timeliness of Mr. Kramer's report, which is State's exhibit

3    '138', I think.

4                                    MR. RION:  I'm not disputing that.

5                                    MRS. KOHLRIESER:  And that was on

6    August 11th.

7                                    MR. RION:  That's fine.

8                                    THE COURT:  Okay.

9                                    MRS. KOHLRIESER:  So, --

10                                   MR. RION:  But, I also would state that I

11   believe the Court set expert report deadlines prior to the Rule 16 deadline

12   timing.

13                                   MRS. KOHLRIESER:  You did set, I

14   believe, either a February 27th or a March 27th deadline way back when and

15   that's when we were having the April trial.  The State and the defense have

16   since then given all kinds of things back and forth, including his expert's

17   report on G.S.R.  So, with that said, -- and, again, also I had Mr. Kramer

18   explain, and we explained this to Mr. Rion awhile ago as well, why Kevin

19   Kramer was necessary.  I can get Heather Williams out of her death bed, if

20   necessary, and bring her in here to talk about her report.  I will fly Todd

21   Wharton from Miami here, if that's an issue.

22                                   THE COURT:  Okay.  How about we zero

23   in on the Motion for the Mistrial and whether you think a mistrial is appropriate

1   or not?

2                              MRS. KOHLRIESER:   Thank you.  All right.

3   So, here's the thing, your Honor.  If you look at, and I have a number of cases

4   that I brought for you, and I also provided these to Mr. Rion prior to going on

5   the record today, they are State -vs- Opp, 2014 Ohio 1138 out of the Third

6   District, State -vs- Fetty, 2012 Ohio 6127 out of the Eleventh District, and

7   State -vs- Proby, which I believe Mr. Rion has referenced, out of --

8                              THE COURT:  Franklin County.

9                              MRS. KOHLRIESER:   -- Franklin County.

10  Thank you.  It's 2015 Ohio 3364.  Now, what those cases discuss and, again,

11  under various factual circumstances, specifically about Rule 16(K), and the

12  purpose of the rule is, "To avoid unfair surprise by providing notice to the

13  defense and allowing the defense an opportunity to challenge the expert's

14  findings, analysis, or qualifications possibly with the support of an adverse

15  expert who could discredit the opinion after carefully reviewing the written

16  report."  Okay.  Now, he could have asked, again, on each of those reports

17  their names, the address there, and some of them have e-mails, phone

18  numbers and things like that.  These are all three professional witnesses.

19  Each and every one of them at any time would have spoken to him.  Again,

20  this Court has ruled time and time again and the Third District has upheld

21  time and time again about laboratory notes and things they use in reliance in

22  making their findings and conclusions and that they do not have to -- that's

23  not part of Rule 16.  The Court can order them to be given.  That's exactly

1   what happened in our G.S.R. instance.  Okay.  He wanted all - and I don't

2   know what they're called, I apologize - but, he basically wanted all these

3   G.S.R. notes and they were all given to him.  In looking at these various

4   reports of the experts - and, again, Kevin Kramer wasn't involved until late

5   July/early August in this case, this year - he could have at any time requested

6   additional information.  He could have called them on gone through line by

7   line in the report and said, "What's this mean?  What's this mean?  What are

8   you referring to here?  What kind of weapons are we talking about?"  At that

9   point I'm sure they would have said, "Oh, there's this," whatever it's called,

10  the G.R.C. or whatever it happens to be, and that type of thing.  If he wanted

11  that list we could have facilitated that.  Or, he could have filed a Court order

12  for that list and the Court could have compelled it or not, whatever you felt

13  was appropriate, or he could have subpoenaed it, just like he subpoenaed

14  other records in this case.  So, it's a part of the notes.  It's not something that

15  has to be given in Criminal Rule 16.

16        There wasn't any kind of unfair surprise.  Because Mr. Rion, or his

17  associate, or one of his many investigators who have spent many hours

18  researching this case, didn't go down that route - well, we can't help that.  It's

19  not our job to help that.  They've known all along that we intended to use Joey

20  Moore in this case.  They've known that.

21        Again, Carlotta Williams -- and I will grant you that a lot of what

22  Detective Clark did in this investigation didn't go towards that Mac-10.  But,

23  again, that doesn't somehow mean when other eyes go looking at it or things

1  of that nature that somehow now that's got to be some kind of a discovery

2  type thing.  I'm sure Mr. Rion's come up with all kinds of things that Detective

3  Clark didn't come up with as well.  Just because that wasn't in reports of

4  various things he's tracking down I can't help that he's hung his hat on

5  whatever theory he's hung his hat on.  There was ample time to address this

6  issue.

7      I would also note that the opinion is whether it came from this firearm.

8  The opinions rendered in this case were that the casings matched each other,

9  or, they were fired from the same weapon, I should say, and that the bullets

10  were fired from the same weapon.  Okay?  Not that the bullets were fired from

11  these casings or that type of thing, but that the bullets were fired from the

12  same weapon.  It's the bullets that have the rifling on them and it's the bullets

13  that can be fired from multiple types of weapons.  That's not an opinion.

14  What their rifling is, the six lands and six grooves and right twist type of thing,

15  that's a fact.  The opinion is whether they match each other.  The opinion is

16  whether they came from the firearm that was submitted.  All along Mr. Rion is

17  absolutely correct that we do not have the firearm in this case.  It's our

18  position that the defendant got rid of it somehow.  That's our position.  Okay?

19  So, we're not talking about some opinion that was hidden from him.  He

20  wasn't ambushed or thwarted in this investigation - he, being the defense - as

21  the language of those three cases that I gave you uses.  Again, there's no

22  unfair surprise here.  It's unfair.  Did he have the opportunity to pursue this?

23  Is he put on some kind of notice about this?  He absolutely, positively has

1   been in less than a month of the defendant being indicted he's been put on

2   notice of this.

3        Furthermore, as to the fact that the two guns found at the house

4   weren't the murder weapon, I don't think it would come as any kind of surprise

5   to the defense that the State would be interested in what all kinds of weapons

6   it could be then.  What are we talking about here?  That type of thing.  And,

7   that Kramer might have info. relevant to the types of weapons.  He's a

8   firearms expert.  As well as the Weapons Under Disability count.  Now, they

9   go to both the Aggravated Murder and the Weapons Under Disability.  Again,

10   just because he didn't make those connections in Joey Moore's statement

11   and the thing there, again, is not our fault.  As I said yesterday, you know, if

12   the expert can't go beyond the letter, the actual words of his report, then

13   there's no point in having him testify.  It's to explain that.  They're put on

14   notice about the summary of his findings.  You're given a summary of his

15   findings.  It doesn't say you have to list his findings.  I would liken it to, say,

16   DNA.  I think that's one of the examples that Mr. Rion used.  As this Court is

17   well aware from the numerous cases that we've had involving DNA, DNA is

18   determined by alleles, those fifteen points that you've seen the numbers are

19   twelve, thirteen, eleven, and all that kind of stuff.  I won't bore you with that.

20   But, again, that's not something that is required in discovery to give those

21   allele charts, even though they make them, and it's the basis for them making

22   their conclusion about whether they can be included in the profile or not.

23   Again, if they make a Motion to get those notes and the Court so rules, well,

1  then they can get those notes.  But, it's not required by 16 (K) and it doesn't

2  mean that the experts can't go into 'well, how can you say that it is'.  "Well,

3  look here.  This allele is this, and this allele is that."  That type of stuff.  So, it's

4  the same type of thing you have here.  It's a summary - not a script.  We have

5  given that time and time again.

6       As to, well, should the Court find that we have a discovery violation

7  here -- and, again, the only other discovery violation that's been present in

8  this case was the thing with the casings, the thing with England, that we've

9  already addressed.  I've already stated how that came about and what we did

10  in response to that and that type of thing.  I'm not going to go into that again.

11  Now, this.  Again, and I think Mr. Rion would acknowledge, and maybe he

12  already has and I missed it, throughout this as we were showing -- I mean,

13  Mr. Rion is into double letters already.  We have a hundred and seventy some

14  exhibits at this point.  As we do it we try to hand each other them.  Sometimes

15  in the moment when you're up there and doing it, well, it's not meant to

16  surprise him.  It's not meant to be 'ah ha, we're going to put this up here

17  without showing you that'.  I mean, there's been numerous things that he's

18  barely shown me and then flown up there with.  That's fine.  I'm not

19  complaining about it.  If I want to look at something further I'll go, 'hey, I'm

20  sorry, can I take a look at that'.  Again, as Mr. Miller was showing the exhibit

21  to the witness first and walking to the screen to put it up, he could have said,

22  'wait just a minute, let me see that', or something along those lines.  Again,

23  you'll see on that exhibit list that it specifically references that we're going to

1 show that to C. Williams.  The only C. Williams in this case is Carlotta

2 Williams.

3 Lastly, with the remedy.  Should this Court find there's a discovery

4 violation 16 (L), and all those cases talk about it, it's your discretion, using the

5 least restrictive sanction necessary to effectuate the result, which means

6 giving him time to look at it, granting a continuance, or a mistrial.  Again, first

7 off, I don't believe in any way, shape, or form, given all the documents I've

8 provided and the acknowledgements that have been made, that the State has

9 not complied with Rule 16 (K) first.  But, even if it has, the stuff that Mr. Rion

10 is talking about with the firing pin and things of that nature, well, the opinion

11 only goes to the rifling and the bullets and not the firing pin marks on the

12 casings.  The opinion goes to the rifling of the bullets, which is totally different.

13 We never said those bullets came out of those casings, or what have you.

14 So, that's what we're talking about here.  He's had every opportunity.

15 I do note that I find that that talismanic language that he just tried to

16 use as the ineffective assistance of counsel, again, is just beyond belief.  Mr.

17 Rion has gone above and beyond and crazy on this case.  I have seen

18 nothing but him and the people helping him in this case going full blast, full

19 on, catching things and doing things, talking to people, investigating things,

20 and working this case like a dog, for lack of a better term.  I've seen it first

21 hand.  I've seen his investigators out there, as I noted to the Court before.

22 So, to say that this one piece of this huge picture is so prejudicial that he's

23 rendering ineffective assistance of counsel or something of that nature is

1    preposterous and I think really it's just a talismanic use of the language.

2                                    THE COURT:   Okay.  Thank you.  Briefly,

3    Mr. Rion, any final response?

4                                    MR. RION:   Just briefly.  As it relates to the

5    last comment, I've told the Court I was put on surprise.  I would agree that I've

6    worked like a dog on this case, which would show or only prove why this was

7    a surprise to me.

8           We've asked for the G.S.R.  The Court's seen what we've requested

9    and the multiple Motions we filed so we could get that so we could adequately

10   prepare for that.

11          Either we can agree to it on a proffer, but the State's exhibit that talks

12   about Joey Moore's testimony, well, the Court needs to understand the first

13   time he was interviewed he talks about this Mac-10.  Two weeks later he

14   goes in for a taped interview with the detective and the detective, well, they're

15   in a room and it's nine ten, and maybe I should mark it, but at nine minutes

16   and ten seconds into the interview Joey Moore's talking about trying to find

17   the gun.  Detective Moore, or, Clark, "this is a black and silver nine; that's

18   what we're looking for."  That was his statement.  It was discounting -- even

19   the detective at that point discounted that the Mac-10 had anything to do with

20   it.

21          I want to show the Court -- if you Google Mac-10 and simply pull up a

22   picture of it, this is what -- can I just show the Court?

23                                    THE COURT:   Yea.

1          MR. RION:  That's what a Mac-10 looks

2     like.

3          MR. MILLER:  Let me see it.

4          MRS. KOHLRIESER:  I'm going to defer to

5     Mr. Miller on this because he knows guns way better than I do, Judge.

6          MR. RION:  There's a couple of things.  I

7     don't know if I can put this --

8          MRS. KOHLRIESER:  Just lay it up there.

9     It might actually work.  You can zoom in.

10          MR. RION:  So, this is a Mac-10 itself.  It'll

11     say that it's a machine gun.  Mac stands for the guy, or, the manufacturer of

12     the weapon back in the sixties during the Cold War.  Essentially the

13     government wanted an automatic machine gun that you could carry in a

14     briefcase to protect in clandestine situations.  This suppressor is there -- if

15     you take the suppressor off -- it's threaded so that you can put the suppressor

16     on.  This weapon itself is illegal and you need a special permit to own this

17     weapon.  It's not something you can go and buy in the store.  That's what a

18     Mac-10 is.  So, when Joey Moore is talking about a Mac-10 and the detective

19     is saying that they were looking for a black and silver nine, and everything

20     else doesn't seem to indicate that a Mac-10 is anyone's thought on this, that's

21     why I'm at a complete surprise, but now they're trying to indicate and draw

22     connections with a Mac-10 in this case.  Now, for the Court's information,

23     there's later knock off versions of it that, you know, have various words on it.

1   So, that's the surprise issue.  That's the Joey Moore issue.  The Court

2   understands my argument.  The opinion in this case -- there are conclusions

3   drawn and an analysis done that was testified to that wasn't provided in the

4   report.  That's my argument.

5              MRS. KOHLRIESER:   Your Honor, just a

6   brief follow-up and Mr. Miller is going to show you what we have.  But, the

7   whole thing with the Mac-10, again, when Carlotta Williams actually puts one

8   in the defendant's hand, and we hadn't heard that either until we prepped her

9   for trial, and the defendant could have easily talked to her beforehand too, or

10  his investigators.  "Have you ever seen Markelus with any other gun?"  The

11  fact that we're looking for a black and silver nine, there are black and silver

12  Mac-10 nine's out there in the world potentially.  People can paint stuff.

13  Anyhow, Mr. Miller has a picture of what we have and I'll let him speak as to

14  the Mac-10 part.

15             THE COURT:   Well, you've already shown

16  me a picture of what you have.  It's an exhibit.

17             MR. MILLER:   Okay.  Well, I've got a little

18  different take on it.  Since we're going off and we're straying off into websites

19  and things, --

20             THE COURT:   Well, we're getting pretty far

21  and I don't want to stray too much farther.

22             MR. RION:   The relevance is just to my

23  surprise.  It's not to --

1    THE COURT:  There are different styles of

2   Mac-10's; is that fair to say?

3    MR. MILLER:  Yes.

4    THE COURT:  Okay.

5    MR. MILLER:  And the manufacturer of

6   this, I think, was a Masterpiece Arms.

7    MRS. KOHLRIESER:  Masterpiece and

8   Cobray.

9    MR. MILLER:  Okay.  Yea.  But, the one I

10   knew about was Masterpiece.  If you pull up Masterpiece Arms on the

11   Internet, since we're going the Internet route, and you look at the pictures, or

12   if you just Google that and click on the images, you see something like this.

13   Okay?

14    THE COURT:  Okay.

15    MR. MILLER:  Which is almost identical to

16   '139'.

17    THE COURT:  All right.  Does anybody

18   know on this Defendant's exhibit 'HH', the hundred and thirty-one results of

19   the types of nine millimeters, well, how many of these would be called

20   Mac-10's?

21    MR. MILLER:  There's two manufacturers.

22   Masterpiece Arms is one.

23    MRS. KOHLRIESER:  That's on page four

1    of six.

2                        MR. MILLER:  By the way, Mac-10 is kind

3    of a generic term.  Masterpiece Arms, which is why you kind of need a

4    picture, because there are very different variations.  It is sort of a generic

5    term, like the term Kleenex; okay?  There are two.  There's Masterpiece Arms

6    and then there's one other called, I think, Cobray.

7                        MRS. KOHLRIESER:  Cobray, also known

8    as, I believe, FJM.

9                        MR. MILLER:  Cobray has switched --

10   they've been bought out and switched a number of times.  But, for all intents

11   and purposes, you may see different manufacturers, but there's really only

12   two.

13                       THE COURT:  Okay.

14                       MR. MILLER:  Because Cobray has been

15   bought.

16                       MRS. KOHLRIESER:  FMJ.  Sorry.

17                       THE COURT:  That's all I needed to know.

18   FMJ - (Cobray)?

19                       MR. MILLER:  Yes.

20                       MRS. KOHLRIESER:  And originally the

21   Mac-10 was designed as a fully automatic weapon.  However, when those

22   were outlawed various manufacturers started making them semi-automatics

23   to comply --

1    MR. MILLER:  Actually the semi-automatic

2    ones were banned because they could be converted.

3    THE COURT:    There's no -- I don't know if

4    that's evidence.  I'll take your word for it.  I don't know.

5    MRS. KOHLRIESER:   Just going to his

6    need for his expert and his continuance and things like that is what I mean by

7    that.

8    THE COURT:  One last inquiry.  I don't

9    know - I think I asked it, but I don't know if I heard an answer.  Do you know

10    the availability of the expert you consulted with?

11    MR. RION:   I don't.  I could try calling him

12    again just on that limited issue.

13    THE COURT:   Okay.

14    MR. RION:   Whether there's a -- well, now

15    I know for the first time, Masterpiece and Cobray.  I didn't know that

16    yesterday.  Now I know this.  First time.  On that list those are the two they're

17    talking about - to show you how little I'm aware of what they're trying to --

18    THE COURT:   Okay.

19    MR. RION:   The bullet action, just so you

20    understand, it's not just a simple issue.  The way the casing ejects out,

21    depending on the model, sometimes it leaves a scrape or a dent on the

22    casing the way it ejects.  If we can limit it to two models then we could

23    compare those casings, I mean, to see if there's -- I mean, there's so

1     many ways to limit the list here.

2                      THE COURT:   Well, check on your expert.

3     We'll take a short recess.  Check on your expert's availability, if you can.  I'm

4     not saying that's necessarily the only thing that will determine my decision.

5     But, it's one consideration I want to give in trying to take into consideration all

6     of the circumstances.  So, we'll stand in recess.  It shouldn't take real long.

7     So, let me know as soon as you hear.

8     (WHEREUPON, COURT WAS IN RECESS.)

9

10                    THE COURT:   Just for the record then, we

11     are back on the record in CR2014 0139, State of Ohio -vs- Markelus Q.

12     Carter.  The defendant is present with counsel.  The State is present through

13     Assistant Prosecuting Attorneys Miller and Kohlrieser.

14       We just took a short break.  Mr. Rion, I had asked you to see if you

15     could contact the expert that you had consulted with over the evening.  Do

16     you want to just place on the record the status of that?

17                    MR. RION:   Your Honor, I spoke to him last

18     night.  I already told the Court that he stated that he believes he would have

19     relevant information that would contradict what's been testified to.  In

20     attempting to contact him today, he may be in Court in the State of Virginia.

21     He may be otherwise disposed.  So, I was not able to answer the Court's

22     question.  I did ask him last night as far as availability and he sort of got side-

23     tracked.  In his mind his question was, 'well, let me see all the reports so I can

1    judge it where I'm headed here'.  So, we got off on that tangent.  We sent him

2    all of the reports yesterday.  I'm waiting to hear back from him.  I do not know

3    if he is engaged in testimony or is otherwise indisposed in the State of

4    Virginia.  This expert, David Townsend, practices out of the City of Lansing in

5    Michigan.  We are waiting -- I left my phone on so I could see if he called

6    back, but I have yet to hear back from him.  I'm telling the Court that his input

7    and his advice would be very beneficial to the defense and necessary on the

8    cross examination of this issue.  I know the Court believes that -- well, this is

9    not an insignificant issue as far as the pinning of this Mac-10 on Markelus

10   Carter.  It's swaying the jury.  They took notes on this issue.

11                          THE COURT:   Well, I don't know what the

12   jurors took notes on.  They could have.

13                          MR. RION:   My point is --

14                          MRS. KOHLRIESER:   I was going to say,

15   just because they're writing, well, that doesn't mean you know what they're

16   writing.

17                          MR. RION:   It's a significant issue is my

18   point.

19                          THE COURT:   I understand that; believe

20   me.  Believe me.  Believe me I understand how significant the issue is.

21       I've listened to all the arguments.  I've reviewed the memorandum

22   supporting, the written memorandum of the defense.  I'll be honest - I haven't

23   read all the cases the State had, but I did look over the case summaries of

1   each case.  I was already familiar with the <u>Proby</u> case because I had read

2   that in my own research last evening.

3       So, I'm going to just set the stage here.  First off, I'll put for purposes of

4   this issue and not admitted for purposes of the jury's consideration unless

5   they are somehow otherwise identified and placed into evidence, like for

6   example the Wharton report, I believe, was already marked as a defense

7   exhibit, but I'll put into the record officially State's exhibits '1-M', '2-M',

8   '3-M', and '4-M' for purposes of the issue here.

9       Again, the hundred and thirty-one list of search results, the C.R.

10  something that Mr. Kramer spoke of, is Defendant's 'HH' and then there's

11  'HH-1', which apparently were provided last evening.  Those, too, will be

12  admitted for at least purposes of the Motion hearing on the Motion for a

13  Mistrial.  I'll reserve whether -- I don't know if anybody is going to move for

14  those to be admitted into evidence for purposes of the jurors' consideration.

15  But, at least for purposes of the mistrial motion 'HH' and 'HH-1' will be

16  admitted.

17      The first case I'll cite, and I've got some cases here and I've got some

18  reasoning behind my findings, but the first case I came upon was cited in

19  most of the cases - <u>Lakewood -vs- Papadelis</u>, if I'm pronouncing that right.

20  It's 32 Ohio State 3d, number one, page one.  The Supreme Court held that,

21  "When contemplating a sanction for a discovery rule violation," which that's

22  basically, as I understand, the basis of the Motion for a Mistrial, it says, "the

23  trial Court must conduct an inquiry into the surrounding circumstances."

1   That's what I've attempted to do and gave everybody an opportunity to put

2   items into evidence, make professional statements, and present, so I would

3   understand, all the surrounding circumstances, which I now believe I

4   understand.  I also went through the voluminous filings here to see -- and,

5   again, this is a problem and this is a pet peeve of the Court's. This electronic

6   discovery I don't like because when I see there's been discovery provided I

7   don't have it unless I can get on the computer.  I didn't originally know that it

8   was under Mr. Barbado's name.  I thought it would be under Mr. Rion's name.

9   It wasn't.  So, I was frustrated.  But, we have, I think, a record now of what

10  was provided and when it was provided.  I also looked at disclosure of

11  witnesses and expert names.  I went through that last night trying to get an

12  idea of what was disclosed and when it was disclosed.  The file itself contains

13  the State's and the defense's compliance with discovery rules.  Again, in the

14  State's case I don't always have that document right there.  I wish I did.  But,

15  it's available by e-discovery.  I, quite honestly, don't know how you're dealing

16  with that with the Court of Appeals.  If they can look on the e-discovery, too; I

17  don't know.

18                    MRS. KOHLRIESER:  It depends, your

19  Honor, based upon each issue and, again, the acknowledgement.

20                    THE COURT:  Well, that's neither here nor

21  there.  Whatever you guys do, that's fine.

22                    MRS. KOHLRIESER:  I can only do so

23  much with my boss' wishes.

1    THE COURT:  I wonder some days -- and I
2  would welcome the Court of Appeals to say, no, let's not do it that way
3  anymore; put it in the file.  That would be -- but, I digress.
4    The Papadelis case also says, "The trial Court must impose the least
5  severe sanction that is consistent with the purposes of the Rules of
6  Discovery."  That's paragraph two of the syllabus.  Lakewood applies to all
7  discovery violations.  In State -vs- Darmond, D-A-R-M-O-N-D,
8  2013-Ohio-966, an Ohio Supreme Court case, 135 Ohio State 3d, 343, says,
9  "Trials are to be conducted on a level playing field and Criminal Rule 16's
10  requirements that remedies for discovery violations apply to the defense and
11  to the prosecution equally."
12    With those ideals in mind, the Parson case I've already talked about,
13  that sets forth that three factor test that governs the trial Court's discretion in
14  imposing a sanction for a discovery violation.  I've already stated those.
15  Those are in the Parson case.  They're cited in about every discovery
16  violation case that I found, including the Proby case.  So, I don't need to go
17  over those again.  Lakewood focuses on the effectiveness of the less severe
18  sanction.  That's an important factor in the Court's balancing test.
19    So, again, with those principles in mind the first thing I had to decide,
20  based upon the representations, and all the evidence, and what the file
21  contained, and the arguments, was there a willful discovery violation.  So, the
22  questions I wanted the answers to, and I think I have those answers now,
23  before I made that determination, based upon what's already been presented

1    and what's been represented here, did the defendant have Joey Moore's

2    statement.  I think that's exhibit '3 or 4-M' now.

3                              MRS. KOHLRIESER:  '4-M'.

4                              THE COURT:   '4-M'.  That's yes.  Did the

5    defendant have Wharton's report?  Yes.  That's all been taken care of back in

6    May of '14.  Did the defendant have access to Moore, Wharton, Kramer,

7    Williams, and Williams?  Yes.  Did the defendant have the opportunity to have

8    a firearms expert?  Yes.  I know there was a consult already with a G.S.R.

9    expert.  But, the fact is that there was an opportunity to have a firearms expert

10   after having Wharton and Williams' reports.  And, the defendant had a list of

11   exhibits - for what that's worth.  Now, the list of exhibits, obviously, was just

12   presented the day the trial started.  But, those questions were all answered in

13   the affirmative.

14           So, the other questions, before I made a determination whether there

15   was a willful discovery violation I said, or, I asked myself - did the defendant

16   have information that a Mac-10 was allegedly involved in this case.  The

17   answer is 'yes'.  The fact that a witness, Joey Moore, said that the defendant

18   told him that he used a Mac-10, well, that was disclosed.  Again, that's exhibit

19   '4-M', I believe.  Now, Mr. Rion makes an argument, probably, or, perhaps a

20   very good argument - I don't know what the jurors are going to do with that -

21   as to the credibility of that statement.  That's an issue for the jurors to decide.

22   It's not an issue as to whether or not it was disclosed.  It was disclosed that

23   Mr. Moore said there was a Mac-10 involved and he said he got that

1    information from the defendant himself.  So, the credibility is a fair issue that

2    can be addressed in a closing argument perhaps, or through other witnesses

3    perhaps.  But, the answer is that the defense did have Joey Moore's

4    statement and that was discovery at least that a Mac-10 was alleged by at

5    least one witness, whose credibility may or may not be good, that a Mac-10

6    was used.

7                              MR. RION:   Your Honor, may I just

8    interrupt on that?  The statement by Mr. Moore was never that a Mac-10 was

9    used.

10                             THE COURT:   All right.  Let me have '4-M'.

11   Let me have '4-M'.  I don't want to misquote anybody.  Exhibit '4-M'.  I'll just

12   quote a portion in the third paragraph.  "Moore stated that he then heard

13   Carter tell Cloud that they caught him with sixteen grams of dope, but didn't

14   get the rest.  Moore said he also heard Carter tell Cloud that he had a

15   disassembled Mac-10 gun at his house that they didn't find."  All right.  So,

16   maybe -- you're right.  It wasn't that he used it, but that he had a

17   disassembled Mac-10.  So, --

18                             MR. RION:   And then if I need to submit

19   another exhibit as it relates to Clark's statement, or, the next interview -

20   there's not a written synopsis of it, but it's on video - where they clearly are

21   moving -- they don't get into a Mac-10 --

22                             THE COURT:   Well, I think if Detective

23   Clark testifies you'll certainly be allowed to get into that type of information.

1   But, if you want to put that report in at this point, I understand that is going to

2   be what Clark will say.  I haven't read Detective Clark's entire report.  But, I

3   take you at your word that the focus may have, in that exchange, may have

4   been on a silver and black firearm.  But, my point is there is notice by Joey

5   Moore's statement that was provided in discovery that there was some

6   implication here that a Mac-10 was in the possession of the defendant.  I'm

7   just setting forth my reasons for my decision that I'm about to make.

8       Did the defendant have information that B.C.I.&I. considered other

9   guns as possible guns or guns that could have fired casings found at the

10  scene?  That's clear from Wharton's report that was provided in discovery.

11  On page two, and it would be the second paragraph, which is one sentence.

12  "The rifling specifications on the evidence bullets correspond to numerous

13  brands of nine millimeter Luger caliber semi-automatic firearms."  So, there's

14  at least notice that we know from all reports that, well, I think it was a .357

15  and a Glock at the Eureka Street address were not the weapons that fired the

16  casings.  But, there's notice in Wharton's report that there are other firearms

17  from which those casings could have been fired.

18      Did the defendant have the actual list of candidate guns that Wharton

19  referred to and Kramer testified about?  No.  That's exhibit 'HH'.  Clearly the

20  defense did not have them until yesterday.

21      The Court would find that the list of candidates of types of firearms that

22  could have shot the casings could either be exculpatory or inculpatory.

23  Inculpatory in that they could be, now that I know that there may be two

1    Mac-10's on that list, maybe they're trying to say, or, the type of brand, one of

2    the two types of brands are the type of brand of firearm that shot the casings.

3    The exculpatory nature is that there could be over a hundred and twenty other

4    types of guns that perhaps shot those casings.  That's pretty clear that there

5    are a hundred and thirty-one brands on there, only two of which are Mac-10's,

6    apparently based upon the representations.  I'm not a firearms expert.  But,

7    that's what's been represented.

