FILED
COMMON PLEAS COURT

2016 MAR 28  PM 1:06

MARGIE MILLER
CLERK OF COURTS
ALLEN COUNTY, OHIO

## IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

-------------------------------------------------------------------------------

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO.  CR2014 0139 |
| Plaintiff | * | |
| | * | **TRANSCRIPT -** |
| -VS- | * | JURY TRIAL |
| **MARKELUS Q. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

-------------------------------------------------------------------------------

### A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio  45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

**(VOLUME 8 OF 10)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# TABLE OF CONTENTS

## (VOLUME 8 OF 10)

### THURSDAY, SEPTEMBER, 17, 2015  - CONTINUED --

STATE OF OHIO WITHDREW MOTION TO CALL
   A POTENTIAL WITNESS                              1418

DISCUSSION REGARDING PLAYING OF SECOND
   VIDEO OF HOLDING CELL INCIDENT            1418

COURT RULING - SECOND VIDEO OF HOLDING
   CELL INCIDENT NOT PERMITTED TO BE PLAYED   1421

STATE'S TWENTY-NINTH WITNESS -
   DET. SCOTT LELAND - KOHLRIESER          1423
                       - RION          1446

STATE'S THIRTIETH WITNESS -
   DET. TIMOTHY CLARK - MILLER            1449
                      - RION       1521

JURY EXCUSED FOR THE DAY AT 4:29 P.M.       1549

DISCUSSION REGARDING DEFENSE WITNESSES,
   A GRAND JURY TRANSCRIPT AND SUBSTITUTION
   OF AN EXHIBIT                      1549

COURT RECESSED FOR DAY AT 4:39 P.M.     1557

### FRIDAY, SEPTEMBER 18, 2015 -

COURT COMMENCED AT 9:15 A.M.        1557

DISCUSSION REGARDING DEFENSE'S
   MOTION FOR MISTRIAL             1558

COURT RULING - MOTION FOR MISTRIAL OVERRULED   1562

COURT COMMENCED AT 9:28 A.M. (WITH JURY)   1565

STATE'S THIRTIETH WITNESS CONTINUED -
DET. TIMOTHY CLARK - RION                          1566
                        - MILLER                   1574
                        - RION                     1583

VOLUME EIGHT CONCLUDED                              1588

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**NOTE:**   THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE.  SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS.  HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT
     436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED
     BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND
     HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED
     BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436
     MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
     POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
     POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT
     BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM (ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS-MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS-MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFEL IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSCT9 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK
AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN
STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK
EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT
436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND
PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
      SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
      KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
      HEAD/NECK;

## DEFENDANT'S EXHIBITS -

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
    WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
    MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT
    122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - **(NOT ADMITTED BY
    COURT)**;

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING
    AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN
    STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY
    CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE
    NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A.
    MOORE;

DD - JUDGMENT ENTRY ON SENTENCING  IN STATE OF OHIO -VS-
    JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R.
    FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON **(WITHDRAWN BY THE
    DEFENSE)**;

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS-
    STEPHEN UPHAM, LUCAS CO. CASE NO.
    G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING
FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR
VICKIE BARTHOLOMEW;

**COURT'S EXHIBITS** -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND
STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW)
BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED
A.C.S.O. OFFENSE REPORTS;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1    THE COURT:   We're reconvening after the

2    noon recess on the 17th of September, 2015 in Case Number CR2014 0139,

3    State of Ohio -vs- Markelus Q. Carter.  The defendant is present in Court with

4    his attorney.  The State is present through the prosecuting attorney's office.

5    The jurors are waiting, but they are not in the Courtroom.

6    The first matter of business - when we recessed an issue was put on

7    the record regarding the State's intent to call Deputy Enyart as a witness.

8    The Deputy is a security officer for the Court.  He was present during the

9    testimony of Mr. Upham.  So, that was the issue there.  But, I understand

10   from representations outside of the Courtroom over the lunch hour that that is

11   now a moot issue.  Is that a fair assessment?

12   MRS. KOHLRIESER:   Yes, your Honor.  In

13   light of everything the State would withdraw its intention to, or, I guess, its

14   Motion to be able to call Mr. Enyart.  However, we would like to call a different

15   C.O. in this matter who has not been present during the trial, but was part of

16   the delivery of Mr. Upham and subsequent break-up of the altercation

17   between the defendant and Mr. Upham.

18   THE COURT:   Okay.  That is C.O. Shaffer,

19   as I understand it?

20   MRS. KOHLRIESER:   Yes.

21   THE COURT:   And I understand along with

22   that the State had noticed Mr. Rion that along with Mr. Shaffer's testimony

23   was additional video footage from the hallway outside of the holding room?

1    MRS. KOHLRIESER:  Yes, your Honor.

2  It's from the hallway outside.  I know it was mentioned in chambers, but that

3  was part of the disc that we gave to Mr. Rion this morning.  But, again, with

4  the computer technology and things of that nature I don't believe Mr. Rion

5  realized he had two views on there.  But, all along I knew it.  I did mention to

6  Mr. Rion when he was going to show it to his client this morning that there's

7  multiple views.  Whether he heard me, he was going into the holding area at

8  the time, but I did say, 'there's multiple views on there'.  Anyhow, this video

9  would go -- you can barely see any of the altercation.  If you look at the

10  screen now, your Honor, you can see the door to the holding cell and you get

11  a little bit of the view of the altercation from there.  But, it's really to show,

12  basically, and I would fast-forward through the fifteen minutes of Upham just

13  waiting there, but of him entering the cell and then when the defendant is

14  brought into the cell.  More particularly, it's about the timing, your Honor,

15  about when Deputy Enyart, well, you can see him locking the door and you

16  can see the shadow of him going out the other door.  That's when the

17  altercation starts.  So, again, it's going to the testimony of Mr. Upham

18  regarding how it all started and things of that nature and also when it ended.

19  You can see the guards coming in.  Again, to Mr. Upham's version of events,

20  they were coming and they were fiddling at the door, so to speak, and you

21  can see that on here.  I do understand that Mr. Rion has some concerns

22  because on this video you can clearly see the defendant in handcuffs and Mr.

23  Enyart taking those handcuffs off of him and leaving him in that cell.  But, I

1    think it's of probative value, again, when the defense basically is that Stephen

2    Upham is a liar and he lies about everything he says, basically. I think the

3    State, you know, is entitled to show corroborating details of various aspects of

4    his testimony.

5                              THE COURT: Okay. Mr. Rion?

6                              MR. RION: I mean, if that's their purpose,

7    use of extrinsic evidence to corroborate a witness, well, I'm not sure if that's

8    allowable. Number two, we're gilding a lily here. Number three, I think the

9    issue as to what happened has been fairly given to the jury. I think at some

10   point it does become prejudicial when you're showing people being locked up

11   and unlocked. I don't think it adds anything to what we already have. It only

12   detracts. There's only a prejudicial value. I don't see the probative value of it.

13   There's no -- nobody is disputing the timing. All the issues the prosecutor

14   raised are not in dispute. They weren't raised during cross examination.

15   They won't be raised in closing somehow. There's more to this video than

16   what was said. I mean, I think the video encapsulates the entire situation.

17   So, it is prejudicial at this point. It seems like it's putting the entire trial as to

18   this issue as opposed to the Murder, which is the one thing the Court doesn't

19   want to have happen.

20                             MRS. KOHLRIESER: Your Honor, I guess

21   the only thing in the alternative I would ask is that if the Court decides that we

22   shouldn't be allowed to do it now, should the defendant take the stand and

23   give some other variation, well, I guess I would ask that be able to re-visit

1    the issue for rebuttal purposes.

2                            MR. RION:   No objection.

3                            THE COURT:   Yea, that would be a whole

4    other issue that would change the context of this whole argument if it was

5    used as rebuttal for any witness that the defense might call if they were

6    inconsistent.

7            The Court, again, just for the record, I was in the hallway looking in the

8    open door when you were showing it and so I've seen it to that extent.  Mr.

9    Rion, have you seen it?

10                           MR. RION:   I have, and I'll tell the Court,

11   and this is sort of another argument, but there's two files on the computer.  I

12   thought I had opened both files, but somewhere within the second file was

13   this view.  So, that's for another -- well, I was told there was two different

14   angles and I looked and I saw two different views from the computer from

15   what happened on the inside.  Those were the two things we reviewed before

16   Upham's testimony.  So, I've viewed this now.  Again, it's yes, to answer your

17   question.  But, I didn't have this -- I didn't know that I had this at the time I

18   was cross examining Upham.

19                           THE COURT:   All right.  The Court is going

20   to find that the evidence may be relevant, but I'm going to order that it be

21   excluded as unfairly prejudicial at this stage of the game.  Again, it's subject

22   to being allowed in rebuttal.  But, I'm also, along with that ruling, since I'm

23   ruling that the video not be played that there won't be argument from either

1   side as to any fact that's not present on the exhibit that was played.  State's

2   '173', if that's admitted into evidence, you can argue about that.  But, you

3   can't argue things that weren't on '173', or, visible on '173'.  I'm just arguing

4   that the video itself, I don't know, -- and I'm not going to limit the State if they

5   still want to call another corrections officer to give testimony.  But, since the

6   video doesn't really demonstrate the altercation that I allowed in as

7   consciousness of guilt, it will be ordered excluded.

8                          MRS. KOHLRIESER:   Your Honor, if I may

9   have just one moment to let C.O. Shaffer go?  He was really simply to

10  authenticate.

11                         THE COURT:   Okay.  All right.  Yea, you

12  can let him go.  Then who would the State's next witness be?

13                         MRS. KOHLRIESER:   Detective Scott

14  Leland, your Honor.

15                         THE COURT:   All right.  Well, why don't

16  somebody find him and we can bring the jurors in.

17                         MRS. KOHLRIESER:   Oh, yea.  We might

18  want to get the jury first.

19                         MR. MILLER:   Do you want me to get Scott

20  now?

21                         THE COURT:   Yea, if he's your next

22  witness.  Bring the jurors in.

23  (WHEREUPON, jury was brought into the Courtroom.)

1       THE COURT:   We're already on the record

2   in CR2014 0139.  The jurors have been returned to the Courtroom.  The State

3   may call their next witness.

4       MRS. KOHLRIESER:   Yes, your Honor.

5   Thank you.  The State would call Detective Scott Leland.

6       THE COURT:  All righty.

7   WHEREUPON, called to appear as a witness in this proceeding was one:

8   **D E T E C T I V E   S C O T T   L E L A N D**

9   who, having been duly sworn by the bailiff herein, testified as follows:

10  BAILIFF:  He has no objection.

11      THE COURT:  All right.  Thank you.

12  **DIRECT EXAMINATION**

13  **BY MRS. KOHLRIESER:**

14  Q       Good afternoon.  Can you state your name for the record, please?

15  A       My name is Scott E. Leland.

16  Q       And where are you currently employed?

17  A       I'm a detective with the Lima Police Department.

18  Q       How long have you been with the Lima Police Department?

19  A       About twenty-two years.

20  Q       How long have you been a detective?

21  A       Fifteen years now.

22  Q       And what is your current department that you're working in?

23  A       I work in the Northwest Ohio Technologies Crime Unit as a computer

1    forensic investigator.

2    Q        Okay.  What is the Northwest Ohio Technologies Crime Unit?

3    A        It is a cyber forensics lab.  We do computer forensics and mobile

4    digital forensics on cell phones, videos, computers, and things like that.

5    Q        Cameras?

6    A        Cameras.

7    Q        And what are your specific duties within that?

8    A        I'm a forensics examiner, as well as I administrate the function of the

9    lab.

10   Q        And who else is in that unit with you currently?

11   A        Sergeant Terry Sneary from the Allen County Sheriff's Department, as

12   well as I think five maybe part-time examiners that come in occasionally.

13   Q        Okay.  Now, when you say Northwest Ohio do you cover multiple

14   jurisdictions?

15   A        Yes, we do.

16   Q        Could you give a few that you cover?

17   A        We cover most of the jurisdictions in Allen County, as well as the City

18   of Lima, and Hardin County, Van Wert County, Mercer County and Auglaize

19   County.

20   Q        Okay.  Do you also serve in an overflow capacity for the local F.B.I.

21   office if necessary?

22   A        Yes.  We do work, or, we have done work for the F.B.I., as well as the

23   United States Secret Service, and Immigrations and Customs, I.C.E., as they

1  call it.  We've done work for I.C.E. as well as federal task forces like I.C.A.C.

2  and things like that.

3  Q       And I.C.A.C. stands for?

4  A       The Internet Crimes Against Children Task Force.

5  Q       Okay.  Did you receive any specialized training and/or education to

6  perform your current position?

7  A       Yes, ma'am.  I have countless hours of training in the field of

8  computers and digital forensics.

9  Q       Such as?

10  A       I'm certified as a basic intermediate and advanced computer forensic

11  examiner from both the Ohio State Peace Officers Training Academy as well

12  as the National White Collar Crime Institute.  I am certified as a mobile

13  forensic examiner in both basic and advanced through the United States

14  Secret Services National Computer Forensic Institute.  I'm certified by several

15  manufacturers of software that we use - Access Data Certified Examiner,

16  Encase, and things like that.  I'm certified in Ocean Systems forensic tools as

17  far as digital videos and graphics.

18  Q       Okay.  I'll stop you there.  The list goes on?

19  A       Yes.

20  Q       Okay.  Did you also receive any in-house training, and by that I mean

21  through the Lima Police Department?

22  A       When I first -- well, training for us, continuing education, is always daily

23  and weekly.  If we're not busy doing something we're training.  I received -- I

1   was fortunate to work under a guy named Kevin DeLong.  I believe he

2   testified in here earlier.  He was in our lab for several years and he's a trainer.

3   I had the good grace to train under him for several years in-house in our lab.

4   Q       Okay.  How many computer examinations would you say you've

5   performed over the years?

6   A       Hundreds upon hundreds of digital examinations on everything from

7   computers, to phones, to cameras, to thumb drives, to flash drives, DVR's,

8   and things like that.  Hundreds upon hundreds.  I know last year alone my lab,

9   between the two of us, conducted five hundred and three examinations.

10  Q       Okay.  You mentioned certifications.  What sorts of things do you have

11  to do in order to be certified in that field?

12  A       Not only do you have to attend training from a certified training course,

13  but you have to complete both practical and written examinations to get

14  certifications.

15  Q       Okay.  And have you testified in Court before in your capacity as a

16  forensic computer mobile data analyst?

17  A       Yes, I have, both in Auglaize County and Allen County Courts.

18  Q       All right.  And have you been qualified as an expert in those two

19  Courts?

20  A       Yes, I have, in both.

21                      MRS. KOHLRIESER:   Your Honor, at this

22  time I would move to have the witness qualified as an expert in forensic

23  computer and mobile data technology analysis.

1          THE COURT:  Do you wish to be heard,

2    Mr. Rion?

3          MR. RION:  No objection.

4          THE COURT:  Okay.  The Court will note

5    that he is an expert qualified to testify in whatever you said.

6          MRS. KOHLRIESER:  Thank you, your

7    Honor.

8    Q    Okay.  Let's get to really the meat of what we're here for now.  In

9    February of 2009 were you -- your title is still Detective; correct?

10   A    Yes, it is.  I am still a Detective.

11   Q    In 2009 were you active in the detective division?

12   A    Yes, I was.

13   Q    And was your primary role at that time detective work versus the

14   computer work?

15   A    Correct.  My primary duties at that time were criminal investigations.

16   Q    Okay.  And specifically on March 23rd of 2009 did you become aware

17   of a homicide over on East McKibben?

18   A    Yes, I did.

19   Q    And as part of that were you asked to seek a search warrant for a

20   home at 122 East Eureka belonging to Markelus Carter?

21   A    Yes, I was.

22   Q    And did you, in fact, get that search warrant?

23   A    Yes.

1    Q       I understand there was more than one search warrant obtained that

2    day?

3    A       Yes, ma'am.

4    Q       Okay.  Let's talk about the first search warrant.  What was the first

5    search warrant, what were you allowed to look for in that first search warrant?

6    A       Weapons, or firearms, and ammunition was the extent of the first

7    search warrant we executed.

8    Q       Now, we've heard a little bit about search warrants and how you go

9    about getting them.  Were you the one who did an affidavit giving the facts to

10   the Court as to why a search warrant should be issued?

11   A       Yes, ma'am, that was me.

12   Q       And what was the basis for that first warrant?

13   A       For the first search warrant we had detectives that were talking to the

14   defendant in an interview room and during the course of that interview the

15   defendant told our investigators that he had a gun, or guns, plural, in his

16   home and that there was ammunition for the guns.  Because we're detectives

17   and we do our homework we knew that the defendant was under what we call

18   disability.  That means by law he wasn't permitted to have a firearm.  So,

19   knowing that there was a firearm in the residence we asked for permission to

20   go in and get it and he said --

21   Q       Now, Detective?

22   A       Yes.

23   Q       Did you get a search warrant for that?

1    A     Yes, we did.

2    Q     Okay.  Thank you.  Now, were you part of the team that went to

3    execute that first search warrant?

4    A     Yes, ma'am.

5    Q     Tell us a little bit about that.

6    A     Several of us, a group of people, we always work in a team.  You

7    know, houses are too big for one or two guys to search.  So, we take a team

8    of people in.  We enter the house and the first thing we always do is make

9    sure there's no one else in the house, or animals in the house that are going

10    to hurt anybody coming in.  We call it clearing and securing.  Once we've

11    cleared and secured a residence then we begin searching for the things that

12    are permitted for us to search for within the body of the search warrant.

13    Q     Okay.  Let me ask you this.  Are you familiar with the term protective

14    sweep?

15    A     Yes.

16    Q     Is that also the -- well, what were the terms you used?

17    A     Yea, that's what I was just kind of describing is a protective sweep.  It's

18    a matter of semantics.  We call it both things.

19    Q     Okay.  All right.  So, a protective sweep is what you did?

20    A     Yes.

21    Q     Okay.  You said you began, you and the others, began searching for

22    the weapons and ammunition that you were allowed to search for at that

23    point?

1   A       Yes.

2   Q       Okay.  Were there any weapons found during that search?

3   A       Yes, ma'am.

4   Q       Did you find one?

5   A       Yes.

6   Q       Do you recall what you found?

7   A       I found a Smith & Wesson, model 686, if memory serves me.  It's an

8   L-frame revolver.  It was a .357 magnum.

9   Q       Okay.  Did you touch it?

10  A       I can't say specifically if I touched it.  I probably did to hold it up so

11  Kenny, or, our I.D. officer could photograph it and things like that.

12  Q       Okay.  Would you have worn gloves when you were touching that?

13  A       Absolutely.  I always wear gloves, as a rule, on any search warrant.

14  You just never know what you're going to get into and you don't want to

15  disturb any evidence or anything.

16  Q       Okay.  When you say Kenny, you're referring to I.D. Officer Kenny

17  Whitney?

18  A       Yes.

19  Q       Now, did there come a time during that search where the decision was

20  made to seek a second search warrant?

21  A       Yes, there was.

22  Q       Okay.  And who was responsible for obtaining that second search

23  warrant?

1    A        That would have been me also.

2    Q        And what was the basis for that second search warrant?

3    A        Well, the basis grew a little bit.

4                                        MR. RION:   Your Honor, may we

5    approach?

6                                        THE COURT:   Sure.

7    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

8    the record, as follows.)

9                                        MR. RION:   I don't know where he's going

10   with this, but there's a lot of basis' for it and I'm not objecting to it but, for

11   instance, they found like cocaine and things like that.  Now, I don't know if

12   he's going to go there and --

13                                       MRS. KOHLRIESER:   That's not in the

14   second search warrant; is it?

15                                       MR. RION:   I think that was the basis and

16   that's why --

17                                       MRS. KOHLRIESER:   Okay.  I'll rephrase

18   my question.  Yea.

19                                       MR. RION:   It's legitimate.  I mean, I'm not

20   challenging the search warrant.

21                                       MRS. KOHLRIESER:   No, no.  That's fine.

22   (WHEREUPON, Court continued on the record, as follows.)

23                                       THE COURT:   Okay.  Proceed.

1          MRS. KOHLRIESER:   Your Honor, can I

2    have just a moment to check something out?

3          THE COURT:   Sure.

4    (WHEREUPON, Court went off the record briefly.)

5    Q      Do you know whether during that first search whether any of the

6    officers in the home also found a nine millimeter weapon?

7    A      Yes.

8    Q      And at that time are you aware of whether, well, maybe not yourself

9    but other officers there on scene had been at the murder scene and found

10   nine millimeter casings?

11   A      Yes, I was aware of that.

12   Q      And was that nine millimeter gun part of the basis for the second

13   search warrant?

14   A      Yes.

15   Q      Did you also outline the relationship, as part of the basis for your

16   second search warrant, between Sonya Burkholder, the victim, and the

17   defendant, Markelus Carter?

18   A      Yes, I did.

19   Q      Do you recall, again, as part of that second search warrant, nine

20   millimeter ammunition being found?

21   A      Yes.

22   Q      And as part of that second search warrant basis by then had

23   information been received from Husky Refinery about some calls that the

1    defendant might have made seeking information as to the victim and Sonya

2    Burkholder?

3    A        Yes.

4    Q        I guess, what was the purpose of -- well, in those parameters, what

5    was the purpose of getting the second search warrant then?  What were you

6    seeking to look for then?

7    A        At that particular time we began to believe that there would have been

8    evidence of involvement in the homicide that we were currently investigating

9    in the residence.

10   Q        Okay.  So, now we've advanced from simply looking for weapons for

11   someone who's not allowed to have them to possible evidence of a murder?

12   A        Yes, ma'am.

13   Q        Okay.  And did that allow you to more extensively search the home?

14   A        Yes.

15   Q        And are you aware of whether a number of items were seized during

16   this second search of the home?

17   A        Yes, a number of items were seized.

18   Q        And are you aware of whether Investigator DeLong seized a number of

19   computer and mobile data and camera and that type of stuff as well?

20   A        Yes, ma'am.  There were computers and things like that, cameras, and

21   flash drives seized during the second search warrant.

22   Q        Now, do you, yourself, during the execution of the first search warrant

23   recall seeing any camouflage clothing?

1    A    I cannot say.  I do not recall off the top of my head.

2    Q    Okay.  During the first search warrant was that even on your radar to

3    look for?

4    A    No.  We were looking for firearms and ammunition.

5    Q    And what was the state of that house?

6    A    It was a mess.  Clothing and things, belongings, piled up upon each

7    other.

8    Q    Okay.  And then at some point did your duties shift more to the forensic

9    examination of the computers and things like that?

10   A    Yes.

11                          MRS. KOHLRIESER:   Can I have just a

12   moment, your Honor?

13                          THE COURT:   Sure.

14   (WHEREUPON, Court went off the record briefly.)

15   Q    All right.  Detective Leland, sometime last year, 2014, were you in the

16   Northwest Ohio Technology Crimes Unit actively?

17   A    Yes. Yes, I was.

18   Q    And were you asked to conduct a forensic examination yourself of

19   various computers that were found?

20   A    Yes, I was.

21   Q    And did you, in fact, do that?

22   A    Yes, I did.

23   Q    Do you recall the purpose of that request?

1    A    Investigator DeLong had done the examination originally and he had

2    since moved on to the private sector and was no longer in the area.  The

3    detective, I believe, asked me if I could restart those investigations and see if

4    I could find anything.

5    Q    Had he done the examination of these things several years before?

6    A    Yes, he had.

7    Q    Okay.  And were you aware of things that he had found?

8    A    Yes, I was.

9    Q    And did you similarly find --

10    A    Yes, I did.

11    Q    -- these types of things?  Okay.  Now, I want to specifically talk about

12    the camera just a little bit.  I'm going to hand you what's been previously

13    marked as State's exhibit '141'.  If you would take a look at that for me,

14    please?

15    A    Okay.

16    Q    Okay?  Do you recognize what that is?

17    A    Yea.  This is a Sony DSCT9 digital camera.

18    Q    Okay.  Was that recovered from 122 East Eureka?

19    A    Yes, it was.

20    Q    And has that been held in evidence, well, I don't know in the right

21    building, but with the Lima Police Department throughout these six years?

22    A    Yes, it has.

23    Q    And did you have occasion to examine that camera?

1   A       Yes, I did.

2   Q       Okay.  I'm going to hand you collectively State's exhibits '142', '143',

3   '144', and '6'.  I'd ask you to take a look at those, please.

4   A       Okay.

5   Q       Do you recognize those documents?

6   A       Yes, I do.

7   Q       What are they?

8   A       These are printed versions of digital pictures I found on the camera.

9   Q       Okay.  Were you able to determine times on those?

10  A       Yes.

11  Q       Now, I'm going to take you through one by one here in a second and

12  ask you about those specific times; okay?

13  A       Yes.

14  Q       Just give me one second.  Were you able also to go into that camera,

15  let me just ask you that, able to go into that camera and determine the times

16  on these pictures?

