FILED
COMMON PLEAS COURT

2016 MAR 23  PM 1:05

IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

----------------------------------------------------------------------

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO.  CR2014 0139 |
| Plaintiff | * | |
| | * | **TRANSCRIPT -** |
| -VS- | * | JURY TRIAL |
| **MARKELUS Q. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

----------------------------------------------------------------------

# A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio  45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

**(VOLUME 9 OF 10)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# TABLE OF CONTENTS

## (VOLUME 9 OF 10)

**FRIDAY, SEPTEMBER, 18, 2015  - CONTINUED --**

STATE'S EXHIBITS TENDERED FOR ADMISSION INTO
   EVIDENCE AND RULED UPON BY THE COURT     1589

STATE OF OHIO RESTS     1611

MOTION FOR ACQUITTAL PURSUANT TO
   CRIMINAL RULE 29 - RION     1611
            - KOHLRIESER     1611

COURT RULING - MOTION FOR ACQUITTAL OVERRULED     1612

DEFENDANT'S FIRST WITNESS -
   THOMAS SMITH - RION     1614
          - KOHLRIESER     1624
          - RION     1626

DEFENDANT'S SECOND WITNESS -
   ABDUL BARI - RION     1627
          - KOHLRIESER     1634

DEFENDANT'S THIRD WITNESS -
   VINCENT CUNNINGHAM - RION     1639
             - KOHLRIESER     1643

DEFENDANT'S FOURTH WITNESS -
   CHASTON SCOTT - RION     1646
           - KOHLRIESER     1651

DEFENDANT'S FIFTH WITNESS -
   AGRUELLO HARRIS - RION     1653
           - KOHLRIESER     1657

DEFENDANT'S SIXTH WITNESS -
   CAROL MATHEWSON - RION     1659
           - KOHLRIESER     1664

DEFENDANT'S SEVENTH WITNESS -
   LEAH REXFORD - RION                                1666
                 - KOHLRIESER               1670

DEFENDANT'S EIGHTH WITNESS -
   VICKIE BARTHOLIMEW - RION               1671
                     - KOHLRIESER       1676
                     - RION                    1677

JURY EXCUSED FOR THE DAY AT 2:03 P.M.      1680

DEFENDANT'S EXHIBITS TENDERED FOR ADMISSION
   INTO EVIDENCE AND RULED UPON BY THE COURT   1682

MOTION PROHIBITING AN INTERVIEW WITH NEWS
   MEDIA - KOHLRIESER                      1697

COURT RULING - MOTION PROHIBITING INTERVIEW
   WITH NEWS MEDIA GRANTED             1697

COURT RECESSED FOR DAY AT 2:24 P.M.       1698


**MONDAY, SEPTEMBER 21, 2015** -

COURT COMMENCED AT 9:23 A.M.             1699

FURTHER RULING ON DEFENSE EXHIBITS BY COURT  1699

DEFENDANT'S NINTH WITNESS -
   TARAH CARTER - RION                       1702
                 - KOHLRIESER       1717
                 - RION                  1725
                 - KOHLRIESER       1727

FURTHER RULING ON DEFENSE EXHIBITS BY COURT  1731

DEFENSE RESTS                             1734

REVIEW OF JURY INSTRUCTIONS             1734

CLOSING ARGUMENT - KOHLRIESER         1746

VOLUME NINE CONCLUDED                1778

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**NOTE:**  THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE.  SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS.  HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT 436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436 MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT;

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED
FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED
AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT
AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT
AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE
WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT
WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE
AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM
(ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE
AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S
    CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS-
    MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS-
    MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM
    AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA
    STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND
    AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET
    SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND
    PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
    STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
    STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA
    STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFEL IN BASEMENT AT 122 EUREKA
STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT
AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122
EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122
EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122
EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122
EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS
PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA
STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING
G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM
VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING
G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS
AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSCT9 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
      SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA
      SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK
      AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN
       STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK
      EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT
      436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND
      PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR
SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR
KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF
HEAD/NECK;

## DEFENDANT'S EXHIBITS -

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH
WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436
MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET
AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET,
SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN
STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND
POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH
BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH
BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE
IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON
MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING
AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH WITH CAMOUFLAGE
CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT 122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - **(NOT ADMITTED BY COURT)**;

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A. MOORE;

DD - JUDGMENT ENTRY ON SENTENCING  IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R. FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON **(WITHDRAWN BY THE DEFENSE)**;

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS- STEPHEN UPHAM, LUCAS CO. CASE NO. G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING
FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR
VICKIE BARTHOLOMEW;

## **COURT'S EXHIBITS -**

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND
STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW)
BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED
A.C.S.O. OFFENSE REPORTS;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1   THE COURT:   Let the record reflect we're

2   reconvening --

3   COURT REPORTER:   Just a minute.

4   THE COURT:   Oh, it won't reflect it yet.  All

5   right.  Now we're on the record.  It's after the recess on September 18th, 2015

6   in Case Number CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The

7   defendant is present with counsel.  The State is present.  The jurors are still

8   on recess.

9   When we broke for the recess I had inquired whether the State has

10  any other witnesses.  Does the State have any other witnesses?

11  MRS. KOHLRIESER:   No, your Honor.

12  THE COURT:   Okay.  So, subject to rulings

13  on the exhibits you would be prepared to rest perhaps?

14  MRS. KOHLRIESER:   Yes, your Honor.

15  THE COURT:   All right.  So, I just want the

16  record to reflect, too, that during the recess then, because it had been

17  represented to the Court that the State wasn't going to have any other

18  witnesses, I had the bailiff let the jurors know that it might be a little longer.  I

19  don't want them in an uproar because it might be a little longer.  The record

20  should also reflect that during the recess, with defense counsel, we tried to

21  coordinate with the Corrections Department the transporting of defense

22  witnesses, if there are going to be any.

23  So, let's talk about your exhibits.  As I said yesterday, we'll try this in

1    as an efficient and orderly way as possible.  So, first off, the State can move,

2    or, let me know the exhibits that you are moving to be admitted into evidence

3    for the jury by way of, well, maybe the easiest way is telling me if there are

4    any you are withdrawing.

5                              MRS. KOHLRIESER:  Okay.  Your Honor,

6    the ones that we would not be using, or, intend to use would be '140'.

7                              THE COURT:  And, Mr. Rion, you have the

8    master list; right?

9                              MR. RION:  I do, your Honor.

10                             THE COURT:  '140'.  Okay.

11                             MRS. KOHLRIESER:  Yesterday we

12   addressed after the jurors went off the record that '140-A' would be basically

13   that substitute.

14                             THE COURT:  Okay.

15                             MRS. KOHLRIESER:  I guess the second

16   '140-A'.  So, '140' we would withdraw.

17                             THE COURT:  Okay.

18                             MRS. KOHLRIESER:  And then we did not

19   introduce '145' or '146'.

20                             THE COURT:  '145' and '146'?  Okay.

21                             MRS. KOHLRIESER:  And then also we did

22   not introduce '149'.

23                             THE COURT:  Okay.

1    MRS. KOHLRIESER:  I believe, other than

2    that, that takes care of the exhibits that we would not be using.  So, with those

3    exceptions we would move for the admission of State's exhibits '1' through

4    '181'.

5    MR. RION:   '181' you said?

6    MRS. KOHLRIESER:   I believe that was

7    my last one.

8    THE COURT:   Well, that brings up a

9    question.  I have everything else marked down and the Court Reporter,

10   Susan, and I got together yesterday afternoon and we didn't have a '181'.  Do

11   you know what that was?

12   MRS. KOHLRIESER:   Yes.  '181' was a

13   photograph, I think, of a lump to the back of Mr. Upham's head.

14   THE COURT:   Okay.  I thought it might be

15   in that group.  I have '174' to '180' as -- I think Mr. Miller may have said I'm

16   going to show you '174' to '181', but I think it was only '174', '175', '176', '177',

17   '178', '179', and '180'.

18   MRS. KOHLRIESER:   Okay.  Then, yes,

19   we would take '181' back, your Honor.

20   THE COURT:   Okay.  So, '181' is not on

21   the table?

22   MRS. KOHLRIESER:   Yes.  My apologies,

23   your Honor.  I messed up.

1      THE COURT:  So, the State is moving,

2  with the exceptions that we've already mentioned, you're moving for the

3  admission of all of the exhibits?

4      MRS. KOHLRIESER:  Yes, your Honor.

5      THE COURT:  It would be '1' through '180',

6  with those four exceptions that you've already noted; correct?

7      MRS. KOHLRIESER:  Yes, your Honor.

8      THE COURT:  All right.  So, the State has

9  moved for the admission of exhibits.  Now, again, we can do it any way but,

10  Mr. Rion, if perhaps you will go through and, well, I'll just do it this way, on the

11  master list by page and in numerical order which ones, if any, you would be

12  objecting to.  So, on page one it's exhibits '1' through '23'.  Any objection?

13      MR. RION:  Just number '2', your Honor, to

14  the e-mail of Pam Callahan.  She testified.  So, it's a repetition of her

15  testimony of what she e-mailed to a friend of hers would not be, or, to her

16  boss or someone in business, well, I would object as it's just redundant and, I

17  guess, technically hearsay.

18      THE COURT:  Okay.  Any response by the

19  State?

20      MRS. KOHLRIESER:  Well, your Honor, it

21  wouldn't be hearsay because it's Pam Callahan's own writing.  She was

22  subject to cross examination.  She testified about it.  It was basically in the

23  course of business and part of those business records that she testified to

1   why it was kept.  We certainly think it's relevant, again, particularly to the

2   nature of she thought it important enough to address and put in Ken

3   Warrington's personnel file.

4                          THE COURT:   Okay.  I'll rule to admit '2'

5   over objection.  Exception noted.  Any other on that first page?

6                          MR. RION:  No, your Honor.

7                          THE COURT:   All right.  Then let's move to

8   page two on the master list.  It would be '24' through '45'.  Any objections?

9                          MR. RION:  No, your Honor.

10                          THE COURT:   All right.  Well, let's back up

11   here.  I've overruled the objection to '2' and so I'll admit '1' through '23'.  I'll

12   admit '24' through '45'.  The third page on the master list is '46' to '70-A'.  Any

13   objections?

14                          MR. RION:  No.

15                          THE COURT:  So, '46' to '70-A' are

16   admitted.  The fourth page on the master list is '70-B through '96'.  Any

17   objections?

18                          MR. RION:   To Doctor Pandey's report.

19   She's testified.  So, I would just object to the report going back.

20                          THE COURT:   And just so the record is

21   clear --

22                          MR. RION:   Number '79'.

23                          THE COURT:   '79'.  Does the State wish to

1    be heard?

2                                MRS. KOHLRIESER:   Your Honor, again,

3    it's the same type thing.  It's part of her examination.  It details her findings

4    and things of that nature.  So, we would -- again, it's relevant.  It's kept in the

5    ordinary course of business.  She testified to that.  We would ask for its

6    admission.

7                                THE COURT:   Okay.  I'll overrule the

8    objection to '79' and admit '79'.  Exception's noted.  Any other objections on

9    that page?

10                               MR. RION:   I was trying to remember

11   which photo was the initial photo in the body bag?

12                               MRS. KOHLRIESER:   It should be the very

13   first one.  '80', I believe.

14                               MR. RION:   That's what I thought.  So, I

15   would object to '80'.

16                               THE COURT:   Well, let me see '80'

17   because I want to -- because on this note the description is kind of scratched

18   out.  I think I have it in mine.  But, let me see it.

19                               MRS. KOHLRIESER:   '80' and '81' are the

20   upper half and the lower half of Mr. Warrington in the body bag.

21                               THE COURT:   '80' is the body and '81' is

22   his legs.  Yea.

23                               MRS. KOHLRIESER:   Yes.

1    MR. RION:   On page five, no objection.

2    THE COURT:  Okay.

3    MRS. KOHLRIESER:   Here are '80' and

4    '81', your Honor.

5    THE COURT:  All right.  So, is one of these

6    in particular you're objecting to?

7    MR. RION:   It was '80'.

8    THE COURT:  All right.  So, there's an

9    objection to '80'.  Do you want to state a reason?

10    MR. RION:   It's, as you can tell from the

11    picture, it really doesn't serve any evidentiary value.  We have other images

12    that detail the bullet wounds, the entrances and exits.  It doesn't -- nor does it

13    accurately reflect -- it may reflect the way the body appeared in the body bag,

14    but we have pictures from the scene of what the body looked like there and

15    we have pictures of the bullet holes.  This picture just seems to be shocking.

16    THE COURT:   Okay.  Any response from

17    the State?

18    MRS. KOHLRIESER:   Yes, your Honor.

19    Again, we made every effort to try and be respectful and not shocking, but

20    Doctor Pandey specifically testified that one of the things that she does in

21    looking at that is she is examining the condition of the clothing, and she's

22    examining damage to the clothing, and things of that nature.  Those do reflect

23    both what happened to Ken Warrington out at the scene of the crime and

1   basically those pictures, well, it's him flipped over, albeit the next day, but

2   then she specifically testified about the importance of those - why she takes

3   those picture and what she's doing through her examination.  Again, while

4   they there appears to be dried blood covering Mr. Warrington and his clothes,

5   they're not there for shock value or to show gruesome nature.  I mean, we

6   purposely didn't put anything else in.  As the Court is well aware, there are a

7   lot more shocking and a lot more gruesome photos that we could have

8   shown.  So, we made every effort to not do that, your Honor.

9              MR. MILLER:   Your Honor, may I add that

10  there is case law that says, and I can't cite the chapter and verse, but there is

11  case law out there that says just the very fact that it may be shocking or

12  gruesome is not, specifically relating to these autopsy pictures, that is not a

13  sufficient reason to keep it out.

14             THE COURT:   All right.  The Court will

15  overrule the objection to '80' and admit that over objection, with exceptions

16  noted.  I think that took care of page four.  Then, Mr. Rion, you had said --

17  well, page five on the master list was '97' through '129'.  There were no

18  objections?

19             MR. RION:   Correct.

20             THE COURT:   Okay.  So, all the exhibits --

21  wait a minute.  I'll back up.  '70-B' through '96' are admitted.  Now, '97'

22  through '129' are admitted.  Then we move to the final page.

23             MRS. KOHLRIESER:   Your Honor?  I

1    apologize.  Just so we're clear, it's not on the master list, but there was like a

2    '115-A and B' and '117-A, B and C'.

3                                    THE COURT:  Right.  '117' had an 'A', 'B'

4    and a 'C'.  '128' also has an 'A', 'B', and a 'C'.  My ruling was including all of

5    those.  Is that included with you, Mr. Rion?

6                                    MR. RION:  Those were just pictures of the

7    basement and the pants, or whatever?

8                                    MRS. KOHLRIESER:  Yes.

9                                    THE COURT:  The basement had three

10   different pictures - 'A', 'B', and 'C', for example.

11                                   MR. RION:  Yea, that's fine.  No objection.

12                                   THE COURT:  '117' had different pictures,

13   also 'A', 'B', and 'C'.  So, those are admitted.  Those were included in the

14   ruling.  Now, first off we'll go with, on the master list, was '130' to '158' and,

15   again, excluding those four exhibits that the State has already withdrawn.

16   Any objection to '130' to '158'?

17                                   MR. RION:  Your Honor, I believe '135' is

18   documents that were found on the table in Markelus' kitchen.  The problem is

19   is that it's the transcripts from prior hearings.  It's the transcript from, well, the

20   Court, literally, the C.P.O. hearing, I believe.  It would have the statements

21   and the off-the-record statements, like if Mr. Rexford and the Court are

22   dealing with an evidentiary issue then, you know, these are all captured on

23   there.  So, that would be of concern.  Also, part of these findings would be

1   there's an order of protection, and there's a Lima Police report, and a trial

2   brief of Mr. Carter's as submitted by Mr. Rexford.  There is affidavits

3   regarding the protection order.  There are decisions of the Magistrate dealing

4   with that case.  There's an appeal that's taken as to the case on the C.P.O.

5   There's a brief of the appellee, so it would then be Dennis Yacobozi or

6   Yacobozi (pronunciation), that deals with his version of the events.  So,

7   there's just a lot of documents that, but for them being found on Mr. Carter's

8   table, the Court would clearly not admit into evidence.  But, here we are.

9                                          THE COURT:   Does the State want to

10  respond?

11                                         MRS. KOHLRIESER:   Yes, your Honor.

12                                         THE COURT:   Mr. Miller, could you get me

13  '135' so I can look at it?  Who has '135'?

14                                         MRS. KOHLRIESER:   Mr. Rion has it.

15                                         MR. RION:   I have it.

16                                         THE COURT:   Then you can respond, Mrs.

17  Kohlrieser.

18                                         MRS. KOHLRIESER:   Yes, thank you, your

19  Honor.  The fact that those were found on his kitchen table the day Ken

20  Warrington is murdered and just a few hours later, and given what's on the

21  computer, given the whole scenario here, and Ched Godfrey's testimony, it

22  goes directly to his mindset that night.  The State's theory of the case about

23  all these things building up, what's going on, here he is and he's got these

1   documents and, again, this boil type of thing of what's going through his mind

2   that night when he kills Ken Warrington is that, you know, look, he lost there,

3   and he lost his appeal, and notably he lost his appeal in September of '08 and

4   that ties in directly to him now calling L.P.D. and wanting these charges filed

5   and things of that nature and then Ched Godfrey telling him, you know, that

6   no charges were going to be filed, and it goes to, again, in his mind, what all

7   happened, what all was said, and how nobody is listening to him and he's got

8   to take matters into his own hands basically.  It's all going to his frame of mind

9   and what's the driving force behind him that night.  Again, that's why we have

10  that.  I understand Mr. Rion's concerns, but those go directly to the heart of

11  motive, mindset, planning, things of that nature, and particularly the prior

12  calculation and design and what is going through his head at that time.

13  Again, it's not that we're going to reference, I mean, again, probably in

14  general the nature of what's in there, but it's not like we're going to stand up

15  and read a certain line out of any of those documents and emphasize them.

16  But, that goes directly to the heart of this matter, your Honor, and so it's

17  probative value way exceeds any type of prejudicial value.

18                          THE COURT:  All right.  Well, the Court

19  admittedly has had a cursory review, but I got the nature of the documents

20  based upon Mr. Rion's representation and just looking through it, again, not

21  reading line by line, and the Court also understands the testimony as the

22  circumstances of how these items were obtained by law enforcement.  The

23  Court's going to overrule the objection to '135' and allow all of those as an

1    exhibit to be admitted.  Exceptions are noted.  Anything else on that last

2    group on the official list from '130' to '158', Mr. Rion?

3                  MR. RION:  Just the reports that were

4    submitted.  Obviously each individual testified and so we would ask that the

5    reports not go back since their testimony was heard by the jury.

6                  THE COURT:  Like Mr. Kramer's?

7                  MR. RION:  And Mr. Congleton's; yes.

8                  THE COURT:  All right.  I'll overrule those

9    objections, too, and allow those in.

10                  MR. RION:  '139' is the picture of the

11    Mac-10.  Again, this was not disclosed to counsel prior to trial and, in fact,

12    even prior to it being shown to the jury.  We would object strongly to that.

13                  THE COURT:  Does the State have a

14    position with regard to '139'?

15                  MRS. KOHLRIESER:  Basically the same

16    argument, particularly the demonstrative value of it, your Honor, is what I was

17    going for.  Again, I'm not going to rehash the arguments we've already made.

18                  MR. RION:  That's the back door to get

19    exhibits in, to get past Rule 16 then.

20                  THE COURT:  Well, okay.  The Court will

21    overrule the objection.  I'd already kind of ruled on that in terms of I didn't find

22    it to be a Criminal Rule 16 violation in terms of the fact that there was prior

23    discovery of the mention of a Mac-10.  So, it wasn't a surprise in terms of

1    there suddenly appearing a Mac-10 in this case because of the statements of

2    Mr. Moore that were provided in discovery.  The Court mentioned when it

3    ruled on this earlier when it was the subject of a prior motion and allowed it to

4    be used that I would formulate an instruction regarding that.  I did that.  I don't

5    know if I read it.  This is a draft that I have.  But, I would instruct the jurors -

6    "The picture of the Mac-10 was not a picture of the actual gun used in the

7    homicide of Mr. Warrington.  It is demonstrative evidence.  Demonstrative

8    evidence is an object, picture, model, or other device intended to clarify or

9    qualify facts for the jury.  Such evidence is merely an aid in understanding

10   certain facts and it is up to the jury to decide what weight to give to such

11   evidence.  The picture may be considered for the limited purposes to show

12   what a Mac-10 looks like."  So, with that instruction I'll overrule the objection.

13   Again, I think I gave a lot of reasons when I allowed it in the first place.  So,

14   instead of re-reading all of that into the record, we'll just reiterate that for

15   those same reasons.

16                            MR. RION:  Just to clarify, your Honor,

17   that's not a picture of a Mac-10.  It is a picture of -- well, we don't know the

18   manufacturer of that weapon.  We don't know whether it's a .45 or whether it's

19   a nine millimeter.  We don't know the manufacturer.  I don't even think it's

20   included in their list of possible weapons that could have been used in this

21   from their own officer, from Mr. Kramer's report.  Mr. Kramer limited it to only

22   two manufacturers that make a gun that sort of has any similarities to a

23   Mac-10 that could have been consistent with it.  We have no testimony that

1    that weapon was even that.  So, to say that that -- it's a big issue as to what a

2    Mac-10 is.

3                      THE COURT:  Okay.  I understand your

4    argument.  I think I can modify the instruction to - "That that picture may be

5    considered for the limited purpose to show what a weapon similar to a

6    Mac-10 may look like."  I think the testimony would indicate that that picture

7    was at least similar to what a Mac-10 - and I know there's a differentiation

8    between an authentic Army issued Mac-10 as opposed to a knock-off, or

9    whatever they were called.

10                  MR. RION:  I guess I would object to the

11    instruction and the Court's referring that this looks similar to a Mac-10.

12                  THE COURT:  If the jurors believe that.

13    The instruction would be that --

14                  MRS. KOHLRIESER:  Your Honor?  May I

15    suggest you could simply say, "There's been an exhibit admitted that's a

16    photo of a gun."  You can say gun.

17                  THE COURT:  I'm admitting the exhibit.

18    I'm admitting the exhibit.  We can talk about an instruction later.

19                  MRS. KOHLRIESER:  Okay.  Thank you.

20                  MR. RION:  Thank you.

21                  THE COURT:  There will be some

22    instruction to either qualify that or to tell the jurors how they can consider it.  I

23    am admitting the exhibit.  So, exceptions are noted on that one.  Any other

1  objections in that last group that's on the official list and then we'll get to the

2  ones that weren't on the list?

3  MR. RION:  It's either '147' or '148'.  One

4  was just a picture of Markelus in paintball attire.  That's fine.  There's another

5  one that came from Detective Leland and he has a lot of information about

6  homicide investigation and Warrington death that's in the exhibit.

7  THE COURT:  That was off of the

8  MySpace page where it had the thumbnail?

9  MR. RION:  No.

10  THE COURT:  No?

11  MR. RION:  No.  It's off of --

12  MRS. KOHLRIESER:  It was a thumbnail,

13  your Honor, but it was his computer analysis and what it is, if you look at

14  State's exhibit '147', and he testified to it, that's his search path.  If you would

15  like, I really don't have a problem whiting that out or something and making a

16  copy of it or something so that that's not showing.  He testified that that's how

17  he bookmarked it, your Honor, and not how it was saved.

18  THE COURT:  Let me ask - is it necessary

19  to have that and the actual blown-up thumbnail?

20  MRS. KOHLRIESER:  I believe it is, your

21  Honor, just, again, to show how he tracked it through his computer and this is

22  the bigger picture of it.

23  MR. RION:  If we would just delete 'Carter

1   in paintball mask' and 'Warrington homicide', this part, then the rest of it I

2   have no problem with.  The information that Leland put in isn't really relevant

3   to the jury.

4                               MRS. KOHLRIESER:  Well, he explained

5   how he tagged things and stuff like that that were pertinent to the

6   investigation.

7                               THE COURT:  Can the State agree to

8   block out the portion down there - the path?

9                               MRS. KOHLRIESER:  I'll be happy to block

10  out 'Warrington homicide'.  But, the rest of the stuff, documents, settings,

11  Markelus, desk top, I mean, that's directly his link, what's in his computer, 'his'

12  being the defendant's.

13                              MR. RION:  Okay.  But, also 'Carter in

14  paintball mask' at the top of that?

15                              MRS. KOHLRIESER:  He testified to that.

16  That's Carter in the paintball mask.

17                              MR. RION:  Okay.  Well, just because

18  someone testifies doesn't mean they get to memorialize it in writing.  I mean, I

19  don't know if this is a paintball mask.  So, it's just --

20                              MRS. KOHLRIESER:  But, it's subject to

21  argument, I guess.

22                              MR. RION:  Right.

23                              MRS. KOHLRIESER:  For the jury to

1    decide.

2                            MR. RION:   Exactly.  So, all I'm asking is

3    that that top line be out and 'Warrington homicide' - those two phrases.  The

4    rest of it is fine.

5                            THE COURT:   Does the State object to

6    taking out this 'Carter in paintball mask' label?

7                            MRS. KOHLRIESER:   The bookmark?

8    Yea.  I think that's the way it was testified to.

9                            MR. RION:   It was created by the detective

10   and not by Mr. Carter.

11                           MRS. KOHLRIESER:  Yes.  Absolutely.

12                           THE COURT:   All right.  And the witness

13   testified.

14                           MRS. KOHLRIESER:  Yes.

15                           THE COURT:   I'm going to admit '147' over

16   objection as is.  If you guys agree to delete something, fine.  But, I'm

17   admitting it.

18                           MRS. KOHLRIESER:   I will take that last

19   part out.

20                           THE COURT:   All right.  So, the State is

21   saying they will delete 'Warrington homicide', that part out.  Okay.  Anything

22   else, Mr. Rion, up to '158'?

23                           MR. RION:   '151' is just a Google map.

1   Again, it wasn't provided in discovery.  It's meant just for demonstrative

2   purposes and not necessarily as substantive proof.

3                              THE COURT:  Any response from the

4   State?

5                              MRS. KOHLRIESER:  A couple of things.

6   Excuse me, your Honor.  Again, he's right - it was demonstrative evidence.

7   The State, at this time, would actually -- well, let me get it for you as I make

8   my request.  It's something that's readily ascertainable by the Court and we

9   would ask that you take judicial notice of the exhibit which is the downtown

10  area, albeit the marks have been made by Detective Clark.  That was testified

11  to.  So, we would ask that you take judicial notice of that as it's a readily

12  ascertainable fact by the Court.  But, beyond that, again, it's for demonstrative

13  purposes, again, to kind of put in context for the jury, you know, the locations

14  of everything and what's going on here and the area from the defendant's

15  home to the McKibben Street address.  That's what its purpose was.  It was

16  at least shown to Mr. Rion, I believe, the first day of trial.  Again, we showed

17  him that and the aerial map.  I believe Tony showed you that and the aerial

18  map.

19                              MR. MILLER:  I showed him that while we

20  were in trial.

21                              MRS. KOHLRIESER:  Okay.  I apologize.

22                              MR. MILLER:  Just a second.  The Google

23  map I showed while we were in trial.  The aerial map he was aware of well

1    before then.

2                              MR. RION:   Yea, I'm not objecting to the

3    aerial map.

4                              MRS. KOHLRIESER:   Anyhow, so, again,

5    he had the opportunity to review it and things like that and, again, it's for

6    demonstrative purposes just so, again, the jury can get some spacial sense

7    and that's why it's relevant.

8                              THE COURT:   Okay.  This one is a little

9    different than demonstrative evidence that was '139' in that I had found that at

10   least '139' didn't have the element of "surprise" because there had been

11   mention of a Mac-10 in prior discovery.  I know that Google maps are readily

12   available and the Google map in and of itself I don't think would give the

13   Court concern.  I think, well, quite honestly I think the concern is the markings

14   that the witness made.  It is a route from McKibben to Eureka Street.  It's not

15   the only route, obviously, on the map.  I'm going to sustain the objection on

16   '151' and say that that will not go to the jury.

17                             MRS. KOHLRIESER:   Okay.

18                             THE COURT:   Anything else?

19                             MR. RION:   Not on that list.

20                             THE COURT:   Okay.  So, now we got off of

21   the master list and there were additional exhibits that were identified and they

22   were '159' through '180'.  I've got those.  I hope you have them documented,

23   too.  Mr. Rion, do you have any objection to '159' to '180'?

1       MR. RION:   '159' through --

2       MRS. KOHLRIESER:   '159' through '162'

3  were photos that Detective Marik testified to.

4       MR. RION:   No objection.

5       THE COURT:   Okay.  And then '163'

6  through '167' are Mr. DeLong's exhibits.

7       MRS. KOHLRIESER:   '163' was Mr.

8  DeLong's C.V.

9       MR. RION:   No objection to '163' through

10  '170'.

11       THE COURT:   Okay.  All righty.  Then '172'

12  was a B.C.I. submission form?

13       MRS. KOHLRIESER:   We skipped '171', I

14  believe.

15       THE COURT:   Oh, I'm sorry.  '171' is in

16  there.  '171' is another B.C.I. report.

