IN THE COURT OF COMMON PLEAS OF ALLEN COUNTY, OHIO

----------------------------------------------------------------------

| | | |
|---|---|---|
| **STATE OF OHIO** | * | CASE NO.  CR2014 0139 |
| Plaintiff | * | |
| -VS- | * | **TRANSCRIPT -** JURY TRIAL |
| **MARKELUS O. CARTER** | * | |
| Defendant | * | SEPTEMBER 8 - 22, 2015 |

----------------------------------------------------------------------

### A P P E A R A N C E S

The HONORABLE JEFFREY L. REED, Judge of the Court of Common Pleas of Allen County, Ohio, presiding;

TERRI L. KOHLRIESER and ANTHONY J. MILLER, Assistant Prosecuting Attorneys, Allen County, Ohio, present on behalf of the State of Ohio;

JON PAUL RION, Attorney at Law, Suite 2150, 130 West Second Street, P.O. Box 10126, Dayton, Ohio  45402, present on behalf of the defendant;

SUSAN K. THOMAS
Court Reporter
Court of Common Pleas
Allen County Justice Center
P.O. Box 1243
Lima, Ohio
45802

(VOLUME 10 OF 10)


# TABLE OF CONTENTS

## (VOLUME 10 OF 10)

**- MONDAY, SEPTEMBER 21, 2015 - CONTINUED -**

FURTHER DISCUSSION REGARDING JURY INSTRUCTIONS ....... 1779

CLOSING ARGUMENT - RION ................................. 1782

REBUTTAL ARGUMENT - MILLER .............................. 1804

COURT'S INSTRUCTIONS TO JURY ............................ 1829

JURY DELIBERATIONS COMMENCED AT 4:20 P.M. .............. 1854

JURY EXCUSED FOR EVENING AT 7:30 P.M. .................. 1855

COURT RECESSED FOR DAY AT 7:33 P.M. ................... 1857

**- TUESDAY, SEPTEMBER 22, 2015 -**

COURT COMMENCED AT 9:10 A.M. ........................... 1858

JURY DELIBERATIONS CONTINUED AT 9:13 A.M. ............. 1859

JURY VERDICTS AT 11:50 A.M. ............................ 1860

JURY POLLED BY COURT ................................... 1862

VERDICTS ACCEPTED AND CONVICTIONS ENTERED ............. 1864

JURY DISCHARGED AND RELEASED ........................... 1864

STATEMENT BEFORE SENTENCING - MILLER .................. 1866

STATEMENT BEFORE SENTENCING - RION .................... 1867

STATEMENT BEFORE SENTENCING - DEFENDANT ............... 1868

COURT RULING - NO MERGER ISSUE ........................ 1869

FINDINGS OF COURT ... 1870

SENTENCE OF COURT ... 1871

DEFENDANT ADVISED OF APPEAL RIGHTS ... 1873

COURT ADJOURNED AT 12:12 P.M. ... 1873

VOLUME TEN CONCLUDED ... 1873

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**NOTE:** THE FOLLOWING IS A LIST OF EXHIBITS OFFERED BY THE PARTIES AND RULED UPON BY THE COURT FOR ADMISSION INTO EVIDENCE. SAID EXHIBITS HAVE BEEN FILED WITH THE ALLEN COUNTY CLERK OF COURT'S OFFICE FOR TRANSFER TO THE THIRD DISTRICT COURT OF APPEALS. HOWEVER, ANY EXHIBIT NOTED WITH AN ASTERISK (*) WAS NOT FILED WITH THE TRANSCRIPT AND SAID EXHIBITS ARE HELD AT THE ALLEN COUNTY COMMON PLEAS COURT AND ARE AVAILABLE UPON REQUEST.

## STATE OF OHIO'S EXHIBITS -

1 - PHOTOGRAPH OF VICTIM, KENNETH WARRINGTON;

2 - E-MAIL FROM PAM CALLAHAN DATED 1-12-09;

3 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

4 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET;

5 - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND CAR AND PICK-UP TRUCK;

6 - PHOTOGRAPH OF VICTIM'S PICK-UP TRUCK;

7 - PHOTOGRAPH OF AEP BILL;

8-A - ALL CALLS FROM DECEMBER, 2007 STAND-OFF, INCLUDING DISCONNECTS AND HANG-UPS;

8-B - PHONE CONVERSATIONS OF CALLS FROM DECEMBER, 2007 STAND-OFF;

9 - 9-1-1 CALL;

10 - L.P.D. CRIME SCENE LOG;

11 - PHOTOGRAPH OF HOUSE AT 436 MCKIBBEN STREET WITH VICTIM LYING ON CONCRETE PAD;

12 - PHOTOGRAPH OF ALLEY NEXT TO HOUSE AT 436 MCKIBBEN STREET;

13 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

14 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

15 - PHOTOGRAPH OF VICTIM AT 436 MCKIBBEN STREET;

16 - PHOTOGRAPH OF CAR PARKED NEXT TO HOUSE AT 436 MCKIBBEN STREET;

17 - PHOTOGRAPH OF VICTIM'S TRUCK (DRIVER'S SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

18 - PHOTOGRAPH OF VICTIM'S TRUCK (REAR) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

19 - PHOTOGRAPH OF VICTIM'S TRUCK (PASSENGER SIDE) PARKED BEHIND HOUSE AT 436 MCKIBBEN STREET;

20 - PHOTOGRAPH OF VICTIM ON CONCRETE PAD AT 436 MCKIBBEN STREET WITH MEASUREMENTS;

21 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

22 - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

23 - PHOTOGRAPH OF BULLET HOLE IN VICTIM'S JACKET;

24 - PHOTOGRAPH OF BULLET HOLES IN VICTIM'S PANTS;

25 - PHOTOGRAPH OF TENT ONE WITH SHELL CASINGS;

26 - PHOTOGRAPH - CLOSE-UP OF TENT ONE WITH SHELL CASINGS;

27 - PHOTOGRAPH OF SHELL CASINGS WITH MEASUREMENTS;

28 - PHOTOGRAPH OF SPENT BULLET BY IGLOO COOLER;

29 - PHOTOGRAPH - CLOSE-UP OF TENT TWO DEPICTING SPENT BULLET BY IGLOO COOLER;

30 - PHOTOGRAPH OF SPENT BULLET BEHIND VICTIM'S BODY;

31 - PHOTOGRAPH OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

32 - PHOTOGRAPH - CLOSE-UP OF TENT THREE DEPICTING SPENT BULLET BEHIND VICTIM'S BODY;

33 - PHOTOGRAPH OF DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

34 - PHOTOGRAPH OF DOOR WITH KEYS AT 436 MCKIBBEN STREET;

35 - PHOTOGRAPH OF BLOOD WITH MEASUREMENTS ON LOWER DOOR AT 436 MCKIBBEN STREET;

36 - PHOTOGRAPH - CLOSE-UP OF BLOOD AND DAMAGE ON LOWER DOOR AT 436 MCKIBBEN STREET;

37 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR AT 436 MCKIBBEN STREET;

38 - PHOTOGRAPH OF BLOOD AND DAMAGE TO MIDDLE OF DOOR WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

39 - PHOTOGRAPH OF DAMAGE TO MIDDLE OF DOOR (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

40 - PHOTOGRAPH OF DAMAGE CLOSE TO DOOR KNOB WITH MEASUREMENTS ON DOOR AT 436 MCKIBBEN STREET;

41 - PHOTOGRAPH OF DOOR FRAME AT 436 MCKIBBEN STREET;

42 - PHOTOGRAPH OF DOOR FRAME (CLOSE-UP) WITH MEASUREMENTS AT 436 MCKIBBEN STREET;

43 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR WITH DOWEL ROD AT 436 MCKIBBEN STREET;

44 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR (MID-RANGE) AT 436 MCKIBBEN STREET;

45 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR, WITH MEASUREMENTS, AT 436 MCKIBBEN STREET;

46 - PHOTOGRAPH OF INSIDE OF DOOR FROM KITCHEN AT 436 MCKIBBEN STREET;

47 - PHOTOGRAPH OF DAMAGE TO UPPER DOOR FROM INSIDE AT 436 MCKIBBEN STREET;

48 - PHOTOGRAPH OF HOLE IN FREEZER AT 436 MCKIBBEN STREET;

49 - PHOTOGRAPH OF HOLE AND SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

50 - PHOTOGRAPH OF SPENT BULLET IN FREEZER (CLOSE-UP) AT 436 MCKIBBEN STREET;

51 - PHOTOGRAPH OF TENT FOUR DEPICTING SPENT BULLET IN FREEZER AT 436 MCKIBBEN STREET;

52 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

53 - PHOTOGRAPH OF KITCHEN AT 436 MCKIBBEN STREET;

54 - PHOTOGRAPH OF AEP BIL ON COUNTER AT 436 MCKIBBEN STREET;

55 - PHOTOGRAPH OF NORTH FACING DOOR AND KITCHEN AND LIVING ROOM AT 436 MCKIBBEN STREET;

56 - PHOTOGRAPH OF LIVING ROOM AT 436 MCKIBBEN STREET;

57 - PHOTOGRAPH OF DOOR MAT AT 436 MCKIBBEN STREET;

58 - PHOTOGRAPH OF BULLET FRAGMENT AND BLOOD ON DOOR MAT AT 436 MCKIBBEN STREET;

59 - PHOTOGRAPH OF TENT FIVE DEPICTING BULLET FRAGMENTS ON DOOR MAT.

60 - PHOTOGRAPH OF MEASUREMENT OF BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

61 - PHOTOGRAPH OF TENT SIX DEPICTING BULLET FRAGMENT ABOVE 'O' ON DOOR MAT AT 436 MCKIBBEN STREET;

62 - PHOTOGRAPH SHOWING DIVOT IN CEMENT PAD WITH DOOR MAT REMOVED AT 436 MCKIBBEN STREET;

63 - PHOTOGRAPH OF TENT SEVEN DEPICTING DOOR MAT REMOVED AND DIVOT IN CEMENT PAD AT 436 MCKIBBEN STREET;

64 - PHOTOGRAPH OF DOOR THRESHOLD AT 436 MCKIBBEN STREET SHOWING GLASS, BLOOD, AND IGLOO COOLER;

65 - PHOTOGRAPH OF BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

66 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

67 - PHOTOGRAPH OF TENT EIGHT DEPICTING BULLET FRAGMENT, GLASS, AND BLOOD BY DOOR THRESHOLD AT 436 MCKIBBEN STREET;

*68 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*69 - WINCHESTER 9 MM SHELL CASING FOUND AT 436 MCKIBBEN STREET;

*70-A - SPENT BULLET BY VICTIM'S BODY FOUND AT 436 MCKIBBEN STREET;

*70-B - SPENT BULLET BY IGLOO COOLER FOUND AT 436 MCKIBBEN STREET;

*71 - SPENT BULLET FOUND IN FREEZER AT 436 MCKIBBEN STREET;

*72 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*73 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*74 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*75 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

*76 - FRAGMENT FOUND AT 436 MCKIBBEN STREET;

77 - AEP BILL FOUND AT 436 MCKIBBEN STREET;

78 - CURRICULUM VITAE FOR MANEESHA PANDEY, M.D.;

79 - AUTOPSY REPORT FOR KENNETH WARRINGTON;

80 - PHOTOGRAPH OF VICTIM'S UPPER BODY AS PRESENTED FOR AUTOPSY;

81 - PHOTOGRAPH OF VICTIM'S LOWER BODY AS PRESENTED AT AUTOPSY;

82 - PHOTOGRAPH OF VICTIM'S UPPER BODY UNCLOTHED AT AUTOPSY;

83 - PHOTOGRAPH OF VICTIM'S LOWER BODY UNCLOTHED AT AUTOPSY;

84 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEGS;

85 - PHOTOGRAPH OF INJURIES TO VICTIM'S UPPER BODY;

86 - PHOTOGRAPH WITH ROD IN VICTIM'S NECK;

87 - PHOTOGRAPH OF INJURIES TO VICTIM'S LEFT CHEST;

88 - PHOTOGRAPH OF LABELS A AND B FROM AUTOPSY (ENTRANCE WOUNDS ON VICTIM'S BACK);

89 - PHOTOGRAPH OF EXIT WOUNDS ON VICTIM'S ABDOMEN;

90 - PHOTOGRAPH OF LABELS E AND F FROM AUTOPSY (EXIT WOUNDS ON ABDOMEN);

91 - PHOTOGRAPH OF LABELS C AND D FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS ON RIGHT BUTTOCK);

92 - PHOTOGRAPH OF INJURIES TO VICTIM'S RIGHT FOREARM (ENTRANCE AND EXIT WOUNDS);

93 - PHOTOGRAPH OF LABELS K AND L FROM AUTOPSY (ENTRANCE AND EXIT WOUNDS TO RIGHT FOREARM);

94 - PHOTOGRAPH OF X-RAY OF VICTIM'S RIGHT FOREARM;

95 - SUMMARY OF GUNSHOT WOUNDS FROM AUTOPSY;

96 - DEATH CERTIFICATE FOR KENNETH WARRINGTON;

97 - DVD - CRUISER CAMERA VIDEO FROM PTL. MONTGOMERY'S CRUISER;

98 - DVD - DEFENDANT'S FIRST INTERVIEW ON 2-23-09;

99 - JUDGMENT ENTRY ON SENTENCING - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

100 - JUDGMENT ENTRY (NUNC PRO TUNC) - STATE OF OHIO -VS- MARKELUS Q. CARTER, CASE NO. CR95 06 0268;

101 - PHOTOGRAPH OF CAMOUFLAGE CLOTHING FROM BEDROOM AT 122 EUREKA STREET;

102 - PHOTOGRAPH OF FRONT OF HOUSE AT 122 EUREKA STREET;

103 - PHOTOGRAPH OF PORCH AND HOUSE AT 122 EUREKA STREET;

104 - PHOTOGRAPH OF LIVING ROOM AT 122 EUREKA STREET;

105 - PHOTOGRAPH OF LIVING ROOM WITH LAPTOP AT 122 EUREKA STREET;

106 - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION FOUND AT 122 EUREKA STREET;

107 - PHOTOGRAPH OF BOOK CASE AT 122 EUREKA STREET;

108 - PHOTOGRAPH OF ROOM AT 122 EUREKA STREET SHOWING MULTIPLE ELECTRONIC ITEMS;

109 - PHOTOGRAPH OF KITCHEN TABLE WITH GLOVES AND PAPERWORK AT 122 EUREKA STREET;

110 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

111 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

112 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

113 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

114 - PHOTOGRAPH OF VARIOUS E-MAILS FOUND AT 122 EUREKA STREET;

115-A - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

115-B - PHOTOGRAPH OF FIREARM IN STUDIO ROOM AT 122 EUREKA STREET;

116 - PHOTOGRAPH OF STUDIO ROOM AT 122 EUREKA STREET;

117-A - PHOTOGRAPH OF CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

117-B - PHOTOGRAPH OF CLOSET IN BEDROOM AT 122 EUREKA STREET;

117-C - PHOTOGRAPH OF WOODEN CHEST FOUND IN CLOSET AT 122 EUREKA STREET;

118 - PHOTOGRAPH OF FIREARM IN WOODEN BOX FOUND AT 122 EUREKA STREET;

119 - PHOTOGRAPH OF 9 MM SEMI-AUTOMATIC PISTOL FOUND AT 122 EUREKA STREET;

120 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

121 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

122 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

123 - PHOTOGRAPH OF LAUNDRY ROOM AT 122 EUREKA STREET;

124 - PHOTOGRAPH OF SECOND FLOOR HALLWAY AT 122 EUREKA STREET;

125 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

126 - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

127 - PHOTOGRAPH OF BASEMENT STEPS AT 122 EUREKA STREET;

128-A - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

128-B - PHOTOGRAPH OF RIFEL IN BASEMENT AT 122 EUREKA STREET;

128-C - PHOTOGRAPH OF CAMOUFLAGE CLOTHING IN BASEMENT AT 122 EUREKA STREET;

*129 - BOX OF WINCHESTER 9 MM AMMUNITION;

*130 - LONG-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*131 - SHORT-SLEEVED CAMOUFLAGE SHIRT FOUND AT 122 EUREKA STREET;

*132 - BLACK GLOVES FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

133 - WRITTEN SCRIPT FOUND AT 122 EUREKA STREET;

134 - VARIOUS E-MAILS FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

135 - VARIOUS COURT DOCUMENTS AND MISCELLANEOUS PAPERWORK FOUND ON KITCHEN TABLE AT 122 EUREKA STREET;

136 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM SUBMITTED CLOTHING AND CURRICULUM VITAE FOR MATTHEW CONGLETON;

137 - B.C.I. REPORT FROM MATTHEW CONGLETON REGARDING G.S.R. FROM DEFENDANT'S CAR;

138 - B.C.I. REPORT FROM KEVIN KRAMER REGARDING BALLISTICS AND CURRICULUM VITAE FOR KEVIN KRAMER;

139 - PHOTOGRAPH OF MAC-10 WEAPON;

140-A - DVD OF DEFENDANT'S SECOND INTERVIEW ON 2-23-09;

*141 - SONY DSC79 DIGITAL CAMERA;

142 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING UNDERPASS ON ELM STREET;

143 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA;

144 - PHOTOGRAPH TAKEN OFF OF DEFENDANT'S CAMERA SHOWING INTERSECTION OF JACKSON AND NORTH STREETS;

147 - FILE PHOTOGRAPH OF DEFENDANT WITH MASK;

148 - PHOTOGRAPH OF DEFENDANT WITH PAINTBALL MASK AND GLOVES;

*150 - AERIAL PHOTOGRAPH OF 400 BLOCK OF EAST MCKIBBEN STREET AND EAST PEARL STREET;

151 - GOOGLE MAP -- **(NOT ADMITTED BY COURT)**;

152 - GAS RECEIPT;

153 - PHOTOGRAPH OF FRONT OF DEFENDANT'S BLACK EXPLORER;

154 - PHOTOGRAPH OF REAR OF DEFENDANT'S BLACK EXPLORER;

155 - PHOTOGRAPH OF FRONT INTERIOR OF DEFENDANT'S BLACK EXPLORER;

156 - PHOTOGRAPH OF GAS RECEIPT AND KEY;

157 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AT 436 MCKIBBEN STREET;

158 - PHOTOGRAPH OF VICTIM'S BODY ON CONCRETE PAD AND PARKED VEHICLE AT 436 MCKIBBEN STREET;

159 - PHOTOGRAPH OF CONTENTS OF IGLOO COOLER;

160 - PHOTOGRAPH OF TIN WITH CONTENTS;

161 - PHOTOGRAPH OF MONEY AND TWO DEBIT/CREDIT CARDS;

162 - PHOTOGRAPH OF MONEY, DRIVER'S LICENSE, AND I.D. TAG;

163 - CURRICULUM VITAE FOR KEVIN DELONG;

164 - PHOTOGRAPH OF DEFENDANT;

165 - ALLEN COUNTY AUDITOR'S WEBSITE SEARCH FOR SONYA BURKHOLDER;

166 - PLOT MAP;

167 - HUSKY LIMA REFINERY SEARCH AND SEARCH FOR KENNETH WARRINGTON;

168 - DEFENDANT'S MYSPACE PAGE;

169 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

170 - B.C.I. EVIDENCE RETURN SUBMISSION SHEET;

172 - B.C.I. EVIDENCE SUBMISSION FORMS;

173 - DVD OF HOLDING ROOM INCIDENT;

174 - PHOTOGRAPH OF STEPHEN UPHAM;

