IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MARKELUS Q. CARTER, | CASE NO. 3:19-CV-00240 |
| Petitioner, | JUDGE JACK ZOUHARY |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN TOM SCHWEITZER, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

### INTRODUCTION

On January 31, 2019, Petitioner Markelus Carter, a prisoner in state custody, filed a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). Although he completed all questions on the AO 241 form Petition and provided other attachments, he did not file a Memorandum in Support.

Respondent Tom Schweitzer, in his capacity as Warden of the Ohio Correctional Reception Center (where Mr. Carter was incarcerated when he filed his Petition), filed an Answer/Return of Writ on June 16, 2019. (ECF #7). After requesting and obtaining several extensions of time, Mr. Carter filed a Traverse to Return of Writ on March 16, 2020. (ECF #13). The following day, Warden Schweitzer filed a Response to Traverse. (ECF #14).

The district court has jurisdiction over the Petition under § 2254(a). On March 18, 2019, pursuant to Local Rule 72.2(b)(2), this matter was referred to a Magistrate Judge for a Report and Recommendation, and was reassigned to me on May 25, 2021, pursuant to General Order

1

2021-06. (Non-document entry of May 25, 2021). For the reasons discussed below, I recommend the Petition be **DISMISSED**. I further recommend that Mr. Carter not be granted a certificate of appealability.

FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, a state court's findings of fact are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings are erroneous. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530.

In its opinion affirming Mr. Carter's convictions, the Ohio Third District Court of Appeals summarized the underlying facts as follows:

{¶ 2} On April 17, 2014, Carter was indicted for Aggravated Murder with a firearm specification in violation of R.C. 2903.01(A) and R.C. 2941.145(A) respectively, and Having Weapons While Under Disability in violation of R.C. 2923.13(A)(3), a felony of the third degree. It was alleged that Carter shot and killed Kenneth Warrington shortly after 5 a.m. on February 23, 2009. Warrington had a relationship with Carter's ex/the mother of Carter's children, Sonya Burkholder (nka "Hughes"). Warrington was shot six times just outside of Sonya's residence in Lima, Ohio. Carter pled not guilty to the charges.

{¶ 3} After a lengthy pre-trial process that included, inter alia, multiple suppression hearings and a competency evaluation, Carter's case proceeded to a jury trial, which was held September 8–22, 2015. At trial the State presented the testimony of 30 witnesses and over 150 exhibits, then rested its case. Carter presented the testimony of 8 witnesses and in excess of 30 exhibits, then rested his case. Ultimately the jury found Carter guilty of Aggravated Murder with a firearm specification and Having Weapons While Under Disability, all as indicted.

{¶ 4} Carter was sentenced to life in prison without parole on the Aggravated Murder charge, a three-year consecutive prison term on the firearm specification, and a three-year concurrent prison term on the Having Weapons While Under Disability charge. . . .

2

* * *

Evidence Presented

*a. Testimony Regarding Events Prior to the February 23, 2009 Murder*

{¶ 12} Carter and Sonya Burkholder had two children together, Tarah and Markelus. The children and Sonya lived with Carter until 2004 when Sonya's mother became "gravely ill," so Sonya moved in with her. After Sonya's mother died, Sonya stayed in her mother's former residence until Sonya lost the house in 2007. At that time, Sonya moved back in with Carter; however, it was not to rekindle a romantic relationship. Rather, according to Sonya the relationship was platonic and she and Carter lived more as "roommates." While staying at Carter's residence, Sonya slept in her daughter Tarah's room with her.

{¶ 13} Despite the fact that Sonya indicated she and Carter did not have a romantic relationship in 2007, Sonya testified that Carter was very controlling. Sonya indicated that Carter had been that way during their relationship when they were previously together, not allowing Sonya to socialize on her own. Additionally, Sonya stated that Carter did not give her a key to his home when she moved in during 2007 and that Carter had to let her in the house or she would get locked out.

{¶ 14} While living with Carter in late 2007, Sonya was working as a security shift supervisor for Allied Barton Security Services, which did security for the Husky Refinery in Lima. Through her job, Sonya developed a friendship with Kenneth Warrington, who worked at the refinery. Sonya indicated that she did not tell Carter about her friendship with Warrington.

{¶ 15} On December 15–16, 2007, Sonya and Warrington exchanged flirtatious emails, which were included in the record at trial. Sonya testified that Carter was good with computers and got into her email and found her exchanges with Warrington. The day after the email exchange, December 17, 2007, Sonya worked second shift at her security job and returned to Carter's home, showered and went to bed in Tarah's room. According to Sonya, Carter woke her up that night, extremely angry, and told her to pack her bags and get out.

{¶ 16} Sonya stated that Carter had a gun in his hand, that he followed her down the stairs, and that Carter struck her across the jaw with the gun. Sonya stated that she went outside and flagged down a police officer who happened to be in the area and told the officer what happened. The officer then approached Carter's residence but Carter would not come outside or let the officers see the children. As a result of being informed that Carter had a gun, that children were inside, and that police were refused access to check on the safety of the children, more officers were called to the scene.

3

{¶ 17} A four-hour "stand-off" then ensued wherein Carter had multiple phone conversations with a police hostage negotiator. On the calls, some of which were recorded and played for the jury, Carter denied that his children were being held hostage, but he would not come outside and would not let the police see the children. On the calls Carter talked about honor and dishonor and how an honorable person should not have to go to jail. Meanwhile, the police attempted to keep him calm. Eventually the situation ended peacefully and Carter was taken into custody. Although an "air gun" was found inside Carter's home, no actual firearm was located at that time. No charges were brought against Carter as a result of the "stand-off" incident.

{¶ 18} After the December 2007 incident, Sonya moved out of Carter's residence and moved in with friends Krista and Don Bodiker, who also worked security at the refinery. Sonya stayed with the Bodikers until late-summer/early fall of 2008 when she moved into a house at 436 McKibben Street in Lima.

{¶ 19} While living with the Bodikers, Sonya sought and received a civil protection order ("CPO") against Carter based primarily on the "stand-off" incident. Carter contested the CPO and appealed the granting of that CPO to this Court. We affirmed the CPO in Burkholder v. Carter, 3d Dist. Allen No. 1-08-20, 2008-Ohio-4644.

{¶ 20} Meanwhile, after he was not charged as a result of the December 2007 "stand-off" incident, Carter was in contact with the Lima Police Department seeking to have Sonya charged for filing a false report or making false claims regarding the incident. That case was eventually assigned to a detective, though the detective testified that it was low priority and he did not look into it for a while.

{¶ 21} During 2008, Sonya and Warrington's relationship deepened and according to Sonya the relationship became sexual for about two weeks in the summer of 2008. When Sonya moved out of the Bodikers' residence and into her own house on McKibben Street around August of 2008, Warrington occasionally stayed at the residence.

{¶ 22} Throughout Warrington's relationship with Sonya, Warrington was married to Faye Warrington. Warrington and Faye had been married since 1983. Faye testified that Warrington told her about his relationship with Sonya when it began. Faye testified that despite the affair she did not want a divorce because Warrington still brought his paycheck home and Faye was hopeful that they would reconcile. Warrington did eventually move out of the marital residence though, and it was Faye's understanding that Warrington stayed either at his uncle's residence or at Sonya's residence.

{¶ 23} Faye testified that she did not tell her family about Warrington's infidelity, choosing instead to speak with her minister about it. Faye indicated that she did not

4

want others to change their opinion of Warrington. However, Faye testified that her family found out about Warrington's affair because they had received anonymous letters informing them of the situation. Faye testified that she did not know who wrote the letters, but she had received phone calls from Carter informing her of the relationship between Warrington and Sonya, which Faye already knew about.

{¶ 24} Faye testified that Carter called her many times, sometimes at two or three in the morning stating that Warrington's truck was at Sonya's residence. Faye testified that on one of the calls in the weeks prior to Warrington's death in February of 2009, Carter stated that he was going to give Warrington "one more chance" and that Carter stated he was going to call Warrington and tell him to stay away from Sonya. (Trial Tr. at 339). Faye asked whether Carter was threatening Warrington and she testified that Carter did not respond.