8         But, I find it's not necessarily a discovery violation not giving the

9    defense exhibit 'HH' until yesterday because Mr. Wharton's report indicates

10   that there was a list of guns that could have fired the casings that were tested.

11   The defendant knew of Mr. Wharton's report.  The defendant's counsel knew

12   that Moore had said that the defendant had an unassembled Mac-10 at his

13   house.  Therefore, since the defendant had Wharton's report and knew that

14   there was evidence that the casings could have been fired from any number

15   of guns, including a Mac-10, I find that failure to provide the full exhaustive

16   hundred and thirty-one list is not a willful discovery violation.  It's more in the

17   nature of notes or data that supports the conclusion in Wharton's report.

18        Did the defendant have prior discovery that the State would show a

19   picture of the Mac-10?  Apparently at the very earliest would be on the day

20   the trial started when the list of exhibits was provided.  I find that the picture is

21   demonstrative or illustrative of what Moore said that the defendant told him, or

22   that he overheard the defendant say.  Demonstrative evidence is admissible if

23   it satisfies the general standard of relevance set forth in Evidence Rule 401,

1    if it is substantially similar to an object that it is intended to represent.  So,

2    under State v. Jones, 135 Ohio State 3d, 10, demonstrative evidence is

3    allowed to be used.  I would cite to State -vs- Palmer, a Seventh District case.

4    It's number 89-B-28.  It's from 1996.  They held that the State could introduce

5    a handgun as a model to show the type of gun used in the homicide.  This is

6    not necessarily a model.  We don't have a three dimensional model.  But, we

7    have a picture.  The nine millimeter firearm -- the evidence in this case is that

8    a nine millimeter firearm was used to shoot the victim.  There are fired -- the

9    evidence shows so far that there are fired nine millimeter casings found at the

10   homicide scene.  The evidence so far is that unfired nine millimeter cartridges

11   were found in the defendant's house which, the evidence shows, were the

12   same brand and type that matched the casings that were fired and located at

13   the scene.  We have in this case a witness who has said, whether he's

14   believable or not is another issue, a witness who has said that the defendant

15   said that he had a Mac-10.  A picture of the Mac-10 was demonstrative of

16   what a Mac-10 looks like.  The Court finds there's no indication that the

17   introduction of the picture of the nine millimeter Mac-10 as demonstrative

18   evidence would confuse or mislead the jury.

19       The defense had access to all B.C.I. reports.  The defense had access

20   to all the witnesses.  If there is a violation I think the only violation here would

21   be not giving the actual picture of the Mac-10, the purported Mac-10, State's

22   exhibit '139'.  So, with that in mind, finding that there has not been any other

23   discovery violation, I'm going to exercise discretion.

1      I do have in my discretion as the most severe sanction a mistrial, which

2  is being requested.  I have to have an inquiry into the circumstances, which I

3  have done, and I have taken into consideration all of the circumstances.

4  Looking at the three part test, whether the failure to disclose was a willful

5  violation, I find it wasn't willful given all the information that the defendant

6  already had.  The determination of willfulness focuses on the acts of the

7  prosecution.  That's clear with regard to the picture because it wasn't a law

8  enforcement picture.  It was a picture, apparently, that the prosecutor got off

9  of the Internet.  But, I find it wasn't a willful violation.

10      Would foreknowledge of the undisclosed material have benefitted the

11  accused?  Again, the defendant had information that a Mac-10 was at least

12  mentioned.  The defense had information that B.C.I. experts said there are

13  other numerous, apparently a hundred and thirty-one, weapons that could

14  have fired the casings.  Not having a picture of a Mac-10, given the picture is

15  very generic and demonstrative only, and the fact that the defendant already

16  had Moore's testimony, and Wharton's report, I find that the picture itself

17  would not have benefitted the accused.

18      Whether the accused was prejudiced, I'm making a finding of 'no',

19  again, keeping in mind that the least severe sanction is consistent with the

20  purposes of the discovery rules.

21      I find that the severe sanction of a mistrial is not appropriate.  So, I

22  overrule the Motion and deny the Motion for a Mistrial.  The Court need not

23  declare a mistrial unless the ends of justice so require in that a fair trial

1    is no longer possible.  That's <u>State -vs- Franklin</u>, 62 Ohio State 3d, 118.  The

2    picture of the Mac-10 and the list of candidate guns -- well, the picture of the

3    Mac-10 is demonstrative.  The list of candidate guns is more in the nature of

4    notes or data upon which Wharton's conclusion is based.  The probable value

5    of the demonstrative evidence, the picture, is, again, just as demonstrative to

6    show what a Mac-10 could look like.  I suppose, now I understand if it has a

7    silencer or whatever that thing was called on the end of it that you guys

8    mentioned and showed me the picture of, I suppose it could look like different

9    things, too.  The Court concludes that the probative value of the

10   demonstrative evidence was not substantially outweighed by the danger of

11   unfair prejudice.

12         The Court gave the defense the evening to prepare for the cross

13   examination of Mr. Kramer.  Mr. Rion, by his representations and arguments,

14   has shown the Court that I believe he is fully prepared.  However, if the

15   defense feels needed to present an expert I will consider and take under

16   advisement a further continuance when we get to the defense case.  That's

17   why I was asking about the availability of Mr. Townsend.  As soon as you

18   know that availability, let me know, and we'll decide at that point whether a

19   continuance to allow Mr. Townsend to come in would be appropriate or not.

20         I also will give an instruction to the jurors in the nature of, and this is a

21   draft, but I'm just giving the nature of the instruction from some of the case

22   law I found, it will be to the extent, and it may need some tweaking and I'll get

23   input from counsel, but the instruction would be, "That the picture of the

1   Mac-10 gun was not a picture of the actual gun used in the homicide of Mr.

2   Warrington.  It is demonstrative evidence.  Demonstrative evidence is an

3   object, picture, model, or other device intended to clarify or qualify facts for

4   the jury." Side note - in this case I find it was intended to clarify the testimony

5   of Mr. Moore.  I will further instruct them that, "Such evidence is merely an aid

6   in understanding certain facts and that it is up to the jury to decide what

7   weight to give to such evidence.  The picture may be considered for the

8   limited purpose to show what a Mac-10 looks like."  So, that's my work in

9   progress of the draft, but I will intend to give an instruction.

10          So, we will continue.  We'll take a short break so I can get a drink of

11   water.  Well, I suppose I can get one here.  So, unless somebody else needs

12   a short break, I'll bring the jurors in now.  Exceptions are noted for the record.

13   Are you guys ready to go?

14                              MRS. KOHLRIESER:  Actually, your

15   Honor, if we could maybe have five minutes just to kind of gather our

16   thoughts?  I don't know if Mr. Rion wants a little bit longer.  But, just to kind of

17   gather our thoughts?

18                              THE COURT:  All right.  Let's take five

19   minutes.  We'll continue with the cross examination of Mr. Kramer and

20   continue with the case.  Mr. Rion, let me know if Mr. Townsend responds as

21   to his availability.  I'm taking under advisement whether or not as part of --

22   well, since I didn't really find that there was a willful discovery violation it's not

23   really a sanction.  But, at least a remedy for the late receipt of 'HH' and 'HH-1'

1    I will consider, perhaps, depending upon his availability, a reasonable

2    continuance to allow you to prepare him if you want to call him as an expert in

3    the defense case.  All right?  We'll take five minutes.

4                         MR. RION:  Your Honor, just for the record,

5    it's Mr. Kramer's report.  It's not necessarily that they didn't give me 'HH'.

6    That would have been something that I would have had to have requested,

7    and I acknowledge that.  But, in Kramer's report it gave no indication that I

8    would have any reason to be trying to get Defendant's exhibit 'HH' given his

9    conclusions.  That was the gist of our argument - just so the Court

10   understands.

11                        THE COURT:  Kramer's report has been

12   marked.  It hasn't been admitted.  Assuming it's admitted, it speaks for itself

13   and what it says.  Okay?  All right.  Thank you.

14   (WHEREUPON, COURT WAS IN RECESS.)

15

16                        THE COURT:  The record will show it's the

17   16th of September, 2015.  We're reconvening in CR2014 0139, State of Ohio

18   -vs- Markelus Q. Carter.  The record will show the defendant is present in

19   Court with his attorney.  The State is present.  The jurors have finally been

20   returned back in the Courtroom.

21          Ladies and gentlemen of the jury, welcome back.  Again, I'm sorry for

22   the delay.  I appreciate your patience.  We're trying to minimize the waiting

23   that you have to do.  But, occasionally there are things that come up, as I

1   explained from the very beginning, that necessitate the Court making further

2   inquiry and making certain decisions.  So, that's what we were doing.  Again, I

3   appreciate your patience.  Please bear with us as we all try to get this thing,

4   or, keep this thing moving in an orderly fashion.

5          I did want to ask - is there any juror who has been unable to follow my

6   instructions or feels that they have been exposed either from someone else or

7   on their own to anything that would prevent them from continuing their service

8   to be fair and impartial?  Nobody's raised their hand.  So, we will continue.

9          As we broke yesterday the witness was Kevin Kramer.  I believe the

10  direct examination had been completed.

11                          MRS. KOHLRIESER:  Yes, I think so.

12                          THE COURT:   Mr. Rion, do you wish to

13  cross examine this witness?

14                          MR. RION:   Thank you, your Honor.

15                 **CROSS EXAMINATION OF KEVIN KRAMER**

16  **BY MR. RION:**

17  Q      Good morning, sir.

18  A      Morning.

19  Q      Sir, you issued a report in this case; correct?

20  A      Yes, sir.

21  Q      And your report indicates essentially a few findings.  Number one, that

22  the weapons that were found in Mr. Carter's house were not the weapons

23  utilized to kill Mr. Warrington; correct?

1 A Items that did not fire the cartridge cases or the bullets that were

2 submitted to me.

3 Q In other words, the weapons that you examined were not consistent

4 with the bullets or the casings found as coming from the same weapon?

5 A That is correct.

6 Q Secondly, that the two casings that were found there were likely fired

7 by the same weapon?

8 A Those two cartridge cases were fired from the same weapon.

9 Q Though that weapon is unknown?

10 A That is correct.

11 Q And that the three bullets that were found, or the parts of them that you

12 could see, appeared similar in nature?

13 A Those three bullets were all fired by the same firearm.

14 Q Again, that firearm being unknown?

15 A That is correct.

16 Q Okay.  Now, you, yourself, did not do any measurements to determine

17 the width of the lands and the grooves; correct?

18 A Yes, sir.

19 Q And the information you -- you testified yesterday that there were a

20 hundred and thirty-one different weapons that would fall under the general

21 category of having six lands and grooves and a right hand motion; correct?

22 A That is correct.

23 Q What you meant by that is there are some vague, and I mean vague,

1    characteristics that could put a series of weapons in the same bucket;

2    correct?

3    A        Six lands and grooves and a right hand twist in nine millimeters is a

4    fairly common rifling pattern.

5    Q        So, that could include -- well, there was a list submitted of guns made

6    by Beretta, Calico, England, Federal Engineering, Germany, Browning,

7    Heckler, and I mean I could go through the list, but essentially every major

8    producer of nine millimeter pistols would be included in that; would you

9    agree?

10   A        That is basically correct.  I said right six, not only Lugers, is a common

11   rifling pattern.

12   Q        And the only thing that you could exclude from that would be

13   something called a polygonal pattern that's found in I think one or two brands,

14   brand names; correct?

15   A        Yes, as well as anything that's not right six.  So, again, that could be

16   left seven, right into left, anything that's not number six - those could all be

17   eliminated at possibilities.

18   Q        And that's an uncommon -- this is the general way in which the normal

19   nine millimeter is manufactured?

20   A        Those are less common, but there are other common patterns as well.

21   Q        Let me talk to you about, well, you brought up this idea of a Mac-10

22   yesterday.  Do you recall that?

23   A        I recall being questioned about a Mac-10; yes, sir.

1   Q       Now, a Mac-10, just so everyone understands, is a military grade fully

2   automatic sub-machine gun; correct?  That's what a Mac-10 is?

3   A       Mac is an abbreviation standing for a Military Armament Corporation

4   and the model being 10.  A true Mac-10 has a select fire option to shoot full

5   auto. or semi-auto.

6   Q       And the Mac-10's require -- they have a place at the end of the barrel,

7   there's a place to put a suppression mechanism or what maybe some people

8   might call a silencer, on the end of the barrel; correct?

9   A       There is a place on numerous pistols that have a threaded barrel

10  where you can screw on an attachment such as a suppressor or a

11  compensator.

12  Q       That's what the Mac-10 had as one of its characteristics; right?

13  A       A person can add that to one; yes.

14  Q       But, the barrel is threaded to add that.  It's designed so you can add

15  this suppressor to it; correct?

16  A       Yes, sir.

17  Q       That weapon in and of itself requires -- first of all, you can't go to a

18  store and just buy one; correct?

19  A       There are tighter restrictions on being able to purchase a full auto.

20  firearm.

21  Q       You would need a certain license to go, government/federal licenses,

22  to go and even possess a true Mac-10; correct?

23  A       Yes, sir.

1    Q        Okay.  And a Mac-10, and I'm going to show you, but I didn't print it out

2    and I apologize for it, but just so the jury can see what a Mac-10 looks like,

3    that's what a Mac-10 looks like; correct?

4    A        That's consistent in style and appearance of a Mac-10, I would agree.

5    Q        Now, just so it's clear for the record, you, yourself, did not conduct the

6    test in which you testified to yesterday as far as the measurements that relate

7    to the possible list of weapons that could be consistent with the right hand

8    groove, et cetera; correct?

9    A        We had a policy change at B.C.I. within the last year where we

10   discontinued reporting out such a list and the results thereof.  So, because of

11   that policy change I did not do so.

12   Q        You had a policy change so that you couldn't now create this

13   information?

14   A        I still have access to the G.R.C.  We have not discontinued it

15   altogether.  We are re-evaluating our use of it as it has not been updated

16   since 2010.  The F.B.I. is in charge of maintaining that and so we're looking

17   into other options as far as getting a more up-to-date list.

18   Q        In other words, if you had done this test today you would not, as a

19   policy of B.C.I., you would not be able to testify to that; is that correct?

20   A        As a policy we're not doing that.  If an agency specifically requested

21   information we still have the discretion to make exceptions to that policy.

22   Q        Now, what you testified to yesterday dealt with these --

23                              THE COURT:   Put on the record what

1  exhibit you're referring to.

2                            MR. RION:   Defendant's exhibit 'HH'.

3                            THE COURT:   Okay.

4  Q      Dealt with certain measurements that were assumed, those four

5  measurements, were assumed in the creation of a list that you say that B.C.I.

6  would not issue a report on today; correct?  But, those are the measurements

7  that were utilized, so you assume; correct?

8  A      Again, we have discretion to make exceptions to that policy.  But, this

9  is the software that I would use if I were to use it.  I have used it previously.

10  Q      The question is - those measurements that are in there, you don't

11  know if they're accurate or not; correct?

12  A      I did not personally take those measurements.

13  Q      You, yourself, did not do the measurements for purposes of

14  re-submitting.  Those measurements, minimum land width of point zero seven

15  one, maximum land width of point zero eight three -- lands are like valleys;

16  right?

17  A      In polygonal rifling they're more like gradual hills and valleys.  In

18  conventional rifling there's going to be sharp edge shoulders.

19  Q      Shoulders?

20  A      So, like my shoulders, my personal shoulders would be the distinct

21  edges where one land ends and the groove starts.

22  Q      Is a groove then a dip?

23  A      So, in the interior surface of the barrel the lands going to be the raised

1254

1     area and the grooves are going to be the lower areas.  When a bullet passes

2     through there it's going to pick up those.  So, it's going to be the reverse on

3     the bullet.  The lands are going to leave a groove on the bullet.  So, the land

4     impression will be the lower area on the bullet and the groove impressions will

5     be the raised area on the bullet itself.

6     Q      So, land -- well, let's just call it a valley for a second; is that fair?  It's

7     the depressed version part?

8     A      If I were describing a polygonal barrel, a bullet going through a

9     polygonal barrel, I would call it as valley, whereas the shape going through a

10     conventional rifle is going to be more distinct with sharp turns.

11     Q      Okay.  Canyon.  We'll call it a canyon.  A depression or whatever.

12     Those measurements for the depression, the land width, you don't even know

13     if those are accurate, correct, because you didn't do them?

14     A      I did not measure them; that's correct.

15     Q      Nor did you measure it afterwards to confirm?

16     A      No, sir.

17     Q      I mean, you agree with me?

18     A      I did not measure them; that is correct.

19     Q      And the same with the groove marks, the upper portion?  Same

20     question and same answer; correct?

21     A      I did not measure them; that is correct.

22     Q      Now, you testified as to this list that's contained in Defense 'HH' which

23     was given to me yesterday.  The Mac-10, a Mac-10, which we saw a picture

1    of just a second ago, the Mac-10 is not on this list; correct?

2    A        That is correct.

3    Q        In fact, a Mac-10 is rifled for a forty-five caliber bullet; correct?  The

4    Mac-10?

5    A        They may make versions that are chambered for a nine millimeter or

6    forty-five.  They have various versions.

7    Q        But, not for a thirty-eight, though?  Not for a three-eighty?  In other

8    words, there's a difference between -- the military version was designed for a

9    forty-five; correct?  Do you know?

10   A        I believe they made a forty-five and a nine millimeter version.

11   Q        Okay.  But, even a nine millimeter version of the Mac-10, to your

12   knowledge, is not on this list?

13   A        A specific model of Mac-10 was not on that list.

14   Q        Okay.  So, the testimony yesterday that a Mac-10 was determined by a

15   comparison with the list to be consistent, that statement, and I'm going to go

16   to the next point of it, but that statement would not be accurate?  A Mac-10 is

17   not here; correct?

18   A        I cannot specifically say a Mac-10 is on that list.

19   Q        Okay.  Now, you testified yesterday that there were two other possible

20   weapons that could -- well, I think your testimony yesterday was that there

21   were two Mac-10's that would fit the right hand pattern and one was a

22   Masterpiece.  The creator, or, the manufacturer was something called the

23   Masterpiece; correct?

1    A       Yes, sir.

2    Q       Now, I showed you, or you saw in your exhibit, that list, the

3    Masterpiece Arms --

4                                      MR. RION:   May I approach the witness?

5                                      THE COURT:   Sure.

6    Q       I'm referring to a page in Defendant's exhibit 'HH'.

7                                      MRS. KOHLRIESER:   Which page?

8                                      MR. RION:   Page four of six.

9    Q       The Masterpiece version there does not give the model of weapon that

10   would fit with this generic right hand twist six grooves; correct?

11   A       Well, what's listed here, four of six, just to clarify, is the page number of

12   the list, but it's page eleven of the notes.  Masterpiece Arms is listed as a

13   manufacturer as having this rifling pattern.  It does not list a specific model.

14   Q       That was one of the two that you told the jury yesterday would be

15   consistent; correct?  That was one of the two of them that you were referring

16   to yesterday; correct?

17   A       Masterpiece Arms does produce a semi-auto. version that looks similar

18   in appearance as a Mac-10.

19   Q       I understand.  But, as it relates to this list, which model, which weapon

20   they're speaking of, whether it's a nine millimeter pistol or whether it's, well,

21   whatever it is, this doesn't list what it is; correct?

22   A       The G.R.C. data does not provide the model.

23   Q       So, you don't know whether that -- so, now, is it fair to say then in

1    looking at the list more closely that you cannot say that what they are talking

2    about here is a Mac-10 model?

3    A    All I can say is that Masterpiece is on the list and they do produce a

4    firearm of that appearance.  But, I can't say that model is what is listed there.

5    Q    And they do also produce firearms that are not of that appearance;

6    correct?

7    A    That is correct.

8    Q    So, there was one other that you mentioned yesterday and that was,

9    well, the company is FMJ Cobray and they create something called a PM-11;

10   correct?

11   A    Yes, sir.

12   Q    Now, have you ever put a PM-11 next to a Mac-10?

13   A    I have not.

14   Q    And the PM-11, first of all, they don't make a forty-five caliber PM-11;

15   right?  That's meant for a three-eighty or for a nine millimeter?

16   A    Cobray may make a forty-five caliber version, but it's not the PM-11.

17   Q    They may or may not?  Do you know?

18   A    They may make a forty-five.

19   Q    May or may not?

20   A    I don't recall specifically, but I generally recall that, well, I think they do.

21   Q    All right.  And this PM-11, well, some people call them M-11's right?

22   A    Someone may call it an M-11.

23   Q    And it is a -- a PM-11 is simply a non-military version of a -- a PM-11 is

1     a nine millimeter.  Is it semi-automatic or fully automatic?

2     A      It's designed to be semi-automatic only.

3     Q      Okay.  It's not a -- a Mac-10 is a PM-11; right?  I mean, that's what it

4     is?

5     A      The model number would be a PM-11 - not Mac-10.

6     Q      Now, of the other hundred and thirty now other possible -- first of all,

7     did you take a PM-11 and do measurements of the lands and grooves of the

8     PM-11?

9     A      I have not.

10     Q      Did you see how the shell casings eject from a PM-11?

11     A      I have fired a PM-11 previously.

12     Q      Did you analyze the shell casings -- well, did you do any cross analysis

13     with a PM-11 in this case?

14     A      No, sir.

15     Q      So, if I put up a hundred and thirty different pictures of weapons, every

16     single one that's on this list, and I'm not going to do it, but if I did you would

17     have to say, 'yea, that would be consistent, that would be consistent, that

18     would be consistent, and that would be consistent'; correct?

19     A      Every one on that list would be consistent with being a right six and a

20     nine millimeter.

21     Q      Again, you can't even, I guess, testify today -- well, to that point, as an

22     expert you do not have any firsthand knowledge as to the veracity or possible

23     mistaken belief that the information that you're referring to -- in other words,

1    you can't state firsthand whether or not there are any similarities to -- let me

2    withdraw the question and say it another way.  There's a window, say point

3    zero seven one to point zero eight three, for the width of the land as an

4    example; right?  That's what's stated here?

5    A        Generally when we do a search we're going to give ourselves some

6    wiggle room so there may be some slight variation in how the F.B.I. may have

7    measured those and maintained the data base.  If a bullet is damaged we will

8    offer some wiggle room.  We're talking thousandths of an inch differences,

9    just to account for some variation between damage, how the F.B.I. may have

10   measured, how another examiner may have measured, just to account for

11   that slight variation that can occur.

12   Q        And we're talking almost a microscopic level with these?  I mean, for

13   you to get the fingerprint or the identify of a bullet in a case requires

14   microscopic analysis; right?

15   A        When we examine a bullet we use a microscope and we measure

16   lands and grooves we are doing so under the microscope.

17   Q        So, there's a window here of these measurements that you don't know

18   whether they're accurate or not, as you've testified; correct?

19   A        I have not personally measured the lands and grooves; that's correct.

20   Q        If that window were narrowed then certain weapons that are on this list

21   could be excluded; fair?

22   A        You can look at the measurements that are provided for each model

23   and see if narrowing it would eliminate them or not.

1     Q     So, in this situation we've given information to the jury about results

2     that you can't verify, and if we were to narrow that window, essentially certain

3     weapons on this could be actually excluded and the list from one thirty-one

4     could be down to one-ten, or eighty, or fifty; correct?

5     A     I would have to look at the measurements and determine how many

6     could narrow it down by.  But, it's possible that it could narrow it down further.

7     Q     Now, Remington is a common manufacturer; correct?

8     A     Yes, sir.

9     Q     Like, you can walk into an ammo. store and there's shells of

10     Remington bullets in almost every store you go into; correct?

11     A     Probably so; yes, sir.

12     Q     Is it one of the most common?

13     A     Remington is a common manufacturer of ammunition and firearms.

14     Q     Remington makes, well, would you estimate millions or billions of

15     rounds a year of ammunition?

16     A     I would agree with that; yes, sir.

17     Q     And a nine millimeter is a very common type of bullet; correct?

18     A     Nine millimeter is a popular cartridge; yes.

19     Q     So, the bullets that you looked at in this case, it's a common

20     manufacturer, a common brand, a common make, and a common model of

21     bullet; fair?

22     A     The cartridge cases were a Winchester brand.  I cannot specifically

23     say the brand of a bullet just from looking at a bullet necessarily.

1  Q      But, the question was - my question was simply that what you

2  analyzed in this case, the cartridges -- the bullet itself you can't, you didn't,

3  you don't know what the brand of the bullet was.

4  A      The fired bullets that were collected from the scene there's really no

5  way to determine the manufacturer of the bullet.  The cartridge case has

6  stamped on it Winchester.  The live rounds, the cartridges of ammunition, the

7  complete unit of ammunition with the bullet and cartridge case, the powder

8  and primer, those were stamped as Winchester.

9  Q      Right.  And that's a common make, a common model, and common

10  brand of cartridges that were looked at in this case; correct?

11  A      Yes, sir.

12  Q      And then the bullet, -- I guess what you're trying to tell the jury is

13  whether or not those bullets came from those cartridges you don't know.

14  A      I can't say.

15  Q      All you can say is those three bullets were fired from a similar weapon

16  and those two cartridges were fired from a similar weapon, but whether that

17  was the same weapon you don't know.

18  A      I can't scientifically say that; no.

19  Q      Thank you.

20                          THE COURT:   Okay.  Any redirect by the

21  State?

22                          MRS. KOHLRIESER:   Yes,  just a little bit.

23  Thank you.

1    **REDIRECT EXAMINATION**

2    **BY MRS. KOHLRIESER:**

3    Q    Kevin, I'm going to ask you to bear with me just a little bit.  Kevin, you

4    were asked about some measurements that were taken and things of that

5    nature.  I believe it was Defendant's - I'm sorry, I'm a little shorter than Mr.

6    Rion -- Defendant's exhibit 'HH' there.  Do you remember that when Mr. Rion

7    put on here and showed you those measurements?

8    A    Yes, sir.  Yes, ma'am.  Sorry.

9    Q    I've been called worse.  That's okay.

10   A    Out of habit.  Sorry.

11   Q    You said it was Heather Williams that had made those measurements?

12   A    Heather Williams measured those bullets, as well as Todd Wharton did

13   previously.

14   Q    Okay.  Now, I believe you testified to this previously, in making those

15   measurements and things like that and reporting out such as you, or Heather,

16   or Todd would have, does it go through peer review?

17   A    Yes, ma'am.

18   Q    Does it go through a supervisory review?  A technical review, I guess

19   is what it's called.

20                          MR. RION:   I'm going to object.  I don't

21   know if he has any personal knowledge of this specific testing.  Unless he has

22   personal knowledge of it.

23                          THE COURT:  Okay.  All right.  It's

1    sustained.  Lay a foundation or rephrase.

2                                  MRS. KOHLRIESER:  Okay.

3    Q      Does it reflect in the notes and in the report whether those went

4    through review?

5                                  MR. RION:  Same objection.

6                                  THE COURT:  Overruled.

7    A      Yes, ma'am.

8    Q      And do yours go through a similar review?

9    A      Yes, ma'am.

10   Q      And is that, in fact, a B.C.I. policy?

11   A      Yes, ma'am.

12   Q      Okay.  Now, when you testified yesterday regarding possible firearms

13   and even on cross examination today about possible firearms, well, based

14   upon your review of those documents did you have any reason to question

15   them before testifying in the manner that you did?

16   A      I had no reason to question the measurements taken by Heather or

17   Todd.

18   Q      Okay.  Thank you.  Now, you used a term on cross examination 'a true

19   Mac-10'.  Mr. Rion showed you a picture.  I'm going to ask Mr. Rion if he

20   could indulge me a moment if I could use that picture again.

21                                  MR. RION:  Just don't call my wife.

22                                  MRS. KOHLRIESER:  It's on your phone.

23   Q      What we have up on the screen here, for demonstrative purposes only,

1      I believe that's what you testified was a true Mac-10 - your words?

2    A     I believe I said it was similar in appearance to a Mac-10.

3    Q     Okay.  Let me ask you about this, well, what appears to be some kind

4    of extended barrel here.  Do you see what I'm talking about?

5    A     Yes, ma'am.

6    Q     Can you tell if that's just the way it's made, or is that something on it?

7    A     I would assume that's an attachment on the barrel as we've described,

8    the threaded barrel that is common to these pistols.

9    Q     Okay.  So, you could take, for instance, this part off?

10    A     Yes, ma'am.

11    Q     And I think you used the term suppressor.  Would that be an

12    attachment?

13    A     A suppressor is something that can be attached to a barrel.

14    Q     What is a suppressor?

15    A     A suppressor is designed to reduce the noise made by firing the gun.

16    Q     Okay.  And I think you used the word compressor.  Does that sound

17    right?

18    A     I also said compensator.

19    Q     A compensator?  Okay.  What's that?

20    A     So, as I've described how a firearm functions, when you fire all the

21    pressure that's pushing the bullet down the barrel and towards the target is

22    also pushing back on the firearm.  You may have commonly heard someone

23    refer to a firearm kicking, or the recoil of the firearm.  A compensator is

1265

1    something that allows for some of that excess gas to be released to reduce

2    the felt recoil by the shooter.