17  A       Yes, I was.

18  Q       Do you recall the times of those pictures yourself off the top of your

19  head?

20  A       Not off the top of my head.  I think they started at about eight fifty-five

21  P.M.

22  Q       Okay.  If I were to show you part of your report would that refresh your

23  recollection as to the time those photos were taken?

1  A      Yes, it would.

2  Q      First off, do you see a date stamp on those pictures?

3  A      Yes, there's a date stamp on each picture.  This one is Jan., January

4  9th, 2009.

5  Q      And were you able to ascertain whether the camera was giving the

6  correct date?

7  A      Yes.

8  Q      I'm going to show you your report and I'd ask you to take a look at that

9  for a second.  I'm sorry.  Hold on just a second.

10                           MR. RION:  I've seen it.  Thank you.

11  Q      I'd ask you to take a look at that.  Tell me when you're done.

12  (WHEREUPON, witness reviewed report.)

13  A      Okay.

14  Q      Does that refresh your recollection as to the time of each of these?

15  A      Yes.

16  Q      Okay.  Let's take them one by one.  State's exhibit '142'.  I know this

17  isn't the best mechanism for looking at it.  But, what do we see pictured in

18  State's exhibit '142'?

19  A      This is an image taken from in the roadway on Elm Street, pointing

20  eastbound, just before the underpass which would be just east of Central.

21  Q      Well, let me ask you this, Detective - how in the world can you tell that

22  from this picture?

23  A      I've been a police officer in Lima for twenty-two years.  I mean, I've

1    driven these streets hundreds and hundreds and hundreds of times.  While

2    this is not a very good representation of what you can see on a computer, it

3    was very clear to see that that underpass bridge, and it's a very unique

4    bridge, is what's in the picture, especially on the left here.

5    Q       Okay.  On January 9th, 2009 when did this picture -- when did your

6    examination reveal this picture was taken?

7    A       At eight fifty-five P.M.

8    Q       And then there's another picture, State's exhibit '143'?

9    A       Yes.

10   Q       Now, this one is even fuzzier.  Again, are you able to tell where that is

11   at this time?

12   A       No, I could not say with any certainty where that picture was taken.

13   Q       What time was this picture taken?

14   A       It was taken less than a minute later at eight fifty-six.

15   Q       Okay.  State's exhibit '144'.  Do you recognize what's depicted in this

16   photograph?

17   A       Yes, I do.  This is a photograph taken from the roadway on Jackson

18   Street, pointing northbound at North Street.

19   Q       Okay.  So, do you know approximately how far that is to the area of the

20   400 block of East Pearl and East McKibben?

21   A       Very, very, very close.  Less than a quarter mile, probably.

22   Q       And that picture was taken at what time?

23   A       That image was taken at eight fifty-seven P.M.  So, a minute later.

1   Q      Okay.  And then, lastly, State's exhibit '6' here.  I'd ask you to take a

2   look at that.  What time was this picture taken?

3   A      This image was taken at nine P.M., three minutes after the last one.

4   Q      Okay.  Now, did you also find a video snippet on that phone?

5   A      Yes, I did.

6   Q      Excuse me.  On that camera?

7   A      Yes, I did.

8   Q      And do you recall approximately how much longer after State's exhibit

9   '6' at nine o'clock that video started?

10  A      Within a few minutes of the last picture that we just saw on the screen

11  a video was on the camera.  It was thirteen seconds long.  It appeared to be

12  on Market Street at Union, pointing westbound toward where the Police

13  Department is located.

14  Q      Okay.  Is it reflected that nine oh seven would have been that video?

15  A      That video is not on here, I don't believe.

16  Q      Okay.  Sorry.  Do you know whether nine oh seven was the time?

17  A      Yea, I believe nine oh seven was the time.  Yes, ma'am.

18  Q      All right.  You said it's just a thirteen second video?

19  A      Yes.

20  Q      Okay.  What does it appear to show?

21  A      It appears to be taken from the inside of a motor vehicle through the

22  front windshield of the intersections of Market Street and Union area in front

23  of the Health Department and Lima Police Department area.

1    Q      Okay.  I want to show something just so we're clear on this.  I know

2    you said you're a Lima Police Officer and you can see, and I'm just going to

3    ask you to hold, because it doesn't show as well, but State's exhibit '142'

4    please.

5    A      Uh-huh.

6    Q      Feel free to stand up.

7                              MRS. KOHLRIESER:  Actually, with the

8    Court's indulgence, if he could step out here, perhaps?

9                              THE COURT:  That's fine.

10                             MRS. KOHLRIESER:  The screen just

11   doesn't show it very well.

12                             THE COURT:  Just so if he speaks he's

13   close to a mic.

14   A      I'll speak up, sir.

15   Q      I'm going to actually have you kind of stand at this podium and hold

16   that picture up there.  Show them the things in this picture that indicate to you

17   where that is.

18   A      When you're looking at this picture, ladies and gentlemen, you'll see

19   right across the top that it's a bridge.  There's an overpass here.  If you look

20   on what would be your left of this picture there is concrete walls and in those

21   concrete walls there's arches.  Okay?  The only overpass we have in Lima

22   going down like that is the Elm Street railroad underpass just east of Central

23   Avenue.

1   Q       Okay.  Thank you.

2   A       Yes.

3   Q       Now, let's talk a little bit about what you did on the computers.  I know

4   that you said that you looked at and were able to confirm some of what

5   Investigator Long, or, DeLong had found.  What kinds of things did you find?

6   A       I found the same things that Investigator DeLong found.

7   Q       Such as?

8   A       Searches for Husky Refinery and things like that, property searches I

9   think for the McKibben Street address somewhere on the computers.  Again,

10  the images on the camera.  Those are all things that we found.  I also located

11  what we call on the computers a SAM file, and that's a capital S, a capital A,

12  and a capital M.  A SAM file is a file that shows, well, how do I put this in

13  language, when you first buy a computer and you first turn it on you have to

14  enter, you know, whose computer is this and you have to enter your name

15  and then they say, you know, what company, and if you have a company you

16  can enter a name.  Well, that data that you enter originally when you start that

17  software for the first time is put into what's called the SAM file.  In this

18  computer I found the SAM files and the user name, I think, was Markelus and

19  the owner was Markelus Carter in the SAM files.

20  Q       Okay.  Did you find any photographs of -- well, first let me ask you, do

21  you remember what Markelus Carter looks like?

22  A       Yes.

23  Q       Okay.  Do you see him in Court today?

1    A     Yes.  He's the gentleman at the defendant's table.

2                      MRS. KOHLRIESER:   Please let the

3    record reflect the witness has identified the defendant.

4                      THE COURT:   Which gentleman?

5    A     In the gray sweater.

6                      THE COURT:   Okay.  So noted.

7                      MRS. KOHLRIESER:   Sorry.

8    Q     Did you find pictures of the defendant on that computer?

9    A     Yes, I did.

10    Q     Okay.  And did you find some where he was dressed in camouflage?

11    A     Yes.

12    Q     And I'm going to show you State's exhibits '147' and '148'.  I'll have

13    you take a look at these for me.

14    (WHEREUPON, witness reviewed exhibits.)

15    A     Yes.

16    Q     Do you recognize State's exhibits '147' and '148'?

17    A     Yes, I do.

18    Q     Okay.  Let's start with '147'.

19    A     Okay.

20    Q     I'm going to put it up on the screen so the jurors can see.  I would ask

21    you, if you will, to kind of tell us what it is exactly we're looking at here.

22    A     What you're looking at here, ladies and gentlemen, is a copy out of a

23    report that is generated by some of the software that we use when we do our

1   forensic investigations.  In this particular case you'll see line one says

2   bookmark.  Bookmark simply means that I checked that image and put a

3   mark by it in the software.  I bookmarked it like you would bookmark a book

4   you were reading so I would know where it was at.  It goes on to tell you I

5   created it.  That's my name.  I only have one file in that bookmark.  It has a

6   thumbnail accompanying it.  The image name is img293.jpg.  Computers give

7   names to all the files you create, a picture, or a word document.  Computers

8   give it a name if you don't give it a name.  So, in this case the computer gave

9   it the name img293.  It tells me the size of it and when the file was created on

10  the computer, --

11  Q      And what's that date?

12  A      -- as well as modified or the last time it was accessed.

13  Q      I'm sorry, Detective Leland.  Can I interrupt you a moment?

14  A      Yes.

15  Q      What's the creation date?

16  A      The creation date means the time the file appeared or was placed on

17  to the computer.

18  Q      Okay.

19  A      So, for example, if you were to take a picture with your camera and

20  you were to take that data and transfer it to your computer that image is then

21  created on your computer on that date.  You may have taken the picture with

22  the camera two weeks earlier.  But, that file is not created on the computer

23  until you put it in the computer.  That's what the created date of that file is.

1  Q      Let me ask you this - I apologize, but I don't think I did - what

2  computers do you recall specifically examining?

3  A      I examined a Hewlett-Packard laptop, we call them HP's, as well as a

4  Dell laptop.

5  Q      Okay.  Is there any information that we see on State's exhibit '147' that

6  let's you know where this image came from?

7  A      Yes.  Down at the bottom there it says 'path'.  It's the HP laptop.  HDD

8  means its hard drive.  So, this information came from the hard drive.

9  Everything you see basically is what we entered, or, I entered when I started

10  the case.  HP laptop, HD Warrington homicide.  E01 is the name of the file

11  that is created by our imaging software.  It's basically, well, we don't work on

12  your computer.  If we have your computer we take an image of your hard

13  drive and we work off of that image.  That way, no matter what we do, we

14  never change the original evidence.  Investigator DeLong worked this case

15  back in 2006.  I was able to work the identical evidence in 2014 - or, 2009 -

16  I'm sorry.  I was able to work it again in 2014 and it was the identical

17  evidence.

18  Q      Okay.  So, now we see the image there.  What's that commonly

19  referred to, that small image?

20  A      That little one is called a thumbnail.

21  Q      Are you able to blow up that thumbnail and see what it actually is?

22  A      Yes.

23  Q      And is that what we have in State's exhibit '148'?

1   A     Yes.

2   Q     What do you see -- who do you see depicted in State's exhibit '148'?

3   A     The defendant, Markelus Carter.

4   Q     And can you tell what object he's wearing?

5   A     He has a shirt on, and it looks like a paintball mask on the top of his

6 head, and he's wearing gloves.

7   Q     Detective Leland, on these devices were you able to tell whether there

8 was anybody using the computer between the hours of three and six A.M. on

9 February 23rd, 2009; if you recall?

10   A     I noted no activity on the computer between those hours.

11   Q     Okay. And then did you also provide, I guess, a CD of all your findings

12 and what you found on the computer to Detective Clark?

13   A     Yes, I did.

14                     MRS. KOHLRIESER: Could I have just

15 one second?

16 (WHEREUPON, Court went off the record briefly.)

17                     MRS. KOHLRIESER: Sorry. I was

18 checking my notes real quick, your Honor.

19   Q     And aside from the initial searches and things like that did that

20 basically conclude your part of this investigation?

21   A     Yes, it did.

22   Q     Let me ask you - you said, and I just want to make sure I'm clear, that

23 during the searches did you, yourself, ever see any camouflage clothing? Let

1    me ask you this - did you, yourself, ever touch any camouflage clothing?

2    A    No.

3    Q    Okay.  During your participation in the search did you wear gloves?

4    A    Yes.

5    Q    Thank you.

6                    MRS. KOHLRIESER:   No further questions

7    at this time, your Honor.

8                    THE COURT:  All right.  Mr. Rion, any

9    questions for this witness?

10                   MR. RION:   Just a few.

11                   **CROSS EXAMINATION**

12   **BY MR. RION:**

13   Q    Sir, in looking at State's exhibit '148', is this the paintball attire that you

14   were referring to on direct examination?

15   A    Yes, sir.

16   Q    These are the images that you found on the computer; correct?

17   A    Yes, sir.

18   Q    That are relevant to this case?

19   A    Yes, sir.

20   Q    You were present at the Eureka Street address.  What time do you

21   think you got there?

22   A    I would say someplace between eleven-thirty and noon, looking back.

23   Q    And how long did the first search take?

1   A   I don't know.

2   Q   Roughly?

3   A   I don't know.  I really couldn't tell you.

4   Q   How long did the second search take?

5   A   I'd say two or three hours.

6   Q   And when -- so, you don't know when the first ended and the second

7   one began?

8   A   Right.  They pretty much kind of blended together, I would think.

9   Q   Well, one was done and then another one started after the first one

10  was completed; right?

11  A   Yes.

12  Q   And when you arrived at the residence for the first search who was

13  initially present with you?  If you need to see your report, --

14  A   I think Detective Clark was with me.  I can't tell you who else was with

15  me without looking at the report.

16                        MR. RION:   May I?

17                        THE COURT:  Sure.  Go ahead.

18  Q   Does this look like your report, sir?

19  A   Yes, it looks like my report.

20  Q   So, initially who else was with you?

21  A   It was myself, Detective Clark, and Detective Miller at 128 (sic) East

22  Eureka Street.

23  Q   Then you also entered the residence with the assistance of who?

1   A      Patrolman Elchert.

2   Q      So, those are the people that you wrote down in your report that you

3   recall, at least at that time?

4   A      Yes.

5   Q      Does that refresh your recollection?  You don't really have an

6   independent recollection of it?

7   A      That's a summary of what happened, in my view, that day.

8   Q      So, those --

9   A      If I wrote that down, those are the people I remember being there.

10  Q      If people came after that -- let me ask it a different way - you obviously

11  wrote this down and you testified to what you saw.

12  A      Yes.

13  Q      Or, what you wrote down.  That's fine.  Is this -- are you relying upon

14  what you wrote down on this day to inform the jury of who was there initially?

15  A      Yes, I am.

16  Q      Okay.  What I mean by that is without that document you wouldn't be

17  able to say today who all was present on that day?  Fair?

18  A      No.  Actually I've read that report multiple times in the last, you know,

19  umpteen days and, to tell you the truth, I just lost it in my mind.

20  Q      Right.  That's what I mean.  Yea.  Okay.  Thank you very much.

21                              THE COURT:  Any redirect?

22                              MRS. KOHLRIESER:  No, your Honor.

23                              THE COURT:  All right.  Detective, thank

1 you for coming in.

2 A  Thank you.

3         THE COURT: Next witness for the State of

4 Ohio?

5         MR. MILLER: Your Honor, can we

6 approach one second for a quick question?

7         THE COURT: Sure.

8 (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

9 the record, as follows.)

10        MR. MILLER: Our next witness is Tim.  It's

11 up to the Court whether or not you want to take a break now or signal when

12 you want to take a break because Tim's going to be, of course, awhile.  He'll

13 probably conclude the afternoon.

14        THE COURT: (Inaudible).

15        MR. MILLER: Okay.  If I get carried away

16 just yell at me or whatever.  You don't have to yell at me literally.

17        THE COURT: Okay.

18 (WHEREUPON, Court continued on the record, as follows.)

19        THE COURT: Next witness, please?

20        MR. MILLER: Tim Clark.

21 WHEREUPON, called to appear as a witness in this proceeding was one:

22     **D E T E C T I V E   T I M O T H Y   C L A R K**

23 who, having been duly sworn by the bailiff herein, testified as follows:

1      THE COURT:  Do you have an objection to

2   being photographed?

3   A      Oh, no.  No.

4   BAILIFF:  I didn't think to ask.  He's been in here the whole time.

5   A      They get the good side of me now.

6      THE COURT:  Okay.

7   **DIRECT EXAMINATION**

8   **BY MR. MILLER:**

9   Q      All right.  Let's get down to it.  Well, with all of that, I've got to go back

10  here and pick up something real quick.  Tim, why don't you state your full

11  name for the record?

12  A      It's Timothy Clark.

13  Q      And, Tim, where do you work?

14  A      I'm a detective with the Lima Police Department.

15  Q      Okay.  And how long have you been with the Lima Police Department?

16  A      In the neighborhood of twenty-nine years.

17  Q      Okay.  And how long have you been a detective?

18  A      I've been a detective since 2002.

19  Q      Okay.  Before we get into the specifics here, and I think we've covered

20  this, but I just want to cover it so I know we've covered it for the record, is 436

21  East McKibben in Allen County, Ohio?

22  A      Yes, it is.

23  Q      Now, how long have you been a detective again?

1    A    Since 2002.

2    Q    Okay.  All right.

3    A    I think that's about thirteen years.

4    Q    Yep.

5    A    Or twelve years.  I'm not very good with math.

6    Q    All right.  How many homicide investigations have you been a part of

7    during your career as a detective?

8    A    I've been a part of a lot of homicide investigations.  I don't know a

9    number.  Twenty?  Twenty plus?

10   Q    Okay.  All of them with the Lima Police Department?

11   A    Yes, sir.

12   Q    In other words, you haven't worked for another police agency?

13   A    I never worked for any other agency.

14   Q    Okay.  Just so we know, in general terms how does -- well, when a

15   homicide call comes into the detective bureau, let me put it this way, when the

16   detective bureau learns of a homicide what happens?  Just take us through

17   the paces.

18   A    Well, to take you through it, our detective bureau, our police

19   department has, and I don't know the exact number back then, but generally

20   seventy-five officers or so.

21   Q    Now, you said back then.  We'll focus on this.  But, generally?

22   A    Generally speaking, our detective bureau has seven detectives and

23   two patrol officers who work as juvenile investigators.  Our office handles well

1    over, our office meaning our detective bureau, handles well over fifteen

2    hundred felony cases a year.  Each detective probably handles over a

3    hundred and fifty, you know, a hundred to a hundred and fifty cases a year.

4    Those cases range from anything as simple as a check fraud, or a minor

5    felony theft if you believe there is such a thing, up to murder and everything

6    in-between.  So, we do, or, we handle, if it's a felony investigation, someone

7    in our bureau, if it's assigned, will investigate it.

8    Q      Okay.  So, do you have a specific homicide investigation department or

9    bureau?

10   A      No.

11   Q      Okay.  So, as you said, and it's my understanding and, again, correct

12   me if I'm wrong, everything from a, you know, low level felony theft all the way

13   up to a homicide is handled by the same group of people?

14   A      Yes, sir.

15   Q      Okay.  Okay.  Go ahead.

16   A      We generally work Monday through Friday eight to four.  In the

17   evenings and on the weekends we have detectives and I.D. officers who are

18   on call for that time frame, which on the night, or, the night prior to this

19   incident myself and I think Detective Kleman were the detectives on call.  I

20   went to bed on a Sunday evening and was planning on coming into work at

21   eight o'clock the next morning, but I was called into work early that morning.

22   I'm not positive of the exact time.  But, it was before eight o'clock and I

23   believe I arrived on the scene somewhere around six-thirty in the morning.

1 But, that's generally how that works. We get called in after hours for any

2 number of different reasons.

3 Q Do all the detectives, and you even mentioned the juvenile bureau, do

4 you have a separate juvenile investigating, well, I don't want to call it a

5 department, but a separate group of people that do that?

6 A They work with us. By rank they're patrol officers who have been

7 assigned as investigators to work and handle juvenile issues. They've got to

8 file paperwork with the Court, Juvenile Court, and things of that nature. But,

9 they also do investigations involving juveniles.

10 Q Okay. So, even those folks, when there's a homicide, do they get

11 called in, too?

12 A When there's a homicide it's basically all hands on deck.

13 Q Okay. All right.

14 A Fortunately for us in this particular incident this occurred early, you

15 know, it was discovered and all hands on deck were first thing on a Monday

16 morning. So, we actually had a lot of hands on deck that day.

17 Q Okay. Why is it all hands of deck as you've described it?

18 A Well, it's a homicide. We don't, you know, I mean, we don't have a lot

19 of those and they're very obviously important and there's a lot of moving parts

20 going on, a lot of things are happening quickly. I'm sure everybody here has

21 heard the term first forty-eight. That's relative. You know, we want to gather

22 as much information on what happened and potentially identify someone as a

23 suspect as quickly as possible.

1454

1   Q       Is it always possible to solve that homicide in the first forty-eight, as

2   you put it?

3   A       No.

4   Q       Okay.  You mentioned coming in that, well, you said it was Monday

5   morning?  Is that correct?

6   A       Yes.

7   Q       Okay.  Which would have been February 23rd, 2009?

8   A       Yes.

9   Q       We'll take you back to that.  You've pretty much taken us up to that

10  point?

11  A       Yes.

12  Q       Specific to that day now, what exactly did you do?  I think you went out

13  to the -- you mentioned you went out to the scene.  What did you do after

14  that?

15  A       Well, when I came into work I drove directly to the scene, which was

16  436 East McKibben.  I believe I parked what would be west of the alley, on

17  McKibben, and approached on foot.  Detective Marik was the senior detective

18  at that time and was working kind of a dual role as both detective and helping

19  out in the I.D. bureau.  He was already there when I arrived.  I believe that

20  Detective Kleman arrived fairly -- well, I don't think he arrived before me, but

21  he arrived fairly quickly, you know, around the time that I arrived.

22  Q       Okay.

23                            MR. MILLER:  Your Honor, if I could, I'm

1    going to take a second and set up this easel.  I think it's State's exhibit '150'.

2                              THE COURT:  Okay.

3                              MR. MILLER:  We may refer to it from time

4    to time.

5                              THE COURT:  Okay.

6    Q      Now, Detective Clark, I've assembled, if you will, or put up I think it's

7    State's exhibit '150'.

8                              THE COURT:  It is.

9    Q      State's exhibit '150'.  Thank you.  What are we looking at there on

10   State's exhibit '150' in general terms?

11   A      Well, it's an aerial view of the general neighborhood in which we're

12   referring to.

13   Q      Okay.  Do you know where 436 East McKibben is on that particular

14   exhibit?

15   A      I believe so.

16   Q      Can you please point to it?

17   A      I've kind of got a bad angle here.

18                             MR. MILLER:  With the Court's permission,

19   could he --

20                             THE COURT:  That's fine.  That's fine.  If

21   you're going to talk, be close to a mic.  Did our laser pointer battery run out,

22   Monica?

23   BAILIFF:  No, it should be good.

1        THE COURT:   Oh.  If you want the laser

2    pointer, we have it.

3    A        Well, I can see it now.  I mean, I could probably point to it with the laser

4    now.  I just wanted to make sure.

5    Q        Could you just write 436 East McKibben next to where 436 East

6    McKibben is?

7    (WHEREUPON, witness marked on exhibit.)

8    Q        Okay.

9    A        I think I put it right on the roof.

10   Q        Okay.  Okay.  Very good.  All right.  Now, that's where you arrived;

11   right?

12   A        That's where I was sent to that morning.

13   Q        That morning?  Okay.  What did you do upon arriving on scene?

14   A        Well, I parked, as I said, you can see McKibben Street and I parked a

15   little bit, I think, to the west and walked up the driveway.  It was a very, very

16   cold morning.  I don't think it had snowed that night, but we had had quite a

17   bit of snow in the previous days.  The terrain was slippery.  It was very cold.  I

18   made my way up the driveway.

19   Q        Let me stop you there and ask you a question because we've heard

20   about the snow in previous testimony.  You were here for the previous

21   testimony, being the lead detective?

22   A        Yes.

23   Q        There was some testimony, and maybe it was cross examination, but

1    anyway there was testimony about footprints and so forth.  As you were -- can

2    you describe the snow?  I mean, you said -- well, was it hard?

3    A      It was a hard packed snow.

4    Q      Okay.

5    A      There had been a lot of travel both by foot and by vehicle in that alley.

6    Like I said, I don't think the snow was in any way fresh.  I think it was, at best,

7    a couple of days old.  But, we had quite a bit of it.  The cold weather had

8    hardened the snow.  You know how snow gets kind of frozen hard?  There

9    was a lot of vehicle and foot traffic that kind of packed it all down.

10   Q      How long have you lived here in Allen County?

11   A      My entire life.

12   Q      Okay.  There's cold and then there's cold here in Allen County.  I

13   mean, how cold was it that morning?

14   A      It was very cold.

15   Q      Okay.  All right.  Go ahead.  What did you do as you were walking up

16   the driveway?

17   A      I made my way up the alley.  I met, outside in the alley before we got to

18   the body, I was still in the alley when I began to confer with Detective Kleman

19   and Detective Marik who were both senior to me at that time.  As I said,

20   Detective Marik had already been there at least for a few minutes and kind of

21   had an idea of what the situation was.  We briefly discussed kind of what was

22   going to occur at that point.

23   Q      Okay.  What did you do after that?

1   A       Well, I was advised that Detective Marik was there more from an I.D.

2   standpoint.  Detective Marik or someone had told me that the folks that lived

3   at the house had already been taken to the Police Department.

4   Q       Okay.  Those folks, would that be Tarah and Sonya, as you come to

5   know them to be?