17       MR. RION:   I don't see it here.  Do you

18  know what it is?

19       MRS. KOHLRIESER:   It's Mr. Wharton's

20  report.

21       MR. RION:   I'd object.  He didn't testify.

22       MRS. KOHLRIESER:   Oh, yes.  I'm sorry,

23  your Honor.  I did mean to withdraw that one.  I'm sorry.

1       THE COURT:  Oh, '171' is withdrawn?

2       MRS. KOHLRIESER:  Yes.  I'm sorry.

3       THE COURT:  All right.  Thank you.  So,

4   we were at '170'.  So, we skip '171'.  That's being withdrawn.  Make sure it's

5   out of the stack of exhibits.  Plus, you know, I've got '151' here.  If you're

6   going to withdraw the exhibits then take them out.  '151' I'll keep as a Court

7   exhibit.

8       MRS. KOHLRIESER:  Yes.  Please.

9       THE COURT:  But, any one you're

10  withdrawing, take them out of the pile.  So, '172' to '180'.  Any objection, Mr.

11  Rion?

12      MR. RION:  The submission sheets.  I'll

13  just generally object.  They weren't testified to - provided by DeWine's office.

14  They're DeWine submission sheets.  I think there was testimony that Officers

15  Carman and others signed for and maybe received them or picked them up.

16  But, just a general objection.

17      THE COURT:  Okay.  Well, '172' will be

18  admitted over objection.  Exceptions noted.  Then we've got, I suppose, '173'

19  to '180' which involve the altercation.  There have been plenty of objections.

20  But, do you have, or, do you want to renew objections to '173' to '180'?

21      MR. RION:  Is '173' the video?

22      THE COURT:  Right.

23      MR. RION:  Yes.  Same arguments.

1         THE COURT:   I should note that I think

2 '174' was the one that I did not allow; wasn't it?

3         MR. RION:   No.  '174' is a picture.

4         MRS. KOHLRIESER:   '174' through '180'

5 are photographs.

6         THE COURT:   Okay.  Okay.  That's right.

7 '173' is the video in the holding room.  '174' through '180' are photographs.

8 You're objecting to those again, Mr. Rion?

9         MR. RION:   Yes, your Honor.

10        THE COURT:   Okay.  I'll admit those over

11 objection.  Reasons have been stated on the record.  I would just reiterate

12 those reasons.  So, I think that concludes that.  Are there any other exhibits

13 that were proffered for admission that I didn't cover or objections to any

14 exhibits that were proffered that we haven't covered?

15        MRS. KOHLRIESER:   Let me just

16 double-check, your Honor.  No.  I believe that's all from the State.

17        THE COURT:   And, again, for the record,

18 you've withdrawn '140', '145', '146', '149', and '171'; correct?

19        MRS. KOHLRIESER:   Yes, '171'.  There

20 was no testimony as to '181'.  That was not --

21        THE COURT:   Right.  There was never a

22 '181' that I marked.  Okay.  So, all those exhibits have been marked, or, have

23 been admitted.  Objections are noted.  One exhibit was not admitted that had

1       been proffered.  Anything else from the State in terms of evidence?

2                                    MR. MILLER:   No, sir.

3                                    THE COURT:   All right.  Does the State

4       rest?

5                                    MR. MILLER:   Yes, sir.

6                                    THE COURT:   The State has rested at

7       about five till eleven.  Does the defense have witnesses to present?

8                                    MR. RION:   We do, your Honor.

9                                    THE COURT:   Okay.  Here's my --

10                                   MR. RION:   I guess I should also make a

11      Rule 29 Motion at this time.

12                                   THE COURT:   Oh, okay.

13                                   MR. RION:   I'll just make a general Rule 29

14      Motion.

15                                   THE COURT:   Okay.  Does the State want

16      to counter just for the record?

17                                   MRS. KOHLRIESER:   Your Honor, I think

18      you know the Rule 29 better than the rest of us in the room.  But, certainly

19      there's been enough evidence established circumstantially that the elements

20      of the crime, both crimes, have been satisfied here - the defendant's identify;

21      the prior calculation and design with the stalking behavior; the stuff on the

22      table, in general those types of things; that he did have another weapon at

23      some point; the possibility of the Mac-10 and things of that nature; his

1    behavior; as well as the various representations about calling his wife and

2    things of that nature; his attempts to get an alibi. Again, among all of the

3    trial evidence, and not giving a closing argument here, your Honor, I think

4    there's sufficient evidence of each and every element for a jury to at least

5    consider.

6                            THE COURT:   Okay.  Well, the Court was

7    reviewing the indictment here just to make sure.  Upon review of that

8    indictment and then, again, the long line of cases regarding Criminal Rule 29,

9    obviously the evidence has to be construed in favor of the State at this point

10   in the case and the Court shall not order an entry of judgment of acquittal if

11   the evidence is such that reasonable minds could reach different conclusions

12   as to whether each material element of the crimes charged have been proven

13   beyond a reasonable doubt.  I find that the evidence is such that reasonable

14   minds could reach different conclusions, construing it in favor of the State.

15   So, the Motion for Acquittal under Criminal Rule 29 will be overruled.

16            All right.  So, we'll have defense evidence.  Here's the plan - to

17   continue, well, depending on how long your witnesses are, I'm kind of

18   shooting to go until noon and then break for lunch until, say, one o'clock, give

19   or take.  I mean, if it's a little after noon, we can go until one-fifteen and if it's a

20   little bit before noon and it's a logical break we'll work with that.  But, we'll

21   shoot for defense witnesses until the noon hour and then break for an hour or

22   so and then continue after lunch.  I believe, again, logistically we have made

23   the arrangements to have -- well, Mr. Rion indicated who his first witness

1  would be and so we've got that person, hopefully.  Let's just stand down here

2  for about five minutes so we can double-check and make sure that witness

3  that Mr. Rion wants to call is ready to go.  Then we'll get the jurors in here in

4  about five more minutes.  Okay?

5                                        MR. MILLER:  So, five minutes?

6                                        THE COURT:  Five minutes.

7  (WHEREUPON, COURT WAS IN RECESS.)

8

9                                        THE COURT:  Okay.  For the record, then,

10  we're reconvening --

11  COURT REPORTER:  Just a minute.  All right.

12                                        THE COURT:  All right.  Now, for the

13  record, we're reconvening in CR2014 0139 this 18th of September, 2015.

14  The case is State of Ohio -vs- Markelus Q. Carter.  The defendant is present.

15  The State is present.  The jurors have been returned to the Courtroom after

16  an extended leave.

17          Ladies and gentlemen of the jury, lest you think we are intentionally

18  trying to make you wait around a lot, we are not.  While we had the extended

19  recess for you we were in here working.  The State has indicated they have

20  no other witnesses to call.  So, I had to take up the issue of what exhibits

21  would be admitted for your consideration and what, if any, would not be

22  admitted for your consideration.  So, that took some time.  I've made the

23  decision.  I've admitted the exhibits that I've admitted.  The State has no other

1   witnesses.  They have rested.  They are done presenting their case.

2          Now, as I said at the beginning of this case, the defense has an

3   opportunity to present witnesses if he chooses to do so.  As we said from the

4   get-go, the defendant does not have the burden of proof.  The burden of proof

5   in this case is with the State of Ohio to prove that the defendant is guilty with

6   proof beyond a reasonable doubt.  The defendant has a constitutional right

7   not to present anything.  He can present witnesses and evidence if he wants

8   to, but he doesn't have to.  I understand that he does have some witnesses.

9   That's correct?

10                         MR. RION:  We do.

11                         THE COURT:  Okay.

12                         MR. RION:   The first witness would be

13  Thomas Smith, your Honor.

14                         THE COURT:  All right.  Thomas Smith?

15  WHEREUPON, called to appear as a witness in this proceeding was one:

16                         **T H O M A S   S M I T H**

17  who, having been duly sworn by the bailiff herein, testified as follows:

18                         THE COURT:  We're going to ask you, sir,

19  just to speak right into the microphone; okay?

20  A      Okay.

21  COURT REPORTER:  Are you going to ask him if he has an objection?

22                         THE COURT:  Oh, again, another thing,

23  you have the right whether you object to being photographed by the media, or

1    videotaped by the media.

2    A      I don't have any objection; no.

3                THE COURT:   Okay.  He has no objection.

4    All right.  Go ahead.

5    **DIRECT EXAMINATION**

6    **BY MR. RION:**

7    Q      Good morning, sir.

8    A      Hello.

9    Q      State your full name for the record.

10    A      Thomas David Smith.

11    Q      And how old are you?

12    A      I am thirty-one years old.

13    Q      And where are you currently incarcerated?

14    A      I am currently incarcerated at Allen Correctional Institution.

15    Q      Okay.  And for how many years have you been there?

16    A      I've been there for six years.

17    Q      And what are you there for?

18    A      I am incarcerated for an Aggravated Robbery, Felonious Assault with a

19    Weapon, and a Kidnapping charge.

20    Q      Okay.  Are you subject to any type of release coming up at any time?

21    A      As I know of right now, no.

22    Q      Okay.  I want to go -- well, but for those charges for which you're

23    serving a sentence now, do you have any other convictions, any other felony

1    convictions?

2    A      I have one, which is a fourth degree felony Burglary from back in 2005.

3    I was on probation at the time that I caught this case.  So, they took the

4    remaining time and put it with my sentence now.

5    Q      Okay.  You're at Allen Correctional Institution?

6    A      I am.

7    Q      And you've been actually at Allen for how long?

8    A      Actually at the jail?

9    Q      At the Allen Correctional Institution.

10   A      At the actual institution for six years.

11   Q      Were you there in 2011?

12   A      I was; yes.

13   Q      And when you were there, well, at some point were you the cellmate of

14   Markelus Carter?

15   A      Yes, I was.

16   Q      Approximately from when to when; if you can recall?

17   A      Approximately from August of 2010 to the third week of August of

18   2013.

19   Q      So, for two or three years?

20   A      Yes, sir.

21   Q      And how would you describe your -- did you get along okay with Mr.

22   Carter?

23   A      Yea.  Yes, we did.  We got along.

1 Q  While you were there did you also have a chance to come to know a

2 person by the name of Stephen Upham?

3 A  Yes, I have.  Yep.

4 Q  And how do you know Stephen Upham?

5 A  He was also an inmate in the same block at the same institution.

6 Q  And during the course of a day or a week would you have the

7 opportunity to speak with him from time to time as well?

8 A  Yes, sir.

9 Q  Was Mr. Upham concerned about the time that he was serving?

10 A  Yea.  He was always -- every day you'd talk to him he would be 'oh,

11 I've got ten years and nine months and two days left'.  I told him that wasn't

12 cool to do because it could actually, well, it could actually make you crazy a

13 little bit.  It could actually do something to your head a little bit when you dwell

14 on the time that you have.

15 Q  Okay.  I want to move forward to early February of 2014.  Did you have

16 at that time an opportunity to speak with Sergeant Smith?

17 A  I did; yes.

18 Q  And how did that conversation come about?

19 A  About eleven o'clock they have what they call an institutional count.

20 That's where every inmate is in their cell and they're accounted for, making

21 sure that they're all in the institution.  It starts at about ten forty-five and ends

22 at eleven-thirty.  At about eleven o'clock in the morning I was in my cell and

23 my door popped open and Sergeant Smith came to me and said, "I need to

1  speak with you in my office when count clears."  I said, "Okay."  He shut my

2  door.  When count cleared I went into his office and that's when he spoke

3  with me.

4  Q  And if you could move your chair just a little closer?  What's happening

5  is you're going in and out of the mic.

6  A  Oh, okay.

7  Q  So, if you could just keep your mouth close to it so that it picks up?

8  A  All right.

9  Q  So, he asked for you to go see him at his office?

10  A  He did; yes.

11  Q  And did you go?

12  A  I did.

13  Q  And did you have a conversation with him?

14  A  Yes, we had a conversation.

15  Q  Describe that conversation.

16  A  When I first walked into the office he asked me if I had -- he said, "How

17  much time do you have?"  I said, "Oh, about five or six years left."  He said,

18  "Well, do you qualify for judicial release at any time?"  I said, "Well, I just filed

19  and I got denied."  He said, "Oh."  I said, "So, what's going on?"  He said,

20  "Well," he said, "when you were here at the institution you were cellmates with

21  Carter; right?"  I said, "Well, yea."  He said, "Well," he said, "what kind of

22  things would you guys talk about?"  I said, "Well, all kinds of things."  I said,

23  "We were cellies for about three years."  He was like, "Well, you know, did he

1  ever mention anything like, you know, anybody that he might want to get

2  revenge on when he got out or, you know, any names specifically that, you

3  know, that come to mind?"  I said, "No."  He said, "What kind of things would

4  you talk about?"  I said, "Well, we talked about all kinds of things - family and,

5  you know, places we've been, and people that, you know, we'd like to meet

6  later on, like celebrities.  You know, we talked about movies, and comic books

7  and, you know, all kinds of things."  He said, "Did he ever mention anything

8  about, you know, any previous crimes that he might have known about or,

9  you know, been involved with?"  I said, "No."  He said, "He never mentioned

10  any woman by name or anything like that?"  I said, "No."  I said, "What is this

11  all about?"  He said, "Well," he said, "I'm going to get to that."  He said, "I'm

12  just asking you right now if you might know anything that might be able to

13  help the prosecution later on because of something that's going on with him."

14  I said, "Well, I don't know anything that's going on as far as what you're

15  talking about."  At that time he said, he said, "Well, you know, it could be

16  beneficial later on to you."  I said, "I understand that."  I said, "But, I still don't

17  know anything."  He said, "All right."  He said, "Well, if you can think of

18  anything later on, please let me know.  You know, just kind of come into my

19  office and let me know, you know, if you have anything."  I said, "All right,

20  that's fine."  He said, "If anybody asks why you were in here, just tell them

21  that we were talking about a ticket or something and I threw it out."  I said, "All

22  right; that's fine."  He said, "All right."  I said, "Okay," and then I left the office

23  at that time.

1  Q      Did he -- did you then -- when you left the office did you have the

2  opportunity to see any individuals?

3  A      I did; yea.

4  Q      Who did you see?

5  A      I happened to see Steve Upham.

6  Q      Okay.  And when you saw Stephen Upham did you have a

7  conversation with him?

8  A      I did; yes.

9  Q      And what was the gist of that conversation?

10 A      Well, when I came out of the office he was the only person in the day

11 room, which is a room that the inmates get to be in from certain periods of

12 time to either play cards or to socialize.  At the time he was the only person in

13 the day room because they happened to have just called a meal time.  When

14 I came out of the office he was sitting at the table that was right in front of the

15 Sergeant's office.  When I came out I had to pass him to get to my cell to grab

16 my radio and my coat to go to work instead of chow.  He said, "Hey," and he

17 motioned me over.  I came over and I said, "What's going on?"  He was like,

18 "What was that all about?"  I said, "What?"  He said, "In there."  He said, "I

19 know you don't get into no trouble so what was that all about?"  I said, "Oh," I

20 said, "he was just asking me about something about Carter, about some

21 murder case that's, you know, being investigated."  He was like, "Oh, for

22 real?"  I said, "Yea."  He said, "Well, what did you say?"  I said, "I told him I

23 didn't know anything."  He was like, "About the case?"  I was like, "Yea, I don't

1    know anything about nothing."  He was like, "Well, what all did the Sarge ask

2    you?"  I was like, I said, "He was just asking me if I knew any people or

3    anything like that."  I said, "But, I didn't know anything personally about the

4    case at all."  I said, "He even went as far as to probably say that I could

5    probably get time knocked off if I knew anything - it could be beneficial."  He

6    goes, "Oh, man, I would have said anything, told him anything if it would

7    make time knocked off."  I said, "What?"  He said, "Yea, man, you've got to do

8    what you've got to do."

9                               MRS. KOHLRIESER:  Objection.  Hearsay,

10   your Honor.

11                              THE COURT:  I'm going to overrule it.  It's

12   not offered to prove the truth of what was said.

13                              MRS. KOHLRIESER:  Yes, it is.

14                              MR. RION:  Actually, it was specifically

15   asked to --

16                              THE COURT:  Okay.  So, then why isn't it

17   hearsay?

18                              MR. RION:  Because it's impeachment of

19   Mr. Upham.  It was specifically asked of Mr. Upham.

20                              THE COURT:  Okay.  I'll overrule the

21   objection.

22   A       After I was told that I said, "That's pretty messed up," and I went to my

23   cell, or, back to my cell and grabbed by I.D. and made sure I had everything

1    that I needed and then I left to go to work.

2    Q      Okay.  Over the next couple of weeks did you and Stephen Upham

3    have any conversations about this murder investigation?

4    A      Yes, we did.

5    Q      What kind of things was Mr. -- did Mr. Upham ask you any questions?

6    A      Yes.

7    Q      What kind of questions was he asking you?

8    A      He was asking me questions if there was a specific weapon that was

9    found from another case with Mr. Carter, well, if it was the same weapon that

10   could have been used, and if he had done it where would he have hid it, or if

11   he would have gotten rid of it.  He asked me specifically about certain places,

12   like around here.  Like, he asked me if there was anything like lakes or

13   anything like that that the gun could be tossed into.  He would ask questions

14   like, 'hey, didn't he know the guy that was shot'.  It was questions like that.

15   Q      And what kind of answers would you give him?

16   A      I would tell him that I didn't know the area.  I told him, "I don't know this

17   area.  I'm not from here.  I don't know where anything's at."  I said, "I don't

18   know if he knew the dude or not."  I said, "As far as I know, there's nothing to

19   be known."

20   Q      Was there a time that Stephen Upham stopped asking questions?

21   A      It was right about the time where he had told me and another person

22   that --

23                                       MRS. KOHLRIESER:   Objection.  Hearsay

1   unless it goes directly to some question he answered.

2                           THE COURT:  Overruled.  Go ahead.

3   A       He had told me and another person that Allen County detectives had

4   come to talk to him about a case that happened in Lucas County that involved

5   a firearm that he personally owned.

6   Q       Okay.  We don't need to go into that.  That's unrelated.  At some point

7   he told you he was in contact with detectives?

8   A       Yes.

9   Q       He said it didn't have to do with this case - it had to do with another

10  case?

11  A       Yes.

12  Q       And after that did you have any other conversations with him about the

13  murder investigation dealing with Markelus Carter?

14  A       After that?  No.

15  Q       During the time that you -- how many years, or, the time period,

16  roughly speaking, were you in custody with Stephen Upham?

17  A       I believe it was from 2012 up until around March of 2014.

18  Q       And did Mr. Upham have a reputation as it relates to his honesty and

19  trustworthiness?

20  A       Yea.  He --

21  Q       And do you know what that reputation is?

22  A       Yes.  Very untrustworthy.  He lies.  He'll say stuff for shock value.  The

23  things that he says are far-fetched and so you don't believe half of what he

1    says anyway.

2                              MR. RION:   Nothing further.  Thank you.

3                              THE COURT:   Any cross examination?

4                              MRS. KOHLRIESER:   Just briefly, your

5    Honor.

6                        **CROSS EXAMINATION**

7    **BY MRS. KOHLRIESER:**

8    Q      Good morning, Mr. Smith.

9    A      Good morning.

10   Q      How are you?  I understand that Mr. Rion asked you a few questions

11   about your conversations with Stephen Upham; correct?

12   A      Yea.

13   Q      And, in fact, when he asked you about a lake, or he would ask you

14   about a weapon, or things like that, you specifically told him that you didn't

15   know any information; correct?

16   A      Right.

17   Q      And you talked about your discussions with Sergeant Smith and I

18   believe you testified that he asked you various questions about your

19   relationship with Mr. Carter?

20   A      Yes.

21   Q      Okay.  He asked you to, I guess, describe his personality and things of

22   that nature?

23   A      Yea.

1   Q      And he asked you also about talking anything to him about prior to his

2   incarceration, anything he might have done prior to his incarceration?

3   A      Right.  Yes.

4   Q      And he also asked you specifically about the weapons charge that he

5   was in on; correct?

6   A      Yes.

7   Q      And you told Sergeant Smith that Markelus Carter had told you that he

8   had been falsely charged with weapons; correct?

9   A      Yes.  Weapons Under Disability, I believe; yes.

10   Q      Okay.  And you also told Sergeant Smith that Mr. Carter said those

11   were his mother's weapons in the house; correct?

12   A      Yes.

13   Q      And you also mentioned that Mr. Carter often blamed others for what

14   had happened to him, or his actions; correct?

15   A      I'm sorry?  I don't understand.

16   Q      You told Sergeant Smith that Mr. Carter always said things weren't his

17   fault and blamed everyone for everything; correct?

18   A      About the weapons charge; yes.

19   Q      You also specifically told him that he blames others for his actions and

20   nothing was ever, nothing was ever his fault?

21   A      No.

22   Q      You did not tell Sergeant Smith that?

23   A      No, I didn't.

1    Q       And then I believe you testified that Sergeant Smith, when you left that

2    day, told you not to talk about this with anybody and if anybody asked you just

3    tell them it was a ticket and he was going to throw it away; correct?

4    A       Correct.

5    Q       And you still discussed that with at least Steve Upham; correct?

6    A       Yea.

7                            MRS. KOHLRIESER:   Just a moment, your

8    Honor.

9    (WHEREUPON, Court went off the record briefly.)

10   Q       Lastly, are you aware -- I'll ask you, Mr. Smith, you're aware that

11   various members of Mr. Carter's family actually works at A.C.I.; correct?

12   A       I do not.

13   Q       You don't know that?  Okay.  Fair enough.  Thank you.

14                           MRS. KOHLRIESER:   Nothing further.

15                           THE COURT:   Any redirect?

16                        **<u>REDIRECT EXAMINATION</u>**

17   **BY MR. RION:**

18   Q       Sir, as it relates to this issue with the weapon, were there discussions

19   about the legal distinction about who owns the weapon and who possesses a

20   weapon?

21   A       At the time that I talked with Mr. Smith I had offered the information

22   and I had said when a search warrant was used and a gun was found at Mr.

23   Carter's home it was registered to his mother and it was in a place that he

1    had access to.

2    Q    So, you explained that part of the case?  So, the question related to

3    Mr. Carter's thoughts about it, and who owned it as compared to who

4    actually possessed it; correct?

5    A    Yea.

6    Q    That was the issue?

7    A    Right.

8                 MR. RION:   Nothing further.  Thank you.

9                 THE COURT:  Any recross?

10                MRS. KOHLRIESER:   No, your Honor.

11                THE COURT:   Okay.  You're done.  Okay?

12    Next witness for the defense?

13                MR. RION:   Mr. Bari.

14                THE COURT:   Okay.  Mr. Rion, when you

15    get him to give his name could you have it spelled for the record?

16                MR. RION:   The first name is Abdul,

17    A-B-D-U-L and the last name is Bari, and I believe that's how you pronounce

18    it, and it's B-A-R-I.

19                THE COURT:   Okay.

20    WHEREUPON, called to appear as a witness in this proceeding was one:

21                **A B D U L   B A R I**

22    who, having been duly sworn by the bailiff herein, testified as follows:

23                THE COURT:   Sir, do you have any

1 objection to being photographed by the media?

2 A     I don't care; no.

3                              THE COURT:   Okay.  Go ahead.

4                          **DIRECT EXAMINATION**

5 **BY MR. RION:**

6 Q     Could you state your full name, please?

7 A     Abdul Bari.

8 Q     And spell your last.

9 A     It's A-B-D-U-L  B-A-R-I.

10 Q     Okay.  Sir, how old are you?

11 A     Forty-eight.

12 Q     And where are you currently incarcerated?

13 A     Allen/Oakwood Correctional Center.

14 Q     How long have you been there?

15 A     Since 2010.

16 Q     And what are you in prison for?

17 A     Two counts of Aggravated Robbery.

18 Q     And in your past do you have multiple Robbery convictions?

19 A     Yes.

20 Q     Do you have a Weapons Under Disability conviction and an Escape

21 conviction?

22 A     Yes.

23 Q     Other than that, does that, to the best of your knowledge, sum up your

1    felony convictions?

2    A     Yes.

3    Q     When you were at Allen -- well, you said Allen/Oakwood.  Are those

4    two different institutions or the same institution?

5    A     They're two different facilities they brought together under one

6    administration and so they call it Allen/Oakwood.  But, I'm in the Allen

7    Correctional Facility part of it.  It's a different prison.

8    Q     If you wouldn't mind just pushing the mic. up just so it can pick you up?

9    I think they're recording this and it's got to be recorded.

10   A     Okay.

11   Q     When you were there did you ever come to know a person by the

12   name of Stephen Upham?

13   A     Yes.

14   Q     And how did you know him?

15   A     When he first came in there, well, at that time I had what was called a

16   store, which is like you loan things out - two soups for three back type of

17   situation.  He wanted to come and he wanted to get stuff to eat and I would

18   loan him stuff.

19   Q     Okay.  My sense is that probably none of these jurors have, maybe

20   one, but the majority of these jurors have probably very little understanding of

21   how things work at the institution.  When you say you had a store, that

22   wouldn't be allowed by the rules; correct?

23   A     No, it's not.  It's not a legal activity.  I mean, it's not something the

1    administration condones and if they catch you doing that they'll put you in the

2    hole.  He lived in the same cellblock as I did and when he came in there if

3    someone needed something, if someone wants candy, cookies, coffee,

4    whatever, at that time - I don't do that now - but, at that time if they wanted

5    something they could come to me and they could say 'I want a bag of chips',

6    or 'two bags of chips' and I'd go to commissary and I'd get them the stuff and

7    then they would pay me back with like one extra on top of that.

8    Q       At a later time?

9    A       Yea, when they went to the commissary.

10   Q       And did you ever have anything that would relate to -- was there cash

11   in the institution at all?

12   A       No.  It was just commissary.

13   Q       Just commissary?

14   A       Yea.

15   Q       So, you're just trading items?  It's a bartering system in a strange way?

16   A       Basically.

17   Q       Okay.  And did Mr. Upham have any contact with you as it related to

18   that store?

19   A       Well, yea.  At first he was just like, I would say, shopping or he would

20   just come and get stuff.  Once he moved from a four man cell, which is a

21   temporary intake cell, to a regular cell he moved into the cell where I had

22   like - let me explain it like this - I had like four/five cells at that time with stuff in

23   it.  You didn't keep all the stuff in your cell because if they shake you down

1    they'll take it.  It's hundreds of dollars worth of commissary.  So, it was a huge

2    amount of stuff.  So, one of the cells that I used to run the store out of he

3    moved into that cell.  The older gentleman that I had do that activity he left

4    and went home.  So, Upham asked me if he could, you know, can he do that

5    because he needed money.  I told him I didn't have a problem with him doing

6    that if I wasn't around and somebody needed something I'd tell them to come

7    to him, or, I mean, they could go to him and get it.

8    Q    So, you had, well, not just a casual relationship with him as far as 'hey,

9    Upham, how are you doing', but you actually had what's called a business

10   relationship with him for a period of time?

11   A    I would say, yea.  I lived in cell one oh six and he lived in cell one oh

12   eight.  It was like a corner cell where I lived and he was right, like, my next

13   door neighbor.  So, I had things with him everyday for a period of probably a

14   year or two.

15   Q    Okay.  Was there a time that you were with him when you were

16   watching a T.V. show on PBS or something?

17   A    Yea.  In relation to -- he would always come to my cell and ask me to

18   do legal work for him and things like that, help him, ask him legal questions,

19   just tell me stupid stories and all kinds of stuff like that.  So, we would be in

20   the cell and sometimes there would be T.V. shows and we would watch a

21   T.V. show.  They had a T.V. show and it was on PBS and I can't remember if

22   it was the news, Sixty Minutes, Twenty/Twenty, but it was some show where

23   they had an agency that federal prisoners were using for three hundred

1   dollars or four hundred dollars and you could get an information packet about

2   criminal activity.  So, if I had an outstanding Burglary you could pay these

3   people three hundred dollars and they would get you police reports, the

4   newspaper clippings, and everything like that.  People would use that

5   information and so they could bust them and they get out of prison.  I know

6   the jurors are not criminals or anything.  I'm a criminal.  I'm in prison.  So, I

7   have the convict type of ethic.  So, I feel that's like a real immoral behavior.

8   He didn't.  I mean, I was kind of shocked at that.  I told him that's pretty low

9   life.  He was like he'd do anything to get out of prison.  He just couldn't stand

10  it.

11  Q      What did he say?

12  A      He said that he would do anything to get out of prison.  He couldn't

13  stand being in prison.

14  Q      During the time that you were with him did you have conversations with

15  him about the concept of judicial release?

16  A      Not so much judicial release, but his prison, or, his case.  I was

17  intimately familiar with his case.  When he first came to prison he asked, or,

18  he told me that --

19  Q      Well, I don't want -- you're not -- I don't want you to go into the facts of

20  his case.

21  A      Okay.  Yea.  Well, he didn't really discuss, he didn't discuss judicial

22  release, but he was trying to figure out ways to get out of there, to get back

23  and beat his case through the Court system.

1   Q      Now, did Stephen Upham -- well, did you know Markelus Carter as

2   well?