175 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

176 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO ARM;

177 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

178 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

179 - PHOTOGRAPH OF STEPHEN UPHAM - INJURY TO LEFT EYE;

180 - PHOTOGRAPH OF STEPHEN UPHAM - SCRATCH TO BACK OF HEAD/NECK;

**DEFENDANT'S EXHIBITS -**

A - 2007 E-MAILS BETWEEN SONYA HUGHES AND KENNETH WARRINGTON;

B - PHOTOGRAPH OF LICENSE PLATE - #1 ASSHOLE;

C - PHOTOGRAPH OF SHED AND DEFENDANT'S TRUCK AT 436 MCKIBBEN STREET;

D - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET AND REAR OF VICTIM'S TRUCK;

E - PHOTOGRAPH OF REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, AND SIDE/REAR OF VICTIM'S TRUCK;

F - PHOTOGRAPH OF SIDE/REAR OF HOUSE AT 436 MCKIBBEN STREET, SHED, CAR, AND SIDE/REAR OF VICTIM'S TRUCK;

G - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

H - PHOTOGRAPH OF SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

I - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

J - PHOTOGRAPH OF CONCRETE PAD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

K - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD;

L - PHOTOGRAPH OF CONCRETE PAD WITH BLOOD AND SHOE IMPRINT WITH BLOOD AND POSSIBLE ASH/TOBACCO;

M - LIMA POLICE DEPARTMENT PROPERTY LOG;

N - DRAWING OF HOUSE AND SHED AT 436 MCKIBBEN STREET;

O - PHOTOGRAPH OF OPENED GUN CASE AT 122 EUREKA STREET;

P - PHOTOGRAPH OF MOVIE/BOOK CASE AT 122 EUREKA STREET;

Q - PHOTOGRAPH OF BOX OF WINCHESTER AMMUNITION ON MOVIE/BOOK CASE AT 122 EUREKA STREET;

R - PHOTOGRAPH OF BEDROOM AT 122 EUREKA STREET;

S - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

T - PHOTOGRAPH OF BEDROOM WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

U - PHOTOGRAPH OF WOODEN BOX IN CLOSET IN BEDROOM AT 122 EUREKA STREET;

V - PHOTOGRAPH OF .357 FIREARM;

W - PHOTOGRAPH OF CAMOUFLAGE PANTS - (NOT ADMITTED BY COURT);

X - PHOTOGRAPH OF BASEMENT AT 122 EUREKA STREET;

Y - PHOTOGRAPH OF BASEMENT WITH CAMOUFLAGE CLOTHING AT 122 EUREKA STREET;

Z - LIMA POLICE DEPARTMENT PROPERTY LOGS;

AA - INDICTMENT AND JUDGMENT ENTRY OF SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

BB - JUDGMENT ENTRY FINDING VIOLATION OF COMMUNITY CONTROLS IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2012 0367;

CC - INDICTMENT IN CR2009 0069, STATE OF OHIO -VS- JOSEPH A. MOORE;

DD - JUDGMENT ENTRY ON SENTENCING IN STATE OF OHIO -VS- JOSEPH A. MOORE, CASE NO. CR2009 0060;

EE - B.C.I. REPORT FROM DANIEL DAVISON REGARDING G.S.R. FROM DEFENDANT'S HANDS/FACE;

FF - B.C.I. REPORT FROM TODD WHARTON (WITHDRAWN BY THE DEFENSE);

II - JUDGMENT ENTRY ON SENTENCING FOR STATE OF OHIO -VS- STEPHEN URHAM, LUCAS CO. CASE NO. G-4801-CR-0201101176-000;

JJ - LETTER TO LIMA POLICE DEPARTMENT;

KK - COPY OF ALLSTATE INSURANCE CARDS/PROOFS;

LL - B.C.I. REPORT FROM VICKIE BARTHOLOMEW REGARDING FINGERPRINT COMPARISONS AND CURRICULUM VITAE FOR VICKIE BARTHOLOMEW;

**COURT'S EXHIBITS** -

1 - A.C.S.O. OFFENSE REPORTS REGARDING DEFENDANT AND STEPHEN UPHAM;

2 - DVD OF HOLDING ROOM CELL INCIDENT (SECOND VIEW) BETWEEN DEFENDANT AND STEPHEN UPHAM;

3 - NOTE FROM JURY TO THE COURT;

4 - COURT'S ORDER TO SUPPLEMENT RECORD WITH ATTACHED A.C.S.O. OFFENSE REPORTS;

1  THE COURT:  We're reconvening on the

2  21st of September, 2015 in Case Number CR2014 0139, State of Ohio -vs-

3  Markelus Q. Carter.  The defendant is present with counsel.  The State is

4  present.  The jurors have not been brought back in after the noon recess.

5  I just want to go on the record real quick.  I gave counsel copies of the

6  latest draft of the instructions.  It includes now the lesser included starting on

7  page eleven of the new ones.  It goes from page eleven through page

8  thirteen.  I also modified the specification to make sure that it would be

9  included in their deliberations, depending upon where they're at in their

10  deliberations, with either the Agg. Murder or the lesser Murder.  I hope

11  counsel has had the chance to look all that over.

12  I also forgot to put in, and the thought occurred to me as I was making

13  the new draft, an instruction regarding the CD and the DVD's that are in

14  evidence.  So, I've handed counsel now the one page that I've included in the

15  instructions.  It comes in -- it will come in towards the end.  I don't know where

16  it's at.  I think it's on the old page twenty-two after we talk about them

17  selecting a foreperson.  I'll give them the instruction with regard to, and it will

18  be around twenty-two and twenty-three, the instruction about if they want to

19  view the DVD's or listen to the CD they have to do that with Court personnel

20  and can't deliberate in their presence.  So, I've given you that.

21  It was pointed out to me that in the last version the date on the verdict

22  form for the lesser included Murder had the wrong date.  So, I've cleaned that

23  up on the original.  I didn't print out original new ones for that.  If you want a

1  copy of the original you can have that. But, I've cleaned that. It said May of

2  2014 and it should be Septomber, 2015 obviously. So, we'll go forward there.

3  What I'll do after closing arguments is I'll give counsel one more

4  chance if there's anything else before I let them retire. If there's anything else

5  you want to put on with regard to the instructions let me know at that point.

6  Okay?

7  Anything from the State?

8  MRS. KOHLRIESER: Your Honor, I

9  apologize. I was trying to look. Where are you intending to put the

10  DVD's/CD?

11  THE COURT: It was after the part on page

12  twenty-two regarding 'after you retire select a foreperson'.

13  MRS. KOHLRIESER: Okay. Thank you.

14  THE COURT: It will be in there towards

15  the end because I tell them 'I'm going to place in your possession the exhibits

16  and the verdict forms' and then that's when I'm going to say 'DVD and CD

17  recordings and testimony relating to it' and that may be grammatically a little

18  bit sketchy, but they'll get the drift. Okay?

19  MR. RION: Is there any way to turn the

20  heat down? I don't know if it's me, but it just seems warm in here.

21  THE COURT: Would it help if you -- well,

22  that fan always makes too much noise. Maybe once we get started, Monica,

23  you can see if maintenance can -- it's all on computer, Mr. Rion. When it gets

1  cooler outside the computer thinks it's cold and so it pumps in heat. I mean,

2  but we'll try.

3  MR. RION: I understand. Thank you.

4  THE COURT: I am going to note, too, for

5  the audience, and this is a public Courtroom, but I'm exercising my discretion

6  and saying that other than Court security or law enforcement I don't want

7  anyone standing in the audience. There's nobody standing there now except

8  for law enforcement, but there was earlier. I know it's a crowded Courtroom.

9  Also, to avoid the distraction, no in and out traffic during the Court

10  proceedings. So, once you're in, unless it's an unavoidable emergency, you'll

11  remain in. Once you go out we're not going to have a reentry. So, anybody

12  who's not here when we get started -- so, everybody look around. If there's

13  anybody you want to get in here now, well, you'd better get them in here now

14  because we're going to have to have them not let anybody else in. Okay? All right.

15  Everybody ready to go with defense closing?

16  MR. RION: Yes, your Honor.

17  THE COURT: Let's bring the jurors in.

18  (WHEREUPON, JURY WAS BROUGHT INTO THE COURTROOM.)

19  THE COURT: Okay. We're reconvening

20  with the jurors in CR2014 0139. It's already on the record. The jurors have

21  returned back into the Courtroom.

22  Ladies and gentlemen of the jury, we'll continue with the presentation

23  of the closing arguments. Now the defense has an opportunity. Mr. Rion,

1    you may make your closing argument.

2    MR. RION:  Thank you, your Honor.  May it

3    please the Court, everyone present today, members of the government, and

4    ladies and gentlemen of the jury.  I want to first start by thanking you myself.

5    Your sacrifice of over two weeks is what makes democracy work and it's real.

6    You gave up part of your lives, not just for Mr. Carter, but for the judicial

7    system itself.  That's a real sacrifice that not a lot of people in the world can

8    say they make for their country to protect something as sacred as we have.

9    I want to start with where we left off with in voir dire which was a

10   statement by William Blackstone.  He was an Englishman that sort of created

11   the common law of our country.  The statement that he made was, "It is better

12   -- that all presumptive evidence of felony should be admitted cautiously for

13   the law holds it is better that ten persons escape than one innocent party

14   suffer."  Now, that was in England.  Ben Franklin repeated that same

15   statement.  He said, "It's better that a hundred guilty persons should escape

16   than one innocent person should suffer."  The importance of that statement as

17   it relates to you today goes to the burden of proof and what beyond a

18   reasonable doubt really means.  It's a standard of proof, and as we said in the

19   beginning, it's the highest in the world.  It's not, well, it's likely that it looks that

20   way, and common sense would tell me it's that way.  It's not clear and

21   convincing evidence and I'll accept it because I find that.  It's beyond a

22   reasonable doubt.  That's the standard.  The Judge will tell you that you have

23   to be firmly convinced of the status of the evidence.  This case, well, this case

1 is largely a circumstantial evidence case. You have to be firmly convinced

2 about the inferences that the Prosecutor and the government are asking you

3 to draw. If you're not firmly convinced about that inference then that piece of

4 evidence maybe shouldn't carry the weight that it might carry around the

5 kitchen table.

6 So, I want to start with you in showing you what the evidence actually

7 is and what it actually shows and from there, piece by piece, go through it and

8 show you how the circumstantial evidence, in fact, does not point to Markelus

9 Carter as the person that gunned down Ken Warrington.

10 Let's start with something very basic and what I think started this case.

11 It's the documents that were found on the table of Markelus Carter, on his

12 kitchen table. If you'll recall, Detective Clark said that he walked into the

13 kitchen and he saw the e-mails from Faye - I'm sorry - from Sonya to Ken and

14 he says, "hmm". He didn't know, he did not know, that Officer Godfrey had

15 been in discussion with Markelus Carter, that they had taken testimony that

16 week before, the Thursday before, he did not know that. So, obviously if you

17 walk in somebody's house and Ken Warrington is killed over here and you

18 walk into somebody else's house and you see a document that Ken

19 Warrington's name on it if you're going to go hmm, that's strange, until you get

20 the inference, until you have more information. Once you have more

21 information it becomes clear. Tarah, Mark, Markelus, they weren't out trying

22 to cause trouble and threatening people the week before. No. They had

23 gone to the law. They had gone to law enforcement, as the twelve/thirteen of

1   you would do if you felt that there was an injustice that had occurred. This
2   wasn't a case where somebody was out there trying to terrorize somebody. If
3   you'll recall, you have the statements of Faye, and you have the statements
4   of Pam, and you have the statements of anybody else that Markelus talked to
5   and never a threat. Never. Always courteous. That will play and be
6   somewhat important as we look down the road on that. So, this piece of
7   evidence, which you could say 'boy, it's so coincidental that this was spread
8   out or placed on the kitchen table of Markelus Carter', has an innocent
9   explanation and it would be where you would put it, I guess, if you were
10  meeting with the police officers and going through the documents and you
11  had hired a lawyer and you were going through your case and everything
12  else. That's what started Detective Clark to say hmm.
13  There's a myth in ancient Greece that's relevant for your
14  understanding. Give me a second to explain it. There's this giant called
15  Procrustus and he sits at the crossroads out in the country of Greece. He is
16  far enough away that anyone who passes by has to spend the night in his
17  house because there's no other place for them to stay. He has a bed.
18  There's only one bed. He tells people that they can go and sleep in that bed.
19  But, what they don't know is if they're too short the giant will stretch them so
20  that they fit in the bed just perfectly. If they're too long, tall, he'll compress
21  them and push them in so that they fit in the bed perfectly. He changes the
22  person to match the bed. If you look at the evidence here, the next piece of
23  evidence, it sort of fits into that concept. They go to Markelus' house. Now,

1   mind you, what are they looking for? They're looking for a hoodie that has

2   pockets that's camouflage. That's the description that we have. We don't

3   have just a camouflage. We don't have not a hoodie. We don't have not

4   pockets. It was very, very specific. A hoodie with pockets. They want you to

5   look at a picture, a far out picture. If you'll recall, this was Officer Whitney's

6   testimony that that's how the room looked when he first saw it. You don't see

7   any camouflage. You don't see a hoodie. You don't see any pockets. In

8   fact, you don't see anything. But, then they start putting shirts up there that

9   have camouflage. They still don't have pockets. They don't have a hoodie.

10   But, they say, 'well, that's consistent with what she said because it's the

11   same, or, sort of the similar pattern." I think Rosalind Johnson's exact words

12   were 'yea, it kind of looks like that', or something to that effect. Okay? How

13   many people have a camouflage t-shirt in their house? I would say many.

14   But, they want you to believe that he was wearing this at the time, even

15   though the physical description, the only eye witness to this event, says it's a

16   hoodie with pockets. They want you to disregard that. They want to impose

17   on you that this must be that garment. Then they say, "Well, we can prove

18   that it's that." They put on a person that gunshot residue and they say,

19   "Well, these things, these two pieces of clothing have gunshot residue on

20   them and so, therefore, that's evidence that points - you can draw an

21   inference that he must have shot a gun that night and specifically shot Ken

22   Warrington." Okay? Maybe. We all saw it. We heard it. It was one of the

23   things he said. But, if you remember, Mr. Congleton testified very clearly that

1    there is another way that you can get gunshot residue on your clothing. The
2    first way would be if an officer handled the evidence with his bare hands. All
3    it would take is take a shirt that's turned inside out and you want to put it up
4    so that it can be photographed and you go like that. Gunshot residue is
5    microscopic. That could contaminate it. But, also, I suppose if Markelus
6    handled a weapon and then put on his shirt that that could contaminate it.
7    That's science. This isn't the defense trying to come up with something. This
8    was Mr. Congleton's testimony that this is a reasonable inference and just as
9    valid as any other inference that could be drawn. You have a shirt that does
10   not match the description of Rosalind Johnson that simply had some gunshot
11   residue on it, a shirt that wasn't tested until 2014. That shirt was not tested
12   for gunshot residue until 2014.
13       There were four officers that you heard talk about the property logs.
14   You're going to see the property logs. You're going to see how loose those
15   property logs were at that time. They have bullets that were missing for five
16   years. They have clothing that was checked out and was never checked
17   back in. We have officers handling it on, if you'll recall, on tables and taking
18   pictures of it on tables. If they take something and put it on the table, like this,
19   and then they put something else on the table, well, it's a little unclear what
20   inference can be drawn from those two pieces of clothing. One inference that
21   could be drawn is, well, it doesn't have a hood and it doesn't have pockets
22   and so it's not what Rosalind Johnson was talking about. The second
23   inference is that that gunshot residue is meaningless because obviously

1    Markelus had weapons in the house.  The officers asked him if he had

2    weapons in the house.  "Yea."  They even asked him, "Do you have any nine

3    millimeters?  Have you ever owned a nine millimeter?"  What's his answer?

4    It's not 'oh, no, I don't know anything about nine millimeters'.  He said, "Sure,

5    I've owned plenty of nine's."  Sure, I've owned plenty of nine's.  Is that the

6    answer somebody, three hours after they just killed somebody, would give to

7    that question to an officer?  Sure, I've owned plenty of nine's.

8    Now, the camouflage shirt that's not a hoodie is inconsistent with the

9    government's theory.  The camouflage t-shirt that's even shorter, is the exact

10   same argument.  The gloves fall under the same theory.  Number one, same

11   thing, you handle this weapon and then you handle these gloves, well, you're

12   going to put gunshot residue on them.  If you're an officer and you pick up

13   these gloves you're going to find gunshot residue on them.  For four, over four

14   years, these things were not tested by police.  For four years they sat -

15   sometimes observed and sometimes unobserved.  There's no blood.  There's

16   no indication they were wet.  There's no indication they've been used.

17   There's no indication that they had any, anything.  They're there in winter

18   when it's fifteen degree outside.  It would be normal for a person to have a

19   pair of gloves on their kitchen counter.  There's nothing unusual about it.

20   I just don't know what to make of Officer Whitney.  I want to believe -- I

21   want to believe.  But, every time you would ask him something you would get

22   an opposite answer when you had a picture to prove it.  He said he took

23   pictures from far off and then took pictures of close up.  We showed him the

1  camouflage from far off and there's no camouflage, and you show him close

2  up and it's close up. You show him a picture of where the CD's are and the

3  movies from far away and there's nothing unusual about the picture. You

4  show him the picture close up and, lo and behold, there's a box of

5  Winchesters. The same in the basement. Showed him pictures from far

6  away in the basement. The first picture that was supposed to be taken

7  there's nothing. You show him a picture close up and all of a sudden he has

8  something. He says that everybody is wearing gloves - there's nobody in

9  there that doesn't have gloves. Yet, we look at pictures and he doesn't have

10  gloves. He says that he's the only one that collected all the evidence and put

11  it all together. But, if you look at the box of shell casings that were taken in

12  this case you'll see that it's not Officer Whitney that collects it allegedly, but

13  Officer Marik allegedly collects it. It says that he was out of there by the early

14  afternoon hours, but it says here that it wasn't collected until six P.M. You

15  can look at it. You'll recall that he said he was the only that touched the

16  evidence and that he personally collected it all and that he put it into the car

17  himself and that he took it and documented it into the Police Station.

18  So, if I'm looking at the camouflage and I have an innocent explanation

19  for it, then an inference can equally be drawn this way as it can be drawn that

20  way. If I look at the gloves and have the same inference, and if I look at the

21  e-mails and have the same inference, then what's left? What's left?

22  We have Stephen Upham. Stephen Upham, I submit, lied to you. He

23  lied to you because he said that he, within two hours of knowing about this,

1    ran and spoke to Sergeant Smith. We know it was closer to two weeks

2    instead of two hours. We know that he was collecting information during that

3    time. He was asking where could the gun be? Could it be in the lake? What

4    did it look like? Does he still have it? He's asking questions from inmates to

5    try and figure out what he can tell to Sergeant Smith. When he got up there,

6    okay, you've got to judge his credibility. It's true that some people get up and

7    tell you the truth and there you are. Some people get up there and lie. So,

8    we know the one lie. You either have to say that Sergeant Smith was lying or

9    you say that Steve Upham was not presenting it. But, go deeper. Let's look

10   at corroboration for a second. What did Upham say? He said that two weeks

11   before that Markelus Carter (sic) had threatened the kids. Tarah was on the

12   stand. The Prosecutor would have asked 'what the threat was two weeks

13   ago; what happened; what was the threat?' Did you hear any evidence about

14   a threat from two weeks ago? Zero. In fact, not only was there not a threat,

15   any evidence of a threat, but there's not even a rumor of a threat within the

16   last two weeks or at any time. From all accounts Mr. Warrington was a fairly

17   mild mannered man. I don't think Mr. Warrington would threaten anybody. I

18   don't think that was his nature. So, the first piece of evidence that he gives is

19   sort of not only uncorroborated, but doesn't ring true. The second thing he

20   said was, "Well, he said he killed him." Did he say how? Did he say where?