{¶ 25} Similarly, the Husky Refinery received a call that was linked to Carter in early January of 2009. A man identifying himself as "Mark Carter" called the refinery requesting company policies regarding the use of property for employees engaged in an extramarital affair, specifically Sonya and Warrington. Pam Callahan answered the call for Husky and she stated that although the caller stated that he needed the information for a lawsuit and he sounded professional, she did not believe it was legitimate.

{¶ 26} On February 18, 2009, the detective who had looked into Carter's claims that Sonya should be charged for making a false report regarding the 2007 "stand-off" incident informed Carter that he had looked into the matter and he recommended that no charges be filed against Sonya. The detective informed Carter that he turned the case over to the city prosecutor's office, which agreed with him. The detective indicated Carter was not happy with the results.

*b. Testimony Regarding the Murder and its Investigation*

{¶ 27} On February 22, 2009, Sonya saw Warrington at work and Warrington indicated that he needed a key to her residence because Sonya had mistakenly taken Warrington's off of the counter and he did not have his key at the time. It seems that at that time the two worked different shifts that overlapped at the end of Sonya's and the beginning of Warrington's. According to Sonya, the two were not romantically involved at the time but Warrington still stayed at her residence occasionally and he kept some work uniforms in her son's room. Sonya testified that when she gave Warrington her key it was the last time she saw Warrington alive.

{¶ 28} Sonya testified that she left work and went to pick up Tarah at Carter's residence. Sonya indicated that Tarah had sent Sonya a text message earlier asking if Warrington was coming over to Sonya's that night and Sonya found it odd. Sonya testified that she asked Tarah about the text message but Tarah did not know

anything about it. Sonya then returned with Tarah to her home at 436 McKibben and went to sleep.

{¶ 29} Work records established that Warrington clocked out of the refinery at 5:04 a.m. on February 23, 2009. Sometime shortly thereafter, Warrington was shot six times just outside a side entrance of Sonya's home.

{¶ 30} Donald Hovest, who was picking up trash on his route on a street close to 436 McKibben, heard the gunshots in his general area. He indicated that the gunshots occurred after 5 a.m., sometime possibly around 5:20. He reported the gunshots to police, which dispatched officers related to possible gunshots in the area at 5:18 a.m. Police responded to the area but officers did not observe anything relevant at that time.

{¶ 31} Rosalind Johnson was asleep on her couch across the street from 436 McKibben and was awakened by the noise from the gunshots. She looked out her window and saw a person coming out of the alley with a "hoodie jacket on, a camouflage jacket." (Trial Tr. at 819). However, Johnson did not see any actual shooting and she simply went back to sleep.

{¶ 32} Sonya woke up at 6 a.m. on February 23, 2009, and noticed that Warrington's truck was parked at her residence but he had not come inside. After waking up Tarah and mentioning that it was odd, Sonya discovered Warrington's body just outside and screamed. Tarah called 9–1–1 after checking Warrington for a pulse. The 9–1–1 call was played for the jury.

{¶ 33} Police responded to the scene and began an investigation. It was ultimately determined that Warrington's death was a homicide resulting from six gunshot wounds. The shots were to his chin, right forearm, left chest, right buttock and two in the back. There were 12 holes total because all six bullets exited Warrington's body. The investigation further revealed that Warrington was shot by Winchester 9mm bullets. Shell casings and bullets were collected at the scene. Warrington was discovered with $160 on him, which officers felt ruled out a robbery, along with a gym bag and a cooler. Photographs of how and where Warrington was found just outside Sonya's door were included in the record.

{¶ 34} While at Sonya's residence surveying the scene, one officer noticed that there was an electric bill for Carter on the counter and the officer recalled the 2007 "stand-off" incident. Officers then wanted to get into contact with Carter. The detective that handled Carter's allegations against Sonya for filing a false report, Sergeant Godfrey, indicated that he had Carter's phone number so he called Carter around 8 a.m. and generally asked Carter to come into the station. When Carter answered, Carter asked if Sergeant Godfrey was calling because there had been some movement on his case with Sonya. At that time Carter was told to just come in without any further information being provided to him and Carter said he would be in shortly.

{¶ 35} A half-hour passed and Carter had not come in, so Sergeant Godfrey called Carter again and said something had happened to "Kenneth" and Carter needed to come in. Carter stated that he did not like the sound of that but would come to the police station as soon as he finished a work-related errand.

{¶ 36} Before Carter came to the police station, Carter called his attorney Ken Rexford's office to ask if something had happened to him since Carter was informed that something had happened to "Kenneth." Leah Rexford, the attorney's wife who also worked at the law firm, informed Carter that nothing had happened to Carter's attorney Ken Rexford. Carter made another call to Rexford's office shortly thereafter where Carter was "inconsolable" and talking about something happening to his baby.

{¶ 37} As Carter drove around to apparently complete his errands that morning, he was being followed by Detective Timothy Clark who was not in a marked cruiser. Detective Clark noticed that Carter's license plates did not match and he called for a marked cruiser to stop Carter. A patrol officer then did stop Carter and Detective Clark approached and told Carter that he wanted Carter to come in for questioning. According to one officer, Carter then "exploded in emotion," as he kept talking about his baby, meaning his daughter Tarah. Officers were surprised by Carter's demeanor and assured Carter that Tarah was fine but Carter kept referring to her. After being repeatedly assured that his daughter was fine, Carter then voluntarily went to the police station for an interview.

{¶ 38} During Carter's interview, he stated that the night prior to Warrington's murder Sonya picked up Tarah sometime after 10 p.m. and took Tarah to Sonya's residence. Carter stated that he went to bed after watching shows on his computer and then woke up at 6 a.m. to his alarm clock. Also during the interview, Carter admitted to owning a .357 but denied owning a 9mm at that time. Carter told the police that they could have his .357 and he allowed the police to do a gunshot residue test on his hands.

{¶ 39} Carter was under a disability for a prior conviction and could not own a firearm, so the police indicated they were going to search his house to get the .357. A search warrant was then obtained and executed on Carter's residence to look specifically for weapons. Two guns were located at Carter's residence at that time along with a box of Winchester 9mm ammunition with some of the bullets missing. Testing later indicated that the bullets were consistent with those that killed Warrington, although they were relatively common bullets. However, testing indicated that neither of the firearms that were found at Carter's residence were used in the murder. Similarly, neither of those firearms were the subject of the Having Weapons While Under Disability charge in this case. Rather, the murder weapon, which was never found, was the firearm related to the charge.

{¶ 40} As the investigation continued on the day of the murder, a second search warrant was executed on Carter's residence looking for anything related to a homicide. On Carter's kitchen table, a number of papers were found together including a copy of the private emails between Warrington and Sonya from December of 2007, a copy of the CPO Sonya had obtained against Carter, and a copy of the related police report from the December 2007 incident. There was also a document officers described as a "script" that appeared to correspond to the phone call that had been made to the Husky Refinery in January related to Sonya and Warrington's affair.

{¶ 41} In addition to this paperwork, officers located camouflage clothing, which was later tested for gunshot residue ("GSR"). A short sleeve camouflage shirt and a long sleeve camouflage shirt both tested positive for GSR despite Carter stating in his interview that he had not fired a gun in years. Rosalind Johnson indicated that the camouflage pattern was consistent with what she had seen from her window on the morning of the murder. However, neither of the camouflage shirts contained a hood, which she had mentioned seeing. Nevertheless, officers also located a pair of gloves on a table and the gloves tested positive for GSR as well.

{¶ 42} Various electronics belonging to Carter were seized during the search and analyzed. On one of Carter's digital cameras, there were images of streets in Lima and a picture of Warrington's truck parked outside of Sonya's home at 436 McKibben dated January 9, 2009. A forensic search of Carter's computer revealed he had been on the county auditor's website for information on the property at 436 McKibben and that he had been looking at a map of the surrounding area. In addition, there were google searches performed for Sonya Burkholder and Kenneth Warrington. A separate "palm" device also contained an address for Kenneth and Faye Warrington as well as a phone number, which had a *67 designation by it indicating that the number had been used while dialing *67 to block the caller ID.

{¶ 43} On the day of the murder Carter was arrested for Having Weapons While Under Disability, which is separate from the same charge in this case. When Carter was taken into custody, he requested to speak with Sergeant Godfrey for a second time that day. Another interview of Carter was then conducted, and that interview was played for the jury. In the interview, Carter had some kind of 'tic,' or seizure-like occurrence that the officers did not believe was genuine. Little of relevance came out of the interview.