3    Q      Okay.  When you say suppressor and you're talking about reducing

4    noise, have you ever heard the term silencer?

5    A      Yes, ma'am.

6    Q      Okay.  Are those different or similar?

7    A      They're interchangeable as far as terms.

8    Q      Okay.  So, if I watch a movie and someone talks about putting a

9    silencer on their gun, the technical name is suppressor?

10   A      I would commonly think of a suppressor, but someone may call it a

11   silencer as well.

12   Q      Okay.  So, you may call it tissue and I may call it Kleenex or

13   something?

14   A      It might be technical since that would essentially make it silent. I would

15   just be more aesthetically correct and call it a suppressor.

16   Q      Gotcha.  Okay.  I see what you're saying now.  I believe you testified

17   on cross examination that the true Mac-10, the military grade fully automatic

18   weapon, isn't on that list, 'HH'; correct?

19   A      That is correct.

20   Q      Let me ask you this - let's use my examples there - if I were to say 'can

21   you hand me a Kleenex', what would you do?

22   A      Grab the Kleenex and hand it to you.

23   Q      You'd hand me one of those tissues; correct?

1266

1    A      Yes, ma'am.

2    Q      Look at this box.  Feel free to pick it up and look at it.  Did you actually

3    hand me a Kleenex?

4    A      It's labeled as a Crystal Ware two-ply soft tissue.

5    Q      Kleenex is the name brand; correct?

6    A      Yes, ma'am.

7    Q      So, when you say words like 'true Mac-10' and I use the word, me, not

8    being any kind of gun expert by any stretch of the imagination use the term

9    'Mac-10', does that mean necessarily in your opinion that I'm referring to a full

10   military grade 1960's design Mac-10?

11   A      You could be referring to that or just commonly the design and

12   appearance of a Mac-10.

13   Q      So, is it similar to the overuse of the word Kleenex?

14   A      I would say it's similar; yes.

15   Q      Okay.  Someone may say rollerblading when it's actually in-line

16   skating?

17   A      Yes, ma'am.

18   Q      Sorry.  I'm looking for my exhibit.  I'll move on to another question for a

19   moment.  You were asked about the fully automatic version of a Mac-10

20   requires federal things you've got to go through and stuff like that; correct?

21   A      There are more restrictions on acquiring such a firearm; yes.

22   Q      Okay.  Is there a version of a semi-automatic commonly referred to as

23   a Mac-10 that's commercially available?

1267

1  A       There are versions that are semi-auto.'s that are based off the Mac-10

2  design.

3  Q       Okay.  When you say based off of, when you say based off, well, do

4  they look like it or are you talking about something else?

5  A       They look like it and function similar to it.

6  Q       Now, you were also asked about this list.  I just want to make sure that

7  we're absolutely clear here.  B.C.I.'s policy at this point is not to take those

8  measurements and look at the list of candidates?

9  A       That is correct.

10  Q       However, if I were to call you up and say, "Hey, Kevin, we kind of need

11  this; can you do this for us," would that be available?

12  A       Yes, ma'am.

13  Q       So, they don't prohibit you from doing it?

14  A       Correct.

15  Q       Okay.  And, again, just so I understand, you said that it hadn't been

16  updated since 2010?

17  A       That is the reason we have temporarily decided not to continue using

18  it.

19  Q       And by updates do you mean more guns have been made and styles

20  have been made since 2010 that are not on the list?

21  A       The F.B.I. maintains this data base.  Every time a new model of firearm

22  is made they are to measure that firearm and add it to the data base.

23  Q       Do you know whether that's the only reason, or was there any problem

1   with the measurements that the F.B.I. were taking and things weren't

2   accurate?

3   A       I'm not aware of any issues with their measurements.  I can only say

4   we've discontinued using it temporarily for the sake of it not being updated

5   recently.

6   Q       Now, in the spectrum of what someone may call a Mac-10, do all of

7   them have threaded barrels so you can add those attachments?

8   A       They don't all necessarily have them, but I would say many do.

9   Q       You were also asked about, and I'll just hand it to you so we can make

10  sure, but page three of six on Defendant's exhibit -- well, is that 'MM' or 'NN'?

11                              THE COURT:  I think it's 'HH'.

12                              MR. RION:  It's 'HH'.

13                              MRS. KOHLRIESER:  'HH'?  I completely

14  changed letters.  Sorry.

15  Q       'HH'.  I'd ask you to take a look at that.  You were asked about this

16  PM-11; correct?

17  A       Yes, ma'am.

18  Q       Okay.  Are you familiar with PM-11's?  Have you ever seen one?  Fired

19  one?

20  A       I have fired a PM-11 previously.

21  Q       Okay.  And do they look similar to the picture you were shown

22  yesterday as to identifying a Mac-10 by the State, exhibit '139' I believe it

23  was?

1   A       The shape and appearance of the PM-11 would be similar.

2   Q       Okay.  How would you go about telling the difference from a visual

3   inspection?

4   A       The differences are going to be fairly subtle when you would have

5   them side by side.  I may even need to take it apart to find some differences.

6   Q       Okay.  So, someone like myself or some other person that doesn't

7   know guns very well, could they mistakenly call a PM-11 a Mac-10?

8                           MR. RION:  Objection.

9                           THE COURT:  Overruled.

10  A       I would say so; yes.

11  Q       From a distance could you, yourself, perhaps make that mistake?

12  A       I think it would be difficult to tell from a distance.

13  Q       And by distance I mean a reasonable distance.  I don't mean a football

14  field away.  But, you know, say someone had one in this room, in the gallery

15  or something.  Would it be difficult for you to tell what they were holding?

16  A       Without examining it up close it would be difficult for me to tell from this

17  distance.

18  Q       But, depending upon the way they were holding it could you give some

19  kind of description of it?

20  A       Yes, ma'am.

21  Q       Do you think you would be able to say, well, it looks similar to a, and fill

22  in the blank, gun?

23  A       Yes, ma'am.

1    Q     If, and I'm just going to say it's commonly referred to as a Mac-10,

2   whether it's a PM-11 or what have you, the Masterpiece version of that had

3   been fired and not had a suppressor on it would you expect someone to be

4   able to hear that being shot?

5    A     Yes, ma'am.

6    Q     Again, within a reasonable distance.

7    A     Yes, ma'am.

8    Q     I don't mean someone in Michigan hearing it here in Lima.  Do you

9   know by chance, in your experience with the PM-11, whether it ejects to the

10   left or to the right?

11    A     The port that the cartridge is ejected is on the right side of the pistol.

12   So, generally speaking they should eject to the rear and to the right.

13                     MRS. KOHLRIESER:  Give me just a

14   minute.

15   (WHEREUPON, Court went off the record briefly.)

16    Q     I just want one point of clarification.  I mentioned peer review.  I'm

17   going to have you explain that.  What is peer review and technical review?

18   What do those mean?

19    A     So, after I've completed my examination another examiner in the

20   firearm section who has the technical expertise as I do will review my notes

21   and make sure they're consistent with the findings that I'm reporting out.

22   Once they've approved that it will then go on to an admin. review where a

23   supervisor will review it for grammar or some administrative issues.  If none

1  of those are present the report is approved and submitted.

2  Q      So, the peer review is really a substantive review versus the technical

3  review?

4  A      The technical review is more in-depth - someone of my technical

5  expertise is looking at it.  The admin. review is simply more for grammar or

6  administrative errors.

7  Q      Okay.  Sorry.  I apologize.  I got those mixed up.  So, the admin.

8  review, well, you mean an administrative review?

9  A      Correct.

10  Q      And, again, you said that's more like spelling or make sure you have

11  the right case number or things of that nature on it?

12  A      Correct.

13  Q      Okay.  Thank you.

14                              MRS. KOHLRIESER:   Nothing further, your

15  Honor.

16                              THE COURT:   Any other questions, Mr.

17  Rion?

18                    <u>**RECROSS EXAMINATION**</u>

19  **BY MR. RION:**

20  Q      The picture that you were shown yesterday, do you know what the

21  make and model of that was?

22  A      I don't recall.

23                              MR. RION:   Nothing further.

1272

1    THE COURT:   Okay.  Sir, you're excused.

2    Thank you for coming in and sticking around.  Make sure you don't have any

3    exhibits.

4    MR. MILLER:   Your Honor, may I approach

5    to put these exhibits back on the table?

6    THE COURT:   Sure.

7    MRS. KOHLRIESER:   Your Honor, real

8    quick, can you check and see whether in the issues we were discussing

9    earlier if the Court's file has exhibit '139' in it?  Can I step out for just a minute

10   to make sure that Mr. Kramer doesn't have it?

11   THE COURT:   Okay.  Who's going to be

12   the next witness for the State?

13   MR. MILLER:   I believe it's going to be Mr.

14   Godfrey.

15   THE COURT:   Okay.  Is that who you're

16   calling?

17   MR. MILLER:   Yes.

18   THE COURT:   Ched Godfrey?

19   MR. MILLER:   Ched Godfrey.  Charles

20   Godfrey.

21   WHEREUPON, called to appear as a witness in this proceeding was one:

22           D E T E C T I V E   C H A R L E S   G O D F R E Y

23   who, having been duly sworn by the bailiff herein, testified as follows:

1   BAILIFF:  He has no objection.

2                              THE COURT:  Okay.  Thank you.

3                              **DIRECT EXAMINATION**

4   **BY MRS. KOHLRIESER:**

5   Q      All right.  Can you state your name for the record, please?

6   A      My name is Charles Godfrey.

7   Q      Okay.  Mr. Godfrey, would you tell us where you're currently

8   employed?

9   A      I'm a police officer with the City of Lima, Lima Police Department.

10  Q      And what do you do for the Lima Police Department?

11  A      I am a supervisor.  I'm currently a supervisor in the West Central Ohio

12  Crime Task Force, which is the local Drug Unit.

13  Q      Okay.  And how long have you been with the Police Department?

14  A      Nineteen years.

15  Q      Back in September of 2008 through February of 2009 what division

16  were you assigned to?

17  A      I was assigned to the detective bureau as a Sergeant, the supervisor.

18  Q      Okay.  You said a supervisor?

19  A      Yes.

20  Q      Okay.  So, you were in charge of the detectives?

21  A      Yes.

22  Q      And, if you would, explain to this jury what kind of cases are assigned

23  to detectives in the Lima Police Department's detective bureau.

1274

1    A       Felonies that have some kind of solvability.  The Lima Police

2    Department has a high call load and there's a lot of felonies that don't get

3    investigated just due to the call load.  So, a case that comes that has some

4    kind of solvability, well, then it gets assigned to a detective.

5    Q       What would be something that wouldn't get assigned to a detective?

6    A       If you have a house that got broken into and they have no idea who did

7    it.  A detective would not be assigned to that case.  Now, if they process the

8    scene and later on they get a fingerprint where you now have a suspect, well,

9    then it would get assigned.  But, initially it would not get assigned.

10   Q       Are there times when, say, someone might cut themselves and leave

11   blood and you could go that way?

12   A       Yes.

13   Q       Okay.  All right.  Now, when you say felonies, could you in general

14   terms explain for the jury a felony versus a misdemeanor just generally?

15   A       You have two Courts.  You have a Municipal Court which handles

16   misdemeanors.  That's everything punishable less than a year.  That's

17   everything from traffic offenses to simple assaults to petty thefts.  Then you

18   have stuff that goes to this Court, which is the Common Pleas Court, and that

19   is felonies - you know, murders --

20   Q       Let's not talk about punishment.

21   A       Okay.  Yea.  More serious offenses that are felonies.

22   Q       Okay.  So, detectives get assigned to the more serious offenses?

23   A       Correct.

1  Q      And during the time -- well, if you would explain, you were a Sergeant

2  for a fairly short period of time in the detective division; correct?

3  A      Yes.

4  Q      Okay.  Could you explain kind of why that was, or how that was?

5  A      At the time they were going to rotate supervisors through the detective

6  bureau to give them the experience so when they're in the patrol division they

7  would have an idea of when to call detectives in, and when not to, and what

8  stuff to look for.  The plan was to rotate the sergeants to do three months at a

9  time.  I ended up staying about eight months.

10  Q      Okay.  Now, during that time were cases ever assigned to you?

11  A      Yes.

12  Q      And do you know a person by the name of Markelus Carter?

13  A      Yes, I do.

14  Q      I believe we have a stipulation, but just for the record, is that the

15  person seated there in the blue shirt and vest?

16  A      Yes, that's Markelus Carter.

17  Q      Okay.  Thank you.

18                                    MRS. KOHLRIESER:   The record will

19  reflect that the witness has identified the defendant.

20                                    THE COURT:  It does.

21  Q      Okay.  Were you ever assigned a case to investigate where the

22  defendant was the complainant, so to speak, the one wanting to bring the

23  charges?

1   A    Yes, I did.

2   Q    Okay.  Could you explain to the jury how that case was brought to

3   you?

4   A    My Lieutenant, my supervisor, came in and gave me some paperwork

5   and asked me if I remembered a standoff in which our tactical team was

6   called out to a house and the guy was inside and refusing to come out.  That

7   guy was Markelus Carter.  It had worked its way through the Municipal Court

8   and a Temporary Protection Order hearing and so forth in which there was

9   conflicting statements and the charges got dropped and he had made a

10   complaint to someone above me in the chain of command that his then

11   ex-girlfriend and father of his, or, mother of his children had made a false

12   police report and they wanted me to investigate it.

13   Q    Was that type of case unusual, filing a false police report?  Is that a

14   misdemeanor or felony?

15   A    Yes, it's a misdemeanor.  In my eight months up there it was the only

16   one that I recall being assigned to any detective, let alone the Sergeant of the

17   detectives.

18   Q    So, this wasn't your usual type of assignment?

19   A    Correct.

20   Q    Did that tell you something about this case?

21   A    It came down through the chain of command.  So, my impression was

22   that someone somewhere was a squeaky wheel enough for it, or, they had a

23   connect to someone in the police department's administration for them to say,

1    'look, someone needs to look into this'.  It ended up falling in my lap.

2    Q       Would it be fair to say and, again, I don't want to put words in your

3    mouth, --

4                                    MR. RION:  Objection.  Leading.

5                                    THE COURT:   You said you didn't want to

6    put words in his mouth.  That's leading.  So, sustained.

7                                    MRS. KOHLRIESER:  Okay.  All right.

8    Fine.

9    Q       When you say squeaky wheel, what do you mean by that?

10   A       If someone was to pester them enough, to continually call them, for

11   them to just kind of, you know, 'you've got to look into this so they leave me

12   alone', that kind of thing.

13   Q       Okay.  In all fairness, is it always just pestering or sometimes there

14   may be something legitimate?

15   A       Yes, absolutely.  Theoretically they could have looked at it and said

16   'this needs to be something looked at' and it gets handed down as well.

17   Q       Okay.  Now, did this involve the December 17th, 2007 what I'll call

18   standoff incident?

19   A       Yes.

20   Q       Were you familiar with that incident?

21   A       Yes.  At that time I was a member of the Lima Police Department's

22   Tactical Team and we were called out to the defendant's home because he

23   was inside with a weapon and refusing to come out with his children.

1    Q      Okay.  Do you recall the address?

2    A      Yes.  122 East Eureka.

3    Q      What was your position that night?

4    A      I was a marksman and observer.  So, I was off in the distance.  I was

5   about, well, in an alley half a block north of there watching the front of the

6   house.

7    Q      Okay.  Were you in a spot visible to the occupants of the house?

8    A      I was hidden in the back seat of a car.

9    Q      Okay.

10   A      It was very cold.  It was like, I don't know, thirty below.  It was freezing

11  out that night.

12  Q      Okay.  Now, let's fast-forward.  When this was first brought to you

13  about investigating a false police report were you immediately able to start

14  investigating that?

15  A      No.  When it first came to my attention was September of '08.  That

16  summer had been a very busy summer for the Lima Police Department.

17  There were a lot of people shot and a lot of houses getting shot up.  Two rival

18  groups were routinely shooting at each other and it was a couple of times a

19  week we were having these kinds of situations.  So, this case, being the

20  complaint of filing a false police report, or making a false statement, was very

21  low on the priority list.  I continually pushed it back, and back, and back as we

22  investigated more serious offenses.

23  Q      Did the defendant call you about the investigation?

1  A      Yea.  He would call me routinely - once or twice a week.  I think as

2  time went on and I continually told him, you know, "I'm going to try to get to it

3  as soon as I can, but I've got, you know, I've got more pressing things I have

4  to do," you know, it would slow down to like once a week.  It got a little bit

5  farther apart.  But, he was very persistent in contacting me and wanting

6  something done with that case.

7  Q      Okay.  Did he express to you what he wanted done?

8  A      Yes.  He wanted the mother of his children, Sonya, to pay for what she

9  had done and he believed she had made a false police report which then

10  caused him to be arrested and embarrassed.

11  Q      Okay.  So, do you recall when you were finally able to, in your words,

12  get around to it?

13  A      Yes.  It was in February of '09.  It was February 17th.  I was due to

14  rotate out of the detective bureau in March and so I quit taking cases and I

15  started cleaning up the cases I had, completing them and closing them out.

16  On the 17th I had contacted Markelus and asked if I could interview him and

17  his daughter.  There was three people awake that night of the standoff.  It was

18  him, his daughter, and then the mother of his daughter.  He agreed to bring

19  her in.  I had the opportunity to interview her.  I had the opportunity to

20  interview him.  Then the following day, on the 18th, I had the opportunity to

21  interview Sonya.

22  Q      Okay.  Were you able to get transcripts or recordings or anything as

23  well?

1   A   Yes.  There was a Civil Protection Order, which is, well, it's just that.

2   It's a civil protection order from the Court that tells someone to stay away

3   from someone else.  Someone goes in and says, 'hey, I feel threatened by

4   this person and, you know, I want them to stay away from me', well, the Court

5   then orders a civil order that they need to limit their contact or not to have

6   contact with them and not to get near them.

7   Q   Okay.  When we say transcripts, are you talking about the hearing the

8   Court would have had to make that decision?

9   A   Yes.  Just as we're testifying now, later on down the road they will

10   transcribe everything that is said.

11   Q   And you got that?

12   A   I got that and I got the audio conversation between Detective

13   Neidemire and Markelus Carter the night of the standoff.  I reviewed both the

14   testimony there, the police reports, and the audio, or, part of the audio

15   between Detective Neidemire and the defendant.

16   Q   You said that you talked to the daughter.  Do you recall her name?

17   A   Yes.  It is - oh, now that you ask me - Tarah.  It had escaped me.

18   Q   All right.  Do you know how Tarah was able to come up and see you?

19   A   Yes.  The defendant brought her up.

20   Q   And you sat down with the defendant and got his version of what

21   happened back in December of '07?

22   A   I did.

23   Q   Did you ask him about his relationship with Sonya in December of

1    2007?

2    A      I did.  He had said that they had an on again/off again relationship.  I

3    asked if they saw other people.  He said that she sees other people and that

4    he's all right with that, but he didn't want her to see a married man.  He didn't

5    think his kids should see that, that it wasn't proper for them to see such stuff.

6    Q      And during that conversation did you ask him about having weapons?

7    A      Yes.  I had inquired because the initial report was that he was holding

8    a gun when he struck Sonya.  When they went in someone from the S.W.A.T.

9    team had found a BB gun, or a pellet gun, or some kind of toy gun.  He had

10   told me at that time that he has paint ball guns, toy guns, but no real guns.

11   He told me that he's not allowed to have them because he had been arrested

12   for Drug Trafficking and he took a plea deal to get it down to Drug Abuse.  It

13   was due to that prior felony that he wasn't allowed to have firearms.

14   Q      Did he say whether he had firearms at the time you were talking to him

15   then?

16   A      He said he did not.

17   Q      And then you eventually, or, I guess the next day did you sit down and

18   talk with Sonya Burkholder?

19   A      Yea, the following day.  I didn't want them to come up at the same time

20   and so I set the appointments on different days.  Sonya Burkholder came up

21   the second day.  I sat down and interviewed her about the case from '07.

22   Q      Did you question her extensively about the version that was against

23   her version?

1282

1   A       Yes.  I reviewed -- her statement was consistent with what she gave in

2   '07 and was contrary to what the defendant and his daughter had said.

3   Q       Okay.  Did you, I guess, grill her about those types of issues?

4   A       I inquired.  At the time it didn't feel right.  It felt forced.  You know, we

5   interview a lot of people.  When I sat down with her I got more of the feeling

6   that she was more of a victim than a suspect.  But, I felt obligated because

7   here I am the person investigating her where she's supposed to be a suspect.

8   So, I tried to put pressure on her to see how she would act with her being a

9   suspect.  In my opinion she acted, or, what she said came across as truthful

10  and honest and in my heart I didn't think she was lying.

11                            MR. RION:  Objection.

12                            THE COURT:  Okay.  I'll sustain it.  The

13  jury will be instructed to disregard what he said from his heart.

14  A       Oh.  Sorry.

15  Q       That's all right.  That was not the intention of my question.  After you

16  looked into everything then did you feel you had enough evidence to

17  prosecute Sonya Burkholder?

18  A       I did not.

19  Q       Okay.  So, is that your decision to make?

20  A       No.  Due to this being a misdemeanor I went down and talked to the

21  misdemeanor prosecutor, who was David Geiger at the time.  I explained to

22  him what I had, what the statements were, and what happened that night.

23  We agreed, but it was ultimately his decision, that there was not enough to

1    prosecute her for filing a false police report.

2    Q      Okay.  So, they decided not to prosecute her for that?

3    A      Correct.

4    Q      And by they, I mean the Muni. Court prosecutor's office?

5    A      Correct.  David Geiger.

6    Q      All right.  Are they the ones responsible for that type of decision?

7    A      Yes.

8    Q      So, after you spoke to the Municipal Court prosecutor's office -- well,

9    was that on the same day, by the way, that you interviewed Sonya?

10    A      Yes.

11    Q      And that was February 18th of '09?

12    A      Yes.

13    Q      Okay.  What did you do?

14    A      I then called the defendant and advised him that there wasn't anything

15    we were going to be able to do - that there wasn't anything beyond what we

16    had already done to prove his case, or, his belief that she made a false police

17    report.

18    Q      Okay.  What did he say?

19    A      He was upset.  You know, he felt that I had let him down, that the

20    system had let him down, and that she was going to get away with it.

21    Q      And he expressed that to you?

22    A      Yes.

23    Q      And that was on what day?

1   A     The 18th, February 18th of 2009.

2   Q     Thank you.  Now, on February 23rd of 2009 were you made aware of a

3  homicide on East McKibben?

4   A     Yes.

5   Q     At some point were you made aware of any persons that the detectives

6  were, you know, maybe wanting to talk to?

7   A     Yes.

8   Q     Okay.  Who was that?

9   A     Markelus Carter, the defendant.

10   Q     Do you remember where you were when you heard his name

11  mentioned?

12   A     Yea.  I showed up to work and I walked up in the detective bureau and

13  it was fairly empty, which was unusual, and they were interviewing people in

14  the interview rooms, which was unusual at that time of morning, and I ran into

15  a couple of the detectives and they told me that there was a homicide and

16  that the victim's live-in girlfriend was Sonya Burkholder.  You know, I inquired

17  if there was any suspects.  At the time it didn't click.  They said, "Well, she

18  suspected her ex live-in boyfriend and father of her children."

19                             MR. RION:  Objection.

20                             MRS. KOHLRIESER:  It's not meant for the

21  truth of the matter at all.

22                             THE COURT:  All right.  I'm overruling the

23  objection.

1                                      MRS. KOHLRIESER:   Thank you.

2    A      Markelus Carter.  Then it clicked with me that this is the case that I just

3    closed out, you know, the week before.  I had a number, recent numbers, to

4    get ahold of them.  Then I asked the detectives if they wanted me to contact

5    them, or, Markelus, and ask him to come up to the Police Department.

6    Q      Okay.  And did they?

7    A      Yes.

8    Q      And did you?

9    A      Yes.

10   Q      And do you recall what time approximately that call was, the call you

11   made?

12   A      Yea.  It was at seven fifty-eight A.M., in the morning.

13   Q      All right.  Did the defendant answer that call?

14   A      Yes, he did.

15   Q      And what did you tell him?

16   A      At first I asked where he was at.  He said he was around the corner

17   from his home.  I asked him if he could come up to the Police Department so

18   we could talk to him.  He asked if there was a break in the case.  I believed

19   that he was referring to the filing of the false police report investigation from

20   before.  I told him, well, I wanted to be vague and I wanted him to come up,

21   so I asked him, you know, "Well, come on up here and we'll talk about it when

22   you get here."  Then we hung up.

23   Q      So, at that point you just let that hang out there and you didn't clarify

1    anything?

2    A     Correct.

3    Q     Okay.  Fair enough.  Did he come up then?

4    A     His house is like five, maybe six blocks away from the Police

5    Department.  He told me he was right around the corner.  So, I expected him

6    to show up.  He's the guy that always calls, you know, and he wants stuff

7    done and so I expected him to come up right away.  After a half hour he

8    hadn't showed up.

9    Q     So, what did you do?

10    A     I called him back and again asked him to come up to the Police

11    Department.

12    Q     What, this time, was said between the two of you?  Go ahead with the

13    whole conversation.

14    A     Well, I inquired, or, I asked him, you know, "Hey, can you come up

15    here?  We need to talk to you."  He asked what it was about.  I told him that

16    something happened to Kenneth and that we needed to talk to him and make

17    sure that he wasn't involved.  He told me, "I don't like the sound of that."  I

18    was like, you know, "Just come up here so we can talk to you and we can,

19    you know, make sure you're not a suspect and make sure you're not

20    involved."

21    Q     Okay.  What did he say then?

22    A     He said that he had to drop off some proofs.  I think he said on West

23    High Street.  Then he said that he would be up in an hour and we hung up.

1   Q      At that point did he express any concerns about any family members?

2   A      No.

3   Q      What time did you say that call was?

4   A      At seven fifty-eight, just before eight o'clock in the morning.

5   Q      No, the second call.

6   A      Oh, the second call was at eight thirty-two.

7   Q      And do you know whether he came in promptly after that call?

8   A      No, he did not.

9   Q      Do you know whether he came up to the station eventually?

10  A      Yes, he did.

11  Q      Do you know how he got there?

12  A      Yes.  After the second phone call I researched what kind of vehicle he

13  had and his information and I relayed that to officers so that they could try to

14  locate him.  That was relayed to them and they ended up coming across him

15  and then they brought him up to the Police Department.

16  Q      Okay.  Was he interviewed at that time?

17  A      Yes.

18  Q      And who interviewed him?

19  A      Detective Kleman and myself.

20  Q      And are you aware of whether that was recorded?

21  A      Yes.

22  Q      Now, during this first interview, I'm talking the first interview, did the

23  defendant tell you that he had a weapon in his home?

1288

1    A    Yes.

2    Q    Was that contrary to what he had told you the week before?

3    A    Yes.

4    Q    Did you confront him about that?

5    A    Yes.

6    Q    After the interview ended did you do anything to ascertain for yourself

7    whether the defendant was permitted to have a firearm?

8    A    Yes.  After the interview I called the Clerk of Courts at the Common

9    Pleas in Allen County and gave them the defendant's information and asked

10   them if he had been convicted of any offenses.  They advised me that he was

11   convicted of Drug Abuse, felony Drug Abuse.  Therefore, that would put him

12   under a disability by the Ohio law.

13   Q    Okay.  By disability what do you mean?

14   A    When someone is convicted of an offense of violence or a felony drug

15   offense they are no longer allowed to possess or handle firearms.

16   Q    So, once he's telling you that he has a firearm in his house, you've

17   seen that he has a conviction for a felony Drug Abuse offense, what

18   happens?

19   A    Officers were outside his house securing it and making sure no one

20   went in and out.  An officer was in the process of typing up a search warrant

21   for the house so we could go in and look for the gun.  I called the Allen

22   County Prosecutor and briefed him on the situation and asked if he would

23   authorize a charge of Having Weapons Under Disability on the defendant.

1  Q  Okay.  And by prosecutor are you referring to myself or Mr. Miller?

2  A  No.  It was Prosecutor Juergen Waldick, the actual prosecutor.

3  Q  The actual elected official?

4  A  Correct.

5  Q  All right.  Now, you said a search warrant was being obtained.

6  Generally speaking, to your knowledge, again, assuming all the normal

7  circumstances, are officers just allowed to go into someone's home and start

8  looking?

9  A  No.

10  Q  You've got to have a search warrant for that?

11  A  Correct.

12  Q  Now, was a search obtained?

13  A  There was.

14  Q  And do you recall as to that search warrant, the scope of it?  By scope

15  I mean what you were allowed to search for?

16  A  We were looking for weapons because that is what he had told us he

17  had in there and that's what the focus of that search warrant was.  So, we're

18  only allowed to look for what's stated in the search warrant.  So, the focus

19  was weapons/firearms.

20  Q  Okay.  Thank you.  Did you, in fact, find weapons?

21  A  Yes.  We found a .357 as he had described in the interview.

22  Q  And was another weapon found?

23  A  Yes.

1   Q      That weapon -- well, were you present when the .357 was found, the

2   weapon that he had acknowledged having?