6   A       As I later found out, that would be Sonya Burkholder and Tarah Carter.

7   Q       Okay.  So, they were not there when you arrived?

8   A       They were not present when I arrived.

9   Q       Okay.  Do, Detective, or, I guess at that time I.D. Officer Marik --

10  A       He's still a Detective.

11  Q       Okay.  Detective Marik was there?

12  A       In my mind, anyhow.

13  Q       Okay.  Detective Marik was there and he was doing his I.D. stuff,

14  collecting evidence?

15  A       Well, yea.  The decision, I guess, collectively was made that he would

16  continue with processing, photographing, all the things that I.D. officers do,

17  and the decision was made that Detective Kleman would return to the Police

18  Department in order to begin speaking with Miss Burkholder and Miss Carter

19  in order to gather information about what all occurred that morning, and I

20  would remain at the scene and make observations and things of that nature.

21  Q       Okay.  Now, did you go into the house at 436 East McKibben that

22  morning?

23  A       Eventually.

1  Q      Okay.  Did you see any indications that the occupants of that house

2  owned a gun?

3  A      No.

4  Q      Okay.

5  A      No.

6  Q      Okay.

7  A      I think we -- I mean, if I may?

8  Q      Sure.

9  A      Before I ever got that far I stood by while Detective Marik did many

10 things outside the house in relationship to Mr. Warrington, who I later learned

11 was the victim, before I ever made it into the house.

12 Q      Okay.

13 A      I made several observations at that point.

14 Q      What observations did you make outside the house before you went

15 into the house?

16 A      Well, at some point Mr. Warrington was identified to me.  I was told

17 that he had been at work.

18                          MR. RION:   I just don't know where we're

19 going as far as hearsay.  I don't know if he's going there, but if he is, then I

20 would object to hearsay.

21                          MR. MILLER:   Your Honor, I think it's in the

22 context of explaining what he did in terms of his investigation.

23                          THE COURT:   If it's in that context then I'll

1    overrule the objection.  But, if it gets to a point that it's more than that, I'll

2    entertain the objection.

3                                    MR. MILLER:   Understood, your Honor.

4    A      I guess -- well, I would put it like my investigation at that point revealed

5    that Mr. Warrington had just been returning home from work.

6    Q      Okay.

7    A      And that would have been during early morning hours, around

8    five-fifteen A.M.  When I viewed the scene it appeared to me that Mr.

9    Warrington had been shot multiple times and possibly from behind.  It

10   appeared that he had all of his belongings, including his wallet and things of

11   that nature.  That struck me.

12   Q      Why?

13   A      Well, it didn't appear, given the weather being as cold as it was, being

14   the time of day that this more than likely occurred, and the fact that it

15   appeared the man had all of his belongings and was in the process of

16   opening the door to the home when he was attacked, it did not seem to me

17   that it was a random event.  It seemed more like overkill, so to speak.

18                                    MR. RION:   Your Honor, I'm going to

19   object.  We're getting into opinion here and not the facts.

20                                    THE COURT:   Yea, I'll sustain the

21   objection.  The jury will disregard the term overkill.  You can continue

22   questioning.

23                                    MR. MILLER:   Okay.  Thank you, your

1    Honor.

2    Q       Okay.  You mentioned a random act.  I mean, did anything at the

3    scene indicate to you as the detective on this case that this was a robbery?

4    A       No.

5    Q       Why?  What was there that indicated that this was not a robbery that

6    you observed?

7    A       Well, he had all of his belongings.  He had everything that he came

8    home with that morning.  He had his keys inside, you know, the door.  The

9    door was -- well, I don't remember if it was -- I don't think it was open, but the

10   door easily could have been opened by robbers, I guess.  I mean, the time,

11   the place, the weather, it just did not suggest anything random.

12   Q       Was there anything, whether it be your observations outside or inside

13   the home, and I know we're talking about outside, but we'll just say outside or

14   inside right now, was there any indication at the scene that the occupants of

15   the home might be responsible for this incident?

16   A       Not in my opinion.

17   Q       As an investigator, --

18                              MR. RION:  Objection as to his opinion.

19                              THE COURT:  Okay.  I'll sustain it to his

20   opinion.  Now, he can testify as to facts.

21   Q       Okay.  But, were they, at this point, they being the occupants -- by the

22   way, did you learn who the occupants of the house were while you were at

23   the scene?

1   A      Yes.

2   Q      Okay.  I can stop calling them the occupants.  Was it Sonya and

3   Tarah?

4   A      Again, it was Sonya Burkholder and Tarah Carter.

5   Q      Okay.  Did you necessarily then at that point dismiss them totally as

6   suspects?

7   A      Well, it's a little early for anything like that.  I mean, we're gathering

8   immediate information.  I did go in the house at one point and walked through

9   the house.  It was very well kept.  It was clean.  It was in order.  I mean, I

10  didn't search the house like it was, you know, -- I just walked through the

11  rooms and looked in the closets and peeked in drawers, you know, just in

12  general and everything in that home appeared to be in order, aside from the

13  doorway.

14  Q      Okay. Yea, the obvious.  Was there anything - I'll go back to my

15  question - was there anything at that scene that would indicate to you as an

16  investigator that the occupants of this house may have been responsible for

17  this?

18  A      Well, again, I hadn't talked to them at this point.  They were already at

19  the Police Department.  But, from my observations, not at all.

20  Q      Okay.  But, they were not dismissed as suspects outright?

21  A      Well, I mean, we don't dismiss anyone -- you don't dismiss anyone as

22  a potential suspect.  But, you follow the evidence.

23  Q      Understood.

1  A      And as all of this stuff is developing quickly and we have several

2  people working the case in other, you know, places and forms we're following

3  the evidence.

4  Q      Okay.  Now, while you're at the scene did anything happen that caused

5  you to become aware of a potential suspect, or a person of interest, if you

6  will?  I don't really know the difference, but people use those terms.

7  A      Yes.

8  Q      Okay.  What was that?

9  A      While I was at the residence I was approached by Curt Hile and I think

10  he was a patrolman then.  He's a Sergeant now.  I believe he testified

11  already.  He came up to me and said, "Hey, I know that this Sonya Burkholder

12  had an incident a couple of years ago with a guy named Markelus Carter and

13  it was a domestic that turned into a stand-off and there might have been a

14  gun involved and things of that nature."

15  Q      Okay.  While we're at the scene and while I'm thinking about it, you

16  know, you were mentioning prior testimony.  There was prior testimony, going

17  back days now, but I think it was --

18                                    MR. RION:   I guess I'm going to object.  It's

19  leading and we're not here to rehash prior testimony.

20                                    MRS. KOHLRIESER:   Can he finish his

21  question?

22                                    MR. MILLER:   I'm just trying to develop the

23  testimony.

1      THE COURT:   Yea.  Develop a question

2  out of that.

3  Q      Going back days, there was a patrolman, Patrolman Douglass, who

4  testified.  He mentioned a car leaving the scene.  Do you recall that testimony

5  that he observed the car leaving the scene?

6  A      Well, those things would have taken place after what we're discussing

7  now.

8  Q      Okay.  But, I'm trying to get focused on this area now.  Let's just get

9  that out there so we're not jumping all over the place when we go to 122.

10  A      Yea.  Yea, I recall Patrolman Douglass' testimony.

11  Q      Okay.  Did you follow up on that car?

12  A      I did not.  Detective Miller did.

13  Q      Okay.  Was there anything during the investigation that, as the lead

14  detective, led you to believe that that car had anything to do with this?

15  A      No.  It was a random lady taking her son to work, I believe.

16  Q      Okay.  Just so I don't have to bounce back and forth.  Okay.  Now, you

17  mentioned Patrolman Hile and him bringing up the name Markelus Carter.

18  Prior to Patrolman Hile mentioning Markelus Carter's name had you ever

19  heard of Markelus Carter?

20  A      No, not that I can recall at that time.

21  Q      Okay.

22  A      I've been around -- I guess, you know, that was 2009 and so I started

23  in 1986 and, I mean, I've worked all areas of Lima, but I didn't recall ever --

1   you know, because I thought about that since then and I do remember

2   thinking that, you know, I didn't have any idea who he was at that time.

3   Q      Okay.

4   A      I still don't believe I knew him before that point and time.  I actually did

5   at one point go back and look through reports to see if I had ever come

6   across him before, but I couldn't find any that I had.

7   Q      Okay.  But, particularly at that time a light bulb didn't go off in your

8   head or anything like that?

9   A      No.  I had no idea who he was at that point.

10  Q      Okay.

11  A      And I wasn't involved in the 2007 incident.  I actually think I was on

12  vacation when that occurred.

13  Q      Okay.  Now you have a suspect, or, a potential suspect's name, I

14  guess.  Did you still keep in mind the possibility of other suspects even at this

15  point?

16  A      Certainly.

17  Q      You have this information about Markelus Carter.  Did you pass that

18  information on to others working the case?

19  A      Yes.

20  Q      Was one of those others Officer Godfrey?

21  A      What I believe initially occurred was when Patrolman Hile gave me that

22  information I obviously thought, given those parameters that he told me, that I

23  was interested in speaking with Mr. Carter, or, at least somebody should find

1   him and speak to him. The first thing I did was ask one of the supervisors

2   that was on duty from day shift if anyone -- you know, I didn't know if I was

3   the first person that had gotten that information or if that information was

4   common knowledge to other officers that had been working that morning and

5   may have known about that other incident. But, what I did was I contacted

6   the shift supervisor and I said, "Hey, has anybody gone by Mr. Carter's home

7   to see if he's at home?" I was informed that, not to their knowledge, that no

8   one had. So, I asked the on duty supervisor to do that, to have somebody

9   drive by Mr. Carter's home and see if he was there.

10  Q       Okay. What did you do then?

11  A       I believe that it was around eight o'clock that it got back to me that

12  patrol officers had gone to Mr. Carter's house and it was dark and it didn't

13  appear that anyone was home. You know, I was working the phones and

14  talking to several people, including my immediate supervisors, which

15  Sergeant Godfrey would have been one of those at the time. I know

16  Lieutenant Baker was involved and other detectives, obviously, were

17  involved. But, eventually I received word that Godfrey was aware of Mr.

18  Carter.

19  Q       Okay. Once you received word that Mr. Godfrey was aware of Mr.

20  Carter what happened after that?

21  A       I don't remember how it went, but Sergeant Godfrey asked if I wanted

22  him to try to contact Mr. Carter because he had been meeting with him in

23  recent days or weeks in regard to something else and he thought that he

1    might have a current cell phone number.  So, I said, "Yea, see if you can get

2    ahold of him."

3    Q        Okay.

4    A        So, then Sergeant Godfrey started making those efforts.  At some point

5    then I decided that I was going to leave the area of 436 McKibben Street and

6    drive over to Mr. Carter's house and just have a look/see for myself.

7    Q        And did you do that?

8    A        I did.

9    Q        Okay.  When you did that what happened?  What did you find, if

10   anything?

11   A        Well, again, there's a lot of things going on at this time - a lot of phone

12   calls and a lot of conversations.  At some point Sergeant Godfrey got back to

13   me and told me that he had spoken to Carter and Carter was supposed to be

14   on his way up.  At some point Sergeant Godfrey had given me a brief

15   description of Carter's vehicle being, well, I think it was a '96 black Ford and

16   he had given me a license plate.  Again, at this point I didn't know what Mr.

17   Carter looked like.  But, with the information that I had gotten from Godfrey,

18   and even though Godfrey said that Carter told him that he was going to be on

19   his way, I thought I would just kind of drive over there and see what I could

20   see.

21   Q        Okay.

22                        MR. RION:   I guess I'm going to only object

23   as to what Godfrey said because I think Godfrey's testimony was slightly

1    different as far as what Carter told him.

2                            THE COURT:   Well, the jury can hopefully

3    remember Godfrey's testimony and this testimony.   The objection will be

4    overruled.  Again, he's just explaining what his next step was and why he took

5    that next step.  So, overruled.  Go ahead.

6                            MR. MILLER:   Okay.  Thank you, your

7    Honor.

8    Q      When you went over to 122 East Eureka to have a look/see, as you put

9    it, were you able to locate any vehicle that you thought was Mr. Carter's

10   vehicle?

11   A      Well, I came down Eureka from Central, which would be from the east.

12   If you're familiar with Eureka Street it's a fairly tight street.  Parking is allowed

13   on what would be the north side and no parking is allowed on the south side.

14   There was pretty much wall to wall cars all the way down the street.  As I

15   approached 122 East Eureka I saw a black Ford Explorer parked along the

16   curb, but I couldn't see the rear plate because there was a car parked in close

17   proximity behind it and the car, the black Ford, was not parked directly in front

18   of 122 East Eureka.  So, as I passed by and looked, well, I don't remember if I

19   looked in my rear view or if I looked back over my shoulder, but I saw the

20   front plate and it wasn't the same plate that Godfrey had given me as the

21   plate number to Mr. Carter's vehicle.  So, it really didn't click at that point that

22   it was a black Ford Explorer.  I did have a '96 black Ford with a different plate

23   number and as I passed by I saw a black Ford and it had a different plate

1  number.  It was parked a house back.  It didn't really click at that point, but

2  what I did was I continued down the block and pulled into the dentist's office

3  parking lot, which is probably three or four houses down on the opposite side

4  of the street from where Mr. Carter lives.

5  Q      Okay.  So, what happened after that?

6  A      So, anyhow, I'm just kind of watching and observing.  I see a fellow

7  approach the black Ford and the hood was up at some point and he was

8  working underneath the car briefly.  At that point and time it still hadn't

9  dawned on me, again, because I didn't know Mr. Carter or what he looked like

10  other than, well, I don't even know if I had a height or a weight or anything,

11  but he was a black male probably about my age.  As I'm sitting in the dentist's

12  parking lot I see, at the time, Sergeant Leary, Brian Leary, and --

13  Q      Who does he work with?

14  A      He, at the time, was working for the Drug Unit, the Drug Task Force.

15  Q      Okay.  Was he also an L.P.D. officer?

16  A      Yea.  He was a Sergeant.

17  Q      Okay.

18  A      Yea.  So, anyhow, again, there's a lot of things going on.  The word is

19  starting to spread that we had a homicide.  I don't know what all is out there

20  with the other officers and stuff at this point.  But, I see Sergeant Leary come

21  down Eureka Street in a plain car and I remember radioing him, or calling him

22  on the phone, and saying, "Hey, I've got this; you can, you know, move on

23  down the road.  I don't want you, you know, getting in the way."  He's like,

1     "Well, that's Carter right there."  It's the guy that's working on the black Ford.

2     So, Leary pulls all the way down the road to the end of the block and turns

3     around.  In the meantime Mr. Carter had gotten into the black Ford Explorer

4     and I was still in the parking lot of the dentist's office and Mr. Carter began

5     pulling away from the curb.

6     Q     Okay.

7     A     In the black Ford Explorer.

8     Q     All right.  So, now he pulls away from the curb.  What do you do when

9     that happens?

10     A     Well, it was early in the morning.  There was morning traffic.  He got to

11     the corner and turned north on Main.  I was waiting for Sergeant Leary to

12     clear past.  We got kind of caught up in traffic as Mr. Carter continued

13     northbound on Main Street.

14     Q     You mentioned that intersection with Main.

15     A     Main and Eureka.

16     Q     Is there a car wash there?

17     A     On the opposite side.

18     Q     Okay.  Go ahead.

19     A     We had the stop sign.  There was a lot of traffic on Main Street.  We

20     got caught up in traffic.  Mr. Carter was able to have a bit of a head start on

21     us at that point.  So, we did -- I radioed if there was any units, any marked

22     police cars, in the downtown area because Sergeant Leary was in a plain car

23     and I was in a plain car and we would have had no way of stopping Mr.

1    Carter.

2    Q       You can't stop somebody in a plain car?

3    A       Well, it's not very easy.  You would have to honk your horn and wave

4    your hands, I suppose.

5    Q       Okay.

6    A       But, I radioed for a marked unit.  There was one that was available, but

7    he wasn't immediately downtown.  Mr. Carter turned westbound on Spring

8    from Main.  Eventually other P.A.C.E., we called our drug unit at that time

9    P.A.C.E, but there were other P.A.C.E. officers in the area and they were able

10   to get in behind Mr. Carter and keep an eye on him and where he was

11   heading and radio that information.  I was far enough back where I could kind

12   of see where everybody was still heading.  Eventually a patrol unit was able

13   to catch up with Mr. Carter on Spring Street.  I think it was Spring and

14   Jameson, just west of there, where they eventually stopped him.

15   Q       Now, from 122 East Eureka Street where you say Mr. Carter pulled

16   away from the curb and then proceeded to where you've just described, is

17   that heading towards the Police Station?

18   A       No.  That's heading west, away from town, away from downtown.

19   Q       Okay.  Let's say if you were at 122 East Eureka Street and if you

20   wanted to go to the Police Station, well, which direction would you have to

21   travel?

22   A       You would have continued north to the Square on Main Street.  You

23   wouldn't have turned west on Spring.

1   Q      Okay.  Now, you mentioned that Mr. Carter was eventually stopped;

2   right?

3   A      Yes.

4   Q      Was that stop what was shown earlier in this case with Officer

5   Montgomery?

6   A      Yes.

7   Q      Were you there?

8   A      Eventually.

9   Q      Okay.  Were you there during the stop?

10  A      Not the initial stop.

11  Q      Okay.  Well, I'll say it this way - when you arrived was Mr. Carter still at

12  the stop?

13  A      Yes.

14  Q      Okay.  Do you remember what you were wearing?  Just so we have

15  some reference on that video.

16  A      I believe I had on a white sweater, a three-quarter length leather

17  jacket, and I think I had gloves on.

18  Q      Okay.

19  A      Driving a red Ford Taurus.

20  Q      Okay.

21  A      Well, maroon actually.

22  Q      Now, at the stop did you have any conversation with Mr. Carter?

23  A      Eventually.

1   Q      Okay.  What did you tell him and what did he say?

2   A      Well, my first concern was when I got out of my car Mr. Carter was

3   being handled by the P.A.C.E. officers, or the drug unit guys that were there,

4   and the first thing I did was I wanted to make sure this was the Mr. Carter that

5   I wanted to speak to.  I think I tried to confirm that with either Mr. Carter

6   himself or the officers.  But, the first thing I wanted to do was to make sure

7   everybody there knew that he was not under arrest and that I just wanted to

8   talk to him.

9   Q      Okay.  Now, when you say handled, what do you mean by they were

10  handling him?

11  A      Well, they had him out of the car.  I think they had him out of the car

12  when I got out of my car and somebody was patting him down.

13  Q      Is that standard procedure?

14  A      It's an officer safety thing.

15  Q      Okay.  So, what happened after that?

16  A      Well, I wanted to make sure everybody was under the, you know, or

17  realized that, okay, I don't know what everybody's been told but he's not

18  under arrest and I just wanted to talk to him.

19  Q      Okay.

20  A      So, I got that accomplished.  At some point I then told Mr. Carter that I

21  was investigating a shooting that took place on McKibben and that there had

22  been a homicide.

23  Q      Okay.  What was Mr. Carter's reaction at that point?

1    A      I would say that he exploded in emotion.

2    Q      Okay.  Was that, again, going back to the video we saw through Officer

3    Montgomery, was that what was depicted on that video?

4    A      Yes.

5    Q      Did he tell you why he was so emotional?

6    A      He kept -- he kept, well, I don't know if screaming is the right word, but

7    he kept wanting, he kept referring to his daughter, his daughter, his daughter,

8    and was she okay and he had to see her.  I told him multiple times that his

9    daughter was fine.

10   Q      Okay.  Did he then calm down after you told him that?

11   A      No.  I mean, he threw himself on the ground.  He was just -- the whole

12   thing was kind of bizarre to me.

13   Q      Well, okay.  We've got it on the tape.

14                          MR. RION:   I'll object to the commentary.

15                          THE COURT:   Okay.  Sustained.  The jury

16   will be instructed to disregard the commentary of "bizarre".

17   Q      As a detective are you trained either by just through experience or any

18   kind of formal training to monitor people's reactions as you tell them things?

19   A      Yea.  I think that just comes with experience and talking to people --

20   Q      Okay.

21   A      -- in the battlefield.  You learn it on the go.

22   Q      Okay.  Have you found that training and/or experience to be

23   valuable in your investigations?

1   A       Yes.

2   Q       What kind of things as an investigator or detective are you looking for

3   in people's reactions?  Well, are you looking at their reactions to try to

4   determine whether or not they're telling you the truth?

5   A       Well, I mean, your reaction should match the intensity, I guess, of

6   what's going on.  You know, this was obviously a very serious -- and I did tell

7   the man that, you know, I was investigating a shooting that occurred on

8   McKibben and it was potentially a homicide.  You know, his daughter was

9   staying at that residence, at least part-time.  But, I don't know how I can

10  answer the question without -- well, it just didn't, it just didn't appear right to

11  me.

12  Q       Well, let me ask you a question that you might be able to answer.

13  After you told him that his daughter was fine, based on your experience as a

14  detective, were you surprised by his continued demeanor?

15  A       Yes, very much so.

16  Q       Did you see any tears coming out of his eyes as you watched him?

17  A       No.

18  Q       At that point did you -- I mean, you were obviously looking for Mr.

19  Carter.  Did you ask him to go down to the station or did you ask him to do

20  anything so that you could get him someplace where you could talk to him?

21  A       I don't know for sure exactly how it was worded, but I was like, "Listen,

22  we just want you to come down to the station and talk to us about what's

23  going on."

1    Q    And was he willing to do that?

2    A    Yea. Yea. In fact, he tried to get into my car.

3    Q    Okay. Did you allow that?

4    A    You know, I think for a brief second I did consider it. But, my car door

5    was locked and so he was unable to get in. Then it kind of clicked and I was

6    like, 'you know, I don't think I want him riding with me in my car and so let's

7    see if we can coax him back and let somebody else give him a ride'.

8    Q    Is that also sort of an officer security issue?

9    A    Yea. Again, all of this happened, as you can see from the video,

10   everything happened pretty quickly. He was eventually escorted back

11   towards the patrol car and he agreed to be driven to the Police Department.

12   He was not handcuffed. He went voluntarily.

13   Q    Are patrol cars outfitted on the inside differently than --

14   A    They have a cage. You know, you're basically in a cage in the back

15   seat.

16   Q    Is it usual to transport people in the back seat of a patrol car?

17   A    We transport a wide variety of people, both in trouble and not in

18   trouble, --

19   Q    In the back of patrol cars?

20   A    -- in the back of police cars.

21   Q    Okay. So, that was, based on your experience, --

22   A    I've been in the back of a police car getting a ride before.

23   Q    But, based on your experience was it unusual to put Mr. Carter in the

1    back of a patrol car rather than your unmarked car?

2    A    Not at all.

3    Q    Okay.  Now, he's going to the station.  His vehicle was still there?

4    A    Correct.

5    Q    Correct?  Okay.  What happened with his vehicle?

6    A    I impounded it.

7    Q    Why?

8    A    It had improper registration and where he had stopped it was partially

9    blocking the driveway.

10   Q    By improper registration --

11   A    It had two different plates, front and back.

12   Q    Okay.  Now, Markelus goes to the station.  Is that when he was

13   interviewed?  To your knowledge is that when he was interviewed by

14   Detective Kleman?

15   A    Yes.

16   Q    Okay.  What were you doing while the interview was going on with

17   Detective Kleman, if you recall?

18   A    I eventually -- well, I impounded the vehicle.  I did a brief impound

19   inventory search of the vehicle, which is basically a limited search for

20   valuables and things of that nature so if we impound somebody's stuff they

21   don't come back later and say, 'hey, where's my bag of jewels that was in

22   there', or, you know, 'my big bag of money'.  We do a brief impound inventory

23   checking for valuables.  I did that.  I did not see anything that I needed to be

1    concerned about.  I impounded it.

2    Q       By concerned about, do you mean with reference to this homicide?

3    A       With reference to anything.

4    Q       Okay.  Nothing out of the ordinary?

5    A       Nothing out of the ordinary.  I stood by for the impound.  Then

6    eventually I returned to the Police Department.

7    Q       Okay.  Now, during the interview, and I don't know how you would

8    come across the information, I'll ask you, but during the interview did

9    Markelus provide investigators information that allowed them to eventually

10   obtain a search warrant for his house?

11   A       Yes.

12   Q       Did you learn of that information somehow during the course of the

13   investigation?

14   A       Well, when I got back to the Police Department that mid-morning,

15   again, we started at six-thirty, I'm not sure what time it was, but it was

16   mid-morning and I got back to the Police Department and I was informed by

17   Detective Marik, I believe, or Detective Kleman maybe, or one of the

18   supervisors, that during the interview Mr. Carter had admitted to having a

19   .357 in his house, in which he's under disability, and so they had made the

20   decision that they were going to seek out a search warrant in order to retrieve

21   that weapon.

22   Q       Okay.  Did that search warrant actually get obtained?

23   A       Yes.

1  Q      Okay.  So, there's the interview and then we go to, or, that interview

2  spawns the search warrant, the ability to get a search warrant?

3  A      Yes.

4  Q      Was the search warrant for 122 East Eureka?

5  A      Yes.

6  Q      How many search warrants -- well, let's put it this way.  How many

7  search warrants were there relative to 122 East Eureka?