3   A      Yes.

4   Q      Were you able to watch or know the relationship, if there was one, --

5   well, how would you describe the relationship between Markelus Carter and

6   Stephen Upham?

7   A      Well, there was a gentleman, Tommy Smith, I believe he's either

8   testified or will testify here, I don't know if he's came in, but he had some of

9   my stuff in his cell.  That was one of the cells that I used to store excess

10  commissary.  Mr. Upham would have to go over there to get, well, like if he

11  runs out of Debbie's he would have to go get some Debbie's from the cell,

12  and Mr. Carter lived in that cell and he would complain to me, 'don't send this

13  guy over to my cell'.  I'd tell him, "Your cellie lives there, too.  It's his cell."  He

14  didn't like him at all.  If Mr. Carter wanted something and I was gone he

15  knows to get it from Mr. Upham.  Well, he wouldn't do that.  He didn't like him

16  and he was like a stumble bum idiot and he didn't want to have nothing to do

17  with him.  He wouldn't even talk to him.

18  Q      Okay.  Now, did you relate -- at some point and time did Stephen

19  Upham stop being in charge, or, assist you with running your store?

20  A      Yea.  Basically I had to fire him, sort of say.

21  Q      And I don't want to get into specific acts, but let me just ask it this way -

22  do you know other people that know Stephen Upham?

23  A      Yes.

1   Q        And do you know at that time what his reputation was for being honest

2   and trustworthy?

3   A        We call him Stupid Steve in prison - everybody to his face.  He's just a

4   stumble bum and he was a liar and a gossip.  He would make things up just

5   for conversation.  If something happened in the yard he would come back in

6   and make up this huge elaborate story.  We would ask him why.  You know,

7   what happened?  Why are you doing that?  There is nothing that man would

8   say that I would take as reliable.  Even in a criminal sense, I'm not going to lie

9   and I value my word, but that man had no concept of being honest at all.

10  Q        And was that -- well, forget about this case and him coming in here, but

11  was that his reputation in the institution?

12  A        Any individual that knows that man or has any dealings with him in the

13  prison system, that's his reputation.

14  Q        Okay.

15                                    MR. RION:   Nothing further.

16                                    THE COURT:   Any cross examination?

17                                    MRS. KOHLRIESER:   Just a moment.

18                              **CROSS EXAMINATION**

19  **BY MRS. KOHLRIESER:**

20  Q        Is it Mr. Bari?

21  A        Yes.

22  Q        You testified that you got to know Stephen Upham through, well, first

23  as a customer, so to speak, at your store?

1635

1  A      Yea.

2  Q      Okay.  And then do you know approximately how long it was after he

3  became a customer that he became, and I'm just going to use business

4  terms, an employee of yours?

5  A      It probably would have been three or four months.

6  Q      Three or four months?  Okay.  I guess if you're the manager he would

7  be like the assistant manager?

8  A      The way it worked was if I was around and somebody wanted

9  something I would tell them to go see Steve.  I didn't want to have to go write

10  this down.  They'd see Steve and he would be playing cards or whatever he

11  was doing in the block and he would go in the cell and get the stuff and he

12  would give it to them and write it down.

13  Q      Okay.  So, he was more like a clerk?

14  A      Yea, you could sort of say that.

15  Q      Okay.  If you were talking about like a gas station, well, he would be

16  the one at the cash register and you would be the one telling him what hours

17  to work?

18  A      Sort of the same.

19  Q      All right.  Now, you said he also was asking you legal questions and

20  things like that?  Yes?  He was asking you about his case?

21  A      He wanted me to help him with his case.  He had his brief and he was

22  very dissatisfied with his brief.  He felt his lawyer basically filed a boiler plate

23  brief, a one issue brief.

1    Q      Okay.  Let me stop you there.  When you talk about a brief are you

2    talking about if someone loses at a trial that they can appeal that conviction?

3    A      Yes.

4    Q      Okay.  And a brief is a legal document they make to argue to the Court

5    their position; correct?

6    A      Yes.

7    Q      Okay.  So, he was asking you for help on his appeal?

8    A      Yes.

9    Q      Okay.  Did you also know an inmate by the name of Kenneth Vicks,

10   also known as LaTief?

11   A      Yes.  That's really how I knew Mr. Carter because he would be --

12   usually when I would go to Mr. Vicks' cell, I know Mr. Vicks and I have a good

13   rapport with Mr. Vicks, and when I would go to Mr. Vicks' cell Mr. Carter

14   would usually be there and they would be talking and that's how I met Mr.

15   Carter.

16   Q      And Mr. Carter was also a customer of yours, so to speak?

17   A      Sometimes; yes.

18   Q      Okay.  And were you transferred here from the prison with Thomas

19   Smith?

20   A      Yes.

21   Q      Were you transported with other inmates as well?

22   A      We had like five guys, I believe, that came.

23   Q      Did that include Kenneth Vicks?

1  A    He's here, yes, as well.

2  Q    Okay.  And Steven Savage?

3  A    Steven Savage?  Yes.

4  Q    Okay.  And do you remember the other individual?  You named

5  Thomas Smith, Kenneth Vicks, Steven Savage, and --

6  A    Cunningham.

7  Q    Vincent Cunningham?

8  A    I don't know his first name.  Just Cunningham.

9  Q    Cunningham.  Okay.

10  A    He goes by a different name in prison.

11  Q    Okay.  Fair enough.  Did they also -- well, you said you don't run the

12  store anymore; correct?

13  A    No.  I haven't done that for about a year.

14  Q    Okay.  Were they previous customers of yours?

15  A    Mr. Vicks had his own little operation.  He wasn't a customer.

16  Cunningham - by the time he moved in the cell with Mr. Upham I had pretty

17  much stopped doing that activity.  I had pretty much stopped doing the store.

18  Q    Okay.  And are you all housed fairly, well, I guess, in the same block?

19  I don't know the language in prison.

20  A    All the individuals you mentioned, we still live in the same general

21  housing.  It's a block like, big building.  We all live in the same cellblock.

22  Q    All right.

23                              MRS. KOHLRIESER:   Just a moment.

1    THE COURT:   Okay.

2    (WHEREUPON, Court went off the record briefly.)

3    MRS. KOHLRIESER:   Nothing further.

4    Thank you.

5    THE COURT:   Any redirect?

6    MR. RION:   No, your Honor.

7    THE COURT:   Okay.  Mr. Bari, you're

8    excused.  Do you need a moment?  Who's the next witness?

9    MR. RION:   Mr. Cunningham.

10   THE COURT:   Okay.  The deputies have

11   indicated they're going to need a few minutes for the logistics.

12   MR. RION:   Would it make sense to break

13   for lunch and just come back early?

14   THE COURT:   Well, I would like to maybe

15   see if we can get one more since they've already set in motion the wheels to

16   get the next witness here.

17   MR. RION:   Mr. Scott is the next one, if

18   they want to bring both.

19   THE COURT:   Well, we'll see how long Mr.

20   Cunningham would take.  I think it's just a matter of going into the hallway.

21   Instead of a full-fledged break, if you want to stand and stretch while they're

22   transferring people, now would be a good opportunity.  Are you still

23   recording?

1   COURT REPORTER:  Uh-huh.

2                 THE COURT:  Everybody, we're still

3   recording.  So, keep it down to a church whisper, I guess they say.

4   WHEREUPON, called to appear as a witness in this proceeding was one:

5             **V I N C E N T   C U N N I N G H A M**

6   who, having been duly sworn by the bailiff herein, testified as follows:

7                 THE COURT:  Sir, do you have any

8   objection to being photographed by the media at all?

9   A     No, I do not.

10               THE COURT:  Okay.  Mr. Rion?

11               MR. RION:  Thank you, your Honor.

12              **DIRECT EXAMINATION**

13   **BY MR. RION:**

14   Q     Good morning, sir.

15   A     How are you doing?

16   Q     Please state your full name for the record.

17   A     Vincent Cunningham.

18   COURT REPORTER:  I didn't get that.

19   Q     And if you would just pull the mic. down a little bit?

20              THE COURT:  Sir, we're recording it, so

21   you need to make sure you speak right into the mic.

22   A     All right.

23   Q     Your name, please?

| | | |
|---|---|---|
| 1 | A | Vincent Cunningham. |
| 2 | Q | C-U-N-N-I-N-G-H-A-M? |
| 3 | A | Correct. |
| 4 | Q | How old are you? |
| 5 | A | I'm forty-four. |
| 6 | Q | And what are you in prison for? |
| 7 | A | Possession of heroin. |
| 8 | Q | And are you serving a four year sentence on that? |
| 9 | A | Yes.  I have like four months left before I go home. |
| 10 | Q | And prior to that did you also serve an extended period of time on a |
| 11 | | Rape case? |
| 12 | A | Correct about that, too. |
| 13 | Q | And were you released in 2005 on that? |
| 14 | A | Yes. |
| 15 | Q | At some point were you -- are you at A.C.I. now? |
| 16 | A | Yes, I am. |
| 17 | Q | And for how long have you been at Allen Correctional Institute? |
| 18 | A | Almost two years. |
| 19 | Q | So, approximately in 2013/2014 you went to A.C.I.? |
| 20 | A | Yes. |
| 21 | Q | Okay.  And were you somewhere else before that? |
| 22 | A | I was in Pickaway. |
| 23 | Q | Pickaway?  Okay.  And when you came to A.C.I. did you have a |

1    cellmate?

2    A       Yes, I did.

3    Q       And who was that cellmate?

4    A       Actually when I came to A.C.I. I was in a four man cell at first.

5    Q       Okay.  When you first -- well, how do you go from a four man cell to a

6    two man cell?

7    A       Actually, you got to have -- well, when a cell comes open, if it's your

8    time, if it's your time to get into a cell they'll put you in a two man cell.  You go

9    to a four man first and then a two man.

10   Q       And when you were put into a two man cell who were you put in the

11   cell with?

12   A       With Steve.

13   Q       Steve who?

14   A       I forget his last name.  I don't know his last name.  Steve.

15   Q       Let me show you a picture of him.

16   A       Yea.  I don't know his last name.

17   Q       Just so we make sure we're talking about the same guy.  If I tell you it's

18   Steve Upham, does that sound --

19   A       That's his name.  That's his name.

20   Q       I'll show you Defense (sic) exhibit '174'.

21                                        MRS. KOHLRIESER:   State's exhibit?

22   Q       State's exhibit '174'.

23   A       Yea, that's that dude.

1   Q       And how long were you his cellmate?

2   A       About three months before they came and got him up out of there.

3   Q       When you were in the cell with him did he ever receive -- did you ever

4   see any documents, like a newspaper article or something else?

5   A       Yes.

6   Q       What kind of case, if you know, did that document -- tell the jury what

7   you saw.

8   A       Actually it said a murder case. It was a murder case. I forget the

9   name of the man because I never seen the man. I know who he is, but I don't

10  know his name. It was a murder case for -- I don't know his name. I don't

11  know the dude's name.

12  Q       Did you even ever know what the name was of the person --

13  A       I never knew until, until recently, after Steve got locked up and then

14  Bari was telling me about how the dude was.

15                                  MRS. KOHLRIESER:   Objection. Hearsay.

16                                  THE COURT:   I'll sustain that objection.

17  Q       The question is simply what you saw in the cell there. Did you see Mr.

18  Upham with any documents?

19  A       Yes, I did.

20  Q       And did it have to do with a murder case?

21  A       Yes.

22  Q       At the time that you saw them did you know which murder case it dealt

23  with?

1  A    No, I did not.

2  Q    In fact, today, but for what other people have told you, do you know

3  what murder case he's talking about?

4  A    No, I did not.

5  Q    Did he receive letters from anybody else?

6  A    No, not that I know of.

7  Q    Did he receive anything from his mother?

8  A    He received a lot of stuff from his mother 'cause that's the only person

9  that he relied on to do anything for him.

10  Q    Okay.

11                          MR. RION:   Nothing else.  Thank you.

12                          THE COURT:   Any cross examination?

13                          MRS. KOHLRIESER:   Just one, or, a

14  couple of quick questions.

15                          **CROSS EXAMINATION**

16  **BY MRS. KOHLRIESER:**

17  Q    Mr. Cunningham, is there another name you go by in the institution?

18  A    I go by Ishmael.

19  Q    Ishmael?

20  A    My Muslim name.

21  Q    Okay.  So, if another inmate were to refer to you as Ishmael they would

22  be talking about you?

23  A    Yes, they'd be talking about me.

1     Q      Did you still keep your last name, or did you change that, too?

2     A      No, I still keep it.

3     Q      Okay.  And you said it's been about two years that you've been in

4 A.C.I.?

5     A      Yea; correct.

6     Q      And it was a period of about three months that Stephen Upham, the

7 man that we showed you the photograph of, or, Mr. Rion showed you the

8 picture of, --

9     A      Correct.

10     Q      -- was your cellmate?  Do you remember, and Mr. Rion called it a

11 document, but was it actually a newspaper clipping of some sort?

12     A      Actually it was a newspaper clipping.

13                    MRS. KOHLRIESER:   Nothing further.

14 Thank you.

15                    THE COURT:   Any redirect?

16                    MR. RION:  No.

17                    THE COURT:   All right.  Sir, you're done.

18 We're going to take a lunch break.  I know you might have another witness,

19 but logistically it'll take more time.  So, we're just going to go ahead and have

20 our noon recess now.  We'll continue with the defense portion of the case

21 after lunch.  It's about ten till twelve.  I'm just going to try to make sure I catch

22 everything and we'll have lunch until twelve-fifteen.  That gives everybody

23 plenty of time.

1    Remember the admonitions, ladies and gentlemen.

2                          MR. MILLER:   Twelve-fifteen?

3                          THE COURT:   I'm sorry.  One-fifteen.

4    One-fifteen.  I'm looking up there.  One-fifteen.  That would be a quick lunch.

5    No.  One-fifteen.  I apologize.  One-fifteen.

6           Remember the admonitions.  Don't discuss the case among

7    yourselves or with anyone else.  Don't pay attention to any media accounts.

8    Don't do any independent investigation.  Don't express or formulate any

9    opinions.

10          We'll see you at one-fifteen.  Okay?  We're in recess.

11   (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

12

13                          THE COURT:   Okay.  We're on the record.

14   We're reconvening in Case Number CR2014 0139, State of Ohio -vs-

15   Markelus Q. Carter.  The defendant is present with counsel.  The State is

16   present.  The jurors have returned from the noon recess.

17          Ladies and gentlemen of the jury, I'm going to ask for your further

18   patience.  Shelly, who was substituting as the bailiff, got ill over the noon hour

19   and so she went home ill and so we are short-handed.  Monica will be busy

20   with the recording equipment and other things with respect to exhibits and

21   such.  We're going to try -- she, like I said, knows how to do everything

22   regarding, well, whether it's Court Reporter or bailiff, but we're going to kind of

23   leave you on your own a little bit to make it to, and I think you know your way

1   now, to the jury room and so that shouldn't be a problem.  But, she'll still be

2   bailiff in terms of if there's any concerns you have you can communicate with

3   her.  Shelly just couldn't go on.  So, that leads me to my question - is

4   everybody feeling okay?  Okay.  All right.  I will swear in witnesses.  That

5   doesn't make it any better or worse if a bailiff does it or the Court.  We'll do

6   that because Monica has to keep track of the recording device.

7           So, we'll continue with the defense evidence.  The defense may call

8   their next witness.

9                                   MR. RION:   Chaston Scott will be our next

10  witness.

11                                  THE COURT:   And I think if we hear a door

12  that --

13                                  MR. RION:   Do you want me to go back

14  there, your Honor?

15                                  THE COURT:   Well, they were right there.

16  They were going to go get him right away.  I said to have him here at

17  one-fifteen.  I don't know if they've got him in the hallway.

18  WHEREUPON, called to appear as a witness in this proceeding was one:

19                       **C H A S T O N   S C O T T**

20  who, having been duly sworn by the Court herein, testified as follows:

21                                  THE COURT:   I'm going to ask you to sit

22  down there and speak right into the microphone.  I also want to ask you if you

23  have any objection to being photographed or videotaped by the media that

1    might be in here.

2    A       Yea, I don't want to do that.

3                            THE COURT:   Okay.  So, this -- I don't

4    see them here now and so maybe you lucked out.  But, if they show up I'll

5    make sure that your right, if you don't want to be videotaped, you don't have

6    to be.  They're not in here right now.  But, that's a matter of record.  If they

7    show up I may interrupt and tell them not to videotape you.  Okay?  All right.

8    Go ahead.

9                            **DIRECT EXAMINATION**

10   **BY MR. RION:**

11   Q       Sir, could you state your full name for the record, please?

12   A       Chaston Martell Scott.

13   COURT REPORTER:   Could he spell that, please?

14   Q       Could you spell your name, please?

15   A       C-H-A-S-T-O-N.

16   Q       Middle name?

17   A       M-A-R-T-E-L-L.

18   Q       And your last name?

19   A       S-C-O-T-T.

20   Q       And where are you being housed right now?

21   A       I'm in Mansfield Correctional.

22   Q       So, you're not in Allen Correctional now?

23   A       No.  I was transferred.

1   Q      Was there a time when you were in Allen Correctional?

2   A      Yes, sir.  I went to Allen Correctional about the end of 2009 and all the

3   way to 2014.

4   Q      And are you getting close to the end of your sentence?

5   A      Yes.  I have a little bit over a year left.  I had a twelve year sentence

6   and I've done about eleven of it.

7   Q      And what were you convicted of that got you a twelve year sentence?

8   A      Two Aggravated Robberies and a Felonious Assault.

9   Q      Okay.  Now, do you know a person by the name of Stephen Upham?

10  A      Yes, sir.  He was my cellie for almost a year at Allen.

11  Q      Okay.

12                        THE COURT:  Excuse me.  I think I heard

13  a ring tone or something.  If there's a cell phone in the Courtroom it's got to

14  be turned off.  So, make sure all cell phones are off.  I thought I heard one.

15  I'm sorry.  Go ahead.

16  Q      Where are you from?

17  A      Fremont, Ohio and I caught my case in Toledo.

18  Q      In Toledo?  Okay.

19                        THE COURT:  Okay.  One more time.  I'm

20  sorry, Mr. Rion.  I noticed the media arrived.

21                        MR. RION:  It's fine.

22                        THE COURT:  This witness doesn't want to

23  be photographed; okay?  Again, I'm sorry.  Okay.  Go ahead.

1     Q      And do you know Mr. Upham from anything in Toledo or just from Allen

2   Correctional?

3     A      Yea, I didn't meet him until I became his cellie in Allen.

4     Q      Okay.  You said for how long you were his cellie?

5     A      Close to a year.

6     Q      I wanted to ask you about just one conversation you had with him

7   during that year period.  Did you have a conversation with him about -- did he

8   ever tell you about something he was trying to do to get himself out of prison?

9     A      Yea.  Well, he didn't tell me.  He told me that an inmate was telling on

10   him, basically, in the county.  So I could find that inmate, and be like, "Hey,

11   man, Steve's saying you're a snitch."  He was like, "No."  So, they went and

12   talked to each other in the cell while I was in there and the inmate informed

13   Steve, "You told me to tell on you 'cause I gave him some stuff to tell on me

14   and we was trying to get a better deal."  That's pretty much.

15     Q      Let's slow that down for a second.  You talked to somebody who -- you

16   had a conversation with someone and you had received information that you

17   felt that Steve was snitching on them; correct?

18     A      No.  Steve told me the guy was snitching on him.

19     Q      Okay.

20     A      Then I had a conversation with the guy.

21     Q      And then that guy said that it wasn't like that?

22     A      No.  It was a mutual understanding between the two of them to get a

23   better deal.

1   Q       And then when you talked to Steve again they explained what the

2   mutual understanding was that they had cooked up?

3   A       Yea, we all three were in the cell together and then Steve told me, "Oh,

4   yea, I remember that.  Yea.  We was trying to get out."

5   Q       By doing what?

6   A       Telling on each other basically - giving up enough information, I guess,

7   to hurt the other guy, but not hurt the other guy, and look like they were

8   cooperating against each other to try to get less time.

9   Q       Okay.  All right.  So, you were in the cell and you saw that and you

10  heard that yourself?

11  A       Yes.

12  Q       All right.  Now, do you know other people that know Steve Upham?

13  A       Yea.

14  Q       Do you know what his reputation is for being honest and trustworthy?

15  A       He's a liar.  He lies about anything.  He's not a very nice person, but I

16  guess none of us are.  But, Steve, well, I wouldn't trust him on anything.

17  Q       And is that your opinion regardless of this case and what's happening

18  here?

19  A       Yes.

20  Q       Was that your opinion before this case started?

21  A       Yea, that was my overall opinion of Steve before the case started.

22                          MR. RION:   Nothing further, your Honor.

23                          THE COURT:   Any cross examination?

1    Before you do that, the media - you guys came in late - he doesn't want to be

2    photographed.  You're free to be in here, but just don't photograph him.

3    Okay.  I'm sorry.  Go ahead.

4                                    MRS. KOHLRIESER:   That's fine.

5                                **CROSS EXAMINATION**

6    **BY MRS. KOHLRIESER:**

7    Q       Good afternoon, Mr. Scott.  How are you?

8    A       I'm all right.

9    Q       Let me ask you something - you said that Steve had told you that some

10   other guy was telling on him.

11   A       Yea.

12   Q       And you confronted that other guy?

13   A       Yes.

14   Q       Okay.  Did you confront him because you don't tell on each other?

15   A       Well, yea, I mean, it's pretty much a written rule in prison you don't

16   snitch on the next man.  If somebody gives you that name in the joint they're

17   really trying to hurt not only your reputation but maybe your personal being

18   also.

19   Q       So, that's like an unwritten rule amongst inmates that, huh-uh, you

20   don't rat each other out; right?

21   A       It's supposed to be.

22   Q       Okay.  Are you familiar with the term snitches get stitches?

23   A       I think everybody is.

1     Q      Okay.  Does that mean to you that if you snitch on me you're going to

2 get paid back?

3     A      I'm in one of the most violent prisons in Ohio right now, so pretty much

4 that's the unwritten rule.

5     Q      So, you don't rat on your fellow brothers in the correction institution;

6 correct?

7     A      Huh?  Who?  Me?

8     Q      Anybody.  I mean, that's the rule - you don't rat out each other?

9     A      I can't -- I mean, there's a lot of rats.

10     Q      There are some rats.  But, generally it's a code; correct?

11     A      Yea.

12     Q      Okay.

13                       MRS. KOHLRIESER:  No further

14 questions.  Thank you.

15                       THE COURT:  Any recross?

16                       MR. RION:  No other questions.  Thank

17 you.

18                       THE COURT:  I'm sorry.  It's redirect.  I'm

19 sorry.

20                       MR. RION:  Yea, no other questions.

21 Thank you.

22                       THE COURT:  Okay.  All right.  Mr. Scott,

23 you're done.

1       MR. RION:  Agruello Harris.

2       THE COURT:   Agruello Harris is the next

3   witness?

4       MR. RION:   Yes, your Honor.

5       THE COURT:   Okay.

6       MR. RION:   Your Honor, do you want me

7   to have Miss Costoff ask the question about the video as they're walking in?

8   Would that assist?

9       MRS. KOHLRIESER:  Monica, normally --

10  oh, she's not up there.  Sorry.

11      THE COURT:   Well, I'll do it.  The rule says

12  the Court should advise.

13      MR. RION:   Okay.

14      THE COURT:   I mean, I usually have my

15  bailiff as an officer of the Court.

16  WHEREUPON, called to appear as a witness in this proceeding was one:

17               **A G R U E L L O   H A R R I S**

18  who, having been duly sworn by the Court herein, testified as follows:

19      THE COURT:   You have a right to object to

20  being photographed by the media.  Do you care to be photographed, or not?

21  A       I don't want to be photographed.

22      THE COURT:   Okay.  He doesn't want to

23  be photographed.  Have a seat.  Speak into the microphone.

**DIRECT EXAMINATION**

**BY MR. RION:**

Q      Sir, could you state your full name, please?

A      Agruello Laimo Harris, Sr.

Q      Okay.  So, can you move the chair up a little bit?  Can you spell your name, please?

A      A-G-R-U-E-L-L-O  L-Laimo-A-I-M-O  Harris, Sr.

Q      H-A-R-R-I-S?

A      Yes.

Q      And where are you employed now, sir?

A      Master Maintenance.

Q      Master Maintenance?

A      Yes.  I've been there thirteen years now.

Q      And what do you do there?

A      Basically everything - janitory (sic), roofs, floors.  Basically we do everything.

Q      Okay.  Was there a time that you knew Sonya Burkholder?

A      Yes.  I worked at the Refinery for ten years.

Q      Okay.  When you worked at the Refinery what department were you in?

A      See, I was stationed -- I had access to everywhere because I was a cleaner out there.  So, I had access to every building.

Q      So, you were working, or, you were cleaning at the Refinery.  Was that

1   through a sub-contracting position through --

2   A     Master Maintenance; yes.

3   Q     -- Master Maintenance?

4   A     Yes.

5   Q     Okay.  And in that capacity, cleaning the place, did you come to

6   develop at least a relationship or conversations with Sonya Burkholder?

7   A     I'd say eight years later.

8   Q     Okay.  So, eight years after being at the Refinery you finally developed

9   some type of a connection with Sonya Burkholder; correct?

10   A     Yea, 'cause they had moved me to the guard shack.  I had started

11   cleaning that out.  She was working up there and that's when we started

12   talking.

13   Q     I don't really -- the reason I'm going into this next set of questions isn't

14   just out of curiosity and I'm sorry I have to go there.  It's not somewhere I

15   normally take someone.  Did you have a --

16                     MRS. KOHLRIESER:   Your Honor, may we

17   approach just a moment?

18                     THE COURT:   Okay.  The jury will be

19   instructed, again, to disregard any Bench conference you might overhear.

20   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

21   the record, as follows.)

22                     MRS. KOHLRIESER:   Him having a one

23   night stand with Sonya Burkholder is not relevant.  It's not relevant to this

1    investigation.  It's meant simply to disparage Sonya.

2                                    MR. RION:   No, it's not to disparage.  It's

3    impeachment.  Again, she denied it.  It's very relevant.

4                                    MRS. KOHLRIESER:   She was not dating

5    him.

6                                    MR. RION:   No.  I asked -- I specifically

7    asked her if she had any sexual relationship with him and she said 'no'.

8                                    MRS. KOHLRIESER:   Okay.

9                                    THE COURT:   Maybe the phraseology of a

10    one night stand wouldn't be --

11                                    MR. RION:   Okay.

12                                    THE COURT:   Okay.  All right.

13    (WHEREUPON, Court continued on the record as follows.)

14                                    THE COURT:   All right.  Continue.

15    Q       Sir, in the context of that relationship that you had with Sonya, talking

16    to her or whatever, did it ever become sexual in nature?

17    A       Yes, one time.

18    Q       And on that one time did you actually have sex with her?

19    A       Yes.

20    Q       And where did you have sex with her?

21    A       Faurot Park.

22                                    MRS. KOHLRIESER:   Objection, your

23    Honor.

1         THE COURT:   Okay.

2         MRS. KOHLRIESER:   The answer is out

3 now.

4         THE COURT:   Well, sustained.  The jury

5 will be instructed to disregard.

6 Q  It was off premises?

7 A  Yes.

8 Q  And did you have a conversation with the detective -- did a detective at

9 some point come up and have a conversation with you about this?

10 A  Yes.

11 Q  And did you tell him the same thing?

12 A  Same thing.

13 Q  Okay.  Was that the end of it?

14 A  That's the end of it.  We talked for like two and a half weeks.  That was

15 it.  Like I said, I already had a family.  I just had a baby on February the 15th,

16 around that time when that happened.  So, I was nowhere around or involved

17 with that.

18 Q  Okay.  That's all I have for you.  Thank you very much.

19         THE COURT:   Questions from the State?

20         MRS. KOHLRIESER:   Just briefly.

21        **CROSS EXAMINATION**

22 **BY MRS. KOHLRIESER:**

23 Q  You said you and Sonya Burkholder -- good afternoon.  You said you

1   and Sonya Burkholder talked for about two/two and a half weeks?

2   A      Yes.

3   Q      And that communication stopped because she started seeing Ken

4   Warrington; correct?  In part?

5   A      As to my knowledge; yes.

6   Q      Okay.  So, after her relationship with Ken Warrington started neither

7   one of you had anything to do with each other other than casual

8   conversation?

9   A      No.  No.

10  Q      And other than that one time with her you wouldn't consider yourself

11  dating her; would you?

12  A      No.  I was in a relationship already for eight years and had four kids

13  already from one girl.  So, I was just screwing around - being a man.

14  Q      Being a man?

15  A      Yea.

16  Q      Okay.  And that relationship, whatever it was, with Sonya Burkholder

17  ended well before February 23rd, 2009 when Ken Warrington was killed;

18  correct?

19  A      Yes.

20  Q      And you, in fact, were at home taking care of a brand new baby with

21  your now wife; correct?

22  A      Yes.

23  Q      So, you didn't kill Ken Warrington; did you?

1  A      No.

2  Q      You told all of this to Detective Clark; correct?

3  A      Yes.

4  Q      Thank you.

5                          MRS. KOHLRIESER:  Nothing further.

6                          THE COURT:  Any redirect?

7                          MR. RION:  No other questions.  Thank

8  you, your Honor.

9                          THE COURT:  Okay.  Mr.  Harris, you're

10  excused.  You can go.