21   Did he say when? Absolutely no detail whatsoever. He was just like, "He

22   said he killed him." Were there witnesses around when he said it? Anything?

23   Any piece of corroboration that you could say? Zero.

1   You heard from Abdul Bari and you heard from a couple other

2   witnesses who said that it was pretty obvious that Mr. Upham and Mr. Carter

3   did not get along.  Them not getting along, by the way, was unfortunately

4   substantiated by what you saw on the video.

5   What did you see on the video and what did you hear testified to?  You

6   saw that by no fault of Mr. Carter's he was put in a locked cell with the person

7   that was going to come in here and, to use Markelus' words, 'why are you

8   going to lie on me'.  That's what he said.  That's what Upham said he said.  It

9   started with Mr. Upham saying, "How's your case going, Carter?"  I don't care

10   how you phrase it, whether you say it in a sarcastic tone, whether you say it in

11   a nice tone, whether you say it, well, it doesn't matter the tone, the person

12   that's trying to come into Court and lie on you, that could potentially put you in

13   prison for a long time, that question is going to evoke an emotional response.

14   It just will.  The Prosecutor wants you to believe it's evidence of guilt.  There's

15   a couple of things.  When a person finds another person in a certain situation

16   things happen that really have nothing to do with anything except for, you

17   know, just losing it, losing your cool.  You find your spouse with somebody

18   else, you have a reaction.  You're locked in a cell with someone who taunts

19   you by saying 'how's your case going', knowing he's going to come in here

20   and try to say you killed somebody, and Markelus' first response was 'why

21   you lying on me', and you can see his hands start coming up.  He's asking

22   questions.  Now, it's unfortunate that it happened and I don't think anyone in

23   this Court meant for it to be that way.  I hope they didn't.  But, it's an

1  unpredictable situation that was created through no fault of Mr. Carter's.

2  They can say, 'oh, Mr. Carter could have said that that's Mr. Upham'. But,

3  Mr. Upham could have just as easily said, 'that's Mr. Carter'. The two of them

4  were put in a room. They clearly didn't like each other before then. Then

5  here we are. So, I didn't like seeing it and you didn't like seeing it. But, I'm

6  not convinced that it's really all that relevant to this case.

7  So, what's left? Well, they have another piece of inferential information

8  they want you to look at and it's this MySpace account. It does say his mood

9  is determined. It says that at the bottom. Now, if he had just written that that

10  morning then I get it, it might be relevant. But, what if Markelus had opened

11  up his MySpace account six months before, or a year before, or whenever all

12  this came into being and they asked him to fill in the space that says 'mood'

13  and he put determined? It's sort of his theme. Then is it relevant to this

14  case? I don't think so. But, the Prosecutor wants you to see that this

15  inference is so strong that you can take it and say, well, his mood on that day

16  was determined, even though there's no evidence that it wasn't added in six

17  months earlier. Detective Clark could have asked MySpace. He could have

18  gotten some of the data. Maybe some of the computer people could have

19  seen when he created it and asked. But, it could be damning if they come in

20  here with the story that the guy's MySpace account, that the MySpace

21  account said determined and his mood on that morning was determined. It

22  starts the imagination going. It's what makes circumstantial evidence so

23  powerful - it's because it starts your imagination going. It starts your

1  imagination going so that you actually disregard the physical stuff you do

2  have. You start disregarding that the only description of the assailant in this

3  case was a hooded person - not man - person, man or woman is what

4  Rosalind Johnson said, walking quickly, with pockets.

5  Then Steve Upham wants to talk about the paintball mask. So, they

6  find a picture of Markelus in his paintball garb. So, that proves that Stephen

7  Upham, through the years that he was with Markelus Carter, knew that he

8  liked to play paintball. Now, if Rosalind Johnson had said the man was

9  wearing a mask, or the woman was wearing a mask, okay, then I get it. Then

10  the things start to sort of connect a little bit. To simply show a picture of a

11  happy man wearing his paintball uniform and saying that somehow that has a

12  ring of truth to it in this case is ridiculous. If it showed that Mr. Upham had

13  some knowledge of Markelus' hobbies, okay, fine if that's what we were trying

14  to prove. But, there's no person that says that the assailant, the person that

15  killed Mr. Warrington, was masked. In fact, the information would probably

16  point otherwise. She said that she saw them walking down the alley. She

17  had a frontal of the person that did it, assuming that the person that walked

18  down the alley was the person that shot, which is another inference, I guess,

19  but a decent one given the hour of night. But, there's no description of that.

20  So, the Prosecutor, in the first part of her closing, said that Mr. Upham was

21  able to point to a paintball mask and - let me get the quote because it was an

22  interesting one - "ring of truth - it gives Mr. Upham the ring of truth." But, what

23  does it show?  So, now we're at a place that if we get rid of paintball masks --

1  By the way, let's finish up with Joey Moore.  What does Joey Moore

2  say?  Well, the Prosecutor said that Joey Moore, in 2009, met with the

3  detective and said something about a Mac-10 and that he killed someone.

4  Well, that's wasn't the testimony.  If you recall, in 2009 there was some

5  reference to a Mac-10 and then in 2014, after Markelus is indicted, after this

6  thing has a life of its own, Joey Moore says, "Well, yea, he said he smoked

7  the bitch."  Again, no corroboration.  If you'll recall when he testified first he

8  said, "He killed," and the Prosecutor said, "What's that mean?"  He said, "Oh,

9  he killed his girlfriend, I mean, the ex, or, his his ex's boyfriend."  He changed.  I

10  don't know why you would get that confused – whether he killed a girlfriend or

11  an ex's boyfriend.  But, he clearly said girlfriend.  Then it was, "Is that what

12  you mean?"  "Oh, no.  I meant ex's."  But, you have no corroboration.  No

13  sense of where he was when he said it, how he said it, what was the context

14  of the conversation, or why he would say it.  You have Joey Moore begging

15  the officer, Detective Clark, multiple times with 'can you help me; can you

16  help me; can you help me'.  He steals from him right there.  He takes

17  cigarettes and puts them in his sock.  He hides them.  He doesn't think people

18  are watching on the camera.  That's their case.

19  So, everything they have pointed to has an inference.  The inference,

20  you could say, well, this points this way and that points that way.  But, if I can

21  simply look at the same piece of evidence and say, no, this points this way

22  and this points that way, well, it wouldn't be fair to take every inference and

23  assume that it points a way towards guilt when it doesn't clearly or

necessarily point that way. Within the body of evidence, within pictures,

within physical descriptions, you have opposite explanations for the material.

Now, we come to Sonya. There was only one person that I can tell

that clearly lied to you and the lies went on and on. I can only ask myself

'why'. By the way, she's also the only one that threatened somebody in this

case when she told Faye 'don't fuck with me'. Now, she tells Detective Clark

they're dating; they've been seeing each other for a year; he moved in in

November; and she is in love with him. She tells you that, oh, they weren't

dating; they only had a two week fling; and that that was the end of it and he

would come and go and he was actually staying with Mrs. Warrington. Maybe

she messed up at one point because she said something about a key, if you'll

recall, if you remember. She said, "Ken had called me that day, or the day

before, because he no longer had a key to my house," or he had left it there,

or he had given it back or something, but he needed to come and get his key

because he needed to go and get his uniforms to take back to Faye's house.

Essentially he was moving out would be the implication. So, on this day,

when Tarah is of the belief that divorce papers are supposed to be on their

way, you have a counter message coming in, at least that she's testifying to

to you, that Mr. Warrington is moving back in with his wife at that time and

he's coming to get his uniforms to go. That was the testimony. She lies

about -- well, let's go to that morning. If you'll recall, she went on and on

about that motion light. She said that the motion light was in Tarah's room -

I'm sorry - the motion light, and you'll have all of the exhibits. If you'll

1   remember you went out to the scene way back when this case started and

2   we asked you to look at the light that was on top of the barn, or the shed

3   there, and is now white and black if you'll recall.  There was one there when

4   you saw it in 2015.  If you'll recall, I showed this picture to Sonya and Sonya

5   said, "Well, you just can't see past this.  The motion light is on the roof just

6   past there."  We had her draw it on Defense exhibit 'A,' so there would be no

7   question about what she was actually saying.  She said the only reason she

8   went into Tarah's room that morning was to wake her up, but then she saw

9   this motion light on.  That's the first time that she had ever opened the blinds

10  to look outside to see what it is.  Now, when she looked outside she saw

11  Ken's truck.  If you'll recall, she said that she didn't think Ken was going to be

12  there that morning and she only thought that he was there because she

13  looked out the window and she saw Ken's truck there.  But, she didn't think

14  he was going to be home that night.  But, she looks out and she sees Ken's

15  truck.  This light, she even goes on to describe it, a thousand watt bulb and it

16  was as bright as could be and there it is.  She tells this story.  Then she goes

17  out and she starts looking around for him and she can't find him.  Tarah fills

18  in - she goes and opens the front door of the house, which they never use,

19  and then finally the one place where he would logically be if he wasn't in the

20  house, the last place she looks, is where they find him.  Why the lies?

21  Because they're clearly lies.  You'll have pictures of this.  Why are things

22  different that night?  Why is she more intoxicated than she ever was?  Why is

23  she throwing up in the Police Station?  Why is she lying about why she

1  entered the room? Why is she looking for Ken in the first place when he's
2  not even supposed to be there? Why can't she give you any detail about
3  what happened after she sees Ken's body? Why does she lie about the
4  relationship that she had with Ken? Why did she lie about its intimacy, or lack
5  of it? Why did she say they never slept in the same bed - that Ken always
6  slept in Mark's bed? Why was she upset that night? What triggered her?
7  Now, I'm not here to say that I have proof that Sonya did this. I'm not saying
8  that I ever could. But, there's a lot of questions that the Police never asked or
9  followed up on? Why would she lie about Agruello Harris? It doesn't matter.
10  I don't think Agruello killed anybody. But, why would she lie about having a
11  relationship with him? If she's lying about having a relationship with him, who
12  else out there that we don't know about -- and the only people that were really
13  interviewed here, men wise, would be people from Husky, from the Refinery.
14  Right? So, these are just the men we can find to ask her about whether or
15  not she's had a relationship with them and how they would react to her. What
16  if there's another man that we didn't find, that nobody asked Sonya about,
17  that she couldn't lie and say 'no, I didn't have a relationship with him'. But,
18  who was actively engaged sexually with her and then Ken comes home? I
19  don't know. I'm just saying there's a lot of lies there that create a lot of
20  thoughts on what could have happened.
21  Let me go back to -- and we know she lies on weird things. I mean,
22  even Officer Hile. She said she had a scratched up face with dried blood on it
23  when she saw the officer on December 17th, 2007. You heard Hile. He

1　testified.  The idea that she said back then on that day, 'he hit me with his

2　fist; he didn't hit me with the gun', and then she comes in here and tells you

3　that he hit her with a gun.  The idea that they didn't even find a gun in the

4　house.  They found like a CO-2 gun or something like that.  They didn't even

5　find a gun in the house when they went and searched it after the whole

6　standoff and everything like that.

7　　Then you get into things like this license plate.  Within a week's time

8　she puts number one asshole on his car.  Two days after Markelus is in jail --

9　two days after Markelus is in jail this strange letter arrives at the Police

10　Department.  That letter has a bunch of information in it - oh, you'd better look

11　at Faye.  It's silly.  I mean, it makes no sense.  I'm not thinking that the

12　evidence, the information here means it's important for the purpose of looking

13　at someone else like Faye for this.  But, look at the evidence for a second.

14　When you're back there you'll have it.  Look at this L.  Look at that L.

15　　You're going to have some of the e-mails back there, the e-mails

16　where Sonya is saying to Ken, when it becomes clear that you're going to be

17　with me and not with anybody else and we'll be together then let's get this

18　relationship started'.  It's clear from those e-mails when you look at them that

19　Sonya wanted Ken and Sonya did not want Faye to have Ken if she were to

20　have him.  There's no other way to read those.  She came up here and she

21　said, "Oh, it was just a joke."  Oh, it was just a joke?  Read them.  Those

22　aren't jokes.  That's not a joking conversation they're having.

23　Officer Sarchet said that there were no motion lights in the pictures.

1  He was there that day.  He saw it.  He had images of it that he took that he

2  testified were accurate.

3      There were cigarette ashes outside, right outside, if you'll remember.

4  The officer was, oh, they didn't really find any great significance in those

5  cigarette ashes.  But, it indicates that somebody -- and they're current.  You'll

6  see pictures of them.  They were recent cigarette ashes very close to the

7  body of Ken Warrington.  That would be evidence of somebody sitting outside

8  waiting, smoking, and thinking.  Sure, they're not going to solve a crime.  But,

9  it shows that somebody was sitting there that would probably have a right to

10  be sitting out there.  It's a maybe.

11      If you'll remember, the coroner said that there was one bullet, well,

12  there was a bullet in the arm and there was a bullet in the neck area.  They

13  were left to right, front to back.  You're going to have pictures of the -- you're

14  going to have pictures.  Now, when you look at them close you're going to

15  see Ken's bag sitting right there.  That's Mr. Warrington's bag.  It's propping

16  up the door.  You're going to see glass on top of the bag.  You're going to

17  realize that this window here, this storm door, that all the glass blew in.  It

18  didn't blow out.  You're not going to see any bullets over here.  The

19  importance of that might be that the shooter was over here somewhere and

20  came around the walk and shot through the glass twice and then Mr.

21  Warrington fell, or, was falling and then was shot other times as well.  But, the

22  order of events could be important as to someone's familiarity and ability to

23  walk around the house and be around the house without concern.

1    Again, remember there was blood in that footprint there. That was

2    never tested. We don't know if it's the blood of the assailant or if it's the blood

3    of Mr. Warrington. But, when you're in the jury room ask yourselves whose

4    blood is that. You don't know the answer.

5    They showed you a utility bill in the house. It was Markelus Carter's

6    utility bill, as if it had some significance, until they realized that Tarah just had

7    to take it to school to prove where she lived so that she was in the right

8    jurisdiction or whatever.

9    I'm winding down now. I guess my argument is like on that AEP

10    receipt. It looked some way until you just asked about it and then you

11    realized, oh, it's nothing. At first you would look at it and you would say, oh, it

12    looks like somebody took a bill and like left it. It's like a sign that they had

13    been there sort of thing. That's the way I saw it when I first saw it. Then you

14    start asking Sonya and she says, no, no, that's what it was for. You ask

15    Tarah and, no, no, that's all it was there for. They could do that with a lot of

16    these pieces of evidence. They could look at a camouflage t-shirt and say,

17    oh, there's a connection. Or, I could look at it deeper and say, well, maybe

18    there's not. If you go through each and every piece of evidence that the

19    government has in this case and look at it, the inferences, the different ones

20    that could be drawn, they don't necessarily point to anything in general.

21    Like Procrustus in these crossroads, to get to a verdict of guilty the

22    evidence has to be imagined and stretched. You can't take Rosalind Johnson

23    at her word on what she saw because then their physical evidence wouldn't

1  correspond to it. I could go on, and on, and on with that.

2  Look at Mr. Carter's tapes. They want to talk to you about his -- well, if

3  an officer comes up to me and says there's been a homicide at my home

4  address, or my mom's address, or whatever, my sister's address, or an

5  address where I know my child was that night, I don't know how I would

6  respond if I knew my daughter was there.

7  The first time an officer calls -- I mean, look at the Prosecutor's

8  argument on this first phone call. First they say, well, Markelus answered the

9  phone. Well, of course he is because he's trying to buy time. Okay. That

10  was their argument to you. Let's assume he hadn't answered the phone.

11  They'd say, well, he didn't answer the phone because he was trying to buy

12  time. So, anything that Markelus does is being spun to somehow mean he's

13  guilty. So, he answers the phone and says, "Hey, Godfrey," The first thing

14  out of his mouth is, "Hey, what new developments do you have on the case,"

15  or something to that effect. Now, that's a pretty -- if you were innocent that's

16  something you would say when an officer calls you if you've been dealing with

17  that officer for the last year and a half. The first thing out of your mouth - "Do

18  you have a new development in this case?" It's consistent with innocence.

19  It's not buying time. It's not trying to deflect. He answers the phone quickly.

20  He answers it. He has his own -- well, what about this? The second time he

21  calls what does he say? He says, "I'll be there within an hour," or something

22  like that. He said he had to go drop off some Allstate insurance cards. All

23  right? So, that was the information the police have. So, the police, well, what

1   do they do?  They start following him.  Where does he go?  If I'm guilty of
2   Aggravated Murder and I have a limited window because I think the police are
3   coming to get me, what am I going to do?  Well, all sorts of things maybe.
4   The last thing I'm going to do is start delivering Allstate insurance cards.
5   When they stopped him, where was he?  Two blocks away from the Allstate
6   insurance agent's house.  When Detective Clark saw him, when he came to
7   just observe him at his house, he wasn't like shoveling things in and out and
8   trying to do things.  He was under the hood just sort of tinkering with the car.
9   So, every time that they sort of got of a snapshot of Markelus Carter on
10  February 23rd he was consistent with what he said he was supposed to be
11  doing.  I mean, who kills somebody and within an hour's time or so starts
12  texting their daughter about their grades and starts complaining about how
13  they're getting D's and F's?  That's a weird -- that would not make sense.  It's
14  inconsistent with common sense.  It's inconsistent.  It's not just a neutral --
15  these are inferences, too.  If this is more circumstantial evidence, fine.  Draw
16  that.  They want you to draw circumstantial evidence.  If the answer is, "Hey,
17  Godfrey, do you have any new developments in the case," that's an inference
18  of guilt?  "Hey, I'll be there in an hour.  Don't worry.  I just want to drop off
19  these cards real quick and then I'll be there."  Then they come down on him.
20  He doesn't know they're going to come down on him when they come down
21  on him.  It's consistent with what he told Godfrey.
22  Then they want to check his phone.  They go get his phone, like they
23  don't believe he's texting his daughter at six something in the morning about

her grades. They get it and look at it and he scrolls down and he shows them the whole thing. "Yea, here it is." I mean, he mentions that he was talking to Faye on the phone. Would the police have discovered it? No. Markelus says -- he tells them the whole thing. "Yea, I've got Faye's number in my phone and I've been calling Faye to explain the situation to her."

The problem with circumstantial evidence is these inferences. You can sit there -- and I watched all your faces during the Prosecutor's first argument. You draw one inference and you start thinking. There's the next one and you start thinking. There's the next one and you start thinking. The next thing you know, you're ready to vote. But, if you start thinking about those inferences the Prosecutor wants you to draw, well, they're not necessarily so. In fact, they might even point in the opposite direction. Or, they might be so neutral you'd say, well, maybe yes, maybe no; I really can't say. So, look at each piece of evidence, please.

When Faye said she had numerous conversations with Markelus how did she describe him? He was kind, calm. He wasn't off the hook.