{¶ 44} While Carter was incarcerated for Having Weapons While Under Disability, Joey Moore, another inmate, stated that he heard Carter discussing the murder investigation. Moore testified at trial that Carter said that police found 16 grams of crack at his residence but they did not find a Mac–10 firearm that Carter claimed to have disassembled. A ballistics expert from BCI testified that a "Mac–10 style" firearm would be one of over 130 possible 9mm firearms that could have been consistent with the firearm that fired the bullets that killed Warrington. Joey Moore

8

also testified that Carter indicated that he had killed his girlfriend's boyfriend. Police found Moore's statement credible because he was fairly accurate in the amount of crack that was found at Carter's residence and it was not something Moore could have known otherwise.

{¶ 45} Also while Carter was incarcerated, he contacted a friend named Carlotta Williams and requested that she visit him. When she did, Carlotta testified that Carter held up a note asking her to tell the police that she was with him from 1:00 a.m. to 6:00 a.m. on the day of the murder. Carlotta refused and stated that the alibi Carter was requesting her to provide was false. She also stated at trial that she had seen Carter with a gun resembling a Mac–10 before when she was shown a generic demonstrative picture of a Mac–10 style firearm, though she said she had little familiarity with firearms.

{¶ 46} Stephen Upham, another inmate who was incarcerated with Carter, testified that Carter told him about the murder. Upham testified that Carter indicated that he had gotten into an argument with the mother of his children and her boyfriend got mad and threatened Carter's children. Carter told Upham that a couple of weeks after this incident Carter shot the boyfriend. Upham testified that Carter indicated he watched the victim for a couple of weeks coming and going and that he was wearing camouflage and a paintball mask when he committed the murder.

{¶ 47} Notably just before Upham testified, he was mistakenly placed in the same holding cell with Carter during a brief recess in the trial. Upham asked Carter how his trial was going, and stood up, then Carter assaulted Upham. A video of this incident was introduced into evidence.

*State v. Carter*, No. 1-15-62, 2017 WL 1208011, at *1, *3-*8 (Ohio Ct. App. Apr. 3, 2017)

(footnotes omitted), *appeal not allowed*, 90 N.E.3d 946 (Ohio 2018) (table).

PROCEDURAL HISTORY

**State Court Conviction**

On April 14, 2017, Carter was charged in a two-count indictment. (ECF #7-1 at PageID 118-20). In Count 1, Mr. Carter was charged with the aggravated murder of Kenneth Warrington in violation of Ohio Rev. Code § 2903.01(A), with a three-year firearm specification as per Ohio Rev. Code § 2941.145(A). In Count 2, Mr. Carter was charged with having weapons under disability in violation of Ohio Rev. Code § 2923.13(A)(3). (*Id.*).

Trial began on September 8, 2015, in the Allen County Court of Common Pleas. (ECF #7-2 at PageID 561). On September 22, 2015, the jury returned a unanimous verdict of guilty on both counts, including the firearm specification of the aggravated murder charge. (ECF #7-1 at Page ID 314-17).

Sentencing took place later that afternoon. (ECF #7-11 at PageID 2962). After hearing from the State and Mr. Carter, the Court announced its sentence. (*Id.*) As set forth in the Judgment Entry of Conviction and Sentencing:

> **IT IS HEREBY ORDERED** that the defendant serve a stated term of:
>
> **LIFE WITHOUT PAROLE** in prison under **COUNT ONE** for the violation of R.C. 2903.01(A), which IS a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925; **FURTHER, AN ADDITIONAL <u>MANDATORY</u> TERM OF 3 YEARS IN IMPOSED ON THE FIREARM SPECIFICATION AND SAID THREE YEARS IS CONSECUTIVE TO THE LIFE WITHOUT PAROLE TERM**;
>
> **36 MONTHS** in prison under **COUNT TWO** for the violation of R.C. 2929.13(A)(3), which **is not** a mandatory term pursuant to R.C. 2929.13(F), 2929.14(D)(3) or 2925;
>
> **IT IS FURTHER ORDERED** the prison term imposed in Count Two is to be served **CONCURRENT** to the mandatory prison term imposed in Count One and **CONCURRENT** to the mandatory 3 year term imposed on the firearm specification.

(ECF #7-1 at PageID 323).

**Direct Appeal**

On October 16, 2015, Mr. Carter filed a Notice of Appeal to the Ohio Third District Court of Appeals. (*Id.* at PageID 325). Through new counsel, he filed his Merit Brief of the Appellant on October 5, 2016, asserting five assignments of error, as follows:

- Assignment of Error One: The Trial Court Committed error prejudicial to the Defendant by failing to exclude evidence of an altercation between the Defendant and a Government Witness in a holding Cell of the Court during

Trial and allowing a Video of that altercation to be played for the Jury during the Government's Case in Chief.

- Assignment of Error Two: The Trial Court Committed error prejudicial to the Defendant by overruling Defendant's Motion for Mistrial filed on September 16, 2016 based upon Rule 16 discovery Violations and Brady Discovery Violations related to testimony of a Government witness on firearms.

- Assignment of Error Three: That the Conviction of the Defendant was against the Manifest Weight of the Evidence and, in the alternative, was based upon insufficient evidence.

- Assignment of Error Four: That the Prosecution Statements in Closing Argument Misstates the Evidence and rise to the level of Prosecutorial Misconduct and require a Reversal.

- Assignment of Error Five: That the Defendant was Deprived of a Fair Trial due to Ineffective Assistance of Trial Counsel.

(ECF #7-1 at PageID 338). The State filed its Brief of Plaintiff-Appellee on December 1, 2016. (*Id.* at PageID 396). It does not appear that Mr. Carter filed a Reply Brief. (*See generally* ECF #7-1).

On April 3, 2017, the Third District issued its Opinion, affirming the trial court's judgment in all respects. (*Id.* at PageID 454-515; *see also State v. Carter*, 2017 WL 1208011, at *1). On May 18, 2017, Mr. Carter filed a Notice of Appeal in the Ohio Supreme Court, seeking a discretionary jurisdictional appeal on the basis that his felony conviction "raises substantial constitutional questions and is one of public or great general interest." (*Id.* at PageID 517; *see also* Ohio Sup. Ct. R. Prac. 5.02(A)(3)). His Memorandum in Support of Jurisdiction asserted a single Proposition of Law, as follows:

Evidence of a physical attack by a criminal defendant upon a Government witness outside of the presence of a jury in the midst of a criminal trial should not be admitted in a criminal trial as intrinsic evidence or for purpose of demonstrating "consciousness of guilt" unless and until the trial court conducts a full and searching analysis of the unfair prejudice that such evidence presents. This violates a criminal defendant's statutory and Constitutional Rights under the Sixth and Fourteenth

11

amendments to the United States Constitution and Article 1, Section 10 Of The Ohio Constitution.

(*Id.* at PageID 519). The State did not file a memorandum in opposition jurisdiction. (*See generally* ECF #7-1). On January 31, 2018, the Ohio Supreme Court declined to accept Mr. Carter's appeal. (*Id.* at PageID 529; *State v. Carter*, 90 N.E.3d 946 (Ohio 2018) (table)).

On January 31, 2019, Mr. Carter filed his Petition in this matter. (ECF # 1).

### Federal Habeas Corpus

Mr. Carter's Petition, filed *pro se*, sets forth five grounds for relief, as follows:

**First Ground**:  Trial court committed error prejudicial to the defendant by failing to exclude evidence of an altercation between the defendant and a government witness in a holding cell of the jail during trial outside the view of the jury and allowing a video of the altercation to be played for the jury during the government's case in chief.

**Second Ground**: The trial court committed error prejudicial to the defendant by overruling defendant's motion for mistrial filed on September 16, 2015 based on Rule 16 discovery violations related to testimony of a government witness on firearms.

**Third Ground:** The conviction of the defendant was against the manifest weight of the evidence and, in the alternative, was based upon insufficient evidence.

**Fourth Ground:** The prosecution statements in closing argument misstates the evidence and rise to the level of prosecutorial misconduct and require a reversal.

**Fifth Ground:** The defendant was deprived of a fair trial due to ineffective assistance of trial counsel.

(ECF #1 at PageID 5-10; ECF #1-1, PageID 16). Each of these were listed in response to the Petition's question: "Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.)." (*E.g.*, ECF #1 at PageID 5).