3   A      I was in the house.  I didn't find it.  I don't recall going over and looking

4   at it.  I just remember the other officers telling me about it.

5   Q      Okay.  And when you say other officers, do you, to your recollection,

6   recall who all was there?

7   A      Detective Clark, Detective Leland who was the affiant on the search

8   warrant, myself, Patrolman --

9   Q      I'm sorry.  Let me stop you right there.  You said Detective Leland was

10  the what?

11  A      The affiant.  He's the one that typed out the search warrant.

12  Q      Okay.

13  A      By my recollection, at least.

14  Q      All right.  When you say affiant are you referring to the person who

15  swears that the contents are correct?

16  A      Yes.

17  Q      Okay.  All right.  So, he's the one that got the search warrant?

18  A      Correct.

19  Q      All right.  Sorry.  After Detective Leland, please carry on.

20  A      Oh, we were there.  When we first went in the house we would have

21  checked it to make sure nobody was in there and then we would have started

22  looking around.

23  Q      When you say you would have checked to make sure nobody was in

1291

1   there, how do you go about that and why?

2   A       No one had been in the house.  As far as we knew the kids could have

3   been home, or a family friend.  Anybody could have been there.  So, when we

4   go in we're going to be searching and so initially you go through the entire

5   house to make sure nobody is in there.  You don't want to be searching and

6   have someone walk out and surprise you.  This is a murder investigation, or,

7   connected to a murder investigation and you don't want to be hurt.  It's for

8   safety reasons.

9   Q       Okay.  So, is that called a protective sweep?

10  A       Yes.

11  Q       Okay.  Were you there for the protective sweep?

12  A       Yes.

13  Q       Okay.  How do officers, and particularly the ones on this particular

14  incident, go about conducting a protective sweep?

15  A       You break down and stay in pairs and go through room to room,

16  systematically going through the house to make sure no one is there.  You

17  don't want to leave a room unsearched.  Again, you're searching for people at

18  this point.  You don't want to bypass anyone.

19  Q       When you say you're searching for people are you looking in places

20  where a body can be?

21  A       Yes.

22  Q       So, you're not necessarily opening a kitchen utensil drawer?

23  A       Correct.

1292

1   Q     You might open a closet, though?

2   A     Correct.

3   Q     Okay.  I just wanted to make sure we were clear on that.  Okay.  Let's

4 just put it out there - are weapons drawn when you're going through the

5 house looking for persons?

6   A     Yes.

7   Q     Could you show me in your case and in your general experience in

8 these matters how an officer holds their weapon when they're going room to

9 room to search?

10   A     Normally they would hold it --

11   Q     Please stand up and show us.

12   A     They would hold it down in front of them, that way if they was to come

13 into contact with someone it would be accessible to them.  You want it

14 accessible.  You don't, you know, you're not going to walk through like you

15 see on T.V. where it's out here the whole time.  You want it down.

16   Q     You want it by your midsection?  Is there where, for the record, you're

17 pointing?

18   A     Yea.  Some people keep it down.  Different people have different

19 styles.  But, you want it pointed in a safe direction so the muzzle is not going

20 to go in front of anyone and so forth.  But, you go through and you open up

21 closets and look under beds.  Again, you're looking for people.

22   Q     Okay.  So, you would be holding your weapon in one hand.  Whether

23 your arm is extended and the weapon would be, I guess, more at the start

1293

1    of your legs type of thing, depending on how long your arms are, or up by

2    your midsection and you would use your other hand to open doors and things

3    like that?

4    A      Correct.

5    Q      Okay.  Were any weapons fired during that protective sweep?

6    A      No.  No.

7    Q      And during that search did you actually find a weapon?

8    A      Yes.

9    Q      Do you recall what kind and caliber that weapon was?

10   A      No.  I only saw the portion of the grip.

11   Q      Okay.  All right.  I'm going to show you some pictures here, if I can get

12   to them.

13                           MRS. KOHLRIESER:  For the record, your

14   Honor, I'm also showing Mr. Rion State's exhibit '117-B', '117-C', '118', and

15   '121'.  I'm now showing them to the witness.

16   Q      Look at those four pictures and tell me when you're done.

17   A      Okay.  I'm done.

18   Q      I'm going to put them on the projector one at a time.  I'm giving you this

19   laser pointer.

20                           THE COURT:  You've got to twist it.

21                           MRS. KOHLRIESER:  Twist it?

22                           THE COURT:  I don't know.

23                           MRS. KOHLRIESER:  Here.  You try it.

1    Q    All right.  State's exhibit '117-B'.  What are we looking at here, if you

2    recall?

3    A    This is the closet in the master bedroom.  It was on the second floor,

4    the north bedroom.  Can I stand up and just point?

5                                THE COURT:  Yes.

6                                MRS. KOHLRIESER:  Yes.  We have one

7    of these, too.

8                                THE COURT:  Let me have that laser.

9    Maybe it needs a battery.

10                               MRS. KOHLRIESER:  Here you go.

11   Q    This is a wooden box.  It's a little blurry.  But, you've got a shelf up

12   there.  It's on there.  It's in the master bedroom.  I had walked up and I had

13   lifted up the lid.  When I lifted up the lid I could see the butt of a pistol.  I'm

14   somewhat familiar with pistols.  I'm not an expert or anything.  But, it looked

15   like the butt of a Glock to me.

16   Q    Okay.  When you say the butt, do you mean where you would hold it?

17   A    Yea.  If you grab a pistol it would be the bottom, the part that would be

18   nearest to your pinkie.

19   Q    Okay.  And does '117-B' fairly and accurately represent what you saw

20   in that closet that day?

21   A    Yes.

22   Q    So, upon seeing that what did you do?

23   A    Once I saw it I left it alone.  I went back downstairs.  At that time

1 Detective Clark and Detective Leland was there.  Our identification officer

2 wasn't there then.  I told them that it was there.  I left it be.

3 Q      Okay.  So, looking at '117-C', could you show the jury where you would

4 have touched that box?

5 A      It was on the corner.  It would have been on this corner.  I lifted it up

6 and I would have saw it inside, noted it, and shut it, and then just left it be.

7 Q      Okay.  So, for the record, when you say this corner, if you're looking at

8 the picture, on the right hand side there, the front?

9 A      Yes.  I'm right handed, though.  I would have reached up with my right

10 hand.

11 Q      Okay.  So, now State's exhibit '118'.  Is that what that box looked like

12 when you opened it?

13 A      Yea.  Now, I couldn't see into it.  I'm not the tallest person and so I did

14 have it down to an angle.  I could see the portion, the top portion, of the grip

15 and I could see inside here where on a Glock there's a little gap on the grip, a

16 hollow gap - where the magazine goes in there's a hollow gap.  That's what I

17 could see.  I couldn't see any of this.  I could only see this portion.  I shut it

18 and left it be.

19 Q      For the record, the portion you were just pointing to, are we talking

20 about the black item in the middle of the picture there?

21 A      Yea.  If you were to hold it in your hand it would be the portion that

22 would touch -- it would be the very back of the weapon at the bottom of the

23 grip.

1   Q     Okay.  That's what you saw?

2   A     Yes.

3   Q     And you were able to say that's a weapon?

4   A     Yes.

5   Q     Or, at least look at this, I'm pretty sure that's one?

6   A     Yes.  It was some kind of pistol.  It could have been a toy pistol at that

7   point.  I couldn't have told you.

8   Q     So, you made that known and that's all you did with that?

9   A     Yes.

10   Q     Would that have been the -- well, you didn't actually touch the weapon;

11   correct?

12   A     Correct.  I never touched -- I never touched that pistol.

13   Q     Now, you say that you left that?

14   A     Correct.

15   Q     Did you, yourself, observe any camouflage in that room that you can

16   remember?

17   A     No.

18   Q     And at that time your focus was looking for what?

19   A     Weapons, guns, firearms.

20   Q     Now, when you say you left, left out of that room, or left the house, or

21   what do you mean?

22   A     While we were there initially, after we went in and we did the protective

23   sweep of the house and we were waiting for the identification officer to come

1   Detective Clark, and we had already found the .357 that Mr. Carter had told

2   us about and we already got permission from Prosecutor Waldick to arrest

3   him for Weapons Under Disability, Detective Clark saw the defendant in a car

4   parked in the block, that he had arrived and he had told us, "Hey, you know,

5   Markelus is back.  You know, do we want to go arrest him?"  We decided we

6   should and a couple of uniformed officers and I believe Detective Clark went

7   out and talked to him and arrested him.

8   Q     Okay.  Do you know when he was arrested was he transported to jail?

9   A     Yea.  He would have been taken up to the Police Department and/or to

10   the jail.  His vehicle was on one side of the house, on the street, and the

11   police cruiser where they were walking him to was on the other side.  I was on

12   the sidewalk in front of the house.  As they walked him past he asked if we

13   were going to talk.  I told him, yea, that I would come up and talk to him.

14   They, then, put him in the police car and they would have took him up to the

15   Police Department.

16   Q     So, he asked you, "Hey, are we going to talk?"

17   A     Yes.  He called me by name and asked if we were going to talk.

18                 MRS. KOHLRIESER:  Your Honor, could

19   we approach just a moment?

20                 THE COURT:  Sure.

21   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

22   the record, as follows.)

23                 MRS. KOHLRIESER:   (Inaudible).

1    COURT REPORTER:   Terri, I can't hear you.

2                              MRS. KOHLRIESER:   We're getting ready

3    to play the video.  It's approximately thirty minutes long.  I don't know if you

4    want to take a break.  I also have follow-up questions for him.  I didn't know if

5    you wanted to take a lunch break now.

6                              MR. RION:   I'd like to make a record,

7    anyway, about --

8                              THE COURT:   All right.  We'll do that.  All

9    right.  We'll take a break.

10   (WHEREUPON, Court continued on the record, as follows.)

11                             THE COURT:   Ladies and gentlemen of

12   the jury, they've indicated they think the witness will take a little bit longer and

13   it may impinge upon our scheduled lunch hour and so we'll recess for lunch.

14        Remember the admonitions that I have given you all along.  Don't

15   discuss the case among yourselves or with anyone else.  Don't have any

16   contact with anybody involved in the case.  Don't post anything on the

17   Internet or social media.  Don't pay attention to media accounts.  Don't

18   formulate or express opinions.

19        You'll be excused.  It's a quarter till twelve.  Let's go until one o'clock

20   and then we'll get back and we'll try to get started.  Okay?  I want counsel to

21   stick around for a minute or two.

22   (WHEREUPON, JURY WAS EXCUSED FOR LUNCH BREAK.)

23                             THE COURT:   The record will show the

1   jurors have left the Courtroom.  Now, the State had indicated that they

2   intended to play a DVD recording of apparently the statement that Mr.

3   Godfrey just spoke of.  Is that correct?

4                                   MR. MILLER:   Yes, your Honor.

5                                   MRS. KOHLRIESER:  Yes.  I'm sorry.

6                                   THE COURT:   And then, Mr. Rion, at the

7   Bench you had indicated you wanted to be heard with regard to that.

8                                   MR. RION:   Yes.  As it relates to the video,

9   well, I don't know if the Court has seen this or not.  But, essentially it is, well,

10  they put Mr. Carter in a room by himself.  While he's in the room by himself he

11  has his head on the table and he's sort of moving his head in an odd manner

12  and making some statements, such as 'why am I here', and things like that.

13  I'm just concerned that there's really no probative value to it.  I see it, and I've

14  shown it to other people, and it will strike people as odd.  It could easily lead

15  someone to believe the wrong -- come to conclusions that aren't necessarily

16  backed by anything other than a bias.  I guess my point is is that there's some

17  prejudicial effect to it and I don't see the probative value.  I don't mind if

18  there's any statements that he made that those be listened to.  When the

19  officers come in the room and they're talking to him, you know, I suppose

20  that's something.  But, while he's in there by himself I just don't really see the

21  probative value of it.  Given the medical history that Mr. Carter has, and the

22  Court is aware of through prior Motions filed, I just think that it's prejudicial.

23  So, I would ask that the Court just modify the tape that way.

1300

1    THE COURT:  All right.  Well, to answer

2    one of your questions, I haven't seen it actually yet.  I don't know what the

3    exhibit is.  I have seen DVD's of statements in prior hearings in perhaps other

4    cases.  I don't know if this is the same.  It sounds familiar.  But, does the

5    State want to be heard?

6    MRS. KOHLRIESER:  Yes, just briefly,

7    your Honor.  It goes to the whole general dynamic of the attempted interview

8    and things of that nature and the defendant's reaction in the moments

9    following his arrest.  It just goes to the overall presentation that he has

10    throughout this.

11    THE COURT:  Is there included in there

12    not only this time when he's alone, but also time when Mr. Godfrey comes in

13    and questions him?  Correct?

14    MRS. KOHLRIESER:  Yes, absolutely,

15    your Honor.  I will say for the record, however, and I told Mr. Rion this, by the

16    L.P.D. clock, not the computer clock, but by the L.P.D. clock at fourteen

17    thirty-eight and and zero seconds I cut it off because at that point Sergeant

18    Godfrey goes, "Look," basically, "final answer, do you want an attorney or

19    not," and he invokes his right to an attorney.  So, I cut that out.

20    THE COURT:  So, everything after that

21    point is not included?

22    MRS. KOHLRIESER:  Yes.  Absolutely.

23    THE COURT:  But, there's some portion

1    before Godfrey questions him that the defendant is viewed in the interview

2    room by himself?

3                              MRS. KOHLRIESER:  Yes.  And, again, it

4    goes to his demeanor and what all is going on with him at that time.

5                              THE COURT:  Again, I don't know if it's the

6    same one I may have seen before in a prior hearing, --

7                              MRS. KOHLRIESER:  I believe you have.

8                              THE COURT:  -- but are statements made

9    while the defendant is alone?

10                             MRS. KOHLRIESER:  I think really the

11   statements he makes are 'I don't know why I'm here, I don't know why I'm

12   here, I don't know why I'm here', which actually plays right into what just

13   happened, the one that we showed, well, not just in this trial, but in real life

14   what had just happened with Investigator Kleman.  Again, it's just his general

15   make-up and it helps explain some of the discussion that happens when the

16   detectives walk in the room.

17                             THE COURT:  All right.  Again, with the

18   representation that this is the same one that I had seen in a previous hearing

19   in one of the other cases in a Motion to Suppress I'll overrule the objection

20   and allow it to be played.  Exceptions will be noted.  Okay?

21                             MR. RION:  Then, as a separate Motion, I

22   would, at this point, motion the Court to exclude the testimony of Mr. Kramer

23   as it relates to a Mac-10 for two reasons.  Number one, he testified that he,

1   himself, did not do the procedure and was relying upon information from

2   others, which I don't think was made clear during direct.  Secondly, that if he

3   were requested to do this now, well, his testimony was that the policy at B.C.I.

4   is not to do it.  So, had -- well, my sense is that the reason why he didn't

5   perform this testing is because B.C.I. has a policy against doing this test.  He

6   may have even been asked to do it and didn't do it because his own

7   department wouldn't allow it for reliability purposes.  So, to bootstrap an old

8   report with results that we can't verify and then all the testimony that came

9   after that it just seems as if it should be excluded as evidence.  So, I would

10  ask that it be ordered excluded.

11                              THE COURT:  Any response?

12                              MRS. KOHLRIESER:  As to the first prong,

13  again, he testified what it was, how it was, how it came about, and that type of

14  thing and his reliance thereon and no reason to doubt her findings again.  We

15  certainly can make arrangements to have Miss Williams herself come in if

16  necessary.

17                              THE COURT:  Let me ask - maybe I wrote

18  it down wrong.  Was not Wharton's and Davison's report stipulated to?

19                              MR. MILLER:  Wharton's, I believe, --

20                              MRS. KOHLRIESER:  Davison's was

21  stipulated to.  That's G.S.R.  Wharton's -- the stipulation was regarding that

22  he test-fired two of the bullets from State's exhibit '129'.  There were seven

23  when he got them and there were five after he test-fired those two.

1                           THE COURT:   Other than the hearing on

2   the Motion for a Mistrial we haven't seen Williams' report?

3                           MRS. KOHLRIESER:  No.

4                           THE COURT:   Nobody identified that?

5   Okay.  So, Davison's report was stipulated to, but Wharton's report was not;

6   correct?

7                          MRS. KOHLRIESER:  Yes.  As for the

8   second prong that Mr. Rion brought up, he said we don't report it out.  It's not

9   part of their routine in doing this anymore.  B.C.I. has said this is not, because

10   it's not updated, they're not going to do it.  We're talking about testing things

11   in 2015 and it hasn't been updated since 2010 and so we're just not going to

12   do that until they update it and we'll revamp our policies as needed.  But, he

13   specifically said, when I asked him, if I were to call you up and say, 'hey, can

14   you do this for me', then he could do it.  B.C.I. doesn't say you absolutely

15   cannot do it under any circumstances - but, just as a matter of course you're

16   not going to unless it's requested.

17                          THE COURT:   I'm going to overrule the

18   request, the Motion to Exclude Mr. Kramer's testimony.  I believe the issues

19   raised would go to his credibility and credibility of his testimony and not to the

20   admissibility.  Therefore, I'm not going to exclude it.

21     Anything else?

22                           MRS. KOHLRIESER:  Not from the State,

23   your Honor.

1    THE COURT:   Okay.  See you at one.

2    (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

3

4    THE COURT:   Okay.  We're reconvening

5    this 16th of September, 2015 in Case Number CR2014 0139, State of Ohio

6    -vs- Markelus Q. Carter.  The defendant is present with counsel.  The State is

7    present.  The jurors have returned from the noon recess.

8    After you folks went to lunch, ladies and gentlemen of the jury, the

9    Court dealt with some matters and those are on the record.  So, now we'll

10   continue with the direct examination of Officer Godfrey.  Mrs. Kohlrieser, you

11   may continue.

12   **DIRECT EXAMINATION OF SGT. CHARLES GODFREY CONTINUED**

13   **BY MRS. KOHLRIESER:**

14   Q    Okay.  I may repeat a couple of questions just because I'm not sure

15   where I left off entirely.  The defendant had asked you at the East Eureka

16   Street home about whether you were going to talk some more?

17   A    Correct.

18   Q    Okay.  And then he was taken to the station?

19   A    Yes, he was taken to the Lima Police Department.

20   Q    Okay.  And did you talk to the defendant a second time?

21   A    Yea.  I went up to the Police Department.  Since I had already got

22   authorization for an arrest warrant for him we hadn't had time to actually

23   obtain the paperwork and so I walked to the Municipal Court and served it on

1   him and then escorted him upstairs to an interview room and conducted an

2   interview with him.

3   Q      I'm going to hand you what has been previously marked State's exhibit

4   '140'.

5                                    MRS. KOHLRIESER:   For the record, your

6   Honor, I've shown Mr. Rion and now I'm showing that to Investigator - excuse

7   me - Sergeant Godfrey.

8   Q      Sergeant, do you recognize what State's exhibit '140' is?

9   A      Yes.

10  Q      What is it?

11  A      It's a DVD of the second interview with the defendant, Markelus Carter,

12  that myself and Lieutenant Baker conducted.

13  Q      And was it on February 23rd, 2009?

14  A      Yes.

15  Q      Have you had the opportunity to review that exhibit?

16  A      Yes.

17  Q      Okay.  And it is, in fact, an edited version?

18  A      Yes.  It's not the complete, but what I watched is true and accurate of

19  what happened that day.

20  Q      Okay.  And the edits weren't relevant to this particular case; correct?

21  A      Correct.

22                                    MRS. KOHLRIESER:   Your Honor, at this

23  time, for the record, I would like to play State's exhibit '140'.

1                    THE COURT:   Okay.  I'll let you play it,

2  noting for the record the discussion we had right when the jurors were

3  excused for lunch.

4  (WHEREUPON, State's exhibit '140' was played in open Court.)

5                    THE COURT:   Stop.  Stop the record.

6                    MRS. KOHLRIESER:   I believe she's

7  getting ill, your Honor.

8                    THE COURT:   I want the record to show

9  that a juror jumped up and left the room.  My bailiff will check on the juror.

10                    MRS. KOHLRIESER:   I believe, for the

11  record, that's she also the one that had the illness last week, your Honor.

12                    THE COURT:   Yea.  For the record, it's

13  number three.

14  (WHEREUPON, Court went off the record briefly.)

15  (WHEREUPON, juror returned to the Courtroom.)

16  JUROR NUMBER THREE:   I apologize.

17                    THE COURT:   No need to apologize.

18  We're back on the record.  Okay.  So, let the record reflect the juror is back in

19  the Courtroom.  Again, Mrs. Krites; right?

20  JUROR NUMBER THREE:   Yes.

21                    THE COURT:   I don't want to embarrass

22  you any more.  We can talk to you privately if you would rather.  But, are you

23  okay?

1   JUROR NUMBER THREE:   I'm fine.

2                                    THE COURT:   Okay.

3   JUROR NUMBER THREE:   It's just -- well, I don't know whether lunch didn't

4   like me or what.

5                                    THE COURT:   Okay.

6   JUROR NUMBER THREE:   It was like it was coming up and I had to run.  I'm

7   sorry.

8                                    THE COURT:   Okay.  Well, it's not the

9   same kind of thing that you had earlier in the trial?

10  JUROR NUMBER THREE:   No.  This was lunch.

11                                   THE COURT:   Do you feel like you can

12  continue?

13  JUROR NUMBER THREE:   I'm fine.  I'm embarrassed; but I'm fine.

14                                   THE COURT:   Well, don't be embarrassed.

15  You haven't been ill during the evenings or anything; have you?

16  JUROR NUMBER THREE:   Pardon me?

17                                   THE COURT:   You haven't been ill --

18  JUROR NUMBER THREE:   No.  I ate lunch and walked back across the

19  street with the rest of them and I could just feel it.  It's like it was right there.

20                                   THE COURT:   Okay.  So, you feel it's not

21  going to interfere with your ability to continue?

22  JUROR NUMBER THREE:   Oh, no.  I'm fine.  Thank you.

23                                   THE COURT:   Okay.  All right.  Do you

1  want a cup of water?

2  JUROR NUMBER THREE:   No.

3  THE COURT:   You're good?

4  JUROR NUMBER THREE:   She gave me some mints.  I'm fine.

5  THE COURT:   Okay.  All right.  With that,

6  we'll continue.  We're still on the record.  You may continue with the DVD.

7  MRS. KOHLRIESER:   Your Honor?

8  THE COURT:   Yes?

9  MRS. KOHLRIESER:   Your Honor, would

10  you inquire of Miss Krites - I mean, does she want us to back it up like a

11  minute or so.  I don't know if she was distracted.

12  JUROR NUMBER THREE:   That would be great.  Thank you.

13  THE COURT:   All right.

14  MR. MILLER:   I'll try to do that.  Okay.

15  Ready, your Honor?

16  THE COURT:   Go ahead.

17  (WHEREUPON, State's exhibit '140' continued to be played in open Court.)

18  MRS. KOHLRIESER:   Okay.  You can go

19  ahead and put the lights back on, Sue.

20  Q      Let me ask you a couple of questions about that.  Again, I don't know

21  why that cut off where it did.  I apologize.  There we can see in that small

22  portion of the video -- it goes on for approximately ten more minutes?

23  A      The total is about twenty-five minutes/thirty minutes total.

1    Q    The whole thing from beginning to end?

2    A    The whole thing from beginning to end.

3    Q    All right. So, at the beginning there when we see, well, who is the

4 other person in the room besides you and the defendant?

5    A    Lieutenant Baker, my boss at the time, and still my boss.

6    Q    Okay. The defendant expressed to you he wasn't feeling well?

7    A    Correct.

8    Q    Now, did you notice things, I guess, throughout this time about his

9 appearance and demeanor, including what we didn't see?

10    A    Yes.

11    Q    What was that?

12    A    To me, it wasn't genuine.

13                 MR. RION: Your Honor, I'm going to

14 object. The jury can view it.

15                 MRS. KOHLRIESER: I'm talking about the

16 portions -- between that and the portions that we did not see, your Honor. I

17 apologize, but I think what happened when I gave it to our editing person is I

18 said to cut it off at fourteen thirty-eight and I think he did fourteen minutes and

19 thirty-eight into it rather than --

20                 THE COURT: I'll overrule the objection to

21 the extent that the witness can testify to what he was about to say, but give a

22 basis as to why he has that.

23                 MRS. KOHLRIESER: Sure. Absolutely.

1310

1   Okay.

2                          THE COURT:   It will be up to the jury to

3   decide whether they believe that or not.

4                          MRS. KOHLRIESER:   Okay.  Thank you.

5   Sorry about that.

6   Q       I forgot what my question was.  Did he display certain behaviors

7   throughout this on what we saw and, more importantly, on what we didn't

8   see?

9   A       I believe there were times that he appeared to have trouble

10  communicating with us and other times he appeared to be able to

11  communicate with us much better.

12  Q       Okay.  And what do you mean by that?

13  A       Whenever we would try to talk to him about his condition or this case

14  you could barely understand him.  I would have to ask him to repeat stuff two

15  or three times.  If I inquired about his son or family stuff he was able to perk

16  up a little bit and respond more coherently.

17  Q       Okay.  Was he able to answer all of your questions?

18  A       Yes.

19  Q       And I think we saw on the video where you offered him a glass of

20  water.  Do you recall what his -- well, could you make out what his response

21  was?  I don't know how clear it was on the video.

22  A       Yea.  I asked him -- I believe I asked him a total of two times what he

23  said and he said that he didn't want it because he thought he would choke

1    on it.

2    Q    Okay.  Each time he gave you the same response?

3    A    The first couple of times I couldn't make it out.  They were mumbled.

4    But, the last time I made out what he said.

5    Q    Okay.  All right.  Now, in your line of work -- well, at this point he's in

6    custody; correct?

7    A    Correct.  At that point he had been arrested for Having Weapons

8    Under Disability.

9    Q    And how was that different from the first time you spoke to him?

10    A    The first time we spoke to him he wasn't in custody.  He was free to

11    leave anytime he wanted.  He could come and go.  He could answer his

12    phone.  He was there voluntarily.  This time he was in custody.  He wasn't

13    free to leave.  He couldn't use the phone unless we gave it to him for him to

14    use it.

15    Q    Okay.  At the very end there of that video and, again, I apologize, I

16    don't know what happened there, but at the end of that video you leaned back

17    and you were trying to get him to hold his head up.  What were you getting

18    ready to do - the part we don't see on the video, but it's actually there

19    somewhere?  It's actually recorded, but we didn't have it there.  What were

20    you getting ready to do as you told him to get his head up.  What were you

21    attempting to do, I should say?

22    A    I wanted him to sit up and be coherent and engage us in conversation.

23    Q    Before you engage him in conversation what are you required to do

1    since he's in custody?

2    A    Oh, we would have advised him of his Miranda Rights.

3    Q    Okay.  Did you, in fact, attempt to do that?

4    A    Yes.

5    Q    Was he able to acknowledge he was understanding those answers, or

6    questions, I mean, or rights?

7    A    No.  Whenever someone is in custody, before we question them about

8    a crime, we have to advise them of their Miranda Rights.  It's our job to make

9    sure they understand those.  We went over them and he would mumble and,

10   you know, it wasn't clear that he understood it.  So, we just repeatedly went

11   over them and over them in hopes of him giving a reaction that 'yes, I

12   understand them'.  But, throughout that he was twitching and rolling around

13   and, in my opinion, appeared to be prolonging it.

14                          MR. RION:   Objection.

15                          THE COURT:   Overruled.

16                          MRS. KOHLRIESER:   Just a moment, your

17   Honor.  I think I have a solution.

18   (WHEREUPON, Court went off the record briefly.)

19   Q    I'm going to hand you what's been previously marked as State's exhibit

20   '140-A' and ask you to take a look at that.

21   A    This is a DVD of the interview with myself, Lieutenant Baker, and the

22   defendant.

23   Q    And that's the full interview?

1   A     Yea, this is my handwriting.  This would have been the original.

2   Q     Okay.  Without the edits and things of that nature?

3   A     Correct.

4   Q     Okay.  Thank you.

5                     MRS. KOHLRIESER:  Your Honor, at this

6  time, I would like to play this from where we left off on that one and I'll stop it

7  at the appropriate time where it should have been edited.

8                     THE COURT:  Okay.  Just so the record

9  shows, like on the counter, where you're starting and, on the counter, where

10  you're stopping.

11                     MRS. KOHLRIESER:  Yes, your Honor.  If

12  I could have just a moment?

13                     THE COURT:  Okay.

14  (WHEREUPON, Court went off the record briefly.)

15                     MRS. KOHLRIESER:  Your Honor, for the

16  record, the total video begins at fourteen fourteen oh two by looking at

17  L.P.D.'s counter there at the top.  I'm going to fast-forward it just a moment.

18  Your Honor, this may copy over a little bit but, for the record, I'm going to play

19  '140-A' starting at fourteen twenty-five thirty-five.

20  (WHEREUPON, portion of State's exhibit '140-A' played in open Court.)