8  A      Two.

9  Q      Two?  Okay.  Were you there at the beginning?  Were you there for

10  any of the search at 122 East Eureka?

11  A      Yes.

12  Q      Okay.  Do you recall what time you arrived at 122 East Eureka for the

13  search?

14  A      I'm sure it's documented in my report, but I believe that the searching

15  activity or the searching part of all of this began around noon.

16  Q      Okay.  Did you get there as soon as the search began?

17  A      Yes.

18  Q      Okay.  Now, we've seen the pictures of 122 East Eureka.  There's, I'll

19  call it crime scene tape, some sort of yellow or orange tape around 122 East

20  Eureka.  You've seen those.  Why was that -- do you recall that being there?

21  A      Vaguely from having seen it refreshed my mind; yea.

22  Q      Is it customary to put that sort of tape around a search warrant in this

23  sort of a case?

1  A      Well, yea.  We -- well, yes and no, I guess is the best answer.

2  Q      Well, explain.

3  A      They put crime scene tape up around crime scenes all the time.

4  Anytime there's a shooting or a serious crime there's going to be crime scene

5  tape put up.  For instance, at Sonya Burkholder's house where this took place

6  I'm quite sure there was crime scene tape wrapped around the general

7  vicinity.  It's not -- well, I can't say that it's done on a regular basis when

8  serving search warrants.

9  Q      Okay.  Do you know why it was done on this particular basis?

10  A      I think because it was in the middle of the day and we didn't want

11  anybody - I didn't put it up - I'm speculating at this point.

12  Q      I understand.  Yea, I'm just asking if you know why it was put up.

13  A      But, I would say just to keep any interested participants back out of the

14  way and so they didn't come in when we weren't paying attention or

15  whatever.

16  Q      How many search warrants have you been on in your career, if you

17  know?

18  A      A lot.

19  Q      Okay.  As an investigator do you want people coming up and knocking

20  on the door and trying to come into the house?

21  A      No, and we've had that happen on multiple occasions.

22  Q      Okay.  Does it usually happen during the day?

23  A      I mean, I don't know that I can put a time on it.  But, it happens.

1   Q       Okay.

2   A       We posted an officer at the door as well.

3   Q       Okay.  For the same reason?

4   A       Yes.

5   Q       You just don't want people just to happen to walk in not knowing there

6   was a search warrant?  Is that correct, or incorrect?

7   A       Yea.  I mean, we're busy.  You don't want anybody coming in that

8   you're unaware of.

9   Q       The first search warrant, what were officers looking for during the first

10  search warrant?

11  A       The first search warrant was for guns and what I would say, or, I would

12  describe as related items.

13  Q       Okay.  Ammunition?

14  A       Yea, I think so.

15  Q       Did you participate in that search?

16  A       Yea.

17  Q       In what way did you participate?

18  A       Well, again, I participated in both searches.  My role was more of

19  directing traffic, being a facilitator of the scene, people were searching,

20  getting Mr. Whitney to where he needed to be to take photographs and things

21  of that nature, and I was handling the phones, handling a lot of phone calls,

22  receiving information and passing out information.  A lot of things were going

23  on.  So, while you could say I was actively involved in the search, I'm not

1    actively involved in the search.  I'm just kind of helping to facilitate the search,

2    so to speak.

3    Q        Okay.  Did you collect, and I want to be very specific about this, did

4    you collect any evidence on either one of those search warrants?

5    A        I did not collect any evidence.

6    Q        Okay.  Now, you mentioned there were two search warrants.  The first

7    search warrant, was there a strict termination of the first search warrant

8    before the second search warrant began?  In other words, did officers -- let

9    me rephrase that.  Was there a point and time when the first search warrant

10   was over and officers cleared the house?

11   A        Yea.  We didn't leave, though.

12   Q        Well, when I say clear the house, I mean everybody leave.  Did that

13   happen?

14   A        I don't think -- I don't think we left.  I think that we stopped.  I think that

15   we were searching for, well, on the first search warrant we were searching for

16   guns.

17   Q        Uh-huh.

18   A        We found a couple of guns.

19   Q        Okay.

20   A        During the course of that search we saw things on the kitchen table

21   that made us go hmm.  We felt at that point that we were going to need to get

22   a second search warrant.

23   Q        And did you get that second search warrant?

1   A       And we did eventually get that second search warrant.

2   Q       And what was that second search warrant for?

3   A       That second search warrant was for items that we believed could be

4   related to the homicide investigation.

5   Q       Okay.  So, was the second search warrant broader in scope than the

6   first?

7   A       Yes.

8   Q       Or the same?

9   A       Broader.

10   Q       Okay.  In what sense?  In what way?

11   A       Well, in ways of recovering items that we believed could be related to a

12   homicide investigation.

13   Q       Rather than just guns and ammo. and things like that?

14   A       Rather than just guns, specifically guns and ammo.

15   Q       Okay.  Now, during that, well, we'll call it the first search warrant, I

16   guess, -- well, let me ask you this.  Do you think of this, I mean, I know there

17   were two search warrants, but do you think of it as two searches or just one,

18   in a sense?

19   A       In a sense?  I mean, in a sense, one.

20   Q       Okay.  Why is that?

21   A       Because we never really left.

22   Q       Okay.  Is it fair to say that --

23   A       We stood down kind of, I guess you could say, waiting for the second

1    search warrant to be completed.

2    Q      Okay.  Very good.  All right.  So, during the initial period of the search,

3    because I'll start talking about it in terms of one search so it doesn't get too

4    confusing, during the initial period of the first search did you actually locate

5    any firearms?

6    A      We located two firearms.

7    Q      Okay.  What were they?

8    A      One was a .357 Smith & Wesson revolver and the other one was a

9    Glock nine millimeter semi-automatic handgun.

10   Q      Did you touch any of these, or, either of these firearms?

11   A      I did not touch either of those weapons.

12   Q      Okay.  Now, at this point were you aware of the caliber of the casings

13   out at 436 East McKibben?

14   A      Yes.

15   Q      Okay.  So, when you come across, or, when investigators, I don't know

16   whether it was you or somebody else searching, but when you are made

17   aware of this .357 did you consider that to be the murder weapon, or,

18   potentially the murder weapon?

19   A      Well, I believe the .357 is why we were there in the first place, which

20   we obviously knew was not the murder weapon.

21   Q      Well, it may be obvious to you.  But, why?  Why was --

22   A      Mr. Carter, in his interview, said he had, I believe, a .357 Smith &

23   Wesson in his studio, which is what led to the search warrant.  I know that a

1    .357 fires .357 rounds and not nine millimeter rounds.  So, going in that

2    search was based under the Weapons Under Disability that Mr. Carter

3    basically admitted to during his interview.

4    Q        Okay.  So, when you find that .357 you can kind of discount that as the

5    murder weapon?  Is that what you're telling us?

6    A        Correct.

7    Q        Okay.  Did you find another gun?

8    A        We found a Glock nine millimeter in an upstairs bedroom.

9    Q        Okay.  Now, you knew the casings at the scene were nine millimeter

10   and you find a nine millimeter gun?

11   A        We also observed a box of shells on a shelf of nine millimeters.

12   Q        Okay.  Let's focus on the Glock for a second.  At that point did you

13   think possibly that that was the murder weapon?

14   A        Well, I mean, it's a nine millimeter.

15   Q        Okay.  So, is that a 'yes'?

16   A        You can't rule it out.

17   Q        Right?

18   A        Right.

19   Q        Did it later during your investigation turn out not to be the murder

20   weapon?

21   A        Well, it was ultimately sent to B.C.I. for testing and it was determined

22   that that gun did not match the shell casings and I think the bullets, too, that

23   were found at the scene.

1   Q        Okay.  All right.  Now, this nine millimeter -- during the course of the

2   search did you -- during the course of the search did investigators receive any

3   information on the nine millimeter, or, the Glock, to be more specific?

4   A        Yes.

5   Q        Okay.  Tell us about that.

6   A        Well, after we had found the guns in question in the house it was

7   decided amongst, or, the consensus that we were going to go ahead and

8   arrest Mr. Carter for what we would call suspicion of Having Weapons Under

9   Disability.  After making that determination Mr. Carter was eventually back

10  outside the residence with another person.  We went outside and approached

11  Mr. Carter and we placed him under arrest for suspicion of Having Weapons

12  Under Disability.  At that time a person, later identified as Eric Bennett,

13  handed me a note while Mr. Carter was being arrested.

14  Q        Okay.  Did that note relate to this Glock?

15  A        I believe so.

16  Q        Okay.  Did you read the note?

17  A        I did.

18  Q        Okay.  What did the note say?

19  A        It said something along the lines of 'be careful' and, you know, 'make

20  sure to check in the upstairs closet', or hallway closet, or something along

21  those lines.

22  Q        Okay.

23  A        It was from another person.

1  Q     Who was it from?

2  A     It was from Attorney Ken Rexford.

3  Q     When you say Attorney Ken Rexford, do you know Ken Rexford?

4  A     I do.

5  Q     And who do you know him to be?

6  A     An attorney in Lima.

7  Q     Okay.

8  A     And I believe Mr. Carter's attorney at that time.

9  Q     Okay.  Was, in fact, the Glock found in a closet upstairs?

10  A     Yea.  I think the note said hallway closet, but the gun was actually

11  found in a bedroom closet.  It had been found actually prior to having received

12  the note.

13  Q     Okay.  That was going to be my next question.  Had you found that

14  Glock prior to receiving the note?

15  A     The Glock was already recovered when I got the note.

16                          MR. MILLER:  Your Honor, can we

17  approach one second?

18                          THE COURT:  Okay.

19  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

20  the record, as follows.)

21                          MR. MILLER:  Before I get into a different

22  subject area I didn't know if you wanted to take a break.

23                          THE COURT:  So, you're at a logical point

1    to take a break?

2                              MR. MILLER:   Yea, we are.

3                              THE COURT:   Okay.

4    (WHEREUPON, Court continued on the record, as follows.)

5                              THE COURT:   Okay.  Ladies and

6    gentlemen of the jury, we're going to continue with the testimony of Detective

7    Clark, but we'll take a break here now.  I'm trying to time this for everybody's

8    convenience.  We'll go for a fifteen minute break.

9            Remember the admonitions I've been giving you all along not to

10   discuss the case or formulate any opinions.

11           So, we'll stand in recess until roughly a quarter till three.

12   (WHEREUPON, COURT WAS IN RECESS.)

13

14                             THE COURT:   Thank you.  Again, for the

15   record, we're reconvening in CR2014 0139, State of Ohio -vs- Markelus Q.

16   Carter.  The defendant is present in Court with counsel.  The State is present.

17   The jurors have returned from the afternoon recess.  We'll continue with the

18   direct examination of Detective Clark.  Mr. Miller?

19                             MR. MILLER:   Okay.  Thank you, your

20   Honor.

21   **DIRECT EXAMINATION OF DETECTIVE TIMOTHY CLARK CONTINUED**

22   **BY MR. MILLER:**

23   Q      I think where we were when we left off, if I recall correctly, was at the

1    search that took place at 122 East Eureka.  Now, did you find any ammunition

2    during the search?

3    A    Yes.

4    Q    What was that?

5    A    It was a box of Winchester nine millimeter, and it had, I think, seven

6    rounds in it.

7    Q    Okay.  What else at the search did you find of any interest to your

8    investigation?

9    A    Well, on the kitchen table, as I had mentioned earlier, things that we

10   observed in plain view which led to seeking the second search warrant was

11   we saw paperwork that we found to be interesting, meaning we found some,

12   well, what appeared to be copies of e-mails between Ken Warrington and

13   Sonya Burkholder.

14   Q    Okay.

15   A    We found Court paperwork from the 2007 incident, including police

16   reports and Court transcripts, I think.  We also found what appeared to me to

17   be kind of a written out script, which was later testified, in regard to Pam

18   Callahan and Husky Refinery.

19   Q    Okay.

20   A    We also found a pair of gloves on the kitchen table.

21   Q    Okay.  Where were the gloves, if you recall, in relation to the Court

22   documents and e-mails that you've mentioned?

23   A    They were all -- I mean, there was a lot of stuff on the kitchen table.

1    Like everywhere else, there was stuff everywhere.  Those paperwork items

2    were laying right out on top of everything else and the gloves were just

3    randomly laying there as well.

4    Q      Okay.  When you found the gloves, if you recall, was there anything

5    covering them?

6    A      They were just laying on the kitchen table.

7    Q      Okay.  On top of other stuff?

8    A      Yea.  We took the gloves because of the weather.  We assumed that

9    had Mr. --

10                           MR. RION:  Objection.

11    A      Yea, you're right.  Wrong word.

12                           THE COURT:  He stopped.

13                           MR. MILLER:  He stopped.  Okay.

14    Q      You mentioned gloves.  Did you find any other clothing items that you

15    considered at the time to be important to the investigation?

16    A      Eventually.

17    Q      Okay.  What were those other items?

18    A      Well, at some point during that second search warrant I received a call

19    from Sergeant Godfrey who had been out and about, like I said.  I was in

20    there and, you know, people were finding things and getting Kenny and

21    pointing out and getting things collected and photographed and things of that

22    nature and I was taking phone calls and making phone calls and basically

23    playing quarterback.  At one point Sergeant Godfrey called me and said that

1    he was able to, or, he was in the process of doing a canvass of the

2    neighborhood where Mr. Warrington had been found and he had spoken to a

3    lady who had indicated that she had observed someone run from the alley, or

4    come from the alley, after having been woken up by gunshots.

5                              MR. RION:   I'll object.  It's now double

6    hearsay, I guess.

7                              MR. MILLER:   Well, again, it's in the

8    development and course of his investigation.

9                              THE COURT:   I'm going to overrule it.  It's

10   just explaining what he did.

11   Q     Okay.  Go ahead, Detective Clark.

12   A     Well, again, I received a phone call from Sergeant Godfrey.  He had

13   spoken to someone in the neighborhood who had indicated that a person was

14   seen leaving the alley wearing camouflage clothing.

15   Q     Okay.  Did you later learn this person's name who saw this individual?

16   A     Rosalind Johnson.

17   Q     Okay.  Now during, well, we keep referring to the first and second

18   search warrant, but during the first search warrant, or either search warrant,

19   did you find cocaine in the house?

20   A     Yes.

21   Q     Do you recall whether or not during the course of your investigation

22   you learned the weight or amount of the cocaine?

23   A     I did later find out the amount - approximately.

1    Q      And what was that amount?

2                                 MR. RION:   Objection.

3                                 THE COURT:   Overruled.

4    A      I believe it was seventeen grams, or close to that.

5    Q      Okay.  Now, all of these items that you've talked about and you've just

6  mentioned during the search warrants that were located, did you, of any of

7  the items, did you physically pick those items up and collect them?  By collect

8  them I mean pick them up and put them into an evidence bag.  Did you do

9  that at all?

10  A      Not any of those items; no.

11  Q      Okay.  We've seen a picture of you holding what looks to be like a gun

12  case.

13  A      That's my finger.

14  Q      Okay.  Was there a gun in that case?  Well, let me ask you this - did

15  you find that gun case, or did you see it?

16  A      I don't recall who found it.

17  Q      Okay.

18  A      And I'll say that I never wore gloves during the entire search.

19  Q      Okay.

20  A      Again, I was doing a lot of other things.

21  Q      Okay.  Not collecting the evidence, as you've stated?

22  A      No.  But, I did touch that gun case.

23  Q      Okay.  Was there --

1   A      I wanted --

2   Q      Well, hang on.  At any time during the search warrant, or any time, did

3   you learn whether or not there was a gun in that case?

4   A      No.

5   Q      There was not a gun in that case, or you did not learn about it?

6   A      I just opened it so I could have a picture of it to illustrate there wasn't a

7   gun in it.

8   Q      Okay.

9   A      It didn't have any evidentiary value, in my opinion, at that point.

10  Q      Okay.  During the course of your investigation did it ever become of

11  any evidentiary value?

12  A      No.

13  Q      Okay.  Now we're at the search and items have been collected.  I think

14  you mentioned, well, was it at or during this search that the defendant was

15  arrested?

16  A      I guess I would term it the time between the two search warrants.

17  Q      Okay.  Sometime after the guns were found?

18  A      Yea.

19  Q      Okay.

20  A      Once the guns were found we obviously had probable cause to make

21  an arrest.

22  Q      For what charge?

23  A      Weapons Under Disability.

1    Q      Okay.  Not the homicide?

2    A      No.

3    Q      Did you - you mentioned the car was impounded, the defendant's car,

4    going back to that now and the stop.  I'm going to show you what has been

5    marked as State's exhibits '153', '154', '155', and '156'.  We'll start with them.

6                                    MR. MILLER:   Your Honor, may I approach

7    the witness?

8                                    THE COURT:  Yes.

9    Q      Sir, I'm going to ask you to take a look at those exhibits and just let me

10   know when you're finished.

11   (WHEREUPON, witness reviewed exhibits.)

12   A      Go ahead.

13   Q      Starting with State's exhibit '153' -- State's exhibit '153'.  What are we

14   looking at in State's exhibit '153'?

15   A      '153' is the front of Mr. Carter's '96 black Ford Explorer bearing I think

16   it's Charles Frank 88 Henry Paul.  That's police talk for the letters.  I think

17   that's what it is.

18   Q      Where are you getting those letters?

19   A      What do you mean?  Oh, those are the letters of the front plate.  That

20   would have been the plate that I had turned around and seen and thought,

21   well, that's not the plate they gave me.

22   Q      Okay.  Now, do you know where this was taken?

23   A      That was taken in the garage at Army's Wrecking Service down on

1   St. Johns.

2   Q     After the car was impounded?

3   A     Yes.

4   Q     Okay.  Does that truly and accurately depict Mr. Carter's car at the time

5   you seen it, prior to the stop, at 122 East Eureka?

6   A     Yes.

7   Q     State's exhibit '154'.  Can you tell us what State's exhibit '154' is?

8   A     That's the same vehicle, Mr. Carter's vehicle.  That's just a picture of

9   the back of it and a photograph displaying the other plate that was on the

10   back.  That's the plate that was originally given during the description and the

11   plate that I think Lieutenant Leary was able to see when he passed by and

12   identified Mr. Carter.

13   Q     Okay.  Again, was that taken at Army's?

14   A     That picture was taken at Army's as well.

15   Q     Does that picture truly and accurately depict the back end of Mr.

16   Carter's car on February 23rd, 2009?

17   A     Yes.

18   Q     When you observed it at 122 East Eureka?

19   A     Yes.

20   Q     Now, just for clarification, on each of these pictures, and I'm going to

21   show you State's exhibit '154', there is a date stamp on the bottom of that

22   picture; correct?

23   A     Yes.

1   Q      And what is the date stamp on that?

2   A      February 24th, 2009, the following day.

3   Q      Okay.  State's exhibit '155'.  What are we looking at there, Detective

4   Clark?

5   A      That appears to be a photograph of the front interior of Mr. Carter's

6   vehicle.

7   Q      Okay.  Does it truly and accurately depict Mr. Carter's -- you searched

8   Mr. Carter's vehicle; correct?  I believe you earlier testified --

9   A      Well, I did an impound inventory.

10  Q      Oh, okay.  Okay.  An impound inventory?  Does that truly and

11  accurately depict the interior of Mr. Carter's vehicle when you did the impound

12  inventory?

13  A      Yes.

14  Q      Sorry.  State's exhibit '156'.  Do you know what is in State's exhibit

15  '156'?

16  A      That would be a key.  It looks like a house key and a gas receipt.

17  Q      Now, does that gas receipt have an address on it?

18  A      It does.

19  Q      And what's the address?

20  A      721 West North Street, Lima, Ohio.

21  Q      Are you familiar with that location?

22  A      I am.

23  Q      Okay.  Can you generally describe where that -- can you just describe

1       where that location is?

2       A       That would be a gas station on the southwest corner of Metcalf and

3       North.  At that time it was a Clark station - no relation.  At this time I think it's a

4       Gold Star.

5       Q       Okay.  It's got a date on it; correct?

6       A       February 23rd of '09, I believe.

7       Q       Okay.

8       A       I think that's an '09.

9       Q       And a time?

10      A       Seven fifty-four A.M.

11      Q       Now, later in your investigation were you able to -- first of all, did you

12      take note of this when it was collected?

13      A       Yes.

14      Q       Did you then follow up and confirm, or, try to confirm whether or not

15      Mr. Carter was at that location at that date and time?

16      A       Yes.

17      Q       Okay.  Were you able to confirm that, in fact, he was?

18      A       Yes.

19      Q       Now, during the course of the investigation was that vehicle processed

20      for gunshot residue?

21      A       Yes.

22      Q       And were you made aware of the results of those tests during the

23      course of this investigation?

1    A     Yes.

2    Q     And what were those results?

3    A     Negative.

4                       MR. MILLER:  Can I have one second,

5    your Honor?

6                       THE COURT:  Yes.

7    (WHEREUPON, Court went off the record briefly.)

8    Q     Now, during the course of your investigation you mentioned and we've

9    seen evidence that there were two firearms located, functional, or apparently

10    functional firearms located in the house.  Were those the only two firearms

11    located in the house --

12    A     Those were the --

13    Q     -- at 122 East Eureka.

14    A     Those were the only two firearms located at 122 East Eureka.

15    Q     Okay.  During the search warrant -- well, you mentioned two search

16    warrants.  Was there also a search warrant for computers obtained during the

17    investigation?

18    A     I believe that the second search warrant included those items.

19    Q     Okay.  Were computers taken from the home for analysis?

20    A     Yes.

21    Q     Okay.  Now, did that analysis take awhile?

22    A     Quite awhile.

23    Q     Quite awhile?  Now, we're through the search.  During your

1    investigation did you continue, you know, after the search warrants to follow

2    up on any information that came in about the case?

3    A        Yes.

4    Q        Okay.  Did you continue to follow up on potential suspects?

5    A        I followed up on anything that -- I mean, to answer the question about

6    potential suspects, we followed up on a variety of different people at different

7    points and time.

8    Q        Okay.  When you followed up on those different people was there

9    anything that came about during the course of the investigation, during that

10    period, that led you to believe that there was any other suspects responsible,

11    or, who could be responsible for this homicide?

12                                    MR. RION:   Objection.

13                                    THE COURT:   Overruled.

14    A        No.

15    Q        Was this case every officially closed at any point and time during the

16    investigation?

17    A        No.  I can elaborate on that, if you would like.

18    Q        Please do.

19    A        I mean, this is six years down the line now.  Early on, after the initial

20    days of the investigation, I was working with another prosecutor who is no

21    longer here and the decision was made, at least at some point, to follow and

22    pursue the drug and weapons charges.  There was also a companion case

23    that resulted from the investigation.  Basically I was told to, you know, keep

1    the case open and see what you can find out, but, you know, there wasn't a

2    lot of excitement back then to move forward with an indictment.

3    Q      Okay.  Was that -- okay, by excitement, do you mean --

4    A      I think -- well, they told me that --

5                                        MR. RION:   Objection to what the

6    prosecutors would have told him.

7                                        THE COURT:   I'll sustain that.

8                                        MR. MILLER:   Yea.  We won't get into that.

9    Q      Okay.  Well, during this period of time, you know, the search warrants,

10   and I just want to get a time frame, the search warrants are done and you've

11   sent some stuff off to the lab in terms of the Glock and so forth, did you

12   periodically review this case?

13   A      Yea.  I mean, at least once a year or so.

14   Q      Okay.  And as information came in you followed up on that information,

15   or did you not?

16   A      No, we always followed up on anything that came in.

17   Q      Okay.  Now, during this period of time, well, I guess as time went on

18   where was Mr. Carter?

19   A      He was eventually in prison.

20   Q      Okay.  Is that in reference to the Weapons Under Disability charge?

21   A      And a couple of other charges.

22   Q      Okay.  At some point did you get some fresh information about the

23   camouflage clothing, in particular, and the gloves?

1    A    Yes.

2    Q    Okay.  What was that information that you received?

3    A    To step back for a second, as I had said, initially he was convicted on

4    several other charges and was going to prison.  The thought process was at

5    that point to, well, 'let's hold off on anything else and see what happens'.  At

6    some point and time Mr. Carter was eventually released from prison.

7    Q    Did you get some information about the clothes?

8    A    Well, I guess my point is, you know, I had other people look at the

9    case.  You know, when you look at the same case over and over again year

10   after year after year you miss things.  I showed people the case and had

11   other people look at it.  Eventually we found that there had never been any

12   G.S.R. testing done on some of the clothing and the gloves.

13   Q    Okay.

14   A    And the car as well.

15   Q    And was that done?

16   A    We did have that eventually done.

17   Q    Okay.  Is that when you got the positive test results that have already

18   been testified to?  Was it eventually tested?

19   A    Well, the items from the car were negative.  The clothing --

20   Q    I'm talking about the clothes.

21   A    Some of the clothing was positive.

22   Q    Okay.  Now, eventually Mr. Carter got out of prison.  What did you do

23   at that point?