11  A      Thank you.

12                          MR. RION:  Carol Mathewson.

13                          THE COURT:  Who is the next witness?

14                          MR. RION:  Carol Mathewson.

15  WHEREUPON, called to appear as a witness in this proceeding was one:

16                        C A R O L   M A T H E W S O N

17  who, having been duly sworn by the Court herein, testified as follows:

18                          THE COURT:  Have a seat.  Move right up

19  to the microphone and speak right into it.  It might have some feedback.

20  Don't worry about that.  We just want to make sure we can get everything

21  recorded and heard.  Okay?  Go ahead.

22  COURT REPORTER:  Objection?

23                          THE COURT:  Pardon?

1   COURT REPORTER:   Objection to being photographed?

2                              THE COURT:   Oh, I'm sorry.  Do you have

3   any objection to being photographed by the media?

4   A      I would rather not.

5                              THE COURT:   Okay.  This witness doesn't

6   want to be photographed by the media.

7                          **DIRECT EXAMINATION**

8   **BY MR. RION:**

9   Q      Thank you for coming, ma'am.  Would you state your full name,

10  please?

11  A      Carol Mathewson.

12  Q      And just spell your last.

13  A      M-A-T-H-E-W-S-O-N.

14  Q      And where are you employed?

15  A      Security at Husky Refinery.

16  Q      And how long have you been with Husky?

17  A      Almost twelve years.

18  Q      What is it that you do there?

19  A      I am a supervisor for security, first shift.

20  Q      In that capacity as a supervisor what are your roles?

21  A      I have several different gatehouses that I am responsible for to make

22  sure everybody does their jobs.  We do rounds in the facility.  We wave trucks

23  in and out and open and close railroad gates.  We have a camera system that

1    we monitor and answer telephones.

2    Q       In your capacity of working there did you come to know a person by

3    the name of Sonya Burkholder?

4    A       Yes.

5    Q       And how is it that you came to know about her?

6    A       She was hired for a shutdown for security and then she ended up

7    being hired full-time after the shutdown was over.

8    Q       Approximately -- well, do you recall the time frame?

9    A       Maybe 2004 for the shutdown and then they kept her after that, a few

10   months later.

11   Q       As we're getting close to 2009 or so -- well, was there a time that she

12   left Husky?

13   A       Not between -- well, I think she had a little span between the time that

14   the shutdown was and when they hired her full-time.  I think she went over to

15   Ineos and then we got her back.  Then when she went on medical leave

16   would have been the only other time she left.

17   Q       Do you know when she ultimately then left and stopped working there?

18   A       She was let go in 2010.  I don't know what month.  But, 2010.

19   Q       Now, did you know a guy, or, an individual by the name of Kenneth

20   Warrington?

21   A       Yes.

22   Q       How did you know Mr. Warrington?

23   A       Mr. Warrington worked at (inaudible) unit in the Refinery and so he

1    would drop paperwork off at the guardhouse and sit sometimes and chit chat

2    with us.

3    Q    Was he well liked?

4    A    Yes.

5    Q    Did he seem like a peaceful kind of guy?

6    A    Yes.

7    Q    Did you ever -- when was it that you first realized that Sonya

8    Burkholder and Kenneth Warrington knew each other?

9    A    Personally or --?

10    Q    Yes.

11    A    They kind of started a flirtatious relationship at work.

12    Q    Did that progress over time?

13    A    Yea.  They followed each other around the Refinery quite a bit.

14    Q    We're getting into the last half year, the last six months, let's say, of

15    Mr. Warrington's life.  Tell the jury what you observed as far as that

16    relationship.

17    A    Well, instead of doing their jobs they were mostly following each other

18    around the facility.  Anytime you needed them you could find them together.

19    Whether it be us looking for them or his unit looking for them, they were

20    always together.  If she was doing rounds he followed her everywhere on her

21    rounds that we did.

22    Q    Did it appear that they were simply friends, or did it seem like there

23    was more than that happening?

1   A      It appeared to be more.

2   Q      Okay.  Was there a time shortly before he passed away that it came to

3   your attention that there was something put on his license plate?

4   A      Yes.  There was a sign put on his license plate.  It's a bad word.

5   Q      We're all adults here.

6   A      It said number one asshole.

7   Q      Okay.   I'm going to show you Defense exhibit 'B'.  Does that appear to

8   be -- well, did you see the sign?

9   A      Yes.  Yes, I actually took a picture of the sign.

10  Q      In relation to -- if I were to tell you it was February 23rd, 2009 that

11  Kenneth Warrington was killed, in relation to that date do you have an

12  estimate as to when you observed this sign?

13  A      I don't remember the date that I observed it.  It was prior to his death.  I

14  don't know if it was the night before or maybe a day before that.  But, it was

15  within a week of his death for sure.

16  Q      And you found it odd enough that you took a picture of it?

17  A      Yes.  Yes, I took a picture of it because I didn't think it was right to be

18  messing with somebody's personal property.

19  Q      And did you report it to any individuals?

20  A      Yes.

21  Q      Were you able to - how do I say this - were you aware as to whether or

22  not Kenneth Warrington and his wife, Faye, were going through any type of

23  counseling or anything during that period?

1   A      I did not know of it personally, but just through rumor.

2   Q      Okay.  Fair enough.  I thank you for coming today.

3                              MR. RION:   That's all the questions I have.

4                              THE COURT:   Okay.  Questions from the

5   State of Ohio?

6                          **CROSS EXAMINATION**

7   **BY MRS. KOHLRIESER:**

8   Q      Good afternoon.  Is it -- it's Mathewson; correct?

9   A      Yes.

10  Q      Okay.  In 2009 when Kenneth Warrington was killed you worked with

11  Sonya Burkholder and Kenneth Warrington; correct?

12  A      Yes.

13  Q      And you actually worked for the security company and not Husky;

14  correct?

15  A      Correct.

16  Q      But, you had been stationed out at Husky for approximately twelve

17  years --

18  A      Correct.

19  Q      -- as of today's date?

20  A      Yes.

21  Q      And at that time Sonya Burkholder was also a supervisor; correct?

22  A      Right, for second shift.  Yes, ma'am.

23  Q      And you were first shift, did you say?

1   A      At that time I would not have been first shift.  That's recent.  Back then

2   I would have been a combination of second and third both at that time.

3   Q      Okay.  And at that time do you recall Krista Bodiker being shift

4   supervisor for third shift?

5   A      She was part-time supervisor for third shift as well; yes.  The days that

6   she wasn't supervisor I was.

7   Q      Oh, okay.  Thank you.  All right.  You said that you saw that sign a day

8   or two before Mr. Warrington passed, or maybe a few days before?

9   A      Just a few days before; yes, ma'am.

10  Q      And you said that you reported that.  Was that to someone at Husky or

11  in security?

12  A      Security.

13  Q      And after Mr. Warrington was killed did you ever speak to a detective

14  regarding that information?

15  A      Yes.

16  Q      Do you recall who that detective was?

17  A      I don't remember his name.

18  Q      Do you recall Detective Clark attempting to make contact with you to

19  talk to you specifically?  Detective Clark from the Lima Police Department?

20  A      It might have been Detective Clark.  I don't remember that gentleman's

21  name.

22  Q      And you believe you actually spoke to him and told him about this?

23  A      Yes, because I was asked if I still had the picture.

1   Q      And he re-contacted you sometime last year; correct?

2   A      Yes.

3   Q      And you spoke to him about it then, too?

4   A      Yes.

5   Q      And were you there when that sign was placed on Mr. Warrington's

6   vehicle?

7   A      I was not there when it was placed.  I found it after the fact.

8   Q      Okay.

9                              MRS. KOHLRIESER:   Nothing further.

10                             THE COURT:   Any redirect?

11                             MR. RION:   No.  Thank you for your time.

12                             THE COURT:   All right.  You're done.

13  Thank you for coming in.

14                             MR. RION:   The next witness would be

15  Leah Rexford.

16  WHEREUPON, called to appear as a witness in this proceeding was one:

17                     **L E A H   R E X F O R D**

18  who, having been duly sworn by the Court herein, testified as follows:

19                             THE COURT:   I'll have you sit down there.

20  Speak into the microphone directly.  Do you have any objection to being

21  photographed by the media?

22  A      No.

23                             THE COURT:   Okay.  She has no

1    objection.  Just make sure you speak into the microphone.  If you hear some

2    feedback, don't be concerned.  It's just a bad sound system.  Okay?  But, we

3    need to get everything recorded.  Go ahead.

4                          **DIRECT EXAMINATION**

5    **BY MR. RION:**

6    Q      State and spell your name, please.

7    A      Leah Rexford, L-E-A-H  R-E-X-F-O-R-D.

8    Q      And where are you employed?

9    A      Kenneth J. Rexford and Company.

10   Q      Just keep your voice up so everybody can hear.

11                                    THE COURT:   Just get a little closer to the

12   mic.  Yea, there you go.

13   Q      You said Kenneth Rexford and Company?

14   A      Uh-huh, attorney.

15   Q      That's a law firm?

16   A      Yes, sir.

17   Q      And are you married to Mr. Rexford?

18   A      Yes, I am.

19   Q      And you work at the law firm as well?

20   A      Yes.

21   Q      In what capacity do you work there?

22   A      I answer the phone, greet clients when they come in, do filings, basic

23   secretarial stuff.

1    Q      Okay.  For how many years have you been a secretary with Mr.

2    Rexford?

3    A      He went out on his own the beginning of 2004.  So, eleven years plus

4    a couple of months.

5    Q      Okay.  Do you know Markelus Carter?

6    A      Yes.

7    Q      And is it through a professional relationship that Mr. Carter had with

8    Mr. Rexford that you know him?

9    A      Yes.

10   Q      You don't know him in any other capacity than through the law firm?

11   A      No.

12   Q      Going back to February 23rd, 2009, if I were to tell you that that's the

13   day that Kenneth Warrington was killed, do you recall that day with that fact?

14   In other words, do you recall February 23rd, 2009?

15   A      Yes.

16   Q      What time do you approximately, or, does the office open?

17   A      Nine A.M. for me.

18   Q      For you?  When you were there did you receive a phone call at some

19   point from Markelus Carter?

20   A      Yes.

21   Q      And do you get there a little early sometimes - give or take ten minutes

22   or so?

23   A      Give or take ten minutes; yes.

1   Q    And do you recall -- how many phone calls did you receive before

2   nine-thirty or nine-forty, well, before ten o'clock from Markelus Carter?

3   A    I don't know for a specific number, or, a specific time.

4   Q    A time frame?

5   A    I spoke with Markelus several times that morning.

6   Q    Okay.  Let's start with the first time you talked to him.  Can you tell the

7   jury about the call?

8   A    Yea.  It was probably one of the first phone calls of the morning and so

9   it was probably close to nine.  I answered the phone and Mark said, "Is Ken

10   okay?"  That was a little bit weird and so I said, "Well, yes."  He said

11   something along the lines of, 'well, thank God; I had heard something bad

12   happened to Ken'.

13   Q    Okay.  Anything else about that call or was that the extent of it?

14   A    That's the extent that I remember.  I mean, that's an odd call to get.

15   Q    Did it seem -- did you get a call shortly thereafter, a second call?

16   A    I got another call and at that point Mark was inconsolable, screaming,

17   crying.  I remember it because I was in the copy room when I answered the

18   phone and because of the noise from the copy machine and his screaming

19   and crying I had to transfer him back to my desk to speak with him.  He was

20   just going on and on about something happened to his baby, something

21   happened to his baby.

22   Q    And at some point -- well, is that all you could make out from him?

23   A    Yes, sir.

1    Q     Were both of those calls in the morning hours of that day?

2    A     I believe so.  I recall them being relatively, you know, within a short

3    span.

4    Q     After he says something about his baby or whatever, did that call just

5    end?  How did that call come to an end; if you recall?

6    A     I believe I, you know, tried to get him to calm down so I could

7    understand more.  Somehow, I mean, we got off the phone.  I believe he

8    called back at least one other time.  I'm assuming that I would have done the

9    same thing I would have done in any other situation - just try to get some

10    information and assure him that I would try to get ahold of Ken, you know, as

11    soon as possible but, you know, there was nothing I could do to, you know,

12    find out any information or anything like that.

13    Q     Okay.  Thank you for your time.

14                    THE COURT:   Any cross examination?

15                    MRS. KOHLRIESER:   Just two quick

16    questions.  I'm not even going to bother coming up there.

17                      **CROSS EXAMINATION**

18    **BY MRS. KOHLRIESER:**

19    Q     You said normally the office opens up at about nine A.M.?

20    A     Yes.

21    Q     And you estimate that this first call from, well, I think you called him

22    Mark, came in and it would have been maybe ten or fifteen minutes before

23    nine, but you're not really sure?

1    A        No.  I said my recollection is that it was one of my first phone calls of

2    the morning.

3    Q        Okay.  So, you don't really know what time?

4    A        Not specifically; no, ma'am.

5    Q        All right.

6                                          MRS. KOHLRIESER:   Nothing further, your

7    Honor.  Thank you.

8                                          THE COURT:   Any redirect?

9                                          MR. RION:   No, your Honor.  Thank you.

10                                         THE COURT:   All right.  You're done.  You

11   may step down.  Your next witness is?

12                                         MR. RION:   Vickie Bartholimew.

13                                         MRS. KOHLRIESER:   Your Honor, we're

14   agreeing on an exhibit, but I have a copy that's not marked up as much as Mr.

15   Rion's.  Do you mind if I step out and make a copy real quick?

16                                         THE COURT:   That's fine.

17   WHEREUPON, called to appear as a witness in this proceeding was one:

18                          **V I C K I E   B A R T H O L I M E W**

19   who, having been duly sworn by the Court herein, testified as follows:

20                                         THE COURT:   Okay.  Do you have any

21   objection to being photographed by the media?

22   A        I prefer not to be.

23                                         THE COURT:   Okay.  This witness has

1    indicated she prefers not to be photographed or videotaped by the media.

2    Are you waiting on an exhibit, or can you go on?

3                                    MR. RION:   I can go, but the prosecutor

4    may want to be here.

5                                    THE COURT:   Okay.  She went to make a

6    copy of something, she said.  So, let's hold up a second here.  Okay.

7    Whenever you're ready, Mr. Rion.

8                          **DIRECT EXAMINATION**

9    **BY MR. RION:**

10   Q      Can you state your full name, please?

11   A      Sure.  Vicki Bartholimew.

12   Q      And where are you employed?

13   A      I work at the Ohio Criminal, or, Ohio Bureau of Criminal Investigation.

14   It's commonly known as B.C.I.

15   Q      And what do you do at B.C.I.?

16   A      I work in the latent print section as a forensic scientist.

17   Q      Working in the latent prints --

18                                   MR. RION:   Do we have a stipulation as to

19   qualifications, or do you want me to go through --

20                                   MRS. KOHLIESER:   Yes, your Honor, the

21   State would stipulate that Miss Bartholimew is a qualified expert in the area of

22   fingerprint identification.

23                                   THE COURT:   Okay.  With that stipulation

1    I'll make the finding that she is.

2    Q      You have a Master's of Science in Forensic Psychology; correct?

3    A      Correct.

4    Q      And a B.A. in various fields of science?

5    A      That's correct.

6    Q      And you've been employed for how many years in this capacity?

7    A      I've worked at B.C.I. for nine years now, eight years as a forensic

8    scientist.

9    Q      And you've been certified to testify as an expert multiple times?

10   A      That's correct.

11   Q      Were you asked in 2014 -- well, what were you asked to do in this

12   case?

13   A      In this case, last July, I believe it was July 30th, 2014, latent lifts had

14   been submitted to the laboratory for analysis purposes.  What I'm asked to do

15   was to determine whether or not there were sufficient prints on those latent

16   lifts for comparison purposes.  I was asked to compare those prints with

17   Markelus Carter, fingerprint cards that we had on file for him.

18   Q      And in looking at your records in preparation for today did it appear to

19   you as if these latent prints were developed from the car of Mr. Warrington?

20   A      Yea.  The way that the label, the latent lifts were labeled, was that they

21   were from the driver's side door and also by the bed of the truck.

22   Q      And so did you do the analysis?  First off, did you make a

23   determination as to whether or not there were any fingerprints that were good

1  enough for purposes of examination?

2  A      Yes.  After examining the lifts, there were a total of seven different

3  fingerprints that were of comparison quality and identification.  They could be

4  identified to an individual.

5  Q      Would five of the -- well, I guess, what would you call this part of the

6  finger?

7  A      That part is called the first joint.

8  Q      The first joint?

9  A      Uh-huh.

10  Q      Is that where most of the identifiers are on the finger?

11  A      In natural fingerprints your entire palm or surface is actually covered

12  with friction ridge skin which actually has this unique configuration.  So, we

13  can do comparisons and identifications from any area.  Commonly, just

14  because of how we handle things, we see fingerprints.

15  Q      In looking at -- so, there are five prints that you had that dealt with the

16  first joint; correct?

17  A      Correct.

18  Q      Were you able to compare those five prints to Markelus Carter?

19  A      Yes.  All five of those prints were compared with the fingerprint cards

20  and none of them identified with him.

21  Q      Now, were there two other prints that dealt with another section of the

22  finger?

23  A      Correct.  The other two prints remaining were of the lower joint area.

1    So, it's just that area below.  The fingerprint card that I had for him didn't have

2    that area recorded early enough for me to perform the comparisons on those

3    two prints.

4    Q    Okay.  Did you request or make a notation that if anybody wanted you

5    to look into those other joints they should send you those other sections and

6    you would then compare them?

7    A    Correct.

8    Q    And did anyone from the Lima Police or anyone else send you those

9    other sections?

10    A    I never received another submission on the case.

11    Q    Is it fair to say of all the information you received that none of the prints

12    came back to a Markelus Q. Carter?

13    A    That's correct.

14    Q    I'm going to hand you what's been marked Defendant's exhibit 'KK'.

15                 THE COURT:   I think we had 'KK' already.

16                 MR. RION:  Oh.  Should I use 'LL'?

17                 THE COURT:   Yea.  'LL' would be the next

18    one.  Okay?

19    Q    Defendant's exhibit 'LL'.  Does this appear to be a fair and accurate

20    and complete copy of your report?

21                 MRS. KOHLRIESER:   Your Honor, the

22    State would stipulate that that is Miss Bartholimew's report and we would

23    stipulate to its admission.

1　　　　　　　　　　　　　THE COURT:  Okay.

2　　　　　　　　　　　　　MR. RION:  Thank you for your time.

3　　　　　　　　　　　　　THE COURT:  All right.  Any questions

4　　from the State?

5　　　　　　　　　　**CROSS EXAMINATION**

6　　**BY MRS. KOHLRIESER:**

7　　Q　　Miss Bartholimew, how long have you been doing this?

8　　A　　I've been working for eight years in the latent print section.

9　　Q　　If I'm wearing gloves would I leave fingerprints on something?

10　　A　　Typically not.

11　　Q　　And when you're talking about the driver's side door handle of a

12　　vehicle, is that something frequently handled?

13　　A　　It is.

14　　Q　　Okay.  Is that something anybody could touch, depending upon where

15　　the vehicle is parked?

16　　A　　It could be.  Correct.

17　　Q　　And my understanding with prints is that, well, depending upon the

18　　surface as well as the person's own body, how much sweat, how sweaty they

19　　are, oily they are, that type of thing, that affects whether somebody leaves a

20　　print of not; correct?

21　　A　　That is absolutely correct; yes.

22　　Q　　And it affects whether somebody leaves what we call a useable print;

23　　correct?

1    A      Yes.

2    Q      And by useable we mean something that can actually be identified?

3    A      That has enough detail to be identified; yes.

4    Q      Okay.  Would you find it uncommon on a vehicle that's parked outside

5    frequently and may have many people in and out of it or near it to find

6    fingerprints from just about anybody?

7    A      No.

8                                    MRS. KOHLRIESER:  Nothing further, your

9    Honor.

10                                   THE COURT:  Okay.  Any redirect?

11                          **REDIRECT EXAMINATION**

12   **BY MR. RION:**

13   Q      You examined all the prints that were submitted to you and those were

14   the results you found; correct?

15   A      Correct.

16                                   MR. RION:  Nothing further.

17                                   THE COURT:  Any recross?

18                                   MRS. KOHLRIESER:  No, your Honor.

19                                   THE COURT:  All right.  Thank you, Miss

20   Bartholimew.  You're excused.  Counsel, want to approach?  You're done.

21   A      Okay.  Do you want the report to stay here?

22                                   THE COURT:  Yea, the exhibit.  Leave that

23   here.  Okay.  Counsel, approach please.

1   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

2   the record, as follows.)

3                                        THE COURT:   So, your next one is Tarah?

4                                        MRS. KOHLRIESER:  I think it's awfully

5   early to break for the day.

6                                        THE COURT:   What's that?

7                                        MRS. KOHLRIESER:   I think it's awfully

8   early to break for the day.  I mean, it's two o'clock.

9                                        THE COURT:   But, he hasn't had a chance

10  to see the Grand Jury transcript.

11                                       MR. RION:   (Inaudible).

12  COURT REPORTER:  I can't hear him, Judge.

13                                       MR. RION:   She's not even here.

14                                       THE COURT:   Well, we'll use the time to

15  look over some instructions.  Okay.  All right.  Could you hear enough of it?

16  COURT REPORTER:  No.

17                                       THE COURT:   You didn't hear me?  Okay.

18  Well, I'm going to put it on the record anyways.

19  (WHEREUPON, Court continued on the record, as follows.)

20                                       THE COURT:   All right.  Ladies and

21  gentlemen of the jury, as hard as we try to plan, like the trial, as you've

22  already experienced, we're not always totally real accurate in planning.  The

23  defense has indicated they have at least one other witness.  We're going to

1   break for the day.  It's an early break.  That's the good news.  The other side

2   of that is we're going to reconvene on Monday.  The good news on that is I

3   think we're going to get the case to you Monday.  All right?  So, at least in

4   terms of the presentation of the case it's anticipated that, knock on wood, that

5   you'll get it submitted to you on Monday.  But, we're going to break for you

6   guys.  I'm going to stay with the lawyers here so we can try and not use up

7   any more of your valuable time.  The attorneys and I will start talking about

8   jury instructions and getting those finalized.  So, hopefully we'll have all of that

9   done so Monday, after all the witnesses are in, we can move into the

10  concluding parts of the trial.

11          So, the good news is that you get an early break on a Friday and then

12  we'll reconvene Monday at nine-thirty.  I want the attorneys - I'll tell them - I

13  want them here a little bit earlier on Monday.

14          Remember the admonitions I've given you every time.  But, again, as

15  we break for the weekend you'll no doubt come into contact with maybe more

16  people or have more time on your hands.  Don't discuss the case among

17  yourselves or with anyone else.  Don't express any opinions or reach any

18  conclusions or express any opinions to anybody.  Don't pay attention to any

19  media accounts about the case.  Don't read the paper or watch the news.

20  Don't do any independent research.  Don't get on electronic media or social

21  networking.  Remember all of these rules.  They're very important to the

22  integrity of the case to maintain your fairness and impartiality.  Monday I'll ask

23  you if anybody has been exposed to anything that prevents you from being

1    fair and impartial.

2          So, we'll go with you at nine-thirty on Monday.  Like I said, we're going

3    to work yet this afternoon.  So, you guys get an early break, but I'm going to

4    keep the attorneys here for awhile to talk about instructions.  Hopefully, then,

5    we'll avoid any more delays for you Monday because we need to get the

6    instructions formalized so the lawyers know what the instructions are going to

7    be before we have our concluding parts of the case.  After all the evidence is

8    in then we'll have closing arguments and then I'll give you the instructions and

9    the case will be yours.  So, right now that's anticipated that that will be

10   sometime on Monday.

11         So, anything else from counsel before I let the jurors go for the

12   weekend?

13                         MR. RION:  No.  Thank you, Judge.

14                         MRS. KOHLRIESER:  No, your Honor.

15                         THE COURT:  All right.  Enjoy your

16   weekend.  Get some rest.  Stay healthy.  We'll see you at nine-thirty on

17   Monday.

18   (WHEREUPON, JURY WAS EXCUSED FOR THE DAY AT 2:03 P.M.)

19                         THE COURT:  We're still on the record.

20   While we're still on the record I just want to put on the record, because

21   Monica said she had trouble hearing the conference we had at the Bench

22   because our sound system is having trouble with the Bench microphone, Mr.

23   Rion indicated that the next witness and that he wanted some time because I

1    understand the State has provided a transcript, an earlier transcript of sworn

2    testimony of the next witness, and so, Mr. Rion, I'll give you an opportunity --

3    again, that was what we talked about earlier being for counsel only.

4                                  MR. RION:   That's correct.

5                                  THE COURT:   And then ---

6                                  MR. RION:   And it's marked as such.

7                                  THE COURT:   Pardon?

8                                  MR. RION:   It's marked that way as well.

9                                  THE COURT:   And you'll have that

10   witness, if you're going to use that witness, at nine-thirty?  You know, if you

11   have any other witnesses, too, we'll do that.

12          But, I want counsel then to stick around now.  Let's start talking about

13   the jury instructions.  I gave a draft of these from the very beginning.  You've

14   had that.  I've made a few notes.  I've indicated on the record a few things

15   that I was going to include, such as some of the 404 (B) things that I've

16   already given some instructions on and things like that.  This is a work in

17   progress.  It won't be finalized until -- what I want to do is have you guys

18   come in at eight o'clock on Monday, unless we can get everything settled this

19   afternoon, but come in on Monday and we'll go on the record before the jurors

20   get here and give everybody a chance on the record to express objections, or

21   requests for instructions, put that all on the record because our conference

22   this afternoon is just going to be in chambers.  We don't have to spend a lot of

23   time this afternoon unless you guys want to.  But, it won't be much more

1    probably than an hour/hour and a half that I've got this afternoon.

2                            MRS. KOHLRIESER:  Your Honor, the

3    only thing, and I certainly don't want to tell Mr. Rion how to do his case, I

4    didn't know, again, depending upon how we go with jury instructions --

5                            THE COURT:  Or you might have rebuttal.

6    Is that what you're getting at?

7                            MRS. KOHLRIESER:  That, but also I

8    didn't know if Mr. Rion was prepared to move for the admission of some of his

9    exhibits or things of that nature.  We could take care of that since the jury is

10   gone and we have two and a half hours.

11                           THE COURT:  I mean, we can.  I mean, I

12   won't be asking you to rest.  Do you want to do that now?

13                           MR. RION:  Sure.  Maybe before we get to

14   that, I'd like the Court to -- well, sure, we can do that now.

15                           THE COURT:  Okay.  Well, from my count

16   I had up to 'LL'.  Are there any - we'll do it the same way - are there any that

17   you can think of now that you would be withdrawing or not proffering to be

18   admitted?  It's not as numerous as the State's exhibits so we could go

19   through them one by one, if you want.

20                           MRS. KOHLRIESER:  Your Honor, I

21   apologize, but I didn't keep very good track.  So, do you mind if I come up

22   there and just kind of look as we go?

23                           THE COURT:  Yea, you both can look at

1     my list.  I don't know how accurate it is.  I think Susan was, and I think Monica

2     continued, but we have one from the Court Reporter also.  You don't want to

3     look at my list?  You're just going to look through those?  Okay.

4                    MRS. KOHLRIESER:  I guess I'll let you

5     keep your list so you don't have to go back and forth.

6                    THE COURT:  I don't know if they're in

7     alphabetical order now.

8     COURT REPORTER:  No, they weren't.  I was trying to work with the State's

9     first.  They were pretty messed up.

10                    MRS. KOHLRIESER:  I did them the other

11     day, but I know we've been through them.

12                    MR. RION:  Here's 'A'.

13                    MRS. KOHLRIESER:  Your Honor, 'A'

14     appears to be the e-mails between Sonya Burkholder and Ken Warrington.

15                    THE COURT:  Well, wait.  I want to see if

16     he wants to withdraw any.

17                    MRS. KOHLRIESER:  Oh, I'm sorry.  I'm

18     sorry.

19                    THE COURT:  I want to kind of do it the

20     way we did with yours.  If he's moving for the admission of all of them, then

21     we can go through them.

22                    MR. RION:  What we could do, your Honor,

23     if you'd like, --

1    THE COURT:   Well, go ahead.  There's not

2    as many.

3    MR. RION:   I am asking for the admission

4    of all of them.

5    THE COURT:   Okay.  Well, let's just do it,

6    since there aren't as many as the State had, let's just start with 'A'.  'A' I had

7    marked as e-mails between Sonya and Ken.  Is that correct?

8    MRS. KOHLRIESER:   Yes, your Honor.

9    THE COURT:   Any objection?

10   MRS. KOHLRIESER:   The only objection is

11   that it's redundant to one of the State's exhibits.  Give me a second and I'll tell

12   you which one.

13   MR. RION:   The reason it is is because we

14   admitted it through Sonya before they would have had the opportunity.

15   MRS. KOHLRIESER:   Yes.  It's the same

16   thing as State's exhibit '134'.  So, it's not really an objection.  I just don't think

17   it's necessary.

18   THE COURT:   I'll admit it.  It's not going to

19   be represented as anything other than it is.

20   MRS. KOHLRIESER:   Yes.

21   THE COURT:   So, I'll admit it.  'B' was just

22   the picture of the note on the license plate.

23   MRS. KOHLRIESER:   No objection.

1                            THE COURT:   All right.  'B' is admitted.

2    'C'?