What evidence do you have that Markelus was stalking Ken within the two weeks before this, as they want you to believe? So, February, what, 9th, to February 23rd. What evidence? Nothing. They want to show you the pictures from January 9th and say, ah ha, this is evidence of stalking. Well, he admitted also that what he was trying to do was show Faye so that Faye would believe him that Ken was not at home and that he was staying over at her house. Is that stalking? I mean, he's communicating to his wife in a kind

1   way.  He communicated with Ken in a kind way.  No one ever said there were

2   threats ever.  The only threat, again, that ever came out in this case that you

3   ever heard about was Sonya threatening Mrs. Warrington.  That's the only

4   threat we have.

5       Ladies and gentlemen, you're as smart or smarter than me.  I'm

6   worried.  I'm worried because the Prosecutor has thrown certain things before

7   you and said, well, this means this, and this means this, and this means this,

8   and then the twelve of you will go back there and say, well, it sure does and

9   we're going to find him guilty.  For six years they've been investigating

10  Markelus.  If you spent six years investigating, well, I was trying to think of an

11  analogy, anybody for anything you're going to come up with certain bits and

12  pieces that if you draw the right inferences from those bits and pieces you're

13  going to get the wrong impression.  Think about that.  If you took my last six

14  years and you wanted to prove, well, there's a whole host of things, and you

15  have a picture here, and a picture there, and a picture there, and even though

16  on each of those things it was completely innocent, but if you started drawing

17  this conclusion, and that conclusion, and that conclusion, and that conclusion,

18  well, I would be as worried as can be.

19      Carlotta, when asked by the Prosecutor, said this whole thing about

20  this alibi stuff.  It wasn't meant by Markelus because he was guilty and he

21  was trying to create a falsehood to get out of it.  Markelus Carter feels, and

22  felt, like the system wasn't going to give him a fair shake and he needed extra

23  help to do it.  That rings true through his entire statement with the police.  He

1    says, "I've given you everything that I have and it's not good enough." That

2    started back in 2007 and went up to the day that they arrested him for

3    Aggravated Murder in 2014.

4        The twelve of you, or, thirteen of you have been diligent.  I thank you.

5    Markelus Carter and his family thanks you.  I'm not allowed to get back up

6    and talk to you again.  I'm not allowed to say when Mr. Miller gets up and tells

7    you his last thoughts on it, 'oh, but I have a great argument for this', or, 'wait a

8    minute, you have to think about that when you go back there'.  The truth of

9    the matter is the twelve of you, in about a half an hour/forty-five minutes time,

10   will be the most powerful people in Markelus Carter's life and probably ever.

11   You hold the responsibility of the verdict in your hands.  So, please, when Mr.

12   Miller is up there and when you go back there, please think about this case

13   from the defense perspective as well.  When you look through each piece of

14   evidence look for the strengths of it from the State's point of view, but look at

15   the weaknesses, too.

16       I genuinely thank you for your time and all the energy you've put into

17   this.  We're asking for a verdict of not guilty on both counts.  Thank you.

18           THE COURT:  Thank you, Mr. Miller?

19           MR. MILLER:  Thank you, your Honor.

20       Ladies and gentlemen, Mr. Rion, we have been here for two weeks.

21   Mrs. Kohlrieser stood before you and did the jury selection and she had the

22   opportunity to do the first closing for the State.  It's now my chance.  Mr. Rion

23   had a chance to speak.  It's now my chance to thank each and every one of

1    you for your time served here over the last two weeks.  I sincerely appreciate

2    it and I echo Mrs. Kohlrieser's statement on that subject and Mr. Rion's

3    statement on that subject.  I know the Court appreciates it as well.

4    I want to focus your attention on the jury instructions.  The Court is

5    going to tell you, after I'm done talking, the jury instructions are the law and

6    they are your guide while deliberating.  Now, all of them are important.  You

7    should read all of them.  The Court is going to read all of them to you, as

8    you're going to see.  But, I want to specifically point your attention to three

9    topics in the jury instructions.  I'm going to mention those throughout my

10   statements here today.

11   The first topic is reasonable doubt.  Reasonable doubt contains within

12   it -- the definition of reasonable doubt contains within it a clause.  Not only

13   does the reasonable doubt definition tell you what reasonable doubt is, but it

14   tells you what it is not.  "Reasonable doubt," right in the jury instructions you'll

15   read, "reasonable doubt is not mere possible doubt because everything

16   relating to human affairs or depending on moral evidence is open to some

17   possible or imaginary doubt."  I want you, again, to read all of the jury

18   instructions.  But, while you're deliberating, and particularly when you're

19   considering Mr. Rion's argument on various things, the evidence, various

20   pieces of evidence, I want you to keep that sentence in mind.  Again, it tells

21   you what reasonable doubt is not.  It is not mere possible doubt.  That's the

22   first thing I want to direct your attention to as I go through my statement here.

23   The other part of the jury instructions I want to direct your attention to

1 deals with credibility of witnesses. It's about a page long, the entire thing. It
2 may even be a little more. Yea, it's a little more. The entire segment on
3 credibility is about a page long. But, at the bottom of the first page, and I
4 believe it's going to be page six in your draft, there is a paragraph that reads,
5 starting with the word 'also,' "Discrepancies in a witness' testimony or
6 between his or her testimony and that of others, if there is any, does not
7 necessarily mean that you should disbelieve that witness as people
8 commonly forget facts or recollect them erroneously after the passage of
9 time. In considering a discrepancy in a witness' testimony you should
10 consider whether such discrepancy," and this is important, "you should
11 consider whether such discrepancy concerns an important fact or a trivial
12 fact." I want you to keep that in mind not only as I make my statement, but
13 also as you consider the argument from the defense while you deliberate.
14 Finally, the third jury instruction deals with circumstantial evidence. In
15 voir dire, you know, there was a discussion by both parties about
16 circumstantial evidence. Circumstantial evidence, as you're going to find
17 when you read the jury instructions, is to be given equal weight with direct
18 evidence. Now, I want to stop before I go on with this for a second, Mr. Rion,
19 in his argument, cautioned you about making certain inferences - he used that
20 word - inferences from the evidence, the circumstantial evidence. We have
21 readily admitted that this is a circumstantial case. But, keep in mind that
22 circumstantial evidence is to be given equal weight to direct evidence. Now, I
23 go back. Mr. Rion cautioned you on making certain inferences from the

1    circumstantial evidence.  But, what you're going to find actually is that the

2    jury instructions actually tell you that that's okay.  Here it is.  "Circumstantial

3    evidence is the proof of facts or circumstances by direct evidence from which

4    you may reasonably infer other related or connected facts which naturally and

5    logically flow according to the common experience of mankind."  It actually

6    uses the word 'infer'.  You may reasonably infer other related or connected

7    facts.  You may do that.

8        So, with those in mind, with those three portions of the jury instructions

9    in mind, let's take a look now at Mr. Rion's argument.  Okay?  Now, Mr. Rion

10   talked about the G.S.R. on the clothes.  How did it get there?  Well, he posed

11   a number of possibilities.  Okay?  Now, I'm going to paraphrase.  I'm going to

12   just sort of capture them in bullet points.  Okay?  I do not wish to misrepresent

13   his argument in any way.  These are my bullet points on what he argued.

14   First, the gunshot residue ended up on not one, not two, but three articles of

15   clothing found in Markelus Carter's home because police officers who either

16   cleared the home for anybody else in it with their weapons drawn or the police

17   officers doing the search transferred that G.S.R. from their hands to these

18   articles of clothing.  He put up for quite awhile a picture of Mr. Clark holding

19   what appeared to be a gun case with his bare hand as evidence that, well,

20   there you go.  Okay?  There you go.  That somehow proves that

21   the officers transferred gunshot residue to these articles of clothing.

22   However, if you actually listened to the testimony and when you consider it

23   the testimony was that Detective Clark did not collect any evidence.  Now, Mr.

1    Rion mentioned Don Marik's name.  That wasn't Don Marik's hand in that

2    picture.  It was Mr. Clark's.  Okay?  In any event, you have to consider

3    whether or not this possibility, is it possible that the officers

4    transferred gunshot residue from their hands and, by the way, there was no

5    evidence that any officer had fired a firearm at any point close to the time that

6    they did the search.  None.  No evidence of that.  Is it possible anyway that

7    the officers transferred gunshot residue from their hands to these clothes?

8    Well, anything is possible; right?  But, the jury instructions say that that does

9    not raise to the level of reasonable doubt.  Mere possibilities, in other words,

10   possibilities detached from evidence, those that are simply floated, does not

11   rise to the level of reasonable doubt.  Why?  Because anything is possible.

12   The jury instructions actually guard against that sort of argument, the

13   argument that anything is possible.

14   Mr. Rion also said, "Well, maybe that gunshot residue got on those

15   clothes," not one article, and not two articles, but three articles of clothing

16   collected from the defendant's house, "got on those clothes at the Police

17   Station."  Maybe.  Maybe.  Okay, now we have two possibilities.  I would

18   submit to you that the more possibilities we have the more likely it is that each

19   one of them is a mere possibility.  Okay?  Well, maybe.  Maybe.  Maybe isn't

20   good enough.  Maybe doesn't get you to reasonable doubt.  The jury

21   instructions tell you that.

22   MR. RION:  Objection, your Honor.  He's

23   reversing the burden of proof.  Maybe doesn't get you reasonable doubt is

1    reversing the burden of proof in the case.

2    MR. MILLER:  I'm speaking directly to the

3    jury instructions that talks specifically about mere possible doubt.

4    THE COURT:  Okay.  The statement you

5    just made I'll sustain and tell the jury to disregard.  But, continue.

6    MR. MILLER:  Okay.

7    THE COURT:  The State has the burden of

8    proof.

9    MR. MILLER:  The State does have the

10    burden of proof.  The point is, mere possibilities do not get to reasonable

11    doubt.  The same relates to the possibility that Mr. Carter touched one of

12    those firearms and transferred the gunshot residue to the articles of clothing.

13    Mr. Carter says in his statement to Detective Kleman that Mr. Carter has not

14    fired a firearm since New Year's Eve of 2006.  So, it is not reasonable to

15    believe that any of those firearms had been fired by Mr. Carter at any point

16    close to the time that those clothes were found.

17    So, let's take a look at an evidence based explanation as to how the

18    gunshot residue got on those articles of clothing.  We'll pick up the story at

19    the time that Mr. Carter is at 436 McKibben waiting on Mr. Warrington.  Here's

20    an explanation.  We heard about the jacket that Rosalind Johnson saw with a

21    hood.  We know that there's gunshot residue on two articles of clothing that

22    have camouflage on them.  We also know that there's gunshot residue on the

23    gloves.  Mr. Carter, waiting on Mr. Warrington, has the coat that was

1    described by Miss Johnson open.  Why can we suppose that?  Well, take a

2    look at those gloves.  Those gloves are not -- they're pretty thick.  Okay?

3    You're not going to use them to unzip any zipper.  Not only that, but if you

4    think back to what Sonya said, Sonya said that Mr. Carter often carried his

5    firearm in his waistband.  So, he's waiting.  He shoots Mr. Warrington.

6    Gunshot residue not only gets on the outer coat, but because the outer coat is

7    open it gets on the inner coat, or, on the long-sleeved t-shirt.  It also gets on

8    the gloves.  All right?

9        Now, we've heard testimony that Mr. Carter is a smart man.  Carlotta

10   talked about that.  He helped her quite a bit with business.  He was good with

11   computers.  He knows that he has got to get this scene cleaned up.  He then

12   sets about picking up the shell casings because there's only two shells

13   casings.  There's at least six shots, and I would submit a seventh that went

14   into the freezer that you've all seen.  He cannot do that with those gloves on.

15   If you take a look at the gloves, they're fairly thick.  You're not going to pick up

16   those small shell casings with the gloves on.  He takes off the gloves.  Before

17   he does that he takes the firearm that he just shot with and he puts it in his

18   waistband.

19       Now, there's already gunshot residue on one t-shirt because of the

20   firing of the gun.  But, he has to lift that t-shirt to put the gun into his

21   waistband at which time, I submit to you, that it is possible, as Mr. Congleton

22   testified, to transfer the gunshot residue on that firearm to the undershirt that's

23   underneath.  If you lift a shirt and you have one underneath it's entirely

1  possible that you only lift one and you slip it into your waistband.  He then
2  begins to pick up whatever bullets he can find.  He then begins to pick up
3  whatever casings he can find.  But, there's a problem.  The problem is that
4  unbeknownst to him Mr. Hovest is at the location that Mr. Hovest pointed out
5  on Pearl Street.  Now, why is that a problem?  That's a problem because, as
6  Detective Clark testified, it only takes a few seconds, I believe it was forty
7  seconds, to travel around Mr. Hovest's travel.  He traveled eastbound on
8  Pearl, northbound on Liberty, and westbound down McKibben directly
9  towards 436 McKibben.  It was dark.  That's a problem for Mr. Carter because
10 Mr. Carter now can see Mr. Hovest coming and can probably hear the truck
11 coming.  He gets what he can get and he goes.  What does he do with the
12 gun, and those gloves, in his waistband?  He does what someone naturally
13 would do and what Miss Johnson described.  He takes those objects that he
14 has and he puts them into his pocket, that hooded jacket, and he walks away.
15 He walks the direction that Miss Johnson described up the alley and down
16 Pearl.  Now, that explains a number of things.  That explains why there was a
17 limited number of shell casings there and why some of the bullets are picked
18 up.  Remember - each one of these shots were through and through.  In other
19 words, they passed directly through his body, Mr. Warrington's body.  It also
20 explains how that gunshot residue got on those shirts while Mr. Carter wore a
21 coat.
22          Now what does he do?  Here's a couple of options.  He either got in
23 the car, that SUV we've seen, and if he were to do that, remember, his hands

1181

1   were gloved, but if he were to do that he might have, he might have some

2   gunshot residue on his hands from those shell casings.  Probably not the

3   bullets because the bullets passed through the body.  But, he might have a

4   little bit from the shell casings.  But, what did Mr. Congleton tell you?

5   Gunshot residue does not stick very well to smooth surfaces.  So, he's got the

6   shell casings in his pocket and he does not put the gloves back on because

7   he doesn't need to and he gets to his car and opens up the car and gets in

8   and drives away.  Now, there was not gunshot residue found on that car.

9   True.  But, Mr. Congleton told you that the gunshot residue does not stick to

10  smooth surfaces.  If there was any on Mr. Carter's bare hands and then

11  transferred to that door handle it probably wouldn't stick to that door handle.

12      If it did, it may have blown away in the wind as Mr. Carter drove.

13          MR. RION:  Objection.  That was not the

14  expert's testimony.

15          THE COURT:  Well, the jury can remember

16  what the testimony was.  This is argument.  It's not evidence.

17          MR. MILLER:  That is an evidence based

18  logical explanation for how the gunshot residue got on those articles of

19  clothing.

20      Now, after he leaves the scene Mr. Carter, given the time frames that

21  Mr. Clark gave you, has plenty of time, to get rid of the jacket,

22  the paintball mask, which explains why there's no gunshot residue on his

23  face, and he has plenty of time to get rid of the shell casings and the bullets.

1  That doesn't take long.  He also has time to get rid of the gun.  He goes

2  home.  By this time, and remember what time those shots fired, or, that shots

3  fired call went out, about five-eighteen, and remember what time Mr. Carter

4  told Detective Kleman that he got Markie up for school.  By the time he gets

5  home he's got to get Markie up for school.  He said in his statement, "I always

6  do that."  So, he takes off those two t-shirts and he takes off the gloves and

7  he sets about getting Markie to school thinking that he has all the time in the

8  world because he cleaned up after himself the best he could.  If Mr. Hovest,

9  whose name he doesn't know, but if the guy in the car who started and saw

10  him, he's gotten rid of everything that could possibly have identified him that

11  Mr. Hovest may have seen.

12  But, he has another problem.  Mr. Carter has another problem - that

13  AEP bill.  That AEP bill is a really big problem for him.  He doesn't even know

14  it at this time.  He doesn't know it, but that AEP bill links him to the shooting.

15  You've heard Patrolman, and now Sergeant, Hile describe how he saw that

16  AEP bill and relayed that information to the detectives who then, well, one

17  thing led to another and they started to track down Markelus Carter.  The

18  detectives got on top of Markelus Carter before he ever thought they would.

19  He did not have time, as he thought he would, to get rid of these articles of

20  clothing before they were found during that search warrant.  That's a

21  reasonable explanation, an evidence based explanation as to how gunshot

22  residue got on the clothing and how it was found by the police officers.

23  Now, Mr. Rion also talks about Mr. Upham and Mr. Upham lying.  Well,

1  he argues that Mr. Upham is lying because he can't remember details. He
2  just can't remember details. This really -- my next point goes to a number of
3  witnesses who could not remember details - Joey Moore, Sonya, Krista
4  Bodiker. I mean, we've heard the details. Mr. Rion says, "Hey, look, they
5  can't remember these details so they must be lying." Well, again, if you look
6  at credibility in the jury instructions it allows for that. I read that portion. That
7  does not necessarily mean they're lying. Here is the problem with Mr. Rion's
8  argument on details. You know, it's entirely possible to ask somebody
9  general questions about a long ago event. You ask those general questions
10 and then you narrow those questions to specific questions until the person
11 cannot remember that specific question, or, the answer to that question. For
12 example, I may ask someone who has been in this Courtroom for the duration
13 of this trial, was Mr. Clark in the Courtroom last Thursday'? 'Well, yes, he
14 was'. 'Was he wearing a suit'? 'Yes, he was'. 'Was he wearing a tie'? 'Yes,
15 he was'. 'Was he wearing a blue tie'? 'Well, yes he was'. 'Did it have a
16 design'? 'Yes'. 'What was the design'? 'It was striped'. 'Are you sure'? 'Oh,
17 yes, I'm sure'. Yes. Then I can take out a picture and I can show it to that
18 person and I can say, 'ah ha, I got you. Mr. Clark had a red tie on with dots'.
19 Here's the problem with Mr. Rion's argument with respect to those sorts of
20 things. Mr. Rion then argues that the answers to the general questions are
21 not credible because the witness couldn't answer specific questions. The
22 problem with that is, well, that's not how our minds work. We remember
23 general things. We may not remember the specific things. It does not mean

1 that the answers necessarily are not credible, those answers to the general

2 questions.  The jury instructions specifically speak to that point in the

3 paragraph under credibility that I read to you.  Don't get distracted with that

4 sort of thing.

5 The other thing is that with all of these witnesses that Mr. Rion argues

6 you can't trust because they can't remember specifics, the other thing about

7 that is you have to ask yourself a question with respect to those specifics.

8 Okay?  Is what they can't remember, is that an important fact or a trivial fact?

9 For example, the light on the shed.  Why did the light on the shed even come

10 up?  The light on the shed came up because Sonya said that the light came

11 on the morning of the murder.  Okay?  Was she correct about that?

12 Apparently not.  Now Mr. Rion argues that you can't trust her because of that

13 very specific detail.  Well, you have to ask yourself - is that light coming on an

14 important fact in the entire consideration as to whether or not Mr. Carter killed

15 Mr. Warrington?  Is that important?  Or, was that just something trivial?  Time

16 and time again we get into these specific questions that folks can't answer

17 from long ago and, therefore, you're asked to conclude that the more general

18 testimony is not reliable.  I submit to you that that is a false argument and you

19 should not get distracted with that.

20 Another example - okay - Joey Moore's statement that Mr. Carter said

21 to him that Mr. Carter smoked the bitch.  Okay?  The important thing there is

22 what Mr. Carter said, and not necessarily whether Joey Moore was confused

23 as to exactly what Mr. Carter meant by that.  Is it really an important fact or is

1     it a trivial fact as to what Mr. Carter meant?  Is the

2     important fact the more general one and that is that Mr. Carter told Mr. Moore,

3     'I smoked the bitch?'