Mr. Carter requests this Court grant the following relief: "The release of petitioner from state custody. He is being held in violation of the US Constitution forming a fundamental

12

miscarriage of justice due to factual innocence and substantial showing of denial of constitutional rights. The state decision was contrary to clearly established federal law and objectively unreasonable." (ECF #1 at PageID 15).

As noted, Mr. Carter did not submit a brief supporting the claims advanced in the Petition. Other than listing the grounds for relief quoted above, his Petition contains no other substantive explanation of his right to habeas corpus relief. There is, however, further particularization of the first ground for relief in his Reply Brief. (*See* ECF #13 at PageID 2724-32).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Carter's petition for writ of habeas corpus. *Lindh v. Murphy,* 521 U.S. 320, 336 (1997). The AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted).

An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may grant habeas relief if the state court arrives at a conclusion

13

that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams*, 529 U.S. at 412. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam). A state-court decision is an unreasonable determination of the facts only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). A petitioner bears the burden to rebut the state court's factual findings "by clear and convincing evidence." 18 U.S.C. § 2254(e)(1). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal just systems," not a substitute for ordinary error correction through appeal. *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307,

14

332, n. 5 (1979) (Stevens, J., concurring in judgment)). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103.

LAW AND ANALYSIS

**Sufficiency of the Petition**

Initially, Respondent suggests Mr. Carter's petition could be deemed insufficient "by reason of its terseness." (ECF #7 at PageID 46). Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules) states that a habeas petition "shall set forth in summary form the facts supporting each of the grounds thus specified." The Habeas Rules do not require that federal courts review the entire state court record of a petitioner to determine whether facts exist to support the grounds for relief. *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990). Although courts should be lenient in interpreting *pro se* pleadings, a habeas petitioner may not place the onus of creating a federal claim on the reviewing court. *Burkey v. Deeds*, 824 F. Supp. 190, 193 (D. Nev. 1993).

To comply with Habeas Rule 2(c), a petitioner must give sufficiently detailed facts to enable the court to determine "from the face of the petition alone" whether the petition merits further review. *Adams*, 897 F.2d at 334; *see also McFarland v. Scott*, 512 U.S. 849, 856 (1994). Failing to provide factual context in support of legal conclusions warrants dismissal of a habeas petition. *Smith v. Haskins*, 421 F.2d 1297, 1298 (6th Cir. 1970); *Gray v. Wingo*, 391 F.2d 268 (6th Cir. 1967). In *Smith*, for example, the petition contained legal conclusions without any supporting facts, such as "the trial judge committed prejudicial error" and "petitioner was denied the right to

15

counsel at a police line-up." *Smith*, 421 F.2d at 1298. The court held the § 2254 petition was insufficient because the proffered grounds failed to provide any factual or circumstantial evidence supporting its conclusions. *Id.*

The same can be said of Mr. Carter's Petition in this matter. It sets forth the five claims for relief as quoted above, but does not provide any other specific facts, details, or argument explaining why the claims are well-taken. The sole exception is the first ground for relief, which is further developed in Mr. Carter's Reply Brief. (*See* ECF #13 at PageID 2724-32).

While there is no requirement to do so, a court does not err in reviewing an otherwise insufficient habeas petition where the claims it raises are based on suppositions drawn from the petitioner's state court appeal. *See Pointer v. Richards*, No. 1:17CV2048, 2018 WL 3029137, at *9 (N.D. Ohio May 25, 2018), *report and recommendation adopted in part, rejected in part on other grounds sub nom. Pointer v. Noble*, No. 1:17CV2048, 2018 WL 3023190 (N.D. Ohio June 18, 2018). Each of Mr. Carter's proffered grounds for relief parallel arguments made in his appeal to the Third District. As Respondent notes, "it will serve the interest of prompt disposition of the petition to proceed to decide the petition entirely on the state record." (ECF #7 at PageID 46). I agree, and therefore proceed to consider the substance of each of Mr. Carter's claims for relief.

**First Ground for Relief**

In his first ground for relief, Mr. Carter asserts the trial court erred in allowing the State to introduce evidence that Mr. Carter attacked a prosecution witness when the two were placed in the same holding cell during trial, including introducing a video of the attack itself. (ECF #1 at PageID 5). In his Reply, Mr. Carter properly concedes that "claims involving the admissibility of evidence under state law are generally not cognizable in federal habeas corpus . . . ." (ECF #13 at

16

PageID 2724). He maintains, however, that his case is exceptional because admission of the testimony and video in question resulted in a denial of fundamental fairness. (*Id.*).

The Sixth Circuit has explained that "state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (cleaned up), *cert. denied*, 532 U.S. 989 (2001). "[C]ourts 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling*, 493 U.S. at 352.

Mr. Carter alleges in his Reply Brief that the trial court's admission of this evidence deprived him of his due process right to a fair trial. I disagree. Under Ohio law, the decision to admit or exclude this evidence was one committed to the trial court's sound discretion. For the same reasons the Third District concluded the trial court's decision survived scrutiny under Ohio law, I conclude that decision does not rise to the level of constitutional error. In its decision, the Third District reasoned as follows:

> *The Altercation, the Mistrial Motion, and the Introduction of Evidence of the Altercation*
>
> {¶ 64} On the seventh day of Carter's trial, Steven Upham, an inmate who had previously been incarcerated with Carter, was set to testify against Carter. Upham was the inmate who Carter had told that Carter killed a man while wearing camouflage and a paintball mask.
>
> {¶ 65} Just prior to Upham testifying, Upham was placed in a holding cell. When the trial court took a brief afternoon recess, Carter was taken and placed in the same holding cell with Upham. No one else was present in the holding cell at that time. It is undisputed that neither Carter nor Upham said anything to the corrections officers questioning why they were placed in the same holding cell or alerting the officers to the situation.

17

{¶ 66} Upham was seated when Carter entered the holding cell. According to Upham, who was surprised that they were placed in the same cell, Upham said to Carter, "How's your trial going?" (Trial Tr. at 1396). Carter then responded by saying, "Why are you lying on me?" (*Id.* at 1397). At that time, Upham stood up and Carter then approached and assaulted Upham by throwing a punch. Next, Upham tried to put Carter in a headlock and Carter put his finger in Upham's eye. Carter also bit Upham's arm, leaving teeth marks. After roughly forty seconds, officers responded and broke up the altercation. The incident was recorded by surveillance video but there was no accompanying sound. Upham had several abrasions from the altercation, which were photographed.

{¶ 67} Following the altercation, the trial court recessed the trial for the day. When court reconvened the following morning defense counsel moved to have evidence of the incident excluded contending that it was improper character evidence. In the event that the evidence was not excluded, defense counsel argued that the trial court should declare a mistrial. The State strongly opposed a mistrial and argued that the evidence should be admissible as showing a "consciousness of guilt."

{¶ 67} The trial court permitted both parties to make arguments in support of their positions. Defense counsel argued that placing Carter and Upham in the holding cell together was a complete accident and that the incident itself was not created by Carter. Defense counsel argued that evidence of the incident would be highly prejudicial and it would constitute improper "other acts" evidence under Evid.R. 404(B). Further, defense counsel argued that if Upham was to testify defense counsel would be seeking a mistrial due to visible marks that may be on Upham from the incident, which could further prejudice Carter. Moreover, defense counsel was concerned that the jury may have heard about the incident because it had been covered in the newspaper.

{¶ 69} By contrast, the State argued that while Carter and Upham should not have been placed in the same holding cell together, the ultimate assault was an intentional act perpetrated by Carter and that he should not be granted a mistrial on the basis of his own actions in assaulting a State's witness. As to the admissibility of the evidence, the State argued that Carter's actions reflected "consciousness of guilt" as Carter was aware of what Upham's testimony was likely to be, particularly since a number of Carter's witnesses were inmates seeking to discredit Upham.

{¶ 70} After allowing the parties to make their arguments, the court addressed both the motion for mistrial and the ability of the State to present evidence of the altercation. The court began with Carter's motion for mistrial because, "obviously if I grant the mistrial then everything else is, I suppose, moot[.]" (Trial Tr. at 1366).