21  COURT REPORTER:  Terri, just a second.

22                     THE COURT:  Just a second.  We want to

23  get it on the record.

1                            MRS. KOHLRIESER:  Oh, I'm sorry.

2     COURT REPORTER:  Okay.

3                            MRS. KOHLRIESER:  For the record, we

4     stopped it at fourteen thirty-eight.

5                            THE COURT:  Okay.

6     Q     All right.  This interview that we just saw, '140-A', or, I guess, '140' and

7     '140-A' in connection, the entire contents of '140', the first DVD I attempted to

8     play, are those also contained on '140-A'?

9     A     Yes, they are.

10    Q     Okay.  Thank you.  We see a time up there.  Could you tell us in

11    non-military time what time of day you were talking to him?

12    A     It was two thirty-eight.

13    Q     Two thirty-eight in the afternoon --

14    A     P.M.  Yea, the afternoon.

15    Q     -- would be when this concluded?

16    A     Yes.

17    Q     So, was this after the interview where he told you about the .357?

18    A     Yes.

19    Q     And was this after the interview over the December 17th issue, or, the

20    interview earlier that day where he had told you he was under disability?

21    A     Yes.

22    Q     And by that I mean not allowed to have guns.

23    A     Correct.

1315

1   Q       Okay.  Thank you.  Now, during this time there are points when his

2   voice shifts and things like that; would you agree or disagree?

3   A       Yes.

4   Q       Okay.  Did you ever notice any tears of any sort?

5   A       Say that again.

6   Q       Did you ever notice any tears of any sort?

7   A       No.

8   Q       The form that you placed in front of him, what is that?

9   A       It is the Lima Police Department's, well, it's called an admonishment

10  form.  It explains his Miranda Rights and then the second paragraph is the

11  waiver portion stating he understands those and he would be willing to speak

12  with us.

13  Q       Okay.  And I believe it's Sergeant Baker - excuse me - at the time

14  Lieutenant Baker and now Major Baker; correct?

15  A       Yes.

16  Q       Okay.  That says to him a few times about 'there's questions we have

17  for you'.

18  A       Yes.

19  Q       Why, if you know, would Investigator Baker be telling him that?  Why

20  would you not just be talking to him about what you're there for?

21                          MR. RION:   Objection.  Objection as to

22  what Officer Baker is thinking when he's asking questions.

23                          MRS. KOHLRIESER:   I said 'if you know'.

1316

1    THE COURT:   I'm going to overrule the

2  objection and allow him answer.

3  Q    Why do you believe he was asking that, based upon your experience?

4  A    We're not allowed, -- when someone's in custody we're not allowed to

5  ask them about the crime that they're in custody for without first making sure

6  they understand their Miranda Rights that we had just read to him.

7  Q    Okay.  And is it simply -- you know, you see on T.V. that you say these

8  rights.  Is that sufficient?

9  A    No.  The purpose is that they understand it.

10 Q    Okay.  Are you required to make some kind of decision as to whether

11 you think they're understanding?

12 A    Correct.

13 Q    Is that why you're asking him some of those questions that we see?

14 A    Yes.  At that point and time I wanted to make sure he understood it.

15 He did tell us, 'yes, I understand it', but at the time I was unsure and so I

16 wanted to verify it.

17 Q    Okay.  There's a point I think where you ask him about understanding

18 that and he looks down.  Did it appear to you as if he was reading that form,

19 or simply putting his head down?

20 A    I do not recall if he was reading it or putting his head down.

21 Q    Okay.  Did you notice any physical signs of illness in him - any, I don't

22 know, sweating or anything like that?

23 A    No.

1317

1   Q      Okay.  Let me ask you - have there been times when you have

2   someone in an interview room and they do show visible signs of illness?

3   A      Yes.  If we believe that they're having a medical emergency we would

4   call the Fire Department and have paramedics respond.

5   Q      Okay.  Was there anything in your interactions with the defendant

6   throughout that day, and particularly in this interview here, that caused you to

7   feel that you should call medical personnel?

8   A      No.

9   Q      And besides what we've seen on the video, was there any point that he

10  had anything further to add besides repeating his earlier statements about

11  protecting his family and that?

12  A      Not that I recall.

13                          MRS. KOHLRIESER:   Just a moment.

14                          THE COURT:   Okay.

15  (WHEREUPON, Court went off the record briefly.)

16  Q      Let me ask you a couple of questions.  Let me back you up.  I don't

17  know what it is in relation to this.  Was there a time on the 23rd that you went

18  back out to the scene, well, not back out, I should say, but did you ever go to

19  436 East McKibben?

20  A      Yes.

21  Q      Okay.  And was that after what we just saw on State's exhibit '140-A'?

22  A      Yes.

23  Q      And what was the purpose of going out to 436 East McKibben?

1   A      Canvass the neighborhood to look for witnesses.

2   Q      What does that mean - canvass the neighborhood?

3   A      Going door to door trying to find anyone that heard something or saw

4   something that may know anything about it.

5   Q      Okay.  Were you specifically knocking on doors in the four hundred

6   block of East Pearl?

7   A      Yes.

8   Q      Without going into detail about what anybody said, were there some

9   people that were home?

10   A      Yes.

11   Q      Were there some people that weren't home?

12   A      Correct.

13   Q      Okay.  Were you able to actually talk to people?

14   A      Yea.  I talked to, I would guess, a half a dozen people.  Several of

15   them heard the gunshots.  Several of them didn't.  One, after hearing the

16   gunshots --

17                     MR. RION:  I'm going to object to the

18   substance of what they said.  I think the jury's already heard it.

19                     MRS. KOHLRIESER:  I can stop him there

20   and ask him another question, your Honor.

21                     THE COURT:  Okay.

22   Q      Did you go to 448 Pearl Street that day?

23   A      I did.

1  Q      Okay.  Did you speak to a resident of the home?

2  A      Yea, Rosalind Johnson.

3  Q      Okay.  Did Miss Johnson provide you with any information that you

4  thought relevant?

5  A      Yes.

6  Q      Okay.  Did you provide that information to Detective Clark or others

7  who were investigating?

8  A      Yes.  After talking to her I relayed the information to Detective Clark.

9  Q      And what information did you relay to Detective Clark?

10  A      That after hearing the gunshots --

11                              MR. RION:  I guess -- I don't know what

12  he's going to say, but --

13                              MRS. KOHLRIESER:  Your Honor, it's not

14  for any truth.  It's to explain his actions.

15                              THE COURT:  Well, I don't know what the

16  objection is.  The objection is --

17                              MR. RION:  I guess if it's not for the truth

18  then what's the relevance?

19                              THE COURT:  I'm going to overrule the

20  objection and allow him to testify.  It just explains what he did.

21                              MRS. KOHLRIESER:  Thank you.

22  A      I called Detective Clark and informed him what the witness said, which

23  was she had heard the gunshots.  She got up and looked out the front

1320

1   window, which the front window of that house is directly across the street from

2   the alley in which Kenneth Warrington was murdered.  She saw what she

3   believed to be a man wearing a camouflage --

4                                   MR. RION:   Objection.

5                                   THE COURT:   Overruled.

6                                   MR. RION:   May we approach?

7                                   THE COURT:   Yea.

8   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

9   the record, as follows.)

10                                  MR. RION:   Your Honor, unless they're

11  trying to -- well, now they're trying to impeach Rosalind Johnson.  She was

12  specifically asked whether or not she could tell it was a man or a woman.

13  She said she couldn't.  This is for no other purpose other than to get another

14  version of Rosalind Johnson's story to this jury.  There's no other reason.  I

15  object and ask that the answer be stricken.

16                                  MRS. KOHLRIESER:   That's absolutely

17  untrue because it goes to, again, when they're in the house for the second

18  search warrant and why they photographed that camouflage and why they

19  took that camouflage.  It goes directly to how the investigation proceeded.  It's

20  not a way to bootstrap in any way Rosalind Johnson's statement.

21                                  MR. RION:   The jury knows what she said.

22  So, they know what information was gained.

23                                  MRS. KOHLRIESER:   It's the timing of it.

1    THE COURT:   I'm going to overrule the

2    objection and let him testify.

3    (WHEREUPON, Court continued on the record, as follows.)

4    Q    Please continue, Sergeant Godfrey.

5    A    She saw someone wearing a camouflage jacket with a hood up and

6    walking at a fast pace south in the alley, directly towards her house, turn and

7    then walk, or, walk at a fast pace walk west down Pearl Street and then out of

8    her view.

9    Q    When you say west, which direction would that take you from her

10   house?

11   A    From her house it would be --

12   Q     Not direction.  What street, I guess, would it take you to?

13   A    Oh, Jackson.

14   Q    Okay.

15   A    They would have went down Pearl towards Jackson Street.

16   Q    Do you know where Detective Clark was when you made the call?

17   A    As far as I know he was still at the house, at the defendant's house at

18   122 East Eureka.

19   Q    Okay.  And at that time did you, or, well, you had been there at 122

20   East Eureka; correct, during the search?

21   A    Yes.

22                              MRS. KOHLRIESER:   Nothing further, your

23   Honor.  Thank you.

1  THE COURT:   Mr. Rion, questions?

2  MR. RION:   Thank you.

3  **CROSS EXAMINATION**

4  **BY MR. RION:**

5  Q    Sir, I'll show you what's been marked as State's exhibit '118'.  I think

6  the prosecutor showed you this exhibit.

7  A    Yes, sir.

8  Q    So, this is that box, which inside the box was a pistol; correct?

9  A    Yes.

10  Q    And that's the pistol right there; right?

11  A    Yes.

12  Q    And this box is sitting on a futon; right?  Or, on a bed of sorts?

13  A    I'm not sure.

14  Q    Some platform; correct, with a bunch of other stuff on it?

15  A    Yes.

16  Q    And this was early on because the gun is still -- the gun was actually

17  removed; correct?

18  A    I know it was removed.  I wasn't there when it was removed.

19  Q    Okay.  And it was removed from the box; right?

20  A    I imagine.

21  Q    Early on, while the gun was still in the box, this picture is taken;

22  correct?

23  A    I wasn't there when this picture was taken.  I believe so.

1323

1   Q       A broader view of the room, State's exhibit '121'.  That appears to be

2   the same box; correct?

3   A       Yes.

4   Q       Right there?

5   A       Yes.

6   Q       In that one can you tell whether the weapon was still inside or not in

7   that picture?

8   A       From that picture I can't.

9   Q       Cannot?

10  A       I can't see.  It looks fuzzy from my angle.  I can see the silver, but if the

11  pistol is in there I can't tell for sure.

12  Q       To the best of your recollection is that about how that room appeared

13  when you were in there looking in the closets and such?

14  A       I don't remember.  I really don't.  I remember the closet and looking

15  into the box.  That was not there when I saw it.

16  Q       Right.  That box was in the closet?

17  A       Correct.

18  Q       And then somebody put it on the bed?

19  A       I would presume; yes.

20  Q       And the first thing -- there were two searches of the place; right?

21  A       There were two search warrants served.  I believe officers remained on

22  scene for one search.

23  Q       And the first thing everyone was looking for was the weapon; right?

1324

1    A       Weapons; yes.

2    Q       Weapons; right?

3    A       Yes.

4    Q       So, that was the primary purpose of the first search warrant, to find and

5    collect weapons?

6    A       Correct.

7    Q       And then at a later time then after you guys were in there and you

8    looked around you found weapons; right?  Individuals found weapons;

9    correct?

10   A       Yes.

11   Q       And then you realized that you wanted to search more; correct?

12   A       We wanted to search for other items; yes.

13   Q       Correct.  So, then a broader search then occurred; correct?

14   A       We obtained another search warrant and then we looked for those

15   items.

16   Q       And so first you searched for the weapons and then --

17                              MRS. KOHLRIESER:  Your Honor, I'm

18   actually going to object because at this point I believe Sergeant Godfrey's

19   testimony was that he wasn't there after he found that.  He left and went and

20   did other things.  He wasn't present for these things when he keeps saying

21   'you did this'.

22                              THE COURT:  Well, we'll wait and see

23   what the question is and we'll see where it's going.  But, I'll overrule the

1    objection.  It's cross examination.

2    Q        The question was, simply, first there was a demand from a Court to

3    search for weapons and then later there was a demand from the Court to

4    search for more evidence; correct?

5    A        Correct.

6    Q        All right.  So, let's go to that morning for a second.  The first call that

7    you placed to Markelus Carter is at seven fifty-eight in the morning; correct?

8    A        That's correct.

9    Q        That's the first time that you attempted to contact him?

10   A        On that day; correct.

11   Q        On that day.  Right.  You had been, I guess, having a very -- well,

12   Markelus Carter was calling you to resolve this issue with Sonya; right?

13   A        Correct.

14   Q        Okay.  And when you called him at seven fifty-eight on February 23rd

15   he picked up; right?

16   A        Correct.

17   Q        He didn't try to duck your calls in any way that morning; correct?

18   A        Correct.

19   Q        And after he picked up you said that you wanted him to come down to

20   the Police Department; right?

21   A        Correct.

22   Q        And his response to you at that point, he said, or, he asked if there was

23   some progress?

1    A    Correct.

2    Q    He was asking you if there was progress and to which you took that to

3    be in the context of your relationship and conversation with him about the

4    whole matter dealing with Sonya?

5    A    Correct.

6    Q    Okay.  And you just said, 'well, I just want to talk to you, so just come

7    on down', or something to that effect; right?

8    A    Yes.

9    Q    Okay.  That's about as complicated as the conversation was; right?

10   A    Correct.

11   Q    You didn't set up a time for him to come down?  You just told him to

12   come down?

13   A    Correct.

14   Q    Now, thirty-four minutes later you called him back; correct?

15   A    Yes.

16   Q    And, again, he answered the phone; right?

17   A    Yes.

18   Q    You don't have to leave a voice mail message?  He's not trying to not

19   contact you.  He answers the phone and says hi to you, or whatever?

20   A    Correct.

21   Q    At that point you told him it was important for him to come down to the

22   Police Station as soon as he could; right?

23   A    I told him it was important and --

1327

1   Q      And to come down as soon as he could?

2   A      Yes.

3   Q      And you still didn't tell him what it's about at that point.  He told you

4   that he would be there within an hour; right?

5   A      Yes.

6   Q      Okay.  Then you stressed to him that he should come down earlier

7   than that, like, sooner; right?

8   A      Yes.  I reiterated that it was important and he should come down right

9   away.

10  Q      Yea.  And Mark responded and he said, "Well, what's this about?"

11  Right?

12  A      Yes.

13  Q      And you said that something happened to Kenneth; right?

14  A      Correct.

15  Q      You didn't say Warrington?

16  A      Correct.

17  Q      You didn't say Rexford?

18  A      Correct.

19  Q      Who's Kenneth Rexford?

20  A      He is an attorney.

21  Q      And did Kenneth Rexford have dealings with Markelus Carter at that

22  time?

23  A      I believe so.

1  Q      Okay.  So, you tell him that something has happened to Kenneth and

2  his response to you is that he doesn't like the way this sounds, or something

3  like that; right?

4  A      Yes, that's correct.

5  Q      Now, he told you that he had to drop some proofs off and then he

6  would be in essentially; right?

7  A      Yes.  He had to drop proofs off on High Street.

8  Q      Some proofs off on High Street?

9  A      Yea.

10  Q      So, he's telling you what he is doing and what he has to do and then

11  after he finished that then he was going to come down; right?

12  A      Correct.

13  Q      That's what he's telling you?

14  A      Yes.

15  Q      That's eight thirty-two.  Is it within minutes of that when you hang up

16  with him after that call that the police effectuate a stop?

17  A      I don't know what time they stopped the defendant.

18  Q      Okay.

19  A      I know it was --

20  Q      You were involved in the second, or, the first interview at the jail; right?

21  Or, at the Police Department; right?

22  A      Yes.

23  Q      And that started around nine-thirty or so?

1329

1   A      Yes.

2   Q      So, that's after the interview is actually beginning; right?

3   A      Correct.

4   Q      Did you go out to the place where his car was stopped and he was put

5   in the cruiser and all?

6   A      I did not.

7   Q      So, you were there at the department waiting for him to be brought

8   back?

9   A      Correct.

10  Q      That was on your request that he be brought in?

11  A      We wanted to talk to him.

12  Q      Right.  Let me put it another way.  Was it you -- who was it that placed

13  whatever you want to call it, the order/request to --

14  A      There was no order.  We wanted to speak to him about --

15  Q      I understand.

16  A      -- his involvement.

17  Q      Who communicated the request then?  I'm not trying to play with

18  words.

19  A      Oh.  Well, I wasn't out there, but my understanding is Detective Clark.

20  Q      Detective Clark put this whole thing in motion to have him brought into

21  the Police Department?

22  A      I believe he was out at the traffic stop scene and talked to the

23  defendant and the defendant willingly came in to talk with us.

1  Q      And then when he first entered into the Police Station were you there

2  talking?  Did you see him then or were other officers with him at first before

3  the video starts?

4  A      They walked him upstairs, or, brought him upstairs and put him directly

5  into an interview room.

6  Q      The first time you have contact with him, is that when the video starts?

7  A      I don't believe.  Well, I don't recall.  I'm not sure if there was any

8  conversation prior to that.  If there was, it was --

9  Q      So, there may have been a conversation explaining what's going on

10  essentially, or some of the details of things before he enters into that room;

11  correct?

12  A      Not that I recall.  If there was anything substantial I would have

13  documented it.

14  Q      With you?

15  A      So, no, I don't believe there was.  I don't recall.

16  Q      Okay.  With you.  So, in other words, we have the time when the police

17  stopped him and we have the time when the interview starts.  So, there's a

18  period of time.  Did you see him when he initially entered into the Police

19  Station?  I guess that's my question.

20  A      No.

21  Q      Okay.  So, what happened before you saw him, well, obviously you

22  don't know?

23  A      Yea, I don't know.

1    Q    All right.  Do you recall during that first interview -- well, it's being audio

2    and videotaped; right?

3    A    Correct.

4    Q    And how obvious -- well, like here we have, it's pretty clear, cameras

5    all of the place.  Anyone that looks around would realize that at least this part

6    of the Courtroom is being videotaped.  Are there cameras like that, so

7    obvious in these interview rooms?  Or, are they a little more hidden?

8    A    They're in the corner of the interview room.  Off the top of my head I

9    can't tell you if it's a camera.  I think it's covered.

10    Q    Okay.

11    A    Probably to prevent people from tampering with it.  But, most people

12    that come in can look up and know it's a camera.

13    Q    But, it's a covered thing?  It's not obvious that it's a camera, but it may

14    be obvious that there's something behind the glass or whatever?

15    A    I think in today's day and age anyone would look up and believe it's a

16    camera.

17    Q    The question is - it doesn't -- all right.  Well, I think it's clear.  Did you

18    tell him that he was being videotaped?

19    A    No.

20    Q    Okay.  And when he's having conversations -- when you guys leave

21    the room and he's in there by himself was he informed at that point that he

22    was being recorded in any way?

23    A    No.

1   Q     Okay.  At the beginning of the interview, that second interview, there

2   was some behavior that made you ask him if he was okay, et cetera, and

3   things like that; correct?

4   A     Yes.

5   Q     It sort of comes off a little mumbled, but he's trying to say that he would

6   like some medication; is that correct?

7   A     He asked for Dilaudid.

8   Q     Dilantin maybe?

9   A     Maybe.  I'm not sure.

10   Q     Do you know what Dilantin is?

11   A     No.

12   Q     Now, you testified during direct that you spoke to Rosalind Johnson;

13   right?

14   A     Correct.

15   Q     And essentially she testified to you -- can you see where everything is

16   here?

17   A     (Inaudible.)

18                            THE COURT:   Mr. Godfrey, bend that

19   microphone around because we can't hear you too well if it's not.

20   A     It's an aerial view --

21   Q     You can sit down.  I'll move it this way and that will make it easier.

22   A     Oh, okay.  This is the first time I've looked at the aerial view.  There's

23   multiple alleys that go all the way through.  Is this where the homicide

1  happened?  It looks right with the concrete.

2  Q      So we can see here, point out to the jury so they can see it.

3                              MRS. KOHLRIESER:  Your Honor, do you

4  mind if I move a little bit so I can see?

5                              THE COURT:  No problem.

6  Q      You can see a little shed right there; right?  There was a house here at

7  the time; correct?  Or, do you recall?

8  A      I don't know.

9  Q      All right.  Where was Miss Johnson's house on this?

10 A      It is right here at the bottom of the alley.  It's going to be one of these

11 two houses.  I believe it's this house.  I'd have to go out there.  I remember

12 looking out her house.  It had a big front window and you had a view of

13 directly down the alley.  By my memory I believe that her house was just, from

14 the jury's point of view, just right of where the alley was.  So, I believe this

15 would have been her house.

16 Q      And she described -- well, the information that you provided was that

17 she described a person -- where did she say she first saw him at?

18 A      Walking south in the alley.

19 Q      Okay.  So, all the way down the alley and then turning this way on the

20 street?

21 A      Correct.

22 Q      Is that essentially your involvement in this case as you've described

23 both on direct and on cross?  In other words, you were involved in the two

1   interviews and speaking to a witness or two in the neighborhood?  Is that

2   what you did in this case?

3   A      Yea.

4                                   MR. RION:   If I could just have one

5   second, your Honor?

6                                   THE COURT:   Okay.

7   (WHEREUPON, Court went off the record briefly.)

8                                   MR. RION:   Thank you.  Nothing further.

9                                   THE COURT:   Any redirect?

10                                  MRS. KOHLRIESER:   Just a couple of

11  things.

12                      **REDIRECT EXAMINATION**

13  **BY MRS. KOHLRIESER:**

14  Q      You had -- let me ask you - had you called the defendant before,

15  before what happened on February 23rd, back when you were dealing with

16  the week before and you were dealing with the December 17th, 2007

17  incident, had you called the defendant?

18  A      Yes.

19  Q      Do you have any idea whether the phone number that you called has

20  caller I.D.?

21  A      I have no idea.

22  Q      And then what we seen on that video there a few minutes ago, is that, I

23  guess, well, what is that room that you're in?

1335

1   A       It's an interview room.  It's whole purpose is for us to conduct

2   interviews.

3   Q       Okay.  It appeared there was a table and like three chairs in there?

4   A       Yes.

5   Q       And where are people that you are going to interview typically seated?

6   Where do you typically seat them?

7   A       They typically sit in a chair farthest away from the door.  That way

8   they're facing the camera.

9   Q       Okay.  So, the camera would be behind you then when you're sitting?

10  A       Correct.

11  Q       You, yourself, are sitting in the chair directly across from your person?

12  A       Yes.  The suspect that we're interviewing, the camera would be directly

13  over our head.

14  Q       Okay.

15  A       In one of the corners.

16  Q       Okay.  And you said you believe there is a covering over it?

17  A       Yes.

18  Q       Okay.  Is that -- well, these domes that you see, like the darkened

19  dome, is that what you're talking about?

20  A       I know it's there.  I can't remember the last time I looked up at the

21  camera.  I really don't recall.  To the best of my recollection --

22                              MR. RION:   Your Honor, I'll object if he

23  doesn't recall.

1336

1       THE COURT:  Sustained.  Sustained.

2       MRS. KOHLRIESER:  That's absolutely

3    fine.

4    Q      Do you know whether that camera has anything to hide it, such as a

5    plant, books, or anything like that?

6    A      No.

7    Q      Are you familiar with the term such as hidden camera?

8    A      Correct.

9    Q      Would you classify the camera that's in that interview room that way?

10   A      No, I would not.

11   Q      Okay.  Mr. Rion was asking you about Rosalind Johnson's statement

12   to you.  He used the words 'she saw him walking all the way down the alley'.

13   Do you remember if those were Rosalind Johnson's exact words?

14       MR. RION:  Objection.  Leading.  He's the

15   one testifying.

16       MRS. KOHLRIESER:  Your Honor, those

17   were the words that he used.  I'm trying to clarify that answer.

18       THE COURT:  Okay.  Okay.  Objection is

19   overruled.  Go ahead.

20   A      If those were her exact words?  I do not know.

21   Q      Would looking at your report refresh your recollection?

22   A      Yes, it would.

23   Q      I'll hand you your report.  I'd ask you to just take a look at that and

1    read it to yourself.  Tell me when you're done.

2    (WHEREUPON, witness reviewed report.)

3    A    Okay.  It does not say 'all the way down the alley'.

4    Q    Hold on.

5    A    Oh, sorry.

6    Q    Does that refresh your recollection?

7    A    Yes.

8    Q    Okay.  Do you remember Rosalind Johnson using the words 'saw him

9    walking all the way down'?

10   A    I do not.

11                              MRS. KOHLRIESER:   Nothing further, your

12   Honor.

13                              THE COURT:   Any recross?

14                      **RECROSS EXAMINATION**

15   **BY MR. RION:**

16   Q    You were calling Markelus' cell phone; correct?

17   A    Say that again?

18   Q    The number that you were calling to get into contact with Markelus,

19   that was his cell phone; correct?

20   A    Yes.

21                              MR. RION:   Nothing further.

22                              THE COURT:   Okay.  You may step down.

23   Thank you.  Before the State calls its next witness I want to give the jurors

1338

1  another instruction.  It's similar to the instructions I've already given.  I'm not

2  trying to dwell on this and overemphasize this, but it is important.  The

3  discussion from Officer Godfrey and his testimony regarding the defendant

4  being arrested for a Weapon Under a Disability and the discussion about the

5  guns that were found on 2-23-09, I think it was a .357 and the gun that was in

6  the closet, they are not the same thing that we're talking about in Count Two

7  in this case.  So, I don't want you to get confused and think those guns that

8  they're talking about on February 23rd of '09 are any one of the same gun

9  that they're talking about in Count Two in the indictment.  So, I want to make

10  sure.

11      Also, the fact that the defendant was arrested for a Weapon Under a

12  Disability back on February 23 of '09 and all this discussion about the things

13  that occurred in December of '07 and leading up to that, well, any of those

14  things that are prior actions of the defendant aren't presented and you can't

15  consider them to say, okay, that happened then and he acted in conformity

16  with it in the instance that we're talking about in terms of Count One and

17  Count Two.  You can't use that to show his character and that he acted in

18  conformity with it.  There's very specific rules and I'll instruct you the only

19  purpose for that testimony that you can use it for is to either show the identity

20  of the defendant to whom the officers were dealing with or that he may have

21  had a motive or knowledge of the facts surrounding the case.

22      But, again, it doesn't have to do with Count Two - the weapons at the

23  house, the .357 and, well, I think it was a nine millimeter Glock in the closet.

1   They are not the subject of Count Two and you can't say, well, that happened

2   then and that shows his character and he must have acted in conformity with

3   that character.  You can't use it for those purposes.  I'm not trying to

4   overemphasize this.  I've said it before.  But, it is important that you keep that

5   in mind.  Okay?

6          Does the State have a witness that you believe would be, in your best

7   estimate, rather brief?

8                              MR. MILLER:  I think so, your Honor.  Yes.

9                              THE COURT:  We'll see.  Call your next

10  witness.

11                             MR. MILLER:  Sergeant Cameron Smith.

12                             THE COURT:  Is everybody good if we try

13  one more brief witness?  Okay.

14                             MRS. KOHLRIESER:  Your Honor, with the

15  Court's permission, may I step out just to get the witness after him lined up?

16                             THE COURT:  Sure.  Next witness?

17                             MR. MILLER:  Cameron Smith.  Sorry.  I

18  thought I said it.

19                             THE COURT:  You probably said it.  I

20  wasn't paying attention.

21  WHEREUPON, called to appear as a witness in this proceeding was one:

22              S E R G E A N T   C A M E R O N   S M I T H

23  who, having been duly sworn by the bailiff herein, testified as follows:

1340

1  BAILIFF:   He has an objection.

2                                THE COURT:   Okay.  This witness is

3  exercising his right and is requesting that he not be photographed or

4  videotaped.  So, I would ask the media to honor that request.  Your witness,

5  Mr. Miller.

6                                MR. MILLER:   Thank you, your Honor.

7                          **DIRECT EXAMINATION**

8  **BY MR. MILLER:**

9   Q      Mr. Smith, good afternoon.

10  A      How are you?

11  Q      Good.  Can you state your full name for the record, please?

12  A      Cameron Brent Smith.

13  Q      And where do you work, Mr. Smith?

14  A      At Allen Corrections.

15  Q      And what is your job title?

16  A      I'm a Sergeant.

17  Q      Okay.  What are you job duties as a Sergeant out at Allen Corrections?

18  A      I have several.  As a Sergeant I'm responsible for two hundred and

19  eighty men.  I do and organize the cleaning schedules.  I work with the

20  officers.  When the inmates violate rules I hear conduct reports.  I give out

21  sanctions anywhere from jumpsuits to taking their money to phone

22  restrictions.  There's all sorts of sanctions.  I also -- oh, I do a lot of stuff.  I do

23  investigations.