1   A      Well, I started, -- you know, again, he was out of prison.  The thought

2   occurred to me that, you know, he had talked about it before to others.

3   Q      Meaning who?

4   A      Joey Moore.

5   Q      Okay.

6   A      The thought occurred to me that, well, here he's been in prison now for

7   four years basically and I thought I would give the prison a call and see if I

8   could speak to an investigator and maybe have that investigator interview cell

9   mates is what I was looking at at that point.  I thought that would be the best

10  place to start.  So, I made contact with the prison and was put in touch with

11  Sergeant Smith.  I basically explained to him that I was investigating a

12  homicide that involved Markelus Carter and that he had been a prisoner there

13  at one point and time - an inmate.  Sergeant Smith remembered him.  I said,

14  "Basically there was a homicide involving the boyfriend of Mr. Carter's

15  children's mother."  I said, "Can you just kind of poke around with his old cell

16  mates, if you can find any, and see if he ever talked about anything like that?"

17  Q      And did you learn that somebody, in fact, had information in that

18  regard?

19  A      Well, he compiled a report on the entire thing.

20  Q      Was Stephen Upham one of those individuals that you learned about?

21  A      Yes.

22  Q      Okay.  So, now you have information that Stephen Upham has

23  provided and you've got some new information about gunshot residue?

1 A  Yes.

2 Q  Did those fill in some blanks?

3 A  Yes. Now the case was getting --

4         MR. RION: Objection to his opinion about

5 this.

6         THE COURT: I'll overrule it and allow him

7 to testify. Go ahead.

8 Q  Go ahead, Tim.

9 A  Well, I mean, you know, we found G.S.R. We had a person telling us

10 that he got information from Carter that I felt --

11         MR. RION: Objection to his --

12         THE COURT: Overruled. Go ahead.

13 A  Mr. Upham couldn't have gotten the information that he had without

14 hearing it from Mr. Carter firsthand.

15         MR. RION: Objection.

16         THE COURT: There was an objection.

17 The objection is overruled.

18 Q  Go ahead.

19 A  Can you ask me another question? I felt with the G.S.R. having come

20 back as there being positive tests, and with what Mr. Upham said, then I

21 began preparing to pursue an indictment.

22 Q  Okay. Did you promise anything to Joey Moore or Stephen Upham in

23 exchange for their testimony?

1 A  No, sir.

2 Q  Okay.

3 A  I don't think I could do anything for Mr. Upham if I wanted to.

4 Q  Okay.  Why is that?

5 A  He's in prison.  He's got charges from another county.  Honestly, this

6 idea that we can help people get out of their cases is not the way it's often

7 portrayed.

8 Q  Okay.  So, during the course of this investigation, you know, we've

9 heard a lot of testimony and we have your testimony now, but during that

10 entire period, during that entire period were there any other suspects that you

11 came upon that supported an indictment against?

12 A  No.

13 Q  Okay.  I want to go back to a State's exhibit.  I know we're going to

14 bounce around a little bit.  State's exhibit '150'.  I'll just hold it up here.  I'll try

15 to talk into that microphone the best I can.  I'll tell you what - I'll just move

16 here.

17 A  Can you put it over here maybe?

18 Q  Do you want it over there?

19 A  Well, I can use the mic. here.

20            MR. MILLER:  Okay.  Is that okay, Judge?

21            THE COURT:  That's fine.  It's important

22 that the jurors see it.

23            MR. MILLER:  Okay.  With the Court's

1    permission, I'm going to have Detective Clark step down here.

2                                    THE COURT:   That's fine.

3    Q       Again, State's exhibit '150'.  Early in your testimony you marked 436

4    McKibben.  There's also an 'X' here that was put there by a previous witness.

5    Can you -- well, do you know where 438 Pearl is?

6    A       Yes.

7    Q       Okay.  Can you put a circle around 438 Pearl Street?

8                                    MRS. KOHLRIESER:   I think you want

9    448.

10                                   MR. MILLER:   Oh, 448.

11   A       Are you talking about Miss Johnson's house?

12   Q       Yea, Miss Johnson's house.

13   A       I believe here is Miss Burkholder's house.  Here is the alley that runs

14   between McKibben and Pearl.  Just off the alley would be where Rosalind

15   Johnson was at when she looked out her front window.  I believe this 'X' here

16   is where the trash hauler said he was when he heard shots.

17   Q       Okay.  Now, there seems to be behind 436 an empty lot, or a vacant

18   lot.  There's a vacant lot.  Do you see that?

19   A       Yes, sir.

20   Q       Was that vacant back on February 23rd of 2009?

21   A       No, it wasn't.  There was a house that sat directly on that corner, which

22   I think burned down in 2011.

23   Q       Okay.

1    A       So, you would have only had limited -- you wouldn't have been able to

2    see the entire alley.  You would have only been able to see the mouth of the

3    alley in regards to someone having come out of the alley.

4    Q       From where?

5    A       From where Miss Johnson was located.

6    Q       And that was going to be the question - even with a house on what is

7    now a vacant lot, and you're familiar with this, you walked the scene, could

8    you see from Miss Johnson's house the intersection of the alley that runs

9    between McKibben and Pearl right next to 436 East McKibben?  Could you

10   see the intersection of that alley and Pearl Street from Miss Johnson's

11   house?

12   A       I was actually in Miss Johnson's home in the days after all of this and

13   looking out her window.  Again, the house was a pretty large two story home.

14   The house was a pretty large two story home.  From my vantage point at Miss

15   Johnson's house, looking through that window, I could see the mouth of the

16   alley.

17   Q       Thank you.  Go ahead.  I'll take it.  You can have a seat.  I asked you

18   to do this earlier.  Can you just mark Miss Johnson's house, as you recall it,

19   with a circle?

20   (WHEREUPON, witness marked exhibit.)

21                              MR. MILLER:   Can I have one second,

22   your Honor?

23                              THE COURT:   Sure.

1                      MR. MILLER:   I think I'm pretty close here.

2    (WHEREUPON, Court went off the record briefly.)

3    Q     All right.  I have a few more things.  During the course of your

4    investigation did you monitor any social media websites for information

5    relating to this particular incident?

6    A     Yes.

7    Q     Okay.  Is that customary nowadays?

8    A     It is today.  It was kind of new back then.

9    Q     Okay.  I'm going to hand you what's been marked as State's exhibit

10    '168'.  Do you recognize that document?

11    A     I do.

12    Q     What is that?

13    A     This would be a -- well, I printed this off of what I believed to be

14    Markelus Carter's MySpace page, which to best describe it in 2009 would be

15    the equivalent of Facebook today.

16    Q     Okay.  Now, is there a last log-in date on that?

17    A     Yes, 2-23 of 2009, which would have been the day of the murder.

18    Q     Okay.  Right underneath his picture it says what?

19    A     On the MySpace pages back then it allowed you to post basically what

20    your mood was that day.  In this picture his mood was determined.

21    Q     Now, you testified earlier that Mr. Carter had been arrested at a certain

22    time on February 23rd of 2009.

23    A     Correct.

1    Q    When was he -- well, was he arrested on February 23rd, 2009?

2    A    Well, I don't have the exact time in front of me, but it was well after

3    noon.  It was after twelve o'clock because we started the first search warrant

4    at around noon and he was arrested, you know, in an hour or so after that.

5    Q    To your knowledge, did Mr. Carter return to 122 East Eureka on

6    2-23-2009, not afterwards, but just on that date?

7    A    To my knowledge he would not have been able -- well, he would not

8    have been able to return there after when I first saw him that morning out on

9    the street.

10   Q    I'm going to hand you what has been marked as State's exhibit '152'.

11   Do you recognize State's exhibit '152'?

12   A    Yes.

13   Q    What is that?

14   A    It's the gas receipt from Mr. Carter's vehicle from the Clark gas station.

15   Q    Okay.  The one that we saw a picture of?

16   A    Yea.

17   Q    Now, are you familiar with the area of East Eureka in Lima?

18   A    Yes.

19   Q    And are you familiar with the area of 436 McKibben in Lima?

20   A    Yes.

21   Q    And are you familiar with the area between those locations?

22   A    Yes.

23   Q    I'm going to hand you what's been marked as State's exhibit '151'.

1          THE COURT:  Excuse me.  What number?

2          MR. MILLER:  '151'.

3          THE COURT:  Oh, okay.

4     Q     Can you tell the jury what '151' appears to be to you?

5     A     Well, it's obviously a printed global map that encompasses both

6     McKibben and Eureka.

7     Q     Okay.  You've been a Lima Police Department officer for how many

8     years?

9     A     Twenty-nine.

10    Q     Are you familiar with this area of Lima?

11    A     I worked that area for many years.

12    Q     Can you take a marker and, well, if you were going to travel from --

13    well, first of all, I would like you to mark the one hundred block of East

14    Eureka.  The one hundred block of East Eureka.

15    (WHEREUPON, witness marked exhibit.)

16    A      That dot there I think would be in close proximity to Mr. Carter's home.

17    Q     And that dot you placed at the bottom of the map?

18    A     Yes.

19    Q     Now, the four hundred block of East McKibben Street.

20    (WHEREUPON, witness marked exhibit.)

21    A     I've placed a dot that would be in close proximity to Miss Burkholder's

22    home at the time.

23    Q     Okay.  Now, can you draw, if you can, what your experience to be as

1  the most direct route between the two dots?

2  A      Well, do you want me to draw it from McKibben Street, leaving --

3  Q      From McKibben to Eureka.

4  A      Well, I would likely go from McKibben, westbound to Jackson, and then

5  I would likely take Jackson down to Market.  Now, I don't recall at the time if

6  Elm Street was two way.  I think Elm Street was still one way going west, or,

7  going east.  So, today if I was doing it I could come straight down --

8  (WHEREUPON, witness marked exhibit.)

9  Q      Well, let's place it back in time.

10  A      I would assume --

11  Q       Let me correct my question.  Let's go back to February 23rd of 2009.

12  What would be the most direct route?

13  A      Well, I mean, I would suggest that you would cut over to Pine Street,

14  either on Market or Elm, and then take Pine.  Or, you could cut over to

15  Central.  Basically that block that Mr. Carter lives in runs between Central and

16  Main.  But, you could come down Pine Street and turn on Eureka, or you

17  could come down Central and turn on Eureka.  So, it would have been from

18  Central or --

19  Q      Well, just go ahead and complete the drawing.  Okay.  So, it would

20  look something like that; correct?

21  A      Yes.

22  Q      Okay.  Now, along those same lines, we'll make just a little bit of a

23  record here, have you had the opportunity to here recently travel from the

1    Husky Refinery to 436 East McKibben?

2    A    Yes.

3    Q    Okay.  Do you recall how long that took you?

4    A    I want to -- I think it was in the vicinity of, like, --

5    Q    Do you recall specifically?

6    A    I don't recall exactly.

7    Q    Okay.

8    A    I did make notes, though, of those trips.

9    Q    Okay.  Did you make notes of certain trips?

10   A    I did.

11   Q    Would referring to those notes help refresh your recollection as to the

12   timing of the trips?

13   A    Yes.

14   Q    Do you recognize that document?

15   A    These are my -- this is my chart that I made of all of the trips that I did.

16   Q    Okay.  I'll put it up here so everyone can see.

17   A    Oh, okay.  I won't need my glasses then.

18   Q    Okay.  All right.  The first location is the -- the first column talks about

19   locations and then the second column is miles and the next column, the final

20   column on the right, is time.  Did you drive between Husky and 436 East

21   McKibben?

22   A    Yea.

23   Q    Okay.  And how long did it take you?

1   A        Well, the first thing I would like to say is that these times would not be

2   exact.  It would depend on the traffic.  I did most of these during the middle of

3   the afternoon.  So, you're going to have more traffic, more than likely, at that

4   time of day than you would maybe in the early morning or the late evening

5   hours.  Then there's also some variables with catching traffic signals and

6   things of that nature.  So, my point is, where you see Husky Refinery to 436

7   East McKibben, well, I did it in eight minutes and thirty-five seconds.  But, it

8   could be a little more or a little less.

9   Q        Okay.  And then the area of 448/447 East Pearl Street to 436 East

10  McKibben?

11  A        Okay.  That would be -- well, just to go back to the first one, Husky

12  Refinery to 436 East McKibben.  That's obviously from where Mr. Warrington

13  left that morning at work to Sonya Burkholder's home.  The second location,

14  447 East Pearl to 436 East McKibben, and that's basically a little under a

15  quarter of a mile, was around forty seconds.  That would be the time from,

16  well, I think Don Hovest driving the garbage truck where he left the Pearl

17  Street address and went down to Liberty and then came back up on

18  McKibben.  That would have been the time from where he started to basically

19  passing Miss Burkholder's home.

20  Q        Okay.  And the next one down is 447 East Pearl Street to the Clark

21  Station.  Which Clark Station is that?

22  A        Now, that Clark Station should not be confused with the Clark Station

23  at Metcalf and North.  That Clark Station is, well, if you turn off of McKibben

1    and go north on Jefferson and up around the corner, and you know where

2    Schoonover Park and pool are, well, I don't know if it's still a Clark Station

3    today, but there's a gas station there that used to be a Clark Station and that

4    would be where Mr. Hovest called in the shots fired call.  As you can see, it's

5    three-quarters of a mile basically, and just under two minutes for him to get to

6    that point.

7    Q      Okay.  436 East McKibben to 122 East Eureka Street.

8    A      That would be the time it took me to drive from Sonya Burkholder's

9    home to Mr. Carter's home.  Again, it's a little over a mile now and a quarter

10   and right around four minutes and fifteen seconds driving.

11   Q      Okay.  And 122 East Eureka Street to Lima Central Catholic.

12   A      Yea, the significance of that is, you know, Mr. Carter had indicated that

13   morning that he took his son, Markie, to school.  So, I just wanted to

14   document the route from Eureka to L.C.C.  The route that I took was a little

15   over two and a half miles and a little over six minutes.  Again, those variables

16   with traffic and things could make it a little more or a little less.

17   Q      Okay.  Then the next entry there?

18   A      Then, having the information that Mr. Carter was at the gas station at

19   North and Metcalf, I would presume after having dropped off Markie at L.C.C.,

20   I went ahead and got the distance from L.C.C. to that gas station.  Again, it's

21   two point six miles and a little over six minutes to make that kind of indirect

22   route.  There's not a really straight route from L.C.C. to that area.  But, it was

23   around six minutes.

1  Q     Okay.

2                              MR. MILLER:   Your Honor, may I have one

3  minute?

4                              THE COURT:   Sure.

5  (WHEREUPON, Court went off the record briefly.)

6  Q     Detective Clark, did you also walk the alley that we've talked about, the

7  one between McKibben and Pearl and along 436?  It runs right along 436

8  East McKibben.

9  A     Yes.

10  Q     Okay.  Do you recall how long it took you to walk that?

11  A     I walked it twice, actually.

12  Q     Okay.  You walked it twice?  Okay.

13  A     I walked it from the side of Sonya's home, the alley side, in the alley,

14  not up next to the house, but the alley next to Sonya Burkholder's house, the

15  side door there.  I walked that to the mouth of the alley in kind of a leisurely

16  pace.  That was a little over forty seconds to do that.  Not in a hurry - just

17  walking along.  It was like forty-three seconds.  Then I did the same thing

18  trying to be a little more hurried without actually running and I did it in like

19  twenty-three seconds.

20  Q     Okay.  Did you run it?

21  A     No.  No, I didn't.

22  Q     All right.  Now, back to this clothing that was collected at 122 East

23  Eureka Street during the search warrants.  I'm going to hand you just for

1   reference sake State's exhibit '130'.  The bag is already opened.  Can you

2   see the pattern of camouflage on State's exhibit '130' without me taking it all

3   the way out?

4   A      Yes.

5   Q      Okay.  Now, was there actually other type, another type of camouflage,

6   collected at 122 East Eureka Street other than the pattern that's depicted on

7   State's exhibit '130'?

8   A      Yes.

9   Q      Okay.  Are you aware of whether or not that camouflage, the other type

10  of camouflage, was sent off for gunshot residue testing?

11  A      Yes.

12  Q      Are you aware of the results?

13  A      Negative.

14  Q      Okay.  Are you aware of the results?

15  A      Oh.

16                        MR. RION:  I guess I'm going to -- well, I'll

17  withdraw the objection.

18                        THE COURT:  Okay.

19  Q      Are you aware of the results?

20                        MR. RION:  No, I guess I am going to

21  object.  If there's going to be an expert -- I mean, he's talking about results of

22  a scientific test.  If we're going to get into it I would like to have the scientist

23  here to testify about it.

1       MRS. KOHLRIESER:   Your Honor, can we

2    approach just a moment?

3       THE COURT:   Sure.  You can approach.

4    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

5    the record, as follows.)

6       MRS. KOHLRIESER:   Your Honor, as we

7    have with some other things and what we've talked to Mr. Rion about earlier

8    was that we are having Tim testify to all the negatives so that he's not having

9    to call the B.C.I. experts.  Again, I think Daniel Davison's report was put into -

10      MR. MILLER:   Plus, more to the point, it's

11   just relaying what he learned during the course of his investigation.  That's it.

12      MRS. KOHLRIESER:   It's Matt Congleton's

13   report that Congleton testified to.

14      THE COURT:   (Inaudible).

15      MR. MILLER:   Really what we're talking

16   about in terms of camouflage this and camouflage that so that there's no

17   confusion.  There was other pictures of camouflage with different patterns.  I

18   was just trying to clear it up so there's no confusion.  That's it.

19      MR. RION:   I just don't know where they're

20   going with it now with these experts.  The last expert went in a direction that I

21   wasn't anticipating.  I'm a little gun shy right now.

22      THE COURT:   Well, he's not giving any

23   more expert testimony.

1                        MR. MILLER:  Who?

2                        THE COURT:  Clark.

3                        MRS. KOHLRIESER:  In Congleton's

4  report he tested both kinds of --

5                        MR. RION:  If Congleton testified to it then

6  this officer doesn't need to.

7                        THE COURT:  The objection is overruled.

8  Go ahead.

9  (WHEREUPON, Court continued on the record, as follows.)

10  Q     Okay.  Detective Clark, back to the question.  Are you aware that there

11  was a different pattern of clothing collected at the scene at 122 East Eureka

12  that had a different pattern of camouflage on it than what is depicted in

13  State's exhibit '130'?

14  A     Yes.

15  Q     Are you aware that that clothing was sent off for testing for gunshot

16  residue?

17  A     Yes.

18  Q     And are you aware of the results?

19  A     Yes.

20  Q     What were those results?

21  A     Negative.

22  Q     Okay.  At the traffic stop did the defendant ever ask you who the victim

23  was?

1  A      No.

2  Q      Now, did you tell Joey Moore that you didn't have time for his F-5's

3  during your interview?

4  A      Probably.

5  Q      What did you mean by that?

6  A      I wasn't going to mess with it.  He was going to tell me what he was

7  going to tell me or he wasn't.

8  Q      You heard Carlotta Williams testify here in this case.  How did you

9  come upon her name during the course of your investigation?

10  A      Through Joey Moore.

11                          MR. MILLER:   One second, your Honor.

12  (WHEREUPON, Court went off the record briefly.)

13  Q      During the course of this investigation did you monitor news reports?

14  A      Yes.

15  Q      Such as what would be written in the newspaper?

16  A      Yes.

17  Q      Do you recall if any of the details -- well, let me ask you this - are you

18  aware of any news report that covered this particular homicide?

19  A      Yes.

20  Q      Okay.  Of the news reports that you're aware of were any of the

21  investigative details given in those news reports?

22                          MR. RION:   Objection.

23                          THE COURT:   Overruled.

1    A        There were no details involving stalking, or camouflage, or paintball

2    masks, things of that nature in any newspaper reports.

3    Q        To the best of your recollection, you know, what was revealed?

4                                    MR. RION:   Objection.

5                                    THE COURT:   Overruled.

6    A        To the best of my recollection, names, dates, places.

7    Q        That's it?

8    A        Just general news filling information.

9    Q        During the course of investigations is it a matter of course for

10   detectives to give out details of a pending investigation to the news media?

11   A        That wouldn't be helpful.

12   Q        In what way?

13   A        Well, I mean, it's apparently clear in a case like this if you had given

14   out those details then certain things that witnesses tell you wouldn't be

15   relevant because what makes it relevant is the only way they could know

16   certain details is in a certain way.

17   Q        Okay.

18                                   MR. MILLER:   One second, your Honor?

19   We're getting there.

20                                   THE COURT:   Okay.  Time's up.  You said

21   one second.

22                                   MR. MILLER:   Maybe a little bit longer?

23   (WHEREUPON, Court went off the record briefly.)

1  Q      Along the same lines as the last question, does the Lima Police

2  Department release in any public way investigative reports during the

3  pendency of an investigation?

4  A      I don't believe that occurs until after a person is indicted.

5  Q      Okay.

6  A      And that wouldn't be to the news media, I don't think.

7  Q      Okay.

8                            MR. MILLER:   One more second, your

9  Honor.

10                            MRS. KOHLRIESER:   Sorry.

11  (WHEREUPON, Court went off the record briefly.)

12  Q      Do you know the year that this defendant was indicted?

13                            MR. RION:   In which case?

14  Q      In this case.

15  A      I think it was 2014.

16  Q      Okay.

17  A      I think.  I'm not positive.

18  Q      Okay.  Was that before or after you spoke to Mr. Upham?

19  A      It would have been after, several months after.

20                            MR MILLER:   No further questions.

21                            THE COURT:   All right.

22                            MR. RION:   May we approach, your

23  Honor?

1       THE COURT:   If you're asking about time?

2       MR. RION:  Yea.

3       THE COURT:   Yea, I'm planning on going

4   until four-thirty.  I'll give you a full opportunity to cross examine.  Let's get in

5   what we can get in between now and four-thirty and then if you need to

6   continue tomorrow we can continue tomorrow with that.

7       MR. RION:   I just didn't want to break in

8   the middle of cross.  That's all.

9       THE COURT:   Well, I want to keep trying

10  to move on here.  So, we'll see where we're at at four-thirty.  If you have a lot

11  more we'll break.  If you don't think you have a lot more, if the jury can stand

12  to be here for awhile, we'll keep going.  Okay?

13                          **CROSS EXAMINATION**

14  **BY MR. RION:**

15  Q       Sir, let's start with that last question.  You said after an indictment is

16  issued then the policy is that information can become public in the case.  Is

17  that what you testified to?

18  A       I don't know that policy is the right word.  It's my understanding that

19  once a person is indicted they have entitlement to discovery and so those

20  items would be released through discovery.

21  Q       Now, when was the indictment on the Weapons Under Disability?

22  A       That would have been in 2009.

23  Q       2009?  Okay.  So, information relating to this case was released at

1    that time; correct?

2    A      Certain information.

3    Q      Right.  And a Grand Jury -- an indictment was sought in this case, this

4    Murder case, in 2010; correct?

5    A      No, I don't think so.

6    Q      No?  There weren't Grand Jury subpoenas issued and a Grand Jury

7    held?

8    A      I don't recall seeking an indictment in 2010 for this.

9    Q      Okay.  In 2010?  Okay.  Now, let's go through the investigation for a

10   minute.  What other search warrants were issued for anyone else's house in

11   this case except for Mr. Carter's?

12   A      None.

13   Q      Okay.  What other houses were searched in the way that a search is

14   completed in this case except for Mr. Carter's?

15   A      Well, you have to have probable cause for a search warrant.

16   Q      I'm sorry?  If you would just answer my question?  You can get

17   permission to search a house, too; correct?

18   A      I suppose; yea.

19   Q      Okay.  So, you don't have to have probable cause.  You can have

20   someone's permission to search a house.  The question is --

21   A      No.  No, is the answer to that question then.

22   Q      To which question?

23   A      Did I search anybody else's house.

1  Q    Okay.  Or did any other officer that you're aware of conduct a thorough

2  search of any other house except for Mr. Carter's house?

3  A    No.

4  Q    Okay.  Now, Mr. Carter was arrested on February 23rd, 2009; correct?

5  A    Yes.

6  Q    On February 25th, 2009 did you receive a letter?  Did the Lima Police

7  Department receive a letter?  I'll mark it as defense exhibit 'JJ'.

8                              THE COURT:  'JJ'?

9                              MR. RION:  Yes.

10                             THE COURT:  Okay.

11 Q    Now, what is Defendant's exhibit 'JJ'?

12 A    It is a letter.

13 Q    Okay.  Who is it addressed to?

14 A    The Lima Police Department.

15 Q    And was that received by the Lima Police Department?

16 A    I would assume so.

17 Q    And I'll show it to the jury.  You've reviewed this letter before today;

18 correct?

19 A    I mean, I'm sure I read it before at some point and time.  Not recently.

20 Q    Well, it went through the mail; correct?

21 A    Yes.

22 Q    Were you able to determine what mailbox it was mailed from?

23 A    No.

1  Q      Did you ever determine what post office it was processed through?

2  A      No.

3  Q      Did you ever check the tracking numbers to determine any information

4  about this?