3                            MRS. KOHLRIESER:  Actually, your

4    Honor, I think I need to see the photos.  If you'll just give me a second?

5                            THE COURT:   Yea, 'C' through 'L' are

6    pictures.

7                            MRS. KOHLRIESER:   I have 'C' through

8    'G' here that I have no objection to.

9                            THE COURT:   All right.  'C' through 'G' are

10    admitted.

11                            MRS. KOHLRIESER:   'H' is fine by us.

12                            THE COURT:   All right.  'H' is admitted.

13                            MRS. KOHLRIESER:   'I' is fine.

14                            THE COURT:   'I' is admitted.

15                            MRS. KOHLRIESER:   'J', 'K', and 'L' are

16    fine, your Honor.

17                            THE COURT:   'J', 'K', and 'L' are admitted.

18    'M' is the property log.

19                            MRS. KOHLRIESER:  No objection.

20                            THE COURT:   'M' is admitted.

21                            MR. RION:   Do we have an 'N'?

22                            THE COURT:   That's the diagram that

23    Sonya had drew.  Any objection to 'N'?  Would Mr. Rion or somebody remove

1  that from the easel?

2  MR. RION:  Let's wait on that whether I'm

3  going to submit it.

4  THE COURT:  Oh, okay.

5  MRS. KOHLRIESER:  Okay.  Yea, let me

6  think about that one.  But, can we put a blue Defendant's exhibit 'N' sticker on

7  it?

8  MR. RION:  We'll definitely have to -- well,

9  let's leave it there for now, but we'll definitely have it marked.

10  THE COURT:  Okay.  But, you're not

11  moving to admit that just yet?

12  MR. RION:  Correct.

13  THE COURT:  Okay.

14  MRS. KOHLRIESER:  We'll skip that one.

15  THE COURT:  'O' through, well, is it 'Y'

16  that are more pictures?

17  MR. RION:  There may be two 'R's'.

18  THE COURT:  'R' is a picture of the

19  bedroom futon.

20  MRS. KOHLRIESER:  'R' is a picture of the

21  bedroom futon.

22  MR. RION:  All right.  So, that's 'R'.

23  MRS. KOHLRIESER:  Your Honor, for the

1   record, Mr. Rion's handwriting is terrible and so we're having a hard time

2   reading these letters.

3                               MR. RION:   I'm not stipulating to that.

4                               THE COURT:   The record will speak for

5   itself on that, I guess.

6                               MRS. KOHLRIESER:   Here's 'U' and 'V'.

7   We have no objection to 'O' through 'V'.

8                               THE COURT:   'O' through 'V' are admitted.

9                               MRS. KOHLRIESER:   I'm sorry.

10                              THE COURT:   That's 'V' as in Victor?

11                              MRS. KOHLRIESER:   Yes.

12                              THE COURT:   Those are admitted.

13                              MRS. KOHLRIESER:   We do have an

14  objection to 'W' because nobody could identify what it actually was or when it

15  was taken or anything of that nature.

16                              MR. RION:   That was the point.

17                              MRS. KOHLRIESER:   Okay.  Well, it has

18  to become relevant to prove it's connected to the case.

19                              THE COURT:   Argument, Mr. Rion?

20                              MR. RION:   Your Honor, this was -- it was

21  on the argument of contamination.  We know -- I mean, we received this

22  picture from the State.  It's a picture that was taken of a pair of pants as a

23  piece of evidence in the case.  The argument was simply that, and I think the

1     testimony was, that there was a table in either the Police Department or some

2     section where items from time to time are photographed on and the concept

3     of cross-contamination was the relevance of Defense exhibit 'W'.

4                 MRS. KOHLRIESER: Part of that, your

5     Honor, is we don't know when that was taken - before or after the test. Not to

6     mention that if these are, in fact, the pants that were seized from Markelus

7     Carter they tested negative for G.S.R.

8                 MR. RION: Okay. Well, that goes to

9     argument. The point is, things are put on a common table and it doesn't

10     really matter what's in the picture because the pair of pants isn't the point.

11     The point is that various pieces of evidence are placed on a common surface

12     to be photographed.

13                 THE COURT: And there was testimony to

14     that.

15                 MR. RION: There was testimony to that.

16                 MRS. KOHLRIESER: There's no

17     testimony whatsoever that these are the pants. Look, he can say that we

18     gave them to him in discovery or whatever he wants, but there was no

19     evidence connecting these pants to this case or when these pictures were

20     taken. For all I know they could have been shown to a defense attorney long

21     after testing. I don't know when this picture was taken, quite frankly.

22                 MR. MILLER: The key is whether, you

23     know, if it's after testing it has no relevance because it's already been tested

1    and --

2                                THE COURT:  Well, I'll rule, because I was

3    paying attention to this and I listened to the testimony and I had questions by

4    it of when and who took it, and there was no evidence as to when or who took

5    the picture, so I'm going to find the objection well taken and with your

6    exceptions noted.  There was testimony about the table.

7                                MR. RION:  Your Honor, it was displayed

8    to the jury.  There was no objection to it being shown to the jury.  It was

9    shown to them.  Again, the point of the picture is to demonstrate -- well, what

10   was testified to and is evidence in this exhibit is that that appeared to be a

11   table in the Police Department somewhere where evidence is routinely

12   photographed.  That was the point of it.

13                               THE COURT:  All right.  You've made your

14   record and I've made my ruling.  So, let's go on.  No on 'W'.

15                               MRS. KOHLRIESER:  Yes.

16                               MR. RION:  Here's 'X' and 'Y'.

17                               MRS. KOHLRIESER:  Your Honor, what

18   do you have for 'X' and 'Y'?

19                               THE COURT:  Pictures in the basement.

20   The note I had by 'Y' was 'with camouflage'.  I didn't have any notes on 'X'.

21   But, they were all identified.

22                               MRS. KOHLRIESER:  No objection, your

23   Honor.

1      THE COURT:   All right.  'X' and 'Y' are

2  admitted.

3      MR. RION:   'Z' are some logs, some

4  property logs.

5      MRS. KOHLRIESER:   No objection.

6      THE COURT:   'Z' is admitted.  Now we're

7  in the double letters.

8      MR. RION:   'AA' through --

9      THE COURT:   That was all Joey Moore

10  stuff - 'AA' through 'DD'.

11      MR. RION:   Yes.

12      MRS. KOHLRIESER:   Your Honor, I would

13  object to these.  The rule doesn't allow extrinsic evidence to be presented as

14  to other convictions.  He admitted to all of these convictions.  So, the

15  relevance is --

16      THE COURT:   Are they certified?

17      MR. MILLER:   They're not certified, I don't

18  think.

19      MR. RION:   He testified to them.

20      MRS. KOHLRIESER:   They're not certified.

21      MR. RION:   I know.  But, he testified to

22  them.  The certification simply goes to no need to have someone testify as to

23  them.

1    MRS. KOHLRIESER:   But, again, one's an

2  indictment.  You know, we've got multiple things attached on each one - an

3  indictment, Entry of Sentencing.  Whether he identified them or not, again, it's

4  extrinsic evidence of prior convictions.

5    THE COURT:   Okay.  I'm going to allow

6  'AA', 'BB', 'CC', and 'DD' on the condition that they be certified.  So, you'll

7  have the rest of today and Monday to go over, if it's Allen County cases, to

8  get them certified.

9    MR. RION:   Yes, your Honor.

10    THE COURT:   It's a matter of getting a

11  stamp put on them if they're true and accurate.  I mean, the Clerks only certify

12  them if they're true.

13    MR. RION:   That's not a problem.

14    MRS. KOHLRIESER:   Well, your Honor, to

15  that extent I don't have a problem.  Again, I object to them for their content.

16    THE COURT:   I understood your objection.

17  My ruling is I'll admit them if they're certified.

18    MRS. KOHLRIESER:   Okay.

19    MR. RION:   You want these certified or

20  substitutes for these?

21    MR. MILLER:   Those.

22    THE COURT:   Those are the ones the

23  witness looked at.  Yea.

1    MR. RION:  Okay.

2    THE COURT:  If that's a problem with the

3    Clerk's Office -- well, I think they'll certify that.

4    MR. MILLER:  If they don't, they don't.

5    Those are the ones that were shown to the witness.

6    THE COURT:  Yea.  Those are the

7    exhibits.  So, they're not admitted officially yet - it's conditional.  Since I see

8    that your secretary or paralegal is taking them -- well, they're not exhibits yet.

9    I don't want her leaving the room with exhibits.  I'll give him time to get them

10   certified.  'EE' was stipulated; wasn't it?

11   MR. RION:  Yes.

12   MRS. KOHLRIESER:  Yes, your Honor.

13   MR. MILLER:  Your Honor, I was just going

14   to walk through the --

15   THE COURT:  Okay.  That's fine.  How do

16   you know the combination to get across there?  'EE' is admitted.

17   MRS. KOHLRIESER:  Yes.

18   THE COURT:  'FF'?  That was Wharton's?

19   'FF'?

20   COURT REPORTER:  Sue has that was withdrawn.

21   THE COURT:  Yea, that was withdrawn.

22   MR. RION:  Yea.

23   THE COURT:  'FF' was withdrawn, I

1    believe.  I hadn't crossed it off.

2                          MRS. KOHLRIESER:   Okay.  So, you're

3    not moving for 'FF' then?

4                          THE COURT:  All right.  So, 'FF' --

5                          MR. RION:  Oh, wait.  We made 'FF' -- oh,

6    you're right.  That was Wharton's.

7                          THE COURT:   Yea.  I didn't have a 'GG'.

8                          MR. RION:   Can we keep that for the

9    record?  It goes into -- since it was referred to it will go into, well, not go back

10   to --

11                         THE COURT:   You want it in the Court's

12   file?

13                         MR. RION:  Yea.

14                         THE COURT:   Give that to me.  'GG' - I

15   had nothing marked.

16   COURT REPORTER:   Right.

17                         THE COURT:   So did the Court Reporter.

18                         MR. RION:   All right.  So, 'HH'?

19                         MRS. KOHLRIESER:   We're skipping

20   'GG'?

21                         THE COURT:   No, there's no 'GG'.  'HH'

22   and 'HH-1' were those additional data based from the G.R.C. and the brand

23   name having to do with the list, the hundred and thirty-one list of brands.

1    MRS. KOHLRIESER:  You've moving to

2    admit that; right?

3    MR. RION:  Well, let me -- I'm going to

4    hold that.

5    THE COURT:  Okay.  That's fine.  That's

6    fair.  We're ahead of schedule.  So, that's good.  'II' was a Judgment Entry of

7    Conviction on Mr. Upham.

8    MR. RION:  Same ruling, I guess, from the

9    Court?

10    MRS. KOHLRIESER:  Same objection.

11    Again, it's just overly emphasizing their prior convictions and unnecessarily.

12    THE COURT:  That's probably going to be

13    more problematic to get it certified; isn't it?

14    MR. RION:  No.  It's Lucas County.  I'll get

15    it done.  It's out of Lucas County.

16    THE COURT:  Okay.  All right.  I'll overrule

17    the State's objection on being duplicitous or however you say it - as being

18    duplicative of the testimony.  'JJ' was an anonymous letter.  Any objection?

19    MRS. KOHLRIESER:  Yes.  I mean,

20    there's no basis as to who wrote it or anything of that nature.

21    MR. RION:  It goes to weight.  It was

22    received.  It was received after -- what's important about it is the date it was

23    received, two days after Mr. Carter was in jail.

1    MRS. KOHLRIESER:   But, it's got a lot of

2    hearsay type of things in it, your Honor, that he's going to certainly use as

3    true for the potential that Faye is a murder suspect.

4    MR. RION:   I am not -- of all the people on

5    this planet I am not going to allege that Mrs. Warrington was involved.

6    THE COURT:   Okay.  That's a new one on

7    me.  I'm going to take that one under advisement; okay?  'KK' was a picture

8    of the set of the proofs.

9    MR. RION:   Do you want this?

10   THE COURT:   Yea, we'll have it up here.

11   I'll have to study on that one.

12   MRS. KOHLRIESER:   I guess, just real

13   quickly, if I could say one more thing about 'JJ', your Honor?  Again, its

14   prejudicial value versus its relevance I think is substantially outweighed.  So,

15   just with that, --

16   MR. RION:   Again, there was no objection

17   when Detective Clark was testifying about it.

18   THE COURT:   'KK' were the proofs, or,

19   picture of the proofs that were found in the defendant's car.

20   MRS. KOHLRIESER:   No objection, your

21   Honor.

22   THE COURT:   Those are admitted.  'LL' I

23   believe we have already stipulated to the admission.

1   MRS. KOHLRIESER:  Yes.

2   THE COURT:  So, all the defense exhibits

3   to date have been moved for and ruled upon.  There may be more.  I'll give

4   you until Monday to consider the ones you indicated you might consider, that

5   being 'HH' and 'HH-1'.  I've given you until Monday to see about certification

6   of the Judgment Entries.

7   COURT REPORTER:  That's on 'II' also, Judge, for a certification?

8   THE COURT:  Oh, yea, a certification on

9   'II', too.  Okay?

10   MRS. KOHLRIESER:  Your Honor, I don't

11   know how you want to do this, but I have this stack that we've just gone

12   through now and I certainly can give that to Monica and tell her that each and

13   every one of these Mr. Rion and I have -- well, these are the admitted ones,

14   with exceptions noted.

15   COURT REPORTER:  Just put those on this side for me.

16   MRS. KOHLRIESER:  Mr. Rion wants

17   these two exhibits, 'W' and 'FF', I guess to be made Court exhibits for future

18   reference on appeal.

19   THE COURT:  Yea.  You can just put them

20   right here.  Okay?  They won't go to the jury, but they'll be in the record.

21   Okay.  Now, again, we'll ask if there's any other exhibits or any other issues

22   before I ask if you're going to rest on Monday.

23   MR. RION:  I'm going to -- let me see --

1    MRS. KOHLRIESER:  Your Honor, I do have one

2  other motion based upon something that just came to my attention.

3    THE COURT:  Well, wait.  Are you --

4    MRS. KOHLRIESER:  Oh, I'm sorry.

5    THE COURT:  He said he had one more

6  thing.  Do you have one more thing, or not?

7    MR. RION:  No.

8    THE COURT:  Okay.  She has a motion.

9  What's the State's motion?

10    MRS. KOHLRIESER:  It's just come to my

11  attention that the defendant somehow is requesting a media interview.  I don't

12  know if Mr. Rion is aware of this.  I guess at this time I would ask for a gag

13  order on this case between the parties and the attorneys until the resolution of

14  this case just so there's nothing else out there in the media.  I know we've

15  given the jury instructions; but, again, to avoid any potential mistrial type of

16  issues that's why I'm asking for a gag order as far as talking about this case

17  to the media.

18    MR. RION:  No objection.

19    THE COURT:  Okay.  Because the case is

20  still pending and, again, to avoid any even opportunity that the jurors may,

21  even though they've been instructed not to pay attention to any media

22  accounts, I don't want to add to the risk that there might be something and so

23  I will grant the motion.  It's not a gag order in terms of gagging the media from

1  reporting on anything that's in the Courtroom.  But, I will issue the order to the

2  extent that the attorneys and the officers and the participants, including the

3  defendant, not communicate with the media while this case is pending.

4              MRS. KOHLRIESER:   Thank you.

5              THE COURT:   If counsel just wants to give

6  me about five or ten minutes and then mosey into chambers we'll have an

7  off-the-record discussion about instructions for a little bit here this afternoon

8  and give everybody else an early break today and then we'll go back on the

9  record.  If you get here Monday morning at eight o'clock, to go on the record

10  with anything we need to with regard to instructions we can do that then.  But,

11  this afternoon would be for the next hour or so just a general discussion and

12  that will give everybody over the weekend, myself included, to firm up the

13  instructions and get another draft, if nothing else, ready for you to look at.

14        Obviously I want all the jury instructions to be finalized and objections

15  put on the record before we start closing arguments.  So you'll know, the

16  parameters of closing arguments are not that you necessarily recite the

17  instructions, but I know it's common for both the State and the defense to

18  indicate to the jurors that the Judge will be instructing you this, or, the Judge

19  will be instructing you that.  That's why I want the final copy - so you're not

20  misrepresenting what the instructions might be.  Okay?

21        So, give me five or ten minutes, or give yourselves five or ten minutes

22  and then come on back and we'll start the discussion about the instructions.

23  **(WHEREUPON, COURT RECESSED FOR THE DAY AT 2:24 P.M.)**

1        **MONDAY, SEPTEMBER 21, 2015**

2        **9:23 A.M.**

3

4        THE COURT: We're on the record today

5 this 21st of September, 2015 in Case Number CR2014 0139, State of Ohio

6 -vs- Markelus Q. Carter.  The record will reflect the defendant is present in

7 Court with his attorney, Mr. Rion.  The State is present through Assistant

8 Prosecuting Attorneys Kohlrieser and Miller.  The jurors were assigned to be

9 here in about six minutes.  They are congregating.  They are not in the

10 Courtroom.

11    The Court wants to put a couple of things on the record.  First off,

12 when we left yesterday - not yesterday - Friday there were a couple of

13 defense exhibits, I think there were some certified copies, or, some records

14 involving the criminal record of Joey Moore.  The Clerk of Courts has

15 delivered certified copies of those.  Mr. Rion, did you get those?

16        MR. RION:  Yes.

17        THE COURT: So, those will be admitted

18 now.  They've been certified.  Okay?  I think that's 'AA', 'BB', 'CC', and 'DD'.

19 Okay?

20    There was another, there was a 'JJ', a Defense 'JJ', that was moved.

21 That was the anonymous letter.  I left that and, I think, took that under

22 advisement.  Upon the Court's research on that the Court is going to admit

23 that over the objection of the State.  The parties know, because I gave them

1    a draft of the instructions, that I'm admitting that, but not to be used as offer of

2    proof of what might be asserted in the anonymous letter because obviously

3    by its very nature we don't know who made the assertion.  But, it's not being

4    offered -- so, it's not hearsay.  I'll allow it as an exhibit over the objection.

5         The Court wants to also put on the record that I think made mention of

6    this, but the video, the DVD recording of what happened in the hallway

7    outside the jail cell, well, the State had provided the Court with a copy of that

8    and we'll make that a Court exhibit.  So, put that in with the Court's exhibits.

9         There's 'JJ'.  We've got 'AA', 'BB', 'CC', and 'DD'.

10        What I'll do then, I'll let the defense -- well, I understand that the

11   defense has some more witnesses.  After the defense witnesses we'll take a

12   break and then any other exhibits or any other discussion that we have to

13   have about exhibits we can have after the defense rests.

14        The Court and counsel stuck around a little bit on Friday after the

15   jurors were excused and had some brief discussions off the record about

16   instructions.  The Court redrafted -- the Court had given an original draft and

17   the Court had redrafted that and got that to counsel electronically so they

18   could have it over the weekend.  I want the record to reflect also that we've

19   had some time this morning to talk about those.  I know there will be some

20   things that the parties want to place on the record with regard to those but,

21   again, my practice would be that we wait until all of the evidence is in.  So,

22   too, after the defense presents all its evidence and we go over all the defense

23   exhibits then we'll see if the State wants any rebuttal and then we'll have that

1   conversation outside the presence of the jurors, but on the record, as to jury

2   instructions.  But, the Court has given counsel this morning what is the most

3   recent draft.  We'll have one other discussion about that on the record.  But,

4   I'm going to wait until all of the evidence is in.  So, keep your objections, if

5   any, in mind and we'll have that discussion before closing arguments.

6        So, I think that was all I wanted to cover.  Is there anything the State

7   wants to put on the record right now other than what I've already mentioned

8   that we'll do later?

9                               MRS. KOHLRIESER:  No, your Honor.

10                              THE COURT:  Anything from the defense?

11                              MR. RION:  No, your Honor.

12                              THE COURT:  Okay.  The defense has

13  another witness ready?  Do you?

14                              MR. RION:  Yes, your Honor.

15                              THE COURT:  Okay.  Now, last time

16  Monica checked I think we may have all the jurors in there.  But, since they

17  were supposed to be here at nine-thirty, well, we'll actually ahead of

18  schedule.  We've got two minutes.  I'm going to step off the Bench and check

19  with the bailiff and if they're all here we'll get started with the jurors.  Okay?

20  So, we'll stand in recess.

21  (WHEREUPON, COURT WAS IN RECESS.)

22

23

1     THE COURT:   We're on the record and

2     we're reconvening in CR2014 0139 this 21st day of September, 2015.  The

3     case name is State of Ohio -vs- Markelus Q. Carter.  The defendant is

4     present in Court with his attorney.  The State of Ohio is present.  The jurors

5     have returned from the weekend recess.

6     Welcome back, ladies and gentlemen of the jury.  I hope you got some

7     rest and you're ready to go.  As I indicated on Friday when we had an early

8     break, I think we're at the position now where hopefully we'll be able to wrap

9     this thing up and get this case to you folks sometime today.

10    We are continuing with the presentation of the defense evidence.

11    Before we do that, again, I don't want to forget and want to make sure - is

12    there any juror, since being on the last recess, who feels like they've either

13    been exposed to something, or read something, or heard something, or

14    someone said something, or something happened that would make any of the

15    jurors feel that they can't continue to serve and fairly and impartially

16    deliberate in this case?  Anybody?  Okay.  Nobody has indicated that.

17    So, Mr. Rion, you may call the defense's next witness.

18    MR. RION:   Call Tarah Carter.

19    WHEREUPON, called to appear as a witness in this proceeding was one:

20    **T A R A H   C A R T E R**

21    who, having been duly sworn by the bailiff herein, testified as follows:

22    BAILIFF:   She has no objection.

23    THE COURT:   No objection?  Okay.  Go

1    ahead.

2                    **DIRECT EXAMINATION**

3    **BY MR. RION:**

4    Q        Good morning.

5    A        Good morning.

6    Q        Can you state your full name for the record, please?

7    A        Tarah Carter.

8    Q        And keep your voice up.  Everything is being recorded.

9                                        THE COURT:    Could we have her spell her

10   first name, too?

11   Q        Can you spell your name, please?

12   A        T-A-R-A-H.

13   Q        And Carter, C-A-R-T-E-R?

14   A        Uh-huh.

15   Q        Where are you living now?  With whom are you living?

16   A        I live with my step-dad and my mom in Brownsburg, Indiana.

17   Q        Okay.  And how old are you?

18   A        Pardon?

19   Q        How old are you?

20   A        I'm twenty-one.

21   Q        And did you graduate from high school?

22   A        Yes.

23   Q        Did you do some college?

1   A       Yes.

2   Q       Where did you go to college?

3   A       I went to Rhodes.

4   Q       And how do you know Sonya Burkholder?

5   A       That's my mom.

6   Q       And Markelus?

7   A       That's my dad.

8   Q       Growing up, prior to 2004 or 5, were you and your brother and your

9   mom and dad all living together?

10  A       It was a couple of years before that; but, yes, we all lived together.

11  Q       Okay.  And what year were you born?

12  A       1994.

13  Q       '94?  So, the first ten years, or less, or so of your life were you all

14  together?

15  A       Yes.

16  Q       Was there a time in your life when your mom moved out and then was

17  there a time that she moved back?

18  A       Yes.  My mom moved out when my grandma was sick and my

19  grandma passed away and she stayed in her house.  My dad moved on and

20  bought a new house.  Then my mom was evicted and he allowed her to come

21  live with us.

22  Q       When your mom came back to live with you guys where did she sleep?

23  A       We shared a room.

1    Q    You and your mom did?

2    A    Yea.

3    Q    So, when she came back it's not as if she was back with your dad?

4    A    No.

5    Q    Okay.  Then you were present in 2007, I guess, when your mom left

6    the house for the last time; correct?

7    A    Yes.

8    Q    In that situation was it your mom wanting to leave or your dad wanting

9    your mom to leave?

10   A    My dad asked my mom to be out by midnight.

11   Q    Okay.  The jury's heard a lot about that night and that incident.  Just

12   very briefly, when your mom was walking down the stairs and your dad was

13   walking down the stairs and you were walking down the stairs describe what

14   happened as your mom left.

15   A    As my mom was walking in front of me and my dad's behind me and

16   he goes and she kind of just stopped and was kind of throwing a fit a little bit.

17   My dad opened the door and she just like slammed it shut and had her bags,

18   or, a bag and she acted like she didn't want to leave and she was just trying

19   to argue and then she finally left.

20   Q    Okay.  Did your dad strike her with a pistol?

21   A    No.

22   Q    Did she have scratches on her face?

23   A    No.

1   Q       Did she have blood dripping down on her face?

2   A       No.

3   Q       How long -- after that happened how long -- so, what happened to

4   you?  Ultimately that next day what happens to you?

5   A       I don't remember.

6   Q       In other words, did you stay at your dad's house that next night or

7   where were you staying?

8   A       I don't remember.  No, my dad was in jail.

9   Q       Okay.  So, do you remember who you stayed with?

10  A       No.

11  Q       The jury has heard that there was a period of time that night when the

12  police were around the house and you guys were inside the house; right?

13  A       Yes.

14  Q       Describe that a little bit.  How did you feel?  What were you thinking?

15  What was going through your mind?

16  A       It wasn't scary and it wasn't anything like that because I didn't realize

17  how serious like a S.W.A.T. team was or what was happening.  My brother

18  slept through it.  My dad was just making sure we were getting ready for

19  school.  But, I was up from the time she left until we found out school was

20  cancelled the next day.

21  Q       Okay.  Were you there with your dad when all that was happening?

22  A       At the house?

23  Q       Yea.

1  A      Yes.

2  Q      Are you saying it wasn't -- were you being kept or anything like that in

3  the house?

4  A      No.

5  Q      Describe just the mood on the inside.

6  A      I think that my dad was just trying to keep me, like, make everything

7  feel kind of normal.  But, it was kind of weird.  The phone was ringing

8  constantly.  People were calling and wanting us to come outside.  But, we

9  were just there, trying to go back to sleep or just waiting for school the next

10  day.

11  Q      Sort of a strange event; huh?

12  A      Yea.

13  Q      Well, the next couple of weeks do you recall where you stayed?  Did

14  you stay with your mom or your dad for those next couple of weeks after that?

15  A      I don't remember.

16  Q      After December 17th did you ever stay with Don and Krista at all at

17  their house?

18  A      Yes.

19  Q      Okay.  Do you remember how many weeks you may have stayed

20  there?

21  A      No.

22  Q      Eventually do you go back to an arrangement where you're staying

23  with your dad?

1   A     Well, I stayed with Krista and Don for awhile, and then I stayed with

2   Eric Bennett, and then when my dad came home I stayed with my dad.

3   Q     Going into 2009 what was the arrangement?  Like what nights would

4   you stay at your mom's and what nights would you stay at your dad's?

5   A     My mom had gotten a house on McKibben Street and I would go stay

6   with her.  I would come Sunday night and stay Monday night, Tuesday night,

7   and then Wednesday, well, I would stay there Tuesday night and then

8   Wednesday after school I would go back with my dad.

9   Q     So, Wednesday through the weekend would you usually be at your

10   dad's?

11   A     Yes.

12   Q     And then Sunday through Tuesday and into Wednesday you would be

13   at your mom's?

14   A     Yes.

15   Q     Was that a fairly regular schedule that you had?

16   A     Yes.

17   Q     Did your brother share that schedule, or not?

18   A     No.

19   Q     Tell me about, just briefly, when it was that your mom moved into the

20   McKibben address.

21   A     I don't remember.

22   Q     A month?  Two months?  Five months?  A year?

23   A     Oh, it was awhile.  She stayed with Krista and Don for awhile.

1    Q     Was she at McKibben for Christmas time that year before?

2    A     Yes.

3    Q     Okay.  In November, that late fall, do you recall, in November, or, for

4   Thanksgiving was she in that house?

5    A     Yes.

6    Q     Was there a time that Ken Warrington was staying there?

7    A     Yes.

8    Q     Describe to the jury when you first met Ken and how you saw that

9   relationship.

10   A     I don't remember the day that I met him.  I just remember little things

11   about him, like the foods he liked and him packing his lunch sometimes.  But,

12   normally I would come and I would, like, miss him.  Like, I would pass him

13   and he would be heading out to work when I was coming to stay at my mom's

14   a lot of the time.  He worked overnight and so we didn't really have a

15   relationship.  I just had met him and saw him sometimes.  I kind of tried to,

16   like, avoid him because it was different to me with my mom having another

17   older companion.

18   Q     Okay.  So, he usually went to work around what time in the evening?

19   A     It was like nine or ten at night.

20   Q     And then he would get off in the morning sometime?

21   A     Yea.

22   Q     Around -- when you were there Sunday, Monday, and Tuesday, well,

23   let's take from Christmas until this event, was he there?  Describe how often

1    was he there.

2    A    I don't really remember.  He wasn't there like seven days a week.  But,

3    he would be there sometimes when I was there.  He wasn't there all three

4    days I was there or anything.  I don't remember.

5    Q    One out of three?  Two out of three?

6    A    I don't remember.

7    Q    Okay.  More often than not?  Is there a way to --

8    A    It was kind of like more or less often - like maybe one of the three days

9    or so.

10   Q    Okay.  Do you know where he would be the other times?

11   A    No.

12   Q    Coming up then to -- now, on Christmas did you see your mom -- did

13   your mom get any gifts from Ken, Mr. Warrington, that Christmas?