4     We get into the same thing with Krista Bodiker.  Krista Bodiker testified

5     that she saw blood on Sonya's face the night of December 17th, 2007.

6     Okay?  Let's assume for the sake of argument she was wrong about that.  Is

7     that an important fact or a trivial fact?  Does it really make any difference as

8     to whether or not the more general facts testified to by both Krista and Sonya

9     were true as to what happened the night of December 17th, 2007?  Again,

10    don't get caught up in confusion as to what's trivial and what's important.

11    Now, Sonya.  Mr. Rion said that Sonya was the only one that

12    threatened someone.  He said a number of other things that would lead to the

13    implication that maybe Sonya was responsible for this murder.  One of them

14    was that it was somebody familiar with the surroundings because, you know,

15    maybe somebody walked around this way from the house and shot from this

16    direction and, you know, the glass is laying here.  Come on.  Look, to believe

17    that Sonya killed Mr. Warrington you would have to believe the following.  You

18    would have to believe that Sonya woke up that cold morning, after apparently

19    being drunk the night before as her daughter says, got out of bed and got a

20    gun, that after numerous witnesses were questioned no one saw, waited on

21    Mr. Warrington to come home and shot Mr. Warrington and went back in the

22    house and got rid of the gun and went to bed and woke up early and got

23    Tarah up early and ran around the house looking for Mr. Warrington and

1  opened up the door and faked the hysteria that you heard on the 9-1-1

2  call. You heard that. You could hear in the background Sonya. You could

3  hear Tarah say, "Sit down, mom." You could hear that. But, she faked that

4  and then allowed Tarah to call the police to her own murder scene and

5  somewhere in the mix of that put on camouflage clothing that just happens to

6  look like that clothing that was found in the defendant's house and walk down

7  the alley just seconds after the gunshots were heard by Rosalind Johnson

8  and walk down Pearl Street. Now, if you get that far, then what you have to

9  do is you have to take all of this evidence against Mr. Carter and dismiss it

10  totally. I submit to you that the idea that Sonya Burkholder killed Ken

11  Warrington is beyond belief.

12  Also with respect to Sonya Mr. Rion brings up the idea that she was

13  with a lot of other men. Well, we know of one other than Mr. Warrington and

14  that would be Agruello Harris. Okay? I don't know that there was any

15  evidence of a lot of other men. But, again, even assuming there were other

16  men, is it just a mere possibility that some other man did this? Because a

17  mere possibility does not rise to a level of reasonable doubt.

18  MR. RION: Objection, your Honor. It's

19  shifting the burden.

20  THE COURT: The Court will remind the

21  jurors, and I'll tell you in the instructions, it's the State's burden to prove.

22  MR. MILLER: Kenny Whitney, Mr. Rion

23  would ask you to believe that somehow Kenny Whitney is not a credible

1   witness.  Well, we get back to this general question and specific question

2   thing.  Here's an instance, and I'm going to bring this up for a reason, but

3   here's an instance where that backfired on the defense and it really proves

4   the defense's argument to be a false argument.  Why?  Because there's a

5   reasonable explanation sometimes as to why people can't remember specific

6   things.  Here's the line of questioning that happened.  Mr. Rion questioned

7   Mr. Whitney about the box of ammunition.  "Mr. Whitney," it went something

8   like this, "Mr. Whitney, how many rounds are in that box?"  "Well, there's

9   seven."  "Are you sure?"  "Yea, seven."  "Are you sure?"  "Oh, yea, I'm sure."

10  "Mr. Whitney, open up that box of ammunition."  He opens it up and there's

11  only five.  It appears like a gotcha moment because we went from a bunch of

12  general questions about Mr. Whitney's involvement in the search and then we

13  got down to the specific one, the one specific one about the ammunition and

14  Mr. Whitney can't remember.  What can't he remember?  He can't remember

15  what was later shown and that was that two of those rounds were used by

16  B.C.I. to do the ballistics testing on the Glock.  Okay?  That is a bright and

17  shining example of why that you cannot say that just because someone can't

18  remember very specific things that their entire testimony is not credible.

19  There may be a very reasonable explanation as to why they might be wrong

20  about a specific question, or, an answer to a specific question.  That is a

21  perfect example.

22  Now, the defense argues that Sonya is lying.  Upham is lying.  Moore

23  is lying.  To a certain extent, Krista Bodiker is lying.  Others are lying.

8181

1    Everybody is lying. Everybody is lying about this evidence that you will

2    consider. Why would everybody be lying about Mr. Carter? These people,

3    most of them, are completely disassociated with each other. For example,

4    Sonya doesn't know Joey Moore. Joey Moore doesn't know Krista Bodiker.

5    Upham doesn't know any of them. Carlotta doesn't know any of them. But,

6    everybody is lying. They're all lying about the same thing. They're all lying

7    about Mr. Carter committing this crime. They're not lying.

8    Mr. Rion brought up the coroner's testimony. Again, back to this idea

9    that maybe Sonya did it. I've touched on that. He gave you a scenario as to

10    how maybe Sonya did it. But, here's the coroner's testimony - it is very clear

11    as to how this happened. Here's how it happened. I want you to think back

12    to her testimony and what she said about those shots and where they hit on

13    the body and the angles. Here's the scenario that's evidence based. Mr.

14    Warrington goes up to that door and he has his cooler in his bag and his left

15    hand and the keys in his right hand. He props open that storm door with his

16    left arm, with the bag and cooler in hand, and puts the keys in the door. At

17    that moment a shot goes whizzing by his head. That's the one that goes into

18    the cooler. Okay? Now, naturally he would crouch. Mr. Carter adjusts his

19    aim because of the crouch. He adjusted it a little too much and he shoots Mr.

20    Warrington in the right hip. You saw that injury. That sends Mr. Warrington

21    down to his right knee, his right leg. That's how that blunt force trauma gets

22    on to his right leg. At the same time Mr. Warrington spins and he turns to

23    look at who is shooting at him. When he does that he turns to his right and he

1   puts his right arm up and his left arm up and at which time Mr. Carter shoots

2   again. The bullet goes through his chest. Remember, all of these are

3   through and through injuries. At this point think about the position. If he's

4   walking into the house this way and he goes down to his right knee and he

5   spins on that right knee he's low. He's now facing the shooter and turning

6   away because he sees the gun. It goes through his chest and possibly right

7   through that glass window. Another shot comes. It hits him in

8   the forearm. He spins away even more, exposing his chin. He gets the shot

9   in the chin. He spins away even more. He gets the shot in the lower back

10  twice. By this time he's facing back in his original direction and hits the

11  ground on his left side, causing the blunt force trauma on his left side. Now,

12  all of these injuries are through and through which means bullets would go

13  through his body and ping off of that door, and we saw all the divots in the

14  door and we seen the divots in the cement, which would scatter bullets

15  everywhere and which would, by the way, make it much harder for Mr. Carter

16  to pick up those rounds as he's looking for them before Mr. Hovest interrupts

17  the project. Okay? Now, if you don't buy that, take a look at the picture of the

18  door at the crime scene. What you will see is that most of the blood on that

19  door is below the door handle, the door knob, suggesting that most of those

20  rounds went through Mr. Warrington's body as he was low. Sonya didn't

21  shoot him. The evidence proves Mr. Carter shot him in some similar manner

22  as I've described.

23  Now, did the shots come from over here where the screen door was

1  swung open, as Mr. Rion suggested?  No, they did not.  They came, if I'm
2  going into the door, they came from the back right of Mr. Warrington.  How do
3  we know that?  Because if you look at the cement pad where the murder
4  happened there's two shell casings found by the police officers to Mr.
5  Warrington's back right, suggesting that that was where the shooter was
6  because you heard Mr. Kramer explain how a semi-automatic weapon
7  operates.  It expels the shells, or, the casings onto the ground.  So, we can
8  get a very good idea as to where the shooter was.  He wasn't over here
9  shooting through the screen door, or, the glass door that was propped open.
10  The casings were found over here.
11  Now, Mr. Rion makes a point here about familiarity with the house.  I
12  agree.  I agree that whoever did this probably plotted and planned
13  and probably took time to get an idea of the surroundings of that house, the
14  layout of that house, where he might hide, where he might walk out, and
15  where he might walk in.  I would submit to you that the evidence actually
16  proves that Mr. Carter got familiar with those surroundings by looking at the
17  Internet.  You've all seen the evidence from the Auditor's website that Mr.
18  DeLong found.
19  Mr. Rion puts out the hypothesis that somebody else did this because
20  there's blood in a footprint in the snow.  Is that blood in a footprint, or is it just
21  merely possible that's blood in that footprint?  We don't know that.  In any
22  event, how do we know it's not Markelus' footprint?  The point is, we don't
23  know.

1    There are things we do know from the evidence.  Motive.  Again, back

2    to Sonya and the idea that Sonya did this.  Did Sonya really have motive to

3    do this, or did the defendant?  Let's think about the defendant's motive

4    because whoever did this had motive.  This wasn't a robbery.  It wasn't some

5    random event.  They had motive.  Let's think about that motive.  Who had the

6    motive in this case?  Mr. Carter.  Mr. Carter had the motive because on

7    December 17th, 2007, like I said, a watershed event happened.  A standoff.

8    Why is that a watershed event?  Because it was at that time that Mr. Carter

9    began to lose control.  Control over whom?  Well, to a certain extent, Sonya.

10   Okay?  But, the control over her was just incidental.  He didn't like her.  You

11   could hear that.  You could hear that in the standoff phone calls, how he talks

12   about her.  Disloyal.  That's probably because he took her in and then was

13   seeing other men.  Dishonest.  Dishonorable.  She's not welcome in this

14   house.  He threw her out.  So, I don't think it was really control over Sonya,

15   per se.  But, what happened after that night?  Well, during that standoff and in

16   the immediate hours afterwards the kids stayed in the house.  I said during

17   my opening don't lose sight of the kids.  The kids stayed in that house on

18   December 17th, 2007.  But, what happened after that?  I'll summarize.

19   You've all heard it.  Soon thereafter Sonya leaves 122 -- well, she was kicked

20   out of 122 East Eureka.  But, that night the kids stayed there.  Soon thereafter

21   she went to live with the Bodikers.  Who went with her?  The kids.  That could

22   not have sat well with Markelus.  Why?  Because we heard Carlotta testify

23   and we heard Tarah testify that he was very close with his kids.  He was the

1822

1  disciplinarian.  He made sure Markie got up for school.  In his interview with
2  Detective Kleman he said several things about his kids.  One of them had to
3  do with Tarah.  "Tarah's becoming too much like her mother, but when I talk
4  to her she listens."  The point is this - Markelus wanted his kids raised the
5  way Markelus wanted them raised.  Not necessarily a bad thing unless you
6  take it too far.  Now, he hated Sonya and the thought of those kids going with
7  Sonya was unbearable because she was dishonorable, she dated married
8  men, she was disloyal, and she was undisciplined.  Again, listen to those
9  phone calls.  Listen to what he says about her in his statement to Detective
10  Kleman.  So, after that night they stayed with the Bodikers for nine months.
11  Then Sonya gets her own house.  Now, Markie, at some point, goes back
12  home to live with his dad.  But, Tarah stays with mom, who he despises.
13  Now, again, Carlotta, the defendant's own words, when you listen to
14  that testimony and you hear his own words, well, Tarah's a concern.  Sonya
15  even talked about it.  She was a little more wild - I use that term, but I don't
16  know if wild is the right word - she may have just been a kid.  That might not
17  be the right word.  Let's put it this way - Markie toed the line more than Tarah
18  did.  Now, after December 17th, 2007, his daughter is living with Sonya, again
19  who he despises, who's dating a man who is married, and that is not the
20  example he wants to set for his kids.  The motive for this is not control over
21  Sonya.  Controlling Sonya while she lived at 122 East Eureka was just
22  incidental to making sure his kids got raised right.  He wanted to know where
23  Sonya was after work.  He wanted to control her access in and out of the

1  house.  He monitored her e-mails.

2  DEFENDANT:  She was a thief.

3  MR. MILLER:  He monitored her e-mails.

4  This was all in an effort to keep up with what she was doing so that she did

5  not put undue influence over his kids.  But, now, after December 17th, 2007

6  she's breaking free.  She's breaking free with the kids.  This is all, not to

7  mention the fact that she filed a C.P.O. soon thereafter that night that first

8  included the kids.  Unacceptable.  Unacceptable.  So, after that night while

9  Sonya was breaking free with the kids he then sets about to regain his

10  control.  How does he do that?  He does it by doing a number of things.

11  You've heard it.  He calls out to Husky.  He calls Husky on sort of a fake

12  phone call, posing as a private investigator, in an effort to influence Husky

13  and Sonya's employer because, remember, she wasn't employed by Husky.

14  But, he let them know that something was going on that was not within the

15  company policy.  Why would he do that?  He would do that because if either

16  one of them would get fired it would disrupt this relationship.  Why is this

17  relationship such a threat to him?  Why is he so concerned about it?

18  Because Sonya has, in his mind, a reputation of hanging around with

19  disreputable men and Ken Warrington was married.  That's not the type of

20  man I want my kids raised around.  I've got to break up this relationship.  That

21  doesn't work.

22  So, what does he do then?  He does a number of other things.  He

23  begins to call Faye, accelerating his calls to Faye.  Why does he do that?

1   Because if he calls Faye and is either such a big nuisance to Faye or scares

2   Faye, well, Faye may go to Ken and say, 'Ken, you've got to stop this'. That

3   is an effort to enlist Faye's help in him regaining control of not just Sonya, but

4   through Sonya, his kids and breaking up this relationship. That doesn't work.

5   Ken Warrington is not going away.

6       Now, at the same time, he launches into another attempt to break up

7   this relationship. He goes down to the Lima Police Department and says that

8   he wants charges filed against Sonya because Sonya obviously filed about

9   this 2007 incident. "She obviously did because my daughter, who I brought

10  up to the Police Station, told you that." Well, what you know is that he

11  continued to call the Lima Police Department in an effort for the Lima Police

12  Department to follow through with his wishes for charges to be filed against

13  Sonya. Why? Because if Sonya would go to jail, or some other action taken

14  against Sonya, then he could somehow use that to get control back over the

15  kids and maybe even break up this relationship. All these are attempts during

16  this time frame to regain control.

17      Now, another watershed moment happens, actually two of them

18  happen pretty close, and one of them is, one of them is Mr. Godfrey telling

19  Mr. Carter, "We're not doing anything with those charges." Well, if you don't

20  think that made Mr. Carter mad and go back and look at his interview with

21  Detective Kleman because right near the end the conversation shifts to that

22  2007 incident and Mr. Carter becomes extremely angry about that situation.

23  The other thing, the other thing that happens, and Mr. Carter talks about it in

his statement to Detective Kleman, Mr. Carter learns, and whether it's true

or not doesn't matter, but he believes, because he tells Detective Kleman,

that Ken Warrington has bought Sonya a ring. Why is that important?

Because now not only has his efforts to regain control and split up this

relationship, well, not only have they failed, but this relationship seems to be

getting stronger because now, in his mind, they're going to get married. So,

you've got two events coming together right near the day of the murder.

That's the motive. Now with all of his efforts falling apart

and apparently the relationship getting stronger and Sonya being stronger and

having, you know, shared parenting, I suppose, with him because you heard

Tarah, "I spent half the week with dad and I spent half the week with mom,"

and then you throw in there that Mr. Carter heard Mr. Warrington tell Tarah

you know, that her mom shouldn't be vacuuming the floor, that she should be

vacuuming the floor, well, how do you think that sat with Mr. Carter? Not very

well. That's the motive. It's not some mere possible motive Sonya did it.

Now, Carlotta. Mr. Rion said something with respect to Carlotta and

this is very important. He said -- Mr. Rion suggested that Mr. Carter was not

trying to set up an alibi because he was guilty, but because maybe he was

innocent and this alibi was true.

MR. RION: Objection. That's not what I

said.

THE COURT: It's just argument. The jury

will decide what the evidence is. Overruled.

1    MR. MILLER:  Well, if the alibi were true, if

2    the alibi were true Mr. Carter would have told Detective Kleman about

3    Carlotta the day of the murder because when you go back and you look at

4    that interview tape Detective Kleman specifically asked Mr. Carter if he did

5    this murder and Mr. Carter adamantly denies it.  "No.  No.  I didn't do it."  He

6    did not say, "No.  No.  I didn't do it.  Go talk to Carlotta."  He never mentioned

7    Carlotta.  Why not?  Because he hadn't set up the alibi yet.  Remember what

8    Carlotta said.  Mrs. Kohlreiser told you what she said.  The morning of the

9    murder he was calling Carlotta.  He couldn't get ahold of Carlotta.  He wanted

10   Carlotta to come down to the jail after that.  She wouldn't come down to the

11   jail after that.  His mother, Mr. Carter's mother, went to get Carlotta.  She told

12   her it had to do with David Evans.  That got Carlotta down to the jail.  Then

13   the note went up on the window.  See, the alibi hadn't been set up yet.  If it

14   were true he would have told Detective Kleman right then and there - go

15   check with Carlotta'.  He didn't.

16   Finally, Mr. Rion, right near the end of his remarks to you, mentioned

17   that this investigation has taken six years.  That's true.  That's true.  We've

18   been here for two weeks going over six years worth of investigation.  But, on

19   the other hand, Mr. Rion wants to argue that there are all of these other

20   possible people out there that could have done this and it was some sort of

21   rush to judgment based on lies from people who are disassociated with each

22   other to pin this on Mr. Carter.  You can't have it both ways.  You can't, on the

23   one hand, say this is a rush to judgment, bad investigation, poorly done, you

1  know, failed to investigate other possible suspects, you can't say that and

2  then on the other hand say that they took six years. It has taken six years.

3  After six years, after an investigation for that period of time, and after two

4  weeks of presenting evidence, as I told you in my opening, justice is going to

5  speak one name and that name is Markelus Q. Carter.

6  DEFENDANT: Not guilty.

7  MR. MILLER: Markelus Q. Carter had the

8  motive. He had the opportunity. He killed Ken Warrington after he could not

9  regain control.

10  THE COURT: Okay. That concludes the

11  closing arguments. We're going to take a short break and then I have to read

12  the instructions to you. That's going to take some more time. That's why

13  we're going to take the break now. It's very important, as it always has been,

14  especially now, I'm sure, as we all, well, you folks would be the same way,

15  you want to get started but you can't get started on your deliberations until

16  you have the instructions. The instructions are an important part of the case

17  that you have to get before you start making any conclusions, or deliberating,

18  or expressing opinions, or formulating opinions. So, remember that

19  admonition.

20  Don't have any contact with anybody. We'll go for fifteen minutes. So,

21  that's roughly twenty till. I'll give you the instructions and then the case will be

22  yours. So, we'll stand in recess for fifteen minutes. I want counsel to stay

23  here for just a second.

1   (WHEREUPON, JURY WAS EXCUSED FROM THE COURTROOM.)

2   THE COURT: The jurors have left the

3   Courtroom. Just quickly, you may have noticed that I was passed something.

4   These are the certified copies of your entries. So, they are 'II'?

5   MRS. KOHLRIESER: Yes.

6   THE COURT: You're right - the

7   handwriting is pretty bad.

8   MRS. KOHLRIESER: They should be 'II'.

9   THE COURT: 'II'.

10  MRS. KOHLRIESER: The Stephen

11  Upham ones?

12  THE COURT: It's 'II'. So, that will be put

13  in there as the exhibit. That's one thing I wanted to make sure because you

14  may have seen something being passed. I just wanted to make sure of that.