{¶ 71} The trial court then analyzed the issue on the record, citing a number of cases to support its decision. First, the trial court noted that a mistrial only needed to be declared when a fair trial was no longer possible and that a mistrial should not be

18

ordered merely because some error or irregularity had intervened. *State v. Franklin*, 62 Ohio St.3d 118, 127–128 (1991). Then, the trial court cited the invited error doctrine, wherein a party could not take advantage of an error that the party induced, and indicated that the invited error doctrine had been applied to motions for a mistrial where the defendant had been disruptive. The trial court cited a number of cases to support its point. *See State v. Greathouse*, 2d Dist. Montgomery No. 21536, 2007–Ohio–2136 (defendant's own disruptive actions in the courtroom could not be grounds for a mistrial); *State v. Chambers*, 10th Dist. No. 99AP-1308, 2000 WL 963890 *5 ("In the present case, appellant cannot participate in numerous, intentional, disruptive acts and then seek the protection of the court from his own misbehavior."); *State v. Gonzalez*, 4th Dist. Athens No. 97CA52, 1998 WL 823737 (invited error doctrine precluded defendant from taking advantage of any prejudice that resulted from his own disruptive behavior in courtroom); *State v. James*, 2d Dist. Clark No. 98-CA-54, 1999 WL 76815 *4 (defendant could not take advantage of his own outburst because it would "provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so.").

{¶ 72} After citing these cases, among others, for their overriding principles, the trial court came to the following conclusion regarding the motion for a mistrial.

> **Now, I agree with the defense characterization, and based upon all of the information that I have that's been presented that's on the record, it was an accident. It was an unfortunate accident that the defendant and the witness were put in the same holding room. But, what occurred thereafter I find was not an accident. It was intentional based upon the viewing of the video of that. I'm going to find that the defendant cannot participate in an intentional act.**

> **So, I'm going to overrule the Motion for a Mistrial under the invited error doctrine.**

(Trial Tr. at 1368–69).

{¶ 73} Next, the trial court turned to whether evidence of the altercation could be presented at trial. The trial court determined that Evid.R. 404(B) was not implicated in situations where the act is related to the crime or has a connection to the offense. *See State v. Goehring*, 6th Dist. No. OT–06–023 2007–Ohio–5886, ¶ 15, quoting *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994) ("Evid.R. 404(B) allows the admission of 'other acts' evidence if it is 'related to and share[s] common features with the crime in question * * *.' "). To support its position, the trial court cited, *inter alia, State v. Williams*, 8th Dist. Cuyahoga No. 89461, 2008–Ohio–1948, which stated, "Evidence of threats or intimidation of witnesses reflect a consciousness of guilt and are admissible as admission by conduct." *Williams* at ¶ 29; *see also, State v. Soke*, 105 Ohio App.3d 226 (8th Dist. 1996).

19

{¶ 74} Here, the trial court found that there was a connection to the offense because Upham was going to testify that Carter had confessed a murder to him and relayed some of the details. Then the court determined that,

> **[Evid.R.] 404(B) is not implicated. This is intrinsic evidence not wholly independent of the offenses and it is evidence of an admission by conduct reflecting a consciousness of guilt that tends logically to prove an element of the crimes charged. But, even if 404(B) were implicated, which I don't think it is, but if 404(B) would be implicated it would be admissible for other purposes other than to prove character or that the defendant acted in conformity with character, such as intent, knowledge, motive, and things that are listed in 404(B).**

(Trial Tr. at 1371).

{¶ 75} Thus the trial court permitted the State to introduce evidence of the incident at trial through the testimony of Upham. Upham then testified regarding the incident, stating that Carter punched him and that Upham put Carter in a headlock in the hopes that guards would respond shortly. In addition, the State introduced the surveillance video from the holding cell, which showed the altercation. The State also introduced multiple pictures of Upham's injuries.

{¶ 76} After Upham testified, defense counsel again moved for a mistrial stating that Carter was now being charged with intimidation of a witness for Carter's actions during the altercation. Additionally, defense counsel stated his understanding that there was an investigation being done as to how Carter and Upham had been placed in the same holding cell. Defense counsel stated that he wanted that investigation to be included in the record. The court ordered that investigation to be included in the record, and the reports that were produced were included as court exhibits separate from the trial.

{¶ 77} Those court exhibits were included in the record on appeal and they contained offense reports from various officers stating what happened from their perspective, including one that concluded, "[i]t was later discovered that there was a miscommunication between jail staff and court security which lead to Dep. Enyart placing the two inmates together in the same holding cell by mistake." (Court's Ex. 4).

{¶ 78} After hearing defense counsel's argument renewing his motion for a mistrial, the trial court went on to state its own view of what led to the incident, beginning with the court's recollection of an in-chambers discussion of the logistics of having the prison witnesses in the same building as Carter.

> **My understanding was that they would be separated. I double-checked my entries. * * * It was the Court's understanding that that would have been generally understood. In our chamber conference there was a discussion**

20

> about the prison inmates, specifically Mr. Upham, being kept in the
> probate holding room, which is separate from the regular holding room. I
> think it was in the nature of perhaps a mistake because Mr. Upham was
> dressed in stripes instead of in typical Department of Corrections garb that
> somehow there was a non-communication, or a miscommunication, to the
> booking officers who brought him up. So, it was an accident/mistake. I
> think I already mentioned that on the record. So, that's the court's take on
> that.

(Trial Tr. at 1562–63).

{¶ 79} The court then overruled defense counsel's renewed motion for a mistrial.
The court did indicate it would inquire into whether anyone on the jury had heard
about the incident from the news, and the court did so. No one on the jury indicated
having heard anything about the case outside of the courtroom. (*Id.* at 1374–75).

{¶ 80} In addition, the trial court did state that it would give a specific instruction to
the jury that the incident could only be considered to show consciousness of guilt
and not to show actions in conformity with character. The trial court did, in fact,
give the jury such an instruction. It read,

> Testimony has been admitted indicating that the defendant was involved
> in a physical altercation with a witness in the holding room. You are
> instructed that defendant's conduct alone does not raise a presumption of
> guilt, but it may tend to indicate the defendant's consciousness or
> awareness of guilt. If you find that the facts do not support that the
> defendant's conduct, or if you find that some other motive prompted the
> defendant's conduct, or if you are unable to decide what the defendant's
> motivation was, then you should not consider this evidence for any
> purpose. However, if you find that the facts support that the defendant
> engaged in such conduct and if you decide that the defendant was
> motivated by a consciousness or an awareness of guilt, you may, but are not
> required to, consider that evidence in deciding whether the defendant is
> guilty of the crimes charged. You alone will determine what weight, if any,
> to give to this evidence.

(Trial Tr. at 1844–45).

*Carter's Arguments Related to the Motion for Mistrial on Appeal*

{¶ 81} On appeal, Carter renews his argument that the trial court should have
granted his motion for a mistrial. Carter contends that the cases cited by the trial
court in making its decision to overrule the motion for a mistrial were distinguishable
and that the situation in this case was not of Carter's making. Carter contends that
court personnel created the situation, not Carter as the trial court determined. Carter

contends that the cases cited by the trial court were all situations where the defendant was specifically disruptive without provocation, and most often in front of the jury.

{¶ 82} In our review of the matter, we cannot condone the serious lapse that occurred by placing Carter in the same holding cell with Upham; however, we cannot find that the trial court abused its discretion in determining that the physical altercation itself was actually a direct result of Carter's own intentional action in assaulting Upham. As the trial court indicated, when Carter was paced in the holding cell he could have told the authorities that it was Upham in the cell or Carter could simply have chosen not to assault Upham when they were in the same cell. Instead, Carter chose to assault Upham, which was not an action by the State.

{¶ 83} Moreover, in the cases cited by the trial court, *James*, *Gonzalez*, *Greathouse*, and *Chambers, supra*, multiple Ohio Appellate Courts found that in situations where a defendant's actions led to his own motion for a mistrial, it was not an abuse of discretion for the trial court to overrule the defendant's motion for a mistrial, particularly under the invited error doctrine. While Carter contends that the cases cited by the court to overrule his motion for a mistrial were distinguishable, they do stand for the proposition that a defendant cannot take advantage of a situation that he created himself. It may be true that the altercation would not have been possible had Carter and Upham been kept separate as they were ordered to be, but Carter ignores that Upham never would have been struck had Carter simply ignored him upon entering the holding cell, or taken some action other than resorting to physical violence.

{¶ 84} In sum, while we wish to emphasize that Carter and Upham should never have been placed in the same holding cell, we cannot find that the trial court abused its discretion in declining to grant Carter a mistrial based on Carter's actions. Thus, Carter's argument is not well-taken.