1    Q    Okay.  I was going to ask you, and we'll get right to that.

2    A    Yea, I do investigations through my unit from theft loss investigations,

3    plus as the S.T.G. coordinator, and --

4    Q    What does that mean?

5    A    'Scuse me?

6    Q    You rattled off some initials.  What did those mean?

7    A    S.T.G.?  Security Threat Groups.

8    Q    What is a Security --

9    A    Gangs, hate groups, cults, things like that.

10   Q    Are you saying you investigate those kind of groups?

11   A    I investigate them.  I profile inmates.  I enter information into D.O.T.S.

12   and it actually goes to the police officers on the streets and LEADS.

13   Q    What is D.O.T.S.?

14   A    Department of Finger Tracking System.

15   Q    Okay.

16   A    It's the computer program we use.

17   Q    Okay.  And what does that do?

18   A    It collects information, all sorts of information, on the inmates from

19   when they're released, to parole hearings, when they're coming up.  It does

20   classifications, security classifications.  It's a myriad of everything that we do.

21   Q    Do you use it as a reference?

22   A    I do.

23   Q    Do others use it as a reference?

1    A      Many.

2    Q      Okay.  Now, you mentioned Allen Correctional.  Just for clarification for

3 the record, is that the prison that's here in Allen County?

4    A      It's Allen Oakwood Correctional Facility technically.

5    Q      Okay.  It's here in Lima?

6    A      Yes.

7    Q      Okay.  You mentioned your job duties.  Do you do those for all the

8 prisons in Ohio, or just a select few, or one?

9    A      Just for Allen Oakwood Corrections.

10    Q      Now, were you at some point asked to assist Detective Clark of the

11 Lima Police Department in an investigation into a person named Markelus

12 Carter?

13    A      Correct.

14    Q      Is that yes, you were?

15    A      Yes.

16    Q      Okay.  Do you recall when you were contacted?

17    A      I don't remember the date.  I would have to refer back to my report.  It

18 was a few days before my report, I believe.

19    Q      Would referencing your report, or reviewing your report, help your

20 recollection to answer that question?

21    A      It probably would.  Sure.

22    Q      Okay.

23                        THE COURT:   If it's going to be an exhibit,

1343

1    it needs marked.  If it's not going to be an exhibit, --

2                                    MR. MILLER:  It's not going to be an

3    exhibit.

4    A       It was a few days.

5    Q       Okay.  I'm going to hand you a document.  Is it Investigator Smith, or

6    Sergeant Smith?

7    A       Sergeant Smith.

8    Q       Sergeant Smith, I'm going to hand you a document.  Can you tell me

9    what that is?

10   A       That's the report I wrote.

11   Q       With reference to?

12   A       With reference to Markelus Carter and the people I interviewed.

13   Q       Okay.  Does that help you determine about what time, the date, that

14   Detective Clark contacted you?

15   A       Yea, it does.  It's approximately three or four days before, I believe.

16   Q       What would be the date that he contacted you?

17   A       I really can't say exactly what date to lock it in.  I don't want to

18   misspeak.

19   Q       Okay.  Can you give me an approximation of when he contacted you

20   by referencing your report?

21   A       Are you asking the date again?

22   Q       Well, I'm asking you if you can tell by review of your report what date

23   Detective Clark asked you to assist in his investigation, or, in an

1344

1   investigation?

2   A       A few days before.  I'm assuming a few days before February 8th,

3   2014.

4   Q       February of 2014?  A few days before February 8th of 2014?

5   A       Yea.  Yea, somewhere in there.

6   Q       Okay.  Did you actually assist in the investigation that Detective Clark

7   asked you to do?

8   A       Yea, I did what I was asked; yes.

9   Q       Okay.  What did Detective Clark ask you to do?

10  A       To go back and find out who his cellmates were.

11  Q       Who's he?  I'm sorry.

12  A       Mr. Carter.

13  Q       Mr. Carter?  Okay.

14  A       Yes.  And then talk to them to find out if he had any involvement in any

15  prior crimes.

16  Q       Okay.  Now, did Detective Clark discuss with you, and I'm specifically

17  referencing Detective Clark, did he discuss with you any facts or

18  circumstances that might be important to Detective Clark?

19  A       I believe so; yes.

20  Q       Okay.  Did that help you in your investigation as you did your

21  investigation in determining what might be important if somebody told you

22  something and what might not be important?

23  A       Absolutely.

1345

1 Q Was that helpful to you in that regard?

2 A Absolutely.  I would be interviewing blind if I didn't.

3 Q Now, those circumstances or facts that Detective Clark may have

4 relayed to you which would better aid in your investigation, did you actually

5 talk to any individuals out at the prison?

6 A Yes.

7 Q Did you -- when you talked to individuals out at the prison did you relay

8 the facts that Detective Clark told you to them?

9 A Absolutely not.

10 Q Okay.  Why not?

11 A That would ruin any -- it would spoil the information that was received.

12 It wouldn't be worthy of reporting then.

13 Q Now, did you, indeed, talk to a number of individuals that had -- well,

14 let me ask you this so we can just use sort of a colloquialism here.  Are you

15 familiar with the term cellie?

16 A Absolutely.

17 Q Okay.  What's a cellie?

18 A A cellie is someone that they cell with within the confines of their cell.

19 Q Okay.  So, somebody they live with in their cell?

20 A They live with them.

21 Q Okay.  So, if I use the word cellie you know what I mean?

22 A Absolutely.

23 Q Did you, in fact, at Detective Clark's request, talk to Markelus' cellies?

1   A       I did.

2   Q       Okay.  Did any of them have any pertinent information that they

3   relayed to you?

4   A       The cellies did not.

5   Q       Okay.  Was there at some point, after you talked to the cellies, was

6   there at some point that someone came to talk to you about the information

7   you were seeking?

8   A       Yes.

9   Q       Okay.  Who was that person?

10  A       That was Mr. Upham - inmate Upham.

11  Q       And do you know his first name?

12  A       Stephen.

13  Q       Okay.  And when you spoke to -- well, let me ask you this.  Do you

14  remember the date you spoke to Stephen Upham?

15  A       It was the same date as the report.

16  Q       Okay.  Did he have what you felt was information helpful to Detective

17  Clark's investigation?

18  A       He did.

19  Q       Now, before Mr. Upham relayed this information to you, again, did you

20  relay any facts to Mr. Upham that Mr. Clark relayed to you?

21  A       No.

22  Q       Did you at any point promise Mr. Upham anything in exchange for the

23  information that he gave?

1    A    Never.

2                  MR. MILLER:  One second, your Honor.

3                  THE COURT:  Okay.

4    (WHEREUPON, Court went off the record briefly.)

5    Q    Sergeant Smith, you mentioned that you do investigations at Allen

6    Oakwood.

7    A    Yes, sir.

8    Q    Do you ever have inmates use other inmates to send letters?

9    A    Oh, absolutely.  That's common.

10    Q    You've investigated that sort of thing?

11    A    Absolutely.

12    Q    Okay.  Are inmates allowed to use cell phones --

13    A    No.

14    Q    -- in the prison?

15    A    No.

16    Q    Have you ever found an inmate to have a cell phone in the prison?

17    A    Oh, yes.

18    Q    Is that a violation of prison rules?

19    A    It is.

20    Q    Let me just ask you this - are people able, are people actually able to

21    smuggle things into the prison?

22    A    Unfortunately all too often.

23    Q    What kinds of things do they smuggle into the prison?

1  A      Just about any kind of drug you can think of; suboxone strips;

2  marijuana; heroin.  They smuggle cell phones.  That's always a constant

3  battle because they can coordinate.  So, there's just a myriad of --

4  Q      You mentioned coordinate.  Why are cell phones a problem in our

5  prisons?

6  A      Well, you can coordinate an attack on a staff member so that there

7  would be less seen.  You could go ahead and organize a way of conveying

8  the contraband into the institution, including where the perimeter vehicles are.

9  There's a list of -- I mean, you could talk about it all day.

10  Q      Okay.  Now, you mentioned that you had spoken to a number of other

11  inmates, other than Mr. Upham.  Did you promise any of those inmates

12  anything in exchange for any information they might have?

13  A      No.  No.

14                              MR. MILLER:  I have nothing further.

15                              THE COURT:  Any questions, Mr. Rion?

16                      **CROSS EXAMINATION**

17  **BY MR. RION:**

18  Q      Good afternoon, sir.

19  A      How are you?

20  Q      On direct examination you stated that you had cellmates come in and

21  you asked them whether or not they were aware of any crimes.  I think that's

22  the way you phrased it; right?

23  A      Yes.

1349

1  Q      You were more specific than that as related to the investigation;

2  correct?

3  A      No.  May I elaborate?

4  Q      Sure.

5  A      I mean, I would say, "Have you discussed or have you ever had any

6  conversations about any of his past criminal activity?"

7  Q      And that was as specific as you got with them?

8  A      Correct.

9  Q      And why was that?

10  A      I don't want to lead the person I'm interviewing in a direction to where

11  they can make something up and I would get hooked by some fabricated

12  story.

13  Q      In other words, if you told them, 'I'm looking at the theft of a pack of

14  gum on Main Street', well, you didn't want to put the idea of a theft offense

15  and, 'oh, yea, I know about that', and them then make up a story about it;

16  correct?

17  A      Correct.

18  Q      And if you even let them know whether you're looking at a theft case,

19  or a bank robbery, or whatever, same thing?  Now you're focusing in on the

20  type of crime.  You would be signaling to them, I guess, what they would be,

21  or, what you would be wanting them to talk about and that could also lead to,

22  or curve the interview in a way that you didn't want it to go; correct?

23  A      Correct.

1350

1 Q So, it's safe to say that the technique that you used was that you would

2 bring in various people and say, "Look, if you have any information about Mr.

3 Carter, I'm seeking it.  Do you have information?"  Well, I think you said, "Do

4 you have any information about any other crimes?"  I'll leave it at that.  Right?

5 A Up until the very end of the interview; yes.

6 Q What do you mean?

7 A At the end of the interview I told them how serious this was and I

8 believe I even said at the very, very end, "This is a murder investigation and

9 you shouldn't talk about this."  That was at the very end.

10 Q Okay.

11 A That's as they were walking out the door.

12 Q Okay.  So, this is to, say, Thomas Smith, as an example, you would

13 have told him that he was being looked at, or, that Markelus was being looked

14 at as a suspect in a murder case; correct?

15 A At the end of the investigation.

16 Q So, you interview Thomas Smith on the date of your report.  Is that on

17 February 8th, 2014?  Is that when you interviewed Thomas Smith?

18 A I believe so; yes.

19 Q Okay.  And you didn't interview Stephen Upham on that same day;

20 right?

21 A I believe it's in my report.  I'm sure I put the date on it.

22         MR. RION:  May I approach the witness?

23         THE COURT:  Yes.

1351

1    Q      To refresh your recollection --

2    A      Oh, interview him?  No.  No.  He came to me.

3    Q      Right.  What day did you speak with Stephen Upham about this?

4    A      This was the 21st.

5    Q      Okay.  So, you didn't interview -- so, Thomas Smith you spoke to on

6    February 8th and then a week or two later, almost two weeks later then,

7    Stephen Upham comes into your office and says that he has information that

8    you wanted?

9    A      Yes.

10   Q      That's the way he states it?  I have -- he has information that I want.

11   He came to me and he said, "I have information that you want."

12   A      Yep.

13   Q      Okay.

14   A      Yes, sir.

15   Q      So, he knew that the -- well, word had gotten out somehow that you

16   were wanting to talk to people; right?

17   A      Oh, I'm sure it did.

18   Q      And for two weeks time or so it's percolating and then Stephen Upham

19   comes to you on the 21st of February, 2014; correct?

20   A      Yes, sir.  Yea, it's going back a year and a half and so I've got to refer

21   to the report.

22   Q      Well, by law I can't ask you what he told you.

23   A      Understood.

1352

1  Q      So, I'm not going there with it.  You said Detective Clark had shared

2  with you various information about the case?

3  A      Yes.

4  Q      About his investigation before that; correct?

5  A      Some; yes.

6  Q      And you have people in your institution that -- well, for instance, if they

7  get a five year sentence or a four year sentence they don't necessarily have

8  to do that period of time; correct?

9  A      That's correct.

10  Q      There's various ways for that to be reduced.  Would one way for a

11  sentence to be reduced is this concept called judicial release?

12  A      Yes.

13  Q      Is that a situation where the Court, upon a Motion of the lawyer for the

14  defendant, or I guess the defendant himself could file his own Motion, but ask

15  the Judge to release him early for a whole host of reasons?

16  A      I don't know.  That's beyond the scope of my duties.

17  Q      But, you see that happening?

18  A      I see judicial releases.  Now, how they come about, I don't really know

19  the full understanding of it all; no.

20  Q      Okay.  So, you've seen people that come in the front door of your

21  prison and they get a seven year sentence, but that doesn't necessarily mean

22  that they're going to serve seven years?  There's other factors that could

23  cause them to be released early?  Is that a fair statement?

1    A    Right.

2    Q    Thank you, sir.

3                              THE COURT:  Any redirect?

4                              MR. MILLER:  Very briefly, your Honor.

5                              THE COURT:  Very brief.

6                      **REDIRECT EXAMINATION**

7    **BY MR. MILLER:**

8    Q    I think you mentioned it kind of on the fly, and when I say that I mean

9    as you were just in conversation with Mr. Rion, but did Upham come to you or

10   did you go to Upham?

11   A    No, he came to my office on his own.  Nobody called him.

12   Q    Okay.

13                              MR. MILLER:  No further questions.

14                              THE COURT:  Okay.  Any recross?

15                      **RECROSS EXAMINATION**

16   **BY MR. RION:**

17   Q    I think the question is obvious, but that would imply to you that he had

18   heard about your request from somebody else?

19   A    Do you want me to answer something?

20   Q    I think you did by nodding your head; but, you can say 'yes'.

21   A    Or overheard; yea.

22   Q    Okay.

23                              MR. RION:  Nothing further.

1354

1   THE COURT:  Okay.  All right.  You may

2   step down.

3   A   Thank you.

4   THE COURT:  Congratulate counsel - that

5   was relatively brief.  We'll take a break now.  Again, this is sort of, well, just

6   like I just got done telling you with the last witness - there's evidence here that

7   the defendant had some cellies and was incarcerated.  If you believe that

8   evidence you can't use that evidence to show his character or that he acted in

9   conformity with it in relationship to the charges in this case.  That type of

10  evidence, the fact that he was incarcerated and had cellmates, could be used

11  for other purposes, perhaps to show the identity of who we're talking about or

12  to show that he would have had some kind of a motive or preparation or

13  something like that.  But, you can't use it to show, okay, he was incarcerated

14  and that shows his character and he must have acted in conformity with that

15  character with respect to these allegations.  You can't use it for that reason.

16  Okay?

17  So, let's take a break here for about fifteen minutes.  Remember the

18  admonitions.  That's like a broken record, but I've got to say it each time.

19  Don't discuss the case among yourselves or with anyone else.  Don't come

20  into contact with any of the parties.  Don't formulate or express any opinions.

21  Don't pay attention to any media accounts of the case.  Don't do any

22  independent research.

23  We'll be in recess until about a quarter after three.  The State will have

1    another witness ready?

2                                    MR. MILLER:  We'll have one.  I believe

3    so.  We'll check on the break.

4                                    MRS. KOHLRIESER:  I arranged it

5    already.  We're good.

6                                    THE COURT:  All righty.  Okay.  We're in

7    recess.

8    (WHEREUPON, COURT WAS IN RECESS.)

9

10                                   THE COURT:   Okay.  I'll just indicate for

11   the record again that it's about three-thirty now on the 16th of September,

12   2015 in Case Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter.

13   The defendant is present with counsel.  The State is back in.  The jurors have

14   been brought back in from the last recess.

15         Ladies and gentlemen, during the recess, and I appreciate again that it

16   was extended, but believe me we're trying to minimize the delays and the

17   waits.  I think you're understanding, or maybe you don't just quite understand

18   yet, but some of those things are just unavoidable.  We've got another

19   witness lined up.  But, given that it's three-thirty and given you folks on the

20   jury have been troopers and have had a long day and I understand the next

21   witness may be a little lengthier, well, we're going to break early.  I apologize

22   if that causes inconvenience.  That means that we'll reconvene tomorrow and

23   try to go as quickly as, well, I understand the State has a few more witnesses

1356

1     to put on.  So, we're getting close to the end of the State's case.  But, the

2     Court's just making the decision so we don't go too long this afternoon to

3     break early.  So, we'll let you guys go.

4           Now, the other thing, I have a couple of things in the morning.  Again,

5     I've been trying to do things at the eight and eight-thirty hour every morning.

6     To the extent that that has caused some delays, I apologize for that, too.  So,

7     what we'll do is we'll do kind of a compromise and not have you folks here

8     until about nine-fifteen.  I think then we can take care of things that I have to

9     take care of.  If you get here at nine-fifteen and then we can promptly, well,

10    around that nine-fifteen hour get started.  Okay?

11          Remember the admonitions.  Don't discuss the case among

12   yourselves or with anyone else.  Don't do any independent research.  Don't

13   do anything on social media or the Internet.  Don't listen to any media

14   accounts or pay attention to or read any media accounts.  Don't discuss it

15   among yourselves or with others.  Don't formulate or express any opinions.

16   Certainly if anything comes to anyone's attention that you feel like it's going to

17   interfere with your ability to be fair and impartial let Monica know as soon as

18   you can.

19          I hope everybody gets some sleep.  Get some rest.  Whatever you ate

20   for lunch today, don't eat it tomorrow.  All right.  Take care.  Let us know if

21   there's any issues.  But, the jury will be excused for the evening.  Get some

22   rest and we'll see you at nine-fifteen tomorrow morning.

23   (WHEREUPON, JURY WAS EXCUSED FOR THE DAY AT 3:35 P.M.)

1357

1                    THE COURT:  Okay.  The jurors have left.

2    I just want to go on the record then that the Court was made aware of

3    something that occurred during the recess.  We've had a conversation in

4    chambers.  Unless someone feels compelled at this point I don't want to put

5    anything on the record about that now.  We've had the discussion and there's

6    some further looking into that that needs to be done.  I've spoken with the

7    prosecutors and Mr. Rion about how information about that can be gained

8    and exchanged.  The Court wants to get all the information it can.  If need be,

9    tomorrow morning we can put things on the record in that regard.  Okay?  Fair

10   enough?

11                MRS. KOHLRIESER:  Fine by the State,

12   your Honor.

13                MR. MILLER:  Yes, sir.

14                THE COURT:  Anything else?

15                MR. RION:  What time would you like us?

16                THE COURT:  I have an eight o'clock and

17   an eight-thirty.  It's a sentencing.  I think if you're here - and I know I kind of

18   stretched things out this morning, too - but, try to get here about eight

19   forty-five, a half hour ahead of the jurors.  If we need to put things on the

20   record about that, we can.  Certainly we can have more discussion.  Any

21   information that the State gets concerning whatever occurred during the

22   break --

23                MRS. KOHLRIESER:  Absolutely, your

1  Honor.

2  THE COURT:   If we can take care of that

3  before Mr. Rion leaves the building?

4  MRS. KOHLRIESER:   That's what I was

5  going to say.  If he wants to hang around?  As soon as that's done --

6  MR. MILLER:   I can update whatever

7  information we have.

8  THE COURT:   And anything that you have

9  make sure I'm aware of before it's sprung on me tomorrow morning at

10  eight-thirty.  Is that fair?

11  MRS. KOHLRIESER:   Yes, your Honor.  I

12  told the Sheriff myself what you wanted.

13  THE COURT:   Okay.  I'm going to hang

14  around.  Our hours are until four-thirty normally.  So, we'll be around at least

15  until then.  Okay?

16  MRS. KOHLRIESER:   Thank you.

17  THE COURT:   Anything else?

18  MR. RION:   If you could just give that

19  Judge in Cleveland my regards?  So, thank you.

20  THE COURT:   Okay.  All right.  I'll talk to

21  you all tomorrow.

22  **(WHEREUPON, COURT RECESSED FOR THE DAY AT 3:37 P.M.)**

23

1     **THURSDAY, SEPTEMBER 17, 2015**

2     **9:32 A.M.**

3

4     THE COURT:   All right.  The record will

5     show that today is the 17th of September, 2015.  We're reconvening in

6     CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The defendant is

7     present in Court with his attorney.  The State is present.  The jurors have

8     reported, but they are not in the Courtroom.

9     We need to go on the record on a few things.  As we recessed

10    yesterday afternoon obviously we put on the record that there had been, well,

11    I'll just call it an incident at this point, in the holding room.  We broke and

12    excused the jurors for the day when that happened.  My understanding is that

13    that incident, because of the security system that the jail has, was videotaped.

14    So, number one, I wanted to make sure that the video was obtained and then

15    both the defense and the prosecution had that and had a chance to review

16    that video and then we can have a discussion about what, if anything, we're

17    going to do about that.

18    So, first off, I think the State of Ohio can represent the video of the

19    security camera video from the incident has been downloaded?

20    MR. MILLER:  Yes.

21    THE COURT:  You guys have a copy?

22    MRS. KOHLRIESER:  Yes, your Honor.

23    After we adjourned they were working on getting it.  They, being the I.T.

1  department for the jail and things like that.  Mr. Rion stayed initially and then

2  asked me about e-mailing it.  I explained to him my limitations in that regard,

3  but that I could see about it.  It was my belief at that point that Mr. Rion had

4  left for the day.  It was probably ten/fifteen minutes after that when I went

5  down and spoke to the I.T. people myself about, you know, where's the video.

6  Someone told me that they thought I.T. could probably e-mail it to Mr. Rion for

7  me and when I spoke to the I.T. guy he said that the file was too large or

8  something of that nature and we couldn't e-mail it.

9                          THE COURT:   Nonetheless, a disc has

10  been made and then you got a disc this morning then, Mr. Rion, as I

11  understand it?

12                          MR. RION:   I received it and I have

13  reviewed it with Mr. Carter.

14                          THE COURT:   Okay.  Again, the record will

15  show we're running a little bit behind because when the Court found out that

16  Mr. Rion didn't have the video yesterday and just got it this morning I wanted

17  to make sure that he had the opportunity to review that with his client if his

18  client wanted to review it with him.  So, that's been done.  So, everybody's got

19  that.

20          I don't have a disc.  I don't know if you have an extra disc.  I will state

21  for the record that yesterday afternoon, after everyone had left, I did, well, I

22  think I viewed, and I don't know if I viewed the whole thing because I don't

23  know what's on the whole DVD, but I did see at least part of what happened

1361

1  in the security office on their computer.  That was after everybody left

2  yesterday.  But, if you have an extra copy?

3                    MRS. KOHLRIESER:  Your Honor, the

4  extra one that was given to us I gave to Mr. Rion.  I guess my point of that

5  was I called Mr. Rion immediately and left a message that I couldn't get him

6  the video e-mailed.

7                    THE COURT:  Well, I guess, and we're

8  about to have a discussion as to what, if any, use that will have in the trial.

9  Depending on how that turns out, whatever the case be, obviously if it is

10  used, if I allow it to be used in the trial, it will be in the record.  If I don't allow it

11  to be used in the trial I want a copy of it filed.  It will be a Court exhibit

12  because I want there to be a record of that, what transpired, in any event.

13  Okay?

14                    MR. MILLER:  We can do that.

15                    THE COURT:  All right.  So, now let's get

16  to the heart of the issue here.  With that occurrence yesterday it's my

17  understanding, based on conversations in chambers, that the State was

18  intending to use that in evidence.  Is that correct?

19                    MRS. KOHLRIESER:  Yes, your Honor.

20                    THE COURT:  And that the defense

21  obviously was objecting to that.  Mr. Rion, you had indicated in chambers also

22  that you might have some other things you want to put on the record in that

23  regard.  So, given the fact that there's a representation that the State

1    intended to offer that as evidence in this case I'll turn to Mr. Rion then and

2    you can put on the record any objections, any motions, or anything you want

3    to put on the record with regard to the DVD of the incident and the incident

4    itself that occurred yesterday.  Mr. Rion?

5                  MR. RION:   Your Honor, this case has

6    been pending for a long time.  I guess I'll address the Court's first inquiry as

7    far as the State's motion, or, intent to enter this into evidence.  This case has

8    been pending a long time and there's been no incident that would cause

9    concern as far as Mr. Carter's behavior.  The creation of this incident wasn't

10    Mr. Carter's fault.  I accept the representations and I truly believe that it was a

11    complete accident in this matter that this situation was even created.  That

12    being said, it's very clear that there was, well, that words were exchanged.

13    Those words are not captured on the video.  But, I think there's a back and a

14    forth.  Mr. Upham said some things to Mr. Carter.  Mr. Carter said some

15    things to Mr. Upham.  Your Honor, I believe that if the Court were to admit this

16    into evidence, one, that it would be very, very prejudicial.  The only argument

17    that could be made in my mind is that it's being used to show Mr. Carter's,

18    well, their argument as to his character.  Obviously we're at a very sensitive

19    part of this trial and emotions are running high.  It really wasn't -- Mr. Carter

20    wasn't seeking this meeting, this confrontation.  Nor was he seeking to have a

21    conversation with Mr. Upham.  So, I would ask the Court to exclude it on 404

22    issues and on 403.  It just clearly would be other acts evidence.  It's a

23    non-charged event that happened for a matter of seconds.  I could not

1   imagine something more prejudicial to go in front of this jury than this video

2   and testimony in relation to it.  It's a separate act and it seems like the animus

3   of it had little to do with the other exceptions in 404.

4           On top of that, at this time, and I know it was an accident, but it

5   happened.  If Mr. Upham were to testify, well, I don't know if he has any

6   visible marks or anything at this point.  But I, again, would ask for a mistrial if

7   he is going to testify.  The jury is going to see these marks on him and if they

8   have any -- well, my second concern is that the jurors may have heard about

9   this either through the press, as it's my understanding there were two articles

10  run in the newspaper and there's video here and so I assume there was some

11  video taken as well, and also I think there were jurors that were around the

12  Courthouse at the time that this occurred and then they have been a witness

13  to at least the reactions of Court personnel and/or statements made by

14  officers while they were trying to deal with the situation.

15          So, those are my two issues and those are my arguments, I guess.

16                              THE COURT:  All right.  Does the State

17  want to respond?

18                              MRS. KOHLRIESER:  Yes, your Honor.

19  Thank you.  There's a couple of things that have been mentioned by Mr. Rion

20  here.  First off, and I'm going to kind of address this a little bit backwards from

21  how Mr. Rion presented them.  As to the mistrial and Mr. Upham's injuries

22  and things of that nature, every injury that's visible was caused by this

23  defendant.  That's of his own creation.

1        As to the statement that due to no fault of Mr. Carter, as far as that

2  goes, well, we also have Tim Enyart, who I would note for the record is

3  present in Court and he was our Court security officer in here yesterday and

4  he is the one -- well, by all representations Mr. Upham was already in the cell

5  in plain jail clothes and Mr. Enyart, during the break, brought the defendant

6  back to the room.  There were also things going on in Judge Cheney's end

7  with multiple people in and Mr. Enyart didn't know what Upham looked like

8  and I think nothing was said to him.  After this incident and we had adjourned

9  for the day Officer Enyart -- and, by the way, I've given all the reports that I

10  have on this incident thus far to Mr. Rion as well, not just the video but the

11  reports that many stayed to write last night, but Mr. Carter directly said to him,

12  that he apologized and he knew that was a witness against him and he

13  should have said something.  So, at any point Mr. Carter, when he realizes

14  who's in there, because he's walking there uncuffed, could have turned

15  around knowing, knowing all the proceedings that have gone on before and

16  all the discussions about all these inmates that are looking to be transferred

17  here, and the timing of these inmates, and how we're going to bring them

18  from the prison, and security risks, and things of that nature, he knew that

19  was a primary concern and he didn't volunteer that information to prevent it.

20  He's the one that took the first swing.  He's the one that created the incident.

21  So, he doesn't get a mistrial due to his own actions, his own choices, I might

22  add.

23        Then, also, he talks about we haven't had any prior incidences with

1365

1  Mr. Carter.  Well, he's been in custody since he was indicted.  He hasn't been

2  around other witnesses to be able to do anything, quite frankly.

3  But, more importantly, that's really not, despite Mr. Rion's

4  representations and his beliefs, that is not the purpose of this.  The purpose is

5  to show a couple of things.  First off, consciousness of guilt.  He knows what

6  Upham is going to testify to.  He has not only Sergeant Smith's reports as to

7  that interview, but he also has Detective Clark's interview of him.  It's been a

8  point of contention in various means.  My understanding is that a number of

9  his witnesses, these prison witnesses, are there to contradict or, I guess,

10  thrust credibility issues upon Mr. Upham's testimony.  So, it wasn't like it was

11  new to him.  What happens is he knows that Upham is about to testify in a

12  way that's very damaging to him and he doesn't want him to testify.  He

13  attacks him.  He's sending a message to him this is what's going to happen to

14  you.  That's a consciousness of guilt.  Not to mention that it also shows, quite

15  frankly, his modus of operation when he feels someone is doing something

16  wrong to him.  Disrespecting him I think was his own language.  Disrespecting

17  him.  You're going to pay.  That's his mode.  He's going to physically attack

18  you and he's going to do it when you're not ready for it because he sucker

19  punched Mr. Upham.  It's the State's belief that he shot Ken Warrington in the

20  back.  Thankfully he didn't have a gun yesterday.