5  A      Where's that?

6  Q      This information here.  Do you see there's some codes, bar codes

7  there?

8  A      Yea.  Okay.

9  Q      Did you check any of that to see where it came from?

10  A      Yea, I don't know what that is.

11  Q      It reads - "In the Ken Warrington murder," -- this is two days, someone

12  mailed this while he was in prison; correct, or while he was in jail?

13  A      While he was in jail for Weapons Under Disability.

14  Q      Right.

15  A      Yea.

16  Q      And it's typed; correct?

17  A      Apparently.  It appears to be.

18  Q      "In the Ken Warrington murder you should be taking a real strong look

19  at his wife, Faye."  It goes on and on and on to talk about that.  It's sort of an

20  odd letter to just receive; correct?

21  A      Yes, I would say that.  That's fair.

22  Q      Did you ever compare -- now, the handwriting on the letter itself is in

23  person; right?  It's not typed; correct?

1   A      That's correct.

2   Q      Did you ever compare that handwriting to any other people's

3   handwriting?

4   A      No.

5   Q      Okay.  Did you ever compare, for example, the L in Lima with the L on

6   a license place magnet that was put on Ken Warrington's car?

7   A      I didn't do any handwriting comparisons.

8   Q      Do you recall that there was a word, and the word was asshole,

9   number one asshole, that was put on Ken Warrington's vehicle; correct?

10  A      Yes.

11  Q      Shortly before the murder; correct?

12  A      I think that we heard that it was a week or so before that.

13  Q      Okay.  So, shortly before --

14  A      So actually, anywhere, yea, a week.

15  Q      Shortly before the murder?

16  A      Okay.  Uh-huh.

17  Q      Okay.  No comparisons?  This was just filed away, this letter?

18  A      Yes.

19  Q      Not compared with anything?  Did you ever try to take any fingerprints

20  off of it?

21  A      Off of?

22  Q      Off of the letter.

23  A      I didn't.

1  Q      Was it sent for fingerprint comparison?

2  A      Not to my knowledge.

3  Q      Was it sent for DNA analysis?

4  A      No.

5  Q      For touch DNA?

6  A      It went through the mail.

7  Q      The letter -- this letter was inside this envelope; correct?

8  A      Yes.

9  Q      Was it checked for touch DNA?

10  A      Not to my knowledge.

11  Q      You spoke with Sonya Burkholder.  Did you ever write a written report

12  as to what she said happened that morning?

13  A      I wrote several reports.  They were generally summaries of what

14  happened.

15  Q      Okay.  I know you wrote several reports.  Did you write a report as to

16  what Sonya Burkholder told you happened in the early morning hours of

17  February 23rd?

18  A      Yea.  I believe you have a report in front of you that's a summary of

19  what she told me.

20  Q      Okay.  Actually I'll show you what I have.  My question is - as it relates

21  to the morning hours of February 23rd did you ever write a report as to what

22  she told you occurred?

23  A      Well, this is kind of a report that details some of that.

1  Q    Does it talk about what she says happened in the early morning hours

2  of February 23rd?  I'm not trying to be argumentative.

3  A    No.  I'm just trying to understand what you --

4  Q    Did you write a report about what Sonya told you about what happened

5  in the morning hours of February 23rd?

6  A    I did not write a report about that, about that specific conversation.

7  That would have been Detective Kleman when he spoke to her that morning.

8  Q    Are you aware -- you've reviewed the discovery in this case; have you

9  not?

10  A    I have.

11  Q    And are you aware of any report from any officer, a written report, that

12  deals with what Sonya told them occurred in the morning hours of that day?

13  A    Yea.  It came to my attention later on that --

14  Q    Detective?  Sorry.  Is that a 'yes' or a 'no'?

15  A    Ask the question again.  I'm sorry.

16  Q    Are you aware of a written report by any officer that deals with what

17  Sonya Burkholder allegedly said, if at all, as it relates to the events of the

18  morning hours of February 23rd?

19  A    What you have in front of you is what she told me.  To answer your

20  question, I guess that would be a 'no'.

21  Q    So, you have a person at your -- well, at the time on February 23rd

22  when you're poking through her house and then you leave were you aware

23  that she had received a conceal and carry permit within months of this?

1  A  I wouldn't have known that that morning.

2  Q  Now, when you interviewed her two days later on February 25th she's

3  describing her relationship with Ken Warrington; correct?

4  A  Yes.

5  Q  You heard her testify the other day in Court; correct?

6  A  Yes.

7  Q  Did she tell you that she had been seeing Ken for about a year prior to

8  moving in, well, of him moving in with her?

9  A  I think that's what I wrote in my report.

10  Q  He moved in with her in November of 2008; correct?

11  A  Yes.

12  Q  Did she tell you that?

13  A  I believe so.

14  Q  Did she tell you that she was in love with Ken?

15  A  At one point and time I'm sure she did if that's what I wrote.

16  Q  Do you need --

17  A  No.  I've seen it.  That's what I wrote.

18  Q  No, no.  I don't want to play words here.  This isn't a question about at

19  one point and time.

20  A  Well, I mean, --

21  Q  On February 25th, 2009 did she tell you that she was in love with Ken

22  Warrington?

23  A  Yea.  Yea.

1  Q  And she had not been seeing any other man during the course of her

2  relationship with Ken Warrington; correct?

3  A  That's what she said.

4  Q  Okay.  Now, obviously at that time you didn't have her testimony that

5  she made on the stand just last week; correct?

6  A  No.

7  Q  Okay.  You inquired as part of your investigation as to other

8  relationships she may have had with other people; correct?

9  A  Yes.

10  Q  And you received information that there were multiple individuals that

11  during this general time frame that she had had some type of sexual

12  relationship with; correct?

13  A  Well, that would be a yes or a no, depending on how I answer.  I spoke

14  with two people who had relationships with her.

15  Q  I'm sorry.  Let me rephrase the question.  I'm really talking about out at

16  the Refinery.

17  A  There were two people over the course of many years that admitted to

18  having a relationship with her.

19  Q  Okay.  My only point is, you were aware that there were other people

20  that you had information on that had relationships with her other than Ken

21  Warrington; correct?

22  A  Other than, for sure; yes.  Not necessarily during the same time frame.

23  Q  Now, she, for instance, would have came to Agruello Harris -- you

1    received information about him; correct?

2    A    Yes, an anonymous phone call.

3    Q    An anonymous phone call?

4    A    Actually it was an anonymous crime stopper's, I think.  I'm not sure.

5    Q    And you investigated?

6    A    Yes.

7    Q    And you received inconsistent information as it related to that; correct?

8    A    Elaborate.

9    Q    She told you one thing and he told you something else?

10   A    She said that --

11   Q    I don't -- I'm real sensitive to hearsay.  I'm just saying that she said one

12   thing and he said something else.

13   A    For sure.  Yes.

14   Q    Okay.  So, it appeared as if someone was not being honest with you in

15   that conversation?

16   A    Well, I had two different stories.

17   Q    Right.  Okay.  Now, back in 2009, actually on the day this happened,

18   Markelus informed detectives that he had gone to a gas station; correct?

19   A    Yes.

20   Q    And you searched his car and, in fact, you found a gas station receipt;

21   correct?

22   A    Yes.

23   Q    He told you that he had taken Markie to school that day; correct?

1   A       Not me.  But, yes.

2   Q       Investigators?

3   A       Uh-huh.

4   Q       You checked that out and, in fact, --

5   A       Seven-thirty, I believe.

6   Q       In fact, you checked with the school and, in fact, they confirmed that he

7   did; correct?

8   A       Yes.

9   Q       You checked -- well, in the seat of the car did you find, I'm sorry, I don't

10  have a big enough table here, did you find a set of proofs for Allstate

11  Insurance?

12  A       Yes.

13  Q       I'll hand you what's been marked as Defendant's exhibit 'KK'.  Does

14  this appear to be a sample of the Allstate Insurance cards that appears as if

15  Mr. Carter was, in fact, doing proofs for?

16  A       Well, I mean, I don't know if these are the same ones, but I do

17  remember such cards being in there that he was doing at the time for Mr.

18  Bennett.

19  Q       Okay.

20  A       In fact, I believe that while I didn't take those cards from the vehicle

21  during the impound I think I retrieved them for Mr. Bennett at some point and

22  time and returned them.

23  Q       Okay.  So, you actually found the Allstate Insurance proofs or cards

1    that Mr. Carter --

2    A      Sir, I think they're best described as, like, maybe like mock-ups or

3    something.

4    Q      Right.  So, those were in the vehicle as described; correct?

5    A      I believe so.

6    Q      Now, were you able to ascertain the address of Mr. Bennett?

7    A      I think it's 1701 West High Street.

8    Q      And where is that in relation to where Mr. Carter's car was ultimately

9    stopped?  In proximity?

10   A      I mean, I think that would be the sixteen hundred block of West Spring

11   where he stopped and Mr. Bennett would be about one, two, two blocks to the

12   north maybe.

13   Q      Okay.  If I told you that his address was 1601 West High --

14   A      Okay.

15   Q      -- does that change your opinion?

16   A      I wouldn't dispute that; no.

17   Q      Okay.  So, the area where Mr. Carter was stopped was within a matter

18   of blocks of Mr. Bennett's house?

19   A      I think that would be like two blocks south.

20   Q      Now, let's talk about, well, you testified during direct that during a case

21   it's not wise to put information about the case out there because if you do so

22   then when it boomerangs back in a different fashion that information may be

23   worthless; correct?

1    A      Yea.

2    Q      Okay.  So, you did a series of interviews with individuals in 2009;

3    correct?

4    A      Yes.

5    Q      And you shared information about the case with these individuals that

6    came from people other than those individuals; correct?

7    A      You'd have to be more specific.

8    Q      All right.  Specifically, you read to Carlotta the actual statement of

9    Rosalind Johnson; correct?

10   A      After she brought up Rosalind Johnson.

11   Q      I understand.  But, you read it to her; correct?

12   A      After she brought the name up; yes.

13   Q      Okay.  You told Joey Moore that you're looking for a gun; correct?

14   A      Not the first time I spoke to him.

15   Q      In 2009 --

16   A      It was probably --

17   Q      In 2009 -- in 2009 you told him that you were looking for a gun?

18   A      I told him that we didn't have a gun.

19   Q      Okay.  From my notes, did you tell him that you were looking for a

20   silver and black gun?

21   A      I would say that I told him we were looking and heard about a black

22   gun with a silver slide that we hadn't recovered.  We hadn't recovered any

23   murder weapon at that point.

1   Q       I understand.  So, through -- now Allen Correctional Institution is in

2   this, well, it's close by; isn't it?

3   A       It's in Allen County, which is where Lima is; yea.

4   Q       Yea.  How far away from here?

5   A       From the Courthouse?

6   Q       Sure.

7   A       North of the city limits.  It's straight up West Street.

8   Q       Now, Carlotta Williams was dating a guy by the name of David Evans

9   at the time that all this happened; correct?

10  A       Yes.

11  Q       And David Evans, in 2011, well, were you able to do some research to

12  determine whether or not David Evans was in Allen Correctional for

13  approximately a thirty day period in 2011?

14  A       Yes.

15  Q       So, if Carlotta, who is dating David Evans, repeats to David while

16  they're in their own house at their kitchen table or waking up in the morning

17  information that you shared with her and then David goes into the prison that

18  information can flood those walls and become porous; correct?

19  A       Is that inconceivable?  No.

20  Q       Okay.

21  A       Not probable.

22  Q       And Joey Moore is -- Joey Moore -- you talked to Joey Moore about a

23  lot of different people's cases; correct?

1    A       No.

2    Q       Even in the tape you talked to him about multiple cases.  When I say

3    'you', I mean police officials.

4    A       Oh, yea.  If you could be a little more specific.

5    Q       First of all, you spoke --

6    A       Has Joey Moore ever talked to the police before?  I'm sure he has.  He

7    had never talked to me.

8    Q       Okay.  And he even states in his statement how there's multiple kites

9    that he put out on this murder, and that murder, and this investigation, and

10   that investigation.

11   A       Well, I don't know about this murder and that murder.

12   Q       I can show you the tape to remind you if you don't recall.

13   A       Well, we get -- I mean -- I guess I don't know.  We get multiple kites.

14   We get multiple kites, letters, notes, and phone calls every day.

15   Q       My point is - every time Joey Moore seemed -- well, let me put it this

16   way.  He contacted multiple officers on multiple offenses as he heard about

17   them.  Is that a fair statement?

18   A       Probably.

19   Q       Or as he wanted to smoke a cigarette or whatever?

20   A       I would assume so.  Yea.  A lot of guys do that.  It's a good way to

21   smoke.

22   Q       And the veracity of the information depends on the person, I suppose?

23   A       Uh-huh.  It depends on what they say.

1  Q      Right.

2  A      And does it match up with things you already know.

3  Q      If he's telling multiple officers multiple things who knows what he's

4  telling multiple other people multiple things?

5  A      I don't know that he was telling multiple officers anything at that point,

6  other than me.

7  Q      Do you recall -- did you watch his video in preparation for your

8  testimony?

9  A      I've watched his video.  I haven't watched it in the last few weeks.

10  Q      Do you recall him talking to you specifically about putting out kites for

11  three completely unrelated cases with completely other individuals?

12  A      Well, you characterized them initially as murders.  I didn't recall that.

13  But, maybe other cases.

14  Q      Okay.  When you talked to Mr. Upham you told him, you told him that

15  Ken Warrington had been shot five times in the back.  Those were your

16  words; weren't they?

17  A      Without seeing it here, I would say probably.  That's fairly accurate.

18  Q      Now, this is what I'm getting -- that's what's on tape.  You spoke to a

19  lot of people that weren't on tape; correct?  In other words, you spoke to a lot

20  of people and those conversations weren't recorded?

21  A      Well, to make it --

22  Q      Just 'yes' or 'no'.

23  A      Okay.  Yes.

1  Q  You interviewed many people --

2  A  I've interviewed people --

3  Q  -- and those conversations aren't always recorded; correct?

4  A  Conversations at the Police Department are generally recorded.

5  Conversations out on the street would not be.

6  Q  So, you spoke to multiple people in situations where the conversation

7  is not recorded; correct?

8  A  Sure.  Yea.

9  Q  Okay.  The license plate on Markelus' vehicle, the front license plate,

10  was there damage to the front of the vehicle?

11  A  I don't recall.

12  Q  Did you attempt to try to remove the front license plate to see if it was

13  removable?

14  A  No.

15  Q  State's exhibit '153'.  Does it appear as if the front license plate is

16  damaged?  Maybe I can let you see the picture.

17  A  Yea, that would probably be better.  Yea, it's a little bit.

18  Q  Now, you searched his car; correct?

19  A  Impound inventory.

20  Q  And in that impound inventory -- well, you also had somebody, or

21  somebody in the investigation, then attempted to, well, first of all, you tried to,

22  or, you checked to see if there were any blood stains on the vehicle; correct?

23  A  Those things were done later on.  That wasn't done with what I did.  I

1    did the impound inventory on the street.  It was taken to Army's and then it

2    was processed later by someone else.

3    Q      Okay.  Who?

4    A      I believe that would be B.C.I., Dave Hammond.

5    Q      Okay.  And Hammond was checking for any blood that could be in the

6    car; correct?

7    A      Well, I think, I mean, his protocol, I would assume, would be to check

8    for any obvious evidence, or G.S.R., or anything like that.

9    Q      Okay.

10   A      Anything laying out that would be of evidentiary value that I didn't see

11   in my cursory search.

12   Q      Were you aware -- did anybody search the trash cans at Sonya's

13   house?

14   A      I did not.

15   Q      You said you were at a dentist's office and you were watching who you

16   later found out to be it was Markelus Carter?

17   A      There's a dentist's office that sits on the northeast corner of Main and

18   Eureka.  It's called Burns Dentistry.  I'm not sure if it was Burns at that time.

19   Q      And about what time were you there?  Between what time and what

20   time?

21   A      Well, I believe it was around eight A.M. when I found out from street

22   officers that it didn't appear anyone was at home.  I know that the traffic stop

23   was conducted at like eight fifty-three.  So, I'm guessing kind of on that time.

1  Q      I guess my question was - what time were you out there?

2  A      Well, my point is it would have been probably -- well, if the stop time on

3  the traffic stop was eight fifty-three, which is what I think it was, but it may

4  have been eight fifty-nine, I'm not sure, but it would have been within the

5  preceding ten minutes.  I wasn't there that long before he got in his car and

6  pulled off, I guess is the point.

7  Q      When you saw him he was fixing his car?  He was working underneath

8  his hood?

9  A      I recall the hood of his vehicle being up.

10  Q      And he was underneath it doing something?

11  A      Well, he was around it.

12  Q      Okay.

13  A      I hadn't seen him come from his house.  I didn't know if it was him,

14  obviously, or not.

15  Q      So, when you saw that person who you didn't know to be Markelus

16  Carter nothing out of -- well, you didn't even realize that that was the

17  individual that you were looking for; correct?

18  A      I didn't know him.

19  Q      And there was nothing about that behavior of that unknown person at

20  that time that caused you any unusual response --

21  A      Yea.

22  Q      -- other than the guy was tinkering with something in his engine?

23  A      I don't know what he was exactly doing.

1  Q      But, it appeared to be normal to you; right?

2  A      It didn't appear to be unnormal (sic).

3  Q      Okay.

4  A      I guess the right word would be abnormal.

5  Q      So, that was about -- well, is it fair to say between eight-thirty and eight

6  forty-five?  Somewhere in that range?

7  A      I would say more -- I mean, if the traffic stop was, again, I haven't seen

8  my reports to see the exact time, but I think in my report or somewhere I

9  wrote eight fifty-nine.  But, I mean, I would say between eight forty-five, then,

10  and the traffic stop, when it ended.

11  Q      How long did you --

12  A      It didn't take very long at all.

13  Q      I understand.  How long did you sit there and watch him for?

14  A      I drove down the block and I saw the car sitting there.  I don't know if I

15  noticed the subject as I passed by.  But, at some point as I'm turning around

16  in the parking lot, I pulled in and turned around and pulled up to the street, I

17  saw him standing there with the hood up.

18  Q      Okay.  How long were you there?

19  A      Not very.

20  Q      How long after that did the other officer come by?

21  A      Not very.  Again, the whole thing happened in probably, from start to

22  finish, with finish being traffic stop and start being when Sergeant Leary came

23  through and said 'that's him', fifteen minutes at the most.

1   Q     Okay.  And during that fifteen minutes the individual that you observed

2   to be Markelus, well, you did not observe any odd behavior, any abnormal

3   behavior, on his behalf?

4   A     Yea, not at that point.

5   Q     Okay.  Now, when you pulled him over you said you asked him if he

6   wanted to come down to talk to you at the Station; right?

7   A     Well, I didn't pull him over and I don't know what was said before I got

8   there, but --

9   Q     When you're at the place of the stop and you're talking to him you say,

10   'hey, I want you to come down to the Police Station', or something to that

11   effect?

12   A     I said that there was a shooting on McKibben.  I was investigating a

13   homicide and I would like for him to come down to the Station to talk.  That

14   was the general tone of what I said.

15   Q     And he gave you zero resistance about -- in fact, he tried to get in your

16   car even without your permission?

17   A     Well, he --  he had an episode.

18   Q     Did he give you any resistance to getting in your vehicle?

19   A     No.  No, no.

20   Q     Okay.  Then there was, well, was it a key to his car, or his wallet, or

21   something that was left that he asked --

22   A     Yea, I think his keys were in the ignition and maybe his wallet was

23   laying on the front seat.

1   Q      And somebody asked, "Do you want this?"  His response was, "I don't

2   care.  I don't care."  It was something like that; right?

3   A      Something like that.

4   Q      Now, when you went into his house over on Eureka were you aware

5   that Officer Godfrey and Markelus had this on-going conversation and there

6   was actually an open investigation, if you will, into Sonya Burkholder?

7   A      Yes and no.

8   Q      You knew about an incident from two years ago, but as far as the

9   extent of the relationship and the communication between Godfrey and Carter

10  you weren't quite aware of, or, the extent of it?  Is that fair?

11  A      Well, from Godfrey telling me that he could get ahold of Carter I knew

12  that, yea, and I don't know how he phrased it, like 'hey, I've been working with

13  Carter', so I knew that he had some sort of relationship because he said that

14  he had a fairly recent phone number.  But, to the extent of what that all was,

15  no.

16  Q      Okay.  So, when you saw -- in other words, at that time that you were

17  in that house in that early morning did you realize that Godfrey had

18  interviewed witnesses in relation to this Sonya Burkholder investigation just

19  the week prior?

20  A      Not the full extent.  Just that an investigation had occurred.

21  Q      So, you --

22  A      I don't know what all he had done.

23  Q      Right.  So, you were not aware at that time that even just the week

1  prior he had interviewed witnesses in relation to that?

2  A       Well, I mean, yes and no.  I knew that he had done an investigation in

3  regards to what he testified to.  But, I don't know the depth of what all he had

4  done.

5  Q       Did you know that he had interviewed witnesses?

6  A       No.

7  Q       Okay.  So, to you, seeing the e-mails on the table, you connected it --

8  you didn't connect that to interviews that would have taken place the week

9  before with Godfrey?  That wasn't the first thing you thought?

10  A       No, that's fair.

11  Q       That's not the first thing you thought when you saw them?

12  A       No.

13  Q       Did you, yourself, interview Sonya Burkholder about the events of the

14  morning hours of February 23rd?

15  A       I spoke to her on the 25th at her house, under the impression that she

16  had already been interviewed.

17  Q       And that statement is memorialized in page eight of nine?

18  A       In that summary right there; yes, sir.

19  Q       And you would agree with me that it did not deal with the morning

20  hours of that day; correct?

21  A       Correct.

22  Q       So, in 2014 you sent out a request to Sergeant Smith; right?

23  A       I contacted the prison and asked to speak with their investigator.

1    Q    So, then you spoke to --

2    A    I didn't know Mr. Smith at that point.

3    Q    Okay.  So, ultimately then you hooked up with Sergeant Smith on that;

4    correct?

5    A    Yes.

6    Q    And that would have been in early February; correct?

7    A    I believe so.

8    Q    Okay.  Like February 8th or before?

9    A    February of 2014.

10   Q    Early February of 2014?

11   A    Yes.

12   Q    Okay.  Then you received information back from him on approximately

13   February 25th; correct?

14   A    Without seeing the date, I'll take your word for it.  It was in February

15   again.

16   Q    You wrote a report on it.  I don't want the jury to have to take my word

17   for it.  It's important.

18   A    Well, I mean, it was shortly thereafter that I received that information

19   back.

20   Q    So, on February 25th you do a report memorializing the investigation of

21   Sergeant Smith; correct?

22   A    Yes.

23   Q    And the original date, report date, would have been February 23rd?

1   A      That refers to the original crime.

2   Q      Oh.  Sorry.  So, the report date that you wrote for this one was

3   February 25th, 2014; correct?

4   A      Yes, sir.

5   Q      Is it fair to say that shortly around that time was when you received the

6   report from Sergeant Smith?

7   A      Yes.

8   Q      And Sergeant Smith indicated to you that he initially interviewed a

9   Thomas Smith; correct?

10  A      Yes.

11  Q      And at some time later -- well, you received his report; correct?

12  A      Yes.

13  Q      And some time later, two or three weeks later, he then interviews - I'm

14  sorry - two weeks later or so he interviews Stephen Upham.  That's the gist of

15  what you report?

16  A      Well, it's all in the same report.

17  Q      I understand.

18  A      He also interviewed a Bloomfield as well, I think.

19  Q      Correct.  But, different days; correct?  Well, I guess I don't want you --

20  A      I don't know that for sure.

21  Q      Okay.  Let me put it to you this way - when you were interviewing --

22  you interviewed Upham on February 25th, 2014?

23  A      That was after having the information --

1  Q  The report. I understand.

2  A  -- and then having him conveyed. You know, it's a difficult process to

3  interview someone in prison, especially to get them brought to the Police

4  Department. But, that's what I did. Yea.

5  Q  Right. When you were speaking with him he indicated that it was just a

6  short time earlier that he had spoken with Sergeant Smith; correct?

7  A  I know he had spoken with Sergeant Smith and given him the

8  information that Sergeant Smith passed on to me.

9  Q  A time line. Didn't he tell you that it was just as recent as a couple of

10  days, or, eight days or less or something?

11  A  He may have. That, to me, at the time, I didn't think it was that

12  important.

13  Q  Yea, it wasn't important. But, once again, you didn't have the benefit

14  of him testifying here in relation to whether that's important or not; correct?

15  A  Sure.

16              MR. RION:  Your Honor, may we

17  approach?

18              THE COURT:  Sure.

19  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

20  the record, as follows.)

21              MR. RION:  This would be a logical place

22  to stop. I mean, we're going to be done Monday one way or the other; right?