14   A    Yes.

15   Q    Did you ever see what it was?

16   A    I knew that it was a jewelry box.

17   Q    Okay.  So, he gave her a piece of jewelry for Christmas?

18   A    Yes.

19   Q    Did you ever see her wear -- she wasn't wearing an engagement ring

20   or anything like that; was she?

21   A    No.

22   Q    In the days leading up to this was there any talk about Ken Warrington

23   getting a divorce that you were talking to your mom about or overheard?

1   A      Yes.

2   Q      Tell the jury about what you heard --

3                                    MRS. KOHLRIESER:  Objection to

4   hearsay, your Honor.

5                                    MR. RION:   It's not really for the truth of

6   the matter.

7                                    THE COURT:   I'll overrule it.  Go ahead.

8   Q      Go ahead.

9   A      My mom had told me that she was waiting for the divorce papers

10  between Ken and his wife to be finalized and apparently, the night that I went

11  and stayed with her, she told me it was going to be the next day.

12  Q      Okay.  So, in your mind at least you thought that Mr. Warrington and

13  Mrs. Warrington were getting a divorce?

14  A      Yes.

15  Q      And the information received from your mother was that it was

16  imminent; correct?

17  A      Yes.

18  Q      When Ken would be at the house where would he stay?  I shouldn't

19  use -- when Mr. Warrington came to the house where would he stay?

20  A      With my mom.

21  Q      Okay.  Whose bedroom would he sleep in?

22  A      In my mom's.

23  Q      Okay.  Did he only sleep in the guest room, or Markie's room, your

1  brother's room?  Did you ever see him just sleeping in Markie's room, or did

2  he sleep with your mother?

3  A       No, he slept in my mom's room.  He would use the closet in that extra

4  room, though.

5  Q       Okay.

6  A       But, he didn't sleep in there.

7  Q       Now, let's go to February 23rd, 2009.  I guess February 22nd would be

8  the night before Mr. Warrington was killed.  Tell me, when you got home,

9  about your mom.  Did you notice anything different about her that you had

10  never seen before?

11  A       I don't remember how I got to my mom's.  I don't remember if my dad

12  took me or if my mom picked me up.  I just remember I was standing in the

13  kitchen talking to my mom.  We were having a conversation.  We stayed up

14  later than normal and then she was acting different.  Her eyes were red.  She

15  was kind of rambling.  I knew she was drunk.  We got into an argument.  I

16  don't remember what it was about.  I went to my room and I just kind of

17  closed the door and avoided her.  I talked on my phone that night with two

18  different people until I went to sleep.

19  Q       We'll get to those phone calls later.  That next morning were you

20  awoken earlier than usual?

21  A       Yes.

22  Q       Tell the jury the events of the early morning hours of February 23rd.

23  A       I don't remember exactly what time I was woke up.  It was between

1 like six/six-thirtyish.  That was earlier than normal.  I normally didn't wake up

2 until like seven o'clock.  I was last minute and always late to school.  My mom

3 came in and she woke me up and she opened my blinds.

4 Q Now, had your mom ever come in and opened your blinds like that?

5 A No.

6 Q What did she say and what did she do?

7 A She came in and she woke me up early.  She opened my blinds and

8 she said, "Ken's truck's there, but he never came in."

9 Q It's okay.

10 A Then she went around the house looking for him.

11 Q Where did she go around the house?

12 A She checked -- like, just looking around.  Like, she looked in the

13 bathroom.  She opened the doors and was looking around, like the bedroom

14 doors and stuff.  She just was like, "I can't find him."  I told her, I was like,

15 "He's probably hiding.  He's probably just trying to scare us.  I'm not falling for

16 it."  I sat on my bed and I was just on my phone.  Then I heard her scream.

17 Q Now, before she screamed, -- well, is there a way to tell if she's

18 opening the front door of the house?

19 A You could hear -- like, if you open the doors you would hear two

20 beeps normally, or, a beep just because we had an alarm system.  That's

21 how I knew she opened the front door because I heard it.  I didn't know what

22 was going on.  I was still back in my bedroom.  But, I knew that she opened

23 that door because when I came and found her after she was screaming --

1    obviously I heard the beep four times.  Like, I heard her open both doors.  I

2    know she opened both doors.  She saw that Ken was laying there.

3    Q        Did you guys ever use the front door whatsoever?

4    A        No.  We parked on the side of the house or the back of the house.

5    Q        If you're looking for Ken would it make sense to look at the side door

6    first or the front door first?

7    A        The side door.

8    Q        When your mom screamed what did you do?

9    A        She screamed my name a few times before I finally got out of my bed

10   and stopped texting.  I walked to the end of the hallway and I looked to my

11   right in the living room where my mom was and she pointed to my left and

12   directly to my left was the side door that we would use.  I saw the screen door

13   being held open by Ken.

14   Q        And you called -- did your mom try to call 9-1-1 and did you ultimately

15   call 9-1-1?

16   A        I walked over and I checked his pulse and I told my mom to call 9-1-1.

17   She just couldn't.  So, I went and I called 9-1-1 and I told them that he had

18   been shot; that he wasn't alive; or that he had been killed.  They asked,

19   basically, you know, 'is he alive'?  I told them no.  They said 'how do you

20   know'?  I told them that I checked his pulse.  I think they asked, like, 'where'

21   or something.  They basically just told me that dispatch is in the area, that

22   somebody reported gunshots.  While I was on the phone the cops pulled up in

23   the yard.

1   Q      When they came did they -- well, where did they take you?

2   A      To the Police Station.

3   Q      What questions did they ask of you?

4   A      They asked our names.  They asked if that was my dad.  I told them

5   no.  They asked who my dad was.  Then that's the last question I remember.

6   Q      Did they take your phone?

7   A      Yes.

8   Q      Was your mom with you?

9   A      Yes.

10  Q      Describe her state that morning.  Was she getting sick at all?

11  A      Yes.

12  Q      Describe to the jury what you saw that morning.

13  A      While we were sitting there waiting for them to call us back to talk to us

14  my mom was crying and, like, vomiting in a trash can.  Instead of like that sad

15  cry that, like, creeps up on you she was just like screaming and just -- I don't

16  know.

17  Q      Now, that night before when you say that your mother had been

18  drinking, had you ever seen her that intoxicated before?

19  A      No.

20  Q      When your mom came in the room and opened the blinds, when she

21  came in like that, -- describe the blinds.  Were these curtains, or blinds, or

22  what were they?

23  A      They're blinds.  You twist them and they open or close.

1   Q     You're saying that in your entire life, or at least your entire teenage life,

2   you had never seen her come in and like open up your blinds like that?

3   A     I don't remember her ever doing that.

4   Q     So, let's go back to -- let me switch subjects for a minute.  When you

5   would go to school on, I guess, Thursday and Friday who would take you to

6   school?

7   A     My dad.

8   Q     What kind of car was he driving?

9   A     It was a black truck, a Ford truck.

10   Q     When it was cold outside was there anything different that you had to

11   do to get that car started?

12   A     When it was cold and it wasn't like started he would have to, like, jump

13   it and we had the jumper box and one person would, like, hold the clamps

14   and one person would go start the car.

15   Q     And were the clamps on the jumper box in order or was one different

16   than the other?

17   A     There was something wrong with them.  You had to hold one of them

18   down.

19   Q     Like literally hold it while another person starts the car?

20   A     Yea.

21   Q     Then once the car was warm how did it work?  Did it work okay?

22   A     Uh-huh.

23   Q     So, in other words, if you drove it for awhile and stopped at the store

1   and ran in for a minute and came back it would re-start at that point?

2   A     Yes.

3   Q     But, if you left it overnight, or whatever, it would be cold; correct?

4   A     Yea.

5   Q     Okay.  There was a time when -- there was a shed outside the side of

6   your house; right?

7   A     Yes.

8   Q     If I were to go out today and look at it is there a motion light on the

9   front of it now?

10  A     I don't know.

11  Q     Did your mom ever tell you why she was upset that night before?

12  A     No.

13  Q     Thank you.

14                          THE COURT:   Questions by the State?

15                          **CROSS EXAMINATION**

16  **BY MRS. KOHLRIESER:**

17  Q     Good morning, Miss Carter.

18  A     Morning.

19  Q     A couple of things I want to just clear up and make sure we're good.

20  You said Sonya Burkholder, now Hughes, is your mother; correct?

21  A     Yes.

22  Q     And Markelus Carter is your father?

23  A     Yes.

1  Q      And you have a brother named Markelus Carter as well, but he goes

2  by Markie; right?

3  A      Yes.

4  Q      He has a different middle name than your dad; right?

5  A      Yea.

6  Q      What's his middle name?

7  A      He has two of them.  It's Kavell and Rene.

8  Q      Okay.  And your dad's middle name is Quan; correct?

9  A      Uh-huh.

10  Q      And you're twenty-one?

11  A      Yes.

12  Q      And Markie is two years older than you; right?

13  A      Uh-huh.

14  Q      And you have a little boy, I understand?

15  A      Yes.

16  Q      What's his name?

17  A      His name is Arian.

18  Q      Okay.  And his dad is Tayvon Brown?

19  A      Yes.

20  Q      And currently you're living with your mom and your step-dad over in

21  Indiana?

22  A      Yes.

23  Q      Now, you testified that you kind of went back and forth between your

1    mom and dad's prior to Ken Warrington's death.  Let's put it in that time

2    frame.  But, largely you stayed at your dad's?

3    A    Yea.

4    Q    And I think you said you stayed with your mom like a Sunday, Monday,

5    Tuesday type of thing?

6    A    Yea.

7    Q    Okay.  And you basically avoided Ken Warrington and he was usually

8    gone by the time you got there off to work?

9    A    Often times.

10    Q    And he would get home to the McKibben Street address between, say,

11    five and five-thirty in the morning usually?

12    A    Yes.

13    Q    Would you be asleep at that time?

14    A    Yes.

15    Q    And on those days -- well, I guess, let me back up.  The McKibben

16    Street address, that's a Habitat for Humanity house; correct?

17    A    Yes.

18    Q    Your mom participated in building that house in order to get that

19    house?

20    A    Yes.

21    Q    And I know you said you didn't quite remember, but does September of

22    2008 sound about right for when your mom moved in?

23    A    I don't remember.

1    Q      Okay.

2    A      I remember we started building when it was hot.

3    Q      So, like the summertime or something?

4    A      Uh-huh.

5    Q      Okay.  Then you were pretty sure that she was in there before

6    Thanksgiving that year; correct?

7    A      Yes.

8    Q      You've testified at Grand Jury before in this case; haven't you?

9    A      Yes.

10    Q      You've also talked with people for your dad's defense team; correct?

11    A      Yes.

12    Q      You explained to them, them being your dad's defense team, about

13    your dad kind of being more of the disciplinarian in the family; correct?

14    A      Yes.

15    Q      He would get on you about your grades and things of that nature?

16    A      Yea.

17    Q      In fact, when you woke up the day Ken Warrington was killed you had

18    a text from your dad about your grades slipping; didn't you?

19    A      Yea.

20    Q      Would it be fair to say you were with your dad more than you were with

21    your mom growing up, for the most part?

22    A      Yea.

23    Q      Now, would it also be fair to say that your mom, or, excuse me, your

1    dad didn't really care for your mom's life style?

2    A      What do you mean?

3    Q      Like who she dated and things of that nature?

4    A      No.

5    Q      Did he ever express to you that he thought you were getting to be a

6    little too much like your mom?

7    A      No.

8    Q      No?  Okay.  Now, let's talk about a couple of things that you talked

9    about with Mr. Rion.  Specifically, you said that you had never seen your mom

10   intoxicated prior to the night before Ken was killed; correct?

11                              MR. RION:   Objection.  That wasn't quite

12   the testimony.

13                              THE COURT:   I'm going to overrule it.  It's

14   cross examination.  Go ahead.

15   Q      Okay.  Let me ask you this.  Just a moment.  Give me just a second,

16   your Honor.  Do you remember testifying at Grand Jury that you had never

17   seen your mom intoxicated before?

18   A      I remember testifying.  I don't remember specific questions.

19   Q      Okay.  Do you remember testifying at Grand Jury that you had seen

20   your mom -- that your mom was actually intoxicated back in December of

21   2007 at that incident?

22   A      Yes.

23   Q      So, she was intoxicated that night as well?

1   A       That's what I was told.

2   Q       That's what you were told?

3   A       I didn't see her drinking.

4   Q       Okay.

5   A       I'd seen her drink.  I hadn't seen her --

6   Q       Drunk?

7   A       Right.

8   Q       Fair enough.  Now, you said the Christmas before Ken Warrington was

9   killed that you saw him give your mom a jewelry box; correct?

10  A       Yes.

11  Q       But, you didn't see the contents of that jewelry box?

12  A       I thought it was a ring, but when I asked her she denied it.  So, I don't

13  know.

14  Q       And is it fair to say that after -- let me rephrase this.  That morning

15  when you had seen Ken Warrington's body you actually checked his pulse;

16  correct?

17  A       Uh-huh.

18  Q       And your mom, for whatever reason, couldn't quite call 9-1-1 and you

19  had to make that phone call?

20                              THE COURT:  You'll have to answer out

21  loud so we can get it on the record.

22  A       Yes.

23  Q       Okay.  Do you remember telling me in Grand Jury that you initially

1    weren't that upset, that you were more in shock at that point?

2    A    Yes.

3    Q    And that the reality of what had happened didn't really set in until you

4    realized you and your mom wouldn't be able to go to the funeral?

5    A    Yea.

6    Q    Okay.  I just want to make sure I'm correct because I don't want to

7    misconstrue your testimony.  The night in December of 2007, that night in

8    December of 2007 with the S.W.A.T. team and things of that nature, you were

9    just told that your mom had been drinking?

10    A    Yes.

11    Q    But, the first time that you ever actually witnessed your mom what you

12    would call under the influence, drunk, was the night before Ken was killed?

13    A    Yes.

14    Q    But, you have no idea what that was about?

15    A    No.

16    Q    Do you remember a time when you were on the phone with your dad

17    while you were at your mom's house and Ken told you to go to your room?

18    A    He told me -- my mom was vacuuming and he told me that I should be

19    the one vacuuming my own room, basically.

20    Q    Okay.  Do you remember your dad telling you to tell him not to tell you

21    what to do?

22    A    Yes.

23    Q    And do you recall the night before Ken Warrington, I know you said

1    you don't remember how you got to your mom's house, but do you recall

2    yourself seeing Ken Warrington the night before he was killed?

3    A      No.

4                                MRS. KOHLRIESER:   Give me just a

5    moment, please.

6                                THE COURT:   Okay.

7    (WHEREUPON, Court went off the record briefly.)

8    Q      How would you describe Ken Warrington?  Did you like him?

9    A      I didn't dislike him.  He was just older and I didn't really get to know

10   him.

11   Q      Okay.  You said you thought that morning when your mom was yelling

12   for you that he was hiding or something like that?

13   A      Yea.

14   Q      Was that something he was apt to do - play jokes and that type of

15   thing?

16   A      He had before.

17   Q      Okay.  I guess maybe it was a little awkward being around him, but did

18   you have any reason to dislike him?

19   A      No.

20   Q      Okay.  Did he treat you nicely when he was around you?

21   A      Yea.

22   Q      Did he appear to treat your mom nicely?

23   A      Yea.

1    Q      Did your mom appear to love him?

2    A      No.

3    Q      Did she appear to like him?

4    A      Well, they got along, but I never saw them like hold hands or anything

5    like that really.

6    Q      Okay.  Fair enough.

7                   MRS. KOHLRIESER:  Nothing further.

8                   THE COURT:  Okay.  Mrs. Kohlrieser, is

9    that your document?

10                 MRS. KOHLRIESER:  Oh, yes.  I'm sorry.

11                 THE COURT:   Mr. Rion, any redirect?

12                 MR. RION:  Just a few quick questions.

13              **REDIRECT EXAMINATION**

14    **BY MR. RION:**

15    Q      The prosecutor asked you about your mom and your now step-dad.

16    What's your step-dad's -- when was it that your -- well, approximately how

17    long after this February 23rd incident did your mom marry Mr. Hughes?

18    A      I don't know when they got married, but one of my first times meeting

19    him was that July right after.  We celebrated my birthday at Cedar Point.

20    Q      And by the fall of that year were they married?

21    A      I don't know.  I came to her house and saw a marriage certificate.

22    That's how I found out.

23    Q      So, your mom didn't even tell you she was getting married?  You just

1    saw a marriage certificate sitting there?

2    A    Yes.

3    Q    And was that in the fall?

4    A    I don't know.

5    Q    Was it within a year of this whole event that your mom was remarried,

6    or, was married?

7    A    Yes.

8    Q    Now, do you know whether or not there were triggers that caused your

9    mom to drink?

10   A    At that time, no.

11   Q    At that time you didn't know, or at that time there weren't?

12   A    At that time I didn't know.

13   Q    Okay.  Since that time have you had the ability to observe your mom?

14   A    Yea.

15   Q    Does it appear that there are triggering events that cause her to drink?

16                         MRS. KOHLRIESER:  Objection, your

17   Honor.  Relevancy.

18                         THE COURT:  Do you want to argue that?

19                         MR. RION:  Well, the relevance is whether

20   or not there's a triggering event this nigh.

21                         MRS. KOHLRIESER:  What?  If she didn't

22   observe it then, your Honor, it's --

23                         THE COURT:  I'll overrule the objection.

1  Go ahead.  Not a whole lot of questions; but, go ahead.

2  Q      The simple question is - having now lived with your mom for some time

3  are there triggering events that cause her to drink?

4  A      Often times; yes.  Things like she saw that her niece had a baby and

5  hasn't seen her baby and hasn't seen her niece.  It's just things that she

6  doesn't know that she finds out and she's missing out on or something like

7  that.

8                              MRS. KOHLRIESER:  Your Honor, again,

9  I'm going to object to relevancy.  We're talking six years down the line here.

10                             THE COURT:  Okay.  Let's move on to

11  another subject now.

12  Q      You've never seen your mom with a gun; correct?

13  A      No.

14  Q      But, did she ever intimate that she had one?

15                             MRS. KOHLRIESER:  Objection, your

16  Honor.  This is way beyond the scope of cross examination.

17                             THE COURT:  I'll sustain that objection.

18  Q      Thank you.

19                             THE COURT:  Any recross?

20                             MRS. KOHLRIESER:  Just briefly.

21                      **RECROSS EXAMINATION**

22  **BY MRS. KOHLRIESER:**

23  Q      Do you remember telling your dad's defense team that you thought

1   your mom and Don, your step-dad now, fell for each other, connected to each

2   other, because they both had had tragedies in their life?

3   A      I don't remember.

4   Q      You don't remember telling them that your mom --

5   A      I don't remember telling them.

6   Q      Okay.  You don't remember telling them that your mom had lost Ken

7   and Don had lost a son and you thought that was what brought them

8   together?

9   A      I believe that.  I don't remember telling them that, though.

10  Q      Oh, okay.  But, you do believe that's kind of what brought them

11  together?

12  A      Yea.

13  Q      And they actually met on a computer dating site sometime after --

14  A      Don or Ken?

15  Q      I'm sorry.  Don, your step-dad.  Your mom and Don actually met on a

16  computer website; correct?

17  A      Yes.

18  Q      In fact, your mom showed you, 'hey, look here'.

19  A      She showed my best friend.

20  Q      Okay.  Gotcha.  That night when Ken Warrington was killed you don't

21  know what, if anything, your mom was upset about; correct?

22  A      I don't know.

23  Q      Now, Tarah, isn't it true that there was an incident involving Tayvon

1   Brown, your baby's father, in which you came to Court and lied for him?

2                                        MR. RION:   Objection.  It's beyond the

3   scope.  It's redirect.

4                                        MRS. KOHLRIESER:   It goes directly to

5   her credibility, your Honor.  It's a specific incident of conduct that I'm not using

6   extrinsic evidence for.

7                                        MR. RION:   May we approach, your

8   Honor?

9                                        THE COURT:   Approach.

10  (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

11  the record, as follows.)

12                                       MR. RION:   Your Honor, the questions on

13  redirect were about Don and about drinking events, or, alcohol.  That was it.

14                                       MRS. KOHLRIESER:   You opened the

15  door.

16                                       MR. RION:   And recross goes to those two

17  issues and those two issues only.

18                                       MRS. KOHLRIESER:   Which opened the

19  door to her willingness to lie.

20                                       MR. RION:   She said she didn't --

21                                       MRS. KOHLRIESER:   She's going to talk

22  about triggering events with her mother.  I'm challenging her credibility.  She's

23  lied before under oath and I don't doubt she'll lie again about anything.

1                                     THE COURT:  All right.  Okay.  I'll overrule

2  the objection since it's credibility.  Go ahead.

3  (WHEREUPON, Court continued on the record, as follows.)

4  Q     Isn't it true that you lied under oath in an incident involving your baby's

5  father?

6  A     Yes.

7                                         THE COURT:  Is that it?

8                                         MRS. KOHLRIESER:  Just a moment.

9  Nothing further.

10                                     THE COURT:  Okay.  Miss Carter, you're

11  done.  Thank you.  You're excused.  Does the defense have any other

12  witnesses?

13                                       MR. RION:  No, your Honor.

14                                       THE COURT:  Okay.

15                                      MR. RION:  At this time, subject to the

16  admission of the defense exhibits, the defense rests.

17                                    THE COURT:  Okay.  I appreciate that.

18  Ladies and gentlemen of the jury, much like we did after the State presented

19  their witnesses, I have to go over and finalize all of the exhibits that the

20  defense has asked to be admitted.  We do that outside the presence of the

21  jury.  Then after that I think we'll be ready to go to the next final stages of the

22  case with you folks.

23      So, we'll excuse the jurors.  It's probably going to be about fifteen or

1    twenty minutes.  So, let's just go for twenty minutes.  That will be twenty till

2    eleven that we'll have you come back in here.

3         Now, remember now, you may have heard all of the evidence.  I don't

4    know if there's going to be anymore.  But, at this point it looks like you've

5    heard all of the evidence.  The State does have the right to present rebuttal.

6    I'll ask them if they want to do that during the break.  Don't formulate or

7    express any opinions yet because you're going to hear the closing arguments

8    from the attorneys and then I have to give you my instructions before you

9    start deliberating.  So, don't start discussing things and start doing anything

10   like that.  Don't express or formulate any opinions.  Don't have any

11   communication with anybody involved.  The jurors will be in recess until

12   twenty till.  But, I want counsel to stay on the record.  Okay?  So, you're

13   excused, folks.

14   (WHEREUPON, JURY WAS EXCUSED FROM THE COURTROOM FOR A

15   BREAK.)

16                     THE COURT:   We have remained on the

17   record, but the jurors have been excused.  So, I think we covered most of the

18   defense exhibits on Friday.  Again, let's just go through here and make sure.

19   I think one of them that was kind of not officially submitted was -- you didn't

20   speak specifically to the picture that was drawn on the easel by Sonya.  Are

21   you moving that to be admitted?

22                     MR. RION:   Yes, your Honor.

23                     THE COURT:   That, I think, was --

1   MRS. KOHLRIESER:  'N'.

2   THE COURT:  'N'.  Yea.  That's right.  I

3   was looking for it there.  Is there any objection?

4   MRS. KOHLRIESER:  Your Honor, we,

5   again, would object because of the lack of accurate representation.  It's

6   basically the same reason that you wouldn't let our Google map in with Tim's

7   lines on it.  It's the same type of thing here.  We obviously have pictures of it.

8   Mr. Rion could have easily used those with her and those would have been

9   accurate representations.  So, we would object to exhibit 'N'.

10   THE COURT:  I'll admit 'N' over objection

11   of the State.  Then I had circled -- did we ever talk about the G.R.C. data

12   base, 'HH' and 'HH-1'?  Are you moving for those to be admitted?

13   MR. RION:  We are not, your Honor.

14   THE COURT:  All right.  So, 'HH' and

15   'HH-1' are not being moved.  Then I had circled 'J', or, 'II', I believe was the

16   conviction of Mr. Upham.

17   MR. RION:  I think by lunch time I'll have a

18   certified copy.  But, as soon as we have a certified copy we would be asking

19   for the admission of that.

20   THE COURT:  I think I ruled on Friday that

21   assuming, or, well, with a certified copy, and I know the State had objected,

22   but I think I previously ruled that if it's certified, much like 'AA', 'BB', 'CC', and

23   'DD', that I would admit that.  So, 'II', again, would be admitted.  Then I

1    believe I already mentioned -- did I mention 'JJ'?  I think I already mentioned

2    'JJ'.  That's admitted.  I think that covers them all.

3                                    MR. RION:  I have a 'KK' here.  But, I

4    believe the Court may have a clean copy.

5                                    MRS. KOHLRIESER:  'KK' was the Allstate

6    proofs.

7                                    THE COURT:  'KK' was marked as the

8    picture of the proofs.

9                                    MRS. KOHLRIESER:  Whose report is

10   that?

11                                   MR. RION:  Vicki Bartholimew's report.

12                                   MRS. KOHLRIESER:  That was 'LL'.

13                                   MR. RION:  'LL'?  Okay.

14                                   THE COURT:  That's 'LL'.  'KK' was the

15   picture of the proofs from the car.  We had already admitted 'KK' and 'LL'.

16                                   MR. RION:  All right.  I was just making

17   sure since I had this one here.

18                                   THE COURT:  If you have it, make sure it's

19   with the exhibits because we want all the exhibits.

20                                   MR. RION:  I think 'KK' -- I think, well, this

21   has OHLEG copy written on it.

22                                   MRS. KOHLRIESER:  He was going to use

23   that, your Honor, and I offered to give him one that didn't have OHLEG copy

1    and that was signed.  That's how 'LL' came into being.

2                              THE COURT:   Okay.  So, with 'LL' then,

3    the defense rests?

4                              MR. RION:   Yes, your Honor.

5                              THE COURT:   Okay.  Any rebuttal the

6    State is going to call?

7                              MRS. KOHLRIESER:   No, your Honor.

8                              THE COURT:   Okay.  Again, the record

9    should show that the Court and counsel both, well, not so much on Friday, but

10   this morning we went over page by page with the draft instructions.  I think

11   there were several typos. and certain things that we agreed upon that counsel

12   have been given.  So, I'll give the State an opportunity, is there anything that

13   you want to object to the latest draft as of our last discussion, or any

14   instructions that you want put in that aren't put in?  Does the State have

15   anything?

16                              MRS. KOHLRIESER:   I apologize, your

17   Honor.  I'm just seeing the changes.  As long as the changes that we talked

18   about in chambers were made, which were just more semantical, I think, and

19   typographical the State would have --

20                              THE COURT:   Right.  I'll draw everybody's

21   attention just to keep everybody so you know what we're talking about - I

22   know there was some discussion about page fifteen, the 'other acts'.  I left it

23   as the recent draft that I gave you on Friday.  There were some other

1　changes, mostly typographical or sentence structure, I suppose, were several

2　changes.  Those are in the latest draft.  Well, look through that.

3　　　　　　　　　　　MRS. KOHLRIESER:  I don't appear to

4　have any objections, your Honor.

5　　　　　　　　　　　THE COURT:  Anything you want to put on

6　the record, Mr. Rion, with regard to any of the instructions?

7　　　　　　　　　　　MR. RION:  Your Honor, as it relates to on

8　page fifteen, 'other acts'.  Two weapons were found in the residence.  There's

9　the fact that Mr. Carter was in prison at the time.  I just don't see that as really

10　being other act evidence.  I have no objection to the paragraph ending 'that

11　evidence was received only for a limited purposes', or, 'for limited purposes'.

12　I'll just be frank - for example, the guns themselves being in the residence

13　could be evidence of an explanation of where the gunshot residue came from

14　as it relates to on the gloves.  So, it has relevance beyond 404 (B) for the

15　defense as well.  I don't really -- so, I'm not asking for this instruction.  The

16　purpose of him being in prison wasn't really raised to show he was in prison.

17　It was just raised to understand the context of how Mr. Upham and others

18　would have had contact with him.  So, I guess it wasn't really presented by

19　the government even as 404 (B) stuff.  It wasn't going to show motive, intent,

20　purpose, preparation, plan, or knowledge of circumstances, or even identity.

21　You know, the only thing that really fits under that -- well, I guess for those

22　reasons I would object to the instruction as it's listed because I think it actually

23　limits the defense's ability to argue the evidence.

1           THE COURT: Okay. Any response from

2   the State?

3           MRS. KOHLRIESER: Just briefly, your

4   Honor. I kind of see the point that Mr. Rion is making there. But, I believe

5   you have to tell them that it's not -- well, I guess, that you have to tell them so

6   that everything is clear for the record, for the jury, that it cannot be used to

7   show action in conformity therewith. I think the December of 2007 incident,

8   the guns in the house, the fact that he was prison, that was not for purposes

9   of showing the conformity type stuff. You know, in law school when we

10  explain it to people, or it gets explained, you know, we talk about, you know, it

11  can't be used to show he's a bad guy. That's not what the prosecution's

12  purpose in introducing that evidence was.

13          MR. RION: Would you agree - sorry to cut

14  you off - would you agree, well, do you see the last, the word 'character' in the

15  second line from the bottom?

16          MRS. KOHLRIESER: Yes.

17          MR. RION: Would you -- what if we simply

18  ended the instruction there?