15  Okay. That was it.

16  MRS. KOHLRIESER: Okay. Thank you.

17  (WHEREUPON, COURT WAS IN RECESS.)

18

19  THE COURT: For the record, we're

20  reconvening in CR2014 0139, State of Ohio -vs- Markelus Q. Carter. The

21  defendant is present with his attorney. The State is present. The jurors have

22  returned.

23  Members of the jury, you have heard the evidence and the arguments

1  of counsel. The Court and the jury have separate functions. You decide the

2  disputed facts and the Court provides the instructions of law. It is your sworn

3  duty to accept these instructions and to apply the law as it is given to you.

4  You are not permitted to change the law or to apply your own conception of

5  what you think the law should be.

6  A criminal case begins with the filing of an indictment. The indictment

7  informs the defendant that he has been charged with an offense or offenses.

8  The fact that it was filed may not be considered for any other purpose. The

9  plea of not guilty is a denial of the charges and puts in issue all the essential

10  elements of the offenses.

11  If, during the course of the trial, the Court has said or done anything

12  that you consider an indication of the Court's view of the facts of the you are to

13  disregard it.

14  The defendant is presumed innocent until his guilt is established

15  beyond a reasonable doubt. The defendant must be acquitted unless the

16  State produces evidence which convinces you beyond a reasonable doubt of

17  every essential element of the offenses charged in the indictment.

18  The defendant in a criminal case is not required to present any

19  evidence. If, after considering the evidence as a whole, you have a

20  reasonable doubt as to the defendant's guilt, you must find him not guilty.

21  Reasonable doubt is present when, after you have carefully considered

22  and compared all of the evidence, you cannot say you are firmly convinced of

23  the truth of the charge. Reasonable doubt is a doubt based on reason and

1 common sense.  Reasonable doubt is not a mere possible doubt because

2 everything relating to human affairs or depending on moral evidence is open

3 to some possible or imaginary doubt.  Proof beyond a reasonable doubt is

4 proof of such a character that an ordinary person would be willing to rely and

5 act upon it in the most important of the person's own affairs.

6 If, after a full and impartial consideration of all of the evidence, you are

7 firmly convinced of the truth of the charge the State has proved its case

8 beyond a reasonable doubt.  If you are not firmly convinced of the truth of the

9 charge you must find the defendant not guilty.

10 Evidence is all the testimony received from the witnesses and the

11 exhibits admitted during the trial and any facts which the Court requires you to

12 accept as true.

13 The parties have stipulated to certain facts.  You are instructed that

14 matters to which the parties have stipulated should be accepted by you as

15 true.

16 Evidence may be direct, or circumstantial, or both.

17 Direct evidence is the testimony given by a witness who has seen or

18 heard the facts to which he or she testifies.  It includes exhibits admitted into

19 evidence during the trial.

20 Circumstantial evidence is the proof of facts or circumstances by direct

21 evidence from which you may reasonably infer other related or connected

22 facts which naturally and logically follow, according to the common

23 experience of mankind.

1 To infer, or to make an inference, is to reach a reasonable conclusion

2 or deduction of fact which you may, but are not required to, make from other

3 facts which you find have been established by direct evidence. Whether an

4 inference is made rests entirely with you.

5 Direct evidence and circumstantial evidence are of equal weight or

6 probative value. The sufficiency of circumstantial evidence to prove a fact or

7 to prove guilt depends, among other things, on whether reason and common

8 sense lead you from the facts proved by real or direct evidence to the fact

9 sought to be proved. If you determine that the connection between what is

10 proved and what is sought to be proved is strong enough to support a finding

11 of proof beyond a reasonable doubt, the circumstantial evidence is sufficient.

12 On the other hand, if that connection is so weak that you cannot say the fact

13 sought to be established has been proved beyond a reasonable doubt, then

14 the circumstantial evidence is insufficient.

15 Where evidence is both direct and circumstantial, the combination of

16 the two must satisfy you of the defendant's guilt beyond a reasonable doubt.

17 You may not make one inference from another inference, but you may

18 draw more than one inference from the same facts or circumstances.

19 The evidence does not include the indictment, opening statements, or

20 closing arguments of counsel. The opening statements and closing

21 arguments of counsel are designed to assist you. They are not evidence.

22 Statements that were stricken by the Court or which you were

23 instructed to disregard are not evidence and must be treated as though you

1 never heard them.

2 Demonstrative evidence was admitted.  Demonstrative evidence is an

3 object, picture, model, or other device intended to clarify or qualify facts for

4 the jury.  Such evidence is merely an aid in understanding certain facts, and it

5 is up to the jury to decide what weight to give such evidence.  Demonstrative

6 evidence may be considered for the limited purpose to show whatever it is

7 presented to demonstrate looks like.

8 You must not speculate as to why the Court sustained the objection to

9 any question or what the answer to such a question might have been.  You

10 must not draw any inference or speculate on the truth of any suggestion

11 included in a question that was not answered.

12 On occasion the attorneys have approached or were called to the

13 Judge's bench for purposes of consulting with the Judge out of the hearing of

14 the jury.  I instruct you to disregard such activity or any conversation which

15 you may have overheard and you should not take any such matter into

16 consideration in coming to a decision in this case.

17 You are the sole judges of the facts, the credibility of the witnesses and

18 the weight of the evidence.

19 To weigh the evidence you must consider the credibility of the

20 witnesses.  You will apply the tests of truthfulness which you apply in your

21 daily lives.  These tests include the appearance of each witness upon the

22 stand; his or her manner of testifying; the reasonableness of the testimony;

23 the opportunity the witness had to see, hear, and know the things concerning

1   which he or she testified; the witness' accuracy of memory, frankness, or lack
2   of it; intelligence; interest and bias, if any, together with all of the facts and
3   circumstances surrounding the testimony.  Applying these tests, you will
4   assign to the testimony of each witness such weight as you deem proper.
5   You should not decide any issue of fact merely on the basis of the
6   number of witnesses who testify on each side of an issue.  Rather, the final
7   test in judging evidence should be the force and weight of the evidence,
8   regardless of the number of witnesses on each side of an issue.  The
9   testimony of one witness, if believed by you, is sufficient to prove any fact.
10  Also, discrepancies in a witness' testimony or between his or her
11  testimony and that of others, if there are any, does not necessarily mean that
12  you should disbelieve that witness, as people commonly forget facts or
13  recollect them erroneously after the passage of time.  In considering a
14  discrepancy in a witness' testimony you should consider whether such
15  discrepancy concerns an important fact or a trivial fact.
16  You are not required to believe the testimony of any witness simply
17  because he or she was under oath.  You may believe or disbelieve all or any
18  part of the testimony of any witness.  It is your province to determine what
19  testimony is worthy of belief and what testimony is not worthy of belief.
20  It is not necessary that the defendant take the witness stand in his own
21  defense.  He has a constitutional right not to testify.  The fact that the
22  defendant did not testify must not be considered for any purpose.
23  Normally a witness may not express an opinion.  However, one who

1   follows a profession or special line of work may express his or her opinion

2   because of his or her education, knowledge, and experience.  Such testimony is

3   admitted for whatever assistance it may provide to help you to arrive at a just

4   verdict.

5      Questions have been asked of the expert witnesses after they had

6   disclosed the underlying facts or data.  It is for you, the jury, to decide if such

7   facts or data upon which they based their opinions are true and you will

8   decide the weight to give such evidence.

9      As with other witnesses, on you alone rests the duty of deciding what

10  weight to give to the testimony of the experts.  In deciding the weight,

11  consider their skill, experience, knowledge, veracity, familiarity with the facts

12  of this case, and the usual rules for testing credibility and believability in

13  deciding the weight to give to the testimony.

14     Each witness is subject to direct examination by the party who calls

15  him or her and to cross examination by the opposing party.  During cross

16  examination counsel may inquire into matters that do not directly relate to the

17  issues involved in this case.  Such questions and answers are permitted for

18  the purpose of helping you to determine his or her credibility and the weight to

19  be given to his or her testimony and for no other purpose.

20     Now, the defendant, Markelus Q. Carter, is charged with one count of

21  Aggravated Murder and one count of Having a Weapon While Under a

22  Disability.  I will instruct you on each count separately.  There is also a

23  specification, or an additional finding, that you will have to consider when you

1  deliberate on Count One. I will instruct you on the specification separately.

2  Before you can find the defendant guilty you have to find that the State

3  of Ohio has proved all of the elements of the offense beyond a reasonable

4  doubt.

5  Count One. Before you can find the defendant guilty of Aggravated

6  Murder in Count One you must find beyond a reasonable doubt that: On or

7  about the 23rd day of February, 2009, in Allen County, Ohio, the defendant,

8  Markelus Q. Carter, did purposely and with prior calculation and design cause

9  the death of Kenneth Warrington.

10  There are several terms relating to the charge in Count One that need

11  to be defined.

12  Purposely. Purpose to cause the death of another is an essential

13  element of the offense charged in this case. Purpose to cause the death of

14  Kenneth Warrington is an essential element of the offense charged in Count

15  One.

16  A person acts purposely when it is the person's specific intention to

17  cause a certain result, or when the gist of the offense is a prohibition against

18  conduct of a certain nature, regardless of what the offender intends to

19  accomplish thereby, it is the offender's specific intention to engage in conduct

20  of that nature. It must be established that at the time in question there was

21  present in the mind of the defendant a specific intention to cause the death of

22  Kenneth Warrington.

23  Purpose is a decision of the mind to do an act with a conscious

1 objective of producing a specific result. To do an act purposely is to do it

2 intentionally and not accidentally. Purpose and intent mean the same thing.

3 The purpose with which a person does an act is known only to himself unless

4 he expresses it to others or indicates it by his conduct.

5 The purpose with which a person does an act or brings about a result

6 is determined from the manner in which it is done, the means or weapon

7 used, and all of the other facts and circumstances in evidence.

8 If a wound is inflicted upon a person with a weapon in a manner

9 calculated to destroy life or inflict great bodily harm, the purpose to cause the

10 death may be inferred from the use of the weapon. That inference, however,

11 is not conclusive, but may be considered in determining intent.

12 Proof of motive is not required. The presence or absence of motive is

13 one of the circumstances bearing on purpose. Where an act is a crime, a

14 good motive or purpose is not a defense. No person shall be convicted of

15 Aggravated Murder unless he is specifically found to have intended to cause

16 the death of another.

17 If there was no purpose to cause the death of anyone, the defendant

18 cannot be found guilty of Aggravated Murder.

19 Prior calculation and design means that the purpose to cause the

20 death was reached by a definite process of reasoning in advance of the

21 homicide, which produces a reasoning must have included - oh - which

22 process of reasoning must have included a mental plan involving studied

23 consideration of the method and the means or instrument with which to cause

1   the death.  To constitute prior calculation there must have been sufficient time

2   and opportunity for the planning of an act of homicide, and the circumstances

3   surrounding the homicide must show a scheme designed to carry out the

4   calculated decision to cause the death.  No definite period of time must

5   elapse and no particular amount of consideration must be given, but acting on

6   the spur of the moment or after momentary consideration of the purpose to

7   cause the death is not sufficient.

8   Cause is an essential element of the offense of Aggravated Murder.

9   Cause is an act which directly produces the death of another and without

10   which it would not have occurred.

11   A death is the result of an act when it is produced directly by the act in

12   a natural and continuance sequence and would not have occurred without the

13   act.

14   Now, as to Count One, you must further consider the offense charged

15   in the indictment.  If you find that the State proved beyond a reasonable doubt

16   all the essential elements of the offense of Aggravated Murder, your verdict

17   must be guilty as charged.

18   However, if you find that the State failed to prove beyond a reasonable

19   doubt all the essential elements of Aggravated Murder, then your verdict must

20   be not guilty of that offense; and, in that event, you will continue your

21   deliberations to decide whether the State has proved beyond a reasonable

22   doubt all of the essential elements of the lesser included offense of Murder.  If

23   all of you are unable to agree on a verdict of either guilty or not guilty of

1838

1. Aggravated Murder on Count One, then you will continue your deliberations to
2. decide whether the State has proved beyond a reasonable doubt all of the
3. essential elements of the lesser included offense of Murder.  The offense of
4. Murder is distinguished from Aggravated Murder by the absence or failure to
5. prove prior calculation and design.
6.     Before you can find the defendant guilty of Murder in Count One you
7. must find beyond a reasonable doubt that:  On or about the 23rd day of
8. February, 2009, in Allen County, Ohio, the defendant, Markelus Q. Carter, did
9. purposely cause the death of Kenneth Warrington.
10.     The definitions given previously for purposely and cause apply if you
11. are considering the lesser offense of Murder.
12.     If you find the State failed to prove beyond a reasonable doubt the
13. Aggravated Murder in Count One, but you find that the State proved beyond a
14. reasonable doubt all of the essential elements of the offense of Murder, your
15. verdict must be guilty of Murder.  If you find that the State failed to prove
16. beyond a reasonable doubt any one of the essential elements of the offense
17. of Murder, your verdict must be not guilty.
18.     If the evidence warrants it, you may find the defendant guilty of an
19. offense lesser than that charged in the indictment.  However, notwithstanding
20. this right, it is your duty to accept the law as given to you by the Court and if
21. the facts and law warrant a conviction of the offense charged in the
22. indictment, namely Aggravated Murder, then it is your duty to make such
23. finding uninfluenced by your power to find the lesser offense.  This provision

1   is not designed to relieve you from the performance of an unpleasant duty. It

2   is included to prevent the failure of justice if the evidence fails to prove the

3   original charge, but just justify a verdict for the lesser offense.

4   The firearm specification on Count One. If you find Markelus Q. Carter

5   guilty of Aggravated Murder or the lesser offense of Murder in Count One, it is

6   your duty to deliberate further with respect to that count and decide whether

7   the State has proved beyond a reasonable doubt that the defendant is guilty

8   of the additional factual question which is called a specification. A

9   specification shall be proved beyond a reasonable doubt in order to support a

10   guilty verdict on the specification.

11   If you find the defendant not guilty of Aggravated Murder or Murder,

12   you will not consider or decide this separate question upon your verdict that

13   was not guilty.

14   Your finding or verdict on this additional question will be expressed by

15   a verdict of guilty or not guilty. Guilt must be proved beyond a reasonable

16   doubt.

17   If your verdict is guilty as to the Aggravated Murder charge or the

18   lesser included charge of Murder, you must separately decide whether the

19   defendant had a firearm on or about his person or under his control while

20   committing the Aggravated Murder or the Murder of Kenneth Warrington, and,

21   displayed the firearm, brandished the firearm, indicated that he possessed the

22   firearm, or used the firearm to facilitate the Aggravated Murder or the lesser

23   included Murder of Kenneth Warrington.

1   A firearm means any deadly weapon capable of expelling or propelling

2   one or more projectiles by the action of an explosive or combustible

3   propellant. A firearm includes an unloaded firearm or any firearm which is

4   inoperable, but which can readily be rendered operable. Deadly weapon

5   means any instrument, device, or thing capable of inflicting death, and

6   designed or specially adapted for use as a weapon, or possessed, carried, or

7   used as a weapon.

8   When deciding whether a firearm is capable of expelling or propelling

9   one or more projectiles by the action of an explosive or combustible

10   propellant, you may rely upon circumstantial evidence, including, but not

11   limited to, the statements or representations and actions of the individuals

12   exercising control over the firearm.

13   On or about his person means that the firearm was either carried on

14   defendant's person or was concealed ready at hand.

15   Under his control means so near the defendant's person as to be

16   conveniently accessible and within his immediate physical reach.

17   Brandish means to wave or exhibit in a menacing or challenging

18   manner.

19   Now, Count Two – Having a Weapon While Under a Disability. Before

20   you can find the defendant guilty of Having a Weapon While Under a

21   Disability as alleged in Count Two in the indictment you must find beyond a

22   reasonable doubt that: On or about the 23rd day of May (sic), 2009, in Allen

23   County, Ohio, the defendant, Markelus Q. Carter, did knowingly have,

1    acquire, or use a firearm and that Markelus Q. Carter had previously been

2    convicted of a felony offense involving the illegal possession of a drug of

3    abuse.

4        There are several terms relating to the charge in Count Two that need

5    to be defined.

6        A person acts knowingly, regardless of purpose, when the person is

7    aware that the person's conduct will probably cause a certain result or will

8    probably be of a certain nature. A person has knowledge of circumstances

9    when the person is aware that such circumstances probably exist. When

10   knowledge of the existence of a particular fact is an element of an offense,

11   such knowledge is established if a person subjectively believes that there is a

12   high probability of its existence and fails to make inquiry or acts with a

13   conscious purpose to avoid learning the fact.

14   Since you cannot look into the mind of another, knowledge is

15   determined from all of the facts and circumstances in evidence.

16   Had means possessed.

17   Possession is a voluntary act if the possessor knowingly procured or

18   received the firearm, or was aware of his control thereof for a sufficient period

19   of time to have ended his possession. A person has possession when he

20   knows that he has the object on or about his person or places it where it is

21   accessible to his use or direction and he has the ability to direct or control its

22   use.

23   Ownership is not necessary.  A person may possess or control

1   property belonging to another.

2   Firearm has already been defined for you under the Specification

3   instructions for Count One. The term firearm with respect to Count Two has

4   the same meaning as it did with respect to the specification on Count One.

5   Evidence was received about the defendant's commission and

6   conviction of a previous felony offense involving the illegal possession of

7   drugs. That evidence was received only for a limited purpose. It was not

8   received, and you may not consider it, to prove the character of the defendant

9   in order to show that he acted in conformity with that character. If you find

10   that the evidence of the previous crime is true and that the defendant was

11   convicted of it, you may consider that evidence only for the purpose of

12   deciding whether it proves defendant's knowledge of circumstances

13   surrounding the offense charged in Count Two that defendant had previously

14   been convicted of a felony offense involving the illegal possession of a drug of

15   abuse. That evidence cannot be considered for any other purpose.

16   A drug of abuse means any controlled substance as defined by the

17   Ohio Revised Code Section 3719.01. Crack cocaine is a drug of abuse.

18   Possession of a drug of abuse, such as crack cocaine, is a felony offense

19   involving the illegal possession, use, sale, administration, distribution, or

20   trafficking of a drug of abuse.

21   Now, these instructions are applicable to all the counts.

22   Evidence was received about an occurrence where the police were

23   called to 122 Eureka Street in December of 2007. Evidence was received

about guns that are not the guns alleged to have been used with respect to
Count One or allegedly to have been possessed with respect to either count
in this case.  Evidence was received about cocaine being located at 122
Eureka Street.  Evidence was also received about the defendant having been
in prison after February 23rd, 2009.  This all involves evidence of the
commission of acts other than the offenses with which the defendant is
charged in this trial.  That evidence was received only for limited purposes.  It
was not received, and you may not consider it, to prove the character of the
defendant in order to show that he acted in conformity with that character.  If
you find that the evidence of the other acts is true and that the defendant
committed them, you may consider that evidence for the purpose of deciding
whether it proves the defendant's motive, intent, purpose, preparation, or plan
to commit the offenses charged in this trial, or whether it proves knowledge of
circumstances surrounding the offenses charged in this trial, or the identity of
the person who committed the offenses in this trial.