*Admissibility of Evidence of the Altercation*

{¶ 85} Carter next contends that even if it was not error for the trial court to overrule his motion for a mistrial, any evidence related to the altercation should not have been presented to the jury. More specifically, Carter contends that his altercation with Upham in the holding cell in 2015 was not connected to the 2009 murder of Kenneth Warrington.

{¶ 86} In support of his position, Carter urges this Court to apply the dissent's rationale in a 4–3 decision by the Supreme Court of Ohio, *State v. Richey*, 64 Ohio St.3d 353, 1992–Ohio–44, *abrogated in part by State v. McGuire*, 80 Ohio St.3d 390, 1997–Ohio–335. In *Richey* the Supreme Court of Ohio determined that threats made by Richey to the prosecutor were admissible evidence as "consciousness of guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses." *Richey* at 357.

22

{¶ 87} By contrast, the dissent in *Richey*, which Carter relies upon, stated that

> **A person wrongly accused could easily take out his frustration and anger in this fashion. In particular, Richey's anti-social and borderline personality traits might make the urge to lash out from a false accusation stronger. In any case, jailhouse threats are of a different order than flight from prosecution or a coverup as evidence of guilt.**
>
> **The threats made by Richey are, pure and simple, acts separate and distinct from the one for which he was being tried. Proof of such threats can be admitted during the guilt phase only to show motive, opportunity, intent, plan, and so forth. (Evid.R. 404[B].) As the threats came after the events for which Richey was being tried, none of these factors can possibly be proved by evidence of later threats. Therefore the evidence is inadmissible for the guilt phase of trial, and it was error for the trial court to admit it.**

*Richey* at 374–375.

{¶ 88} Carter contends that the rationale in the *Richey* dissent should be applied in this case. However, the cited portion is facially from the *Richey* dissent rather than the majority. Moreover, while a separate portion of *Richey* has been abrogated, the majority's ruling on consciousness of guilt has not been altered. *Richey's* underlying holding related to "consciousness of guilt" has, in fact, been cited even recently by multiple Ohio Appellate Courts. *State v. White*, 10th Dist. Franklin No. 15AP-565, 2016-Ohio-1405; *State v. Tucker*, 10th Dist. Franklin Nos. 15AP-434, 15AP-435, 2016-Ohio-1033, ¶ 17; *State v. Culegrove*, 8th Dist. Cuyahoga No. 102173, 2015-Ohio-3476, ¶ 20, citing *State v. Soke*, 105 Ohio App.3d 226, 250 (8th Dist. 1995) ("Intimidation of a witness is not independent of the charged offense; it is an indicator of guilt."). This court has also used similar reasoning to *Richey* recently, although we did not directly cite *Richey*. *State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ("Moreover, '[u]nder Ohio law, 'evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct.'").

{¶ 89} Carter thus urges this Court to essentially disavow a majority decision from the Supreme Court of Ohio and ignore decisions from various districts, including a prior opinion from this Court, indicating that threats against a witness can be used to show consciousness of guilt. Until this Court is given guidance otherwise from the Supreme Court of Ohio, we are bound to follow the majority opinion in *Richey*, and we are persuaded by the precedent of this Court and the other appellate courts. In these circumstances, we cannot find that the trial court abused its discretion in finding that Carter's actions could be reflective of a consciousness of guilt and thus were admissible at trial.

{¶ 90} Although Carter next contends that evidence of the altercation would not be admissible under Evid.R. 404(B) if it was not admissible as "consciousness of guilt," we need not address this issue having found that it was not an abuse of discretion for the trial court to find that the evidence was admissible as consciousness of guilt. However, Carter does contend that even if this Court did find that the evidence was somehow relevant and admissible, its probative value was still substantially outweighed by the danger of unfair prejudice and it should have been excluded under Evid.R. 403.

{¶ 91} After reviewing the record and the arguments, we cannot find Carter's argument well-taken. Undoubtedly there is some inherent prejudice in evidence being used against Carter but there is probative value in the altercation as well. We cannot find that the trial court abused its discretion in determining that the probative value was not substantially outweighed by the danger of unfair prejudice, particularly given the deference accorded to trial courts in evidentiary matters. Therefore, Carter's first assignment of error is overruled.

*Carter*, 2017 WL 1208011, at *11-*16.

Upon review of the record and the applicable law, I conclude that nothing in the Third District's decision on this issue is objectively unreasonable. Mr. Carter's first ground for relief is unavailing.

**Second through Fifth Grounds for Relief**

In his second through fifth grounds for relief, Mr. Carter alleges (i) the trial court erred in not granting his motion for a mistrial based on alleged discovery violations by the State, (ii) his conviction was either against the manifest weight of the evidence or based on insufficient evidence, (iii) the prosecutor misstated evidence during closing arguments and thereby committed prosecutorial misconduct, and (iv) he did not receive a fair trial due to ineffective assistance of trial counsel. None of these arguments were presented in Mr. Carter's Memorandum in Support of Jurisdiction to the Ohio Supreme Court. (*See* ECF #7-1 at PageID 519). As a result, they are procedurally defaulted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (2001) (noting that petitioner's "failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely

24

fashion has resulted in a procedural default of those claims"); *Mosley v. Petro*, No. 5:04CV726, 2006 WL 2640958, at *7 (N.D. Ohio Sept. 13, 2006) ("A petitioner procedurally defaults those claims that he fails to appeal to the Ohio Supreme Court.").

A habeas petitioner may secure review of procedurally defaulted claims if cause exists for the failure to follow state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,] '. . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The habeas petitioner bears the burden to show cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001). To establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007).

In his Reply Brief, Mr. Carter addresses this issue by arguing as follows:

The Petitioner's 26(B) application was denied being filed by the Third District Court of Appeals, which would have presented serious issues; and introduced ineffective assistance of appellate counsel on grounds which would have shown a clear conflict of interest with the appointed counsel and Petitioner. All issues to be considered at every inferior stage, prior to this habeas petition, was prepared by appointed appellate counsel against the wishes of the Petitioner.

(ECF #13 at PageID 2720). Respondent counters that no application under Ohio R. App. P. 26(B)[1] was ever filed by or on behalf of Mr. Carter. (ECF #14 at PageID 2735). Exhibit 20 attached

---

[1]  "A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate

to Respondent's Response to Petitioner's Traverse is the docket from Mr. Carter's appeal to the Third District. (ECF #14-1 at PageID 2737). Respondent correctly notes there is nothing on the Third District's docket reflecting any Rule 26(B) filing by or on behalf of Mr. Carter, or a denial by the Third District of any such attempted filing. Accordingly, I conclude Mr. Carter has not met the cause-and-prejudice standard to excuse his procedural default of his second through fifth grounds for relief.

Even if Mr. Carter could overcome the procedural default by showing cause and prejudice, each of his claims nevertheless fail on the merits, for the reasons that follow.

*Second Ground for Relief*

In his second ground for relief, Mr. Carter alleges the trial court should have granted a mistrial after the State committed a discovery violation "related to testimony of a government witness on firearms." (ECF #1 at PageID 7). The Third District's opinion summarized this issue as follows: "Carter argues that the State failed to disclose information that was testified to by its ballistic expert and that Carter was prejudiced by it. Carter also argues that the State failed to disclose a demonstrative picture of a Mac–10 style firearm to the defense." *Carter*, 2017 WL 1208011, at \*17.

Because the premise of Mr. Carter's wrongful-denial-of-mistrial argument arises from an allegation that the prosecutor violated state discovery rules, he is not entitled to habeas relief. "It is well settled that there is no general constitutional right to discovery in a criminal case." *Stadler v. Curtin*, 682 F. Supp. 2d 807, 818 (E.D. Mich. 2010) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988)), *aff'd*, 483 F. App'x 173

---

judgment unless the applicant shows good cause for filing at a later time." Ohio R. App. P. 26(B)(1).

(6th Cir. 2012). Therefore, a claim that a prosecutor violated state discovery rules is not cognizable in federal habeas review, because it is not a constitutional violation. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003); *Friday v. Straub*, 175 F. Supp. 2d 933, 940 (E.D. Mich. 2001).

Accordingly, Mr. Carter's second ground for relief is not well-taken.