21  So, for those reasons, and particularly the consciousness of guilt, we

22  would ask that the motion be overruled, both motions be overruled.

23  THE COURT:  Okay.  Again, I'll give Mr.

1366

1    Rion an opportunity, if you want to rebut anything they've argued.  Do you

2    have anything else you want to say?

3                              MR. RION:   You know, the State's last

4    statement was essentially an argument of actions in conformity therewith

5    once again.  You know, the statement that allegedly was made by Mr. Carter

6    was 'why are you lying on me'.  So, I don't see how it's consciousness of guilt.

7    Nothing further.

8                              THE COURT:   Okay.  All right.  This

9    presents kind of a unique situation for the Court, and I'm sure counsel, too.  I

10   studied on it because I anticipated there would be these kinds of issues and I

11   reserved making any kind of determination until I heard all of the arguments

12   and, first off, made sure whether or not the State actually intended to use any

13   of the evidence of the incident that occurred.  Apparently they do.  So, I'm

14   going to deal with this.

15       First off, I think the most important point here would be right now the

16   Motion for Mistrial.  So, I'll deal with that first because obviously if I grant a

17   mistrial then everything else is, I suppose, moot at this point.  We went over a

18   little bit of this when the prior Motion for a Mistrial was made in terms of how

19   the Court has to exercise its discretion.  Again, I've done some research in

20   anticipation of this.  I just want to state this as kind of a background of my

21   decision and how I'm exercising my discretion so this is pretty commonly

22   understood.  State -vs- Franklin, 62 Ohio State 3d, 118, there's a quote from

23   there that, "Mistrials need to be declared only when the ends of justice so

1   require and a fair trial is no longer possible.  A mistrial should not be ordered

2   in a criminal case merely because some error or irregularity has intervened."

3   It's also well established that a Court will not permit a party to take advantage

4   of what they call in the case law invited error.  Under invited error, under that

5   doctrine, "A party may not take advantage of an alleged error that the party

6   induced."  I would state State, ex. rel. Fowler -vs- Smith at 68 Ohio State 3d,

7   357, Rhodes -vs- Rhodes Industries, 71 Ohio Appellate 3d, 797, Lester -vs-

8   Leuck, L-E-U-C-K, it's an older case, 142 Ohio State 91, but it's still cited, "A

9   litigant cannot be permitted either intentionally or unintentionally to induce an

10  error and then procure a reversal of the judgment for an error for which he

11  was actively responsible."  They've taken those types of theories into the

12  realm of mistrials and State -vs- James, which is a Clark County appeal case

13  from 1999, Clark County Number 98-CA-54, and it didn't have a computer

14  website number that I could find, but says, "Courts have been reluctant to

15  consider disruptive conduct of a defendant to be a proper ground for a

16  mistrial."  Now, this disruptive conduct wasn't in the Courtroom, which many

17  of the cases referred to outbursts in the Courtroom.  But, I think the case law

18  and the reasons behind the cases would be the same, especially when

19  there's an issue of whether or not the disruptive conduct that may have

20  happened in the holding room, well, whether or not that's going to be

21  presented to the jurors and they would know about it.  Also, State -vs-

22  Gonzalez, an Athens appeal case number 97CA52.  All these cases pretty

23  much are of the same nature.  They hold that, "To allow disruptive conduct

1368

1   or an intentional or unintentional inducement of what might be considered by

2   some to be error, to allow a party to do that as a proper ground for a mistrial

3   would provide a defendant with a convenient device for provoking a mistrial

4   whenever he or she chose to do so." That is the <u>State -vs- James</u> case. It's

5   a 1999 case. That's the Clark County case - <u>State -vs- James</u>. There's

6   cases that say outbursts during voir dire -- well, that's not what we're talking

7   about. But, again, -- well, that's the <u>Gonzalez</u> case from Athens. But, again,

8   the theory, I'm citing this as the theory as can something that the defendant

9   has done be used as a grounds for a mistrial. In <u>State -vs- Greathouse</u>,

10   Montgomery Court of Appeals, the computer website number is

11   2007-Ohio-2136, the defendant violently overturned a defense table and then

12   moved for a mistrial. The Common Pleas Court denied the mistrial. The

13   Court of Appeals affirmed that, again, saying, "A defendant should not be

14   permitted to profit from his voluntary and physical disruptive behavior." Also,

15   in <u>State -vs- Chambers</u>, a 2000 case, and I'm sorry but I don't have the

16   computer website number, it's Court of Appeals number 99 AP-1308, and I

17   have the Westlaw and it's 2000 Westlaw 963890, and it says, "A defendant

18   cannot participate in intentional acts and then seek the protection of the Court

19   from his own misbehavior."

20       Now, I agree with the defense characterization, and based upon all of

21   the information that I have that's been presented that's on the record, it was

22   an accident. It was an unfortunate accident that the defendant and the

23   witness were put in the same holding room. But, what occurred thereafter I

1    find was not an accident.  It was intentional based upon the viewing of the

2    video of that.  I'm going to find that the defendant cannot participate in an

3    intentional act.

4            So, I'm going to overrule the Motion for a Mistrial under the invited

5    error doctrine.

6            Now, with regard to whether or not I'll permit the evidence of the

7    incident to be presented, again, I'm basing that upon the representations of

8    counsel as to how they intend to use that.  The first question I need to make

9    sure is there sufficient evidence that the defendant committed an act?  Well,

10   obviously there's the DVD and so I find there is sufficient evidence that he

11   committed an act.  So, then the analysis becomes is this a 404 (B) issue or

12   not, or is it a combination of 404 (B) and something other?  404 (B) allows the

13   admission of other acts.  This is an other act.  If it's related to the crime in

14   question.  State -vs- Lowe, 69 Ohio State 3d, 527 and State -vs- Goehring,

15   G-O-E-H-R-I-N-G, 2007-Ohio-5886.  Even the Sixth Circuit Federal Court of

16   Appeals in United States -vs- Adams said, "404 (B) is not implicated when the

17   other act evidence is part of a continuing pattern."  Necessarily I know that the

18   State is trying, perhaps, to argue that.  But, they go into a discussion more

19   about is it intrinsic or extrinsic evidence.  If it is intrinsic, i.e. related to the

20   crime, it can be brought in under 404 (B).  They basically discuss what

21   intrinsic evidence is and the language that I feel is controlling in this case is,

22   "Intrinsic evidence is, is there a connection to the charged offense."

23   Insomuch as this was a witness in the case who apparently is going to testify

1370

1   against the defendant, I find there is that connection to the offense.  Also,

2   Ohio Courts have said, "Evidence, 404 (B) precludes evidence of other acts

3   that are wholly independent of the criminal offense for which the defendant is

4   on trial." I find that what happened yesterday is not wholly independent.  This

5   is State -vs- Justice, Franklin County Court of Appeals 89 AP 956 and State

6   -vs- Leonard, Court of Appeals, again, I'm sorry, I don't have the county, but

7   it's CA92-12 and a Westlaw number of 1993 Westlaw 172198.  Also, State

8   -vs- Wilkerson, 64 Ohio State 2d, 308, "Evidence of other crimes may be,"

9   and let's insert the words 'other acts', "may be presented when they are so

10  blended or connected with the one on trial as that proof of one incidentally

11  involves the other or explains the circumstances thereof." I think it's that last

12  phrase that would apply in this case - 'explains the circumstances thereof or

13  tends logically to prove any element of the crime charged'.  One of the

14  elements, obviously, is a culpable mental state here that has to be proven.

15  So, does what happened yesterday explain the circumstances or logically

16  tend to prove an element of the crimes charged?  So, I was drawn to State

17  -vs- Ritchey, 64 Ohio State 3d, 353, State -vs- Leonard, a Lawrence County

18  Appellate Court case number CA92-12, State -vs- Reese from Cuyahoga

19  County, and the number is 53115 and 53116, and State -vs- Soke, S-O-K-E,

20  105 Ohio Appellate 3d, 226.  They're all standing for the proposition that,

21  "Evidence of threats or intimidation of witnesses reflects a consciousness of

22  guilt and is admissible as an admission by conduct because intimidation of a

23  witness is not wholly independent of the charged offenses." State -vs-

1371

1   <u>Williams</u> also stands for that. 2008-Ohio-1948.

2       So, I find, first off, that 404 (B) is not implicated. This is intrinsic

3   evidence not wholly independent of the offenses and it is evidence of an

4   admission by conduct reflecting a consciousness of guilt that tends logically to

5   prove an element of the crimes charged. But, even if 404 (B) were

6   implicated, which I don't think it is, but if 404 (B) would be implicated it would

7   be admissible for other purposes other than to prove character or that the

8   defendant acted in conformity with character, such as intent, knowledge,

9   motive, and things that are listed in 404 (B).

10      So, I'm going to allow the State to use the evidence over the defense

11  objection. Exceptions are noted. I've stated my reasons. I will have a

12  consciousness of guilt instruction and that will also be a blended, well, not

13  only a consciousness of guilt, but also to make sure the jurors understand

14  they cannot use the evidence to show the defendant's character or that he

15  acted in conformity with that character in allegedly committing the crimes that

16  are before the Court. But, as the consciousness of guilt instruction in O.J.I. is,

17  well, I'll use that. I will voir dire the jurors to make sure they haven't heard

18  anything about it. I'm going to also order that the State not, in closing

19  argument, not use the 'thankfully he didn't have a gun yesterday' argument

20  that you made in your argument.

21                      MRS. KOHLRIESER: Absolutely, your

22  Honor.

23                      THE COURT: You won't do that in closing

1372

1    argument in front of the jurors.  Okay?

2                               MRS. KOHLRIESER:   Yes, your Honor.

3                               THE COURT:   So, I hope you understand

4    my ruling.  Exceptions are noted for the record.  Anything else that we need to

5    do before the jurors come in?

6                               MR. RION:   Can we approach, your

7    Honor?

8                               THE COURT:   Sure.

9    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

10   the record, as follows.)

11                              MR. RION:   May I have five minutes with

12   him to discuss the implications of this?  Is it possible that we could be back

13   there and I was wondering if his mother could be outside the room, but still in

14   ear shot of us, so I can talk to them about something?

15                              MRS. KOHLRIESER:   Hanging out in the

16   hallway?

17                              MR. RION:   No.  I'd like her outside, right

18   outside the cell door, just maybe with the food door open or something.

19                              MR. MILLER:   (Inaudible).

20                              MRS. KOHLRIESER:   I would just want

21   two deputies out there.  That's all.

22                              MR. RION:   That's fine.  I have no

23   problems with that.

1　　　　　　　　　　　　　　MRS. KOHLRIESER:  One other thing,

2　your Honor.  I believe we also need to call Tim Enyart as a potential witness if

3　Jon Paul wants to argue, or, would argue that, you know, due to no fault of his

4　own he was placed in there, well, Tim Enyart would need to testify that he

5　specifically told him after that that he knew that was a witness and he should

6　have said something to him.  So, I don't know how we want to handle Tim's

7　presence is my thing.

8　　　　　　　　　　　　　　THE COURT:  Okay.

9　COURT REPORTER:  Wait.  I can't hear you.

10　　　　　　　　　　　　　　THE COURT:  Oh.  I pressed the button.

11　That's why.  Make the arrangement with his mother as inconspicuously as

12　possible.  I mean, maybe just -- well, maybe the media will walk out in the

13　hallway.  Just kind of do it quietly.  Okay?

14　　　　　　　　　　　　　　MR. MILLER:  Well, do you want a deputy

15　to take her back there?

16　　　　　　　　　　　　　　THE COURT:  No.  Just take her back.

17　　　　　　　　　　　　　　MR. RION:  Okay.

18　　　　　　　　　　　　　　THE COURT:  Just figure something out so

19　it isn't obvious.  Okay.

20　(WHEREUPON, Court continued on the record, as follows.)

21　　　　　　　　　　　　　　THE COURT:  Okay.  All right.  We're

22　going to take a short recess and then we'll have the jurors back in here.

23　(WHEREUPON, COURT WAS IN RECESS.)

1    THE COURT:  All right.  Let the record

2    reflect that it's the 17th of September, 2015.  We're reconvening in CR2014

3    0139, State of Ohio -vs- Markelus Q. Carter.  The record will reflect that the

4    defendant is present in Court with his attorney.  The State is present.  The

5    jurors have finally been returned to the Courtroom.

6    First and foremost, ladies and gentlemen of the jury, again, I tried as

7    hard as I could to try to estimate or guesstimate where we would be.  We

8    weren't there.  Again, I appreciate your patience and I ask that you continue

9    to have patience in matters like these, very important cases.  There are a lot

10   of things that the Court has to cover.  There's a lot of things that I can't do

11   with the jury present - procedure and legal and things like that.  Several things

12   had come up.  You know, sometimes I can try to plan and I think, okay, if I

13   give them an extra half hour it's going to be good and unfortunately for us

14   today it wasn't.  So, again, I appreciate your presence, or, your patience.

15   I want to ask again, as I have asked every morning, has anything

16   happened in your lives?  Been exposed to anything?  Talked to anybody?

17   Heard anything?  Rumors?  Media?  Anything about the case - anybody -

18   that's going to prevent you from being fair and impartial and continuing to

19   serve as a juror in this case?  Anyone?  Anything come up in anyone's lives?

20   Sickness?  Problems?  Anything like that?  Everybody's good?  Okay.

21   I'll just ask a little bit more, too, because we did have an early break

22   yesterday, did anybody hear any rumors or accounts, whether they were in

23   the media or not, about things that happened after or while we were in

1  recess yesterday?  Anybody?  Okay.  The jury has indicated not.  So, we will

2  continue.  We are in the State's case.  The State may call their next witness.

3                              MR. MILLER:  Stephen Upham.

4  WHEREUPON, called to appear as a witness in this proceeding was one:

5                      **S T E P H E N   U P H A M**

6  who, having been duly sworn by the bailiff herein, testified as follows:

7  BAILIFF:  He has an objection.

8                              THE COURT:  Okay.  This witness has

9  indicated, as is his right, not to be photographed or videotaped.  Under

10  Superintendence Rule 12 I would order the media not to videotape or print his

11  photograph in the media.  Go ahead.

12                      **<u>DIRECT EXAMINATION</u>**

13  **BY MR. MILLER:**

14  Q        Mr. Upham, can you state your full name for the record, please?

15  A        Stephen T. Upham.

16  Q        Is it pronounced Upham or Upham (pronunciation)?

17  A        Upham.

18  Q        Upham?

19  A        Yes.

20  Q        Okay.

21                              THE COURT:  Get close to the

22  microphone.

23  Q        Stephen, I'm going to ask you, and we've had to do this with a

1376

1    number of witnesses because what the witnesses don't realize is that this

2    records everything that's being said in here, but it also amplifies your voice so

3    that everybody can hear.  Okay?

4    A     Okay.

5    Q     So, I'm going to ask you those questions again that I just asked you so

6    that everybody can hear your answers.  Okay?

7    A     Yes.

8    Q     I'm going to ask you to state your full name for the record.

9    A     Stephen T. Upham.

10   Q     Okay.  And then I asked if it was Upham instead of Upham

11   (pronunciation) because I pronounced it Upham.

12   A     It's Upham.

13   Q     Upham?  Okay.  Mr. Upham, are you in prison?

14   A     Yes, sir.

15   Q     And where are you in prison at?

16   A     Oakwood.

17   Q     Okay.  Is that part of, if you know, is that part of the Allen County

18   prison system here in Lima?

19   A     Yes.

20   Q     Okay.  What are you in prison for?

21   A     Attempted Murder.

22   Q     Okay.  And is this your first stint in prison?

23   A     No.

1   Q      How many other -- if I say how many numbers, do you know what I'm

2   talking about?

3   A      Yes.

4   Q      What am I talking about if I ask you how many numbers do you have?

5   A      How many prison sentences I've served.

6   Q      Okay.  I'm going to ask you to speak up real loud; okay?

7   A      Okay.

8   Q      How many numbers do you have?  Well, actually, what does numbers

9   mean?

10  A      How many prison sentences I've served.

11  Q      Okay.  So, how many numbers have you had?

12  A      Three.

13  Q      Okay.  Is this your third that you're serving now?

14  A      Yes.

15  Q      And how many years are you serving for this Attempted Murder?

16  A      Thirteen.

17  Q      Okay.  What was your former prison stints for?

18  A      The first one was for Attempted Trafficking in LSD with a Sex Battery

19  and the second one was Attempted Trafficking in Marijuana.

20  Q      Okay.  And are all of those in Ohio?

21  A      No.

22  Q      What other state?

23  A      Michigan.

1  Q      Michigan?

2  A      Yes.

3  Q      And you say you have three numbers, so to speak, or three stints in

4  prison.  How many in Ohio and how many in Michigan?

5  A      Two in Ohio and one in Michigan.

6  Q      So, this would be your second in Ohio?

7  A      Yes.

8  Q      Let's talk about the one you're currently serving.  When did you go in?

9  A      April 26th of '11.

10  Q      Okay.  And when is your out date?

11  A      1-19 of '24.

12  Q      Okay.  That's 2024?

13  A      Yes.

14  Q      Now, you're here to testify for the State.

15  A      Yes.

16  Q      Correct?  Has anyone promised you anything, absolutely --

17  A      No.

18  Q      Okay.  Again, witnesses don't generally do this and they'll try to

19  anticipate my question and answer.  That makes it difficult for Sue here to

20  transcribe what's recorded.  So, I'm going to ask that you just wait until I finish

21  my question and then answer; okay?

22  A      Okay.

23  Q      Has anyone promised you anything in exchange for your testimony

1    here today?

2    A        No.

3    Q        Okay.  Now, do you know an individual named Markelus Carter?

4    A        Yes.

5    Q        Do you see him in the Courtroom today?

6    A        Yes, I do.

7    Q        Can you please indicate where he's sitting?

8                                  MR. MILLER:  For the record, he's

9    indicating to Mr. Upham's left.  I would just ask the record to reflect he's

10   identified the witness - I'm sorry - the defendant.

11                                 THE COURT:  Okay.  So noted.

12                                 MR. MILLER:  Thank you.

13   Q        How do you know Mr. Carter?

14   A        I met Carter when I arrived at A.C.I. somewhere after 9-16 of '11 when

15   I got to A.C.I.

16   Q        Okay.  Now, just for clarification, because many folks don't know, when

17   you say A.C.I. do you include in that term A.C.I. Oakwood?

18   A        Yes.

19   Q        Okay.  Okay.  So, we can use that term Oakwood and A.C.I.

20   interchangeably if we choose to during this and you'll understand what

21   everybody's talking about?

22   A        Yes.

23   Q        Okay.  How did you meet him?

1    A     He was on the same block as I was on.

2    Q     Okay.  Now, how would you describe your relationship with Mr. Carter

3  upon your arrival in prison here at A.C.I.?

4    A     Just pretty much asking questions to him.

5    Q     Okay.

6    A     You know, he's quiet.

7    Q     Okay.

8    A     But, he knew something about the law is what I was told and so I

9  asked him some questions.

10    Q     Okay.

11    A     Concerning my case.

12    Q     Okay.  Was he helpful to you?

13    A     No.

14    Q     Okay.  But, nonetheless, you asked him questions about the law?

15    A     I asked a lot of people questions about it.

16    Q     Understood.  Now, during these conversations did Mr. Carter ever

17  speak to you about a homicide?

18    A     He told me he shot somebody.

19    Q     Okay.  Did he tell you who he shot?

20    A     No.

21    Q     Okay.  Did he tell you any other facts about that particular homicide?

22    A     He told me there was an argument between his babies' momma and

23  him and a boyfriend got mad and threatened his kids and a couple of weeks

1    later he shot him.

2    Q       Okay.  Did anything strike you funny about his statement about the

3    boyfriend threatening his kids?

4    A       Yea.

5    Q       Yea?  What struck you as odd about that?

6    A       Because if a person threatens your kids you're going to shoot him right

7    then if you take it --

8    Q       Well, I take from your answer, then, a follow-up question and that is,

9    did Mr. Carter say anything about how the shooting took place?

10    A       He said after the argument he watched him for, like, a couple of weeks,

11    standing outside watching him come and go.

12    Q       Okay.  Did he say anything about what he wore - and when I say 'he' I

13    mean Mr. Carter -- well, let me rephrase the question and not use so many

14    pronouns.  Did Mr. Carter say anything about what Mr. Carter wore when he

15    shot this guy?

16    A       Yea.

17    Q       What did he say?

18    A       He said that he was wearing camouflage and a paintball mask.

19    Q       Okay.  How many conversations did you have with Mr. Carter about

20    this topic?

21    A       Quite a few.

22    Q       Did you know Mr. Carter prior to your arrival at A.C.I./Oakwood?

23    A       No.

1382

1   Q     Do you know anything about Mr. Carter's life outside of prison?

2   A     No.

3   Q     Now, at some point when you -- let me strike that.  Did you approach

4 somebody who worked at the prison with this information at some point?

5   A     Yea.

6   Q     Okay.  Who did you approach?

7   A     Sergeant Smith.

8   Q     And did you tell Sergeant Smith this information?

9   A     Yes.

10   Q     Did Sergeant Smith promise you anything whatsoever in exchange for

11 this information?

12   A     No.

13   Q     Did you go to Sergeant Smith right away with this information?

14   A     No.

15   Q     How long after learning this information -- well, let me ask you this.

16 How did you -- you went to Sergeant Smith.  Did you know Sergeant Smith

17 wanted to know some information about Mr. Carter?

18   A     Yes.

19   Q     How did you -- how did you learn that Sergeant Smith wanted to know

20 information about Mr. Carter?

21   A     Another inmate.

22   Q     Okay.  How did that come about?  How did you learn that?

23   A     Tom Smith had, I guess, been called to his office.  He came out and

1    he told me.

2    Q      So, Tom Smith is another inmate?

3    A      Yes.

4    Q      And he was called to Sergeant Smith's office?

5    A      Yes.

6    Q      And then who came out and told you what?

7    A      Tom.

8    Q      Tom came out and told you what?

9    A      Basically, "You're not going to believe this, but they're investigating his

10   shooting."

11   Q      Okay.  That's all he said to you?

12   A      I believe so.

13   Q      Okay.  Then that's when you went to Sergeant Smith?

14   A      No, I didn't go right away.

15   Q      You didn't?  How long did it take you?

16   A      It took me -- it took me a little while.

17   Q      Why did it take you a little while?

18   A      It's kind of like a code.  You don't tell on people; you know?  That's

19   how I've lived my life.

20   Q      So, you just decided to go?

21   A      I just decided to go.  I started thinking, you know, about the people

22   that, you know, are left behind and just one thing led to another and I figured I

23   would step up and offer help.

1   Q       Again, were you seeking anything in return for this information?

2   A       No.

3                              MR. MILLER:  Can I have one second,

4   your Honor?

5                              THE COURT:  Sure.

6                              MR. MILLER:  Thank you.

7   (WHEREUPON, Court went off the record briefly.)

8   Q       Okay.  Now, Mr. Upham, were you prepared to come in and testify

9   yesterday?

10  A       Yes.

11  Q       Okay.  Did something happen just prior to you coming in and

12  testifying?

13  A       Yes.

14  Q       Can you tell the jury what happened just prior to coming in and

15  testifying yesterday?

16  A       I was assaulted.

17  Q       Who were you assaulted by?

18  A       Carter.

19  Q       Okay.  The same person you've identified here in the --

20  A       Yes.

21  Q       Okay.  Now, where were you when you were assaulted?

22  A       In the holding cell.

23  Q       Okay.  I know you don't, well, you don't know this building very well,

1   I suppose.  Let me ask it this way - when you were assaulted was it your

2   impression that you were getting just ready to come in and testify?

3   A      Yes.

4   Q      Tell us what happened when you were assaulted.

5   A      I was sitting in the -- I was standing in the holding cell.  They brung

6   (sic) Carter into the same holding cell I was in.

7   Q      Okay.

8   A      They uncuffed him and brung (sic) him in and shut the door.  He

9   walked up to me and goes, "Why are you lying on me?  Why are you

10  testifying on me?"

11  Q      Uh-huh.  Then what happened?

12  A      He threw a punch.

13  Q      Okay.  Then what happened?

14  A      We had an altercation.

15  Q      Okay.

16  A      This thing sucks.

17  Q      Yea.  It's kind of awkward.

18                          THE COURT:  Don't worry about it.  It does

19  have some weird back feed.

20  A      Yea.

21  Q      Yea, it has some feedback when you talk right into it.  Like if I do this,

22  you get a lot of stuff coming back at you.

23  A      We had an altercation.  After he swung I tried to put him in a headlock

1   and wait.  I figured somebody would come in.

2   Q       Okay.  Did they come in?

3   A       It took them a minute.

4   Q       Okay.

5   A       About forty seconds or so.

6   Q       All right.  So, --

7   A       He put his finger in my eye.

8   Q       Can you describe the position you were in when -- well, you know the

9   term C.O.?

10  A       Yea.

11  Q       What does C.O. mean?

12  A       Corrections officer.

13  Q       Okay.  So, can you describe the position you were in when the C.O.'s

14  came in?

15  A       I was in -- when the C.O.'s came in my arm was turned.  He had ahold

16  of my tricep.

17  Q       With what?

18  A       His mouth.

19  Q       Okay.  Was he behind you?

20  A       On the side of me more.

21  Q       Okay.

22  A       Wrenching my arm back.

23  Q       Okay.

1387

1    A     So, I guess maybe behind me a little.

2    Q     And how were you?

3    A     I was facing a little wall about this big.

4    Q     Okay.  I didn't quite hear that.

5    A     I was facing a wall about this big and he had my arm back like this.

6    Q     Okay.  All right.

7    A     His finger was in my eye.

8    Q     Yea.  Do you have an injury to your eye?

9    A     Yes.

10    Q     Okay.  Do you have an injury to your arm?

11    A     Yes.

12    Q     What is that?

13    A     Thirty-two of his teeth.

14    Q     Okay.  Do you have any other injuries?

15    A     A lump to the back of my head.

16    Q     Okay.

17                 MR. MILLER:  Could I have one second,

18    your Honor?

19                 THE COURT:  Yes.

20                 MR. MILLER:  Thank you.

21    (WHEREUPON, Court went off the record briefly.)

22    Q     Mr. Upham, after the C.O.'s -- well, I guess I should ask, did the C.O.'s

23    eventually come?

1    A    Yes.

2    Q    Okay.  And did the C.O.'s break up this altercation?

3    A    Yes.

4    Q    Okay.  And where did they take you, if they took you anywhere?

5    A    They took me out of there and gave me medical treatment.

6    Q    Okay.  Did you then give a statement to Sheriff's Deputies?

7    A    Yes.

8    Q    Okay.  As part of that statement that you gave were there pictures

9    taken?

10   A    Yes.

11   Q    Have you had an opportunity to see those pictures yet?

12   A    Yes.

13   Q    Okay.  I'm going to hand you those pictures here in just one second, as

14   soon as we get them marked as an exhibit.  Okay?  I'm going to ask you one

15   or two questions about them; okay?

16   A    All right.

17                                    MR. MILLER:  Sorry, your Honor.  We'll do

18   this as quickly as we can.

19                                    MR. RION:  Your Honor, we just have a

20   continuing objection.

21                                    THE COURT:  Okay.  That will be noted.

22                                    MR. MILLER:  Can I approach the witness,

23   your Honor?

1                               THE COURT:  Yes.

2    Q     All right.  I'll step right up here beside you so I can project my voice

3    over that microphone.  Mr. Upham, I'm going to present you with what has

4    been marked as State's exhibit --

5                      MRS. KOHLRIESER:  They start at '174',

6    Tony.

7                      MR. MILLER:  And go to?

8                      MRS. KOHLRIESER:  '181' (sic).

9    Q     I'll hand you what has been marked as State's exhibits '174' through

10   '180'.

11                   THE COURT:  Okay.  Let me just ask - is

12   there a '173'?

13                   MRS. KOHLRIESER:  There is, your

14   Honor.  It's the video.

15                   THE COURT:  Okay.  All right.  It just

16   jumped a number.  Okay.  Go ahead.  '174' through --

17                   MR. MILLER:  '180'.

18                   THE COURT:  '180'.  Okay.

19   Q     Mr. Upham, I'm going to hand you these photographs and I'm going to

20   ask you to take a quick look at them.  When you're done looking at them I'd

21   just ask you to tell me when you're done.

22   (WHEREUPON, witness reviewed exhibits.)

23   A     Done.

1390

1   Q      Do those truly and accurately depict the injuries you suffered during

2   the altercation you've described here during your testimony?

3   A      Yes.

4   Q      And, again, can you just describe those injuries?

5   A      My eye.

6   Q      Uh-huh.  Where else?

7   A      My nose.

8   Q      Okay.

9   A      My tricep, left tricep.

10   Q      Okay.

11   A      And the back of my head.

12   Q      Let's do it the old-fashioned way.  Mr. Upham, I'm going to hand you

13   what's been marked as State's exhibit '176'.  Do you see that?