23  I'm telling you that there's --

1      THE COURT:   You're still going to be

2   awhile?

3      MR. RION:   I think so.  So, this would be a

4   logical breaking point for me if that's okay with you.

5      THE COURT:   Okay.

6      MR. RION:   It could be a half hour or more.

7      THE COURT:   (Inaudible).

8      MR. MILLER:   So, you want to break for

9   the day?

10      THE COURT:   Yea.  Okay.  All right.

11   (WHEREUPON, Court continued on the record, as follows.)

12      THE COURT:   Okay.  Again, I'm trying to

13   be understanding of the jury's time, and it's been a long day, and there's been

14   delays, we're going to break for the evening.  We'll continue with the

15   examination of Detective Clark tomorrow.  We're still in the cross examination

16   of Detective Clark's testimony.

17      I do want to say this.  I was kind of going to wait until the end, but now

18   that we're breaking for the day I'm just going to reiterate, and it shouldn't

19   come as anything real new to you folks and I'm not, again, trying to

20   overemphasize anything, but there's been testimony, obviously, about two

21   weapons found on Eureka Street.  They are not the weapons that are alleged

22   to be involved in the counts in this case.  There's also been some testimony

23   here by the Detective as to cocaine that was found during a search, or other

1   charges that were brought, or the fact that the defendant was incarcerated at

2   different times.  Again, that is not to be considered as proof of any of the

3   counts in this case in terms of the elements that you're going to have to find

4   whether or not the State proved beyond a reasonable doubt in this case.  But,

5   that evidence cannot be considered, all that evidence cannot be considered

6   to prove the character of the defendant or that he acted in conformity with that

7   character as it relates to the exact charges in this case.  That evidence,

8   however, can be used only for limited purposes, including identity, or motive,

9   or opportunity, or preparation, or plan.  As I said before, with respect to what

10  other witnesses may have said in terms of who was talking to who, if it

11  corroborates or it can go towards the credibility of identity evidence, well, you

12  can use it for those limited purposes.  But, again, you can't say, well, there

13  were other charges, or the defendant was incarcerated, for example, and

14  therefore this is proof of his character and that he acted in conformity with that

15  in these cases.  That, -- you can't use it for that.  It's important that you keep

16  that in mind.  I know I've repeated that before, but since there was another

17  witness who testified to that I thought that instruction was appropriate at this

18  point and time.

19       So, we'll break for the evening.  We'll continue with the examination of

20  Detective Clark.  Again, I'm trying to be an optimist.  Nine-fifteen again?  We'll

21  return at nine-fifteen.  Remember the admonitions.  Don't discuss the case.

22  Don't do any independent research.  Don't pay attention to any media.  If

23  anything comes up all those admonitions that I've been giving you, well, keep

1    them in mind.  If anything comes up that you feel in some way affects your

2    ability to continue to be fair and impartial, well, make that known tomorrow

3    morning.

4              So, the jury will be excused for the evening.  Counsel, I just want a

5    couple of things with counsel before you folks leave.  So, the jurors are

6    excused.  Detective, you can step down.

7    (WHEREUPON, JURY WAS EXCUSED FOR THE DAY AT 4:29 P.M.)

8                              THE COURT:   The jury has left the

9    Courtroom.  I just want counsel to let me know, if you can, to the extent you

10   can, and I'm not necessarily going to hold you, but is this the State's last

11   witness as far as you know right now?

12                             MRS. KOHLRIESER:   Potentially.

13                             MR. MILLER:   Potentially.  Potentially what

14   happens here on cross examination and all of that.  But, yea.

15                             THE COURT:   Okay.  I understand.  I'm

16   open to some leeway.  But, what I'm trying to say, -- well, Mr. Rion, you got a

17   copy of this exhibit list?

18                             MR. RION:   I did.

19                             THE COURT:   I've been working off of that.

20   There obviously have been some exhibits marked that weren't on the original

21   list, and obviously there's defense exhibits.  But, what I would like the parties

22   to be prepared to do when the State is finished with their case-in-chief that we

23   go, obviously, and I assume you're going to move for the admission of

1     exhibits.

2                                    MR. MILLER:  Uh-huh

3                                    THE COURT:  I'd like to do that, and

4     because of the great number of exhibits we'll key in and if you can let me

5     know the best way, or, the most efficient way would be to say 'we are moving

6     for the admission of all of our exhibits except for --

7                                    MRS. KOHLRIESER:  Yes.

8                                    THE COURT:  Then we'll limit those.  We'll

9     cancel those out fast, the ones you're not moving for.  Then, Mr. Rion, be

10    prepared to object numerically.  Like, for example, if the first one you're

11    objecting to is, and I'm just using this completely as an example, is number

12    '20', well, you can say, well, the first one you're objecting to would be number

13    '20' and that means you're not objecting to the admission of '1' through '19'.

14    We'll try to do it orderly.  A lot of times in cases that don't have a lot of

15    exhibits I'll go number '1', number '2', and that would take some time.  So, if

16    we could zero in on the ones that the State are not moving to be admitted,

17    and we would assume that you're moving to admit all the others, and then Mr.

18    Rion will be prepared to object specifically.  Now, if Mr. Rion is objecting to

19    every one, well, we'll take them one by one.  But, if you're not objecting to

20    every one let's zero in on the ones you are objecting to.  I think that will make

21    it more efficient because, again, that will be some time when the jurors are

22    going to be waiting around and wondering what's going on.

23                                    MRS. KOHLRIESER:  Your Honor?

1    Actually, if you want, I can just tell you real quick so Mr. Rion can think about

2    it overnight, the ones that we're withdrawing specifically.

3                            MR. RION:  I think I can guess.  I'm good.

4    We don't need to waste everyone's, the whole Courtroom's time.

5                            THE COURT:  Okay.  Yea.  I don't know,

6    you know, Detective Clark hasn't finished.  So, I don't know if there's other

7    exhibits.  So, anyways.

8            Then I understand, Mr. Rion, the witnesses that you had subpoenaed

9    that are in custody are here.  Again, without --

10                           MR. RION:  I'll put them on first, your

11   Honor.

12                           THE COURT:  Well, if you had an order

13   because the corrections officers talked to me during a break and because of

14   the logistics, again, and to avoid any kind of collision, well, to have them, the

15   ones you need first ready to go, and then as one is done they'll be taking that

16   person down.  They can probably have two of those folks up here at a time.

17   We're going to try to keep it a flow here so it's not waiting around to bring

18   them up from booking or to bring them down from wherever they're at and

19   crossing in the hall and all of that stuff.  So, if you have a general idea who

20   the first couple of ones would be, well, just let me know in the morning and I'll

21   let the officers know.

22                           MR. RION:  I can tell you tonight.  Also,

23   Steve Savage is not going to be called and so he can be returned at any time

1    that the jail wishes to return him.

2               THE COURT:  Okay.  Well, that's good to

3    know.  I'll let them know.  I don't know -- where's he from?

4               MR. RION:  He's in booking.  He's from

5    A.C.I.

6               THE COURT:  Okay.  Okay.  Well, yea, I'll

7    try to remind them.  Maybe, Deputy, you can make note that Steve Savage

8    will not be called.  So, I don't know if they have a car leaving tonight or

9    tomorrow morning.  But, we'll let them worry about that.

10    So, that's generally where I want to go.  So, as soon as the State rests

11    we'll talk about exhibits and take up any other matters that we need to and

12    then the defense will have the opportunity to present witnesses.

13               MR. RION:  Okay.  Your Honor, I think

14    there is some Grand Jury testimony of Tarah Carter that I believe has been

15    transcribed and I would like to review that.  I believe it's been -- it's been

16    transcribed for a potential cross examination by the State.  Given their

17    representations that that's the purpose of its creation I would --

18               THE COURT:  Okay.  I'm not aware of that.

19    I don't know if it was filed or if that is in supplemental discovery or anything

20    like that.

21               MR. RION:  I was told that they -- I don't

22    think there's any great objection to them giving it to me, but they need a Court

23    Order for that to happen.  That's my understanding.

1           THE COURT:   The State want to respond?

2           MRS. KOHLRIESER:   Your Honor, I

3    apologize.  I don't have the rule in front of me.  I think there has to be some

4    kind of showing and, again, off the top of my head, I can't remember what that

5    showing is.

6           THE COURT:   Particularity or whatever it

7    is.  Yea.  Particularized need.  Yea.

8           MRS. KOHLRIESER:   Yea.  With

9    particularity about what it is.  Yes.  I will represent to the Court it has been

10   transcribed.  It has not been filed.  I had indicated to Mr. Rion based upon,

11   again, not her testimony, but based upon some representations he made

12   during opening that I did not think it entirely jived with her testimony from

13   Grand Jury, for lack of a better term, and so that's why I had it prepared.  But,

14   it is the State's position that, number one, I think he needs to satisfy that

15   burden of particularity first and, number two, I think it has to be ordered by the

16   Court for me to give it and certainly I would follow the Court order on that

17   regard, or, in that regard, excuse me.

18          THE COURT:   Do you want to be heard?

19          MR. RION:   I think the State just satisfied

20   my first prong.  I have representation as to its relevance in this case.

21          MRS. KOHLRIESER:   Well, it's not about

22   relevance.  Relevance isn't the standard.

23          THE COURT:   The need.  Does he have a

1    need to have it?  Yea, I mean, do you want a written order?  Is an oral order

2    on the record good enough?

3                              MRS. KOHLRIESER:   I think an oral order

4    is sufficient, your Honor.

5                              THE COURT:   Then I am making that

6    Order to let him see that now.

7                              MRS. KOHLRIESER:   Okay.  All right.  No

8    problem.

9                              THE COURT:   Let him read it.  I don't want

10   it released to the general public or to anybody else.

11                             MR. RION:   It will be counsel only.

12                             THE COURT:   Okay.

13                             MR. RION:   It can be stamped or orally

14   stated as such.

15                             THE COURT:   It's in the nature of Criminal

16   Rule 16, counsel only then.

17                             MRS. KOHLRIESER:  Yes.

18                             THE COURT:   Because I don't want that

19   turning up wherever.

20                             MR. RION:   It won't be shared.  Counsel

21   only rule will be followed.

22                             THE COURT:   Okay.  You can read it.

23   Okay.  All right.

1       MRS. KOHLRIESER:  I actually have two

2   things.  That's why I had stood earlier.

3       THE COURT:  Why is that not a surprise?

4   Go ahead.

5       MRS. KOHLRIESER:  Well, I guess I'll be

6   happy to sit down, your Honor, and not make a record if you would rather.

7       THE COURT:  No, no.  Go ahead.  Go

8   ahead.

9       MRS. KOHLRIESER:  As you can tell, we

10  had an issue with State's exhibit '140-A'.

11      MR. RION:  No objection.

12      THE COURT:  All right.  Let me get that,

13  though.  '140-A'?  Okay.  That's Godfrey's interview and the first one was

14  stopped at a point you didn't want it stopped?  Okay.  What's your --

15      MRS. KOHLRIESER:  I just wanted to say

16  that what had happened was it had been edited to stop at fourteen thirty-eight

17  by the computer counter and not the L.P.D. clock of two thirty-eight P.M.  That

18  has been fixed and I have a new one.  I guess I'm asking, and I believe we

19  have a stipulation here, to supplement that new one as the exhibit for the

20  Court.

21      THE COURT:  So, it will be the new '140'?

22      MRS. KOHLRIESER:  '140-A' is what I

23  made it.

1    THE COURT:  Oh, okay.

2    MRS. KOHLRIESER:  We wouldn't be

3    pushing for '140'.

4    THE COURT:  Okay.  So, are you satisfied,

5    Mr. Rion?  Or, do you want to take a look at the new one?  Has anybody

6    looked at the new thing?  You'd better look at the new thing.

7    MRS. KOHLRIESER:  Yes.  I did.  This

8    time I did and made sure that it does, in fact.  I mean, I actually stood over the

9    I.T. guy's shoulder while he did it.

10   THE COURT:  Do you want a chance to

11   look at that?  Or, do you have anything you want to be heard on?

12   MR. RION:  Before it goes back to the jury

13   I may.  But, I have no concerns about it.

14   THE COURT:  Okay.  If Mr. Rion is

15   satisfied and gets a chance to look at it I'll let you substitute it.  As far as

16   going back to the jury, that's yet to be decided.  But, yea, it will be the new

17   '140-A'.

18   MRS. KOHLRIESER:  Yes.

19   THE COURT:  Okay.

20   MRS. KOHLRIESER:  Then my second

21   thing, your Honor, was in light of some of the questions that were asked of

22   Stephen Upham today by the defense I guess I would just put the defense on

23   notice that a potential rebuttal witness we would have would be Cory Smith

1    of the Department of Rehabilitation and Corrections - the records keeper.

2                            THE COURT:   Okay.  It's on record and it

3    shows that he's on notice.  Okay?

4                            MRS. KOHLRIESER:   That's all I wanted

5    to put out there.

6                            THE COURT:   All right.  That wasn't too

7    bad.  Anything else?

8                            MRS. KOHLRIESER:   No.

9                            THE COURT:   Okay.  If there's nothing

10   else, I've got the jurors coming at nine-fifteen.  I've got an eight o'clock and an

11   eight-thirty.  If you guys get here by eight-thirty, that way if there's any last

12   minute things we can stick it on the record before the jury gets in.  I would like

13   to try and keep the case moving for the jury's benefit.  Okay?  So, we'll see

14   you in the morning.

15   **(WHEREUPON, COURT RECESSED FOR THE DAY AT 4:39 P.M.)**

16

17

18                            **FRIDAY, SEPTEMBER, 18, 2015**

19                            **9:15 A.M.**

20

21                            THE COURT:   We're on the record this

22   18th of September, 2015 in Case Number CR2014 0139, State of Ohio -vs-

23   Markelus Q. Carter.  The defendant is present with counsel.  The State is

1    present.  The jurors are not in the Courtroom.

2         We're about to begin the continuation of the case.  Mr. Rion, you

3    wanted to place something on the record?

4                          MR. RION:   Your Honor, it came to my

5    attention last night that Mr. Carter is now charged with, I believe, Intimidation

6    of a Witness.  I'm just renewing my Motion for a Mistrial.  Here's my thinking.

7    Let's assume that he's indicted and then has a jury trial and he's acquitted of

8    intimidating a witness.  At that point I think that it would be -- I question

9    whether or not the video and/or Upham's statement about the incident in the

10   jail cell, or the holding cell, would be admissible.  So, I'm just raising it on that

11   basis.

12        Secondarily, I just want to make a record of the events and just so the

13   record is clear on this.  It's my understanding and belief that the Court and

14   counsel had spoken about where Mr. Upham was going to be housed and

15   placed prior to him being put in the holding cell just so this would not happen,

16   this event.  It was my understanding that the Court stated to the prosecutor

17   that they were to tell transport units to keep Mr. Upham in a probate closet, or

18   cell, or some separate area of the floor to avoid this from happening.  It's my

19   understanding that there is an investigation at least that's being done to

20   determine what did or did not happen.  I'm simply asking the Court to order

21   that that investigation and the records from that be made part of the record in

22   this case for appellate purposes.

23                          THE COURT:   Does the State want to be

1    heard?

2              MRS. KOHLRIESER:   Yes, I guess just

3    briefly, your Honor.  I did give Mr. Rion the reports that have been generated

4    thus far about the incident by law enforcement here.  Number one, I thought

5    the Court and security had worked everything out in accordance with keeping

6    people separated.  I tried to be very active, Mr. Miller and myself, be very

7    active to make sure people were separated from one another and that type of

8    thing.  I'd gone over and talked to the assistant head of the jail and all types of

9    things to make sure everybody knew who everybody was and get things

10   arranged.  Before Sergeant Smith testified Mr. Miller had just called him and I

11   asked permission of the Court to step out so our next witness could be

12   arranged.  I went to John Allen, who was in the security office, and said, "Hey,

13   we need Upham in twenty minutes."  My understanding, and certainly Mr.

14   Allen is here and we can have him testify if the Court desires, my

15   understanding is that Mr. Allen then called down to booking, or whoever they

16   call to, I should say, I don't know, but called whoever they call to get inmates

17   up here and said, "Hey, we'll be ready for Upham here; you need to bring him

18   up," or something along those lines.  Corrections Officer Lee Shaffer says he

19   was told to bring Upham up for Court.  He did.  He placed him in the holding

20   cell, as they normally do.  Again, not realizing where, I guess, where the

21   defendant had been being placed and things of that nature.  So, Mr. Upham,

22   and the video shows this, is placed in the cell.  There are other inmates in

23   there at the time because Judge Cheney was sentencing people and holding

1  pre-trials and things for people that were incarcerated that day and you can

2  see on the video there's a prisoner taken back to the jail and a prisoner, well,

3  jail inmate, I should say, who's still in there and then he's eventually taken out

4  and that type of thing.  Eventually Upham is left in the cell by himself.  You

5  can see him just kind of walking around and doing his thing.  Then we broke

6  at three o'clock and Deputy Enyart, as has been his practice when we take a

7  morning break and an afternoon break and it's longer than just a couple of

8  minutes, then walked the defendant to the holding cell, opened it up,

9  unhandcuffed him and put him in there.  Nobody said word one to Deputy

10  Enyart.  It's my understanding that Deputy Enyart did not realize who the

11  inmate sitting in there was and actually believed it was one of Deputy Martin's

12  inmates for the other Courtroom.  Then he left and you saw what happened

13  and they converged.

14          The State -- and I don't believe it was, or, the Court instructed me to

15  make sure they put him in the probate pocket.  I thought that was, I guess, a

16  consensus of how things would be handled and that it had been conveyed to

17  security and I had nothing to do with that, nor did Mr. Miller.  I feel that's kind

18  of been insinuated here.  Maybe I'm just taking it personally.  But, I did not

19  know it was my responsibility to tell them to make sure to put him in the

20  probate pocket because, I'll be honest, I didn't say that.  I said, "We need him

21  in twenty minutes."  I thought they knew the protocol.  That's the extent of my

22  knowledge of that.  Again, Lieutenant Allen, C.O. Shaffer, and, well, I guess

23  he's not Lieutenant Allen anymore, and Deputy Enyart are here if the Court

1    wants the record clarified.

2                              THE COURT:   Is that all reflected in those

3    reports?

4                              MRS. KOHLRIESER:   Well, the only thing I

5    can think of is in John Allen's report, and I don't have it right in front of me

6    immediately, he says something about that I came out there and said to him

7    'we need Upham and place him in the holding cell'.  Those were not my

8    words.  Lieutenant, I keep calling him that, I apologize, but Deputy Allen will

9    tell you that.  That's his summation based upon what he thought.  Those were

10   not my words.  I simply said, "We need him in twenty minutes."  That's it.

11                             THE COURT:   All right.  Well, the Court will

12   order, for what it's worth, any reports generated by any law enforcement

13   regarding what occurred.  Submit those.  We'll make them Court exhibits for

14   the record.  Obviously I've already ruled that certain things would or would not

15   be presented to the jury.  That would include that video of the hallway scene

16   that the State, well, that we had discussions about.  Make that a Court exhibit,

17   too, for purposes of just so it's on the record.  Everything that we have that's

18   generated, -- if there are any other reports generated as of now that you

19   might not have had yesterday, and I don't know if there's a detective report or

20   anything that's been involved in that, --

21                             MRS. KOHLRIESER:   I don't have

22   anything beyond that.

23                             THE COURT:   -- get those.  Anything

1    that's as of the present day, or, let's put it this way, anything that is generated

2    that you can find before the end of this trial, well, we'll make it a Court exhibit

3    just so that it's there in the record to explain what occurred.  Okay?

4                              MRS. KOHLRIESER:   Just to put the Court

5    on notice, Detective Baker is the one assigned to that and he is on, I think, a

6    medical leave effective today.

7                              THE COURT:   Okay.  If there's anything

8    that exists, get it and we'll just make it a Court record so that will all be on the

9    record, including that video in the hallway that I would not be allowed to be

10   played to the jury.

11          As far as the Motion for Mistrial, again, the Court made the

12   determination yesterday that I allowed this evidence in for the jury as

13   consciousness of guilt under the case law that I cited.  The Court is going to

14   make a finding that the actions of intimidation of a witness as consciousness

15   of guilt does not necessarily require there to be a conviction.  It is the

16   description of the actions both Mr. Upham described and the video shows.

17   Whether the defendant is convicted of that in the long run or not the Court

18   finds does not enter into the determination as to whether that can be

19   presented as evidence.  So, the Motion for a Mistrial is overruled.

20          The Court will also make a statement to kind of go along with what

21   counsel already said.  The Court's recollection is there was an in-chambers

22   discussion about the logistics of having the prison witnesses in the same

23   building as the defendant.  My understanding was that they would be

1   separated. I double-checked my entries. I don't think with respect to the

2   entry on Upham, because that was done weeks ago, I think, or at least far in

3   advance of the trial, but certainly with respect to the other inmate witnesses

4   my Order conveying them to the county specifies that they are to be kept

5   separate from the defendant and that was consistent with our separation of

6   witnesses Order. It was the Court's understanding that that would have been

7   generally understood. In our chamber conference there was discussion about

8   the prison inmates, specifically Mr. Upham, being kept in the probate holding

9   room, which is separate from the regular holding room. I think it was in the

10  nature of perhaps a mistake because Mr. Upham was dressed in stripes

11  instead of in typical Department of Corrections garb that somehow there was

12  a non-communication, or a miscommunication, to the booking officers who

13  brought him up. So, it was an accident/mistake. I think I already mentioned

14  that on the record. So, that's the Court's take on that.

15          But, again, I'm finding that the mistrial is not well taken. The Motion for

16  a Mistrial is not well taken because the evidence was permitted as

17  consciousness of guilt which, under the case law that I read, I don't recall in

18  those, maybe there are some cases where a person is subsequently tried for

19  an intimidation, but I don't think consciousness of guilt necessarily requires a

20  determination as to whether a person -- well, it's similar to an escape or an

21  absconding as consciousness of guilt and I don't think it necessarily is

22  contingent upon whether a person is ultimately in a Court of law found guilty

23  or not of the actions that demonstrate a consciousness of guilt. The actions

1    were described by the witness and were described in detail on the video.

2    Whether the defendant is convicted of that ultimately or not I find has nothing

3    to do with whether it's permitted.  So, if that's the basis for the Motion for

4    Mistrial, again, it's overruled.  Exceptions are noted.

5        Anything else?

6                        MRS. KOHLRIESER:  Just briefly, your

7    Honor.  Part of the reason you said that second video couldn't be played, and

8    also calling other witnesses and things like that, is because Mr. Rion was very

9    adamant back in chambers that there was no question of the fact that it was

10   an accident, or mistake, or something of that nature.  So, I guess, you know, it

11   opens the window back up if now he's going to try and act like it was the

12   prosecutor's job to make sure he was put in the pocket and somehow we

13   didn't fulfill that and somehow we had something to do with Mr. Carter's

14   decisions that he made in that room that day.

15                       THE COURT:  When I ordered that the

16   video in the hallway was not going to be played to the jurors I think I ruled that

17   there would be no argument in closing arguments as to things that may or

18   may not have occurred that aren't already on exhibit '173', which is the actual

19   holding room video that I did allow to be played.  So, I think that would take

20   care of that.  There's not going to be any argument on what else may have or

21   may not have occurred.  I will not allow any argument on the Sheriff's

22   Department, or the Corrections Officers, or the prosecutor, or anybody else

23   should have done something differently in the logistics of housing the

1    witness and the defendant.  I thought -- well, I tried to make that clear

2    yesterday.  I'm just not going to permit that.  You've made your argument with

3    regard to the Motion for a Mistrial.  It's overruled.  Anything else?

4                              MRS. KOHLRIESER:  No, your Honor.

5                              MR. RION:  No, your Honor.

6                              THE COURT:  All right.  Let's get the jurors

7    in.  We have Shelly Osting now as a substitute.  Detective?

8    (WHEREUPON, jury was brought into the Courtroom at 9:29 A.M.)

9                              THE COURT:  Okay.  The record should

10   reflect then the jurors have been returned to the Courtroom for Friday,

11   September the 18th, 2015.  Welcome back, ladies and gentlemen of the jury.

12        I want to introduce Shelly Osting.  Shelly is now our substitute bailiff.

13   Susan Thomas, my Court Reporter, had previously scheduled some time off

14   for today.  Monica, who is a jack of all trades, knows how to operate the

15   recording information and so she moves over to that seat.  Shelly, you may

16   have seen as our receptionist, does a myriad of different duties and she

17   knows how to be a bailiff and so she's substituting.  So, we've got new

18   personnel and so I just wanted to explain that and welcome Shelly.

19        We're doing better.  I didn't have you waiting two hours this morning.

20   So, we'll get started right away.  Detective Clark is on the stand.  We were in

21   the middle of cross examination when we broke.  So, Mr. Rion, you may

22   continue.