19          MRS. KOHLRIESER: Well, I don't think

20  that that's completely accurate either. I guess what I would suggest is that at

21  the end here on page fifteen where it says, 'if you find that the evidence of

22  other acts is true and that the defendant committed them, you may consider

23  that evidence only for the purpose of', and then you list the 404 (B) things. I

1  think it does go specifically to identify, but I think perhaps taking that word

2  'only' out, well, you tell them what they may not consider it for, but I think if we

3  quantify it that 'you may consider that evidence for the purpose of', and then

4  maybe even among other things deciding whether it proves dah, dah, dah,

5  dah, dah, and that way they can consider it for, again, things such as how

6  they would have this knowledge, how they came to be, you know.  Again,

7  some of the 2007 incident, as an example, is part of what the State's

8  contention was a motivating factor - not the end all be all, but how it played

9  into all of this.  It does all go to identity in that regard.  Joey Moore being in jail

10  with him and Stephen Upham being in prison with him and things like that,

11  well, that all goes to establishing the identity of the killer and why they would

12  know that type of information.  So, I think the Court does need to include that,

13  but perhaps maybe not say this is the only reason, or, these are the only

14  reasons you can consider it.  Do you see what I'm saying, your Honor, if that

15  makes any sense?

16                          THE COURT:  It does.

17                          MRS. KOHLRIESER:  So, I understand Mr.

18  Rion's concerns, but I think they don't encompass the entirety of the purposes

19  of this evidence.

20                          THE COURT:  Okay.  I see both sides, too.

21  I agree that evidence about the other guns, well, I've told the jurors on several

22  occasions that the other guns are not the guns alleged to have been used in

23  this case.  But, the fact that he has other guns and the fact that he admitted to

1    having another gun, those are other acts.  I think it would be prejudicial to the

2    defense if I didn't tell the jurors to don't think that his character, or, the

3    character of a person that has a gun when he's not supposed to have a gun

4    and, therefore, he might be guilty of Count Two, for example, in this case.

5    So, I think, Mr. Rion, with all due respect, I think for the protection of the

6    defendant there's got to be something in there that says they can't use that

7    evidence to show his character if a juror would think that a person who

8    possesses guns when they're not supposed to would be of such a character

9    to show that he acted in accordance with that character in either of the counts

10    in this case.

11         So, I'm going to leave it in.  But, I'm open to modifying it somehow to

12    allow the defense, obviously, all of this could be argued from a different point

13    of view.  So, I mean, does the defense have a problem if I take out on the last

14    line there on page fifteen - 'you may consider that evidence' and take out the

15    word 'only'?  Then maybe at the end of that sentence, in other words, 'you

16    may consider that evidence for the purpose of deciding whether it proves the

17    defendant's, move, intent', et cetera, and, well, we kind of covered that with

18    the last phrase, 'or whether it proves knowledge of circumstances

19    surrounding the offenses'.  That would leave room for you to argue that those

20    other weapons may be the source of G.S.R.

21                       MR. RION:  Fair enough.

22                        THE COURT:   I'm certainly not going to

23    limit your argument in that regard.  But, I think it's the Court's responsibility,

1    whether it's requested or not requested from either side, to make sure that the

2    jurors are not misled.  There's evidence of the other guns.  If I don't say

3    something about those other guns there perhaps could be an opportunity for

4    a juror to think, 'well, he had guns back then and he wasn't supposed to;

5    maybe he is guilty of Count Two', which is another Weapon Under Disability.

6    I was trying to make sure they didn't -- and that's why I did that all through the

7    trial, was to make sure they weren't thinking that .357 or that Glock in the

8    closet, well, were not the guns involved in this case.  I think I made that clear.

9    But, now, I also, I think, under 404 (B) I'm required to -- so, I think I'm going to

10    leave it in, but I'll take out the word 'only' in the last sentence on page fifteen

11    and allow counsel to argue that the list is not exclusive in terms of what the

12    defense could argue.

13                   MRS. KOHLRIESER:  Your Honor, with

14    that, on page sixteen, under that paragraph --

15                   THE COURT:  'For any other purpose';

16    yea.

17                   MRS. KOHLRIESER:  Yea.  You might

18    want to take that out.

19                   THE COURT:  Maybe that line -- well, that

20    line is a quote right from 404 (B), or, no, I think it's a quote from O.J.I.  But, I'll

21    take out the last sentence where it says, 'that evidence cannot be considered

22    for any other purpose'.  I will do that.

23    Anything else from the defense?  Exceptions noted.

1    MR. RION:   The entire paragraph of the

2    incident in the holding room.

3    THE COURT:   On page sixteen?

4    MR. RION:   On page sixteen.  Obviously

5    we objected to Mr. Upham speaking about it.  We objected to the tape itself

6    coming in.  We would object to any reference at all.  Again, this instruction

7    seems to invite -- well, I would suggest that it may indicate the defendant's

8    consciousness or awareness of guilt is almost the Court weighing in on the

9    value of the evidence.  I think that the testimony was pretty clear.  Mr. Carter's

10   statement of 'why are you lying on me' was his main statement.  It's not clear

11   from even the acts that occurred whether this has anything to do with

12   consciousness or awareness of guilt.  So, we would renew all of our

13   objections that we made before and object to this in its whole.

14   THE COURT:   Okay.  I understand.  The

15   objection will be overruled with exceptions for the reasons previously stated.

16   Obviously the instruction speaks for itself, but it also says that they could also

17   find some other motive prompted his conduct.  So, it's not -- I don't think it

18   overly suggests that the only reason one would strike out in the manner that

19   the defendant, or, the testimony was that the defendant did, the only reason

20   for that is not necessarily consciousness of guilt.  The instruction allows --

21   they may not believe, they may not even believe what Upham said and they

22   could find some other motive prompted the conduct.  So, it's a standard --

23   well, it's not standard because it's kind of modified to fit the facts of this case,

1   but that's what instructions are supposed to do.  So, this objection will be

2   overruled with exceptions noted.

3          Anything else from the defense?

4                          MR. RION:  No, your Honor.

5                          THE COURT:  Anything else from the

6   State?

7                          MRS. KOHLRIESER:  Just one thing by

8   way of clarification on page seventeen, your Honor.  We had talked about at

9   the very bottom where you say 'you will have with you in the jury room two

10  verdict forms'.  However, in looking at them, and I don't know if the Court

11  considers it one, but there's actually a verdict form for the specification.

12                          THE COURT:  Well, that's all part of Count

13  One.  That was my --

14                          MRS. KOHLRIESER:  Okay.  That's fine.

15                          THE COURT:  I'll explain that to the jurors

16  because it's still Count One.  Yea.  I mean, technically there are three, but

17  Count One, well, the specification is part of Count One.

18                          MRS. KOHLRIESER:  That's fine, your

19  Honor.  I just wanted to bring that to your attention and, I guess, get your way

20  of thinking.

21                          THE COURT:  All right.  Well, good.

22  Anything else?

23                          MR. RION:  Your Honor, may I consult with

1   my client for a second?

2                                         THE COURT:  Sure.

3   (WHEREUPON, Court went off the record briefly.)

4                                         THE COURT:  Anything else on the record

5   at this point?

6                                         MR. RION:  Your Honor, you're not going

7   to like this next statement, but after consulting with my client we would ask for

8   another charge to be given for simple Murder.

9                                         THE COURT:  For what?

10                                        MRS. KOHLRIESER:  Straight Murder?

11                                        MR. RION:  Just Murder - not Aggravated

12  Murder - as being a lesser included offense.  I apologize for the late

13  notification.

14                                        THE COURT:  Does the State want to be

15  heard?

16                                        MRS. KOHLRIESER:  Your Honor, I guess

17  can we have a few minutes?

18                                        THE COURT:  Sure.

19                                        MRS. KOHLRIESER:  I'm sorry.  This is

20  the first this has been mentioned.

21                                        MR. RION:  It is.

22                                        THE COURT:  Well, --

23                                        MRS. KOHLRIESER:  Do you mind if we

1    just step out to talk privately?

2                    THE COURT:   Yea.  Again, I want the

3    record to reflect, Mr. Rion, you don't have to apologize if you want to ask

4    these things.  I mean, don't make the statement 'I'm not going to like it'.

5                    MR. RION:   I didn't mean it in any way

6    other than professional courtesy, your Honor.

7                    THE COURT:   I know.  That it's a last

8    minute thing.  Well, I appreciate that.  So, yea, take a few moments.  Why

9    don't counsel maybe take a few moments and come back to chambers and

10   we can discuss and then we'll go on the record if need be.  Okay?

11   (WHEREUPON, COURT WAS IN RECESS.)

12

13                   THE COURT:   We're reconvening this 21st

14   of September, 2015 in CR2014 0139, State of Ohio -vs- Markelus Q. Carter.

15   The defendant is present with counsel.  The State is present.  The jurors are

16   still on a recess.

17        When we broke the defense had requested a lesser included

18   instruction on a straight Murder.  We had a discussion in chambers.  The

19   Court will grant that and include in the instructions an instruction on the lesser

20   included offense of Murder with a Firearm Specification.

21        Anybody else want to have anything to say on that?

22                   MRS. KOHLRIESER:   No, your Honor.

23                   THE COURT:   Okay.  With that, and then

1    I'll get that into the instructions and get you all the final copy before I read it to

2    the jurors.  But, we're going to go forward with closing arguments.  Are the

3    parties ready?  The State ready?

4                                    MRS. KOHLRIESER:   Just a second.  Can

5    we approach just privately?

6                                    THE COURT:   Oh, okay.

7    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

8    the record, as follows.)

9                                    MRS. KOHLRIESER:   I'm told the

10    defendant isn't feeling well.  Are we going to have a mistrial if he suddenly

11    falls out?

12                                    MR. RION:   I don't know.  Maybe.

13                                    THE COURT:   Well, I inquired.  You're

14    ready to go forward; right?

15                                    MR. RION:   Yes, your Honor.

16                                    THE COURT:   Okay.  The defense is ready

17    to go forward.

18    (WHEREUPON, Court continued on the record, as follows.)

19                                    THE COURT:   Schedule-wise, because it's

20    almost eleven, we will start with the State obviously, and then depending on

21    how long that is, anticipating that that will get us close to the noon hour we'll

22    have the noon recess.  It might be a little longer than normal because I'll have

23    to work on those instructions that we've already discussed.  Then after the

1  noon recess we'll have the defense closing argument, if they choose to make

2  one, and then if they do the State will have a final rebuttal argument and then

3  we'll go right -- well, depending again on time-wise, that might be a time then

4  for an afternoon break before I give the final instructions.  But, I will go right

5  into final instructions.  Okay?  So, bring the jurors in.

6  (WHEREUPON, JURY WAS BROUGHT INTO THE COURTROOM.)

7                           THE COURT:   The jurors have come back

8  into the Courtroom, let the record show.  Ladies and gentlemen of the jury, we

9  are at that point -- she wants the pencil sharpener.  It's right there.  Okay.

10  Ladies and gentlemen, we are at the point in the trial where I can say now

11  that you have heard all of the evidence.  The State has, after I went over the

12  exhibits and the exhibits that you're going to have have all been admitted, and

13  the defense rested their case, and the State would have the opportunity to

14  offer further evidence in rebuttal because they have the burden of proof that

15  we talked about, but they have opted not to present any rebuttal testimony or

16  evidence.  So, now it's time to close up the attorneys' part of this case and

17  hand the case over to you folks.

18          We'll do that first with closing arguments.  Now, if you can remember

19  back that far, we had opening statements.  They were statements of the

20  counsel.  They were not evidence.  Neither are the closing arguments.

21  They're not evidence, either.  They're kind of a summation as to what the

22  parties believe the evidence proves or doesn't prove, as the case may be.

23  Closing arguments are given to assist you.  Again, they're not evidence.  But,

1  they're very helpful.  They kind of help you organize your thoughts if you need

2  that help.  The State goes first because they have the burden of proof.  Then

3  the defense will have the opportunity to present a closing argument.  Then,

4  again, because the State of Ohio has the burden of proof they get the final

5  word.  We call that a rebuttal argument, or a final closing.  Then after those

6  closing arguments I will give you the instructions.  I will read them to you.  The

7  law says I have to read them to you and then we also will give you a copy of

8  them to have with you in your deliberations that you can refer to.  We'll give

9  you those and have some explanation about all of that.

10        Now, we're conscious of the clock.  I'm going to let the State go first,

11  again, as is their right.  That would probably put us close to the noon hour and

12  then we would probably have a break for lunch and then come back and

13  finish it all up this afternoon.  I'll have some instructions if we go that way, too.

14        So, with that, is the State of Ohio ready?

15                              MRS. KOHLRIESER:   Yes, your Honor.

16                              THE COURT:   And is the defense ready?

17                              MR. RION:   Yes, your Honor.

18                              THE COURT:   All right.  You may make

19  your first closing argument.  Mrs. Kohlrieser?

20                              MRS. KOHLRIESER:   Good morning,

21  folks.  Before I get started I want to thank you.  It's been a long two weeks.

22  You've had lots of information.  I've seen a lot of you taking notes.  I've seen

23  you paying attention and being involved in this case.  I won't pretend like this

1     has been easy on your lives, either.  I know you've had to sit back in that

2     room wondering what's going on out here.  But, I promise you every time that

3     you were back there and promised fifteen minutes and it was thirty or forty

4     before we got back to you, well, the lawyers and Judge Reed, we were

5     working on this case.  But, in any event, this isn't what you normally do in

6     your lives and we really, really appreciate you taking the time to do this.

7           I asked you during voir dire two weeks ago if you would listen to all of

8     the evidence and if you would be patient and wait until the end to make your

9     determination.  Well, the end is near and your real work begins, quite frankly.

10     You'll decide whether the defendant is guilty of Aggravated Murder with a

11     Firearm.  You'll also hear there is what we call a lesser included offense of

12     Murder with a Firearm and/or whether he was under disability when he did

13     that.  In order to make that decision the Judge is going to give you, as he's

14     already described, numerous instructions with what the State must show in

15     order to prove the offenses of Aggravated Murder with a Firearm Specification

16     and Having a Weapon While Under a Disability.

17           So, let's talk about that just a little bit.  As the Court has noted to you, it

18     is our burden to prove this case to you.  It's a burden that myself and Mr.

19     Miller gladly bear.  It's one, quite frankly, that we take honor and pride in.  It

20     has been quite an honor to be the voice of Ken Warrington and to finally have

21     a jury hear what happened to Ken Warrington that night, or, morning, I should

22     say.

23           So, let's talk about what we do know.  The Judge is going to give you

1   instructions on these offenses.  By that, what I'm going to tell you is the Judge

2   is going to actually say that you have to find X, Y, and Z in order to convict.  If

3   you don't find X, Y, and Z then it's not guilty.  Now, one of those elements is

4   that this happened on or about February 23rd, 2009.  That's undisputed.  All

5   of the evidence was that Ken Warrington was shot on February 23rd, 2009.

6   The evidence shows he left work at five oh four that morning and that the last

7   time he was seen alive was by Krista Bodiker waving good-bye to him as he

8   drove back to the McKibben Street address.  No dispute.  I think the defense

9   would agree that's the day he was killed.

10      Next, the State has to show you that this happened here in Allen

11  County, Ohio.  You heard us ask questions about that, whether 436 East

12  McKibben is located here in Lima, Allen County, Ohio.  Again, no dispute that

13  Ken was killed just outside that door at 436 East McKibben here in Allen

14  County, Ohio.

15      Now, we also have to show you that Ken Warrington's death was

16  purposely caused.  That's both in an Aggravated Murder sense or a Murder

17  sense.  Again, I think everyone can agree this wasn't an accident.  Ken

18  Warrington was shot six times.  Six times.  That's not an accident.  That's

19  caused by someone who wanted him dead.

20      Additionally, on both the Aggravated Murder and the Murder you're

21  going to have what's called a firearm specification.  Should you find him

22  guilty of either of those offenses then you'll move on to the firearm

23  specification.  Again, the State's burden is to show that a firearm was used in

1    the commission of this crime.  Again, I think it's undisputed that he was shot.

2    There were two casings and three bullets found at the scene.  You heard the

3    Coroner testify that his injuries were caused by bullets entering and traveling

4    through and exiting his body.  Now, this firearm specification, we don't have --

5    well, before I get to that, we have Doctor Pandey's credentials.  You'll have

6    her report.  You'll have the autopsy photos back there with you to see how he

7    was shot and the number of times he was shot.  But, this specification isn't to

8    be confused with those two other guns that were found in the house because

9    the State's aware, and I think the evidence has clearly shown, those two guns

10   aren't the murder weapon.  So, this firearm specification is for a third gun that

11   was clearly used.  A gun was clearly used to kill Ken Warrington.

12        Now, we also have to show for Aggravated Murder that this was done

13   with prior calculation and design.  Think about that just a second, folks.  It's a

14   cold Monday morning in February.  It's around five-fifteen that morning, a time

15   when there's very little traffic in the city in general - some, but not much.  Most

16   people are in bed.  No one is driving home from the bar, or a party, and even

17   your night owl types are usually well asleep by then.  You're in a residential

18   neighborhood that isn't some major thoroughfare.  There's absolutely no

19   signs of a robbery.  He's got over a hundred and fifty dollars on him.  There's

20   his wallet and credit cards.  Nothing - nothing missing.  The keys are in the

21   door.  No evidence anything was taken from that house.  So, robbery clearly

22   isn't your motive.  If someone wanted to steal something they could have

23   easily taken his wallet or gone in that house.  Also, generally speaking,

1  someone is not going to pump Ken Warrington full of bullets if they simply

2  wanted to steal from him.  So, the person who killed Ken Warrington meant to

3  do it.  They had to wait until he came to 436 East McKibben.  This wasn't

4  some happenstance.  Everything about the circumstances surrounding Ken

5  Warrington's murder showed that it was planned.  It was thought out.  It was

6  calculated.

7        Then, we also have the offense of Having a Weapon While Under a

8  Disability.  It's undisputed that the defendant was previously convicted in

9  1995 of a felony Drug Abuse offense.  Judge is going to talk about that as

10  well.  But, you'll have the Judgment Entry of Conviction.  When you have a

11  felony drug offense you're not allowed to have a gun - period; end of story;

12  sorry about your luck; no.  So, again, it's undisputed.  I don't think the defense

13  will even bring that up.  He's not allowed to have a firearm.

14        So, these elements are all present beyond a reasonable doubt.

15        As Mr. Miller told you during his open statement, this is really a

16  whodunit.  In other words, your decision ultimately is whether you believe,

17  that you're firmly convinced, that the defendant is the person who killed Ken

18  Warrington.

19        Now, Mr. Miller also told you that this case wasn't linear.  By that, I

20  mean it just doesn't simply follow.  You have A, then you have B, and then

21  you have C.  He told you that we would be going back and forth in time,

22  piece by piece, and that at times you might hear something and think, you

23  know, 'what's the big deal about that', or, 'why are you telling that'.  Simply

1    put, there are a lot of moving parts in this that required us to present things in

2    certain ways.  But, Mr. Miller promised that when everything was concluded

3    we would show you how all of this shows that the defendant, Markelus Quan

4    Carter, murdered Ken Warrington, having thought it out, planned it, and

5    executed it by shooting Ken Warrington six times on that cold dark morning in

6    February of 2009.

7          You heard Officer Sarchet, who took pictures as soon as he arrived

8    after he realized and you can see right in those pictures it is a very dark

9    place.  You were able to take a jury view.  You could see there's all kinds of

10    nooks and crannies and houses and sheds and garages and places to hide

11    and places to wait.  So, now let's put it together.  Let me show you how the

12    defendant came to that moment on February 23rd, 2009 when he murdered

13    Ken Warrington.

14          Let's start with the sound of those shots.  Do you remember Don

15    Hovest?  He was one of our earliest witnesses.  He was collecting garbage in

16    the four hundred block of East Pearl when he hears gunshots.  He tells you

17    that he's right here where this 'X' is here on Pearl Street.  He hears gunshots.

18    He finishes putting the garbage in his pick-up truck and drives around this

19    way, down Liberty, up McKibben, and ends up going past 436 McKibben and

20    up Jefferson north until he made it to that gas station to call the police.  He

21    drove past East McKibben without knowing that Ken Warrington lay dying on

22    a concrete patio.  Now, that call he's able to make, and Detective Clark

23    testified about those times and driving and it takes a few minutes to get to that

1   Clark Station, but that call comes in to L.P.D. at five-eighteen.  Officer Sarchet

2   is dispatched to that location.  He told you that he was in the area of Main and

3   McKibben, which is actually off this map, up a little bit more here, when he

4   gets that call and so he drives to that area.  That takes him a minute or two to

5   get down there and start looking.

6       Now, somewhere in here is Rosalind Johnson, who also hears the

7   shots.  She told you that she was fast asleep and it took her a bit to kind of

8   realize what she was hearing and to kind of get her wits about her and go to

9   that window where she sees someone - again, Rosalind Johnson's home is

10  right here, R.J. - someone coming out of the mouth of this alley and head

11  west on Pearl.  She described that person walking briskly with his hoodie on

12  and hands in the pockets and that his hoodie is camouflage, specifically this

13  type of camouflage.  Now, there are all different kinds of camouflages.  But,

14  she said it's this pattern and this coloring that she sees.

15      Now, by the time Don Hovest makes his call and Officer Sarchet is

16  able to drive from his location there's no one to be found by Officer Sarchet.

17  He drives around.  It's very dark.  If you noticed on your jury view, there's a

18  slight incline up that alley.  Again, he has no idea that Ken Warrington lies

19  there dying.  There's tons of places for him to look, really.  As I said, there's

20  all kinds of houses, sheds, and places to get into, yards, trash cans, and even

21  the river walk goes right through Schoonover and down around the Main

22  Street by the Y and up through that way.

23      So, over an hour goes by before Sonya Burkholder realizes Ken didn't

1    come in last night and his truck is out there.  But, she can't find him.  She told

2    you it was icy outside.  When she couldn't find him she worried that maybe he

3    had fallen outside.  So, she goes checking.  Her first thought when she

4    opened that side door was that the neighbor kids threw hot sauce or

5    something at her window because they often mess with people and that was

6    really her first thought.  She didn't immediately think that it was blood.  But,

7    then she realizes that what she saw was blood, Ken Warrington's blood,

8    sprayed all over her door.   You'll have all these pictures, every last one of

9    those photographs, and you will see that door.  You'll have close-up shots of

10   that window.  You'll see his blood largely behind him.

11        So, by six thirty-nine Police Officers now know that these shots that

12   were reported a little over an hour before that were the shots that killed Ken

13   and a murder investigation is begun.  Enter Detective Clark.  He gets the call

14   that morning and goes to the home.  Detective Marik is already there

15   processing the scene, photographing, measuring, collecting evidence.  You

16   heard Detective Marik testify he found casings, nine millimeter Winchester

17   casings, sitting right there.  You'll have pictures of that as well.  He also found

18   a bullet right behind Ken Warrington's back, a spent bullet, I should say, just

19   on the inside of that door and down there by the cooler and the duffel bag and

20   then one that actually entered the door and somehow found its way into the

21   freezer.  He also, around and underneath Ken Warrington's body, found

22   multiple fragments.

23        Sonya Burkholder and Tarah Carter are already taken to the station by

1    the time Detective Clark arrives.  He looks around the house.  He's going

2    through the rooms and drawers.  Nothing seems out of place to him.  It's a

3    nice, tidy home.  It's well cared for.  No signs of weapons or anything out of

4    the ordinary inside the home, with the exception of the obvious results of the

5    murder that had spilled into the kitchen.  Again, it becomes apparent at this

6    point that this wasn't a robbery.  His money is still there.  No one came to the

7    home and stole anything.  It also becomes apparent that Ken Warrington has

8    been shot more than once.  So, again, it doesn't have the appearances of a

9    random act of violence.  Everything about it says he was killed on purpose.

10        So, now while Detective Clark is making these observations Patrolman

11   Curt Hile, who is there on the scene, steps inside the home.  While he's inside

12   there he notices sitting on a counter this AEP bill with the name of Mark Q.

13   Carter, 122 East Eureka Street.  Then it hits him.  He makes that connection.

14   'That's where I know Sonya Burkholder', because he seen her and thought

15   she kind of looked familiar.  When he sees this name it all comes together for

16   him and he realizes these are the people from some fourteen months before,

17   in December of 2007, where the defendant refused to come out of his home

18   after he was stopped, after Patrolman Hile was stopped by Sonya and told

19   about the defendant hitting her, and of him having a gun, and that there were

20   children inside the home.  You heard now Sergeant Hile's testimony in that

21   respect and what made him take the steps that he ended up taking and what

22   about that seemed genuine to him and that this isn't a call they just make.

23   So, it stuck out for him.  It's an uncommon thing.  So, he passes that

1   information on.  'Hey, these two, her kids' dad and her, were involved in

2   something back on Eureka Street'.

3         Now, this is the first time that Detective Clark has ever heard the name

4   Markelus Carter.  He's given little info.  Given what he's seen of this crime at

5   this time, and what we've seen of it, it makes a person at least say, 'you know

6   what, we should probably talk to him'.  When we're investigating crimes there

7   are points in the investigation where we have ah-ha moments, so to speak,

8   where we go, 'you know what, that's a red flag and we probably need to

9   check into that'.  So, this incident just over a year ago sends up a red flag that

10  the defendant is someone that we at least want to talk to.  Keep in mind that

11  it's all hands on deck at this time.  We've got a murder.  We don't know where

12  it's going.  So, everyone is doing whatever they can to assist.

13        So, this name is passed along and, lo and behold, Sergeant Godfrey

14  hears the name and says, "Hey, I've got his number.  I've been in contact with

15  him just last week.  I'll call him."  This call happened just before eight A.M.

16  Not much is said in that case.  He says, "Hey, I've got some information and I

17  need to talk to you."  The defendant asks him something about developments

18  in the case.  He was, like, "Well, just come on up and we'll talk to you."  What

19  happens?  He agrees.

20        Now, the defense asks you, or, excuse me, not asks you, but asked

21  Sergeant Godfrey, "Did he answer the phone?  Did he try to avoid you?"

22  Well, no, he didn't.  I submit to you if the defendant did have caller I.D. and

23  realized what number came up then of course he's going to answer the

phone, folks.  He's got to act normal and he's got to test the waters.  He

doesn't know at this point just how much the police know.  He's got to know

by this time, given when Tarah's due for school, that Sonya and Tarah are up.

Tarah hasn't called him and so he doesn't know anything about what's going

on back at 436 East McKibben at this point.  So, act like normal.  Play dumb.

See what the cops will tell you and what they've caught on to yet.  Anyway,

when Sergeant Godfrey hasn't heard from him yet and thirty minutes goes by,

well, he calls again.  This is eight thirty-two A.M.  This time he's more

pressing and more urgent.  He tells him that something has happened to Ken

and he needs to know if the defendant was involved.  "I really need you to

come up here.  We've got to clear some things up and make sure you're not

involved."  His response isn't Ken who?  It isn't - Ken Rexford?  Ken

Warrington?  No.  His response is, "I don't like the sound of this."  It wasn't -

what do you mean?  Nothing.  No.  "I don't like the sound of this.  But, yea, I'll

be up."

Now, you heard Leah Rexford testify that the defendant called the

office somewhere around nine A.M., maybe ten to fifteen minutes before, to

ask about Ken Rexford's well-being and was told he was fine.  Seriously?

Why is your first thought Ken Rexford?  Out of all of his clients the police are

calling you to see if you had something to do with Ken Rexford?  Does that

make sense?  Or, even after you find out that Ken Rexford is okay and

knowing the cops are wanting to see if you're involved, knowing you've called

Ken Warrington's wife several times and have his address and phone number

1  and have searched his name on the Internet and called his work acting like

2  you're involved in a lawsuit and trying to report his affair with Sonya and

3  you've followed his truck and you've photographed it outside of Sonya's

4  home, wouldn't you think of Ken Warrington?  The reason is that he doesn't

5  ask those questions is because he knows who it is and he's trying to cover

6  things up.  He's trying to buy himself more time.  He's trying to keep control of

7  the situation.  So, he takes these proofs and he's going to run them over to

8  Eric Bennett.  He acts like he has business to take care of.  So, he'll casually

9  get up there at his own pace.  It actually gives him time to think for how he's

10  going to play this.

11        That's when they stop him at Spring and Jameson.  Now he's lost a

12  little bit of that control.  He no longer has any more time to think about it so

13  you get the behavior that you see in Officer Montgomery's cruiser video.  He

14  is told several times that Tarah is fine.  He's already been told that something

15  happened to Ken.  He's already confirmed that it's not Ken Rexford.  He

16  knows Ken Warrington is often at 436 East McKibben when he's told there's

17  been a shooting on McKibben.  Again, he photographed his truck right there.

18  Yet, you see his behavior.  That's another red flag.  It's this bizarre

19  overreaction when he's repeatedly told Tarah is fine.  Again, acting like that

20  buys him more time.  He keeps control of when he'll talk and how he'll answer

21  and how he's going to play this emotionally distraught person.