Testimony has been admitted indicating that the defendant was
involved in a physical altercation with a witness in the holding room.  You are
instructed that defendant's conduct alone does not raise a presumption of
guilt, but it may tend to indicate the defendant's consciousness or awareness
of guilt.  If you find that the facts do not support that the defendant's conduct,
or if you find that some other motive prompted the defendant's conduct, or if
you are unable to decide what the defendant's motivation was, then you
should not consider this evidence for any purpose.  However, if you find that

the facts support that the defendant engaged in such conduct and if you

decide that the defendant was motivated by a consciousness or an

awareness of guilt, you may, but are not required to, consider that evidence in

deciding whether the defendant is guilty of the crimes charged. You alone will

determine what weight, if any, to give to this evidence.

The offenses charged are alleged to have occurred "on or about

February 23, 2009". It is not necessary that the State prove that the offenses

were committed on the exact day as charged in the indictment. It is sufficient

to prove that the offense took place on a date reasonably near the date

claimed.

An anonymous letter was offered to prove that a letter was sent, rather

than to prove that the statements in the letter were true. You are not to

consider that anonymous letter as proof of what the letter says.

If you find the State proved beyond a reasonable doubt all the

essential elements of the offenses charged in the indictment, or a lesser

included offense on Count One, your verdict must be guilty as to such

offense.

If you find the State failed to prove beyond a reasonable doubt any one

of the essential elements of either of the offenses charged in the indictment,

or a lesser included offense on Count One, your verdict must be not guilty as

to such offense according to your findings.

The defendant can be found guilty of only one offense in Count One.

Whether the State proved the firearm specification beyond a reasonable

1   doubt must be decided on Count One in the event if you find the defendant

2   guilty of either the offense charged, Aggravated Murder, or the lesser offense

3   of Murder.

4       You may not discuss or consider the subject on punishment during

5   your deliberations. Your duty is confined to the determination of the guilt or

6   innocence of the defendant and the additional finding in the specification.

7   You will have with you in the jury room the verdict forms for each count

8   and the specification on Count One. I will now read the forms to you. That

9   caption is the case number and the name of the case that I read every time

10  we get started. I won't reread that. But, the verdict in Count One reads -

11  "We, the jury, being duly impaneled, sworn and affirmed, find the State of

12  Ohio," blank, and then there's a little instruction to fill in 'did' or 'did not',

13  "prove beyond a reasonable doubt that Markelus Q. Carter did purposely and

14  with prior calculation and design cause the death of Kenneth Warrington on

15  Septemeber (sic) 23rd, 2009 and in Allen County, Ohio. Therefore, we find

16  beyond a reasonable doubt that Markelus Q. Carter," either is 'guilty,' or 'not

17  guilty', "of Aggravated Murder as charged in Count One of the indictment."

18  Then there's a space for the date and the signatures of the jurors that reach

19  that verdict.

20  Then it goes on in Count One - "If your verdict is guilty of Aggravated

21  Murder on Count One, do not consider the lesser included offense of Murder.

22  If your verdict is not guilty of Aggravated Murder, proceed to consider the

23  lesser included offense. The lesser included offense of Murder is to be

1 considered only if you determine that the State failed to prove beyond a
2 reasonable doubt that the defendant is guilty of Aggravated Murder.
3 Defendant can be found guilty of only one offense on Count One."
4 So, if you got to that point, the lesser included offense of Murder
5 verdict form would read –"We, the jury, being duly impaneled, sworn and
6 affirmed, find the State did not prove beyond a reasonable doubt that the
7 defendant, Markelus Q. Carter, is guilty of Aggravated Murder as alleged in
8 Count One of the indictment, and we find that the State blank," either 'did' or
9 'did not'," "prove beyond a reasonable doubt that on or about the 23rd day of
10 February, 2009, in Allen County, Ohio, the defendant, Markelus Q. Carter, did
11 purposely cause the death of Kenneth Warrington. Therefore," it reads, "we
12 find beyond a reasonable doubt that the defendant is blank," either 'guilty' or
13 'not guilty'," "of the lesser included offense of Murder in Count One." There's
14 signature lines and a date line.
15 The next instruction would be, "Proceed to the specification only if you
16 find the defendant guilty of Aggravated Murder or Murder." This is the verdict
17 for the specification on Count One. It reads, omitting the caption, "We, the
18 jury, being duly impaneled, sworn and affirmed, having found defendant guilty
19 of," and there's a blank and you're either going to insert in ink "Aggravated
20 Murder," if you found beyond a reasonable doubt the defendant was guilty of
21 Aggravated Murder or you're going to leave that blank if you found the
22 defendant guilty of Murder and so it would just read Murder, "in Count One,
23 further find the State," either 'did' or 'did not'," "prove beyond a reasonable

1    doubt that the defendant had a firearm on or about his person or under his

2    control while committing the Aggravated Murder or Murder," whichever one it

3    is," "and displayed the firearm, brandished the firearm, indicated that he

4    possessed the firearm, or used the firearm to facilitate either the Aggravated

5    Murder or the Murder of Kenneth Warrington and, therefore, we find beyond a

6    reasonable doubt that the defendant, Markelus Q. Carter, is" either 'guilty' or

7    'not guilty', "of the specification on Count One." So, there's instructions there,

8    and there's signature lines, and a date line.

9        Moving to Count Two, the verdict form, there's just one verdict, one

10   sheet - "We, the jury, being duly impaneled, sworn and affirmed, find the

11   State of Ohio," either 'did,' or 'did not,' "prove beyond a reasonable doubt that

12   Markelus Q. Carter did knowingly have, carry, or use a firearm and that he

13   had previously been convicted of a felony offense involving the illegal

14   possession of a drug of abuse. Therefore, we find beyond a reasonable

15   doubt that Markelus Q. Carter, is" either 'guilty' or 'not guilty', "of Having a

16   Weapon While Under a Disability as charged in Count Two of the indictment."

17       So, let's continue. Those are the verdict forms. When you have

18   reached a verdict you will complete the form, or forms, in the manner that

19   corresponds with your decision and sign the verdicts in ink.

20       You must not be influenced by any consideration of sympathy or

21   prejudice. It is your duty to carefully weigh the evidence, to decide all

22   disputed questions of fact, to apply the instructions of the Court to your

23   findings, and to render your verdict accordingly. In fulfilling your duty your

1 efforts must be to arrive at a just verdict.  Consider all of the evidence and

2 make your findings with intelligence and impartiality, and without bias,

3 sympathy, or prejudice so that the State of Ohio and the defendant will feel

4 that this case was fairly and impartially tried.

5 If, during the course of the trial, the Court has said or done anything

6 that you consider an indication of the Court's view on the facts, you are

7 instructed to disregard it.

8 Now, it may be difficult for you to remember all of the instructions that I

9 have given you.  You will have a copy of all of this to use in your

10 deliberations.  But, if during your deliberations you cannot remember or are in

11 doubt about a portion of the instructions you may request such information by

12 asking the Court a question.  The foreperson must put your question in

13 writing, indicating specifically what is requested.  Such communication must

14 be delivered to the bailiff.

15 Do not investigate or attempt to obtain additional information about this

16 case from any source outside the Courtroom.  This includes making calls or

17 doing research on a cell phone, smart phone, or I-Phone during deliberations.

18 You are instructed to turn your phones and other electronic devices off during

19 deliberations.  You must not make or accept any calls or use the electronic

20 devices in any way or for any reason during deliberations.  If you have a

21 special concern about expecting an emergency call from a family member or

22 otherwise today, turn your phone over to the bailiff and she will notify the

23 Court and you if a call comes in.  It is vital that you carefully follow these

instructions.  The reason is simple.  The law requires that you consider only

the testimony and evidence you hear and see in the Courtroom.  If you have a

question about the instructions, ask the Court for clarification.

Your initial conduct upon entering the jury room is a matter of

importance.  It is not wise immediately to express a determination to insist

upon a certain verdict because if your sense of pride is aroused you may

hesitate to change your position even if you later decide you are wrong.

Consult with one another, consider each other's views, and deliberate

with the objective of reaching an agreement, if you can do so without

disturbing your individual judgment.  Each of you must decide this case for

yourself, but you should do so only after a discussion and consideration of the

case with your fellow jurors.  Do not hesitate to change an opinion if you are

convinced that it is wrong.  However, you should not surrender an honest

conviction in order to be congenial or to reach a verdict solely because of the

opinion of other jurors.

After you retire, select a foreperson.  Whenever all twelve - I repeat -

all twelve jurors agree upon a verdict you will sign the verdict in ink and

advise Monica when you're done with both counts by calling 8831 on the

phone in there.  You will then be returned to the Courtroom.

The Court will place in your possession the exhibits and the verdict

forms.  The foreperson will retain possession of these records, including the

verdicts, and return them to the Courtroom.  The foreperson will see that your

discussions are orderly and that each juror has the opportunity to discuss the

1 case and to cast his or her vote; otherwise, the authority of the foreperson is

2 the same as any other juror.

3 Until your verdict is announced in open Court you are not to disclose to

4 anyone else the status of your deliberations or the nature of your verdict.

5 DVD and CD recordings and testimony relating to them have been

6 introduced into evidence. You shall consider whether the CD and DVD's are

7 true records of what transpired at the time they were recorded. If you find that

8 they are, you will then determine what weight, if any, the CD and DVD's

9 should receive in light of all of the evidence.

10 You will have with you in the jury room, as exhibits, the CD and DVD's

11 that were introduced into evidence. If, and whenever, you wish to view or

12 listen to the DVD's or the CD, the Court instructs you that this must be done

13 under the control of the bailiff or other person designated by the Court, rather

14 than a member of the jury panel. Please make your requests accordingly.

15 No deliberations shall take place in the presence of the bailiff or other person.

16 Now, an alternate juror, Miss Harris, was selected to serve in the event

17 of any misfortune to a member of the panel. It will not be necessary for you to

18 deliberate at this time. However, the Court orders that you shall be retained

19 after the jury retires to deliberate so that you can be called into service if

20 something happens that prevents one of the jurors from finishing. You do not

21 have to stay in this building, but you are not released from the order that you

22 not discuss this case with anyone until you either replace a juror or are

23 officially discharged. If an alternate replaces a juror after deliberations have

NaN

1   begun, the Court must instruct the jury to being its deliberations anew.  Miss

2   Harris, you are not to discuss this case or tell anyone how you would have

3   voted until after the jury has returned a verdict.  You can be excused; but, see

4   the bailiff before you leave so we know how to contact you if we need you.

5   You are not officially discharged and must still abide by my previous

6   admonitions.

7       Again, folks, you are not permitted to discuss the case amongst

8   yourselves or with anyone else until your verdict has been returned and until

9   the Court formally discharges you from your duties as a juror.  That goes

10  mainly for the alternate.  Obviously the jurors can discuss it among

11  themselves when they're in the jury room.

12      Whether you discuss this case with counsel after the case is done, or

13  anyone else after you are discharged, is a matter of your own free choice.

14      Does counsel for the State desire anything further at this time?

15      MRS. KOHLRIESER:  Your Honor, just

16  one thing.  When you were reading the date for the Weapon Under Disability,

17  the official instructions and not on the verdict form, I think you misspoke and

18  said 'May' when it's actually 'February 23rd'.  The verdict form is correct.

19      THE COURT:  All right.  If I did -- well, let

20  me double check.

21      MRS. KOHLRIESER:  The instructions say

22  'February'.

23      THE COURT:  If I said 'May', well, it's

1  clearly in the instructions and on the verdict form the 23rd day of February

2  that we're talking about.  I apologize if I did that.

3  MRS. KOHLRIESER:  That's it, your

4  Honor.

5  THE COURT:  Anything else from the

6  State?

7  MRS. KOHLRIESER:  No, your Honor.

8  THE COURT:  Anything from the defense?

9  MR. RION:  No, your Honor.

10  THE COURT:  Okay.  On behalf of the

11  public, ladies and gentlemen, and the parties in this case, I would like to

12  express my appreciation for your services in performing this important

13  function.

14  Now, here's the deal.  It's about twenty after four.  We'll get this stuff to

15  you, the exhibits and the jury instructions and things, and you can start your

16  deliberations.  Probably within a few moments Monica will come in and will

17  take supper orders.  We'll feed you because we're not going to have you go

18  out to have your supper on your own.  You'll eat as a group.  If you need to

19  make calls home to let folks know that you're going to have supper here, you

20  know, you can do that.  Again, when Monica is in there don't deliberate and

21  don't express any opinions about the case.  But, if you need to make those

22  kinds of arrangements -- well, other than that, turn off the cell phones, like I

23  said before.

1    We'll just wait and see how things go and for how late we go. I'm

2    trying to be considerate of your time. I know you've sat through a lot. You

3    guys deliberate as long as you need to deliberate. But, we may manage

4    some time later this evening. We'll see what's going on. Okay?

5    All right. We'll stand in recess until the jurors let us know they either

6    have a question or verdicts. Parties - let the Court know, Monica or Court

7    staff, know if you're not going to stick around where we can quickly reach you.

8    All right. The jurors are excused.

9    (WHEREUPON, JURY DELIBERATIONS COMMENCED AT 4:20 P.M.)

10    THE COURT: The jurors have left the

11    room. I just wanted to make sure -- I believe I read through them, but there

12    were some typos. and plurals and I read singulars with regard to the prior

13    conviction. I will change all of that on the instructions that go to the jurors. I

14    caught -- I think I might have slipped one 'S' in there for a plural, but I'll

15    change the instructions. I caught it and read it in the singular. There were a

16    couple of other typos, that I caught and I'll correct all of those. If counsel

17    wants a clean copy of the ones that are going to be submitted to the jurors,

18    well, see the staff and we'll make copies for you.

19    Before I forget it, too, I want counsel to turn over the jury lists that were

20    handed out, the questionnaires and all that stuff. Hand those over to the

21    Court. The original copy will be in the Court file. But, other than that, I don't

22    want them floating around. All right?

23    MR. RION: Judge, those may be in my

1   living room.

2   MRS. KOHLRIESER:  I don't have mine

3   immediately available, either.

4   THE COURT:  Well, get them to me.  I'll

5   trust your representations.  Okay.

6   (WHEREUPON, Court was in recess.)

7

8

9   **MONDAY, SEPTEMBER 21, 2015**

10   **7:30 P.M.**

11

12   THE COURT:  We're on the record.  It's

13   about 7:30 P.M. on Monday, the 21st of Setpember, 2015 in Case Number

14   CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The record will reflect

15   the defendant is in the Courtroom with counsel.  The State is present.  The

16   jurors have been returned to the Courtroom at the request of the Judge.

17   Ladies and gentlemen of the jury, it's been a long day for everyone,

18   especially you folks.  Now that the lawyers have presented the case and I

19   have given you the instructions I know you're working diligently.  But, I'm

20   trying to be conscientious here and I understand that it's been a long day.

21   So, we're going to take an evening recess now and interrupt your

22   deliberations.  Your deliberations are going to be interrupted because of the

23   lateness of the hour of the night.  This will give any of you folks that need to

1      make arrangements for transportation, or kids, or work, to get those done so

2      it's not too late to do that.

3      Now, the Court cautions you that this is a delicate moment when

4      comment concerning the case or the status of your deliberations is improper

5      and may prejudice the rights of either party or require a new trial. You will be

6      permitted to separate for overnight and will return to the Courtroom and

7      resume your deliberations at nine o'clock. Does anyone have a problem

8      getting back at nine? So, nine o'clock is when you'll be back here. Before

9      you start your deliberations I'll have you in the Courtroom. We'll go on the

10      record and make sure that no one has been exposed to anything or any

11      violation of any of the admonitions have happened and then I'll let you go

12      back and start your deliberations.

13      Before you leave the foreperson shall make sure that all the exhibits

14      are left here. Monica will go in and make sure of that. Leave your notepads.

15      Do not let anyone, including the bailiff, know what's in your notes.

16      During your absence remember that you are a member of a

17      deliberating body. Do not deliberate or discuss this case until you return to

18      the jury room tomorrow morning. Do not discuss this case with anyone until

19      you are all together tomorrow morning. You are instructed not to read, view,

20      or listen to any report in the newspaper, the radio, or television on the subject

21      of this trial. Do not permit anyone to read or comment upon them to you or in

22      your presence. Do not permit anyone to discuss this case with you or in your

23      presence. Do not investigate or attempt to obtain additional facts about this

1    case. It would be improper if any of you would attempt to do so. The

2    standard admonitions that I have been giving all along still apply.

3    So, with that, anything from the State before we break for the evening

4    and to return at nine o'clock?

5    MRS. KOHLRIESER: No, your Honor.

6    THE COURT: Anything from the defense?

7    MR. RION: No, your Honor.

8    THE COURT: Like I said, at nine o'clock,

9    when everybody is here, we'll get you in and just make sure that everybody is

10   still able to continue and be fair and impartial and then we'll let you go back

11   into your deliberations. Okay?

12   Then, if that's the case, the jurors will be excused and we'll recess the

13   deliberations until nine o'clock tomorrow morning.

14   **(WHEREUPON, COURT RECESSED FOR THE DAY AT 7:33 P.M.)**

15

16

17

18

19

20

21

22

23

1     TUESDAY, SEPTEMBER 22, 2015

2     9:10 A.M.

3

4     THE COURT: Today is the 22nd day of

5     September, 2015. We are reconvening in Case Number CR2014 0139, State

6     of Ohio -vs- Markelus Q. Carter. I want the record to reflect the defendant is

7     in the Court room with his attorney. The State is present through the

8     Prosecuting Attorney's office. The jurors have returned from the recess, the

9     recess of their deliberations.

10     So, welcome back, ladies and gentlemen. The first question I need to

11     ask is similar to what I've asked you before - have any of the jurors had a

12     violation of the admonitions that I've been giving, or has anybody been

13     exposed to anything, or has anything happened in any of your lives that you

14     feel is going to prevent you from continuing your service now that you're in

15     deliberations from continuing your deliberations in a fair and impartial

16     manner? Anyone have any issues? Okay. So, they're indicating not.

17     Again, the rules that have been given to you as far as deliberations still

18     are in effect. Do not reveal the status of your deliberations or the nature of

19     your discussions with anyone when you're in a setting like this where other

20     people are present, anybody present, including the bailiff.

21     I know there was a request in terms of changing the location of your

22     deliberations. Obviously we had you meet in the Grand Jury room today for

23     purposes of logistics here this morning to get you all together. I know that's

1    a little cramped, especially with the great volume of evidence you have in our

2    jury room, but you'll notice in there the wall has that padding and that was for

3    soundproof, for privacy reasons.  We just don't have that capability in

4    that other room.  So, I'm going to say that you stay in this room here.  We've

5    tried to get the temperature down here so maybe it won't get so warm.

6    Another accommodation we might be able to do is lock this room and open

7    the door and have the fan out here blowing cooler air in there so that the fan

8    doesn't disrupt in there.  But, we'll try to accommodate that.

9    So, go back and continue your deliberations under the same rules that

10   we had yesterday.

11   Anything from the State?

12   MRS. KOHLRIESER:  No, your Honor.

13   THE COURT:  Anything from the defense?

14   MR. RION:  No, your Honor.

15   THE COURT:  All right.  We'll stand in

16   recess until the jurors indicate they have a question or a verdict.