*Third Ground for Relief*

In his third ground for relief, Mr. Carter maintains his conviction was either against the manifest weight of the evidence or based on insufficient evidence.

Claims regarding the manifest weight of the evidence are grounded in state law and thus not cognizable in federal habeas. *See, e.g.*, *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.) (stating that Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those convicted without sufficient proof to allow a finding of guilt beyond a reasonable doubt), *cert. denied*, 464 U.S. 951 (1983). In *Nash v. Eberlin*, 258 F. App'x 761, 765 n.4 (6th Cir. 2007), however, the Sixth Circuit liberally construed a *pro se* habeas petitioner's manifest-weight-of-the-evidence claim to be a sufficiency-of-the-evidence claim. Therefore, I do the same here.

For a challenge to a conviction to succeed based on alleged insufficiency of the evidence, a habeas court must determine, based on the record at trial, that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *Jackson* claims face the high burden of two layers of judicial deference. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, the state court on direct appeal may set aside the jury's verdict on insufficient evidence only if no trier of fact could have agreed with the jury. *Id.* And second, the

27

habeas court may only overturn if the state court decision was "objectively unreasonable"—it may not overturn simply because the federal court disagrees with the state court's result. *Id.* (internal quotations and citations omitted).

Mr. Carter presented a sufficiency-of-the-evidence challenge to the Third District in his Third Assignment of Error, which the court found misplaced. It explained as follows:

*Sufficiency of the Evidence*

{¶ 48} At the conclusion of the State's case, which consisted of 30 witnesses and over 150 exhibits, Carter made a Crim.R. 29 motion for acquittal. Carter's motion was overruled by the trial court. Carter now contends on appeal that the State presented insufficient evidence to convict him of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability.

{¶ 49} Although Carter claims that there was insufficient evidence to convict him his actual arguments related to his convictions seem to be that his convictions were against the manifest weight of the evidence because he contends that the State's testimony was not credible and that Sonya was more likely to be the killer than Carter. These arguments go to weight of the evidence rather than sufficiency.

{¶ 50} Nevertheless, to the extent that Carter is arguing that there was insufficient evidence presented to convict him, we do not find Carter's arguments well-taken as the State produced ample evidence to establish each element of Aggravated Murder, the accompanying firearm specification, and Having Weapons While Under Disability. In fact, the State presented substantial circumstantial evidence against Carter. Notably, the Supreme Court of Ohio has stated that, "direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991).

{¶ 51} In this case the State clearly established evidence of a motive and it also clearly established a plan for Carter to murder Warrington based on Carter's statements to Faye, the pictures Carter took essentially casing the area around Sonya's residence, and the searches Carter did on his computer. Warrington was shot six times just as he was returning to Sonya's from work, indicating that the murder was not an accident and that the killer had been waiting for him to return and aware of his schedule, which is essentially what Carter told Upham.

{¶ 52} The State also presented evidence of a witness who saw someone near the scene at the time of the gunshots wearing camouflage and Carter was found in possession of camouflage clothing and gloves that had GSR on them. Corroborative of this evidence was the fact that Carter told Upham that Carter had committed a murder while

28

wearing camouflage and a paintball mask. Further, Carter possessed bullets of the same type and caliber that were used to kill Warrington.

{¶ 53} Moreover, multiple jailhouse witnesses testified that Carter admitted to killing someone and Carter also sought out a friend to manufacture an alibi. Additionally, on the day of the murder officers remarked on the repeatedly odd behavior of Carter during the traffic stop and during his interviews, much of which was viewed by the jury.

{¶ 54} Based on all of this we conclude that sufficient evidence was presented to find that Carter committed Aggravated Murder and did so with a gun, which would make him guilty of the accompanying firearm specification and Having Weapons While Under Disability as well.

*Carter*, 2017 WL 1208011, at *9.

The Third District further analyzed whether Mr. Carter's convictions were against the

manifest weight of the evidence. It also found this argument lacking, observing as follows:

*Manifest Weight of the Evidence*

{¶ 55} Turning to Carter's argument that his convictions were against the manifest weight of the evidence, we must review all of the evidence presented, which includes the evidence presented by Carter. Carter called several witnesses on his behalf who were inmates with the inmates who testified against Carter. The inmates testifying on Carter's behalf casted doubt on the credibility of the State's inmate-witnesses, particularly Upham.

{¶ 56} Carter also emphasized that sometime after the "stand-off" incident, Sonya got a concealed-carry license. In addition, Carter called a witness who testified that prior to Warrington's death a sign had been put on Warrington's license plate that said "Number One Asshole." Sonya previously testified that she put that sign on Warrington's truck in jest, as Warrington was a practical joker.

{¶ 57} In his case-in-chief, Carter also called a fingerprint expert from BCI who testified that none of the prints taken from Warrington's truck were consistent with Carter's prints. Finally, Carter called his daughter, Tarah, who testified that Carter did not strike Sonya with a gun during the 2007 "stand-off" incident, contrary to what Sonya had testified. Tarah also testified that Warrington was not at Sonya's residence every night; however, Tarah testified, contrary to Sonya, that Sonya indicated she was waiting on Warrington to get a divorce, and that Warrington had indicated to Sonya that it was imminent. Finally, Tarah testified that the night before the murder Sonya was "acting different," and that she was drunk, which Tarah had never seen.

{¶ 58} On appeal, Carter contends that the evidence actually established that Sonya was the more likely suspect or, at the very least, the evidence created reasonable doubt as to whether Carter killed Warrington. Despite Carter's arguments, officers testified that Sonya was investigated and that she was ruled-out as a suspect. In addition, Sonya testified that she took the concealed-carry course with a number of people at work who were doing the course but she never actually purchased a gun. The jurors were also able to see and hear Sonya's testimony, as well as any contrary testimony of her daughter Tarah, and evaluate their credibility for themselves.

{¶ 59} Notwithstanding Sonya, Carter ignores the overwhelming circumstantial evidence establishing him as the culprit of the Warrington murder, which was discussed previously. After a thorough review of the record, the transcripts, and the exhibits presented we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice. Therefore, we find that Carter's arguments are not well-taken and his third assignment of error is overruled.

*Id.* at \*9-\*10.

Upon review of the evidence presented and the applicable law, I find sufficient evidence exists to uphold both of Mr. Carter's convictions, including the firearm specification, and that those convictions are not against the manifest weight of the evidence. The Third District's analysis was not objectively unreasonable. I conclude that Mr. Carter's third ground for relief is without merit.

*Fourth Ground for Relief*

In his fourth ground for relief, Mr. Carter argues the prosecutor misstated evidence during closing arguments and thereby committed prosecutorial misconduct.

The Sixth Circuit follows a two-step approach to determining whether prosecutorial misconduct warrants a new trial. *See United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994). Under this approach, a court first considers whether the prosecutor's conduct and remarks were improper. *Id.* at 1387; *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). If the remarks were improper, then the court considers and weighs four factors in determining whether the impropriety was flagrant and thus warrants reversal, as follows:

(1)     whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant;

(2)     whether the conduct or remarks were isolated or extensive;

(3)     whether the remarks were deliberately or accidentally made; and

(4)     whether the evidence against the defendant was strong.

*Carroll*, 26 F.3d at 1385; *see also Boyle*, 201 F.3d at 717. In reviewing a claim of prosecutorial misconduct, "the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process." *Lundgren v. Mitchell*, 440 F.3d 754, 778 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). In evaluating fairness, the trial must be "taken as a whole and within the context of the entire record." *Lundy v. Campbell*, 888 F.2d 467, 472–73 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990).

Neither the Petition nor Mr. Carter's Reply particularize the comments of the prosecutor at trial that allegedly misstated the evidence. In his appeal to the Third District, however, Mr. Carter took issue with arguments the prosecutor made regarding GSR evidence and witness Carlotta Williams.[2] The Third District found these arguments unavailing, analyzing them as follows:

> {¶ 125} Carter first argues that during its rebuttal closing argument the State made an improper statement related to the expert testimony of Matthew Congleton, who had performed the GSR testing in this case. Carter claims that the following statement during the prosecutor's rebuttal closing argument was improper.
>
> **Now, there was not gunshot residue found on that car. True. But, Mr. Congleton told you that gunshot residue does not stick to smooth surfaces. If there was any on Mr. Carter's bare hands and then transferred to that**

---

[2]     Several other statements were at issue in Mr. Carter's appeal to the Third District – those that his trial counsel alleged were improper attempts by the prosecutor to shift the burden of proof. But because Mr. Carter's habeas petition specifically focuses on statements by the prosecutor that "misstate[d] the evidence" (*see* ECF 1 at PageID #10), he waives argument on these other statements.