14   A      Yes.

15   Q      What are we looking at there?

16   A      A bite mark to my left tricep.

17   Q      Speak right into the microphone.

18   A      A bite mark to my left tricep.

19   Q      State's exhibit '177'.  What are we looking at there?

20   A      A finger gouge to my left eye.

21   Q      State's exhibit '178'.  What are we looking at there?

22   A      Same.

23   Q      Same?

1391

1   A      Eye.

2   Q      State's exhibit '179'?

3   A      Eye.

4   Q      State's exhibit '180'?

5   A      Scratch to the back of my head.

6   Q      State's exhibit '181'?

7   A      Lump to the back of my head.

8   Q      Okay.

9                           MRS. KOHLRIESER:   Mr. Miller, it's

10  working now if you want to use it.

11  Q      State's exhibit '174'.  Who's that?

12  A      Me.

13  Q      That's you?

14  A      Yes.

15  Q      And State's exhibit '175'?

16  A      Me with a mark to my left tricep.

17                          MR. MILLER:   One second, your Honor?

18                          THE COURT:   Uh-huh.

19  (WHEREUPON, Court went off the record briefly.)

20  Q      I don't think I had the opportunity to put these particular pictures up on

21  the screen.  I'll do that quickly here.  State's exhibit '176'?

22  A      Bite marks to the left tricep.

23  Q      Okay.  State's exhibit '177'?

1392

1    A      Left eye.

2    Q      Injury?

3    A      Injury.

4    Q      State's exhibit '179'?

5    A      Left eye injury.

6    Q      State's exhibit '180'?

7    A      Scratch to the back of my head/neck.

8    Q      State's exhibit '181'?

9    A      Lump to the back of my head.

10   Q      All these injuries you've just described and that have been shown to

11   the jury, were those suffered during the altercation you've described?

12   A      Yes, sir.

13   Q      Mr. Upham, or Upham, sorry, --

14   A      That's all right.

15   Q      Do you know whether or not this altercation was videotaped?

16   A      Yes.

17   Q      Have you had an opportunity to look at that videotape?

18   A      Yes, I have.

19               MR. MILLER:  Your Honor, at this point I'm

20   going to play State's exhibit '173'.

21               THE COURT:  All right.  There is a

22   continuing objection; right, Mr. Rion?

23               MR. RION:  Yes, your Honor.

1                        THE COURT:  Okay.  So noted.

2    Q     Now, in the videotape you've seen was there any audio?

3    A     No.

4    Q     By the way, did Mr. Carter say anything to you while this altercation

5    was going on?

6    A     Yes.

7    Q     What did he say?

8    A     He asked why I was testifying against him; why I was lying on him.

9    Q     And anything after that?

10    A     Yes.  He told me I wasn't going to testify against him.

11    Q     Okay.

12                       MR. MILLER:  Your Honor, I'm going to

13    ask for the Court's indulgence for a second.  This video has proprietary

14    software and it takes a second to open it up and get to where we need.  So, I

15    apologize ahead of time.  There's nothing I can do about that.

16                       THE COURT:  Does it work on your

17    laptop?

18                       MR. MILLER:  Yes, I've played it on the

19    laptop.  It's just the software.

20                       MRS. KOHLRIESER:  Your Honor, we're

21    going to actually seek some assistance from an I.T. person.

22                       THE COURT:  Anything you can do to get

23    it going quicker - I'll let you do it.

1          MRS. KOHLRIESER:  We're getting closer.

2 Q  Mr. Upham?

3 A  Yes.

4 Q  I'm going to ask you to watch this videotape; okay?

5 (WHEREUPON, State's exhibit '173' was played in open Court.)

6 Q  Mr. Upham, does that video truly and accurately depict the altercation

7 you've described here today with Mr. Carter?

8 A  Yes.

9 Q  Now, there was a moment in that video, and I'm just going to

10 demonstrate, and I hope the microphone picks it up, where you are bent over

11 and your left arm is behind you.

12 A  Yes.

13 Q  Is that when you suffered that bite mark to your left tricep?

14 A  Yes.

15          MR. MILLER:  One second, your Honor.

16          THE COURT:  Okay.

17 (WHEREUPON, Court went off the record briefly.)

18 Q  Mr. Upham, when the guards came did you know they were at the

19 door?  Could you hear them?  I don't want to ask a compound question.

20 Could you hear the guards coming?

21 A  Yes.

22 Q  Okay.  Did you know when they were at the door?

23 A  Yea.  They were fumbling with their keys.

1    Q    They were what?  I'm sorry.

2    A    Fumbling with their keys.

3    Q    Okay.

4    A    Trying to open the door.

5    Q    They were trying to open the door?

6    A    Yes.

7    Q    And is that when -- well, is that when Mr. Carter stopped biting your

8    arm?

9    A    Yes.

10   Q    Now, Mr. Upham, just one last time.  State's exhibit '173', I don't think

11   when I asked you the first time that I referenced the exhibit, which is the video

12   that you just watched.  Does that truly and accurately depict the altercation

13   that you've described in your testimony between you and Mr. Carter?

14   A    Yes.

15                    MR. MILLER:  One second, your Honor.

16   (WHEREUPON, Court went off the record briefly.)

17                    MR. MILLER:  I have no further questions,

18   your Honor.

19                    THE COURT:  Okay.  Mr. Rion, questions?

20                    <u>**CROSS EXAMINATION**</u>

21   **BY MR. RION:**

22   Q    Sir, let's start with yesterday first.

23   A    Sure.

1   Q     It was a mistake that they put Carter in a cell with you; correct?

2   A     I guess.

3   Q     For security reasons that shouldn't happen; right?

4   A     Correct.

5   Q     When they put him in the cell you didn't tell the officers, 'hey, wait a

6  minute, that's Carter'?

7   A     No.

8   Q     You didn't tell them that you were going to come in and testify in an

9  Aggravated Murder case against this person, and that you were coming up to

10  do that; did you?

11  A     No.

12  Q     You waited for him to come into the cell and for them to close the door

13  and then you said something to him; didn't you?

14  A     After he said something to me; yes.

15  Q     No.  Well, you started -- you were interviewed just yesterday about

16  this; right?

17  A     Yes.

18  Q     Didn't you say to them that as soon as he walked into the room and

19  they closed the door and they locked it and after the officer was out of earshot

20  didn't you say something like, 'how's your case going, Carter'?

21  A     Yes, actually I did.  I said, "How's your trial going?"

22  Q     Yes.  Knowing that you were about to come in and testify against him

23  in an Aggravated Murder case you started with that; correct?

1   A       I was in shock.  I mean, --

2   Q       And now his response to you at that point was, "Why are you lying on

3   me?"

4   A       Correct.

5   Q       It wasn't -- the statement you gave yesterday to the officers wasn't

6   'why are you testifying against me'.  It was 'why are you lying on me'.  That

7   was the statement; correct?

8   A       That was the first one.

9   Q       That's what you told the officers yesterday.

10  A       Yes.  That was the first one.

11  Q       You didn't tell the officers any other statements about that; correct?  I

12  can show you -- well, I guess it's not your statement.  You talked to Officer

13  Lauck yesterday; right?

14  A       I talked to a few.

15  Q       Uh-huh.  After saying 'why are you lying on me', he sort of put his

16  hands up like this; right?  "Why are you lying on me?"

17  A       I believe so.

18  Q       And you're sitting down at that time when he's asking you that

19  question; right?

20  A       Yes, I believe so.

21  Q       And at that point you start to stand up and move towards him; didn't

22  you?  It's on the video.

23  A       I believe I just stood up.

1398

1    Q      And moved in his direction?  Stood up in his direction?

2    A      I don't believe so.

3    Q      And then the jury saw what the jury saw.  You were punching Mr.

4    Carter as well; correct?

5    A      Correct.

6    Q      Now, you're serving a thirteen year sentence; right?

7    A      Yes.

8    Q      For Conspiracy, or, Complicity to Commit Attempted Murder?

9    A      Correct.

10   Q      And there's a gun specification on that?

11   A      Yes, there is.

12   Q      Because a lady was shot in the head?

13   A      Correct.

14                                    MR. MILLER:  Objection.

15                                    MRS. KOHLRIESER:  Objection.

16                                    THE COURT:  Sustained.  The jury will be

17   instructed to disregard that question and answer.

18   Q      The gun -- the point of it was the gun spec. carries a three year

19   mandatory; correct?

20   A      Correct.

21   Q      And that three year mandatory sentence means you can't get

22   something called judicial release as long as there's a three year mandatory;

23   right?

1399

1  A    As far as I know I can't get judicial release at all.

2  Q    Okay.  You've looked over your case a lot; have you not?

3  A    I've tried.

4  Q    I'll hand you what's been marked Defendant's exhibit 'II'.  Does that

5  appear to be a Judgment Entry of Conviction?

6  A    It appears to be.

7  Q    And does it indicate on the bottom of the first page that you have a

8  thirteen year sentence and only three years of that is mandatory?

9  A    Correct.

10  Q    Now, back in 2014 you were in prison; correct?

11  A    Correct.

12  Q    You went to prison in 2011?

13  A    Correct.

14  Q    You were convicted in April of 2011, but you didn't go to prison in April;

15  did you?

16  A    I believe I got to C.R.C. the 26th of April.

17  Q    Wasn't it in September when you actually went to prison?

18  A    No.

19  Q    Have you ever testified before in any other case?

20  A    No.

21  Q    Now, when you went to prison you knew a person by the name of

22  Thomas Smith; correct?

23  A    Correct.

1400

1    Q      In February of 2014 you saw Thomas Smith come out of a room with

2    Sergeant Smith; correct?

3    A      He came up to the table where I was at.

4    Q      And you talked to Thomas Smith?

5    A      He talked to me and I talked back; yea.

6    Q      Uh-huh.  You asked him, 'why is it that you were in talking to Sergeant

7    Smith'?

8    A      No.  He came out to me and told me why he was in with Sergeant

9    Smith.

10   Q      Uh-huh.  Did he tell you that Sergeant Smith was investigating a

11   murder case as it related to Markelus Carter?

12   A      Yes.

13   Q      You were asked -- do you deny telling Thomas Smith, did you ask

14   Thomas Smith, 'what did you say'?  Did you ask him that?

15   A      Yea.  I asked him what was going on.

16   Q      Uh-huh.  Did you ask Thomas Smith whether or not Sergeant Smith

17   offered him anything to get out if he could give any information?

18   A      He said something towards if he went forward he could possibly get

19   judicial release.  He did say that.

20   Q      And at that point did you tell Thomas Smith -- well, Thomas Smith said,

21   'I'm not giving any information; I'm not talking on Carter'; right?

22   A      No.  He didn't say that.

23   Q      Okay.  Then did you say at that point, and I assume you're going to

1401

1  deny this, but did you say, --

2                                        MR. MILLER:  Objection.  Objection.

3                                        THE COURT:  Okay.  All right.  I'll sustain

4  it.

5                                        MR. RION:  Okay.  I'll withdraw it.

6  Q      Did you say this to him, 'I would have told him anything that they

7  wanted to know to get some time knocked off'?  Do you admit or deny making

8  that statement?

9  A      I didn't make that statement.

10  Q      Uh-huh.  Now, this was in early February of 2014; correct?

11  A      I'm not sure if it was February or March.  It was sometime after

12  January.

13  Q      And then some two weeks go by before you actually go in and talk to

14  Sergeant Smith; correct?

15  A      No.  I went in that day.

16  Q      The same day?

17  A      About an hour or two afterwards.

18  Q      Okay.  So, your testimony is one to two hours after you spoke to

19  Thomas Smith that you went in and spoke with Sergeant Smith?

20  A      Correct.

21  Q      Okay.  So, you wouldn't have time then, according to your testimony,

22  to get information about Markelus Carter; correct?

23  A      I already had --

1  Q      Just answer my question, sir.  You wouldn't have time to gain

2  additional information about Markelus Carter; correct?

3  A      I mean, -- no.

4  Q      Okay.  Now, did you spend those next two weeks from early February

5  till mid-February, well, did you ask Thomas Smith, did you say questions like,

6  and I'm going to use the words, and excuse my language, did you use the

7  words like, 'well, that's fucked up what they're trying to do to Carter'.  This is

8  in a question that you would have asked to Thomas Smith - 'did they offer you

9  any deals yet'?  Did you make that statement?

10  A      I don't recall that.

11  Q      Did you ask him, 'if he did do it I wonder how he did it or if there are

12  any facts about how he did it'?  Were you trying to get information from

13  Thomas Smith?

14  A      No.

15  Q      Did you ask questions about a lake?  'I wonder if he put something in

16  the lake'?

17  A      A lake?  No.

18  Q      A lake.  'Could he have destroyed the evidence somehow'?  Were you

19  asking these questions of Thomas Smith?

20  A      No.

21  Q      You deny that.  Did you ask him, 'Have you heard anything on Carter?

22  Any more information'?  Did you keep going back to Thomas Smith and

23  asking for information, trying to get information from him?

1403

1  A      I didn't keep coming back to him.

2  Q      I see.

3  A      We played video games together.  That's about it.

4  Q      Now, Thomas Smith used to speak to Markelus Carter; right?

5  A      He used to be his cellie.

6  Q      Right.  Now, was there a time -- do you know a guy by the name of

7  Abdul Bari?

8  A      Yea.  He was two cells from me the other way.  He actually did a paper

9  to my attorney for me.

10  Q      Did you and Abdul Bari have what they call a store?

11  A      Yes.

12  Q      So, you and he, for a period of time, were selling things and doing

13  different types of deals there in the prison?  Correct?

14  A      I held his store for him.

15  Q      Uh-huh.  Which means that you have various forms of contraband,

16  whether it's cigarettes or other things?

17  A      Commissary - sweets, food.

18  Q      Nothing illegal?

19  A      No.

20  Q      Were the two of you watching a PBS show one day?  Were you

21  watching T.V. with him one day and it was a show about, well, a show that

22  dealt with the ability for people to order in information, for inmates to order in

23  police reports and other information in people's cases and then the people

1    in prison were using that to then try to get their sentence lessened by acting

2    like they had information?  Do you recall that?

3    A        No.

4    Q        You don't recall that.  Do you recall telling him while you were watching

5    that show, 'I'll do anything to get out of here'?

6    A        No.

7    Q        You don't recall that.  So, you didn't -- since it was just commissary

8    materials you didn't have any type of narcotics or drugs in the institution?

9    A        No.

10   Q        You didn't use drugs or narcotics in the institution?

11   A        No.

12   Q        Do you know a guy by the name of Vincent Cunningham?

13   A        Yes.  He was my cellie for a couple of weeks, maybe a month.

14   Q        Uh-huh.  Do you ever get letters from your mother?

15   A        Yea.  I got a card.  I got a birthday card probably around the time he

16   was my cellie.

17   Q        Uh-huh.  And in that birthday card was there a newspaper article about

18   Markelus Carter's case?

19   A        No.

20   Q        Was there a newspaper article about a murder case?

21   A        No.

22   Q        Did you show an article to Vincent Cunningham dealing with a murder

23   case?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Do you know a Chaston Scott? |
| 3 | A | Yes. |
| 4 | Q | How do you know Chaston Scott? |
| 5 | A | He was my cellie before Cunningham. |
| 6 | Q | And you also knew Chaston Scott from in Toledo; correct? |
| 7 | A | No. |
| 8 | Q | Lucas County? |
| 9 | A | I don't ever recall meeting him there. |
| 10 | Q | Okay.  Do you know that he knew Valenzo Ozley? |
| 11 | A | I thought Cunningham knew him.  I don't think Scott knew him. |
| 12 | Q | And did you tell Chaston Scott that you and another inmate had come |

13  up with this scheme where they were going to have information on your case

14  and you were going to have information on their case and each of you at

15  different times were going to go to different prosecutors to try to make it

16  appear as if you were cooperating to get your sentences reduced?

| | | |
|---|---|---|
| 17 | A | No. |
| 18 | Q | That didn't happen, either?  You didn't spend a lot of time with |

19  Markelus Carter in prison; did you?

| | | |
|---|---|---|
| 20 | A | Not a whole bunch. |
| 21 | Q | No.  He wouldn't be like one of your friends that you had there, like you |

22  had other friends; right?

23  A       I didn't mind him.  I really didn't have any friends.  I just talked to

1   people that would listen to me.

2   Q      Uh-huh.  And it's your testimony today that within an hour or two of

3   Thomas Smith speaking with Sergeant Smith that you then went to speak to

4   Sergeant Smith?  That's your testimony?

5   A      Yea.  I believe that to be correct.

6   Q      And when Thomas Smith came out from speaking with Sergeant Smith

7   he told you that now Sergeant Smith was looking for information in a murder

8   case?

9   A      That sounds about right.

10  Q      And you're telling me that the testimony was that there was a direct --

11  well, okay.

12                              MR. RION:   Nothing further.

13                              THE COURT:   Any redirect?

14                              MR. MILLER:   Yes, your Honor, just a few

15  questions.

16                      **REDIRECT EXAMINATION**

17  **BY MR. MILLER:**

18  Q      Mr. Upham?

19  A      Yes.

20  Q      Yesterday, I'll take you back to yesterday before this altercation, were

21  you surprised to see Mr. Carter at the door?

22  A      To say the least.

23  Q      That does not generally happen, does it, in these situations?

1407

1   A      As far as I know; no.

2   Q      Okay.  But, it was a surprise to you?

3   A      I was shocked.

4   Q      Okay.  Did Mr. Carter say at that time to any C.O., 'I really shouldn't go

5   in there', or anything like that?

6   A      No.

7   Q      No?  And where was the C.O. when the altercation began?

8   A      Back here, I guess.

9   Q      Did he leave the door?

10  A      Yea.

11  Q      How soon after he left the door did the altercation begin?  I mean, the

12  physical altercation.

13  A      Probably twenty seconds.

14  Q      Okay.  Now, you testified that you said to Mr. Carter, 'how's the trial

15  going'.

16  A      Yes.

17  Q      Why did you say that?

18  A      Shocked.

19  Q      Now, Mr. Rion, and it doesn't show up well on the record, but he used

20  kind of an inflection in his voice that was kind of, well, it's not going to show

21  up on the record, but it was kind of --

22                          MR. RION:   I'm going to object to his

23  commentary.

1408

1                                 THE COURT:  I'm going to sustain it.  The

2    jury can hear what they heard.

3    Q       Okay.  Okay.  Mr. Upham, you heard the inflection that Mr. Rion used

4    when he asked you if you said 'how's the trial going'.  Did you hear how Mr.

5    Rion said that?

6    A       He just said it.

7    Q       Okay.  Did he accurately -- did he accurately say it?  Did he say it the

8    same way you said it?

9    A       I probably said it just the way I'm talking now - calm, shocked.  I mean,

10    just --

11    Q       Okay.  Just how you're talking now?

12    A       Yea.

13    Q       The video does show you standing up after you were seated.  Why did

14    you stand up?

15    A       Just had that feeling it was coming.

16    Q       That what was coming?

17    A       Altercation.

18    Q       Okay.  Mr. Rion went through a number of cases that you've had.

19    A       Yea.

20    Q       Were any of those cases here in Allen County?

21    A       No.

22    Q       Let's go back.  How exactly did you and Mr. Carter come to talk about

23    this case while you were in prison?  Can you tell me in a little more detail

1409

1    about how that conversation came about?

2                              MR. RION:   I'm going to object, your

3    Honor.  It's beyond the scope.

4                              THE COURT:   I'll overrule the objection.

5    Go ahead.

6    Q       Go ahead and answer.

7    A       I was trying to study about my case.  Becoming a lawyer is not easy.  I

8    read some books and found some things that might help.  I asked a lot of

9    people, you know, 'would this help me', 'could this help me'.  Then one thing

10   led to another and I told him everything about my case, the shooting,

11   everything, everything how everything happened.

12   Q       Okay.  Is that how the conversation began between you and Mr. Carter

13   about this case?

14   A       Yea.

15   Q       Okay.

16                              MR. MILLER:   One second, your Honor.

17   (WHEREUPON, Court went off the record briefly.)

18                              MR. MILLER:   I have no further questions.

19                              THE COURT:  Any recross?

20                              MR. RION:   Nothing further.

21                              THE COURT:  Okay.  This witness is

22   excused then.  It's almost eleven-thirty.  Does the State have a witness?

23                              MRS. KOHLRIESER:  Actually, your

1410

1    Honor, we need to approach just a moment, please.

2                              THE COURT:  Okay.

3                              MRS. KOHLRIESER:  Oh, the witness is

4    still excused.  Right?  Correct?

5                              THE COURT:  Yea.  The witness is

6    excused.

7    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

8    the record, as follows.)

9                              MRS. KOHLRIESER:  I mentioned this

10   before about wanting to call Tim Enyart.

11                             THE COURT:  I've got a problem with that.

12                             MRS. KOHLRIESER:  (Inaudible).

13                             THE COURT:  Well, if you knew you were

14   going to use him --

15   COURT REPORTER:  I can't hear you.

16                             MRS. KOHLRIESER:  I specifically told

17   you that.

18                             MR. MILLER:  (Inaudible).

19                             MRS. KOHLRIESER:  (Inaudible).

20                             THE COURT:  Okay.  Well, do you have

21   another witness?

22                             MRS. KOHLRIESER:  Pardon?

23                             THE COURT:  Do you have another

1  witness?

2                    MRS. KOHLRIESER:   Scott Leland.

3                    THE COURT:  Who?

4                    MRS. KOHLRIESER:   Scott Leland.

5                    THE COURT:  Oh.  Okay.  All right.

6  (WHEREUPON, Court continued on the record, as follows.)

7                    THE COURT:   We're going to break for

8  lunch.  Remember the admonitions I've been giving you all along.  Don't

9  discuss the case.  Don't listen to, pay attention, or read any media accounts.

10  Don't discuss the case with anyone you come in contact with.  Don't have any

11  contact with the participants in the case.  Don't express or formulate any

12  opinions.

13           I did also want to instruct you now after that last witness.  Testimony

14  had been admitted indicating that the defendant was involved in a physical

15  altercation with a witness.  You are instructed that defendant's conduct alone

16  does not raise a presumption of guilt.  But, it may tend to indicate the

17  defendant's consciousness or awareness of guilt.  If you find that the facts do

18  not support that the defendant's conduct, or if you find that some other motive

19  prompted the defendant's conduct, or if you are unable to decide what the

20  defendant's motivation was, then you should not consider this evidence for

21  any purpose.  However, if you find that the facts support that the defendant

22  engaged in such conduct and if you decide that the defendant was motivated

23  by a consciousness or awareness of guilt you may, but are not required to,

1412

1    consider that evidence in deciding whether the defendant is guilty of the

2    crimes charged in this case.  You alone will determine what weight, if any, to

3    give to this evidence.

4         Also, as has been the case before, there was evidence from this

5    witness that the defendant had been incarcerated in the past.  You're not to

6    use the fact that he was incarcerated to show his character or that he acted in

7    conformity with that character as it relates to the allegations in this case.

8    However, that evidence can be used for a limited purpose to show the identity

9    of who the witness was talking to.

10        So, with that, we'll excuse you folks for lunch.  This is the problem I've

11   got.  Let's just go ahead and have you back at twelve-thirty and I'll make other

12   arrangements for some other docket I have.  I don't want to impose upon you

13   folks' time anymore.  So, twelve-thirty.  Okay?  The jury will be excused.

14   (WHEREPON, JURY WAS EXCUSED FOR LUNCH RECESS.)

15                     THE COURT:  Now that the jurors are

16   excused let's put out on the record in a better way because our sound system

17   is such that these Bench conferences are very cumbersome, an issue arose

18   as to the State may be calling a witness who has been in the Courtroom.

19   Mrs. Kohlrieser?

20                     MRS. KOHLRIESER:  Yes, your Honor.

21   Obviously prior to yesterday's events the State had no intention whatsoever

22   of calling Deputy Enyart to the stand.  He's been nothing but security in this

23   case.  I attempted to discuss with Mr. Rion and the Court about the fact --

1   THE COURT:  Well, let the record reflect

2   that you did.

3   MRS. KOHLRIESER:  Yes, I did.

4   THE COURT:  You did mention that Mr.

5   Enyart might be a witness.

6   MRS. KOHLRIESER:  I specifically said

7   that to explain how it happened that he got in there so it wouldn't look like the

8   State had anything to do with that.

9   THE COURT:  Okay.  You did.  You did.

10   MRS. KOHLRIESER:  As well as Mr.

11   Carter's statement to him afterwards apologizing and saying that he knew that

12   it was Upham, or, he knew that that was a witness and he should have said

13   something to him.  So, that's why I was like, well, that may pose a problem.  I

14   don't have any control of who -- what I was asking was for somebody -- well, I

15   said because he's in here.

16   THE COURT:  No.  You never mentioned

17   that.

18   MRS. KOHLRIESER:  Well, I gestured

19   towards him, your Honor.

20   THE COURT:  You do have control.  You

21   could have asked that he be separated.  I ordered a separation of --

22   MRS. KOHLRIESER:  I guess I could have

23   asked you that, your Honor.

1                    THE COURT:  I ordered a separation of

2  witnesses. I expect the attorneys to be conscious of that. I don't know who

3  every witness is going to be. You did mention that Mr. Enyart might be a

4  witness. He was in here. He's a security officer. The record will reflect that

5  he's a Court security officer. It is -- it wasn't brought to my attention that he

6  should not be in here.

7                    MRS. KOHLRIESER:  I guess I did not use

8  those exact words, your Honor. I guess my apologies for not using those

9  exact words.

10                 THE COURT:  I mean, you don't have to

11  apologize. It is what it is.

12                 MRS. KOHLRIESER:  I guess what I'm

13  saying is I understand what the separation of witnesses is for. The only

14  testimony that I would be asking Mr. Enyart to give would be how it was that

15  he went about placing Mr. Carter in the cell, and his knowledge of the other

16  inmate in there, and then what Mr. Carter said to him afterwards, which has

17  nothing to do with what Stephen Upham or, quite frankly, any other witness

18  so far has testified to.

19                 THE COURT:  Okay.

20                 MRS. KOHLRIESER:  So, I don't think

21  there's a prejudice in that regard. I guess, again, I should have been more

22  direct. But, that was what I was attempting to convey to the Court was that

23  Mr. Enyart was here, but we were probably going to have to call him as a

1415

1    witness.

2                          THE COURT:  Okay.  I don't know if that

3    was on the record or not.  But, you did.  I'll put on the record that you did

4    mention that.  Mr. Rion?

5                          MR. RION:  Your Honor, I would object.  I

6    would object.

7                          THE COURT:  On what grounds?

8                          MR. RION:  One, that he was in the room

9    and, two, really the relevance of it at this point.  We have -- the testimony

10   elicited was that it was an accident already.  There's really no -- it's not going

11   to be argued.  There's going to be no evidence that it was purposely done or

12   anything like that.  So, we're past that.  There's no real probative value of it.

13   Again, if he was in the room during the testimony of a relevant witness, I

14   mean, that's what the Order deals with.  It was not brought to my attention

15   that that witness was in the room during Upham's testimony.  So, I didn't --

16   you know, this is moving so fast here and I'm trying to figure out who is who.

17   So, I wasn't aware that there was an officer who was going to be a witness

18   sitting in the Courtroom.  So, it's not like I saw it and was just like, okay, I just

19   won't say anything.  I didn't know.  The government clearly knew that that

20   witness was sitting in the room and did nothing to specify at least during

21   Upham's testimony that that person was in the room.  So, I would ask that he

22   be excluded, one, because he's a minor witness and, two, that it was a

23   violation and, three, I don't know, Mr. Carter was in custody at that point and

1416

1   so do we have to have a Motion to Suppress hearing on whether the

2   statements made to a law enforcement officer could be used.  I haven't

3   interviewed my client on that issue as to whether or not that statement was a

4   custodial statement.

5                                    THE COURT:  Okay.

6                                    MRS. KOHLRIESER:  Your Honor, could I

7   just address a couple of things?

8                                    THE COURT:  Yes.

9                                    MRS. KOHLRIESER:  Number one, I

10  believe Mr. Enyart's testimony in that regard will be that it was a spontaneous

11  statement made to him by Mr. Carter and not anything that he asked Mr.

12  Carter as to that.

13         As to the other part, while Mr. Rion was standing there I gestured

14  specifically, in the same manner I'm doing now, to Deputy Enyart who has

15  been here multiple times and has a name tag on and has sat six feet from Mr.

16  Rion throughout many of these proceedings.  But, he is absolutely right,

17  because the way things are moving so quickly, again, it wasn't any intentional

18  thing on my part.  I tried to draw it to the Court's attention.  Clearly, I did that

19  poorly.  But, --

20                                   THE COURT:  Okay. Let me take it under

21  advisement and I'll let you know before one o'clock.

22                                   MRS. KOHLRIESER:  Okay.

23                                   THE COURT:  Oh, no.  I said twelve-thirty.

1                        MRS. KOHLRIESER:   Oh, twelve-thirty.

2                        THE COURT:   Okay.  Let's have a recess

3   for everybody.

4   (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

5

6   **(WHEREUPON, VOLUME SEVEN CONCLUDED.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23