23                              MR. RION:  Thank you, your Honor.

1    **CROSS EXAMINATION OF DETECTIVE TIMOTHY CLARK CONTINUED**

2    **BY MR. RION:**

3    Q       Good morning, sir.

4    A       Good morning.

5    Q       I just have a few more questions for you.  Let's start with -- well, there

6    were two shell casings that were found at the scene on the cement pad; do

7    you recall?

8    A       Yes.

9    Q       And those two shell casings, if you recall from testimony in Defense

10   exhibit 'M', appear to be not logged in for a five or six month period - from

11   May until October; do you recall that?

12   A       I do.

13   Q       Okay.  And do you recall that one of the officers said, well, it was

14   checked out by you; correct?

15   A       That's what he said, I think.

16   Q       And that if I wanted to know where that was that I would have to speak

17   to you about it?  That's essentially what he said.

18   A       Yes, I remember that.

19   Q       So, I'm speaking to you about it.

20   A       Very good.

21   Q       So, the two shell casings that were found, well, you did check them

22   out; didn't you?

23   A       Well, yes, so to speak.

1  Q      And you sent them off for some additional testing?

2  A      They were sent to London, England, to Scotland, well, I don't know if it

3  was Scotland Yard, but something along those lines in London, England.

4  Q      The Northamptonshire Police Department in England; correct?

5  A      Yes.

6  Q      And they did some testing that came up of no value to you; correct?

7  A      Correct.

8  Q      And they sent those casings back to you on June 29th, 2010; correct?

9  A      They were Fed. Ex'd back to the Police Department, I think.

10 Q      And you would agree that June 29th was when they were Fed. Ex'd

11 back to you?

12 A      I don't --

13 Q      If you need to refresh your recollection I'm happy to show you --

14 A      Well, yea, I don't specifically remember the exact dates, but I don't

15 have any reason to dispute the record.

16                              MR. RION:   If I could just show him this so

17 there's no question?

18                              THE COURT:  Sure.

19 Q      Does it appear to you that on June 29th that you were informed by the

20 Northamptonshire Police Department that they were Fed. Ex'ing those

21 casings back to you?

22 A      Yea.  That's the date of the e-mail that indicated that they had checked

23 them and weren't able to do anything with them.

1  Q      And that they were going to Fed. Ex. them back to you?

2  A      Yes.  Uh-huh.

3  Q      So, if that's in June of 2010 do you have an explanation as to why it is

4  they're not put into the property room until October?

5  A      No.  I don't handle property.

6  Q      There was testimony yesterday about a MySpace account.  Do you

7  recall that?

8  A      I do.

9  Q      A couple of things on that.  First of all, you said that on Markelus

10  Carter's MySpace account that he had, well, I guess at that point there's sort

11  of a space where you can put your mood for the day, I guess, or for a time

12  period; correct?

13  A      Not being a user of MySpace, that's an assumption I made.

14  Q      Okay.  And the mood said determined; right?

15  A      Yes, it did.

16  Q      Do you know how long that mood had been his posting?

17  A      I took it as --

18  Q      Sir, do you know how long the word 'determined' had been next to the

19  word 'mood' for his mood?  Do you know how long it had been there?

20  A      No.

21  Q      Could it have been days?

22  A      Well, there was a date attached.

23  Q      The date attached was the last time that the computer was logged in;

1  correct?

2  A      That's correct.

3  Q      Well, let me finish this before I go to something else.  The mood stated

4  as determined could have been just what he put there when he opened up

5  the account and it had never been changed; correct?

6  A      I suppose.

7  Q      Did you check with MySpace to see how long that listing had been

8  there?

9  A      No.

10  Q      Now, referring to Defense (sic) exhibit '115-A', you had officers in

11  Markelus' house on that day; correct?

12  A      On the 23rd?

13  Q      Yea, on February 23rd.

14  A      Yes.

15  Q      And this picture accurately reflects that; correct?

16  A      Accurately reflects what?

17  Q      Markelus' house on February 23rd.

18  A      Oh.  Yea, that appears to be a picture of the studio.

19  Q      Yes.  This was taken on --

20  A      On the 23rd; yes, sir.

21  Q      -- February 23rd while you guys were searching; correct?

22  A      Yes.

23  Q      And, as you can see, while you are searching the computer screens

1   are essentially all active; right?

2   A   Well, it appears that there are two that are on in some fashion.

3   Q   Possibly three; correct?

4   A   Uh, --

5   Q   That one, and --

6   A   Well, I would definitely agree with those two there.  I'm not sure what's

7   going on down at that end.

8   Q   It's a picture and so --

9   A   May I see it?

10  Q   It doesn't really matter whether it's two or three.  But, it appears as if

11  the computers are being accessed by either an officer, or they're just on, or

12  whatever?

13  A   Well, I don't know that you can say they're being accessed by officers.

14  Q   They were turned on by officers?

15  A   I don't -- I don't know that to be the case, either.

16  Q   I think we had testimony from Officer DeLong that he had to properly

17  shut them down.

18  A   Oh, that may be.  Okay.

19  Q   So, in 2009 you sent a series of things for testing; right?

20  A   Yes.

21  Q   You sent Markelus' shoes?

22  A   I know we sent a lot of things to B.C.I. early on.

23  Q   Okay.  A lot of different sets of clothing and things at that point that

1      you thought were relevant; right?

2      A      An assortment of items; yes.

3      Q      Okay.  And they were testing for blood?

4      A      Yes.

5      Q      Testing for DNA?

6      A      Yes.

7      Q      Actually what items did you test for fingerprints?

8      A      I don't know that we send a lot of stuff to B.C.I. for fingerprinting.

9      That's something that I think our guys do generally at the L.P.D.

10     Q      B.C.I. Agent Bartholimew tested seven prints, did she not, that were

11     lifted from somewhere?

12     A      I'm not sure.  I think there might have been some prints lifted from his

13     vehicle, or, from a vehicle.  Maybe from Carter's, or, from Mr. Warrington's

14     vehicle.  I'm not recalling that.

15     Q      But, do you have your notes here to refresh your recollection?

16     A      I do not have my notes here.

17     Q      So, nothing that -- well, prints were taken from an assortment of things;

18     correct?

19     A      Well,  I vaguely remember prints taken from a car.  I don't remember if

20     it was Mr. Warrington's or Mr. Carter's.  But, I don't recall that anything came

21     back as useful.

22     Q      Well, there were -- well, which officer would have been responsible for

23     the lifting of prints?

1    A        That could have been Detective Marik, or Detective Whitney, or B.C.I.

2    Agent Hammond.

3    Q        Okay.  But, you're not aware as the case agent as to whether or not

4    prints were lifted and where they were lifted from?  You have no way of

5    determining?

6    A        Case agent?

7    Q        It is true that there were some unidentified prints that did come back;

8    correct?  In other words, there were prints lifted from some surface that you

9    believed to be relevant that came back from an unidentified person?

10   A        Well, as the case agent I didn't do any fingerprint lifting and I never

11   received any information of any relevant prints coming back.

12   Q        Okay.  If prints were lifted from a relevant object and came back to an

13   unidentified third party could that be potentially relevant?

14   A        Well, obviously it would.

15   Q        Okay.  Yesterday we spoke briefly about a gentleman by the name of

16   David Evans; correct?

17   A        Yes.

18   Q        David Evans name came up in the context of whether or not

19   information travels, or, potentially can travel through various ways in the

20   community to get into prison.  But, it was on the subject of how information

21   travels and whether it can travel; correct?

22   A        That was a theory that you were floating at that time.

23   Q        Well, no, you would agree with me that information travels and people

1    gossip by nature; correct?

2    A      I can't argue with that.

3    Q      Okay.  And David Evans told you that he had been in A.C.I. around

4    2011; correct?

5    A      Yes.

6    Q      And he was just there as a transfer, for a short amount of time;

7    correct?

8    A      It's my understanding --

9    Q      Well, he was just there as a transfer for a short amount of time;

10   correct?

11   A      Thirty days.

12   Q      Yea.  Right.  And at that time, though he remembered it to be 2011, it

13   could have been late 2010 as well; correct?

14   A      I think it was, actually, in that time frame.

15   Q      And so David Evans, from the information that you had by looking

16   maybe at logs, Evans said it was in 2011, but the logs from the prison may

17   indicate that it was late 2010; correct?

18   A      I spoke with David Evans and he said that he was there for a short

19   period of time in 2011, but I believe the logs indicate that that was not the

20   case and it was actually 2010.

21   Q      Right.  Same theory applies though.  Information and people, by

22   nature, gossip; fair enough?

23   A      People do gossip.  I don't.

1   Q      Everyone on the planet except for you?

2   A      Pretty much.

3   Q      Officer, that's all the questions I have.  Thank you.

4   A      Thank you.

5                          THE COURT:  Okay.  Any redirect?

6                          MR. MILLER:  Yes, your Honor.  Thank

7   you.

8                    **REDIRECT EXAMINATION**

9   **BY MR. MILLER:**

10  Q      Okay.  Morning.

11  A      Morning.

12  Q      Back to yesterday.  I want to take you back to yesterday when your

13  cross examination began.  I believe Mr. Rion asked if any other houses were

14  searched in this particular case.  I may be paraphrasing it.  I'm not using the

15  exact question.  But, I believe he asked you if any other houses were

16  searched in this case other than Mr. Carter's house.  I believe your response

17  was that 'there was not'.  Do you recall that testimony?

18  A      Right.  Yes.  I did briefly, and I don't know if I would describe it as a

19  search, but I did briefly walk through Miss Burkholder's home that morning

20  and casually look around.  But, no, no other search warrants of anyone else's

21  homes.  No other searches were conducted.

22  Q      Okay.  A formal search where a search warrant was obtained?

23  A      A formal search would be a good way to describe that; yea.

1    Q        What do you need to have -- what do you need as a police officer to

2    search formally for evidence?

3    A        Well, as I said yesterday, to get a search warrant you have to have

4    probable cause and you have to be able to provide a Judge with enough

5    information for him to grant the search warrant.  But, Mr. Rion said, you know,

6    'did you also ask for anyone's permission'.  I did not do that, either.

7    Q        Okay.  Did you ever have even probable cause to search anyone

8    else's home as a suspect in this particular case other than Mr. Carter?

9    A        No.

10   Q        Now, also, right after that, I believe, Mr. Rion handed you what was

11   marked as Defense exhibit 'JJ'.  I'm not going to dig through the pile unless

12   it's necessary to get that out.  I'll just describe what that was.  That was a

13   letter saying to investigate Faye Warrington.

14   A        Yes.

15   Q        Do you recall that from yesterday?

16   A        Yes.

17   Q        Just to refresh things from yesterday.

18   A        Uh-huh.

19   Q        When you received that did you have an idea of who might have sent

20   that letter?

21   A        No.  It was anonymous.

22   Q        Just an anonymous letter?

23   A        I got anonymous phone calls, too.

1    Q      Okay.  Did you, at any point, have any reason to suspect Faye

2    Warrington of this crime?

3    A      Not at all.

4    Q      You were also, and I think this was yesterday as well, well, it was

5    because it wasn't today, I believe Mr. Rion handed you a report and, again,

6    asking you about the words in there about Ken moving in with Sonya and a

7    report saying that Sonya loved Ken.  Do you remember that testimony from

8    yesterday?

9    A      Yea.  Sure.  Uh-huh.

10    Q      Any reports that you generate during the course of an investigation,

11    are those word for word what people tell you when you're talking to them?  In

12    other words, does your report reflect their very language?

13    A      No.

14    Q      What are they?  What are your reports?

15    A      My reports are generally a summary of my activities.  That's just how I

16    have always done it.  Other people do it differently.  Other people have their

17    reports transcribed word for word.  You know, they record their reports on a

18    tape and send it in and have the whole thing transcribed.  I've always just

19    used the summary method.  The thing about that with Sonya and Mr.

20    Warrington, I really didn't put a lot into whether he lived there full-time, or

21    whether he lived there part-time, or whether he lived there at all.  The only

22    thing that seemed relevant to me was that he was there that morning and he

23    was allowed to be there and that he was there that morning and he was

1   murdered.  I really didn't get caught up in if he lived there full-time or not.  He

2   was there that morning and he was allowed to be there.

3   Q       Okay.  Okay.  Just to close out this particular subject, your reports are

4   summations and they're not quotes from the person, necessarily quotes from

5   the person that you're interviewing at the time?

6   A       That's correct.

7   Q       Okay.  So, the words, or the phrase, moved in, or, you know, she loved

8   Ken, were those necessarily Sonya's words?

9   A       That's the way I took it at the time I wrote the report.

10  Q       Now, you were asked yesterday by Mr. Rion whether you were aware

11  that Sonya had other relationships, or, had relationships with other men other

12  than Ken Warrington.

13  A       Yes.

14  Q       Were you aware that she did, in fact, have relationships with other

15  men?

16  A       I was aware of one other relationship that both sides confirmed, and I

17  was aware of another relationship that both sides didn't confirm.  In other

18  words, there was a bit of a dispute as to what kind of a relationship it actually

19  was.

20  Q       Okay.  Let's just narrow it down.  Agruello Harris, because that's the

21  name that came up yesterday, do you recall Agruello Harris coming up in this

22  investigation?

23  A       Yes.

1  Q      Okay.  Did you check into Agruello Harris as a possible suspect?

2  A      Yea.  Well, I interviewed him briefly and he was home that night with

3  his wife and newborn.

4  Q      Okay.  You were asked about the proofs, the Allstate Insurance card

5  proofs, in the car, in Mr. Carter's car that you impounded the day he was

6  interviewed, or, taken to the Police Station.

7  A      Yes.

8  Q      Did you have an opportunity to talk to Mr. Bennett about those proofs

9  at any point during your investigation?

10  A      Yes.

11  Q      Did he tell you anything about Mr. Carter bringing those proofs to him

12  that morning?

13                              MR. RION:   Your Honor, objection.

14  Hearsay.

15                              MR. MILLER:   I'll try to rephrase the

16  question and get around the hearsay.

17  Q      Did you speak to Mr. Bennett about those proofs and Mr. Carter telling

18  investigators that he was on his way to Mr. Bennett's house?

19  A      I did speak with Mr. Bennett.

20  Q      Okay.  After speaking with Mr. Bennett did you draw a conclusion as to

21  whether --

22                              MR. RION:   Objection, your Honor.  They

23  can call Mr. Bennett as a witness if they want.

1                                  MR. MILLER:  It's in the course of the

2    investigation.

3                                    THE COURT:  Well, I'll overrule the

4    objection the way the question was phrased.

5    Q       I've got to phrase it that way again.

6    A       Start over, please.

7    Q       After speaking with Mr. Bennett did you draw a conclusion as to

8    whether or not Mr. Carter was actually going to deliver those proofs?

9                                    MR. RION:  Objection.

10                                THE COURT:  Overruled.

11    A       Mr. Bennett indicated that he wasn't expecting that visit and that Mr.

12    Carter had been working on those things for such a long time that he had kind

13    of forgotten about it.

14    Q       Yesterday you were asked about a silver and black handgun that came

15    up during the course of this investigation.

16    A       Yes.

17    Q       Do you recall actually that "silver and black handgun" coming up during

18    the course of your investigation?

19    A       I believe the --

20    Q       Well, do you recall it coming up?

21    A       Yes.

22    Q       Where did you get that information?

23    A       Markie Carter.  That's his son.  I don't know if that was clarified or not.

1   Q     Yes.  Okay.  Did investigators speak to Markie Carter about where

2   Markie Carter had seen that black and silver handgun?

3                   MR. RION:   Objection, your Honor.

4                   THE COURT:  Overruled.

5   A     Yes.

6   Q     Did you talk to those investigators about their conversation with Markie

7   Carter?

8   A     Yes.

9   Q     Did you then draw a conclusion as to where that silver and black

10   handgun, or, whether or not there was, in fact, a silver and black handgun at

11   122 East Eureka?

12   A     Yes.

13   Q     And what was your conclusion?

14                   MR RION:   Objection.

15                   THE COURT:  Overruled.

16   A     That there was another handgun in the home aside from the two that

17   we recovered that had been kept on the shelf near where the Winchester nine

18   millimeter rounds were found.

19   Q     Did you ever find that silver and black handgun?

20   A     No.

21   Q     Yesterday Mr. Rion asked you if you recalled telling Mr. Upham that

22   Mr. Warrington was shot and I think the term was 'five times in the back'.  Do

23   you recall that testimony from yesterday?

1    A    Yes.

2    Q    Did you, in fact, say that to Mr. Upham?

3    A    I may have.

4    Q    Did you say that to him before or after he gave you the information that

5    he testified about in this trial?

6    A    Any conversations about details would have been after his initial story

7    to me.  It wouldn't make any sense, again, like we spoke before, to give him

8    details before he told me and then expect those details to be useful.

9    Q    During the course of your investigation did you find anything that would

10   cause you to doubt the integrity of Mr. Upham's statement to you?

11   A    No.

12                              MR. RION:  Objection.

13                              THE COURT:  Overruled.

14   A    No.  In fact, --

15                              MR. RION:  Objection.

16                              THE COURT:  I already overruled the

17   objection.  There wasn't another question.

18                              MR. MILLER:  There wasn't another

19   question.

20   A    I was going to continue on with my answer.

21                              THE COURT:  Well, wait until there's a

22   question.

23   A    Okay.  I'm sorry.

1  Q      I think there was a question yesterday, and I apologize if I'm not

2  recollecting correctly, but I think there was a question yesterday about Sonya

3  having a C.C.W.  Do you recall a question from Mr. Rion about that topic?

4  A      I think so.

5  Q      Okay.  Did you find any information during the course of your

6  investigation that would indicate that Sonya killed Ken Warrington?

7  A      No.  Lots of people have C.C.W.'s.

8                              MR. MILLER:  One second, your Honor.

9                              THE COURT:  Okay.

10  (WHEREUPON, Court went off the record briefly.)

11  Q      Carlotta Williams.  Did you tell Carlotta Williams during the course of

12  your investigation about, well, anything about paintball masks?

13  A      No.  I didn't know about a paintball mask until Stephen Upham

14  mentioned it.

15  Q      And was that after you spoke with Carlotta?

16  A      Yes.

17  Q      Did you ever tell Carlotta about, anything about Mr. Carter potentially

18  stalking Mr. Warrington?

19  A      I don't believe so.  I believe that stalking and paintball masks are the

20  two things that Mr. Upham told me, despite everything else, that make his --

21                              MR. RION:  Objection.

22                              THE COURT:  Sustained.

23  Q      Other than with your fellow law enforcement officers who were taking

1    part in the investigation did you ever share the pictures that have been shown

2    in this trial from Mr. Carter's camera, for example, the picture taken at night of

3    Ken's truck behind, just to refresh, Sonya's house?  Do you know what

4    pictures I'm talking about?

5    A       Yes.

6    Q       Did you ever show anyone those pictures other than law enforcement

7    during the course of your investigation?

8    A       Yea, but not outside of prosecutors and detectives.

9    Q       Okay.

10   A       Or upstairs personnel in our office.

11   Q       Okay.

12                                  MR. MILLER:  One second.

13                                  THE COURT:  Okay.

14   (WHEREUPON, Court went off the record briefly.)

15                                  MR. MILLER:  I have no further questions.

16                                  THE COURT:  Okay.  Any recross?

17                          **RECROSS EXAMINATION**

18   **BY MR. RION:**

19   Q       Your reports accurately reflect the essence of the conversations that

20   you had with witnesses; correct?

21   A       I believe so.

22   Q       They're not meant to not accurately reflect the information; correct?

23   A       Correct.

1  Q       So, when she says that she had been seeing him for about a year,

2  that's an accurate statement from that conversation; correct?

3  A       Probably.

4  Q       And she stated that he had moved in in November and that's an

5  accurate statement or reflection of your conversation with her; correct?

6  A       At that time, for sure.  Yes.

7  Q       Did she ever tell you on that date that Ken Warrington had returned a

8  key to Miss Burkholder?

9  A       I think there was some discussion that he had to pick up a key the

10  night before or something having left it in the house or something.

11  Q       Uh-huh.  That he no longer had access to it.  Did she tell you at that

12  time that he was coming to pick up his uniforms to take them back to Mrs.

13  Warrington's house?

14  A       I don't recall that.

15  Q       You interviewed Eric Bennett; correct?

16  A       I spoke with Eric Bennett on several occasions and interviewed him --

17  well, I guess interviewed him, technically, late in the investigation.

18  Q       And Eric Bennett told you he had received a call around eight A.M. that

19  morning from Mr. Carter; correct?

20  A       If that's what my report says.  I'd have to see it.  Okay.  Yes.

21  Q       The call was in reference that business cards were completed;

22  correct?

23  A       I don't know if they were completed.  That may be what I wrote.  But,

1       Mr. Bennett later went on to say --

2   Q       Sorry.  Sorry.

3   A       -- that he wasn't expecting it.

4   Q       Sorry.  Sorry.  Just answer my questions.

5   A       All right.

6   Q       He received a call around eight A.M.; correct?

7   A       Yep.  Yes.

8   Q       Business cards were finished?

9   A       That's what I wrote.

10  Q       That Mr. Carter was to bring them to him?

11  A       Yes.

12  Q       When did you first receive information that Sonya Burkholder was

13  highly intoxicated the late evening hours/early morning hours of February

14  22nd and into February 23rd?

15  A       Never - until this all started.

16  Q       What do you mean until this all started?

17  A       This trial.

18  Q       Really?  So, you weren't present during Grand Jury?

19  A       Was I in Grand Jury when this took place?

20                          MR. MILLER:   Your Honor, I'm going to

21  object.

22                          MRS. KOHLRIESER:   Your Honor?

23                          MR. RION:   Let me put it another way.  I'll

1    withdraw the question.

2                              MRS. KOHLRIESER:   He's not allowed to

3    be present when other witnesses are testifying at Grand Jury.

4                              MR. RION:   I'll withdraw the question.

5                              THE COURT:   All right.  He withdrew the

6    question.  I understand where you're going.  Mr. Rion understands what your

7    objection was and he's rephrasing.

8    Q        Did you ever interview Tarah Carter?

9    A        She wouldn't allow it.

10   Q        Just 'yes' or 'no'.

11   A        No.

12   Q        Are you aware of the information that she has given, a sworn testimony

13   that she's given?

14   A        Yes.

15   Q        And you've reviewed it?

16   A        The Grand Jury statement?

17   Q        Have you reviewed any sworn testimony she's given?

18   A        I wouldn't say I've reviewed it.  I've been told about it.

19   Q        It's your testimony that it wasn't until this trial began was the first time

20   that you, as the lead detective, became aware that there was information out

21   there that Sonya Burkholder was highly intoxicated in the late evening

22   hours/early morning hours of February 23rd, 2009; is that correct?

23   A        It's not credible information.

1    Q      Sorry, sir.  If you could answer my question?

2    A      Is that correct?

3    Q      That you had no, prior to the beginning of this trial, that you had no

4    information whatsoever, and it was news to you, --

5    A      Well, I think you're phrasing it in a way that's not true.  But, yes, I

6    guess, to answer your question.

7    Q      Okay.  I'm not trying to get personal with you.

8    A      Well, you kind of are.

9    Q      I'm asking you a simple question.  Did you --

10   A      Did Tarah Carter say that in Grand Jury?  I believe she did.

11   Q      Okay.  So, you knew --

12   A      Is that something that I considered before this trial?  No, because I

13   don't consider her credible.

14   Q      Okay.

15   A      I think that fairly sums it up.

16   Q      But you, yourself -- you, yourself, never -- you don't consider her

17   credible, but she was placed in Grand Jury?

18   A      I'm pretty sure that --

19   Q      Actually I withdraw the question.  Let me put it to you like this - did you

20   ever interview Tarah within the first two days, within the first forty-eight hours?

21   A      She was interviewed that morning - not by me.  She would not allow

22   herself to be interviewed at any time after that.

23   Q      On February -- the first forty-eight hours seem to be important to you;

1    correct?

2    A      It is important.

3    Q      Do you know which questions were asked of her at that time?

4    A      I don't know.  She was interviewed by, I believe, Detective Kleman.

5                              MR. RION:   Nothing further.

6                              THE COURT:   Okay.  You may step down,

7    Detective.

8    A      Thank you.

9                              THE COURT:   Any other witnesses for the

10   State of Ohio?

11                             MRS. KOHLRIESER:   Your Honor, can we

12   have a break, please?

13                             THE COURT:   Okay.  During the break let

14   me know if you have any other witnesses.  Okay?  We're going to take a

15   break.  I'd like to say that it's going to be about fifteen minutes or so.  It might

16   be a little longer.  I'll let the bailiff know if we're going a little longer.

17          Remember the admonitions.  Don't discuss the case among

18   yourselves or with anyone else.  Don't formulate or reach any conclusions.

19   Don't have any contact with the parties.  We'll stand in recess for fifteen

20   minutes or so.  Okay?

21   (WHEREUPON, COURT WAS IN RECESS.)

22

23   **(WHEREUPON, VOLUME EIGHT CONCLUDED.)**