22        Then he comes to the Police Department and you saw his discussion

23  with Detective Kleman and, at times, Sergeant Godfrey.  He answers

1    questions that are easy.  He talks about things that are routine.  He admits he

2    has a .357 because he knows that's not the gun.  If he admits at least that, he

3    looks cooperative and he looks forthright.  He admits, "Well, yes, I have a

4    gun," because he knows that's never going to come back.  But, he begins to

5    panic when they start talking about going in his house to get it.  He tries to

6    convince them, "Oh, I'll give it to you.  I'll give it to you.  If you want it, oh, I'll

7    give it to you.  No problem."  Again, he's trying to control what's happening.

8    He's trying to limit them.  "Oh, here, I'll just give you the gun.  No need to go

9    in the house.  I'll just give it to you."  Then when that doesn't work and you

10   see Detective Kleman insisting, "No, we're going into the house," because,

11   again, he's admitted that he's under disability and he has no right to have that

12   weapon and he's admitted that he has a weapon and so we're able to get a

13   search warrant to go get any weapon that he may have in his house, any

14   firearm.  So, at this point he shifts to try and convince Detective Kleman not to

15   get that gun.  You know, "Why are you leaving me naked out here?"  He's

16   begging and pleading and talking about safety and he's got to watch out for

17   things and 'I need to protect my family' - whatever he can say to keep them

18   out of his house.  Again, now we know the defendant has a gun.  He talks

19   about other guns that he's had.  "Oh, yea, I used to have this," and, "I sold

20   this," and that type of thing.  He talks about having to protect his family.  So,

21   now that's another red flag that guns, multiple guns, aren't unfamiliar to this

22   person.

23           Next comes the search of his house.  They find not one, but two guns.

1   The second gun is a nine millimeter.  That's a red flag.  They also find a box

2   of nine millimeter Winchester ammo. which appears to be the same kind that

3   they seen at the scene and, in fact, it turns out to be the same kind.  Now

4   we've got bullets in his home that are the same make and caliber as what we

5   found at the crime scene.  Another red flag.

6        As they're searching for guns they find all this paperwork on the table.

7   What is it?  Well, right on the top of all of this are e-mails, e-mails between

8   Sonya Burkholder and Ken Warrington.  December 16th, 2007, one day

9   before that standoff incident.  Fourteen months before Ken Warrington's

10  murder.  These are private e-mails between Ken Warrington and Sonya

11  Burkholder.  Markelus Carter was not cc'd.  But, here he goes, he has their

12  e-mails sitting right on top.  That's another red flag.

13        Now, under that is the paperwork related to the incident back in

14  December of 2007.  You'll have that back there with you.  There's a stack of it

15  sitting right there on top of his table and right underneath those e-mails.

16  There's a transcript of a civil protection order hearing.  The Magistrate's

17  decision on that.  The Order of Protection that's issued.  The things that his

18  attorney has filed in his case.  The police reports of that incident.  The

19  objections he filed to that decision.  The appeal that he filed and the results of

20  that appeal issued September 15th, 2008 denying his appeal.  He's lost.  All

21  of that is sitting right there.  Red flag.

22        Then comes the information we learn from Husky about the call that

23  Pam Callahan received a month before Ken Warrington's murder where the

1   defendant misrepresents who he is.  He says that he's investigating a case

2   regarding an affair between co-workers and specifically referencing Sonya

3   Burkholder and Ken Warrington.  'A private investigator investigating the

4   issue.  Had David Evans if we needed to provide them with it.  They're

5   expecting to turn this over to the Courts on Thursday and didn't want to

6   implicate Husky if it wasn't necessary'.  Wanted those policies.  Gave them

7   their e-mail addresses - Ken's and Sonya's.  So, now they have this.  Again,

8   that information is a red flag.  He's calling their work and trying to act like he's

9   something that he's not and relaying that Sonya and Ken are in a relationship

10  together.  Then, lo and behold, on that table with that paperwork and how we

11  know that it was actually this Mark Carter that made that call, State's exhibit

12  '133'.  It's what I call the script.  You have Pam Callahan, Human Resources

13  2630 - 'I represent one half of a pending lawsuit which may include your

14  company'.  That's him telling himself what words to say to her.  That's how

15  you know he made that phone call.  Again, red flag.  So, given these additions

16  they decide to seek that second search warrant that goes beyond guns and

17  ammunition.

18          Meanwhile, after they found the guns the defendant shows up at the

19  Eureka Street home and he's arrested for Weapons Under Disability.  He

20  specifically asks Sergeant Godfrey about talking with him.  That leads us back

21  to the Police Department and Sergeant Godfrey's attempts to speak with him.

22  You saw how that went.  He's the one that wants to talk.  Yet, when he gets

23  there, he starts telling -- they ask him if he's feeling all right and he tells them

1   that he has a seizure disorder.  You saw his behavior on '140-A' and he's

2   acting confused.  However, if you noticed, he is able to answer any question

3   that he chooses to.  He's coherent.  He actually repeats answers two or three

4   times when Sergeant Godfrey can't make out what he's saying.  He keeps

5   making these jerky movements periodically.  Quite frankly, it looks more like a

6   tic than a seizure.  But, he never loses consciousness.  He never shakes or is

7   unable to answer any questions that he wants to answer.  Again, bizarre

8   behavior that does not appear genuine or sincere to Sergeant Godfrey.  Look

9   at it yourselves.  It is not genuine.  It is not sincere.  Red flag.  He says this is

10  what happens when he gets stressed.  But, he doesn't regularly take

11  medication.  He simply tries to avoid stressful situations.  Well, Patrolman

12  Montgomery's video where he's acting as if something has happened to

13  Tarah and no one will tell him, you don't see any kind of seizure on there.  I

14  think that would be a stressful issue.  He also, if he's looking to avoid stress

15  because of this condition, you think, you know, maybe you don't drive by

16  Sonya's house.  Maybe you don't take photos of Ken's truck.  Maybe you

17  don't call Faye Warrington at all hours, trying to press charges against Sonya,

18  or calling Pam Callahan acting like he's investigating a case and acting like

19  Husky could be implicated.  No, folks.  I submit to you that what is happening

20  during that second interview is that things at this point are beyond his control.

21  Things are moving rapidly and he cannot control the situation.  So, he needs

22  to delay, delay, delay, and stall, stall, stall.  Buy more time.  Think, think,

23  think.

1    Now, this interview is concluded and Sergeant Godfrey goes out to the

2    murder scene and begins canvassing the neighborhood.  There he finds

3    Rosalind Johnson, again, who was awakened by multiple shots.  Once she

4    realizes what's going on she makes her way to the window where she sees

5    someone coming out of that alley wearing camouflage.  Now, during her

6    testimony she said that she couldn't tell if it was a man or a woman, but she

7    actually tells Sergeant Godfrey that day that it's a man.

8                    MR. RION:  Objection.

9                    THE COURT:  Overruled.  It's closing

10   argument.

11                   MRS. KOHLRIESER:  Thank you.  And it's

12   this information that Sergeant Godfrey passes on.  He doesn't just pass on

13   camouflage.  He passes on that it's a man and he knows they're at Markelus

14   Carter's house.  So, that's the information that gets passed along back to

15   those officers at the Eureka Street home.  It's at this point - remember, the

16   officers had found the guns and the ammo., and they found all this

17   paperwork, and they found a nine millimeter gun, and they found the nine

18   millimeter ammo. that matches - so, they're getting a second search warrant

19   to expand the scope of their search because of all of these red flags.  So,

20   when they get this information that, hey, there's a witness out here, because

21   up to this point they didn't know about Rosalind Johnson, but there's a

22   witness out here that says she saw a man in camouflage that they go, 'oh,

23   there's camouflage clothing in this house'.  There's camouflage clothing in his

1    bedroom.  The decision is made for Officer Whitney to collect four pieces of

2    camouflage clothing - the sweatshirt in the basement, which you have

3    pictures of it, and it's a real tree pattern, it's a different type of pattern than

4    what we've seen thus far in the trial; there's a pair of pants in that master

5    bedroom, again, that real tree pattern, it's more like if you were out in the

6    forest in the fall, that grayish color, and you'll see it in those photographs; and

7    then there's also these camouflage shirts, and I'll just pull one of them out,

8    and it's the same type of pattern that later we learned, and, again, at this point

9    we don't know what pattern, but they also see these shirts and they collect

10    those four pieces as evidence because now we have information that there's

11    camo. involved.  Now we have a witness who saw a man in camouflage

12    leaving the alley, in addition to everything else, and now we see the

13    camouflage in the home.  Red flag.

14            Now, they also collect a pair of gloves.  They aren't camouflage, but

15    they're laying there on the table just a short ways away from the paperwork

16    that they found.  So, they collect these, too.

17            They also find all this computer equipment, a sound system, and a

18    camera.  You saw the pictures of the studio.  In this day and age people use

19    all manner of electronic devices and you can find all kinds of things out

20    through the use of the computer.  So, those were collected as well.

21            We also learned that the last access on MySpace, the defendant's

22    MySpace page, was on 2-23-09 and that his mood was determined.  Red

23    flag.

1        In the days following, while the defendant is in jail for the Weapons

2    Under Disability for the guns that turned out to not be involved in this case,

3    Detective Clark is contacted by Joey Moore.  Joey Moore tells him that the

4    defendant was saying that he killed someone, that he had a Mac-10 --

5                                    MR. RION:   Objection.

6                                    THE COURT:   Overruled.

7                                    MRS. KOHLRIESER:   -- that the Police

8    didn't find, and he also tells him that he also said 'they caught me with sixteen

9    grams of cocaine'.  This is the ring of truth that Joey Moore actually heard the

10   defendant say this because at that point there was no way, no way, for him to

11   know the amount of cocaine found in the defendant's home with such

12   accuracy.  I mean, he was off by like a gram.  So, unless he heard it from the

13   defendant he wouldn't have known that because we're talking about just a

14   few days later.

15   DEFENDANT:   Or the Police.

16                                    MRS. KOHLRIESER:   That's not a red flag

17   in and of itself, but it does lead us in the investigation to believe Joey Moore

18   because it was a detail he could not have otherwise known.  He came to us.

19   We didn't go to him.

20        The nine millimeter was sent for testing, as are the bullets and casings

21   found at the scene.  These come back from the lab and, as you heard, the

22   nine millimeter isn't the murder weapon.  However, the casings they found at

23   the scene were fired from the same gun and are the same as those found in

1    the defendant's home.  Again, red flag.  The bullets all came from the same

2    gun and these identifying marks on the bullets, specifically the lands and

3    grooves and conventional rifling to the right, lead to a list of possible

4    candidates of guns that would leave the same general type of rifling including

5    what is commonly referred to as a Mac-10.  Remember, I say commonly

6    referred to because Kevin Kramer testified that this, well, they look very

7    similar and it's like saying can I have a tissue when I'm really handing you a

8    silky soft brand of tissue.  It's not a Kleenex.  Again, red flag.  It makes Joey

9    Moore's account far more credible than somebody simply willing to say

10   whatever to get a deal because now we know those bullets can be expelled

11   from a Mac-10.

12          We also learned about Carlotta Williams in the days that follow.  She's

13   a woman with absolutely nothing to gain by lying about the defendant.  We

14   learned from her that the defendant was upset the night before Ken

15   Warrington was killed.  He was upset about doing for everybody and being

16   unappreciated and disrespected.  Nobody was ever doing for him.  He gives,

17   and gives, and gives.  We learned that he also called her that morning a few

18   times after six A.M., but she didn't answer or return his calls.  Then he

19   repeatedly tried to get her to come to the jail to see him.  She ends up getting

20   a ride from the defendant's own mother to the jail and she goes and sees him.

21   What happens while she's there?  The defendant holds up a note asking her

22   to tell the Police that she was with him between two and six A.M.  Now he's

23   looking for an alibi.  More specifically, he's asking her to lie to the Police that

1    he was with her.  That's a red flag.  Now you're asking people to lie for you.

2          In the months and years after Ken Warrington was murdered those

3    electronics were analyzed.  You heard what both Kevin DeLong and

4    Detective Leland found on those computers.  The defendant was doing

5    Internet searches for Sonya Burkholder.  He's doing it for Ken Warrington.

6    He has Ken and Faye's address and phone number.  He's got star

7    sixty-seven in front of that phone number.  You were told that that's a way to

8    keep people from seeing who was calling and so Faye Warrington will pick up

9    and so when he calls Ken Warrington he'll pick up.  You heard Faye testify

10    about why she picked up.  She was worried about her mom.  Those calls

11    might be from her mother.  You also find that he's looking up Sonya

12    Burkholder's address and her home on the Auditor's website.  You can see a

13    picture of it.  You can see a plot map of it.  You can see sketches of it.  He's

14    doing searches for Husky Refinery.  Red flags.  He is clearly invested in these

15    people.  He is clearly looking into them.

16          Now, we also learned that the defendant's vehicle, and his face, and

17    hands come back negative for G.S.R.  We also learned that the real tree

18    camouflage, and you'll have the report from that, but specifically the pants

19    and the sweatshirt in the basement were negative.  But, what wasn't negative

20    for G.S.R. were the short-sleeved and the long-sleeved shirts with the

21    camouflage pattern that Rosalind Johnson said she saw someone wearing

22    out of that alley.  Also, the gloves had G.S.R. on them.  That explains the

23    absence of G.S.R. on his hands.  If he was wearing gloves he wouldn't have

1   G.S.R. on his hands and, in addition, the fact that he could have washed

2   them.  It only takes a split second to wash your hands.  Matt Congleton

3   testified and told you, "Yea, you can wash that off your hands."  It's not a big

4   deal.  Keep in mind that this clothing and these gloves have G.S.R. on them

5   when by the defendant's own representations to Detective Kleman he had not

6   fired a gun since New Year's of 2006 going into the 2007 year - over two

7   years before that.  Two years before Ken Warrington was gunned down was

8   the last time the defendant admits to having shot a weapon.

9        As if all of this wasn't enough, by this point the defendant had been in

10  prison for a few years.  We know that inmates talk.  Of course they do.  They

11  share stories.  So, the decision was made, you know, 'let's just see if he

12  talked to any of his cellmates about it, and, you know, if they're willing to talk

13  to us or if they know anything'.  Well, the cellmates say no, they don't know

14  anything.  But, Thomas Smith, who was his cellmate, was explicitly told by

15  Sergeant Smith not to talk about this with anyone.  "Just tell them it was a

16  ticket I was asking you about and I threw it away."  He goes and he tells

17  Stephen Upham no sooner than he gets out of there, according to his

18  testimony, that they're looking into a murder involving the defendant.  You

19  know, he tells this to a man who all these inmates came in here and said, 'oh,

20  he'll do anything, he'll say anything to get out of here'.  That's who you

21  decide to share that with instead of just blowing it off?  Someone you don't

22  trust and despite being told not to do it?  So, Upham goes to see Sergeant

23  Smith, who testified here.  Again, he's got nothing to gain.  He's not getting

1   some medal for this.  He told the inmates very little about this.  He actually

2   didn't know that much to tell himself, quite honestly.  He tells Sergeant Smith,

3   Upham tells Sergeant Smith details that only the defendant would know.

4   Specifically, that the victim was his ex.'s boyfriend; that it was over his kids;

5   and that the defendant wore a paintball mask when he shot him.  Up until this

6   point we know that the defendant liked to go paintballing, but we had no

7   information whatsoever that a paintball mask could be involved in this.  None.

8   But, that would also explain, aside to washing yourself, why there wouldn't

9   have been G.S.R. on his face.  You saw a picture of him in a paintball mask.

10  That's when we knew, hey, let's go back and look.  Let's see what we've got

11  in here.  Oh, my goodness, there's a picture of him with a paintball mask.

12  That's a detail that tells Detective Clark, tells us, and tells you the truth of

13  what Upham is saying.  Do you think Detective Clark, myself, and Mr. Miller

14  don't know inmates lie?  That they're trying to get stuff?  They're in prison for

15  a reason.  Do you think he's just going to take the word of him?  Oh, well,

16  here we go.  He's willing to say this.  Fantastic.  No.  You're looking for the

17  ring of truth.  What has the ring of truth to it that what he's telling us is true?

18  Well, the paintball mask is one of them.  But, more importantly, he says that

19  the defendant told him that he followed the victim for a few weeks before he

20  killed him.  There is no way, absolutely none, that Stephen Upham would

21  have known that unless the defendant said it because none of those details

22  were released.  Nothing.  Nothing about these pictures, the Elm Street bridge,

23  the blurry picture in traffic, what is clearly the intersection of North and

1    Jackson where you guys went directly by, albeit from another direction on

2    your jury view, and just up the way here, State's exhibit '144', is East

3    McKibben.  No one, no one outside of law enforcement knew that on the

4    defendant's camera was this picture of Ken Warrington's truck, the victim's

5    truck.  It's not just some truck parked somewhere.  It's not just some car

6    parked at Sonya Burkholder's house.  No.  Ken Warrington's.  It was his truck

7    there.  It was taken January 9th, 2009, the month before Ken Warrington was

8    gunned down.  Again, those are the types of things that let us know Steve

9    Upham, with whatever motive he may have had, he still couldn't have known

10   that unless the defendant said it.

11        Now, maybe this isn't quite enough for you.  Maybe you question some

12   of the witnesses.  Well, the defendant himself tells you that Carlotta Williams'

13   testimony and Stephen Upham's testimony are credible.  How does he do

14   that?  Well, five years later, now that he knows Carlotta Williams has told us

15   about this alibi, he sends his son to do his dirty work.  He sends her a letter

16   asking her why she's lying on him.  I submit to you that he's not truly asking

17   her why she's lying on him.

18   DEFENDANT:  Why not?

19                         MRS. KOHLRIESER:  Because she's got

20   no reason to lie - none whatsoever to lie.  It's his way of sending her a

21   message.  It's pretty important that Markie Carter takes it to her and won't let

22   her keep it and has things folded down that she can only see that part.

23   Instead of apologizing and explaining himself or something of that nature,

1  he's trying to make her feel guilty. But, he's smart enough that he wouldn't

2  dare let that letter fall into the wrong hands, which is why Markie stands there

3  and waits for him to read it, or, her to read it. Excuse me. He's trying to

4  intimidate her and shame her, quite frankly.

5                           MR. RION:  Objection.

6                           THE COURT:  Overruled.

7                           MRS. KOHLRIESER:  This woman, who

8  he did all kinds of things for, she clearly thought well of him. She clearly

9  appreciates what he did for her. Yet, she's not willing to lie for him. She's

10  absolutely not willing to do that. Now she's going to testify against him.

11        He did the same thing to Stephen Upham. He had every opportunity to

12  avoid that confrontation.

13                           MR. RION:  Objection.

14                           THE COURT:  Overruled.

15                           MRS. KOHLRIESER:  He could have told

16  that deputy at any point who this man was.

17  DEFENDANT:  Wow. Really?

18                           MRS. KOHLRIESER:  He chose not to do

19  that. He doesn't do it because this is his first opportunity to remind Upham

20  that snitches get stitches. He reacts this way because he's conscious of his

21  guilt and he knows Upham is about to get on this stand and tell us what he

22  said - tell all of you what he said. What did Chaston Scott tell you? Oh, yea,

23  snitches get stitches. You don't rat each other out. That's the code. He

1    knows that Upham is about to expose him.  You don't break the code.  Now

2    you're going to pay - as much as I can give you.  You have that video.  See it

3    for yourself.  You can see the injuries that he causes to Stephen Upham.

4    Stephen Upham tried to get him in a head lock and subdue him.  He's

5    wiggling away and he ends up hitting him a few times.  The defendant is able

6    to finally wiggle out of that and he grabs on to the defendant's (sic) arm with

7    his teeth and he bites with all his might.  The only thing that stops him is those

8    guards coming to the door.

9        Now, maybe you're the kind of person that this simply isn't enough for

10   you.  Maybe you're more interested in the why in order to be convinced.  Well,

11   I told you there are some questions that we simply can't answer.  But, this is

12   one that we actually can answer.  In order to do that, however, you have to

13   understand the defendant's mindset.  Now, we spent a lot of time talking

14   about December 17th, 2007.  Why?  Because that's what starts the defendant

15   down this path.  That day he gets into her e-mail and he finds out that she's

16   seeing some other guy, or, at least talking to him in ways that it sure does

17   seem that way.  Whether it's true or not, whether she's seeing him, flirting

18   with him, sleeping with him, the truth of it doesn't matter.  It's his perception of

19   it.  He believes that she's seeing this other guy.  He kicks her out.  Not 'we'll

20   deal with this in the morning'.  Not 'you need to be out by X date'.  No.  It's get

21   out now.  He said he told her to leave because he can't deal with stress.

22   Well, again, he could have avoided that by minding his own business and not

23   getting into somebody else's e-mails trying to see what he could find out.  He

1    could have avoided that stress.  Nope.  He got into her e-mails.  Now she's

2    got the nerve to tell people that he's got a gun, that he's got her kids, and she

3    sends the police to his house.  Never mind that he doesn't answer the door

4    and he could have resolved the issue without everything going the way it did.

5    Never mind that he could have come out right away when he talked to Sean

6    Neidemire and settled things.  Nope.

7    DEFENDANT:  And died like Tirika?

8                              MRS. KOHLRIESER:  Your Honor, I'm

9    going to ask to strike that, and that was way before Tirika Wilson, I might add.

10                             THE COURT:  Closing arguments are not

11   evidence.  Counsel, approach.

12   (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

13   the record, as follows.)

14                             THE COURT:  You might want to caution

15   him.  He's not going to take the stand and he can't --

16                             MR. RION:  I understand.

17                             THE COURT:  Okay.  All right.

18   (WHEREUPON, Court continued on the record, as follows.)

19                             THE COURT:  The Court will instruct the

20   jurors to disregard anything that you hear from anyone other than counsel at

21   this point in closing arguments, or the Court.  Again, closing arguments are

22   not evidence.  Things that might come from others, other than counsel or the

23   Court, are not to be considered in this case.  Go ahead.

1                    MRS. KOHLRIESER:  Thank you.  You

2    heard those calls and what Sean Neidemire tells him over and over again -

3    'just follow my instructions; just come on out'.  Nope.  He wants things the

4    way he wants them.  He doesn't do it unless he wants to do it.  It's his way or

5    no way.  Now, the media and others have tried to play interference over the

6    last year and things do happen.  But, not when a person obeys the officer,

7    and not unless there's extreme situations.  Again, not everybody's perfect.

8    But, oh no.  He made that choice.  The sooner you comply the less the effect.

9    With each growing minute the chances of that going bad are increased.  They

10    could have busted in that house.  He's got his kids in there.  He didn't know

11    that they wouldn't.  But, nope, he ain't coming out until he gets good and

12    ready.  Again, he made that situation worse.  But, let's not take responsibility

13    for that.  Nope.  We're going to blame Sonya and blame the police who, by

14    the way, tried to get to the bottom of it long before the hostage negotiation

15    team ever came out there.  They have to assume the worse when they have

16    someone who seems very credible, and doesn't waver, telling them that he

17    has a gun, and that he's just been violent with her, and there's children in

18    there, and she wants them because if they don't, and she's telling the truth,

19    and then something happens the police are going to get blamed for that, too.

20    So, when they think there is something that really is legitimate and they need

21    to act upon it, well, that's what they have to do.  But, again, place the blame

22    on anyone else - not yourself.  Nevertheless, the truth of what happened,

23    quite frankly, on December 17th, 2007 doesn't matter because it's the truth as

1    he sees it.  Either, one, she brought the police down on him and she has to

2    pay for it, or, two, she brought down the police with her lies and she really has

3    to pay for it.

4         Another thing, not only did this happen, but she gets a civil protection

5    order based upon what he calls her lies.  He appeals it.  He loses.  So, now

6    he goes to the Police Department and tries to get them to file charges.  He's

7    persistent.  He's calling over and over again to the point they finally assign

8    Sergeant Godfrey, who's in charge of the detective unit, to look into it.  Now,

9    you heard him talk about why he wasn't able to get to it right away, Sergeant

10   Godfrey that was.  So, it's February when he gets to it and the defendant

11   brings in Tarah.  Sergeant Godfrey talks to her, talks to the defendant, and

12   talks to Sonya.  He goes hard at her.  He told you that.  He went hard at

13   Sonya.  He reviewed the other information and he thinks there's no case

14   here.  But, anyhow, that's not his decision.  So, he goes to the City

15   Prosecutor's and they say there's no case here and they're not going to file

16   charges.  So, this decision is relayed to the defendant on February 18th,

17   2009, five days, five days before Ken Warrington's murder.  You saw just how

18   furious he was about that decision when he gets so loud with Detective

19   Kleman that the audio in that room, well, I thought it was the speaker here

20   and was trying to adjust.  It's him getting so loud the audio in that room can't

21   take the loudness of it.  He complains that no one is helping him and no one

22   is doing anything for him.  They let him down.  They asked him a number of

23   questions for quite some time.  When they push at all, though, about the

1   issues he may have had with Kenneth Warrington, that people are saying he

2   did it, does he get furious about that?  No.  He shifts back to December of

3   2007 and getting angry about that.  Distract.  Distract.  Distract.

4          Meanwhile, he had also started calling Faye Warrington, telling her

5   about their affair, reporting to her when Ken is at Sonya's house, repeatedly

6   calling her.  Again, he's got that star sixty-seven so she'll pick up.  The

7   defendant learns this man, Ken Warrington, and this woman, who's disloyal,

8   who's dishonorable, who started all of this, well, now Ken Warrington has

9   given her a ring.  He tells you that Tarah told him that.  He said that in his

10  interview with Detective Kleman.  So, now things really turn up.  You see in

11  January of 2009 those photographs.  You also heard about the video clip that

12  was taken shortly after the time of day that was.  He's reporting Ken's

13  whereabouts to Faye.  Faye's family gets some notes in the mail, too, telling

14  them about the affair.  Then he makes that call to Pam Callahan.  He sounds

15  professional.  He tries to make it sound legitimate.  He wants to know Husky's

16  policies.  It's disturbing enough that Pam Callahan feels the need to

17  document that.  Again, you know how we know it's him.

18         So, all this comes to a head and he knows Ken's movements.  He

19  knows the layout of Sonya's house and how the neighborhood is, and the

20  traffic, and the noise, because he's gone out there at night.  He's lost control.

21  His kids are around a married man who's dating their mother.  Nothing is

22  going to happen to her.  Nothing is happening to them.  Faye's not helpful.

23  Husky's not helpful.  The kids are being exposed to all of this.  That's when

1    he goes out there and he waits for Ken Warrington to return to East

2    McKibben.  He brought a gun with him and he waited until Ken Warrington put

3    his stuff down, had his keys in the door, and he shot him in the back.  He shot

4    him, and he shot, and he shot him.  He is paying Sonya back and he is taking

5    back control of his children and who will play a part in their lives.  No one else

6    would do anything about it and so he waited for his chance to do something

7    because, remember, Ken didn't take that one last chance that the defendant

8    tried to give him when he warned Faye Warrington.

9         In the end, there were too many red flags to ignore.  Any one of these

10   in isolation might be a coincidence, or it might be explained.  But, there are

11   simply too many things here for it to be a coincidence.  That's what it boils

12   down to.  Everything taken together dispels any reasonable doubt.  All of this,

13   all of this isn't dumb bad luck for the defendant.  It's a plan.  It's premeditation.

14   It's Aggravated Murder with a firearm by someone who wasn't permitted by

15   law to have a firearm in the first place.  Don't check your common sense at

16   the door.  You came in here knowing nothing about this case.  When you look

17   at everything before you you know the defendant purposely and with prior

18   calculation and design shot and killed Ken Warrington.  If you know that now,

19   when you knew nothing at the beginning, that's proof beyond a reasonable

20   doubt and you must find the defendant guilty of the Aggravated Murder of Ken

21   Warrington with the firearm specification and Having a Weapon Under

22   Disability for that firearm.  Thank you.

23                                   THE COURT:  Okay.  That concludes

1    the State's first argument.  The hour of the day is twelve noon.  To be

2    conscious of the time of the jurors and based upon our discussions

3    beforehand we'll take a noon recess and then the defense will have the

4    opportunity to give a closing argument after the noon recess.

5         Ladies and gentlemen of the jury, it's very important, and it's always

6    been important, but it's of the utmost importance here again that you follow

7    the admonitions that I gave you and have been giving you throughout the

8    course of this case.  You've heard the evidence.  You've only heard one

9    argument.  So, you can't start deliberating.  Don't express or formulate any

10   opinions about the case until you have all the information.  That includes the

11   rest of the arguments and the instructions.  It's very important that you not

12   start deliberations until you get the instructions because the instructions will

13   give you some guidelines as to how you conduct your deliberations, what you

14   can consider, and what you can't consider.  So, don't start any of that until

15   you hear everything.  Don't have any communications with anybody involved

16   in the case.  Don't have any communications with your friends or families

17   about the case.  Again, not because I believe you might do something that

18   you shouldn't.  I'm more concerned about others who aren't under the rules

19   that you're under saying something or doing something in your presence that,

20   then, would influence your ability to look at this case fairly and impartially.

21   Don't do any independent research.  Don't pay any attention to any media

22   accounts.

23        We'll go -- let's go until one-fifteen and then we'll reconvene and the

1  defense will have the opportunity to do a closing argument at one-fifteen. So,

2  ladies and gentlemen of the jury, you're excused for the noon recess. The

3  rest of us will stand in recess until that time, too.

4  (WHEREUPON, COURT WAS IN RECESS FOR LUNCH BREAK.)

5

6  **(WHEREUPON, VOLUME NINE CONCLUDED.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23