17   (WHEREUPON, CONTINUATION OF JURY DELIBERATIONS

18   COMMENCED AT 9:13 A.M.)

19

20

21

22

23

1    TUESDAY, SEPTEMBER 22, 2015
2    11:50 A.M.
3
4    THE COURT:  Okay.  It's approximately
5    11:50 on September 22nd, 2015 and we are reconvening in Case Number
6    CR2014 0139, State of Ohio -vs- Markelus Q. Carter.  The record will reflect
7    the defendant is present in Court with his attorney, Jon Paul Rion.  Assistant
8    Prosecuting Attorneys Anthony Miller and Terri Kohlrieser are here for the
9    State of Ohio.  The jurors have been returned to the Courtroom at this time,
10   after they informed the bailiff that they had reached verdicts.  I understand,
11   juror number nine, you were appointed the foreperson; is that correct?
12   JURY FOREPERSON:  Yes.
13   THE COURT:  And have you reached
14   verdicts?
15   JURY FOREPERSON:  We have.
16   THE COURT:  All right.  If you would fold
17   those over and hand those over to the bailiff she can turn them over to me
18   and I'll review them.  Thank you.
19   Okay.  The Court just wanted to review and make sure that all the
20   open slots were filled in according to the instructions and all jury verdict forms
21   are completed by signatures of the jurors.
22   The Court will now read the jury verdicts.  Omitting the caption, the
23   verdict on Count number One reads - "We, the jury, being duly impaneled,

1    sworn and affirmed, find the State of Ohio DID prove beyond a reasonable

2    doubt that Markelus O. Carter did purposely and with prior calculation and

3    design cause the death of Kenneth Warrington on February 23rd, 2009 and in

4    Allen County, Ohio. Therefore," it reads, "we find beyond a reasonable doubt

5    that Markelus O. Carter is GUILTY of Aggravated Murder as charged in Count

6    One of the indictment."

7    That is signed with today's date, the 22nd day of September, 2015,

8    and signed by all jurors.

9    The second page with regard to the lesser included offense is not filled

10    in.

11    The verdict on the specification for Count One reads - "We, the jury,

12    being duly impaneled, sworn and affirmed, having found the defendant guilty

13    of Aggravated Murder in Count One, further find the State DID prove beyond

14    a reasonable doubt that the defendant had a firearm on or about his person or

15    under his control while committing the Aggravated Murder and displayed the

16    firearm, brandished the firearm, indicated that he possessed the firearm, or

17    used the firearm to facilitate the Aggravated Murder of Kenneth Warrington

18    and, therefore, we find beyond a reasonable doubt that the defendant,

19    Markelus O. Carter, is GUILTY of the specification on Count One." That's

20    signed with today's date, in ink, by all twelve jurors.

21    The verdict on Count Two reads - "We, the jury," omitting the caption,

22    reads, "We, the jury, being duly impaneled, sworn and affirmed, find the State

23    of Ohio DID prove beyond a reasonable doubt that Markelus O. Carter did

1    knowingly have, carry, or use a firearm and that he had previously been

2    convicted of a felony offense involving the illegal possession of a drug of

3    abuse.  Therefore, we find, beyond a reasonable doubt, that Markelus Q.

4    Carter is GUILTY of Having a Weapon While Under a Disability as charged in

5    Count Two of the Indictment." It's dated today's date and signed by all twelve

6    jurors.

7            Again, the Court has read the verdicts into the record.  Does either

8    party wish to have the jurors polled?  Does the State of Ohio?

9            MRS. KOHLRIESER:  No, your Honor.

10           THE COURT:  Mr. Rion, does the

11   defense?

12           MR. RION:  Yes, your Honor.

13           THE COURT:  Okay.  Ladies and

14   gentlemen of the jury, either party is entitled to have what was say is a polling

15   of the jurors where I'm going to go down the line, just numerically, and ask

16   you if these are your verdicts.  A simple 'yes,' or 'no,' is what we're looking for.

17   I know, because of our seating arrangement, we had had juror number two seated

18   in the first seat.  But, I'll start with juror number one.  Are these your verdicts?

19           JUROR NUMBER ONE:  Yes.

20           THE COURT:  Juror number two, are these

21   your verdicts?

22           JUROR NUMBER TWO:  Yes.

23           THE COURT:  Juror number three, are

1    these your verdicts?

2    JUROR NUMBER THREE:  Yes.

3    THE COURT:  Juror number four, are

4    these your verdicts?

5    JUROR NUMBER FOUR:  Yes.

6    THE COURT:  Juror number five, are these

7    your verdicts?

8    JUROR NUMBER FIVE:  Yes.

9    THE COURT:  Juror number six, are these

10   your verdicts?

11   JUROR NUMBER SIX:  Yes.

12   THE COURT:  Juror number seven, are

13   these your verdicts?

14   JUROR NUMBER SEVEN:  Yes.

15   THE COURT:  Juror number eight, are

16   these your verdicts?

17   JUROR NUMBER EIGHT:  Yes.

18   THE COURT:  Juror number nine, are

19   these your verdicts?

20   JUROR NUMBER NINE:  Yes.

21   THE COURT:  Juror number ten, are these

22   your verdicts?

23   JUROR NUMBER TEN:  Yes.

1    THE COURT:  Juror number eleven, are

2    these your verdicts?

3    JUROR NUMBER ELEVEN:  Yes.

4    THE COURT:  And, juror number twelve,

5    are these your verdicts?

6    JUROR NUMBER TWELVE:  Yes.

7    THE COURT:  Okay.  The Court has polled

8    the jurors.  All jurors have indicated on the record that these are their verdicts.

9    With that, the Court is going to accept the verdicts of the jurors and

10   enter a judgment of conviction in this case on the verdicts of the jurors - a

11   conviction of the Aggravated Murder in Count One with the firearm

12   specification and a judgment entry of conviction on Count Two on the Having

13   a Weapon While Under a Disability.

14   With the acceptance of the verdicts and the judgment entry on the

15   verdicts, ladies and gentlemen of the jury, now your obligations to the Court,

16   well, you are discharged and your obligations are over with.  This was a long

17   case in terms of duration.  A lot of information.  A very serious case.

18   obviously.  But, I just want to thank you on behalf of the Court, the Court staff,

19   and the community for your service as jurors.  These aren't pleasant things.

20   They're difficult at times.  You paid attention in there when we

21   had delays.  But, I do, I really sincerely appreciate your service as jurors.  You

22   can be proud of your service in this case.  With that, the jury will be

23   discharged.

1864

1    We are going to move to sentencing at this time.  We'll give the State

2    of Ohio an opportunity to be heard.  We'll give a representative of the victim's

3    family an opportunity to be heard.  You guys are free to go, if you want, or you

4    can stick around.  It's all up to you.  Okay?  Again, your obligation to speak to

5    anybody, you don't have to talk to anybody.  That's entirely up to you if you

6    want to.  If anybody bothers you about anything, let us know, because there's

7    rules against that, even though you are being discharged.

8    (WHEREUPON, jurors were discharged and excused from the Courtroom.)

9    MRS. KOHLRIESER:  Your Honor, may I

10    approach a moment?

11    (WHEREUPON, Court and counsel had a brief discussion at the Bench, on

12    the record, as follows.)

13    MRS. KOHLRIESER:  This is the victim

14    impact statement.  It's kind of lengthy.  I didn't know if you wanted to break for

15    a few minutes to read it over or not.  It's an attached paper.

16    THE COURT:  Do they want to be heard at

17    sentencing?

18    MRS. KOHLRIESER:  No.  She wants you

19    to review it privately.

20    THE COURT:  Okay.  All right.

21    (WHEREUPON, Court continued on the record, as follows.)

22    THE COURT:  Okay.  The jurors have left

23    the room.  We'll continue with sentencing, as I indicated.  I was going to say

1  that I would give the State an opportunity to be heard and I would give a
2  representative from the victim's family an opportunity to be heard and I'll give
3  the defense an opportunity to be heard. I just was handed a victim impact
4  statement on behalf of the victim that has, also, an attached letter. So, I will
5  review that and listen carefully to the presentation. The State of Ohio may be
6  heard.
7  MR. MILLER: Your Honor, thank you very
8  much. The Court is somewhat aware of Markelus' priors in that at least one
9  of his priors was heard before this Court and that would be what I would refer
10  to as the gun and drug case that was sort of a brother case to this case,
11  which would be, you know, the prior trial and conviction for Possession of
12  Cocaine and Weapons Under Disability. The Court is also aware, due to the
13  evidence presented in this case, that Mr. Carter has a 1995 conviction for a
14  drug charge, whether it be Possession of Cocaine/Trafficking of Cocaine.
15  I would also highlight some of the facts of this particular case. Those
16  facts span some fourteen months between the date of September - I'm sorry -
17  December 17th of 2007 and February 23rd, 2009. During that period of time
18  Mr. Carter plotted, planned, and then finally perpetrated this crime.
19  Your Honor, it's the State's position that the defendant be sentenced to
20  the maximum amount under the law. I would defer any other further
21  comment, as I do many times in these particular cases, to the victim impact
22  summary that the Court now has before it, which I believe contains Mrs.
23  Warrington's written statement. I think it is particularly important in these

1  cases that, quite frankly, the prosecution limit its comments in deference to

2  the victims in these cases and in this case in particular where a life has been

3  taken, unnecessarily so, and I defer with honor, frankly, to Mrs. Warrington's

4  comments that are attached to the victim impact summary. It is my

5  understanding that Mrs. Warrington does not want to make a statement. She

6  does not want to make a statement here before the Court; but, she has, as I

7  said, made a statement attached to the victim impact summary.

8  So, with that, your Honor, I defer to Mrs. Warrington and I thank the

9  Court for its time during the last two weeks.

10  THE COURT: All right. Thank you. The

11  Court has, like I said, just got in receipt the victim impact summary that

12  includes a letter from Mrs. Warrington that I have reviewed. Again, it's my

13  understanding the victim does not care to be heard?

14  MR. MILLER: That is correct.

15  THE COURT: Okay. All right. Mr. Rion,

16  do you want to be heard on behalf of Mr. Carter?

17  MR. RION: Your Honor, Markelus Carter

18  maintains his innocence. Given that position, which I believe he's held

19  consistently throughout this case, it's hard to argue anything except for that

20  statement that he believes he's innocent of these charges. The evidence in

21  this case, as you know, was primarily circumstantial. I have great concern as

22  to the weight of the evidence that was found in this case. That's all I have,

23  your Honor.

1   THE COURT:  I understand, Mr. Carter,

2   you have a right to be heard if there's anything you want to say.

3   DEFENDANT:  Yes.  I am a hundred percent innocent.  I have nothing more

4   to add than that this is a travesty on my part and the part of the victim's family

5   because whoever did this is still out there and I, myself, will not stop until that

6   person is brought to justice.  I am not that person.  I have, from the beginning,

7   tried to put in position all of the right facts and tried to bring forth the truth from

8   everyone.  When that failed it seems it that more lies came about for the selfish

9   need of others - not the truth - but, a seemingly easy way out, an easy way

10   out for the investigative part, other people who seem to want some other gain.

11   We have a person that is deceased, no longer with us, but not from

12   something I did, not because of something I did.  I can't change that.  I can't

13   change the fact that someone is gone due to no fact of mine, due to no

14   purpose of mine.  I had nothing whatsoever to gain from this man dying.

15   None whatsoever.  I am separated from my family and as much as dead as

16   that man is to his due to the fact that someone carelessly, maliciously, and

17   maliceily took that man's life.  Now it's cost me my life.  I am not guilty.  I did

18   not do this.  Had I done this I would have accepted responsibility a long time

19   ago.  I am facing the rest of my life for fighting for what I believe.  I'm fighting

20   for my family and for everyone else to know the truth.  I did not kill Ken

21   Warrington.  I want his wife and his family to know that.  Had I

22   did this I would have admitted it.  I did not do this.  You, as well as I, should

23   not ever stop wanting justice for the person who's done this.  Mrs. Warrington,

1    I am sorry for your loss, but I did not cause it.  I am sorry.  I will not stop

2    looking because I've suffered, my family has suffered, and you have suffered.

3    This is not on us.  We did not cause this.  I have never at one time threatened

4    anyone in your family or you.  Ken was a good man, with the exception of

5    being with the wrong person who manipulated him.  He was a good man.

6    MR. MILLER:  Your Honor, I'm going to

7    ask that the defendant stop addressing the victim's family.

8    MRS. KOHLRIESER:  This is mitigation.

9    THE COURT:  He has a right.

10    DEFENDANT:  I'm sorry for your loss.  I did not cause this loss.  With

11    everything in my being I will still not stop looking because I've suffered.  I've

12    suffered, you've suffered, and your family has suffered.  We all know that

13    someone else is responsible for this.

14    THE COURT:  Okay.  All right then.

15    There's not a whole lot more for the Court to say.  I did want to put on the

16    record, and I neglected to do that because I've already entered the judgments

17    of conviction, but I'm finding that the two counts do not merge under State v.

18    Ruff because I find there were separate animuses involved with the separate

19    counts.  I would cite to cases like State -vs- Cowan, an Eighth District,

20    Cuyahoga County Case Number 97877.  It's 2012-Ohio-5723.  Also, State

21    -vs- Hodges from Cuyahoga County.  It's 2013-Ohio-5025.  State -vs- Cowan,

22    2012-Ohio-5723.  I know that those predate the Ruff case, but the test, the

23    three part test in the Ruff case, well, the third prong is where the offense is

1    committed with a separate animus.  The cases I cited stand for the
2    proposition that the animus of Having a Weapon Under Disability is making a
3    conscious choice to possess a weapon.  So, when a person chooses to
4    possess a weapon that's a separate animus than using the weapon to commit
5    another crime, which in this case with the gun specification it was found that
6    the weapon was used to commit the Aggravated Murder.  So, that's why I find
7    that they didn't merge and that's why I entered convictions on both counts.
8       The Court will move to sentencing now.  The Court finds the defendant
9    has been convicted upon a judgment after a jury trial and upon the verdicts of
10   the jurors on Count One, the Aggravated Murder with a firearm specification,
11   and on Count Two, Having a Weapon Under Disability, a felony of the third
12   degree.
13      Again, the Court finds the counts do not merge.
14   Mandatory prison is required on Count One and on the specification.
15      The Court would find that under 2929.12 the offense was more serious
16   than conduct normally constituting the offense.  It's one of the factors that
17   kind of doesn't make a whole lot of sense to say that because the harm done
18   obviously is the ultimate harm that can be done.  But, one of the factors is that
19   the victim suffered serious physical harm as a result of the offense.  That's
20   one of the enumerated factors.  I just take that into consideration for what it's
21   worth.
22      There's no factors indicating that it was less serious.
23      There are factors indicating the defendant is likely to commit future

1    crimes.  Those include that he has previously been convicted of criminal

2    offenses and he has not been rehabilitated to a satisfactory degree and has

3    not responded favorably to sanctions previously imposed.  That is previous to

4    this offense, I would make note of.

5    He doesn't have a juvenile record other than a traffic, a juvenile traffic

6    offender record.  So, I would make note of that.  That's a factor that indicates

7    he's not likely to commit future crimes.

8    I don't have an ORAS score, for what that's worth.

9    I will not make any comment on the defendant has the right to maintain

10   his innocence.  So, whether or not there's genuine remorse or not I will not

11   make a finding on.

12   Mandatory prison here.  So, the Court further finds that after

13   considering the factors in 2929.12 a prison sentence is consistent with the

14   purposes and principles of sentencing.  The defendant is not amenable to

15   community control.  Community control would be demeaning.  It would be

16   illegal on Count One.  But, it would be demeaning to the seriousness of the

17   conduct and impact on the victim.  Prison is commensurate with the

18   seriousness of the conduct and impact on the victim and does not place an

19   unnecessary burden on State governmental resources.

20   So, it will be the judgment of the Court the defendant will be sentenced

21   on Count number One, the Aggravated Murder of Kenneth Warrington, to a

22   life sentence in prison without the opportunity for parole.  He'll have also three

23   years on the gun specification, which is mandatory.  The life without parole is

Case: 3:19-cv-00240-JZ  Doc #: 7-11  Filed:  07/16/19  114 of 118.  PageID #: 2699

1    also mandatory.

2    The defendant will be sentenced to thirty-six months on Count number

3    Two, which is not mandatory.

4    I will run Count number Two concurrent with Count number One.

5    The defendant is subject to post-release control on Count number

6    Two. It's optional three years of post-release control, which is supervision

7    after the prison sentence on Count number Two. It's supervision for three

8    years by the Adult Parole Authority. If the defendant violates post-release

9    control he could be returned to prison on that count for up to one-half the

10    stated prison sentence. If he is on post-release control and commits another

11    felony and gets sent to prison on a new felony additional prison time can be

12    added to that sentence equal to the balance of the post-release control time,

13    or one year, whichever is greater. That's part of the sentence on Count

14    number Two.

15    The defendant is ordered to pay the court costs in this case. Judgment

16    will be entered for the court costs.

17    The defendant is ordered to give a DNA sample to the State of Ohio.

18    The defendant will be given credit for time served. I'll have to calculate

19    that because I'll have to double-check when he started being incarcerated for

20    this particular offense. I'm sure it was shortly after the indictment. But, we'll

21    give credit for all the time served in the Allen County Jail, plus any additional

22    time waiting transportation to the Department of Corrections.

23    Anything further from the defense, Mr. Rion?

1     MR. RION:  No, your Honor.

2     THE COURT:  Anything from the State?

3     MR. MILLER:  No, sir.

4     THE COURT:  All right then.  It's my duty,

5   Mr. Carter, to advise you that you have the right to an appeal.  If you are

6   unable to pay the cost of an appeal you have the right to an appeal without

7   payment.  If you are unable to obtain counsel for an appeal counsel will be

8   appointed without costs.  If you are unable to pay the costs of the documents

9   necessary for an appeal the documents will be provided without costs.  You

10  have the right to have a notice of appeal timely filed upon your behalf.

11     So, Mr. Rion, if the defendant intends to appeal the decision, make

12  sure a notice of appeal is timely filed.  If he's going to seek court appointed

13  counsel, make application for that.  Can you do that?

14     MR. RION:  I'll do that for the Court, your

15  Honor.

16     THE COURT:  All right.  If there's nothing

17  further then, the Court will stand adjourned.

18     (WHEREUPON, COURT ADJOURNED AT 12:12 P.M.)

19

20

21

22

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1          C E R T I F I C A T E

2

3      I, Susan K. Thomas, Court Reporter for the Court of Common Pleas of

4  Allen County, Ohio, duly appointed therein, do hereby certify that the

5  foregoing, consisting of 1,873 pages, is a true and complete transcript of the

6  Jury Trial as transcribed by me pertaining to Case Number CR2014 0139

7  conducted in that Court on the 8th, 9th, 10th, 11th, 14th, 15th, 16th, 17th,

8  18th, 21st, and 22nd day of September, 2015 before the Honorable Jeffrey L.

9  Reed, Judge of said Court.

10     I do further certify that I was personally present in the Courtroom

11  during all of the said proceedings, except for the 18th day of September, 2015

12  (pages 1,589 – 1,698).  However, I did transcribe the proceedings for that day,

13  along with the rest of the proceedings for which I was personally present.

14

15

16

17

18                                    SUSAN K. THOMAS, Court Reporter

19

20

21

22

23

1874

1

# CERTIFICATE

2

3    I, Monica M. Garlock, Assistant Court Reporter for the Court of

4    Common Pleas of Allen County, Ohio, duly appointed therein, do hereby

5    certify that I was personally present in the Courtroom during the proceedings

6    held on September 18, 2015 pertaining to Case Number CR2014 0139 before

7    the Honorable Jeffrey L. Reed, Judge of said Court.  Said portion of the trial

8    for that day was transcribed by Susan K. Thomas, Court Reporter for the

9    Court of Common Pleas of Allen County, Ohio, duly appointed therein (pages

10   1,589 - 1,698).

11

12

13

14

15

16        MONICA M. GARLOCK, Assistant Court Reporter

17

18

19

20

21

22

23

1875