> door handle it probably wouldn't stick to that door handle. If it did, it may have blown away in the wind as Mr. Carter drove.
>
> [DEFENSE COUNSEL]: Objection. That was not the expert's testimony.
>
> THE COURT: Well, the jury can remember what the testimony was. This is argument. It's not evidence.

(Trial Tr. at 1812).

{¶ 126} Carter contends that a "fair review" of Congleton's testimony shows that Congleton did not make any statements as to GSR blowing away as Carter drove away. Contrary to Carter's argument, a "fair review" of the prosecutor's statement indicates that the prosecutor was suggesting something that "may" have happened. The prosecutor was not indicating that the GSR expert actually did testify that the GSR likely blew off of the vehicle. Rather the prosecutor was making an inference based on Congleton's testimony. Congleton actually did testify that "[a] smoother object obviously would have less adhesion power—it would give the particles less stick-to-itiveness than a rougher surface." (Trial Tr. at 1135). Congleton also testified that, "[g]enerally speaking * * * [t]he more an object or person moves, or it rubs up against something or themselves, the more likely you will have gunshot residue shed and continue to be shed from whatever surface it might be." (*Id.* at 1136). Thus the prosecutor's statement is a fair inference made from the evidence.

{¶ 127} Finally, even if the statement was somehow error, which we do not find that it is, the jury was clearly instructed that closing arguments were not evidence and we presume the jury followed that instruction. Thus Carter's argument on this issue is not well-taken.

\* \* \*

{¶ 133} Next, Carter argues that the following statement of the prosecutor during rebuttal closing argument was error.

> Now, Carlotta. [Defense Counsel] said something with respect to Carlotta and this is very important. He said—[Defense Counsel] suggested that Mr. Carter was not trying to set up an alibi because he was guilty, but because maybe he was innocent and the alibi was true.
>
> [DEFENSE COUNSEL]: Objection. That's not what I said.
>
> THE COURT: It's just argument. The jury will decide what the evidence is. Overruled.

(Trial Tr. at 1826).

32

{¶ 134} It appears that the prosecutor's statement in rebuttal closing argument was in reference to the following portion of defense counsel's closing argument.

> Carlotta, when asked by the Prosecutor, said this whole thing about this alibi stuff. It wasn't meant by Markelus because he was guilty and he was trying to create a falsehood to get out of it. Markelus Carter feels, and felt, like the system wasn't going to give him a fair shake and he needed extra help to do it.

(Trial Tr. at 1803).

{¶ 135} While the prosecutor's characterization of what defense counsel said in rebuttal closing argument was not entirely accurate, we cannot find that it was an unfair characterization of the evidence or that it in any way prejudiced the outcome of the trial or rose to the level of prosecutorial misconduct. Thus Carter's arguments related to statements made during the prosecutor's rebuttal closing statements are not well-taken.

*Carter*, 2017 WL 1208011, at *22, *24.

For the same reasons the Third District outlined, I conclude that the statements by the prosecutor were not improper. Even if they were, the complained-of statements were isolated and did not infect the trial with unfairness so as to make the convictions a denial of due process. Mr. Carter's fourth ground for relief is rejected.

*Fifth Ground for Relief*

In his fifth ground for relief, Mr. Carter avers he did not receive a fair trial due to ineffective assistance of trial counsel. To prevail on this claim, Mr. Carter must demonstrate his trial counsel's performance was so deficient that it resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This deferential standard requires a reasonable probability that but for counsel's errors, the results of the proceedings would have been different. *Id.* at 694. And at the habeas stage, the question is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel's conduct satisfied the deferential standard in *Strickland*. *Premo v. Moore*, 562 U.S. 115, 123 (2011).

33

Furthermore, the standard on habeas review "severely constrains" this Court's analysis. *See Smith v. Anderson*, 632 F.3d 277, 281 (6th Cir. 2011). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington*, 562 U.S. at 105. And "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* Because § 2254(d)(1) limits the circumstances in which federal courts may grant a writ of habeas corpus, the Supreme Court has described habeas review of state court adjudications of ineffective assistance of counsel claims as "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable, the state court's decision must have been more than incorrect or erroneous ... The state court's application must have been 'objectively unreasonable.'" *Wiggins,* 539 U.S. at 520 (citations omitted).

Again, neither the Petition nor the Reply articulates the specific acts or omissions of Mr. Carter's trial counsel that supposedly rendered his performance ineffective. In his appeal to the Third District, however, Mr. Carter contended that "defense counsel poorly handled the government firearms expert, Kramer, and that defense counsel failed to adequately investigate the possibility of a Mac–10 style weapon being involved in this case." *Carter*, 2017 WL 1208011, at *24. The Third District, applying the *Strickland* standard, rejected these claims, writing as follows:

> {¶ 139} Carter contends that if the State is to be believed that defense counsel should have been on notice from discovery that a Mac–10 style firearm would be painted as the alleged murder weapon, then defense counsel was ineffective for failing to adequately investigate the matter. In addition, Carter contends that defense counsel

failed to call an expert related to ballistics despite indicating on the record that he had been in contact with one.

{¶ 140} Contrary to Carter's arguments, there is no evidence in the record that his trial counsel could have called a witness to dispute Kramer's testimony. Multiple days before Carter presented his case-in-chief, the trial court addressed Carter's motion for a mistrial related to discovery matters, which was discussed in the second assignment of error. As defense counsel argued for a mistrial, he indicated that he had been in contact with an expert and the expert would look into the matter and the expert gave some brief opinions on the matter over the phone, but it did not appear that the expert had actually reviewed the ballistic evidence yet based on Carter's counsel's representations. Although it overruled Carter's motion for a mistrial, the trial court indicated that it would consider granting Carter a continuance when the trial reached his case-in-chief if Carter needed to bring in an expert, but defense counsel never requested such a continuance. In fact, defense counsel did not suggest at any point later in the trial that he had received further word from the expert and would like to call the expert to testify.

{¶ 141} On appeal, Carter would have us find, without any facts to support it, that his counsel was ineffective for failing to investigate, request a continuance, or call an expert when there is no indication that a ballistic expert would actually have been able to meaningfully contradict testimony by the State. It is equally likely, though equally uncertain, that the expert reviewed the evidence and could not provide any exculpatory testimony. Carter would have this Court engage in pure speculation that some expert existed who would have provided exculpatory testimony related to ballistics that would somehow overcome the mountain of other circumstantial evidence against him.

{¶ 142} Moreover, even if Carter could produce evidence disputing the State's expert that a Mac–10 style firearm was one of over 130 firearms that could match the groove patterns on the bullets found at the Warrington murder scene, such testimony would only call into question the type of firearm used in the murder, not the murder itself. Thus we cannot find any prejudicial error here.

{¶ 143} This is particularly true given that Carter's trial counsel was able to effectively cross-examine the State's expert and have him admit that the bullet grooves matched with over 130 weapons, giving little weight to his assertion that the Mac–10 style weapon was one of many possible firearms. For these reasons, Carter's fifth assignment of error is overruled.

*Id.* at *24-*25.

Decisions as to what evidence to present, whether to call certain witnesses, and how to

conduct cross-examination are presumed to be a matter of trial strategy, and the failure to call

35

witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir.), *cert. denied*, 543 U.S. 833 (2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002), *cert. denied*, 539 U.S. 944 (2003). When making all strategic decisions, counsel's conduct must be reasonable. *See Roe v. Flores–Ortega*, 528 U.S. 470, 481 (2000).

The Third District's analysis of the manner in which Mr. Carter's trial counsel conducted the defense case – including how he cross-examined the State's firearms expert and pursued potential retention of a defense firearms expert relative to Mac-10 handguns – sufficiently demonstrates why there is no constitutional error sufficient to satisfy *Strickland*, especially under the habeas "doubly deferential" standard. Mr. Carter's fifth ground for relief lacks any merit.

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, I recommend the Petition be **DISMISSED**. I further recommend that Mr. Carter not be granted a certificate of appealability.

Dated: January 3, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).